Robert I. Bodian (*pro hac vice* application pending)
Scott A. Rader (*pro hac vice* application pending)
Amanda B. Asaro (*pro hac vice* application pending)
Kerime S. Akoglu (*pro hac vice* application pending)
**MINTZ LEVIN COHN FERRIS GLOVSKY and POPEO, P.C.**
Chrysler Center
666 Third Avenue, 25th Floor
New York, New York 10017
(212) 935-3000

- and -

James C. Cosby, Esq. (VSB No. 25992)
J. Brandon Sieg, Esq. (VSB No. 84446)
**O'HAGAN MEYER, PLLC**
411 E. Franklin Street, Suite 500
Richmond, Virginia 23219
Tel:     (804) 403-7100
Fax:     (804) 403-7110

*Counsel for Defendants*

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| TOYS "R" US, INC., *et al.*,[1] | ) Case No. 17-34665 |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |
| TRU CREDITOR LITIGATION TRUST, | ) |
| | ) |
| Plaintiff, | ) Adv. Proceeding No. 20-03038-KLP |
| | ) |
| v. | ) |
| | ) |
| DAVID A. BRANDON, *et al* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF SCOTT A. RADER IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief.* (Dkt No. 78.) The location of Debtors' service address is One Geoffrey Way, Wayne, NJ 07470.

I, SCOTT A. RADER, hereby declare as follows:

1.      I am a member of the New York bar and a member at the law firm Mintz, Levin,
Cohn, Ferris, Glovsky and Popeo, P.C., attorneys for defendants David A. Brandon, Joshua
Bekenstein, Matthew S. Levin, Paul E. Raether, Nathaniel H. Taylor, Joseph Macnow, Wendy A.
Silverstein, Richard Goodman, Michael Short, and Richard Barry (collectively, the
"Defendants"). I have submitted a *pro hac vice* application with this Court, which is currently
pending.  I make this declaration in support of Defendants' motion to dismiss the complaint.

2.      Attached hereto as **Exhibit 1** is a true and accurate copy of the March 12, 2020
press release issued by Dovel & Luner LLP, counsel to Plaintiff TRU Creditor Litigation Trust
(the "Trust"), announcing the filing of this lawsuit.  This press release and filing followed a
demand letter sent from the Trust's counsel to defendants on November 1, 2019 threatening that
Defendants will experience "horrors" and "humiliation and scorn" if this lawsuit proceeds.

3.      Attached hereto as **Exhibit 2** are true and accurate copies of excerpted pages from
the transcripts of the following hearings, held in the Bankruptcy Proceeding administered in this
Court (Case No. 17-34665-KLP):

   a.   the September 19, 2017 First-Day Hearing (Dkt. No. 192);
   b.   the October 24, 2017 Hearing on the DIP Financing (Dkt. No. 749);
   c.   the December 5, 2017 Hearing on the Senior Executive Incentive Plan (Dkt. No. 1184);
   d.   the January 23, 2018 Hearing (Dkt. No. 1606);
   e.   the March 15, 2018 Initial Hearing on the Wind-Down Motion (Dkt. No. 2098); and
   f.   the March 20, 2018 Second Hearing on the Wind-Down Motion (Dkt. No. 2341).

4.      Attached hereto as **Exhibit 3** is a true and accurate copy of the Advisory
Agreement entered into by Toys "R" Us Holdings, Inc; Toys "R" Us, Inc.; Bain Capital Partners,
LLC; Bain Capital, Ltd.; Kohlberg Kravis Roberts & Co., L.P.; and Vornado Truck LLC on July

21, 2005 (which was subsequently amended on several occasions).  The Advisory Agreement is

referenced in Paragraph 47 of the Complaint.

     5.     Attached hereto as **Exhibit 4** are true and accurate copies of excerpted pages from

the following documents filed by Toys "R" Us, Inc. ("TRU") with the United States Securities

and Exchange Commission ("SEC"):

    a.   the Form 10-K filed by Toys "R" Us, Inc. on April 12, 2017;

    b.   the Form 10-Q, including Exhibit 10.7 thereto, filed by Toys "R" Us, Inc. on
December 11, 2014;

    c.   the Form 10-Q, including Exhibits 10.1 and 10.2 thereto, filed by Toys "R" Us,
Inc. on September 27, 2017;

    d.   the Form 10-K filed by Toys "R" Us, Inc. on March 24, 2016; and

    e.   the Form 10-Q filed by Toys "R" Us, Inc. on June 10, 2008.

     6.     Attached hereto as **Exhibit 5** is a true and accurate copy of the Minutes of a

Meeting of the Board of Directors of Toys "R" Us, Inc., held on August 23, 2017.  TRU's Board

meetings from June 20, 2017 through September 18, 2017 are referenced in Paragraph 186 of the

Complaint.

     7.     Attached hereto as **Exhibit 6** is a true and accurate copy of excerpted pages from

a slideshow presentation dated July 31, 2017, entitled "Toys 'R' Us Contingency Preparation

Overview."  This presentation appears to be referenced in Paragraph 60 of the Complaint.

     8.     Attached hereto as **Exhibit 7** is a true and accurate copy of excerpted pages from

a slideshow presentation dated August 25, 2017, entitled "Toys 'R' Us Restructuring

Compensation Proposal."  This presentation is referenced in Paragraph 66 of the Complaint.

     9.     Attached hereto as **Exhibit 8** is a true and accurate copy of a slideshow

presentation dated September 13, 2017, entitled "Toys 'R' Us Restructuring Compensation

Proposal."  This presentation is referenced in Paragraph 77 of the Complaint.

10.    Attached hereto as **Exhibit 9** is a true and accurate copy of an email sent from David Brandon to Brian Cumberland on September 5, 2017 at 7:07 PM, with subject line "Re: Board meeting." This email is referenced in Paragraph 75 of the Complaint.

11.    Attached hereto as **Exhibit 10** is a true and accurate copy of the Minutes of a Joint Meeting of the Boards of Directors of Toys "R" Us, Inc., Toys "R" Us-Delaware, Inc., TRU TAJ, LLC, TRU TAJ Finance, Inc., Wayne Real Estate Parent Company, LLC, and Giraffe Holdings, LLC, held on September 13, 2017. TRU's Board meetings from June 20, 2017 through September 18, 2017 are referenced in Paragraph 186 of the Complaint.

12.    Attached hereto as **Exhibit 11** is a true and accurate copy of the Minutes of a Joint Meeting of the Board of Directors of Toys "R" Us, Inc., held on January 28, 2018. This Board meeting is referenced in Paragraph 126 of the Complaint.

13.    Attached hereto as **Exhibit 12** is a true and accurate copy of redacted Minutes of a Joint Meeting of the Boards of Directors of Toys "R" Us, Inc., Toys "R" Us-Delaware, Inc., TRU TAJ LLC, TRU TAJ Finance, Inc., Wayne Real Estate Parent Company, LLC and Giraffe Holdings, LLC, held on January 31, 2018. This Board meeting is referenced in Paragraph 133 of the Complaint.

14.    Attached hereto as **Exhibit 13** is a true and accurate copy of an email sent from Dave Brandon to Mike Volkema on September 20, 2017 at 3:07 PM, with subject line "Re: Quick Note." This email is referenced in Paragraph 45 of the Complaint.

15.    Attached hereto as **Exhibit 14** is a true and accurate copy of the transcript of the Toys "R" Us, Inc. FQ3 2018 Earnings Call, held on December 21, 2017.

16.    I declare under the penalty of perjury that the foregoing is true and correct.

Dated: May 21, 2020

By: _____

Scott A. Rader (*pro hac vice* application pending)

# EXHIBIT 1

# Dovel & Luner: Toys "R" Us Bankruptcy Creditor Trust Files Lawsuit Against Former CEO David Brandon, Directors from Private Equity Firms KKR, Bain Capital, and Vornado Realty Trust, and Others

NEWS PROVIDED BY
**Dovel & Luner** →
Mar 12, 2020, 19:30 ET

NEW YORK, March 12, 2020 /PRNewswire/ -- The TRU Creditor Litigation Trust today filed a lawsuit in New York Supreme Court.  The hundred-page Complaint alleges fraud and breaches of fiduciary duty by senior executives and corporate directors in connection with the ill-fated bankruptcy and later liquidation of Toys "R" Us.

The TRU Trust, which was charged with investigating and bringing claims against the former directors and officers of Toys "R" Us for their wrongful acts, uncovered substantial evidence of wrongdoing.  The Complaint includes a laundry list of specific examples, quoting extensively from Toys "R" Us' own internal emails made available to the Trust under a Bankruptcy Court Order.

"Toys "R" Us is yet another unfortunate example of corporate greed resulting in executives and private equity firms benefiting at the expense of others," said Greg Dovel, attorney for the TRU Trust.  "The Defendants prioritized their own financial well-being, as well as the financial well-being of three private equity companies, ahead of the company that they were entrusted to run.  They siphoned desperately-needed funds out of Toys "R" Us as it tumbled into bankruptcy and then misrepresented TRU's financial situation to induce toymakers to provide goods on credit.  Some toymakers lost almost everything."

It has been widely reported that private-equity firms KKR, Bain Capital, and Vornado Realty Trust acquired Toys "R" Us in 2005 for about $6.6 billion, financed with over $5 billion in debt secured by Toys "R" Us' own assets.  They took millions of dollars of fees out of the company, leaving it overleveraged and unable to pay down its debt.

The Complaint lays out the following facts:

- **Improper Executive Bonuses** – Just days before filing for bankruptcy, CEO David Brandon caused Toys "R" Us to pay $16 million in bonuses to top executives. Although his compensation was already above market, Brandon included a $2.6 million bonus for himself. The officers and directors had these bonuses paid just before bankruptcy to avoid any scrutiny by the Bankruptcy Court.

- **Wrongful Advisory Fees** – Directors, hand-selected and employed by private equity firms Bain, KKR, and Vornado, had Toys "R" Us pay millions of dollars in "advisory fees" to these same private equity firms, even though TRU was strapped for cash and unable to pay its overwhelming debt.

- **Misrepresentations and Fraudulent Concealment** – David Brandon and other Defendants represented to toymakers that Toys "R" Us would be able to pay for goods shipped on credit throughout the bankruptcy process because Toys "R" Us had secured $3.1 billion in new financing. But by mid-December 2017, company directors and officers learned that the company could not meet financial milestones required by the lenders, which meant the financing would terminate, and Toys "R" Us would not have the ability to pay for goods shipped on credit. Defendants concealed and never disclosed the truth. Instead, Defendants Brandon, Michael Short (former CFO), and Richard Barry (former CMO) continued throughout January, February, and early March 2018, to misrepresent the status of Toys 'R' Us financial condition and to urge vendors to ship more product on credit. When Toys "R" Us liquidated in March 2018, the toymakers lost over $600 million.

- **Wrongful Decision to Take on $3.1 Billion in DIP Financing and Pledge all Remaining Assets to Lenders** – For years, the Defendants took money out of Toys "R" Us and underinvested in critical resources. As a result, in 2017, Toys "R" Us was at a financial crossroads. To satisfy their fiduciary duties, Defendants should have carefully considered all possible paths to determine which would be in the best interest of all stakeholders. Instead, Defendants took Toys "R" Us down the path of obtaining $3.1 billion in debtor-in-possession (DIP) financing that could benefit themselves and the

private equity firms to whom they were beholden to the detriment of Toys "R" Us and its creditors. In doing so, they abdicated their fiduciary duties. The DIP financing strategy was a foolish, ill-considered, and selfish gamble that cost Toys "R" Us more than $500 million.

The case is *TRU Creditor Litigation Trust v. David A. Brandon, Joshua Bekenstein, Matthew S. Levin, Paul E. Raether, Nathaniel H. Taylor, Joseph Macnow, Wendy A. Silverstein, Richard Goodman, Michael Short, Richard Barry*, New York Supreme Court, Case No. 651637/2020.

Link to complaint:   www.dovel.com/tru-complaint

**About Dovel & Luner**
Dovel & Luner is a high-stakes business litigation law firm handling a variety of cases on a contingency-fee basis in courts across the country.

Media Contact: Joe Marchelewski| joe@jurisproductions.com | 310-462-2252

SOURCE Dovel & Luner

Related Links

http://www.dovel.com

# EXHIBIT 2

# EXHIBIT 2-A

Dkt. No. 192 - Excerpts from Transcript
of Sept. 19, 2017 Hearing

Case 17-34665-KLP   Doc 193-2   Filed 05/21/20   Entered 05/21/20 16:16:51   Desc Main
Declaration of Scott A. Rader   Page 13 of 27
Case 20-03028-KLP   Doc 1-2   Filed 05/21/20   Entered 05/21/20 16:16:05   Desc Main
Document   Page 1 of 585

1

```
 1                IN THE UNITED STATES BANKRUPTCY COURT
                  EASTERN DISTRICT OF VIRGINIA (RICHMOND)
 2

 3    In Re:                          )  Case No. 17-34665-KLP
                                      )  Richmond, Virginia
 4    TOYS "R" US, INC., ET AL.,      )
                                      )
 5                  Debtors.          )  September 19, 2017
                                      )  11:17 a.m.
 6    ------------------------------- )

 7                      TRANSCRIPT OF HEARING ON
      DEBTORS' MOTION FOR AN EXPEDITED HEARING ON "FIRST DAY MOTIONS"
 8     [DOCKET NO. 35]; MOTIONS OF CERTAIN ATTORNEYS FROM KIRKLAND &
        ELLIS LLP PURSUANT TO LOCAL BANKRUPTCY RULE 2090-1(E)(2) FOR
 9     ADMISSION PRO HAC VICE [DOCKET NOS. 23-27]; DEBTORS' MOTION FOR
       ENTRY OF AN ORDER (I) DIRECTING JOINT ADMINISTRATION OF CHAPTER
10       11 CASES AND (II) GRANTING RELATED RELIEF [DOCKET NO. 10];
          DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
11      AUTHORIZING THE NORTH AMERICAN DEBTORS TO OBTAIN POST-PETITION
       FINANCING, (II) AUTHORIZING THE NORTH AMERICAN DEBTORS TO USE
12          CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING
         SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING
13     ADEQUATE PROTECTION TO THE PRE-PETITION LENDERS, (V) MODIFYING
       THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII)
14      GRANTING RELATED RELIEF [DOCKET NO. 29]; DEBTORS' MOTION FOR
        ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE TRU TAJ
15     DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE
        TRU TAJ DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS
16     AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV)
        GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION LENDERS, (V)
17      MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING,
         AND (VII) GRANTING RELATED RELIEF [DOCKET NO. 32]; DEBTORS'
18       MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
         THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT
19       SYSTEM, (B) HONOR CERTAIN PRE-PETITION OBLIGATIONS RELATED
        THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) PERFORM
20       INTERCOMPANY TRANSACTIONS, AND (II) GRANTING RELATED RELIEF
         [DOCKET NO. 22] DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
21        ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PRE-PETITION
        WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES
22       AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING
         RELATED RELIEF [DOCKET NO. 21]; DEBTORS' MOTION FOR ENTRY OF
23        INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY
         PRE-PETITION CLAIMS OF LIEN CLAIMANTS, IMPORT CLAIMANTS, AND
24      503 (B) (9) CLAIMANTS, (II) CONFIRMING ADMINISTRATIVE EXPENSE
          PRIORITY OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED
25        RELIEF [DOCKET NO. 14]; DEBTORS' MOTION FOR ENTRY OF INTERIM
```

Case 17-34665-KLP   Doc 293-2   Filed 05/21/20   Entered 05/21/20 16:16:51   Desc Main
Declaration of Scott A. Rader   Page 2 of 27

2

1    AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN
    PRE-PETITION CLAIMS OF CRITICAL VENDORS AND (II) GRANTING

2    RELATED RELIEF [DOCKET NO. 15]; DEBTORS' MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE PAYMENT OF CERTAIN

3    PRE-PETITION AND POST-PETITION TAXES AND FEES AND (II) GRANTING
    RELATED RELIEF [DOCKET NO. 12]; DEBTORS' MOTION FOR ENTRY OF

4    INTERIM AND FINAL ORDERS (I) APPROVING NOTIFICATION AND HEARING
    PROCEDURES FOR CERTAIN TRANSFERS OF AND DECLARATIONS OF

5    WORTHLESSNESS WITH RESPECT TO COMMON STOCK, AND (II) GRANTING
    RELATED RELIEF [DOCKET NO. 13]; DEBTORS' MOTION FOR ENTRY OF

6    INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY
    CERTAIN PRE-PETITION CLAIMS OF CRITICAL VENDORS AND (II)

7    GRANTING RELATED RELIEF [DOCKET NO. 6]; DEBTORS' MOTION FOR
   ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS

8    TO PAY PRE-PETITION CLAIMS OF FOREIGN VENDORS; AND (II)
    GRANTING RELATED RELIEF [DOCKET NO. 5]; DEBTORS' MOTION FOR

9   ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
    TO (A) CONTINUE AND RENEW THEIR LIABILITY, PROPERTY, CASUALTY,

10   AND OTHER INSURANCE POLICIES AND HONOR ALL OBLIGATIONS IN
RESPECT THEREOF, AND (B) CONTINUE THE SURETY BOND PROGRAMS, AND

11  (II) GRANTING RELATED RELIEF [DOCKET NO. 16]; DEBTORS' MOTION
    FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING THE

12    DEBTORS' PROPOSED ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE
    UTILITY SERVICES, (II) PROHIBITING UTILITY COMPANIES FROM

13  ALTERING, REFUSING, OR DISCONTINUING SERVICES, (III) APPROVING
    THE DEBTORS' PROPOSED PROCEDURES FOR RESOLVING ADDITIONAL

14    ASSURANCE REQUESTS, AND (IV) GRANTING RELATED RELIEF [DOCKET
NO. 11] ; DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS

15  (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PRE-PETITION CLAIMS
    OF CRITICAL VENDORS AND (II) GRANTING RELATED RELIEF [DOCKET

16  NO. 7] ; DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING
   CERTAIN NOTICE, CASE MANAGEMENT, AND ADMINISTRATIVE PROCEDURES

17    AND (II) GRANTING RELATED RELIEF [DOCKET NO. 9]; DEBTORS'
  MOTION FOR ENTRY OF AN ORDER APPROVING THE FORM AND MANNER OF

18  NOTICE OF COMMENCEMENT OF THE CHAPTER 11 CASES [DOCKET NO. 28];
    DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) EXTENDING TIME TO

19    FILE SCHEDULES AND STATEMENTS OF FINANCIAL AFFAIRS, (II)
    AUTHORIZING THE DEBTORS TO FILE A CONSOLIDATED LIST OF

20   CREDITORS IN LIEU OF SUBMITTING A MAILING MATRIX FOR EACH
  DEBTOR, (III) AUTHORIZING THE DEBTORS TO FILE A CONSOLIDATED

21  LIST OF THE DEBTORS' 50 LARGEST UNSECURED CREDITORS, AND (IV)
   GRANTING RELATED RELIEF [DOCKET NO. 3]; DEBTORS' APPLICATION

22  FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO EMPLOY AND
  RETAIN PRIME CLERK LLC AS CLAIMS AND NOTICING AGENT, EFFECTIVE

23  NUNC PRO TUNC TO THE PETITION DATE AND (II) GRANTING RELATED
             RELIEF [DOCKET NO. 4]

24        BEFORE THE HONORABLE KEITH L. PHILLIPS,
          UNITED STATES BANKRUPTCY JUDGE

25

Case 17-34665-KLP Doc 192-2 Filed 09/26/17 Entered 09/26/17 20:16:05 Desc Main
Document Page 15 of 585
Case 20-03028-KLP Doc 3-2 Filed 05/21/20 Entered 05/21/20 16:18:51 Desc
Declaration of Scott A. Rader Page 3 of 27

3

```
 1   APPEARANCES:
     For the Debtors:               PETER J. BARRETT, ESQ.
 2                                  MICHAEL A. CONDYLES, ESQ.
                                     JEREMY S. WILLIAMS, ESQ.
 3                                  KUTAK ROCK LLP
                                     901 East Byrd Street
 4                                  Suite 1000
                                     Richmond, VA 23219
 5
                                     JOSHUA A. SUSSBERG, ESQ.
 6                                  KIRKLAND & ELLIS LLP
                                     601 Lexington Avenue
 7                                  New York, New York 10022

 8                                   CHAD J. HUSNICK, P.C.
                                     ROBERT A. BRITTON, ESQ.
 9                                  JOSHUA M. ALTMAN, ESQ.
                                     EMILY E. GEIER, ESQ.
10                                  ANDREW R. MCGAAN, P.C.
                                     KIRKLAND & ELLIS LLP
11                                  300 North LaSalle
                                     Chicago, IL 60654
12
     For River Birch Capitol, LLC:  PAUL N. SILVERSTEIN, ESQ.
13                                   ANDREWS KURTH KENYON LLP
                                     450 Lexington Avenue
14                                   New York, NY 10017

15   For B-2 and B-3 Lenders:       MICHAEL MESSERSMITH, ESQ.
                                     ARNOLD & PORTER KAYE SCHOLER
16                                   LLP
                                     70 West Madison Street
17                                   Chicago, IL 60602

18   For Owl Creek Asset            SAMANTHA MARTIN, ESQ.
     Management, L.P.:              STROOCK & STROOCK & LAVAN LLP
19                                   767 Third Avenue
                                     New York, NY 10017
20
     For NexBank SSB, Ad Hoc B-4    DOUG FOLEY, ESQ.
21   Lenders:                       MCGUIREWOODS LLP
                                     2001 K Street N.W.
22                                   Suite 400
                                     Washington, DC 20006
23

24

25
```

Case 17-34665-KLP   Doc 193-2   Filed 05/21/20   Entered 05/21/20 16:18:51   Desc Main
Declaration of Scott A. Rader   Page 4 of 27

Case 20-03028-KLP   Doc 2-2   Filed 05/26/20   Entered 05/26/20 11:26:05   Desc Main
Document   Page 16 of 585

4

```
 1    For Ad Hoc B-4 Lenders:          JOSHUA A. FELTMAN, ESQ.
                                       EMIL A. KLEINHAUS, ESQ.
 2                                     NEIL K. CHATANI, ESQ.
                                       WACHTELL, LIPTON, ROSEN & KATZ
 3                                     51 West 52nd Street
                                       New York, NY 10019
 4
      For Wilmington Trust:            TODD MEYERS, ESQ.
 5                                     KILPATRICK TOWNSEND & STOCKTON
                                       1100 Peachtree Street NE
 6                                     Suite 2800
                                       Atlanta, GA 30309
 7
      For Ad Hoc Taj Noteholders:      CHRISTOPHER A. JONES, ESQ.
 8                                     WHITEFORD, TAYLOR & PRESTON
                                       LLP
 9                                     3190 Fairview Park Drive
                                       Suite 800
10                                     Falls Church, VA 22042

11    For Ad Hoc Taj Noteholders:      BRIAN S. HERMANN, ESQ.
                                       PAUL, WEISS, RIFKIND, WHARTON
12                                     & GARRISON LLP
                                       1285 Avenue of the Americas
13                                     New York, NY 10019

14    For the Landlords:               ROBERT L. LEHANE, ESQ.
                                       KELLEY DRYE & WARREN LLP
15                                     101 Park Avenue
                                       New York, NY 10178
16
                                       DAVID L. POLLACK, ESQ.
17                                     DUSTIN P. BRANCH, ESQ.
                                       BALLARD SPAHR, LLP
18                                     2029 Century Park East
                                       Suite 800
19                                     Los Angeles, CA 90067

20                                     IVAN GOLD
                                       ALLEN MATKINS LECK GAMBLE
21                                     MALLORY & NATSIS LLP
                                       3 Embarcadero Center
22                                     12th Floor
                                       San Francisco, CA 94111
23

24

25
```

```
 1   For Washington Prime Group:      JENNIFER MCLEMORE, ESQ.
                                      AUGUSTUS C. EPPS, ESQ.
 2                                    CHRISTIAN & BARTON, LLP
                                      909 East Main Street
 3                                    Suite 1200
                                      Richmond, VA 23219
 4
     For Mattel Inc.:                 MICHAEL M. WILSON, ESQ.
 5                                    RICHARD WYNN, ESQ.
                                      JONES DAY
 6                                    717 Texas Avenue
                                      Suite 3300
 7                                    Houston, TX 77002

 8   For Chase Bank:                  TYLER BROWN, ESQ.
                                      HUNTON & WILLIAMS LLP
 9                                    951 East Byrd Street
                                      Riverfront Plaza East Tower
10                                    Richmond, VA 23219

11                                    MARSHALL S. HUEBNER, ESQ.
                                      DAVIS POLK & WARDWELL LLP
12                                    450 Lexington Avenue
                                      New York, NY 10017
13

14

15

16

17

18

19

20

21   Transcription Services:             eScribers, LLC
                                         352 Seventh Avenue
22                                       Suite 604
                                         New York, NY 10001
23                                       (973) 406-2250

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE
```

Colloquy 32

1 talked about. We are going to save the holidays, Your Honor.

2 And in addition, we will, as we always do, engage with

3 our stakeholders including the unsecured creditors' committee

4 which will be appointed I believe next week in coordination

5 with the United States Trustee. We have been in close contact

6 with Ms. Kohen and the United States Trustee's Office. I'm

7 pleased to report, and we'll explain in the course of the

8 motions, that I believe we resolved all issues that have been

9 raised by the United States Trustee, and we very much

10 appreciate Ms. Kohen's collaboration over the course of the

11 last couple of days. She, of course, did not have much time to

12 react, as I know Your Honor did not have much time to react.

13 And we very much appreciate the ability to move quickly.

14 We will facilitate disinterested director activities

15 and investigations. We will, importantly, complete our lease

16 portfolio review, which is already underway, and we will

17 consider, analyze, and develop reorganization strategies. And

18 I want to be very clear, Your Honor. In many cases, you see

19 milestones present themselves in financing packages, and you

20 see milestones attached to various arrangements that companies

21 present. There are no milestones in our financing packages

22 other than presenting to Your Honor final relief on our DIP

23 financing facilities.

24 And this was important. The company needs an

25 opportunity to engage both among itself and with its

1  company to address that maturity.

2  Q.  When did that engagement, then, wind up?

3  A.  In approximately August of 2018 -- excuse me -- 2016.

4  Q.  Okay, did there come a time later when you were reengaged

5  by the company to provide restructuring advice?

6  A.  Yes.  We were reactivated, if you will, in February of

7  2017.  We didn't actually sign an engagement letter with the

8  company until June of 2017.

9      And initially, the focus of our engagement was to address

10 two new maturities, or two additional maturities that the

11 company was confronting which manifested themselves in 2018.

12 One was an approximately 180-million-dollar maturity coming due

13 with respect to the B-2 and B-3 tranches of our pre-petition

14 term debt.  And then in October of 2018, 208 million dollars of

15 debt that existed at the Toys, Inc. level was coming due.  We

16 were hired to evaluate and present strategies to the company to

17 address those maturities.

18 Q.  And what ideas or strategies did you explore with the

19 company to address those maturities?

20 A.  We developed strategies that we felt could have enabled the

21 company to address those maturities successfully by borrowing

22 money from third-party sources to retire those maturities.

23 Q.  Did the company go forward and do that?

24 A.  The company concluded not to do that.

25 Q.  Why not?

Case 17-34665-KLP   Doc 993-2   Filed 05/21/20   Entered 05/21/20 16:18:51   Desc Main
Declaration of Scott A. Pager   Page 20 of 585

Kurtz - Direct                                                                    52

1  A.   In the summer of 2017, a few months ago, management and the

2  board stepped back to look at the company's situation in its

3  totality.  And we -- while we believed that we could have

4  kicked the can down the road, if you will, with respect to the

5  2018 maturities, by extending them from 2018 to 2020 or perhaps

6  2021, we had a fundamental with our balance sheet that we, in

7  fact, would be making worse.  And that problem is too much

8  leverage; you've heard a lot about that this morning.  This

9  company has too much debt.  This company pays too much money in

10  interest:  over 400 million dollars a year.  This company does

11  not have sufficient capital and liquidity to make appropriate

12  investments in its stores, workforce, IT, in order to be

13  competitive in an extremely competitive environment.  And so

14  while we could have moved those maturities, we believe, out

15  into 2020 or 2021, we would be delaying the inevitable, and the

16  inevitable would be a fundamental restructuring of the

17  company's balance sheet to eliminate a very significant amount

18  of the five billion-plus dollars of debt that currently exists.

19       The reason not to wait?  There were two important reasons

20  not to wait, and by "wait", I mean to do the

21  kick-the-can-down-the-road and address this two years from now.

22  Number one, first and foremost, we felt -- when I say "we", I'm

23  talking about not only the advisors but the board and

24  management -- that if we had to go through a wholesale

25  restructuring two years from now, which perhaps would have

 1  entailed a Chapter 11 filing at that point in time, we would be

 2  a weaker business  than we are today.  So it would've been two

 3  more years of delayed investment in the stores; two more years

 4  of delayed investment in the IT.  And at that point in time,

 5  one might seriously question the viability of the business.  So

 6  we have a weaker company to reorganize two years from now, even

 7  though we probably could have kicked the can down the road by

 8  two years.

 9       Secondly, in order to accomplish the resolution of the

10  2018 maturities, moving them two years down the road, we would

11  have to have utilized approximately 600 million dollars of

12  appraised value of unencumbered real estate owned by Delaware

13  to facilitate that transaction.  So in effect, what we would

14  have done is to borrow money against the collateral security of

15  those assets and used that cash to retire these maturities.

16       That would have resulted in no new liquidity, no new

17  capital coming into the company.  And most importantly, those

18  assets would no longer be available to support DIP financing

19  that the company would undoubtedly need to seek if it were to

20  enter bankruptcy proceedings two years from now.  And in fact,

21  Your Honor, the 450-million-dollar term facility in Delaware is

22  supported by exactly these assets.

23       Based upon those considerations, it was determined by the

24  board that the kick-the-can strategy was not in the best

25  interests of the company, and it was abandoned, I would say, in

Case 20-09028-KLP Doc 193-2 Filed 05/21/20 Entered 05/21/20 16:18:51 Desc
Document Page 54 of 21

Kurtz - Direct                                              54

 1  approximately late July.

 2  Q.  You mentioned the concern, then, that emerged at this time

 3  that the company might well find itself weakened and maybe

 4  seeking Chapter 11 protection two years down the road.  My

 5  question is, while we'll get to it in some detail, the DIP

 6  financing relief the company's seeking today, is that intended

 7  to address that weakness right now?

 8  A.  Right now, exactly.  The DIP -- I'm sorry.

 9  Q.  Oh, I was going to -- go ahead.

10  A.  The DIP financing is designed to provide the company with

11  the capital and liquidity it needs to begin to catch up on the

12  underinvestment that has occurred over the course of the last

13  several years in the stores and the operations to begin the

14  turnaround of the business in a way that will enable the

15  company to operate successfully in a very competitive

16  environment, and that plan will be the cornerstone of our

17  reorganization activities in this case.

18  Q.  So the company management and its board made the decision

19  not to pursue the strategy you just described?

20  A.  The kick-the-can strategy.

21  Q.  The kick-the-can strategy.  What, if anything, did it ask

22  you to do next?

23  A.  The board did ask us to see if we could obtain financing

24  for the company that would enable it to buy time to do two

25  things:  number one, to get past the Christmas season, the 2017

1    Christmas season.  Filing bankruptcy in September for a

2    business that is so dependent on Christmas sales is less than

3    ideal, and that's an understatement.  We very much tried to

4    avoid, in fact, being here today, and the goal was to obtain

5    200 million dollars of financing, if we could, that would have

6    enabled the company to stabilize the vendor base such that we

7    would be able to realize the benefit of an uninterrupted flow

8    of inventory so that we'd have the right merchandise in our

9    stores for Christmas.  That was one reason that we solicited

10   the 200 million dollars of financing.

11       The other reason we solicited the 200 million dollars of

12   financing was to give us an opportunity to engage with our

13   creditors with respect to how we were going to fundamentally

14   restructure this balance sheet and how we were going to

15   eliminate the debt that needs to be eliminated in order for

16   this company to proceed into the future with a balance sheet

17   that will enable it to be competitive.

18       So we wanted to avoid a filing in September.  We wanted to

19   stabilize the trade.  We wanted time to engage with our

20   creditors.  Maybe that would have led to a bankruptcy filing;

21   maybe it wouldn't have.  But we knew that the only way to fix

22   the balance sheet was to engage with the creditors, and we

23   needed time to do that.

24       And so we spent approximately thirty days, starting at the

25   end of July until really the last week in August, trying to

1    obtain the 200 million dollars of financing that I just

2    referred to.

3    Q.  Were you able to?

4    A.  We were not successful in achieving it.

5    Q.  In general, what sort of structure or strategy did you

6    pursue to try to do that?

7    A.  We were going to use some of the unencumbered real estate

8    value to support the infusion of 200 million dollars into the

9    company.  In order to satisfy the requirements of our

10   pre-petition indentures which limited the company's ability to

11   actually grant liens out of the Delaware entity, that financing

12   would have had to have been structured as a sale leaseback

13   transaction.

14        And so it is, in fact, a sale leaseback transaction that

15   we presented to several potential lenders and were not

16   successful in obtaining money.

17   Q.  So with respect to the timing, when did it become apparent

18   to you, when did the company conclude that that strategy

19   wouldn't work?

20   A.  I think it became apparent by the third week in August that

21   the odds were heavily stacked against us.

22   Q.  Did the company decide, with your advice, to change

23   direction, pursue a different strategy?

24   A.  The company did decide to change direction at that point in

25   time and to begin accelerated preparations for a Chapter 11

1  Q.  Okay.  Now, you mentioned and the chart reflects a Delaware
2  term DIP or term loan DIP here on the chart.
3  A.  Right.
4  Q.  Why did the company need any additional DIP financing
5  facility on this side of the house?
6  A.  So the company needed additional financing for two reasons.
7  One, to support inventory build, as I testified to, and there
8  again, there is a very significant inventory build that occurs
9  right now, and we needed to show our vendors that we had the
10  liquidity to give them comfort that they will be paid for the
11  extensions of credit that they hope they make available to us
12  to build that inventory.  That's number one.
13      Number two, that incremental financing will be made
14  available to, as I testified to earlier, as you heard in Mr.
15  Sussberg's remarks, begin to fund the delayed investments in
16  the company's business that we need to embark upon immediately
17  in order to reestablish the competitiveness of this business.
18      So, number one, we need the additional liquidity in order
19  to stabilize the trade.  One of the interesting things about a
20  DIP loan as it relates to trade is the more you have, the less
21  you need, because your trade creditors are comfortable that
22  they will be paid.  So that's purpose number one.
23      But purpose number two is to, again, to make the
24  reinvestments in our business that we have not been able to
25  make over the course of the last several years, having been

 1  constrained by our capital structure.

 2  Q.  Can you describe the process the company went through with

 3  its advisors to determine the appropriate sizing of the DIP

 4  lending that it's asking the court to approve?

 5  A.  Sure.  In early August, the company brought on the firm of

 6  Alvarez & Marsal, specialists in advising companies through

 7  restructurings, to work with management and also Lazard, but

 8  primarily working with management to develop a forecast for the

 9  company that would be applicable to a Chapter 11 scenario.

10      Even though we were very much hoping to avoid it, even

11  though we were still out in the marketplace looking for the

12  200-million-dollar bridge loan, we felt that we knew we

13  couldn't raise DIP financing without a forecast, and we

14  couldn't wait until we proved that we couldn't get the 200

15  million dollars to begin the forecasting process.

16      So, during the month of August, starting in early August,

17  maybe even late July, a process began to develop a forecast for

18  the business under a hypothetical Chapter 11 scenario.  That

19  forecasting process derived the capital need of the company,

20  both from the standpoint of working capital ensuring that we

21  have the liquidity to stabilize the trade, but also to make the

22  investments in our business that I just testified to.

23  Q.  Now, would you briefly then describe for the court the

24  marketing process Lazard led to find a provider for this DIP

25  facility?

Case 17-34665-KLP   Doc 193-2   Filed 05/21/20   Entered 05/21/20 16:18:51   Desc Main
Declaration of Scott A. Page 76 Page 27 of 585

Kurtz - Direct                                                              76

1   A.   So now you're talking about the 450 million-dollar term?

2   Q.   Yes, yes.

3   A.   So we approached a number of the institutions that signed

4   the NDA, so this is this group of twenty-one.  We're only

5   interested in the term loan.  So these are institutions who

6   lend money on a riskier basis for higher reward, higher coupon,

7   hedge funds who don't win money with the rates that we were

8   able to achieve in the ABL.  And we -- I was very pleased that

9   we had a spirited competition for that 450 million dollar -- we

10  had sized it at 450 million dollar term piece.  So there were

11  four very credible institutions who made proposals for that

12  financing.

13        In addition, JPMorgan, our lead arranger on the 2.3

14  billion dollars, indicated that they would be prepared to

15  provide that 450 million dollars of financing to the company by

16  underwriting the full amount that they would later syndicate

17  into the marketplace.  So we had five competitive proposals for

18  the 450 million dollar term piece in Delaware.

19  Q.   Who was the winner, and why?

20  A.   The winner was the B-4 group.  By the way, all of these

21  proposals were submitted at the close of business last Tuesday,

22  so just to illustrate how much was accomplished in a -- one

23  week ago today, we received -- that was our deadline for

24  receiving proposals.

25  Q.   In its existing -- the company's existing --

1  A.  Existing before lenders.  And so this is the group of

2  institutions that own more than fifty percent of the B-4

3  tranche of our pre-petition term debt forming together to

4  provide the 450 million dollars.  They were one of the five

5  competitors for this facility.  Why did we select them?

6      We selected them for two reasons.  First, the economic

7  terms associated with their proposal, and we did engage in a

8  spirited negotiation with them to improve the terms relative to

9  their initial proposal, were relatively consistent with the

10  other proposals that we had received.  I won't say they were

11  the cheapest, but they were certainly within the range of

12  reasonableness relative to those other proposals.  And the nice

13  thing about having run the process was that we had developed a

14  pretty good sense as to what a market rate for this facility

15  would be.  So that was reason number one.  They were within the

16  range of reasonableness as it relates to market terms.

17      But number two, most importantly, this group made it clear

18  to us that, if they were the successful provider of this

19  financing, they would consensually agree to allow their

20  pre-petition collateral to be primed by this 450 million dollar

21  facility.  And so what is the collateral for this facility?  So

22  it's a little less than 600 million dollars of appraised value

23  of real estate that you've heard me speak to.

24      It's approximately 300-plus million dollars of appraised

25  equity value flowing out of Propco II, but it is also a first

Case 17-34665-KLP   Doc 193-2   Filed 05/21/20   Entered 05/21/20 16:16:51   Desc Main
Declaration of Scott A. Fager   Page 29 of 585

Kurtz - Direct                                                                78

1   priority security interest in the company's trademarks.  The

2   highly valuable Toys "R" Us and Babies "R" Us trademarks.  And

3   those trademarks serve as collateral for the pre-petition term

4   debt, the B-2, the B-3, and the B-4.

5       The only way we could obtain the 450 million dollars of

6   financing was to offer all three forms of collateral as

7   collateral support.  And that was something that was made clear

8   by the market process that we ran.  So every one of the other

9   potential providers of this financing indicated that they could

10  not proceed unless they got a first priority security interest

11  in the trademark.  That requires priming the pre-petition term.

12      We could have engaged in a contested battle with the B-4's

13  and started our case in a very different way.  The B-4 group

14  made it clear that they would agree to consensually subordinate

15  their existing first priority security interest in that

16  trademark to the new 450 million dollars of financing.

17      A component part of that agreement is to pay adequate

18  protection to them, and we'll come back to that a little bit

19  later, but we felt -- company, management, board -- that if we

20  could obtain the 450 million dollars of financing on terms that

21  were approximately equal to those that were otherwise available

22  in the marketplace, and if we could do so in a way that would

23  avoid having a contested proceeding before this court on day

24  one of our case to non-consensually prime, that would be a very

25  significant benefit flowing to the company.

1    And so as a result of the fact that their terms were

2    reasonable in light of other proposals that had been made and

3    that we were able to agree with them that they would consent to

4    being primed, to priming themselves, if you will, on the 450,

5    we decided to proceed with this group.

6  Q.  With respect to both your familiarity with the company and

7  your participation in the bidding and the negotiations, did you

8  come to an understanding as to why these lenders would agree to

9  prime their own notes?

10 A.  Why they would agree to do it?  I believe that they agreed

11 to do it because, two reasons.  One, the money that they're

12 providing was coming into the company on terms that were

13 attractive, so they were going to earn a reasonable rate of

14 return on those dollars.

15      But number two, it was a recognition that having the

16 company properly financed, having the company with access to an

17 appropriate amount of capital to invest in its business,

18 reestablish its competitiveness in the marketplace, that was

19 beneficial to their position as a pre-petition creditor.  And

20 while I hesitate to speak for them, I believe those were the

21 reasons that they decided that they were interested in

22 providing this financing.

23 Q.  You mentioned adequate protection.  What adequate

24 protection, if any, is being provided in this facility?

25 A.  We have reached agreement with this group, and what I'm

 1          MR. MCGAAN:  Yes.

 2          THE COURT:  Any objection to the admission of Mr.

 3   Brandon's declaration?

 4          All right, that declaration is also deemed admitted.

 5      (Mr. Brandon's declaration was hereby received into

 6   evidence as Debtors' Exhibit, as of this date)

 7          MR. SILVERSTEIN:  Your Honor, is that solely for the

 8   purpose of this hearing?

 9          THE COURT:  For the purpose of this hearing.

10          MR. SILVERSTEIN:  Okay.

11          MR. MCGAAN:  Yeah, and that's the limit of the offer

12   as well, so I appreciate that, Your Honor.

13          THE COURT:  All right.  Thank you.

14          Now, I think it might appropriate to take a break at

15   this point.  Do you know how much more evidence you intend to

16   put on in connection with the DIP facility?

17          MR. MCGAAN:  That's the end of the evidence in

18   connection with the DIP, Your Honor.

19          THE COURT:  All right.  Why don't we take a ten-minute

20   break?

21          MR. MCGAAN:  Okay, thank you.

22          THE CLERK:  All rise.  The Court is now in recess.

23      (Recess from 1:44 p.m. until 2:02 p.m.)

24          THE CLERK:  The Court is now in session.  Please be

25   seated and come to order.

Case 17-34665-KLP   Doc 993-2   Filed 05/21/20   Entered 05/21/20 16:18:51   Desc Main
Declaration of Scott A. Pagel   Page 32 of 217

Case 20-03038-KLP   Doc 2-2   Filed 05/21/20   Entered 05/21/20 16:16:05   Desc Main
Document   Page 32 of 585

Colloquy                                                      132

1    That is our very important concern as we're moving towards the

2    final order that we don't want major changes when no one's

3    really had notice of what's happening this morning.

4              Importantly, the documents, as I understand, do permit

5    the lenders to be recording mortgages between now and the time

6    of the final order, and that is a pretty serious concern that

7    would be a change under the status quo.  So we would ask that

8    any mortgage recording be held off until the final order is

9    entered and we actually have some notice and understanding and

10   a chance to read that binder of documents that's sitting in

11   front of Your Honor.

12             THE COURT:  All right.

13             MS. MCLEMORE:  That's all I have.

14             THE COURT:  Thank you.

15             MR. WILSON:  Good afternoon, Your Honor.  Mike Wilson,

16   I've been retained by Mattel, Incorporated.  Did file a motion

17   pro hac vice for my co-counsel, Mr. Wynne, from the JonesDay

18   Firm and --

19             THE COURT:  All right.

20             MR. WILSON:  -- I ask that he be admitted.

21             THE COURT:  Mr. Wynne may participate.

22             MR. WYNNE:  Thank you, Your Honor.  Thank you for

23   hearing us, and I'll try to be very brief.

24             Your Honor, on behalf of Mattel, who the debtors have

25   listed as their largest trade creditor, we wanted to express,

Colloquy    133

1   actually, very strong support for the Debtors' interim relief,
2   particularly the DIP financing.

3   　　　　　Your Honor, we really had -- obviously, saw the
4   newspaper reports and like the other vendors to the debtor,
5   Mattel was in the process of cutting off shipments.  The
6   debtors have an incredibly complex supply chain which, for the
7   last ten days, I've been learning far more about, even having
8   had experience with other supply chains.  And we think it is
9   critical that this interim financing be approved today as
10  requested.

11  　　　　　Frankly, a lot of it we saw for the first time at 5 in
12  the morning.  We think it's a very robust package.  We think it
13  sends the right signal to the vendors that are situated like
14  Mattel, and we are very supportive of that.

15  　　　　　I read with some care, Mr. Brandon's declaration with
16  respect to the goals for the company and this is, really, in
17  many sense, a traditional reorganization.

18  　　　　　And what we have from the objecting parties is,
19  interestingly, they want in on this financing.  And we don't
20  think that those objections should be dealt with on an interim
21  basis.  We think they should be moved to the final basis.  We
22  think this should be approved.  We think this is an important
23  company.  We think it's important not just to the suppliers
24  like Mattel, it's important to lots of the employees, really,
25  to the retail environment.  Retail's, obviously, under great

1    stress, the brick and mortar retail.  So we think it's
2    important that this company survive and thrive, and we think
3    that this DIP, what we heard today, the lack of milestones, the
4    lack of cross-collaterization, all of those issues are quite
5    significant and a good accomplishment.
6            Your Honor, I don't want to belabor it and, obviously,
7    we'll reserve our rights; we're going through papers, and we'll
8    reserve our rights on the final basis, and I'm sure there will
9    be disputes because, somehow, I didn't see the big check I was
10   expecting to get when I got here.
11           But we think that it's important they get the
12   liquidity and that the flow of goods is uninterrupted,
13   particularly for Christmas.  And so, Your Honor, we would urge
14   the Court to approve it today on an interim basis as requested.
15           THE COURT:  All right.  Thank you.
16           MR. WYNNE:  Thank you.
17           MR. EPPS:  Good afternoon, Your Honor.  A.C. Epps, Jr.
18   from Christian & Barton.  I delay the Court by about thirty
19   seconds merely to say that Ms. McLemore's comments are also for
20   Washington Prime Group, which is a landlord in this case.  And
21   we would like to enter our appearance on behalf of Washington
22   Prime Group today.  And thank you very much.
23           THE COURT:  All right, thank you, Mr. Epps.
24           MR. LEAKE:  Good afternoon, Your Honor.  Paul Leake
25   from Skadden Arps on behalf of the pre-petition ABL agent.

Colloquy                                                          156

1          MR. HUEBNER:  Okay.  Thank you, Your Honor.  We'll do

2    that.

3          THE COURT:  All right.  Thank you.

4          Is there anyone else who feels the need to address the

5    Court in connection with the DIP financing?

6          All right.  Well, I think we've resolved the landlord

7    issue as I've described.  And the issue regarding the adequate

8    protection, I know there are objections regarding sufficiency

9    of adequate protection.  It appears to me there's a number of

10   parties who are anxious to lend money to this company.  Maybe

11   it's a little too late, but anyway.

12         I've listened to the testimony, and I believe that the

13   record is satisfactory in terms of satisfying the criteria set

14   forth in Section 364(c) with respect to approval of DIP

15   financing.  And this is with respect to all three components of

16   the DIP financing.  I believe the evidence demonstrates that

17   there was a competitive process, arm's length negotiations.

18         The proposed financing represents an exercise of sound

19   business judgment and represents the best available

20   alternatives.  And it also appears that the debtors are unable

21   to obtain unsecured financing, that this financing is necessary

22   to preserve the assets of the estate, and is fair and

23   reasonable, given the circumstances.

24         Now, I believe that the adequate protection that's

25   been suggested by the evidence involves interest payments and

 1   that it does preserve the value.  I think for purposes of

 2   approving the interim financing, that the adequate protection

 3   is sufficient.

 4        I do, as I'd indicated before, approve the proposed

 5   financing on an interim basis with preservation of all rights

 6   pending a final hearing.  So if you'll submit an order in

 7   connection with both motions, with the language that we've

 8   discussed today, I will approve the interim financing.

 9        MR. HUSNICK:  Thank you, Your Honor, and will do.

10        MR. BRITTON:  Good afternoon, Your Honor.  Bob

11   Britton, Kirkland & Ellis, on behalf of the debtors.

12        Just quickly, a little bit of clean up on the agenda,

13   Your Honor.  I think we skipped over the joint administration.

14        THE COURT:  Well, I think we also -- did you skip over

15   the expedited motion or expedited hearing motion?

16        MR. BRITTON:  With Your Honor's permission, we would

17   like to have today's hearing on an expedited basis.

18        THE COURT:  Any objections?

19        MR. BRITTON:  The debtors require the financing.

20        THE COURT:  That's approved.

21        MR. BRITTON:  Thank you, Your Honor.  Also, with

22   respect to joint administration, obviously only for procedural

23   purposes, we think that it's in the best interests of the

24   debtors, the Court, and all other parties-in-interest to have

25   combined hearings and otherwise administer these cases as

1   authorities may be entitled to assert claims not only against
2   the debtors, but against the debtors' management if these fees
3   are not paid -- sorry -- rather, if these taxes are not paid.
4   Therefore, we would seek entry of the order, unless Your Honor
5   has any questions.
6           THE COURT:  Thank you.  Does anyone wish to be heard
7   in connection with the taxes motion?
8       (No audible response)
9           THE COURT:  The motion is granted.
10          MR. BRITTON:  Thank, Your Honor.  Flipping to item
11  number 16 on the agenda, Your Honor, this is the insurance
12  motion, the debtors maintain, in the ordinary course,
13  approximately sixty-two insurance policies as well as certain
14  surety bonds in favor of utilities and to support workers'
15  compensation program and for other purposes.  Your Honor,
16  maintaining insurance policies, in the reasonable exercise of
17  the debtors' business judgment, will maximize the value of
18  their estates.  In addition, the U.S. Trustee guidelines
19  require debtors to maintain certain insurance policies during
20  the ordinary course; therefore, in order to protect their
21  assets for the benefit of all parties-in-interest, the debtors
22  would ask that the Court grant the relief requested in the
23  insurance motion, which is essentially to maintain all of the
24  debtors' insurance policies in the ordinary course.
25          THE COURT:  Does any party wish to be heard in

 1  connection with the insurance motion?

 2          MR. HUEBNER:  Just super briefly, Your Honor, some DIP

 3  lenders or DIP lenders' counsel -- not us -- asked to put, sort

 4  of, the DIP overrides and "don't forget about the DIP

 5  covenants" in every first-day that pays pre-petition claims.

 6  We don't like that approach because we think it's very

 7  cumbersome and obnoxious.

 8          This is the last of the pre-petition vendor-type

 9  motions.  I just do want to remind everybody, there still has

10  to be compliance with the DIP covenants and the like in order

11  to borrow.  Those things were addressed in the DIP.  We

12  absolutely support all of the relief, but since somebody may

13  notice the absence of DIP governor language in each motion,

14  just understood it was put once, and only once, in the DIP

15  because that's more efficient and elegant drafting.  And we are

16  absolutely in support of all these motions.

17          THE COURT:  I understand.

18          Anyone else wish to be heard in connection with the

19  insurance motion?

20      (No audible response)

21          THE COURT:  That motion is granted.

22          MR. BRITTON:  Thank, Your Honor.  Finally, flipping to

23  item number 13 on the agenda, this is our NOL motion.  Your

24  Honor, we do have three large holders of our pre-petition

25  equity, and if those large holders were to either sell off

1   their equity or take a worthless stock deduction, it could

2   cause a change of control for tax purposes, which would limit

3   the debtors' ability to use their tax attributes from and after

4   the date that that change of control is deemed to occur.  Those

5   tax attributes are a valuable asset of the debtors' estates.

6   And therefore, Your Honor, we would ask that you enter the

7   relief requested by the motion.

8          I note that the motion doesn't prevent any

9   party-in-interest from seeking to sell their equity or take a

10  worthless stock deduction.  It merely puts into place a certain

11  set of procedures that require them to come to court and

12  consult with the debtors before they do so.

13         THE COURT:  All right.  Does anyone wish to be heard

14  in connection with the NOL motion?

15     (No audible response)

16         THE COURT:  All right.  The motion is granted.

17         MR. BRITTON:  Thank you, Your Honor.  With that, I

18  will cede the podium to my colleague, Ms. Emily Geier, to take

19  us through the balance of the agenda.

20         THE COURT:  All right.

21         MS. GEIER:  Good afternoon, Your Honor, Emily Geier

22  from Kirkland & Ellis on behalf of the debtors.

23         Just one real quick cleanup item, we never moved Mr.

24  Short's declaration into evidence.  We'd like to --

25         THE COURT:  I was going to ask about that.  All right.

 1          MS. GEIER:  If we could do that at this time?

 2          THE COURT:  Does any party object to the admission of

 3   Mr. Short's declaration?

 4      (No audible response)

 5          THE COURT:  The declaration is admitted.

 6      (Declaration of Michael Short was hereby received into

 7   evidence as Debtors' Exhibit, as of this date)

 8          MS. GEIER:  Excellent.  So I hate to disappoint.  We

 9   still have a couple more operational motions and they're

10   actually, kind of, a couple of big ones to cover.  And then we

11   will just finish out the rest of the, sort of, administrative

12   docket, if that --

13          THE COURT:  All right.

14          MS. GEIER:  -- works for Your Honor.

15          So I'd like to pick it up with critical vendors.  We

16   took this a little bit out of order today, but critical vendor

17   relief, located at docket number 6.  We talked a lot earlier

18   today about what makes this company so special.  Part of that

19   is the special relationship that the company has with its own

20   vendors.  So I'd like to take a moment just to explain a little

21   bit about what makes them so critical and the relief that we're

22   going to requesting.

23          Over ninety-seven percent of the critical vendors are

24   merchandise vendors.  They put the products in our stores, and

25   they bring people in the doors.  Nearly a third of our critical

# EXHIBIT 2-B

Dkt. No. 749 - Excerpts from Transcript
of Oct. 24, 2017 Hearing

Case 20-03038-KLP   Doc 9-2   Filed 05/21/20   Entered 05/21/20 16:18:51   Desc
Declaration of Scott A. Rader   Page 1 Page 42 of 585

Case 17-34665-KLP   Doc 749-2   Filed 05/25/20   Entered 05/25/20 08:50:55   Desc Main
Document   Page 1 of 79

1

```
 1                 IN THE UNITED STATES BANKRUPTCY COURT
                   EASTERN DISTRICT OF VIRGINIA (RICHMOND)
 2
     In Re:                           )  Case No. 17-34665-KLP
 3                                     )  Richmond, Virginia
     TOYS "R" US, INC., et al.,        )
 4                                     )
               Debtors.               )  October 24, 2017
 5                                     )  2:04 p.m.
     ------------------------------- )
 6
                     TRANSCRIPT OF HEARING ON:
 7         DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
            (I) AUTHORIZING THE NORTH AMERICAN DEBTORS TO OBTAIN
 8      POST-PETITION FINANCING, (II) AUTHORIZING THE NORTH AMERICAN
          DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND
 9        PROVIDING SUPERPRIORITY ADMINISTRATIVE-EXPENSE STATUS,
     (IV) GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION LENDERS,
10     (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL
        HEARING, AND (VII) GRANTING RELATED RELIEF [DOCKET NO. 29];
11
                DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
12      (I) AUTHORIZING THE TRU TAJ DEBTORS TO OBTAIN POST-PETITION
        FINANCING, (II) AUTHORIZING THE TRU TAJ DEBTORS TO USE CASH
13      COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
          ADMINISTRATIVE-EXPENSE STATUS, (IV) GRANTING ADEQUATE
14       PROTECTION TO THE PRE-PETITION LENDERS, (V) MODIFYING THE
           AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND
15            (VII) GRANTING RELATED RELIEF [DOCKET NO. 32];

16         DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
     (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PRE-PETITION CLAIMS
17       OF CRITICAL VENDORS AND (II) GRANTING RELATED RELIEF
                          [DOCKET NO. 6];
18
           DEBTORS; MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
19      (I) AUTHORIZING THE DEBTORS TO PAY PRE-PETITION CLAIMS OF
           FOREIGN VENDORS; AND (II) GRANTING RELATED RELIEF
20                        [DOCKET NO. 5];
     (cont'd. on next page)
21   Transcription Services:              eScribers, LLC
                                          352 Seventh Avenue
22                                        Suite #604
                                          New York, NY 10001
23                                        (973) 406-2250

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

Case 17-34665-KLP    Doc 749-2    Filed 05/21/20    Entered 05/21/20 18:50:55    Desc Main
Declaration of Scott A. Rede    Page 43 of 585

2

1        DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
      (I) AUTHORIZING THE DEBTORS TO (A) PAY PRE-PETITION WAGES,
2    SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND
    (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING
3               RELATED RELIEF [DOCKET NO. 21];

4        DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
   (I) AUTHORIZING THE DEBTORS TO PAY PRE-PETITION CLAIMS OF LIEN
5      CLAIMANTS, IMPORT CLAIMANTS, AND 503(B)(9) CLAIMANTS,
  (II) CONFIRMING ADMINISTRATIVE-EXPENSE PRIORITY OF OUTSTANDING
6   ORDERS, AND (III) GRANTING RELATED RELIEF [DOCKET NO. 14];

7     SUPPLEMENT TO THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND
  FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY PRE-PETITION
8    CLAIMS OF LIEN CLAIMANTS, IMPORT CLAIMANTS, AND 503(B)(9)
  CLAIMANTS, (II) CONFIRMING ADMINISTRATIVE-EXPENSE PRIORITY OF
9     OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF
               [DOCKET NO. 652];
10

    MOTION FOR EXPEDITED HEARING ON SUPPLEMENT TO THE DEBTORS'
11   MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
   THE DEBTORS TO PAY PRE-PETITION CLAIMS OF LIEN CLAIMANTS,
12    IMPORT CLAIMANTS, AND 503(B)(9) CLAIMANTS, (II) CONFIRMING
   ADMINISTRATIVE-EXPENSE PRIORITY OF OUTSTANDING ORDERS, AND
13       (III) GRANTING RELATED RELIEF [DOCKET NO. 653];

14 DEBTORS' MOTION FOR ENTRY OF AN ORDER IMPLEMENTING A PROCEDURAL
   PROTOCOL FOR THE ADMINISTRATION OF CROSS-BORDER INSOLVENCY
15           PROCEEDINGS [DOCKET NO. 7];

16        DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
    (I) AUTHORIZING THE PAYMENT OF CERTAIN PRE-PETITION AND
17  POST-PETITION TAXES AND FEES AND (II) GRANTING RELATED RELIEF
             [DOCKET NO. 12];
18

19        DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
  (I) APPROVING NOTIFICATION AND HEARING PROCEDURES FOR CERTAIN
20   TRANSFERS OF AND DECLARATIONS OF WORTHLESSNESS WITH RESPECT TO
 COMMON STOCK, AND (II) GRANTING RELATED RELIEF [DOCKET NO. 13];

21        DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
  (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR
22     CASH-MANAGEMENT SYSTEM, (B) HONOR CERTAIN PRE-PETITION
  OBLIGATIONS RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS
23     FORMS, AND (D) PERFORM INTERCOMPANY TRANSACTIONS, AND
       (II) GRANTING RELATED RELIEF [DOCKET NO. 22];
24

(cont'd. on next page)
25

Case 17-34665-KLP Doc 749-2 Filed 05/21/20 Entered 05/21/20 16:18:51 Desc Main
Case 20-03028-KLP Doc 3-2 Filed 05/21/20 Entered 05/21/20 18:50:35 Desc
Declaration of Scott A. Rader Page 3 Page 44 of 585

3

1     DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
      (I) AUTHORIZING THE DEBTORS TO MAINTAIN AND ADMINISTER THEIR
2         EXISTING CUSTOMER PROGRAMS AND HONOR CERTAIN PRE-PETITION
       OBLIGATIONS RELATED THERETO AND (II) GRANTING RELATED RELIEF
3                          [DOCKET NO. 15];

4     DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
       (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE AND RENEW THEIR
5     LIABILITY, PROPERTY, CASUALTY, AND OTHER INSURANCE POLICIES AND
       HONOR ALL OBLIGATIONS IN RESPECT THEREOF, AND (B) CONTINUE THE
6         SURETY BOND PROGRAMS, AND (II) GRANTING RELATED RELIEF
                            [DOCKET NO. 16];
7

8     DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
       (I) APPROVING THE DEBTORS' PROPOSED ADEQUATE ASSURANCE OF
9      PAYMENT FOR FUTURE UTILITY SERVICES, (II) PROHIBITING UTILITY
       COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES,
10    (III) APPROVING THE DEBTORS' PROPOSED PROCEDURES FOR RESOLVING
      ADDITIONAL ASSURANCE REQUESTS, AND (IV) GRANTING RELATED RELIEF
                            [DOCKET NO. 11];
11

12    DEBTORS' FIRST OMNIBUS MOTION FOR ENTRY OF AN ORDER AUTHORIZING
         (I) REJECTION OF CERTAIN UNEXPIRED LEASES OF VACANT REAL
13       PROPERTY EFFECTIVE NUNC PRO TUNC TO THE PETITION DATE, AND
           (II) ABANDONMENT OF ANY BURDENSOME PROPERTY LOCATED AT
14     LOCATIONS COVERED BY SUCH UNEXPIRED LEASES [DOCKET NO. 218];

15    DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE
      RETENTION AND EMPLOYMENT OF KIRKLAND & ELLIS LLP AND KIRKLAND &
16       ELLIS INTERNATIONAL LLP AS ATTORNEYS FOR THE DEBTORS AND
       DEBTORS-IN-POSSESSION EFFECTIVE NUNC PRO TUNC TO THE PETITION
17                        DATE [DOCKET NO. 219];

18    DEBTORS' APPLICATION TO EMPLOY AND RETAIN ALVAREZ & MARSAL
      NORTH AMERICA, LLC AS RESTRUCTURING ADVISORS TO THE DEBTORS AND
19     DEBTORS-IN-POSSESSION PURSUANT TO SECTIONS 327(A) AND 328 OF
       THE BANKRUPTCY CODE EFFECTIVE NUNC PRO TUNC TO THE PETITION
20                        DATE [DOCKET NO. 212];

21    DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
         EMPLOYMENT AND RETENTION OF LAZARD FRÈRES & CO. LLC AS
22     INVESTMENT BANKER TO THE DEBTORS AND DEBTORS-IN-POSSESSION,
       EFFECTIVE NUNC PRO TUNC TO THE PETITION DATE, (II) MODIFYING
23     CERTAIN TIMEKEEPING REQUIREMENTS, AND (III) GRANTING RELATED
                            RELIEF [DOCKET NO. 213];

24    (cont'd. on next page)

25

Case 17-34665-KLP  Doc 743-2  Filed 05/21/20  Entered 05/21/20 16:18:51  Desc Main
Declaration of Scott A. Rader  Page 45 of 579

4

1   DEBTORS' APPLICATION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS
    327(A) AND 328 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2014(A)
2       AND 2016 AND LOCAL RULES 2014-1 AND 2016-1 AUTHORIZING THE
        EMPLOYMENT AND RETENTION OF A&G REALTY PARTNERS, LLC AS A
3        REAL-ESTATE CONSULTANT AND ADVISOR NUNC PRO TUNC TO
                   SEPTEMBER 25, 2017 [DOCKET NO. 214];
4
5        DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE
         DEBTORS TO EMPLOY AND RETAIN KUTAK ROCK LLP AS CO-COUNSEL
6      EFFECTIVE NUNC PRO TUNC TO THE PETITION DATE [DOCKET NO. 215];

7       DEBTORS' APPLICATION FOR AN ORDER AUTHORIZING THE EMPLOYMENT
       AND RETENTION OF PRIME CLERK LLC AS ADMINISTRATIVE ADVISOR NUNC
8             PRO TUNC TO THE PETITION DATE [DOCKET NO. 217];

9         DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING
          PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF
10     EXPENSES FOR RETAINED PROFESSIONALS AND (II) GRANTING RELATED
                   RELIEF [DOCKET NO. 211]; AND
11
12      DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS
       TO RETAIN AND COMPENSATE PROFESSIONALS UTILIZED IN THE ORDINARY
            COURSE OF BUSINESS [DOCKET NO. 216]
13
                   BEFORE THE HONORABLE KEITH L. PHILLIPS
14                   UNITED STATES BANKRUPTCY JUDGE

15   APPEARANCES:
     For the Debtors:                    JOSHUA A. SUSSBERG, P.C.
16                                        KIRKLAND & ELLIS LLP
                                          601 Lexington Avenue
17                                        New York, NY 10022

18                                        CHAD J. HUSNICK, P.C., ESQ.
                                          EMILY E. GEIER, ESQ.
19                                        ROBERT BRITTON, ESQ.
                                          JOSHUA M. ALTMAN, ESQ.
20                                        KIRKLAND & ELLIS LLP
                                          300 North LaSalle
21                                        Chicago, IL 60654

22   For Official Committee of           CULLEN D. SPECKHART, ESQ.
     Unsecured Creditors:                WOLCOTT RIVERS GATES
23                                        919 East Main Street
                                          Suite 1040
24                                        Richmond, VA 23219

25

Case 17-34665-KLP    Doc 749-2    Filed 05/21/20    Entered 05/21/20 16:18:51    Desc Main
Case 20-09028-KLP    Doc 3-2    Filed 10/26/21    Entered 10/26/21 18:50:55    Desc
Declaration of Scott A. Rader    Page 5 of 99    Page 46 of 585

5

```
 1   For Official Committee of      KENNETH H. ECKSTEIN, ESQ.
     Unsecured Creditors (cont'd.): RACHAEL RINGER, ESQ.
 2                                   KRAMER LEVIN NAFTALIS &
                                      FRANKEL LLP
 3                                   1177 Avenue of the Americas
                                     New York, NY 10036
 4
     For Ad Hoc Group of Taj        CHRISTOPHER A. JONES, ESQ.
 5   Noteholders:                   WHITEFORD, TAYLOR & PRESTON,
                                      LLP
 6                                   3190 Fairview Park Drive
                                     Suite 800
 7                                   Falls Church, VA 22042

 8                                   BRIAN S. HERMANN, ESQ.
                                     PAUL, WEISS, RIFKIND, WHARTON
 9                                   & GARRISON LLP
                                     1285 Avenue of the Americas
10                                   New York, NY 10019

11   For Ad Hoc Group of B-4        DOUGLAS M. FOLEY, ESQ.
     Lenders:                       MCGUIREWOODS LLP
12                                   2001 K Street N.W.
                                     Suite 400
13                                   Washington, DC 20006

14                                   EMIL A. KLEINHAUS, ESQ.
                                     WACHTELL, LIPTON, ROSEN & KATZ
15                                   51 West 52nd Street
                                     New York, NY 10019
16
     For Various Landlords:         JENNIFER MCLAIN MCLEMORE, ESQ.
17                                   CHRISTIAN & BARTON, LLP
                                     909 E. Main Street
18                                   Richmond, VA 23219

19

20

21

22

23

24

25
```

1  two, kids would rather be promised a trip to Toys "R" Us than

2  they would any other store, and that is absolutely one-hundred

3  percent the case; and number three, and I saw this for my own

4  eyes, he said kids can run through the aisles at Toys "R" Us

5  and find all the stuff that they'd like, in one store.

6          And then he talks about not having to go on a device

7  and not having to browse for things online.  That is confusing

8  in and of itself, but it's the way of the world.  And that's

9  the bigger-faster-stronger generation that we live in.  But it

10 doesn't detract from the fact that these kids appreciate the

11 opportunity to really be in a toy store, to have an opportunity

12 to run through the aisles.  And for kids like Andrew and many

13 others, including my own, we're working on something to ensure

14 that they have this opportunity for many, many years to come.

15         The problem, Your Honor, that we've been dealing with

16 and we talked about is a macroeconomic one; it's a change in

17 course, it's consumer preferences.  But it comes back all the

18 time to the fact that we are operating in an environment that

19 is heavy-loaded to the fourth quarter.  And we talked about

20 this back at the first-day hearing.  In early September, this

21 company dealt with a rash of new stories talking about and

22 focused on a potential restructuring and the subsequent

23 bankruptcy that was filed back on September 18th.

24         And at the time when that news broke in early

25 September, more than forty percent of our trade base stopped

Case 17-34665-KLP Doc 749-2 Filed 05/21/20 Entered 05/21/20 16:18:51 Desc Main
Case 20-03038-KLP Doc 9-2 Filed 10/23/20 Entered 10/23/20 16:50:55 Desc
Declaration of Scott A. Page 1 of 9
Document Page 10 of 9 48 of 585

Colloquy                                                    10

 1  **shipping.**  That's an important time that we talked about with

 2  Your Honor, because that's when this company builds inventory

 3  for, again, the all-important fourth quarter, a time where the

 4  company does forty percent of its business.

 5          And following the Chapter 11 filing and even today,

 6  right, back when we talked about the new stories the first time

 7  around with the potential restructuring, the new stories

 8  haven't stopped.  And a lot of people say perception is

 9  reality.  I would posit today, Your Honor, that perception is

10  not reality.  Just as I tell my mother for the last fifteen

11  years, with every company that we work with, just because a

12  company's in Chapter 11, it doesn't mean it's going anywhere.

13          To the contrary, companies have an opportunity to take

14  a deep breath, access financing, in this case 3.2 billion

15  dollars of financing, and an opportunity to reset things and

16  move forward in a way that makes sense in an everchanging

17  environment.  And if there was ever an example for a company

18  that can utilize Chapter 11 in the right way, redirect funds,

19  redeploy funds, put them into the business and dedicate itself

20  to doing things the way that it should be done in this day and

21  age, it's this company.  And so we need to flip that script,

22  and we're working on that.  And the company has been working

23  tirelessly on that effort.

24          At the same time, we've got competition, and we've got

25  competition that's existed for a long time.  It's big-box

Colloquy                                                            18

 1          As Mr. Sussberg reported in his opening, the financing

 2     is, as are all the other motions up today, uncontested at this

 3     point in time.  Your Honor, I'll keep my presentation on the

 4     DIPs brief, but I do think there's a few things that I'll put

 5     into the record.  And I'll address, as I did at the first-day

 6     hearing, if it's okay with Your Honor, the two DIP motions

 7     together, although I'm going to parse out a couple of the

 8     changes to the orders, in separate slides, just so you can see

 9     what they are.

10          THE COURT:  All right.  Very well.

11          MR. HUSNICK:  Your Honor, those are docket number 29

12     and 32, the first two items on the agenda.  Your Honor, the

13     debtors filed a reply late last night, and hopefully Your

14     Honor's had an opportunity to review it.  It summarizes some of

15     the changes.  I would note for the record that we filed an

16     amended, or corrected, reply today, to correct one mis -- or

17     one word that was a typo, and that is -- has to do with the

18     redemption of the notes, in connection with the settlement with

19     the Andrews Kurth group of Taj noteholders, that I'll mention a

20     little bit a later.  We did correct that that redemption is --

21     in effect, we're redeeming some of the post-petition notes, not

22     the pre-petition notes.  And we're just basically swapping out

23     for notes that'll be issued to the Andrews Kurth group.

24          Your Honor, as you -- as Mr. Sussberg mentioned, we

25     have 3.125 billion dollars of post-petition financing, split

 1    across the two silos.  The evidence that we offered at the

 2    first-day hearing consisted of:  a declaration of Mr. Brandon;

 3    declaration of Mr. Michael Short, the chief financial officer;

 4    declaration of David Kurtz, the debtors' investment banker from

 5    Lazard; and the other testimony that Mr. Kurtz put on orally at

 6    the last hearing.

 7           We do not intend to call any witnesses today, Your

 8    Honor; instead, I would like, if the Court will indulge us, to

 9    incorporate the record from the first-day hearing, including

10    these three declarations, into this hearing, for purposes of

11    the evidentiary record.

12           THE COURT:  All right, any parties object to

13    incorporating the testimony and declarations of the first-day

14    hearings into the record in this hearing?

15           All right, it's ordered.

16       (Declarations of Messrs. Brandon, Short, and Kurtz, and

17    testimony of Mr. Kurtz, all from first-day hearing, were hereby

18    received into evidence as Debtors' exhibits, as of this date)

19           MR. HUSNICK:  Thank you, Your Honor.

20           So, as you know, the 3.125 billion is spread across

21    the North American and international silos:  roughly 2.75

22    billion dollars of financing on the North American side, and

23    375 million dollars on the Taj side, or the international silo.

24    The North American DIP is the 1.85-billion-dollar revolving ABL

25    facility and, 450 million, a FILO term loan; that is, first-in,

```
 1            THE COURT:  All right, Mr. Eckstein?
 2            MR. ECKSTEIN:  Your Honor, good afternoon.
 3            THE COURT:  Afternoon.
 4            MR. ECKSTEIN:  My name is Kenneth Eckstein.  I'm a
 5    partner at the Kramer Levin law firm in New York, and it's my
 6    pleasure to appear before Your Honor today.  And as
 7    Ms. Speckhart stated, we are proposed counsel for the
 8    unsecured-creditors' committee.
 9            Your Honor, you've heard that the committee has, since
10    it was organized on September 26, been working quite
11    diligently.  We are -- in addition to working with
12    Ms. Speckhart's firm, we also are working with FTI as our
13    financial advisor and with Moelis as our banker.  And my hope,
14    Your Honor, is that retention applications for each of the
15    committee professionals will be on file by the end of this week
16    and hopefully Your Honor will be able to consider those in due
17    course.  And we look forward to working with the Court and with
18    all the parties in this case, to hopefully facilitate, as
19    Mr. Sussberg described, a successful long-term reorganization
20    of this company.
21            If I may, Your Honor, without taking too much of the
22    Court's time, I thought it would be useful to try to give Your
23    Honor a little bit of a perspective of the process that we
24    undertook over the last several weeks to get to what ultimately
25    is a consensual second-day hearing in this case, including both
```

1   the DIPs and all the other first-day motions in this case.

2           I hope Your Honor has had an opportunity to see the

3   pleading that we filed yesterday, which outlined for the Court

4   the resolutions we were able to achieve and some of the work

5   that went into getting to where we got to in this case over the

6   last several weeks.

7           I'm not going to try to describe all the points, but I

8   think some of the points are useful to give the Court a bit of

9   a perspective on sort of where this case stands.  I think, as

10  Your Honor has now heard on at least two occasions, this is an

11  unusual case.  This is an extremely complex company.  It has a

12  complex capital structure.  It had more than fifteen separate

13  financing facilities that were in place pre-petition.  It has

14  three separate DIP facilities.  It has complicated intercompany

15  transactions.  It has scrolling (ph.) operations involving

16  hundreds of vendors, more than 1,600 real-estate locations, and

17  thousands of employees, throughout the world.

18          Unlike most large Chapter 11 cases that we encounter

19  today, this case does not come with a pre-baked RSA or with a

20  pre-negotiated restructuring.  The company and its creditors in

21  this case are going to need to work together to develop a

22  template for a long-term restructuring and hopefully a

23  successful reorganization.  And a successful reorganization by

24  its terms is going to require meaningful cooperation between

25  the company's financial creditors, the company's vendors, the

Case 17-34665-KLP Doc 749-2 Filed 05/21/20 Entered 05/21/20 18:50:35 Desc Main
Case 20-03028-KLP Doc 3-2 Filed 05/21/20 Entered 05/21/20 16:18:51 Desc
Declaration of Scott A. Page Page 29 of 53

Document Page 53 of 585

Colloquy                                                                      29

 1    company's landlords.  They're all going to have to have

 2    confidence in the business and in the long-term restructuring.

 3              Toward that end, Your Honor, the committee had two

 4    goals leading into today's hearing.  Its first goal was a clear

 5    recognition from the outset that this company clearly needed

 6    debtor-in-possession financing.  As Mr. Sussberg has outlined

 7    at length, the key to this company's business is the fourth

 8    quarter and the holiday season.  The case was filed on the eve

 9    of the fourth quarter.

10              And the committee recognized that it was important to

11    make sure that the company had the financial wherewithal and

12    the market confidence to operate successfully.  And we believed

13    that a consensual order or consensual orders and a consensual

14    hearing would help facilitate both the necessary financing and

15    the confidence that the marketplace would have in the company's

16    viability and success going forward, and we worked hard to try

17    to achieve consensus.

18              Number two, Your Honor, because this is not a pre-

19    negotiated case, the committee felt that it was particularly

20    important for the debtor-in-possession-financing orders not to

21    be utilized in essentially two pre-ordained rights between

22    pre-petition creditors.  And therefore there were provisions

23    that Your Honor is familiar with and sees in many debtor-in-

24    possession-financing orders that we felt in this case needed a

25    careful look and, frankly, required modification.

Case 17-34665-KLP Doc 749-2 Filed 05/21/20 Entered 05/21/20 16:18:51 Desc Main
Declaration of Scott A. Rader Page 30 of 254

Colloquy 30

1       And I'm pleased to report that, after extensive
2   negotiation not only with the debtor but with each of the
3   debtor-in-possession-financing parties, the committee was able
4   to arrive at a resolution of the 506(c) waivers, the 552(b)
5   equity-of-the-case waivers, and the marshaling waiver, all
6   important creditor rights, modifications, in a manner that we
7   laid out in our pleading, that to our satisfaction, Your Honor,
8   maintains the appropriate balance between the rights of
9   pre-petition secured creditors and pre-petition unsecured
10  creditors, so that we can all move forward in this case in a
11  manner that allows all parties to have confidence in the
12  financing but at the same time to have the right to address,
13  potentially at a later stage in this case, whether or not the
14  intercreditor rights need to be addressed.  And toward that
15  end, we were satisfied that we have carved back the 506(c)
16  waiver, we've carved back the 552(b) waiver, and we've
17  preserved very important marshaling rights.
18      So, regardless of how this case ultimately comes out,
19  we believe that the unsecured creditors will be able to protect
20  themselves appropriately and the lenders will reserve all of
21  their rights to respond, and Your Honor will have the pleasure
22  of hearing these issues if we have to get there.
23      My personal sense is this is the right way to lay the
24  foundation for ultimately negotiating a plan of reorganization.
25  And in my experience, more often than not, if we can develop a

```
 1   defined in the final form of order.  And since the objection
 2   will be overruled with the order, they just want something on
 3   the record to that effect.
 4           THE COURT:  All right.  Very good.
 5           MS. MCLEMORE:  Thank you, Your Honor.
 6           THE COURT:  Thank you.
 7           MR. HUSNICK:  Well, Your Honor, you know what they
 8   say:  With friends like these, I don't know what you need
 9   enemies for.  But I --
10           THE COURT:  Well, you've made it this far.
11           MR. HUSNICK:  -- I think what I heard after all the
12   speechifying is there's no objection.  So, I think I got that
13   part right and I'd ask Your Honor to enter the orders, unless
14   you have any --
15           THE COURT:  All right.  Well, thank --
16           MR. HUSNICK:  -- further questions.
17           THE COURT:  Are there any other parties that wish to
18   be heard in connection with either of the DIP-lending
19   facilities?
20           All right, well, I'm pleased that the parties have
21   been able to work together to this point and table any
22   potential disputes in an effort to try to stabilize the debtor.
23   I do think that's important and I think that's being
24   accomplished with the orders that are being presented at this
25   point.  Appreciative of that, and I'll grant the motion in
```

Case 17-34665-KLP Doc 749-2 Filed 05/21/20 Entered 05/21/20 16:50:35 Desc Main
Case 20-03028-KLP Doc 9-3 Filed 10/26/21 Entered 10/26/21 18:15:51 Desc
Declaration of Scott A. Rader Page 44 Page 56 of 585

Colloquy                                                           44

 1  respect to both DIP facilities and overrule any objections.

 2          MR. HUSNICK:  Thank you, Your Honor.  And with that,

 3  I'll turn the podium to my partner Bob Britton.

 4          THE COURT:  All right.  Thank you.

 5          MR. HUSNICK:  My partner Emily Geier.  Sorry.

 6          THE COURT:  All right.

 7          MS. GEIER:  Good afternoon, Your Honor.

 8          THE COURT:  Good afternoon.

 9          MS. GEIER:  You'll get to see Bob Britton fairly soon.

10  I'll take you through a few of the -- few of the next motions

11  and then I'll turn the podium over.

12          The next item on the agenda is the debtors' critical-

13  vendor motion at docket number 6.  Debtors filed a revised

14  proposed final order at docket number 661.  As Your Honor may

15  recall, the debtors are requesting authority to pay 325 million

16  on a final basis to critical vendors.  The debtors have agreed

17  to a number of changes with their various stakeholders,

18  including the UCC.  Those changes are reflected in the proposed

19  final order.

20          The changes generally provide that -- provide for

21  certain reporting obligations and some limited consent rights

22  for the committee, with respect to critical vendors.  I'm happy

23  to walk Your Honor through the specific changes that are in the

24  order; otherwise -- we had one objection that was filed on the

25  docket, I should say.  That formal objection was resolved with

1    667.  This revised order reflects certain changes agreed to

2    with both the United States Trustee and with the unsecured-

3    creditors' committee.

4         In the proposed final order, the -- we make clear that

5    the debtors do not seek authority to make payments to employees

6    that exceed the statutory cap on pre-petition payments to

7    employees.  This would include any severance on a pre-petition

8    basis as well.

9         Second, the debtors do not seek authority to make any

10   payments under certain other employee-incentive plans.  We will

11   seek those pursuant to a separate motion that we'll file

12   shortly.

13        Finally, we've also capped go-forward severance at ten

14   million dollars, without consent from either the committee or

15   further order of the Court.  So, if we need additional funds,

16   we would return to this Court.

17        If Your Honor has any questions, happy to answer them;

18   otherwise we'd request entry of this order as well.

19        THE COURT:  Thank you.

20        Does any party wish to be heard in connection with the

21   wages motion?

22        Motion's granted.

23        MS. GEIER:  Thank you, Your Honor.  The next item on

24   the agenda's the motion to approve payments to holders of both

25   lien and 503(b)(9) claims.  This was originally located at

1   docket number 14.  Yesterday the debtors filed a supplemental

2   motion at docket number 652.  This accompanying motion also had

3   a motion to expedite, at docket number 653.  This motion was

4   intended to supplement the debtors' 503(b)(9) requested relief.

5   The increase is from payments of up to 100 million to payments

6   up to 200 million.

7           In the original motion, the debtors requested 100

8   million; that was in an effort to pay only an amount that they

9   viewed as absolutely necessary to avoid irreparable harm to the

10  debtors.  However, as the debtors have engaged with various

11  503(b)(9) claimants, it's become clear over the past month that

12  the debtors would need this additional funding up to 200

13  million dollars.  This will ensure that the debtors can obtain

14  vital products for the holiday season, and also it will be used

15  to facilitate settlements with vendors that would otherwise

16  perhaps be paid general-unsecured claim payments under the

17  critical-vendor order.

18          So, the proposed final order for the lien claimants

19  and 503(b)(9) is attached to the debtors' supplemental motion

20  and it also includes various changes agreed to with the

21  debtors' stakeholders, again, providing certain reporting

22  obligations and consent rights over certain thresholds.

23          So, with that, Your Honor, I'd be happy to walk you

24  through those changes as well.  Otherwise we'd request entry of

25  both the order for the lien claimants and also for the

# EXHIBIT 2-C

## Dkt. No. 1184 - Excerpts from Transcript of Dec. 5, 2017 Hearing

```
 1                IN THE UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF VIRGINIA (RICHMOND)
 2
        In Re:                          )  Case No. 17-34665-KLP
 3                                       )  Richmond, Virginia
        TOYS "R" US, INC., et al.,       )
 4                                       )
                 Debtors.                )  December 5, 2017
 5      ------------------------------- )  12:05 p.m.
                                         )
 6

 7                      TRANSCRIPT OF HEARING ON
        HEARING ON DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING
 8      THE DEBTORS' SENIOR EXECUTIVE INCENTIVE PLAN AND (B) GRANTING
                      RELATED RELIEF [DOCKET NO. 957];
 9
          DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE
10       DEBTORS' NONINSIDER-COMPENSATION PROGRAM AND (B) GRANTING
                      RELATED RELIEF [DOCKET NO. 958];
11
          DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND
12      APPROVING PROCEDURES TO REJECT OR ASSUME EXECUTORY CONTRACTS
           AND UNEXPIRED LEASES AND (II) GRANTING RELATED RELIEF
13                          [DOCKET NO. 955];

14      APPLICATION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
        UNDER 11 U.S.C. SECTION 1103, FED. R. BANKR. P. 2014, AND LOCAL
15       BANKRUPTCY RULE 2014-1, FOR ORDER AUTHORIZING RETENTION AND
         EMPLOYMENT OF WOLCOTT RIVERS GATES, P.C. AS LOCAL CO-COUNSEL
16                          [DOCKET NO. 867]

17
                   BEFORE THE HONORABLE KEITH L. PHILLIPS
18                   UNITED STATES BANKRUPTCY JUDGE

19      APPEARANCES:
        For the Debtors:                 JOSHUA A. SUSSBERG, P.C., ESQ.
20                                        KIRKLAND & ELLIS LLP
                                          601 Lexington Avenue
21                                        New York, NY 10022

22                                        ANDREW R. MCGAAN, P.C., ESQ.
                                          SCOTT LERNER, ESQ.
23                                        CHAD J. HUSNICK, P.C., ESQ.
                                          EMILY E. GEIER, ESQ.
24                                        KIRKLAND & ELLIS LLP
                                          300 North LaSalle
25                                        Chicago, IL 60654
```

Case 20-03038-KLP Doc 184-2 Filed 05/21/20 Entered 05/21/20 16:05:00 Desc Main
Case 17-34665-KLP Doc 1283 Filed 12/6/17 Entered 12/6/17 16:51:51 Desc
Declaration of Scott A. Rader Page 2 of 243
Document Page 361 of 585

2

| | | |
|---|---|---|
| 1 | For Official Committee of Unsecured Creditors: | CULLEN D. SPECKHART, ESQ. KRAMER LEVIN NAFTALIS & |
| 2 | | FRANKEL LLP 1177 6th Avenue |
| 3 | | Suite 29 New York, NY 10036 |
| 4 | | |
| 5 | For Office of the United States Trustee: | LYNN A. KOHEN, ESQ. UNITED STATES DEPARTMENT OF |
| 6 | | JUSTICE 6305 Ivy Lane |
| 7 | | Suite 600 Greenbelt, MD 20770 |
| 8 | For Ad Hoc Group of B-4 Lenders: | DOUGLAS M. FOLEY, ESQ. MCGUIREWOODS LLP |
| 9 | | 2001 K Street N.W. Suite 400 |
| 10 | | Washington, DC 20006 |
| 11 | For Tavenner & Beran, PLC: | LYNN L. TAVENNER, ESQ. TAVENNER & BERAN, PLC |
| 12 | | 20 North Eighth Street Second Floor |
| 13 | | Richmond, VA 23219 |
| 14 | For Landlords JDK Townline LLC, Overlook Townline LLC and TMT | AUGUST C. EPPS, JR., ESQ. CHRISTIAN & BARTON LLP |
| 15 | Point Plaza, Inc.: | 909 East Main Street Suite 1200 |
| 16 | | Richmond, VA 23219 |
| 17 | | ROBERT D. TEPPER, ESQ. SCHENK ANNES TEPPER CAMPBELL |
| 18 | | LTD. 311 S Wacker Drive |
| 19 | | Suite 2500 Chicago, IL 60606 |
| 20 | | |
| 21 | | |
| 22 | (cont'd. on next page) | |
| 23 | | |
| 24 | | |
| 25 | | |

3

```
 1   Also Present:                     Timothy Grace
                                       Global Chief Talent Officer
 2                                      for the Debtors

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21   Transcription Services:           eScribers, LLC
                                       7227 North 16th Street
22                                     Suite #207
                                       Phoenix, AZ 85020
23                                     (973) 406-2250

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

Case 20-03038-KLP Doc 184-2 Filed 05/21/20 Entered 05/21/20 16:05:00 Desc
Declaration of Scott A. Page 8 Frage 63 of 585

Case 5-34608-KLP Doc 263-2 Filed 12/6/21/20 Entered 12/5/21/20 16:51:51 Desc Main
Document Page 63 of 585

Colloquy 8

1    very, very uncertain time.

2        This was an initiative that was driven by the

3    compensation committee of this company's board of directors.

4    And that's a compensation committee that's comprised of five

5    members: number one, Nate Taylor, he's from KKR; number two,

6    Matt Levin from Bain Capital; number three, four, and five --

7    I'm going to cover each of these -- are independent directors.

8    The third, Richard Goodman, he's the former executive vice

9    president of global operations at PepsiCo and former executive

10    at W.R. Grace, Taco Bell, and Diamond Resorts.

11        In addition, Alan Miller, also a member of the

12    compensation committee, he has more than thirty years of

13    restructuring experience and is one of the founders of the

14    bankruptcy practice at Weil, Gotshal & Manges, sits on dozens

15    of companies' boards in distress situations.

16        And finally, Mo Meghji, who has more than twenty years

17    of experience in the restructuring industry, as well as

18    specific expertise in the retail arena. He is the founding

19    partner and a member of the practice at M-III Partners and also

20    was related to Loughlin Meghji back several years in the past.

21        Those members of the compensation committee asked

22    Kirkland & Ellis and Alvarez & Marsal, again, to put together a

23    plan in an uncertain time, to retain, motivate, and incentivize

24    employees. And that's exactly what we did, Your Honor. And as

25    the papers reflect, there was both a retention plan as well as

 1    an incentive plan.  The retention plan -- and there's been much
 2    talked about it -- was implemented prior to the Chapter 11
 3    filing; it included and contemplated payments to various
 4    parties, including the key executives, and includes a clawback
 5    feature if those executives were to voluntarily leave the
 6    company's employ, up until September 1st of 2018.

 7            In addition and at the same time, the company put in
 8    place an incentive plan.  Company historically had an incentive
 9    plan that was paid on an annual basis, but, in light of the
10    circumstances surrounding the company, the pending Chapter 11
11    filing, we moved to a quarterly incentive plan.  And as you're
12    going to hear today, Your Honor, that is quite standard in the
13    course of Chapter 11 cases and incentive plans more generally,
14    under the new regime under the Bankruptcy Code, and it was
15    designed specifically to adhere to that standard.

16            That is a quarterly incentive plan that had several
17    components and was designed with an EBITDA target, as is
18    typical in these circumstances.  And if the company was able to
19    achieve an EBITDA target, certain payments would begin to be
20    made and payments would be accelerated as the company proceeded
21    to increase that EBITDA-target level.

22            As you'll hear today, Your Honor, the company set
23    those targets back in October and, at the time, the company
24    took into account the events that were likely to happen going
25    forward up to the holiday season as well as what happened in

Colloquy                                                      25

1   the primary purpose, we'd just look at the adjustments that

2   remain.  Now they take five million dollars of bonuses that

3   were going to go to the seventeen insiders if they hit these

4   threshold targets, and they say now the only thing that has to

5   be done is a successful plan of reorganization.  There are no

6   EBITDA targets, no adjusted EBITDA targets.  There's no

7   financial target to that five million dollars.  It's only a

8   plan of reorganization.  And you will hear in the noninsider

9   motion that it's, I believe, 3.8 million.  That is now what I

10  call a guaranteed bonus.

11           In addition, as Mr. Sussberg informed this Court

12  already, the bonuses that are being paid are now subject to a

13  clawback if the employee that receives a bonus leaves before

14  September 2018.  That's retention by definition.  If the

15  employee leaves, they have to give back their bonus.  That is

16  retention by definition.  There should be no doubt that this

17  SEIP is in fact a KERP, again, driven by fear, fear of these

18  employees leaving.

19           So, Your Honor, if the bonus motion is a KERP, it must

20  be justified -- I'm sorry, it must be reviewed under 503(c)(1).

21  But if the plan is -- the Court determines that it is not a

22  KERP, that it's a KEIP, it must be justified under the facts

23  and circumstances of the case.

24           Given the poor financial health of the debtors, the

25  fact that the insiders already received millions in retention

1    and other bonuses, and the fact that the metric is undefined
2    and subject to distortion, the SEIP is not justified under the
3    facts and circumstances of this case.  Thank you.
4              THE COURT:  All right.  Thank you.
5              All right.  Mr. Sussberg (sic)
6              MR. MCGAAN:  Good afternoon, Your Honor.  Andrew
7    McGaan for the debtors.  Good to see you again.
8              Our plan today is to call -- begin with Brian
9    Cumberland, who will take the stand.  He's the national
10   managing director of Alvarez & Marsal's compensation and
11   benefits practice.  And then we'll call, also from Alvarez, Jon
12   Goulding, who's acting as a financial advisor to the debtors.
13   And then lastly, we intend, for the time being, to submit the
14   declaration of Timothy Grace, who's the debtors' executive vice
15   president, global chief talent officer.  He's here in the
16   courtroom and prepared to testify if there's any desire to
17   examine him.
18             You have -- and we will at the end of the presentation
19   of the evidence -- you have declarations on file now; there are
20   two -- I should say three, now four, from Mr. Cumberland.
21   There was one each submitted with the two motions in support of
22   the incentive programs initially.  There was a supplemental
23   from Mr. Cumberland submitted with the reply.  And then there
24   was a change in a fact that was submitted in a supplement
25   today.  And then there are declarations from Mr. Goulding and

1   A.  July 26, Alvarez & Marsal was retained.

2   Q.  All right.  And then how soon after that did you get

3   involved specifically?

4   A.  My first conversation with, I guess, the VP of HR and the

5   CEO was August 4th.

6   Q.  Of this year?

7   A.  Of this year.

8   Q.  All right.  What did -- in general, what did Toys "R" Us

9   ask you to do?

10  A.  Well, they asked me to help them understand the rules of

11  compensation and bankruptcy.  They asked me to help them

12  understand their program and also understand what type of

13  programs would be appropriate in their situation for

14  bankruptcy, and to talk to the board and the compensation

15  committee about what market is, and coming up with a program

16  and then making sure that we believed it was at market.

17  Q.  And in general, would you just describe the process he went

18  through?  What did you go about doing to satisfy their request?

19  A.  We had detailed discussions and data requests from the

20  company about their prior programs, their annual incentive

21  plan, their long-term incentive plan.  We looked at all their

22  benchmarking data that they gathered and they've utilized in

23  the past.  We then helped them come up with what would be

24  appropriate in the current situation to design the program.

25  And then we benchmarked it against other bankruptcies and we

1  benchmarked it against other nonbankruptcy companies, to make

2  sure that we believed it was market-competitive.

3  Q.  You just said that you looked at what would be appropriate

4  in the current circumstances.  I think you said something to

5  that effect.  What is it you were referring to?

6  A.  A company that's going through bankruptcy.

7  Q.  What effect, if any, did the company want the proposed

8  program to have on its managers and employees?

9  A.  Yeah; it -- it -- it wanted a program that would

10  incentivize --

11        MS. KOHEN:  Objection, Your Honor.

12  A.  -- the employees.

13        MS. KOHEN:  I don't know if he's here as an expert or

14  not, but that's hearsay.

15        MR. MCGAAN:  Your Honor, the question invites the

16  witness to describe what he was told to provide, whether true

17  or false, to guide the work he did.  So it's offered for that

18  purpose.

19        THE COURT:  Only offered for the purpose of what his

20  instructions were?  I'll overrule the objection.

21        MR. MCGAAN:  Thank you, Your Honor.

22  Q.  So let me put the question again, Mr. Cumberland.  What

23  effect, if any, did the company want the proposed program --

24  what was your understanding of what the company wanted the

25  proposed program to have with regard to an effect on its senior

1 | calling the compensation committee, correct?

2 | A.  Well, we negotiated -- prior to filing, we followed the

3 | ordinary course of putting in a bonus program.  The ordinary

4 | course is you put it in place based on the company.  The

5 | company comes up with what they think is appropriate, and then

6 | we filed it in the court.  And then we negotiated with the

7 | other stakeholders.

8 | Q.  Did any of the insiders who are beneficiaries of this bonus

9 | program, did they play a role in formulating this SEIP?

10 | A.  Well, yes, I mean, they're the senior management.

11 | Q.  Yes, so they did.  So before the proposed SEIP was filed

12 | with the court, the CEO and the CFO, they played a role in

13 | formulating it, correct?

14 | A.  They did.  It's standard practice that any company putting

15 | in a bonus program, their insiders are going to have some types

16 | of insight into what -- what is appropriate and what type of

17 | performance metrics are right.  And then we stepped in and

18 | looked at it saying is it appropriate in the marketplace as far

19 | as design and amounts.

20 | Q.  Did you interview all seventeen insiders or --

21 | A.  I did not.

22 | Q.  So in formulating the SEIP, what insiders did you discuss

23 | with prior to proposing the SEIP?

24 | A.  We talked with the CEO.  We talked with the VP of HR, the

25 | head VP.  At that time, it wasn't widely known in the company

 1          And you also heard in the SEIP declaration that the

 2     award opportunities reflect a reasonable differentiation

 3     between employees' contribution and the restructuring effort.

 4     And this reflects that there is some differential treatment

 5     between employee levels, including the top seventeen that we

 6     talk about in the insider-comp program, and that filters down

 7     into the noninsider program as well.  At bottom, Your Honor

 8     though, what I think is the key takeaway on both of these

 9     factors is that no economic stakeholder is standing here today

10     objecting to the compensation programs or arguing that the

11     costs and scope are inappropriate.

12          You heard, Your Honor, on the next factor whether the

13     program as proposed is consistent with industry standards.  You

14     heard from Mr. Cumberland.  He put up those two charts that I

15     thought were incredibly helpful, where he laid out both within

16     the retail industry, and then he did comparables across

17     similarly sized companies based on revenue and assets.  And in

18     both circumstances, Your Honor, Mr. Cumberland testified that

19     these programs are right down the fairway in terms of what's

20     out there in the industry standards.  And there was absolutely

21     no contrary testimony on that point.  Ultimately, Your Honor,

22     there's now way to conclude, other than that these programs are

23     reasonable.

24          As far as substantial due diligence, Your Honor, Mr.

25     Cumberland testified as to his process in working with the

 1  debtors' other advisors, both his colleague Mr. Goulding and

 2  his team, as well as the debtors' -- the Kirkland & Ellis

 3  folks, as well as the compensation -- I'm sorry, the

 4  compensation committee of the board.  And you heard from Mr.

 5  Sussberg at the very outset, and it's in the Cumberland

 6  declaration:  that board is an independent board.  That is

 7  three members are completely independent.  They have no tie to

 8  the company other than their role on the board.

 9          It was that committee that spent significant amount of

10  time with the debtors in reviewing these programs and ensuring

11  that they are incentivizing in nature.  And ultimately, the

12  program that we put forward to you was the result of that

13  substantial diligence.

14          But that diligence didn't stop then.  It actually

15  continued.  Even leading up to the filing of the motion, we

16  began to engage with creditors, right around the time of the

17  second-day hearing.  We began to engage with Mr. Eckstein and

18  his clients, that's the official committee of unsecured

19  creditors; with Mr. Hermann from the Paul Weiss group and his

20  clients, that's the ad hoc group of Taj noteholders, which now

21  represents over ninety percent of the Taj noteholders; with Mr.

22  Feltman and Mr. Kleinhaus and their clients who represent more

23  than fifty percent of the secured creditors on the Delaware

24  side.  They conducted their own substantial diligence and

25  ultimately concluded, following some modifications that were

 1   agreed to with the debtors, that this program is incentivizing

 2   in nature, is reasonable, but they conducted substantial due

 3   diligence.

 4          Factor six, Your Honor, did the debtors receive

 5   independent counsel.  Again here, running similar to factor

 6   number five, the debtors consulted not just with independent

 7   advisors and Mr. Cumberland and Kirkland & Ellis as the

 8   restructuring counsel, but they also employed a rigorous review

 9   process through the compensation committee which, as I said,

10   three out of five of which have no other connection to the

11   company other than their service on the boards of directors.

12   You saw here the testimony from Mr. Cumberland about his role

13   in the development of this plan and ultimately how he feels and

14   what his connections are.

15          Before I turn to the conclusion, Your Honor, I just

16   felt it's necessary to address a couple of the points that the

17   U.S. Trustee raised in her opening.  The U.S. Trustee focused

18   on several payments that were made in March of 2017 following,

19   unfortunate layoffs in January of 2017.  And while the later

20   testimony from Mr. Cumberland explained that those payments

21   made in March 2017 were really associated with a bonus program

22   from 2016, that is the 8.51 percent of target that I mentioned,

23   it's really not relevant that there were bonuses paid in March

24   of 2017 for last year's performance.  And it's really not

25   relevant that there were layoffs.

 1  ultimately, if the parties don't agree with the final
 2  calculation, we would come back to Your Honor.  But the answer
 3  to your question is yes, we would be happy to drop that
 4  definition.  And I have copies of it here -- not in the order
 5  today, but I do have copies of that definition with us, and it
 6  clearly sets out everything you heard from Mr. Goulding.
 7          THE COURT:  That seems to be one of the primary
 8  concerns of the U.S. Trustee's office, is that it's not
 9  defined.  And I'd understood that there was going to be a
10  definition established by today.  So is there any harm in
11  including that definition?
12          MR. HUSNICK:  There's no harm whatsoever, Your Honor,
13  in including it.  My only caveat is to say I'm not sure it
14  would resolve the U.S. Trustee's concerns --
15          THE COURT:  Well, I expect it won't.
16          MR. HUSNICK:  -- but I'm happy to do it.
17          THE COURT:  But it will certainly --
18          MR. HUSNICK:  Yeah, I'm happy to do it.
19          THE COURT:  All right, thank you.
20          MR. HUSNICK:  Thank you.
21          MR. ECKSTEIN:  Your Honor, good afternoon.  Kenneth
22  Eckstein of Kramer Levin, counsel for the unsecured creditors'
23  committee.  If it would please Your Honor, I thought it made
24  sense for me to speak on behalf of the committee before the
25  U.S. Trustee makes her argument in opposition.

1          Your Honor, I thought it would be useful to hopefully

2   succinctly describe for Your Honor the process that the

3   committee went through and some of the key issues that the

4   committee focused on.  We did file a statement which tried to

5   lay it out, but I thought in light of the arguments and the

6   testimony today, we might be helpful to summarize that.

7          Before doing so, Your Honor, I do want to note that I

8   fully appreciate the points and the concerns raised by Ms.

9   Kohen, and I will say that the committee initially raised many

10  of the same concerns and other concerns, and while we

11  ultimately believe that the modified plan as it's been

12  presented today should be approved, we don't take lightly the

13  issues and concerns that have been raised by the U.S. Trustee.

14  And we think that they're all raised appropriately in good

15  faith.

16         Your Honor, I think it's important to appreciate that

17  this was a motion and a proposal that the committee has taken

18  extremely seriously.  With me in court today is Mr. Sam Star

19  who's a senior managing director at FTI, and Mr. Star, together

20  with my office, really carried the laboring oar in doing

21  extensive diligence into several questions that I'll describe.

22  And that went a long way to giving us the comfort that

23  ultimately, we could negotiate modifications that will allow

24  the committee to support ultimately the key plan in this case.

25         I think as Your Honor already knows, this is an

1  unusual case.  And I believe every case has to be looked at on

2  its own merits.  The reality is you don't see a lot of these

3  issues raised in many of the Chapter 11 reorganizations that we

4  work on today because most of them, for better or for worse,

5  are pre-negotiated plans where the restructuring has already

6  been put in place.  And the main purpose of the Chapter 11 case

7  is to effectively do no harm as we get from the filing date to

8  what usually is a very quick confirmation.

9          And in many respects, this is a case that really

10  harkens back to some of the key issues that we looked at ten,

11  fifteen, twenty years ago.  And in fact, my office -- my firm

12  and FTI represented the creditors' committee in connection with

13  the Dana Chapter 11 case and the ResCap Chapter 11 case and the

14  Patriot Coal Chapter 11 case, which were the three cases that I

15  think the U.S. Trustee cited to most prominently in her

16  objection as cases that define the law as it relates to KEIP.

17          So I've lived through a lot of these cases, and each

18  of them really are very different.  The reality is this is a

19  case without a business plan.  This is a case that is in an

20  industry that is undergoing macro -- almost seismic

21  transformation.  And how this company ultimately emerges from

22  Chapter 11 is still to be defined and may well be a bellwether

23  or will predetermine how retail in this country -- maybe in the

24  world ultimately is structured.

25          It's to be determined, and it's very, very uncertain.

Colloquy 162

1    And we're looking -- the committee is looking at this case

2    really with that lens, where we're not taking this case for

3    granted.  And I'll get to that point when I talk about the

4    element of the KEIP, which we think is critical, which is that

5    a portion of the KEIP be tied to achieving a confirmable and

6    effective plan of reorganization.  The order is very clear; it

7    says plan of reorganization.

8        There were four issues, Your Honor, that gave us

9    concern in the big picture.  Number one:  were the EBITDA

10   targets appropriate?  We asked ourselves were they considered

11   layups; were they easy to achieve.  Or were they really levels

12   that were going to take work to try to reach?

13       And we were concerned initially, Your Honor, because

14   as the U.S. Trustee correctly points out, the EBITDA targets

15   were dramatically lower than the targets for 2016 and were in

16   fact lower than the DIP -- than the targets in the DIP

17   projections that had just been presented to the Court for

18   approval weeks before the motion was filed.  And it initially

19   raised a red flag with us that somehow these were lowballs.  So

20   that was the number-one concern:  were these too easy to

21   achieve or where they, in fact, incentives?

22       Second question was were the levels of compensation

23   reasonable for the company and the industry?  There's no

24   question, and we said it in our pleading:  the amount of bonus

25   compensation in this case is high.  And as it was initially

1  the way the DIP was written, we ultimately concluded that for

2  this company, it was important to have a financing.  Similarly

3  for this company, we believe that it is important to have a

4  reasonable KEIP in place.  And we believe we've achieved that.

5        Now, we have negotiated some very specific

6  adjustments, which I laid out in our pleading.  I'll just

7  highlight a few of them.  In terms of the EBITDA targets, that

8  was the first thing.  FTI did extensive diligence, and as the

9  testimony from Mr. Goulding I think clearly stated, we were

10  satisfied, after a lot of work, that these EBITDA targets are

11  not layups.  In fact, they're going to be very difficult to

12  achieve, as Your Honor has heard.  Even the target is going to

13  be aspirational.

14        I think we've heard that the stretch is -- for all

15  practical purposes, nobody has any expectation that the stretch

16  numbers are going to be hit.  And Your Honor, from a business

17  standpoint, the committee is rooting for this company to hit

18  the targets and to trigger these bonus payments, because that

19  will signal that we're on the right track.

20        Frankly, we'll be disappointed if no bonus payments

21  are made, and we are hoping that the senior executives and all

22  of the employees who are a party to this KEIP are going to work

23  as hard as they possibly can to make sure that the sales are as

24  high as possible and the expenses are as low as possible.  But

25  we're satisfied that the key requirement of a KEIP is that

1  these numbers are aspirational and are certainly not easily

2  achieved.

3          Number two, as to the amounts of the compensation, as

4  I said, we thought originally they were high.  We had a lot of

5  negotiation over amounts.  We ultimately were able to achieve

6  some modifications, and those modifications were essentially

7  for the senior executives, the seventeen employees.  We dropped

8  the total amount of payments that would be payable on the

9  target from 16.1 to 14.1 million dollars.  That was a two-

10  million-dollar reduction.  And in addition, we were able to

11  negotiate that 5 million dollars of the 14.1 would only be

12  payable if the company consummates a Chapter 11 plan of

13  reorganization.

14          So essentially, from the committee's perspective, of

15  the eight million dollars that was paid to the senior

16  executives pre-petition, seven million dollars was essentially

17  addressed through a reduction of the payment amounts by two

18  million and a deferral of the five million dollars to the back

19  of the case.  Now, let me speak briefly, Your Honor, as to --

20  and we thought that was important because we thought the

21  retention payments were unusual, and we thought that this was a

22  more pragmatic and constructive way to address those retention

23  payments rather than litigating about them.

24          Let me speak for a moment, Your Honor, about how the

25  committee has looked at the five million dollars that is only

1  payable in the event a plan of reorganization is confirmed.  In

2  this case, Your Honor, we believe that this is very much the

3  key incentive in this case.  As I think Your Honor knows, and

4  as we all know in this business, the retail industry is

5  fragile, and there is a long list of failed retail cases, of

6  retail cases that, despite everybody's best efforts and wishes,

7  did not reorganize.

8          My constituency, which includes the largest vendors in

9  this case, are at present advancing hundreds of millions of

10  dollars of new credit on an administrative basis to this

11  company and have a vested stake in making sure that this

12  company confirms a Chapter 11 plan.  It is most important to

13  the committee that management be focused singularly on working

14  to not only sell toys, but at the same time, put this company

15  in a place where it can take this company to a Chapter 11 plan

16  of reorganization.  That's not just the job of the

17  professionals, because at the end of the day, the business

18  plan, which as you heard from Mr. Goulding has not yet been

19  established, needs to be created first and foremost by

20  management so that it can then be reviewed by the committee and

21  the other lenders.

22          They need to deal with a massive lease structure.

23  There are thousands and thousands of stores, and coming up with

24  the right footprint for this company, and then figuring out how

25  do you address store closures, how do you come up with the

1   right size of stores -- should it be a 40,000-square-foot

2   store, a 20,000-square-foot store; should there be 5,000 or

3   4,000 or 3,000 stores -- that is a massive undertaking, and

4   it's going to be something that the company is going to be

5   doing in the next six to nine months.  That is a major task.

6   It could require a full-time job separate and apart from

7   running the largest toy store in the world.

8           The company has to right-size a balance sheet with

9   over five billion dollars of debt.  That is a massive

10  undertaking where you don't have any commitments of new

11  capital.  They're going to have to convince lenders to convert

12  to equity.  They're going to have to recapture the support of

13  vendors to provide new credit to a reorganized company.

14  They're going to probably have to raise new capital.  They're

15  going to have to consider how to restructure the corporate

16  structure and the balance sheet of this company, all in a short

17  period of time.

18          This is not a layup.  This is a big, big task, and we,

19  the committee, wants management incentivized to be rowing

20  exactly the way we want to row, which is let's get this case to

21  a successful reorganization.  So we viewed the five million

22  dollars as the most important incentive of all, which is in

23  addition to doing your day job, doing all the things -- and

24  it's no pleasure dealing with five different creditor

25  constituencies, all of whom want information yesterday.  And I

```
 1    can tell you firsthand we want everything yesterday, and the
 2    clients are unhappy when it takes too long, but it's a big, big
 3    task to do all this.  So we felt that was very, very important.
 4           We got a variety of other modifications that we felt
 5    aligned the interests of the company with the creditors.  And
 6    on balance, Your Honor, there's no perfection in these matters.
 7    And I think as Mr. Husnick said -- and I believe Judge Lifland
 8    said this in the Dana case -- every KEIP has some element of
 9    retention to it.  There's no question that we all want the
10    employees to stay with the company and work through the Chapter
11    11 case.  That's obvious, so it's not does it have some element
12    of retention, but is it properly structured so that it's
13    primarily an incentive coupled with retention.
14           We think we've accomplished that.  We think the
15    modifications that the committee and the other lenders were
16    able to negotiate were quite favorable.  And on balance, it
17    allowed us to say that we support this and we are hopeful that
18    we can move beyond this important step and then get to the real
19    challenging stage of reorganizing the case.  Thank you, Your
20    Honor.
21           THE COURT:  Thank you, Mr. Eckstein.
22           MS. KOHEN:  Your Honor, I'm so sorry.  Could we take a
23    two-minute break before -- I just have to use the ladies room?
24    I'm sorry.
25           THE COURT:  I'm fine with that.
```

1    total comparables, and the debtors want you to say well, that's

2    not important to these debtors and they'll stop working if they

3    don't get their bonus money.  It just doesn't make sense that

4    they would stop working when they have all these perks that

5    they obviously enjoy.

6            THE COURT:  Well, the numbers in the statement of

7    financial affairs are striking; I agree with that.  But

8    I -- how is that really relevant, I mean, going forward in

9    terms of providing an incentive?

10           I mean, the evidence, the only evidence I've heard was

11   that that wasn't taken into consideration in connection with

12   the comparables.

13           MS. KOHEN:  It wasn't, and also we put in the monthly

14   operating reports that show -- and Mr. Cumberland testified --

15   they're still getting all those perks.  And in that one month

16   of the operating report it shows payment to insiders, and all

17   those perks that I showed you beforehand, they're still being

18   paid post-petition.

19           THE COURT:  Which apparently is consistent with the

20   industry.

21           MS. KOHEN:  Except for Mr. Cumberland couldn't tell

22   you -- he said it's consistent with the industry, but he

23   doesn't know facts.

24           I said to him which one of these companies pays this?

25   He says I don't know.  I don't know.

Case 17-34665-KLP Doc 1034-2 Filed 05/21/20 Entered 05/21/20 16:05:00 Desc Main
Case 20-03038-KLP Doc 3-2 Filed 12/6/20 Entered 12/6/20 16:58:51 Desc
Declaration of Scott A. Page 18 Page 83 of 585
Document Page 18 of 243

Colloquy 188

1          Again, they can make statements all they want.
2    There's no facts to back up any of the statements that Mr.
3    Cumberland told you was industry standard.  And I would say
4    well, what -- do you know for sure which one of these companies
5    pays this or that, and the answer was no, I just assume they
6    do.  I mean, that's not sufficient evidence.

7          I mean, I'm looking for facts.  I question facts, and
8    I all I got was assumption, and I just think that's enough to
9    support a market analysis.

10         The fifth Dana factor is, "What were the due diligence
11   efforts of the debtor in investigating the need for a plan."
12   This is interesting.  There was no evidence that they
13   investigated the need for a plan.

14         If you look, when Mr. Sussberg stood up and he put
15   that PDF up in front of you, the very first thing told you that
16   Alvarez & Marsal were hired to design a plan.

17         When they testified that's what they said, we were to
18   design a plan.  Not investigate whether a plan was needed.  We
19   were told a plan was needed.  We just designed it.  So they
20   don't meet the fifth Dana factor either.

21         And did the debtor -- the last Dana factor is, "Did
22   the debtor receive independent counsel in performing due
23   diligence and in creating and authorizing the incentive
24   compensation?"

25         Again, and I think this relates to number five,

 1  Alvarez & Marsal did not do an investigation and determine if

 2  this was needed.  They just implemented or designed a plan

 3  because that's what they were told to do.

 4       So I don't believe that there was independent counsel

 5  in performing due diligence.  I think they paid, and are

 6  heavily paying Alvarez & Marsal to do exactly what they did;

 7  come up with a plan and then sit here and justify it.

 8       Again, Your Honor, these Dana factors are factors to

 9  consider in the overarching question is this bonus plan, is it

10  fair and reasonable under the circumstances of this case?

11       And so when I gave this Court the backdrop of the

12  employees being laid off in January, and the net losses that

13  I -- I did spend some time with, Mr. Husnick tells you

14  that's -- it was -- it doesn't matter.  He said it was

15  irrelevant. But it is relevant because the Court has to

16  determine under this case, with the facts presented here, is it

17  fair and reasonable.

18       And so that's why I say is it fair and reasonable to

19  pay these insiders another eight million dollars when they laid

20  off employees in January?  Is it fair and reasonable to pay

21  these insiders another -- I'm sorry; I said eight million, that

22  was wrong because it's nine million is under the SEIP -- when

23  they received eight million as retention bonuses five days

24  before the bankruptcy filing?  And is that fair and reasonable?

25       So the timing here, giving the losses of the company,

```
 1  given the amount of money that they received, giving the annual
 2  bonuses that were paid on March 17th, given all the perks that
 3  these officers receive, the Court needs to look at all that and
 4  weigh that and say look at everything these officers receive.
 5  Is it still fair and reasonable to give them even more money
 6  when there's no plan on the horizon?  There's not even
 7  discussions.
 8         The first I heard was from Goulding -- Mr. Goulding
 9  who said oh, yeah, we got like basis of a plan but we haven't
10  discussed it with anyone.  And of course, they didn't tell us
11  anything about that either.  So we have no clue about whether
12  the creditors receive any money in this case.
13         And is it fair and reasonable to pay these officers
14  even more money when we just don't know?  I also -- one of the
15  reasons I wanted to also bring up some of the historical losses
16  relates to what's happening now.
17         I think there's real fear here that the debtor is not
18  going to survive after this Christmas season.  And I don't want
19  to be overly dramatic here, but what we heard from Goulding and
20  Cumberland is that when you compare the -- what's going on with
21  the stores now to last year, the debtors' way below sales from
22  last year at this time.  And if an adjusted EBITDA margin is
23  forty percent lower than last year, and the debtor is going to
24  have a lot of difficulty meeting it, that's what they're
25  saying, very challenging even though there's no evidence of it,
```

1   even if you just want to believe that to be true, that's a
2   scary thought.
3            EBITDA targets are forty percent lower.  Sales are
4   dramatically lower.  And they want to say to this Court, but we
5   still want millions in bonuses.
6            It's so early in this case, and we have no idea what's
7   going to happen after this Christmas season, but forty percent
8   of their revenue is now, and they're telling you things aren't
9   looking so good.  And is that fair and reasonable to approve an
10  incentive program, if that's what it is, of millions of dollars
11  based on that backdrop?  And I argue that it is not.
12           I'll quickly turn, just very quickly, to the insider
13  motion.  United States Trustee does not dispute that the 3,725
14  employees that we've really heard very little about but they're
15  probably not insiders.  The only reason we make the arguments
16  or we are arguing that the eighty that have titles, that
17  they're included, I believe, in the Grace declaration are
18  insiders is because of our position that the program is
19  retentive.  And if it's retentive then for these 80 employees,
20  they have to reviewed under the KERP, and the remaining 3,725,
21  that's the -- that's the (c)(3) standard.  And based on what we
22  know are these eighty people, are they insiders?  So here's the
23  only thing I'm going to say to the Court about it.  The debtors
24  included them as insiders in response to question 28 on the
25  SOFA.

```
 1              MR. HUSNICK:  Okay.
 2              THE COURT:  All right.  Well, I've heard everyone's
 3    argument.
 4              Ms. Kohen, I understand the U.S. Trustee's job is to
 5    be the watchdog and you certainly adequately -- very well
 6    performed that responsibility, and I -- but I believe that the
 7    preponderance of the evidence which is, basically, the evidence
 8    that's been submitted by the debtor -- the U.S. Trustee's
 9    office did not submit any of its own expert testimony --
10    establishes that he primary purpose of this plan is -- is
11    incentive.  It's not retention.  And as the Alpha case makes
12    clear, the primary purpose is to incentivize the employees and
13    the insiders, then it's to be analyzed under 503(c)(3) and not
14    under 503(c)(1).
15              I also find that it's in this case particularly
16    striking that the incentive-compensation program is supported
17    by the creditor constituencies.  I haven't seen any objections
18    other than the U.S. Trustee's objection and on the contrary, I
19    see the committee and any creditors who've addressed the Court
20    are asking the Court to approve this plan.  And I think that's
21    telling.
22              And also believe that the concerns that Mr. Eckstein
23    indicated that he had and that other creditors had when this
24    plan was first proposed, and which the Court had with the
25    initial plan have been adequately vetted and among the
```

 1    divisions from the initial plan, those include decreased payout

 2    levels, creditor review of the target goals, modifications to

 3    the thresholds, focus on achieving confirmation and

 4    effectiveness of a plan, fallback provisions.

 5            So I believe that in this case, the proposed plan is

 6    not only within the sound business judgment of the debtors, but

 7    it's fair and reasonable under the circumstances, and I think

 8    that the preponderance of the evidence supports that.

 9            For those reasons, I'm going to overrule the objection

10    and approve the plan as modified -- or the program.  And if

11    you'll submit the order with the additional language that was

12    going to address the definition of global adjusted EBITDA, then

13    I'll enter that order.

14            MR. HUSNICK:  Will do, Your Honor.  Thank you.

15            THE COURT:  Thank you.  So what's next on the agenda?

16            MR. HUSNICK:  Your Honor, I believe there are two

17    other items on the agenda.  I'll turn the podium over to my

18    colleague, Ms. Geier.

19            MS. GEIER:  Good afternoon, Your Honor.  I'll keep

20    this brief; I know it's the end of the day.  This one will not

21    be nary as contested.

22            Emily Geier from Kirkland & Ellis on behalf of the

23    debtors.  I'm appearing before you today to present the

24    contract assumption and rejection procedures motion.  That's

25    agenda item 3, docket number 955.

# EXHIBIT 2-D

Dkt. No. 1606 - Excerpts from Transcript
of Jan. 23, 2018 Hearing

| | |
|---|---|
| 1 | IN THE UNITED STATES BANKRUPTCY COURT |
| | EASTERN DISTRICT OF VIRGINIA (RICHMOND) |
| 2 | |
| | In Re:                              )  Case No. 17-34665-KLP |
| 3 |                                     )  Richmond, Virginia |
| | TOYS "R" US, INC., et al.,          ) |
| 4 |                                     ) |
| |         Debtors.                    )  January 23, 2018 |
| 5 |                                     )  11:12 a.m. |
| | ------------------------------ ) |
| 6 | |
| | |
| 7 |                    TRANSCRIPT OF HEARING ON |
| |   "DEBTORS' SEAL MOTION" DEBTORS' MOTION FOR ENTRY OF AN ORDER |
| 8 |     AUTHORIZING THE DEBTORS TO FILE CERTAIN CONFIDENTIAL |
| |   INFORMATION IN THE FACT STIPULATION UNDER SEAL [DOCKET NO. |
| 9 |                            1500] |
| | |
| 10 | "DEBTORS' MOTION TO EXPEDITE HEARING" DEBTORS' MOTION FOR (I) |
| |   EXPEDITED HEARING ON DEBTORS' MOTION FOR ENTRY OF AN ORDER TO |
| 11 | FILE CERTAIN CONFIDENTIAL INFORMATION IN THE FACT STIPULATION |
| |   UNDER SEAL AND (II) GRANTING RELATED RELIEF [DOCKET NO. 1501] |
| 12 | |
| | "COMMITTEE'S SEAL MOTION" MOTION OF THE OFFICIAL COMMITTEE OF |
| 13 |   UNSECURED CREDITORS FOR ENTRY OF AN ORDER AUTHORIZING THE |
| |   COMMITTEE TO REDACT AND FILE CERTAIN CONFIDENTIAL INFORMATION |
| 14 |               UNDER SEAL [DOCKET NO. 1510] |
| | |
| 15 | "COMMITTEE'S MOTION TO EXPEDITE" MOTION TO EXPEDITE HEARING ON |
| |   MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR |
| 16 | ENTRY OF AN ORDER AUTHORIZING THE COMMITTEE TO REDACT AND FILE |
| |   CERTAIN CONFIDENTIAL INFORMATION UNDER SEAL [DOCKET NO. 1511] |
| 17 | |
| | "DEBTORS' MOTION TO ASSUME THE SUBSIDY AGREEMENT" DEBTORS' |
| 18 |   MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING GEOFFREY LLC TO |
| | ASSUME THE SUBSIDY AGREEMENT AND (II) GRANTING RELATED RELIEF |
| 19 |                   [DOCKET NO. 1262] |
| | |
| 20 |    "DEBTORS' MOTION TO ASSUME THE INTERCOMPANY IP LICENSE |
| |     AGREEMENTS" DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) |
| 21 | AUTHORIZING GEOFFREY LLC TO ASSUME THE INTERCOMPANY IP LICENSE |
| |   AGREEMENTS, AND (II) GRANTING RELATED RELIEF [DOCKET NO. 1263] |
| 22 | |
| | "DEBTORS' SEAL MOTION" DEBTORS' MOTION FOR ENTRY OF AN ORDER |
| 23 |      AUTHORIZING THE DEBTORS TO FILE CERTAIN CONFIDENTIAL |
| | INFORMATION AND EXHIBITS IN THE ASSUMPTION MOTIONS UNDER SEAL |
| 24 |                   [DOCKET NO. 1264] |
| | |
| 25 | |

Case 20-03038-KLP Doc 2608-2 Filed 05/21/20 Entered 05/21/20 16:29:35 Desc Main
Declaration of Scott A. Rader Page 2 of 205

2

1

2          "DEBTORS' MOTION TO PROVIDE CONSIDERATION TO LANDLORDS IN
       EXCHANGE FOR EXTENDING THE 365(D)(4) DEADLINE" DEBTORS' MOTION
3        FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO PROVIDE
           CONSIDERATION TO LANDLORDS IN EXCHANGE FOR EXTENDING THE
           365(D)(4) DEADLINE, (II) APPROVING THE EXTENSION LETTER, AND
4               (III) GRANTING RELATED RELIEF [DOCKET NO. 1450]

5         "DUCERA RETENTION" APPLICATION OF DEBTOR TOYS "R" US, INC. FOR
         ENTRY OF AN ORDER (A) AUTHORIZING THE RETENTION AND EMPLOYMENT
6        OF DUCERA PARTNERS LLC AS FINANCIAL ADVISOR TO DEBTOR TOYS "R"
            US, INC., EFFECTIVE NUNC PRO TUNC TO NOVEMBER 1, 2017, (B)
7         MODIFYING CERTAIN TIMEKEEPING REQUIREMENTS, AND (C) GRANTING
                        RELATED RELIEF [DOCKET NO. 1410]
8
          "CENTERVIEW RETENTION" APPLICATION OF DEBTORS TRU TAJ LLC AND
9          TRU TAJ FINANCE, INC., FOR ENTRY OF AN ORDER AUTHORIZING THE
                    RETENTION AND EMPLOYMENT OF CENTERVIEW PARTNERS LLC AS
10      FINANCIAL ADVISOR FOR DEBTORS AND DEBTORS-IN-POSSESSION TRU TAJ
            LLC AND TRU TAJ FINANCE, INC. EFFECTIVE NUNC PRO TUNC TO
11                       NOVEMBER 1, 2017 [DOCKET NO. 1413]

12        "ZOLFO COOPER RETENTION" APPLICATION OF DEBTOR TOYS "R" US –
            DELAWARE, INC. FOR ENTRY OF AN ORDER (A) AUTHORIZING THE
13        EMPLOYMENT AND RETENTION OF ZOLFO COOPER, LLC AS FINANCIAL
            ADVISOR TO TOYS "R" US – DELAWARE, INC. NUNC PRO TUNC TO
14       DECEMBER 26, 2017 AND (B) GRANTING RELATED RELIEF [DOCKET NO.
                                    1444]
15
          "MALFITANO RETENTION" DEBTORS' APPLICATION FOR ENTRY OF AN
16      ORDER, PURSUANT TO SECTIONS 327(A) AND 328(A) OF THE BANKRUPTCY
         CODE, (I) AUTHORIZING EMPLOYMENT AND RETENTION OF MALFITANO
17        ADVISORS, LLC AS THE DEBTORS' ASSET DISPOSITION ADVISOR AND
            CONSULTANT, NUNC PRO TUNC TO DECEMBER 11, 2017 AND (II)
18                  GRANTING RELATED RELIEF [DOCKET NO. 1412]

19          "PWC RETENTION" DEBTORS' APPLICATION FOR ENTRY OF AN ORDER
                        AUTHORIZING THE EMPLOYMENT AND RETENTION OF
20            PRICEWATERHOUSECOOPERS LLP AS TAX AND ACCOUNTING ADVISORY
          CONSULTANTS TO THE DEBTORS NUNC PRO TUNC TO OCTOBER 26, 2017
21                             [DOCKET NO. 1446]

22         "KEEN RETENTION" DEBTORS' APPLICATION FOR ENTRY OF AN ORDER
        AUTHORIZING THE RETENTION AND EMPLOYMENT OF KEEN SUMMIT CAPITAL
23       PARTNERS LLC AS REAL ESTATE ADVISOR NUNC PRO TUNC TO DECEMBER
                           5, 2017 [DOCKET NO. 1407]
24

25

Case 20-03038-KLP  Doc 3-2  Filed 05/21/20  Entered 05/21/20 16:18:51  Desc Main
Declaration of Scott A. Rader  Page 92 of 585

3

 1

 2          "BERWIN LEIGHTON RETENTION" APPLICATION OF THE OFFICIAL
         COMMITTEE OF UNSECURED CREDITORS, PURSUANT TO SECTIONS 328 AND
 3          1103 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY
           PROCEDURE 2014 FOR AN ORDER APPROVING THE RETENTION AND
 4        EMPLOYMENT OF BERWIN LEIGHTON PAISNER LLP AS SPECIAL FOREIGN
          COUNSEL TO THE COMMITTEE NUNC PRO TUNC TO DECEMBER 4, 2017
 5                           [DOCKET NO. 1408]

 6        "BENNETT JONES RETENTION" APPLICATION OF THE OFFICIAL COMMITTEE
            OF UNSECURED CREDITORS, PURSUANT TO SECTIONS 328 AND 1103 OF
 7          THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE
           2014 FOR AN ORDER APPROVING THE RETENTION AND EMPLOYMENT OF
 8        BENNETT JONES LLP AS CANADIAN COUNSEL TO THE COMMITTEE NUNC PRO
                   TUNC TO JANUARY 3, 2018 [DOCKET NO. 1452]

 9                  BEFORE THE HONORABLE KEITH L. PHILLIPS
                      UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:
     For the Debtors:              CHAD J. HUSNICK, P.C., ESQ.
12                                 ROBERT A. BRITTON, ESQ.
                                   EMILY E. GEIER, ESQ.
13                                 KIRKLAND & ELLIS LLP
                                   300 North LaSalle
14                                 Chicago, IL 60654

15   For the Debtors:              JOSHUA A. SUSSBERG, P.C., ESQ.
                                   KIRKLAND & ELLIS LLP
16                                 601 Lexington Avenue
                                   New York, NY 10022
17
     For Office of the United      LYNN A. KOHEN, ESQ.
18   States Trustee:               UNITED STATES DEPARTMENT OF
                                   JUSTICE
19                                 6305 Ivy Lane
                                   Suite 600
20                                 Greenbelt, MD 20770

21   For Independent directors of  STEVEN J. REISMAN, ESQ.
     Toys "R" Us - Delaware, Inc.: CURTIS, MALLET-PREVOST, COLT &
22                                 MOSLE LLP
                                   101 Park Avenue
23                                 New York, NY 10178

24

25

4

```
 1
 2    For Independent directors of        THOMAS B. WALPER, ESQ.
      Toys "R" Us, Inc.:                  MUNGER, TOLLES & OLSON LLP
 3                                         350 South Grand Avenue
                                           50th Floor
 4                                         Los Angeles, CA 90071

 5    For Official Creditors'             KENNETH H. ECKSTEIN, ESQ.
      Committee:                          RACHAEL L. RINGER, ESQ.
 6                                         KRAMER LEVIN NAFTALIS &
                                           FRANKEL LLP
 7                                         1177 Avenue of the Americas
                                           New York, NY 10036

 8    For Toys "R" Us - Delaware,         DONALD C. SCHULTZ
      Inc.                                 CRENSHAW, WARE & MARTIN,
 9                                         P.L.C.
                                           150 West Main Street
10                                         Suite 1500
                                           Norfolk, VA 23510
11
      For Toys "R" Us, Inc.               RONALD A. PAGE, JR.
12                                         KEVIN S. ALLRED
                                           RONALD PAGE, PLC
13                                         919 East Main Street
                                           Suite 1000
14                                         Richmond, VA 23219

15    For ad hoc group of Taj            CHRISTOPHER A. JONES
      noteholders                         WHITEFORD, TAYLOR & PRESTON
16                                         3190 Fairview Park Drive
                                           Suite 800
17                                         Falls Church, VA 22042

18    For ad hoc group of Taj            BRIAN S. HERMANN
      noteholders                         PAUL, WEISS, RIFKIND, WHARTON
19                                         & GARRISON LLP
                                           1285 Avenue of the Americas
20                                         New York, NY 10019

21    For TRU Taj, LLC and TRU Taj       PETER YOUNG
      Finance, Inc.                       PROSKAUER ROSE LLP
22                                         2049 Century Park East
                                           Los Angeles, CA 90067
23
      For Cyrus Capital Partners,        DAVID ROSNER
24    L.P.                                KASOWITZ BENSON TORRES, LLP
                                           1633 Broadway
25                                         New York, NY 10019
```

Case 20-03038-KLP Doc 3-2 Filed 05/21/20 Entered 05/21/20 16:18:51 Desc
Declaration of Scott A. Rader Page 5 of 105
Case 17-34665-KLP Doc 1606-2 Filed 01/24/18 Entered 01/24/18 16:29:35 Desc Main
Document Page 5 of 585

5

```
 1
 2  For Ad Hoc B4 Lenders:          EMIL A. KLEINHAUS, ESQ.
    WACHTELL, LIPTON, ROSEN & KATZ
    51 West 52nd Street
 3                                  New York, NY 10019

 4  Also Present:                   Alan Miller
                                    Compensation Committee
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21  Transcription Services:         eScribers, LLC
                                    7227 North 16th Street
22                                  Suite #207
                                    Phoenix, AZ 85020
23                                  (973) 406-2250

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

Case 5:7-34668-KLP Doc 2608-2 Filed 05/21/20 Entered 05/21/20 16:29:35 Desc Main
Declaration of Scott A. Page Page 95 of 585

Colloquy                                                                    84

1    seats, and they do have capable counsel to make sure that

2    they're fulfilling their fiduciary duties, but --

3           THE COURT:  And you didn't object to their appointment

4    of counsel.

5           MR. ECKSTEIN:  We didn't object to their appointment,

6    because they're paid on an hourly-rate basis, they're there to

7    deal with conflicts.  I'm a little concerned by what I view as

8    the creeping scope of the independent directors.  I'm not, in

9    fact -- I don't adopt as fact that the independent director's

10   scope is necessary to deal with debt capacity and capital

11   structure.  That's the job of the debtors.  But to the extent

12   the independent directors are going to sit and listen to that,

13   that's okay -- that's okay.  But it's not -- you don't need

14   independent directors to deal with debt capacity, or to deal

15   with capital structure.

16          There may be discrete conflicts that can't be

17   resolved, and at the end of the day if there really is going to

18   be intercompany litigation it may turn out that you actually do

19   need to really arm for that litigation.  But we are not there.

20   This case, while it's complicated, it's primarily a business

21   reorganization.

22          This case is a company facing tremendous head winds.

23   There are tremendous market challenges.  I mean, it's

24   noteworthy there are -- there are -- at this point I think

25   there are eight financial advisors that are already retained in

1    this case, and there are now -- it was announced that the five

2    independent director groups wanted to retain five more

3    financial advisors.  You now have heard that there's another

4    one, Geoffrey, that's going to be coming on board.  We're going

5    to have six separate silos, each of whom are going to have

6    their own structure.  At some point the burden of this case is

7    going to become so overwhelming.

8           The company is facing real serious cash challenges at

9    this point time that are going to make it hard for the company

10   to meet its contractual and financial obligations under its

11   debt instruments.  To burden the estate with millions and

12   millions of dollars of fixed obligation to basically for

13   additional financial advice that may not add value, we believe

14   it is premature.

15          And that is particularly the case where you already

16   have the independent director's in place.  They're there.  They

17   do have access to Lazard and Alvarez if they have issues or

18   questions, as very, very capable experts on behalf of the

19   debtors.

20          And what I actually would have expected is that over

21   the next couple of weeks and months as the debtor is developing

22   its business plan it's starting to outline a plan of

23   reorganization, we could frame whether there really are

24   specific conflicts that somehow are not going to get resolved,

25   and figure out how we go about negotiating those issues.  And I

# EXHIBIT 2-E

Dkt. No. 2098 - Excerpts from Transcript
of Mar. 15, 2018 Hearing

Case 20-03038-KLP   Doc 3-2   Filed 05/21/20   Entered 05/21/20 16:18:51   Desc Main
Case 17-34665-KLP   Doc 2098-2   Filed 03/16/18   Entered 03/16/18 16:00:41   Desc
Declaration of Scott A. Rague   Page 1 Page 98 of 585
Document   Page 1 of 67

1

<table>
<tr><td>1</td><td></td></tr>
</table>

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA (RICHMOND)

```
In Re:                          )  Case No. 17-34665-KLP
                                )  Richmond, Virginia
TOYS "R" US, INC., et al.,      )
                                )
            Debtors.            )  March 15, 2018
                                )  2:07 p.m.
------------------------------- )
```

TRANSCRIPT OF HEARING ON
APPLICATION OF DEBTORS GEOFFREY, LLC AND GEOFFREY HOLDINGS, LLC
FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT
OF CLEARY GOTTLIEB STEEN & HAMILTON LLP AS COUNSEL FOR
GEOFFREY, LLC AND GEOFFREY HOLDINGS, LLC NUNC PRO TUNC [DOCKET
NO. 1788];
DEBTORS', GEOFFREY, LLC AND GEOFFREY HOLDINGS, LLC, APPLICATION
TO RETAIN AND EMPLOY KAUFMAN & CANOLES AS ITS LOCAL COUNSEL
[DOCKET NO. 1790];
APPLICATION OF DEBTORS GEOFFREY, LLC AND GEOFFREY HOLDINGS, LLC
FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT
OF CHILMARK PARTNERS, LLC AS FINANCIAL ADVISOR FOR GEOFFREY,
LLC AND GEOFFREY HOLDINGS, LLC NUNC PRO TUNC [DOCKET NO. 1786]

BEFORE THE HONORABLE KEITH L. PHILLIPS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:                JOSHUA A. SUSSBERG, ESQ.
                                KIRKLAND & ELLIS LLP
                                601 Lexington Avenue
                                New York, NY 10022

                                CHAD J. HUSNICK, ESQ.
                                KIRKLAND & ELLIS LLP
                                300 North LaSalle
                                Chicago, IL 60654

For Geoffrey, LLC and Geoffrey  PAUL K. CAMPSEN, ESQ.
Holdings:                       KAUFMAN & CANOLES, P.C.
                                150 West Main Street
                                Norfolk, VA 23514

                                JAMES L. BROMLEY, ESQ.
                                CLEARY GOTTLIEB STEEN &
                                HAMILTON LLP
                                One Liberty Plaza
                                New York, NY 10006

```
 1   For NexBank SSB:                EMIL A. KLEINHAUS, ESQ.
                                     WACHTELL, LIPTON, ROSEN & KATZ
 2                                   51 West 52nd Street
                                     New York, NY 10019
 3
     For Taj Noteholders:           BRIAN S. HERMANN, ESQ.
 4                                  PAUL, WEISS, RIFKIND, WHARTON
                                    & GARRISON, LLP
 5                                  1285 Avenue of the Americas
                                    New York, NY 10019
 6
     For Office of the United States LYNN A. KOHEN, ESQ.
 7   Trustee:                       UNITED STATES DEPARTMENT OF
                                    JUSTICE
 8                                  6305 Ivory Lane
                                    Suite 600
 9                                  Greenbelt, MD 20070

10

11

12

13

14

15

16

17

18

19

20   Transcription Services:        eScribers, LLC
                                     7227 North 16th Street
21                                   Suite #207
                                     Phoenix, AZ 85020
22                                   (973) 406-2250

23   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

24   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

25
```

1          THE CLERK:  In the matter of Toys "R" Us, Inc.

2          MR. SUSSBERG:  Judge Phillips.

3          THE COURT:  Good afternoon.

4          MR. SUSSBERG:  Joshua Sussberg, Kirkland & Ellis, on

5    behalf of Toys "R" Us.

6          I certainly will say, and I don't think I speak just

7    for myself, but did not imagine just six months ago that I'd be

8    standing here today before Your Honor about to talk about what

9    we're going to talk about.  Thousands of employees, vendors,

10   and customers have questions and very few answers.  And the

11   answers that people are getting are unsettling and, frankly,

12   devastating.  And everyone is going to attempt to write their

13   own narrative, and we all know that hindsight is always twenty-

14   twenty.

15         But today, at least in my humble opinion, Your Honor,

16   it's not a day for that.  The finger-pointing does nothing to

17   change the reality or the facts.  And so what I was hopeful to

18   do with Your Honor, along with Mr. Husnick, is try to answer

19   two important questions:  first, how we got here; and second,

20   where we are going from here.

21         How we got here.  Six months ago, September 18th,

22   2017. We filed these cases.  And as Your Honor will remember,

23   we came into this courtroom on an interim basis and got

24   approval of 3.1 billion dollars of post-petition financing.

25   And we came back to Your Honor in October on a fully consensual

1  basis with that same 3.1 billion dollars of financing.  There
2  were not restructuring-specific milestones in that financing.
3  It instead included limited and, what we thought were at the
4  time, conservative covenants relating to cash flow and
5  liquidity.
6       And the thesis behind the DIP financing, as we said
7  from the beginning, was to help the company to turn back on the
8  supply at a critical time, to propel the company through the
9  all-important holiday season, and then allow for sixteen months
10 of runway to effectuate a deleveraging transaction which was
11 very important and obviously necessary.  And that was a
12 transaction that was going to be designed to effectuate a
13 global restructuring a seventy-year-old brand that it would
14 continue to operate and control across the various regions in
15 which this company operates.
16       300 million dollars-plus of that financing was
17 utilized to make vendor payments to key vendors as well as
18 early 503(b)(9) payments in effort to turn back on the trade,
19 all of which had stopped in the weeks leading up to the
20 bankruptcy filing.  And in a somewhat unprecedented feature,
21 Your Honor, as we talked about at the beginning of these cases,
22 the DIP financing actually included hundreds of millions of
23 dollars to potentially utilize beginning in early 2018 for
24 reinvestment back into the stores and reinvestment in the brand
25 which was badly needed after many years of leverage didn't

1    allow the company to reinvest in operations.

2            We, frankly, entered these cases on our toes.  And we

3    were ready to take advantage of opportunities that were

4    presented in Chapter 11 and effectuate what was the plan, a

5    holistic restructuring.

6            But just as Toys "R" Us was seeking to recover from

7    the bankruptcy filing at frankly the worst possible time of

8    year for a retailer that does forty percent of its sales at the

9    holidays -- and in September and October when you're building

10   inventory and supposed to be preparing for that inventory, this

11   company was busy turning back on its supply.  And the

12   competition noticed, and the competition took advantage.

13           And we're not here to belabor all the points about

14   what happened in the competition and what they did and how it

15   was done.  The numbers speak for themselves.  But the heat was

16   turned up, Your Honor.  And I think we've been clear about that

17   from the beginning.  And people saw an opportunity to take

18   advantage of eleven billion dollars of sales that Toys "R" Us

19   did just in 2016.

20           And so what did they do?  Competitors who are

21   diversified competitors offering multiple products expanded

22   their toy selections.  And they offered toys at low margins and

23   as loss-leaders, enticing customers to shop for other potential

24   products with toys being the loss-leader.  And these are prices

25   at which the debtors who just sell toys simply could not and

 1  cannot compete.

 2          The pricing and aggressive advertising drove

 3  unprofitable online growth, starving the brick and mortar model

 4  as we know it.  And as everyone has talked about, the retail

 5  apocalypse and the changes in the ever shifting dynamic and

 6  landscape in the world that we live in, it was self-evident and

 7  is self-evident by what is going on over the course of the last

 8  several months and the holidays in particular.

 9          The company's previous successful strategy of selling

10  late at higher margins because it would have product offering

11  that others would not prove to be completely ineffective

12  because higher inventory levels were available at all these

13  diversified competitors.  And the availability of expedient and

14  free shipping impacted a longstanding tradition of Toys "R" Us

15  being the last resort for holiday shopping where people feared

16  of being able to get something online coming in time for the

17  holidays.  That was no longer a problem.  And again, with same-

18  day delivery and free delivery, Toys "R" Us lost out on a

19  massive amount of sales that are typically at its fingertips.

20          Toys also suffered, make no mistake, from self-

21  inflicted wounds, whether it was connectivity issues from the

22  web store and supply chain, delayed response to online customer

23  inquiries, inexperience at the store levels with district

24  managers, massive overhead costs that needed to be addressed,

25  all of which, when combined, put together a holiday performance

 1    that was horrifying.

 2            To put it on context, Your Honor, United States EBITDA
 3    Q4 of 2017 was eighty-one million dollars.  When compared to Q4
 4    of 2015 of 374 million dollars and Q4 of 2016 of 347 million
 5    dollars, in each instance, you're looking at a dramatic fall of
 6    more than 250 million dollars of EBITDA in the quarter at which
 7    this company does most of its business.

 8            And as a result, after being on our toes heading into
 9    this process, the company was quickly on its heels.  All the
10    business planning, real estate review process, all of which had
11    started in the fall, had to be scratched and started over
12    entirely in light of the performance and the margin labors.
13    Liquidity was suddenly evaporating.  And those originally
14    conservative covenants were in jeopardy of certain breach.

15            The alarm bells were sounding.  And the company's
16    board management team and its advisors, frankly, I will say
17    stepped up to the challenge.  And people can say what they
18    want, but there's no question that that's the case.  And we
19    made a commitment to be transparent, to maximize value, and to
20    run out every single ground ball.  And that's what we've done.
21    And that's what we will continue to do.  And we'll answer that
22    question for Your Honor today.  And that's what twenty-twenty
23    hindsight is going to show.

24            We quickly toggled with the company at the direction
25    of the board to reviewing a new business plan that had both a

Case 20-03038-KLP   Doc 2098-2   Filed 05/21/20   Entered 05/21/20 16:18:51   Desc Main
Declaration of Scott A. Radke   Page 8 of 67

Case 17-34665-KLP   Doc 2093-2   Filed 03/26/18   Entered 03/26/18 16:00:41   Desc Main
Document   Page 105 of 585

Colloquy                                                                                                 8

 1    630-store model, so reducing it from the 740-some-odd stores

 2    that exist today, as well as a 400-store model.  And the

 3    company quickly pulled that together and analyzed what it would

 4    take to implement that transaction.

 5              And unfortunately, it became apparent when looking at

 6    that transaction and the holiday performance and same store

 7    sales that just getting through the 2018 holiday season, so

 8    thorough the bankruptcy, not even emerging from bankruptcy,

 9    would require several hundred million dollars of investment in

10    addition to emergence cost and then new dollars to invest in

11    this business which -- so badly needed investment.

12              And with the post-holiday cash burn looking to be

13    fifty to a hundred million dollars per month, the company's

14    forecast indicated that on its current path, it would run out

15    of liquidity in May after, again, putting in place conservative

16    covenants and a financing package that was consensual and

17    agreed to and presented to Your Honor back in the fall.

18              Notwithstanding a thorough and exhaustive process led

19    by David Kurtz who is here today and the Lazard team to find a

20    potential investor or financial or strategic over the last

21    sixty-plus days, and it has been a complete sprint in an effort

22    to get there, the debtors' efforts have not yet yielded a

23    result that would ultimately present a viable transaction for

24    the entirety of the 740 U.S. stores.

25              So we find ourselves at a crossroads, Your Honor.

Case 20-03038-KLP Doc 2098-2 Filed 05/21/20 Entered 05/21/20 16:18:51 Desc Main
Declaration of Scott A. Radke Page 106 of 585

Colloquy                                                                    9

1    Covenant relief and financial support to operate on our current
2    trajectory is not available.  And the B-4 lenders, the primary
3    economic stakeholder with respect to the U.S. collateral, had
4    determined that the best way to maximize their recoveries is to
5    liquidate inventory in the remaining U.S. 735-store footprint.
6    And they would do that and begin that in an orderly wind-down
7    process.  But the one thing that I mentioned to Your Honor
8    before that we will not do, and we won't, is give up on the
9    prospect of a going-concern option for the U.S.
10            At the direction of our board and in close
11   coordination with management, we've developed with a
12   potentially value-maximizing transaction that would combine up
13   to 200 of the top U.S. stores with a going-concern transaction
14   for our Canadian operations.  Now, these would be, Your Honor,
15   the side-by-side Babies "R" Us/Toys "R" Us stores, the best
16   performing ones in the United States which are similar in
17   format to the stores that are operated under the current
18   Canadian structure.  And those U.S. stores would be folded into
19   and operated under Canadian management and operations, thereby
20   eliminating the overhead costs that have impaired standalone
21   U.S. going concern.
22            The debtors are engaged with their stakeholders and
23   certain interested parties in this transaction and are hopeful
24   it can be developed as part of the Canadian sale process, which
25   Canadian sale process, and we'll talk about that a little bit

 1    today, Your Honor, is moving forward in and of itself on a

 2    standalone basis for the Canadian operations.  And there is

 3    interest in those assets.  And we are moving quickly to move

 4    forward with and lock down those interests.

 5          At the same time, Your Honor, and fully recognizing

 6    the economic realities of this situation and the cash burn, the

 7    debtors must take the prudent and responsible step of seeking

 8    authority to immediately commence an orderly wind-down of

 9    operations.

10          So where are we going from here, Your Honor?  It's

11    regrettable to note that today more notices were issued

12    throughout the United States in the applicable states to the

13    company's employees, including those at the global resource

14    center in Wayne, New Jersey, starting a sixty-day clock for

15    purposes of more.

16          Last night, in the middle of the night, we filed a

17    motion, Your Honor.  We don't intend to present that motion

18    today, but it has been filed on an emergency basis which we

19    will be presenting on Tuesday.  That motion seeks relief under

20    three primary buckets.

21          Number one is to seek authority to enter into a

22    consulting agreement with a consortium of liquidators to

23    liquidate the inventory immediately at the company's 735 U.S.

24    stores.

25          Secondarily, we seek approval for bidding procedures

1  and stalking horse protections related to the Canadian sale.

2  That would be a potential Canadian sale of just the Canadian

3  assets and/or a sale of the Canadian assets combined, again,

4  with the 200 U.S. stores.

5          Finally, Your Honor, we seek to set an administrative

6  stay from collection in these cases so that we are in a

7  position to effectuate an orderly wind-down of operations,

8  effectively creating a bifurcation of the estates so as to not

9  create a rush to the courthouse and Your Honor for collection

10 purposes because there will be significant administrative

11 claims.  There have been administrative claimants filing

12 motions for immediately payment, 503(b)(9)'s as well.  And we

13 need to be able to be in a position to effect a wind-down and

14 maximize value in an appropriate manner.

15         We will be filing, Your Honor, in the next twenty-four

16 hours emergency motions to modify our various DIP financing

17 facilities.  Those modifications will be made to implement and

18 effectuate the wind-down.  There will be budgets included in

19 those modifications to the DIP amendments that provide for the

20 payment of goods and services to implement the wind-down as

21 well as the payment of cost associated with the wind-down.

22         As our motion made clear in light of the covenant

23 issues that we've had, and we appreciate Your Honor's

24 flexibility over the course of the last ten-plus days in moving

25 this hearing, we have negotiated waivers of a covenant that

 1  existed early on this month.  And in connection with that
 2  agreement, one of those covenants contemplated the payment of
 3  merchandise on and after March 5th would be provided for and
 4  paid for subject to review and reconciliation of invoices and
 5  purchase orders and the like.  So the wind-down budget will
 6  include a line item to address those goods.

 7          And, Your Honor, importantly -- and Mr. Husnick will
 8  address this in more detail, this is, as we've noted to Your
 9  Honor, a global company.  And it has operations throughout the
10  world including Canada, Central Europe, and Asia.  And shared
11  services for all these operations are provided through our
12  global recourse center in Wayne.

13          Over the next sixty days, with the help and support of
14  the team on the ground in Wayne as well as the team from
15  Alvarez & Marsal -- and Bill Kosturos and Jon Goulding are both
16  here in the courtroom today -- will be working to establish a
17  shared services center so that we can continue to service the
18  global operations and ensure that there's uninterrupted service
19  so long as we have willing stakeholders and participants moving
20  things forward and avoiding what we have made clear would be
21  contagion effect in the event we don't put measures in place to
22  ensure that services continue.

23          So with that, Your Honor, I'll cede the podium to
24  Mr. Husnick and, of course, be available for questions.

25          THE COURT:  All right.  Thank you, Mr. Sussberg.  I'm

# EXHIBIT 2-F

## Dkt. No. 2341 - Excerpts from Transcript of Mar. 20, 2018 Hearing

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
              EASTERN DISTRICT OF VIRGINIA (ALEXANDRIA)
 2
      In Re:                          )  Case No. 17-34665 (KLP)
 3                                    )  Alexandria, Virginia
      TOYS "R" US, INC., et al.,      )
 4                                    )
              Debtors.                )  March 20, 2018
 5                                    )  12:01 p.m.
      ------------------------------  )
 6
                    TRANSCRIPT OF HEARING ON:
 7     DEBTORS' OMNIBUS MOTION FOR ENTRY OF ORDERS: (I) AUTHORIZING
      THE DEBTORS TO WIND DOWN U.S. OPERATIONS, (II) AUTHORIZING THE
 8      DEBTORS TO CONDUCT U.S. STORE CLOSINGS, (III) ESTABLISHING
         BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' CANADIAN
 9    EQUITY, (IV) ENFORCING AN ADMINISTRATIVE STAY, AND (V) GRANTING
                           RELATED RELIEF [DOCKET NO. 2050];
10
      MOTION TO EXPEDITE HEARING ON DEBTORS' OMNIBUS MOTION FOR ENTRY
11       OF ORDERS: (I) AUTHORIZING THE DEBTORS TO WIND DOWN U.S.
       OPERATIONS, (II) AUTHORIZING THE DEBTORS TO CONDUCT U.S. STORE
12    CLOSINGS, (III) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF
       THE DEBTORS' CANADIAN EQUITY, (IV) ENFORCING AN ADMINISTRATIVE
13       STAY, AND (V) GRANTING RELATED RELIEF [DOCKET NO. 2051];

14    DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE NORTH
       AMERICAN DEBTORS' ENTRY INTO WAIVERS WITH RESPECT TO ABL/FILO
15    DIP DOCUMENTS AND THE TERM DIP DOCUMENTS AND (B) AMENDING FINAL
        ORDER (I) AUTHORIZING THE NORTH AMERICAN DEBTORS TO OBTAIN
16     POST-PETITION FINANCING, (II) AUTHORIZING THE NORTH AMERICAN
        DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND
17         PROVIDING SUPERPRIORITY ADMINISTRATIVE-EXPENSE STATUS,
       (IV) GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION LENDERS,
18      (V) MODIFYING THE AUTOMATIC STAY, AND (VI) GRANTING RELATED
                           RELIEF [DOCKET NO. 2189];
19
        MOTION FOR EXPEDITED HEARING ON FINANCING MOTIONS [DOCKET NO.
20                                 2272];

21    DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING BIDDING
       PROCEDURES, (II) APPROVING THE SALE OF CERTAIN REAL PROPERTY
22     AND LEASES, AND (III) GRANTING RELATED RELIEF [DOCKET NO.
                                  1880];
23
        MOTION FOR EXPEDITED HEARING ON PROPCO I DEBTORS' MOTIONS FOR
24        ENTRY OF AN ORDER (I) DIRECTING JOINT ADMINISTRATION AND
       (II) APPLICATION OF THE WIND-DOWN ORDER [CASE NO. 18-31429;
25                          DOCKET NO. 8];
```

Case 20-03038-KLP Doc 24-1 Filed 05/21/20 Entered 05/21/20 16:18:51 Desc Main
Declaration of Scott A. Reese - Page 2 Page 112 of 585

2

```
 1       PROPCO I DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) DIRECTING
     JOINT ADMINISTRATION OF THE PROPCO I DEBTORS' CHAPTER 11 CASES
 2        AND (II) GRANTING RELATED RELIEF [CASE NO. 18-31429;
                          DOCKET NO. 3];
 3
         PROPCO I DEBTORS' MOTION FOR ORDER (I) SEEKING LIMITED
 4     APPLICATION OF THE RELIEF REQUESTED UNDER THE TOYS "R" US
     DEBTORS' OMNIBUS WIND-DOWN MOTION; (II) APPLYING THE INITIAL
 5      STORE-CLOSING SALE ORDER TO THE PROPCO I DEBTORS AND
          (III) GRANTING RELATED RELIEF [CASE NO. 18-31429;
 6                        DOCKET NO. 7];
 7    APPLICATION OF GIRAFFE HOLDINGS, LLC, GIRAFFE JUNIOR HOLDINGS,
       LLC AND TOYS "R" US PROPERTY COMPANY II, LLC FOR ENTRY OF AN
 8     ORDER AUTHORIZING THEIR RETENTION AND EMPLOYMENT OF FRONTLINE
       REAL ESTATE PARTNERS, LLC AS REAL ESTATE ADVISOR IN CONNECTION
 9     WITH CONFLICT MATTERS EFFECTIVE NUNC PRO TUNC TO FEBRUARY 1,
                     2019 [DOCKET NO. 1850]
10
                BEFORE THE HONORABLE KEITH L. PHILLIPS
11                UNITED STATES BANKRUPTCY JUDGE
     APPEARANCES:
12   For the Debtors:               JOSHUA A. SUSSBERG, ESQ.
                                     KIRKLAND & ELLIS LLP
13                                   601 Lexington Avenue
                                     New York, NY 10022
14
                                     ANDREW R. MCGAAN, P.C., ESQ.
15                                   SCOTT LERNER, ESQ.
                                     CHAD J. HUSNICK, P.C., ESQ.
16                                   EMILY E. GEIER, ESQ.
                                     KIRKLAND & ELLIS LLP
17                                   300 North LaSalle
                                     Chicago, IL 60654
18
     For Office of the United States LYNN A. KOHEN, ESQ.
19   Trustee:                       UNITED STATES DEPARTMENT OF
                                     JUSTICE
20                                   6305 Ivory Lane
                                     Suite 600
21                                   Greenbelt, MD 20070

22   For Official Committee of      KENNETH H. ECKSTEIN, ESQ.
     Unsecured Creditors:           ADAM C. ROGOFF, ESQ.
23                                   KRAMER LEVIN NAFTALIS &
                                     FRANKEL LLP
24                                   1177 6th Avenue
                                     Suite 29
25                                   New York, NY 10036
```

Case 20-03038-KLP Doc 2341-2 Filed 05/21/20 Entered 05/21/20 13:51:51 Desc Main
Case 5-34508-KLP Doc 2341-2 Filed 03/22/20 Entered 03/22/20 13:53:11 Desc
Declaration of Scott A. Radge Page 113 of 585
Document Page 3 of 412

3

```
 1    For Ad Hoc Group of B-4         EMIL A. KLEINHAUS, ESQ.
      Lenders:                        WACHTELL, LIPTON, ROSEN & KATZ
 2                                     51 West 52nd Street
                                       New York, NY 10019
 3
      For Thorley Industries LLC      AUGUST C. EPPS, JR., ESQ.
 4    d/b/a 4moms:                    CHRISTIAN & BARTON LLP
                                       909 East Main Street
 5                                     Suite 1200
                                       Richmond, VA 23219
 6
                                       JAMES M. WILTON, ESQ.
 7                                     ROPES & GRAY LLP
                                       800 Boylston Street
 8                                     Boston, MA 02199

 9    For Ad Hoc Group of B-4         EMIL A. KLEINHAUS, ESQ.
      Lenders:                        WACHTELL, LIPTON, ROSEN & KATZ
10                                     51 West 52nd Street
                                       New York, NY 10019
11
      For Various Landlords:          JENNIFER MCLAIN MCLEMORE, ESQ.
12                                     CHRISTIAN & BARTON, LLP
                                       909 E. Main Street
13                                     Richmond, VA 23219

14                                     DAVID L. POLLACK, ESQ.
                                       BALLARD SPAHR LLP
15                                     1735 Market Street
                                       51st Floor
16                                     Philadelphia, PA 19103

17    For Various Landlords:          IVAN M. GOLD, ESQ.
                                       ALLEN MATKINS LECK GAMBLE
18                                      MALLORY & NATSIS LLP
                                       3 Embarcadero Center
19                                     12th Floor
                                       San Francisco, CA 94111
20
      For Various Landlords:          RUSSELL R. JOHNSON, III, ESQ.
21                                     LAW FIRM OF RUSSELL R. JOHNSON
                                       III, PLC
22                                     2258 Wheatlands Drive
                                       Manakin-Sabot, VA 23103
23

24

25
```

Case 20-03038-KLP Doc 243-2 Filed 05/21/20 Entered 05/21/20 16:18:51 Desc Main
Declaration of Scott A. Reade Page 114 of 585

4

```
 1   For Crayola LLC:             MICHAEL G. WILSON, ESQ.
                                  MICHAEL WILSON PLC
 2                                P.O. Box 6330
                                  Glen Allen, VA 23058
 3
                                  GREGORY W. WERKHEISER, ESQ.
 4                                MORRIS, NICHOLS, ARSHT &
                                  TUNNELL LLP
 5                                1201 North Market Street
                                  Wilmington, DE 19899
 6
     For Just Play, LLC and Certain  BRITTANY NELSON, ESQ.
 7   of Its Subsidiaries:         FOLEY & LARDNER LLP
                                  3000 K Street, N.W.
 8                                Suite 600
                                  Washington, DC 20007
 9
                                  JEFFREY T. MARTIN, JR., ESQ.
10                                HENRY & O'DONNELL, P.C.
                                  300 N. Washington Street
11                                Suite 204
                                  Alexandria, VA 22314
12
                                  PAUL J. LABOV, ESQ.
13                                FOX ROTHSCHILD LLP
                                  101 Park Avenue
14                                17th Floor
                                  New York, NY 10178
15
                                  JOSHUA KLEIN, ESQ.
16                                (TELEPHONIC)
                                  FOX ROTHSCHILD LLP
17                                2000 Market Street
                                  20th Floor
18                                Philadelphia, PA 19103

19   For Kent International Inc.,  DONALD WALTER CLARKE, ESQ.
     USA Helmet Sub Kent Intl.,   WASSERMAN, JURISTA & STOLZ,
20   Inc., and KaZAM             P.C.
     LLC:                         225 Millburn Avenue
21                                Millburn, NJ 07041

22   For Artsana (USA) Inc.:      JOHN D. DEMMY, ESQ.
                                  SAUL EWING ARNSTEIN & LEHR LLP
23                                1201 North Market Street
                                  Suite 2300
24                                Wilmington, DE 19899

25
```

Case 20-03028-KLP  Doc 23-1  Filed 05/21/20  Entered 05/21/20 13:18:51  Desc Main
Declaration of Scott A. Ragan  Page 115 of 585

5

```
 1   For Kids II, Inc., Kids II     BRITTANY J. NELSON, ESQ.
     Canada Co., Kids II Australia  ERIKA L. MORABITO, ESQ.
 2   Pty Limited, Kids II Europe BV, (TELEPHONIC)
     Kids II Japan KK, and Kids II  FOLEY & LARDNER LLP
 3   UK Limited:                    3000 K Street, NW
                                    Suite 600
 4                                  Washington, DC 20007

 5   For TOMY International Inc.:    DANIEL R. SWETNAM, ESQ.
                                    ICE MILLER LLP
 6                                  250 West Street
                                    Suite 700
 7                                  Columbus, OH 43215

 8   For AVR CPC Associates, LLC:   JEFFREY H. SCHWARTZ, ESQ.
                                    JASPAN SCHLESINGER LLP
 9                                  300 Garden City Plaza
                                    Garden City, New York 11530
10

11   For Learning Resources, Inc.:  JEFFREY M. SCHWARTZ, ESQ.
                                    MUCH SHELIST, P.C.
12                                  191 N. Wacker Drive
                                    Suite 1800
13                                  Chicago, IL 60606

14   For Strategic Asset Services,  ABID QURESHI, ESQ.
     LLC:                           AKIN GUMP STRAUSS HAUER & FELD
15                                  LLP
                                    One Bryant Park
16                                  New York, NY 10036

17   For Washington Prime Group     RONALD E. GOLD, ESQ.
     Inc.:                          FROST BROWN TODD LLC
18                                  301 East Fourth Street
                                    Great American Tower
19                                  Suite 3300
                                    Cincinnati, OH 45202

20   For Dorel Industries Inc.      JONATHAN L. GOLD, ESQ.
     (d/b/a Dorel Home Products),   MICHAEL BEST & FRIEDRICH LLP
21   Dorel Juvenile Group, Inc.,    601 Pennsylvania Avenue, NW
     Dorel Asia, Inc., Pacific      Suite 700 South
22   Cycle Inc. (f/k/a Pacific      Washington, DC 20004
     Cycle LLC), and Dorel Home
23   Furnishings Inc. (f/k/a        LOUIS T. DELUCIA, ESQ.
     Ameriwood Industries Inc.):    SCHIFF HARDIN, LLP
24                                  666 Fifth Avenue
                                    Suite 1700
25                                  New York, NY 10103
```

```
 1   For LSC Communications:        JACKSON D. TOOF, ESQ.
                                    ARENT FOX LLP
 2                                  1717 K Street, NW
                                    Washington, DC 20006
 3
     For Georgia-Pacific Corrugated LAUREN FRIEND MCKELVEY, ESQ.
 4   LLC:                           ODIN FELDMAN & PITTLEMAN PC
                                    1775 Wiehle Avenue
 5                                  Suite 400
                                    Reston, VA 20190
 6
                                    DAVID A. WENDER, ESQ.
 7                                  ALSTON & BIRD LLP
                                    One Atlantic Center
 8                                  1201 West Peachtree Street
                                    Atlanta, GA 30309
 9
     For ShopperTrak RCT            PETER M. PEARL, ESQ.
10   Corporation:                   SPILMAN THOMAS & BATTLE, PLLC
                                    P.O. Box 90
11                                  Roanoke, VA 24002

12   For Propco I Lenders:          DAN T. MOSS, ESQ.
                                    JONES DAY
13                                  51 Louisiana Avenue, N.W.
                                    Washington, DC 20001
14
                                    BRUCE BENNETT, ESQ.
15                                  555 South Flower Street
                                    50th Floor
16                                  Los Angeles, CA 90071

17   For Cantor Fitzgerald          JOHN R. ASHMEAD, ESQ.
     Securities:                    SEWARD & KISSEL LLP
18                                  One Battery Park Plaza
                                    New York, NY 10004
19
     For Synchrony Bank:            PATRICK J. CURRAN, JR., ESQ.
20                                  RAGAN L. POWERS, ESQ.
                                    DAVIS WRIGHT TREMAINE LLP
21                                  1919 Pennsylvania Avenue NW,
                                    Suite 800
22                                  Washington, DC 20006

23   For Nurture Inc. d/b/a Happy   CHRISTIAN K. VOGEL, ESQ.
     Family and Prestige Capital    VOGEL & CROMWELL, L.L.C.
24   Corporation:                   8550 Mayland Drive
                                    Suite 204
25                                  Richmond, VA 23294
```

Case 20-03038-KLP Doc 243-2 Filed 05/21/20 Entered 05/21/20 13:18:51 Desc Main
Declaration of Scott A. Reade - Page 7 Page 117 of 585

7

```
 1   For JPMorgan Chase Bank, N.A.:    JUSTIN F. PAGET, ESQ.
                                       HUNTON & WILLIAMS LLP
 2                                     Riverfront Plaza, East Tower
                                       951 East Byrd Street
 3                                     Richmond, VA 23219

 4                                     ELI J. VONNEGUT, ESQ.
                                       DAVIS POLK & WARDWELL LLP
 5                                     450 Lexington Avenue
                                       New York, NY 10017
 6
     For Kolcraft Enterprises,         NEIL E. MCCULLAGH, ESQ.
 7   Inc.:                             SPOTTS FAIN PC
                                       411 East Franklin Street
 8                                     Suite 600
                                       Richmond, VA 23219
 9
     For Nurture Inc. d/b/a/ Happy     ANDREW BEHLMANN, ESQ.
10   Family; The Dannon Company        (TELEPHONIC)
     Inc.; Ontel Products Corp.;       LOWENSTEIN SANDLER LLP
11   Prestige Capital Corp.; Play      One Lowenstein Drive
     Monster:                          Roseland, NJ 07068
12
     For Centerpoint Owner LLC:        SAMUEL C. WISOTZKEY, ESQ.
13                                     (TELEPHONIC)
                                       KOHNER, MANN & KAILAS, S.C.
14                                     4650 North Port Washington
                                       Road
15                                     Milwaukee, WI 53212

16   For TMT Point Plaza, JDK          ROBERT D. TEPPER, ESQ.
     Townline LLC, and Overlook        SCHENK ANNES TEPPER CAMPBELL
17   Townline:                         311 S. Wacker Drive
                                       Suite 2500
18                                     Chicago, IL 60606

19   For Munchkin, and Square Trade:   EVE H. KARASIK, ESQ.
                                       LEVENE, NEALE, BENDER, YOO &
20                                     BRILL L.L.P.
                                       10250 Constellation Boulevard
21                                     Suite 1700
                                       Los Angeles, CA 90067
22
     For Grant Thornton:               KEN COLEMAN, ESQ.
23                                     ALLEN & OVERY LLP
                                       1221 Avenue of the Americas
24                                     New York, NY 10020

25
```

Case 20-03038-KLP   Doc 43-2   Filed 05/21/20   Entered 05/21/20 16:18:51   Desc Main
Case 17-34665-KLP   Doc 2841   Filed 03/22/18   Entered 03/22/18 23:53:11   Desc
Declaration of Scott A. Reade   Page 87 of 412   Document   Page 118 of 585

8

```
 1  For Summer Infant, Inc. and      WILLIAM R. MOORMAN, JR., ESQ.
    Summer Infant (USA), Inc.:       PARTRIDGE SNOW & HAHN LLP
 2                                    30 Federal Street
                                      Boston, MA 02110
 3
    For Acadia Realty Limited        LESLIE C. HEILMAN, ESQ.
 4  Partnership, et al.:             BALLARD SPAHR LLP
                                      919 North Market Street
 5                                    11th Floor
                                      Wilmington, DE 19801
 6
    For Ramco-Gershensohn            PAUL A. DRISCOLL, ESQ.
 7  Properties Trust and Levin       ZEMANIAN LAW GROUP
    Management Corp.:                 223 East City Hall Avenue
 8                                    Suite 201
                                      Norfolk, VA 23510
 9
    For Joint Venture formed by      STEVEN E. FOX, ESQ.
10  Gordon Brothers, Hilco, Tiger    RIEMER & BRAUNSTEIN LLP
    Group, and Great American:       Times Square Tower, Suite 2506
11                                    Seven Times Square
                                      New York, NY 10036
12

13

14

15

16

17

18

19

20

21  Transcription Services:              eScribers, LLC
                                          7227 North 16th Street
22                                        Suite #207
                                          Phoenix, AZ 85020
23                                        (973) 406-2250

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

1    debt holders as well as, of course, our vendors as well.

2    Q.  And I've been asking questions about you and Lazard, the

3    effort of the Lazard team, but what role, if any, did

4    management and members of the board of directors play in these

5    efforts in January and February?

6    A.  Yeah, so this was literally a seven-day-a-week undertaking

7    for management and the advisors, I'd say, starting on January

8    2nd, and -- and even into December, as I said, as we were

9    developing the -- the 2018 forecast.

10       You know, people worked as hard as they physically could.

11   You know, every possible effort was made to find a -- a

12   solution for the U.S. business that maximized the value of that

13   business and preserved the going-concern value of that

14   business.

15       With respect to the board, you know, there've been so many

16   board meetings, I literally can't count them.  The board was

17   extremely active.  A typical week had at least two, and

18   sometimes three, board meetings.  We wanted to make -- we the

19   advisors and the management team wanted to make sure that the

20   board was intimately involved on a -- literally a day-to-day

21   basis in terms of what was going on.

22       And it was a very dynamic process.  It was an extremely

23   fluid time.  So one day one investor is interested, the next

24   day they're not interested, the following day someone else

25   comes back.  We didn't really know from moment to moment where

Case 20-03038-KLP Doc 243-2 Filed 05/21/20 Entered 05/21/20 16:18:51 Desc Main
Declaration of Scott A. Page 32 of 112 Page 120 of 585

David Kurtz - Direct                                              32

1  this was headed, and we felt it was extremely important for the

2  board to be, on a day-to-day basis, notified of how discussions

3  were occurring with third parties, our prospects for success.

4  And we received a -- a very significant amount of input and

5  direction from our board.

6      I would say this board is as active, was as active, remains

7  as active, as any board I've ever worked with in my career.

8  Q.  You mentioned in your testimony a few moments ago that

9  there were still, even now, negotiations or discussions

10 underway with respect to these efforts to find a deal.  Can you

11 describe for the Court what you're talking about?  Say,

12 beginning late February through here in the early part of

13 March.  Let's focus on that time period.  What activities have

14 you undertaken?

15 A.  Think the best way to answer your question is to -- let's

16 start with early February.  So what's happening in early

17 February is we're -- we've signed NDAs with potential

18 investors.  We now have all of the debt holders under NDA by, I

19 believe, the second week of February, and we're trying to find

20 support from that group.

21     At the same time, the company is working on this new

22 business plan; smaller store footprint, aggressive actions to

23 reduce operating costs.  That plan was finalized in -- I'm

24 going to say on or about February 15th.  That plan reduced --

25 contemplated reducing the company's store operations to 411

 1   been in discussions with the holders of the Taj debt, if you
 2   will, about those holders potentially acquiring the Europe
 3   business as well as the Asian business.  And those discussions
 4   are still ongoing.  And so that presents another option to the
 5   company in connection with our efforts to preserve the going-
 6   concern value in these other geographies.
 7   Q.  So I want to come back, then, to the U.S. business, ex-
 8   Canada.
 9   A.  Um-hum.
10   Q.  So you described the effort to separate off the Canadian
11   business in a potential sale.  But focusing on the U.S.
12   business which is now subject to the liquidation motions --
13   I'll call them -- do you have a view, sitting here today,
14   whether the U.S. business is administratively insolvent?
15   A.  Based upon the facts as we see them, I would say that it's
16   likely to be administratively insolvent, the U.S. business.
17   Q.  Why not -- let me reflect back and hindsight is twenty-
18   twenty.  But we can go back to, say, January, as the holiday
19   results are rolling in -- why not liquidate the company then?
20   Did you consider giving that advice?
21   A.  No, we didn't.
22   Q.  Why not?
23   A.  As I indicated a few moments ago, you know, we felt that
24   while there were certainly challenges associated with the
25   effort, every effort should be made to preserve the going-

1  concern value of the U.S. business, because that would maximize
2  the recovery to our stakeholders, and very importantly, would
3  enable all of our trade vendors to be paid in full, because
4  that was the assumption on which we were working.  And that was
5  the assumption on which all of the forecasts associated with
6  the restructuring of the -- of the U.S. business were made.
7       With respect to the trade vendors, interestingly, the
8  months of January and February were favorable to the trade
9  vendors in the U.S.
10 Q.  In what way?
11 A.  They were favorable in the sense that the dollars paid to
12 the trade vendors during that two-month period of time exceeded
13 the amount of inventory deliveries during that period.  And the
14 number was approximately 260 million dollars.
15      So if you compared what was owed to the trade vendors on
16 January 1st to what was owed to the trade vendors on the 28th
17 of February, after giving effect to dollars owed on deliveries
18 that were received during this two-month period, the trade
19 vendors had improved their position by approximately 260
20 million dollars, and that 260 million dollars is comprised of
21 two things.  Number one, just 170 million dollars of net pay-
22 down -- so by net pay-down I mean we start with what was owed
23 on the first, you add the amount that was received, and then
24 you deduct for dollars paid.  So 170 million dollars of
25 improvement.  So the amount owed by Toys "R" Us went down by --

1   U.S. went down by 170 million.  And then there were

2   approximately ninety-two million dollars of critical-vendor

3   payments that were made during this two-month period -- ninety-

4   two million dollars.

5       And so that's how I get to my roughly 260 million dollars:

6   170 million dollars of net improvement through payments

7   effectuated during the months of January and February, and then

8   92 million dollars of critical-vendor payments also made during

9   that period.

10      And so from the standpoint of trade vendors, number one, we

11  were working very hard to really make every effort possible to

12  get them paid in full through our effort to produce a going-

13  concern solution for the U.S., but on the other hand, the net

14  exposure of those vendors to the company during this two-month

15  period went down by 260 million dollars.

16      And then frankly, I mean, we -- we felt that to liquidate

17  in January without sort of, you know, completing our efforts to

18  see if a reorganization of the U.S. could be effectuated, would

19  not have been the correct decision.

20  Q.   Thank you, Mr. Kurtz.

21          MR. MCGAAN:  That's all I have for now, Your Honor.

22          THE COURT:  All right, thank you.  Are there any

23  parties who would like to cross-examine Mr. Kurtz?

24          Mr. Eckstein?

25          MR. ECKSTEIN:  Your Honor, it's not our plan today to

1   Q.   Okay.

2   A.   Pre- and -- post- and pre-petition.

3   Q.   Are the debtors still continuing to order inventory?

4   A.   No.

5   Q.   Okay.  And are -- are the debtors moving inventory to the

6   200 stores that are trying to be sold as a going concern?

7   A.   Yes.

8   Q.   We understand, while we may not agree, why the debtors

9   waited to file their MOR until March 15th, but why did the

10  debtors continue to place large purchase orders at the end of

11  February if they knew the true financial status of the company

12  was as bleak as it was?

13  A.   Well, I think, as I testified earlier, that they were still

14  large -- there were still many avenues available to the company

15  for a potential third-party investor or a third party who was

16  interested in asset sales.  So it was not until, as Mr. Kurtz

17  said, until the negotiations with the B-4 lenders was it

18  apparent that we were no longer going to be -- continue as a

19  going concern.

20  Q.   Okay.  And in your experience -- and you have, for lack of

21  a better word, vast experience with reorganizations and

22  liquidations in this country -- is there any reason that a

23  Chapter 7 trustee couldn't oversee the going-out-of-business

24  sale?

25  A.   I think you would definitely want to have the current

# EXHIBIT 3

## ADVISORY AGREEMENT

This Advisory Agreement (this "Agreement") is made and entered into as of July 21, 2005 (the "Effective Date") by and among Toys "R" Us Holdings, Inc., a Delaware corporation ("Holdings") Toys "R" Us, Inc., a Delaware corporation (the "Company") Bain Capital Partners, LLC, a Delaware limited liability company ("BCP") Bain Capital, Ltd., a company organized under the laws of England and Wales ("BCL" and, together with BCP, "Bain") Kohlberg Kravis Roberts & Co., L.P., a Delaware limited partnership ("KKR") and Vornado Truck LLC, a Delaware limited liability company ("Vornado" and together with Bain and KKR, the "Advisors") Certain defined terms are defined in Section 21

WHEREAS, the Company desires to retain the Advisors with respect to the services described herein.

NOW, THEREFORE, the parties to this Agreement agree as follows:

1. Term. This Agreement shall be in effect for an initial term commencing on the Effective Date and ending on the tenth anniversary of the Effective Date (the "Term"), which Term shall automatically be extended thereafter on a year to year basis unless the Company or the Advisor Majority provides written notice of its desire to terminate this Agreement to each of the Advisors and the Company at least 90 days prior to the expiration of the Term or any extension thereof. In addition, in connection with the consummation of a Change in Control or the Initial Public Offering, the Advisor Majority may terminate this Agreement by delivery of written notice of termination to the Company. In the event of a termination of this Agreement, the Company shall pay in cash to each of the Advisors (a) all unpaid Advisory Fees (as defined in Section 3 (a)), all unpaid Subsequent Transaction Fees (as defined in Section 4(b)) and expenses due under this Agreement with respect to periods prior to the termination date, plus (b) the net present value (using a discount rate equal to the yield as of such termination date on U.S. Treasury securities of like maturity based on the times such payments would have been due) of the Advisory Fees that would have been payable with respect to the period from the termination date through the tenth anniversary of the Effective Date or, in the case of any extension thereof, through the end of such extension period (assuming, for purposes of such calculation, that each Advisor will be deemed to hold throughout such period the same percentage of its Initial Shares as it holds at the termination date). The provisions of Sections 1, 4(b), 6, 7, 9, and 17 through 21 shall survive any termination of this Agreement.

2. Services. The Advisors shall perform or cause to be performed such services for the Company and/or its subsidiaries as mutually agreed by the Advisors and the Company, which services may include, without limitation, the following:

(a) general executive and management services;

(b) identification, support, negotiation and analysis of acquisitions and dispositions by the Company and/or its subsidiaries;

(c) support, negotiation and analysis of financing alternatives, including, without limitation, in connection with acquisitions, capital expenditures and refinancing of existing indebtedness;

(d) finance functions, including assistance in the preparation of financial projections and monitoring of compliance with financing agreements;

(e) real estate functions, including management and monitoring of real estate properties and development and implementation of real estate strategies;

(f) marketing functions, including monitoring of marketing plans and strategies;

(g) human resources functions, including searching and hiring of executives; and

(h) other services for the Company and its subsidiaries upon which the Company and the Advisors agree.

3. Advisory Fees and Expenses

(a) During the Term of this Agreement, the Company will pay each Advisor an advisory fee (such Advisor's "Advisory Fee") for each fiscal quarter of the Company equal to the product of (x) one-third of the Quarterly Fee Amount for such fiscal quarter times (y) such Advisor's Fee Allocation Percentage. Each Advisor's Advisory Fee will be payable in advance to such Advisor or its designee by wire transfer of immediately available funds on the first business day of the first month of each fiscal quarter, except that no payment shall be due and owing in respect of the final fiscal quarter in 2005 as a result of the payment made on the Effective Date. The pro-rated amount of each Advisor's Advisory Fee for the period commencing on the Effective Date and ending on the last day of the Company's fiscal quarter ending on or about October 31, 2005 will be payable by wire transfer of immediately available funds on the Effective Date and shall be paid in respect of services for the remainder of the 2005 fiscal year.

(b) The Company will reimburse each Advisor for such reasonable travel expenses and other reasonable out-of-pocket fees and expenses (including the reasonable fees and expenses of attorneys and, to the extent approved in advance by the Company, accountants or other advisors retained by such Advisor) as may be incurred by such Advisor and its partners, members, employees or agents in connection with the rendering of services pursuant to this Agreement. Such expenses will be reimbursed by wire transfer of immediately available funds promptly upon the request of such Advisor (but in any case no later than five business days following such request) and will be in addition to any other fees or amounts payable to such Advisor pursuant to this Agreement. Unless requested by the Company, in no event shall any Advisor submit its expenses to the Company more often than monthly.

4. Transaction Fees and Expenses

(a) The Company will pay the Advisors or their respective designees a fee in the aggregate amount of $75,000,000 for services rendered in connection with debt financing of the transactions (the "Merger") contemplated by the Agreement and Plan of Merger, dated as of March 17, 2005, among the Company, Global Toys Acquisition, LLC, a Delaware limited liability company, and Global Toys Acquisition Merger Sub, Inc., a Delaware corporation. Such fee shall be allocated among the Advisors as follows: one-third to Bain; one-third to KKR; and

- 2 -

one-third to Vornado. Each Advisor's allocated portion of such fee will be payable to such Advisor or its designee by wire transfer of *immediately* available funds on the Effective Date. In addition, the Company will reimburse each Advisor or its designee, by wire transfer of immediately available funds on the Effective Date, for its reasonable travel expenses and other reasonable out-of-pocket fees and expenses (including the fees and expenses of accountants, attorneys and other advisors retained by such Advisor) incurred in connection with the foregoing and the investigation, negotiation, and consummation of the Merger.

(b) The Company will pay the Advisors or their designees a transaction fee (each, a "Subsequent Transaction Fee") in connection with the consummation of each transaction that is completed during the Term (or completed after any termination of this Agreement, if such transaction was contemplated at the time of termination of the Agreement) resulting in a Change in Control, acquisition, disposition or divestiture, spin-off, split-off, or financing (whether debt or equity financing) by or involving Holdings, the Company or their respective subsidiaries in an amount equal to 1% of the aggregate value of each such transaction (in each case, whether such transaction is by way of merger, purchase or sale of stock, purchase or sale or other disposition of assets, recapitalization, reorganization, consolidation, tender offer, public or private offering or otherwise, and whether consummated directly by Holdings, the Company or their respective subsidiaries or, in the case of a Change in Control, indirectly by their respective stockholders, and determining the value of debt financing without regard to whether such debt financing is actually drawn upon). Each Advisor shall be entitled to a portion of such Subsequent Transaction Fee equal to the product of (x) the amount of such Subsequent Transaction Fee, times (y) a fraction, the numerator of which is the Fee Allocation Percentage of such Advisor, and the denominator of which is the aggregate Fee Allocation Percentages of all Advisors. Each Advisor's allocated portion of a Subsequent Transaction Fee will be payable to such Advisor or its designee by wire transfer of immediately available funds on the date on which such transaction resulting in a Subsequent Transaction Fee is consummated.

5. Personnel. Each Advisor will provide and devote to the performance of this Agreement such partners, employees and agents of such Advisor as it shall deem appropriate to the furnishing of the services mutually agreed upon by the Company and the Advisors; it being understood that no minimum number of hours is required to be devoted by any or all of the Advisors on a weekly, monthly, annual, or other basis. The fees and other compensation specified in this Agreement will be payable by the Company regardless of the extent of services requested by the Company pursuant to this Agreement, and regardless of whether or not the Company requests an Advisor to provide any such services. The Company acknowledges that the services of each of the Advisors are not exclusive, and that each of the Advisors will render similar services to other Persons (including with the same partners, employees, and agents thereof as may render services to the Company).

6. Liability. None of the Advisors nor any of their respective Affiliates, nor any of their respective partners, shareholders, directors, officers, members, employees or agents (collectively, the "Advisor Group") shall be liable to Holdings, its subsidiaries or any of their Affiliates or stockholders for any loss, liability, damage or expense (including attorneys' fees and expenses) (collectively, a "Loss") arising out of or in connection with the performance of services contemplated by this Agreement or otherwise provided by any of the Advisors to, or otherwise in connection with the operations of, Holdings or any of its subsidiaries or Affiliates,

- 3 -

other than as a result of the willful misconduct or gross negligence of such Advisor or any member of its Advisor Group. No Advisor makes any representations or warranties, express or implied, in respect of the services provided by any member of the Advisor Group. Except as an Advisor may otherwise agree in writing after the date hereof with respect to itself or its Affiliates: (i) each member of the Advisor Group shall have the right to, and shall have no duty (contractual or otherwise) not to, directly or indirectly: (A) engage in the same or similar business activities or lines of business as Holdings, its subsidiaries or any of their Affiliates and (B) do business with any client or customer of Holdings, its subsidiaries or any of their Affiliates; (ii) no member of the Advisor Group shall be liable to Holdings, its subsidiaries or any of their Affiliates or stockholders for breach of any duty (contractual or otherwise) by reason of any such activities or of such Person's participation therein; and (iii) in the event that any member of the Advisor Group acquires knowledge of a potential transaction or matter that may be a corporate opportunity for Holdings, its subsidiaries or any of their Affiliates or stockholders on the one hand, and any member of the Advisor Group, on the other hand, or any other Person, no member of the Advisor Group shall have any duty (contractual or otherwise) to communicate or present such corporate opportunity to Holdings, its subsidiaries or any of their Affiliates or Stockholders and, notwithstanding any provision of this Agreement to the contrary, the Advisor Group shall not be liable to Holdings, its subsidiaries or any of their Affiliates or Stockholders for breach of any duty (contractual or otherwise) by reason of the fact that any member of the Advisor Group directly or indirectly pursues or acquires such opportunity for itself, directs such opportunity to another Person, or does not present such opportunity to Holdings, its subsidiaries or any of their Affiliates or Stockholders. In no event will any of the parties hereto be liable to any other party hereto for (i) any indirect, special, incidental or consequential damages, including lost profits or savings, whether or not such damages are foreseeable, arising out of this Agreement or the performance of services hereunder, or (ii) in respect of any liabilities relating to any third party claims (whether based in contract, tort or otherwise) arising out of this Agreement or the performance of services hereunder, except as set forth in <u>Section 7</u> below.

7. <u>Indemnity</u>. The Company and its subsidiaries shall defend, indemnify and hold harmless each member of the Advisor Group from and against any and all Losses arising from any claim by any Person with respect to, or in any way related to, this Agreement (collectively, "<u>Claims</u>") arising out of or in connection with the performance of services contemplated by this Agreement or otherwise provided by any member of the Advisor Group to, or otherwise in connection with the operation of, Holdings or any of its subsidiaries or Affiliates; provided that the foregoing indemnity shall not be available to any Advisor if such Advisor's Loss is a result of the willful misconduct or gross negligence of such Advisor or any member of its Advisor Group. The Company and its subsidiaries shall defend at their own cost and expense any and all suits or actions (just or unjust) which may be brought against Holdings, its subsidiaries or any of their Affiliates, or any member of the Advisor Group or in which any member of the Advisor Group may be impleaded with others upon any Claims, or upon any matter, directly or indirectly related to or arising out of this Agreement or the performance hereof by any member of the Advisor Group; provided that the Company and its subsidiaries shall not settle any such Claim without the consent of the Advisors party thereto. If the indemnification provided for above is unavailable in respect of any Losses, then the Company, in lieu of indemnifying any member of the Advisor Group, shall contribute to the amount paid or payable by such member of the Advisor Group in such proportion as is appropriate to reflect the relative fault of Holdings, the Company and their subsidiaries, on the one hand, and such member, on the other hand, in

- 4 -

connection with the actions which resulted in such Losses, as well as any other equitable considerations.

8. <u>Independent Contractor</u>. Each of the Advisors and the Company agree that each Advisor shall perform services hereunder as an independent contractor, retaining control over and responsibility for its own operations and personnel. No Advisor or any of its partners, members, employees or agents shall be considered employees or agents of Holdings, the Company or any of their subsidiaries as a result of this Agreement nor shall any of them have authority under this Agreement to contract in the name of or bind Holdings, the Company or any of their subsidiaries, except as expressly agreed to in writing by Holdings, the Company or any of their subsidiaries, respectively.

9. <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given, delivered and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this Section 9 prior to 5:00 p.m. (New York time) on a business day, (ii) the business day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this Agreement later than 5:00 p.m. (New York time) on any business day and earlier than 11:59 p.m. (New York time) on the day preceding the next business day, (iii) one (1) business day after when sent, if sent by nationally recognized overnight courier service (charges prepaid), or (iv) upon actual receipt by the party to whom such notice is required to be given. The address for such notices and communications shall be as follows:

<u>To Holdings</u>:

Toys "R" Us Holdings, Inc.
c/o Toys "R" Us, Inc.
One Geoffrey Way
Wayne, NJ 07470
Facsimile:    (973) 617-4004
Attention:    Chief Executive Officer

<u>To the Company</u>:

Toys "R" Us, Inc.
One Geoffrey Way
Wayne, NJ 07470
Facsimile:    (973) 617-4004
Attention:    Chief Executive Officer

- 5 -

<u>To Bain</u>:

Bain Capital Partners, LLC
111 Huntington Avenue
Boston, MA 02199
**Facsimile:** (617) 516-2010
Attention:     Matthew S. Levin

and

Bain Capital, Ltd.
Devonshire House 6th floor, Mayfair Place
London ENGLAND WIJ 8AJ
**Facsimile:** +44 20 7514 5250
Attention:     Dwight Poler

<u>To KKR</u>:

Toybox Holdings LLC
2800 Sand Hill Road, Suite 200
Menlo Park, CA 94025
**Facsimile:** (650) 233-6553
Attention:     Michael M. Calbert

<u>To Vornado</u>:

Vornado Truck LLC
888 Seventh Avenue
New York, NY 10019
**Facsimile:** (212) 894-7996
Attention:     Alan J. Rice

10.  <u>Successors</u>. This Agreement and all the obligations and benefits hereunder shall inure to the successors and assigns of the parties.

11.  <u>Assignment</u>. No party may assign any obligations hereunder to any other party without the prior written consent of each of the other parties; provided that any Advisor may, without consent of the Company or the other Advisors, assign its rights and obligations under this Agreement to any of its Affiliates.

12.  <u>Counterparts</u>. This Agreement may be executed and delivered by each party hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which taken together shall constitute but one and the same agreement.

13.  <u>Entire Agreement</u>. The terms and conditions hereof constitute the entire agreement between the parties hereto with respect to the subject matter of this Agreement and

supersede all previous communications, either oral or written, representations or warranties of any kind whatsoever, except as expressly set forth herein.

14. Amendments and Waivers. No amendment or waiver of any term, provision or condition of this Agreement shall be effective unless in writing and executed by the Company and each of the Advisors as to which the Sponsor that is, or is an Affiliate of, such Advisor continues to own at least 30% of its Initial Shares.

Notwithstanding the foregoing, if any amendment, modification, extension, termination or waiver (each, an "Amendment") would (i) adversely change the rights of a particular Advisor in a manner different than changes to the rights of the Advisors approving such Amendment or (ii) adversely impose any additional material obligation of a particular Advisor, then the consent of such particular Advisor shall also be required.

Each such Amendment shall be binding upon each party hereto. In addition, each party hereto may waive any right hereunder, as to itself, by an instrument in writing signed by such party. No waiver on any one occasion shall extend to or effect or be construed as a waiver of any right or remedy on any other occasion. No course of dealing of any Person nor any delay or omission in exercising any right or remedy shall constitute an amendment of this Agreement or a waiver of any right or remedy of any party hereto.

15. Aggregation of Shares. For purposes of any determination under this Agreement concerning the number of shares of Holdings capital stock held by an Advisor, all shares of Holdings capital stock held by an Advisor and its Affiliates shall be aggregated together.

16. Allocation of Bain Fees. All fees payable to Bain hereunder shall be allocated between BCP and BCL as they shall direct the Company by joint notice.

17. Governing Law. All issues concerning this agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of New York.

18. Consent to Jurisdiction. Each party to this Agreement, by its execution hereof, (a) hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York and the state courts sitting in the State of New York, County of New York for the purpose of any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter hereof, (b) hereby waives to the extent not prohibited by applicable law, and agrees not to assert, and agrees not to allow any of its subsidiaries to assert, by way of motion, as a defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such proceeding brought in one of the above-named courts is improper, or that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court and (c) hereby agrees not to commence or maintain any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or

- 7 -

based upon this Agreement or relating to the subject matter hereof or thereof other than before one of the above-named courts nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation to any court other than one of the above-named courts whether on the grounds of inconvenient forum or otherwise. Notwithstanding the foregoing, to the extent that any party hereto is or becomes a party in any litigation in connection with which it may assert indemnification rights set forth in this agreement, the court in which such litigation is being heard shall be deemed to be included in clause (a) above. Notwithstanding the foregoing, any party to this Agreement may commence and maintain an action to enforce a judgment of any of the above-named courts in any court of competent jurisdiction. Each party hereto hereby consents to service of process in any such proceeding in any manner permitted by New York law, and agrees that service of process by registered or certified mail, return receipt requested, at its address specified pursuant to Section 9 hereof is reasonably calculated to give actual notice.

19. WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTIES HERETO THAT THIS SECTION 19 CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 19 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

20. Joint and Several Liability. Each obligation described herein of Holdings, the Company and/or its subsidiaries, as the case may be, shall be a joint and several obligation of Holdings and its subsidiaries. If requested by any of the Advisors, then Holdings shall cause any of its subsidiaries to sign a counterpart signature page to this Agreement to evidence such joint and several liability. Upon an underwritten registered public offering of capital stock of any subsidiary of Holdings, the Advisor Majority may cause such subsidiary (and its subsidiaries) to be released from joint and several liability for obligations hereunder arising after the closing of such offering, but this Agreement shall continue in full force and be binding on Holdings, the Company, and all of their other subsidiaries.

21. Certain Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

"Advisor Majority" shall mean (w) if each of the three (3) Sponsors who are, or are Affiliates of, the Advisors continues to own at least 30% of its Initial Shares, then at least two (2)

of such three (3) Sponsors; (x) if only two (2) of such Sponsors continue to own at least 30% of their Initial Shares, then both of such Sponsors; (y) if only one (1) such Sponsor continues to own at least 30% of its Initial Shares, then such Sponsor; and (z) otherwise, the holders of a majority of the shares of Company capital stock then held by all such Sponsors.

"Affiliate" shall mean, with respect to any Person, (i) any other Person which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such Person (for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise); provided, however, that neither Holdings nor any of its controlled Affiliates shall be deemed an Affiliate of any of Holdings' stockholders (and vice versa) and none of Holdings' stockholders shall be deemed Affiliates of each other solely as a result of their relationship with respect to the Holdings, or (ii) if such Person is an investment fund, any other investment fund the primary investment advisor to which is the primary investment advisor to such Person or an Affiliate thereof.

"Change in Control" shall have the meaning set forth in the Stockholders Agreement.

"Fee Allocation Percentage" shall mean, with respect to any Advisor at any time, a percentage equal to (i) if the Sponsor who is, or who is an Affiliate of, such Advisor continues to own at least 50% of its Initial Shares, then 100%, (ii) if the Sponsor who is, or who is an Affiliate of, such Advisor continues to own at least 30% (but less than 50%) of its Initial Shares, then 50%, (iii) if the Sponsor who is, or who is an Affiliate of, such Advisor continues to own at least 15% (but less than 30%) of its Initial Shares, then 25%, and (iv) if the Sponsor who is, or who is an Affiliate of, such Advisor owns less than 15% of its Initial Shares, then zero.

"Holdings" shall mean Toys "R" Us Holdings, Inc., a Delaware corporation.

"Independent Third Party" shall have the meaning set forth in the Stockholders Agreement.

"Initial Public Offering" shall have the meaning set forth in the Stockholders Agreement.

"Initial Shares" shall mean, with respect to any Sponsor, the number of shares of Holdings' capital stock held by the Sponsor who is, or who is an Affiliate of, such Advisor as of the Effective Date, which number of shares shall be proportionally and equitably adjusted for any stock split, combinations, stock dividend or other recapitalization affecting such stock.

"Person" shall mean any individual, partnership, corporation, company, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof.

"Quarterly Fee Amount" shall mean (a) $3,750,000 per fiscal quarter for the Company's fiscal year 2005; and (b) for each fiscal year thereafter during the Term, an amount per fiscal quarter equal to 105% of the applicable Quarterly Fee Amount for the immediately preceding fiscal year; provided that, notwithstanding the foregoing, the Quarterly Fee Amount for the first

- 9 -

fiscal quarter of 2006 (i.e., the quarter commencing on or about February 1, 2006) shall be $7,500,000.

"Sponsors" shall have the meaning set forth in the Stockholders Agreement.

"Stockholders Agreement" shall mean that certain stockholders agreement of even date herewith, by and among Vornado, Toybox Holdings LLC, certain funds managed by Bain and Holdings, as amended from time to time in accordance with its terms.

\* \* \* \* \*

- 10 -

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

HOLDINGS:

TOYS "R" US HOLDINGS, INC.

By: _____ /s/ Jordan Hitch
Name: _____ Jordan Hitch
Its: _____ Vice President

COMPANY:

TOYS "R" US, INC.

By: _____ /s/ Jordan Hitch
Name: _____ Jordan Hitch
Its: _____ Vice President

ADVISORS:

BAIN CAPITAL PARTNERS, LLC

By: _____ /s/ Matthew S. Levin
Name: _____ Matthew S. Levin
Its: _____ Managing Director

BAIN CAPITAL, LTD.

By: _____ /s/ Matthew S. Levin
Name: _____ Matthew S. Levin
Its: _____ Managing Director

*Signature Page to Advisory Agreement*

KOHLBERG KRAVIS ROBERTS & CO., L.P.

By:                                 KKR & Co. LLC

By: _____ /s/ Michael M. Calbert
Name: _____ Michael M. Calbert
Its: _____


VORNADO TRUCK LLC

By:                               Vornado Realty L.P.
Its:                                 Sole Member

By:                                Vornado Realty Trust
Its:                                 General Partner

By: _____ /s/ Wendy Silverstein
Name: _____ Wendy Silverstein
Its: _____ Executive Vice President–Capital Markets

*Signature Page to Advisory Agreement*

# EXHIBIT 4

# EXHIBIT 4-A

Excerpts from
TRU's Apr. 12, 2017 Form 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended January 28, 2017**
**Commission file number 1-11609**



# TOYS "R" US, INC.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **22-3260693** |
| **(State or other jurisdiction of incorporation or organization)** | **(IRS Employer Identification Number)** |
| **One Geoffrey Way Wayne, New Jersey** | **07470** |
| **(Address of principal executive offices)** | **(Zip code)** |

**(973) 617-3500**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) or 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.   Yes ☒   No ☐

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☐   No ☐

(Note: As a voluntary filer not subject to the filing requirements of Section 13(a) or 15(d) of the Exchange Act, the registrant has filed all reports pursuant to Section 13(a) or 15(d) of the Exchange Act during the preceding 12 months as if the registrant were subject to such filing requirements.)

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☐   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☒

Indicate by checkmark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one)

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒  (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

As of March 17, 2017, there were 49,353,943 outstanding shares of common stock, $0.001 par value per share, of Toys "R" Us, Inc., none of which were publicly traded.

**DOCUMENTS INCORPORATED BY REFERENCE**
None

requires 12 months of service and completion of 1,000 hours. In addition, the Company makes a matching contribution in an amount equal to 100% of the first 4% of the participant's contribution. We also have various defined contribution and other foreign government sponsored retirement plans for foreign employees, which are managed by each respective foreign location. Expenses related to the Savings Plan, other foreign defined contribution plans and other foreign government sponsored retirement plans were $26 million, $25 million and $24 million in fiscals 2016, 2015 and 2014, respectively. The Board of Directors did not elect to contribute to the profit sharing portion of the Savings Plan in fiscals 2016, 2015 and 2014.

## NOTE 14 — LITIGATION AND LEGAL PROCEEDINGS

In May 2013, we opted out of the settlement of a class action lawsuit against Visa and MasterCard alleging violations of antitrust laws.  In January 2014, we, along with several other companies, filed a separate lawsuit against Visa and MasterCard entitled Progressive Casualty Insurance Co. et al. v. Visa, Inc., et al. (United States District Court for the Eastern District of New York, No. 14-00276).  A settlement was reached in December 2014, and we received a payment of $12 million in January 2015 which was recorded in SG&A.

In addition to the litigation discussed above, we are, and in the future may be, involved in various other lawsuits, claims and proceedings incident to the ordinary course of business. The results of litigation are inherently unpredictable. Any claims against us, whether meritorious or not, could be time consuming, result in costly litigation, require significant amounts of management time and result in diversion of significant resources. We are not able to estimate an aggregate amount or range of reasonably possible losses for those legal matters for which losses are not probable and estimable, primarily for the following reasons: (i) many of the relevant legal proceedings are in preliminary stages, and until such proceedings develop further, there is often uncertainty regarding the relevant facts and circumstances at issue and potential liability; and (ii) many of these proceedings involve matters of which the outcomes are inherently difficult to predict. However, based upon our historical experience with similar matters, we do not expect that any such additional losses would be material to our consolidated financial position, results of operations or cash flows.

## NOTE 15 — COMMITMENTS AND CONTINGENCIES

We are subject to various claims and contingencies related to lawsuits as well as commitments under contractual and other commercial obligations. We recognize liabilities for contingencies and commitments when a loss is probable and estimable. Refer to Note 9 entitled "LEASES" for minimum rental commitments under non-cancelable operating leases having a term of more than one year as of January 28, 2017. Refer to Note 10 entitled "INCOME TAXES" for liabilities associated with uncertain tax positions.

As of January 28, 2017, we remain contingently liable for amounts due or amounts that may become due under certain real estate lease agreements that have been assigned to third parties. In the event of default by the assignees, we could be liable for payment obligations associated with these leases which have future lease related payments (not discounted to present value) of $42 million through September 2032. The impact of these obligations is not material to our Consolidated Financial Statements.

## NOTE 16 — RELATED PARTY TRANSACTIONS

### Sponsor Advisory Agreement

The Sponsors provide management and advisory services to us pursuant to an advisory agreement executed at the closing of the merger transaction effective as of July 21, 2005 and amended June 10, 2008, February 1, 2009, August 29, 2014, June 1, 2015 and December 1, 2015 ("Advisory Agreement"). The term of the Advisory Agreement is currently a one-year renewable term unless we or the Sponsors provide notice of termination to the other. Management and advisory fees (the "Advisory Fees") of $6 million per annum are payable on a quarterly basis. The Advisory Agreement includes customary exculpation and indemnification provisions in favor of the Sponsors and their affiliates. In the event that the Advisory Agreement is terminated by the Sponsors or us, the Sponsors will receive all unpaid Advisory Fees and expenses due under the Advisory Agreement with respect to periods prior to the termination date plus the net present value of the Advisory Fees that would have been payable for the remainder of the then applicable one-year term of the Advisory Agreement.

In August 2014, the Advisory Agreement was amended in order to reduce the Advisory Fees to $17 million for fiscal year 2014 and each year thereafter.  The amendment provided that if in the future we successfully complete an initial public offering ("IPO"), the Sponsors may elect to receive from the proceeds of such IPO, an amount equal to the aggregate difference between: (x) the Advisory Fees that would have been paid in fiscal year 2014 and each fiscal year thereafter had such amounts not been fixed and (y) the Advisory Fees that were actually paid for fiscal year 2014 and each fiscal year thereafter.

In June 2015, the Advisory Agreement was further amended in order to reduce the Advisory Fees payable in fiscal 2015 and thereafter from $17 million to $6 million annually with no further adjustment upon an IPO for such reductions. We recorded

Advisory Fees of $6 million for fiscals 2016 and 2015, respectively, and $17 million for fiscal 2014. We also paid the Sponsors for out-of-pocket expenses, which were nominal during fiscal 2016 and less than $1 million during fiscals 2015 and 2014, respectively.

Additionally, the original Advisory Agreement provided that affiliates of the Sponsors will be entitled to receive a fee equal to 1% of the aggregate transaction value in connection with certain financing, acquisition, disposition and change of control transactions ("Transaction Fees"). Transaction Fees were capitalized as deferred debt issuance costs and amortized over the term of the related debt agreement. In December 2015, the Advisory Agreement was further amended to waive all Transaction Fees including prior accrued and unpaid transaction fees of $47 million as well as any fees to be paid upon an IPO.

*Other Relationships and Transactions with our Sponsors*

From time to time, we and our subsidiaries, as well as the Sponsors or their affiliates, may acquire debt or debt securities issued by us or our subsidiaries in open market transactions, tender offers, exchange offers, privately negotiated transactions or otherwise. KKR did not own any of our debt as of January 28, 2017 and owned the following aggregate amounts of our debt as of January 30, 2016. For further details, refer to Note 2 entitled "SHORT-TERM BORROWINGS AND LONG-TERM DEBT."

| (In millions) | January 30, 2016 |
|---|---|
| Propco I Term Loan Facility | $      16 |
| Incremental Secured Term Loan | 12 |
| Secured Term B-4 Loan | 2 |
| Second Incremental Secured Term Loan | 2 |
| **Total** | $      32 |

During fiscals 2016, 2015 and 2014, affiliates of KKR held debt and debt securities issued by the Company and its subsidiaries. The interest amounts paid on such debt and debt securities held by related parties were $1 million, $7 million and $10 million in fiscals 2016, 2015 and 2014, respectively.

Additionally, under lease agreements with affiliates of Vornado Realty Trust ("Vornado"), we paid an aggregate amount of $8 million in fiscals 2016, 2015 and 2014, respectively, with respect to less than 1% of our operated stores, which include Express stores. Of the aggregate amount paid in fiscals 2016 and 2015, $2 million, respectively, was allocable to joint-venture parties not otherwise affiliated with Vornado.

Each of the Sponsors, either directly or through affiliates, has ownership interests in a broad range of companies ("Portfolio Companies") with whom we may from time to time enter into commercial transactions in the ordinary course of business, primarily for the purchase of goods and services. After a competitive bidding process, on February 1, 2015, we entered into an agreement with SquareTrade Inc. ("SquareTrade"), which was a Portfolio Company of Bain Capital Private Equity, L.P. ("Bain"). SquareTrade provides protection plans for electronic and other products that cover the repair, replacement or refund of such products. Under the agreement, we are licensed to sell protection plans on behalf of SquareTrade and receive a fixed percentage commission fee for each sale. During fiscal 2016, Bain divested its interest in SquareTrade, which is therefore no longer related to us. For fiscals 2016 and 2015, we recorded $19 million and $21 million, respectively, in commissions within Net sales. Receivables from SquareTrade were less than $1 million as of January 30, 2016 and included in Accounts and other receivables on the Consolidated Balance Sheet. Payables to SquareTrade were $3 million as of January 30, 2016 and included in Accrued expenses and other current liabilities on the Consolidated Balance Sheet.

In addition, we have a relationship with Veritiv Operating Company ("Veritiv"), which is a Portfolio Company of Bain. Prior to its formation, we had an agreement with Veritiv's predecessor, which was independent from us. Veritiv is a strategic distribution company, from which we purchase packaging materials and receive facility and logistics solutions.  In fiscals 2016, 2015 and 2014, we recorded expenses of $12 million, $13 million and $15 million, respectively, within SG&A.  Payables to Veritiv were nominal as of January 28, 2017 and January 30, 2016, respectively, which are included in Accounts payable on the Consolidated Balance Sheets. We believe that none of our transactions or arrangements with Portfolio Companies are significant enough to be considered material to the Sponsors or to our business.

**NOTE 17 — ACQUISITIONS**

On October 31, 2011, the Company acquired a 70% ownership interest in Asia JV from Fung Retailing for a purchase price of $79 million (including a $10 million hold back) plus $8 million of contingent consideration. The terms of the agreement, as amended, provide us with the future option to acquire Fung Retailing's 30% interest in the business and also provides Fung Retailing the option to require us to buy their 30% interest in the business beginning on April 30, 2017.

# EXHIBIT 4-B

Excerpts from
TRU's Dec. 11, 2014 Form 10-Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

### QUARTERLY REPORT

**PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended November 1, 2014**

### Commission file number 1-11609



# TOYS "R" US, INC.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **22-3260693** |
| **(State or other jurisdiction of incorporation or organization)** | **(IRS Employer Identification Number)** |
| **One Geoffrey Way Wayne, New Jersey** | **07470** |
| **(Address of principal executive offices)** | **(Zip code)** |

### (973) 617-3500
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☐    No ☐

(Note: As a voluntary filer not subject to the filing requirements of Section 13(a) or 15(d) of the Exchange Act, the registrant has filed all reports pursuant to Section 13(a) or 15(d) of the Exchange Act during the preceding 12 months as if the registrant were subject to such filing requirements.)

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐    No ☒

As of December 8, 2014, there were 49,163,709 outstanding shares of common stock of Toys "R" Us, Inc., none of which were publicly traded.

**Exhibit 10.7**

AMENDMENT NO. 3 TO THE
ADVISORY AGREEMENT

August 29, 2014

This Amendment No. 3 (this "Amendment") to the Advisory Agreement among Toys "R" Us, Inc., (the "Company"), Bain Capital Partners, LLC, a Delaware limited liability company ("BCP"), Bain Capital, Ltd., a company organized under the laws of England and Wales ("BCL" and, together with BCP, "Bain"), Kohlberg Kravis Roberts & Co., L.P., a Delaware limited partnership ("KKR"), and Vornado Truck LLC, a Delaware limited liability company ("Vornado" and together with Bain and KKR, the "Advisors"), dated as of July 21, 2005, as amended on June 10, 2008 and as further amended on February 1, 2009 (the "Agreement"), shall become effective as of August 29, 2014. Capitalized terms used but not otherwise defined in this Amendment have the meaning given to such terms in the Reorganization Agreement and/or the Agreement, as applicable.

1.    Definition of Quarterly Fee Amount. The definition of "Quarterly Fee Amount" is hereby amended and restated as follows:

""Quarterly Fee Amount" shall mean (a) $3,750,000 per fiscal quarter for the Company's fiscal year 2005 and (b) for each fiscal year thereafter during the Term, an amount per fiscal quarter equal to one hundred five percent (105%) of the applicable Quarterly Fee Amount for the immediately preceding fiscal year (the "Quarterly Fee Increase"); provided that, for fiscal year 2009 only, the Quarterly Fee Amount shall be reduced to $3,750,000 per fiscal quarter. If the Company successfully completes an Initial Public Offering ("IPO"), the Advisors may elect to receive and the Company shall pay from the proceeds of an IPO, an amount equal to the aggregate difference between: (i) the Quarterly Fee Amount the Company would have paid had the amount not been fixed in fiscal year 2009 and (ii) the Quarterly Fee Amount payments that were made by the Company for fiscal year 2009. For purposes of clarification, the Quarterly Fee Amount for fiscal year 2010 shall be $4,786,055.86 per fiscal quarter. Notwithstanding the foregoing, the Quarterly Fee Amount for fiscal year 2014 and each fiscal year thereafter during the Term or any extension of the Term shall be $4,363,110. If the Company successfully completes an IPO, the Advisors may elect to receive and the Company shall pay from the proceeds of an IPO, an amount equal to the aggregate difference between: (x) the Quarterly Fee amount the Company would have paid in fiscal year 2014 and each fiscal year thereafter had such amounts not been fixed and (y) the Quarterly Fee Amount payments that were made by the Company for fiscal year 2014 and each fiscal year thereafter."

2.    The parties acknowledge that for fiscal year 2014, any excess Quarterly Fee Amounts paid by the Company before this Amendment was adopted (i.e., the amount of any Quarterly Fee Amount that was paid which was in excess of $4,363,110) will be applied as a credit to the next occurring Quarterly Fee Amount so that the total paid in fiscal year 2014 will equal $17,452,440.

3.    <u>Continuing Force and Effect</u>. The Agreement, as modified by the terms of this Amendment, shall continue in full force and effect from and after the date of the adoption of this Amendment set forth above.

4.    <u>Counterparts</u>. This Amendment may be executed by the parties hereto in any number of separate counterparts (including facsimiled counterparts), each of which shall be deemed to be an original, and all of which taken together shall be deemed to constitute one and the same instrument.

5.    <u>GOVERNING LAW</u>. THIS AMENDMENT AND SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the parties have executed this Amendment No. 3 to the Advisory Agreement on the day and year first written above.

TOYS "R" US, INC.

/s/ David J. Schwartz

By: _____

Name: David J. Schwartz

Title: Executive Vice President – General
                     Counsel

BAIN CAPITAL PARTNERS, LLC

By:    /s/ Matthew S. Levin _____

Name: Matthew S. Levin

Its: _____

BAIN CAPITAL, LTD.

By:    /s/ Matthew S. Levin _____

Name: Matthew S. Levin

Its: _____

KOHLBERG KRAVIS ROBERTS & CO., L.P.

By:    KKR & Co. LLC

By:    /s/ William Janetschek _____

Name: William Janetschek

Its:    Chief Financial Officer

VORNADO TRUCK, LLC

By:    /s/ Wendy Silverstein _____

Name: Wendy Silverstein

Its: Authorized Signatory

# EXHIBIT 4-C

Excerpts from
TRU's Sept. 27, 2017 Form 10-Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C. 20549

## FORM 10-Q

### QUARTERLY REPORT

**PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended July 29, 2017**

### Commission file number 1-11609



# TOYS "R" US, INC.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **22-3260693** |
| **(State or other jurisdiction of incorporation or organization)** | **(IRS Employer Identification Number)** |
| **One Geoffrey Way Wayne, New Jersey** | **07470** |
| **(Address of principal executive offices)** | **(Zip code)** |

**(973) 617-3500**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☐   No ☐

(Note: As a voluntary filer not subject to the filing requirements of Section 13(a) or 15(d) of the Exchange Act, the registrant has filed all reports pursuant to Section 13(a) or 15(d) of the Exchange Act during the preceding 12 months as if the registrant were subject to such filing requirements.)

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

As of September 26, 2017, there were 49,353,943 outstanding shares of common stock of Toys "R" Us, Inc., none of which were publicly traded.

**TOYS "R" US, INC. AND SUBSIDIARIES**
**NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## 1. Basis of presentation

As used herein, the "Company," "we," "us," or "our" means Toys "R" Us, Inc., and its consolidated subsidiaries, except as expressly indicated or unless the context otherwise requires. The Condensed Consolidated Balance Sheets as of July 29, 2017, January 28, 2017 and July 30, 2016, the Condensed Consolidated Statements of Operations and the Condensed Consolidated Statements of Comprehensive Loss for the thirteen and twenty-six weeks ended July 29, 2017 and July 30, 2016 and the Condensed Consolidated Statements of Cash Flows and the Condensed Consolidated Statements of Stockholders' Deficit for the twenty-six weeks ended July 29, 2017 and July 30, 2016, have been prepared by us in conformity with accounting principles generally accepted in the United States of America ("GAAP") for interim reporting, and in accordance with the requirements of this Quarterly Report on Form 10-Q. Our interim Condensed Consolidated Financial Statements are unaudited and are subject to year-end adjustments. In the opinion of management, the financial statements include all known adjustments (which consist primarily of normal, recurring accruals, estimates and assumptions that impact the financial statements) necessary to present fairly the financial position at the balance sheet dates and the results of operations for the thirteen and twenty-six weeks then ended. The Condensed Consolidated Balance Sheet at January 28, 2017, presented herein, has been derived from our audited balance sheet included in our Annual Report on Form 10-K for the fiscal year ended January 28, 2017, but does not include all disclosures required by GAAP. These financial statements should be read in conjunction with the consolidated financial statements and footnotes thereto included within our Annual Report on Form 10-K for the fiscal year ended January 28, 2017. The results of operations for the thirteen and twenty-six weeks ended July 29, 2017 and July 30, 2016 are not necessarily indicative of operating results for the full year.

### Toys-Japan/Asia JV Transaction

On March 24, 2017, the Company combined the legal entity structure for its Toys-Japan and Toys (Labuan) Holding Limited ("Asia JV") businesses (the "Asia Merger"). The combination was effected by the issuance of new shares of the Asia JV in exchange for our contribution of Toys-Japan, which resulted in Fung Retailing's ownership of 15% in the combined company and our ownership of 85% in the combined company. In connection with the Asia Merger, we no longer hold a future option or requirement to acquire Fung Retailing's ownership interest in the Asia JV. As a result, the Noncontrolling interest is no longer redeemable at the option of the holder and was reclassified from Temporary equity to Stockholders' deficit on the Condensed Consolidated Balance Sheet in fiscal 2017. We recorded a $68 million adjustment to Noncontrolling interest to reflect Fung Retailing's ownership of the combined company's net assets at book value.

### Subsequent Events

On August 21, 2017, Toys "R" Us (Canada) Ltd. Toys "R" Us (Canada) Ltee ("Toys-Canada"), a subsidiary of the Company, entered into a sale-leaseback arrangement for its corporate resource center and distribution center for gross proceeds of CAD $76 million ($60 million as of August 21, 2017). Pursuant to the lease agreement, the initial minimum lease term is 15 years with five additional 5-year extension terms. In accordance with Accounting Standards Codification ("ASC") 840-40, the leaseback period, including the fixed renewal options, constitutes continuing involvement with the associated property. Due to this continuing involvement, we recorded a financing obligation for the proceeds received and will defer the recognition of the gain.

### Bankruptcy Filing

As discussed further in Note 2 entitled "Subsequent Event - Bankruptcy Filing," on September 18, 2017 (the "Petition Date"), the Company and certain of the Company's direct and indirect subsidiaries (collectively with the Company, the "Debtors"), filed voluntary petitions ("Bankruptcy Petitions") for reorganization under Chapter 11 of the U.S. Bankruptcy Code ("Bankruptcy Code") in the U.S. Bankruptcy Court for the Eastern District of Virginia, Richmond Division ("Bankruptcy Court"). See Note 3 entitled "Short-term borrowings and long-term debt" for a discussion of debtor-in-possession financing.

## 2. Subsequent Event - Bankruptcy Filing

### Chapter 11 Proceedings

On the Petition Date, the Debtors filed Bankruptcy Petitions for reorganization under Chapter 11 of the Bankruptcy Code in Bankruptcy Court. The Debtors have filed a motion with the Bankruptcy Court seeking joint administration of their Chapter 11 cases. The Debtors' Chapter 11 cases are being jointly administered for procedural purposes under the caption *In re Toys "R" Us, Inc., et al.*, Case No. 12-34665 (KLP). Documents and other information related to the Chapter 11 Proceedings is available free of charge online at https://cases.primeclerk.com/toysrus/.

*Operation and Implications of the Chapter 11 Cases*

The accompanying Condensed Consolidated Financial Statements contemplate the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to continue as a going concern is contingent upon our ability to comply with the financial and other covenants contained in the debtor-in-possession financing (the "DIP Financing") described below, the development of, and the Bankruptcy Court's approval of, a Chapter 11 plan and our ability to successfully implement a restructuring plan and obtain new financing, among other factors. Such conditions raise substantial doubt as to the Company's ability to continue as a going concern.

As a result of the Chapter 11 cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. The filing of the Chapter 11 petitions constituted an event of default with respect to certain of our existing debt obligations. While operating as debtors-in-possession under Chapter 11, the Debtors may sell or otherwise dispose of or liquidate assets or settle liabilities, subject to the approval of the Bankruptcy Court or as otherwise permitted in the ordinary course of business (and subject to restrictions contained in the DIP Financing and applicable orders of the Bankruptcy Court), for amounts other than those reflected in the accompanying Condensed Consolidated Financial Statements. Further, any restructuring plan may impact the amounts and classifications of assets and liabilities reported in our Condensed Consolidated Financial Statements.

*Financing During the Chapter 11 Cases*

See Note 3 entitled "Short-term borrowings and long-term debt" for discussion of the DIP Financing, which provides up to $3,125 million in senior secured, super-priority financing, subject to the terms, conditions, and priorities set forth in the applicable definitive documentation and orders of the Bankruptcy Court.

*Significant Bankruptcy Court Actions*

On September 19, 2017 at the first-day hearings of the Chapter 11 cases, the Bankruptcy Court issued certain interim and final orders relating to the Debtors' businesses. These orders authorized the Debtors to, among other things, enter into the DIP Financing (described in Note 3 entitled "Short-term borrowings and long-term debt"), pay certain pre-petition employee and retiree expenses and benefits, use their existing cash management system, maintain and administer customer programs, pay certain critical and foreign vendors and pay certain pre-petition taxes and related fees. In addition, during the first-day hearings, the Bankruptcy Court set October 10, 2017 as the date for the second-day hearings in the Chapter 11 cases. We expect that at the second-day hearings the Bankruptcy Court will consider issuing final orders related to the matters approved in the interim orders as well as certain other related matters.

These orders are significant because they allow us to operate our businesses in the normal course.

7

**3. Short-term borrowings and long-term debt**

*Pre-Petition short-term borrowings and long-term debt*

A summary of the Company's consolidated Short-term borrowings and Long-term debt as of July 29, 2017, January 28, 2017 and July 30, 2016 is outlined in the table below:

| (In millions) | July 29, 2017 | January 28, 2017 | July 30, 2016 |
|---|---|---|---|
| **Short-term borrowings** | | | |
| Asia JV uncommitted lines of credit | $ 5 | $ — | $ 6 |
| **Long-term debt** | | | |
| 10.375% senior notes, due fiscal 2017 (1) | — | — | 445 |
| 8.500% senior secured notes, due fiscal 2017 (2) | — | — | 718 |
| French real estate credit facility, due fiscal 2018 | 53 | 48 | 50 |
| Incremental secured term loan facility, due fiscal 2018 (3) | 124 | 125 | 127 |
| Second incremental secured term loan facility, due fiscal 2018 (3) | 62 | 62 | 63 |
| Toys-Japan unsecured credit line, expires fiscal 2018 | — | — | 32 |
| 7.375% senior notes, due fiscal 2018 (1) | 209 | 209 | 401 |
| $1.85 billion secured revolving credit facility, expires fiscal 2019 (3) | 845 | 465 | 649 |
| Senior unsecured term loan facility, due fiscal 2019 (4) | 847 | 874 | 872 |
| Tranche A-1 loan facility, due fiscal 2019 (3) | 273 | 272 | 271 |
| Propco II mortgage loan, due fiscal 2019 (2) | 488 | 489 | — |
| Giraffe Junior mezzanine loan, due fiscal 2019 (5) | 69 | 78 | — |
| Secured term B-4 loan facility, due fiscal 2020 (3) | 980 | 982 | 984 |
| UK real estate credit facility, due fiscal 2020 | 339 | 323 | 340 |
| European and Australian asset-based revolving credit facility, expires fiscal 2020 | 78 | — | 76 |
| Toys-Japan 1.85%-2.18% loans, due fiscals 2019-2021 | 40 | 44 | 50 |
| 12.000% Taj senior secured notes, due fiscal 2021 | 578 | 577 | — |
| 8.750% debentures, due fiscal 2021 (6) | 22 | 22 | 22 |
| Finance obligations associated with capital projects | 177 | 179 | 181 |
| Capital lease and other obligations | 12 | 12 | 15 |
| | 5,196 | 4,761 | 5,296 |
| Less: current portion | 3,176 | 119 | 80 |
| Total Long-term debt (7) | $ 2,020 | $ 4,642 | $ 5,216 |

(1) Represents obligations of Toys "R" Us, Inc. (the "Parent Company").

(2) Represents obligations of Toys "R" Us Property Company II, LLC ("TRU Propco II"). TRU Propco II is a single-purpose entity and is a separate entity from the Company. The assets and credit of TRU Propco II and its direct parent Giraffe Junior Holdings, LLC ("Giraffe Junior") are not available to satisfy the debts or other obligations of the Company or any affiliate.

(3) Represents obligations of Toys "R" Us – Delaware, Inc. ("Toys-Delaware").

(4) Represents obligations of Toys "R" Us Property Company I, LLC and its subsidiaries ("TRU Propco I").

(5) Represents obligations of Giraffe Junior.

(6) Represents obligations of the Parent Company and Toys-Delaware.

(7) We may maintain derivative instruments on certain of our long-term debt. Refer to Note 4 entitled "Derivative instruments and hedging activities" for further details.

The Parent Company is a holding company and conducts its operations through its subsidiaries, certain of which have incurred their own indebtedness. Our credit facilities, loan agreements and indentures contain customary covenants that, among other things, restrict our ability to:

- incur certain additional indebtedness;

- transfer money between the Parent Company and our various subsidiaries;

- pay dividends on, repurchase or make distributions with respect to our or our subsidiaries' capital stock or make other restricted payments;

- issue stock of subsidiaries;

- make certain investments, loans or advances;

- transfer and sell certain assets;

- create or permit liens on assets;

- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets;

- enter into certain transactions with our affiliates; and

- amend certain documents.

The amount of total net assets that were subject to such restrictions was $92 million as of July 29, 2017. Our agreements also contain various and customary events of default with respect to the indebtedness, including, without limitation, the failure to pay interest or principal when the same is due under the agreements, cross default and cross acceleration provisions, the failure of representations and warranties contained in the agreements to be true and certain insolvency events. If an event of default occurs and is continuing, the principal amounts outstanding thereunder, together with all accrued and unpaid interest and other amounts owed thereunder, may be declared immediately due and payable by the lenders.

We are dependent on the borrowings provided by the lenders to support our working capital needs, capital expenditures and to service debt. As of July 29, 2017, we have funds available to finance our operations under our $1.85 billion secured revolving credit facility ("ABL Facility") through March 2019, subject to an earlier springing maturity, our Toys-Japan unsecured credit line through June 2018 and our European and Australian asset-based revolving credit facility ("European ABL Facility") through December 2020. In addition, Asia JV and Toys-Japan have uncommitted lines of credit due on demand.

### Asia JV uncommitted lines of credit, due on demand ($5 million at July 29, 2017)

Asia JV has several uncommitted unsecured lines of credit with various financial institutions with total availability of HK$285 million ($37 million at July 29, 2017). As of July 29, 2017, we had $5 million of borrowings, which has been included in Accrued expenses and other current liabilities on the Condensed Consolidated Balance Sheet and $5 million of bank guarantees issued under these facilities. The remaining availability under these facilities was $27 million. The average interest rate on the drawn borrowings was 1.15% and 1.20% at July 29, 2017 and July 30, 2016, respectively.

### Toys-Japan unsecured credit line, expires fiscal 2018 ($0 million at July 29, 2017)

Toys-Japan currently has an agreement with a syndicate of financial institutions, which includes an unsecured loan commitment line of credit, "Tranche 2" due fiscal 2018. Tranche 2 is available in amounts of up to ¥9.45 billion ($85 million at July 29, 2017) and expires on June 29, 2018. As of July 29, 2017, we had no outstanding borrowings under Tranche 2, with $85 million of remaining availability. On June 30, 2017, Toys-Japan's second unsecured loan commitment line of credit, "Tranche 1A" expired.

Additionally, Toys-Japan has two uncommitted lines of credit with ¥1.0 billion and ¥0.5 billion of total availability, respectively. At July 29, 2017, we had no outstanding borrowings under these uncommitted lines of credit with a total of ¥1.5 billion ($14 million at July 29, 2017) of incremental availability.

### $1.85 billion secured revolving credit facility, expires fiscal 2019 ($845 million at July 29, 2017)

Under our ABL Facility which expires on March 21, 2019 subject to an earlier springing maturity, we had outstanding borrowings of $845 million, a total of $93 million of outstanding letters of credit and excess availability of $439 million as of July 29, 2017. We were subject to a minimum excess availability covenant of $125 million, with remaining availability of $314 million in excess of the covenant at July 29, 2017. Availability was determined pursuant to a borrowing base, consisting of specified percentages of eligible inventory and credit card receivables and certain Canadian real estate less any applicable availability reserves, and generally peaks in the third quarter of our fiscal year.

***European and Australian asset-based revolving credit facility, expires fiscal 2020 ($78 million at July 29, 2017)***

The European ABL Facility, as amended, provides for a five-year £138 million ($181 million at July 29, 2017) asset-based senior secured revolving credit facility which expires on December 18, 2020. As of July 29, 2017, we had outstanding borrowings of $78 million, with $29 million of remaining availability under the European ABL Facility.

***Senior unsecured term loan facility, due fiscal 2019 ($847 million at July 29, 2017)***

The senior unsecured term loan facility due fiscal 2019 (the "Propco I Term Loan Facility") requires TRU Propco I to prepay outstanding term loans with 25% of TRU Propco I's annual excess cash flow (as defined in the Propco I Term Loan Facility), subject to the rights of the lenders to decline such prepayment. As a result, TRU Propco I made a prepayment of $29 million on May 9, 2017.

***Giraffe Junior mezzanine loan, due fiscal 2019 ($69 million at July 29, 2017)***

The Giraffe Junior mezzanine loan due fiscal 2019 required TRU Propco II to make principal repayments of (i) available excess cash flow, (ii) escrow refunds and (iii) excess release proceeds, each as defined in the Giraffe Junior mezzanine loan agreement, following payment of monthly debt service and required reserves under the Propco II mortgage loan and Giraffe Junior mezzanine loan. During the thirteen and twenty-six weeks ended July 29, 2017, Giraffe Junior made prepayments of $6 million and $11 million, respectively, related to available excess cash flow.

***Subsequent Event - Debtor-in-Possession Financing***

***Debtor-in-Possession Credit Facilities***

We have received binding commitments and agreements to participate, subject to certain customary conditions, for approximately $3,125 million of post-petition financing consisting of (i) $1,850 million of revolving commitments under our proposed ABL/FILO debtor-in-possession financing (the "ABL/FILO DIP Facility"), (ii) $450 million of "first in last out" term loan financing under the ABL/FILO DIP Facility, (iii) $450 million of term loan financing under our proposed term debtor-in-possession financing (the "Term DIP Facility" and, together with the ABL/FILO DIP Facility, the "DIP Facilities") and (iv) $375 million Senior Secured ABL DIP Notes (the "DIP Notes" and together with the DIP Facilities, the "DIP Financing").

On September 20, 2017, the Bankruptcy Court approved an interim order authorizing the Debtors to pay certain fees related to the DIP Facilities in accordance with the applicable commitment and fee letters.

*ABL/FILO DIP Facility*

The ABL/FILO DIP Facility is governed by the Superpriority Debtor-In-Possession Credit Agreement (the "ABL/FILO DIP Credit Agreement"), by and among Toys-Delaware, certain additional Debtors party thereto, the lenders that are party thereto from time to time and an administrative and collateral agent.

The ABL/FILO DIP Facility will mature on the sixteenth month after the closing date of the ABL/FILO DIP Facility.

The principal amounts outstanding under the ABL/FILO DIP Facility will bear interest, with respect to the US borrowings, based on applicable LIBOR, prime rate or federal funds rates plus applicable margins and with respect to Canadian borrowings, based on applicable BA Rate, Canadian Prime Rate or Bank of Canada Overnight Rate plus applicable margins as set forth in the ABL/FILO Facility. The ABL/FILO Facility also will provide for certain additional fees payable to the agents and lenders, as well as availability fees payable with respect to any unused portions of the available ABL/FILO Facility.

The obligations under the ABL/FILO DIP Facility will be secured by (i) a superpriority claim over the Avoidance Actions (as defined under the ABL/FILO DIP Facility), (ii) a third priority lien on all of the collateral of the domestic loan parties, (iii) a first priority senior priming lien on all pre- and post-petition collateral of the domestic loan parties of the same type, scope and nature as the collateral under the that certain Amended and Restated Credit Agreement, dated as of August 24, 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Pre-petition Term Loan Agreement"), by and among Toys-Delaware, as borrower, certain of its subsidiaries as guarantors, Bank of America, N.A., as administrative agent, and the lenders from time to time party thereto, in each case subject to certain exceptions set forth in the ABL/FILO DIP Facility, (iv) a junior lien on all of the collateral of the domestic loan parties, subject to non-avoidable liens in existence at the time of the commencement of the Chapter 11 cases or valid liens in existence at the time of such commencement and (v) in the case of Toys-Canada, a superpriority lien on all property of Toys-Canada.

The ABL/FILO DIP Facility will provide for affirmative and negative covenants applicable to the Debtors, including affirmative covenants requiring the Debtors to provide financial information, budgets and other information to the agents under the ABL/FILO DIP Facility, and negative covenants restricting the Debtors' ability to incur additional indebtedness, grant liens, dispose of assets, pay dividends or take certain other actions, in each case except as permitted in the ABL/FILO DIP Facility.

Our ability to borrow under the ABL/FILO DIP Facility will be subject to the satisfaction of certain customary conditions precedent set forth therein.

The ABL/FILO DIP Facility will provide for certain usual and customary events of default for financings of this type, including non-payment of obligations, defaults under covenants, breaches of representations and warranties, cross-defaults to other indebtedness, attachment defaults, judgment defaults, failure to comply with ERISA rules and regulations, invalidity of collateral documents, change of control, invalidity of pre-petition loan documents and the occurrence of any number of adverse actions or consequences in any of the Chapter 11 cases. Upon the existence of an event of default, the ABL/FILO DIP Facility will provide that all principal, interest and other amounts due thereunder will become immediately due and payable, either automatically or at the election of specified lenders.

The foregoing summary of the ABL/FILO DIP Credit Agreement does not purport to be a complete description and is qualified in its entirety by reference to the complete text of the ABL/FILO DIP Credit Agreement, which is filed herewith as Exhibit 10.1 and incorporated by reference herein.

*DIP Term Loan*

The Term DIP Facility is governed by a Debtor in Possession Credit Agreement (the "Term DIP Credit Agreement"), by and among Toys-Delaware, as borrower, certain of the other Debtors party thereto, (together with the Borrower, the "DIP Term Loan Parties"), NexBank SSB, administrative agent and collateral agent, and the lenders from time to time party thereto.

The Term DIP Facility will mature sixteen months after the closing date of the Term DIP Facility, subject to certain Bankruptcy-related events.

The principal amounts outstanding under the Term DIP Facility will bear interest at either (i) the base rate plus a margin of 7.75% or (ii) the Eurodollar rate plus a margin of 8.75%. The obligations under the Term DIP Facility will be secured by, subject to certain exceptions and limitations, (i) a first priority priming lien with respect to the collateral pledged under the Pre-petition Term Loan Agreement, (ii) a first lien on property of the DIP Term Loan Parties of the same type, scope and nature as under the Pre-petition Term Loan Agreement that is unencumbered as of the Petition Date, (iii) a junior lien with respect to the property of the DIP Term Loan Parties that is of the same nature, scope and type as the collateral pledged under the ABL/FILO DIP Facility and was secured prior to the Petition Date and (iv) a first priority lien on the property of Wayne Real Estate Company, LLC.

The Term DIP Facility will provide for affirmative and negative covenants applicable to the Debtors, including affirmative covenants requiring the Debtors to provide financial information, budgets and other information to the agents under the Term DIP Facility, and negative covenants restricting the Debtors' ability to incur additional indebtedness, grant liens, dispose of assets, pay dividends or take certain other actions, in each case except as permitted in the Term DIP Facility. Our ability to borrow under the Term DIP Facility will be subject to the satisfaction of certain customary conditions precedent set forth therein.

The Term DIP Facility will provide for certain usual and customary events of default for financings of this type, including non-payment of obligations, defaults under covenants, breaches of representations and warranties, cross-defaults to other indebtedness, judgment defaults, failure to comply with ERISA rules and regulations, invalidity of the loan documents, change of control and the occurrence of any number of adverse actions or consequences in any of the Chapter 11 cases against Debtors. Upon the existence of an event of default, the Term DIP Facility will provide that all principal, interest and other amounts due thereunder will become immediately due and payable, either automatically or at the election of specified lenders.

The foregoing summary of the Term DIP Credit Agreement does not purport to be a complete description and is qualified in its entirety by reference to the complete text of the Term DIP Credit Agreement, which is filed herewith as Exhibit 10.2 and incorporated by reference herein.

*Debtor-in-Possession Notes Financing*

In connection with the Bankruptcy Filing, TRU Taj LLC and TRU Taj Finance, Inc., as the issuers (the "TRU Taj Issuers") entered into a Note Purchase Agreement (the "DIP Notes Purchase Agreement") with certain holders (the "Consenting Holders") of the TRU Taj Issuers' 12.000% Senior Secured Notes due 2021 (the "Existing TAJ Notes"), pursuant to which such Consenting Holders committed to provide debtor-in-possession financing consisting of $375 million aggregate principal amount of 11.00% DIP Notes.

On September 20, 2017, the Bankruptcy Court entered an interim order with respect to the issuance of the DIP Notes and the payment of related fees, and on September 22, 2017, the DIP Notes were issued under an Indenture (the "DIP Notes Indenture" and, together with the DIP Notes Purchase Agreement, the "DIP Notes Documents"), by and among the TRU Taj Issuers, the

Company, as a guarantor, certain additional subsidiaries of the Company party thereto, as guarantors (collectively with the Company, the "DIP Notes Guarantors") and Wilmington Savings Fund Society, FSB, as trustee and collateral trustee.

The net proceeds of the issuance and sale of the DIP Notes were funded into escrow; provided that $96 million of the proceeds of the DIP Notes was disbursed immediately to the Debtors to (i) fund the operations and administration of the TRU Taj Issuers and non-Debtor subsidiaries, (ii) pay fees, costs and expenses and (iii) engage in on-lending transactions to non-Debtor subsidiaries of the Company, in each case, subject to the terms and conditions of the Bankruptcy Court's interim order, the DIP Notes Purchase Agreement and the DIP Notes Indenture. An additional $35 million of the proceeds of the issuance and sale of the DIP Notes will be disbursed to the TRU Taj Issuers upon satisfactions of certain terms and conditions in the DIP Note Purchase Agreement, including, among other things, entry of the final order of the Bankruptcy Court approving the DIP Notes financing, for use in connection with the working capital needs of the TRU Taj Issuers' and their restricted subsidiaries during the 2017 holiday season. The release of the remaining proceeds of the purchase and sale of the DIP Notes to the TRU Taj Issuers is subject to certain terms and conditions in the Notes Purchase Agreement and the interim order, including, among other things, (i) granting a security interest in the collateral of certain non-Debtor European subsidiaries of the Company, including obligors under the European ABL Facility and (ii) an order of the Bankruptcy Court approving the assumption of certain intellectual property licenses. $50 million of the proceeds of the issuance and sale of the DIP Notes will be disbursed for the prepayment of the French real estate credit facility, due fiscal 2018.

The DIP Notes are the sixteen-month senior secured superpriority obligations of the Company and the DIP Notes Guarantors and, subject to the entry of the final order approving the DIP Notes financing and certain exceptions described more fully in the DIP Notes Documents and the interim order approving the DIP Notes, will be secured by (i) a priming first priority senior security interest in the pre-petition collateral of the TRU Taj Issuers and the DIP Notes Guarantors and (ii)(A) a second priority security interest on the assets of the Company's non-Debtor European subsidiaries party to the European ABL Facility, (B) a first priority security interest in the property and assets of Toys "R" Us Iberia Real Estate S.L.U. and its subsidiaries and (C) second priority security interest in the property and assets of Toys "R" Us France Real Estate SAS.

Interest on the DIP Notes accrues at the rate of 11.00%, payable monthly. The proceeds of the DIP Notes shall be used solely (i) to pay interest on the Existing TAJ Notes and the DIP Notes, (ii) for working capital and general corporate purposes of the TRU TAJ Issuers and their subsidiaries materially consistent with the interim order and (iii) to pay fees, costs and expenses incurred in connection with the issuance of the DIP Notes and other administration costs incurred in connection with the Chapter 11 cases and claims or amounts approved by the Bankruptcy Court.

The terms of the DIP Notes contain numerous covenants imposing financial and operating restrictions on the TRU Taj Issuers and the DIP Notes Guarantors. These covenants include a minimum EBITDA covenant, restrictions on the Taj Issuers' ability and certain of their restricted subsidiaries to, among other things, incur or assume additional debt or provide guarantees in respect of obligations of other persons, issue redeemable stock and preferred stock, prepay, redeem or repurchase subordinated debt, make loans and investments, incur certain liens, impose limitations on dividends, loans or asset transfers from subsidiaries, sell or otherwise dispose of assets, including capital stock of subsidiaries, consolidate or merge with or into, or sell substantially all of its assets to another person and enter into transactions with affiliates, in each case except as permitted by the DIP Notes Indenture.

The foregoing summary of the DIP Notes Indenture does not purport to be a complete description and is qualified in its entirety by reference to the complete text of the DIP Notes Indenture, which is filed herewith as Exhibit 10.3 and incorporated by reference herein.

## 4. Derivative instruments and hedging activities

We are exposed to market risk from potential changes in interest rates and foreign currency exchange rates. We regularly evaluate our exposure and enter into derivative financial instruments to economically manage these risks. We record all derivatives as either assets or liabilities on the Condensed Consolidated Balance Sheets measured at estimated fair value and we do not offset assets and liabilities with the same counterparty. We recognize the changes in fair value as unrealized gains and losses. The recognition of these gains or losses depends on our intended use of the derivatives and the resulting designation. In certain defined conditions, we may designate a derivative as a hedge for a particular exposure.

### *Interest Rate Contracts*

As of July 29, 2017 and January 28, 2017, we had two interest rate caps designated as cash flow hedges. As of July 30, 2016, we had one interest rate cap designated as a cash flow hedge. No material ineffectiveness was recorded for the thirteen and twenty-six weeks ended July 29, 2017 and July 30, 2016. We expect to reclassify a net loss of less than $1 million over the next 12 months to Interest expense from Accumulated other comprehensive loss.

**Item 2.**        **Unregistered Sales of Equity Securities and Use of Proceeds**

None.

**Item 3.**        **Defaults Upon Senior Securities**

The filing of the voluntary petitions seeking relief under Chapter 11 of the Bankruptcy Code constituted an event of default that accelerated the Company's obligations under the following debt instruments:

- the Indenture governing our 7.375% senior notes due 2018;

- the Indenture governing our 8.750% debentures due 2021;

- the Third Amended and Restated Credit Agreement, dated as of March 21, 2014, among Toys "R" Us - Delaware, Inc., as the Lead Borrower, Toys "R" Us (Canada) Ltd., Toys "R" Us (Canada) Ltee, as the Canadian Borrower, and certain other subsidiaries of Toys "R" Us - Delaware, Inc., as Facility Guarantors, Bank of America N.A., as Administrative Agent, as Canadian Agent and Co-Collateral Agent, Wells Fargo Bank, National Association, as Co-Collateral Agent, and the Lenders named therein, Wells Fargo Bank National Association and JPMorgan Chase Bank, N.A., as Co-Syndication Agents, Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman Sachs Bank USA and Bank of Montreal as Co-Documentation Agents, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Wells Fargo Bank National Association and JPMorgan Securities, LLC, as Joint Lead Arrangers, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Wells Fargo Bank National Association, JPMorgan Securities, LLC, Citigroup Global Markets Inc., Deutsche Bank Securities Inc. and Goldman Sachs Bank USA as Joint Bookrunners, as amended by the First Amendment, dated as of October 24, 2014 to the Third Amended and Restated Credit Agreement;

- the Amended and Restated Credit Agreement (the "New Secured Term Loan"), dated as of August 24, 2010 by and among Toys "R" Us - Delaware, Inc., as Borrower, Banc of America, N.A., as Administrative Agent and as Collateral Agent, Goldman Sachs Credit Partners L.P. and JPMorgan Chase Bank, N.A., as Syndication Agents, the Lenders named therein, Credit Suisse Securities (USA) LLC and Wells Fargo Bank, N.A., as Documentation Agents, Banc of America Securities LLC, J.P. Morgan Securities, Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Banc of America Securities LLC, J. P. Morgan Securities Inc., Wells Fargo Securities, LLC, Goldman Sachs Lending Partners LLC, Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as Joint Bookrunning Managers, as amended by Amendment No. 1, dated as of September 20, 2010, to the New Secured Term Loan, Amendment No. 2, dated as of April 10, 2012, to the New Secured Term Loan, dated as of August 24, 2010 and Amendment No. 3, dated as of October 24, 2014, to the New Secured Term Loan, dated as of August 24, 2010;

- Mezzanine Loan Agreement, dated November 3, 2016, between Giraffe Junior Holdings, LLC and certain funds managed by Brigade Capital Management, LP; and

- the Loan Agreement, dated as of November 3, 2016, among Toys "R" Us Property Company II, LLC, Goldman Sachs Mortgage Company and Bank of America N.A.

As previously disclosed, subject to certain exceptions provided for in the Bankruptcy Code, the Chapter 11 filings automatically stayed all judicial or administrative actions against the Company and efforts by creditors to collect on or otherwise exercise rights or remedies with respect to pre-petition claims.

**Item 4.**        **Mine Safety Disclosures**

None.

**Item 5.**        **Other Information**

***Retention Bonus Agreements***

On September 13, 2017, the board of directors (the "Board") of the Company approved a form of retention bonus agreement (the "Retention Agreement") and individual retention bonus amounts for the Company's named executive officers, including: David A. Brandon, Chairman of the Board and Chief Executive Officer ($2,812,500); Michael J. Short, Executive Vice President – Chief Financial Officer ($600,000); Richard Barry, Executive Vice President – Global Chief Merchandising Officer ($450,000); Lance Wills, Executive Vice President – Global Chief Technology Officer ($412,500) and Andre Javes, President–Toys "R" Us, Asia Pacific ($325,125 based on the conversion rate on the date of payment of 1.0000 AUD = 0.78806 USD) (collectively, the "Named Executive Officers"). Pursuant to the Retention Agreement, each Named Executive Officer received a retention bonus, which was paid on or about September 14, 2017. Recipients are required to repay the retention bonus if the recipient's employment terminates before September 13, 2018.

The foregoing summary of the form of Retention Agreement does not purport to be a complete description and is qualified in its entirety by reference to the complete text of the form of Retention Bonus Agreement, which is filed herewith as Exhibit 10.4 and incorporated by reference herein.

### Executive Compensation Change

On September 13, 2017, the Board approved an increase in the annual base salary of Mr. Michael J. Short, Executive Vice President – Chief Financial Officer, from $700,000 to $800,000. The increase in annual base salary was effective September 15, 2017.

### Executive Incentive Plan

On September 13, 2017, the Board approved a cash-based Executive Incentive Plan for certain key employees. Pursuant to the Executive Incentive Plan, these key employees are expected to receive quarterly payments according to target percentages of their base salary based on the certain performance metrics established by the Board. The formal adoption of the Executive Incentive Plan is subject to the Bankruptcy Court's approval.

### Amendment No 3. to Stockholders' Agreement

On September 13, 2017, the Company entered into Amendment No. 3 to the Stockholders' Agreement, dated as of July 21, 2005 with the Sponsors and certain other investors, pursuant to which, among other things, the size of the Board was increased from eight to ten members, providing for an increase from one to three "independent directors" (as such term is defined in the Stockholder's Agreement and having the meaning that such director is not an employee, partner, member, stockholder, agent or affiliate of any of the Sponsors). In addition, the Stockholders' Agreement was amended to increase the maximum size of Board committees from three to six and to permit independent directors to serve on such committees.

The foregoing summary of Amendment No. 3 does not purport to be a complete description and is qualified in its entirety by reference to the complete text of Amendment No. 3, which is filed herewith as Exhibit 10.5 and incorporated by reference herein.

### Appointment of New Independent Directors

On September 13, 2017, the Board approved an increase in the size of the Board from eight to ten members and appointed Alan B. Miller, Esq. and Mohsin Y. Meghji to serve as members of the Board, each as an independent director.

Mr. Miller, age 80, serves as the Special Counsel and Litigation Trustee of the Collins & Aikman Litigation Trust and as an independent director on more than a dozen boards of directors. Mr. Miller served as Senior Partner in the Business, Finance and Restructuring practice at Weil, Gotshal & Manges LLP until December 2005 and was its co-founder of Business Finance & Restructuring practice. Mr. Miller has concentrated in business reorganizations, including Chapter 11 reorganizations, out-of-court debt restructures, secured financings and investments in troubled companies for more than 30 years. Mr. Miller holds a J.D. from Boston College Law School and a B.A. from Trinity College.

Mr. Meghji, age 52, has been Founding Partner and Managing Partner at M-III Partners LLC since February 2014. Mr. Meghji served as President and Chief Executive Officer of Merit Life Insurance Co. and Yosemite Insurance Company Inc. from January 2012 to February 2014. Mr. Meghji serves as the Chief Restructuring Officer of Capmark Financial Group. Mr. Meghji has been Chief Executive Officer at M-III Acquisition Corp. since August 04, 2015. Mr. Meghji served as the Head of Strategy and Corporate Development and Executive Vice President at Springleaf Finance Corporation since January 2012. He served as the Executive Vice President and Head of Strategy at Springleaf Holdings, Inc. Mr. Meghji served as Senior Managing Director of C-III Capital Partners from October 2011 to January 2012. Prior to that, Mr. Meghji served as Principal and Managing Director of Loughlin Management Partners+Co from February 2002 to October 2011. For the majority of his career, Mr. Meghji has specialized in advising management, investors and creditors in relation to business restructurings in a variety of industries, including healthcare. Mr. Meghji graduated with a Bachelor's degree in Business Administration from the Schulich School of Business of York University, Canada and has completed the Advanced Corporate Finance Program at the INSEAD Business School in France.

For their service as independent directors, Messrs. Miller and Meghji will be entitled to receive the compensation and other benefits the Company generally provides to its Independent Directors as described below.

In connection with the appointment of Messrs. Miller and Meghji to the Board, there are no arrangements or understandings between Messrs. Miller and Meghji and any other person pursuant to which either of Messrs. Miller and Meghji were selected as a director and there are no transactions in which either of Messrs. Miller and Meghji hold an interest requiring disclosure under Item 404(a) of Regulation S-K.

In addition to the foregoing, additional independent directors have been appointed to certain subsidiaries of the Company in connection with the Chapter 11 cases.

### Amendment No .4 to Stockholder's Agreement

On September 17, 2017, the Company entered into Amendment No. 4 to the Stockholders' Agreement, dated as of July 21, 2005 with the Sponsors and certain other investors, pursuant to which, among other things and the size of the Board was increased from ten to eleven members and the number of Bain Designees (as defined the Stockholders' Agreement) was increased from two to three.

The foregoing summary of Amendment No. 4 does not purport to be a complete description and is qualified in its entirety by reference to the complete text of Amendment No. 4, which is filed herewith as Exhibit 10.6 and incorporated by reference herein.

### Appointment of New Director

On September 17, 2017, the Board approved an increase in the size of the Board from ten to eleven members and appointed John Belitsos to serve as a Bain Designee.

Mr. Belitsos, age 38, is a Principal at Bain Capital Private Equity, L.P. ("Bain Capital"). Prior to joining the Bain Capital investment team in 2005, Mr. Belitsos worked at Goldman Sachs where he focused primarily on mergers and acquisitions for companies in the technology, media, and telecommunications industries. Mr. Belitsos also is a current member of the board of directors of iHeartCommunications, Inc. and the Gymboree Corporation, and previously served as a board member of D&M Holdings, Inc. (Denon & Marantz). Mr. Belitsos holds an A.B. in Economics from Harvard College and an M.B.A. from Harvard Business School.

Except as described herein, there are no existing or currently proposed transactions to which the Company or any of its subsidiaries is a party and in which Mr. Belitsos has a direct or indirect material interest. There are no arrangements or understandings between Mr. Belitsos and any other person pursuant to which he was selected as a director.

### Increase in Director Compensation

On September 13, 2017, the Board approved certain changes in the compensation paid to its independent directors, including Richard Goodman, who has served on the Board since October 2011 and Alan B. Miller, Esq. and Mohsin Y. Meghji, which were appointed on September 13, 2017 in connection with entry into Amendment No. 3. The Company's independent directors will receive $200,000 per year, payable quarterly in advance. In addition, the Company's independent directors will be compensated on a "per diem" basis at a rate of $5,000 in cash, for days on which such independent directors devote more than four hours outside of board meetings, for meetings or activities outside the scope of normal board duties. In accordance with the Company's customary practice, the independent directors are expected to be covered by the Company's directors' and officers' insurance policy, in an amount and on terms as reasonably determined by each Board, which would require the Company to indemnify them against certain liabilities that may arise in connection with their status or service as a member of the Board.

### Consent to Extension to Advisory Agreement

As described in Note 9 to our Condensed Consolidated Financial Statements entitled "Related Party Transactions," pursuant to the Consent Agreement, effective as of August 31, 2017, the Sponsors agreed that the Advisory Fees due to such Sponsors under the Advisory Agreement will be deferred and the Company will not be required to pay such Advisory Fees until the earlier of (i) the date specified in writing by the Sponsors and (ii) August 31, 2018.

### Waiver and Forbearance Agreement

On September 18, 2017, the Company, the TRU Taj Issuers, certain additional subsidiaries of the Company, and the Consenting Noteholders or investment managers or advisors of the Consenting Noteholders entered into the Waiver and Forbearance Agreement, as amended by Amendment No. 1, dated as of September 22, 2017 whereby the Consenting Noteholders have agreed to (1) prospectively waive the Specified Defaults; (2) forbear from exercising any of the rights and remedies under the existing Taj Notes Indenture, related documents or applicable law against the Foreign Guarantors solely with respect to the Specified Defaults and (3) consent to the incurrence of the DIP Financing.

The foregoing summary of each of the Waiver and Forbearance Agreement and Amendment No. 1 to the Waiver and Forbearance Agreement do not purport to be complete descriptions and are qualified in its entirety by reference to the complete text of the Waiver and Forbearance Agreement and Amendment No. 1 to the Waiver and Forbearance Agreement, which are filed herewith as Exhibits 10.7 and 10.8, respectively, and each are incorporated by reference herein.

**Exhibit 10.1**

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of
September 22, 2017

TOYS "R" US-DELAWARE, INC.
as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code

As the Lead Borrower
for
THE BORROWERS PARTY HERETO

THE FACILITY GUARANTORS PARTY HERETO

JPMORGAN CHASE BANK, N.A.
as Administrative Agent

JPMORGAN CHASE BANK, N.A., TORONTO BRANCH
as Canadian Agent

JPMORGAN CHASE BANK, N.A.
as Collateral Agent

THE LENDERS
NAMED HEREIN

JPMORGAN CHASE BANK, N.A.
CITIGROUP GLOBAL MARKETS INC.,
DEUTSCHE BANK SECURITIES INC.,
GOLDMAN SACHS BANK USA AND
BARCLAYS BANK PLC
as Joint Lead Arrangers and
as Joint Bookrunners

CITIGROUP GLOBAL MARKETS INC.,
DEUTSCHE BANK SECURITIES INC.,
GOLDMAN SACHS BANK USA AND
BARCLAYS BANK PLC
as Co-Documentation Agents

## TABLE OF CONTENTS

| | | | **Page** |
|---|---|---|---|
| ARTICLE I Definitions; Interpretive Provisions | | | 2 |
| | SECTION 1.01 | Definitions | 2 |
| | SECTION 1.02 | Terms Generally | 72 |
| | SECTION 1.03 | Time for Payment and Performance | 73 |
| | SECTION 1.04 | Certifications; Provision of Information | 73 |
| | SECTION 1.05 | Accounting Terms; GAAP | 73 |
| | SECTION 1.06 | Letter of Credit | 73 |
| | SECTION 1.07 | Quebec Matters | 74 |
| | SECTION 1.08 | Compliance with Article VII | 74 |
| ARTICLE II Amount and Terms of Credit | | | 75 |
| | SECTION 2.01 | Revolving Commitment of the Lenders | 75 |
| | SECTION 2.02 | [Reserved] | 76 |
| | SECTION 2.03 | Reserves; Changes to Reserves | 76 |
| | SECTION 2.04 | Making of Loans | 77 |
| | SECTION 2.05 | [Reserved] | 79 |
| | SECTION 2.06 | Swingline Loans | 79 |
| | SECTION 2.07 | Notes | 80 |
| | SECTION 2.08 | Interest on Loans | 81 |
| | SECTION 2.09 | Conversion and Continuation of Loans | 82 |
| | SECTION 2.10 | Alternate Rate of Interest for Loans | 83 |
| | SECTION 2.11 | Change in Legality | 84 |
| | SECTION 2.12 | Default Interest | 85 |
| | SECTION 2.13 | Letters of Credit | 85 |
| | SECTION 2.14 | Increased Costs | 93 |
| | SECTION 2.15 | Termination or Reduction of Commitments | 95 |
| | SECTION 2.16 | Optional Prepayment of Loans: Reimbursement of Lenders | 96 |
| | SECTION 2.17 | Mandatory Prepayment of Loans; Mandatory Reduction or Termination of Commitments; Cash Collateral | 98 |
| | SECTION 2.18 | Cash Management | 100 |
| | SECTION 2.19 | Fees | 103 |
| | SECTION 2.20 | Maintenance of Loan Account; Statements of Account | 106 |
| | SECTION 2.21 | Payments; Sharing of Setoff | 106 |
| | SECTION 2.22 | Settlement Amongst Lenders | 108 |
| | SECTION 2.23 | Taxes | 109 |
| | SECTION 2.24 | Mitigation Obligations; Replacement of Lenders | 114 |
| | SECTION 2.25 | Designation of Lead Borrower as Domestic Borrowers' Agent | 115 |
| | SECTION 2.26 | Priority; Liens; Payment of Obligations | 116 |
| | SECTION 2.27 | Payment of Obligations | 120 |
| | SECTION 2.28 | Defaulting Lenders | 120 |
| ARTICLE III Representations and Warranties | | | 123 |

SECTION 3.01          Organization; Powers                                                    123
SECTION 3.02          Authorization; Enforceability                                           123
SECTION 3.03          Governmental Approvals; No Conflicts                                    124

i

| | | |
|---|---|---|
| SECTION 3.04 | Financial Condition; No Material Adverse Effect | 124 |
| SECTION 3.05 | Properties | 124 |
| SECTION 3.06 | Litigation and Environmental Matters | 124 |
| SECTION 3.07 | Compliance with Laws and Agreements | 125 |
| SECTION 3.08 | Investment Company Status | 125 |
| SECTION 3.09 | Taxes | 125 |
| SECTION 3.10 | ERISA; Canadian Defined Benefit Pension Plans | 125 |
| SECTION 3.11 | Disclosure | 126 |
| SECTION 3.12 | Subsidiaries | 126 |
| SECTION 3.13 | [Reserved] | 127 |
| SECTION 3.14 | Labor Matters | 127 |
| SECTION 3.15 | Security Documents | 127 |
| SECTION 3.16 | Federal Reserve Regulations | 128 |
| SECTION 3.17 | Anti-Corruption Laws and Sanctions | 128 |
| ARTICLE IV Conditions | | 129 |
| SECTION 4.01 | Closing Date | 129 |
| SECTION 4.02 | Conditions Precedent to Each Loan and Each Letter of Credit | 133 |
| SECTION 4.03 | Effective Date | 135 |
| ARTICLE V Affirmative Covenants | | 135 |
| SECTION 5.01 | Financial Statements and Other Information | 135 |
| SECTION 5.02 | Notices of Material Events | 139 |
| SECTION 5.03 | Information Regarding Collateral | 140 |
| SECTION 5.04 | Existence; Conduct of Business | 140 |
| SECTION 5.05 | Payment of Obligations | 140 |
| SECTION 5.06 | Maintenance of Properties | 141 |
| SECTION 5.07 | Insurance | 141 |
| SECTION 5.08 | Books and Records; Inspection and Audit Rights; Appraisals; Accountants | 142 |
| SECTION 5.09 | Physical Inventories | 144 |
| SECTION 5.10 | Compliance with Laws | 144 |
| SECTION 5.11 | Use of Proceeds and Letters of Credit | 144 |
| SECTION 5.12 | Additional Subsidiaries | 145 |
| SECTION 5.13 | Further Assurances | 145 |
| SECTION 5.14 | [Reserved] | 146 |
| SECTION 5.15 | Post-Closing Obligations | 146 |
| SECTION 5.16 | Ratings | 146 |
| SECTION 5.17 | Certain Case Milestones | 146 |
| SECTION 5.18 | Certain Other Bankruptcy Matters. | 146 |
| SECTION 5.19 | Conference Calls. | 147 |
| ARTICLE VI Negative Covenants | | 147 |
| SECTION 6.01 | Indebtedness and Other Obligations | 147 |
| SECTION 6.02 | Liens | 147 |
| SECTION 6.03 | Fundamental Changes | 147 |

SECTION 6.04          Investments, Loans, Advances, Guarantees and Acquisitions          148

SECTION 6.05          Asset Sales                                                        148

SECTION 6.06          Restricted Payments; Certain Payments of Indebtedness              148

SECTION 6.07          Transactions with Affiliates                                       150

ii

| | | |
|---|---|---|
| SECTION 6.08 | Restrictive Agreements | 151 |
| SECTION 6.09 | Amendment of Material Documents | 151 |
| SECTION 6.10 | Excess Availability | 152 |
| SECTION 6.11 | Fiscal Year | 152 |
| SECTION 6.12 | Designated Account | 152 |
| SECTION 6.13 | Canadian Defined Benefit Pension Plan | 152 |
| SECTION 6.14 | Sanctions and Anti-Corruption Laws | 152 |
| SECTION 6.15 | Maximum Cumulative Net Cash Flow Before DIP ABL Draw/Paydown | 152 |
| SECTION 6.16 | Additional Bankruptcy Matters | 152 |
| SECTION 6.17 | Compliance | 153 |
| ARTICLE VII Events of Default | | 153 |
| SECTION 7.01 | Events of Default | 153 |
| SECTION 7.02 | Remedies on Default or Master Lease Liquidation Event | 159 |
| SECTION 7.03 | Application of Proceeds | 160 |
| ARTICLE VIII The Agents | | 163 |
| SECTION 8.01 | Appointment and Administration by Administrative Agent | 163 |
| SECTION 8.02 | Appointment of Collateral Agent | 164 |
| SECTION 8.03 | Appointment of Canadian Agent | 164 |
| SECTION 8.04 | Sharing of Excess Payments | 165 |
| SECTION 8.05 | Agreement of Applicable Lenders | 166 |
| SECTION 8.06 | Liability of Agents | 166 |
| SECTION 8.07 | Notice of Default | 167 |
| SECTION 8.08 | Credit Decisions | 168 |
| SECTION 8.09 | Reimbursement and Indemnification | 168 |
| SECTION 8.10 | Rights of Agents | 169 |
| SECTION 8.11 | Notice of Transfer | 169 |
| SECTION 8.12 | Successor Agents | 169 |
| SECTION 8.13 | Relation Among the Lenders | 170 |
| SECTION 8.14 | Reports and Financial Statements | 170 |
| SECTION 8.15 | Agency for Perfection | 171 |
| SECTION 8.16 | [Reserved] | 171 |
| SECTION 8.17 | Risk Participation | 171 |
| SECTION 8.18 | Collateral Matters | 173 |
| SECTION 8.19 | Co-Documentation Agent, Arrangers and Bookrunners | 174 |
| ARTICLE IX Miscellaneous | | 174 |
| SECTION 9.01 | Notices | 174 |
| SECTION 9.02 | Waivers; Amendments | 175 |
| SECTION 9.03 | Expenses; Indemnity; Damage Waiver | 179 |
| SECTION 9.04 | Successors and Assigns | 180 |
| SECTION 9.05 | Survival | 184 |
| SECTION 9.06 | Counterparts; Integration; Effectiveness; Orders Control | 185 |
| SECTION 9.07 | Severability | 185 |

SECTION 9.08          Right of Setoff                                                                                185
SECTION 9.09          Governing Law; Jurisdiction: Consent to Service of Process          186
SECTION 9.10          WAIVER OF JURY TRIAL                                                          187
SECTION 9.11          Press Releases and Related Matters                                        187

iii

.

| | | |
|---|---|---|
| SECTION 9.12 | Headings | 187 |
| SECTION 9.13 | Interest Rate Limitation | 187 |
| SECTION 9.14 | Additional Waivers | 188 |
| SECTION 9.15 | Confidentiality | 191 |
| SECTION 9.16 | Patriot Act; Proceeds of Crime Act | 192 |
| SECTION 9.17 | [Reserved] | 192 |
| SECTION 9.18 | Limitation Of Canadian Loan Parties' Liability | 192 |
| SECTION 9.19 | Judgment Currency | 192 |
| SECTION 9.20 | Language | 193 |
| SECTION 9.21 | [Reserved] | 193 |
| SECTION 9.22 | Keepwell | 194 |
| SECTION 9.23 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 194 |
| Article X Facility Guaranty | | 194 |
| SECTION 10.01 | Guarantee | 194 |
| SECTION 10.02 | Obligations Not Waived | 195 |
| SECTION 10.03 | Security. | 195 |
| SECTION 10.04 | Guarantee of Payment. | 195 |
| SECTION 10.05 | No Discharge or Diminishment of Guarantee | 196 |
| SECTION 10.06 | Defenses Waived | 196 |
| SECTION 10.07 | Agreement to Pay; Subordination | 196 |
| SECTION 10.08 | General Limitation on Guarantee Obligations | 197 |
| SECTION 10.09 | Information | 197 |

iv

**EXHIBITS**

| | |
|---|---|
| Exhibit A: | Form of Assignment and Acceptance |
| Exhibit B: | Form of Customs Broker Agreement |
| Exhibit C-1: | Notice of Borrowing (Domestic Borrowers) |
| Exhibit C-2: | Notice of Borrowing (Canadian Borrower) |
| Exhibit D-1: | Revolving Credit Note to Domestic Lenders |
| Exhibit D-2: | Domestic Term Loan Note |
| Exhibit E-1: | Revolving Credit Note to Canadian Lenders |
| Exhibit E-2: | Canadian Term Loan Note |
| Exhibit F: | Form of Canadian Initial Order |
| Exhibit G: | Form of Interim Order |
| Exhibit H: | Swingline Note to Domestic Swingline Lender |
| Exhibit I: | Swingline Note to Canadian Swingline Lender |
| Exhibit J: | Form of Joinder |
| Exhibit K: | Form of Credit Card Notification |
| Exhibit L: | Form of Compliance Certificate |
| Exhibit M: | Form of Borrowing Base Certificate |
| Exhibit N: | [Reserved] |

Exhibit O:            Form of Tri-Party Agreement

Exhibit P:            Closing Agenda

Exhibit Q:            Form of Intercreditor Agreement

v

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(b): | Lenders and Commitments |
| Schedule 1.1(c): | Asset Sales |
| Schedule 2.18(b): | Credit Card Processing Agreements |
| Schedule 2.18(c)(ii): | Blocked Accounts |
| Schedule 3.01: | Names of Loan Parties |
| Schedule 3.06(a): | Disclosed Matters |
| Schedule 3.06(b): | Environmental Matters |
| Schedule 3.12: | Subsidiaries; Joint Ventures |
| Schedule 5.01(b): | Business Segment Reporting Requirements |
| Schedule 5.01(i): | Reporting Requirements |
| Schedule 6.01: | Existing Indebtedness |
| Schedule 6.01(z) | Existing Joint Venture Guarantees |
| Schedule 6.02: | Existing Encumbrances |
| Schedule 6.04: | Existing Investments |
| Schedule 6.04(g): | Investment Policy |
| Schedule 6.07: | Transactions with Affiliates |

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT** dated as of September 22, 2017 among:

**TOYS "R" US-DELAWARE, INC.,** a corporation organized under the laws of the State of Delaware and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, with its principal executive offices at One Geoffrey Way, Wayne, New Jersey, for itself and as agent (in such capacity, the "Lead Borrower") for the other Domestic Borrowers now or hereafter party hereto;

The **DOMESTIC BORROWERS**;

**TOYS "R" US (CANADA) LTD. TOYS "R" US (CANADA) LTEE** (the "Canadian Borrower"), a corporation organized under the laws of the Province of Ontario, a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code and applicant under the CCAA with its principal executive offices at 2777 Langstaff Road, Concord, Ontario L4K 4M5;

The **FACILITY GUARANTORS**;

**JPMORGAN CHASE BANK, N.A.,** as administrative agent (in such capacity, together with any replacement thereof pursuant to SECTION 8.12 hereof, the "Administrative Agent") for its own benefit and the benefit of the other Secured Parties;

**JPMORGAN CHASE BANK, N.A., TORONTO BRANCH**, as Canadian Administrative Agent (in such capacity, together with any replacement thereof pursuant to SECTION 8.12 hereof, the "Canadian Agent") for its own benefit and the benefit of the other Secured Parties;

**JPMORGAN CHASE BANK, N.A.,** as Collateral Agent (in such capacity, together with any replacement thereof pursuant to SECTION 8.12 hereof, the "Collateral Agent") for their own benefit and the benefit of the other Secured Parties; and

The **LENDERS**;

in consideration of the mutual covenants herein contained and benefits to be derived herefrom, the parties hereto agree as follows:

W I T N E S S E T H:

WHEREAS, the capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.01 hereof;

WHEREAS, on September 18, 2017, (the "Petition Date"), the Lead Borrower and certain Domestic Subsidiaries of the Lead Borrower (collectively, and together with any other Affiliates that become debtors-in-possession in the Cases (the "US Debtors" and, collectively with the Canadian Borrower, the "Debtors") and the Canadian Borrower filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each, a "US Case" and collectively, the "US Cases") and have continued in the possession of their assets and in the management of their businesses pursuant to Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, also on the Petition Date, the Canadian Borrower filed an application (the "Canadian Case" and, together with the US Cases, the "Cases") before Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA") and the Canadian Borrower continues to operate its business and manage its properties under CCAA protection;

WHEREAS, for its general corporate purposes, including working capital, to discharge certain prepetition obligations and other corporate needs, the Borrowers have requested the Lenders to extend credit (a) in the form of Revolving Credit Loans, Swingline Loans and Letters of Credit at any time and from time to time prior to the Maturity Date, in an aggregate principal amount at any time outstanding not in excess of $1,850,000,000 (subject to the then applicable Borrowing Base (as hereinafter defined)) (the "Revolving Facility"), (b) in the form of Domestic Term Loans in an aggregate principal amount of $250,000,000 and (c) in the form of Canadian Term Loans in an aggregate principal amount of $200,000,000 (collectively, the "Term Loan Facility" and, together with the Revolving Facility, the "Facilities"), with all of the obligations to be guaranteed by each Domestic Loan Party and, in addition, all of the obligations of the Canadian Borrower to be guaranteed by the Canadian Loan Parties, if any;

WHEREAS, the Lenders are willing to extend such credit to the Borrowers on the terms and subject to the conditions set forth herein;

WHEREAS, the respective priorities of the Facilities with respect to the Collateral shall be as set forth in the Interim Order, the Canadian Initial Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court or the Canadian Court, as applicable, and in the Security Documents;

WHEREAS, all of the claims and the Liens granted under the Orders and the Loan Documents to the Collateral Agent and the Secured Parties in respect of the Facilities rank only behind the Carve-Out (in the case of the US Debtors), the Canadian Priority Charges (in the case of the Canadian Borrower) and Permitted Prior Liens (other than the Primed Liens); and

NOW, THEREFORE, in consideration of the premises and the agreements of the parties set forth herein, the parties hereto agree as follows:

<div align="center">ARTICLE I</div>

<div align="center">Definitions; Interpretive Provisions</div>

SECTION 1.01    Definitions

As used in this Agreement, the following terms have the meanings specified below:

"13-Week Projection" shall mean a projected statement of sources and uses of cash for the Lead Borrower and its Subsidiaries on a weekly basis for the current and following 12 calendar weeks, including the anticipated uses of the Facilities for each week during such period, in a form reasonably acceptable to the Administrative Agent. As used herein, "13-Week Projection" shall initially refer to the projections most recently delivered on or prior to the Effective Date and, thereafter, the most recent 13-Week-Projection delivered by the Lead Borrower in accordance with Section 5.01(l).

<div align="center">2</div>

"ACH" means automated clearing house transfers.

"Accelerated Borrowing Base Delivery Event" means the occurrence of any of the following: (a) the occurrence and continuance of any Event of Default or (b) the failure of the Borrowers for five (5) consecutive days to maintain Excess Availability of at least (i) $150,000,000 during the period from March 1 through November 30 of each year, or (ii) $200,000,000 during the period from December 1 through the last day of February of each year.

"Access Agreement" means a collateral access agreement to be reasonably satisfactory to the Administrative Agent.

"Accommodation Payment" has the meaning provided in SECTION 9.14.

"Account(s)" means "accounts" and "payment intangibles" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, or (c) arising out of the use of a credit or charge card or information contained on or for use with the card. The term "Account" does not include (a) rights to payment evidenced by chattel paper or an instrument, (b) commercial tort claims, (c) deposit accounts, (d) investment property, (e) letter-of-credit rights or letters of credit, or (f) rights to payment for money or funds advanced other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

"Acquisition" means, with respect to a specified Person, (a) an Investment in or a purchase of a 50% or greater interest in the Capital Stock of any other Person, (b) a purchase or acquisition of all or substantially all of the assets of any other Person, or (c) any merger or consolidation of such Person with any other Person, in each case in any transaction or group of transactions which are part of a common plan.

"Adjusted LIBO Rate" means, with respect to any LIBO Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100th of one percent) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate, but in no event, in the case of Term Loans, shall the Adjusted LIBO Rate be less than one percent (1.00%) per annum.

"Administrative Agent" has the meaning provided in the preamble to this Agreement.

"Affiliate" means, with respect to a specified Person, any other Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with the Person specified.

"Agents" means collectively, the Administrative Agent and the Collateral Agent.

"Agreement" means this Credit Agreement, as modified, amended, supplemented or restated, and in effect from time to time.

"Agreement Value" means for each Hedge Agreement, on any date of determination, an amount determined by the Administrative Agent in its reasonable discretion equal to:

3

(a)    In the case of a Hedge Agreement documented pursuant to an ISDA Master Agreement, the amount, if any, that would be payable by any Loan Party to its counterparty to such Hedge Agreement, as if (i) such Hedge Agreement was being terminated early on such date of determination, (ii) such Loan Party was the sole "Affected Party" (as therein defined) and (iii) the Administrative Agent was the sole party determining such payment amount (with the Administrative Agent making such determination pursuant to the provisions of the form of ISDA Master Agreement);

(b)    In the case of a Hedge Agreement traded on an exchange, the mark-to-market value of such Hedge Agreement, which will be the unrealized loss on such Hedge Agreement to the Loan Party which is party to such Hedge Agreement, determined by the Administrative Agent based on the settlement price of such Hedge Agreement on such date of determination; or

(c)    In all other cases, the mark-to-market value of such Hedge Agreement, which will be the unrealized loss on such Hedge Agreement to the Loan Party that is party to such Hedge Agreement determined by the Administrative Agent as the amount, if any, by which (i) the present value of the future cash flows to be paid by such Loan Party exceeds (ii) the present value of the future cash flows to be received by such Loan Party, in each case pursuant to such Hedge Agreement.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Loan Parties or their Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Law" means, as to any Person: (a) all laws, statutes, rules, regulations, orders, codes, ordinances or other requirements having the force of law; and (b) all court orders, decrees, judgments, injunctions, notices, binding agreements and/or rulings, in each case of or by any Governmental Authority which has jurisdiction over such Person, or any property of such Person.

"Applicable Lenders" means the Required Lenders, the Supermajority Lenders, or all Lenders, as applicable.

"Applicable Margin" means:

(a)    with respect to the Revolving Credit Loans denominated in $, (i) in the case of Revolving Credit Loans which are LIBO Loans 2.50% and (ii) in the case of Revolving Credit Loans which are Prime Rate Loans, 1.50%; and

(b)    with respect to the Revolving Credit Loans denominated in CD$, (i) in the case of Revolving Credit Loans which are BA Equivalent Loans 2.50% and (ii) in the case of Revolving Credit Loans which are Prime Rate Loans, 1.50%.

"Applicable Subsidiary" has the meaning given to such term in Section 7.01(h).

"Appraised Value" means the Average Seasonal Net Appraised Recovery Value of the Borrowers' Inventory as set forth in the Borrowers' stock ledger (expressed as a percentage of the

4

Cost of such Inventory) as determined from time to time by reference to the most recent appraisal received by the Agents conducted by an independent appraiser reasonably satisfactory to the Agents. The Appraised Value may be determined through a combined appraisal of the TRU Inventory and BRU Inventory.

"Approved Fund" means any Fund that is administered or managed by (a) a Credit Party, (b) an Affiliate of a Credit Party (c) an entity or an Affiliate of an entity that administers or manages a Credit Party, or (d) the same investment advisor or an advisor under common control with such Credit Party or advisor, as applicable.

"Arrangers" means JPMorgan Chase Bank, N.A, Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman Sachs Bank USA and Barclays Bank PLC.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by SECTION 9.04), and accepted by the Administrative Agent, in the form of Exhibit A, or any other form approved by the Administrative Agent.

"Availability Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves (including the Carve-Out Reserve and (with respect to the Canadian Borrowing Base) the Canadian Court Reserve, each of which shall be in effect as of the Closing Date) as the Collateral Agent from time to time determines in its reasonable commercial discretion exercised in good faith as being appropriate (a) to reflect any impediments to the realization upon the Collateral included in the Domestic Borrowing Base, Incremental Availability or Canadian Borrowing Base, (b) to reflect claims and liabilities that the Collateral Agent determines will need to be satisfied in connection with the realization upon such Collateral, (c) to reflect criteria, events (including any actual or contemplated rejection of leases and actual or contemplated store closures or "going out of business sales"), conditions, contingencies or risks which adversely affect any component of the Domestic Borrowing Base, the Canadian Borrowing Base or the Collateral or the validity or enforceability of this Agreement or the other Loan Documents or any of the material rights or remedies of the Secured Parties hereunder or thereunder, or (d) to reflect the outstanding amount of Bank Products and Cash Management Reserves, provided that no Availability Reserve shall be established pursuant to this clause (d) until Excess Availability is less than or equal to fifteen percent (15%) of the Line Cap. Upon the determination by the Collateral Agent that an Availability Reserve should be established or modified, the Collateral Agent shall notify the Administrative Agent in writing and the Administrative Agent shall thereupon establish or modify such Availability Reserve, subject to the other provisions of this Agreement.

"Average Daily Excess Availability" means, as of any date of determination, the average daily Excess Availability for the immediately preceding Fiscal Quarter most recently ended.

"Average Seasonal Net Appraised Recovery Value" means the average monthly net appraised recovery value (expressed as a percentage of Cost) of the Borrowers' Inventory during the High Selling Period or the Low Selling Period, as applicable.

"Avoidance Action" shall have the meaning provided in SECTION 2.26(a)(i).

5

"BA Equivalent Loan" means any Loan in CD$ bearing interest at a rate determined by reference to the BA Rate in accordance with the provisions of Article II.

"BA Equivalent Loan Borrowing" means any Borrowing comprised of BA Equivalent Loans.

"BA Rate" means, for the Interest Period of each BA Equivalent Loan, the rate of interest per annum equal to the annual rates applicable to CD$ Bankers' Acceptances having an identical or comparable term as the proposed BA Equivalent Loan displayed and identified as such on the display referred to as the "CDOR Page" (or any display substituted therefor) of Reuter Monitor Money Rates Service as at approximately 10:00 A.M. on such day (or, if such day is not a Business Day, as of 10:00 A.M. on the immediately preceding Business Day), plus five (5) basis points; provided that if such rates do not appear on the CDOR Page at such time on such date, the rate for such date will be the annual discount rate (rounded upward to the nearest whole multiple of 1/100 of 1%) as of 10:00 A.M. on such day at which a Canadian chartered bank listed on Schedule 1 of the Bank Act (Canada) as selected by the Canadian Agent is then offering to purchase CD$ Bankers' Acceptances accepted by it having such specified term (or a term as closely as possible comparable to such specified term), plus five (5) basis points. In no event shall the BA Rate be less than zero (0.00%) per annum.

"Bank of Canada Overnight Rate" means, on any date of determination, the rate of interest charged by the Bank of Canada on one-day Canadian dollar loans to financial institutions, for such date.

"Bank Products" means any services or facilities provided to any Loan Party by any Lender or any of its Affiliates on account of (i) each Hedge Agreement that (a) is in effect on the Effective Date with a counterparty that is a Credit Party as of the Effective Date or (b) is entered into after the Effective Date with any counterparty that is a Credit Party at the time such Hedge Agreement is entered into, or (ii) supply chain financing services, including, without limitation, trade payable services and supplier accounts receivable purchases and factoring.

"Bankruptcy Code" means Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Eastern District of Virginia or any other court having jurisdiction over the US Cases from time to time.

"Bankruptcy Law" means each of (i) Title 11, U.S.C., (ii) the BIA, (iii) the CCAA, (iv) the Winding-Up and Restructuring Act (Canada), (v) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, receivership or similar debtor relief Laws of the United States, Canada or other applicable state, provincial or municipal jurisdictions from time to time in effect and affecting the rights of creditors generally (including without limitation any plan of arrangement provisions of applicable corporation statutes), in the case of (i) through (iv), inclusive, as now or hereafter in effect, or any successor thereto, and (vi) any order made by a Court of competent jurisdiction in respect of any of the foregoing.

6

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"BIA" means the Bankruptcy and Insolvency Act R.S.C. 1985. C.B-3., as amended, as now or hereafter in effect, or any successor thereto.

"Blocked Account" has the meaning provided in SECTION 2.18(c).

"Blocked Account Agreement" has the meaning provided in SECTION 2.18(c).

"Blocked Account Banks" means the banks with whom deposit accounts are maintained in which material amounts (as reasonably determined by the Collateral Agent) of funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Bookrunners" means JPMorgan Chase Bank, N.A., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman Sachs Bank USA and Barclays Bank PLC.

"Borrower" means the Lead Borrower, each other Domestic Borrower and the Canadian Borrower; "Borrowers" shall mean, collectively, the Domestic Borrowers and the Canadian Borrower.

"Borrowing" means (a) the incurrence of Revolving Credit Loans or Term Loans of a single Type, on a single date and having, in the case of LIBO Loans and BA Equivalent Loans, a single Interest Period, or (b) a Swingline Loan.

"Borrowing Base" means the Domestic Borrowing Base and/or Canadian Borrowing Base, as applicable.

"Borrowing Base Certificate" has the meaning provided in SECTION 5.01(f).

"Borrowing Request" means a request by the Lead Borrower on behalf of any of the Domestic Borrowers or by the Canadian Borrower for a Borrowing in accordance with SECTION 2.04.

"Breakage Costs" has the meaning provided in SECTION 2.16(b).

"BRU Inventory" means all Inventory of the Loan Parties which is offered for sale (or is designated for sale) at any "Babies "R" Us" Store, including, but not limited to, any such Inventory held for sale in internet and other direct sales, and all Inventory of the Loan Parties specifically

7

designated as "Babies "R" Us" Inventory at any distribution center or warehouse maintained by the Loan Parties.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed; provided, however, that when used in connection with a LIBO Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market; provided further that, when used in connection with any Loan to the Canadian Borrower, the term "Business Day" shall also exclude any day on which banks are authorized or required by law to be closed in Toronto, Ontario, Canada.

"Canadian Administration Charge" means the first priority charge to be granted by the Canadian Court against Collateral of the Canadian Borrower to secure payment of the professional fees of the Canadian Borrower's counsel, the Monitor and the Monitor's counsel, in an aggregate amount not to exceed C$2,000,000.

"Canadian Agent" has the meaning set forth in the preamble hereto.

"Canadian Availability" means, at any time of calculation, the lesser of (a) or (b), where:

    (a)    is the result of:

        (i)   the Canadian Credit Ceiling,

            Minus

        (ii)  The Total Canadian Revolver Outstandings,

    (b)    is the result of:

        (i)   The Canadian Borrowing Base,

            Minus

        (ii)  The Total Canadian Revolver Outstandings.

In calculating Canadian Availability at any time and for any purpose under this Agreement, any amount calculated or referenced in dollars shall also refer to the Equivalent Amount in CD$.

"Canadian Borrower" means Toys "R" Us (Canada) Ltd. Toys "R" Us (Canada) Ltee, a corporation organized under the laws of the Province of Ontario.

"Canadian Borrowing Base" means, at any time of calculation, an amount equal to the Equivalent Amount in dollars of:

    (a)  the face amount of Eligible Credit Card Receivables of the Canadian Loan Parties multiplied by ninety percent (90%);

    plus

8

(b)   the Cost of Eligible Inventory (other than Eligible In-Transit Inventory) of the Canadian Loan Parties consisting of TRU Inventory, net of Inventory Reserves, <u>multiplied by</u> the Inventory Advance Rate for TRU Inventory, <u>multiplied by</u> the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Canadian Loan Parties consisting of TRU Inventory;

<u>plus</u>

(c)   the Cost of Eligible Inventory (other than Eligible In-Transit Inventory) of the Canadian Loan Parties consisting of BRU Inventory, net of Inventory Reserves, <u>multiplied by</u> the Inventory Advance Rate for BRU Inventory, <u>multiplied by</u> the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Canadian Loan Parties consisting of BRU Inventory;

<u>plus</u>

(d)   the Cost of Eligible In-Transit Inventory of the Canadian Loan Parties consisting of TRU Inventory, net of Inventory Reserves, <u>multiplied by</u> the Inventory Advance Rate for TRU Inventory, <u>multiplied by</u> the Appraised Value of Eligible In-Transit Inventory of the Canadian Loan Parties consisting of TRU Inventory;

<u>plus</u>

(e)   the Cost of Eligible In-Transit Inventory of the Canadian Loan Parties consisting of BRU Inventory, net of Inventory Reserves, <u>multiplied by</u> the Inventory Advance Rate for BRU Inventory, <u>multiplied by</u> the Appraised Value of Eligible In-Transit Inventory of the Canadian Loan Parties consisting of BRU Inventory;

<u>minus</u>

(f)   the then amount of all Availability Reserves.

"<u>Canadian Case</u>" has the meaning provided in the recitals.

"<u>Canadian Commitment</u>" shall mean, with respect to each Canadian Lender, the commitment of such Canadian Lender hereunder to make Revolving Credit Loans to the Canadian Borrower and to participate in Letters of Credit and Swingline Loans to the Canadian Borrower in the amount set forth opposite its name on <u>Schedule 1.1(b)</u> hereto or as may subsequently be set forth in the Register from time to time, as the same may be increased from time to time pursuant to SECTION 2.02 or reduced from time to time pursuant to SECTION 2.15 and SECTION 2.17.

"<u>Canadian Commitment Percentage</u>" shall mean, with respect to each Canadian Lender, that percentage of the Canadian Commitments of all Canadian Lenders hereunder to make Revolving Credit Loans to the Canadian Borrower and to participate in Letters of Credit and Swingline Loans to the Canadian Borrower in the amount set forth opposite its name on <u>Schedule 1.1(b)</u> hereto or as may subsequently be set forth in the Register from time to time, as the same may be increased from time to time pursuant to SECTION 2.02 or reduced from time to time pursuant to SECTION 2.15 and SECTION 2.17.

9

"Canadian Court" has the meaning provided in the recitals.

"Canadian Court Ordered Charges" means, collectively, the Canadian Administration Charge, the Canadian D&O Charge and the Canadian DIP Charge.

"Canadian Court Reserve" means an amount equal to the Canadian Priority Charges.

"Canadian Concentration Account" has the meaning provided in SECTION 2.18(d).

"Canadian Credit Ceiling" means, initially, $300,000,000, as such amount may be decreased from time to time pursuant to SECTION 2.15 and SECTION 2.17.

"Canadian DIP Charge" has the meaning provided to it in Section 2.26(a)(vi).

"Canadian D&O Charge" means the second priority charge (junior only to the Canadian Administration Charge) granted by the Canadian Court against the Collateral of the Canadian Borrower to secure the Canadian Borrower's obligations to indemnify its directors and officers for personal liability incurred in their capacities as directors and officers, in an aggregate amount not to exceed C$41,500,000.

"Canadian Defined Benefit Pension Plan" means a pension plan for the purposes of any applicable pension benefits standards statute or regulation in Canada, which contains a "defined benefit provision," as defined in subsection 147.1(1) of the *Income Tax Act* (Canada) other than a multi-employer pension plan in respect of which the obligations of the Loan Party are limited to a fixed amount set out in a collective agreement.

"Canadian Incremental Availability" means, at any time of calculation, an amount equal to the Equivalent Amount in dollars of the lesser of $200,000,000 and the sum of the following:

(a)   the face amount of Eligible Credit Card Receivables of the Canadian Loan Parties multiplied by ten percent (10%);

plus

(b)   the Cost of Eligible Inventory (other than Eligible In-Transit Inventory) of the Canadian Loan Parties consisting of TRU Inventory, net of Inventory Reserves, multiplied by ten percent (10%), multiplied by the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Canadian Loan Parties consisting of TRU Inventory;

plus

(c)   the Cost of Eligible Inventory (other than Eligible in-Transit Inventory) of the Canadian Loan Parties consisting of BRU Inventory, net of Inventory Reserves, multiplied by ten percent (10%) multiplied by the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Canadian Loan Parties consisting of BRU Inventory;

10

plus

(d)   the Cost of Eligible In-Transit Inventory of the Canadian Loan Parties consisting of TRU Inventory, net of Inventory Reserves, multiplied by ten percent (10%), multiplied by the Appraised Value of Eligible In-Transit Inventory of the Canadian Loan Parties consisting of TRU Inventory;

plus

(e)   the Cost of Eligible In-Transit Inventory of the Canadian Loan Parties consisting of BRU Inventory, net of Inventory Reserves, multiplied by ten percent (10%), multiplied by the Appraised Value of Eligible In-Transit Inventory of the Canadian Loan Parties consisting of BRU Inventory;

plus

(f)   the FMV of Eligible Real Estate of the Canadian Loan Parties, less the Canadian Realty Reserves, multiplied by seventy-five percent (75%);

plus

(g)   forty-four percent (44%) of the Required Availability Amount.

"Canadian Initial Order" means an order of the Canadian Court in respect of the Canadian Case, which shall among other things authorize the Facilities (as the same may be amended, supplemented, or modified from time to time after entry thereof with, to the extent adverse to the Lenders, the consent of the Administrative Agent and the Majority Arrangers in their sole discretion) in the form set forth as Exhibit F, with changes to such form as are satisfactory to the Administrative Agent and the Majority Arrangers, in their sole discretion.

"Canadian Initial Order Entry Date" shall mean the date on which the Canadian Initial Order is entered by the Canadian Court and the Administrative Agent shall have received a certified copy thereof.

"Canadian Lenders" means the Lenders having Canadian Commitments or holding Canadian Term Loans from time to time or at any time. Any Person may be a Canadian Lender only if (i) it is a financial institution that is listed on Schedule I, II or III of the *Bank Act* (Canada) or is not a foreign bank for purposes of the *Bank Act* (Canada), and if such financial institution is not resident in Canada and is not deemed to be resident in Canada for purposes of the *Income Tax Act* (Canada), then such financial institution deals at arm's length with each Canadian Loan Party for purposes of the *Income Tax Act* (Canada), and (ii) it or any of its Affiliates also has Domestic Commitments in an amount at least equal to its Canadian Commitment.

"Canadian Letter of Credit" shall mean a Letter of Credit that is issued pursuant to this Agreement for the account of the Canadian Borrower.

11

"Canadian Letter of Credit Commitment" shall mean, with respect to an Issuing Bank, the commitment of such Issuing Bank hereunder to make Letters of Credit available to the Canadian Borrower in the amount set forth opposite its name on Schedule 1.1(b) hereto.

"Canadian Letter of Credit Outstandings" shall mean, at any time, the sum of (a) with respect to Canadian Letters of Credit outstanding at such time, the aggregate maximum amount that then is, or at any time thereafter may become, available for drawing or payment thereunder plus, without duplication, (b) all amounts theretofore drawn or paid under Canadian Letters of Credit for which the applicable Issuing Bank has not then been reimbursed.

"Canadian Letter of Credit Sublimit" means $30,000,000.

"Canadian Liabilities" means (a) (i) the principal of, and interest on, the Loans made hereunder to, or for the benefit of, the Canadian Borrower or any of its Subsidiaries, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise (including all interest that accrues after the commencement of any case or proceeding by or against the Canadian Borrower or any of its Subsidiaries under Bankruptcy Law, whether or not allowed in such case or proceeding), (ii) other amounts owing by the Canadian Borrower or any of its Subsidiaries under this Agreement and the other Loan Documents in respect of any Canadian Letter of Credit, when and as due, including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral, and (iii) all other monetary obligations, including fees, costs, expenses and indemnities (including all fees, costs, expenses and indemnities that accrue after the commencement of any case or proceeding by or against the Canadian Borrower or any of its Subsidiaries under Bankruptcy Law, whether or not allowed in such case or proceeding), whether primary, secondary, direct, contingent, fixed or otherwise, of the Canadian Borrower or any of its Subsidiaries to any of the Secured Parties under this Agreement and the other Loan Documents, (b) the due and punctual payment and performance of all covenants, agreements, obligations and liabilities of the Canadian Borrower or any of its Subsidiaries under or pursuant to this Agreement or the other Loan Documents, and (c) any Cash Management Services or Bank Products entered into or furnished to the Canadian Borrower or any of its Subsidiaries.

"Canadian Loan Party" means the Canadian Borrower and each Canadian Subsidiary, if any, which becomes a Loan Party pursuant to the terms of SECTION 5.12.

"Canadian Loan to Value" means the difference between (i) the Total Canadian Outstandings and (ii) the sum of (A) the Canadian Borrowing Base plus the amounts calculated under clauses (a) through and including (e) of the definition of Canadian Incremental Availability plus (B) 100% of the FMV of Eligible Real Estate of the Canadian Loan Parties, less the Canadian Realty Reserves.

"Canadian Loans" means, collectively, the Loans made by the Canadian Lenders pursuant to ARTICLE II.

"Canadian Pledge" means the pledge of 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of the Canadian Borrower and related stock certificates, dividends, distributions, rights and proceeds of the foregoing pursuant to the Security Agreement and the Orders; provided, that, for the avoidance of doubt, the voting Capital Stock that is subject to the

12

Canadian Pledge shall be the same voting Capital Stock that is subject to a pledge in support of the Prepetition ABL and FILO Credit Agreement.

"Canadian Prime Rate" means, on any day, the rate determined by the Canadian Agent to be the higher of (i) the rate equal to the PRIMCAN Index rate that appears on the Bloomberg screen at 10:15 a.m. Toronto time on such day (or, in the event that the PRIMCAN Index is not published by Bloomberg, any other information services that publishes such index from time to time, as selected by the Canadian Agent in its reasonable discretion) and (ii) the average rate for 30 day Canadian Dollar bankers' acceptances that appears on the Reuters Screen CDOR Page (or, in the event such rate does not appear on such page or screen, on any successor or substitute page or screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time, as selected by the Administrative Agent in its reasonable discretion) at 10:15 a.m. Toronto time on such day, plus 1% per annum; provided, that if any the above rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement. Any change in the Canadian Prime Rate due to a change in the PRIMCAN Index or the CDOR Rate shall be effective from and including the effective date of such change in the PRIMCAN Index or CDOR Rate, respectively.

"Canadian Priority Charges" means collectively, the Canadian Administration Charge and the Canadian D&O Charge.

"CDOR Rate" means, on any day and for any period, an annual rate of interest equal to the average rate applicable to CAD Dollar bankers' acceptances for the applicable period that appears on the Reuters Screen CDOR Page (or, in the event such rate does not appear on such page or screen, on any successor or substitute page or screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time, as selected by the Canadian Agent in its reasonable discretion), rounded to the nearest $1/100^{th}$ of 1% (with .005% being rounded up), at approximately 10:15 a.m. Toronto time on such day, or if such day is not a Business Day, then on the immediately preceding Business Day (the **"Screen Rate"**); provided that if such Screen Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Canadian Realty Reserves" means, without duplication of any other Reserves, such reserves as the Collateral Agent from time to time determines in its reasonable commercial discretion exercised in good faith as being appropriate to reflect any impediments to the realization upon any Collateral consisting of Eligible Real Estate of the Canadian Loan Parties (including, without limitation, claims that the Collateral Agent determines will need to be satisfied in connection with the realization upon such Eligible Real Estate and any Environmental Compliance Reserve with respect to such Eligible Real Estate). Canadian Realty Reserves shall include, without limitation, a reserve in an amount equal to ten percent (10%) of the FMV of any Eligible Real Estate of the Canadian Borrower which is subject to a right of first refusal or similar right to which the Mortgage in favor of the Canadian Agent is subject.

"Canadian Security Documents" means the General Security Agreement, Mortgages, and the deed of hypothec charging the universality of moveable and immovable property, in each case granted by the Canadian Borrower and each other Canadian Loan Party in favor of the Canadian

13

Agent. The Canadian Security Documents shall supplement, and shall not limit, the security interests granted pursuant to the Orders.

"Canadian Subsidiary" means any Subsidiary of the Canadian Borrower organized under the laws of Canada or any province thereof.

"Canadian Superpriority Claims" has the meaning provided in SECTION 2.26(a)(v).

"Canadian Swingline Loan Ceiling" means $20,000,000, as such amount may be increased or reduced in accordance with the provisions of this Agreement.

"Canadian Term Lender" means each Person who makes a Term Loan to the Canadian Borrower in the amount set forth opposite its name on Schedule 1.1(b) hereto or as may subsequently be set forth in the Register from time to time.

"Canadian Term Loans" means all Term Loans made to the Canadian Borrower pursuant to this Agreement. As of the Effective Date, the aggregate of all Canadian Term Loans totals $200,000,000.

"Canadian Term Notes" means the promissory notes of the Canadian Borrower substantially in the form of Exhibit E-2, payable to the order of a Canadian Lender, evidencing the Term Loans made to the Canadian Borrower.

"Canadian Total Commitments" means the aggregate of the Canadian Commitments of all Canadian Lenders. On the Effective Date, the Canadian Total Commitments are $300,000,000.

"Canadian Unused Fee" has the meaning provided in SECTION 2.19(c).

"Capital Expenditures" means, with respect to the Loan Parties for any period, the additions to property, plant and equipment and other capital expenditures of the Loan Parties that are (or would be) set forth in a Consolidated statement of cash flows of the Loan Parties for such period prepared in accordance with GAAP; provided that "Capital Expenditures" shall not include (i) any additions to property, plant and equipment and other capital expenditures made with (A) the proceeds of any equity securities issued or capital contributions received by the Lead Borrower, (B) the proceeds from any casualty insurance or condemnation or eminent domain, to the extent that the proceeds therefrom are utilized for capital expenditures within twelve months of the receipt of such proceeds, or (C) the proceeds from any sale or other disposition of any Loan Party's assets (other than assets constituting Collateral consisting of Inventory, Accounts, and Eligible Real Estate and the proceeds thereof), to the extent that the proceeds therefrom are utilized for capital expenditures within twelve months of the receipt of such proceeds, (ii) any portion of the purchase price of a Permitted Acquisition which is allocated to property, plant or equipment acquired as part of such Permitted Acquisition, or (iii) any expenditures which are contractually required to be, and are, reimbursed to the Loan Parties in cash by a third party (including landlords) during such period of calculation.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying

14

the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP; for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP consistently applied with the principles existing on the Effective Date.

"Capital Stock" means, as to any Person that is a corporation, the authorized shares of such Person's capital stock, including all classes of common, preferred, voting and nonvoting capital stock, and, as to any Person that is not a corporation or an individual, the membership or other ownership interests in such Person, including, without limitation, the right to share in profits and losses, the right to receive distributions of cash and other property, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from such Person, whether or not such interests include voting or similar rights entitling the holder thereof to exercise Control over such Person, collectively with, in any such case, all warrants, options and other rights to purchase or otherwise acquire, and all other instruments convertible into or exchangeable for, any of the foregoing; provided that any Indebtedness convertible into equity interests shall not constitute Capital Stock until so converted.

"Carve-Out" has the meaning as provided in the Orders.

"Carve-Out Reserve" means, at any time, a reserve in an amount equal to $20,000,000.

"Case" and "Cases" has the meaning provided in the recitals.

"Cash Collateral Account" means an interest bearing account established by the Loan Parties (other than the Canadian Borrower and its Subsidiaries) with the Administrative Agent, for its own benefit and the benefit of the other Secured Parties, at JPMorgan under the sole and exclusive dominion and control of the Administrative Agent, in the name of the Administrative Agent or as the Administrative Agent shall otherwise direct, in which deposits are required to be made in accordance with this Agreement, and, in the case of the Canadian Borrower and its Subsidiaries, an interest bearing account established by the Canadian Borrower and its Subsidiaries with the Canadian Agent, for its own benefit and the benefit of the other Secured Parties, at JPMorgan Chase Bank, Toronto Branch under the sole and exclusive dominion and control of the Canadian Agent, in the name of the Canadian Agent or as the Canadian Agent shall otherwise direct, in which deposits are required to be made in accordance with this Agreement.

"Cash Collateralize" has the meaning provided in SECTION 2.13(j).

"Cash Dominion Event" means the occurrence of any of the following: (a) the occurrence and continuance of any Event of Default; (b) the failure of the Borrowers to maintain Excess Availability for any three (3) days (whether or not consecutive) during any thirty (30) day period of at least $150,000,000; or (c) the failure of the Borrowers to maintain Excess Availability at any time of at least $130,000,000. For purposes of this Agreement, the occurrence of a Cash Dominion Event shall be deemed continuing (A) so long as such Event of Default has not been cured or waived, (B) if the Cash Dominion Event arises as a result of the Borrowers' failure to maintain Excess Availability as required pursuant to clause (b) hereunder, until Excess Availability has exceeded $150,000,000 for thirty (30) consecutive days, or (C) if the Cash Dominion Event arises as a result

15

of the Borrowers' failure to maintain Excess Availability as required pursuant to clause (c) hereunder, until Excess Availability has exceeded the $130,000,000 for thirty (30) consecutive days; provided that a Cash Dominion Event may not be so cured on more than two (2) occasions in any period of 365 consecutive days.

"Cash Management Order" shall mean one or more orders, in form and substance satisfactory to the Administrative Agent in its sole discretion, approving cash management systems and arrangements (as may be amended, supplemented or modified from time to time after entry thereof with the written consent of the Administrative Agent).

"Cash Management Reserves" means such reserves as the Collateral Agent, from time to time, determines in its reasonable commercial discretion exercised in good faith as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services (other than in respect of Designated Cash Management Services) then provided or outstanding.

"Cash Management Services" means any one or more of the following types of services or facilities provided to any Loan Party by any Lender or any of its Affiliates: (a) ACH transactions; (b) cash management services, including, without limitation, controlled disbursement services, treasury, depository, overdraft and electronic funds transfer services; (c) foreign exchange facilities; (d) credit card processing services; (e) purchase cards; and (f) credit or debit cards.

"Cash Receipts" has the meaning provided in SECTION 2.18(d).

"CCAA" has the meaning provided in the recitals hereto.

"CD$" means Canadian dollars.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CFC" means any Subsidiary (other than TRU of Puerto Rico, Inc.) that is (a) a "controlled foreign corporation" within the meaning of the Code or (b) "disregarded as an entity separate from its owner" within the meaning of Treasury Regulation section 301.7701-3 and is a direct Subsidiary of a "controlled foreign corporation" within the meaning of the Code.

"Change in Control" means, at any time:

(a) a change in the Control of the Parent such that the Loan Parties are not Controlled by any one or more of the Sponsor Group; or

(b)  the Parent fails at any time to own, directly or indirectly, 100% of the Capital Stock of each Loan Party.

"Change in Law" means (a) the adoption or taking effect of any law, rule, regulation or treaty after the Effective Date, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority after the Effective Date, or (c) compliance by any Credit Party (or, for purposes of

16

SECTION 2.14, by any lending office of such Credit Party or by such Credit Party's holding company, if any) with any request, rule, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Effective Date; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Base III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Charges" has the meaning provided in SECTION 9.13.

"Charter Document" means as to any Person, its partnership agreement, certificate of incorporation, operating agreement, membership agreement or similar constitutive document or agreement or its by-laws.

"Closing Agenda" means the closing agenda attached hereto as Exhibit P.

"Closing Date" means the date on which the conditions precedent set forth in SECTION 4.01 have been satisfied, which date is September 22, 2017.

"Co-Documentation Agents" means, collectively, Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman Sachs Bank USA and Barclays Bank PLC.

"Code" means the Internal Revenue Code of 1986 and the United States Treasury regulations promulgated thereunder, as amended from time to time.

"Collateral" means any and all "Collateral" or words of similar intent as defined in any applicable Security Document or any Order, including "Property" as defined in the Canadian Initial Order; provided that (a) any assets of the Canadian Borrower and its Subsidiaries shall secure only the Canadian Liabilities; (b) the Canadian Pledge (together with any corresponding provision of any Order) shall constitute the only pledge of voting Capital Stock of the Canadian Borrower; (c) any pledge of the voting Capital Stock of any other CFC or FSHCO shall be limited to 65% of such stock (and if any such stock is pledged in support of any of the Prepetition ABL and FILO Credit Agreement or any other debt obligation, the stock that constitutes Collateral shall be the same stock that is pledged in support of such other obligations; and (d) no asset of any CFC or FSHCO (other than as described in clause (a) of this definition) shall constitute Collateral; (e) such definition shall exclude any assets expressly excluded from the Collateral pursuant to any of the Orders.

"Collateral Agent" has the meaning provided in the preamble to this Agreement.

"Combined Borrowing Base" means the sum of (a) the Domestic Borrowing Base plus (b) the Canadian Borrowing Base.

"Comeback Motion" means the motion to be heard by the Canadian Court not later than 30 days following the entry of the Canadian Initial Order.

17

"<u>Commercial Letter of Credit</u>" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Borrower in the ordinary course of business of such Borrower.

"<u>Commitment</u>" means, with respect to each Lender, the aggregate commitment(s) of such Lender hereunder in the amount set forth opposite its name on <u>Schedule 1.1(b)</u> hereto (being the aggregate of the Domestic Commitments and the Canadian Commitments of such Lender) or as may subsequently be set forth in the Register from time to time, as the same may be increased or reduced from time to time pursuant to this Agreement.

"<u>Commitment Letter</u>" means that certain commitment letter dated as of September 18, 2017, among the Arrangers and the Lead Borrower.

"<u>Commitment Percentage</u>" means, with respect to each Lender, that percentage of the Commitments of all Lenders hereunder, in the amount set forth opposite such Lender's name on <u>Schedule 1.1(b)</u> hereto or as may subsequently be set forth in the Register from time to time, as the same may be increased or reduced from time to time pursuant to this Agreement.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"<u>Compliance Certificate</u>" has the meaning provided in SECTION 5.01(d).

"<u>Connection Income Taxes</u>" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"<u>Consolidated</u>" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"<u>Control</u>" means the possession, directly or indirectly, of the power (a) to vote 50% or more of the securities having ordinary voting power for the election of directors (or any similar governing body) of a Person, or (b) to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. The terms "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Cost</u>" means the cost of purchases, as reported on the Borrowers' financial stock ledger based upon the Borrowers' accounting practices in effect on the Effective Date or thereafter consented to by the Administrative Agent, whose consent will not be unreasonably withheld. "Cost" does not include inventory capitalization costs or other non-purchase price charges (except for freight charges with respect to all Inventory (other than unpaid freight charges for Eligible In-Transit Inventory) to the extent treated consistently with the Borrowers' accounting practices in effect on the Effective Date) used in the Borrowers' calculation of cost of goods sold.

"<u>Credit Card Notifications</u>" has the meaning provided in SECTION 2.18(c).

"<u>Credit Extensions</u>" mean each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Credit Party" means (a) the Lenders, (b) the Agents and the Canadian Agent and their respective Affiliates and branches, (c) the Issuing Banks, (d) the Arrangers and (e) the successors and permitted assigns of each of the foregoing.

"Credit Party Expenses" means, without limitation, all of the following to the extent incurred in connection with this Agreement and the other Loan Documents: (a) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, the Canadian Agent and the Arrangers in connection with the preparation, execution and delivery of the Loan Documents and the syndication of the Facilities, in the case of legal counsel, limited to (x) the reasonable fees, charges and disbursements of one United States counsel for the Administrative Agent and its Affiliates, one Canadian counsel for the Canadian Agent and its Affiliates and branches (plus one foreign and one local counsel (in respect of any state or province, if reasonably required) for any other jurisdiction to the extent reasonably necessary) and (y) in the case of consultants, limited to outside consultants for the Agents and the Canadian Agent consisting of one inventory appraisal firm and one Canadian real estate appraisal firm, one commercial finance examination firm and one Canadian environmental engineering firm; (b) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, the Canadian Agent and the Arrangers in connection with the administration of this Agreement and the other Loan Documents and any amendments, modifications or waivers requested by a Loan Party of the provisions hereof or thereof (whether or not any such amendments, modifications or waivers shall be consummated), including, without limitation, the reasonable fees, charges and disbursements of one United States counsel for the Administrative Agent and its Affiliates, one Canadian counsel for the Canadian Agent and its Affiliates and branches (plus one foreign and one local counsel (in respect of any state or province, if reasonably required) for any other jurisdiction to the extent reasonably necessary); (c) all reasonable out-of-pocket expenses incurred by the Issuing Banks in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder; (d) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, the Canadian Agent, and their respective Affiliates and branches in connection with the enforcement and protection (including collateral monitoring, collateral reviews and appraisals in accordance with the terms herein) of their rights in connection with the Loan Documents (including all such out-of-pocket expenses incurred during any workout, restructuring or related negotiations in respect of such Loan Documents), in the case of legal counsel, limited to the reasonable fees, charges and disbursements of one United States counsel for JPMorgan and its Affiliates, one Canadian counsel for the Canadian Agent and its Affiliates (plus one foreign and one local counsel (in respect of any state or province, if reasonably required) for any other jurisdiction to the extent reasonably necessary) and in the case of other consultants, limited to outside consultants for the Agents (including, without limitation, except as permitted in clause (e) hereof, one inventory appraisal firm and one real estate appraisal firm, one commercial finance examination firm and one environmental engineering firm); and (f) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, the Canadian Agent, each Lender and their respective Affiliates and branches in connection with the Cases, or with the enforcement of their rights in any case under Bankruptcy Law or any judicial proceeding commenced by any Loan Party against the Credit Parties relating to the Loan Documents after the occurrence and during the continuance of an Event of Default, in the case of legal counsel, limited to the reasonable fees, charges and disbursements of one United States counsel for JPMorgan and its Affiliates, one Canadian counsel

19

for the Canadian Agent and its Affiliates (plus local counsel in any other jurisdiction to the extent reasonably necessary) and in the case of other consultants, limited to one outside consultants for the Agents (including, without limitation, inventory appraisal firm(s) and one real estate appraisal firm(s), one commercial finance examination firm(s) and one environmental engineering firm(s)); provided that, in addition to all of the foregoing, the Lenders who are not the Agents or the Canadian Agent shall be entitled to reimbursement in connection with all of the foregoing for no more than one counsel representing all such Lenders (absent a conflict of interest in which case the Lenders may engage and be reimbursed for additional counsel). Credit Party Expenses shall not include the allocation of any overhead expenses of any Credit Party.

"Cumulative Net Cash Flow Before DIP ABL Draw/Paydown" means, as of any Test Date, an amount equal to the cumulative variance calculated as the Total Cash Flow Before DIP ABL Draw/Paydown as set forth in the DIP Budget in Schedule 1 to Exhibit A of the motion for entry of the Interim and Final Orders filed in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division on September 19, 2017 on a cumulative basis from the Petition Date to such Test Date less the actual Total Cash Flow Before DIP ABL Draw/Paydown, on a cumulative basis from the Petition Date to such Test Date calculated in the same manner as set forth in such DIP Budget, but in each case adjusted to exclude (A) proceeds of asset sales and other dispositions outside the ordinary course of business, in each case other than of inventory, (B) Loans made under the DIP Term Loan Facility after the initial funding thereof, Loans made under the Facilities and any other proceeds of Indebtedness and (C) and principal prepayments or repayments of Indebtedness (other than capital lease obligation payments accounted for as part of operating cash flow in the DIP Budget).

"Customer Credit Liabilities" means, at any time, the aggregate remaining balance at such time of (a) outstanding gift certificates and gift cards of the Loan Parties entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, and (b) outstanding merchandise credits and customer deposits of the Loan Parties, net of any dormancy reserves maintained by the Loan Parties on their books and records in the ordinary course of business consistent with past practices.

"Customs Broker Agreement" means an agreement in substantially the form attached hereto as Exhibit B among a Loan Party, a customs broker or other carrier, and the Administrative Agent or the Canadian Agent, as applicable, in which the customs broker or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory or other property for the benefit of the Administrative Agent or the Canadian Agent, as applicable, and agrees, upon notice from the Administrative Agent or the Canadian Agent, as applicable, to hold and dispose of the subject Inventory and other property solely as directed by the Administrative Agent or the Canadian Agent, as applicable.

"DDAs" means any checking or other demand deposit account maintained by the Loan Parties. All funds in such DDAs shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents, the Canadian Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the DDAs.

"Debtors" has the meaning provided in the recitals.

20

"<u>Default</u>" means any event or condition described in SECTION 7.01 that constitutes an Event of Default or that upon notice, lapse of any cure period set forth in SECTION 7.01, or both, would, unless cured or waived, become an Event of Default.

"<u>Default Rate</u>" has the meaning provided in SECTION 2.12.

"<u>Defaulting Lender</u>" means, subject to SECTION 2.27(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder, or (ii) pay to any Agent, any Issuing Bank, the Swingline Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit or Swingline Loans) within two Business Days of the date when due, (b) has notified the Borrower, any Agent, any Issuing Bank or the Swingline Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, or has publicly announced that it does not intend to comply with its funding obligations under other loan agreements, credit agreements or similar facilities generally, (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a Bail-In Action or proceeding under Bankruptcy Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; <u>provided</u> that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Capital Stock in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or Canada or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by any Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to SECTION 2.27(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower, the Issuing Banks, the Swingline Lender and each other Lender promptly following such determination.

"<u>Designated Account</u>" has the meaning provided in SECTION 2.18(d); <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary contained therein, in no event shall the amounts deposited into the Designated Account at any time exceed $25,000,000 in the aggregate.

"<u>Designated Cash Management Services</u>" means Cash Management Services that have been designated by the Lead Borrower and the provider thereof in writing to the Administrative Agent as "Designated Cash Management Services", such designation to specify the maximum amount of obligations in respect of such Cash Management Services that shall constitute Designated Cash

Management Services (such maximum amount at any time with respect to all Designated Cash Management Services, the "Designated Cash Management Services Obligations Amount"). The Designated Cash Management Services Obligations Amount with respect to any Designated Cash Management Services may be increased or decreased by subsequent notice to the Administrative Agent from the Lead Borrower and the applicable provider; *provided* that the Designated Cash Management Services Obligations Amount may not be increased if after giving pro forma effect to such increase, the outstanding Domestic Term Loans would exceed the Domestic Incremental Availability.

"Designated Cash Management Services Obligations Amount" has the meaning provided in the definition of "Designated Cash Management Services".

"Determination Date" shall mean the date upon which each of the following has occurred:

(a)    The Canadian Commitments and/or the Domestic Commitments have been terminated by the Required Lenders (or are deemed terminated) upon the occurrence of an Event of Default; and

(b)    The Obligations and/or the Canadian Liabilities have been declared to be due and payable (or has become automatically due and payable) and have not been paid in accordance with the terms of this Agreement.

"DIP Budget" means monthly projections for the Loan Parties for the 16 fiscal months after the Closing Date in a form customary for "DIP budgets", as updated from time to time (but no more frequently than bi-monthly) with the consent of the Administrative Agent and the Required Lenders. References herein to the DIP Budget shall be deemed referenced to the DIP Budget most recently delivered as provided in this definition.

"DIP Term Loan Facility" means Term Loan Facility pursuant to that certain Debtor-in-Possession Credit Agreement, dated as of the Effective Date, by and among, the Lead Borrower, NexBank SSB, as administrative agent and collateral agent and the lenders party thereto.

"Disbursement Accounts" has the meaning provided in SECTION 2.18(g).

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed on Schedule 3.06(a) and Schedule 3.06(b).

"Disqualified Capital Stock" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) is mandatorily redeemable in whole or in part prior to the Maturity Date, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) Indebtedness or any Capital Stock referred to in (a) above prior to the Maturity Date, or (c) contains any mandatory repurchase obligation which comes into effect prior to the Maturity Date; provided that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Capital Stock is convertible, exchangeable or exercisable) the right to require the issuer thereof to

22

redeem such Capital Stock upon the occurrence of a change in control or an asset sale shall not constitute Disqualified Capital Stock.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Availability" means the lesser of (a) or (b), where:

    (a)   is the result of:

        (i)   The Revolving Credit Ceiling,

           Minus

        (ii)   The Total Domestic Revolver Outstandings.

           Minus

        (iii)   The Total Canadian Revolver Outstandings.

    (b)   is the result of the following:

        (i)   The Domestic Borrowing Base, as determined from the most recent Borrowing Base Certificate (as adjusted pursuant to SECTION 2.03 hereof);

           Minus

        (ii)   The Total Domestic Revolver Outstandings.

"Domestic Borrowers" means, collectively, the Lead Borrower, the other Domestic Borrowers identified on the signature pages hereto and each Other Borrower who becomes a Domestic Borrower hereunder in accordance with the terms of this Agreement.

"Domestic Borrowing Base" means, at any time of calculation, an amount equal to:

    (a)   the face amount of Eligible Credit Card Receivables of the Domestic Borrowers multiplied by ninety percent (90%);

    plus

    (b)   the Cost of Eligible Inventory (other than Eligible In-Transit Inventory) of the Domestic Borrowers consisting of TRU Inventory, net of Inventory Reserves, multiplied by the Inventory Advance Rate for TRU Inventory, multiplied by the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Domestic Borrowers consisting of TRU Inventory;

    plus

    (c)   the Cost of Eligible Inventory (other than Eligible In-Transit Inventory) of the Domestic Borrowers consisting of BRU Inventory, net of Inventory Reserves, multiplied

by the Inventory Advance Rate for BRU Inventory, <u>multiplied by</u> the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Domestic Borrowers consisting of BRU Inventory;

<u>plus</u>

(d)   the Cost of Eligible In-Transit Inventory of the Domestic Borrowers consisting of TRU Inventory, net of Inventory Reserves, <u>multiplied by</u> the Inventory Advance Rate for TRU Inventory, <u>multiplied by</u> the Appraised Value of Eligible In-Transit Inventory of the Domestic Borrowers consisting of TRU Inventory;

<u>plus</u>

(e)   the Cost of Eligible In-Transit Inventory of the Domestic Borrowers consisting of BRU Inventory, net of Inventory Reserves, <u>multiplied by</u> the Inventory Advance Rate for BRU Inventory, <u>multiplied by</u> the Appraised Value of Eligible In-Transit Inventory of the Domestic Borrowers consisting of BRU Inventory;

<u>minus</u>

(f)   the then current amount of all Availability Reserves;

<u>minus</u>

(g)   an amount equal to the excess, if any, of the Designated Cash Management Services Obligations Amount over $10,000,000.

"<u>Domestic Commitment</u>" shall mean, with respect to each Domestic Lender, the commitment of such Domestic Lender hereunder to make Revolving Credit Loans to the Domestic Borrowers and to participate in Letters of Credit and Swingline Loans to the Domestic Borrowers in the amount set forth opposite its name on <u>Schedule 1.1(b)</u> hereto or as may subsequently be set forth in the Register from time to time, as the same may be increased from time to time pursuant to SECTION 2.02 or reduced from time to time pursuant to SECTION 2.15 and SECTION 2.17.

"<u>Domestic Commitment Percentage</u>" shall mean, with respect to each Domestic Lender, that percentage of the Domestic Commitments of all Domestic Lenders hereunder to make Revolving Credit Loans to the Domestic Borrowers and to participate in Letters of Credit and Swingline Loans to the Domestic Borrowers, in the amount set forth opposite its name on <u>Schedule 1.1(b)</u> hereto or as may subsequently be set forth in the Register from time to time, as the same may be increased from time to time pursuant to SECTION 2.02 or reduced from time to time pursuant to SECTION 2.15 and SECTION 2.17.

"<u>Domestic Concentration Account</u>" has the meaning provided in SECTION 2.18(d).

"<u>Domestic Incremental Availability</u>" means, at any time of calculation, an amount equal to the lesser of $250,000,000 and the sum of the following:

24

(a)   the face amount of Eligible Credit Card Receivables of the Domestic Borrowers multiplied by ten percent (10%);

plus

(b)   the Cost of Eligible Inventory (other than Eligible In-Transit Inventory) of the Domestic Borrowers consisting of TRU Inventory, net of Inventory Reserves, multiplied by ten percent (10%), multiplied by the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Domestic Borrowers consisting of TRU Inventory;

plus

(c)   the Cost of Eligible Inventory (other than Eligible in-Transit Inventory of the Domestic Borrowers consisting of BRU Inventory, net of Inventory Reserves, multiplied by ten percent (10%) multiplied by the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Domestic Borrowers consisting of BRU Inventory;

plus

(d)   the Cost of Eligible In-Transit Inventory of the Domestic Borrowers consisting of TRU Inventory, net of Inventory Reserves, multiplied by ten percent (10%), multiplied by the Appraised Value of Eligible In-Transit Inventory of the Domestic Borrowers consisting of TRU Inventory;

plus

(e)   the Cost of Eligible In-Transit Inventory of the Domestic

Borrowers consisting of BRU Inventory, net of Inventory Reserves, multiplied by ten percent (10%), multiplied by the Appraised Value of Eligible In-Transit Inventory of the Domestic Borrowers consisting of BRU Inventory;

plus

(f)   fifty-six percent (56%) of the Required Availability Amount.

"Domestic Lenders" means the Lenders having Domestic Commitments or hold Domestic Term Loans from time to time or at any time.

"Domestic Letter of Credit" means a Letter of Credit that is issued pursuant to this Agreement for the account of a Domestic Borrower.

"Domestic Letter of Credit Commitment" shall mean, with respect to each Issuing Bank, the commitment of such Issuing Bank hereunder to make Letters of Credit available to the Domestic Borrowers in the amount set forth opposite its name on Schedule 1.1(b) hereto.

"Domestic Letter of Credit Outstandings" means, at any time, the sum of (a) with respect to Domestic Letters of Credit outstanding at such time, the aggregate maximum amount that then is, or at any time thereafter may become, available for drawing or payment thereunder, plus, without

25

duplication, (b) all amounts theretofore drawn or paid under Domestic Letters of Credit for which the applicable Issuing Bank has not then been reimbursed.

"Domestic Letter of Credit Sublimit" means, at any time, the sum of $400,000,000 less the then Canadian Letter of Credit Outstandings, as such amount may be increased or reduced in accordance with the terms of this Agreement.

"Domestic Loan Party" means any Loan Party other than a Canadian Loan Party.

"Domestic Loans" means, collectively, the Loans made by the Domestic Lenders pursuant to Article II.

"Domestic Swingline Loan Ceiling" means (a) from January 1st through August 31st of each year, $50,000,000 and (b) from September 1st through December 31st of each year, $100,000,000, as such amount may be increased or reduced in accordance with the provisions of this Agreement.

"Domestic Subsidiary" means any Subsidiary other than a Foreign Subsidiary.

"Domestic Term Lender" means each Person who makes a Term Loan to the Domestic Borrowers in the amount set forth opposite its name on Schedule 1.1(b) hereto or as may subsequently be set forth in the Register from time to time.

"Domestic Term Loans" means all Term Loans made to the Domestic Borrowers pursuant to this Agreement. As of the Effective Date, the aggregate of all Domestic Term Loans totals $250,000,000.

"Domestic Term Notes" means the promissory notes of the Domestic Borrowers substantially in the form of Exhibit D-2, payable to the order of a Domestic Lender, evidencing the Term Loans made to the Domestic Borrowers.

"Domestic Total Commitments" means the aggregate of the Domestic Commitments of all Domestic Lenders. On the Effective Date, the Domestic Total Commitments are $1,850,000,000.

"Earn-Out Obligations" means the maximum amount of all obligations incurred or to be incurred in connection with any Acquisition of a Person pursuant to a Permitted Acquisition under non-compete agreements, consulting agreements, earn-out agreements and similar deferred purchase arrangements.

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

26

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which each of the conditions precedent set forth in SECTION 4.03 have been satisfied (or waived), which date is September 22, 2017.

"Eligible Assignee" means a commercial bank, insurance company, company engaged in the business of making commercial loans or a commercial finance company, investment vehicle, investment fund or other Person (other than a natural Person), or any Lender or Affiliate of any Credit Party under common control with such Credit Party, or an Approved Fund of any Credit Party, or any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities; provided that, in any event, "Eligible Assignee" shall not include (x) any natural person, (y) the Parent, or (z) the Sponsor Group or any of their respective Affiliates.

"Eligible Credit Card Receivables" means, as of any date of determination, Accounts due to a Loan Party from major credit card processors (including, but not limited to, VISA, Mastercard, American Express, Diners Club and DiscoverCard) as arise in the ordinary course of business and which have been earned by performance, that are not excluded as ineligible by virtue of one or more of the criteria set forth below. None of the following shall be deemed to be Eligible Credit Card Receivables:

(a)    Accounts due from major credit card processors that have been outstanding for more than five (5) Business Days from the date of sale (except that, with respect to those due from American Express to the Canadian Loan Parties, that have been outstanding for more than ten (10) Business Days from the date of sale), or for such longer period(s) as may approved by the Collateral Agent;

(b)    Accounts due from major credit card processors with respect to which a Loan Party does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Administrative Agent or the Canadian Agent, as applicable, for its own benefit and the benefit of the other Secured Parties pursuant to the Security Documents and the Orders, those Liens specified in clauses (a) and (e) of the definition of Permitted Encumbrances and Permitted Encumbrances having priority by operation of Applicable Law or the applicable Order over the Lien of the Administrative Agent or Canadian Agent, as applicable) (the foregoing not being intended to limit the discretion of the Collateral Agent to change, establish or eliminate any Reserves on account of any such Liens);

(c)    Accounts due from major credit card processors that are not subject to a first priority (except as provided in clause (b), above) security interest in favor of the Administrative Agent or the Canadian Agent, as applicable, for its own benefit and the benefit of the other Secured Parties;

(d)    Accounts due from major credit card processors which are disputed, or with respect to which a claim, counterclaim, offset or chargeback has been asserted, by the related

credit card processor (but only to the extent of such dispute, counterclaim, offset or chargeback) (it being the intent that chargebacks in the ordinary course by the credit card processors shall not be deemed violative of this clause);

(e)   Except as otherwise approved by the Collateral Agent, Accounts due from major credit card processors as to which the credit card processor has the right under certain circumstances to require a Loan Party to repurchase the Accounts from such credit card processor; or

(f)   Accounts due from major credit card processors (other than Visa, Mastercard, American Express, Diners Club and Discover) which the Collateral Agent determines in its commercial reasonable discretion acting in good faith to be unlikely to be collected.

"Eligible In-Transit Inventory" means, as of any date of determination, without duplication of other Eligible Inventory, Inventory (a) (i) which has been delivered to a carrier in a foreign port or foreign airport for receipt by a Loan Party in the United States or Canada within sixty (60) days of the date of determination, but which has not yet been received by a Loan Party or (ii) which has been delivered to a carrier in the United States or Canada for receipt by a Loan Party in the United States or Canada within five (5) Business Days of the date of determination, but which has not yet been received by a Loan Party, (b) for which the purchase order is in the name of a Loan Party and title has passed to a Loan Party, (c) except as otherwise agreed by the Collateral Agent, for which a Loan Party is designated as "shipper" and/or the consignor and the document of title or waybill reflects a Loan Party as consignee (along with delivery to a Loan Party or its customs broker of the documents of title, to the extent applicable, with respect thereto), (d) as to which the Administrative Agent or the Canadian Agent, as applicable, has control over the documents of title, to the extent applicable, which evidence ownership of the subject Inventory (such as by the delivery of a Customs Broker Agreement), (e) as to which a Tri-Party Agreement has been executed and delivered in favor of the Collateral Agent, (f) which is insured in accordance with the provisions of this Agreement and the other Loan Documents, including, without limitation marine cargo insurance; and (g) which otherwise is not excluded from the definition of Eligible Inventory; provided that the Administrative Agent may (and shall, at the written direction of the Collateral Agent), upon written notice to the Lead Borrower, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event that the Administrative Agent or the Collateral Agent determines that such Inventory is subject to any Person's right or claim which is (or is capable of being) senior to, or pari passu with, the Lien of the Administrative Agent or the Canadian Agent (such as, without limitation, a right of stoppage in transit), as applicable, or may otherwise adversely impact the ability of the Administrative Agent, the Collateral Agent or the Canadian Agent, as applicable, to realize upon such Inventory.

"Eligible Inventory" means, as of any date of determination, without duplication, (a) Eligible Letter of Credit Inventory, (b) Eligible In-Transit Inventory, (c) Inventory reported at Location 5001 in the Loan Parties' books and records (such being cross-docked product and not then included in the Loan Parties' stock ledger but which is otherwise Eligible Inventory), and (d) items of Inventory of a Loan Party that are finished goods, merchantable and readily saleable to the public in the ordinary course that are not excluded as ineligible by virtue of the one or more of the criteria set forth below. None of the following shall be deemed to be Eligible Inventory:

28

(a)    Inventory that is not solely owned by a Loan Party, or is leased by or is on consignment to a Loan Party, or as to which the Loan Parties do not have title thereto;

(b)    Inventory (other than any Eligible Letter of Credit Inventory and Eligible In-Transit Inventory) that is not located in the United States of America or Canada (or any territories or possessions thereof);

(c)    Inventory (other than any Eligible Letter of Credit Inventory and Eligible In-Transit Inventory) that is not located at a location that is owned or leased by the Loan Parties (including, without limitation, as a result of a Loan Party's rejection or other termination of such Lease), except, in each case, to the extent that the Loan Parties shall have used commercially reasonable efforts to furnish (in the case of each such location leased by a third party for which the Loan Parties contracted with such third party on or before the Effective Date), or shall have furnished (in the case of each such location leased by a third party for which the Loan Parties contracted with such third party after the Effective Date), the Administrative Agent or the Canadian Agent, as applicable, with (i) any UCC financing statements, PPSA filings or other registrations that the Administrative Agent or the Canadian Agent, as applicable, may reasonably determine to be necessary to perfect its security interest in such Inventory at such location, and (ii) an intercreditor agreement (containing, among other things, a lien waiver) executed by the Person owning or leasing any such location on terms reasonably acceptable to the Collateral Agent and, if applicable, the Canadian Agent; provided that, with respect to any location which is leased by a third party as of the Effective Date and which contains Inventory to be utilized to fulfill internet orders or Inventory to be forwarded to stores or distribution centers of the Loan Parties, such Inventory shall not be deemed ineligible solely by virtue of this clause (c) if such an intercreditor agreement is not obtained by the Borrowers (after having used commercially reasonable efforts to obtain same); provided further that any Inventory located at a location described in clauses (i) and/or (ii) below shall not be deemed ineligible solely by virtue of this clause (c) even if such an intercreditor agreement is not furnished for any such location: (i) any location that is not owned or leased by the Loan Parties at which Inventory of a Domestic Loan Party is located (or locations under the control of the same Person other than store leases) having a value of less than or equal to $20,000,000 at Cost (or, with respect to seasonal locations, at which Inventory is located having a value less than or equal to $40,000,000 at Cost for a period of not greater than 60 days), or (ii) any location that is not owned or leased by the Loan Parties at which Inventory of a Canadian Loan Party is located (or under the control of the same Person other than store leases) having a value of less than or equal to $5,000,000 at Cost (or, with respect to seasonal locations, at which Inventory is located having a value less than or equal to $10,000,000 at Cost for a period of not greater than 60 days);

(d)    Inventory that is located at a distribution center that is leased by the Loan Parties, except to the extent that (unless otherwise agreed by the Collateral Agent or the Canadian Agent, as applicable) the Loan Parties shall have used commercially reasonable efforts to furnish (in the case of each such distribution center for which the Loan Parties have entered into a lease on or before the Effective Date), or shall have furnished (in the case of each such distribution center for which the Loan Parties have entered into a lease after the Effective Date), the Administrative Agent or the Canadian Agent, as applicable,

29

.

with a landlord's lien waiver and collateral access agreement on terms reasonably acceptable to the Collateral Agent or the Canadian Agent, as applicable, executed by the Person owning any such distribution center; provided that any Inventory located at a distribution center described in clauses (i) and/or (ii) below shall not be deemed ineligible solely by virtue of this clause (d) even if such a landlord's lien waiver and collateral access agreement is not furnished for any such distribution center: (i) any distribution center at which Inventory of a Domestic Loan Party is located (or locations under the control of the same Person other than store leases) having a value of less than or equal to $20,000,000 at Cost (or, with respect to seasonal warehouses, at which Inventory is located having a value less than or equal to $40,000,000 at Cost for a period of not greater than 60 days), or (ii) any distribution center at which Inventory of a Canadian Loan Party is located (or under the control of the same Person other than store leases) having a value of less than or equal to $5,000,000 at Cost (or, with respect to seasonal warehouses, at which Inventory is located having a value less than or equal to $10,000,000 at Cost for a period of not greater than 60 days);

(e)    Inventory that represents goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are work in process, raw materials, or that constitute spare parts or supplies used or consumed in a Loan Party's business, (iv) are bill and hold goods, or (v) are not in compliance in all material respects with all standards imposed by any Governmental Authority having regulatory authority with respect thereto;

(f)    Except as otherwise agreed by the Collateral Agent, Inventory that represents goods that do not conform in all material respects to the representations and warranties contained in this Agreement or any of the Security Documents;

(g)    Inventory that is not subject to a perfected first priority security interest in favor of the Administrative Agent or Canadian Agent, as applicable, for its own benefit and the benefit of the other Secured Parties (subject only to Permitted Encumbrances having priority by operation of Applicable Law);

(h)    Inventory which consists of samples, labels, bags, packaging materials, and other similar non-merchandise categories;

(i)    Inventory as to which casualty insurance in compliance with the provisions of SECTION 5.07 is not in effect;

(j)    Inventory which has been sold but not yet delivered or Inventory to the extent that any Loan Party has accepted a deposit therefor; or

(k)    Inventory acquired in a Permitted Acquisition, unless the Collateral Agent shall have received or conducted (i) appraisals, from appraisers reasonably satisfactory to the Collateral Agent, of such Inventory to be acquired in such Acquisition and (ii) such other due diligence as the Collateral Agent may reasonably require, all of the results of the foregoing to be reasonably satisfactory to the Collateral Agent.

30

"Eligible Letter of Credit Inventory" means, as of any date of determination (without duplication of other Eligible Inventory), Inventory:

(a)   (i) which has been delivered to a carrier in a foreign port or foreign airport for receipt by a Loan Party in the United States or Canada within sixty (60) days of the date of determination, but which has not yet been received by a Loan Party, or (ii) which has been delivered to a carrier in the United States or Canada for receipt by a Loan Party in the United States or Canada within five (5) Business Days of the date of determination, but which has not yet been received by a Loan Party;

(b)   the purchase order for which is in the name of a Loan Party, title has passed to a Loan Party and the purchase of which is supported by a Commercial Letter of Credit issued under this Agreement having an initial expiry, subject to the proviso hereto, within 120 days after the date of initial issuance of such Commercial Letter of Credit; provided that ninety percent (90%) of the maximum Stated Amount all such Commercial Letters of Credit shall not, at any time, have an initial expiry greater than ninety (90) days after the original date of issuance of such Commercial Letters of Credit;

(c)   except as otherwise agreed by the Collateral Agent, for which a Loan Party is designated as "shipper" and/or consignor and the document of title or waybill reflects a Loan Party as consignee (along with delivery to a Loan Party or its customs broker of the documents of title, to the extent applicable, with respect thereto);

(d)   as to which the Administrative Agent or the Canadian Agent, as applicable, has control over the documents of title, to the extent applicable, which evidence ownership of the subject Inventory (such as by the delivery of a Customs Broker Agreement);

(e)   which is insured in accordance with the provisions of this Agreement and the other Loan Documents, including, without limitation marine cargo insurance;

(f)   as to which a Tri-Party Agreement has been executed and delivered in favor of the Collateral Agent, and

(g)   Which otherwise is not excluded from the definition of Eligible Inventory;

provided that the Administrative Agent may (and shall, at the written direction of the Collateral Agent), upon prior written notice to the Lead Borrower, exclude any particular Inventory from the definition of "Eligible Letter of Credit Inventory" in the event that the Administrative Agent or the Collateral Agent determines that such Inventory is subject to any Person's right or claim (other than the Carve-Out and the Canadian Priority Charges) which is (or is capable of being) senior to, or pari passu with, the Lien of the Administrative Agent or the Canadian Agent (such as, without limitation, a right of stoppage in transit), as applicable, or may otherwise adversely impact the ability of the Administrative Agent, the Collateral Agent or the Canadian Agent, as applicable, to realize upon such Inventory.

"Eligible Real Estate" means Real Estate which satisfies each of the following conditions:

(a)    Either (i) a Canadian Loan Party owns fee title or (ii) a Canadian Loan Party is ground lessee under a ground lease on real estate improved by a building owned by such Canadian Loan Party, the terms and conditions of which ground lease permit assignment and mortgaging thereof in the Collateral Agent's and the Canadian Agent's reasonable commercial discretion exercised in good faith;

(b)    The applicable Canadian Loan Party has granted pursuant to the Security Documents, and the Interim Order and the Canadian Initial Order, and when entered the Final Order and the Canadian Final Order, valid and enforceable liens on such Canadian Loan Party's interest in such Real Estate;

(c)    the applicable Canadian Loan Party shall have delivered to the Collateral Agent (upon request, available environmental site assessments and any other document customarily delivered in connection with mortgages real property reasonably agreed by the Collateral Agent and the Lead Borrower, acting in good faith;

(d)    The Canadian Agent has a perfected first priority lien in such Real Estate (subject only to Permitted Encumbrances having priority by operation of Applicable Law) for its own benefit and the benefit of other Secured Parties;

(e)    If requested by the Canadian Agent, each such parcel of Real Estate has been appraised by a third party appraiser reasonably acceptable to the Agents and the Canadian Agent (it being agreed the appraisals delivered to the Agents prior to the Petition Date are acceptable and shall satisfy this requirement);

(f)    Either (i) the Real Estate is used by a Canadian Loan Party for offices, as a Store or distribution center, or is being held for sale and, if more than twelve (12) months have elapsed from the date such Real Estate was initially held for sale, the Collateral Agent and the Canadian Agent shall have received an updated appraisal of such Real Estate, or (ii) the Real Estate is leased by a Canadian Loan Party to another Person, the terms of such lease and the creditworthiness of the lessee are reasonably satisfactory to the Collateral Agent (the Collateral Agent acknowledges this condition is satisfied as to any such leased properties in existence as of the Effective Date), and the Collateral Agent and the Canadian Agent shall have received an updated appraisal of such Real Estate reflecting the effect of such lease on FMV; provided that Real Estate described in this clause (f)(ii) shall not comprise more than 25% of the Canadian Incremental Availability; and

(g)    As to any particular property, except as otherwise agreed by the Collateral Agent, the Canadian Borrower is in compliance in all material respects with the representations, warranties and covenants set forth in the Mortgage (if any) relating to such property.

As of the Closing Date the Eligible Real Estate shall be deemed to consist of the same Real Estate that constitutes "Eligible Real Estate" under the Prepetition FILO and ABL Credit Agreement.

"Environmental Compliance Reserve" means, with respect to Eligible Real Estate, any reserve which the Collateral Agent (after consultation with the Canadian Agent), from time to time in its reasonable commercial discretion exercised in good faith, establishes for estimable amounts that are reasonably likely to be expended by any of the Canadian Loan Parties in order for such Loan Party and its operations and property (a) to comply with any notice from a Governmental Authority asserting non-compliance with Environmental Laws, or (b) to correct any such non-compliance with Environmental Laws relating to such Eligible Real Estate.

"Environmental Laws" means all Applicable Laws issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the protection of human health or the environment, to the handling, treatment, storage, disposal of Hazardous Materials or to the assessment or remediation of any Release or threatened Release of any Hazardous Material to the environment.

"Environmental Liability" means any liability, contingent or otherwise (including, without limitation, any liability for damages, natural resource damage, costs of environmental remediation, administrative oversight costs, fines, penalties or indemnities), of any Loan Party directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the Security Documents.

"Equivalent Amount" means, on any day, with respect to any amount denominated in CD$, the equivalent of such amount in Dollars determined by using the rate of exchange for the purchase of the Dollars with CD$ in the London foreign exchange market at or about 11:00 a.m. London time (or New York time, as applicable) on a particular day as displayed by ICE Data Services  as the "ask price", or as displayed on such other information service which publishes that rate of exchange from time to time in place of ICE Data Services (or if such service ceases to be available, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it deems appropriate in its reasonable discretion).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Lead Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means: (a) with respect to the Domestic Borrowers, any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) with respect to the Domestic Borrowers, the failure of any Plan to satisfy the minimum funding standards (as defined in Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, whether or not waived, and with

33

respect to the Canadian Borrower, the existence with respect to any Plan of any due but un-remitted contribution, whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Lead Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Lead Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Lead Borrower or any of its ERISA Affiliates of any liability in excess of $100,000,000 (or such lesser amount as would reasonably be expected to result in a Material Adverse Effect) with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Lead Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Lead Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability in excess of $100,000,000 (or such lesser amount as would reasonably be expected to result in a Material Adverse Effect) or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization within the meaning of Title IV of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" has the meaning provided in SECTION 7.01. An "Event of Default" shall be deemed to have occurred and to be continuing unless and until that Event of Default has been duly waived in writing in accordance with the terms of this Agreement.

"Excess Availability" means the difference between (a) the Line Cap and (b) the Total Revolver Outstandings.

"Excess Swingline Loans" has the meaning provided in SECTION 2.22(b).

"Excluded Swap Obligation" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party under the Facility Guarantee of, or the grant under a Loan Document by such Loan Party of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal or unlawful under the Commodity Exchange Act (or the application or official interpretation thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to SECTION 9.22 hereof and any and all guarantees of such Loan Party's Swap Obligations by other Loan Parties) at the time the guaranty of such Loan Party, or grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one Hedge Agreement, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Hedge Agreements for which such guaranty or security interest becomes illegal.

"Excluded Taxes" means, with respect to the Agents, the Canadian Agent, any Lender, any Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, (a) income or franchise taxes imposed on (or measured by) its net income by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is

34

located or that constitute Other Connection Taxes, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which any Borrower is located or that constitute Other Connection Taxes, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by a Borrower under SECTION 2.24(b) or a Lender that becomes a Domestic Lender by virtue of the application of SECTION 8.17), any withholding tax that (i) is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office other than at the request of a Borrower under SECTION 2.24), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to SECTION 2.23(a), or (ii) is attributable to such Foreign Lender's failure to comply with SECTION 2.23(e), (d) in the case of a Canadian Lender (other than an assignee pursuant to a request by a Borrower under SECTION 2.24(b) or a Lender that becomes a Domestic Lender by virtue of the application of SECTION 8.17), any withholding tax that is imposed on amounts payable to such Canadian Lender at the time such Canadian Lender becomes a party to this Agreement (or designates a new lending office other than at the request of a Borrower under SECTION 2.24) or is attributable to such Canadian Lender's failure to comply with SECTION 2.23(j), except to the extent that such Canadian Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Canadian Borrower with respect to such withholding tax pursuant to SECTION 2.23(a); provided that the provisions of the foregoing clause (d) shall not apply upon and after the occurrence of the Determination Date; provided further that each such Lender shall use reasonable efforts to eliminate or reduce amounts payable pursuant to this clause (d), (e) any Canadian federal or provincial withholding tax that would not have been imposed but for such Credit Party (i) not dealing at arm's length (within the meaning of the Income Tax Act (Canada)) with the Canadian Loan Party or (ii) being a "specified shareholder" (as defined in subsection 18(5) of the Income Tax Act (Canada)) of the Canadian Loan Party or not dealing at arm's length with such a specified shareholder for the purposes of the Income Tax Act (Canada), (f) any withholding tax that is imposed by reason of FATCA; and (g) any withholding tax that is attributable to the failure of (i) any Domestic Lender to provide Internal Revenue Service Forms W-9 (or any successor form) as provided by SECTION 2.23(e); (ii) any Administrative Agent (other than the Canadian Agent) to comply with SECTION 2.23(k).

"Existing Debt" shall mean any Indebtedness outstanding on the Petition Date.

"Facilities" has the meaning provided in the recitals.

"Facility Guarantee" means (a) any Guarantee of the Obligations and Other Liabilities executed by the Domestic Borrowers and their respective Subsidiaries which are subject to a Case (other than Foreign Subsidiaries and the Subsidiaries described on Schedule 3.12) in favor of the Administrative Agent and the other Secured Parties pursuant to this Agreement or a separate Facility Guaranty (it being understood that the Canadian Borrower and its Subsidiaries shall not be required to execute a Facility Guarantee of the Obligations or Other Liabilities of the Domestic Borrowers), and (b) in addition to the Guarantee described in clause (a), any Guarantee of the Canadian Liabilities executed by any of the Canadian Borrower's Subsidiaries in favor of the Canadian Agent and the other Secured Parties pursuant to a separate agreement.

"Facility Guarantors" means any Person executing a Facility Guarantee.

"Facility Guarantors' Collateral Documents" means all security agreements, Mortgages, pledge agreements, deeds of trust, and other instruments, documents or agreements executed and delivered by the Facility Guarantors to secure the Facility Guarantee, the Obligations, the Other Liabilities, or the Canadian Liabilities, as applicable; provided that in no event shall the Canadian Loan Parties guarantee the Obligations, or Other Liabilities of the Domestic Borrowers.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules, or practices adopted pursuant to any intergovernmental agreement, treaty, or convention entered into in connection with the implementation of the foregoing.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as the federal funds effective rate; provided that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Final Order" shall mean a final order of the Bankruptcy Court (that has been entered on the docket in the Chapter 11 Cases (or the docket of such other court) that is not subject to a stay and has not been reversed or vacated or otherwise modified or amended, if adverse to the Lenders, without the consent of the Administrative Agent and the Majority Arrangers in their sole discretion and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing pursuant to Bankruptcy Rule 9023 has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired) authorizing the Facilities in substantially the form of the Interim Order, with only such modifications in form and substance that are satisfactory to the Administrative Agent and the Majority Arrangers in their sole discretion (as the same may be amended, supplemented or modified to the extent adverse to the Lenders from time to time after entry thereof with the written consent of the Administrative Agent and the Majority Arrangers in their sole discretion).

"Final Order Entry Date" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Consultant" has the meaning provided in SECTION 5.14.

36

"<u>Financial Officer</u>" means, with respect to any Loan Party, the chief financial officer, the senior vice president of finance, treasurer, assistant treasurer, controller or assistant controller of such Loan Party.

"<u>First and Second Day Orders</u>" means, all customary interim and final orders of the Bankruptcy Court relating to (i) critical vendors, (ii) foreign vendors, (iii) shippers, warehouseman and lienholders, (iv) 503(b)(9) claimants, (v) customer programs, (vi) insurance, (vii) tax claims, (viii) tax attributes, (ix) utilities, (x) wages and employee benefits, (xi) cash management, (xii) case management and/or cross-border protocols, (xiii) joint administration, (xiv) extension of time to file schedules and statements of financial affairs, and (xv) debtor in possession financing and/or the use of cash collateral.

"<u>Fiscal Month</u>" means any fiscal month of any Fiscal Year, which month shall generally end on the last Saturday of each calendar month in accordance with the fiscal accounting calendar of the Borrowers.

"<u>Fiscal Quarter</u>" means any fiscal quarter of any Fiscal Year, which quarters shall generally end on the last Saturday of each April, July, October or January of such Fiscal Year in accordance with the fiscal accounting calendar of the Borrowers.

"<u>Fiscal Year</u>" means any period of twelve consecutive months ending on the Saturday closest to January 31 of any calendar year.

"<u>Fixed Assets</u>" means Equipment and Real Estate.

"<u>Flood Documentation</u>" shall mean, with respect to each parcel of owned and ground leased Real Estate constituting Collateral and located in the United States of America or any territory thereof, (i) a completed "life-of-loan" Federal Emergency Management Agency standard flood hazard determination, together with a notice about Special Flood Hazard Area status and flood disaster assistance duly executed by the applicable Loan Party relating thereto (to the extent such Real Estate is located in a Special Flood Hazard Area) and (ii) evidence of flood insurance as required by Section 5.02(c) hereof and the applicable provisions of the Security Documents, each of which shall (A) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), (B) name the Collateral Agent, on behalf of the Secured Parties, as additional insured and loss payee/mortgagee, (C) identify the address of each property located in a Special Flood Hazard Area, the applicable flood zone designation and the flood insurance coverage and deductible relating thereto and (D) be otherwise in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Flood Insurance Laws</u>" shall mean, collectively, (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

37

"FMV" means, as to any Eligible Real Estate, the fair market value of such Eligible Real Estate determined in accordance with an appraisal from an independent appraisal firm, each reasonably acceptable to the Collateral Agent and delivered to the Administrative Agent on or prior to the Effective Date.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than the United States of America or any State thereof or the District of Columbia.

"Foreign Subsidiary" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States of America or any State, commonwealth or territory thereof or the District of Columbia.

"Fronting Exposure" means, at any time there is a Defaulting Lender, (a) with respect to any Issuing Bank, such Defaulting Lender's Commitment Percentage of the Letter of Credit Outstandings other than Letter of Credit Outstandings as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or cash collateralized in accordance with the terms hereof, and (b) with respect to the Swingline Lender, such Defaulting Lender's Commitment Percentage of Swingline Loans other than Swingline Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders in accordance with the terms hereof.

"FSHCO" means any Subsidiary (i) that is organized under the laws of the United States, any state thereof or the District of Columbia and (ii) substantially all the assets of which constitute Capital Stock (including instruments treated as equity interests for U.S. federal income tax purposes, regardless of the form of such instruments) of Foreign Subsidiaries.

"Full Availability Date" means the date on which the following conditions have been satisfied (or waived or modified by the Administrative Agent and the Arrangers):

(i)    The Closing Date shall have occurred.

(ii)    To the extent that the Canadian Initial Order does not approve the full amount of the Canadian Loans, then the full amount of the Canadian Loans shall subsequently have been approved by the Canadian Court no later than 30 days following the date of the entry of the Canadian Initial Order.

(iii)    (x) The Final Order Entry Date shall have occurred no later than 45 days after the Effective Date, and the Final Order shall approve the full amount of the DIP Term Loan Facility, and (y) gross proceeds of no less than $450,000,000 in aggregate principal amount of loans thereunder shall have been funded to the Lead Borrower thereunder on or prior to such date.

(iv)    all material "second day orders" intended to be entered on or prior to the date of entry of the Final Order, including a final Cash Management Order and any order establishing procedures for the administration of the Cases, shall have been entered by the Bankruptcy Court. The Administrative Agent acknowledges that the form of such orders substantially in the forms filed on the Effective Date are acceptable.

38

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means principles which are consistent with those promulgated or adopted by the Financial Accounting Standards Board and its predecessors (or successors) in effect and applicable to that accounting period in respect of which reference to GAAP is being made; provided that, with respect to Foreign Subsidiaries of Borrower organized under the laws of Canada, "GAAP" shall mean principles which are consistent with those promulgated or adopted by the Canadian Institute of Chartered Accountants and its predecessors (or successors) in effect and applicable to the accounting period in respect of which reference to GAAP is being made.

"General Security Agreement" means the General Security Agreement dated as of the Closing Date among the Canadian Borrower and the Canadian Agent for the benefit of the Secured Parties thereunder, as amended and in effect from time to time.

"Geoffrey" means Geoffrey, LLC, a Delaware limited liability company.

"Governmental Authority" means the government of the United States of America, Canada, any other nation or any political subdivision thereof, whether state, local or provincial, and any agency, authority, instrumentality, regulatory body, court, tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, mold, fungi or similar bacteria, and all other substances or wastes of any nature regulated pursuant to any Environmental Law because of their dangerous or deleterious properties, including any material listed as a hazardous substance under Section 101(14) of CERCLA.

"Hedge Agreement" means any derivative agreement, or any interest rate protection agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement,

39

foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement designed to hedge against fluctuations in interest rates or foreign exchange rates or commodity prices.

"High Selling Period" means (i) with respect to the TRU Inventory owned by the Domestic Loan Parties and all Inventory owned by the Canadian Loan Parties, the period in each year commencing on September 15th and ending on the first Sunday after December 15th, and (ii) with respect to BRU Inventory owned by the Domestic Loan Parties, the period commencing each year on February 1st and ending on October 31st.

"Impacted Interest Period" has the meaning provided in the definition of "LIBO Rate".

"Incremental Availability" means, Canadian Incremental Availability or Domestic Incremental Availability, as applicable, and collectively means the sum of both of them.

"Indebtedness" of any Person means, without duplication:

(a)    All obligations of such Person for borrowed money; provided, however, that all such obligations and liabilities which are limited in recourse to such property shall be included in Indebtedness only to the extent of the lesser of the fair market value of such property and the then outstanding amount of such Indebtedness;

(b)    All obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

(c)    All obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person; provided, however, that all such obligations and liabilities which are limited in recourse to such property shall be included in Indebtedness only to the extent of the lesser of the fair market value of such property and the then outstanding amount of such Indebtedness;

(d)    All obligations of such Person in respect of the deferred purchase price of property or services (excluding accrued expenses and accounts payable incurred in the ordinary course of business);

(e)    All Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed; provided, however, that all such obligations and liabilities which are limited in recourse to such property shall be included in Indebtedness only to the extent of the lesser of the fair market value of such property and the then outstanding amount of such Indebtedness;

(f)    All Guarantees by such Person of Indebtedness of others described in clauses (a)- (e) and (g)- (l) herein;

(g)    All Capital Lease Obligations of such Person; provided, however, that all such obligations and liabilities which are limited in recourse to such property shall be

40

included in Indebtedness only to the extent of the lesser of the fair market value of such property and the then outstanding amount of such Indebtedness;

(h)    All obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty;

(i)    All obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

(j)    The Agreement Value of all Hedge Agreements;

(k)    The principal and interest portions of all rental obligations of such Person under any Synthetic Lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP; and

(l)    Indebtedness consisting of Earn-Out Obligations in connection with Permitted Acquisitions but only to the extent that the contingent consideration relating thereto is not paid within thirty (30) days after the amount due is finally determined;

Indebtedness shall not include (A) any sale-leaseback transactions to the extent the lease or sublease thereunder is not required to be recorded under GAAP as a Capital Lease, (B) any obligations relating to overdraft protection and netting services, (C) any preferred stock required to be included as Indebtedness in accordance with GAAP and FAS 150, or (D) trade accounts payable, deferred revenues and deferred tax liabilities, liabilities associated with customer prepayments and deposits and any such obligations incurred under ERISA, and other accrued obligations (including transfer pricing), in each case incurred in the ordinary course of business and operating leases.

The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"Indemnitee" has the meaning provided in SECTION 9.03(b).

"Information" has the meaning provided in SECTION 9.15.

"Informational Website" has the meaning provided in SECTION 5.01.

"Intellectual Property Rights" has the meaning provided in SECTION 3.05(b).

"Intellectual Property Rights Agreement" means the agreement dated as of the Closing Date (or any applicable later date) between Geoffrey and the Administrative Agent, for its own benefit and the benefit of the Secured Parties.

41

"Intercreditor Agreement" shall mean an intercreditor agreement substantially in the form attached hereto as Exhibit Q.

"Interest Payment Date" means (a) with respect to any Prime Rate Loan (including a Swingline Loan), the last day of each calendar quarter, and (b) with respect to any LIBO Loan or BA Equivalent Loan, on the last day of the Interest Period applicable to the Borrowing of which such LIBO Loan or BA Equivalent Loan is a part, and, in addition, if such LIBO Loan or BA Equivalent Loan has an Interest Period of greater than ninety (90) days, on the last day of every third month of such Interest Period.

"Interest Period" means, with respect to any LIBO Borrowing or BA Equivalent Loan, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one (1), two (2), three (3), or six (6) months thereafter (or such shorter period, to the extent available, to which the Administrative Agent or the Canadian Agent, as applicable, may reasonably consent), as the Lead Borrower or the Canadian Borrower, as applicable, may elect by notice to the Administrative Agent or the Canadian Agent in accordance with the provisions of this Agreement; provided, however, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period of one month or more that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month during which such Interest Period ends) shall end on the last Business Day of the calendar month of such Interest Period, and (c) no Interest Period shall extend beyond the Maturity Date. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Order" shall mean an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof to the extent adverse to the Lenders with the consent of the Administrative Agent and the Majority Arrangers in the form set forth as Exhibit G, with changes to such form as are satisfactory to the Administrative Agent and the Majority Arrangers, in their sole discretion, approving the Loan Documents.

"Interim Order Entry Date" shall mean the date on which the Interim Order is entered by the Bankruptcy Court.

"Interpolated Rate" means, at any time, for any Interest Period, the rate *per annum* (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Screen Rate for the longest period for which the LIBO Screen Rate is available) that is shorter than the Impacted Interest Period; and (b) the LIBO Screen Rate for the shortest period (for which that LIBO Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.

"Inventory" has the meaning assigned to such term in the Security Agreement or the General Security Agreement and, as regards the Canadian Borrower, includes all "inventory" as defined in the PPSA.

42

"Inventory Advance Rate" means ninety percent (90%).

"Inventory Reserves" means such reserves as may be established from time to time by the Collateral Agent, in its reasonable commercial discretion exercised in good faith, with respect to changes in the determination of the saleability, at retail, of the Eligible Inventory or which reflect such other factors as negatively affect the market value of the Eligible Inventory.

"Investment" means, with respect to any Person:

(a)    Any Capital Stock of another Person, evidence of Indebtedness or other security of another Person, including any option, warrant or right to acquire the same;

(b)    Any loan, advance, contribution to capital, extension of credit (except for current trade and customer accounts receivable for inventory sold or services rendered in the ordinary course of business) to another Person;

(c)    Any Acquisition; and

(d)    Any other investment of money or capital in order to obtain a profitable return,

in all cases, whether now existing or hereafter made. For purposes of calculation, the amount of any Investment outstanding at any time shall be the aggregate cash Investment less all cash returns, cash dividends and cash distributions (or the fair market value of any non-cash returns, dividends and distributions) received by such Person.

"ISDA Master Agreement" means the form entitled "2002 ISDA Master Agreement" or such other replacement form then currently published by the International Swap and Derivatives Association, Inc., or any successor thereto.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Issuing Banks" means, individually and collectively, (a) as to the Domestic Borrowers, each of JPMorgan Chase Bank, N.A., Citibank N.A., Deutsche Bank AG New York Branch, Goldman Sachs Bank USA and Barclays Bank PLC and any other Domestic Lender selected by the Lead Borrower, who agrees to serve as an Issuing Bank and who is approved by the Administrative Agent in its reasonable discretion (such approval not to be unreasonably withheld), and (b) as to the Canadian Borrower, each of JPMorgan Chase Bank, Toronto Branch, Citibank N.A., Deutsche Bank AG New York Branch, Goldman Sachs Bank USA and Barclays Bank PLC and no more than one other Canadian Lender selected by the Canadian Borrower and who agrees to serve as an Issuing Bank and who is approved by the Canadian Agent in its reasonable discretion (such approval not to be unreasonably withheld), in each case in its capacity as the issuer of Letters of Credit hereunder, and any successor in such capacity. Any Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued

by such Affiliate. Notwithstanding anything to the contrary herein, Goldman Sachs Bank USA, Barclays Bank PLC, Deutsche Bank AG New York Branch and Citibank N.A. shall not be obligated to issue any Commercial Letters of Credit.

"Joinder Agreement" shall mean an agreement, in the form attached hereto as Exhibit J, pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Facility Guarantor, as the Administrative Agent may determine.

"JPMorgan" means JPMorgan Chase Bank, N.A. and its Subsidiaries, Affiliates and branches.

"Judgment Conversion Date" has the meaning set forth in SECTION 9.19.

"Judgment Currency" has the meaning set forth in SECTION 9.19.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof, or the renewal thereof.

"L/C Credit Support" has the meaning set forth in SECTION 2.13(k).

"Lead Borrower" has the meaning provided in the Preamble to this Agreement.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lenders" means, collectively, the Domestic Lenders and the Canadian Lenders and each assignee that becomes a party to this Agreement as set forth in SECTION 9.04(b).

"Letter of Credit" means a letter of credit that is (i) issued by an Issuing Bank pursuant to this Agreement for the account of a Borrower, (ii) a Standby Letter of Credit or Commercial Letter of Credit, issued in connection with the purchase of Inventory by a Borrower and for other purposes for which such Borrower has historically obtained letters of credit, or for any other purpose that is reasonably acceptable to the Administrative Agent or the Canadian Agent, as applicable, and (iii) in form reasonably satisfactory to the applicable Issuing Bank.

"Letter of Credit Disbursement" means a payment made by an Issuing Bank to the beneficiary of, and pursuant to, a Letter of Credit.

"Letter of Credit Outstandings" means, collectively, Canadian Letter of Credit Outstandings and Domestic Letter of Credit Outstandings. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of any Rule under the ISP or any article of the UCP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

44

"Letter of Credit Fees" means the fees payable in respect of Letters of Credit pursuant to SECTION 2.19.

"LIBO Borrowing" means a Borrowing comprised of LIBO Loans.

"LIBO Loan" shall mean any Loan bearing interest at a rate determined by reference to the Adjusted LIBO Rate in accordance with the provisions of Article n.

"LIBO Rate" means, with respect to any LIBO Rate Borrowing for any Interest Period, the LIBO Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that if the LIBO Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") then the LIBO Rate shall be the Interpolated Rate.

"LIBO Screen Rate" means, for any day and time, with respect to any LIBO Rate Borrowing for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion, provided that if the LIBO Screen Rate shall be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, hen, pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, and, with respect to the Canadian Borrower, also includes any prior claim or deemed trust in, on or of such asset, and the Canadian Court Ordered Charges, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Line Cap" means, at any time of determination, the lesser of (i) the sum of (x) the Revolving Credit Ceiling minus (y) the Carve-Out Reserve minus (z) the Canadian Court Reserve and (ii) the Combined Borrowing Base.

"Liquidation" means the exercise by the Administrative Agent, the Collateral Agent or the Canadian Agent, as applicable, of those rights and remedies accorded to the Administrative Agent, the Collateral Agent or the Canadian Agent, as applicable, under the Loan Documents and Applicable Law as a creditor of the Loan Parties, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties, acting with the consent of the Collateral Agent, of any public, private or "Going-Out-Of-Business Sale" or other disposition of Collateral for the purpose of liquidating the Collateral, including any of the foregoing that may be undertaken by a receiver, interim receiver or receiver and manager. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

45

"Liquidation Percentage" shall mean, (a) for any Lender (other than a Term Lender), a fraction, the numerator of which is the sum of such Lender's Domestic Commitment and Canadian Commitment on the Determination Date and the denominator of which is the sum of the Total Commitments of all Lenders on the Determination Date, and (b) for any Term Lender, a fraction. the numerator of which is such Term Lender's outstanding Term Loans on the Determination Date and the denominator of which is the sum of all outstanding Term Loans of all Term Lenders on the Determination Date.

"Loan Account" has the meaning provided in SECTION 2.20.

"Loan Documents" means this Agreement, the Notes, the Orders, the Letters of Credit, the Intercreditor Agreement and the Security Documents and any other instrument or agreement now or hereafter executed and delivered by a Loan Party in connection herewith that is expressly designated to be a "Loan Document" (excluding agreements entered into in connection with any transaction arising out of any Bank Product or Cash Management Services), each as amended and in effect from time to time.

"Loan Party" or "Loan Parties" means the Borrowers and the Facility Guarantors.

"Loans" means all Revolving Credit Loans (including Domestic Loans and Canadian Loans), Swingline Loans, Term Loans and other advances to or for account of any of the Borrowers pursuant to this Agreement.

"Low Selling Period" means (i) with respect to the TRU Inventory owned by the Domestic Loan Parties and all Inventory owned by the Canadian Loan Parties, the period in each year commencing on the first day after the first Sunday after December 15th and ending on September 14th of the subsequent year and (ii) with respect to BRU Inventory owned by the Domestic Loan Parties, the period in each year commencing on November 1 and ending on January 31 of the subsequent year.

"Majority Arrangers" means the Arrangers representing a majority of the Arrangers under the Commitment Letter (as of the date thereof).

"Margin Stock" has the meaning assigned to such term in Regulation U.

"Master Lease" means, collectively, each of the Master Leases entered into by a Loan Party with any Special Purpose Entity of the Parent and its Subsidiaries, and any and all modifications thereto, substitutions therefore and replacements thereof made (i) with the consent of the Collateral Agent or (ii) not in violation of the provisions of SECTION 6.09.

"Master Lease Liquidation Event" means the acceleration of any Indebtedness of a Special Purpose Entity (or any successor in interest thereto) which is secured by the Real Estate which is the subject of a Master Lease, and the commencement of the exercise of remedies seeking to collect such Indebtedness (including, without limitation, foreclosure, by the holder of such Indebtedness), as a result of which either (a) the Loan Parties occupying such Real Estate could reasonably be expected to be dispossessed of such Real Estate due to the failure by the Loan Party to fulfill the

46

terms of any SNDA or (b) any Access Agreement could reasonably be expected to be unenforceable or ineffective.

"Material Adverse Effect" means any event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on (i) the business, financial condition, operations, performance, properties, or liabilities of the Lead Borrower and its subsidiaries taken as a whole (other than as a result of the events leading up to and following commencement of a proceeding under chapter 11 of the Bankruptcy Code or the CCAA and the continuation and prosecution thereof and the Cases), (ii) the ability of the Loan Parties to perform their respective material payment obligations under the Loan Documents, or (iii) the material rights and remedies of the Administrative Agent, the Collateral Agent, the Issuing Banks and the Lenders under the Loan Documents.

"Material Indebtedness" means post-petition Indebtedness (other than the Obligations) of the Loan Parties, individually or in the aggregate, having an aggregate principal amount exceeding $25,000,000.

"Maturity Date" means the date that is 16 months from the Effective Date.

"Maximum Rate" has the meaning provided in SECTION 9.13.

"Minority Lenders" has the meaning provided in SECTION 9.02(c).

"Monitor" shall mean Grant Thornton Limited in its capacity as the CCAA Court-appointed monitor of the Canadian Borrower, and any court-appointed successor thereto.

"Monthly Excess Availability" means, for any date of calculation, Excess Availability on the last day of each month during such measurement period.

"Moody's" means Moody's Investors Service, Inc.

"Mortgages" means the Collateral Mortgages, Assignments of Leases and Rents, deed of hypothec charging the universality of immovable property and any other security documents granting a Lien on Real Estate between the Loan Party owning the Real Estate encumbered thereby and the Canadian Agent for the benefit of the Canadian Agent and the other Secured Parties, if any.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, (a) the cash proceeds received in respect of such event, including (i) any cash received in respect of any non-cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, in each case net of (b) the sum of (i) all reasonable fees and out-of-pocket fees and expenses (including appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Debtor to third parties (other than Affiliates, except to the extent permitted under SECTION 6.07 hereof) in connection with such event, and (ii) in the case of a sale or other disposition of an asset (including pursuant to a casualty or condemnation), the amount of all payments required to be made by any Loan Party

47

or any of their respective Subsidiaries as a result of such event to repay (or to establish an escrow for the repayment of) any Indebtedness (other than the Obligations and any other obligations secured by the Security Documents) secured by a Permitted Encumbrance that is senior to the Lien of the Administrative Agent or Canadian Agent, as applicable, and (iii) as long as the Determination Date has not occurred, capital gains or other income taxes paid or payable as a result of any such sale or disposition (after taking into account any available tax credits or deductions).

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Notes" means, collectively, (a) the Revolving Credit Notes (b) the Swingline Notes, and (c) the Term Notes, each as may be amended, supplemented or modified from time to time.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Banking Day, for the immediately preceding Banking Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at at 11:00 a.m. on such day received to the Administrative Agent from a Federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Obligations" means (a) (i) the principal of, and interest (including all interest that accrues after the commencement of any case or proceeding by or against any Borrower or Facility Guarantor under Bankruptcy Law or any state, federal or provincial bankruptcy, insolvency, receivership or similar law, whether or not allowed in such case or proceeding) on the Loans and Facility Guarantees, (ii) other amounts owing by the Loan Parties under this Agreement or any other Loan Document in respect of any Letter of Credit, including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral and (iii) all other monetary obligations, including fees, costs, expenses and indemnities (including all fees, costs, expenses and indemnities that accrue after the commencement of any case or proceeding by or against any Borrower or Facility Guarantor under Bankruptcy Law or any state, federal or provincial bankruptcy, insolvency, receivership or similar law, whether or not allowed in such case or proceeding), whether primary, secondary, direct, contingent, fixed or otherwise, of the Loan Parties to the Secured Parties under this Agreement and the other Loan Documents, and (b) the due and punctual payment and performance of all the covenants, agreements, obligations and liabilities of each Loan Party under or pursuant to this Agreement and the other Loan Documents. Without limiting the foregoing, for purposes of clarity, whenever used herein the term "Obligations" shall include all Canadian Liabilities.

"Orders" shall mean, collectively, the Interim Order, the Canadian Initial Order and the Final Order.

"Other Borrower" means each Person who shall from time to time enter into a Joinder Agreement as a "Domestic Borrower" hereunder.

48

"Other Connection Taxes" means, with respect to any Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Liabilities" means (a) any Cash Management Services furnished to any of the Loan Parties or any of their Subsidiaries and/or (b) any transaction with any Agent, the Canadian Agent, any Lender or any of their respective Affiliates, in each case which arises out of any Bank Product entered into with any Loan Party and any such Person, as each may be amended from time to time.

"Other Taxes" means any and all current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight LIBO Rate borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

"Participant" shall have the meaning provided in SECTION 9.04(e).

"Participant Register" has the meaning provided in SECTION 9.04(e).

"Parent" means Toys "R" Us, Inc., a Delaware corporation.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Acquisition" means any Acquisition in which each of the following conditions is satisfied:

(a)   No Default or Event of Default then exists or would arise from the consummation of such Acquisition;

(b)   Such Acquisition shall have been approved by the Board of Directors of the Person (or similar governing body if such Person is not a corporation) which is the subject of such Acquisition and such Person shall not have announced that it will oppose such Acquisition or shall not have commenced any action which alleges that such Acquisition will violate Applicable Law;

(c)   The Lead Borrower shall have furnished the Administrative Agent with five (5) Business Days prior written notice of such intended Acquisition and shall have furnished the Administrative Agent with (i) a current draft of the acquisition agreement and other

49

material acquisition documents relating to the Acquisition and (ii) to the extent the purchase price relating to the Acquisition is in excess of $5,000,000 (excluding such portion of the purchase price consisting of Capital Stock of a Loan Party (or cash proceeds of the issuance of the foregoing) or contingent Earn-Out Obligations), a summary of due diligence undertaken by the Borrowers in connection with such Acquisition, applicable financial statements of the Person which is the subject of such Acquisition, pro forma projected financial Statements for the twelve (12) month period following such Acquisition after giving effect to such Acquisition (including balance sheets, cash flows and income statements by month for the acquired Person, individually, and on a Consolidated basis with all Loan Parties) and such other information readily available to the Loan Parties as the Administrative Agent shall reasonably request;

(d)    To the extent the purchase price relating to the Acquisition is in excess of $5,000,000 and any portion of such amount is financed with the proceeds of any Credit Extensions, the legal structure of the Acquisition shall be acceptable to the Administrative Agent in its reasonable discretion (provided the Administrative Agent's indication of acceptability shall not be unreasonably withheld or delayed);

(e)    If the Acquisition is an Acquisition of Capital Stock, (i) a Loan Party shall acquire and own, directly or indirectly, a majority of the Capital Stock in the Person being acquired and (ii) shall Control a majority of any voting interests or otherwise Control the governance of the Person being acquired;

(f)    Any material assets acquired shall be utilized in, and if the Acquisition involves a merger, consolidation or stock acquisition, the Person which is the subject of such Acquisition shall be engaged in, a business otherwise permitted to be engaged in by a Borrower under this Agreement;

(g)    If the Person which is the subject of such Acquisition will be maintained as a Subsidiary of a Loan Party, or if the assets acquired in an acquisition will be transferred to a Subsidiary which is not then a Loan Party, such Subsidiary shall have been joined as a "Borrower" hereunder or as a Facility Guarantor, as required by SECTION 5.12, and the Administrative Agent or the Canadian Agent, as applicable, shall have received a first priority security and/or mortgage interest (subject only to Permitted Encumbrances (x) having priority by operation of Applicable Law on Collateral included in the Domestic Borrowing Base and/or the Canadian Borrowing Base, or (y) on any Collateral not described in clause (x) above) in such Subsidiary's Inventory, Accounts and other property constituting Collateral under the Security Documents in order to secure the Obligations and the Other Liabilities (or the Canadian Liabilities if such Person is a Canadian Loan Party); and

(h)    The aggregate consideration for all such Acquisitions during the term of the Facilities shall not exceed $5,000,000.

50

"Permitted Disposition" means any of the following, subject to Bankruptcy Law, the terms of the Orders and any required approval by the Bankruptcy Court or the Canadian Court:

(a)    (i) licenses, non-exclusive sublicenses, settlement of claims, and entering into co-existence agreements with respect to Intellectual Property Rights, in each case, entered into in the ordinary course of business or (ii) licenses of licensed departments of a Loan Party or any of its Subsidiaries, in each case, in the ordinary course of business or (iii) the sale, transfer or other disposition of Intellectual Property Rights (or related rights thereto) to Geoffrey so long as such Intellectual Property Rights (or related rights thereto) is subject to the Intercompany Licenses (as defined in the Security Agreement) and the Intellectual Property Rights Agreement;

(b)    As long as no breach of the provisions of SECTION 6.10 hereof then exists or would arise therefrom, bulk sales or other dispositions of the Loan Parties' Inventory in connection with Store closings, at arm's length: provided that such Store closures and related Inventory dispositions shall not exceed in the aggregate from and after the Effective Date, thirty percent (30%) of the number of the Loan Parties' Stores in existence as of the Effective Date (net of new Store openings); provided further that all sales of Inventory in connection with Store closings in a transaction or series of related transactions which in the aggregate involve Inventory having a value greater than $20,000,000 at Cost shall be in accordance with liquidation agreements and with professional liquidators reasonably acceptable to the Collateral Agent;

(c)    Dispositions of assets (other than assets included in the Canadian Borrowing Base or the Domestic Borrowing Base or Incremental Availability) that are substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary;

(d)    (i) Sales, transfers and dispositions among the Loan Parties and (ii) sales, transfers and disposition by a Loan Party to a Subsidiary or Affiliate of Parent that is not a Loan Party in an amount not to exceed $5,000,000;

(e)    [reserved];

(f)    Sales or forgiveness of Accounts in the ordinary course of business or in connection with the collection or compromise thereof and (ii) the settlement (or waiver) of litigation or other disputes;

(g)    Leases, subleases, licenses and sublicenses of real or personal property entered into by Loan Parties and their Subsidiaries in the ordinary course of business at arm's length and on market terms;

(h)    Sales of non-core assets acquired in connection with Permitted Acquisitions which are not used in the business of the Loan Parties;

51

(i)    Issuances of equity by Foreign Subsidiaries (other than the Canadian Borrower or any other Canadian Subsidiary) to qualifying directors of such Foreign Subsidiaries;

(j)    As long as no Event of Default would arise therefrom, sales or other dispositions of (i) Permitted Investments described in clauses (a) through (g) of the definition thereof and (ii) the Loan Parties' interest in SALTRU Associates JV or its parent entity;

(k)    Any disposition of Real Estate to a Governmental Authority as a result of a condemnation of such Real Estate;

(l)    The making of (i) Permitted Investments, and (ii) Restricted Payments and other payments, in each case under this clause (ii) to the extent permitted under SECTION 6.06, and (iii) transactions permitted by SECTION 6.03;

(m)    Permitted Encumbrances;

(n)    sales, transfers or other dispositions of assets pursuant to any order of the Bankruptcy Court or the Canadian Court, in form and substance reasonably satisfactory to the Administrative Agent, permitting non-material asset dispositions without further order of the Bankruptcy Court or the Canadian Court;

(o)    Exchanges or swaps of Equipment, Store leases and other Real Estate of the Domestic Loan Parties having substantially equivalent value; provided that, upon the completion of any such exchange or swap, (i) the Administrative Agent or the Canadian Agent, as applicable, for its own benefit and the benefit of other Secured Parties, has a perfected first priority lien (subject only to Permitted Encumbrances having priority by operation of law) in such Equipment received by the Loan Parties, and (ii) all Net Proceeds, if any, received in connection with any such exchange or swap of Equipment are applied to the Obligations or the Canadian Liabilities, as applicable, if then required in accordance with SECTION 2.17 or SECTION 2.18 hereof;

(p)    [reserved];

(q)    As long as no Event of Default exists or would arise as a result of the transaction, sales of a Subsidiary (or any Special Purpose Entity or its subsidiaries) or any business segment, or any portion thereof (including, in each case, sales of any Person created to hold such assets), to a Person other than a Loan Party or a Subsidiary or Affiliate of a Loan Party, for fair market value in an aggregate amount not to exceed $20,000,000 in the aggregate during the term of this Agreement; provided that, in each case, such sale shall be for cash in an amount at least equal to the greater of the amounts advanced or available to be advanced against the assets included in the sale under the Borrowing Base or Canadian Incremental Availability, as applicable;

(r)    Dispositions set forth on Schedule 1.1(c);

52

(s)   As long as no breach of the provisions in SECTION 6.10 hereof exists or would arise as a result of the transaction, sales or other dispositions of Real Estate of the Canadian Loan Parties for fair market value in an amount not to exceed $20,000,000; provided that such sales or other dispositions shall be for cash in an aggregate amount at least equal to the greater of the amounts advanced or available to be advanced against the assets included in the sale under the Canadian Borrowing Base; and

(t)   As long as no Event of Default exists or would arise as a result of the transaction, other dispositions of assets in an aggregate amount for all Loan Parties not to exceed $50,000,000 in the aggregate.

"Permitted Encumbrances" means:

(a)   Liens imposed by law for (i) pre-petition Taxes, assessments or other governmental charges or levies not yet delinquent as of the Petition Date or that are being contested in compliance with SECTION 5.05 or (ii) post-petition Taxes, assessments or other governmental charges or levies not yet delinquent or that are being contested in compliance with SECTION 5.05;

(b)   Carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by Applicable Law (i) arising in the ordinary course of business and securing obligations that are not overdue by more than sixty (60) days, (ii) (A) that are being contested in good faith by appropriate proceedings, (B) as to which the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, or (iii) the existence of which would not reasonably be expected to result in a Material Adverse Effect;

(c)   Liens made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)   Liens to secure, or relating to, the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds (and Liens arising in accordance with Applicable Law in connection therewith), and other obligations of a like nature, in each case in the ordinary course of business;

(e)   Judgment Liens in respect of judgments that do not constitute an Event of Default under SECTION 7.01(k);

(f)   Easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way, development, site plan or similar agreements and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects, or survey matters that are disclosed by current surveys, but that, in each case, do not interfere with the current use of the property in any material respect;

53

(g)    Any Lien on any property or asset of any Loan Party in existence on the Effective Date and set forth on Schedule 6.02 (and extensions, renewals and replacements thereof permitted hereby which does not increase the obligations); provided that individual financings of such assets by one lender may be cross-collateralized to other financings of such assets by such Lender;

(h)    Liens on fixed or capital assets acquired by any Loan Party which are permitted under clause (e) of the definition of Permitted Indebtedness, so long as (A) with respect to purchase money Liens and capital leases, such Liens and the Indebtedness secured thereby are incurred prior to or within ninety (90) days after such acquisition or the completion of the construction or improvement thereof (other than refinancings thereof permitted hereunder), (B) the Indebtedness secured thereby does not exceed 100% of the cost of acquisition or improvement of such fixed or capital assets, and (C) such Liens shall not extend to any other property or assets of the Loan Parties (other than proceeds or accessions thereto); provided that individual financings of such assets by one lender may be cross-collateralized to other financings of such assets by such Lender;

(i)    Liens in favor of the Administrative Agent or the Canadian Agent, as applicable, for its own benefit and the benefit of the other Secured Parties;

(j)    Landlords' and lessors' Liens in respect of rent not in default for more than sixty (60) days or the existence of which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect;

(k)    Possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the Effective Date and Permitted Investments; provided that such liens (a) attach only to such Investments and (b) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)    Liens securing the DIP Term Loan Facility on the terms described in the Orders, which Liens shall be subject to the Orders and the Intercreditor Agreement;

(n)    the Canadian Court Ordered Charges and any other charge granted by the Canadian Court with the consent of the Canadian Agent, acting reasonably;

(o)    Liens arising from precautionary UCC filings regarding "true" operating leases or the consignment of goods to a Loan Party;

(p)    Voluntary Liens on Fixed Assets in existence at the time such Fixed Assets are acquired pursuant to a Permitted Acquisition or on Fixed Assets of a Subsidiary of a

54

Loan Party in existence at the time such Subsidiary is acquired pursuant to a Permitted Acquisition; provided that such Liens are not incurred in connection with or in anticipation of such Permitted Acquisition and do not attach to any other assets of any Loan Party or any of its Subsidiaries;

(q)    Liens in favor of customs and revenues authorities imposed by Applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations (i) that are not overdue by more than sixty (60) days, (ii)(A) that are being contested in good faith by appropriate proceedings, (B) as to which the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, or (iii) the existence of which would not reasonably be expected to result in a Material Adverse Effect;

(r)    Liens granted to provide adequate protection pursuant to the Interim Order or the Final Order or the Carve-Out;

(s)    Any interest or title of a licensor, sublicensor, lessor or sublessor under any non-exclusive license or operating or true lease agreement;

(t)    licenses, sublicenses, leases or subleases granted to third Persons in the ordinary course of business;

(u)    The replacement, extension or renewal of any Permitted Encumbrance; provided that such Lien shall at no time be extended to cover any assets or property other than such assets or property subject thereto on the Effective Date or the date such Lien was incurred, as applicable and proceeds and accession thereto; provided further that the amount secured by such replacement, extension or renewal Lien shall not exceed the amount secured by the Permitted Encumbrance on the Effective Date or the date such Lien was incurred, as applicable;

(v)    Liens on insurance proceeds incurred in the ordinary course of business in connection with the financing of insurance premiums;

(w)    Liens on securities which are the subject of repurchase agreements incurred in the ordinary course of business;

(x)    Liens arising by operation of law under Article 4 of the UCC (or any similar law in Canada) in connection with collection of items provided for therein;

(y)    Liens arising by operation of law under Article 2 of the UCC (or any similar laws in Canada) in favor of a reclaiming seller of goods or buyer of goods;

(z)    Liens on deposit accounts or securities accounts in connection with overdraft protection and netting services in the ordinary course of business;

(aa)    Security given to a public or private utility or any Governmental Authority as required in the ordinary course of business;

55

(bb)   With respect to any Real Estate located in Canada, any rights, reservations, limitations and conditions contained in the grant from the Crown or any Crown Patent;

(cc)   Liens on royalty payments due or to become due to Geoffrey and its Subsidiaries to secure Indebtedness described in clause (y) of the definition of Permitted Indebtedness;

(dd)   Liens not otherwise permitted hereunder; provided that (i) if such Liens secure Indebtedness, such Indebtedness is Permitted Indebtedness, (ii) the aggregate outstanding principal amount of the obligations secured by such Liens does not exceed (as to all Loan Parties) $25,000,000 at any one time and (iii) such Liens on assets of Canadian Loan Parties shall not secure obligations in an aggregate principal amount of greater than $5,000,000 at any time;

(ee)   Liens in favor of a financial institution encumbering deposits (including the right of setoff) held by such financial institution in the ordinary course of business in respect of Indebtedness permitted hereunder and which are within the general parameters customary in the banking industry;

(ff)   Liens granted pursuant to the Orders (x) in favor of the Canadian Borrower securing the Secured Intercompany Advances, and (y) in favor of Wayne securing the Secured Wayne Loans, in each case, subject to the priorities set forth in the Orders;

(gg)   Liens securing Indebtedness, to the extent permitted under clause (w) of the definition of "Permitted Indebtedness"; and

(hh)   Liens in the nature of the right of setoff in favor of counterparties to contractual agreements with the Loan Parties (other than the Sponsor Related Parties (other than the Parent and any of its Subsidiaries)) in the ordinary course of business.

The designation of a Lien as a Permitted Encumbrance shall not limit or restrict the ability of the Agents to establish any Reserve relating thereto.

"Permitted Indebtedness" means each of the following:

(a)   Indebtedness created under the Loan Documents or otherwise secured by the Security Documents;

(b)   Existing Debt set forth on Schedule 6.01;

(c)   Indebtedness of any Loan Party to any other Loan Party (including the Secured Intercompany Advances);

(d)   Guarantees by any Loan Party of Indebtedness or other obligations arising in the ordinary course of business of any other Loan Party;

(e)   Purchase money Indebtedness of any Loan Party to finance the acquisition or improvement of any fixed or capital assets (other than Real Estate), including Capital

56

Lease Obligations, and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof or result in an earlier maturity date or decreased weighted average life thereof; underlined provided that the aggregate amount of all such Indebtedness at any time outstanding shall not exceed $100,000,000;

(f)    Indebtedness under Hedge Agreements, other than for speculative purposes, entered into in the ordinary course of business (including on behalf of an Affiliate of a Loan Party);

(g)    (i) Contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business in connection with the construction or improvement of retail stores, and (ii) advances made by landlords to finance tenant improvements of Real Estate in the ordinary course of business;

(h)    Indebtedness of the Domestic Loan Parties under the DIP Term Loan Facility as in effect on the Effective Date in an amount not to exceed $450,000,000 and subject at all times to the Intercreditor Agreement and the Orders;

(i)    Indebtedness of the Lead Borrower under the Secured Wayne Loans;

(j)    [reserved];

(k)    [reserved];

(l)    [reserved];

(m)    Indebtedness incurred in connection with sale leaseback transactions set forth on Schedule 6.01;

(n)    [reserved];

(o)    [reserved];

(p)    Indebtedness constituting the obligation to make purchase price adjustments and indemnities in connection with Permitted Acquisitions;

(q)    [reserved];

(r)    Indebtedness incurred in the ordinary course of business in connection with the financing of insurance premiums;

(s)    [reserved];

(t)    [reserved];

(u)    Indebtedness relating to surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

57

(v)    without duplication of any other Indebtedness, non-cash accruals of interest, accretion or amortization of original issue discount and/or pay-in-kind interest;

(w)    Indebtedness relating to documentary letters of credit obtained in the ordinary course of business; provided that the security for any such documentary letter of credit may be secured only by Liens attaching to the related documents of title and not the Inventory represented thereby;

(x)    [reserved];

(y)    [reserved];

(z)    Guarantees of joint venture Indebtedness described or contemplated in Schedule 6.01(z);

(aa)    [reserved]; and

(bb)    other Indebtedness so long as at the time of incurrence thereof, the aggregate principal amount of such Indebtedness does not exceed $25,000,000 at any time outstanding (plus non-cash accruals of interest, accretion or amortization of original issue discount and/or payment-in-kind interest) at any time outstanding).

"Permitted Investments" means each of the following:

(a)    Direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America or, with respect to the Canadian Loan Parties, Canada (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America or Canada, as applicable) or any state or state agency thereof, in each case maturing within one (1) year from the date of acquisition thereof;

(b)    Investments in commercial paper maturing within 360 days from the date of acquisition thereof and having, at the date of acquisition, the highest or next highest credit rating obtainable from S&P or from Moody's;

(c)    Investments in certificates of deposit, banker's acceptances and time deposits maturing within 360 days from the date of acquisition thereof which are issued or guaranteed by, or placed with, and demand deposit and money market deposit accounts issued or offered by, any Lender or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof (or with respect to the Canadian Loan Parties, Canada or any province thereof) that has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)    Fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer;

58

(e)    Shares of any money market or mutual fund that has substantially all of its assets invested in the types of investments referred to in clauses (a) through (d), above;

(f)    Investments existing or contemplated on the Effective Date and set forth on Schedule 6.04 and any renewal, extensions, replacements thereof that do not increase the principal amount (other than by unused commitments) accrued interest, fees and expenses;

(g)    Investments made in accordance with the investment policy of the Borrowers set forth as Schedule 6.04(g) hereto;

(h)    Investments made by (i) any Loan Party in any other Loan Party, including the Secured Intercompany Advances or (ii) as long as no Event of Default then exists or would arise therefrom, any Loan Party in any Subsidiary or Affiliate of any Loan Party in an aggregate amount not to exceed $5,000,000 at any time outstanding, in each case determined without regard to any write-downs or write-offs thereof;

(i)    Permitted Dispositions, Permitted Encumbrances, and Restricted Payments permitted pursuant to SECTION 6.06, in each case to the extent constituting Investments;

(j)    [reserved];

(k)    Guarantees constituting Permitted Indebtedness;

(l)    Guarantees of Indebtedness of Subsidiaries that are not Loan Parties; provided that in no event shall any Loan Party issue Guarantees of Indebtedness of Subsidiaries that are not Loan Parties pursuant to this clause (l) in an aggregate amount (combined with Investments permitted under clause (w) below) exceeding $5,000,000 at any time outstanding;

(m)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business and settlement or waiver of any litigation or dispute;

(n)    Loans or advances to employees for the purpose of travel, entertainment or relocation in the ordinary course of business; provided that all such loans and advances to employees shall not exceed $2,500,000 in the aggregate at any time, and determined without regard to any write-downs or write-offs thereof;

(o)    Investments received from purchasers of assets pursuant to dispositions permitted pursuant to SECTION 6.05;

(p)    [reserved];

(q)    Permitted Acquisitions and existing Investments of the Persons acquired in connection with Permitted Acquisitions so long as such Investment was not made in contemplation of such Permitted Acquisition;

59

(r)   Hedge Agreements entered into in the ordinary course of business for non-speculative purposes;

(s)   To the extent permitted by Applicable Law, notes from officers and employees in exchange for equity interests of the Parent purchased by such officers or employees pursuant to a stock ownership or purchase plan or compensation plan;

(t)   Investments in TRU (Vermont), Inc. in an aggregate amount not to exceed (together with Investments made pursuant to clause (bb) below) $25,000,000 at any time outstanding;

(u)   Subject to SECTION 2.18, Investments in deposit accounts and securities accounts opened in the ordinary course of business;

(v)   Capitalization or forgiveness of any Indebtedness (i) owed to any Loan Party by another Loan Party or (ii) a Subsidiary that is not a Loan Party to another Subsidiary that is not a Loan Party;

(w)   Investments in Foreign Subsidiaries; provided that such Investments shall not (combined with Guarantees permitted under clause (l) above) exceed $5,000,000 in the aggregate outstanding at any time;

(x)   Creation and initial nominal capitalization of new Subsidiaries, subject to the provisions of SECTION 5.12;

(y)   Capital Expenditures;

(z)   Other Investments in an amount not to exceed $25,000,000 in the aggregate outstanding at any time, determined without regard to any write-downs or write-offs thereof; provided that no greater than $5,000,000 of such amount shall be made by the Canadian Loan Parties;

(aa)   Investments consisting of acquisition of inventory, equipment and other fixed assets in the ordinary course of business; and

(bb)   Investments in SALTRU Associates JV existing as of the Effective Date and additional Investments (including capital contributions) required to be made from time to time pursuant to the organizational documents of SALTRU Associate JV as in effect on the Effective Date in an amount not to exceed (together with Investments made pursuant to clause (t) above) $25,000,000 outstanding at any time;

provided, however, that, for purposes of calculation, the amount of any Investment outstanding at any time shall be the aggregate cash Investment, less all cash returns, cash dividends and cash distributions (or the fair market value of any non-cash returns, dividends and distributions) received by such Person (not to exceed the original amount of such Investment), and less all liabilities expressly assumed by another Person in connection with the sale of such Investment (not to exceed the original amount of such Investment).

60

"Permitted Prior Liens" shall mean, collectively, (i) Liens in existence on the Effective Date securing the Existing Debt, and (ii) adequate protection Liens granted under the Orders with respect to Existing Debt which adequate protection Liens are not subject to the Priming Liens.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning provided in the recitals.

"Plan" means (a) any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Lead Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or (b) in respect of the Canadian Loan Parties, any pension benefit or retirement savings plan maintained by any of the Canadian Loan Parties for its employees or its former employees to which any of the Canadian Loan Parties contribute or are required to contribute with respect to which any of the Canadian Loan Parties have incurred or may incur liability, including contingent liability.

"PPSA" means the *Personal Property Security Act* of Ontario (or any successor statute) or similar legislation of any other Canadian jurisdiction, including, without limitation, the Civil Code of Quebec, the laws of which are required by such legislation to be applied in connection with the issue, perfection, enforcement, opposability, validity or effect of security interests.

"Prepetition ABL Collateral" has the meaning provided in SECTION 2.26(a)(iii).

"Prepetition ABL and FILO Credit Agreement" means that certain Third Amended and Restated Credit Agreement, dated as of March 21, 2014, by and among the Company, as the lead borrower for the borrowers party thereto, the facility guarantors party thereto, Bank of America, N.A., as administrative agent, Bank of America, N.A., acting through its Canada branch, as Canadian agent, Bank of America, N.A. and Wells Fargo Bank, National Association, as co-collateral agents, the lenders party thereto and the other agents party thereto (as amended by the First Amendment thereto, dated as of October 24, 2014, and as further amended, supplemented, restated or otherwise modified prior to the Petition Date).

"Prepetition Payment" shall mean a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Existing Debt, (ii) "critical vendor payments" or (iii) reclamation claims or other pre-petition claims against any Debtor.

"Prepetition Term Loan Agreement" means that certain Amended and Restated Credit Agreement dated as of August 24, 2010 among the Lead Borrower, the lenders party thereto, Bank of America, N.A., as administrative agent and collateral agent, and the other parties thereto, as amended by that certain Incremental Joinder Agreement No. 1, dated as of September 20, 2010, and that certain Incremental Joinder Agreement No. 2, dated as of September 10, 2012, and that certain Amendment No. 3 thereto, dated as of October 24, 2014, and as further amended, supplemented, restated or otherwise modified prior to the Effective Date.

"Prepetition Term Loans" means the term loan facilities in favor of the Lead Borrower established under the Prepetition Term Loan Agreement.

"Prime Rate" means, for any day, the highest of: (a) the variable annual rate of interest then most recently announced by JPMorgan Chase Bank, N.A. at its head office in New York, New York as its "prime rate"; (b) the NYFRB Rate in effect on such day plus one-half of one percent (0.50%) per annum; or (c) the Adjusted LIBO Rate (calculated utilizing the LIBO Rate for a one-month Interest Period) plus one percent (1.00%) per annum; provided that for the purpose of this definition, the Adjusted LIBO Rate for any day shall be based on the LIBO Screen Rate (or if the LIBO Screen Rate is not available for such one month Interest Period, the Interpolated Rate) at approximately 11:00 a.m. London time on such day. The "prime rate" is a reference rate and does not necessarily represent the lowest or best rate being charged by JPMorgan Chase Bank, N.A. to any customer. If for any reason the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate or the LIBO Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations thereof in accordance with the terms hereof, the Prime Rate shall be determined without regard to clause (b) of the first sentence of this definition or clause (a)(i) of the definition of Adjusted LIBO Rate, as applicable, until the circumstances giving rise to such inability no longer exist. Any change in the Prime Rate due to a change in JPMorgan's "prime rate", the NYFRB Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in JPMorgan's Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate, respectively.

"Prime Rate Loan" means any Revolving Credit Loan bearing interest at a rate determined by reference to the Prime Rate or the Canadian Prime Rate, as the case may be, in accordance with the provisions of Article II.

"Primed Liens" means the liens that are being primed as described in SECTION 2.26(a)(iii).

"Priming Liens" has the meaning assigned in SECTION 2.26(a)(iii)

"Projections" shall mean the financial projections and any forward-looking statements of the Borrowers and the Subsidiaries furnished to the Lenders or the Administrative Agent by or on behalf of the Borrowers or any of the Subsidiaries prior to the Effective Date, including the DIP Budget.

"Propco" shall mean each direct or indirect subsidiary of the Parent in existence on the Petition Date and designated as such on Schedule 3.12.

"Propco Facilities" shall mean the Propco II Loan Agreement and any other real estate facilities entered into by a Propco and existing on the Effective Date.

"Propco I" means Toys "R" Us Property Company I, LLC.

"Propco II" means Toys "R" Us Property Company II, LLC.

"Propco II Loan Agreement" means that certain Loan Agreement, dated November 3, 2016, among Toys "R" Us Property Company II, LLC, Goldman Sachs Mortgage Company and Bank of America, N.A.

"Pro Rata Percentage" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the sum of the Commitments and Term Loans represented by such Lender's Commitment and Term Loans at such time tor if the Commitments have been terminated, the percentage of the Total Outstandings).

"Qualified ECP Guarantor" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section la(18)(A)(v)(II) of the Commodity Exchange Act.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Register" has the meaning provided in SECTION 9.04(c).

"Regulation U" means Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" has the meaning provided in Section 101(22) of CERCLA.

"Reorganization Plan" means a plan of reorganization, compromise or arrangement in any or all of the Cases of the Debtors.

"Reports" has the meaning provided in SECTION 8.14.

"Required Availability Amount" means $125,000,000 (which is the initial amount required pursuant to SECTION 6.10) or such greater or lesser amount as the Borrowers and the Required Lenders may agree.

"Required Lenders" means, at any time, (a) Lenders (other than Defaulting Lenders) having Commitments aggregating more than 50% of the sum of the Total Commitments, or if the Commitments have been terminated, Lenders (other than Defaulting Lenders) whose percentage of the Total Revolver Outstandings (calculated assuming settlement and repayment of all Swingline Loans by the Lenders) aggregate more than 50% of all Total Revolver Outstandings and (b) Lenders holding more than 50% of the sum of all Term Loans outstanding.

"Reserves" means all (if any) Inventory Reserves (including, without limitation, Shrink Reserves) and Availability Reserves (including, without limitation, Cash Management Reserves, Canadian Realty Reserves, the Canadian Court Reserve, Customer Credit Liabilities Reserves, the Carve-Out Reserve, the Term Push-Down Reserve and other Reserves of the type described in SECTION 2.03 hereof).

"Responsible Officer" of any Person shall mean any executive officer or financial officer of such Person and any other officer or similar official thereof with responsibility for the administration of the obligations of such Person in respect of this Agreement.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any class of Capital Stock of a Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Capital Stock of a Person or any option, warrant or other right to acquire any Capital Stock of a Person; provided that "Restricted Payments" shall not include any dividends payable solely in Capital Stock (other than Disqualified Capital Stock) of a Loan Party.

"Revolving Credit Ceiling" means $1,850,000,000, as such amount may be reduced from time to time in accordance with SECTION 2.15 and SECTION 2.17 of this Agreement.

"Revolving Credit Loans" means all loans (other than Term Loans) at any time made by any Lender (including, without limitation, Domestic Loans and Canadian Loans) pursuant to Article II and, to the extent applicable, shall include Swingline Loans made by the Swingline Lender pursuant to SECTION 2.06.

"Revolving Credit Notes" means (a) the promissory notes of the Domestic Borrowers substantially in the form of Exhibit D-1, each payable to the order of a Domestic Lender, evidencing the Revolving Credit Loans made to the Domestic Borrowers, and (b) the promissory note of the Canadian Borrower substantially in the form of Exhibit E-1, payable to the order of a Canadian Lender, evidencing the Revolving Credit Loans made to the Canadian Borrower.

"Revolving Facility" has the meaning provided in the recitals.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of a comprehensive embargo under Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, by the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person that is, in the aggregate 50 percent or greater owned by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person that is otherwise the subject of Sanctions.

64

"Sanctions" economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"S&P" means Standard & Poor's Financial Services LLC or any successor thereto.

"SEC" means the Securities and Exchange Commission.

"Secured Intercompany Advances" means advances made by the Canadian Borrower to any other Loan Party in an aggregate amount at any time outstanding not to exceed $75,000,000 at any time outstanding, which shall be secured by a court-ordered charge of the Bankruptcy Court given pursuant to the Interim Order and the Final Order.

"Secured Party" means (a) each Credit Party, (b) any Lender or any Affiliate of a Lender providing Cash Management Services or entering into or furnishing any Bank Products to or with any Loan Party (in each case, to the extent the Administrative Agent has received notice thereof prior to the Effective Date), (c) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (d) the successors and, subject to any limitations contained in this Agreement, assigns of each of the foregoing.

"Secured Wayne Loans" means loans from Wayne Real Estate Parent Company, LLC to the Lead Borrower.

"Security Agreement" means the Security Agreement dated as of the Closing Date (or any later date) among the Loan Parties (other than the Canadian Borrower and its Subsidiaries) and the Administrative Agent, for its benefit and for the benefit of the other Secured Parties, as amended and in effect from time to time.

"Security Documents" means the Security Agreement, the Canadian Security Documents, the Mortgages, the Intellectual Property Rights Agreement, the Facility Guarantee, the Facility Guarantors' Collateral Documents, the Blocked Account Agreements, and each other security agreement or other instrument or document executed and delivered pursuant to this Agreement or any other Loan Document to secure any of the Obligations, the Other Liabilities or the Canadian Liabilities, as applicable.

"Settlement Date" has the meaning provided in SECTION 2.22(b).

"Shrink" means Inventory identified by the Borrowers as lost, misplaced, or stolen.

"Shrink Reserve" means an amount reasonably estimated by the Collateral Agent to be equal to that amount which is required in order that the Shrink reflected in Borrowers' stock ledger would be reasonably equivalent to the Shrink calculated as part of the Borrowers' most recent physical inventory.

"SNDA" means (a) that certain Subordination, Non-Disturbance and Attornment Agreement, dated as of July 21, 2005, between German American Capital Corporation and the Lead

65

Borrower, as agreed and consented to by MPO Properties, LLC, and (b) that certain Subordination, Non-Disturbance and Attornment Agreement (MPO Properties, LLC), dated as of July 21, 2005, between German American Capital Corporation and the Lead Borrower, as agreed and consented to by Giraffe Properties, LLC (n/k/a Toys "R" Us Property Company II, LLC).

"Supermajority Consent of Revolving Lenders" means the consent of Lenders under the Revolving Facility (other than Defaulting Lenders) holding at least sixty-six and two-thirds percent (66.67%) of the Commitments and, following the termination of the Commitments, holding at least sixty-six and two-thirds percent (66.67%) of the Loans under the Revolving Facility.

"Supermajority Consent of Term Lenders" means the consent of Lenders under the Term Loan Facility (other than Defaulting Lenders) holding at least sixty-six and two-thirds percent (66.67%) of the Term Loans.

"Special Purpose Entity" means a Person (other than any Loan Party) that (a) is a domestic subsidiary of the Parent and (b) has no operations and whose primary assets (other than cash and cash equivalents) are, directly or indirectly, the stock or other equity interests of a subsidiary that is a Propco and the Real Estate that is the subject of the Propco Facilities.

"Specified Indebtedness" means (i) the DIP Term Loan Facility; (ii) the Taj DIP Facility and (iii) any other debtor-in-possession financing facility approved in the Cases in an amount in excess of $25,000,000, but excluding for greater certainty, the Secured Intercompany Advances.

"Sponsors" means, collectively, Bain Capital (TRU) VIII, L.P., a Delaware limited partnership; Bain Capital (TRU) VIII-E, L.P., a Delaware limited partnership; Bain Capital (TRU) VIII Coinvestment, L.P., a Delaware limited partnership; Bain Capital Integral Investors, LLC, a Delaware limited liability company; BCIP TCV, LLC, a Delaware limited liability company; Kohlberg Kravis Roberts & Co.; Toybox Holdings, LLC; Vornado Truck, LLC; and Vornado Realty Trust; and each of their respective Affiliates.

"Sponsor Group" means the Sponsors and the Sponsor Related Parties.

"Sponsor Related Parties" means, with respect to any Person, (a) any Controlling stockholder or partner (including, in the case of an individual Person who possesses Control, the spouse or immediate family member of such Person, provided that such Person retains Control of the voting rights, by stockholders agreement, trust agreement or otherwise of the Capital Stock owned by such spouse or immediate family member) or 80% (or more) owned Subsidiary, or (b) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons beneficially holding a 51% or more Controlling interest of which consist of such Person and/or such Persons referred to in the immediately preceding clause (a), or (c) the limited partners of the Sponsors.

"Standby Letter of Credit" means any Letter of Credit other than a Commercial Letter of Credit.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

66

"<u>Statutory Reserve Rate</u>" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one <u>minus</u> the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent or the Canadian Agent, as applicable, is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. LIBO Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"<u>Store</u>" means any retail store (which includes any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"<u>Subsidiary</u>" means, with respect to any Person (the "<u>parent</u>"), at any date, any corporation, limited liability company, partnership, association or other entity (a) of which Capital Stock representing more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held, or (b) that is, as of such date, otherwise Controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent. For purposes hereof, a Special Purpose Entity and its subsidiaries and any holding company which has as its primary asset the stock of such Special Purpose Entity shall not be deemed a Subsidiary.

"<u>Substantial Liquidation</u>" means either (a) the Liquidation of substantially all of the Collateral, or (b) the sale or other disposition of substantially all of the Collateral by the Loan Parties.

"<u>Superpriority Claims</u>" has the meaning provided in SECTION 2.26(a)(v).

"<u>Swap Obligations</u>" means with respect to any Loan Party any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"<u>Swingline Lender</u>" means JPMorgan Chase Bank, N.A., in its capacity as lender of Swingline Loans hereunder to the Domestic Borrowers hereunder, and JPMorgan Chase Bank, N.A., Toronto Branch, in its capacity as lender of Swingline Loans to the Canadian Borrower hereunder.

"<u>Swingline Loan</u>" means a Loan made by the Swingline Lender to a Domestic Borrower or the Canadian Borrower, as applicable, pursuant to SECTION 2.06.

"<u>Swingline Note</u>" means (a) the promissory note of the Domestic Borrowers substantially in the form of <u>Exhibit H</u>, payable to the order of the applicable Swingline Lender, evidencing the Swingline Loans made by the Swingline Lender to the Domestic Borrowers, and (b) the promissory note of the Canadian Borrower substantially in the form of <u>Exhibit I</u>, payable to the order of the

applicable Swingline Lender, evidencing the Swingline Loans made by the Swingline Lender to the Canadian Borrower.

"Synthetic Lease" means any lease or other agreement for the use or possession of property creating obligations which do not appear as Indebtedness on the balance sheet of the lessee thereunder but which, upon the insolvency or bankruptcy of such Person, may be characterized as Indebtedness of such lessee without regard to the accounting treatment.

"Taj DIP Facility" means those certain 11% Senior Secured DIP Notes issued by TRU Taj LLC and TRU Taj Finance, Inc. pursuant to that indenture dated on or around the date hereof by and among Tru Taj LLC, Tru Taj Finance, Inc., Wilmington Savings Fund Society, FSB, as trustee and collateral trustee, and the other parties party thereto.

"Taxes" means any and all current or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Term Applicable Margin" means, (a) with respect to Term Loans which are LIBO Loans. 7.50% per annum, and (b) with respect to Term Loans which are Prime Rate Loans, 6.50% per annum.

"Term Lenders" means, collectively, the Domestic Term Lenders and the Canadian Term Lenders.

"Term Loan Facility" has the meaning provided in the recitals.

"Term Loan" means collectively, the Domestic Term Loans and the Canadian Term Loans, which shall be considered a single loan consisting of two sub–tranches.

"Term Notes" means collectively, the Canadian Term Notes and the Domestic Term Notes.

"Term Percentage" means with respect to each Term Lender, that percentage of the Term Loans of all Term Lenders hereunder, in the amount set forth opposite such Term Lender's name on Schedule 1.1(b) hereto or as may subsequently he set forth in the Register from time to time, as the same may he increased or reduced from time to time pursuant to this Agreement.

"Term Push-Down Reserve" means the amount, as of any date of determination, equal to (a) the difference, if a positive number, between the outstanding Domestic Term Loans and Domestic Incremental Availability, and/or (b) the difference, if a positive number, between the outstanding Canadian Term Loans and Canadian Incremental Availability.

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated) in accordance with ARTICLE VII or (c) the date the Commitments are permanently terminated in full in accordance with the provisions of SECTION 2.15 hereof.

"Test Date" means the last day of each fiscal month of the Lead Borrower, commencing with the last day of the fiscal month ending October 28, 2017.

"Total Canadian Outstandings" means as of any day, the sum of (a) the principal balance of all Loans made to the Canadian Borrower then outstanding (including Revolving Credit Loans and Term Loans), and (b) the then outstanding amount of Canadian Letter of Credit Outstandings.

"Total Canadian Revolver Outstandings" means, as of any day, the sum of (a) the principal balance of all Revolving Credit Loans and Swingline Loans made to the Canadian Borrower then outstanding, and (b) the then outstanding amount of Canadian Letter of Credit Outstandings.

"Total Domestic Outstandings" means as of any day, the sum of (a) the principal balance of all Loans made to the Domestic Borrowers then outstanding (including Revolving Credit Loans and Term Loans), and (b) the then outstanding amount of Domestic Letter of Credit Outstandings.

"Total Domestic Revolver Outstandings" means, as of any day, the sum of (a) the principal balance of all Revolving Credit Loans and Swingline Loans made to the Domestic Borrower then outstanding, and (b) the then outstanding amount of Domestic Letter of Credit Outstandings.

"Total Commitments" means, at any time, the sum of the Domestic Total Commitments and the Canadian Total Commitments at such time.

"Total Outstandings" means, as of any day, the sum of (a) the Total Canadian Outstandings, and (b) the Total Domestic Outstandings.

"Total Revolver Outstandings" means, as of any day, the sum of the Total Canadian Revolver Outstandings and the Total Domestic Revolver Outstandings.

"Tri-Party Agreement" means an agreement substantially in the form of Exhibit O among a Loan Party, any Person providing freight, warehousing and consolidation services to such Loan Party and the Administrative Agent or Canadian Agent, as applicable, in which such Person acknowledges that (a) the Administrative Agent holds a first priority Lien on the Inventory of the Loan Parties, (b) such Person has furnished written acknowledgment to such Loan Party that such Person holds Inventory in its possession as bailee for such Loan Party and that such Loan Party has title to such Inventory, (c) any Inventory delivered to a carrier for shipment will reflect a Loan Party as consignor and consignee, (d) it will promptly notify the Administrative Agent of its receipt of notice from the seller of such Inventory of the seller's stoppage of delivery of such Inventory to the Loan Party, and (e) agrees, upon notice from the Administrative Agent or the Canadian Agent, as applicable, to hold and dispose of the subject Inventory solely as directed by the Administrative Agent or the Canadian Agent, as applicable.

"TRU Inventory" means all Inventory of the Loan Parties which is offered for sale (or is designated for sale) at any "Toys "R" Us" Store, including, but not limited to, any such Inventory held for sale in internet and other direct sales and all Inventory of the Loan Parties specifically designated as "Toys "R" Us" Inventory at any distribution center or warehouse maintained by the Loan Parties.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate, BA Equivalent Rate, Canadian Prime Rate or Prime Rate, as applicable.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Unanimous Consent" means the consent of Lenders (other than Defaulting Lenders) holding 100% of the Commitments (other than Commitments held by a Defaulting Lender) and Loans.

"Unanimous Consent of all Lenders under the Revolving Facility" means the consent of Lenders under the Revolving Facility (other than Defaulting Lenders) holding 100% of the Commitments (other than Commitments held by a Defaulting Lender).

"Unused Canadian Commitment" means, on any day, (a) the then Canadian Total Commitments, minus (b) the sum of (i) the principal amount of Revolving Credit Loans to the Canadian Borrower then outstanding, and (ii) the then Canadian Letter of Credit Outstandings.

"Unused Domestic Commitment" shall mean, on any day, (a) the lesser of (i) the then Domestic Total Commitments, or (ii) the difference between the then Domestic Total Commitments and the then Canadian Total Commitments, minus (b) the sum of (i) the principal amount of Revolving Credit Loans of the Domestic Borrowers then outstanding, and (ii) the then Domestic Letter of Credit Outstandings.

"Unused Fee" has the meaning provided in SECTION 2.19(b).

"US Case" and "US Cases" have the meaning provided in the recitals.

"US Debtors" has the meaning provided in the recitals.

"US Superpriority Claim" has the meaning provided in SECTION 2.26(a)(i).

"Wayne" shall mean Wayne Real Estate Parent Company, LLC.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02    Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include",

"includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) all Schedules to this Agreement shall relate solely to the Domestic Loan Parties and the Canadian Loan Parties, (f) the term "security interest" shall include a hypothec, (g) the term "solidary" as used herein shall be read and interpreted in accordance with the Civil Code of Quebec, (h) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible, moveable and immoveable, and intangible assets and properties, including cash, securities, accounts and contract rights, (i) all financial statements and other financial information provided by the Domestic Borrowers to the Administrative Agent or any Lender shall be provided with reference to dollars, (j) all references to "$" or "dollars" or to amounts of money and all calculations of Canadian Availability, Incremental Availability, Domestic Availability, permitted "baskets" and other similar matters shall, unless otherwise expressly provided to be CD$, be deemed to be references to the lawful currency of the United States of America at the Equivalent Amount, (vii) all references to "knowledge" or "awareness" of any Loan Party or a Subsidiary thereof means the actual knowledge of a Responsible Officer of a Loan Party or such Subsidiary and (viii) all references to "in the ordinary course of business" of any Loan Party or a Subsidiary thereof means (x) in the ordinary course of business of, or in furtherance of an objective that is in the ordinary course of business of, the Loan Party and/or such Subsidiary, as applicable, (y) customary and usual in the retail industry where the Loan Parties' or any Subsidiary's businesses are located or performed or (z) generally consistent with the past or current practice of the Loan Parties or any Subsidiary thereof and/or similarly situated retail companies where the Loan Parties or any Subsidiary's businesses are located or performed, and (k) this Agreement and the other Loan Documents are the result of negotiation among, and have been reviewed by counsel to, among others, the Borrowers and the Agents and are the product of discussions and negotiations among all parties. Accordingly, this Agreement and the other Loan Documents are not intended to be construed against the Agents or any of the Lenders merely on account of the Agents' or any Lender's involvement in the preparation of such documents. Any provision included in this Agreement that requires the satisfaction (or reasonable satisfaction) of the Administrative Agent and the Required Lenders in respect of any Order, certificate or other document, shall be deemed satisfied if Administrative Agent is satisfied therewith and the Required Lenders shall not have indicated otherwise (after having been given a reasonable opportunity to review to the extent practicable) in writing to the Administrative Agent.

SECTION 1.03    Time for Payment and Performance.

Unless otherwise specified, all references herein to times of day shall be references to Eastern Time (daylight or standard, as applicable). When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on (or before) a day

which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

SECTION 1.04    Certifications; Provision of Information.

All provisions of information, presentations, statements and certifications to be made hereunder by a director, officer or other representative of a Loan Party or other Subsidiary shall be made by such a Person in his or her capacity solely as an officer or a representative of such Loan Party or other Subsidiary, on such Loan Party's or such Subsidiary's behalf and not in such Person's individual capacity, and without personal liability.

SECTION 1.05    Accounting Terms; GAAP. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

SECTION 1.06    Letter of Credit. Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the undrawn Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any issuer document related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the amount of the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount may be drawn at such time.

SECTION 1.07    Quebec Matters. For purposes of any assets, liabilities or entities located in the Province of Quebec and for all other purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Quebec or a court or tribunal exercising jurisdiction in the Province of Quebec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "lien" shall include a "hypothec", "right of retention", "prior claim" , "reservation of ownership" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the UCC or a PPSA shall include publication under the Civil Code of Quebec, (g) all references to "perfection" of or "perfected" liens or security interest shall include a reference to an "opposable" or "set up" hypothec as against third parties, (h) any "right of offset", "right of setoff" or similar expression shall include

72

a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction liens" or "mechanics, materialmen, repairmen, construction contractors or other like Liens" shall include "legal hypothecs" and "legal hypothecs in favour of persons having taken part in the construction or renovation of an immovable", (l) "joint and several" shall include "solidary", (m) "gross negligence or wilful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary", (o) "easement" shall include "servitude", (p) "priority" shall include "rank" or "prior claim", as applicable (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership" and "ownership" (including ownership under a right of superficies), (t) "accounts" shall include "claims", (u) "legal title" shall be including "holding title on behalf of an owner as mandatory or prete-nom", (v) "ground lease" shall include "emphyteusis" or a "lease with a right of superficies, as applicable, (w) "leasehold interest" shall include a "valid lease", (x) "lease" shall include a "leasing contract" and (y) "guarantee" and "guarantor" shall include "suretyship" and "surety", respectively. The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated herein be drawn up in the English language only and that all other documents contemplated thereunder or relating thereto, including notices, may also be drawn up in the English language only. *Les parties aux présentes confirment que c'est leur volonté que cette convention et les autres documents de crédit soient rédigés en langue anglaise seulement et que tous les documents, y compris tous avis, envisagés par cette convention et les autres documents peuvent être rédigés en langue anglaise seulement.*

SECTION 1.08   Compliance with Article VII. In the event that any Lien, Investment, Indebtedness (whether at the time of incurrence or upon application of all or a portion of the proceeds thereof), asset sale, Restricted Payment, Affiliate transaction, restrictive agreement or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions then permitted pursuant to any clause of such Sections in Article VII, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

ARTICLE II

Amount and Terms of Credit

SECTION 2.01   Revolving Commitment of the Lenders.

(a)        Subject to the terms and conditions set forth herein and in the Orders, each Domestic Lender, severally and not jointly with any other Domestic Lender, agrees, upon the terms and subject to the conditions herein set forth, to make Credit Extensions to or for the benefit of the Domestic Borrowers, and each Canadian Lender severally and not jointly with any other Canadian Lender, agrees upon the terms and subject to the conditions herein set forth, to make Credit Extensions to the Canadian Borrower, on a revolving basis, subject in each case to the following limitations:

(i)    The Total Domestic Revolver Outstandings shall not at any time exceed Domestic Availability;

73

(ii)    The Total Canadian Revolver Outstandings shall not at any time exceed Canadian Availability;

(iii)    Letters of Credit shall be available from the Issuing Banks to the Borrowers, subject to the ratable participation of the Domestic Lenders or Canadian Lenders, as applicable, as set forth in SECTION 2.13. The Domestic Borrowers shall not at any time permit the aggregate Domestic Letter of Credit Outstandings at any time to exceed the Domestic Letter of Credit Sublimit and the Canadian Borrower shall not at any time permit the aggregate Canadian Letter of Credit Outstandings to exceed the Canadian Letter of Credit Sublimit;

(iv)    The Loans made to, and the Letters of Credit issued on behalf of, the Canadian Borrower by the Canadian Lenders may be either in $ or CD$, at the option of the Canadian Borrower, as herein set forth;

(v)    The Revolving Credit Loans (other than Swingline Loans) made to the Canadian Borrower shall be Prime Rate Loans or BA Equivalent Loans, or if made in dollars, shall be LIBO Loans or dollar denominated Prime Rate Loans;

(vi)    No Lender shall be obligated to make any Credit Extension (A) to the Domestic Borrowers in excess of such Lender's Domestic Commitment, or (B) to the Canadian Borrower in excess of such Lender's Canadian Commitment or (C) to the Borrowers in excess of such Lender's Commitment set forth in Schedule 1.1(b); and

(vii)    Subject to all of the other provisions of this Agreement, Revolving Credit Loans to the Borrowers that are repaid may be reborrowed prior to the Termination Date.

(b)    Each Borrowing of Revolving Credit Loans (other than Swingline Loans) by the Domestic Borrowers shall be made by the Domestic Lenders pro rata in accordance with their respective Domestic Commitment Percentages, and each Borrowing of Revolving Credit Loans (other than Swingline Loans) by the Canadian Borrower shall be made by the Canadian Lenders pro rata in accordance with their respective Canadian Commitment Percentages. The failure of any Domestic Lender or Canadian Lender, as applicable, to make any Loan to the Domestic Borrowers or the Canadian Borrower, as applicable, shall neither relieve any other Domestic Lender or Canadian Lender, as applicable, of its obligation to fund its Loan to the Domestic Borrowers or the Canadian Borrower, as applicable, in accordance with the provisions of this Agreement nor increase the obligation of any such other Domestic Lender or Canadian Lender, as applicable.

(c)    Subject to the terms and conditions set forth herein and in the Orders, on the Closing Date, (i) each Domestic Term Lender shall make the Domestic Term Loan to the Domestic Borrower and (ii) each Canadian Term Lender shall make the Canadian Term Loan to the Canadian Borrower in the amount set forth opposite such Lender's name on Schedule 1.1(b).

SECTION 2.02    [Reserved].

74

SECTION 2.03    <u>Reserves; Changes to Reserves</u>.

(a)    The Inventory Reserves and Availability Reserves as of the Effective Date are those set forth in the Borrowing Base Certificate delivered to the Administrative Agent on the Effective Date.

(b)    The Administrative Agent shall establish an Availability Reserve applicable to the Domestic Borrowing Base in the amount of the Term Push-Down Reserve at any time that outstanding Domestic Term Loans exceeds Domestic Incremental Availability. The Administrative Agent shall establish an Availability Reserve applicable to the Canadian Borrowing Base in the amount of the Term Push-Down Reserve at any time that outstanding Canadian Term Loans exceeds Canadian Incremental Availability.

(c)    The Administrative Agent may hereafter establish additional Reserves or change any of the Reserves in effect on the Effective Date, in the exercise of its reasonable business judgment acting in accordance with industry standards for asset based lending in the retail industry; <u>provided that</u> such Reserves shall not be established or changed except upon not less than five (5) Business Days' notice to the Borrowers (during which period the Collateral Agent shall be available to discuss any such proposed Reserve with the Borrowers); <u>provided further</u> that no such prior notice shall be required for (1) changes to any Reserves resulting solely by virtue of mathematical calculations of the amount of the Reserve in accordance with the methodology of calculation previously utilized (such as, but not limited to, Customer Credit Liabilities), (2) any actual or contemplated rejection or disclaimer of leases and actual or contemplated store closings or "going out of business sales", or (3) changes to Reserves or the establishment of additional Reserves if a Material Adverse Effect under clause (iii) of the definition thereof has occurred or it would be reasonably likely that a Material Adverse Effect under clause (iii) of the definition thereof would occur were such Reserves not changed or established prior to the expiration of such five (5) Business Day period, or (3) the establishment of the Term Push-Down Reserve.

(d)    On any date prior to the date that is 60 days after the Closing Date (as may be extended by the Administrative Agent in its sole discretion; <u>provided</u> that such extensions shall not last beyond the 90th day after the Closing Date), the Administrative Agent, in its reasonable discretion, may make exceptions from the requirements set forth in the definitions of "Eligible Credit Card Receivables", "Eligible In-Transit Inventory", "Eligible Inventory", "Eligible Letter of Credit Inventory" and "Eligible Real Estate" relating to the delivery of any documents or agreements to any Agent, which for the avoidance of shall mean that the Borrower shall not have to comply with clauses (e), (d) and (f) in "Eligible In-Transit Inventory", clauses (c)(ii) and (d) of "Eligible Inventory," clauses (c) and (f) of "Eligible Letter of Credit Inventory" and clauses (c) and (i) of "Eligible Real Estate".

SECTION 2.04    <u>Making of Loans</u>.

(a)    Except as set forth in SECTION 2.09, SECTION 2.10 and SECTION 2.11, Revolving Credit Loans (other than Swingline Loans) shall be either Prime Rate Loans, LIBO Loans or BA Equivalent Loans as the Lead Borrower, on behalf of the Domestic

75

Borrowers, or the Canadian Borrower, may request (which request shall, in the case of the Domestic Borrowers, be made in the form attached hereto as Exhibit C-l and, in the case of the Canadian Borrower, be made in the form attached hereto as Exhibit C-2, and in the case of Loans to the Canadian Borrower, indicate whether CD$ or $ advances are requested) subject to and in accordance with this SECTION 2.04. All Swingline Loans shall be only Prime Rate Loans. All Revolving Credit Loans made pursuant to the same Borrowing shall, unless otherwise specifically provided herein, be Revolving Credit Loans of the same Type. Each Lender may fulfill its Commitment with respect to any Revolving Credit Loan by causing any lending office of such Lender to make such Revolving Credit Loan; provided, however, that any such use of a lending office shall not affect the obligation of the Borrowers to repay such Revolving Credit Loan in accordance with the terms of the applicable Revolving Credit Note. Each Lender shall, subject to its overall policy considerations, use reasonable efforts to select a lending office which will not result in the payment of increased costs by the Borrowers. Subject to the other provisions of this SECTION 2.04 and the provisions of SECTION 2.11, Borrowings of Revolving Credit Loans of more than one Type may be incurred at the same time, but in any event no more than fifteen (15) Borrowings of LIBO Loans may be outstanding at any time and no more than eight (8) Borrowings of BA Equivalent Loans may be outstanding at any time.

(b)    The Lead Borrower shall give the Administrative Agent (i) three (3) Business Days' prior telephonic notice (thereafter confirmed in writing) of each Borrowing of LIBO Loans, and (ii) notice of each Borrowing of Prime Rate Loans by the Domestic Borrowers on the proposed day of each Borrowing. The Canadian Borrower shall give the Canadian Agent (i) three (3) Business Days' prior telephonic notice (thereafter confirmed in writing) of each Borrowing of BA Equivalent Loans or LIBO Loans and (ii) one (1) Business Day's prior telephonic notice (thereafter confirmed in writing) of each Borrowing of Prime Rate Loans by the Canadian Borrower. Any such notice, to be effective, must be received by the Administrative Agent or the Canadian Agent, as applicable, (i) not later than 11:00 a.m. on the third Business Day, in the case of LIBO Loans or BA Equivalent Loans, and on the first Business Day, in the case of Prime Rate Loans to the Canadian Borrower, prior to the date on which such Borrowing is to be made and, and (ii) no later than 12:00 noon on the same Business Day in the case of Prime Rate Loans to the Domestic Borrowers on which such Borrowing is to be made. Such notice shall contain disbursement instructions and shall specify: (i) whether the Borrowing then being requested is to be a Borrowing of Prime Rate Loans (and, in the case of the Canadian Borrower, whether the Borrowing is in CD$ or $), BA Equivalent Loans, or LIBO Loans, and, if BA Equivalent Loans or LIBO Loans, the Interest Period with respect thereto; (ii) the amount of the proposed Borrowing (which shall be in an integral multiple of $1,000,000, but not less than $5,000,000, in the case of LIBO Loans, and be in an integral multiple of CD$1,000,000, but not less than CD$ 1,000,000, in the case of BA Equivalent Loans); and (iii) the date of the proposed Borrowing (which shall be a Business Day). If no election of Interest Period is specified in any such notice for a Borrowing of LIBO Loans or BA Equivalent Loans, such notice shall be deemed a request for an Interest Period of one (1) month. If no election is made as to the Type of Revolving Credit Loan, such notice shall be deemed a request for Borrowing of Prime Rate Loans. The Administrative Agent or the Canadian Agent, as applicable, shall promptly notify each

76

Lender of its proportionate share of such Borrowing, the date of such Borrowing, the Type of Borrowing being requested and the Interest Period or Interest Periods applicable thereto, as appropriate. On the borrowing date specified in such notice, each Domestic Lender shall make its share of the Borrowing available at the office of the Administrative Agent at JPMorgan Chase Bank, N.A., JPM Loan & Agency Services, 500 Stanton Christiana Road, NCC5, 1st Floor, Newark, DE 19713-2107, and each Canadian Lender shall make its share of the Borrowing available at the office of the Canadian Agent at JPMorgan Chase Bank, N.A., JPM Loan & Agency Services, 500 Stanton Christiana Road, NCC5, 1st Floor, Newark, DE 19713-2107, in each case no later than 3:00 p.m., in immediately available funds. Unless the Administrative Agent or the Canadian Agent, as applicable, shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent or the Canadian Agent, as applicable, such Lender's share of such Borrowing, the Administrative Agent and the Canadian Agent may assume that such Lender has made such share available on such date in accordance with this SECTION 2.04 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In the event a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent or the Canadian Agent, as applicable, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent or the Canadian Agent, as applicable, forthwith on demand such corresponding amount, with interest thereon for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent or the Canadian Agent, at (i) in the case of a Domestic Lender, the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, (ii) in the case of a Canadian Lender, the greater of the Bank of Canada Overnight Rate and a rate determined by the Canadian Agent in accordance with banking industry rules on interbank compensation, or (iii) in the case of the Borrowers, the interest rate applicable to Prime Rate Loans. If such Lender pays such amount to the Administrative Agent or the Canadian Agent, as applicable, then such amount shall constitute such Lender's Revolving Credit Loan included in such Borrowing. Upon receipt of the funds made available by the Lenders to fund any borrowing hereunder, the Administrative Agent or the Canadian Agent, as applicable, shall disburse such funds in the manner specified in the notice of borrowing delivered by the Lead Borrower or Canadian Borrower.

(c)    [reserved]

(d)    Notwithstanding anything to the contrary herein contained, with respect to the Canadian Borrower, (i) all references to "the Lead Borrower" and "the Administrative Agent" in SECTIONS 2.04(b), 2.04(c), 2.17, and 2.18 shall mean and refer to the Canadian Borrower and the Canadian Agent (except to the extent such provisions already make reference to the Canadian Borrower and the Canadian Agent), respectively, (ii) the address of the Canadian Agent to which each Lender must make its share of Borrowings to the Canadian Borrower available is JPMorgan Chase Bank, N.A., JPM Loan & Agency Services, 500 Stanton Christiana Road, NCC5, 1st Floor, Newark, DE 19713-2107, and (iii) the Canadian Agent shall promptly notify the Administrative Agent of each Borrowing by the Canadian Borrower, the date of such Borrowing, the Type of Borrowing being requested and the Interest Period or Periods applicable thereto.

SECTION 2.05    [Reserved].

SECTION 2.06    Swingline Loans.

(a)    Each Swingline Lender is authorized by the Domestic Lenders and the Canadian Lenders, as applicable, to, and shall, make Swingline Loans at any time (subject to SECTION 2.06(b)) (i) to the Domestic Borrowers up to the Domestic Swingline Loan Ceiling, and (ii) to the Canadian Borrower up to the Canadian Swingline Loan Ceiling, in each case upon a notice of Borrowing from Lead Borrower received by the Administrative Agent or the Canadian Agent, as applicable, and the applicable Swingline Lender (which notice, at the Swingline Lender's discretion, may be submitted prior to 3:00 p.m. for the Domestic Borrowers and 12:00 noon for the Canadian Borrower, on the Business Day on which such Swingline Loan is requested); provided that the Swingline Lender shall not be obligated to make any Swingline Loan in its reasonable discretion if it shall determine (which determination shall be conclusive and binding absent manifest error) that it has, or by the making of such Swingline Loan may have, Fronting Exposure, Swingline Loans shall be Prime Rate Loans and shall be subject to periodic settlement with the Domestic Lenders and Canadian Lenders, as applicable, (other than Term Lenders) under SECTION 2.22 below. Immediately upon the making of a Swingline Loan, each Domestic Lender or Canadian Lender, as applicable, (other than Term Lenders) shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the applicable Swingline Lender a risk participation in such Swingline Loan in an amount equal to the product of such Lender's Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, times the amount of such Swingline Loan. Each Swingline Lender shall have all of the benefits and immunities (A) provided to the Agents in Article VIII with respect to any acts taken or omissions suffered by the Swingline Lender in connection with Swingline Loans made by it or proposed to be made by it as if the term "Agents" as used in Article VIII included each Swingline Lender with respect to such acts or omissions, and (B) as additionally provided herein with respect to each Swingline Lender.

(b)    The Lead Borrower's request for a Swingline Loan shall be deemed a representation that the applicable conditions for borrowing under SECTION 4.02 are satisfied. If the conditions for borrowing under SECTION 4.02 cannot in fact be fulfilled, (i) the Lead Borrower or the Canadian Borrower, as applicable, shall give immediate notice (a "Noncompliance Notice") thereof to the Administrative Agent, the Canadian Agent, and the applicable Swingline Lender, and the Administrative Agent and the Canadian Agent, as applicable, shall promptly provide each Lender with a copy of the Noncompliance Notice, and (ii) the Required Lenders may direct the applicable Swingline Lender to, and such Swingline Lender thereupon shall, cease making Swingline Loans until such conditions can be satisfied or are waived in accordance with SECTION 9.02. Unless the Required Lenders so direct the applicable Swingline Lender, such Swingline Lender may, but is not obligated to, continue to make Swingline Loans commencing one (1) Business Day after the Non-Compliance Notice is furnished to the Domestic Lenders. Notwithstanding the foregoing, no Swingline Loans shall be made pursuant to this SECTION 2.06(b) if the Total Domestic Revolver Outstandings or the Total Canadian Revolver Outstandings, as applicable, would exceed the limitations set forth in SECTION 2.01.

SECTION 2.07    Notes.

(a)    Upon the request of any Domestic Lender, the Loans made by such Domestic Lender shall be evidenced by a Revolving Credit Note or Term Note, as applicable, duly executed on behalf of the Domestic Borrowers, dated the Closing Date, payable to such Domestic Lender or its registered assignees, if any, in an aggregate principal amount equal to such Domestic Lender's Commitment.

(b)    Upon the request of any Swingline Lender, the Revolving Credit Loans made by such Swingline Lender with respect to Swingline Loans shall be evidenced by a Swingline Note, duly executed on behalf of the Borrowers, dated the Closing Date, payable to such Swingline Lender or its registered assignees, if any, in an aggregate principal amount equal to the Domestic Swingline Loan Ceiling or Canadian Swingline Loan Ceiling, as applicable.

(c)    Upon the request of any Canadian Lender, the Loans made by such Canadian Lender shall be evidenced by a Revolving Credit Note or Term Note, as applicable, duly executed on behalf of the Canadian Borrower, dated the Closing Date, payable to such Canadian Lender or its registered assignees, if any, in an aggregate principal amount equal to such Canadian Lender's Commitment.

(d)    Each Lender is hereby authorized by the applicable Borrowers to endorse on a schedule attached to each Note delivered to such Lender (or on a continuation of such schedule attached to such Note and made a part thereof), or otherwise to record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, each payment of interest on any such Loan and the other information provided for on such schedule; provided, however, that the failure of any Lender to make such a notation or any error therein shall not affect the obligation of any Borrower to repay the Loans made by such Lender in accordance with the terms of this Agreement and the applicable Notes.

(e)    Upon receipt of an affidavit and indemnity of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor at such Lender's expense.

SECTION 2.08    Interest on Loans.

(a)    Interest on Revolving Credit Loans.

(i)    Subject to SECTION 2.12, each Revolving Credit Loan which is a Prime Rate Loan made by a Lender shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable) at a rate per annum that shall be equal to the Prime Rate or Canadian Prime Rate, as applicable, plus the Applicable Margin for Prime Rate Loans.

(ii)    Subject to SECTION 2.09 through SECTION 2.12, each Revolving Credit Loan which is a LIBO Loan made by a Lender shall bear interest (computed on the

79

basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal, during each Interest Period applicable thereto, to the Adjusted LIBO Rate for such Interest Period, plus the Applicable Margin for LIBO Loans (or with respect to Loans to the Canadian Borrower made in dollars, the Applicable Margin for LIBO Loans made in dollars or Prime Rate Loans, as applicable).

(iii)    Subject to SECTION 2.12, each Revolving Credit Loan which is a BA Equivalent Loan made by a Lender shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable) at a rate per annum that shall be equal to the then BA Rate, plus the Applicable Margin for BA Equivalent Loans.

(b)    Interest on Term Loans.

(i)    Subject to SECTION 2.12, each Term Loan which is a Prime Rate Loan made by a Term Lender shall hear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable) at a rate per annum that shall be equal to the Prime Rate plus the Term Applicable Margin for Prime Rate Loans.

(ii)    Subject, to SECTION 2.09 through SECTION 2.12, each Term Loan which is a LIBO Loan made by a Term Lender shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal, during each Interest Period applicable thereto, to the Adjusted LIBO Rate for such Interest Period, plus the Term Applicable Margin for LIBO Loans.

(c)    Accrued interest on all Loans shall be payable in arrears on each Interest Payment Date applicable thereto, at maturity (whether by acceleration or otherwise) and after such maturity on demand.

(d)    For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever interest to be paid hereunder is to be calculated on the basis of a year of 360 days or any other period of time that is less than a calendar year, the yearly rate of interest to which the rate determined pursuant to such calculation is equivalent is the rate so determined multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by either 360 or such other period of time, as the case may be. Calculations of interest shall be made using the nominal rate method of calculation, and will not be calculated using the effective rate method of calculation or any other basis that gives effect to the principle of deemed reinvestment of interest.

SECTION 2.09    Conversion and Continuation of Loans.

(a)    The Lead Borrower or the Canadian Borrower, as applicable, shall have the right at any time, on three (3) Business Days' prior notice to the Administrative Agent or the Canadian Agent, as applicable (which notice, to be effective, must be received by the Administrative Agent not later than 11:00 a.m. on the third Business Day preceding the date of any conversion), (i) to convert any outstanding Borrowings of Prime Rate Loans to Borrowings of LIBO Loans, in the case of the Domestic Borrowers, Dollar denominated Prime Rate Loans to Borrowings of LIBO

80

.

Loans or CD$ denominated Prime Rate Loans to Borrowings (other than Canadian Term Loans) of BA Equivalent Loans, in the case of the Canadian Borrower, or (ii) to continue an outstanding Borrowing of LIBO Loans or BA Equivalent Loans for an additional Interest Period, or (iii) to convert any outstanding Borrowings of LIBO Loans to a Borrowing of dollar denominated Prime Rate Loans, and to convert any outstanding Borrowings of BA Equivalent Loans to a Borrowing of CD$ denominated Prime Rate Loans subject in each case to the following:

(i)    No Borrowing of Loans may be converted into, or continued as, LIBO Loans or BA Equivalent Loans at any time when any Event of Default has occurred and is continuing (nothing contained herein being deemed to obligate the Borrowers to incur Breakage Costs upon the occurrence of an Event of Default unless the Obligations are accelerated);

(ii)    If less than a full Borrowing of Loans is converted, such conversion shall be made pro rata among the Domestic Lenders or Canadian Lenders, as applicable, based upon their Domestic Commitment Percentages, Canadian Commitment Percentages, or Term Percentages, as applicable, in accordance with the respective principal amounts of the Loans comprising such Borrowing held by such Lenders immediately prior to such conversion;

(iii)    The aggregate principal amount of Prime Rate Loans being converted into, or continued as, LIBO Loans shall be in an integral of $1,000,000 and at least $5,000,000, and the aggregate principal amount of Prime Rate Loans being converted into, or continued as, BA Equivalent Loans shall be in an integral of CD$ 1,000,000 and at least CD$ 1,000,000;

(iv)    Each Lender shall effect each conversion by applying the proceeds of its new LIBO Loan or dollar denominated Prime Rate Loan, as the case may be, to its Loan being so converted and also, in the case of each Canadian Lender, shall effect each conversion by applying the proceeds of its new BA Equivalent Loan or CD$ denominated Prime Rate Loan, as the case may be, to its Loan being so converted;

(v)    The Interest Period with respect to a Borrowing of LIBO Loans or BA Equivalent Loans effected by a conversion or in respect to the Borrowing of LIBO Loans or BA Equivalent Loans being continued as LIBO Loans or BA Equivalent Loans, respectively, shall commence on the date of conversion or the expiration of the current Interest Period applicable to such continuing Borrowing, as the case may be;

(vi)    A Borrowing of LIBO Loans or BA Equivalent Loans may be converted only on the last day of an Interest Period applicable thereto, unless the applicable Borrower pays all Breakage Costs incurred in connection with such conversion;

(vii)    In no event shall more than fifteen (15) Borrowings of LIBO Loans be outstanding at any time or more than eight (8) Borrowings of BA Equivalent Loans be outstanding at any time; and

81

(viii)   Each request for a conversion or continuation of a Borrowing of LIBO Loans or BA Equivalent Loans which fails to state an applicable Interest Period shall be deemed to be a request for an Interest Period of one (1) month.

(b)   If the Lead Borrower or the Canadian Borrower, as applicable, does not give notice to convert any Borrowing of LIBO Loans or BA Equivalent Loans, or does not give notice to continue, or does not have the right to continue, any Borrowing as LIBO Loans or BA Equivalent Loans, in each case as provided in SECTION 2.09(a) above, such Borrowing shall automatically be converted to, or continued as, as applicable, a Borrowing of dollar denominated Prime Rate Loans or a Borrowing of CD$ denominated Prime Rate Loans, at the expiration of the then-current Interest Period. The Administrative Agent or Canadian Agent, as applicable, shall, after it receives notice from the Lead Borrower or the Canadian Borrower, promptly give each Domestic Lender or Canadian Lender, as applicable, notice of any conversion, in whole or part, of any Revolving Credit Loan made by such Lender.

SECTION 2.10   <u>Alternate Rate of Interest for Loans</u>.

If prior to the commencement of any Interest Period for a LIBO Borrowing or BA Equivalent Loan Borrowing, the Administrative Agent or the Canadian Agent, as applicable:

(a)   Reasonably determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the BA Rate (in accordance with the terms of the definitions thereof) for such Interest Period; or

(b)   Is advised by the Required Lenders that the Adjusted LIBO Rate or BA Rate for such Interest Period will not adequately and fairly reflect the cost to such Required Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent or the Canadian Agent, as applicable, shall give notice thereof to the Lead Borrower or the Canadian Borrower, as applicable, and the Lenders, in the case of a requested LIBO Borrowing, and the Canadian Lenders, in the case of a requested BA Equivalent Loan Borrowing, by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent or the Canadian Agent notifies the Lead Borrower or the Canadian Borrower, as applicable, and the applicable Lenders that the circumstances giving rise to such notice no longer exist (which notice the Administrative Agent or the Canadian Agent, as applicable, shall deliver promptly upon obtaining knowledge of the same), (i) any Borrowing Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a LIBO Borrowing or a BA Equivalent Loan Borrowing shall be ineffective and (ii) if any Borrowing Request requests a LIBO Borrowing or a BA Equivalent Loan Borrowing, such Borrowing shall be made as a Borrowing of Prime Rate Loans unless withdrawn by the Lead Borrower or Canadian Borrower, as the case may be.

SECTION 2.11   <u>Change in Legality</u>.

82

(a)   Notwithstanding anything to the contrary contained elsewhere in this Agreement, if any Change in Law occurring after the Effective Date shall make it unlawful for a Lender to make or maintain a LIBO Loan or to give effect to its obligations as contemplated hereby with respect to a LIBO Loan, then, by written notice to the Lead Borrower or to the Canadian Borrower, as applicable, such Lender may (i) declare that LIBO Loans will not thereafter be made by such Lender hereunder, whereupon any request by the Lead Borrower or the Canadian Borrower, as applicable, for a LIBO Borrowing shall, unless withdrawn, as to such Lender only, be deemed a request for a Dollar denominated Prime Rate Loan unless such declaration shall be subsequently withdrawn; and (ii) require that all outstanding LIBO Loans made by such Lender be converted to Dollar denominated Prime Rate Loans, in which event all such LIBO Loans shall be automatically converted to Dollar denominated Prime Rate Loans as of the effective date of such notice as provided in SECTION 2.09(b). In the event any Lender shall exercise its rights hereunder, all payments and prepayments of principal which would otherwise have been applied to repay the LIBO Loans that would have been made by such Lender or the converted LIBO Loans of such Lender, shall instead be applied to repay the Prime Rate Loans made by such Lender in lieu of, or resulting from the conversion of, such LIBO Loans.

(b)   For purposes of this SECTION 2.11, a notice to the Lead Borrower or to the Canadian Borrower, as applicable, pursuant to SECTION 2.11(a) above shall be effective, if lawful, and if any LIBO Loans shall then be outstanding, on the last day of the then-current Interest Period; and, otherwise, such notice shall be effective on the date of receipt by the Lead Borrower or the Canadian Borrower, as applicable.

SECTION 2.12   Default Interest. Effective upon written notice from the Administrative Agent or the Canadian Agent, as applicable, after the occurrence of any Event of Default and at all times thereafter while such Event of Default is continuing, interest for all Loans will be increased to, and overdue interest, fees and other amounts owing by the Borrowers (after as well as before judgment, as and to the extent permitted by law) shall accrue interest at, a rate per annum (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days as applicable) (the "Default Rate") equal to the rate (including the Applicable Margin) in effect from time to time plus two percent (2.00%) per annum and such interest shall be payable on each Interest Payment Date (or any earlier maturity of the Loans).

SECTION 2.13   Letters of Credit.

Upon the terms and subject to the conditions herein set forth, at any time and from time to time after the Closing Date and prior to the Termination Date, the Lead Borrower on behalf of the Domestic Borrowers, and the Canadian Borrower for itself and its Subsidiaries, may request an Issuing Bank (which in the case of the Canadian Borrower shall be the Canadian Agent or a Canadian Lender) to issue, and subject to the terms and conditions contained herein, such Issuing Bank shall issue, for the account of the relevant Borrower, one or more Letters of Credit; provided, however, that no Letter of Credit shall be issued if, after giving effect to such issuance, (i) the aggregate Domestic Letter of Credit Outstandings shall exceed the Domestic Letter of Credit Sublimit, (ii) the aggregate Canadian Letter of Credit Outstandings shall exceed the Canadian Letter of Credit Sublimit, (iii) the Total Domestic Revolver Outstandings or the Total Canadian Revolver Outstandings, as applicable, would

83

exceed the limitations set forth in SECTION 2.01(a), (iv) the aggregate Domestic Letter of Credit Outstandings with respect to any Issuing Bank shall exceed the Domestic Letter of Credit Commitment of such Issuing Bank or (v) the aggregate Canadian Letter of Credit Outstandings with respect to any Issuing Bank shall exceed the Canadian Letter of Credit Commitment of such Issuing Bank; provided further that no Letter of Credit shall be issued unless an Issuing Bank shall have received notice from the Administrative Agent or the Canadian Agent that the conditions to such issuance have been met (such notice shall be deemed given (x) if the Issuing Bank has not received notice that the conditions have not been met, within two (2) Business Days of the initial request to the Issuing Bank and the Administrative Agent or Canadian Agent, as applicable, pursuant to SECTION 2.13(h), or (y) if the aggregate undrawn amount under Letters of Credit issued by such Issuing Bank then outstanding does not exceed the amount theretofore agreed to by the Lead Borrower, the Administrative Agent and such Issuing Bank, on the same Business Day as the receipt by the Issuing Bank of the request for issuance of a Letter of Credit if the request is received prior to 12:00 noon or on the next Business Day if the request is received after 12:00 noon); and provided further that an Issuing Bank shall not be required to issue any such Letter of Credit in its reasonable discretion if: (A) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Bank from issuing such Letter of Credit, or any Applicable Law relating to such Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Bank shall prohibit, or request that such Issuing Bank refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Bank is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon such Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which such Issuing Bank in good faith deems material to it, (B) the issuance of such Letter of Credit would violate one or more policies of such Issuing Bank applicable to letters of credit generally, (C) any Lender is at that time a Defaulting Lender, unless such Issuing Bank has entered into arrangements, including the delivery of cash collateral, satisfactory to such Issuing Bank (in its sole discretion) with the Borrowers or such Lender to eliminate such Issuing Bank's actual or potential Fronting Exposure (after giving effect to SECTION 2.27(a)(iv)) with respect to the Defaulting Lender arising from either (x) the Letter of Credit then proposed to be issued or (y) that Letter of Credit and all other Letter of Credit Outstandings as to which such Issuing Bank has actual or potential Fronting Exposure, as it may elect in its sole discretion, (D) such Letter of Credit contains any provisions for automatic reinstatement of the Stated Amount after any drawing thereunder, or (E) such Letter of Credit is not in compliance with SECTIONS 2.13(b) or 2.13(c), as applicable. If requested by an Issuing Bank, the Borrower also shall submit a letter of credit application on such Issuing Bank's standard form in connection with any request for a Letter of Credit. In the event of any inconsistency between the terms and conditions of this Agreement or any Order and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of the applicable Order and this Agreement shall control and any grant of security interest or Lien under any such Letter of Credit application shall be void and of no force and effect.

(a)    A permanent reduction of the Domestic Commitments or Canadian Commitments shall not require a corresponding pro rata reduction in the Domestic Letter

84

of Credit Sublimit or the Canadian Letter of Credit Sublimit, as applicable; provided, however, that if the Domestic Total Commitments or Canadian Total Commitments are reduced to an amount less than the Domestic Letter of Credit Sublimit or the Canadian Letter of Credit Sublimit, as applicable, then the Domestic Letter of Credit Sublimit or the Canadian Letter of Credit Sublimit, as applicable shall be reduced to an amount equal to (or, at Lead Borrower's or the Canadian Borrower's option, less than) the Domestic Total Commitments or Canadian Total Commitments. Any Issuing Bank (other than JPMorgan or any of its Affiliates) shall notify the Administrative Agent in writing on each Business Day of all Letters of Credit issued on the prior Business Day by such Issuing Bank; provided that (A) until the Administrative Agent advises any such Issuing Bank that Excess Availability is less than $250,000,000, or (B) the aggregate amount of the Letters of Credit issued in any such week exceeds such amount as shall be agreed by the Administrative Agent and the Issuing Bank, such Issuing Bank shall be required to so notify the Administrative Agent in writing only once each week of the Letters of Credit issued by such Issuing Bank during the immediately preceding week as well as the daily amounts outstanding for the prior week, such notice to be furnished on such day of the week as the Administrative Agent and such Issuing Bank may agree. No Issuing Bank shall amend any Letter of Credit if such Issuing Bank would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof or if the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(b)   Each Standby Letter of Credit shall expire at or prior to the close of business on the earlier of the date which is (i) one (1) year after the date of the issuance of such Letter of Credit (or such other longer period of time as the Administrative Agent and the applicable Issuing Bank may agree) (or, in the case of any renewal or extension thereof, one (1) year after such renewal or extension) and (ii) unless Cash Collateralized or otherwise credit supported to the reasonable satisfaction of the Administrative Agent and the applicable Issuing Bank, five (5) Business Days prior to the Maturity Date; provided, however, that each Standby Letter of Credit may, upon the request of the Lead Borrower or the Canadian Borrower, as applicable, include a provision whereby such Letter of Credit shall be renewed automatically for additional consecutive periods of twelve (12) months or less (but not beyond the date that is five (5) Business Days prior to the Maturity Date unless Cash Collateralized or otherwise credit supported to the reasonable satisfaction of the Administrative Agent and the applicable Issuing Bank) unless the applicable Issuing Bank notifies the beneficiary thereof at least thirty (30) days prior to the then-applicable expiration date that such Letter of Credit will not be renewed.

(c)   Each Commercial Letter of Credit shall expire at or prior to the close of business on the earlier of the date which is (i) one year after the date of the issuance of such Commercial Letter of Credit (or such other period as may be acceptable to the Administrative Agent and the applicable Issuing Bank) and (ii) unless Cash Collateralized or otherwise credit supported to the reasonable satisfaction of the Administrative Agent and the applicable Issuing Bank, five (5) Business Days prior to the Maturity Date.

(d)   Drawings under each Letter of Credit shall be reimbursed by the Domestic Borrowers, in the case of any Letter of Credit issued for them, and by the Canadian Borrower,

85

in the case of a Canadian Letter of Credit, in the currency in which the Letter of Credit is issued by paying to the Administrative Agent or the Canadian Agent, as applicable, an amount equal to such drawing not later than 12:00 noon on the Business Day immediately following the day that the Lead Borrower or the Canadian Borrower receives notice of such drawing and demand for payment by the applicable Issuing Bank, provided that (i) in the absence of written notice to the contrary from the Lead Borrower or the Canadian Borrower, as applicable, and subject to the other provisions of this Agreement, such payments shall be financed when due with a Prime Rate Loan or Swingline Loan to the applicable Borrower in an Equivalent Amount and the same currency and, to the extent so financed, the respective Borrower's obligation to make such payment shall be discharged and replaced by the resulting Prime Rate Loan or Swingline Loan, and (ii) in the event that the Lead Borrower or the Canadian Borrower, as applicable, has notified the Administrative Agent or the Canadian Agent, as applicable, that it will not so finance any such payments, the applicable Borrowers will make payment directly to the applicable Issuing Bank when due. Such payments shall be due on the date specified in the demand for payment by the Issuing Bank. The Administrative Agent or the Canadian Agent, as applicable, shall promptly remit the payments received by it from any Borrower in reimbursement of a draw under a Letter of Credit to the applicable Issuing Bank or the proceeds of a Prime Rate Loan or Swingline Loan, as the case may be, used to finance such payment. The Issuing Banks shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Issuing Banks shall promptly notify the Administrative Agent or the Canadian Agent, as applicable, and the Lead Borrower or the Canadian Borrower, as applicable, by telephone (confirmed by telecopy) of such demand for payment and whether the applicable Issuing Bank has made or will make payment thereunder; provided, however, that any failure to give or delay in giving such notice shall not relieve the Borrowers of their obligation to reimburse the applicable Issuing Bank and the Lenders with respect to any such payment.

(e)    If an Issuing Bank shall make any Letter of Credit Disbursement, then, unless the applicable Borrowers shall reimburse such Issuing Bank in full on the date provided in SECTION 2.13(d), above, the unpaid amount thereof shall bear interest at the rate per annum then applicable to Prime Rate Loans for Domestic Borrowers or the Canadian Borrower, as applicable, for each day from and including the date such payment is made to, but excluding, the date that such Borrowers reimburse such Issuing Bank therefor; provided, however, that, if such Borrowers fail to reimburse such Issuing Bank when due pursuant to this SECTION 2.13(e), then interest shall accrue at the rate set forth in SECTION 2.12. Interest accrued pursuant to this paragraph shall be for the account of, and promptly remitted by the Administrative Agent or the Canadian Agent, as applicable, upon receipt to, the applicable Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to SECTION 2.13(g) to reimburse such Issuing Bank shall be for the account of such Lender to the extent of such payment.

(f)    Immediately upon the issuance of any Letter of Credit by an Issuing Bank (or the amendment of a Letter of Credit increasing the amount thereof), and without any further action on the part of such Issuing Bank, such Issuing Bank shall be deemed to have sold to each Domestic Lender or Canadian Lender, as applicable, (other than a Term Lender)

86

and each such Lender shall be deemed unconditionally and irrevocably to have purchased from such Issuing Bank, without recourse or warranty, an undivided interest and participation, to the extent of such Lender's Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, in such Letter of Credit, each drawing thereunder and the obligations of the Borrowers under this Agreement and the other Loan Documents with respect thereto. Upon any change in the Domestic Commitments or Canadian Commitments pursuant to SECTION 2.02 (other than pursuant to SECTION 2.02(e)), SECTION 2.15, SECTION 2.17 or SECTION 9.04 of this Agreement, it is hereby agreed that with respect to all Letter of Credit Outstandings, there shall be an automatic adjustment to the participations hereby created to reflect the new Domestic Commitment Percentages or new Canadian Commitment Percentages, as applicable, of the assigning and assignee Lenders. Any action taken or omitted by an Issuing Bank under or in connection with a Letter of Credit, if taken or omitted in the absence of gross negligence or willful misconduct, shall not create for such Issuing Bank any resulting liability to any Lender.

(g)    In the event that an Issuing Bank makes any Letter of Credit Disbursement and the Borrowers shall not have reimbursed such amount in full to such Issuing Bank pursuant to this SECTION 2.13, such Issuing Bank shall promptly notify the Administrative Agent or the Canadian Agent, as applicable, which shall promptly notify each Domestic Lender or Canadian Lender, as applicable, of such failure, and each Domestic Lender or Canadian Lender, as applicable, (other than a Term Lender) shall promptly and unconditionally pay to the Administrative Agent or the Canadian Agent, as applicable, for the account of such Issuing Bank the amount of such Lender's Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, of such unreimbursed payment in dollars and in same day funds. If an Issuing Bank so notifies the Administrative Agent or the Canadian Agent, as applicable, and the Administrative Agent or the Canadian Agent so notifies the applicable Lenders prior to 11:00 a.m. on any Business Day, each such Domestic Lender or Canadian Lender, as applicable, shall make available to such Issuing Bank such Lender's Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, of the amount of such payment on such Business Day in same day funds (or if such notice is received by the Domestic Lenders or Canadian Lenders, as applicable, after 11:00 a.m. on the day of receipt, payment shall be made on the immediately following Business Day in same day funds). If and to the extent such Domestic Lender or Canadian Lender, as applicable, shall not have so made its Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, of the amount of such payment available to the applicable Issuing Bank, such Domestic Lender or Canadian Lender, as applicable, agrees to pay to such Issuing Bank forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent or the Canadian Agent, as applicable, for the account of such Issuing Bank at the Federal Funds Effective Rate, in the case of payments by a Domestic Lender, and the Bank of Canada Overnight Rate, in the case of payments by a Canadian Lender. Each Lender agrees to fund its Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, of such unreimbursed payment notwithstanding a failure to satisfy any applicable lending conditions or the provisions of SECTION 2.01 or SECTION 2.06, or the occurrence of the Termination Date. The failure of any Domestic

87

Lender or Canadian Lender to make available to the applicable Issuing Bank its Domestic Commitment Percentage or Canadian Commitment Percentage of any payment under any Letter of Credit shall neither relieve any Domestic Lender or any Canadian Lender, as applicable, of its obligation hereunder to make available to such Issuing Bank its Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, of any payment under any Letter of Credit on the date required, as specified above, nor increase the obligation of such other Domestic Lender or Canadian Lender. Whenever any Domestic Lender or Canadian Lender, as applicable, has made payments to an Issuing Bank in respect of any reimbursement obligation for any Letter of Credit, such Domestic Lender or Canadian Lender shall be entitled to share ratably, based on its Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, in all payments and collections thereafter received on account of such reimbursement obligation. All participations in Letters of Credit by the Lenders shall be made in such currency as the Letter of Credit is denominated or in the dollar equivalent thereof.

(h)    Whenever the Lead Borrower or the Canadian Borrower, as applicable, desires that an Issuing Bank issue a Letter of Credit (or the amendment, renewal or extension (other than automatic renewal or extensions) of an outstanding Letter of Credit), the Lead Borrower or the Canadian Borrower, as applicable, shall give to the applicable Issuing Bank and the Administrative Agent or the Canadian Agent, as applicable, at least two (3) Business Days' and, solely with respect to Letters of Credit denominated in CD$, five (5) Business Days', prior written notice (including, without limitation, by telegraphic, telex, facsimile or cable communication) (or, in each case, such shorter period as may be agreed upon in writing by the applicable Issuing Bank and the Lead Borrower) specifying the date on which the proposed Letter of Credit is to be issued, amended, renewed or extended (which shall be a Business Day), the Stated Amount of the Letter of Credit so requested (and, if for the Canadian Borrower, whether such Letter of Credit is to be denominated in dollars or CD$), the expiration date of such Letter of Credit, the name and address of the beneficiary thereof, and the provisions thereof. If requested by an Issuing Bank, the Lead Borrower or the Canadian Borrower, as applicable, shall also submit documentation on such Issuing Bank's standard form in connection with any request for the issuance, amendment, renewal or extension of a Letter of Credit; provided that, in the event of a conflict or inconsistency between the terms of such documentation and this Agreement, the terms of this Agreement shall supersede any inconsistent or contrary terms in such documentation and this Agreement shall control and any grant of security interest or Lien under any such Letter of Credit application shall be void and of no force and effect.

(i)    Subject to the limitations set forth below, the obligations of the Borrowers to reimburse the Issuing Banks for any Letter of Credit Disbursement shall be unconditional, absolute and irrevocable and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including, without limitation (it being understood that any such payment by the Borrowers shall be without prejudice to, and shall not constitute a waiver of, any rights the Borrowers might have or might acquire as a result of the payment by an Issuing Bank of any draft or the reimbursement by the Borrowers thereof): (i) any lack of validity or enforceability of a Letter of Credit; (ii) the existence of any claim, setoff, defense or other right which a Borrower may have at any time against a beneficiary of any

88

Letter of Credit or against any Issuing Bank or any of the Credit Parties, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction; (iii) any draft, demand, certificate or other document presented under any Letter of Credit proving to be forged or fraudulent in any respect or any statement therein being untrue or inaccurate in any respect, or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit; (iv) payment by an Issuing Bank of any Letter of Credit against presentation of a demand, draft or certificate or other document which does not comply with the terms of such Letter of Credit; (v) waiver by an Issuing Bank of any requirement that exists for such Issuing Bank's protection and not the protection of any Borrower or any waiver by an Issuing Bank which does not in fact materially prejudice any Borrower; (vi) any honor of a demand for payment presented electronically even if a Letter of Credit requires that demand be in the form of a draft; (vii) any payment made by any Issuing Bank in respect of an otherwise complying item presented after the date specified as the expiration date of, or the date by which documents must be received under, a Letter of Credit if presentation after such date is authorized by the UCC, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance), or the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600 (or such later version thereof as may be in effect at the time of issuance), as applicable; (viii) any payment by an Issuing Bank under a Letter of Credit against presentation of a draft or certificate that does not comply with the terms of such Letter of Credit; or any payment made by an Issuing Bank under a Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver, interim receiver, monitor or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under Bankruptcy Law; (ix) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this SECTION 2.13, constitute a legal or equitable discharge of, or provide a right of setoff against, any Loan Party's obligations hereunder; or (x) the fact that any Event of Default shall have occurred and be continuing; provided that the Borrowers shall have no obligation to reimburse the Issuing Bank to the extent that such payment was made in error due to the gross negligence or willful misconduct of the Issuing Bank (as determined by a court of competent jurisdiction or another independent tribunal having jurisdiction). No Credit Party shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Banks; provided that the foregoing shall not be construed to excuse the Issuing Banks from liability to the Borrowers to the extent of any direct damages (as opposed to special, indirect, punitive or consequential damages, claims in respect of which are hereby waived by the Borrowers to the extent permitted by applicable law) suffered by the Borrowers that are caused by the applicable Issuing Bank's gross

89

negligence or willful misconduct when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented that appear on their face to be in compliance with the terms of a Letter of Credit, an Issuing Bank may, in its reasonable discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(j)    Subject to the terms and conditions of the Orders, if any Event of Default shall occur and be continuing, on the Business Day that the Lead Borrower or the Canadian Borrower, as applicable, receives notice from the Administrative Agent or the Canadian Agent, as applicable, or the Required Lenders demanding the deposit of cash collateral pursuant to this paragraph, the applicable Loan Parties shall promptly Cash Collateralize the Letter of Credit Outstandings owing by such Loan Parties as of such date. For purposes of this Agreement, "Cash Collateralize" means to deposit in the applicable Cash Collateral Account an amount in cash equal to 103% of the Letter of Credit Outstandings owing by such Loan Parties as of such date, plus any accrued and unpaid interest thereon. Each such deposit shall be held by the Administrative Agent or the Canadian Agent for the payment and performance of the Obligations and the Other Liabilities. The Administrative Agent or the Canadian Agent, as applicable, shall have exclusive dominion and control, including the exclusive right of withdrawal, over such Cash Collateral Account. Other than any interest earned on the investment of such deposits (for the benefit of the applicable Borrower), which investments shall be made at the option and in the sole discretion of the Administrative Agent or the Canadian Agent, as applicable (at the request of the Lead Borrower and at the Borrowers' risk and expense), such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such Cash Collateral Account shall be applied by the Administrative Agent or the Canadian Agent to reimburse the Issuing Banks for payments on account of drawings under Letters of Credit for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrowers for the Letter of Credit Outstandings at such time or, if the maturity of the Loans has been accelerated, shall be applied to satisfy the other respective Obligations and the Other Liabilities of the applicable Borrower. If at any time the total amount of funds held as cash collateral are subject to any senior right or claim of any Person other than the Administrative Agent or that the total amount of such funds is less than 103% of the Letter of Credit Outstandings owing by the Loan Parties as of such date, the Borrowers will, promptly following written demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited as cash collateral, an amount equal to such deficiency. If the applicable Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned promptly to the respective Borrower but in no event later than two (2) Business Days after all Events of Defaults have been cured or waived.

90

(k)    Notwithstanding anything to the contrary contained herein, with respect to the Canadian Borrower only, if an Issuing Bank for any Canadian Letter of Credit is not the Canadian Agent or a Canadian Lender: (i) the Canadian Borrower authorizes the Canadian Agent to arrange for the issuance of Canadian Letters of Credit from such Issuing Bank and to pay and indemnify (the "L/C Credit Support") such Issuing Bank from and against all reasonable charges in connection with the issuance, negotiation, settlement, amendment and processing of each such Canadian Letter of Credit, and the Canadian Borrower agrees to pay and indemnify the Canadian Agent for and in respect of the L/C Credit Support and agrees that such obligation to pay and indemnify shall be deemed Canadian Liabilities; (ii) any notices, requests or applications under this SECTION 2.13 shall contemporaneously be delivered to both such Issuing Bank and the Canadian Agent; (iii) drawings under any Letters of Credit as provided in and L/C Disbursements as provided in SECTION 2.13(d) shall immediately and on the same Business Day be reimbursed by the Canadian Agent, and all interest accruing or payable pursuant to SECTION 2.13(d) or SECTION 2.13(f) shall be for the account of the Canadian Agent and not the Issuing Banks; and (iv) the Canadian Borrower's reimbursement obligation under SECTION 2.13(d) and/or SECTION 2.13(g) shall be due to the Canadian Agent and the Lenders shall make available to the Canadian Agent (for its own account) the amount of its payment provided for in SECTION 2.13(g).

(l)    Each Issuing Bank shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and each Issuing Bank shall have all of the benefits and immunities (A) provided to the Agents in Article VIII with respect to any acts taken or omissions suffered by such Issuing Bank in connection with Letters of Credit issued by it or proposed to be issued by it and letter of credit applications and other documents, instruments or agreements relating to such Letters of Credit as fully as if the term "Agents" as used in Article V included such Issuing Bank with respect to such acts or omissions, and (B) as additionally provided herein with respect to such Issuing Bank.

(m)    Unless otherwise expressly agreed by the Issuing Bank and the Lead Borrower when a Letter of Credit is issued, (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP shall apply to each Commercial Letter of Credit. Notwithstanding the foregoing, the Issuing Banks shall not be responsible to the Borrowers for, and the Issuing Banks' rights and remedies against the Borrowers shall not be impaired by, any action or inaction of the Issuing Banks required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the Law or any order of a jurisdiction where the Issuing Bank or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade - International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

(n)    [Reserved].

(o)    Notwithstanding anything herein to the contrary, no Issuing Bank shall have any obligation hereunder to issue, and shall not issue, any Letter of Credit the proceeds of

91

which would be made available to any Person (i) to fund any activity or business of or with any Sanctioned Person, or in any Sanctioned Country, or (ii) in any manner that would result in a violation of any applicable Sanctions by any Person a party to this Agreement.

SECTION 2.14    <u>Increased Costs</u>.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or any holding company of any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate) or the Issuing Banks;

(ii)    subject any Lender or Issuing Bank to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (c) through (e) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or any Issuing Bank or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or LIBO Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or such Issuing Bank of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit) or to reduce the amount of any sum received or receivable by such Lender or such Issuing Bank hereunder (whether of principal, interest or otherwise), then, upon the request of such Lender or such Issuing Bank, the Domestic Borrowers or the Canadian Borrower, as applicable, will pay to such Lender or such Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(b)    If any Lender or any Issuing Bank determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or such Issuing Bank's capital or liquidity or on the capital or liquidity of such Lender's or such Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company would have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender or such Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company for any such reduction suffered.

92

(c)     A certificate of a Lender or an Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or such Issuing Bank or its holding company, as the case may be, as specified in paragraphs (a) or (b) of this SECTION 2.14 and setting forth in reasonable detail the manner in which such amount or amounts were determined shall be delivered to the Lead Borrower or the Canadian Borrower, as applicable, and shall be conclusive absent manifest error. The Domestic Borrowers or the Canadian Borrower, as applicable, shall pay such Lender or such Issuing Bank, as the case may be, the amount shown as due on any such certificate within fifteen (15) Business Days after receipt thereof.

(d)     Failure or delay on the part of any Lender or any Issuing Bank to demand compensation pursuant to this SECTION 2.14 shall not constitute a waiver of such Lender's or such Issuing Bank's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender or an Issuing Bank pursuant to this SECTION 2.14 for any increased costs or reductions incurred more than 90 days prior to the date that such Lender or such Issuing Bank, as the case may be, notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such Issuing Bank's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 90 day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.15     Termination or Reduction of Commitments.

(a)     Upon at least two (2) Business Days' prior written notice to the Administrative Agent, the Lead Borrower may, at any time, in whole permanently terminate, or from time to time in part permanently reduce, the Domestic Commitments. Each such reduction shall be in the principal amount of $5,000,000 or any integral multiple thereof. Each such reduction or termination shall (i) be applied ratably to the Domestic Commitments of each Lender and (ii) be irrevocable at the effective time of any such termination or reduction. The Domestic Borrowers shall pay to the Administrative Agent, for application as provided in clause (i) of this SECTION 2.15(a), (A) at the effective time of any such termination (but not any partial reduction), all earned and unpaid Unused Fees accrued on the Domestic Commitments so terminated and (B) at the effective time of any such reduction or termination, any amount by which the Total Domestic Revolver Outstandings on such date exceed the amount to which the Domestic Commitments are to be reduced effective on such date.

(b)     Upon at least two (2) Business Days' prior written notice to the Canadian Agent, the Canadian Borrower may, at any time, in whole permanently terminate, or from time to time in part permanently reduce, the Canadian Commitments. Each such reduction shall be in the principal amount of $5,000,000 or any integral multiple thereof. Each such reduction or termination shall (i) be applied ratably to the Canadian Commitments of each Canadian Lender and (ii) be irrevocable at the effective time of any such termination or reduction. The Canadian Borrower shall pay to the Canadian Agent, for application as provided in clause (i) of this SECTION 2.15(b), (A) at the effective time of each such termination (but not any partial reduction), all earned and unpaid Canadian Unused Fees accrued on the Canadian Commitments so terminated and (B) at the effective time of each

93

such reduction or termination, any amount by which the Total Canadian Revolver Outstandings on such date exceed the amount to which the Canadian Commitments are to be reduced effective on such date.

(c)    In the event that the Lead Borrower terminates the Domestic Commitments, the Canadian Commitments shall be deemed to have also been terminated, without any further action by the Lead Borrower, the Canadian Borrower or any Credit Party.

SECTION 2.16    Optional Prepayment of Loans: Reimbursement of Lenders.

(a)    The Borrowers shall have the right, at any time and from time to time, to prepay (without a commitment reduction) outstanding Revolving Credit Loans and Term Loans, in whole or in part, (x) with respect to LIBO Loans or BA Equivalent Loans, upon at least three (3) Business Days' prior written, telex or facsimile notice to the Administrative Agent or the Canadian Agent, as applicable, prior to 12:00 noon, and (y) with respect to Prime Rate Loans, on the same Business Day if written, telex or facsimile notice is received by the Administrative Agent or the Canadian Agent, as applicable, prior to 12:00 noon (or 11:00 a.m. in the case of the CD$ Prime Rate Loans or Dollar denominated Prime Rate Loans of the Canadian Borrower), subject in each case to the following limitations: Notwithstanding the foregoing, Term Loans may not be voluntarily prepaid unless and until either all other Obligations or Canadian Liabilities, as applicable (other than, in each case, Term Loans) have been paid in full and all Letters of Credit have been Cash Collateralized.

(i)    Subject to SECTION 2.17, all prepayments of Revolving Credit Loans shall be paid to the Administrative Agent or the Canadian Agent, as applicable, for application (except as otherwise directed by the applicable Borrower), first, to the prepayment of outstanding Swingline Loans, second, to the prepayment of other outstanding Revolving Credit Loans ratably in accordance with each Lender's Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, and, third, if an Event of Default then exists, to Cash Collateralize the Letter of Credit Outstandings. All prepayments of Term Loans shall be paid to the Administrative Agent or the Canadian Agent, as applicable, for application to the prepayment of outstanding Term Loans.

(ii)    Subject to the foregoing, outstanding Prime Rate Loans of the Domestic Borrowers shall be prepaid before outstanding LIBO Loans are prepaid, and outstanding Prime Rate Loans of the Canadian Borrower shall be prepaid before outstanding BA Equivalent Loans or LIBO Loans are prepaid (except as otherwise directed by the applicable Borrower). Each partial prepayment of LIBO Loans shall be in an integral multiple of $1,000,000 (but in no event less than $10,000,000), and each partial prepayment of BA Equivalent Loans shall be in an integral multiple of CD$1,000,000 (but in no event less than CD$5,000,000). No prepayment of LIBO Loans or BA Equivalent Loans shall be permitted pursuant to this SECTION 2.16 other than on the last day of an Interest Period applicable thereto, unless the applicable Borrowers reimburse the Lenders for all Breakage Costs associated therewith within five (5) Business Days of receiving a written demand for such reimbursement which sets forth the calculation of such Breakage Costs in reasonable detail. No partial prepayment of a Borrowing of LIBO Loans or BA Equivalent Loans shall result in the aggregate principal amount of the LIBO Loans or BA Equivalent Loans remaining outstanding pursuant to such Borrowing being less than $10,000,000 or CD$5,000,000, as

94

applicable (unless all such outstanding LIBO Loans or BA Equivalent Loans are being prepaid in full). No partial prepayment of a Borrowing of BA Equivalent Loans shall result in the aggregate principal amount of the BA Equivalent Loans remaining outstanding pursuant to such Borrowing being less than CD$5,000,000 (unless all such outstanding BA Equivalent Loans are being prepaid in full); and

        (iii)   Each notice of prepayment shall specify the prepayment date, the principal amount and Type of the Loans to be prepaid and, in the case of LIBO Loans or BA Equivalent Loans, the Borrowing or Borrowings pursuant to which such Revolving Credit Loans were made. Each notice of prepayment shall be revocable; provided that, within five (5) Business Days of receiving a written demand for such reimbursement which sets forth the calculation of such Breakage Costs in reasonable detail, the applicable Borrower shall reimburse the Lenders for all Breakage Costs associated with the revocation of any notice of prepayment. The Administrative Agent or the Canadian Agent, as applicable, shall, promptly after receiving notice from the Lead Borrower hereunder, notify each applicable Lender of the principal amount and Type of the Loans held by such Lender which are to be prepaid, the prepayment date and the manner of application of the prepayment.

     (b)   The Domestic Borrowers shall reimburse each Domestic Lender and the Canadian Borrower shall reimburse each Canadian Lender as set forth below for any loss incurred or to be incurred by the Domestic Lenders or the Canadian Lenders, as applicable, in the reemployment of the funds (i) resulting from any prepayment (for any reason whatsoever, including, without limitation, conversion to Prime Rate Loans or acceleration by virtue of, and after, the occurrence of an Event of Default) of any LIBO Loan or BA Equivalent Loan required or permitted under this Agreement, if such Revolving Credit Loan is prepaid other than on the last day of the Interest Period for such Revolving Credit Loan or (ii) in the event that after the Lead Borrower or the Canadian Borrower, as applicable, delivers a notice of borrowing under SECTION 2.04 in respect of LIBO Loans or BA Equivalent Loans, such Revolving Credit Loans are not made on the first day of the Interest Period specified in such notice of borrowing for any reason (including, without limitation, revocation by a Borrower of a notice of Borrowing) other than a breach by such Lender of its obligations hereunder or the delivery of any notice pursuant to SECTION 2.09, SECTION 2.10 or SECTION 2.11, or (iii) in the event that after a Borrower delivers a notice of commitment reduction under SECTION 2.15 or a notice of prepayment under this SECTION 2.16 in respect of LIBO Loans or BA Equivalent Loans, such commitment reductions or such prepayments are not made on the day specified in such notice of reduction or prepayment. Such loss shall be the amount (herein, collectively, "Breakage Costs") as reasonably determined by such Lender as the excess, if any, of (A) the amount of interest which would have accrued to such Lender on the amount so paid, not prepaid or not borrowed at a rate of interest equal to the Adjusted LIBO Rate or BA Equivalent Rate, as applicable, for such Revolving Credit Loan (but specifically excluding any Applicable Margin), for the period from the date of such payment or failure to borrow or failure to prepay to the last day (x) in the case of a payment or refinancing of a LIBO Loan or BA Equivalent Loan with Prime Rate Loans other than on the last day of the Interest Period for such Revolving Credit Loan or the failure to prepay a LIBO Loan of BA Equivalent Loan, of the then current Interest Period for such Revolving Credit Loan or (y) in the case of such failure to borrow,

<p style="text-align:center">95</p>

of the Interest Period for such LIBO Loan or BA Equivalent Loan which would have commenced on the date of such failure to borrow, over (B) in the case of a LIBO Loan, the amount of interest which would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the London interbank market or, in the case of a BA Equivalent Loan, the amount of interest which would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with The Toronto-Dominion Bank. Any Lender demanding reimbursement for such loss shall deliver to the Lead Borrower or the Canadian Borrower, as applicable, from time to time one or more certificates setting forth the amount of such loss as determined by such Lender and setting forth in reasonable detail the manner in which such amount was determined and such amounts shall be due within ten (10) Business Days after the receipt of such notice; provided that the requirements of this SECTION 2.16(b) shall not be condition upon any actual match funding by any Lender.

(c)    [Reserved].

(d)    Whenever any partial prepayment of Revolving Credit Loans is to be applied to LIBO Loans or BA Equivalent Loans, such LIBO Loans or BA Equivalent Loans shall be prepaid in the chronological order of their Interest Payment Dates or as the Lead Borrower or the Canadian Borrower, as applicable, may otherwise designate in writing.

SECTION 2.17    <u>Mandatory Prepayment of Loans; Mandatory Reduction or Termination of Commitments; Cash Collateral</u>. The outstanding Obligations shall be subject to prepayment as follows:

(a)    If, at any time, the Total Domestic Revolver Outstandings exceeds Domestic Availability, including, without limitation, as a result of one or more fluctuations in the exchange rate of the CD$ against the dollar, the Domestic Borrowers will, immediately upon notice from the Administrative Agent: (i) prepay the Revolving Credit Loans in an amount necessary to eliminate such excess; and (ii) if, after giving effect to the prepayment in full of all outstanding Revolving Credit Loans such excess has not been eliminated, Cash Collateralize the Domestic Letters of Credit Outstanding.

(b)    If, at any time, the Total Canadian Revolver Outstandings exceeds Canadian Availability, in each case calculated in dollars at the Equivalent Amount, including, without limitation, as a result of one or more fluctuations in the exchange rate of the CD$ against the dollar, the Canadian Borrower will immediately upon notice from the Canadian Agent (or within five (5) Business Days after notice from the Canadian Agent if such excess is solely the result of one or more fluctuations in the exchange rate of the CD$ against the dollar and the Canadian Loan Ceiling has not been exceeded) (i) prepay the Revolving Credit Loans to the Canadian Borrower in an amount necessary to eliminate such excess, and (ii) if, after giving effect to the prepayment in full of all such outstanding Revolving Credit Loans such excess has not been eliminated, Cash Collateralize the Canadian Letters of Credit Outstanding.

96

(c)    If at any time, the calculation of Canadian Loan to Value is less than zero (0), the Canadian Borrower will, upon notice from the Canadian Agent, promptly prepay the Revolving Credit Loans that were made to the Canadian Borrower in such amount as may be necessary so that, after giving effect to such prepayment, the Canadian Loan to Value is not less than zero.

(d)    The Revolving Credit Loans shall be repaid daily in accordance with (and to the extent required under) the provisions of SECTION 2.18, to the extent then applicable.

(e)    [Reserved]

(f)    [Reserved]

(g)    Subject to the foregoing, outstanding Prime Rate Loans of the Domestic Borrowers shall be prepaid before outstanding LIBO Loans of the Domestic Borrowers are prepaid and outstanding Prime Rate Loans of the Canadian Borrower shall be prepaid before outstanding BA Equivalent Loans or LIBO Loans of the Canadian Borrower are prepaid. No prepayment of LIBO Loans or BA Equivalent Loans shall be permitted pursuant to this SECTION 2.17 other than on the last day of an Interest Period applicable thereto, unless the applicable Borrowers reimburse the Domestic Lenders or Canadian Lenders, as applicable, for all Breakage Costs associated therewith within five (5) Business Days of receiving a written demand for such reimbursement which sets forth the calculation of such Breakage Costs in reasonable detail. In order to avoid such Breakage Costs, as long as no Event of Default has occurred and is continuing, at the request of the Lead Borrower, the Administrative Agent or the Canadian Agent, as applicable, shall hold all amounts required to be applied to LIBO Loans or BA Equivalent Loans in the Cash Collateral Account and will apply such funds to the applicable LIBO Loans and BA Equivalent Loans at the end of the then pending Interest Period therefor (provided that the foregoing shall in no way limit or restrict the Agents' or the Canadian Agent's rights upon the subsequent occurrence of an Event of Default). A prepayment of the Revolving Credit Loans pursuant to SECTION 2.16 or this SECTION 2.17 shall not permanently reduce the Commitments. A prepayment of the Term Loans shall permanently reduce the Term Loans and may not he reborrowed.

(h)    All amounts required to be applied to all Revolving Credit Loans hereunder (other than Swingline Loans) shall be applied ratably in accordance with each Domestic Lender's Domestic Commitment Percentage or each Canadian Lender's Canadian Commitment Percentage, as applicable. All credits against the Obligations or the Canadian Liabilities shall be conditioned upon final payment to the Administrative Agent or the Canadian Agent, as applicable, of the items giving rise to such credits. If any item credited to the Loan Account is dishonored or returned unpaid for any reason, whether or not such return is rightful or timely, the Administrative Agent or the Canadian Agent, as applicable, shall have the right to reverse such credit and charge the amount of such item to the Loan Account and the Borrowers shall indemnify the Secured Parties against all claims and losses resulting from such dishonor or return.

97

(i)    Without in any way limiting the provisions of SECTION 2.17(a) or SECTION 2.17(b), the Administrative Agent shall, monthly (or more frequently in the Administrative Agent's reasonable discretion in the event of a material change in the foreign exchange rates), make the necessary exchange rate calculations to determine whether any such excess described in such Sections exists on such date.

(j)    Upon the Termination Date, the Commitments of the Lenders and the credit facility provided hereunder shall be terminated in full, and the Domestic Borrowers shall pay, in full and in cash, all outstanding Loans and all other outstanding Obligations and Other Liabilities then owing by them to the Lenders, and the Canadian Borrower shall pay in full and in cash, all outstanding Loans to it and all other Canadian Liabilities owing by it to the Lenders.

(k)    All Obligations, Canadian Liabilities and Other Liabilities shall be payable to the Administrative Agent or the Canadian Agent, as applicable, in the currency in which they are denominated.

(l)    In the event of a direct conflict between the priority provisions of this SECTION 2.17 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this SECTION 2.17 shall control and govern.

SECTION 2.18    Cash Management.

(a)        Promptly upon (and in any event not later than two Business Days following) the occurrence of a Cash Dominion Event, the Loan Parties, upon the request of the Collateral Agent, shall deliver to the Collateral Agent a schedule of all DDAs, that to the knowledge of the Responsible Officers of the Loan Parties, are maintained by the Loan Parties, which schedule includes, with respect to each depository, (i) the name and address of such depository, (ii) the account number(s) maintained with such depository, and (iii) a contact person at such depository.

(b)    [Reserved.]

(c)    Each Loan Party has or shall have:

(i)    delivered to the Administrative Agent and the Canadian Agent, as applicable, notifications (each, a "Credit Card Notification") substantially in the form attached hereto as Exhibit K which have been executed on behalf of such Loan Party and addressed to such Loan Party's credit card clearinghouses and processors. Schedule 2.18(b) sets forth all credit card processing agreements as of the Effective Date;

(ii)    entered into a blocked account agreement (each, a "Blocked Account Agreement") in form and substance reasonably satisfactory to the Collateral Agent or the Canadian Agent, as applicable, with any bank with which such Loan Party maintains deposit

98

account(s) into which the DDA's are swept (collectively, the "Blocked Accounts"). Schedule 2.18(c)(ii) sets forth all Blocked Accounts as of the Effective Date.

(d)  Each Credit Card Notification and Blocked Account Agreement shall require, during the continuance of a Cash Dominion Event (and delivery of notice thereof from the Administrative Agent), the ACH or wire transfer on each Business Day (and whether or not there is then an outstanding balance in the Loan Account) of all available cash receipts (the "Cash Receipts") (other than amounts not to exceed $25,000,000 in the aggregate which may be deposited into a segregated DDA (not to be located in the Province of Quebec, Canada) which the Lead Borrower designates in writing to the Administrative Agent as being the "uncontrolled cash account" (the "Designated Account")) to the concentration account maintained by the Administrative Agent at JPMorgan Chase Bank, N.A. (the "Domestic Concentration Account") or maintained by the Canadian Agent (the "Canadian Concentration Account"), from:

      (i)   the sale of Inventory and other Collateral;

      (ii)  all proceeds of collections of Accounts;

      (iii) each Blocked Account (including all cash deposited therein from each DDA (other than the Designated Account); and

      (iv)  the cash proceeds of all credit card charges.

(e)  If, at any time during the continuance of a Cash Dominion Event, any cash or cash equivalents owned by any Loan Party (other than (i) an amount of up to $25,000,000 that is on deposit in the Designated Account, which funds shall not be funded from, or when withdrawn from the Designated Account, shall not be replenished by, funds constituting proceeds of Collateral so long as such Cash Dominion Event continues, (ii) de minimis cash or cash equivalents inadvertently misapplied by the Loan Parties and (iii) payroll, trust and tax withholding accounts funded in the ordinary course of business and required by Applicable Law) are deposited to any account, or held or invested in any manner, otherwise than in a Blocked Account that is subject to a Blocked Account Agreement (or a DDA which is swept daily to a Blocked Account), the Collateral Agent or the Canadian Agent may require the applicable Loan Party to close such account and have all funds therein transferred to a Blocked Account, and all future deposits made to a Blocked Account which is subject to a Blocked Account Agreement.

(f)  The Loan Parties may close DDAs or Blocked Accounts and/or open new DDAs or Blocked Accounts, subject to the execution and delivery to the Administrative Agent or the Canadian Agent, as applicable, of appropriate Blocked Account Agreements (unless expressly waived by the Collateral Agent or the Canadian Agent) consistent with the provisions of this SECTION 2.18 and otherwise reasonably satisfactory to the Collateral Agent and, if applicable, the Canadian Agent. The Loan Parties shall furnish the Collateral Agent with prior written notice of their intention to open or close a Blocked Account and the Collateral Agent shall promptly notify the Lead Borrower as to whether the Collateral Agent shall require a Blocked Account Agreement with the Person with whom such account

99

will be maintained. Unless consented to in writing by the Collateral Agent and, if applicable, the Canadian Agent, the Loan Parties shall not enter into any agreements with credit card processors other than the ones expressly contemplated herein unless, contemporaneously therewith, a Credit Card Notification, is executed and delivered to the Administrative Agent or the Canadian Agent, as applicable.

(g)  The Loan Parties may also maintain one or more disbursement accounts (the "Disbursement Accounts") to be used by the Loan Parties for disbursements and payments (including payroll) in the ordinary course of business or as otherwise permitted hereunder.

(h)  The Domestic Concentration Account and the Canadian Concentration Account shall at all times be under the sole dominion and control of the Administrative Agent or the Canadian Agent, as applicable. Each Loan Party hereby acknowledges and agrees that (i) such Loan Party has no right of withdrawal from such Concentration Accounts, (ii) the funds on deposit in such Concentration Accounts shall at all times continue to be collateral security for all of the Obligations and the Other Liabilities, provided that funds in the Canadian Concentration Account shall be applied only to the Canadian Liabilities, and (iii) the funds on deposit in each such Concentration Account shall be applied as provided in this Agreement. In the event that, notwithstanding the provisions of this SECTION 2.18, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Loan Party for the Administrative Agent or the Canadian Agent, as applicable, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall promptly be deposited into the applicable Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Collateral Agent or the Canadian Agent, as applicable.

(i)  Any amounts received in the Domestic Concentration Account or the Canadian Concentration Account at any time when all of the Obligations or the Canadian Liabilities, as applicable, and Other Liabilities then due have been and remain fully repaid shall be remitted to the operating account of the Domestic Borrowers or the Canadian Borrower maintained with the Administrative Agent or the Canadian Agent, respectively.

(j)  The Administrative Agent or the Canadian Agent, as applicable, shall promptly (but in any event within one (1) Business Day) furnish written notice to each Person with whom a Blocked Account is maintained of any termination of a Cash Dominion Event.

(k)  The following shall apply to deposits and payments under and pursuant to this Agreement:

(i)  Funds shall be deemed to have been deposited to the applicable Concentration Account on the Business Day on which deposited, provided that such deposit is available to the Administrative Agent or the Canadian Agent, as applicable, by 4:00 p.m. on that Business Day (except that, if the Obligations or Canadian Liabilities are being paid in full, by 2:00 p.m. on that Business Day);

100

(ii)   Funds paid to the Administrative Agent or the Canadian Agent, as applicable, other than by deposit to the Concentration Account, shall be deemed to have been received on the Business Day when they are good and collected funds, provided that such payment is available to the Administrative Agent or the Canadian Agent, as applicable, by 4:00 p.m. on that Business Day (except that, if the Obligations or Canadian Liabilities are being paid in full, by 2:00 p.m. on that Business Day);

(iii)   If a deposit to a Concentration Account or payment is not available to the Administrative Agent until after 4:00 p.m. (or, to the Canadian Agent, until after 2:00 p.m.) on a Business Day, such deposit or payment shall be deemed to have been made at 9:00 a.m. on the then next Business Day;

(iv)   If any item deposited to a Concentration Account and credited to the Loan Account is dishonored or returned unpaid for any reason, whether or not such return is rightful or timely, the Administrative Agent or the Canadian Agent, as applicable, shall have the right to reverse such credit and charge the amount of such item to the applicable Loan Account and the applicable Loan Parties shall indemnify the Secured Parties against all out-of-pocket claims and losses resulting from such dishonor or return.

(l)   Notwithstanding anything to the contrary in this SECTION 2.18, the Loan Parties shall be afforded a period of 60 days after the Effective Date to establish the arrangements described in this SECTION 2.18, as such period may be extended by the Administrative Agent in its reasonable discretion.

SECTION 2.19   Fees.

(a)      The Borrowers agree to pay to the Agents the fees in the amounts and on the dates as set forth in any fee letters or fee agreements with the Agents and to perform any other obligations (including the requirement to amend the Loan Documents pursuant to the "market flex" provisions) contained therein.

(b)   The Domestic Borrowers shall pay the Administrative Agent, for the account of the Lenders having Domestic Commitments, an aggregate fee (the "Unused Fee") equal to 0.375% per annum (on the basis of actual days elapsed in a year of 365 or 366 days, as applicable) of the average daily balance of the Unused Domestic Commitment (it being understood and agreed that outstanding Swingline Loans will be disregarded in the calculation of such Unused Domestic Commitment), during the calendar quarter just ended (or relevant period with respect to the payment being made for the first calendar quarter ending after the Closing Date or on the Termination Date). The Unused Fee shall be paid in arrears, on the tenth day of each October, January, April and July after the execution of this Agreement and on the Termination Date. The Administrative Agent shall pay the Unused Fee to the Lenders having Domestic Commitments upon the Administrative Agent's receipt of the Unused Fee based upon their pro rata share of an amount equal to the aggregate Unused Fee to all Lenders having Domestic Commitments.

(c)   The Canadian Borrower shall pay the Canadian Agent, for the account of the Lenders having Canadian Commitments, an aggregate fee (the "Canadian Unused Fee")

101

equal to 0.375% per annum (on the basis of actual days elapsed in a year of 365 or 366 days, as applicable) of the average daily balance of the Unused Canadian Commitment (it being understood and agreed that outstanding Swingline Loans will be disregarded in the calculation of such Unused Canadian Commitment), during the calendar quarter just ended (or relevant period with respect to the payment being made for the first calendar quarter ending after the Closing Date or on the Termination Date). The Canadian Unused Fee shall be paid in arrears, on the tenth day of each October, January, April and July after the execution of this Agreement and on the Termination Date. The Canadian Agent shall pay the Canadian Unused Fee to the Lenders having Canadian Commitments upon the Canadian Agent's receipt of the Canadian Unused Fee based upon their pro rata share of an amount equal to the aggregate Canadian Unused Fee to all Lenders having Canadian Commitments.

(d)  The Domestic Borrowers shall pay the Administrative Agent and the Canadian Borrower shall pay to the Canadian Agent, for the account of the Domestic Lenders or the Canadian Lenders, as applicable, (other than Term Lenders) on the first day of each September, December, March and June, in arrears, a fee calculated on the basis of a 365 or 366 day year, as applicable and actual days elapsed (each, a "Letter of Credit Fee"), equal to the following per annum percentages of the average Stated Amount of the following categories of Letters of Credit outstanding during the three month period then ended:

(i)  Standby Letters of Credit for the Domestic Borrowers: for the account of each Lender in accordance with its Domestic Commitment Percentage, at a per annum rate equal to the then Applicable Margin for LIBO Loans;

(ii)  Commercial Letters of Credit for the Domestic Borrowers: for the account of each Lender in accordance with its Domestic Commitment Percentage, at a rate per annum equal to fifty percent (50%) of the Applicable Margin for LIBO Loans;

(iii)  Standby Letters of Credit for the Canadian Borrower: for the account of each Lender in accordance with its Canadian Commitment Percentage, at a per annum rate equal to the then Applicable Margin for BA Equivalent Loans;

(iv)  Commercial Letters of Credit for the Canadian Borrower: for the account of each Lender in accordance with its Canadian Commitment Percentage, at a per annum rate equal to fifty percent (50%) of the Applicable Margin for BA Equivalent Loans; and

(v)  After the occurrence and during the continuance of an Event of Default and acceleration of the Obligations or the Canadian Liabilities, as applicable, if the Domestic Letter of Credit Outstandings or of the Canadian Letter of Credit Outstandings, as applicable, as of such date, plus accrued and unpaid interest thereon, have not been Cash Collateralized, effective upon written notice from the Administrative Agent or the Canadian Agent, as applicable, the Letter of Credit Fee shall be increased, at the option of the Administrative Agent or the Canadian Agent, as applicable, by an amount equal to two percent (2%) per annum.

(e)  The Domestic Borrowers or the Canadian Borrower, as applicable, shall pay directly to the applicable Issuing Bank, on the first day of each September, December, March and June, in arrears, a fee calculated on the basis of a 365 or 366 day year, as applicable and actual days elapsed, in addition to all Letter of Credit Fees otherwise provided for hereunder, a fronting fee with respect to each Letter of Credit issued by such Issuing Bank equal to 0.125% per annum of the average Stated Amount of such Letter of Credit outstanding under during the three-month period then ended and shall also pay directly to the applicable Issuing Bank, on demand, the reasonable and customary fees and charges of such Issuing Bank in connection with the issuance, negotiation, settlement, amendment and processing of each Letter of Credit issued by such Issuing Bank.

(f)  In the event that, prior to the 6 month anniversary of the Closing Date, all or any portion of the Term Loans is (i) repaid, prepaid, refinanced or replaced with any term loan financing, or (ii) repriced or effectively refinanced through any waiver, consent, amendment or amendment and restatement, and in the case of each of (i) and (ii) above, the effect thereof is to lower the All-in Yield of the Term Loans (or portion thereof) or new term loan financing, as applicable, from the All-in Yield of the Term Loans (or portion thereof) so repaid, prepaid, refinanced, replaced or repriced (a "Repricing Event"), the Borrowers shall pay to Administrative Agent for the account of Term Lenders (A) in the case of clause (i), a prepayment premium equal to 1.00% of the aggregate principal amount of the Term Loans so repaid, prepaid, refinanced, replaced or repriced and (B) in the case of clause (ii), a fee equal to 1.00% of the aggregate principal amount of the Term Loans repriced or effectively refinanced through such waiver, consent, amendment or amendment and restatement. If all or any portion of the Term Loans held by any Term Lender is subject to mandatory assignment pursuant to SECTION 9.02(c) as a result of, or in connection with, such Term Lender's not agreeing or otherwise consenting to any waiver, consent or amendment referred to in clause (ii) above (or otherwise in connection with a Repricing Event) on or prior to the 6 month anniversary of the Closing Date, the Borrowers shall pay to such Term Lender (and not any Person replacing such Term Lender pursuant to SECTION 9.02(c), its pro rata portion (as determined immediately prior to it being so replaced) of a prepayment premium under clause (ii) of the immediately preceding sentence. Such amounts shall be due and payable on the date of effectiveness of such Repricing Event.

(g)  Notwithstanding anything to the contrary herein contained, the Borrowers shall not be obligated to pay any Unused Fees or Canadian Unused Fees to or for the account of any Lender to the extent and during the period such Lender is a Defaulting Lender.

(h)  All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent or the Canadian Agent, as applicable, for the respective accounts of the Administrative Agent or the Canadian Agent, as applicable, and other Credit Parties as provided herein. Once due, all fees shall be fully earned and shall not be refundable under any circumstances. For greater certainty, the Canadian Borrower shall not be liable for any fees which form part of the Obligations unless they are Canadian Liabilities (including as provided in SECTION 2.19(a), SECTION 2.19(c) or SECTION 9.03).

SECTION 2.20   Maintenance of Loan Account; Statements of Account.

103

(a)   The Administrative Agent or the Canadian Agent, as applicable, shall maintain an account on its books in the name of the Domestic Borrowers and the Canadian Borrower (each, the "Loan Account") which will reflect (i) all Loans and other advances made by the Lenders to such Borrowers or for such Borrowers' account, (ii) all Letter of Credit Disbursements, fees and interest that have become payable as herein set forth, and (iii) any and all other monetary Obligations or Canadian Liabilities, as applicable, that have become payable.

(b)   The Loan Account will be credited with all amounts received by the Administrative Agent or by the Canadian Agent from the applicable Borrower or from others for the Borrowers' account, including all amounts received in the Concentration Account from the Blocked Account Banks, and the amounts so credited shall be applied as set forth in and to the extent required by SECTION 2.17(e) or SECTION 7.03, as applicable. After the end of each month, the Administrative Agent or the Canadian Agent, as applicable, shall send to the Domestic Borrowers and the Canadian Borrower, as applicable, a statement accounting for the charges (including interest), loans, advances and other transactions occurring among and between the Administrative Agent, or the Canadian Agent, as applicable, the Lenders and the applicable Borrowers during that month. The monthly statements shall, absent manifest error, shall be deemed presumptively correct.

SECTION 2.21   Payments; Sharing of Setoff.

(a)   The Borrowers shall make each payment required to be made hereunder or under any other Loan Document (whether of principal, interest, fees or reimbursement of drawings under Letters of Credit, of amounts payable under SECTIONS 2.14, 2.16(b) or 2.23, or otherwise) prior to 2:00 p.m. on the date when due, in immediately available funds, without setoff or counterclaim, in the same currency in which the Credit Extension was made. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made, as applicable, to the Administrative Agent at its offices at JPMorgan Chase Bank, N.A., JPM Loan & Agency Services, 500 Stanton Christiana Road, NCC5, 1st Floor, Newark, DE 19713-2107, or to the Canadian Agent at its offices at JPMorgan Chase Bank, N.A., JPM Loan & Agency Services, 500 Stanton Christiana Road, NCC5, 1st Floor, Newark, DE 19713-2107, except payments to be made directly to an Issuing Bank or Swingline Lender as expressly provided herein and payments pursuant to SECTIONS 2.14, 2.16(b), 2.23 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. Subject to SECTION 2.22, the Administrative Agent or the Canadian Agent, as applicable, shall distribute any such payments to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, except with respect to LIBO Borrowings or BA Equivalent Loan Borrowings, the date for payment shall be extended to the next succeeding Business Day, and, if any payment due with respect to LIBO Borrowings or BA Equivalent Loan Borrowings shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, unless that succeeding Business Day is in the next calendar month, in which event, the date

104

of such payment shall be on the last Business Day of subject calendar month, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments in respect of any Loan or Letter of Credit shall be repaid in the currency in which such Loan or Letter of Credit was originally disbursed or issued.

(b)   All funds received by and available to the Administrative Agent to pay principal, unreimbursed drawings under Letters of Credit, interest and fees then due hereunder, shall be applied in accordance with the provisions of SECTION 2.17 or SECTION 7.03 ratably among the parties entitled thereto in accordance with the amounts of principal, unreimbursed drawings under Letters of Credit, interest, and fees then due to such respective parties. For purposes of calculating interest due to a Lender, that Lender shall be entitled to receive interest on the actual amount contributed by that Lender towards the principal balance of the Revolving Credit Loans outstanding during the applicable period covered by the interest payment made by the Borrowers. Any net principal reductions to the Revolving Credit Loans received by the Administrative Agent or the Canadian Agent in accordance with the Loan Documents during such period shall not reduce such actual amount so contributed, for purposes of calculation of interest due to that Lender, until the Administrative Agent or the Canadian Agent, as applicable, has distributed to the applicable Lender its Commitment Percentage thereof.

(c)   Unless the Administrative Agent or the Canadian Agent, as applicable, shall have received notice from the Lead Borrower prior to the date on which any payment is due to the Administrative Agent or the Canadian Agent, as applicable, for the account of the Domestic Lenders or the Canadian Lenders or the Issuing Banks hereunder that the Borrowers will not make such payment, the Administrative Agent or the Canadian Agent as applicable, may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Domestic Lenders or the Canadian Lenders, as applicable, or the Issuing Banks, as the case may be, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the Issuing Banks, as the case may be, severally agrees to repay to the Administrative Agent or the Canadian Agent, as applicable, forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Effective Rate in the case of amounts to be paid by the Domestic Lenders and at the Bank of Canada Overnight Rate in the case of payments to be made by the Canadian Lenders.

SECTION 2.22   Settlement Amongst Lenders.

(a)   The Swingline Lender may, at any time (but, in any event shall weekly, as provided in SECTION 2.22(b)), on behalf of the Domestic Borrowers or the Canadian Borrower, as applicable (which hereby authorize the Swingline Lender to act on their behalf in that regard) request the Administrative Agent or the Canadian Agent, as applicable, to cause the Domestic Lenders and the Canadian Lenders, as applicable, (other than Term Lenders) to make a Revolving Credit Loan (which shall be a Prime Rate Loan) in an amount equal to such Lender's Domestic Commitment Percentage or Canadian Commitment

105

Percentage, as applicable, of the outstanding amount of Swingline Loans made in accordance with SECTION 2.06, which request may be made regardless of whether the conditions set forth in ARTICLE IV have been satisfied. Upon such request, each Domestic Lender or Canadian Lender, as applicable, (other than Term Lenders) shall make available to the Administrative Agent or the Canadian Agent, as applicable, the proceeds of such Revolving Credit Loan for the account of the Swingline Lender. If the Swingline Lender requires a Revolving Credit Loan to be made by the Domestic Lenders or the Canadian Lenders and the request therefor is received prior to 11:00 a.m. on a Business Day, such transfers shall be made in immediately available funds on that day; and, if the request therefor is received after 11:00 a.m., then no later than on the next Business Day. The obligation of each such Lender to transfer such funds is irrevocable, unconditional and without recourse to, or warranty by, the Administrative Agent, the Canadian Agent, or the Swingline Lender. If and to the extent any Domestic Lender or Canadian Lender, as applicable, (other than Term Lenders) shall not have so made its transfer to the Administrative Agent or the Canadian Agent, such Domestic Lender or Canadian Lender agrees to pay to the Administrative Agent or the Canadian Agent, as applicable, forthwith on demand, such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent or the Canadian Agent, as applicable, at the Federal Funds Effective Rate, in the case of amounts to be paid by the Domestic Lenders, and at the Bank of Canada Overnight Rate, in the case of payments to be made by the Canadian Lenders.

(b)   The amount of each Lender's Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, of outstanding Revolving Credit Loans (including outstanding Swingline Loans, except that settlements of Swingline Loans during the months of November and December of each year shall be required to be made by the Swingline Lender only with respect to those Swingline Loans in excess of $25,000,000 in the aggregate (the "Excess Swingline Loans")) shall be computed weekly (or more frequently in the Administrative Agent's or the Canadian Agent's, as applicable, discretion) and shall be adjusted upward or downward based on all Revolving Credit Loans (including Swingline Loans, other than Excess Swingline Loans) and repayments of Revolving Credit Loans (including Swingline Loans, other than Excess Swingline Loans) received by the Administrative Agent or Canadian Agent, as applicable, as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Administrative Agent or the Canadian Agent, as applicable.

(c)   The Administrative Agent or the Canadian Agent, as applicable, shall deliver to each of the Domestic Lenders or Canadian Lenders, as applicable, promptly after a Settlement Date a summary statement of the amount of outstanding Revolving Credit Loans (including Swingline Loans, other than Excess Swingline Loans) for the period and the amount of repayments received for the period. As reflected on the summary statement, (i) the Administrative Agent or the Canadian Agent, as applicable, shall transfer to each Domestic Lender and Canadian Lender its applicable Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, of repayments, and (ii) each Domestic Lender and Canadian Lender, as applicable, (other than Term Lenders) shall transfer to the Administrative Agent or the Canadian Agent, as applicable (as provided below), or the Administrative Agent or the Canadian Agent, as applicable, shall transfer to each Domestic

106

Lender or Canadian Lender, as applicable, (other than Term Lenders) such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Revolving Credit Loans made by each Domestic Lender and Canadian Lender with respect to Revolving Credit Loans to the Domestic Borrowers and the Canadian Borrower, respectively (including Swingline Loans, other than Excess Swingline Loans), shall be equal to such Lender's Domestic Commitment Percentage or Canadian Commitment Percentage, as applicable, of Revolving Credit Loans (including Swingline Loans which are not Excess Swingline Loans) outstanding as of such Settlement Date. If the summary statement requires transfers to be made to the Administrative Agent or the Canadian Agent, as applicable, by the Domestic Lenders or the Canadian Lenders and is received prior to 11:00 a.m. on a Business Day, such transfers shall be made in immediately available funds on that day; and, if received after 11:00 a.m., then no later than on the next Business Day. The obligation of each Domestic Lender and Canadian Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Administrative Agent. If and to the extent any Domestic Lender shall not have so made its transfer to the Administrative Agent or the Canadian Agent, as applicable, such Domestic Lender or Canadian Lender (other than Term Lenders) agrees to pay to the Administrative Agent or the Canadian Agent, as applicable, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent or the Canadian Agent, as applicable, at the Federal Funds Effective Rate, in the case of amounts to be paid by the Domestic Lenders, and at the Bank of Canada Overnight Rate, in the case of payments to be made by the Canadian Lenders.

SECTION 2.23    Taxes.

(a)    Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of, and without deduction or withholding for, any Taxes, except as required by Applicable Law; provided, however, that if a Loan Party or any Agent shall be required by Applicable Law to deduct or withhold any Taxes from such payments, then (i) in the case of any Indemnified Taxes or Other Taxes, the sum payable shall be increased as necessary so that, after making all required deductions, withholding or remittances for such Taxes (including deductions and withholding applicable to additional sums payable under this SECTION 2.23), the applicable Credit Party receives an amount equal to the sum it would have received had no such deductions or withholding been made, (ii) the Loan Party or the Agents, as applicable, shall make such deductions or withholding and (iii) the Loan Party or the Agents, as applicable, shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law.

(b)    In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)    (i) The Domestic Borrowers shall indemnify each Credit Party, and the Canadian Borrower shall indemnify the Canadian Agent, each Canadian Lender and the Issuing Banks of any Letter of Credit on its behalf, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by such Credit

Party on or with respect to any payment by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this SECTION 2.23) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto; provided that, if any Borrower reasonably believes that such Taxes were not correctly or legally asserted, each Lender will use reasonable efforts to cooperate with such Borrower to obtain a refund of such taxes so long as such efforts would not, in the sole determination of such Lender result in any additional costs, expenses or risks or be otherwise disadvantageous to it; provided further that the Borrowers shall not be required to compensate any Credit Party pursuant to this SECTION 2.23 for any amounts incurred in any Fiscal Year for which such Lender is claiming compensation if such Credit Party does not furnish notice of such claim within 90 days from the later of the final assessment of an Indemnified Tax or Other Tax by a Governmental Authority or the payment of such Indemnified Taxes or Other Taxes; provided further that, if the circumstances giving rise to such claim have a retroactive effect, then the beginning of such period shall be extended to include such period of retroactive effect. A certificate as to the amount of such payment or liability delivered to the Lead Borrower by a Credit Party, or by the Administrative Agent on its own behalf or on behalf of any other Credit Party, setting forth in reasonable detail the manner in which such amount was determined, shall be conclusive absent manifest error.

(ii)    Each Lender shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (x) the Agents against any Indemnified Taxes and Other Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Agents for such Indemnified Taxes or Other Taxes, as applicable, and without limiting the obligation of the Loan Parties to do so), (y) the Agents and the Loan Parties, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of SECTION 9.04(e)(vii) relating to the maintenance of a Participant Register and (z) the Agents and the Loan Parties, as applicable, against any Excluded Taxes attributable to such Lender that are payable or paid by the Agents or a Loan Party in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by any Agent shall be conclusive absent manifest error. Each Lender hereby authorizes each Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to such Agent under this clause (ii).

(d)    As soon as practicable after any payment pursuant to this SECTION 2.23 by a Loan Party to a Governmental Authority, the Lead Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent or the Canadian Agent, as applicable.

(e)    Any Lender that is entitled to an exemption from, or reduction of, any applicable withholding Tax (including backup withholding) or with respect to information

108

reporting requirements with respect to any payments under any Loan Document shall, without limitation by the more specific provisions of the rest of SECTION 2.23 deliver to the Lead Borrower and the Administrative Agent, at the time or times reasonably requested by the Lead Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Lead Borrower or the Administrative Agent as will permit such payments to be made without, or at a reduced rate of, withholding. Any Domestic Lender that is not a Foreign Lender shall deliver to the Lead Borrower and the Administrative Agent on or before the date it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Administrative Agent), two (2) copies of a properly completed and duly executed United States Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax. Any Foreign Lender that is a Domestic Lender that is entitled to an exemption from, or reduction in, withholding tax shall deliver to the Lead Borrower and the Administrative Agent two (2) copies of (i) either United States Internal Revenue Service Form W-8BEN, W-8BEN-E, Form W-8ECI or Form W-8IMY (together with any applicable underlying forms), or any subsequent versions thereof or successors thereto, or, (ii) in the case of a Foreign Lender claiming exemption from or reduction in U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", (A) the applicable Form W-8BEN or W-8BEN-E, or any subsequent versions thereof or successors thereto and (B) a certificate representing that such Foreign Lender (1) is not a bank for purposes of Section 881(c) of the Code, (2) is not a 10 percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of any Loan Party (other than the Canadian Borrower and its Subsidiaries), and (3) is not a controlled foreign corporation related to the Loan Parties (other than the Canadian Borrower and its Subsidiaries) (within the meaning of Section 864(d)(4) of the Code)), in all cases, properly completed and duly executed by such Foreign Lender claiming, as applicable, complete exemption from or reduced rate of, U.S. federal withholding tax on payments by the Loan Parties under this Agreement and the other Loan Documents. Such forms shall be delivered by each Foreign Lender on or before the date it becomes a party to this Agreement (or, in the case of a transferee that is a participation holder, on or before the date such participation holder becomes a transferee hereunder) and on or before the date, if any, such Foreign Lender changes its applicable lending office by designating a different lending office (a "New Lending Office"). In addition, each Foreign Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Foreign Lender. Notwithstanding any other provision of this SECTION 2.23(e), a Lender shall not be required to deliver any form pursuant to this SECTION 2.23(e) that such Lender is not legally able to deliver. If a payment made to a Credit Party under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Credit Party were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Credit Party shall deliver to the Lead Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Lead Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent as may be necessary for the Lead Borrower

109

or the Administrative Agent to comply with its obligations under FATCA, to determine that such Credit Party has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. For purposes of this SECTION 2.23(e), FATCA shall include any amendments made to FATCA after the date of this Agreement.

(f)   The Borrowers shall not be required to indemnify any Foreign Lender or to pay any additional amounts to any Foreign Lender in respect of U.S. federal withholding tax pursuant to paragraph (a) or (c) above to the extent that the obligation to pay such additional amounts would not have arisen but for a failure by such Foreign Lender to comply with the provisions of paragraph (e) above. Should a Lender become subject to Taxes because of its failure to deliver a form required hereunder, the Loan Parties shall, at such Lender's expense, take such steps as such Lender shall reasonably request to assist such Lender to recover such Taxes.

(g)   If any Loan Party shall be required pursuant to this SECTION 2.23 to pay any additional amount to, or to indemnify, any Credit Party to the extent that such Credit Party becomes subject to Taxes subsequent to the Effective Date (or, if applicable, subsequent to the date such Person becomes a party to this Agreement) as a result of any change in the circumstances of such Credit Party (other than a change in Applicable Law), including, without limitation, a change in the residence, place of incorporation, principal place of business of such Credit Party or a change in the branch or lending office of such Credit Party, as the case may be, such Credit Party shall use reasonable efforts to avoid or minimize any amounts which might otherwise be payable pursuant to this SECTION 2.23(g); provided, however, that such efforts shall not include the taking of any actions by such Credit Party that would result in any tax, costs or other expense to such Credit Party (other than a tax, cost or other expense for which such Credit Party shall have been reimbursed or indemnified by the Loan Parties pursuant to this Agreement or otherwise) or any action which would or might in the reasonable opinion of such Credit Party have an adverse effect upon its business, operations or financial condition or otherwise be disadvantageous to such Credit Party.

(h)   If any Lender is entitled to a reduction in (and not complete exemption from) the applicable withholding tax, the Borrowers may withhold from any interest payment to such Lender an amount equivalent to the applicable withholding tax after taking into account such reduction.

(i)   If any Credit Party reasonably determines that it has actually and finally realized, by reason of a refund of any Indemnified Taxes or Other Taxes paid or reimbursed by the Loan Parties pursuant to subsection (a) or (c) above in respect of payments under the Loan Documents, a current monetary benefit that it would otherwise not have obtained and that would result in the total payments under this SECTION 2.23 exceeding the amount needed to make such Credit Party whole, such Credit Party shall pay to the Lead Borrower, with reasonable promptness following the date upon which it actually realizes such benefit, an amount equal to the lesser of the amount of such benefit or the amount of such excess, in each case net of all out of pocket expenses (including Taxes) incurred in securing such refund. The Lead Borrower, upon the request of such Credit Party, shall repay to such Credit Party the amount paid over pursuant to this paragraph (i) (plus any penalties, interest or

110

other charges imposed by the relevant Governmental Authority) in the event that such Credit Party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (i), in no event will the Credit Party be required to pay any amount to the Lead Borrower pursuant to this paragraph (i) the payment of which would place the Credit Party in a less favorable net after-Tax position than the Credit Party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax has never been paid. This paragraph shall not be construed to require any Credit Party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Lead Borrower or any other Person.

(j)    Each Lender (other than a Person who becomes a lender to the Canadian Borrower as a result of the provisions of SECTION 8.17) which has a Canadian Commitment hereby certifies that it is a Canadian Lender. Each Person that becomes a Lender to the Canadian Borrower hereafter (other than as a result of the provisions of SECTION 8.17 or otherwise following the occurrence of a Determination Date) shall promptly deliver to the Canadian Borrower and the Canadian Agent a certificate confirming that such Person is a Canadian Lender or is otherwise exempt from withholding taxes. If any such Lender (other than a Lender that becomes a Canadian Lender as a result of the provisions of SECTION 8.17) is not a Canadian Lender or otherwise is not exempt from the payment of withholding taxes on interest payments to it, prior to the Determination Date only, such Lender shall not be entitled to payments hereunder with respect to taxes imposed under Part XIII of the Income Tax Act (Canada) and such interest payments will be net of any applicable withholding taxes required to be withheld and remitted by the payor.

(k)    Each Administrative Agent (other than the Canadian Agent) shall deliver to the Borrower on or before the date on which it becomes a party to this Agreement, either (i) two properly completed and duly signed original copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Administrative Agent is exempt from U.S. federal backup withholding, or (ii)(A) two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI to establish that the Administrative Agent is not subject to withholding Taxes under the Internal Revenue Code with respect to any amounts payable for the account of the Administrative Agent under any of the Loan Documents and (B) two properly completed and duly signed original copies of Internal Revenue Service Form W-8IMY (or applicable successor form) certifying that it is a U.S. branch that has agreed to be treated as a U.S. person for United States federal withholding Tax purposes with respect to payments received by it from the Borrower for the account of others under the Loan Documents.

SECTION 2.24    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under SECTION 2.14 or cannot make Loans under SECTION 2.11, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to SECTION 2.23, then such Lender shall use reasonable efforts to designate a different lending

111

office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to SECTION 2.14 or SECTION 2.23, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense. The Borrowers (in the case of the Canadian Borrower, only in respect of any Canadian Lender) hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment; provided, however, that the Borrowers shall not be liable for such costs and expenses of a Lender requesting compensation if (i) such Lender becomes a party to this Agreement on a date after the Effective Date and (ii) the relevant Change in Law occurs on a date prior to the date such Lender becomes a party hereto.

(b)    If any Lender requests compensation under SECTION 2.14 or cannot make Loans under SECTION 2.11 for thirty (30) consecutive days, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to SECTION 2.23, or if any Lender is a Defaulting Lender or otherwise defaults in its obligation to fund Loans hereunder, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in SECTION 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, however, that (i) the Lead Borrower shall have received the prior written consent of the Administrative Agent, the Issuing Banks and the Swingline Lender (and the Canadian Agent only in the case of a Canadian Lender), which consent shall not be unreasonably withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in unreimbursed drawings under Letters of Credit and Swingline Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (iii) in the case of any such assignment resulting from a claim for compensation under SECTION 2.14 or payments required to be made pursuant to SECTION 2.23, such assignment will result in a reduction in such compensation or payments, and (iv) in the case of an assignment resulting from a Lender becoming a Minority Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

SECTION 2.25    Designation of Lead Borrower as Domestic Borrowers' Agent.

(a)    Each Domestic Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Loans and Letters of Credit, the proceeds of which shall be available to each Domestic Borrower for such uses as are permitted under this Agreement. As the disclosed principal for its agent, each Domestic Borrower shall be obligated to the Administrative Agent and each Domestic Lender on account of Loans so

112

made and Letters of Credit so issued as if made directly by the Domestic Lenders to such Domestic Borrower, notwithstanding the manner by which such Loans and Letters of Credit are recorded on the books and records of the Lead Borrower and of any other Domestic Borrower.

(b)   Each Borrower represents to the Credit Parties that it is an integral part of a consolidated enterprise, and that each Loan Party will receive direct and indirect benefits from the availability of the joint credit facility provided for herein, and from the ability to access the collective credit resources of the consolidated enterprise which the Loan Parties comprise. Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers. Consequently, each Borrower hereby assumes and agrees to discharge all Obligations, Other Liabilities and Canadian Liabilities of each of the other Borrowers as if the Borrower which is so assuming and agreeing were each of the other Borrowers; provided that the Canadian Borrower and its Subsidiaries shall be liable only for the Canadian Liabilities.

(c)   The Lead Borrower shall act as a conduit for each Domestic Borrower (including itself, as a Domestic Borrower) on whose behalf the Lead Borrower has requested a Revolving Credit Loan. None of the Agents nor any other Credit Party shall have any obligation to see to the application of such proceeds.

(d)   The authority of the Lead Borrower to request Loans and Letters of Credit on behalf of, and to bind, the Domestic Borrowers, shall continue unless and until the Administrative Agent actually receives written notice of: (i) the termination of such authority; and (ii) the subsequent appointment of a successor Lead Borrower, which notice is signed by the respective Financial Officers of each Domestic Borrower; and (iii) written notice from such successive Lead Borrower accepting such appointment and acknowledging that from and after the date of such appointment, the newly appointed Lead Borrower shall be bound by the terms hereof, and that as used herein, the term "Lead Borrower" shall mean and include the newly appointed Lead Borrower.

SECTION 2.26   Priority; Liens; Payment of Obligations.

(a)   Each of the Loan Parties hereby covenants and agrees that upon the entry of an Interim Order and Canadian Initial Order, (and when applicable, the Final Order) its obligations hereunder and under the Loan Documents, including all Loans and obligations in respect of Letters of Credit, and the obligations of the Borrower and its Subsidiaries under any Other Liabilities, and subject to Excluded Swap Obligations, the obligations of each Guarantor in respect of its guarantee of all of the foregoing, shall, subject to the Carve-Out, the Canadian Priority Charges (in the case of the Canadian DIP Charge) and Permitted Prior Liens (other than the Primed Liens), at all times:

(i)   in the case of the Obligations of the US Debtors, pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status

113

in the US Cases (the "US Superpriority Claims") (but excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (collectively "Avoidance Actions") (it being understood that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such lien shall attach to any proceeds of Avoidance Actions), with the priority of the claims in respect of the Facilities relative to the claims in respect of the DIP Term Loan Facility as set forth in the Orders and the Intercreditor Agreement; provided, however, that for the avoidance of doubt, no CFC or FSHCO shall be obligated on any US Superpriority Claim;

(ii) in the case of the Obligations of the US Debtors, pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected third priority (junior to the Liens in respect of the DIP Term Loan Facility, the Secured Wayne Loans and Secured Intercompany Advances and adequate protection liens with respect to the Prepetition Term Loans) security interest in and Lien upon all of the Collateral of the Domestic Loan Parties, whether consisting of real, personal, tangible or intangible property (including all of the outstanding shares of capital stock of subsidiaries) that are not subject to valid, perfected and non-avoidable Liens, excluding Avoidance Actions and, prior to entry of the Final Order, the proceeds of avoidance actions (it being understood that, notwithstanding such exclusion of avoidance actions, the proceeds of such actions (including, without limitation, assets as to which Liens are avoided) shall, after entry of the Final Order, be subject to such Liens under Section 364(c)(2) of the Bankruptcy Code and available to repay the Loans and all other Obligations), with the priority of the Liens in respect of the Facilities relative to the Liens in respect of the DIP Term Loan Facility as set forth in the Orders and the Intercreditor Agreement;

(iii) in the case of the Obligations of the US Debtors, pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and Lien upon all pre- and post-petition Collateral of the Domestic Loan Parties, whether now existing or hereafter acquired, of the same nature, scope and type as the collateral purportedly securing amounts outstanding under the Prepetition ABL and FILO Credit Agreement on a first priority basis (such collateral, the "Prepetition ABL Priority Collateral"). Such security interests and Liens shall be (x) in respect of the Prepetition ABL Priority Collateral, senior in all respects to the security interests and liens of the secured parties under the Prepetition ABL and FILO Credit Facility, (y) in respect of the Prepetition ABL Priority Collateral, senior in all respects to the security interests and liens of the secured parties under the Prepetition Term Loan Credit Facility (the Liens, described in clause (x) and (y), the "Priming Liens"), and (z) in respect of the pre-and post-petition property of the Domestic Loan Parties, of the nature, scope and type as purportedly secures any obligations under or in connection with the Prepetition Term Loan Agreement on a first priority basis, junior to the security interests and liens of the secured parties under the Prepetition Term Loan Credit Facilities, in each case arising from their respective current and future liens;

(iv) in the case of the Obligations of the US Debtors, pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all of the Collateral

of the Domestic Loan Parties that are subject to (x) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases (other than the Primed Liens) or (y) valid liens (other than Primed Liens) in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (together with the assets described in clauses (ii) and (iii) above, the "US Collateral"), with the priority of the claims in respect of the Facilities relative to the claims in respect of the DIP Term Loan Facility as set forth in the Intercreditor Agreement; and

(v)   in the case of the Obligations of the Canadian Borrower, pursuant to the terms of the Canadian Initial Order, be secured by a valid, binding, continuing, enforceable, fully-perfected superpriority (subject only to the Canadian Priority Charges) senior priming charge, security interest in and lien upon all property of the Canadian Borrower, whether now existing or hereafter acquired (the "Canadian DIP Charge" and, together with the US Superpriority Claims, the "Superpriority Claims");

(b)

(i)   Each Loan Party hereby confirms and acknowledges that, pursuant to the Interim Order and the Canadian Initial Order, (and, when entered, the Final Order), the Liens in favor of the Administrative Agent on behalf of and for the benefit of the Secured Parties in all of the U.S. Debtors' US Unencumbered Property (as each term is defined in the Interim Order) and all of the Canadian Borrower's Property (as such term is defined in the Canadian Initial Order), shall be created and (to the extent the Interim Order and the Canadian Initial Order, (and, when entered, the Final Order) is effective to perfect under local law) perfected without the recordation or filing in any land records or filing offices of any Mortgage, assignment or similar instrument.

(ii)   Further to Section 2.26(b)(i), the Interim Order and the Canadian Initial Order (and, when entered, the Final Order), subject to Section 2.26(d) below, to secure the full and timely payment and performance of (A) in the case of any Domestic Loan Party, the Obligations and Other Liabilities, and (B) in the case of the Canadian Borrower and its Subsidiaries, solely the Canadian Liabilities and Other Liabilities of the Canadian of the Canadian Borrower and its Subsidiaries, each Loan Party hereby MORTGAGES, GRANTS, BARGAINS, collaterally ASSIGNS, SELLS, CONVEYS and CONFIRMS, to the Collateral Agents, for the ratable benefit of the Secured Parties, in each case to the extent constituting Collateral, the Real Estate (which, for the avoidance of doubt, shall include all of such Loan Party's right, title and interest now or hereafter acquired in and to all Real Estate and (a) all goods, accounts, inventory, general intangibles, instruments, documents, contract rights and chattel paper, (b) all reserves, escrows or impounds and all deposit accounts maintained by such Loan Party with respect to the Real Estate, (c) all leases, licenses, concessions, occupancy agreements or other agreements (written or oral, now or at any time in effect) which grant to any Person a possessory interest in, or the right to use, all or any part of the Real Estate, together with all related security and other deposits, (d) all of the rents, revenues, royalties, income, proceeds, profits, accounts receivable, security and other types of deposits, and other benefits paid or payable by parties to the leases for using, leasing, licensing possessing, operating from, residing in, selling or otherwise

115

enjoying the Real Estate, (e) all other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, warranties, permits, licenses, certificates and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership of the Real Estate, (f) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing, (g) all property tax refunds payable with respect to the Real Estate, (h) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof, (i) all insurance policies, unearned premiums therefor and proceeds from such policies covering any of the above property now or hereafter acquired by such Loan Party as an insured party, and (j) all awards, damages, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made to any Loan Party by any governmental authority pertaining to any condemnation or other taking (or any purchase in lieu thereof) of all or any Real Estate, TO HAVE AND TO HOLD to the Collateral Agent, and such Loan Party does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to such property, assets and interests unto the Collateral Agents.

(iii)  Each Loan Party further agrees that, upon the request of the Collateral Agents, in the exercise of its reasonable business judgment, such Loan Party shall execute and deliver to the Collateral Agents, as soon as reasonably practicable following such request but in any event within 60 days following such request (as extended by the Administrative Agent), Mortgages in recordable form with respect to the Real Estate constituting Collateral with a fair market value in excess of $5,000,000 owned by such Loan Party and identified by the applicable Collateral Agent on terms reasonably satisfactory to the Administrative Agent and the Lead Borrower, including any ancillary deliverables as reasonably agreed by the Administrative Agent and the Lead Borrower, acting in good faith, which shall in no event require more deliverables than as required by the Term Loan Lenders.

(c)  All of the Liens described in this Section 2.26 shall be effective and (to the extent the Interim Order and the Canadian Initial Order, (and, when entered, the Final Order) is effective to perfect under local law) perfected upon entry of the Interim Order and the Canadian Initial Order or Final Order, as applicable, without the necessity of the execution, recordation of filings by any Loan Party of mortgages (with the exception of any Mortgages executed and delivered after the Closing Date pursuant to Section 2.26), security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Collateral Agent of, or over, any Collateral, as set forth in the Interim Order and the Canadian Initial Order and the Final Order, as applicable.

(d)  Notwithstanding anything to the contrary herein, except as set forth in the Orders, in no event shall the Collateral of the US Debtors, and in no event shall the Liens described in SECTION 2.26 apply to, include (A) if and to the extent invoked pursuant to the Orders, proceeds in an amount equal to the Carve-Out (provided that Collateral shall include residual interest in the Carve-Out), (B) any other property specifically excluded pursuant to the Orders including all "Excluded Assets", (C) more than 65% of the voting Equity Interests of each CFC and FSHCO *provided*, that if any such stock is pledged in

116

.

support of any of the Prepetition Secured Debt Documents or any other debt obligation, the stock that constitutes Collateral shall be the same stock that is pledged in support of such other obligations; (D) any "building" or "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Laws) located on the land comprising part of the real property associated with Store # 6510 (North Miami, FL), Store # 6465 (Phoenix, AZ), Store # 7016 (Metairie, LA), Store # 7044 (Slidell, LA), Store # 6518 (Danbury, CT), Store # 6332 (Danbury, CT), Store # 8706 (Plantation, FL), Store # 6308 (Brooklyn, NY), Store # 6323 (Brooklyn, NY), Store # 6310 (Valley Stream, NY) and Store #8722 (De Diego Expressway San Juan, PR) until the Administrative Agent has received the Flood Documentation in form and substance reasonably satisfactory to the Administrative Agent as described in SECTION 4.01(h), or (E) any asset (including stock) owned by any CFC or FSHCO.

(e)    Notwithstanding anything to the contrary herein, in no event shall he Canadian Borrower or any of its Subsidiaries be obligated in respect of, nor shall any Collateral of the Canadian Borrower and its Subsidiaries secure any Obligations or Other Liabilities, other than the Canadian Liabilities and Other Liabilities of the Canadian Borrower and its Subsidiaries.

(f)    Each of the Loan Parties agrees that (i) its Obligations under the Loan Documents shall not be discharged by the entry of an order confirming or sanctioning a Reorganization Plan (and each of the US Debtors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby irrevocably waives any such discharge) and (ii) the US Superpriority Claim granted to the Agents and the Lenders pursuant to the Orders and the Liens granted to the Agents and the Lenders pursuant to the Orders shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

(g)    Notwithstanding any other provision hereof, the Loan Parties and the Credit Parties agree that (i) the Canadian Liabilities shall be secured by the Canadian DIP Charge and the Canadian Security Documents; (ii) the priority of the Court Ordered Charges as against the Collateral of the Canadian Borrower shall be governed solely by the Canadian Initial Order and not by any other Order or the Intercreditor Agreement, and (iii) the Collateral of the Canadian Borrower shall not be subject to the Carve-Out.

SECTION 2.27    Payment of Obligations

(a)    Subject to clause (iv) of the penultimate paragraph of Section 7.01 and the proviso in the last paragraph of SECTION 7.01, upon the maturity (whether by acceleration or otherwise) of any of the Obligations of the Loan Parties under this Agreement or any of the other Loan Documents, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court or the Canadian Court.

(b)    Each Loan Party agrees that to the extent that the Obligations hereunder have not been satisfied in full in cash (other than contingent indemnity or expense reimbursement obligations and Other Liabilities that are Cash Collateralized) (i) its Obligations arising

117

hereunder shall not be discharged by the entry of any order of the Bankruptcy Court or the Canadian Court, including but not limited to an order confirming or sanctioning any Reorganization Plan and (ii) the Superpriority Claims granted to the Agents and the Lenders pursuant to the Orders and described in Section 2.26 and the Liens granted to any Agent pursuant to the Orders and described in Section 2.26 shall not be affected in any manner by the entry of any order of the Bankruptcy Court or the Canadian Court confirming any such plan.

SECTION 2.28    Defaulting Lenders.

(a)    Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(i)    Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and SECTION 9.02.

(ii)    Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Agent from a Defaulting Lender pursuant to SECTION 9.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first,* to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second,* to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Issuing Banks or Swingline Lender hereunder; *third,* to cash collateralize the Issuing Banks' Fronting Exposure with respect to such Defaulting Lender; *fourth,* as the Lead Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth,* if so determined by the Administrative Agent and the Lead Borrower, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) cash collateralize the Issuing Banks' future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement; *sixth,* to the payment of any amounts owing to the Lenders, the Issuing Banks or Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, any Issuing Bank or the Swingline Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh,* so long as no Default or Event of Default exists, to the payment of any amounts owing to any Borrower as a result of any judgment of a court of competent jurisdiction obtained by such Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans (including any Loans made pursuant to SECTION 2.13(e)) in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such

118

Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in SECTION 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and Letter of Credit Outstandings owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or Letter of Credit Outstandings owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in Letter of Credit Outstandings and Swingline Loans are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to SECTION 2.27(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this SECTION 2.27(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)   Certain Fees.

(A)   No Defaulting Lender shall be entitled to receive any fee payable under SECTIONS 2.19 (b) or 2.19(c) for any period during which that Lender is a Defaulting Lender (and no Borrower shall be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)   Each Defaulting Lender shall be entitled to receive Letter of Credit Lees for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Commitment Percentage of the stated amount of Letters of Credit for which it has provided cash collateral pursuant to SECTION 2.13(j).

(C)   With respect to any fee payable under SECTIONS 2.19(b) or 2.19(c) or any Letter of Credit Lee not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Borrowers shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in Letter of Credit Outstandings or Swingline Loans that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y) pay to the Issuing Banks and Swingline Lender, as applicable, the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such Issuing Banks' or Swingline Lender's Fronting Exposure to such Defaulting Lender, and (z) not be required to pay the remaining amount of any such fee.

(iv)   Reallocation of Applicable Percentages to Reduce Fronting Exposure. All or any part of such Defaulting Lender's participation in Letter of Credit Outstandings and Swingline Loans shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Commitment Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that (x) the conditions set forth in SECTION 4.02 are satisfied (or waived) at the time of such reallocation (and, unless the Lead Borrower shall have otherwise notified the Administrative Agent at such time, the

119

Borrowers shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (y) such reallocation does not cause the portion of the Total Domestic Revolver Outstandings or Total Canadian Revolver Outstandings owing to any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Domestic Commitment or Canadian Commitment, as applicable. No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)    Cash Collateral, Repayment of Swing Line Loans. If the reallocation described in clause (a)(iv) above cannot, or can only partially, be effected, the Borrowers shall, without prejudice to any right or remedy available to them hereunder or under Applicable Law, (x) first, prepay Swingline Loans in an amount equal to the Swingline Lenders' Fronting Exposure and (y) second, cash collateralize the Issuing Banks' Fronting Exposure in accordance with the procedures set forth in SECTION 2.13(j).

(b)    Defaulting Lender Cure. If the Lead Borrower, the Administrative Agent, the Swingline Lender and the Issuing Banks agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit and Swingline Loans to be held on a pro rata basis by the Lenders in accordance with their Commitment Percentages (without giving effect to SECTION 2.27(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

120

ARTICLE III

Representations and Warranties

To induce the Lenders to make the Loans and the Issuing Banks to issue Letters of Credit on and after the Effective Date, each Loan Party executing this Agreement or a Joinder hereto, jointly and severally, make the following representations and warranties to each Credit Party with respect to such Loan Party and after giving effect and subject to the Orders and any other applicable Bankruptcy Court order:

SECTION 3.01   Organization; Powers. Each Loan Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to own its property and assets and to carry on its business as now conducted, except, in each case, where the failure to do so, or so possess, individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect. Subject, in the case of each Loan Party that is a Debtor, to the entry of the Orders and the terms thereof, each Loan Party has all requisite organizational power and authority to execute and deliver and perform all its obligations under all Loan Documents to which such Loan Party is a party. Each Loan Party is qualified to do business in, and is in good standing (where such concept exists) in, every jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary, except where the failure to be so qualified or in good standing individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect. Schedule 3.01 sets forth, as of the Effective Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

SECTION 3.02   Authorization; Enforceability. Subject, in the case of each Loan Party that is a Debtor, to the entry of the Orders and the terms thereof, the transactions contemplated hereby and by the other Loan Documents to be entered into by each Loan Party are within such Loan Party's corporate powers and have been duly authorized by all necessary corporate, membership, partnership or other necessary action. Subject, in the case of each Loan Party that is a Debtor, to the entry of the Orders and the terms thereof, this Agreement has been duly executed and delivered by each Loan Party that is a party hereto or thereto and constitutes, and each other Loan Document to which any Loan Party is a party, when executed and delivered by such Loan Party will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms subject, except in the case of each Loan Party that is a Debtor, to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03   Governmental Approvals; No Conflicts. Subject, in the case of each Loan Party that is a Debtor, to the entry of the Orders and the terms thereof, the transactions to be entered into and contemplated by the Loan Documents (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except for (A) such as have been obtained or made and are in full force and effect, (B) filings and recordings

121

necessary to perfect Liens created under the Loan Documents and enforce the rights of the Lenders and the Secured Parties under the Loan Documents or (C) the failure of which to obtain would not reasonably be expected to result in Material Adverse Effect, (b) will not violate any Applicable Law or the Charter Documents of any Loan Party, except to the extent that such violation would not reasonably be expected to result in a Material Adverse Effect, (c) will not violate or result in a default under any indenture or any other agreement, instrument or other evidence of Material Indebtedness, except to the extent that such default would not reasonably be expected to result in a Material Adverse Effect, and (d) will not result in the creation or imposition of any Lien on any asset of any Loan Party, except Liens created under the Loan Documents, the Orders and Permitted Encumbrances.

SECTION 3.04    Financial Condition; No Material Adverse Effect. The Lead Borrower has heretofore furnished to the Administrative Agent the Consolidated balance sheet, and statements of income, stockholders' equity, and cash flows for the Parent and its Subsidiaries as of and for the Fiscal Year ending on or about January 28, 2017 and as of and for the Fiscal Quarter ended April 29, 2017, certified by a Financial Officer of the Parent. Such financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Parent and its Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes. Since January 28, 2017, there has been no Material Adverse Effect.

SECTION 3.05    Properties.

(a)    Each Loan Party has title to, or valid leasehold interests in, or rights to use all its real (immovable) and personal (movable) property material to its business, except for defects which would not reasonably be expected to have a Material Adverse Effect.

(b)    Each Loan Party owns or is licensed to use, all patents, patent rights, trademarks, trade names, trade styles, brand names, service marks, logos, copyrights, domain names, technology, software, trade secrets, proprietary information, know-how, processes, and other intellectual property (including all applications for registrations, registrations and goodwill associated with any of the foregoing) (collectively, "Intellectual Property Rights") used in its business, except to the extent that the failure to so own or have the right to use would not reasonably be expected to have a Material Adverse Effect, and the use thereof by the Loan Parties does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.06    Litigation and Environmental Matters.

(a)    Except as set forth on Schedule 3.06(a) and other than with respect to the Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the actual knowledge of Responsible Officers of a Loan Party, threatened in writing against any Loan Party (i) as to which there is a reasonable possibility of an adverse determination which, if adversely determined, would reasonably be expected individually or in the aggregate to result in a Material Adverse Effect (other

122

than Disclosed Matters) or (ii) that involve any of the Loan Documents and would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Except as set forth on <u>Schedule 3.06(b)</u>, no Loan Party (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, which, in each case, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

SECTION 3.07    <u>Compliance with Laws and Agreements</u>. Each Loan Party is in compliance with all Applicable Law and all Material Indebtedness, and no event of default has occurred and is continuing under any Material Indebtedness, except in each case where the failure to comply or the existence of a default, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. Without limiting the generality of the foregoing, each Loan Party has obtained all permits, licenses and other authorizations which are required with respect to the ownership and operations of its business, except where the failure to obtain such permits, licenses or other authorizations, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Each Loan Party is in material compliance with all terms and conditions of all such permits, licenses, orders and authorizations, except where the failure to comply with such terms or conditions, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.08    <u>Investment Company Status</u>. No Loan Party is an "investment company" as defined in, and subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09    <u>Taxes</u>. Each Loan Party has timely filed or caused to be filed all tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings, for which such Loan Party has set aside on its books adequate reserves, and as to which no Lien other than a Permitted Encumbrance has arisen, (b) to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect or (c) Taxes that need not be paid pursuant to an order of the Bankruptcy Court or Canadian Court pursuant to Bankruptcy Law.

SECTION 3.10    <u>ERISA; Canadian Defined Benefit Pension Plans</u>.

(a)    No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect. The present value of all accumulated benefit obligations under each Plan subject to ERISA (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans subject to ERISA (based on the assumptions

123

used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans, in each case, to the extent that any resulting liabilities would reasonably be expect to result in a Material Adverse Effect.

(b)    No Canadian Loan Party sponsors, maintains, administers or contributes to, or has any liability, including any contingent liability, in respect of, any Canadian Defined Benefit Pension Plan. No Canadian Loan Party sponsors, administers or contributes to any "registered pension plan" as defined in subsection 248(1) of the *Income Tax Act* (Canada).

SECTION 3.11    Disclosure. None of the reports, financial statements, certificates or other information (other than any projections, pro formas, budgets and general market information) concerning the Loan Parties furnished by or on at the direction of any Loan Party to any Credit Party in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder in connection therewith (as modified or supplemented by other information so furnished), when taken as a whole, contained, as of the date furnished, any material misstatement of fact or omitted to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading in light of the circumstances under which such statements were made. The Projections prepared by or on behalf of the Lead Borrower, and that have been made available to any Lenders or the Administrative Agent prior to the Effective Date in connection with the Facilities have been prepared in good faith based upon assumptions believed by the Lead Borrower to be reasonable as of the date thereof (it being understood that actual results may vary materially from such Projections and estimates, including any 13-Week Projection, and such Projections are not a guarantee of performance), as of the date such Projections and estimates were furnished to the Lenders and as of the Closing Date.

SECTION 3.12    Subsidiaries.

(a)    Schedule 3.12 sets forth the name of, and the ownership interest of each Loan Party in the Lead Borrower and each Subsidiary and Propco as of the Effective Date; there is no other Capital Stock of any class outstanding as of the Effective Date. To the knowledge of the Responsible Officers of the Loan Parties, all such shares of Capital Stock are validly issued, fully paid, and, except as set forth on Schedule 3.12, non-assessable (to the extent applicable).

(b)    Except as set forth on Schedule 3.12, no Loan Party is party to any joint venture, general or limited partnership, or limited liability company agreements as of the Effective Date.

SECTION 3.13    [Reserved].

SECTION 3.14    Labor Matters. As of the Effective Date, there are no strikes, lockouts or slowdowns against any Loan Party pending or, to the actual knowledge of any Responsible Officer of any Loan Party, threatened, except to the extent that strikes, lockouts or slowdowns would not reasonably be expected to result in a Material Adverse Effect. The hours worked by and payments made to employees of the Loan Parties have not been in violation of the Pair Labor Standards Act or any other applicable federal, state, local or

124

foreign law dealing with such matters to the extent that any such violation could reasonably be expected to have a Material Adverse Effect. Except for Disclosed Matters and to the extent that such liability would not reasonably be expected to have a Material Adverse Effect, all payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued in accordance with GAAP as a liability on the books of such Loan Party. As of the Effective Date, there are no representation proceedings pending or, to the actual knowledge of any Responsible Officer of any Loan Party, threatened to be filed with the National Labor Relations Board or other applicable Governmental Authority, and no labor organization or group of employees of any Loan Party has made a pending demand for recognition which could result in a Material Adverse Effect. As of the Effective Date, the consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound to the extent that such would be reasonably expected to result in a Material Adverse Effect.

SECTION 3.15   Security Documents.

(a)   Subject to, and upon entry of the Orders, the Orders and the Security Documents are effective to create in favor of the Collateral Agent (for the benefit of the Secured Parties described therein) a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof. Subject to, and upon entry of the Orders, when financing statements and other filings specified in the Closing Agenda are filed in the offices specified in the Closing Agenda (and all required fees are paid), the Collateral Agent (for the benefit of the Secured Parties) shall have a perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Collateral described therein and, the proceeds thereof, as security for the applicable Obligations to the extent perfection can be obtained pursuant to the Orders or by filing Uniform Commercial Code or PPSA financing statements (and all required fees are paid), in each case with the priority set forth in the Orders and the Security Documents.

(b)   Subject to, and upon entry of the Orders, when the Security Agreement or Intellectual Property Rights Security Agreement a summary thereof is properly filed in the United States Patent and Trademark Office, the United States Copyright Office or the Canadian Intellectual Property Office, and, with respect to Collateral in which a security interest cannot be perfected by such filings, upon the proper filing of the financing statements (and payment of fees) referred to in paragraph (a) above, the Collateral Agent (for the benefit of the Secured Parties) shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties thereunder in the Intellectual Property Rights described therein and constituting Collateral to the extent such perfection can be obtained pursuant to the Orders or by such filings (including the payment of any required fees) (it being understood that subsequent recordings in the United States Patent and Trademark Office, the United States Copyright Office or the Canadian Intellectual Property Office may be necessary to perfect a Lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the grantors after the Closing Date).

125

(c)   Subject to, and upon entry of the Orders, the Orders and the Mortgages (if any) executed and delivered after the Closing Date pursuant to Section 2.26, (when such Mortgages are filed or recorded in the property real estate filing or recording office and the applicable fees are paid) shall be effective to create in favor of the Collateral Agent (for the benefit of the Secured Parties) a legal, valid and enforceable Lien on all of the Loan Parties' right, title and interest in and to the Real Estate thereunder and the proceeds thereof, and upon entry of the Orders, the Collateral Agent (for the benefit of the Secured Parties) shall have a fully perfected Lien on, and security interest in, all right, title, and interest of the Loan Parties in such Real Estate and the proceeds thereof, in each case with the priority set forth in the applicable Orders and the Intercreditor Agreement.

126

SECTION 3.16    Federal Reserve Regulations.

(a)    No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)    No part of the proceeds of any Loan or any Letter of Credit will be used by any Loan Party or any of its Subsidiaries, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to buy or carry Margin Stock or to extend credit to others for the purpose of buying or carrying Margin Stock or to refund indebtedness originally incurred for such purpose in violation of Regulation U or X or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

SECTION 3.17    Anti-Corruption Laws and Sanctions.

The Loan Parties have implemented and maintain in effect policies and procedures designed to ensure compliance by the Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrowers, their Subsidiaries and their respective officers and employees and to the knowledge of the Borrowers their directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person. None of (a) the Borrowers, any Subsidiary or any of their respective directors, officers or (to the knowledge of the Borrowers) employees, or (b) to the knowledge of the Borrowers, any agent of any Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

ARTICLE IV

Conditions

SECTION 4.01    Closing Date. The occurrence of the Closing Date is subject to the satisfaction (or waiver) of the following conditions precedent, subject to the of last paragraph of this SECTION 4.01:

(a)    The Effective Date shall have occurred. No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases. No order shall have been issued by the Canadian Court terminating the Canadian Cases or converting the Canadian Case to, bankruptcy proceedings or converting or augmenting the Canadian Case to or with receivership proceedings.

(b)    The Administrative Agent (or its counsel) shall have received from each party either (i) a counterpart of this Agreement and all other Loan Documents signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed signature page of this

Agreement) that such party has signed a counterpart of this Agreement and all other Loan Documents.

(c)    The Administrative Agent shall have received a customary written opinion (addressed to each Agent, the Issuing Banks and the Lenders and dated the Closing Date) of (i) Kirkland and Ellis LLP, domestic counsel for the Loan Parties, (ii) Goodmans LLP, Canadian counsel for the Canadian Borrower and its Subsidiaries (in respect of the province of Ontario), (iii) BCF LLP, Quebec counsel for the Canadian Borrower and (iv) counsel for TRU-SVC, LLC. The Loan Parties hereby request such counsel to deliver such opinions.

(d)    The Administrative Agent shall have received Charter Documents evidence of the existence of each Loan Party, the authorization of the transactions contemplated by the Loan Documents and any other legal matters relating to the Loan Parties, the Loan Documents or the transactions contemplated thereby.

(e)    (i) The Administrative Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the fiscal month ended on August 31, 2017, and executed by a Financial Officer of the Lead Borrower (and certified by such Financial Officer as being complete and correct in all material respects), evidencing that Excess Availability as of the Effective Date, assuming the full amount of the Commitments were available to be drawn (subject to borrowing base restrictions) is not less than $1,400,000,000.

(f)    [Reserved].

(g)    After giving effect to the consummation of the transactions contemplated under this Agreement and the other Loan Documents as of the Closing Date, no Default or Event of Default shall exist.

(h)    The Administrative Agent shall have received flood determinations and flood certificates with respect to any owned and ground-leased Real Estate located in the United States of the Loan Parties and, to the extent previously prepared and available to the Lead Borrower, any requested environmental review reports.

(i)    All material governmental approvals necessary in connection with the Facilities shall have been obtained and shall be in full force and effect and no Applicable Law shall exist that restrains or prevents the Facilities or the transactions contemplated hereby.

(j)    No Material Adverse Effect shall have occurred since the Petition Date.

(k)    The Administrative Agent shall have received (i) the DIP Budget dated as of a date not more than 3 Business Days prior to the Closing Date and (ii) a cash flow forecast for the 13-week period ending after the Closing Date dated as of a date not more than 3 Business Days prior to the Closing Date.

(l)   The Administrative Agent shall have received updated appraisals (in each case with customary reliance letters) with respect to (i) TRU Inventory and BRU Inventory, and (ii) Eligible Real Estate of the Canadian Loan Parties.

(m)   The Administrative Agent shall have received results of searches or other evidence reasonably satisfactory to the Administrative Agent indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases are being tendered on the Closing Date.

(n)   The Administrative Agent shall have received all documents and instruments, including Uniform Commercial Code and PPSA financing statements and certified statements issued by the Quebec Register of Personal and Movable Real Rights, required by law or reasonably requested by the Collateral Agent to be filed, registered, published or recorded to create or perfect the first priority Liens (subject only to Permitted Encumbrances having priority by operation of Applicable Law) intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered, published or recorded or other arrangements reasonably satisfactory to the Collateral Agent for such filing, registration, publication or recordation shall have been made.

(o)   All fees due on or prior to the Closing Date, and all Credit Party Expenses incurred by in connection with the establishment of the credit facility contemplated hereby (including the reasonable fees and expenses of counsel to the Agents), shall have been paid in full.

(p)   There shall have been delivered to the Administrative Agent each of the instruments and agreements on the Closing Agenda required to be delivered on or prior to the Closing Date.

(q)   The Interim Order Entry Date and the Canadian Initial Order Entry Date shall have occurred not later than five days following the Petition Date (or such later date as the Administrative Agent may agree) and the Interim Order and the Canadian Initial Order shall not have been vacated or reversed, shall not be subject to any stay, and shall not have been modified or amended in a manner adverse to the Lenders without the consent of the Administrative Agent and the Arrangers.

(r)   The Administrative Agent shall be reasonably satisfied with the form and substance of the "first day orders" sought by the Borrower and entered on (or prior to) the Closing Date.

(s)   The Administrative Agent shall be reasonably satisfied with the cash management arrangements of the Loan Parties.

(t)   On or prior to the Closing Date and substantially concurrently with the incurrence of Loans and the use of such Loans to refinance the extensions of credit under the Prepetition ABL and FILO Credit Agreement on such date, all Indebtedness of the Lead Borrower and its subsidiaries under the Prepetition ABL and FILO Credit Agreement shall have been repaid in full, together with all fees and other amounts owing thereon, all

129

commitments under the Prepetition ABL and FILO Credit Agreement shall have been terminated, and all letters of credit issued pursuant to the Prepetition ABL and FILO Credit Agreement shall have been terminated, cash collateralized or backstopped and the Administrative Agent shall have received reasonably satisfactory evidence of the same.

(u)  On the Closing Date and substantially concurrently with the incurrence of Loans on such date, all security interests granted under the "Security Documents" (as defined in the Prepetition ABL and FILO Credit Agreement) shall have been terminated and released pursuant to release documentation reasonably satisfactory to the Administrative Agent.

(v)  Each Lender who has requested the same at least five Business Days prior to the Closing Date shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the USA PATRIOT Act.

(w)  [Reserved]

(x)  The Facilities shall comply with all applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve System.

(y)  The documentation with respect to the DIP Term Loan Facility shall be reasonably satisfactory to the Administrative Agent and the Required Lenders and, substantially simultaneously, gross proceeds of no less than $350,000,000 shall have been made available to the Lead Borrower thereunder.

(z)  To the extent such items can be delivered on or prior to the Closing Date after the exercise of commercially reasonable efforts and subject to the paragraph immediately following subsection (iii) below, the Administrative Agent shall have received the following:

(i)  A duly executed copy of the Intellectual Property Rights Agreement.

(ii)  Agreements for filing with the United States Copyright Office, the United States Patent and Trademark Office or the Canadian Intellectual Property Office providing notice of the security interest granted in favor of the Administrative Agent in the Intellectual Property Rights registered in the United States and Canada listed on the applicable. For the purposes of the grant of security under the laws of the Province of Quebec which may now or in the future be required to be provided by any Canadian Loan Party, the Canadian Agent is hereby irrevocably authorized and appointed by each Lender, the Issuing Banks and each Secured Party that is owed any Canadian Liabilities to act as hypothecary representative (within the meaning of Article 2692 of the Civil Code of Quebec) for all present and future Lenders, Issuing Banks and Secured Parties that is owed any Canadian Liabilities (in such capacity, the "Hypothecary Representative") in order to hold any hypothec granted under the laws of the Province of Quebec and to exercise such rights and duties as are conferred upon the Hypothecary Representative under the relevant deed of hypothec and Applicable Laws (with the power to delegate any such rights or

130

duties). The execution prior to the date hereof by the Canadian Agent in its capacity as the Hypothecary Representative of any deed of hypothec or other security documents made pursuant to the laws of the Province of Quebec, is hereby ratified and confirmed. Any Person who becomes a Lender, an Issuing Bank or a Secured Party that is owed any Canadian Liabilities or successor Canadian Agent shall be deemed to have consented to and ratified the foregoing appointment of the Canadian Agent as the Hypothecary Representative on behalf of all Lenders, Issuing Banks and each Secured Party that is owed any Canadian Liabilities, including such Person and any Affiliate of such Person designated above as a Lender, Issuing Bank or a Secured Party that is owed any Canadian Liabilities. For greater certainty, the Canadian Agent, acting as the Hypothecary Representative, shall have the same rights, powers, immunities, indemnities and exclusions from liability as are prescribed in favor of the Canadian Agent in this Agreement, which shall apply mutatis mutandis. In the event of the resignation of the Canadian Agent (which shall include its resignation as the Hypothecary Representative) and appointment of a successor Canadian Agent, such successor Canadian Agent shall also act as the Hypothecary Representative, as contemplated above schedules to the Security Documents, duly executed by the Borrowers and each Canadian Loan Party.

(iii)  Evidence of all insurance required to be maintained, and evidence that the Administrative Agent shall have been named as an additional insured or loss payee, as applicable, on all insurance policies covering loss or damage to Collateral and on all liability insurance policies as to which the Administrative Agent has reasonably requested to be so named.

(aa)  To the extent that any of the items described in this Section 4.01(h), (l) (with respect to reliance letters only), (m), (n), (p) or (z) shall not have been received by the Administrative Agent notwithstanding the Borrower's use of its commercially reasonable efforts to provide same, delivery of such items shall not constitute a condition effectiveness of this Agreement and the obligations of each Lender to make Loans hereunder and of each Issuing Bank to issue Letters of Credit hereunder, and the Borrower shall, instead, cause such items to be delivered to the Administrative Agent not later than 60 days following the Closing Date (or such later date as the Administrative Agent shall agree in its discretion).

SECTION 4.02    Conditions Precedent to Each Loan and Each Letter of Credit. The obligation of the Lenders to make each Revolving Credit Loan and of the Issuing Banks to issue or extend each Letter of Credit from and after the Closing Date is also subject to satisfaction (or waiver) of the following conditions precedent:

(a)  The Closing Date shall have occurred.

(b)  The Interim Order and the Canadian Initial Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to any stay, and shall not have been modified or amended in a manner adverse to the Lenders without the consent of the Administrative Agent and the Arrangers.

131

(c)   On any day that is 45 days or later after the Effective Date, the Final Order Entry Date shall have occurred and the Final Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to any stay, and shall not have been modified or amended in a manner adverse to the Lenders without the consent of the Administrative Agent and the Arrangers.

(d)   For any Revolving Credit Loan to be made or Letter of Credit to be issued or extended on or after the Comeback Motion (i) the Canadian Initial Order shall not have been amended, restated, supplemented or otherwise modified as a result of the Comeback Motion or otherwise without the consent of the Administrative Agent and the Required Lenders; (ii) the Canadian Court shall have issued an order amending, restating, supplementing or otherwise modifying the Canadian Initial Order at the Comeback Motion, as necessary, to (i) approve service and/or substitute service on all secured creditors likely to be affected by the Liens created by the Credit Documents; (ii) approve full availability of the Facilities; and (iii) provide for the full priming (excluding, for the avoidance of doubt, the Canadian Priority Charges) of the Canadian DIP Charge.

(e)   The Administrative Agent shall have received a notice with respect to such Borrowing or issuance, as the case may be, as required by ARTICLE II, and in the case of the issuance of a Letter of Credit, the applicable Issuing Bank shall have received notice with respect thereto in accordance with SECTION 2.13.

(f)   [Reserved]

(g)   All representations and warranties contained in this Agreement and the other Loan Documents or otherwise made in writing in connection herewith or therewith (including in any Borrowing Base Certificate) shall be true and correct in all material respects on and as of the date of each Borrowing or the issuance of each Letter of Credit hereunder with the same effect as if made on and as of such date, other than representations and warranties that relate solely to an earlier date which shall be true and correct in all material respects as of such earlier date (in each case, other than representations and warranties which are qualified by "materiality" or "Material Adverse Effect", each of which shall be true and correct in all respects as of such date or as of such earlier date, as applicable).

(h)   On the date of each Borrowing hereunder and the issuance of each Letter of Credit and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing.

(i)   After giving effect to such Borrowing or such issuance or extension of a Letter of Credit, the aggregate outstanding amount of the Credit Extensions shall not exceed the amount authorized by the Interim Order and the Canadian Initial Order or the Final Order, as applicable.

(j)   After giving effect to such Borrowing or such issuance or extension of a Letter of Credit, (i) in the case of an Extension of Credit to a Domestic Borrower, the aggregate outstanding amount of the Credit Extensions to Domestic Borrowers shall not exceed Domestic Availability and (ii) in the case of an Extension of Credit to the Canadian

132

Borrower the aggregate outstanding amount of the Credit Extensions to the Canadian Borrower shall not exceed Canadian Availability.

(k)   Prior to the Full Availability Date, the aggregate amount of the Credit Extensions under the Revolving Facility shall not exceed $1,300,000,000.

The request by the Lead Borrower or the Canadian Borrower, as applicable, for, and the acceptance by any Borrower of, each extension of credit hereunder shall be deemed to be a representation and warranty by the Loan Parties that the conditions specified in this SECTION 4.02 have been satisfied (or waived) at that time and that, after giving effect to such extension of credit, the Borrowers shall continue to be in compliance with the Domestic Borrowing Base or the Canadian Borrowing Base. The conditions set forth in this SECTION 4.02 are for the sole benefit of the Administrative Agent and the Canadian Agent and each other Credit Party and may be waived by the Administrative Agent or the Canadian Agent, in whole or in part, without prejudice to the rights of the Administrative Agent, the Canadian Agent or any other Credit Party. Until the Required Lenders otherwise direct the Administrative Agent or the Canadian Agent to cease making Loans and issuing Letters of Credit, the Lenders will fund their Commitment Percentage of all Loans and participate in all Swing Line Loans and Letters of Credit whenever made or issued, which are requested by the Borrowers and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, agreed to by the Administrative Agent or the Canadian Agent, provided, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

SECTION 4.03   Effective Date.

This Agreement shall become effective on the first day on which (A) the Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence reasonably satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (B) the Effective Date shall have occurred, and the Case of each Loan Party shall have commenced and shall not be subject to an appeal.

ARTICLE V

Affirmative Covenants

Until (i) the Commitments have expired or been terminated, (ii) the principal of and interest on each Loan and all fees and other Obligations (other than contingent indemnity obligations with respect to then unasserted claims and the Other Liabilities) shall have been paid in full, (iii) all Letters of Credit shall have expired or terminated (or been Cash Collateralized or backstopped in a manner reasonably satisfactory to the applicable Issuing Banks) and (iv) all Letter of Credit Outstandings have been reduced to zero (or Cash Collateralized in a manner reasonably satisfactory to the applicable Issuing Banks), each Loan Party covenants and agrees with the Credit Parties (provided that the Canadian Borrower covenants only for itself and its Subsidiaries) that:

133

SECTION 5.01  <u>Financial Statements and Other Information</u>. The Lead Borrower will furnish to the Administrative Agent:

(a)  Within one hundred twenty (120) days after the end of each Fiscal Year of the Parent, the Consolidated balance sheet and related statements of operations, and Consolidated statements of cash flows as of the end of and for such year for (x) the Parent and its Subsidiaries, and (y) the Lead Borrower and its Subsidiaries, setting forth in each case, in comparative form, the Consolidated figures for the previous Fiscal Year, all audited and reported on by independent public accountants of recognized national standing (without a qualification or exception as to the scope of such audit, but which may contain a "going concern" or like qualification or exception) to the effect that such Consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Parent and its Subsidiaries, or the Lead Borrower and its Subsidiaries, as applicable, in each case on a Consolidated basis in accordance with GAAP;

(b)  Within sixty (60) days after the end of the first three Fiscal Quarters of each Fiscal Year of the Lead Borrower, the unaudited Consolidated balance sheet and related statements of operations, and Consolidated statements of cash flows for (i) the Lead Borrower and its Subsidiaries, (ii) the Lead Borrower and its Subsidiaries (other than the Canadian Borrower and its Subsidiaries), and (iii) the Canadian Borrower and its Subsidiaries, as of the end of and for such Fiscal Quarter (other than in the case of statements of cash flows) and the elapsed portion of the Fiscal Year, setting forth in each case, in comparative form the Consolidated figures for the previous Fiscal Year, all certified by one of the Lead Borrower's Financial Officers as presenting in all material respects the financial condition and results of operations of the Loan Parties and their Subsidiaries on a Consolidated basis in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes, and, in addition, separate financial statements for each business segment identified on, and as required by, <u>Schedule 5.01(b)</u> hereto;

(c)  Beginning with the first full Fiscal Month after the Closing Date, within thirty (30) days after the end of each Fiscal Month of the Lead Borrower and its Subsidiaries, such reports as are prepared by the Loan Parties' management for their own use, including the Consolidated balance sheet and related statements of operations and Consolidated statements of cash flows for (i) the Lead Borrower and its Subsidiaries, (ii) the Lead Borrower and its Subsidiaries (other than the Canadian Borrower and its Subsidiaries), and (iii) the Canadian Borrower and its Subsidiaries, with respect to (A) the balance sheet and statement of operations, as of the end of and for such Fiscal Month and the elapsed portion of the Fiscal Year, and (B) the statements of cash flow, for the elapsed portion of the Fiscal Year, setting forth in each case, in comparative form the Consolidated figures for the previous Fiscal Year, all certified by one of the Lead Borrower's Financial Officers as agreeing to the Lead Borrower's books and records and presenting in all material respects the financial condition and results of operations of the Loan Parties and their Subsidiaries on a Consolidated basis, and, in addition, separate financial statements for each business segment identified on, and as required by, <u>Schedule 5.01(b)</u> hereto;

134

(d)   Concurrently with any delivery of financial statements under clauses (a) or (b) above, a certificate of a Financial Officer of the Lead Borrower in the form of Exhibit L hereto (a "Compliance Certificate") (i) certifying as to whether a Default or Event of Default has occurred and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations with respect to compliance with the provisions of SECTION 6.10, (iv) detailing all Store openings and Store closings during the immediately preceding fiscal period, and (v) stating whether any change in GAAP or in the application thereof has occurred since the date of the Lead Borrower's most recent audited financial statements and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such Compliance Certificate;

(e)   [reserved];

(f)   The Lead Borrower will furnish to the Administrative Agent a certificate in the form of Exhibit M (a "Borrowing Base Certificate") showing the Domestic Borrowing Base, the Canadian Borrowing Base (reflected both in CD$ and the Equivalent Amount) and Incremental Availability, each Borrowing Base Certificate to be certified as complete and correct in all material respects on behalf of the Lead Borrower by a Financial Officer of the Lead Borrower, as follows:

(i)   On or prior to the 10th Business Day of each fiscal month, the Lead Borrower shall furnish a Borrowing Base Certificate as of the last day of the immediately preceding fiscal month;

(ii)   Upon the occurrence and during the continuance of an Accelerated Borrowing Base Delivery Event, the Lead Borrower shall furnish a Borrowing Base Certificate (which shall roll forward the Loan Parties' Inventory, credit card receivables and Credit Extensions) on Thursday of each week (or, if Thursday is not a Business Day, on the next succeeding Business Day), as of the close of business on the immediately preceding Saturday;

(iii)   If there are Loans then outstanding, the Lead Borrower shall also furnish a Borrowing Base Certificate within five (5) Business Days after December 15 of each year (which shall roll forward the Loan Parties' Inventory, credit card receivables and Credit Extensions), as of the close of business on the immediately preceding Saturday;

(iv)   Upon the sale or other disposition of Collateral of any Loan Party included in the Domestic Borrowing Base, the Canadian Borrowing Base or Incremental Availability outside of the ordinary course of business (including, in connection with the rejection of one or more leases, store closings or a going out of business sale) if the Net Proceeds are in excess of $5,000,000, the Lead Borrower shall also furnish an updated Borrowing Base Certificate promptly upon the receipt of the Net Proceeds from such sale or other disposition of Collateral and make any mandatory prepayment contemporaneously therewith as required by Section 2.17; and

135

(v)   The Borrowers may, at their option, elect to furnish the Administrative Agent with a Borrowing Base Certificate on a more frequent basis than is otherwise required pursuant to this SECTION 5.01(f); provided that, if the Borrowers elect to deliver a Borrowing Base Certificate on a more frequent basis than is required by the other provisions of this SECTION 5.01(f), then the Lead Borrower shall continue to furnish a Borrowing Base Certificate on such basis from the date of such election through the remainder of the Fiscal Year in which such election was made.

(g)   Promptly after the same become publicly available, copies of (i) all material periodic and other reports, proxy statements and other materials filed by any Loan Party with the SEC or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, as the case may be, and (ii) SEC Forms 10K and 10Q for the Parent (for so long as the Parent is subject to the reporting requirements under the Securities Exchange Act of 1934, as amended); provided that no such delivery shall be required hereunder with respect to each of the foregoing to the extent that such are publicly available via EDGAR or another publicly available reporting system and the Lead Borrower has advised the Administrative Agent of the filing thereof;

(h)   Promptly upon receipt thereof, copies of all material reports submitted to any Loan Party by independent certified public accountants in connection with each annual, interim or special audit of the books of the Loan Parties or any of their Subsidiaries made by such accountants, including any management letter commenting on the Loan Parties' internal controls submitted by such accountants to management in connection with their annual audit (subject to any confidentiality restrictions);

(i)   The financial and collateral reports described on Schedule 5.01(i) hereto, at the times set forth in such Schedule;

(j)   [Reserved];

(k)   Notice of any intended sale or other disposition of Collateral of any Loan Party included in the Domestic Borrowing Base, the Canadian Borrowing Base or Incremental Availability outside of the ordinary course of business (including, in connection with the rejection of one or more leases, store closings or a going out of business sale), if the Net Proceeds of which exceed $5,000,000, at least five (5) Business Days prior to the date of consummation such sale or disposition;

(l)   On or before the fifth Business Day following the end of every fiscal month (for purposes hereof, each calendar week being deemed to end on Friday), a 13-Week Projection (together with a reconciliation of actual results to forecasted results);

(m)   Beginning with the second full fiscal month after the Closing Date, on or before the fifth Business Day following the end of every fiscal month (for purposes hereof, each calendar week being deemed to end on Friday), a detailed calculation, in a form reasonably acceptable to the Administrative Agent, of the Cumulative Net Cash Flow Before DIP ABL Draw/Paydown for the applicable period ending as of the second preceding Test

136

Date, with a certificate of a Financial Officer of the Lead Borrower certifying as to the compliance under Section 6.15.

(n)  Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Loan Party as any Agent or any Lender may reasonably request, including information from the Debtors' restructuring and financial advisors (except such information that is subject to attorney-client privilege or would result in a breach of a confidentiality obligation or applicable law or constitutes attorney work product).

At the request of the Lead Borrower and with the consent of the Administrative Agent, not to be unreasonably withheld, any of the delivery requirements relating to written financial information set forth in this SECTION 5.01 may be satisfied by either (x) the Borrowers' posting such information in electronic format readable by the Administrative Agent and the Lenders to a secure address on the world wide web (the "Informational Website") which is accessible by the Administrative Agent and the Lenders or (y) the Borrowers' delivering such financial information in electronic format to the Administrative Agent and the Administrative Agent's posting such information to an Informational Website. The accommodation provided by the foregoing sentence shall not impair the right of the Administrative Agent, or any Lender through the Administrative Agent, to request and receive from the Borrowers physical delivery of specific financial information provided for in this SECTION 5.01. The Lead Borrower shall give the Administrative Agent and each Lender (or, if applicable, the Administrative Agent shall give each Lender) written or electronic notice each time any information is delivered by posting to the Informational Website. Except to the extent such Informational Website is established and maintained by the Administrative Agent, the Loan Parties shall be responsible for and shall bear all risk associated with establishing and maintaining the security and confidentiality of the Informational Website and the information posted thereto.

SECTION 5.02   Notices of Material Events. The Lead Borrower will furnish to the Administrative Agent prompt written notice of the occurrence of any of the following after any Responsible Officer of the Lead Borrower or the Canadian Borrower obtains knowledge thereof:

(a)  A Default or Event of Default, specifying the nature and extent thereof and the action (if any) which is proposed to be taken with respect thereto;

(b)  The filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any Loan Party or any Subsidiary of the Parent that has a reasonable likelihood of adverse determinations and such determinations would reasonably be expected to result in a Material Adverse Effect;

(c)  An ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect;

(d)  Any other development that results in a Material Adverse Effect;

137

(e)   The discharge by any Loan Party of its present independent accountants or any withdrawal or resignation by such independent accountants;

(f)   Any casualty or other insured damage to any portion of the Collateral included in the Domestic Borrowing Base, the Canadian Borrowing Base or Incremental Availability in excess of $25,000,000, or the commencement of any action or proceeding for the taking of any interest in a portion of the Collateral included in the Domestic Borrowing Base, the Canadian Borrowing Base or Incremental Availability in excess of $25,000,000 or any part thereof or interest therein under power of eminent domain or by condemnation or similar proceeding;

(g)   (i) To the extent feasible, in advance of filing with the Bankruptcy Court or the Canadian Court or delivering to any statutory committee appointed in the Cases or the U.S. trustee, as the case may be, the Final Order and all other proposed orders and pleadings related to the Loans and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, or having a value in excess of $5,000,000, cash management, adequate protection, any Reorganization Plan and/or any disclosure statement related thereto and (ii) two Business Days prior to being filed (and if impracticable, then as soon as possible and in no event later than as promptly practicable before being filed) on behalf of any of the Debtors with the Bankruptcy Court or the Canadian Court, all other notices, filings, motions or pleadings materially impacting the financial condition of the Parent or any of its Subsidiaries or any request to approve any compromise and settlement of material claims or for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or Section 9019 of the Federal Rules of Bankruptcy Procedure each having a value in excess of $10,000,000; and

(h)   The occurrence of a Master Lease Liquidation Event.

Each notice delivered under this SECTION 5.02 shall be accompanied by a statement of a Financial Officer or other executive officer of the Lead Borrower setting forth the details of the event or development requiring such notice and, if applicable, any action taken or proposed to be taken with respect thereto.

SECTION 5.03   Information Regarding Collateral. The Lead Borrower will furnish to the Administrative Agent prompt written notice of any change in: (a) any Loan Party's name; (b) the location of any Loan Party's chief executive office or its principal place of business; (c) any office in which a Canadian Loan Party maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility), to the extent that a filing would be required to perfect the Lien of the Canadian Agent in the Collateral at such location; (d) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (e) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings, publications and registrations, have been made (or shall be made promptly) under the Uniform Commercial Code, PPSA or other Applicable Law that are required in order for the Administrative Agent or the Canadian Agent, as applicable, to continue at all times following such

138

change to have a valid, legal and perfected first priority security interest (subject only to Permitted Encumbrances having priority by operation of Applicable Law, the Orders or pursuant to the Intercreditor Agreement) in all the Collateral for its own benefit and the benefit of the other Secured Parties.

SECTION 5.04    Existence; Conduct of Business. Subject to Bankruptcy Law, the terms of the applicable Orders and any required approval by the Bankruptcy Court or the Canadian Court, each Loan Party will do all things necessary to comply with its Charter Documents in all material respects, and to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises and Intellectual Property Rights material to the conduct of its business, except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect; provided, however, that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution or other transaction permitted hereby.

SECTION 5.05    Payment of Obligations. Subject to Bankruptcy Law, the terms of the applicable Orders and any required approval by the Bankruptcy Court or the Canadian Court, each Loan Party will pay its post-petition Tax liabilities before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, or (d) the failure to make payment would not reasonably be expected to result in a Material Adverse Effect. The provisions of this paragraph shall not limit or restrict the ability of the Collateral Agent to establish any Reserve for any unpaid Tax liabilities.

SECTION 5.06    Maintenance of Properties. Subject to Bankruptcy Law, the terms of the applicable Orders and any required approval by the Bankruptcy Court or the Canadian Court, each Loan Party will keep and maintain all property material to the conduct of its business in good working order and condition (ordinary wear and tear, casualty loss and condemnation excepted), except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect and except for Permitted Dispositions and other transactions permitted by Article VII.

SECTION 5.07    Insurance.

(a)    Subject to SECTION 5.15, each Loan Party shall: (i) maintain insurance with financially sound and reputable insurers (or, to the extent consistent with business practices in effect on the Effective Date, a program of self-insurance) on such of its property and in at least such amounts and against at least such risks as is consistent with business practices in effect on the Effective Date or as otherwise determined by the Responsible Officers of the Loan Parties acting reasonably in their business judgment, including public liability insurance against claims for personal injury or death occurring upon, in or about or in connection with the use of any properties owned, occupied or controlled by it (including the insurance required pursuant to the Security Documents); (ii) maintain such other insurance as may be required by Applicable Law; and (iii) furnish to the Administrative Agent, promptly following reasonable written request, full information as to the insurance carried.

139

(b)   Fire and extended coverage policies maintained with respect to any Collateral shall be endorsed or otherwise amended to include: (i) a lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Agents, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Administrative Agent or the Canadian Agent, as applicable; (ii) a provision to the effect that none of the Loan Parties, Credit Parties (in their capacity as such) or any other Affiliate of a Loan Party shall be a co-insurer (the foregoing not being deemed to limit the amount of self-insured retention or deductibles under such policies, which self-insured retention or deductibles shall be consistent with business practices in effect on the Effective Date or as otherwise determined by the Responsible Officers of the Loan Parties acting reasonably in their business judgment); and (iii) such other provisions as the Collateral Agent or the Canadian Agent may reasonably require from time to time to protect the interests of the Credit Parties. Commercial general liability policies shall be endorsed to name the Administrative Agent or the Canadian Agent, as applicable, as an additional insured. Business interruption policies shall name the Administrative Agent or the Canadian Agent, as applicable, as a loss payee and shall be endorsed or amended to include: (i) a provision that, during the continuance of a Cash Dominion Event, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Administrative Agent or the Canadian Agent, as applicable; (ii) a provision to the effect that none of the Loan Parties, Credit Parties (in their capacity as such) or any other Affiliate of a Loan Party shall be a co-insurer; and (iii) such other provisions to the endorsement as the Collateral Agent or the Canadian Agent may reasonably require from time to time to protect the interests of the Credit Parties. Each such casualty or liability policy referred to in this SECTION 5.07(b) shall also provide that it shall not be canceled, modified in any manner that would cause this SECTION 5.07 to be violated, or not renewed (i) by reason of nonpayment of premium, except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Administrative Agent or the Canadian Agent, as applicable (giving the Administrative Agent or the Canadian Agent, as applicable, the right to cure defaults in the payment of premiums), or (ii) for any other reason, except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Administrative Agent or the Canadian Agent, as applicable. The Lead Borrower shall deliver to the Administrative Agent, and the Canadian Borrower shall deliver to the Canadian Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent or the Canadian Agent, as applicable, including an insurance binder) together with evidence reasonably satisfactory to the Administrative Agent or the Canadian Agent, as applicable, of payment of the premium therefor.

(c)   If any portion of any Real Estate constituting Collateral and located in the United States of America is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area (each a "Special Flood Hazard Area") with respect to which flood insurance has been made available under the Flood Insurance Laws, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws

140

and (ii) deliver to the Collateral Agent evidence of such compliance in form and substance reasonably satisfactory and acceptable to the Administrative Agent, including a copy of the flood insurance policy and declaration page relating thereto.

SECTION 5.08   Books and Records; Inspection and Audit Rights; Appraisals; Accountants.

(a)   Each Loan Party will keep proper books of record and account in accordance with GAAP and in which full, true and correct entries are made of all material dealings and transactions in relation to its business and activities. Each Loan Party will permit any representatives designated by the Administrative Agent or the Collateral Agent, upon reasonable prior notice, to visit and inspect its properties, to discuss its affairs, finances and condition with its officers and independent accountants (so long as such Loan Party is afforded an opportunity to be present) and to examine and make extracts from its books and records, all at such reasonable times and as often as reasonably requested (other than such information that is subject to attorney-client privilege or could result in a breach of a confidentiality obligation or applicable law or otherwise constitutes attorney work product).

(b)   Each Loan Party will from time to time upon the request of the Administrative Agent or the Collateral Agent, permit the Administrative Agent or the Collateral Agent or professionals (including consultants, accountants, lawyers and appraisers) retained by the Collateral Agent, on reasonable prior notice and during normal business hours, to conduct appraisals and commercial finance examinations (other than such information that is subject to attorney-client privilege or could result in a breach of a confidentiality obligation or applicable law or otherwise constitutes attorney work product), including, without limitation, of (i) the Domestic Borrowers' and the Canadian Borrower's practices in the computation of the Domestic Borrowing Base, the Canadian Borrowing Base and Incremental Availability, and (ii) the assets included in the Domestic Borrowing Base, the Canadian Borrowing Base and Incremental Availability and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves. Subject to the following, the Loan Parties shall pay the reasonable out-of-pocket fees and expenses of the Administrative Agent, the Collateral Agent and such professionals with respect to such evaluations and appraisals:

(i)   The Collateral Agent (acting in consultation with the Administrative Agent) may conduct two (2) commercial finance examinations in each calendar year for each of the Domestic Loan Parties and Canadian Loan Parties, as applicable, each at the Loan Parties' expense. Notwithstanding anything to the contrary contained herein, the Collateral Agent (acting in consultation with the Administrative Agent) may cause to be taken (A) up to one (1) additional commercial finance examination for each of the Domestic Loan Parties and Canadian Loan Parties, as applicable, at any time in each calendar year at the expense of the Lenders, and (B) after the occurrence and during the continuance of any Event of Default, such additional commercial finance examinations for each of the Domestic Loan Parties and Canadian Loan Parties, as applicable, as the Collateral Agent, in its reasonable discretion, determine are necessary or appropriate (each, at the expense of the Loan Parties).

141

(ii)   The Collateral Agent (acting in consultation with the Administrative Agent) may undertake two (2) appraisals in each calendar year of (A) the Domestic Loan Parties' BRU Inventory, (B) the Domestic Loan Parties' TRU Inventory, (C) the Canadian Loan Parties' BRU Inventory, and (D) the Canadian Loan Parties' TRU Inventory, each at the Loan Parties' expense. Notwithstanding anything to the contrary contained herein, the Collateral Agent (acting in consultation with the Administrative Agent), may cause to be undertaken (x) up to one additional Inventory appraisal for each category of Inventory described in clauses (A) through (D) above, at any time in each calendar year at the expense of the Lenders, and (y) after the occurrence and during the continuance of any Event of Default, such additional Inventory appraisals as the Collateral Agent, in its reasonable discretion, determine are necessary or appropriate (each, at the expense of the Loan Parties).

(iii)   The Collateral Agent (acting in consultation with the Administrative Agent) may undertake up to two appraisal of other Collateral in each twelve calendar month period for each of the Domestic Loan Parties and Canadian Loan Parties, as applicable, each at the Loan Parties' expense. Notwithstanding anything to the contrary contained herein, the Collateral Agent (acting in consultation with the Administrative Agent), after the occurrence and during the continuance of any Event of Default, may cause such additional appraisals of other Collateral to be undertaken for each of the Domestic Loan Parties and Canadian Loan Parties, as applicable, as the Collateral Agent, in its reasonable discretion, determine are necessary or appropriate (each, at the expense of the Loan Parties).

(c)   The Loan Parties shall at all times retain independent certified public accountants of national standing and a financial advisor and shall instruct such accountants and advisor to cooperate with, and be available to, the Administrative Agent and the Collateral Agent or their representatives to discuss the annual audited statements, the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters (in the case of accountants within the scope of the retention of such accountants for such audited statements) as may be raised by the Administrative Agent or the Collateral Agent; provided that a representative of the Lead Borrower shall be given the opportunity to be present all such discussions.

SECTION 5.09   Physical Inventories. The Loan Parties, at their own expense, shall cause not less than two (2) physical inventories to be undertaken in each twelve (12) month period (or alternatively, periodic cycle counts) in conjunction with the preparation of their annual audited financial statements, conducted following such methodology as is consistent with the methodology used in the immediately preceding inventory (or cycle count) or as otherwise may be reasonably satisfactory to the Collateral Agent. Following the completion of such inventory, and in any event by the next date required for the delivery of a Borrowing Base Certificate hereunder, the Borrowers shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

SECTION 5.10   Compliance with Laws. Except as otherwise excused by Bankruptcy Law and the Orders, each Loan Party will comply with all Applicable Laws and the orders of any Governmental Authority except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its

142

Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

SECTION 5.11    Use of Proceeds and Letters of Credit. The proceeds of Loans made hereunder and Letters of Credit issued hereunder will be used only (i) on the Closing Date, to refinance (or, in the case of the Other Liabilities (as defined in the Prepetition ABL and FILO Credit Agreement), to cash collateralize or roll over, including cash collateralizing any letters of credit issued thereunder) in full the indebtedness outstanding as of the Petition Date under the Prepetition ABL and FILO Credit Facility and the Other Liabilities, (ii) on and after the Closing Date, to finance the working capital needs/general corporate purposes of the Lead Borrower and its subsidiaries following the commencement of the Cases and (iii) to pay the fees, costs and expenses incurred by the Lead Borrower and its Subsidiaries in connection with the transactions contemplated hereby and the Cases, in each case, consistent in all material respects with the DIP Budget delivered from time to time pursuant to this Agreement. No part of the proceeds of any Loan will be used by any Loan Party or any of its Subsidiaries, whether directly or indirectly, for any purpose that entails a violation of any regulation of the Board, including Regulations U and X.

SECTION 5.12    Additional Subsidiaries.

(a)    If any Domestic Loan Party shall form or acquire a Subsidiary after the Effective Date (other than an Excluded Subsidiary), the Lead Borrower will notify the Administrative Agent thereof and if such Subsidiary is not a Foreign Subsidiary, the Lead Borrower will cause such Subsidiary to become a Loan Party hereunder (pursuant to a customary joinder hereto (which shall not require the consent of any Lender)) and under each applicable Security Document in the manner provided therein within thirty (30) days after such Subsidiary is formed or acquired and promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Obligations and the Other Liabilities as the Administrative Agent or the Required Lenders shall request.

(b)    If the Canadian Borrower or any of its Subsidiaries shall form or acquire a Subsidiary (other than Excluded Subsidiary) after the Effective Date, the Canadian Borrower will notify the Administrative Agent thereof and (i) if such Subsidiary is organized under the laws of Canada or any province thereof, the Canadian Borrower will cause such Subsidiary to become a Canadian Loan Party hereunder (pursuant to a customary joinder hereto (which shall not require the consent of any Lender)) and under each applicable Canadian Security Document in the manner provided therein within 30 Business Days after such Subsidiary is formed or acquired and promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Canadian Liabilities as the Canadian Agent or the Required Lenders shall reasonably request and (ii) if any shares of Capital Stock or Indebtedness of such Subsidiary are owned by or on behalf of the Canadian Borrower or any of its Subsidiaries, the Canadian Borrower will cause such shares and promissory notes evidencing such Indebtedness to be pledged to secure the Canadian Liabilities within five (5) Business Days after such Subsidiary joined as a Loan Party.

SECTION 5.13    Further Assurances.

143

(a)    Each Loan Party will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any Applicable Law, or which any Agent, the Canadian Agent or the Required Lenders may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties (to the extent required under this Agreement). The Loan Parties also agree to provide to each Agent and the Canadian Agent, from time to time upon the reasonable request of the Administrative Agent, the Collateral Agent or the Canadian Agent, as applicable, evidence reasonably satisfactory to the Administrative Agent, Collateral Agent or Canadian Agent, as applicable, as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    Upon the request of the Collateral Agent or the Canadian Agent, as applicable, each Loan Party shall use commercially reasonable efforts to cause each of its customs brokers to deliver an agreement (including, without limitation, a Customs Broker Agreement) to the Administrative Agent or the Canadian Agent, as applicable, covering such matters and in such form as the Collateral Agent or the Canadian Agent, as applicable, may reasonably require commencing 60 days after the Closing Date. In the event Inventory is in the possession or control of a customs broker that has not delivered an agreement as required by the preceding sentence, such Inventory shall not be considered Eligible In-Transit Inventory or Eligible Letter of Credit Inventory hereunder.

SECTION 5.14    [Reserved]

SECTION 5.15    Post-Closing Obligations

The Lead Borrower shall deliver, or cause to be delivered, all documents and perform, or cause to be performed, all actions described on Schedule 5.15 (each in form and substance reasonably satisfactory to the Administrative Agent) within the time periods set forth therein (each of which may be extended by the Administrative Agent in its reasonable discretion).

SECTION 5.16    Ratings

The Lead Borrower shall use commercially reasonable efforts to obtain and maintain ratings (but not a specific rating) for each of the Facilities from each of S&P and Moody's.

SECTION 5.17    Certain Case Milestones

(a)    Not later than 5 days after the Petition Date, the Interim Order Entry Date and the Canadian Initial Order Entry Date shall occur.

(b)    Not later than 30 days after the date of the Canadian Initial Order, the Comeback Motion will be heard and resolved in accordance with SECTION 4.02(d).

144

(c)   Not later than 45 days after the Effective Date, the Final Order Entry Date shall occur.

SECTION 5.18   <u>Certain Other Bankruptcy Matters.</u>

(a)   The Lead Borrower and the Subsidiaries shall comply (i) in all material respects, after entry thereof, with all of the requirements and obligations set forth in the Orders and the Cash Management Order, as each such order is amended and in effect from time to time in accordance with this Agreement and (ii) in all material respects, after entry thereof, with the First and Second Day Orders, as such orders, if entered by the Bankruptcy Court, must comply with.

(b)   The Borrower shall provide at least five (5) Business Days' (or such shorter notice acceptable to the Administrative Agent in its sole discretion) prior written notice to the Administrative Agent and its advisors prior to any assumption or rejection of any Loan Party's or any other Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code of Section 32 of the CCAA.

SECTION 5.19   <u>Conference Calls.</u>

(a)   The Loan Parties and/or their advisors, as applicable (including appropriately senior members of management with respect to clause (b) below), shall host the following telephonic conference calls with the Administrative Agent and its advisors:

(b)   a weekly call (at a time to be mutually agreed) with the Administrative Agent and its advisors to discuss contemplated lease rejections and any going out of business sales, which will include a discussion of the cost benefit analysis with respect to any contemplated lease rejection dates and the maximization of value of inventory and any other assets with respect to any stores contemplated to be closed.

(c)   No less frequently than monthly, a call to discuss the Budget and Budget-related initiatives (including SG&A and Capital Expenditures) and discuss the contents of the budget variance report.

<div align="center">ARTICLE VI</div>

<div align="center"><u>Negative Covenants</u></div>

Until (i) the Commitments have expired or been terminated, (ii) the principal of and interest on each Loan and all fees and other Obligations (other than contingent indemnity obligations with respect to then unasserted claims and the Other Liabilities) shall have been paid in full, (iii) all Letters of Credit shall have expired or terminated (or been Cash Collateralized in a manner satisfactory to the applicable Issuing Banks) and (iv) all Letter of Credit Outstandings have been reduced to zero (or Cash Collateralized in a manner satisfactory to the Issuing Banks), each Loan Party covenants and agrees with the Credit Parties that (<u>provided</u> <u>that</u> the Canadian Borrower covenants only for itself and its Subsidiaries) that:

<div align="center">145</div>

SECTION 6.01    <u>Indebtedness and Other Obligations</u>. No Loan Party will create, incur, assume or permit to exist any Indebtedness, except Permitted Indebtedness.

SECTION 6.02    <u>Liens</u>. No Loan Party will create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except Permitted Encumbrances.

SECTION 6.03    <u>Fundamental Changes</u>.

(a)    No Loan Party will merge or amalgamate into or consolidate with any other Person, or permit any other Person to merge or amalgamate into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing or would arise therefrom: (i) any Subsidiary of the Lead Borrower may liquidate, dissolve, consolidate, amalgamate or merge into a Loan Party in a transaction in which a Loan Party is the surviving corporation if the security interest granted pursuant to the Orders and the Loan Documents shall not be impaired and shall remain in full force and effect; (ii) any Subsidiary of the Lead Borrower that is not a Loan Party may liquidate, dissolve, consolidate, amalgamate or merge into any Subsidiary of the Lead Borrower that is not a Loan Party; (iii) any Loan Party may amalgamate or merge with or into any other Loan Party if the security interest granted pursuant to the Orders and the Loan Documents shall not be impaired and shall remain in full force and effect, <u>provided</u> that no Domestic Loan Party shall merge or amalgamate with a Canadian Loan Party, if after giving effect thereto, a breach of SECTION 6.10 would exist; and (iv) Permitted Acquisitions and transactions permitted pursuant to SECTION 6.05 may be consummated in the form of a merger, amalgamation, or consolidation, as long as, in the event of a Permitted Acquisition, a Loan Party is the surviving Person if the security interest granted pursuant to the Orders and the Loan Documents shall not be impaired and shall remain in full force and effect, <u>provided</u> that any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger or amalgamation shall not be permitted unless also permitted by SECTION 6.04.

(b)    No Loan Party will engage, to any material extent, in any business other than businesses of the type conducted by such Loan Party on the date of execution of this Agreement and businesses reasonably related thereto and those complementary or ancillary thereto.

SECTION 6.04    <u>Investments, Loans, Advances, Guarantees and Acquisitions</u>. No Loan Party will make or permit to exist any Investment, except Permitted Investments.

SECTION 6.05    <u>Asset Sales</u>. No Loan Party nor any Subsidiary of the Lead Borrower will sell, transfer, lease (as lessor) or otherwise voluntarily dispose of any asset, including any Capital Stock of another Person, (including by way of a sale-leaseback, except to the extent otherwise permitted hereunder) except sales of Inventory and the use of cash in the ordinary course of business, transactions permitted by SECTIONS 6.03 and 6.04 and Permitted Dispositions.

SECTION 6.06    <u>Restricted Payments; Certain Payments of Indebtedness</u>.

146

(a)   No Loan Party will declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except that:

(i)   any Subsidiary of the Lead Borrower may declare and pay Restricted Payments to its direct equity holders.

(ii)   the Loan Parties may make Restricted Payments to the Parent solely for the purpose of paying operating expenses incurred in the ordinary course of business by the Parent;

(iii)   to the extent constituting a Restricted Payment, Permitted Dispositions and Permitted Investments; and

(iv)   the Loan Parties may make Restricted Payments to the Parent:

(A) the proceeds of which shall be used by the Parent to pay franchise Taxes and other fees, Taxes and expenses required to maintain its (or any of its direct or indirect parents') corporate existence; and

(B) the proceeds of which shall be used by the Parent to pay the Tax liability for any consolidated, combined or similar foreign, federal, state or local income or similar tax group that includes the Loan Parties and/or their Subsidiaries that is attributable to the taxable income, revenue, receipts, gross receipts, gross profits, capital or margin of the Loan Parties and/or their applicable Subsidiaries; provided that such Tax liability shall not exceed the amount that the Loan Parties and/or their applicable Subsidiaries would have been required to pay in respect of the relevant foreign, federal, state or local income or similar Taxes for such fiscal year had the Loan Parties and their Subsidiaries paid such Taxes separately from any such parent as a standalone consolidated, combined, or similar foreign, federal state or local income or similar tax group.

(b)   No Loan Party nor any Subsidiary will make or agree to pay or make any voluntary or optional prepayment or other similar distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness incurred after the Petition Date (other than Indebtedness under the Loan Documents), or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness incurred after the Petition Date (other than Indebtedness under the Loan Documents), except:

(i)   Payments in Capital Stock (as long as no Change in Control would result therefrom) or payments of interest in-kind;

147

(ii)   prepayments in connection with a refinancing of Permitted Indebtedness permitted hereunder;

(iii)   prepayments on account of Permitted Indebtedness due to any of the Loan Parties;

(iv)   prepayments as expressly provided for in the DIP Budget, the "first day" orders or the Orders entered by the Bankruptcy Court or the Canadian Court that are reasonably acceptable to the Administrative Agent;

(v)   prepayments in respect of Permitted Indebtedness described in clause (h) of the definition thereof with the proceeds of the disposition of assets other than any such assets constituting ABL Collateral (as defined in the Intercreditor Agreement) and any assets of the Canadian Borrower and the other Canadian Loan Parties; and

(vi)   other prepayments in an aggregate amount not to exceed $25,000,000.

SECTION 6.07   <u>Transactions with Affiliates</u>. No Loan Party nor any Subsidiary of the Lead Borrower will sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(a)   transactions that are at prices and on terms and conditions, taken as a whole, not less favorable to such Loan Party than could be obtained on an arm's-length basis from unrelated third parties;

(b)   transactions between or among the Loan Parties;

(c)   [reserved];

(d)   as set forth on <u>Schedule 6.07</u> as such agreements and arrangements are amended, modified or supplemented in a manner not materially adverse to the Lenders;

(e)   payment of reasonable compensation to officers and employees for services actually rendered to any Loan Party or any Subsidiary of the Lead Borrower;

(f)   payment of director's fees, expenses and indemnities;

(g)   stock option and compensation plans of the Loan Parties and the Subsidiaries of the Lead Borrower;

(h)   employment contracts with officers and management of the Loan Parties and the Subsidiaries of the Lead Borrower;

(i)   the repurchase of equity interests from officers, directors and employees to the extent specifically permitted under this Agreement;

(j)   advances and loans to officers and employees of the Loan Parties and the Subsidiaries of the Lead Borrower to the extent specifically permitted under this Agreement;

148

(k)  Investments consisting of notes from officers, directors and employees to purchase equity interests to the extent specifically permitted under this Agreement;

(l)  the payment and performance under any Master Lease to which the Lead Borrower is a party; and

(m)  the making of Restricted Payments permitted under this Agreement.

SECTION 6.08  <u>Restrictive Agreements</u>. No Loan Party will incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon: (a) the ability of such Loan Party to create, incur or permit to exist any Lien upon any of its property or assets in favor of the Administrative Agent or the Canadian Agent, as applicable; or (b) the ability of any Subsidiary thereof to pay dividends or other distributions with respect to any shares of its Capital Stock to such Loan Party or to make or repay loans or advances to a Loan Party or to guarantee Indebtedness of the Loan Parties; <u>provided that</u> (i) the foregoing shall not apply to restrictions and conditions imposed by Applicable Law, by any Loan Document, or under any documents relating to joint ventures of any Loan Party to the extent that such joint ventures are not prohibited hereunder, (ii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of assets or equity permitted hereunder by a Loan Party or a Subsidiary pending such sale, provided such restrictions and conditions apply only to the assets of the Loan Party or Subsidiary that are to be sold and such sale is permitted hereunder, (iii) the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iv) clause (a) of the foregoing shall not apply to customary provisions in contracts or leases restricting the assignment, (v) the foregoing will not apply to restrictions which the Borrower has reasonably determined in good faith will not materially impair the Borrower's ability to make payments under this Agreement when due, (vi) the foregoing shall not apply to any agreement relating to the Existing Debt or to the Indebtedness under the DIP Term Loan Facility, and (vi) the foregoing shall not apply to any restrictions in existence prior to the time any such Person became a Subsidiary and not created in contemplation of any such acquisition.

SECTION 6.09  <u>Amendment of Material Documents</u>. No Loan Party will (x) amend, modify or waive any of its rights under (a) its Charter Documents, (b) any Master Lease, (c) the nature of the obligations under any guaranty of recourse obligations or any environmental indemnity agreement executed and delivered in connection with any Propco Facility or (d) any Material Indebtedness, in each case if such amendment, modification or waiver could reasonably be expected to have an adverse effect on the Lenders (taken as a whole) or (y) amend, modify or waive any provision of the DIP Term Loan Facility if such amendment, modification or waiver would violate the provisions of the Intercreditor Agreement or would have the effect of (i) shortening the scheduled maturity date applicable to the loans thereunder, (ii) increasing the interest rate or yield applicable to, or fees payable in connection with (or adding new fees in connection with), the loans thereunder (other than any such increase in an amount not to exceed 3.50% per annum in connection with an amendment, waiver or consent in respect thereof; provided that to the extent such increase is in an amount in excess of 1.00% per annum, the Term Applicable Margin shall be increased by an amount equal to such excess over 1.00% per annum), (iv) imposing additional mandatory prepayments of, or any amortization (other than any nominal amortization) with respect to, the loans thereunder or

149

(v) providing additional collateral with respect to the loans or other obligations thereunder except as permitted by the Intercreditor Agreement.

SECTION 6.10    <u>Excess Availability</u>. The Loan Parties shall maintain (x) Excess Availability at all times of not less than $125,000,000 and (y) Domestic Availability at all times of not less than $90,000,000.

SECTION 6.11    <u>Fiscal Year</u>. No Loan Party will change its Fiscal Year except as reasonably acceptable to the Agents.

SECTION 6.12    <u>Designated Account</u>. After the occurrence and during the continuance of a Cash Dominion Event, the Loan Parties shall not use utilize the funds on deposit in the Designated Account for any purposes other than (a) the payment of operating expenses incurred by the Lead Borrower and its Subsidiaries in the ordinary course of business (including payments of interest when due on account of the DIP Term Loan Facility, and any expenses incurred by the Parent attributable to the Loan Parties, such as taxes and Inventory acquisition costs), and (b) for such other purposes as the Loan Parties and the Administrative Agent deem appropriate.

SECTION 6.13    <u>Canadian Defined Benefit Pension Plan</u>. No Loan Party shall, without the consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed), maintain, administer, contribute or have any liability in respect of any Canadian Defined Benefit Pension Plan or acquire an interest in any Person if such Person sponsors, maintains, administers or contributes to, or has any liability in respect of any Canadian Defined Benefit Pension Plan, except that a Loan Party may acquire an interest in such Person if (i) the Loan Party does not incur any liability in respect of the Canadian Defined Benefit Pension Plan of such Person and (ii) such Person is not required to become a Loan Party hereunder.

SECTION 6.14    <u>Sanctions and Anti-Corruption Laws</u>

The Borrowers will not request any Borrowing or Letter of Credit, and the Borrowers shall not use, and shall procure that their Subsidiaries and their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, business or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or in a European member state, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

SECTION 6.15    <u>Maximum Cumulative Net Cash Flow Before DIP ABL Draw/Paydown</u>

The Lead Borrower shall not permit the Cumulative Net Cash Flow Before DIP ABL Draw/Paydown as of any Test Date to exceed (x) beginning on the first Test Date until the Test Date with respect to the September 2018 fiscal month, $150,000,000 and (y) thereafter, $200,000,000.

150

SECTION 6.16   Additional Bankruptcy Matters

No Loan Party shall, without the prior written consent of the Administrative Agent and the Majority Arrangers, do any of the following:

(a)   assert or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against any of the Agents, Lenders or Issuing Banks; or

(b)   subject to the terms of the Orders and subject to Section 7.01, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Agents or the Lenders with respect to the Collateral during the continuation of an Event of Default, including without limitation a motion or petition by any Agent or Lender to lift an applicable stay of proceedings to do the foregoing (provided that any Loan Party may contest or dispute whether an Event of Default has occurred); or

(c)   except as expressly provided or permitted hereunder (including, without limitation, to the extent pursuant to any First and Second Day Order, complying with the terms of this Agreement or expressly included in the DIP Budget) or, with the prior consent of the Administrative Agent, make any payment or distribution to any non-Debtor Affiliate or insider of the Company outside of the ordinary course of business.

SECTION 6.17   Compliance

Notwithstanding the foregoing, for purposes of determining compliance with Article VI (and, in each case, other definitions used therein) with respect to the amount of any Indebtedness, Lien, disposition, Investment, Restricted Payment or other applicable transaction in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Lien is incurred or such disposition Investment, Restricted Payment or other applicable transaction is made (so long as such Indebtedness, Lien, disposition, Investment, Restricted Payment or other applicable transaction at the time incurred or made (or declared or notified, as applicable) was permitted hereunder).

ARTICLE VII

Events of Default

SECTION 7.01   Events of Default. If any of the following events ("Events of Default") shall occur:

(a)   Any Loan Party shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any Letter of Credit Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

151

(b)   Any Loan Party shall fail to pay any interest on any Loan or any fee or any other amount (including, for avoidance of doubt, any amount referred to in SECTION 2.19(a) but excluding any amount referred to in SECTION 7.01(a) or any amount payable for Cash Management Services or Other Liabilities) payable under this Agreement or any other Loan Document and such failure continues for five (5) Business Days;

(c)   Any representation or warranty made or deemed made by or on behalf of any Loan Party in, or in connection with, any Loan Document or any amendment or modification thereof or waiver thereunder (including, without limitation, in any Borrowing Base Certificate or any certificate of a Financial Officer accompanying any financial statement) shall prove to have been incorrect in any material respect when made or deemed made;

(d)   Any Loan Party shall fail to observe or perform when due any covenant, condition or agreement contained (i) in ARTICLE VI, SECTIONS 5.14, 5.17, 5.18 or (ii) SECTION 5.01(f), (l) or (m) (in each of the foregoing cases, after a three Business Day grace period), or (iii) in any of SECTION 2.18, 2.19(a), SECTION 5.02(a), SECTION 5.07, SECTION 5.08(b), or SECTION 5.11 (provided that, if (A) any such Default described in this clause (iii) is of a type that can be cured within five Business Days and (B) such Default could not materially adversely impact the Lenders' Liens on the Collateral, such default shall not constitute an Event of Default for five Business Days after the occurrence of such Default so long as the Loan Parties are diligently pursuing the cure of such Default);

(e)   Any Loan Party shall fail to observe or perform when due any covenant, condition or agreement contained in any Loan Document (other than those specified in SECTION 7.01(a), SECTION 7.01(b), SECTION 7.01(c), or SECTION 7.01(d)), and such failure shall continue unremedied for a period of thirty (30) days after notice thereof from the Administrative Agent to the Lead Borrower;

(f)   Any Loan Party or other obligor shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness or Specified Indebtedness when and as the same shall become due and payable (after giving effect to the expiration of any grace or cure period set forth therein) or any event or condition occurs that results in any Material Indebtedness or Specified Indebtedness becoming due prior to its scheduled maturity or (other than in respect of the Taj DIP Facility) that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any such Material Indebtedness or Specified Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness or Specified Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, which default, event or condition is not being contested in good faith; provided that this paragraph (f) shall not apply to (A) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement), (B) Indebtedness which is convertible into Equity Interests and converts to Equity Interests in accordance with its terms or (C) any breach or default that is (x) remedied by the Loan

152

Party or the applicable Subsidiary or (y) waived (including in the form of amendment) by the required holders of the applicable Indebtedness, in each case prior to the acceleration of all the Loans pursuant to this SECTION 7.01;

(g)   a Change in Control shall occur;

(h)   [reserved];

(i)   [reserved];

(j)   Except as permitted under SECTION 6.05, the determination of the Loan Parties, whether by vote of the Loan Parties' board of directors or otherwise to: suspend the operation of the Loan Parties' business in the ordinary course, liquidate all or substantially all of the Loan Parties' assets or Store locations, or employ an agent or other third party to conduct any so-called store closing, store liquidation or "Going-Out-Of-Business" sales for all or substantially all of the Loan Parties' Stores;

(k)   One or more final judgments for the payment of money (which, in the case of the Debtors only, arose following the Petition Date) in an aggregate amount in excess of $25,000,000 (or such lesser amount as would reasonably be expected to result in a Material Adverse Effect), in excess of insurance coverage (or indemnities from indemnitors reasonably satisfactory to the Agents), shall be rendered against any Loan Party or any combination of Loan Parties and the same shall remain undischarged for a period of forty-five (45) days during which execution shall not be effectively stayed, satisfied or bonded or any action shall be legally taken by a judgment creditor to attach or levy upon any material assets of any Loan Party to enforce any such judgment;

(l)   An ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect and the same shall remain undischarged for a period of thirty (30) consecutive days during which period any action shall not be legally taken to attach or levy upon any material assets of any Loan Party to enforce any such liability;

(m)   Any challenge by or on behalf of any Loan Party to the validity of any Loan Document or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto;

(n)   Any challenge by or on behalf of any other Person to the validity of any Loan Document or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto, in each case, as to which an order or judgment has been entered materially adverse to the Agents and the Lenders;

153

(o)   Any Lien purported to be created under any Security Document or any Order in Collateral and the proceeds thereof shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any such Collateral, with the priority required by the applicable Security Document or Order except as a result of the sale, release or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or the failure of the Agents or the Canadian Agent, through their acts or omissions and through no fault of the Loan Parties, to maintain the perfection of their Liens in accordance with Applicable Law;

(p)   The indictment of any Loan Party, under any Applicable Law where the crime alleged would constitute a felony under Applicable Law and such indictment remains unquashed or such legal process remains undismissed for a period of 90 days or more, unless the Administrative Agent, in its reasonable discretion, determines that the indictment is not material;

(q)   the imposition of any stay or other order, the effect of which restrains the conduct by the Loan Parties, taken as a whole, of their business in the ordinary course in a manner that has resulted in, or could reasonably be expected to have, a Material Adverse Effect;

(r)

(i)   the entry of an order dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code or a proceeding under BIA, or any filing by the Lead Borrower of a motion or other pleading seeking entry of such an order;

(ii)   a trustee, responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) the BIA or any provincial statute relating to the appointment of a receiver, or any similar person (but excluding for the avoidance of doubt, the Monitor) is appointed or elected in the any of the Cases, any Loan Party applies for, consents to, or fails to contest in, any such appointment, or the Bankruptcy Court or the Canadian Court shall have entered an order providing for such appointment, in each case without the written consent of the Required Lenders;

(iii)   the entry of an order or the filing by any Loan Party of an application, motion or other pleading seeking entry of an order staying, reversing, vacating or otherwise modifying the Interim Order, the Canadian Initial Order or the Final Order, in each case in a manner adverse in any material respect (to be determined without duplication of any other "materiality" qualifier herein) to the Administrative Agent or the Lenders without the consent of the Administrative Agent and the Majority Arrangers;

(iv)   (x) the entry of an order in any of the Cases denying or terminating use of cash collateral by the Loan Parties or (y) the termination of any Loan Party's right to use any cash collateral under the Interim Order, the Canadian Initial Order or the Final Order, and in either case the Debtors have not otherwise obtained authorization to use cash

154

collateral with the prior written consent of the Administrative Agent and the Required Lenders;

(v)   the entry of an order in any of the Cases granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Loan Parties having a value in excess of $5,000,000;

(vi)   the entry of a final non-appealable order in the Cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the commencement of any other actions by the Loan Parties (or any direct or indirect parent thereof), that challenges the rights and remedies of the Administrative Agent or the Lenders under the Facility in any of the Cases or that is inconsistent with the Loan Documents;

(vii)   the entry of an order in any of the Cases seeking authority to use cash collateral (other than with the prior written consent of the Administrative Agent) or to obtain financing under Section 364 of the Bankruptcy Code or Section 11.2 of the CCAA (other than the Facility, the DIP Term Loan Facility, the Secured Wayne Loans facility, or the Secured Intercompany Advances or any facility which would repay in full in cash the Facilities upon effectiveness thereof);

(viii)   without the written consent of the Administrative Agent and the Required Lenders, the entry of an order in any of the Cases granting adequate protection to any other Person (which, for the avoidance of doubt, shall not apply to any payments made pursuant to any Order or any First and Second Day Orders reasonably acceptable to the Administrative Agent);

(ix)   the filing or support of any pleading by any Loan Party (or any direct or indirect parent thereof) or any Subsidiary thereof seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (viii) above;

(s)   termination or expiration of any exclusivity period for any Loan Party to file or solicit acceptances for a Plan of Reorganization;

(t)   the amount of the Canadian Priority Charges shall at any time exceed the aggregate maximum set forth in the respective definitions for each in SECTION 1.01 hereof;

(u)   the making of any Prepetition Payments other than (i) as permitted by the Interim Order, the Canadian Initial Order or the Final Order, (ii) as permitted by (x) any First and Second Day Orders reasonably satisfactory to the Administrative Agent and (y) if such payments are in excess of $5,000,000, the Required Lenders, (iii) consistent with the DIP Budget or (iv) as permitted by any other order of the Bankruptcy Court or the Canadian Court in amounts reasonably satisfactory to the Administrative Agent;

(v)   the entry of the Final Order shall not have occurred within 45 days after the Effective Date;

155

(w)   an order of the Bankruptcy Court or the Canadian Court granting, other than in respect of the Facilities, the DIP Term Loan Facility, the Canadian Priority Charges, the Secured Wayne Loans facility, the Secured Intercompany Advances and the Carve-Out or as otherwise permitted under the Loan Documents, any claim entitled to superpriority administrative expense claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code or any charge pursuant to the CCAA, which is pari passu with or senior to the claims of the Administrative Agent and the Lenders or the Canadian DIP Charge, or the filing by the Lead Borrower or any of its Subsidiaries or the Parent of a motion or application seeking entry of such an order;

(x)   other than with respect to the Carve-Out, the Canadian Priority Charges, the DIP Term Loan Facility, the Secured Wayne Loans facility, Secured Intercompany Advances and the Liens permitted to have such priority under the Loan Documents and the Orders, any Loan Party shall create or incur, or the Bankruptcy Court or the Canadian Court enters an order granting, any Lien which is pari passu with or senior to any Liens under the Loan Documents;

(y)   material noncompliance by any Loan Party or any of its Subsidiaries with the terms of the Interim Order, the Canadian Initial Order or the Final Order;

(z)   the Loan Parties or any of their Subsidiaries (or any direct or indirect parent of any Loan Party), or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Lenders regarding this Agreement or the other Loan Documents, unless such suit or other proceeding is in connection with the enforcement of the Loan Documents against the Administrative Agent or Lenders;

(aa)   a Plan of Reorganization shall be confirmed in any of the Cases, or any order shall be entered which dismisses any of the Cases, in each case, which does not provide for termination of the Commitments under the Facility and indefeasible payment in full in cash of the Obligations under the Loan Documents, or any of the Loan Parties or any of their subsidiaries (other than contingent obligations not due and owing), shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

(bb)   any Loan Party (or any direct or indirect parent thereof) shall file any motion seeking authority to consummate the sale of assets of any Loan Party (other than any such sale that is permitted under the Loan Documents) pursuant to Section 363 of the Bankruptcy Code or under the CCAA having a value in excess of $5,000,000, without the prior written consent of the Administrative Agent; or

(cc)   any Loan Party shall make, permit to be made or seek any change, amendment or modification, to the Canadian Initial Order or any other order of the Canadian Court with respect to the Canadian Case in a manner that is adverse to the interest of the Lenders without the consent of the Required Lenders,

156

then, and in every such event, and at any time thereafter during the continuance of such event and subject to the terms of the Orders ,the Administrative Agent, at the request of the Required Lenders, shall, by notice to the Lead Borrower, take any or all of the following actions, at the same or different times, and solely to the extent required in the Canadian Case, with the leave of the Canadian Court: (i) terminate the Commitments, and thereupon the Commitments shall irrevocably terminate immediately; (ii) declare the Obligations owing by such Borrowers then outstanding to be due and payable in whole, and thereupon the principal of the Loans and all other Obligations so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Loan Parties accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties; (iii) require the applicable Loan Parties to Cash Collateralize its respective Letter of Credit Outstandings to be held and applied in accordance with SECTION 7.03; and/or (iv) exercise all other rights and remedies provided for in the Security Documents and the Orders and under applicable law; provided that with respect to any enforcement of remedies with respect to the Collateral, the Administrative Agent shall provide the Lead Borrower and the Canadian Borrower at least 5 Business Days' notice prior to the taking of such action; provided that during such period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court and/or the Canadian Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.

Without limiting the foregoing subject to the terms of the Orders, in every such event, and at any time thereafter during the continuance of such event, the Canadian Agent, at the request of the Required Lenders, shall, by notice to the Canadian Borrower, take either or both of the following actions, at the same or different times, and solely to the extent required in the Canadian Case, with the leave of the Canadian Court: (i) terminate the Canadian Commitments, and thereupon the Canadian Commitments shall terminate immediately, and (ii) declare the Canadian Liabilities then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Canadian Liabilities so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Canadian Loan Parties accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers; and (iii) require the Canadian Borrower to Cash Collateralize the Letter of Credit Outstandings of the Canadian Borrower; provided that with respect to the enforcement of any remedies with respect to the Collateral, the Canadian Agent shall provide the Lead Borrower and the Canadian Borrower at least 5 Business Days' notice prior to the taking of such action; provided that during such period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court and/or the Canadian Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.

SECTION 7.02   Remedies on Default or Master Lease Liquidation Event.

(a)   In case any one or more of the Events of Default shall have occurred and be continuing, and whether or not the maturity of the Obligations shall have been accelerated pursuant hereto but subject in all respects to the Orders, the Administrative Agent and the Collateral Agent shall at the direction of the Required Lenders proceed to protect and enforce their rights and remedies under this Agreement or any of the other Loan Documents or the

157

Orders by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or the Orders or any instrument pursuant to which the Obligations and Other Liabilities are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Secured Parties, and solely to the extent required in the Canadian Case, with the leave of the Canadian Court. No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law and the Administrative Agent and the Collateral Agent may, subject to leave of the Canadian Court solely to the extent required in the Canadian Case, proceed to protect and enforce their rights and remedies under this Agreement or any of the other Canadian Security Documents by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Canadian Liabilities are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Canadian Agent or the Canadian Lenders to whom any Canadian Liabilities are owing.

(b)   In case any one or more of Master Lease Liquidation Events shall have occurred and be continuing, and whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, the Administrative Agent and the Collateral Agent may (and, at the direction of the Required Lenders, shall) proceed to Liquidate the Collateral at any location which is the subject of such Master Lease Liquidation Event and solely to the extent required in the Canadian Case, with the leave of the Canadian Court. Whether or not a Cash Dominion Event then exists, the proceeds of any such Liquidation shall be applied to the Obligations, the Other Liabilities or Canadian Liabilities, as applicable, in accordance with the provisions of SECTION 7.03 hereof, but the occurrence of any such Master Lease Liquidation Event, in and of itself, shall not constitute a Default or Event of Default hereunder or result in the acceleration of the Obligations or the termination of the Commitments.

SECTION 7.03   Application of Proceeds

(a)   After the occurrence and during the continuance of (i) any Cash Dominion Event or (ii) any Event of Default and acceleration of the Obligations, except as provided in SECTION 7.03(b), all proceeds realized from any Domestic Loan Party or on account of any Collateral owned by a Domestic Loan Party or any payments in respect of any Obligations or Other Liabilities and all proceeds of the Collateral of the Domestic Loan Parties, shall be applied in the following order:

(i)   FIRST, ratably to pay the Obligations in respect of any Credit Party Expenses, indemnities and other amounts then due to the Agents until paid in full;

158

(ii)    SECOND, ratably to pay any Credit Party Expenses and indemnities, and to pay any fees then due to the Domestic Lenders (other than fees to the Term Lenders), until paid in full;

(iii)    THIRD, ratably to pay interest accrued in respect of the Obligations (other than the Canadian Liabilities and the Term Loans) until paid in full;

(iv)    FOURTH, to pay principal due in respect of the Swingline Loans to the Domestic Borrowers until paid in full;

(v)    FIFTH, ratably to pay principal due in respect of the Revolving Credit Loans to the Domestic Borrowers (other than Term Loans) until paid in full;

(vi)    SIXTH, to the Administrative Agent, to be held by the Administrative Agent, for the ratable benefit of the Issuing Banks and the Domestic Lenders to Cash Collateralize the then extant Stated Amount of Domestic Letters of Credit until paid in full;

(vii)    SEVENTH, to pay outstanding Obligations with respect to Designated Cash Management Services furnished to any Domestic Loan Party in an amount not in excess of the Designated Cash Management Services Obligations Amount;

(viii)    EIGHTH, ratably to pay any fees then due to the Domestic Term Lenders on account of their Domestic Term Loans, until paid in full:

(ix)    NINTH, ratably, to Domestic Term Lenders to pay interest accrued on account of their Domestic Term Loans, until paid in full;

(x)    TENTH, ratably, to Domestic Term Lenders to pay principal on account of their Domestic Term Loans, until paid in full;

(xi)    ELEVENTH, subject to the provisions of SECTION 7.03(c), to the Canadian Agent to be held by the Canadian Agent, for the ratable benefit of the Canadian Lenders as cash collateral to pay Credit Party Expenses, indemnities and other similar amounts then due in connection with Credit Extensions to the Canadian Borrower;

(xii)    TWELFTH, subject to the provisions of SECTION 7.03(c), to the Canadian Agent to be held by the Canadian Agent, for the ratable benefit of the Canadian Lenders as cash collateral to pay interest, indemnities, and fees (other than fees to the Canadian Term Lenders) due and payable on the Credit Extensions to the Canadian Borrower;

(xiii)    THIRTEENTH, subject to the provisions of SECTION 7.03(c), to the Canadian Agent to be held by the Canadian Agent, for the ratable benefit of the Canadian Lenders as cash collateral to pay outstanding Swingline Loans of the Canadian Borrower;

(xiv)    FOURTEENTH, subject to the provisions of SECTION 7.03(c), to the Canadian Agent to be held by the Canadian Agent, for the ratable benefit of the Canadian

159

Lenders as cash collateral to pay principal outstanding under other outstanding Revolving Credit Loans to the Canadian Borrower;

(xv)  FIFTEENTH, subject to the provisions of SECTION 7.03(c), to the Canadian Agent, to be held by the Canadian Agent, for the ratable benefit of the Issuing Banks and the Canadian Lenders, to Cash Collateralize the then extant Stated Amount of Canadian Letters of Credit until paid in full;

(xvi)  SIXTEENTH, subject to the provisions of SECTION 7.03(c), ratably to pay any fees then due to Canadian Term Lenders on account of their Canadian Term Loans, until paid in full;

(xvii)  SEVENTEENTH, subject, to the provisions of SECTION 7.03(c), ratably, to Canadian Term Lenders to pay interest accrued on account of their Canadian Term Loans, until paid in full;

(xviii)  EIGHTEENTH, subject, to the provisions of SECTION 7.03(c), ratably, to Canadian Term Lenders to pay principal on account of their Canadian Term Loans, until paid in full;

(xix)  NINETEENTH, to pay outstanding Obligations with respect to Cash Management Services furnished to any Loan Party to the extent not paid pursuant to clause SEVENTH above;

(xx)  TWENTIETH, ratably to pay any other outstanding Obligations and Other Liabilities (including Bank Products) of the Domestic Borrowers;

(xxi)  TWENTY-FIRST, to pay all other outstanding Canadian Liabilities; and

(xxii)  TWENTY-SECOND, to the Lead Borrower or such other Person entitled thereto under Applicable Law.

(b)  After the occurrence and during the continuance of (i) any Cash Dominion Event, or (ii) any Event of Default and acceleration of the Canadian Liabilities, all payments in respect of any Canadian Liabilities or Other Liabilities of the Canadian Loan Parties and all proceeds of the Collateral of the Canadian Borrower and the other Canadian Loan Parties, shall be applied in the following order:

(i)  FIRST, ratably to pay the Obligations in respect of any Credit Party Expenses, indemnities and other amounts then due to the Canadian Agent until paid in full;

(ii)  SECOND, ratably to pay any Credit Party Expenses, indemnities and fees (other than fees to the Canadian Term Lenders) then due to the Canadian Lenders until paid in full;

(iii)  THIRD, ratably to pay interest accrued in respect of the Canadian Liabilities (other than Canadian Term Loans) until paid in full;

160

(iv)   FOURTH, to pay principal due in respect of the Swingline Loans to the Canadian Borrower until paid in full;

(v)   FIFTH, ratably to pay principal due in respect of the Revolving Credit Loans to the Canadian Borrower (other than Canadian Term Loans) until paid in full;

(vi)   SIXTH, to the Canadian Agent, to be held by the Canadian Agent, for the ratable benefit of the Issuing Banks and the Canadian Lenders, to Cash Collateralize the then extant Stated Amount of Canadian Letters of Credit until paid in full;

(vii)   SEVENTH, ratably to pay any fees then due to Canadian Term Lenders on account of their Canadian Term Loans, until paid in full;

(viii)   EIGHTH, ratably, to Canadian Term Lenders to pay interest accrued on account of their Canadian Term Loans, until paid in full;

(ix)   NINTH, ratably, to Canadian Term Lenders to pay principal on account of their Canadian Term Loans, until paid in full;

(x)   TENTH, to pay outstanding Canadian Liabilities with respect to Cash Management Services furnished to the Canadian Borrower and its Subsidiaries;

(xi)   ELEVENTH, ratably to pay any other Canadian Liabilities and Other Liabilities (including Bank Products) of the Canadian Borrower; and

(xii)   TWELFTH, to the Canadian Borrower or such other Person entitled thereto under Applicable Law.

(c)   Any amounts received by the Canadian Agent pursuant to clauses TENTH through and including SEVENTEENTH of SECTION 7.03(a) shall be held as cash collateral for the applicable Canadian Liabilities until the earlier of (i) the Substantial Liquidation of the Collateral granted by the Canadian Borrower and its Subsidiaries to secure the Canadian Liabilities, or (ii) such date that the Agents shall otherwise determine.

(d)   Excluded Swap Obligations with respect to any Facility Guarantor shall not be paid with amounts received from such Facility Guarantor, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to the Obligations otherwise set forth above in this Section.

## ARTICLE VIII

## The Agents

SECTION 8.01   Appointment and Administration by Administrative Agent. Each Lender and each Issuing Bank hereby irrevocably designates JPMorgan as Administrative Agent under this Agreement and the other Loan Documents and the Orders. The general administration of the Loan Documents shall be by the Administrative Agent. The Lenders and each Issuing Bank

161

each hereby (a) irrevocably authorizes the Administrative Agent (i) to enter into the Loan Documents to which it is a party, and (ii) at its discretion, to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto, and (b) agrees and consents to all of the provisions of the Security Documents. All Collateral shall be held or administered by the Administrative Agent (or its duly-appointed agent) for its own benefit and for the ratable benefit of the other Secured Parties. Any proceeds received by the Administrative Agent from the foreclosure, sale, lease or other disposition of any of the Collateral and any other proceeds received pursuant to the terms of the Security Documents or the other Loan Documents shall be paid over to the Administrative Agent for application as provided in this Agreement and the other Loan Documents. The Administrative Agent shall have no duties or responsibilities except as set forth in this Agreement and the other Loan Documents, nor shall it have any fiduciary relationship with any other Credit Party, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Administrative Agent.

SECTION 8.02    Appointment of Collateral Agent. Each Lender and each Issuing Bank hereby irrevocably designates JPMorgan (or any Affiliates thereof succeeding to such position) as Collateral Agent under this Agreement and the other Loan Documents. The Lenders and each Issuing Bank each hereby irrevocably authorizes the Collateral Agent (a) to enter into the Loan Documents to which they are parties, and (b) at their discretion, to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto. The Collateral Agent shall have no duties or responsibilities except as set forth in this Agreement and the other Loan Documents, nor shall they have any fiduciary relationship with any other Secured Party, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Collateral Agent.

SECTION 8.03    Appointment of Canadian Agent.

(a)    Each Lender, the Issuing Banks and each Secured Party that is owed any Canadian Liabilities hereby irrevocably designates JPMorgan Chase Bank, N.A., Toronto Branch as the Canadian Agent under this Agreement and the other Loan Documents. The general administration of the Loan Documents with respect to the Canadian Borrower shall be by the Canadian Agent. The Lenders, the Issuing Banks and each Secured Party that is owed any Canadian Liabilities each hereby (i) irrevocably authorizes the Canadian Agent (x) to enter into the Loan Documents to which it is a party and (y) at its discretion, to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto, and (ii) agrees and consents to all of the provisions of the Canadian Security Documents. All Collateral from the Canadian Loan Parties shall be held or administered by the Canadian Agent (or its duly-appointed agent) for its own benefit and for the ratable benefit of the other Secured Parties holding Canadian Liabilities. Any proceeds received by the Canadian Agent from the foreclosure, sale, lease or other disposition of any of the Collateral from the Canadian

162

Loan Parties and any other proceeds received pursuant to the terms of the Canadian Security Documents or the other Loan Documents shall be paid over to the Canadian Agent for application as provided in this Agreement and the other Loan Documents. The Canadian Agent shall have no duties or responsibilities except as set forth in this Agreement and the remaining Loan Documents, nor shall it have any fiduciary relationship with any other Secured Party, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Canadian Agent.

(b)    For the purposes of the grant of security under the laws of the Province of Quebec which may now or in the future be required to be provided by any Canadian Loan Party, the Canadian Agent is hereby irrevocably authorized and appointed by each Lender, the Issuing Banks and each Secured Party that is owed any Canadian Liabilities to act as hypothecary representative (within the meaning of Article 2692 of the Civil Code of Quebec) for all present and future Lenders, Issuing Banks and Secured Parties that is owed any Canadian Liabilities (in such capacity, the "Hypothecary Representative") in order to hold any hypothec granted under the laws of the Province of Quebec and to exercise such rights and duties as are conferred upon the Hypothecary Representative under the relevant deed of hypothec and Applicable Laws (with the power to delegate any such rights or duties). The execution prior to the date hereof by the Canadian Agent in its capacity as the Hypothecary Representative of any deed of hypothec or other security documents made pursuant to the laws of the Province of Quebec, is hereby ratified and confirmed. Any Person who becomes a Lender, an Issuing Bank or a Secured Party that is owed any Canadian Liabilities or successor Canadian Agent shall be deemed to have consented to and ratified the foregoing appointment of the Canadian Agent as the Hypothecary Representative on behalf of all Lenders, Issuing Banks and each Secured Party that is owed any Canadian Liabilities, including such Person and any Affiliate of such Person designated above as a Lender, Issuing Bank or a Secured Party that is owed any Canadian Liabilities. For greater certainty, the Canadian Agent, acting as the Hypothecary Representative, shall have the same rights, powers, immunities, indemnities and exclusions from liability as are prescribed in favor of the Canadian Agent in this Agreement, which shall apply *mutatis mutandis*. In the event of the resignation of the Canadian Agent (which shall include its resignation as the Hypothecary Representative) and appointment of a successor Canadian Agent, such successor Canadian Agent shall also act as the Hypothecary Representative, as contemplated above.

SECTION 8.04    Sharing of Excess Payments. If at any time or times any Secured Party shall receive (a) by payment, foreclosure, setoff, banker's lien, counterclaim, or otherwise, or any payments with respect to the Obligations of the Domestic Borrowers or the Canadian Liabilities owing to such Secured Party arising under, or relating to, this Agreement or the other Loan Documents, or (b) payments from the Administrative Agent or the Canadian Agent, as applicable, in excess of such Secured Party's ratable portion of all such distributions by the Administrative Agent or the Canadian Agent, such Secured Party shall promptly (i) turn the same over to the Administrative Agent or the Canadian Agent, as applicable, in kind, and with such endorsements as may be required to negotiate the same to the Administrative Agent or the Canadian Agent, or in same day funds, as applicable, for the account of all of the Secured Parties and for application to the Obligations of the Domestic Borrowers or the Canadian Liabilities, as applicable,

163

in accordance with the applicable provisions of this Agreement, or (ii) purchase, without recourse or warranty, an undivided interest and participation in the Obligations of the Domestic Borrowers or the Canadian Liabilities, as applicable, owed to the other Secured Parties so that such excess payment received shall be applied ratably as among the Secured Parties in accordance with the provisions of SECTION 2.17 or SECTION 7.03, as applicable, and with their Domestic Commitment Percentages or Canadian Commitment Percentages, or Term Percentage, as applicable; provided, however, that if all or part of such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment. In no event shall the provisions of this SECTION 8.04 be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Domestic Lender or Canadian Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in drawings under Letters of Credit to any assignee or participant, other than to the Borrowers or any Affiliate(s) thereof (as to which the provisions of this SECTION 8.04 shall apply). Notwithstanding the foregoing, any amounts of the Canadian Borrower so offset shall be applied solely to, and shall be limited to, the Canadian Liabilities and any adjustments with respect thereto shall be made solely amongst Lenders having a Canadian Commitment.

SECTION 8.05    Agreement of Applicable Lenders. Upon any occasion requiring or permitting an approval, consent, waiver, election or other action on the part of the Applicable Lenders, action shall be taken by each Agent or the Canadian Agent, as applicable, for and on behalf or for the benefit of all Credit Parties upon the direction of the Applicable Lenders, and any such action shall be binding on all Credit Parties. No amendment, modification, consent, or waiver shall be effective except in accordance with the provisions of SECTION 9.02.

SECTION 8.06    Liability of Agents.

(a)    Each of the Agents and the Canadian Agent, when acting on behalf of the Credit Parties, may execute any of its respective duties under this Agreement or any of the other Loan Documents by or through any of its officers, agents and employees, and no Agent or the Canadian Agent or any of its respective directors, officers, agents or employees shall be liable to any other Secured Party for any action taken or omitted to be taken in good faith, or be responsible to any other Secured Party for the consequences of any oversight or error of judgment, or for any loss, except to the extent of any liability imposed by law by reason of such Agent's or Canadian Agent's own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). No Agent or the Canadian Agent or any of its respective directors, officers, agents and employees shall in any event be liable to any other Secured Party for any action taken or omitted to be taken by it pursuant to instructions received by it from the Applicable Lenders, or in reliance upon the advice of counsel selected by it. Without limiting the foregoing, no Agent or the Canadian Agent or any of its respective directors, officers, employees, or agents shall be: (i) responsible to any other Secured Party for the due execution, validity, genuineness, effectiveness, sufficiency, or enforceability of, or for any recital, statement, warranty or representation in, this Agreement, any other Loan Document or any related agreement,

164

.

document or order; (ii) required to ascertain or to make any inquiry concerning the performance or observance by any Loan Party of any of the terms, conditions, covenants, or agreements of this Agreement or any of the Loan Documents; (iii) responsible to any other Secured Party for the state or condition of any properties of the Loan Parties or any other obligor hereunder constituting Collateral for the Obligations, the Other Liabilities or Canadian Liabilities or any information contained in the books or records of the Loan Parties; (iv) responsible to any other Secured Party for the validity, enforceability, collectability, effectiveness or genuineness of this Agreement or any other Loan Document or any other certificate, document or instrument furnished in connection therewith; or (v) responsible to any other Secured Party for the validity, priority or perfection of any Lien securing or purporting to secure the Obligations, the Other Liabilities or the Canadian Liabilities or for the value or sufficiency of any of the Collateral.

(b)   Each of the Agents and the Canadian Agent may execute any of its duties under this Agreement or any other Loan Document by or through its agents or attorneys-in-fact, and shall be entitled to the advice of counsel concerning all matters pertaining to its rights and duties hereunder or under the other Loan Documents. No Agent or the Canadian Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

(c)   No Agent or the Canadian Agent or any of its respective directors, officers, employees, or agents shall have any responsibility to any Loan Party on account of the failure or delay in performance or breach by any other Secured Party (other than by each such Agent or Canadian Agent in its capacity as a Lender) of any of its respective obligations under this Agreement or any of the other Loan Documents or in connection herewith or therewith.

(d)   Each of the Agents and the Canadian Agent shall be entitled to rely, and shall be fully protected in relying, upon any notice, consent, certificate, affidavit, or other document or writing believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon the advice and statements of legal counsel (including, without, limitation, counsel to the Loan Parties), independent accountants and other experts selected by any Loan Party or any Secured Party. Each of the Agents and the Canadian Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Applicable Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the other Secured Parties against any and all liability and expense which may be incurred by it by reason of the taking or failing to take any such action.

SECTION 8.07   Notice of Default. No Agent or the Canadian Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent or Canadian Agent has actual knowledge of the same or has received notice from a Secured Party or Loan Party referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that any Agent or the Canadian Agent obtains such actual knowledge or receives such a notice, such Agent or Canadian Agent shall give prompt

165

notice thereof to each of the other Secured Parties. Upon the occurrence of an Event of Default, the Administrative Agent, the Collateral Agent or the Canadian Agent, as applicable, shall (subject to the provisions of SECTION 9.02) take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders. Unless and until the Administrative Agent, the Collateral Agent or the Canadian Agent, as applicable, shall have received such direction, the Administrative Agent, the Collateral Agent or the Canadian Agent, as applicable, may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Secured Parties. In no event shall the Administrative Agent, the Collateral Agent or the Canadian Agent, as applicable, be required to comply with any such directions to the extent that the Administrative Agent, the Collateral Agent or the Canadian Agent, as applicable, believes that its compliance with such directions would be unlawful.

SECTION 8.08   Credit Decisions. Each Secured Party (other than the Agents and the Canadian Agent) acknowledges that it has, independently and without reliance upon any Agent or the Canadian Agent or any other Secured Party, and based on the financial statements prepared by the Loan Parties and such other documents and information as it has deemed appropriate, made its own credit analysis and investigation into the business, assets, operations, property, and financial and other condition of the Loan Parties and has made its own decision to enter into this Agreement and the other Loan Documents. Each Credit Party (other than the Agents and the Canadian Agent) also acknowledges that it will, independently and without reliance upon any Agent, the Canadian Agent or any other Secured Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in determining whether or not conditions precedent to closing any Loan hereunder have been satisfied and in taking or not taking any action under this Agreement and the other Loan Documents.

SECTION 8.09   Reimbursement and Indemnification. Each Secured Party (other than the Agents and the Canadian Agent) agrees to (a) reimburse each Agent and the Canadian Agent for such Lender's Pro Rata Percentage of (i) any expenses and fees incurred by any Agent or the Canadian Agent for the benefit of the Secured Parties under this Agreement and any of the other Loan Documents, including, without limitation, counsel fees and compensation of agents and employees paid for services rendered on behalf of the Secured Parties, and any other expense incurred in connection with the operations or enforcement thereof not reimbursed by the Loan Parties, and (ii) any expenses of any Agent or the Canadian Agent incurred for the benefit of the Secured Parties that the Loan Parties have agreed to reimburse pursuant to this Agreement or any other Loan Document and have failed to so reimburse, and (b) indemnify and hold harmless each Agent and the Canadian Agent and any of its respective directors, officers, employees, or agents, on demand, in the amount of such Lender's Pro Rata Percentage, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any Secured Party in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by it or any of them under this Agreement or any of the other Loan Documents to the extent not reimbursed by the Loan Parties, including, without limitation, costs of any suit initiated by each Agent or the Canadian Agent against any Secured Party (except such as shall have been determined by a court of competent jurisdiction or another independent tribunal having jurisdiction by final and non-appealable judgment to have

166

resulted from the gross negligence or willful misconduct of such Agent or Canadian Agent); provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Secured Party in its capacity as such. The provisions of this SECTION 8.09 shall survive the repayment of the Obligations, the Other Liabilities, the Canadian Liabilities and the termination of the Commitments.

SECTION 8.10    Rights of Agents. It is understood and agreed that the Agents and the Canadian Agent shall have the same rights and powers hereunder (including the right to give such instructions) as the other Lenders and may exercise such rights and powers, as well as their rights and powers under other agreements and instruments to which they are or may be party, and engage in other transactions with the Loan Parties, as though they were not the Agents or the Canadian Agent. Each Agent, the Canadian Agent and its respective Affiliates may accept deposits from, lend money to, and generally engage in any kind of commercial or investment banking, trust, advisory or other business with the Loan Parties and their Affiliates as if it were not an Agent or Canadian Agent thereunder.

SECTION 8.11    Notice of Transfer. The Administrative Agent or the Canadian Agent, as applicable, may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations or Canadian Liabilities, as applicable, or the Other Liabilities for all purposes, unless and until, and except to the extent, an Assignment and Acceptance shall have become effective as set forth in SECTION 9.04.

SECTION 8.12    Successor Agents. The Administrative Agent or the Canadian Agent may resign at any time by giving thirty (30) Business Days' written notice thereof to the other Secured Parties and the Lead Borrower and the Canadian Borrower, as applicable. The Collateral Agent may resign at any time by giving 30 Business Days prior written notice thereof to the other Agents and the Lead Borrower and the Canadian Borrower, as applicable. Upon any such resignation of the Administrative Agent or the Canadian Agent, the Required Lenders shall have the right to appoint a successor Administrative Agent or Canadian Agent, as applicable, which, so long as there is no Event of Default, shall be reasonably satisfactory to the Lead Borrower (whose consent in any event shall not be unreasonably withheld or delayed). If no successor Administrative Agent or Canadian Agent shall have been so appointed by the Required Lenders and/or none shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent's or Canadian Agent's giving of notice of resignation, the retiring Administrative Agent or Canadian Agent may, on behalf of the other Secured Parties, appoint a successor Administrative Agent or Canadian Agent which, (i) with respect to the Administrative Agent shall be a Person a commercial bank (or affiliate thereof) organized under the laws of the United States of America or of any State thereof and having a combined capital and surplus of at least $1,000,000,000, or (ii) with respect to the Canadian Agent, a commercial bank or institutional lender (or branch or Affiliate thereof) resident in Canada (for purposes of the Income Tax Act (Canada) or otherwise not subject to withholding taxes on any interest paid by a resident of Canada) and having a combined capital and surplus of at least $1,000,000,000 or (iii) in either case, capable of complying with all of the duties of such Administrative Agent or Canadian Agent, as applicable, hereunder (in the opinion of the retiring Administrative Agent or Canadian Agent and as certified to the other Secured Parties in writing by such successor Administrative Agent or Canadian Agent) which, so long as there is no Event of Default, shall be reasonably satisfactory to the Lead Borrower (whose consent shall not

167

in any event be unreasonably withheld or delayed). Upon the acceptance of any appointment as Administrative Agent or Canadian Agent by a successor Administrative Agent or Canadian Agent, as applicable, such successor Administrative Agent or Canadian Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent or Canadian Agent and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Administrative Agent's, Collateral Agent's or Canadian Agent's resignation hereunder as such Administrative Agent, Collateral Agent or Canadian Agent, as applicable, the provisions of this ARTICLE VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was such Administrative Agent, Collateral Agent or Canadian Agent under this Agreement. Upon the resignation of the Collateral Agent, a successor shall be appointed in accordance with the procedures set forth above in this SECTION 8.12.

SECTION 8.13    Relation Among the Lenders. The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of any Agent or the Canadian Agent) authorized to act for, any other Lender.

SECTION 8.14    Reports and Financial Statements. By signing this Agreement, each Lender:

(a)    agrees to furnish the Administrative Agent on the first day of each month with a summary of all Other Liabilities due or to become due to such Lender;

(b)    is deemed to have requested that the Administrative Agent or the Canadian Agent, as applicable, furnish such Lender, promptly after they become available, copies of all financial statements required to be delivered by the Lead Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Administrative Agent or the Collateral Agent, as applicable (collectively, the "Reports") (and the Administrative Agent and the Canadian Agent, as applicable, agree to furnish such Reports promptly to the Lenders, which may be furnished in accordance with the final paragraph of SECTION 5.01);

(c)    expressly agrees and acknowledges that no Agent or the Canadian Agent (i) makes any representation or warranty as to the accuracy of the Reports or (ii) shall be liable for any information contained in any Report;

(d)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agents, the Canadian Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)    agrees to keep all Reports confidential in accordance with the provisions of SECTION 9.15 hereof, and not to use any Report in any other manner; and

(f)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold each Agent, the Canadian Agent and any

168

such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans of the Borrowers; and (ii) to pay and protect, and indemnify, defend, and hold each Agent, the Canadian Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agents, the Canadian Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender in violation of the terms hereof.

SECTION 8.15    <u>Agency for Perfection</u>. Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agents, the Canadian Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other Applicable Law of the United States of America or Canada can be perfected only by possession, control or notation. Should any Lender (other than the Administrative Agent or the Canadian Agent) obtain possession of any such Collateral, such Lender shall notify the Administrative Agent or the Canadian Agent, as applicable, thereof, and, promptly upon the Administrative Agent's or Canadian Agent's, as applicable, request therefor, shall deliver such Collateral to the Administrative Agent or Canadian Agent, as applicable, or otherwise deal with such Collateral in accordance with the Administrative Agent's or Canadian Agent's (as applicable) instructions.

SECTION 8.16    <u>[Reserved]</u>.

SECTION 8.17    <u>Risk Participation</u>.

(a)    Upon the earlier of Substantial Liquidation or the Determination Date, if all Canadian Liabilities have not been repaid in full (other than the Other Liabilities and those relating to Term Loans of the Canadian Borrower and its Subsidiaries), then the Domestic Lenders (other than Domestic Term Lenders) shall purchase from the Canadian Lenders (other than Canadian Term Lenders) (on the date of Substantial Liquidation or the Determination Date, as applicable) such portion of the Canadian Liabilities (other than Other Liabilities and Term Loans relating to the Canadian Borrower and its Subsidiaries) so that each such Lender shall, after giving effect to any such purchases, hold its Liquidation Percentage of all outstanding Canadian Liabilities (other than those relating to Canadian Term Loans) and all other Obligations (other than those relating to Term Loans).

(b)    Upon the earlier of Substantial Liquidation or the Determination Date, if all Obligations of the Domestic Borrowers (other than those relating to the Canadian Liabilities, Term Loans, or the Other Liabilities of the Domestic Borrowers) have not been repaid in full, then the Canadian Lenders (other than Canadian Term Lenders) shall purchase from the Domestic Lenders (other than Domestic Term Lenders) (on the date of Substantial Liquidation or the Determination Date, as applicable) such portion of such Obligations (other than those relating to Term Loans) so that each such Lender shall, after giving effect to any such purchases, hold its Liquidation Percentage of all outstanding Obligations (other than

169

those relating to Term Loans) of the Domestic Borrowers and the Canadian Liabilities, (other than those relating to Term Loans).

(c)   Upon the earlier of Substantial Liquidation or the Determination Date, if all Canadian Term Loans have not been repaid in full, then the Domestic Term Lenders shall purchase from the Canadian Term Lenders (on the date of Substantial Liquidation or the Determination Date, as applicable) such portion of the Canadian Term Loans so that each such Term Lender shall, after giving effect to any such purchases, hold its Liquidation Percentage of all outstanding Canadian Term Loans and all other Obligations relating to Term Loans.

(d)   Upon the earlier of Substantial Liquidation or the Determination Date, if all Domestic Term Loans have not been repaid in full, then the Canadian Term Lenders shall purchase from the Domestic Term Lenders (on the date of Substantial Liquidation or the Determination Date, as applicable) such portion of such Domestic Term Loans so that each such Term Lender shall, after giving effect to any such purchases, hold its Liquidation Percentage of all outstanding Obligations relating to Term Loans and the Canadian Term Loans.

(e)   All purchases of Obligations under this SECTION 8.17 shall be at par, for cash, with no premium, discount or reduction.

(f)   No Lender shall be responsible for any default of any other Lender in respect of any other Lender's obligations under this SECTION 8.17, nor shall the obligations of any Lender hereunder be increased as a result of such default of any other Lender. Each Lender shall be obligated to the extent provided herein regardless of the failure of any other Lender to fulfill its obligations hereunder.

(g)   Each Lender shall execute such instruments, documents and agreements and do such other actions as may be necessary or proper in order to carry out more fully the provisions and purposes of this SECTION 8.17 and the purchase of Obligations or the Canadian Liabilities, as applicable, as provided herein.

(h)   The obligations of each Lender under this SECTION 8.17 are irrevocable and unconditional and shall not be subject to any qualification or exception whatsoever including, without limitation, lack of validity or enforceability of this Agreement or any of the Loan Documents or the existence of any claim, setoff, defense or other right which any Loan Party may have at any time against any of the Lenders.

(i)   No fees required to be paid on any assignment pursuant to SECTION 9.04 of this Agreement shall be payable in connection with any assignment under this SECTION 8.17.

SECTION 8.18   Collateral Matters.

(a)   The Lenders hereby irrevocably authorize the Administrative Agent, the Canadian Agent and the Collateral Agent, as applicable, to take actions to evidence the

170

release of any Lien upon any Collateral: (i) upon the termination of the Domestic Commitments and the Canadian Commitments, as applicable, and payment and satisfaction in full by the Domestic Borrowers of all Obligations the Canadian Borrower of all Canadian Liabilities, as applicable and, if the obligations have been accelerated and Liquidation has commenced, the Other Liabilities then due and payable (in any event other than contingent indemnity obligations with respect to then unasserted claims), all Letters of Credit shall have expired or terminated (or been collateralized in a manner reasonably satisfactory to the Issuing Banks) and all Letter of Credit Outstandings have been reduced to zero (or collateralized in a manner reasonably satisfactory to the Issuing Banks); (ii) constituting property being sold, transferred or disposed of in a Permitted Disposition or other transaction permitted hereunder upon receipt by the Administrative Agent or the Canadian Agent, as applicable, of the Net Proceeds thereof to the extent required by this Agreement (or, if no such Net Proceeds are required to be remitted to the Administrative Agent or the Canadian Agent, as applicable, upon consummation of such transaction); (iii) to the extent such Collateral is owned by a Loan Party, upon the release of such Loan Party from its obligations under the Loan Documents to the extent such release occurs as a result of a Permitted Disposition or other transaction permitted under SECTION 6.03, resulting in such Person ceasing to be a Loan Party; or (iv) upon request of the Lead Borrower, constituting Real Estate being transferred from a Domestic Loan Party to another Domestic Loan Party but only to the extent that after such transfer, no Event of Default exists. Except as provided above, the Administrative Agent or the Canadian Agent, as applicable, will not release any of the Agent's or Canadian Agent's Liens without the prior written authorization of the Applicable Lenders. Upon request by the Administrative Agent, the Canadian Agent or any Loan Party at any time, the Lenders will confirm in writing the Administrative Agent's or the Canadian Agent's authority to release any Liens upon particular types or items of Collateral pursuant to this SECTION 8.18.

(b)   The Lenders hereby authorize the Administrative Agent and the Canadian Agent, as applicable, to take such actions, including making filings and entering into agreements and any amendments or supplements to any Security Document or Intercreditor Agreement, as may be necessary or desirable to reflect the intent of this Agreement and the refinancing of any Indebtedness permitted hereunder. Upon request by the Administrative Agent, the Canadian Agent or any Loan Party at any time, the Lenders will confirm in writing the Administrative Agent's or the Canadian Agent's authority to enter into such agreements, amendments or supplements.

(c)   Upon at least two (2) Business Days' prior written request by the Lead Borrower or the Canadian Borrower, as applicable, the Administrative Agent or the Canadian Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens upon any Collateral described in SECTION 8.18(a); provided, however, that (i) neither the Administrative Agent nor the Canadian Agent shall be required to execute any such document on terms which, in its reasonable opinion, would, under Applicable Law, expose the Administrative Agent or the Canadian Agent to liability or create any obligation or entail any adverse consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations, the Other Liabilities, the Canadian

171

Liabilities, or any Liens (other than those expressly being released) upon (or obligations of any Loan Party in respect of) all interests retained by any Loan Party, including (without limitation) the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

SECTION 8.19    Co-Documentation Agent, Arrangers and Bookrunners.

Notwithstanding the provisions of this Agreement or any of the other Loan Documents, the Co-Documentation Agents, the Arrangers and the Bookrunners shall have no powers, rights, duties, responsibilities or liabilities with respect to this Agreement and the other Loan Documents.

<div align="center">ARTICLE IX</div>

<div align="center">Miscellaneous</div>

SECTION 9.01    Notices. Except in the case of notices and other communications expressly permitted to be given by telephone or electronically, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or other electronic transmissions, as follows:

(a)   if to any Loan Party, to it at One Geoffrey Way, Wayne, New Jersey, Attention: Chief Financial Officer (Telecopy No. (973) 617-4006), with a copy to the attention of General Counsel (Telecopy No. (973) 617-4043), with a copy to Kirkland & Ellis LLP, Attention: Michelle Kilkenney, P.C. (Telecopy No. 312.862.2200), (E-Mail michelle.kilkenney@kirklad.com;

(b)   if to the Administrative Agent, the Collateral Agent or the Swingline Lender to JPMorgan Chase Bank, N.A., JPM Loan & Agency Services, 500 Stanton Christiana Road, NCC5, 1st Floor, Newark, DE 19713-2107, Attention Chris Johnson (Telecopy No. (302) 634-2617, (E-Mail christopher.x.johnson@chase.com), with a copy to JPMorgan Chase Bank, N.A., IB Credit Risk, 383 Madison Ave, 24th Floor, New York, NY 10179, Attention Anna Kostenko (Telecopy No. 212-270-5100), (E-Mail anna.kostenko@jpmorgan.com);

(c)   if to the Canadian Agent, or the Swingline Lender of Swingline Loans to the Canadian Borrower, to the attention of the Administrative Agent; and

(d)   if to any other Credit Party, to it at its address (or telecopy number or electronic mail address) set forth on the signature pages hereto or on any Assignment and Acceptance.

Notwithstanding the foregoing, any notice hereunder sent by e-mail shall be solely for the distribution of (i) routine communications such as financial statements and (ii) documents and signature pages for execution by the parties hereto, and for no other purpose. Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in

<div align="center">172</div>

accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 9.02    <u>Waivers; Amendments</u>.

(a)    No failure or delay by any Credit Party in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Credit Parties hereunder and under the other Loan Documents are cumulative and are not exclusive of any other rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by SECTION 9.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

(b)    Except as otherwise specifically provided herein, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Loan Parties and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Agent(s) or the Canadian Agent and the Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; <u>provided</u>, <u>however</u>, that no such waiver, amendment, modification or other agreement shall:

(i)    Increase the Domestic Commitment or Canadian Commitment of any Lender without the prior written consent of such Lender;

(ii)    Without:

(A)    the prior written consent of each Lender directly adversely affected thereby, reduce the principal amount of any Loan or reduce the rate of interest thereon (other than the waiver of the Default Rate), or reduce any fees payable under the Loan Documents;

(B)    the prior written consent of each Lender directly adversely affected thereby, postpone the scheduled date of payment of the principal amount of any Obligation, or any interest thereon, or any fees payable under the Loan Documents, or reduce the amount of, waive or excuse any such payment, or postpone the expiration of the Commitments or postpone the Maturity Date;

173

(C)   the prior written Unanimous Consent of all Lenders, except for Permitted Dispositions or for Collateral releases as provided in SECTION 8.18, release all or substantially all of the Collateral from the Liens of the Security Documents;

(D)   the prior written consent of each Term Lender, change the definition of the term "Supermajority Consent of Term Lenders";

(E)   the prior written Supermajority Consent of Term Lenders and Supermajority Consent of Revolving Lenders, change the definition of the terms "Domestic Availability", "Domestic Borrowing Base", or "Domestic Incremental Availability", or any component definition thereof if, as a result thereof, the amounts available to be borrowed by the Domestic Borrowers would be increased; provided that the foregoing shall not limit the discretion of the Agents to change, establish or eliminate any Reserves or to add Inventory or Accounts acquired in a Permitted Acquisition to the Borrowing Base as provided herein; or

(F)   the prior written Supermajority Consent of Term Lenders and Supermajority Consent of Revolving Lenders, change the definition of the terms "Combined Borrowing Base", "Canadian Availability", "Canadian Incremental Availability" or "Canadian Borrowing Base" or any component definition thereof if, in each case, as a result thereof, the amounts available to be borrowed by the Canadian Borrower would be increased; provided that the foregoing shall not limit the discretion of the Agents to change, establish or eliminate any Reserves;

(G)   the prior written Unanimous Consent of all Lenders, except in connection with Permitted Dispositions or other transactions permitted hereunder resulting in such Loan Party ceasing to constitute a Loan Party, release any Loan Party from its obligations under any Loan Document, or limit its liability in respect of such Loan Document;

(H)   [Reserved];

(I)   the prior written Unanimous Consent of all Lenders, change SECTION 2.17, SECTION 7.03; SECTION 8.04 or SECTION 8.17;

(J)   the prior written consent of the Required Lenders and the Collateral Agent, change SECTION 2.18;

(K)   the prior written Unanimous Consent of all Lenders, except as provided by operation of Applicable Law and otherwise expressly permitted hereunder, amend or modify the Superpriority Claim status of the Lenders under the Orders or under any Loan Document, subordinate the Obligations or Other Liabilities hereunder or the Liens granted hereunder or

174

under the other Loan Documents, to any other Indebtedness or Lien, as the case may be;

(L)   the prior written Unanimous Consent of all Lenders, change any of the provisions of this SECTION 9.02(b) or the definitions of "Pro Rata Percentage", "Canadian Commitment Percentage", "Domestic Commitment Percentage", "Commitment Percentage", "Required Lenders" or "Supermajority Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder in each case to reduce such percentage; or

(M)   the prior written Unanimous Consent of all Lenders under the Revolving Facility, increase the amount of the Excess Swingline Loans.

(iii)   Without the prior written Supermajority Consent of Term Lenders and Supermajority Consent of Revolving Lenders, in connection with other transactions permitted herein or for Collateral releases as expressly provided herein, release any material portion of the Collateral from the Liens of the Security Documents.

(iv)   Without the prior written consent of the Agents, the Canadian Agent or the Issuing Banks, as the case may be, affect the rights or duties of the Agents, the Canadian Agent or the Issuing Banks, it being understood that any increase in an amount up to $50,000,000 or decrease of the Canadian Swingline Ceiling can be effected by an agreement of the Canadian Borrower and the Canadian Agent and any increase in an amount up to $50,000,000 or decrease of the Domestic Swingline Ceiling can be effected by an agreement of the Lead Borrower and the Administrative Agent, in each case without the consent of any other Lender.

(c)   Notwithstanding anything to the contrary contained in this SECTION 9.02, in the event that the Lead Borrower or the Canadian Borrower shall request that this Agreement or any other Loan Document be modified, amended or waived in a manner which would require the consent of the Lenders pursuant to SECTION 9.02(b) and such amendment is approved by the Required Lenders or at least 50.1% of the directly adversely affected Lenders, but not by the requisite percentage of all of the Lenders, the Lead Borrower and the Administrative Agent shall be permitted to amend this Agreement without the consent of the Lender or Lenders which did not agree to the modification or amendment requested by the Lead Borrower or the Canadian Borrower (such Lender or Lenders, collectively the "Minority Lenders") subject to their providing for (i) the termination of the Commitment (including the Domestic Commitment and the Canadian Commitment) of each of the Minority Lenders, (ii) the addition to this Agreement of one or more other financial institutions which would qualify as an Eligible Assignee, subject to the reasonable approval of the Administrative Agent to the extent required by Section 9.04, or an increase in the Domestic Commitment or Canadian Commitment of one or more of the Required Lenders, so that the Domestic Total Commitments and the Canadian Total Commitments after giving effect to such amendment shall be in the same amount as the aggregate Commitments

175

immediately before giving effect to such amendment, (iii) if any Loans are outstanding at the time of such amendment, the making of such additional Loans by such new or increasing Lender or Lenders, as the case may be, as may be necessary to repay in full the outstanding Loans (including principal, interest, and fees) of the Minority Lenders immediately before giving effect to such amendment and (iv) such other modifications to this Agreement or the Loan Documents as may be appropriate and incidental to the foregoing.

(d)   No notice to or demand on any Loan Party shall entitle any Loan Party to any other or further notice or demand in the same, similar or other circumstances. Each holder of a Note shall be bound by any amendment, modification, waiver or consent authorized as provided herein, whether or not a Note shall have been marked to indicate such amendment, modification, waiver or consent and any consent by a Lender, or any holder of a Note, shall bind any Person subsequently acquiring a Note, whether or not a Note is so marked. No amendment to this Agreement or any other Loan Document shall be effective against the Borrower unless signed by the Borrower or other applicable Loan Party.

(e)   Notwithstanding the foregoing, this Agreement and any other Loan Document may be amended solely with the consent of the Administrative Agent and the Borrower without the need to obtain the consent of any other Lender if such amendment is delivered in order to correct or cure (i) ambiguities, errors, omissions, defects, (ii) to effect administrative changes of a technical or immaterial nature or (iii) incorrect cross references or similar inaccuracies in this Agreement or the applicable Loan Document, in each case and the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof. Guarantees, collateral documents, security documents, intercreditor agreements, and related documents executed in connection with this Agreement may be in a form reasonably determined by the Administrative Agent or Collateral Agent, as applicable, and may be amended, modified, terminated or waived, and consent to any departure therefrom may be given, without the consent of any Lender if such amendment, modification, waiver or consent is given in order to (x) comply with local law or advice of counsel or (y) cause such guarantee, collateral document, security document or related document to be consistent with or to give effect to or to carry out the purpose of this Agreement and the other Loan Documents.

(f)   Notwithstanding anything in this Agreement or any Security Document to the contrary, the Administrative Agent may, in its reasonable discretion, grant extensions of time for the satisfaction of any of the requirements under Sections _____ or any Security Documents in respect of any particular Collateral or any particular Subsidiary if it determines that the satisfaction thereof with respect to such Collateral or such Subsidiary cannot be accomplished without undue expense or unreasonable effort or due to factors beyond the control of Holdings, the Borrower and the Restricted Subsidiaries by the time or times at which it would otherwise be required to be satisfied under this Agreement or any Security Document.

SECTION 9.03   Expenses; Indemnity; Damage Waiver.

(a)   The Loan Parties shall jointly and severally (to the extent provided herein) pay on the Effective Date all invoiced Credit Party Expenses incurred as of the Effective Date, subject to any reimbursement limitations agreed to in writing prior to the Effective Date. Thereafter, the Loan Parties shall jointly and severally (to the extent provided herein) pay all Credit Party Expenses promptly, and in event within fifteen (15) Business Days after receipt of an invoice therefor setting forth such expenses in reasonable detail.

(b)   The Loan Parties shall, jointly and severally, indemnify the Secured Parties and each of their Subsidiaries and Affiliates, and each of the respective stockholders, directors, officers, employees, agents, attorneys, and advisors of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all damages, actual out-of-pocket losses, claims, actions, causes of action, settlement payments, obligations, liabilities and related expenses, in the case of legal advisors, the reasonable fees, charges and disbursements of one counsel for JPMorgan, one counsel for the Canadian Agent and one counsel for all other similarly situated Indemnitees (other than the Agents and the Canadian Agent) (and in each case one additional counsel for each foreign or local state or provincial jurisdiction) and in the case of a perceived conflict of interest, one additional domestic, Canadian, local and foreign counsel for each group of similarly situated Indemnitees, incurred, suffered, sustained or required to be paid by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the transactions contemplated by the Loan Documents or any other transactions contemplated hereby, (ii) any Credit Extension or the use of the proceeds therefrom (including any refusal by an Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by any Loan Party or any Subsidiary, or any Environmental Liability related in any way to any Loan Party or any Subsidiary, (iv) any actual or prospective claim, litigation, investigation or proceeding relating to or arising from any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto and whether such claim, litigation, investigation or proceeding is brought by any Loan Party or any other Person or (v) any documentary taxes, assessments or similar charges made by any Governmental Authority by reason of the execution and delivery of this Agreement or any other Loan Document; provided, however, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined in a final judgment by a court of competent jurisdiction or another independent tribunal having jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or any Affiliate of such Indemnitee (or any officer, director, employee, advisor or agent of such Indemnitee or any such Indemnitee's Affiliates), (y) are relating to disputes among Indemnitees or (z) are determined in a final judgment by a court of competent jurisdiction to have resulted from a material breach by such Indemnitee (or its related parties), other than (i) any such claims arising out of any act or omission of the Loan Parties or any of their Affiliates or claims

177

against an Indemnitee in its capacity as an Issuing Bank or other similar role or (ii) any such claims arising out of any act or omission on the part of Parent or any of its Affiliates. In connection with any indemnified claim hereunder, the Indemnitee shall be entitled to select its own counsel and the Loan Parties shall promptly pay the reasonable fees and expenses of such counsel.

(c)    No party to this Agreement shall assert and, to the extent permitted by Applicable Law, each such party hereby waives, any claim against any other party to this Agreement or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated by the Loan Documents, any Credit Extension or the use of the proceeds thereof; provided that nothing contained in this clause (c) shall limit the Loan Parties' indemnification obligations to the extent such special, indirect, consequential and punitive damages are included in any third party claim in connection with which such Indemnitee is entitled to indemnification hereunder.

(d)    The provisions of SECTION 9.03(b) and SECTION 9.03(c) shall remain operative and in full force and effect regardless of the termination of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations or the Other Liabilities, the invalidity or unenforceability of any term or provision of any Loan Document, or any investigation made by or on behalf of any Credit Party. All amounts due under this SECTION 9.03 shall be payable within fifteen (15) Business Days of written demand therefor, which written demand shall set forth such amounts in reasonable detail.

(e)    Notwithstanding anything to the contrary in SECTION 9.03(a) or SECTION 9.03(b), the Canadian Borrower's obligation to pay and indemnify shall be limited to matters, fees, expenses charges and disbursement, or losses, claims, damages and liabilities which the Administrative Agent or the Canadian Agent determines in their reasonable judgment to be properly attributable or allocable to the Canadian Borrower.

SECTION 9.04    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and the Lenders (and any such attempted assignment or transfer without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of an Issuing Bank that issues any Letter of Credit) and, to the extent expressly contemplated hereby, Indemnitees, any legal or equitable right, remedy or claim under or by reason of this Agreement.

178

(b)  Any Lender may, with the consent of the Administrative Agent, each Issuing Bank (other than in connection with an assignment of any Term Loan) and, so long as no Event of Default has occurred and is continuing, the Lead Borrower (each of whose consents shall not be unreasonably withheld or delayed and, with respect to the Lead Borrower, shall be deemed given if the Lead Borrower has not responded to a request for such consent within ten (10) Business Days), assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Domestic Commitment or Canadian Commitment and the Loans at the time owing to it); provided, however, that no such consent (other than consent of each Issuing Bank) shall be required in connection with any assignment to another Lender or any assignment of Term Loans; provided further that each assignment shall be subject to the following conditions: (i) except in the case of an assignment to a Lender or an Affiliate of a Lender, the amount of the Commitment or Loans of the assigning Lender subject to a partial assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 with respect to the Domestic Commitments or Canadian Commitments or $1,000,000 with respect to the Term Loans, as applicable; (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligation; without limitation, for clarity, any partial assignments of a Lender's Term Loans shall include the same proportion of its Canadian Term Loans and its Domestic Term Loans; provided that Commitments may be assigned separately from Term Loans; (iii) any Person may be a Canadian Lender (other than a Canadian Term Lender) only if it or any of its Affiliates also has Domestic Commitments in an amount at least equal to its Canadian Commitment; and (iv) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with (unless waived by the Administrative Agent) a processing and recordation fee of $3,500.00. Subject to acceptance and recording thereof pursuant to SECTION 9.04(d), from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, shall have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of SECTION 9.03; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this SECTION 9.04(b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with SECTION 9.04(e). The Loan Parties hereby acknowledge and agree that any effective assignment shall give rise to a direct obligation of the Loan Parties to the assignee and that the assignee shall be considered to be a "Credit Party" for all purposes under this Agreement and the other Loan Documents.

179

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Lead Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, any Issuing Bank or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swingline Loans in accordance with its Commitment Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under Applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)   The Administrative Agent, acting for this purpose as an agent of the Loan Parties, shall maintain, at one of its offices in the United States, a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders, and the Domestic Commitment and the Canadian Commitment of, and principal amount of the Loans and Letter of Credit Disbursements owing to, each Lender pursuant to the terms hereof from time to time. The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties and Credit Parties may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Lead Borrower, the Canadian Borrower, the Issuing Banks and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)   Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the processing and recordation fee referred to in SECTION 9.04(b) and any written consent to such assignment required by SECTION 9.04(a), the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this SECTION 9.04(d).

(e)   Any Lender may, without the consent of the Loan Parties or any other Person, sell participations to one or more banks or other entities (other than any Person in direct competition with a Loan Party's business) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Domestic Commitment, Canadian Commitment and the Loans owing to it), subject to the following:

180

(i)   such Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged;

(ii)   such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations;

(iii)   the Loan Parties and other Credit Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement;

(iv)   any agreement or instrument pursuant to which a Lender sells a participation in the Commitments, the Loans and the Letters of Credit Outstandings shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided, however, that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the proviso to SECTION 9.02(b)(ii)(A) or SECTION 9.02 (b)(ii)(B) that affects such Participant;

(v)   subject to clauses (viii) and (ix) of this SECTION 9.04(e), the Loan Parties agree that each Participant shall be entitled to the benefits (and subject to the requirements) of SECTION 2.14 and SECTION 2.23 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to SECTION 9.04(b);

(vi)   to the extent permitted by law, each Participant also shall be entitled to the benefits of SECTION 9.08 as though it were a Lender so long as such Participant agrees to be subject to SECTION 2.21(c) as though it were a Lender;

(vii)   each Lender, acting solely for this purpose as a non-fiduciary agent of the Loan Parties, shall maintain at its offices a record of each agreement or instrument effecting any participation and a register (each a "Participant Register") meeting the requirements of 26 CFR §5f. 103 1(c) for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts and other Obligations from time to time. The entries in each Participant Register shall be conclusive and the Loan Parties and the Credit Parties may treat each Person whose name is recorded in a Participant Register as a Participant for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under SECTION 2.14, SECTION 2.23, and SECTION 9.08). No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations;

(viii)   a Participant shall not be entitled to receive any greater payment under SECTION 2.14 or SECTION 2.23 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the

181

participation to such Participant is made with the Lead Borrower's prior written consent; and

(ix)  a Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of SECTION 2.23 unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with SECTION 2.23(e) as though it were a Lender and such Participant is eligible for exemption from, or reduction in, the withholding Tax referred to therein, following compliance with SECTION 2.23(e).

(f)  Any Credit Party may, without obtaining the consent of any Loan Party, at any time charge, pledge, assign or otherwise grant a security interest in, all or any portion of its rights under this Agreement to secure obligations of such Credit Party, including any pledge or assignment to secure obligations to a central bank or any of the twelve Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341 or other central bank, and this SECTION 9.04 shall not apply to any such pledge or assignment of a security interest; provided, however, that no such pledge or assignment of a security interest shall release a Credit Party from any of its obligations hereunder or substitute any such pledgee or assignee for such Credit Party as a party hereto.

(g)  The Loan Parties authorize each Credit Party to disclose to any Participant or assignee and any prospective Participant or assignee, subject to the provisions of SECTION 9.15, any and all financial information in such Credit Party's possession concerning the Loan Parties which has been delivered to such Credit Party by or on behalf of the Loan Parties pursuant to this Agreement or which has been delivered to such Credit Party by or on behalf of the Loan Parties in connection with such Credit Party's credit evaluation of the Loan Parties prior to becoming a party to this Agreement.

SECTION 9.05   Survival. All covenants, agreements, indemnities, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until (a) the Commitments have expired or been terminated, (b) the principal of, and interest on, each Loan and all fees and other Obligations (other than contingent indemnity obligations with respect to then unasserted claims and, if no acceleration has occurred and no Liquidation has commenced, the Other Liabilities) shall have been paid in full, (c) all Letters of Credit shall have expired or terminated (or been Cash Collateralized in a manner satisfactory to the Issuing Bank) and (d) all Letter of Credit Outstandings have been reduced to zero (or Cash Collateralized in a manner satisfactory to the Issuing Bank). The provisions of SECTION 2.14, SECTION 2.23, SECTION 9.03 and ARTICLE VIII shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof. In

182

connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Administrative Agent or the Canadian Agent, on behalf of itself and the other Credit Parties, may require such indemnities as it shall reasonably deem necessary or appropriate to protect the Credit Parties against loss on account of such release and termination, including, without limitation, with respect to credits previously applied to the Obligations or Other Liabilities that may subsequently be reversed or revoked, and any Obligations that may thereafter arise, including without limitation under SECTION 9.03 and/or with respect to the Other Liabilities.

SECTION 9.06   Counterparts; Integration; Effectiveness; Orders Control. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents (and any fee letters or fee agreements referred to in SECTION 2.19(a) and any other agreements entered into in connection with the transactions contemplated herein on or around the date hereof) constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all contemporaneous or previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in SECTION 4.01, this Agreement shall become effective on the Effective Date in accordance with SECTION 4.03. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement. To the extent that any provision herein is inconsistent with any term of any Order the applicable Order shall control.

SECTION 9.07   Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08   Right of Setoff. Subject to the Orders and the last two paragraphs of SECTION 7.01, if an Event of Default shall have occurred and be continuing, each Secured Party, each Participant and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, but excluding the Designated Account, and payroll, trust , trust-gift card, and tax withholding accounts) at any time held and other obligations at any time owing by such Secured Party, Participant or Affiliate to or for the credit or the account of the Loan Parties against any and all of the Obligations of the Loan Parties now or hereafter existing under this Agreement or other Loan Document to the extent such are then due and owing, although such Obligations may be otherwise fully secured; provided that such Secured Party shall provide the Lead Borrower with written notice promptly after its exercise of such right of setoff. The rights of each Secured Party under this SECTION 9.08 are in addition to other rights and remedies (including other rights of setoff) that such Credit Party may have. No Credit Party will, or will permit its Participant to, exercise its rights under this SECTION 9.08 without the consent of the Administrative Agent or the Required Lenders. Notwithstanding the foregoing, any amounts of the Canadian Borrower so offset shall be applied solely to the Canadian Liabilities. ANY AND ALL RIGHTS TO REQUIRE ANY AGENT OR THE CANADIAN AGENT TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH

183

.

SECURES ANY OF THE OBLIGATIONS, THE OTHER LIABILITIES OR THE CANADIAN LIABILITIES, AS APPLICABLE, PRIOR TO THE EXERCISE BY ANY SECURED PARTY, PARTICIPANT OR A LETT TATE OF ITS RIGHT OF SETOFF UNDER THIS SECTION ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

SECTION 9.09   <u>Governing Law; Jurisdiction: Consent to Service of Process</u>.

(a)   THIS AGREEMENT AND ALL ACTIONS ARISING UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE AND THE CCAA.

(b)   Each Loan Party agrees that any suit for the enforcement of this Agreement or any other Loan Document shall be brought before the Bankruptcy Court or the Canadian Court (provided that any suit for the enforcement of this Agreement or any other Loan Documents against a Canadian Loan Party shall be brought before the Canadian Court, including by way of a joint hearing with the Bankruptcy Court pursuant to the any cross-border insolvency protocol approved in the Cases) and, if the Bankruptcy Court or Canadian Court does not have (or abstains from) jurisdiction, in the courts of the State of New York sitting in the Borough of Manhattan or any federal court sitting therein as the Administrative Agent may elect in its sole discretion and consents to the non-exclusive jurisdiction of such courts. Each party to this Agreement hereby waives any objection which it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum and agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any Credit Party may otherwise have to bring any action or proceeding relating to this Agreement against a Loan Party or its properties in the courts of any jurisdiction.

(c)   Each Loan Party agrees that any action commenced by any Loan Party asserting any claim or counterclaim arising under or in connection with this Agreement or any other Loan Document shall be brought solely before the Bankruptcy Court or the Canadian Court and, if the Bankruptcy Court or the Canadian Court, as applicable does not have (or abstains from) jurisdiction, in a court of the State of New York sitting in the Borough of Manhattan or any federal court sitting therein as the Administrative Agent may elect in its sole discretion and consents to the exclusive jurisdiction of such courts with respect to any such action.

(d)   Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in SECTION 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10   <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR

INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY); AND WAIVES TO THE EXTENT PERMITTED BY APPLICABLE LAW DUE DILIGENCE, DEMAND, PRESENTMENT AND PROTEST AND ANY NOTICES THEREOF AS WELL AS NOTICE OF NONPAYMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11    Press Releases and Related Matters. Each Borrower consents to the publication by the Administrative Agent or the Canadian Agent of customary trade advertising material in tombstone format relating to the financing transactions contemplated by this Agreement using any Borrower's name, and with the consent of the Lead Borrower, logo or trademark. The Administrative Agent or the Canadian Agent, as applicable, shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof. The Administrative Agent and the Canadian Agent reserve the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

SECTION 9.12    Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.13    Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Revolving Credit Loan, together with all fees, charges and other amounts that are treated as interest on such Revolving Credit Loan under Applicable Law (collectively, the "Charges"), shall be found by a court of competent jurisdiction in a final order to exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Revolving Credit Loan in accordance with Applicable Law, the rate of interest payable in respect of such Revolving Credit Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Revolving Credit Loan but were not payable as a result of the operation of this SECTION 9.13 shall be cumulated and the interest and Charges payable to such Lender in respect of other Revolving Credit Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate, in the case of the Domestic Lenders, and at the Bank of Canada Overnight Rate, in the case of Canadian Lenders, to the date of repayment, shall have been received by such Lender.

SECTION 9.14    Additional Waivers.

(a)    The Obligations, the Other Liabilities and the Canadian Liabilities are the joint and several obligation of each Loan Party, provided that the Canadian Borrower and

185

the other Canadian Loan Parties shall be liable only for the Canadian Liabilities. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party hereunder shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release of any Loan Party from, any of the terms or provisions of, this Agreement, any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Administrative Agent, the Canadian Agent, the Collateral Agent or any other Credit Party.

(b)   The obligations of each Loan Party to pay the Obligations, the Other Liabilities or the Canadian Liabilities, as applicable, in full hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the payment in full in cash of the Obligations, the Other Liabilities or the Canadian Liabilities, as applicable, after the termination of all Commitments to any Loan Party under any Loan Document), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, the Other Liabilities or the Canadian Liabilities, as applicable, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations, the Other Liabilities or Canadian Liabilities, as applicable, or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of any Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations or the Other Liabilities, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the payment in full in cash of the Obligations and Other Liabilities after termination of all Commitments to any Loan Party under any Loan Document).

(c)   To the fullest extent permitted by Applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations, the Other Liabilities or Canadian Liabilities or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the payment in full in cash of all the Obligations, the Other Liabilities and the Canadian Liabilities after the termination of all Commitments to any Loan Party under any Loan Document. The Agents and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, the Other Liabilities and the Canadian Liabilities, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations, the Other Liabilities and the Canadian Liabilities have been paid in full in cash and performed in full after the

186

termination of Commitments to any Loan Party under any Loan Document. Pursuant to Applicable Law, each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to Applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)    Except as otherwise specifically provided herein, each Domestic Borrower is obligated to repay the Obligations and the Other Liabilities as joint and several obligors under this Agreement. Upon payment by any Loan Party of any Obligations, Other Liabilities or the Canadian Liabilities, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full in cash of all the Obligations (other than contingent indemnity obligations for then unasserted claims), the Other Liabilities and the Canadian Liabilities (other than contingent indemnity obligations for then unasserted claims) and the termination of all Commitments to any Loan Party under any Loan Document. If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Administrative Agent or the Canadian Agent, as applicable, to be credited against the payment of the Obligations, the Other Liabilities and the Canadian Liabilities, as applicable, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents. Subject to the foregoing, to the extent that any Domestic Loan Party shall, under this Agreement as a joint and several obligor, repay any of the Obligations, the Other Liabilities or Canadian Liabilities constituting Revolving Credit Loans made to another Loan Party hereunder (an "Accommodation Payment"), then the Domestic Loan Party making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Domestic Loan Parties (or the Canadian Loan Parties, if applicable) in an amount, (x) for each of such other Domestic Loan Parties, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Domestic Loan Party's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Domestic Loan Parties, or (y) for each Canadian Loan Party, in an amount equal to such Accommodation Payment. As of any date of determination, the "Allocable Amount" of each Domestic Loan Party shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Domestic Loan Party hereunder without (a) rendering such Domestic Loan Party "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Domestic Loan Party with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Domestic Loan Party unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

(e)    Without limiting the generality of the foregoing, or of any other waiver or other provision set forth in this Agreement, each Loan Party waives all rights and defenses

187

arising out of an election of remedies by any Credit Party, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed such Credit Party's rights of subrogation and reimbursement against such Loan Party by the operation of Section 580(d) of the California Code of Civil Procedure or otherwise. Each Loan Party waives all rights and defenses that such Loan Party may have because the Obligations and Other Liabilities are secured by Real Estate which means, among other things: (i) a Credit Party may collect from any Loan Party without first foreclosing on any Real Estate or personal property Collateral pledged by a Loan Party; (ii) if any Credit Party forecloses on any Real Estate pledged by any Loan Party, the amount of the Obligations and Other Liabilities may be reduced only by the price for which that Real Estate is sold at the foreclosure sale, even if the Real Estate is worth more than the sale price; and (iii) the Credit Parties may collect Obligations and Other Liabilities from a Loan Party even if a Credit Party, by foreclosing on any such Real Estate, has destroyed any right any Loan Party may have to collect from the other Loan Parties. This is an unconditional and irrevocable waiver of any rights and defenses any Loan Party may have because the Obligations and Other Liabilities are secured by Real Estate. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure. Each Loan Party hereby absolutely, knowingly, unconditionally, and expressly waives any and all claim, defense or benefit arising directly or indirectly under any one or more of Sections 2787 to 2855 inclusive of the California Civil Code or any similar law of California.

(f)    Each Loan Party hereby agrees to keep each other Loan Party fully apprised at all times as to the status of its business, affairs, finances, and financial condition, and its ability to perform its Obligations under the Loan Documents and the Other Liabilities, and in particular as to any adverse developments with respect thereto. Each Loan Party hereby agrees to undertake to keep itself apprised at all times as to the status of the business, affairs, finances, and financial condition of each other Loan Party, and of the ability of each other Loan Party to perform its Obligations under the Loan Documents and the Other Liabilities, and in particular as to any adverse developments with respect to any thereof. Each Loan Party hereby agrees, in light of the foregoing mutual covenants to inform each other, and to keep themselves and each other informed as to such matters, that the Credit Parties shall have no duty to inform any Loan Party of any information pertaining to the business, affairs, finances, or financial condition of any other Loan Party, or pertaining to the ability of any other Loan Party to perform its Obligations under the Loan Documents and the Other Liabilities, even if such information is adverse, and even if such information might influence the decision of one or more of the Loan Parties to continue to be jointly and severally liable for, or to provide Collateral for, Obligations or Other Liabilities of one or more of the other Loan Parties. To the fullest extent permitted by applicable law, each Loan Party hereby expressly waives any duty of the Credit Parties to inform any Loan Party of any such information.

SECTION 9.15    Confidentiality. Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to their and their Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors involved in the future transaction (it being understood that the Persons

188

to whom such disclosure is made will be informed of the confidential nature of such Information and agree to keep such Information confidential), and to the Monitor and its counsel, (b) to the extent requested by any regulatory authority, (c) to the extent required by Applicable Law or by any subpoena or similar legal process (the Credit Parties' agreeing to furnish the Lead Borrower with notice of such process and an opportunity to contest such disclosure as long as furnishing such notice and opportunity would not result in the Credit Parties' violation of Applicable Law), (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this SECTION 9.15, to any Eligible Assignee of, or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement and any actual or prospective counterparty or advisors to any swap or derivative transactions relating to the Loan Parties, the Canadian Liabilities, the Other Liabilities and the Obligations so long as such Person or any of their Affiliates is not a competitor of any Loan Party, (g) with the prior consent of the Loan Parties, or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this SECTION 9.15, to the knowledge of such Credit Party, the breach of any other Person's obligation to keep the information confidential, or (ii) becomes available to any Credit Party on a non-confidential basis from a source other than the Loan Parties. For the purposes of this SECTION 9.15, the term "Information" means all information received from or on behalf of the Loan Parties or any of their Affiliates relating to their business. Any Person required to maintain the confidentiality of Information as provided in this SECTION 9.15 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents, including conference calls or meetings with the Loan Parties to review their earnings and other information, may include material non-public information concerning the Loan Parties and their Subsidiaries and Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Loan Parties or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents, including conference calls or meetings with the Loan Parties to review their earnings and other information, will be syndicate-level information, which may contain material non-public information about the Loan Parties and their Subsidiaries and Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Loan Parties and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including federal and state securities laws.

SECTION 9.16   Patriot Act; Proceeds of Crime Act. Each Lender hereby notifies the Loan Parties that, pursuant to the requirements of the USA PATRIOT Act (Title in of Pub. L. 107-56

189

.

(signed into law October 26, 2001)) (the "Patriot Act") (including all applicable "know your customer" rules, regulations and procedures applicable to such Lender in Canada), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the Patriot Act. Each Loan Party is in compliance, in all material respects, with the Patriot Act and the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) (the "Proceeds of Crime Act"). No part of the proceeds of the Loans will be used by the Loan Parties, directly or, to the knowledge of the Borrowers, indirectly, for any purpose which would contravene or breach the Proceeds of Crime Act.

SECTION 9.17   [Reserved].

SECTION 9.18   Limitation Of Canadian Loan Parties' Liability. Notwithstanding anything to the contrary herein contained, the liability of the Canadian Loan Parties hereunder and under any other Loan Documents shall be limited to the Canadian Liabilities, and the Canadian Loan Parties shall have no liability whatsoever under the Loan Documents with respect to any other Obligations or Other Liabilities of the Domestic Borrowers.

SECTION 9.19   Judgment Currency.

(a)   If, for the purpose of obtaining or enforcing judgment against the Canadian Borrower or any other Canadian Loan Party, if any, in any court in any jurisdiction, it becomes necessary to convert into any other currency (such other currency being hereinafter in this SECTION 9.19 referred to as the "Judgment Currency") an amount due in CD$ or dollars under this Agreement, the conversion will be made at the rate of exchange prevailing on the Business Day immediately preceding:

(i)   the date of actual payment of the amount due, in the case of any proceeding in the courts of the Province of Ontario or in the courts of any other jurisdiction that will give effect to such conversion being made on such date; or

(ii)   the date on which the judgment is given, in the case of any proceeding in the courts of any other jurisdiction (the date as of which such conversion is made pursuant to this SECTION 9.19 being hereinafter in this SECTION 9.19 referred to as the "Judgment Conversion Date").

(b)   If, in the case of any proceeding in the court of any jurisdiction referred to in SECTION 9.19(a)(ii), there is a change in the rate of exchange prevailing between the Judgment Conversion Date and the date of actual payment of the amount due, the Canadian Borrower or any other Canadian Loan Party, if any, will pay such additional amount (if any, but in any event not a lesser amount) as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of CD$ or dollars, as the case may be, which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial order at the rate of exchange prevailing on the Judgment Conversion Date.

190

(c)   Any amount due from the Canadian Borrower or any other Canadian Loan Party, if any, under the provisions of this SECTION 9.19 will be due as a separate debt and will not be affected by judgment being obtained for any other amounts due under or in respect of this Agreement.

(d)   The term "rate of exchange" in this SECTION 9.19 means:

(i)   for a conversion of CD$ to the Judgment Currency, the reciprocal of the official noon rate of exchange published by the Bank of Canada for the date in question for the conversion of the Judgment Currency to CD$;

(ii)   for a conversion of dollars to the Judgment Currency when the Judgment Currency is CD$, the official noon rate of exchange published by the Bank of Canada for the date in question for the conversion of dollars to CD$;

(iii)   for a conversion of dollars to the Judgment Currency when the Judgment Currency is not CD$, the effective rate obtained when a given amount of dollars is converted to CD$ at the rate determined pursuant to this SECTION 9.19 and the result thereof is then converted to the Judgment Currency pursuant to this SECTION 9.19; or

(iv)   if a required rate is not so published by the Bank of Canada for any such date, the spot rate quoted by the Canadian Agent at Toronto, Canada at approximately noon (Toronto time) on that date in accordance with its normal practice for the applicable currency conversion in the wholesale market.

SECTION 9.20   Language. The parties herein have expressly requested that this Agreement and all related documents be drawn up in the English language. A la demande expresse des parties aux présentes, cette convention et tout document y afférent ont été rédigés en langue anglaise.

SECTION 9.21   [Reserved].

SECTION 9.22   Keepwell. Each Loan Party that, at the time the guarantee of (or grant of a security interest by, as applicable) another Loan Party becomes or would become effective as to any Swap Obligation of any Loan Party, is a Qualified ECP Guarantor intends that the Facility Guarantee constitute at such time, and such guarantee shall be deemed to constitute at such time, a guarantee for the benefit of each other Loan Party for purposes of Section la(18)(a)(v)(H) of the Commodity Exchange Act. For the avoidance of doubt, and for purposes of the foregoing sentence, such "effective" date with respect to any Loan Party shall be the date of the execution of a Hedge Agreement in respect of a Swap Obligation that constitutes a Bank Product if this Agreement is then in effect with respect to such Loan Party, and otherwise it shall be the date of execution and delivery of this Agreement by such Loan Party.

SECTION 9.23   Acknowledgement and Consent to Bail-In of EEA Financial Institutions.

191

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)   the effects of any Bail-In Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

ARTICLE X

Facility Guaranty

SECTION 10.01   Guarantee

Each Domestic Loan Party unconditionally guarantees, jointly with any other Domestic Loan Parties and severally, as a primary obligor and not merely as a surety, the due and punctual payment of the Secured Obligations (as defined in the Security Agreement) (but excluding any Excluded Swap Obligations). To the fullest extent permitted by applicable law and except as otherwise provided in the Loan Documents, each Domestic Loan Party waives notice of, or any requirement for further assent to, any agreements or arrangements whatsoever by the Secured Parties with any other person pertaining to the Secured Obligations, including agreements and arrangements for payment, extension, renewal, subordination, composition, arrangement, discharge or release of the whole or any part of the Secured Obligations, or for the discharge or surrender of any or all security, or for the compromise, whether by way of acceptance of part payment or otherwise, and, to the fullest extent permitted by applicable law, the same shall in no way impair each Domestic Loan Party's liability hereunder.

SECTION 10.02   Obligations Not Waived.

To the fullest extent permitted by applicable law and except as otherwise provided for herein or in the other Loan Documents, each Domestic Loan Party waives presentment to, demand of

192

payment from and protest to the Borrowers or any other person of any of the Secured Obligations, and also to the extent permitted by law and except as otherwise provided for herein or in the other Loan Documents waives notice of acceptance of its guarantee, notice of protest for nonpayment and all other formalities. To the fullest extent permitted by applicable law and except as otherwise provided for herein or in the other Loan Documents, the Guarantee of each Domestic Loan Party hereunder shall not be affected by (a) the failure of any Loan Party to assert any claim or demand or to enforce or exercise any right or remedy against the Borrowers or any Domestic Loan Party under the provisions of this Agreement, any other Loan Document or otherwise; (b) any extension, renewal or increase of or in any of the Secured Obligations; (c) any rescission, waiver, amendment or modification of, or any release from, any of the terms or provisions of this Agreement, the Credit Agreement, any other Loan Document, any guarantee or any other agreement or instrument, including with respect to any Domestic Loan Party under the Loan Documents; (d) the release of (or the failure to perfect a security interest in) any of the security held by or on behalf of the Administrative Agent or any other Secured Party; or (e) the failure or delay of any Secured Party to exercise any right or remedy against the Borrowers or any Loan Party of the Secured Obligations.

SECTION 10.03   Security.

Each Domestic Loan Party authorizes the Administrative Agent to (a) take and hold security (to the extent such Domestic Loan Party has executed a Security Agreement in favor of the Administrative Agent) for the payment of this Guarantee and the Secured Obligations and exchange, enforce, waive and release any such security pursuant to the terms of any other Loan Documents; (b) apply such security and direct the order or manner of sale thereof as it in its sole discretion may determine subject to the terms of any other Loan Documents; and (c) release or substitute any one or more endorsers, other Domestic Loan Parties or other obligors pursuant to the terms of any other Loan Documents. In no event shall this SECTION 10.3 require any Domestic Loan Party to grant security, except as required by the terms of the Loan Documents.

SECTION 10.04   Guarantee of Payment.

Each Domestic Loan Party further agrees that its guarantee constitutes a guarantee of payment when due and not of collection, and, to the fullest extent permitted by applicable law, waives any right to require that any resort be had by the Administrative Agent or any other Secured Party to any of the security held for payment of the Secured Obligations or to any balance of any deposit account or credit on the books of the Administrative Agent or any other Secured Party in favor of the Borrowers or any other person.

SECTION 10.05   No Discharge or Diminishment of Guarantee.

To the fullest extent permitted by applicable law and except as otherwise expressly provided in this Agreement, the Secured Obligations of each Domestic Loan Party hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the payment in full in cash of the Secured Obligations (other than contingent indemnity obligations with respect to then unasserted claims)), including any claim of waiver, release, surrender, alteration or compromise of any of the Secured Obligations, and shall not be subject to any defense (other than a defense of payment) or setoff, counterclaim, recoupment or termination whatsoever by reason

193

of the invalidity, illegality or unenforceability of the Secured Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Domestic Loan Party hereunder shall, to the fullest extent permitted by applicable law, not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or any other Secured Party to assert any claim or demand or to enforce any remedy under the Credit Agreement, any other Loan Document, any guarantee or any other agreement or instrument, by any amendment, waiver or modification of any provision of the Credit Agreement or any other Loan Document or other agreement or instrument, by any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations, or by any other act, omission or delay to do any other act that may or might in any manner or to any extent vary the risk of any Domestic Loan Party or that would otherwise operate as a discharge of any Domestic Loan Party as a matter of law or equity (other than the payment in full in cash of all the Secured Obligations (other than contingent indemnity obligations with respect to then unasserted claims)) or which would impair or eliminate any right of any Domestic Loan Party to subrogation. If at any time any payment of a Secured Obligation is rescinded or must be otherwise restored or returned upon the insolvency or receivership of any Borrower or otherwise, the Guarantees shall be reinstated with respect thereto as though such payment had been due but not made at such time.

SECTION 10.06   Defenses Waived

To the fullest extent permitted by applicable law, each Domestic Loan Party waives any defense based on or arising out of the unenforceability of the Secured Obligations or any part thereof from any cause or the cessation from any cause of the liability (other than the payment in full in cash of the Secured Obligations) of the Borrowers or any other person. Subject to the terms of the other Loan Documents, the Administrative Agent and the other Secured Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Secured Obligations, make any other accommodation with the Borrowers or any other Domestic Loan Party or exercise any other right or remedy available to them against the Borrowers or any other Domestic Loan Party, without affecting or impairing in any way the liability of each Domestic Loan Party hereunder except to the extent the Secured Obligations have been paid in cash. Pursuant to and to the fullest extent permitted by applicable law, each Domestic Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of each Domestic Loan Party against the Borrowers or any other Domestic Loan Party or any security.

SECTION 10.07   Agreement to Pay; Subordination.

In furtherance of the foregoing and not in limitation of any other right that the Administrative Agent or any other Secured Party has at law or in equity against each Domestic Loan Party by virtue hereof, upon the failure of the Borrowers or any other Loan Party to pay any Secured Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Domestic Loan Party hereby promises to and will forthwith pay, or cause to be paid, to the Administrative Agent or such other Secured Party as designated thereby in cash an amount equal to the unpaid principal amount of such Obligations then due, together with

194

accrued and unpaid interest and fees on such Obligations. Upon payment by each Domestic Loan Party of any sums to the Administrative Agent or any Secured Party as provided above, all rights of each Domestic Loan Party against the Borrowers arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full in cash of all the Secured Obligations (other than contingent indemnity obligations with respect to then unasserted claims). In addition, any indebtedness of the Borrowers or any Subsidiary now or hereafter held by each Domestic Loan Party that is required by the Credit Agreement to be subordinated to the Secured Obligations is hereby subordinated in right of payment to the prior payment in full of the Secured Obligations. If any amount shall be paid to any Domestic Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness at any time when any Secured Obligation then due and owing has not been paid, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Administrative Agent (or to the First Lien Administrative Agent, to the extent provided in the Intercreditor Agreement) to be credited against the payment of the Secured Obligations, whether matured or unmatured, in accordance with the terms of the Loan Documents (including the Intercreditor Agreement).

SECTION 10.08   General Limitation on Guarantee Obligations.

In any action or proceeding involving any state corporate law, or any state, Federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Domestic Loan Party under this Article X would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under this Agreement, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by any Domestic Loan Party, any creditor or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

SECTION 10.09   Information.

Each Domestic Loan Party assumes all responsibility for being and keeping itself informed of the Borrowers' financial condition and assets, all other circumstances bearing upon the risk of nonpayment of the Secured Obligations and the nature, scope and extent of the risks that each Domestic Loan Party assumes and incurs hereunder and agrees that none of the Administrative Agent or the other Secured Parties will have any duty to advise such Domestic Loan Party of information known to it or any of them regarding such circumstances or risks.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as a sealed instrument as of the day and year first above written.

**TOYS "R" US-DELAWARE, INC.**, as Lead Borrower

By: <u>/s/ Michael J. Short</u>
Name: Michael J. Short
Title: Executive Vice President - Chief Financial Officer

Signature Page to Superpriority Secured Debtor-in-Possession Credit Agreement

TOYS "R" US (CANADA) LTD.
TOYS "R" US (CANADA) LTEE, as a Canadian Borrower

By: /s/ Melanie Teed Merch
Name: Melanie Teed Merch
Title: Authorized Officer

By: /s/ Pascale Naccarato
Name: Pascale Naccarato
Title: Authorized Officer

Signature Page to Superpriority Secured Debtor-in-Possession Credit Agreement

GIRAFFE HOLDINGS, LLC

By: /s/ Michael J. Short
Name: Michael J. Short
Title: Executive Vice President - Chief Financial    Officer

**TOYS ACQUISITION, LLC**

By: /s/ Michael J. Short
Name: Michael J. Short
Title: President

**GEOFFREY HOLDINGS, LLC**

By: /s/ Michael J. Short
Name: Michael J. Short
Title: Executive Vice President - Chief Financial    Officer

**TRU OF PUERTO RICO, INC.**

By: /s/ Michael J. Short
Name: Michael J. Short
Title: Executive Vice President - Chief Financial    Officer

**TRU-SVC, INC.**

By: /s/ Michael J. Short
Name: Michael J. Short
Title: President

**GEOFFRY, LLC**

By: /s/ Michael J. Short
Name: Michael J. Short
Title: President

**GEOFFREY INTERNATIONAL, LLC**

By: Geoffrey, LLC
Its: Managing Member

By: /s/ Michael J. Short
Name: Michael J. Short
Title: President

Signature Page to Superpriority Secured Debtor-in-Possession Credit Agreement
.

**JPMORGAN CHASE BANK, N.A.**, as Administrative Agent, as Swingline Lender, and as a Domestic Lender

By: /s/ Barry Bergman
Name: Barry Bergman
Title: Managing Director

Signature Page to Superpriority Secured Debtor-in-Possession Credit Agreement

**JPMORGAN CHASE BANK, N.A. (acting through its Toronto branch)**,
as Canadian Agent, as Swingline Lender and as a Canadian Lender

By: /s/ Barry Bergman
Name: Barry Bergman
Title: Managing Director

Signature Page to Superpriority Secured Debtor-in-Possession Credit Agreement

**DEUTSCHE BANK AG NEW YORK BRANCH**, as Lender and Issuing Bank

By: /s/ Frank Fazio
Name: Frank Fazio
Title: Managing Director

By: /s/ Philip Saliba
Name: Philip Saliba
Title: Director

Signature Page to Superpriority Secured Debtor-in-Possession Credit Agreement

**GOLDMAN SACHS BANK USA**, as Lender and Issuing Bank

By: /s/ Robert Ehudin
Name: Robert Ehudin
Title: Authorized Signatory

**GOLDMAN SACHS LENDING PARTNERS LLC**, as Lender and Issuing Bank

By: /s/ Robert Ehudin
Name: Robert Ehudin
Title: Authorized Signatory

Signature Page to Superpriority Secured Debtor-in-Possession Credit Agreement

**BARCLAYS BANK PLC**, as Lender and Issuing Bank

By: /s/ Joseph Jordan
Name: Joseph Jordan
Title: Authorized Signatory


Signature Page to Superpriority Secured Debtor-in-Possession Credit Agreement

Exhibit 10.2

# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of September 22, 2017

among

TOYS "**R**" US-DELAWARE, INC.,
as Borrower

and

NexBank SSB,
as Administrative Agent and as Collateral Agent,

The Lenders Party Hereto,

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION FACILITY

## **TABLE OF CONTENTS**

|  |  |  | **Page** |
|---|---|---|---|
| ARTICLE I DEFINITIONS AND ACCOUNTING TERMS |  |  | 1 |
|  | 1.01 | Defined Terms | 1 |
|  | 1.02 | Other Interpretive Provisions | 30 |
|  | 1.03 | Accounting Terms | 31 |
|  | 1.04 | Times of Day; Time for Payment and Performance | 32 |
|  | 1.05 | Resolution of Drafting Ambiguities | 32 |
|  | 1.06 | Currency Equivalents Generally | 32 |
|  | 1.07 | Certifications; Provision of Information | 32 |
|  | 1.09 | Certifications; Compliance with Article VII | 32 |
| ARTICLE II THE COMMITMENTS AND BORROWING OF LOANS |  |  | 32 |
|  | 2.01 | Commitment to Lend Loans | 33 |
|  | 2.02 | Borrowings, Conversions and Continuations of Loans | 33 |
|  | 2.03 | Prepayments | 34 |
|  | 2.04 | Termination of Commitments | 36 |
|  | 2.05 | Repayment of Loans | 37 |
|  | 2.06 | Interest | 37 |
|  | 2.07 | Fees | 37 |
|  | 2.08 | Computation of Interest and Fees | 38 |
|  | 2.09 | Evidence of Indebtedness | 38 |
|  | 2.10 | Payments Generally; Administrative Agent's Clawback | 39 |
|  | 2.11 | Sharing of Payments by Lenders | 40 |
|  | 2.12 | [Reserved] | 41 |
|  | 2.13 | Defaulting Lenders | 41 |
| ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY |  |  | 42 |
|  | 3.01 | Taxes | 42 |
|  | 3.02 | Change in Legality | 45 |
|  | 3.03 | Alternate Rate of Interest for Loans | 46 |
|  | 3.04 | Increased Costs; Reserves on Eurodollar Rate Loans | 46 |
|  | 3.05 | Compensation for Losses | 47 |
|  | 3.06 | Mitigation Obligations; Replacement of Lenders | 48 |
|  | 3.07 | Survival | 49 |
| ARTICLE IV CONDITIONS PRECEDENT TO LOANS |  |  | 49 |
|  | 4.01 | Conditions Precedent to Closing Date | 49 |
|  | 4.02 | Conditions of Loans | 51 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES |  |  | 52 |
|  | 5.01 | Organization; Powers | 52 |
|  | 5.02 | Authorization; Enforceability | 52 |
|  | 5.03 | Governmental Approvals | 52 |
|  | 5.04 | Financial Condition | 53 |

| | | |
|---|---|---|
| 5.05 | Properties | 53 |
| 5.06 | Litigation and Environmental Matters | 53 |
| 5.07 | Compliance with Laws and Agreements | 54 |
| 5.08 | Investment and Holding Company Status | 54 |
| 5.09 | Taxes | 54 |
| 5.10 | ERISA | 54 |
| 5.11 | Disclosure | 55 |
| 5.12 | Subsidiaries | 55 |
| 5.13 | Insurance | 55 |
| 5.14 | Labor Matters | 55 |
| 5.15 | Federal Reserve Regulations | 56 |
| 5.16 | [Reserved] | 56 |
| 5.17 | Use of Proceeds | 56 |
| 5.18 | Intellectual Property Matters | 56 |
| 5.19 | Security Documents | 57 |
| 5.20 | Budget | 57 |
| 5.21 | Anti-Terrorism Law | 57 |
| ARTICLE VI AFFIRMATIVE COVENANTS | | 58 |
| 6.01 | Financial Statements and Other Information | 58 |
| 6.02 | Notices of Material Events | 61 |
| 6.03 | Existence; Conduct of Business | 61 |
| 6.04 | Payment of Obligations | 62 |
| 6.05 | Maintenance of Properties | 62 |
| 6.06 | Insurance | 62 |
| 6.07 | Books and Records; Inspection Rights; Accountants | 62 |
| 6.08 | Compliance with Laws | 63 |
| 6.09 | Use of Proceeds | 63 |
| 6.10 | Additional Collateral; Additional Guarantors: Additional Covenants | 63 |
| 6.11 | Security Interests; Further Assurances | 64 |
| 6.12 | Information Regarding Collateral | 65 |
| 6.13 | Lender Calls | 66 |
| 6.14 | Access to Information | 66 |
| 6.15 | Maintenance of Ratings | 66 |
| 6.16 | Revisions to Budget | 66 |
| ARTICLE VII NEGATIVE COVENANTS | | 67 |
| 7.01 | Liens | 67 |
| 7.02 | Investments | 70 |
| 7.03 | Indebtedness and Disqualified Capital Stock | 72 |
| 7.04 | Fundamental Changes | 74 |
| 7.05 | Asset Sales | 75 |
| 7.06 | Restricted Payments | 76 |
| 7.07 | Transactions with Affiliates | 77 |

-ii-

.

| | | |
|---|---|---|
| 7.08 | Sales and Leasebacks | 78 |
| 7.09 | Clauses Restricting Subsidiary Distributions | 78 |
| 7.10 | Use of Proceeds | 79 |
| 7.11 | Modifications of Charter Documents and Other Documents, Etc. | 81 |
| 7.12 | Fiscal Year | 81 |
| 7.13 | Chapter 11 Modifications | 81 |
| 7.14 | Anti-Terrorism Law; Anti-Money Laundering | 82 |
| 7.15 | Embargoed Person | 82 |
| 7.16 | No Further Negative Pledge | 82 |
| 7.17 | Maximum Cumulative Net Cash Flow Before DIP ABL Draw/Paydown. | 83 |
| 7.18 | Minimum Liquidity. | 83 |
| ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES | | 83 |
| 8.01 | Events of Default | 83 |
| 8.02 | Remedies upon Event of Default | 87 |
| 8.03 | Application of Funds | 87 |
| ARTICLE IX AGENTS | | 88 |
| 9.01 | Appointment and Authority | 88 |
| 9.02 | Rights as a Lender | 88 |
| 9.03 | Action by Agent. | 89 |
| 9.04 | Exculpatory Provisions | 89 |
| 9.05 | Reliance by the Administrative Agent | 90 |
| 9.06 | Delegation of Duties | 91 |
| 9.07 | Resignation of the Agent | 91 |
| 9.08 | Non-Reliance on the Agents and Other Lenders | 91 |
| 9.09 | No Other Duties, Etc. | 92 |
| 9.10 | Administrative Agent May File Proofs of Claim | 92 |
| 9.11 | Collateral and Guarantee Matters | 93 |
| 9.12 | Withholding Tax | 95 |
| ARTICLE X MISCELLANEOUS | | 95 |
| 10.01 | Amendments, Etc. | 95 |
| 10.02 | Notices; Effectiveness; Electronic Communication | 97 |
| 10.03 | No Waiver; Cumulative Remedies | 99 |
| 10.04 | Expenses; Indemnity; Damage Waiver | 99 |
| 10.05 | Payments Set Aside | 102 |
| 10.06 | Successors and Assigns | 102 |
| 10.07 | Treatment of Certain Information; Confidentiality | 106 |
| 10.08 | Right of Setoff | 107 |
| 10.09 | Interest Rate Limitation | 108 |
| 10.10 | Counterparts; Integration; Effectiveness | 108 |
| 10.11 | Survival of Representations and Warranties | 109 |
| 10.12 | Severability | 109 |
| 10.13 | Replacement of Lenders | 109 |

-iii-

.

| 10.14 | Governing Law, Jurisdiction; Etc. | 110 |
| 10.15 | Waiver of Jury Trial | 111 |
| 10.16 | USA PATRIOT Act Notice | 111 |
| 10.17 | Intercreditor Agreements | 111 |
| 10.18 | [Reserved]. | 111 |
| 10.19 | No Advisory or Fiduciary Responsibility | 111 |
| 10.20 | Electronic Execution of Assignments and Certain Other Documents | 112 |
| ARTICLE XI SECURITY AND PRIORITY | | 112 |
| 11.01 | Collateral; Grant of Lien and Security Interest | 112 |
| 11.02 | Priority and Liens Applicable to Loan Parties | 112 |
| 11.03 | Grants, Rights and Remedies | 114 |
| 11.04 | Survival | 114 |
| 11.05 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 115 |

**SCHEDULES**

| 2.01 | Commitments |
| 5.01 | Organization Information |
| 5.06(a) | Disclosed Matters |
| 5.06(b) | Environmental Matters |
| 5.12 | Subsidiaries; Joint Ventures; Assessable Equity Interests |
| 5.13 | Insurance |
| 5.14 | Collective Bargaining Agreements |
| 5.18 | Intellectual Property |
| 6.01(a) | Business Segment Reporting Requirements |
| 6.11 | Post-Closing Schedule |
| 7.01(g) | Existing Liens |
| 7.02(i) | Existing Investments |
| 7.03(c) | Existing Indebtedness |
| 7.05 | Dispositions |
| 7.07 | Transactions with Affiliates |
| 10.02 | Administrative Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

| Exhibit A-1 | Form of Borrowing or Conversion Notice |
| Exhibit A-2 | Form of Prepayment Notice |
| Exhibit B | Form of Note |
| Exhibit C | Form of Assignment and Assumption |
| Exhibit D | Form of Guarantee |
| Exhibit E | Form of Security Agreement |

Exhibit F   Form of Intercreditor Agreement
Exhibit G   United States Tax Compliance Certificate
Exhibit H   Interim Bankruptcy Court Order

-v-

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") dated as of September 22, 2017, among TOYS R" US-DELAWARE, INC., a Delaware corporation, as debtor and debtor-in-possession (the "Borrower"), each Lender from time to time party hereto, NexBank SSB, as administrative agent for the Lenders (together with its permitted successors and assigns in such capacity, the "Administrative Agent"), NexBank SSB, as collateral agent for the Secured Parties (together with its permitted successors and assigns in such capacity, the "Collateral Agent").

**WHEREAS**, the Loan Parties, Holdings and certain of their Affiliates have commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code (as hereinafter defined) in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), and the Loan Parties continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrower has asked the Lenders to make post-petition loans and advances to the Borrower comprising a priming term loan facility in an aggregate principal amount of $450.0 million. The Lenders have severally, and not jointly, agreed to extend such credit to the Borrower subject to the terms and conditions hereinafter set forth; and

**WHEREAS**, to provide security for the repayment of the Loans, and the payment of the other Obligations of the Loan Parties hereunder and under the Loan Documents, the Loan Parties will provide and grant to the Administrative Agent, for its benefit and the benefit of the other Secured Parties, certain security interests, liens, and other rights and protections pursuant to the terms hereof, and, in the case of the Loan Parties, security interests and liens pursuant to Sections 364(c)(2), 364(c)(3) and 364 (d) of the Bankruptcy Code, and super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, and other rights and protections, as more fully described herein and the Bankruptcy Court Orders.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## Article I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01   Defined Terms**. As used in this Agreement, the following terms shall have the meanings set forth below:

"13-Week Projection" shall mean a projected statement of sources and uses of cash for the Borrower and its Subsidiaries on a weekly basis for the current and following 12 calendar weeks, including the anticipated uses of the Facilities for each week during such period, in a form reasonably acceptable to the Administrative Agent. As used herein, "13-Week Projection" shall initially refer to the projections delivered prior to the Petition Date and, thereafter, the most recent 13-Week-Projection delivered by the Lead Borrower in accordance with Section 6.01(h).

-1-

"<u>ABL Collateral Agent</u>" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the ABL Credit Agreement.

"<u>ABL Credit Agreement</u>" means that certain debtor-in-possession asset-based credit agreement dated as of September 22, 2017 (as amended, modified or otherwise supplemented from time to time) among Toys "R" Us-Delaware, Inc., as lead borrower for the borrowers named therein, the lenders party thereto, J.P. Morgan Chase Bank, N.A., as administrative agent, J.P. Morgan Chase Bank, N.A., Toronto Branch, as Canadian agent, J.P. Morgan Chase Bank, N.A., as collateral agent, and the other agents and arrangers party thereto from time to time.

"<u>ABL Credit Agreement Documents</u>" means (a) the ABL Credit Agreement and (b) the other Loan Documents (as defined in the ABL Credit Agreement), including each mortgage and other security documents, guarantees, letter of credit documents and the notes issued thereunder, each as amended, restated, supplemented, waived or modified from time to time to the extent permitted by this Agreement.

"<u>ABL Credit Agreement Obligations</u>" means the "<u>ABL Obligations</u>" as defined in the Intercreditor Agreement.

"<u>ABL Priority Collateral</u>" has the meaning assigned to such term in the Intercreditor Agreement.

"<u>Adequate Protection Orders</u>" has the meaning assigned to such term in <u>Section 4.01(d)</u>.

"<u>Administrative Agent</u>" has the meaning assigned to such term in the preamble hereto.

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address and, as appropriate, account as set forth on <u>Schedule 10.02</u>, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affiliate</u>" means, with respect to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Affiliated Debt Fund</u>" means any investment fund managed or advised by Affiliates of the Sponsors that is a bona fide debt fund that extends credit or buys loans or debt securities as part of its ordinary course of business.

"<u>Affiliated Lender</u>" means a Sponsor or any Affiliate thereof that is not an Affiliated Debt Fund.

"<u>Agent Parties</u>" has the meaning assigned to such term in <u>Section 10.02(c)</u>.

"<u>Agents</u>" means the Administrative Agent and the Collateral Agent; and "<u>Agent</u>" shall mean either of them.

"<u>Aggregate Commitments</u>" means the Commitments of all the Lenders. As of the Petition Date, the Aggregate Commitments total $450.0 million.

"<u>Agreement</u>" has the meaning assigned to such term in the preamble hereto.

-2-

"Agreement Value" means, for each Hedge Agreement, on any date of determination, an amount determined by the Administrative Agent in its reasonable discretion equal to:

  a.   in the case of a Hedge Agreement documented pursuant to the ISDA Master Agreement, the amount, if any, that would be payable by any Loan Party to its counterparty to such Hedge Agreement, if (i) such Hedge Agreement was being terminated early on such date of determination, (ii) such Loan Party was the sole "Affected Party" (as therein defined) and (iii) the Administrative Agent was the sole party determining such payment amount (with the Administrative Agent making such determination pursuant to the provisions of the form of ISDA Master Agreement);

  b.   in the case of a Hedge Agreement traded on an exchange, the mark-to-market value of such Hedge Agreement, which will be the unrealized loss on such Hedge Agreement to the Loan Party which is party to such Hedge Agreement, determined by the Administrative Agent based on the settlement price of such Hedge Agreement on such date of determination; or

  c. in all other cases, the mark-to-market value of such Hedge Agreement, which will be the unrealized loss on such Hedge Agreement to the Loan Party that is party to such Hedge Agreement determined by the Administrative Agent as the amount, if any, by which (i) the present value of the future cash flows to be paid by such Loan Party exceeds (ii) the present value of the future cash flows to be received by such Loan Party, in each case pursuant to such Hedge Agreement.

"Anti-Terrorism Laws" has the meaning assigned to such term in Section 5.21(a).

"Applicable Law" means as to any Person: (a) all laws, statutes, rules, regulations, orders, codes, ordinances or other requirements having the force of law; and (b) all court orders, decrees, judgments, injunctions, notices, binding agreements and/or rulings, in each case of or by any Governmental Authority which has jurisdiction over such Person, or any property of such Person.

"Applicable Rate" means with respect to the Loans, 7.75% per annum for Base Rate Loans and 8.75% for Eurodollar Rate Loans.

"Applicable Subsidiaries" has the meaning assigned to such term in the definition "Net Cash Proceeds."

"Approved Fund" means any Fund that is managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that manages a Lender.

"Asset Sale" means any conveyance, sale, lease (as lessor), transfer (other than in connection with a granting of a Lien permitted hereunder) or other voluntary disposition (but excluding any Restricted Payment) (including by way of merger or consolidation and including any sale and leaseback transaction) of any property or assets (including, for the avoidance of

-3-

doubt, any sale of any Equity Interests of any Subsidiary of a Loan Party) by a Loan Party, excluding:

    i.   sales of inventory in the ordinary course of business;

    ii.   any use of cash and Cash Equivalents by any Loan Party or any of its Subsidiaries (other than a Special Refinancing Subsidiary);

    iii.   any casualty or property losses covered by insurance or condemnation proceeds by a Governmental Authority;

    iv.   subject to the Lenders' security interests therein, any licensing, sublicensing, settlement of claims or entering into co-existence agreements with respect to intellectual property in the ordinary course of business and consistent with past practice; and

    v.   solely for purposes of Section 2.03(b) hereof, any transaction permitted by Section 7.05 (other than transactions permitted by Sections 7.05(h), (j), (l), (n), (o) and (p) and, to the extent relating to a lease that is required to be capitalized on the lessor's financial statements prepared in accordance with GAAP, Section 7.05(g));

to any Person other than a Loan Party; provided that sales of assets for an aggregate consideration of $1.5 million or less with respect to any individual transaction or series of related transactions shall not constitute an "Asset Sale"; provided that, if the total amount of transactions exempted from the definition of "Asset Sale" pursuant to this proviso exceeds $10.0 million in the aggregate, then sales of assets thereafter (other than a sale of assets for a consideration of $500,000 or less) will be considered "Asset Sales."

      "Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

      "Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit C or any other form approved by the Administrative Agent.

      "Attributable Indebtedness" means, on any date, (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any synthetic lease obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

      "Avoidance Actions" means all causes of action arising under Chapter 5 of the Bankruptcy Code.

      "Backstop/Structuring Fee" has the meaning assigned to such term in Section 2.07(d).

      "Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

      "Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the

European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" has the meaning specified therefor in the recitals hereto.

"Bankruptcy Court Order" means the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as applicable.

"Bankruptcy Code" means Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"Base Rate" means, for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus ½ of 1%, (b) the Prime Rate and (c) the Eurodollar Rate for interest periods of one month plus 1.00%. Any change in such prime rate pursuant to subsection (b) above shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the preamble hereto.

"Borrower Materials" has the meaning assigned to such term in Section 6.01.

"Borrowing" means a borrowing consisting of Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period.

"Borrowing or Conversion Notice" means a notice of (a) a borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurodollar Rate Loans, pursuant to Section 2.02(a), which, if in writing, shall be executed by the Borrower and substantially in the form of Exhibit A-1 or such other form as may he approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent) appropriately completed and signed by a Responsible Officer of the Borrower.

"BRG" means Berkeley Research Group, LLC.

"Budget" means Schedule 1 to Exhibit A of the motion for entry of the Interim and Final Orders filed in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division on September 19, 2017, as updated from time to time in accordance with Section 6.16 (except for purposes of determining Cumulative Net Cash Flow Before DIP ABL Draw/Paydown) or with the consent of the Required Lenders. References herein to the Budget shall be deemed referenced to the Budget most recently delivered as provided in this definition.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located and, if such day relates to any Eurodollar Rate Loan, means any such day that is also a London Banking Day.

"Canadian Case" means the voluntary proceeding by Toys "R" Us (Canada) Ltd. Toys "R" Us (Canada) Ltee before the Ontario Superior Court of Justice Commercial List pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

"Canadian Pledge" means the pledge of 65% of the voting Equity Interests and 100% of the non-voting Equity Interests of Toys "R" Us (Canada) Ltd. Toys "R" Us (Canada) Ltee and related stock certificates dividends distributions rights and proceeds of the foregoing pursuant to the Security Agreement.

"Capital Lease Obligations" means, as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP; for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP consistently applied with the principles existing on the Closing Date.

"Carve Out" has the meaning specified in the Bankruptcy Court Order.

"Cash Equivalents" means, as to any Person, (a) securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States, Canada or any agency or instrumentality thereof (provided that the full faith and credit of the United States or Canada is pledged in support thereof) or any state or state agency thereof having maturities of not more than one year from the date of acquisition by such Person; (b) time deposits, banker's acceptances and certificates of deposit of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia (or Canada or any province thereof) having, capital and surplus aggregating in excess of $500.0 million with maturities of not more than one year from the date of acquisition by such Person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in subsection (a) above (without regard to the limitation on maturity contained in such clause) and entered into with any financial institution meeting the qualifications specified in subsection (b) above or with any primary dealer, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper rated at least A-l or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than one year after the date of acquisition by such Person; (e) investments in money market or mutual funds substantially all of whose assets are comprised of securities of the types described in subsections (a) through (d) above; (f) in the case of Foreign Subsidiaries, Investments made locally of a type comparable to those described in subsections (a)-(e) of this definition; and (g) demand deposit accounts maintained in the ordinary course of business.

"Cash Management Orders" has the meaning assigned to such term in Section 4.01(d).

"CCAA DIP Orders" means the entry of an order of the Ontario Superior Court of Justice (Commercial List) pursuant to the commencement of the *Companies' Creditors Arrangements Act* proceedings of Toys "R" Us (Canada) Ltd.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq.

"CFC" means a Subsidiary that is a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

-6-

"CFC Holdco" means any wholly owned Subsidiary that (i) is organized under the laws of the United States, any State thereof or the District of Columbia and (ii) owns no material assets other than the Equity Interests (or any debt or obligations treated as Equity Interests for U.S. federal income tax purposes) of one or more CFCs.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption of any law, rule or regulation, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International settlements the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III shall in each case he deemed to have none into effect after the Closing Date regardless of the date enacted, adopted or issued and shall he included as a Change in Law hut only to the extent a Lender is imposing applicable increased costs or costs in connection with capital adequacy requirements generally on other borrowers of loans under United States credit facilities.

"Change of Control" means

      a.      Holdings at any time ceases to directly own 100% of the Equity Interests of the Borrower;

      b.      the sale, lease, transfer or other conveyance, in one or a series of related transactions, of all or substantially all of the assets of the Borrower and its Subsidiaries, taken as a whole, to any Person other than a Permitted Holder;

      c.      the Borrower becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(l) under the Exchange Act), other than the Permitted Holders, in a single transaction or in a related series of transactions, by way of merger, consolidation or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), of 50% or more of the total voting power of the Voting Stock of the Borrower or Holdings; or

      d.      occupation of a majority of the non-vacant seats on the board of directors (or other body exercising similar management authority) of Holdings by Persons who were neither (i) nominated by the Sponsors nor (ii) appointed by directors so nominated.

"Chapter 11 Cases" has the meaning assigned to such term in the recitals hereto.

"Charter Documents" means (a) with respect to any corporation, the certificate or s of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or s of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Closing Date" means the first date all the conditions in Section 4.01 have been satisfied or waived which shall not be later than six (6) Business Days after the Interim Bankruptcy Court Order Entry Date, in either case without the consent of the Required Lenders.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all the property pledged or granted as collateral pursuant to the Security Documents and the "Term DIP Group Collateral" referred to in the Bankruptcy Court Orders, including substantially all real and personal property of the Loan Parties other than Excluded Assets (as defined in the Security Agreement).

"Collateral Agent" has the meaning assigned to such term in the preamble hereto.

"Commitment" shall mean, (a) in the case of each Lender that is a Lender on the Closing Date, the amount set forth opposite such Lender's name on Schedule 2.01 as such Lender's "Commitment" and (b) in the case of any Lender that becomes a Lender after the date hereof, the amount specified as such Lender's "Commitment" in the Assignment and Acceptance pursuant to which such Lender assumes a portion of the Commitments, as the same may be changed from time to time pursuant to the terms hereof. The aggregate amount of the Commitments as of the Closing Date totals $450.0 million.

"Consolidated" means, when used to modify a financial term, test, statement or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries (other than the Propco Subsidiaries).

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Investment Affiliate" means, as to any Person, any other Person which directly or indirectly is in Control of, is Controlled by, or is under common Control with, such Person and is organized by such Person (or any Person Controlling such Person) primarily for making equity or debt investments in Holdings or other portfolio companies.

"Credit Date" means the date of making of a Loan.

"Cumulative Net Cash Flow Before DIP ABL Draw/Paydown" means, as of any Test Date, an amount equal to the cumulative variance calculated as the Total Cash Flow Before DIP ABL Draw/Paydown as set forth in the Budget on a cumulative basis from the Petition Date to such Test Date less the actual Total Cash Flow Before DIP ABL Draw/Paydown, on a cumulative basis from the Petition Date to such Test Date calculated in the same manner as set forth in such Budget, but in each case adjusted to exclude (A) proceeds of Asset Sales and other dispositions outside the ordinary course of business, in each case other than of inventory, (B) Loans made hereunder after the initial funding, loans under the ABL Credit Agreement, and any other proceeds of Indebtedness, and (C) and principal prepayments or repayments of Indebtedness (other than Capital Lease Obligations payments accounted for as part of Operating Cash Flow in the Budget).

"Debt Issuance" means the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness (other than any Excluded Debt) after the Closing Date.

-8-

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the lapse of any cure period set forth in <u>Section 8.01</u>, or both, would, unless cured or waived hereunder, become an Event of Default.

"<u>Default Rate</u>" has the meaning assigned to such term in <u>Section 2.06(b)</u>.

"<u>Defaulting Lender</u>" means, subject to <u>Section 2.13(b)</u>, any Lender that, as determined by the Administrative Agent, has (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; <u>provided</u> that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority.

"<u>DIP Superpriority Claim</u>" has the meaning specified in <u>Section 11.02(a)(i)</u>.

"<u>Disclosed Matters</u>" means the actions, suits and proceedings and the environmental matters disclosed on <u>Schedule 5.06</u>.

"<u>Disqualified Capital Stock</u>" means any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is six months following the Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the date that is six months following the Maturity Date, or (c) contains any mandatory repurchase obligation which may come into effect prior to payment in full of all Obligations; <u>provided</u> that any Equity Interests that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a change in control or an asset sale occurring prior to the date that is six months following the Maturity Date shall not constitute Disqualified Capital Stock; <u>provided</u> <u>further</u>, that if such Equity Interests are issued pursuant to a plan for the benefit of employees of the Holdings (or any direct or indirect parent thereof), the Borrower or the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by Holdings, the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"<u>Disqualified Lender</u>" means those persons that are direct or indirect competitors of the Borrower and its Subsidiaries to the extent identified by the Borrower or its Affiliates to the Administrative Agent by name in writing from time to time, and any of their controlled Affiliates clearly identifiable as such on the basis of such controlled Affiliate's name; *provided*, that the foregoing shall not apply retroactively to disqualify any parties that have previously acquired an assignment or participation interest in the Loans to the extent such party was not an Disqualified

-9-

Lender at the time of the applicable assignment or participation, as the case may be; *provided* further that the Administrative Agent shall have no obligation to carry out due diligence in order to identify such Affiliates.

"Dollar" and "$" mean lawful money of the United States.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; (d) any other commercial bank, insurance company, investment or mutual fund that is engaged in the business of making, purchasing, holding or investing in commercial or bank loans and similar extensions of credit or a commercial finance company, which Person, together with its Affiliates or Approved Funds, have a combined capital and surplus or net asset value in excess of $500.0 million; (e) any Affiliated Debt Fund; and (f) any other Person reasonably approved by the Administrative Agent; provided that an "Eligible Assignee" shall not include any natural person, an Affiliated Lender, Holdings, the Borrower or any of their Subsidiaries or any Disqualified Lender.

"Embargoed Person" has the meaning assigned to such term in Section 7.15.

"Employee Benefit Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) that is maintained or contributed to by a Loan Party or with respect to which a Loan Party or any ERISA Affiliate could incur liability.

"Environmental Laws" means all Applicable Laws issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the protection of human health or the environment, to the handling, treatment, storage, disposal of Hazardous Materials or to the assessment or remediation of any Release or threatened Release of any Hazardous Material to the environment.

"Environmental Liability" means any liability, contingent or otherwise (including, without limitation, any liability for damages, natural resource damage, costs of environmental remediation, administrative oversight costs, fines, penalties or indemnities), of any Loan Party directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any

-10-

Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interest" means, with respect to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation (including an interest or participation in one or more divisions or lines of a business of a Loan Party) that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such Person, division or line of business, whether outstanding on the date hereof or issued after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) with respect to the Borrower and its domestic Subsidiaries, any "reportable event," as defined in Section 4043 of ERISA with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) with respect to the Borrower and its domestic Subsidiaries, the failure to satisfy the minimum funding standard under Section 412 of the Code and Section 302 of ERISA with respect to any Plan, whether or not waived, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan, where any such failure, individually or in the aggregate, is in excess of $150.0 million (or such lesser amount as would reasonably be expected to result in a Material Adverse Effect); (c) the filing pursuant to Section 412 of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan that has a funding deficiency of more than $150.0 million (or such lesser amount as would reasonably be expected to result in a Material Adverse Effect); (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan (other than in a standard termination under Section 4041(b) of ERISA); (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability in excess of $150.0 million (or such lesser amount as would reasonably be expected to result in a Material Adverse Effect) with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability in excess of $150.0 million (or such lesser amount as would reasonably be expected to result in a Material Adverse Effect) or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

-11-

"<u>Eurodollar Base Rate</u>" means:

a.         (a) for any Interest Period with respect to a Eurodollar Rate Loan, the rate per annum equal to the London Interbank Offered Rate ("<u>LIBOR</u>") or (to the extent such rate ceases to exist) a comparable or successor rate, which comparable or successor rate is approved by the Administrative Agent in consultation with the Borrower, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for deposits in dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the "<u>Eurodollar Rate</u>" for such Interest Period shall be (i) the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted by and with a term equivalent to such Interest Period would be offered by to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period based on information presented by any interest rate reporting service of recognized standing selected by Administrative Agent in consultation with the Borrower (or if Administrative Agent determines that no interest rate reporting service has presented such information, the rate of interest at which deposits in U.S. dollars are offered to major banks in the London interbank market for a term equivalent to such Interest Period by any bank reasonably selected by Administrative Agent in consultation with the Borrower) or (ii) an alternative rate mutually agreed between the Administrative Agent and the Borrower; <u>provided</u> that, notwithstanding the foregoing, in no event shall the Eurodollar Rate with respect to a Eurodollar Rate Loan at any time be less than 1.00%; and

b.         for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to (i) LIBOR, at approximately 11:00 a.m., London time determined two Business Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the date of determination in same day funds in the approximate amount of the Base Rate Loan being made or maintained and with a term equal to one month would be offered to major banks in the London interbank eurodollar market at their request at the date and time of determination based on information presented by any interest rate reporting service of recognized standing selected by Administrative Agent in consultation with the Borrower (or if Administrative Agent determines that no interest rate reporting service has presented such information, the rate of interest at which deposits in U.S. dollars are offered to major banks in the London interbank market for a term equivalent to such Interest Period by any bank reasonably selected by Administrative Agent in consultation with the Borrower).

-12-

"Eurodollar Rate" means for any Interest Period with respect to a Eurodollar Rate Loan, a rate per annum determined by the Administrative Agent pursuant to the following formula:

$$\text{Eurodollar Rate} = \frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurodollar Reserve Percentage}}$$

"Eurodollar Rate Loan" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"Eurodollar Reserve Percentage" means, for any day during any Interest Period, the reserve percentage (expressed as a decimal, carried out to five decimal places) in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the FRB for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurodollar funding (currently referred to as "Eurocurrency liabilities"). The Eurodollar Rate for each outstanding Eurodollar Rate Loan shall be adjusted automatically as of the effective date of any change in the Eurodollar Reserve Percentage.

"Event of Default" has the meaning assigned to such term in Section 8.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Debt" means, collectively, any Indebtedness permitted by Section 7.03.

"Excluded JVs" means, collectively, ZT-Winston Salem Associates JV and SALITRU Associates JV.

"Excluded Subsidiaries" means, collectively, Giraffe Junior Holdings, LLC, TRU Guam, LLC, the Propco Subsidiaries, the Excluded JVs and Wayne Real Estate Holding Company, LLC.

"Excluded Taxes" means, with respect to the Agents, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the recipient's principal office or applicable Lending Office is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 10.13), any U.S. federal withholding tax that is imposed pursuant to any laws in effect at the time such Foreign Lender becomes a party to this Agreement (or designates a new Lending Office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from such Loan Party with respect to such withholding tax pursuant to Section 3.01(a), (d) any withholding

-13-

tax that is attributable to such Foreign Lender's failure to comply with Section 3.01(e), (e) any U.S. federal withholding tax that is imposed by reason of FATCA; or (f) any withholding tax attributable to a Lender's (other than a Foreign Lender) or the Administrative Agent's failure to provide applicable IRS Forms W-9 (to the extent such Lender or Agent is eligible to provide such forms) pursuant to Sections 3.01(e)(ii)(A) or 3.01(j), as applicable.

"Executive Order" has the meaning assigned to such term in Section 5.21(a).

"Extraordinary Receipts" means any receipt by any Loan Party or any of its Subsidiaries of any casualty or property insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace, restore, refurbish or repair such equipment, fixed assets or real property; provided that any casualty or property insurance proceeds or condemnation awards of $3.5 million or less with respect to any individual event or series of related events shall not constitute "Extraordinary Receipts."

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Sections 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty, or convention entered into in connection with the implementation of the foregoing.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) quoted for such day by three Federal funds brokers of recognized standing selected by the Administrative Agent.

"Fee Letter" means the letter agreement dated as of September 22, 2017, between the Borrower and the Administrative Agent.

"First and Second Day Orders" means all customary interim and final orders of the Bankruptcy Court relating to (i) critical vendors, (ii) foreign vendors, (iii) shippers, warehouseman and lienholders, (iv) 503(b)(9) claimants, (v) customer programs, (vi) insurance, (vii) tax claims, (viii) tax attributes, (ix) utilities, (x) wages and employee benefits, (xi) cash management, (xii) case management and/or cross-border protocols, (xiii) joint administration,

-14-

(xiv) extension of time to file schedules and statements of financial affairs, and (xv) debtor in possession financing and/or the use of cash collateral.

"Final Bankruptcy Court Order" means the order of the Bankruptcy Court, approving the Term Facility on a final basis, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, as the same may be amended, modified or supplemented from time to time with, solely in the case any such amendment, modification or supplement that adversely impacts the rights or duties of the Lenders in any respect, the consent of the Required Lenders (and with respect to amendments, modifications or supplements that adversely affect the rights or duties of the Administrative Agent in any respect, the Administrative Agent).

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarters shall generally end on the last Saturday of each April, July, October or January of such Fiscal Year in accordance with the fiscal accounting calendar of the Borrower.

"Fiscal Year" means any period of twelve consecutive months ending on the Saturday closest to January 31 of any calendar year.

"Flood Insurance Laws" means, collectively (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" means any Lender that is not a United States person within the meaning of Section 7701(a)(30) of the Code.

"Foreign Subsidiary" means any direct or indirect Subsidiary of a Loan Party which is not organized under the laws of the United States, any State thereof or the District of Columbia.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in investing in commercial loans and similar extensions of credit in the ordinary course.

"GAAP" means principles which are consistent with those promulgated or adopted by the Financial Accounting Standards Board and its predecessors (or successors) in effect and applicable to that accounting period in respect of which reference to GAAP is being made; provided that with respect to Foreign Subsidiaries of Borrower organized under the laws of Canada, "GAAP" shall mean principles which are consistent with those promulgated or adopted

-15-

by the Canadian Institute of Chartered Accountants and its predecessors (or successors) in effect and applicable to the accounting period in respect of which reference to GAAP is being made; <u>provided</u> further that with respect to other Foreign Subsidiaries of Borrower the books and records of such Subsidiary may instead be prepared with principles consistent with those promulgated or adopted by the applicable accounting standard board (or similar governing entity) in effect and applicable to the accounting period.

"<u>Geoffrey Collateral</u>" means the "Geoffrey Collateral" as defined in the Intercreditor Agreement.

"<u>Governmental Authority</u>" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"<u>Granting Lender</u>" has the meaning assigned to such term in <u>Section 10.06(g)</u>.

"<u>Guarantee</u>" means, collectively, the guarantee made by the Guarantors in favor of the Administrative Agent, substantially in the form of <u>Exhibit D</u>, and each other guarantee and guarantee supplement delivered pursuant to <u>Section 6.10</u>.

"<u>Guarantors</u>" means the Affiliates of the Borrower signatory to the Guarantee on the date hereof and any Person required to execute a Guarantee pursuant to <u>Section 6.10</u>.

"<u>Hazardous Materials</u>" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, mold, fungi or similar bacteria, and all other substances or wastes of any nature regulated pursuant to any Environmental Law because of their dangerous or deleterious properties, including any material listed as a hazardous substance under Section 101(14) of CERCLA.

"<u>Hedge Agreement</u>" means any derivative agreement, any interest rate protection agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement designed to hedge against fluctuations in interest rates or foreign exchange rates or commodity prices.

"<u>Holdings</u>" means Toys "R" Us, Inc., a Delaware corporation.

"<u>Houlihan</u>" means Houlihan Lokey Capital, Inc.

-16-

"<u>Indebtedness</u>" means, as to any Person at a particular time, the following (without duplication):

a.      all obligations of such Person for borrowed money; <u>provided</u> that all such obligations and liabilities which are limited in recourse to such property shall be included in Indebtedness only to the extent of the lesser of the fair market value of such property and the then outstanding amount of such Indebtedness;

b.      all obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

c.      all direct or contingent obligations of such Person arising under letters of credit as an account party (including standby and commercial), letters of guarantee, bankers' acceptances and bank guarantees;

d.      the Agreement Value of all Hedge Agreements;

e.      all obligations of such Person to pay the deferred purchase price of property or services (excluding accrued expenses and accounts payable incurred in the ordinary course of business);

f.      Indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; <u>provided</u> that all such obligations and liabilities which are limited in recourse to such property shall be included in Indebtedness only to the extent of the lesser of the fair market value of such property and the then outstanding amount of such Indebtedness;

g.      Capital Lease Obligations; <u>provided</u> that all such obligations and liabilities which are limited in recourse to such property shall be included in Indebtedness only to the extent of the lesser of the fair market value of such property and the then outstanding amount of such Indebtedness;

h.      all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Disqualified Capital Stock in such Person or any other Person (except any obligation to purchase, redeem, retire or otherwise acquire for value any Equity Interests of any Loan Party from present or former officers, directors or employees of such Loan Party or any Subsidiary thereof upon the death, disability, retirement or termination of employment or service of such officer, director or employee, or otherwise under any stock option or employee stock ownership plan approved by the board of directors of such Loan Party), valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends;

i.    the principal and interest portions of all rental obligations of such Person under any synthetic lease, tax retention operating lease, off-balance-sheet loan or similar off-balance-sheet financing where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP; and

j.    all guarantees of such Person in respect of Indebtedness of others.

Indebtedness shall not include (A) any sale-leaseback transactions to the extent the lease or sublease thereunder is not required to be recorded under GAAP as a capital lease, (B) any obligations relating to overdraft protection and netting services, (C) any preferred stock required to be included as Indebtedness in accordance with GAAP and FAS 150, (D) trade accounts payable, customary obligations under employment agreements and deferred compensation, and liabilities associated with customer prepayments and deposits, in each case incurred in the ordinary course of business, or (E) operating leases.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner), to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of any Capital Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

"Indemnified Taxes" means all Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Indemnitee" has the meaning assigned to such term in Section 10.04(b).

"Information" has the meaning assigned to such term in Section 10.07.

"Initial Lender" means each Lender as of the Closing Date.

"Initial Loan" has the meaning assigned to such term in Section 2.01.

"Intellectual Property" has the meaning assigned to such term in Section 5.18.

"Intercreditor Agreement" means an intercreditor agreement relating to the ABL Credit Agreement, and if applicable the Wayne Loans and the TRU Canada Loans, and this Agreement substantially in the form of Exhibit F.

"Interest Payment Date" means the last Business day of each month.

-18-

"<u>Interest Period</u>" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one month thereafter; <u>provided</u> that:

  i.  any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

  ii.  any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

  iii.  no Interest Period shall extend beyond the Maturity Date.

"<u>Interim Bankruptcy Court Order</u>" means the order of the Bankruptcy Court, approving the Term Facility on an interim basis, in the form of <u>Exhibit</u> H hereto, as the same may be amended, modified or supplemented from time to time with, solely in the case of any amendment, modification or supplement that is adverse to the rights or duties of the Lenders, the consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent).

"<u>Interim Bankruptcy Court Order Entry Date</u>" means the date on which the Interim Bankruptcy Court Order shall have been entered on the docket of the Bankruptcy Court.

"<u>Investment</u>" means, as to any Person, any direct or indirect (a) purchase or other acquisition of capital stock or other securities, including any option, warrant or right to acquire the same, of another Person, (b) loan, advance or capital contribution to, extension of credit (except for current trade and customer accounts receivable for inventory sold or services rendered in the ordinary course of business), guarantee of Indebtedness of a Non-Loan Party or assumption of obligations of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor guarantees Indebtedness of such other Person, or (c) purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the assets of another Person or any merger or consolidation of such Person with any other Person, in each case in any transaction or group of transactions which are part of a common plan. For purposes of covenant compliance, the amount of any Investment shall be the aggregate Investment less all cash returns, cash dividends and cash distributions (or the fair market value of any non-cash returns, dividends or distributions) received by such Person and less all liabilities expressly assumed by another Person in connection with the sale of such Investment.

-19-

"ISDA Master Agreement" means the form entitled "2002 ISDA Master Agreement" or such other replacement form then currently published by the International Swap and Derivatives Association, Inc. or any successor thereto.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Lenders" means a financial institution party hereto with a Commitment or an outstanding Loan, together with any Person that subsequently becomes a Lender by way of assignment in accordance with the terms of Section 10.06, together with their respective successors, other than any Person that ceases to be a Lender as a result of an assignment in accordance with Section 10.06 or an amendment of this Agreement.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities, whether or not filed, recorded or perfected under applicable Law.

"Liquidity" means, as of any time (i) domestic cash and Cash Equivalents of the Loan Parties plus (ii) as of such time, the principal amount of loans available for borrowing under the ABL Credit Agreement after giving effect to the borrowing base formula and all applicable reserves, holdbacks and minimum availability tests.

"Loan(s)" means any (each) loan made to the Borrower pursuant to Section 2.01 hereof.

"Loan Documents" means this Agreement, each Note, the Guarantees, the Security Documents, the Fee Letter, the Intercreditor Agreement and any other agreement, instrument, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing an Obligation.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

-20-

"London Banking Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Margin Stock" has the meaning assigned to such term in Regulation U.

"Marketable Securities" means any security that is listed or recorded on a United States national securities exchange, quoted on Nasdaq (or any other successors thereto), on the Nasdaq National Market (or any successors thereto) or any United States national automated interdealer quotation system, with a seven-day average public float of at least $500.0 million.

"Master Lease" means each of the Master Leases entered into by any Loan Party with any other direct or indirect domestic subsidiary of Holdings, and any and all modifications thereto, substitutions therefor and replacements thereof.

"Material Adverse Effect" means any event, facts, or circumstances, which has a material adverse effect on (a) the business, assets, financial condition or income of the Loan Parties taken as a whole, excluding in any event the events leading up to and resulting from the Chapter 11 Cases and the Chapter 11 Cases themselves or (b) the validity or enforceability of the Loan Documents or any of the material rights or remedies of the Lenders or the Agents thereunder.

"Maturity Date" means the date which is the earliest of (i) January18, 2019, (ii) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code), in each case, of an Approved Plan of Reorganization, (iii) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a Chapter 7 case, (iv) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (v) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise, and (vi) such earlier date on which the Term Loans shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"Maximum Rate" has the meaning assigned to such term in Section 10.09.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means, individually or collectively as the context may require, one or more mortgages, deeds of trust, trust deeds, deeds to secure indebtedness, debenture, financing statement or other similar document entered into or authorized to be filed by the owner or lessee, as applicable, of each parcel of Real Property owned by the Loan Parties encumbering each such owner's fee interest in such Real Property, collectively with all additions, improvements, component parts and personal property related thereto and all rents and profits therefrom, each securing the Obligations, in favor of the Collateral Agent for the benefit of the Lenders, as the same may be amended, supplemented or otherwise modified from time to time, in each case, subject to Permitted Liens.

-21-

"Multiemployer Plan" means an Employee Benefit Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds" means:

a.    with respect to any asset sale, the cash proceeds received by any Loan Party or any of its Subsidiaries (other than (1) the Excluded Subsidiaries and (2) any Foreign Subsidiary to the extent the repatriation of such cash proceeds could result in adverse tax consequence to the Borrower, until such time as any such cash proceeds are repatriated or otherwise transferred out of the home jurisdiction of any such Foreign Subsidiary, (collectively, the "Applicable Subsidiaries")) including cash proceeds subsequently received (as and when received by such Loan Party or any of its Subsidiaries (other than the Applicable Subsidiaries)) in respect of non-cash consideration initially received, net of (i) selling and/or liquidation expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, appraisal and title expenses, recording, transfer and similar taxes paid or payable upon such sale); (ii) amounts reasonably and in good faith estimate of other taxes paid or payable in connection with such sale; (iii) amounts reasonably and in good faith provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by such Loan Party or any of its Subsidiaries (other than the Applicable Subsidiaries) associated with the properties sold in such Asset Sale (provided that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds); (iv) such Loan Party's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 90 days of such Asset Sale (provided that, to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Asset Sale, such cash proceeds shall constitute Net Cash Proceeds); (v) in the case of a sale or other disposition (including casualty or condemnation) of an asset, the amount of all payments required to be made by any Loan Party or any of its Subsidiaries (other than the Applicable Subsidiaries) as a result of such event to repay (or to establish any required escrow for the repayment of) any Indebtedness secured by such asset; (vi) other reasonable fees and expenses actually incurred in connection therewith; (vii) capital gains or other income taxes paid or payable as a result of any such sale or disposition (after taking into account available tax credits or deductions) and (vii) in the case of assets sold in connection with a sale and leaseback transaction, the amount of all (x) repayments made with such proceeds in respect of borrowings incurred and (y) prior capital expenditures made by the Loan Parties, in each case to finance the acquisition or improvement of such assets in contemplation of such sale and leaseback transaction;

b.    with respect to any Debt Issuance by any Person or any of its Subsidiaries (other than the Applicable Subsidiaries), the cash proceeds thereof, net of reasonable fees, commissions, costs and other expenses incurred in connection therewith; and

c.    with respect to any Extraordinary Receipts, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, other than proceeds of ABL Priority Collateral (which, for the avoidance of doubt, shall not include the Canadian Pledge) if and for so long as the obligations under the ABL Credit

-22-

Agreement remain outstanding, net of (i) all reasonable fees, costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Extraordinary Receipts and net of any portion of such proceeds, awards or compensation constituting reimbursement or compensation for amounts previously paid by the Loan Parties or their Subsidiaries (other than the Applicable Subsidiaries) in respect of the theft, loss, destruction, damage or other similar event relating to such Extraordinary Receipts, (ii) in the case of a sale or other disposition of an asset pursuant to a casualty or condemnation, the amount of all payments required to be made by any Loan Party or any of their respective Subsidiaries (other than the Applicable Subsidiaries) as a result of such event to repay (or to establish an escrow for the repayment of) any Indebtedness secured by such asset or otherwise subject to mandatory prepayment under the ABL Credit Agreement (other than a prepayment in respect of the Canadian Pledge) as a result of such event, and (iii) capital gains or other income taxes paid or payable upon such sale or disposition (after taking into account any available tax credits or deduction).

"Non-Delaware Silo Entities" has the meaning assigned to such term in Section 7.10(c).

"Non-Guarantor Subsidiary" means any Subsidiary of a Loan Party that is not a Guarantor.

"Non-Loan Party" means Holdings and any direct or indirect Subsidiary of Holdings that is not a Loan Party.

"Note" means a promissory note made by the Borrower in favor of a Lender or its registered assigns, in substantially the form of Exhibit B hereto, evidencing Loans made by such Lender to the Borrower.

"Obligations" means (a) obligations of the Borrower and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including monetary obligations accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise, of the Borrower and the other Loan Parties under this Agreement and the other Loan Documents and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrower and the Loan Parties under or pursuant to this Agreement and the other Loan Documents.

"OFAC" has the meaning assigned to such term in Section 5.21(b)(v).

"on" when used with respect to the Property or any property adjacent to the Property, means "on, in, under, above or about."

"Other Taxes" means any and all current or future stamp, court, intangible, recording, filing, or documentary Taxes or any other excise, property or similar Taxes arising from any

-23-

payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Participant" has the meaning assigned to such term in Section 10.06(d).

"Participation Register" has the meaning assigned to such term in Section 10.06(d)(vii).

"Patriot Act" has the meaning assigned to such term in Section 10.16.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Acquisition" shall mean any transaction or series of related transactions for the direct or indirect (a) acquisition of all or substantially all of the property of any Person, or of any business or division of any Person; (b) acquisition of in excess of 50% of the Equity Interests of any Person, and otherwise causing such Person to become a Subsidiary of such Person; or (c) merger or consolidation or any other combination with any Person (each of the foregoing, an "Acquisition"), if each of the following conditions is met:

> (i)    no Default then exists or would result therefrom;

> (ii)    the Person or business to be acquired shall be, or shall be engaged in, a business of the type that Borrower and the Subsidiaries are engaged in on the Restatement Date and reasonable extensions thereof, including, but not limited to businesses which are complementary to the business of the type that Borrower and the Subsidiaries are engaged in on the Restatement Date, such as manufacturing and shipping, or any other business otherwise permitted to be engaged in the Borrower or its Subsidiaries under this Agreement, and the property acquired in connection with any such transaction shall be made subject to the Lien of the Security Documents, to the extent required therein;

> (iii)    the board of directors of the Person to be acquired shall not have indicated publicly its opposition to the consummation of such acquisition (which opposition has not been publicly withdrawn) or commenced any action which alleges that such acquisition will violate Applicable Law; and

> (iv)    the Borrower shall have furnished the Administrative Agent with ten (10) days' prior written notice of such intended acquisition and shall have furnished the Administrative Agent with a current draft of the acquisition agreement and other acquisition documents relating to the Acquisition.

"Permitted Holders" means (a) the Sponsors and (b) their respective Permitted Transferees.

"Permitted Holdings Expenses" means expenses of Holdings consisting of (a) franchise taxes and other costs required to maintain the legal existence of Holdings, (b) corporate overhead expenses incurred in the ordinary course of business, excluding any payments made to or for the benefit of the Sponsors (excluding payments pursuant to the following clause (d)), (c) audit costs, professional fees and expenses and other costs incurred by Holdings in connection with

-24-

reporting obligations under or otherwise incurred in connection with compliance with Applicable Law (including applicable rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, including in respect of any reports filed with respect to the Securities Act, the Exchange Act or the respective rules and regulations promulgated thereunder), (d) obligations of Holdings under or in respect of director and officer insurance policies or indemnification obligations to directors or officers and directors' fees and expenses, and (e) trade payables and other operating expenses incurred in the ordinary course of business and attributable to the operations of the Borrower and its Subsidiaries and which are reasonably expected to be, and appropriately should be payable by, the Borrower and its Subsidiaries.

"Permitted Liens" has the meaning assigned to such term in Section 7.01.

"Permitted Tax Distributions" means, without duplication, payments, dividends or distributions by Borrower to Holdings in order for Holdings to pay the Tax liability for any consolidated, combined or similar federal, state or local income or similar tax group that includes the Loan Parties and/or their Subsidiaries that is attributable to the taxable income, revenue, receipts, gross receipts, gross profits, capital or margin of the Loan Parties and/or their applicable Subsidiaries; provided that such Tax liability shall not exceed the amount that the Loan Parties and/or their applicable Subsidiaries would have been required to pay in respect of the relevant federal, state or local income or similar Taxes for such fiscal year had the Loan Parties and their Subsidiaries paid such Taxes separately from Holdings as a standalone consolidated, combined, or similar federal, state or local income or similar tax group.

"Permitted Transferees" means (a) any Controlled Investment Affiliate of the Sponsors (collectively, "Sponsor Affiliates"), (b) any managing director, general partner, limited partner, director, officer or employee of the Sponsors or any Sponsor Affiliate (collectively, the "Sponsor Associates"), (c) the heirs, executors, administrators, testamentary trustees, legatees or beneficiaries of any Sponsor Associate and (d) any trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only a Sponsor Associate, his or her spouse, parents, siblings, members of his or her immediate family (including adopted children) and/or direct lineal descendants.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" means September 18, 2017.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, could reasonably under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization" means a plan of reorganization with respect to the Debtors pursuant to the Chapter 11 Cases.

"Platform" has the meaning assigned to such term in Section 6.01.

"Prepetition Term Agent" means (i) Bank of America, N.A., in its capacity as administrative agent under any of the Prepetition Term Loan Documents, or (ii) any successor administrative agent.

"Prepetition Term B-4 Lenders" means the Term B-4 Lenders party to the Prepetition Term Loan Agreement, from time to time, under and as defined in the Prepetition Term Loan Agreement.

"Prepetition Term B-4 Obligations" means "Obligations" (as defined in the Prepetition Term Loan Agreement) owing under the Prepetition Term Loan Agreement to the Term B-4 Lenders or the Prepetition Term Agent.

"Prepetition Term Lenders" means the "Lenders" party to the Prepetition Term Loan Agreement, from time to time.

"Prepetition Term Loan Agreement" means that certain Amended and Restated Credit Agreement, dated as of August 24, 2010, by and among the Borrower, the Guarantors party thereto, the Prepetition Term Agent and the Prepetition Term Lenders, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Term Loan Documents" means the "Loan Documents" as defined in the Prepetition Term Loan Agreement.

"Prepetition Term Obligations" means "Obligations" (as defined in the Prepetition Term Loan Agreement).

"Prime Rate" means for any day, the rate of interest per annum quoted in the "Money Rates" section of The Wall Street Journal from time to time and designated as the "Prime Rate." If such prime rate, as so quoted is split between two or more different interest rates, then the Prime Rate shall be the highest of such interest rates. If such prime rate shall cease to be published or is published infrequently or sporadically, then the Prime Rate shall be the rate of interest per annum based on information presented by any interest rate reporting service of recognized standing selected by Administrative Agent in consultation with the Borrower.

"Priming Lien" has the meaning specified in Section 11.05(a)(v).

"Pro Rata Share" means, with respect to each Lender, (i) at or prior to the funding on the Closing Date, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitment of such Lender and the denominator of

-26-

which is the amount of the Aggregate Commitments and (ii) thereafter, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the principal amount of the Loans of such Lender and the denominator of which is the aggregate principal amount of the Loans of all Lenders.

"Propco I" means Toys "R" Us Property Company I, LLC.

"Propco II" means Toys "R" Us Property Company II, LLC.

"Propco Subsidiaries" means Giraffe Junior Holdings, LLC, Propco I, Propco II and each Subsidiary of Propco I.

"Real Property" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all buildings, structures, parking areas and improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"Register" has the meaning specified in Section 10.06(c).

"Regulation U" means Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the respective directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"Release" has the meaning provided in Section 101(22) of CERCLA.

"Required Lenders" means, as of any date of determination, Lenders holding more than 50% of the Loans and Commitments outstanding on such date; provided that Loans held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Requirements of Law" means, collectively, any and all requirements of any Governmental Authority including any and all laws, judgments, orders, decrees, ordinances, rules, regulations, statutes or case law.

"Responsible Officer" of any Person shall mean any executive officer or financial officer of such Person and any other officer or similar official thereof with responsibility for the administration of the obligations of such Person in respect of this Agreement and, solely for purposes of notices given pursuant to Article II, any other officer of the applicable Loan Party so designated by any of the foregoing officers in a written notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to a written agreement between the applicable Loan Party and the Administrative Agent.

"Restricted Payment" means any (a) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of a Loan Party or any of its

Subsidiaries, (b) payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests of any Loan Party or any of its Subsidiaries or (c) payment on or in respect of any Indebtedness or other obligation of Holdings or any other Non-Delaware Silo Entity, other than payments by the Borrower of professional fees and other expenses of administration of the Chapter 11 Cases that are allocable to the Non-Delaware Silo Entities; provided such payments are, pursuant to the Adequate Protection Order, reimbursable by the applicable Non-Delaware Silo Entities and the claims in respect thereof are granted super-priority administrative, claim status with respect to any Non-Delaware Silo Entity that is a Debtor, subject only to the Carve Out and claims in respect of any new money debtor-in-possession financing provided by non-Affiliates of Holdings (and any claims to which such non-Affiliate financing is subject).

"Restructuring" means the restructuring of the Loan Parties and their Subsidiaries to be implemented through the filing of cases and confirmation of a Plan of Reorganization under Chapter 11 of the Bankruptcy Code.

"S&P" means Standard & Poor's Financial Services LLC or any successor thereto.

"SALITRU Transaction" means that certain transaction to be entered into by the Borrower pursuant to which the Borrower shall leases back the property of SALITRU Associates JV after the sale thereof.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" means collectively, (a) the Administrative Agent, (b) the Collateral Agent, (c) the Lenders and (d) with respect to the Obligations under Section 10.04(b), the other Indemnitees; it being understood and agreed that such Indemnitees shall be bound by the Intercreditor Agreements.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Agreement" means the security agreement, substantially in the form of Exhibit E, dated as of the Closing Date, among the Borrower, the Guarantors, and the Agents.

"Security Documents" means the Bankruptcy Court Order, the Guarantee, the Security Agreement and each other security agreement, mortgage, collateral assignment, intellectual property security agreement, pledge agreement or other document or agreement delivered in accordance with applicable law to grant, or purport to grant, a security interest in any property as collateral for the Obligations.

"SPC" has the meaning assigned to such term in Section 10.06(g).

"Specified Indebtedness" means (i) the ABL Facility; (ii) the obligations under the Indenture dated on or about September 22, among TRU Taj LLC and TRU Taj Finance, Inc., certain affiliates thereof and Wilmington Savings Fund Society, FSB, as Trustee and Collateral Trustee, or any Indebtedness refinancing such Indebtedness (the "Taj DIP Debt"); and (iii) any other debtor-in-possession financing facility of any Loan Party or its Subsidiaries approved in the Chapter 11 Cases with respect to financing in an amount in excess of $10 million.

"Specified Intercompany Agreements" means the contracts listed on Part II of Schedule 7.07, as in effect on the date hereof.

-28-

"<u>Sponsors</u>" means Bain Capital (TRU) VIII, L.P., a Delaware limited partnership, Bain Capital (TRU) VIII-E, L.P., a Delaware limited partnership, Bain Capital (TRU) VIII Coinvestment, L.P., a Delaware limited partnership, Bain Capital Integral Investors, LLC, a Delaware limited liability company, and BCIP TCV, LLC, a Delaware limited liability company, Kohlberg Kravis Roberts & Co., Toybox Holdings, LLC, Vornado Realty Trust and Vornado Truck, LLC, and their respective affiliates.

"<u>Spot Rate</u>" has the meaning assigned to such term in <u>Section 1.06</u>.

"<u>Store</u>" means any retail store (which includes any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party or a Subsidiary thereof.

"<u>Subsidiary</u>" means, of a Person, a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless the context otherwise requires, all references herein to a "<u>Subsidiary</u>" or to "<u>Subsidiaries</u>" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"<u>Subsidiary Guarantors</u>" means, collectively, each existing and future direct and indirect Subsidiary of the Borrower that is party to the Guarantee.

"<u>Taxes</u>" means any and all current or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Facility</u>" means the credit facility provided for under this Agreement.

"<u>Term Priority Collateral</u>" shall have the meaning assigned to such term in the Intercreditor Agreement.

"<u>Test Date</u>" means the last day of each fiscal month of the Borrower, commencing with the last day of the fiscal month ending October 28, 2017.

"<u>TRU Canada Loans</u>" loans from Toys "R" Us (Canada) Ltd./Toys "R" Us (Canada) Ltee to Borrower secured by the Collateral on a pari passu basis with the Loans, which loans (i) shall have an interest rate comparable to the Loans, subject, as the lender and the Borrower may reasonably agree, to adjustments for duration, "PIK" interest and other commercially reasonable factors and shall not be subject to upfront, exit or similar fees or original issue discount and (ii) shall not include covenants more restrictive in any respect than any covenant hereunder.

"<u>Type</u>" means the character of a Loan as a Base Rate Loan or a Eurodollar Rate Loan.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"<u>United States</u>" and "<u>U.S.</u>" mean the United States of America.

"<u>Upfront Fee</u>" has the meaning assigned to such term in <u>Section 2.07(c)</u>).

-29-

"<u>Voting Stock</u>" means, with respect to any Person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors of such Person.

"<u>Wachtell</u>" means Wachtell, Lipton, Rosen & Katz.

"<u>Wayne</u>" means Wayne Real Estate Parent Company, LLC.

"<u>Wayne Loans</u>" loans from Wayne to Borrower secured by the Collateral on a pari passu basis with the Loans for use by the Borrower for its general corporate purposes, which loans (i) shall have an interest rate comparable to the Loans, subject, as Wayne and the Borrower may reasonably agree, to adjustments for duration, "PIK" interest and other commercially reasonable factors and shall not be subject to upfront, exit or similar fees or original issue discount and (ii) shall not include covenants more restrictive in any respect than any covenant hereunder.

"<u>Withdrawal Liability</u>" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"<u>Write-Down and Conversion Powers</u>" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**1.02   Other Interpretive Provisions**. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "<u>include</u>," "<u>includes</u>" and "<u>including</u>" shall be deemed to be followed by the phrase "<u>without limitation</u>." The word "<u>will</u>" shall be construed to have the same meaning and effect as the word "<u>shall</u>." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Charter Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (iii) the words "<u>herein</u>," "<u>hereof</u>," "<u>hereto</u>" and "<u>hereunder</u>," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to, Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (vi) the words "<u>asset</u>" and "<u>property</u>" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (vii) all references to "knowledge" or "awareness" of any Loan Party or a Subsidiary thereof means the actual knowledge of a Responsible Officer of a Loan Party or such Subsidiary after due inquiry and

(viii) all references to "in the ordinary course of business" of any Loan Party or a Subsidiary thereof means (x) in the ordinary course of business of the Loan Party and/or such Subsidiary, as applicable or (y) generally consistent with the past or current practice of the Loan Parties or any Subsidiary thereof. Any provision in this Agreement that requires the "satisfaction" (or "reasonable satisfaction") of the Administrative Agent and the Required Lenders in respect of any Bankruptcy Court Order, certificate or other document, shall be deemed satisfied if Administrative Agent is satisfied therewith and the Required Lenders shall not have indicated otherwise (after having been given a reasonable opportunity to review to the extent practicable) in writing to the Administrative Agent.

(b)   In the computation of periods of time from a specified date to a later specified date, the word "<u>from</u>" means "<u>from and including</u>," the words "<u>to</u>" and "<u>until</u>" each mean "<u>to but excluding</u>," and the word "<u>through</u>" means "<u>to and including</u>."

(c)   Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**1.03   Accounting Terms**. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect on the Closing Date. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. It is understood and agreed that any recharacterization of an accounting entry or term shall be permitted hereunder so long as the action relating to or underlying the entry or item as so recharacterized would have been permitted if it had originally been characterized in such manner.

**1.04   Times of Day; Time for Payment and Performance**. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable). When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on (or before) a day which is not a Business Day, the date of such payment (other than as described in the definition of "<u>Interest Period</u>") or performance shall extend to the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

**1.05   Resolution of Drafting Ambiguities**. The Borrower acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents, that it and its counsel reviewed and participated in the preparation and negotiation of the Loan Documents and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Loan Documents.

**1.06   Currency Equivalents Generally**. Any amount specified in this Agreement or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Administrative Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars. For purposes of this <u>Section 1.06</u>, the "<u>Spot Rate</u>" for a currency means the rate determined by the Administrative Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; <u>provided</u> that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

**1.07   Certifications; Provision of Information.** All provisions of information, presentations, statements and certifications to be made hereunder by a director, officer or other representative of a Loan Party or other Subsidiary shall be made by such a Person in his or her capacity solely as an officer or a representative of such Loan Party or other Subsidiary, on such Loan Party's or such Subsidiary's behalf and not in such Person's individual capacity, and without personal liability. **Certifications; Compliance with Article VII** In the event that any Lien, Investment, Indebtedness (whether at the time of incurrence or upon application of all or a portion of the proceeds thereof), Asset Sale, Restricted Payment, Affiliate transaction, restrictive agreement or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions then permitted pursuant to the applicable Section in <u>Article VII</u>, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

**THE COMMITMENTS AND BORROWING OF LOANS**

**2.01   Commitment to Lend Loans**.

(a)   Subject to the terms and conditions set forth herein and in the Bankruptcy Court Order, each Lender severally and not jointly agrees to make, on the applicable Credit Date, loans to the Borrowers in an aggregate amount not to exceed such Lender's Commitment. The Borrowers may request up to three (3) advances under the Commitments, of which (i) the first shall be made on the Closing Date in an aggregate principal amount of $350,000,000 (the "<u>Initial Loan</u>") and (ii) the second shall be in an aggregate principal amount of $50,000,000 or any multiple of $5,000,000 in excess thereof; <u>provided</u>, in no event shall the aggregate amount of the Loans advanced hereunder exceed $450,000,000. Upon the making of the third Loan hereunder,

-32-
.

all remaining Commitments shall immediately and automatically terminate. Amounts borrowed under this <u>Section 2.01</u> and subsequently repaid or prepaid may not be reborrowed.

(b)   Each Initial Lender hereby acknowledges and agrees that each Prepetition Term B-4 Lender shall be entitled to participate in the Term Facility in an amount equal to such Prepetition Term B-4 Lender's pro rata share of the aggregate Commitments (determined on the basis of the principal amount of Prepetition B-4 Term Obligations held by such Prepetition Term B-4 Lender as of a date to be determined by the Administrative Agent as compared to the principal amount of Prepetition B-4 Term Obligations held by all Prepetition Term B-4 Lenders as of such date). The Borrower, Administrative Agent and the Initial Lenders agree to reasonably cooperate to effectuate such participation promptly following the Closing Date, including by facilitating the assignment by the Initial Lenders and assumption by electing Prepetition Term B-4 Lenders, pursuant to a master Assignment and Assumption substantially in the form of Exhibit C hereto and satisfactory to the Administrative Agent, of ratable portions of (i) the Initial Loan, for a purchase price equal to par less the ratable portion of the Upfront Fee, and (ii) the remaining, unfunded Commitments. For the avoidance of doubt, the Prepetition Term B-4 Lenders shall not be entitled to share in the Backstop/Structuring Fee and shall not be entitled to purchase any portion of the Initial Loan unless they shall assume a ratable portion of the remaining, unfunded Commitments. Interest and Commitment Fees accrued on the Initial Loan and the undrawn Commitments from the Closing Date through and including the date of any assignment to a Prepetition Term B-4 Lender pursuant to this paragraph shall be for the account and benefit of the applicable assigning Initial Lender.

**2.02   Borrowings, Conversions and Continuations of Loans**.

(a)   The borrowing of Loans, each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable written notice to the Administrative Agent. Such notices may be provided by a Borrowing or Conversion Notice; <u>provided</u> that each such notice (x) in respect of a Borrowing must be received by no later than 3:00 p.m. on the date that is five (5) (or, in the case of the Initial Loans, the same Business Day of the requested date of such Borrowing and (y) in respect of a continuation or conversion of Loans, must be received by no later than 3:00 p.m. on the date that is two (2) Business Days prior to the requested date of such conversion or continuation. Each Borrowing or Conversion shall specify (i) in the case of a conversion or continuation, whether the Borrower is requesting a conversion of Loans from one Type to the other or a continuation of Eurodollar Rate Loans, (ii) the requested date of the borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued and (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted. If the Borrower fails to specify a Type of Loan in a Borrowing or Conversion Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base

-33-

Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.

(b)    Following receipt of a Borrowing or Conversion Notice with respect to the initial borrowing of any Loan, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of such Loan. Subject to the satisfaction or waiver of the conditions set forth in Sections 4.01 and 4.02, each Lender shall make the amount of its Loan available (net, in the case of the Initial Loan, of fees owing pursuant to Section 2.07) to the Administrative Agent in Dollars in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing or Conversion Notice. Upon satisfaction of the applicable conditions set forth in Sections 4.01 and 4.02, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)    Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan unless the Borrower pays breakage costs incurred in connection with such conversion and required to be paid pursuant to Section 3.05 of which it has been notified. During the existence of a Default, no Loans may be converted to or continued as Eurodollar Rate Loans without the consent of the Required Lenders.

(d)    The Administrative Agent shall promptly notify the Borrower and the applicable Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the prime rate used in determining the Base Rate promptly following the public announcement of such change.

**2.03    Prepayments.**

(a)    <u>Optional</u>. The Borrower may, upon notice to the Administrative Agent, pursuant to Section 2.03(g), voluntarily prepay the Loans in whole or in part (and such prepayment shall be applied to any Type of Loan as directed by the Borrower) at any time without premium or penalty (other than payment by the Borrower of a prepayment premium equal to 1.0% of the principal amount of Loans prepaid); provided that (A) any prepayment of Eurodollar Rate Loans shall be in a principal amount of $1.0 million or a whole multiple of $1.0 million in excess thereof or, if less, the entire principal amount thereof then outstanding; (B) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall be in the form of Exhibit A-2, shall be given in accordance with Section 2.03(g) and shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid; and (C) no prepayment premium shall be due in connection with a repayment of the Loans as a result of the occurrence of the Maturity Date (as defined in clauses (i)-(iv), but not clauses (v) or (vi), thereof). The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such

-34-

prepayment. If such notice is given by the Borrower, the Borrower shall be committed to make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Eurodollar Rate Loan shall be accompanied by any additional amounts required pursuant to Section 3.05.

(b)    Asset Sales. Following the receipt of any Net Cash Proceeds of any Asset Sale after the Closing Date, (x) at the option of the Borrower pursuant to a written notice of reinvestment delivered to the Administrative Agent, the Borrower may reinvest all or any portion of such Net Cash Proceeds in assets useful for its business within 90 days following receipt of such Net Cash Proceeds; provided that (1) if the assets subject to such Asset Sale constituted Term Priority Collateral, such reinvestment may not be made in assets other than non-current assets constituting Term Priority Collateral (2) if an Event of Default shall have occurred and be continuing, the Borrower shall not be permitted to make any such reinvestments (other than pursuant to a legally binding commitment that the Borrower entered into at a time when no Event of Default existed or was continuing), and (3) if the assets subject to such Asset Sale constituted Geoffrey Collateral, such reinvestment may only be in assets constituting Geoffrey Collateral and ((y) other than the Net Cash Proceeds of ABL Priority Collateral, to the extent applied as required by the ABL Credit Agreement or the Intercreditor Agreement, or to repay obligations under the ABL Credit Agreement (provided that Net Cash Proceeds of ABL Priority Collateral other than Inventory shall be subject to this clause (y) to the extent not prohibited under the ABL Credit Agreement), (A) any Net Cash Proceeds not reinvested shall be applied to the prepayment of the Loans on a ratable basis within five (5) Business Days, and (B) any remaining Net Cash Proceeds from such Asset Sale on the last day of such 90-day period specified in clause (x) shall be applied to the prepayment of the Loans on a ratable basis.

Notwithstanding the foregoing, no such prepayment shall be required under this Section 2.03(b) with respect to (A) Extraordinary Receipts; and (B) Net Cash Proceeds from an Asset Sale by (1) a Foreign Subsidiary of the Borrower except to the extent that any such proceeds are repatriated to the United States (such amount to be net of an amount equal to the additional taxes of Holdings, the Borrower or its Subsidiaries that would be payable or reserved against as a result of such repatriation, as reasonably determined by the Borrower in consultation with the Administrative Agent), which the Loan Parties will use commercially reasonable efforts to cause to occur as soon as possible without causing adverse tax consequences or (2) Geoffrey International LLC unless and to the extent that such proceeds are dividended, loaned or otherwise transferred to a Loan Party.

(c)    Debt Issuance or Disqualified Capital Stock Issuance. Promptly following the receipt of any Net Cash Proceeds of any Debt Issuance after the Closing Date or any issuance by any Loan Party of Disqualified Capital Stock after the Closing Date, the Borrower shall apply 100% of such Net Cash Proceeds to the ratable repayment of Loans.

(d)    Extraordinary Receipts. Promptly following the receipt of any Net Cash Proceeds from any Extraordinary Receipts, at the option of the Borrower, the Borrower may reinvest all or any portion of such Net Cash Proceeds to repair, replace, refurbish or restore any property in respect of which such Net Cash Proceeds were paid or to reinvest in other fixed or capital assets (provided that (1) if such Extraordinary Receipts are in respect of Real Property, such reinvestment may not be made in assets other than Real Property; and (2) if such Extraordinary Receipts are in respect of Term Priority Collateral, such reinvestment may not be made in assets other than assets will, upon such reinvestment become Term Priority Collateral within (x) six (6) months following receipt of such Net Cash Proceeds or (y) if the Borrower enters into a legally binding commitment to reinvest such Net Cash Proceeds within six (6)

-35-

months following receipt thereof, within 90 days of the date of such legally binding commitment; <u>provided</u> that (i) if an Event of Default shall have occurred and be continuing, the Borrower shall not be permitted to make any such reinvestments (other than pursuant to a legally binding commitment that the Borrower entered into at a time when no Event of Default existed or was continuing) and (ii) if any Net Cash Proceeds cannot be so reinvested during the periods described above, an amount equal to any such Net Cash Proceeds shall be applied on the last day of such period to the ratable prepayment of the Loans.

(e)   On the date of receipt by the Borrower or any of its Subsidiaries of cash proceeds from a capital contribution to, or the issuance of any Equity Interests of, the Borrower or any of its Subsidiaries (other than issuances of Equity Interests by a Subsidiary to the Borrower and capital contributions by the Borrower to a Subsidiary), the Borrower shall prepay an aggregate principal amount of the Loans equal to 100% of such Net Cash Proceeds received therefrom no later than five Business Days following receipt thereof by such Person.

(f)   [Reserved].

(g)   <u>Notice of Prepayment</u>. The Borrower shall notify the Administrative Agent by written notice of any voluntary prepayment hereunder (i) in the case of prepayment of a Eurodollar Rate Loan, not later than 12:00 noon, two Business Days before the date of prepayment and (ii) in the case of prepayment of a Base Rate Loan, not later than 12:00 noon, one Business Day before the date of prepayment. Each such notice shall be in the form of <u>Exhibit A-2</u> and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice of voluntary prepayment shall be revocable; <u>provided</u> that, within 5 Business Days of receiving a written demand for such reimbursement which sets forth the calculation of breakage costs incurred and payable pursuant to <u>Section 3.05</u> in reasonable detail, the Borrower shall reimburse the Lenders for such breakage costs associated with the revocation of any notice of prepayment. Each mandatory prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing and otherwise in accordance with this <u>Section 2.03</u>. Each optional prepayment of a Borrowing shall be applied among the Types of Borrowings as directed by the Borrower and otherwise in accordance with this <u>Section 2.03</u>. Prepayments shall be accompanied by accrued interest as required by <u>Section 2.06</u>.

**2.04   Termination of Commitments**. The Commitments of each Lender shall automatically be reduced on each Credit Date (to the extent of the borrowing of the Loans on such date) and shall otherwise expire in full on the earlier to occur of (I) the date the third Loan is made hereunder (after giving effect to the funding thereof) and (II) 30 days prior to the Maturity Date pursuant to clause (i) of the definition thereof.

**2.05   Repayment of Loans**. Upon the Maturity Date or earlier, if otherwise required by the terms hereof, (i) the Borrower shall repay to the Administrative Agent for the ratable account of the Lenders, the aggregate outstanding principal amount of the Loans and all accrued but unpaid interest thereon (together with any fees and expenses earned, due and payable therewith, including without limitation, any such fees or expenses earned, due and payable under <u>Section 2.07</u>, <u>Section 10.04</u> and <u>Section 10.05</u>), and (ii) the Administrative Agent shall apply such funds to repay each Lender in the amount of such Lender's ratable portion of the remaining amount (based on such Lender's Pro Rata Share in respect of the Term Facility).

-36-

**2.06  Interest**.

(a)   Subject to the provisions of subsection (b) below, each Loan that is a (i) Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate; and (ii) Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)   Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due (without regard to any applicable grace periods), whether at stated maturity, upon acceleration or otherwise, such overdue amount shall, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal or interest on any Loan, 2% plus the rate otherwise applicable to such Loan as provided in Section 2.06(a) or (ii) in the case of any other overdue amount, 2% plus the rate applicable to Base Rate Loans as provided in Section 2.06(a) (in either case, the "Default Rate").

(c)   Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto; provided that (i) interest accrued pursuant to Section 2.06(b) shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Rate Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.07  Fees**.

(a)   Administrative Agent Fee. The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times set forth in the Fee Letter.

(b)   Commitment Fee. The Borrower shall pay to the Administrative Agent for the ratable benefit of the Lenders an undrawn line fee in an amount equal to 2.0% per annum of the aggregate amount of the undrawn Commitments, as in effect from time to time. Such fee shall be payable in arrears on each Interest Payment Date.

(c)   Upfront Fee. The Borrower shall pay to the Administrative Agent for the account of each Initial Lender an upfront fee in an amount equal to 1.0% of the Commitment of such Lender immediately prior to the making of the Initial Loans on the Closing Date (the "Upfront Fee"). The Borrower and each Lender agree that on the Closing Date, the Lenders shall fund the Initial Loan in the principal amount of $350,000,000 net of (i) the entirety of such fee and (ii) the Backstop/Structuring Fee, notwithstanding that the full amount of the Commitment shall not have been drawn as of the Closing Date. Such fees shall be earned, due and payable on the Closing Date.

(d)   Backstop/Structuring Fee. The Borrower shall pay to the Administrative Agent for the account of each Initial Lender, in consideration of arranging and committing to

-37-

fund its portion of the entirety of the Term Facility, a backstop/structuring fee in an amount equal to 3.25% of the Commitment of such Lender immediately prior to the making of the Initial Loans on the Closing Date (the "Backstop/Structuring Fee"). Such fee shall be earned, due and payable on the Closing Date.

**2.08   Computation of Interest and Fees**. All computations of interest for Base Rate Loans including Base Rate Loans (determined by reference to the Eurodollar Rate) shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made or continued or converted from a Loan of another Type, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one day. Any change in the interest rate in a Loan resulting from a change in the Base Rate or the Eurodollar Reserve Percentage shall become effective as of the opening of business on the day on which such change becomes effective. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.09   Evidence of Indebtedness**.

(a)   The Loans, and the principal and interest due with respect thereto, made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(b)   Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to a Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

-38-

**2.10  Payments Generally; Administrative Agent's Clawback**.

(a)  General. All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)  (i) Funding by Lenders; Presumption by Administrative Agent. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then each of the applicable Lender and the Borrower agrees to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Loans of the Type comprising such Borrowing. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(i)  Payments by the Borrower; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at

-39-

the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Section 2.10, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the Loans set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligations of Lenders Several. The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 10.04(c) are several and not joint. The failure of any Lender to make any Loan or to make any payment under Section 10.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under Section 10.04(c).

(e)    Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)    Insufficient Funds. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of Loans then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of Loans then due to such parties.

**2.11    Sharing of Payments by Lenders**. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans and accrued interest thereon greater than its Pro Rata Share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with their respective Pro Rata Share; provided that:

(i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest;

(ii)    the provisions of this section shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant,

-40-

other than to the Borrower or any Subsidiary thereof (as to which, subject to clause (iii) below, the provisions of this section shall apply); and

(iii)   the provisions of this section shall not apply to any assignment made pursuant to, and in accordance with, Section 10.06(b).

Subject to the provisions of Section 10.06(d), each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.12   [Reserved]**.

**2.13   Defaulting Lenders**.

(a)   Waivers and Amendments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law, such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(b)   Defaulting Lender Cure. If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

# ARTICLE III
# TAXES, YIELD PROTECTION AND ILLEGALITY

**3.01   Taxes**.

(a)   Payments Free of Taxes. Unless required by applicable Law (as determined in good faith by the applicable withholding agent), any and all payments by or on

-41-

account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any Taxes; provided, however, that if the applicable withholding agent shall be required by applicable Law to deduct, or an Agent or a Lender shall be required to remit, any Taxes from such payments, then (i) in the case of Indemnified Taxes or Other Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after all required deductions or remittances for such Taxes (including deductions applicable to additional sums payable under this Section 3.01) have been made, the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or remittances been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)  Payment of Other Taxes by the Loan Parties. In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)  Indemnification by the Borrower. The Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. Subject to and without limiting the preceding sentence, if the Borrower reasonably believes that such Taxes were not correctly or legally asserted, each Lender will use reasonable efforts to cooperate with the Borrower to obtain a refund of such taxes so long as such efforts would not, in the sole determination of such Lender, result in any additional costs, expenses or risks or be otherwise disadvantageous to it; provided, further, that the Borrower shall not be required to compensate any Lender pursuant to this Section 3.01 for any amounts incurred in any fiscal year for which such Lender is claiming compensation if such Lender does not furnish notice of such claim within six months from the end of such fiscal year; provided, further, that if the circumstances giving rise to such claim have a retroactive effect (e.g., in connection with the audit of a prior tax year), then the beginning of such six-month period shall be extended to include such period of retroactive effect. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent on its own behalf or on behalf of any Lender, setting forth in reasonable detail the manner in which such amount was determined, shall be conclusive absent manifest error.

-42-

(d)  <u>Evidence of Payments</u>. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)  <u>Status of Lenders</u>. (i) Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law, or reasonably requested by the Borrower or the Administrative Agent, certifying as to any applicable entitlement of such Lender to an exemption from, or reduction in, any withholding Tax (including backup withholding) or with respect to information reporting requirements with respect to any payments to be made to such Lender under the Loan Documents. Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation expired, obsolete or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify the Borrower and the Administrative Agent of its inability to do so.

(ii)  Without limiting the generality of the foregoing:

(A)  Each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding.

(B)  Each Foreign Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter when required by Law or upon the reasonable request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(1)  two duly completed copies of Internal Revenue Service Form W-8BEN or Internal Revenue Service Form W-8BEN-E, as applicable (or any successor forms),

(2)  two duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(3)  in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of <u>Exhibit G</u> (any such certificate a

-43-

"United States Tax Compliance Certificate"), or any other form approved by the Administrative Agent, to the effect that such Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Loan Documents are effectively connected with such Lender's conduct of a U.S. trade or business and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or Internal Revenue Service Form W-8BEN-E, as applicable (or any successor forms),

(4)    to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a Lender that has granted a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (provided that, if the Lender is a partnership (and not a participating Lender) and one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate shall be provided by such Lender on behalf of such beneficial owner(s)), or

(5)    any other form prescribed by applicable requirements of U.S. federal income tax Law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Borrower and the Administrative Agent to determine the withholding or deduction required to be made (including, in the case of any Lender claiming exemption from withholding under FATCA, any documentation required to comply with such exemption); provided that, the completion, execution and submission of such form or documentation (other than in the case of a Lender claiming exemption from withholding under FATCA) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Notwithstanding any other provision of this clause (e), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(f)    Should a Lender become subject to Taxes because of its failure to deliver a form required hereunder (including any documentation necessary to prevent withholding under FATCA), the Loan Parties shall, at such Lender's expense, take such steps as such Lender shall reasonably request to assist such Lender to recover such Taxes.

(g)    If any Loan Party shall be required pursuant to this Section 3.01 to pay any additional amount to, or to indemnify, any Agent or Lender to the extent that such Agent or Lender becomes subject to Taxes subsequent to the Closing Date (or, if applicable, subsequent to the date such Person becomes a party to this Agreement) as a result of any change in the

-44-

circumstances of such Agent or Lender (other than a change in Applicable Law), including without limitation a change in the residence, place of incorporation, principal place of business of such Agent or Lender or a change in the branch or Lending Office of such Agent or Lender, as the case may be, such Agent or Lender shall use reasonable efforts to avoid or minimize any amounts which might otherwise be payable pursuant to this Section 3.01; provided, however, that such efforts shall not include the taking of any actions by such Agent or Lender that would result in any tax, costs or other expense to such Agent or Lender (other than a tax, cost or other expense for which such Agent or Lender shall have been reimbursed or indemnified by the Loan Parties pursuant to this Agreement or otherwise) or any action which would or might in the reasonable opinion of such Agent or Lender have an adverse effect upon its business, operations or financial condition or otherwise be disadvantageous to such Agent or Lender.

(h)   If any Lender or Agent reasonably determines that it has actually and finally realized, by reason of a refund, deduction or credit of any Indemnified Taxes or Other Taxes as to which it has been paid or reimbursed by the Loan Parties pursuant to subsection (a) or (c) above in respect of payments under the Loan Documents, a current monetary benefit that it would otherwise not have obtained and that would result in the total payments under this Section 3.01 exceeding the amount needed to make such Lender or Agent whole, such Lender or Agent shall pay to the Borrower, with reasonable promptness following the date upon which it actually realizes such benefit, an amount equal to the lesser of the amount of such benefit or the amount of such excess, in each case net of all out-of-pocket expenses (including Taxes) incurred in securing such refund, deduction or credit and without interest (other than any interest paid by the relevant taxing authority with respect to such refund net of any Taxes payable by any Lender or Agent on such interest).

(i)   If a payment made to the Administrative Agent or any Lender under any Loan Document would be subject to withholding under FATCA if such Administrative Agent or Lender were to fail to comply with the information reporting requirements of FATCA, such Administrative Agent or Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by FATCA and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine Lenders' compliance under FATCA (or to determine the amount, if any, to deduct and withhold from such payment). Solely for purposes of this paragraph, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(j)   The Administrative Agent shall deliver to the Borrower on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Administrative Agent is exempt from U.S. federal backup withholding.

**3.02   Change in Legality**.

(a)   Notwithstanding anything to the contrary contained elsewhere in this Agreement, if any Change in Law occurring after the Closing Date shall make it unlawful for a Lender to make or maintain a Eurodollar Rate Loan or to give effect to its obligations as contemplated hereby with respect to a Eurodollar Rate Loan, then, by written notice to the Borrower, such Lender may (x) declare that Eurodollar Rate Loans will not thereafter be made by such Lender hereunder, whereupon any request by the Borrower for a Eurodollar Rate Loan

-45-

shall, unless withdrawn, as to such Lender only, be deemed a request for a Base Rate Loan unless such declaration shall be subsequently withdrawn; and (y) require that all outstanding Eurodollar Rate Loans made by such Lender be converted to Base Rate Loans, in which event all such Eurodollar Rate Loans shall be automatically converted to Base Rate Loans as of the effective date of such notice as provided in Section 2.02. In the event any Lender shall exercise its rights hereunder, all payments and prepayments of principal which would otherwise have been applied to repay the Eurodollar Rate Loans that would have been made by such Lender or the converted Eurodollar Rate Loans of such Lender shall instead be applied to repay the Base Rate Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Rate Loans.

(b)   For purposes of this Section 3.02, a notice to the Borrower pursuant to Section 3.02(a) above shall be effective, if lawful, and if any Eurodollar Rate Loans shall then be outstanding, on the last day of the then-current Interest Period; and otherwise such notice shall be effective on the date of receipt by the Borrower.

**3.03   Alternate Rate of Interest for Loans**. If, prior to the commencement of any Interest Period for a Eurodollar Rate Loan, the Administrative Agent:

(a)   reasonably determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Eurodollar Rate (in accordance with the terms of the definitions thereof) for such Interest Period; or

(b)   is advised by the Required Lenders that the Eurodollar Rate for such Interest Period will not adequately and fairly reflect the cost to such Required Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period; then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the applicable Lenders that the circumstances giving rise to such notice no longer exist (which notice the Administrative Agent shall deliver promptly upon obtaining knowledge of the same), (i) any Borrowing or Conversion Notice that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Rate Loan shall be ineffective and (ii) if any Borrowing Request requests a Eurodollar Rate Loan, such Borrowing shall be made as a Borrowing of Base Rate Loans unless withdrawn by the Borrower.

**3.04   Increased Costs; Reserves on Eurodollar Rate Loans**.

(a)   Increased Costs Generally. If any Change in Law shall:

(i)   impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any reserve requirement reflected in the Eurodollar Rate); or

-46-

(ii)    impose on any Lender or the London interbank market any other condition affecting Eurodollar Rate Loans made by such Lender; and the result of any of the foregoing shall be to increase the cost in any material amount in excess of that incurred by similarly situated lenders to such Lender of making or maintaining any Eurodollar Rate Loan or to reduce the amount in any material respect of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements. If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company would have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy) then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 3.04 and setting forth in reasonable detail the manner in which such amount or amounts were determined shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) Business Days after receipt thereof.

(d)    Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04, or Section 3.02 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04, or Section 3.02 for any increased costs or reductions (or other compensation provided in such Sections) incurred more than 90 days prior to the date that such Lender notifies the Borrower of the Change in Law or other applicable circumstance giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefore and provided, further, that if the Change in Law or other applicable circumstance giving rise to such increased costs or reductions is retroactive, then the 90-day period referred to above shall be extended to include the period of retroactive effect thereof.

**3.05    Compensation for Losses**. The Borrower shall promptly reimburse any Lender for any loss, cost or expense incurred by it in the reemployment of funds resulting from:

(a)    any continuation, conversion, payment or prepayment of any Eurodollar Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or

(b)   any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan or the failure of the Lender to deliver any notice pursuant to Section 3.02, 3.03 or 3.04) to prepay, borrow, continue or convert any Eurodollar Rate Loan on the date or in the amount notified by the Borrower.

Such loss shall be the amount as reasonably determined by such Lender as the excess, if any, of (A) the amount of interest which would have accrued to such Lender on the amount so paid, not prepaid or not borrowed at a rate of interest equal to the Eurodollar Rate for such Loan (but specifically excluding any Applicable Rate) for the period from the date of such payment or failure to borrow or failure to prepay to the last day (x) in the case of a payment or refinancing of a Eurodollar Rate Loan with Base Rate Loans other than on the last day of the Interest Period for such Loan or the failure to prepay a Eurodollar Rate Loan, of the then current Interest Period for such Loan or (y) in the case of such failure to borrow, of the Interest Period for such Eurodollar Rate Loan which would have commenced on the date of such failure to borrow, over (B) in the case of a Eurodollar Rate Loan, the amount of interest which would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the London interbank market. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section 3.05 and the manner in which such amount was determined shall be delivered to the Borrower (with a copy to the Administrative Agent). The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

**3.06   Mitigation Obligations; Replacement of Lenders**.

(a)   Designation of Different Lending Office. If any Lender requests compensation under Section 3.04 or cannot make Loans under Section 3.02, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment; provided, however, that the Borrower shall not be liable for such costs and expenses of a Lender requesting compensation if (i) such Lender becomes a party to this Agreement on a date after the Closing Date and (ii) the relevant Change in Law occurs on a date prior to the date such Lender becomes a party hereto.

(b)   Replacement of Lenders. If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrower may replace such Lender in accordance with Section 10.13.

**3.07   Survival**. Each Party's obligations under this Article III shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the

-48-

replacement of, a Lender, the termination of the Aggregate Commitments and repayment, satisfaction or discharge of all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO LOANS

**4.01   Conditions Precedent to Closing Date**. This Agreement shall become effective as of the Business Day of and, subject to, the satisfaction, or waiver by the Required Lenders in accordance with this Agreement of the following conditions:

(a)   The Administrative Agent shall have received the following, each of which shall be originals or facsimiles (followed promptly by originals) unless otherwise specified, each, if applicable, properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of government officials, a recent date before the Closing Date):

(i)   executed counterparts of this Agreement (including the Exhibits and Schedules thereto) and each other Loan Document;

(ii)   a Note executed by the Borrower in favor of each Lender requesting a Note;

(iii)   such customary certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party;

(iv)   such documents and certifications as the Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed;

(v)   a certificate signed by a Responsible Officer of the Borrower on behalf of the Borrower certifying(A) that the conditions specified in Sections 4.02(f) and 4.02(g) have been satisfied and (B) that there has been no Material Adverse Effect since the Petition Date;

(vi)   a customary opinion of counsel to the Loan Parties.

(b)   The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the First and Second Day Orders and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall be in form and substance consistent with the Budget in all material respects and otherwise reasonably satisfactory to the Required Lenders.

(c)   The Interim Bankruptcy Court Order shall have been entered by the Bankruptcy Court within five (5) days of the Petition Date and the Administrative Agent shall have received a true and complete copy of such order, and such order shall be in the form of

Exhibit H hereto, be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Administrative Agent and the Required Lenders.

(d)   All orders entered by the Bankruptcy Court pertaining to cash management ("Cash Management Orders") and adequate protection ("Adequate Protection Orders") and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance reasonably satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) and include provisions reasonably satisfactory to the Administrative Agent with respect to (i) the super-priority, secured status (junior to the Liens and claims of any third-party debtor-in-possession financing creditor) of advances by the Loan Parties to or on behalf of their Debtor Affiliates (including through payment of professional fees and other administrative expenses of the Debtors) and of any overdue amounts owing by such Debtor Affiliates pursuant to the Specified Intercompany Agreements, and (ii) the advance to the Borrower as a super-priority administrative claim (junior to the claims of any third-party debtor-in-possession financing creditor), rather than distribution, of all amounts received by Geoffrey International, LLC or Geoffrey, LLC following the Petition Date and made available to the Borrower.

(e)   No trustee, examiner or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking any such relief or seeking any other relief in the Bankruptcy Court to exercise control over any Collateral.

(f)   The Adequate Protection Orders shall have been entered by the Bankruptcy Court.

(g)   The Administrative Agent shall have received UCC, tax and judgment lien searches and other appropriate evidence, in form and substance reasonably satisfactory to the Administrative Agent.

(h)   The Administrative Agent, for its benefit and the benefit of each other Secured Party, shall have been granted a perfected lien on the Collateral by the Bankruptcy Court Orders on the terms and conditions set forth herein and in the other Loan Documents.

(i)   The Administrative Agent shall have received appropriate UCC-1 financing statements for filing under the UCC of each jurisdiction of organization of each Loan Party.

(j)   The ABL Facility Documentation shall be in form and substance reasonably satisfactory to the Required Lenders and the "Closing Date" thereunder shall have occurred substantially contemporaneously with the Closing Date hereunder.

(k)    The Administrative Agent shall have received (i) the Budget and (ii) a cash flow forecast for the 13-week period ending after the Closing Date dated as of a date not more than 3 Business Days prior to the Closing Date.

(l)    The Borrower shall have paid to the Administrative Agent and Lenders the fees and expenses then earned, due and payable under the Loan Documents (including, without limitation, the fees and expenses of Houlihan, BRG and Wachtell) subject to and in accordance with the Bankruptcy Court Orders.

(m)    The Administrative Agent shall have received executed counterparts of this Agreement and the other Loan Documents executed by each party hereto and thereto, each of which shall be in form and substance reasonably satisfactory to the Required Lenders.

**4.02    Conditions of Loans**. The obligation of each Lender to make Loans on each Credit Date (including the Closing Date) is subject to satisfaction (or waiver) of the following further conditions precedent:

(a)    With respect to any Loan that is made after the Closing Date, the Final Bankruptcy Court Order shall have been entered by the Bankruptcy Court, and (i) the Administrative Agent shall have received a true and complete copy of such order, (ii) such order shall be in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion and (iii) such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent).

(b)    The Borrower shall have delivered to the Administrative Agent a duly executed and completed Borrowing Notice not fewer than five (5) Business Days prior to the proposed date for the Loan (or, in the case of the Initial Loan, the Business Day thereof).

(c)    The Interim Bankruptcy Court Order or, in the case of any Loan other than the Initial Loan, the Final Bankruptcy Court Order, and the Adequate Protection Order, shall be in full force and effect and shall not (in whole or in part) have been enjoined temporarily, preliminarily or permanently, reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge.

(d)    The Loan Parties shall be in compliance in all material respects with the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be.

(e)    The Loan Parties shall be in compliance in all material respects with each Cash Management Order.

(f)    The representations and warranties of the Loan Parties contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the Credit Date as though made on such date; provided that to the extent that such representations and warranties specifically refer to an earlier date, then such representations and warranties shall be true and correct in all material respects as of such earlier date.

-51-

(g)   As of the applicable Credit Date, no Default or Event of Default exists or would result from the making of such Loan and the application of the proceeds thereof.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make the Loans to be made hereby, each Loan Party represents and warrants to each Lender on the date hereof and on each Credit Date that the following statements are true and correct:

**5.01   Organization; Powers**. Each Loan Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and, subject to the entry and the terms of the Bankruptcy Court Order and other orders of the Bankruptcy Court, as applicable, each Loan Party has all requisite power and authority to own its property and assets and to carry on its business as now conducted except, in each case, where the failure to do so, or so possess, individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect. Each Loan Party has all requisite organizational power and authority to execute and deliver and perform all its obligations under all Loan Documents to which such Loan Party is a party. Each Loan Party and each of its Subsidiaries is qualified to do business in, and is in good standing (where such concept exists) in, every jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary, except where the failure to be so qualified or in good standing individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect. Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02   Authorization; Enforceability**. Subject to the entry and the terms of the Bankruptcy Court Order, the transactions contemplated hereby and by the other Loan Documents to be entered into by each Loan Party are within such Loan Party's corporate powers and have been duly authorized by all necessary corporate, membership, partnership or other necessary action. This Agreement has been duly executed and delivered by each Loan Party that is a party hereto and, subject to the entry and the terms of the Bankruptcy Court Order, constitutes, and each other Loan Document to which any Loan Party is a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms.

**5.03   Governmental Approvals**. Other than the Bankruptcy Court Orders, the transactions to be entered into and contemplated by the Loan Documents (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except for such as (i) have been obtained or made and are in full force and effect, or (ii) the failure of which to obtain would not reasonably be expected to result in a Material

-52-

Adverse Effect, and (b) will not violate any Applicable Law, except to the extent that such violation would not reasonably be expected to result in a Material Adverse Effect, or the Charter Documents of any Loan Party.

**5.04  Financial Condition**.

(a)  (i) The audited financial statements set forth in Holdings' Form 10-K filed with the SEC on April 12, 2017 for the fiscal year ended January 28, 2017 (x) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (y) fairly present in all material respects the financial condition of Holdings and its consolidated Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein and (y) show all material indebtedness and other liabilities, direct or contingent, of the Borrower and its Subsidiaries as of the date thereof.

(ii)  The unaudited financial statements disclosed to the initial Lenders prior to the Petition Date with respect to the Fiscal Quarter ended July 29, 2017 fairly present in all material respects the financial condition of Holdings and its consolidated Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein. Except as disclosed in such financial statements, the Loan Parties and their Subsidiaries do not have any Indebtedness for borrowed money outstanding on the date hereof.

(b)  Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**5.05  Properties**. Each Loan Party has title to, or valid leasehold interests in, or rights to use all its real (immovable) and personal (movable) property material to its business, except for defects which would not reasonably be expected to have a Material Adverse Effect.

**5.06  Litigation and Environmental Matters**.

(a)  Except for the Chapter 11 Cases and as set forth on <u>Schedule 5.06(a)</u> or as disclosed in the financial statements described in Section 5.04(a)(i), there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the actual knowledge of Responsible Officers of a Loan Party and its Subsidiaries, threatened in writing against any Loan Party or its Subsidiaries (other than claims (A) which are covered by insurance, (B) which are being defended by the relevant insurance company and (C) as to which no Loan Party has knowledge (though notice from such insurance company or otherwise) that the claim potentially exceeds the total amount of insurance coverage applicable to such claim) (i) as to which there is a reasonable possibility of an adverse determination which, if adversely determined, would reasonably be expected individually or in the aggregate to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents.

(b)    Except as set forth on Schedule 5.06(b), no Loan Party or its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, which, in each case, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

(c)    Since the date of this Agreement, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or would reasonably be expected to result in, a Material Adverse Effect.

**5.07    Compliance with Laws and Agreements**. Subject to the orders of the Bankruptcy Court, each Loan Party is in compliance with all Applicable Law in all material respects and each Loan Party and each Subsidiary of a Loan Party is in compliance with all Specified Indebtedness except where the failure to be in compliance, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Without limiting the generality of the foregoing, each Loan Party and each Subsidiary has obtained all permits, licenses and other authorizations which are required with respect to the ownership and operations of its business except where the failure to obtain such permits, licenses or other authorizations, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Each Loan Party and each Subsidiary is in material compliance with all terms and conditions of all such permits, licenses, orders and authorizations, except where the failure to comply with such terms or conditions, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.08    Investment and Holding Company Status**. No Loan Party or any of its Subsidiaries is an "investment company" as defined in, and required to be registered as such under, the Investment Company Act of 1940.

**5.09    Taxes**. Each Loan Party and its Subsidiaries has timely filed or caused to be filed all tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings, for which such Loan Party and its Subsidiaries have set aside on its books adequate reserves, and as to which no Lien other than a Permitted Lien has arisen or (b) to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect or (c) Taxes the payment of which are stayed by the Chapter 11 Cases (or the related Canadian Case).

**5.10    ERISA**. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect. The present value of all accumulated benefit obligations under each Plan subject to ERISA (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans subject to ERISA (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the

-54-

most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans, in each case, to the extent that any resulting liabilities would reasonably be expect to result in a Material Adverse Effect.

**5.11   Disclosure**. None of the reports, financial statements, certificates or other information (other than any projections, pro formas, budgets and general market information) concerning the Loan Parties furnished by or on at the direction of any Loan Party to any Lender or Agent in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished), when taken as a whole, contains, as of the date furnished, any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading in light of the circumstances under which such statements were made.

**5.12   Subsidiaries**.

(a)   Schedule 5.12 sets forth the name of, and the ownership interest of each Loan Party in, each Subsidiary as of the Closing Date; there are no other Equity Interests of any class outstanding as of the Closing Date. To the knowledge of the Responsible Officers of the Loan Parties, all such Equity Interests are validly issued, fully paid and, except as set forth on Schedule 5.12, non-assessable.

(b)   Except as set forth on Schedule 5.12, no Loan Party is party to any joint venture, general or limited partnership, or limited liability company agreements as of the Closing Date.

**5.13   Insurance**. Schedule 5.13 sets forth a description of all business interruption, general liability, directors' and officers' liability, comprehensive, and casualty insurance maintained by or on behalf of the Loan Parties as of the Closing Date. Each insurance policy listed on Schedule 5.13 is in full force and effect as of the Closing Date and all premiums in respect thereof that are due and payable as of the Closing Date have been paid.

**5.14   Labor Matters**. There are no strikes, lockouts or slowdowns against any Loan Party pending or, to the actual knowledge of any Responsible Officer of any Loan Party, threatened, except to the extent that strikes, lockouts or slowdowns would not reasonably be expected to result in a Material Adverse Effect. The hours worked by and payments made to employees of the Loan Parties have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters to the extent that any such violation could reasonably be expected to have a Material Adverse Effect. Except for Disclosed Matters and to the extent that such liability would not reasonably be expected to have a Material Adverse Effect, all payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.14, as of the Closing Date, no Loan Party nor any of its Subsidiaries is a party to or bound by any material collective bargaining agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to the actual knowledge of any Responsible Officer of any Loan Party, threatened to be filed with the National Labor Relations Board or other applicable Governmental Authority, and no labor organization or group of employees of any Loan Party has made a pending demand for

-55-

recognition which would reasonably be expected to result in a Material Adverse Effect. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound to the extent that such would be reasonably expected to result in a Material Adverse Effect.

**5.15   Federal Reserve Regulations**.

(a)   No Loan Party nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)   No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to buy or carry Margin Stock or to extend credit to others for the purpose of buying or carrying Margin Stock or to refund indebtedness originally incurred for such purpose in violation of Regulation U or X or (ii) for any purpose that entails a violation of the provisions of the Regulations of the Board, including Regulation U or Regulation X.

**5.16   [Reserved]**.

**5.17   Use of Proceeds**. The proceeds of the Loans will be used in accordance in all material respects with the terms of the Budget (subject to the permitted variance) and in compliance with Section 7.10, including, without limitation: (i) to pay amounts due to Lenders and the Administrative Agent hereunder and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby, (ii) payments in respect of the Prepetition Term Obligations contemplated by the Adequate Protection Order; and (iii) to provide working capital, and for other general corporate purposes of the Loan Parties, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court.

**5.18   Intellectual Property Matters**. Each Loan Party owns, or is licensed to use, all patents, patent applications, trademarks, trade names, service marks, copyrights, technology, trade secrets, proprietary information, domain names, know-how and processes necessary for the conduct of its business as currently conducted (the "Intellectual Property"), except for those the failure to own or license which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. To the knowledge of each Loan Party, no claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor to the knowledge of each Loan Party does the use of such Intellectual Property by each Loan Party infringe the rights of any Person, except for such claims and infringements disclosed on Schedule 5.06(a) or that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. The License Agreement, dated as of February 1, 2009, by and among Geoffrey, LLC, Toys "R" Us Handelsgesellchaft mbH, Toys "R" Us (Australia) Pty Ltd., Toys "R" Us SARL, Toys "R" Us GmbH, Toys "R" Us Portugal, Limitada, Toys "R" Us Iberia, SA, Toys "R" Us AG and Toys "R" Us Limited (the "Europe License"), as amended by

-56-

the First Amendment thereto, dated as of December 21, 2012 ("First Amendment to Europe License"), is in full force and effect as of the Closing Date. Attached hereto as Schedule 5.18 is a true, complete and correct copy of the Europe License and the First Amendment to Europe License. There have been no amendments, supplements, waivers or other modifications of the Europe License other than the First Amendment to Europe License, and there are no understandings or agreements among the parties to the Europe License as amended by the First Amendment to the Europe License, on the one hand, and any of their Affiliates, on the other hand, concerning the subject matter thereof except as expressly set forth therein.

**5.19    Security Documents**.

(a)    Security Agreement. The provisions of the Interim Bankruptcy Court Order and Final Bankruptcy Court Order, as applicable, are effective (subject to their respective terms) to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid, enforceable and perfected security interest (subject, in the case of any Collateral, to Liens permitted by Section 7.01) on all right, title and interest of the respective Loan Parties in the Collateral described therein (with such priority as provided for in the Bankruptcy Court Order). No filing or other action will be necessary to perfect the Liens on any Collateral under the Laws of the United States of America.

**5.20    Budget**. The Budget was prepared in good faith based on assumptions believed by the Loan Parties to be reasonable at the time made.

**5.21    Anti-Terrorism Law**.

(a)    No Loan Party and, to the knowledge of the Loan Parties, none of its Affiliates is in violation (other than an immaterial violation) of any applicable law relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

(b)    No Loan Party and, to the knowledge of the Loan Parties, no Affiliate or broker or other agent of any Loan Party acting or benefiting in any capacity in connection with the Loans is any of the following:

(i)    a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

-57-

(v)    a Person that is named as a "<u>specially designated national and blocked person</u>" on the most current list published by the U.S. Treasury Department Office of foreign Assets Control ("<u>OFAC</u>") at its official website or any replacement website or other replacement official publication of such list.

(c)    No Loan Party and, to the knowledge of the Loan Parties, no broker or other agent of any Loan Party acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in paragraph (b) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

<p style="text-align:center"><strong>ARTICLE VI<br>AFFIRMATIVE COVENANTS</strong></p>

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnity obligations with respect to then unasserted claims), each Loan Party shall, and shall cause each of its Subsidiaries (other than the Excluded JVs, to the extent they are Subsidiaries) to:

**6.01   Financial Statements and Other Information**. Furnish to the Administrative Agent:

(a)    (i) Within one hundred twenty (120) days after the end of each Fiscal Year of the Borrower, the Consolidated balance sheet and related statements of operations, and Consolidated statements of cash flows as of the end of and for such year for the Borrower and its Subsidiaries, all audited and reported on by independent public accountants of recognized national standing to the effect that such Consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a Consolidated basis in accordance with GAAP, together with separate financial statements for each business segment identified on, and as required by, <u>Schedule 6.01(a)</u> hereto and (ii) simultaneously with the delivery of the financial statements pursuant to clause (i) hereof, make publicly available (for so long as Holdings is subject to the reporting requirements under the Exchange Act) such financial statements (but, to the extent prohibited by the independent public accountants, excluding the audit report thereto; <u>provided</u> that if such audit report contains material non-public information, the Borrower shall use its commercially reasonable efforts to make such information publicly available simultaneously with the financial statements);

(b)    Within sixty (60) days after the end of each of the first three Fiscal Quarters of the Borrower, and simultaneously make publicly available (for so long as Holdings is subject to the reporting requirements under the Exchange Act), (x) the unaudited Consolidated balance sheet and related statements of operations for the Borrower and its Subsidiaries, as of the end of and for such Fiscal Quarter and (y) the unaudited Consolidated balance sheet and related statements of operations and Consolidated statements of cash flow for the Borrower and its Subsidiaries for the elapsed portion of the Fiscal Year, in each case, all certified by one of the

Borrower's Responsible Officers as presenting in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a Consolidated basis in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes, together with separate financial statements for each business segment identified on, and as required by, Schedule 6.01(a) hereto;

(c)    Promptly after the same become publicly available, copies of (i) all material periodic and other reports, proxy statements and other materials filed by any Loan Party with the SEC or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, as the case may be, and (ii) SEC Forms 10-K and 10-Q for Holdings (for so long as Holdings is subject to the reporting requirements under the Exchange Act); provided that no delivery shall be required hereunder with respect to each of the foregoing to the extent that such are publicly available via EDGAR or other publicly available reporting system;

(d)    Within two weeks after the financial statements of the Borrower are required to be delivered pursuant to Sections 6.01(a) and 6.01(b), the Borrower shall participate in a conference call to discuss results of operations of the Borrower and its Subsidiaries with the Lenders; provided that (i) the Borrower shall not be required to disclose any information that would be considered to be material non-public information (as determined by the Borrower in its reasonable discretion) and (ii) so long as Holdings is an SEC registrant, the participation by Holdings in quarterly conference calls to discuss results of Holdings' domestic operations shall be deemed to satisfy the obligations of Borrower under this Section 6.01(d);

(e)    Promptly upon receipt thereof, copies of all material reports submitted to any Loan Party by independent certified public accountants in connection with each annual, interim or special audit of the books of the Loan Parties or any of their Subsidiaries made by such accountants, including any management letter commenting on the Loan Parties' internal controls submitted by such accountants to management in connection with their annual audit (except such information that is subject an applicable confidentiality obligation, under contract or applicable law);

(f)    Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Loan Party as an Agent or any Lender may reasonably request including, without limitation, evidence of insurance renewals as required under Section 6.06 (except such information that is subject to attorney-client privilege or would result in a breach of a confidentiality obligation); provided that the Borrower shall not be required to disclose any information that (i) constitutes non-financial trade secrets, (ii) is prohibited by Law or any written confidentiality agreement not entered into in contemplation hereof or (iii) is subject to attorney-client or similar privilege or constitutes attorney work product; and

(g)    within forty-five (45) days after the end of each fiscal month of the Borrower and its Subsidiaries, such reports as are prepared by the Loan Parties' management for their own use, including the Consolidated balance sheet and related statements of operations and Consolidated statements of cash flows for the Borrower and its Subsidiaries, with respect to (A) the balance sheet and statement of operations, as of the end of and for such fiscal month and the

-59-

elapsed portion of the fiscal year, and (B) the statements of cash flow, for the elapsed portion of the fiscal year, setting forth in each case, in comparative form the Consolidated figures for the previous fiscal year; and

(h)   On or before the fifth Business Day following the end of every fiscal month (for purposes hereof, each calendar week being deemed to end on Friday), a 13-Week Projection (together with a reconciliation of actual results to forecasted results for the immediately preceding month);

(i)   Beginning with the second full fiscal month after the Closing Date, on or before the fifth Business Day following the end of every fiscal month (for purposes hereof, each calendar week being deemed to end on Friday), a detailed calculation, in a form reasonably acceptable to the Administrative Agent, of the Cumulative Net Cash Flow Before DIP ABL Draw/Paydown for the applicable period beginning on the first day of the second preceding fiscal month and ending on the second preceding Test Date, with a certificate of a Financial Officer of the Lead Borrower certifying as to the compliance under Section 7.17 for such fiscal month.

(j)   promptly after the same are available and to the extent feasible not later than two (2) days prior to the filing thereof (other than in exigent circumstances in which case as soon as practicable), all pleadings, motions, applications and any other documents to be filed by or on behalf of the Loan Parties and any other written reports given to the US Trustee and to any official committee relating to the operations, business, assets, properties or financial condition of the Loan Parties; and

(k)   the financial statements and other information required by Section 4.1 of the Guarantee, dated as of October 24, 2014, among Wayne and Bank of America, N.A. (without giving effect to any subsequent amendment, supplement or other modification thereto), as and when required thereby.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be

entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." For the avoidance of doubt, the financial statements and other information delivered pursuant to Section 6.01(g) shall not be Public Side Information. The Loan Parties shall be under no obligation to make any document PUBLIC, other than the information contemplated by Sections 6.01(a) – (c). Upon request, the Borrower shall provide courtesy copies by email to the legal and financial advisors to the Administrative Agent (but not to any Lender) of any Borrower Materials made available on the Platform.

**6.02    Notices of Material Events**. Furnish to the Administrative Agent prompt written notice of the occurrence of any of the following after any Responsible Officer of the Borrower obtains knowledge thereof:

(a)    a Default or Event of Default, specifying the nature and extent thereof and the action (if any) which is proposed to be taken with respect thereto;

(b)    the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority (i) against any Loan Party or any Subsidiary of Holdings thereof that has a reasonable likelihood of adverse determination and, if so adversely determined, would reasonably be expected to result in a Material Adverse Effect (other than the Chapter 11 Cases) or (ii) with respect to any Loan Document, and in each case any material development with respect thereto;

(c)    an ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect;

(d)    any development that results in a Material Adverse Effect;

(e)    any change in any Loan Party's chief executive officer or chief financial officer;

(f)    entry into and any material amendments, restatements, supplements or other modifications to the ABL Loan Documents; and

(g)    the discharge by any Loan Party of its present independent accountants or any withdrawal or resignation by such independent accountants.

Each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and, if applicable, any action taken or proposed to be taken with respect thereto.

**6.03    Existence; Conduct of Business**. Do all things necessary to comply with its Charter Documents in all material respects, and to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, amalgamation, liquidation or dissolution or other transaction permitted under Article VII.

-61-

**6.04   Payment of Obligations**. Promptly pay, discharge or otherwise satisfy as the same shall become due and payable all of its financial obligations arising after the Petition Date, except where (i) the amount or validity is being contested in good faith, (ii) non-payment thereof is permitted under the Bankruptcy Code or order of the Bankruptcy Court, or (iii) failure to make such payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

**6.05   Maintenance of Properties**. Keep and maintain all property material to the conduct of its business in good working order and condition (ordinary wear and tear, casualty loss and condemnation excepted), except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect and except for Store closings and Asset Sales permitted pursuant to Section 7.05.

**6.06   Insurance**.

(a)   (i) Maintain insurance with financially sound and reputable insurers (or, to the extent consistent with business practices in effect on the Closing Date, a program of self-insurance) on such of its property and in at least such amounts and against at least such risks as is consistent with business practices in effect on the Closing Date or as otherwise determined by the Responsible Officers of the Loan Parties acting reasonably in their business judgment, including public liability insurance against claims for personal injury or death occurring upon, in or about or in connection with the use of any properties owned, occupied or controlled by it; (ii) maintain such other insurance as may be required by law; and (iii) furnish to the Administrative Agent, promptly following written request, full information as to the insurance carried.

(b)   If any portion of any Real Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the Flood Insurance Laws, then the Borrower shall, or shall cause each applicable Loan Party to (i) maintain or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) no later than 90 days (as such period may be extended in the reasonable discretion of the Administrative Agent) after the Closing Date (or the day such insurance is obtained, renewed or extended in the case of such insurance obtained, renewed or extended after the Closing Date), deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent, including, without limitation, evidence of annual renewals of such insurance.

**6.07   Books and Records; Inspection Rights; Accountants**.

(a)   Keep proper books of record and account in accordance with GAAP and in which full, true and correct entries are made of all applicable dealings and transactions in

-62-

relation to its business and activities and permit any representatives designated by an Agents, upon reasonable prior notice, to visit and inspect its properties, to discuss its affairs, finances and condition with its officers and independent accountants (so long as a representative of the Borrower is afforded an opportunity to be present) and to examine and make extracts from its books and records, all for such reasonable times and as often as reasonably requested; provided that the Borrower shall not be required to disclose any information that (i) constitutes non-financial trade secrets, (ii) is prohibited by Law or any written confidentiality agreement not entered into in contemplation hereof or (iii) is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)   Shall at all times retain independent certified public accountants of national standing and shall instruct such accountants to cooperate with, and be available to, the Agents or their representatives to discuss the annual audited statements, the financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such accountants for such audited Statements, as may be raised by the Agents; provided that a representative of the Borrower shall be given the opportunity to be present at all such discussions.

**6.08   Compliance with Laws**. Comply with (i) all Applicable Laws and the orders of any Governmental Authority, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect or such compliance is stayed by the Chapter 11 Cases and (ii) the Bankruptcy Court Orders in all material respects.

**6.09   Use of Proceeds**. Shall use the proceeds of the Loans in accordance in all material respects with the terms of the Budget (subject to the permitted variance), including, without limitation: (i) to pay amounts due to Lenders and the Agents hereunder and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Agents, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby, (ii) payments in respect of the Prepetition Term Obligations contemplated by the Adequate Protection Order, and (iii) to provide working capital, and for other general corporate purposes of the Loan Parties, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court.

**6.10   Additional Collateral; Additional Guarantors: Additional Covenants**.

(a)   Subject to the terms of the Intercreditor Agreement and this Section 6.10, with respect to any property acquired after the Closing Date by any Loan Party that is intended to be subject to the Lien created by any of the Security Documents but is not so subject, promptly (and in any event within 30 days after the acquisition thereof) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments or supplements to the relevant Security Documents or such other documents as the Administrative Agent or the Collateral Agent shall reasonably deem necessary or advisable to grant to the Collateral Agent, for its benefit and for the benefit of the other Secured Parties, a Lien on the Collateral subject to no Liens other

-63-

than Permitted Liens and (ii) take all actions necessary to cause such Liens to be duly perfected to the extent required by such Security Documents in accordance with all applicable law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent. Subject to the terms of the Intercreditor Agreement, the Borrower shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Administrative Agent or the Collateral Agent shall reasonably require to confirm the validity, perfection and priority of the Liens of the Security Documents on such after-acquired properties. Prior to the Discharge of ABL Obligations, (i) the requirements of this Section 6.10(a) to deliver any Collateral constituting ABL Priority Collateral to the Collateral Agent shall be deemed satisfied by the delivery of such Collateral to the ABL Collateral Agent as bailee for the Collateral Agent pursuant to the Intercreditor Agreement and (ii) solely in the case of any property that constitutes ABL Priority Collateral, the Borrower shall, and shall cause each domestic Subsidiary to, comply with the requirements of this Section 6.10(a) with respect to the Obligations hereunder only to the same extent that the Borrower and such Subsidiaries are required to comply with provisions analogous to this Section 6.10(a) with respect to the ABL Credit Agreement Obligations in the ABL Credit Agreement (which excludes, for the avoidance of doubt, the Canadian Pledge, the Geoffrey Collateral and all Real Property).

(b)   Subject to the terms of the Intercreditor Agreement, with respect to any Person that is or becomes a Subsidiary after the Closing Date, cause such Subsidiary (other than any Excluded Subsidiary or Foreign Subsidiary), within ten (10) Business Days after such Subsidiary is formed or acquired or becomes a Subsidiary, (i) to execute the joinder agreements to the Guarantee and the Security Agreement, substantially in the forms annexed thereto and (ii) to take all actions necessary in the reasonable opinion of the Administrative Agent or the Collateral Agent to cause the Liens created by the Security Agreement to be duly perfected to the extent required by such agreement in accordance with all applicable law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent or the Collateral Agent.

**6.11  Security Interests; Further Assurances**. Subject to the terms of the Intercreditor Agreement, promptly, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any Applicable Law, or which an Agent or the Required Lenders shall reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties (to the extent required by this Agreement). The Loan Parties also agree to provide each Agent, from time to time promptly following the reasonable request of such Agent, evidence reasonably satisfactory to each such Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents. Prior to the Discharge of ABL Obligations, (i) the requirements of this Section 6.11 to deliver any Collateral constituting ABL Priority Collateral to the Collateral Agent or to provide control agreements over pledged accounts (other than accounts of Wayne) shall be deemed satisfied by the delivery of such Collateral to the ABL Collateral Agent as bailee for the Collateral Agent pursuant to the Intercreditor Agreement or perfection by control by the ABL Collateral Agent over such account and (ii) solely in the case of any property that constitutes ABL Priority Collateral (which excludes, for the avoidance of doubt, the Canadian Pledge, the Geoffrey Collateral and all Real Property), the Borrower shall, and shall cause each domestic Subsidiary to, comply with the requirements of this Section 6.11 with respect to the Obligations hereunder only to the same extent that the Borrower and such Subsidiaries are required to comply with provisions analogous to this Section 6.11 with respect to the ABL Credit Agreement Obligations

-64-

in the ABL Credit Agreement. With respect to any Real Property with a fair market value greater than $2.5 million constituting Collateral, notwithstanding that the Agents and/or the Lenders may already have a perfected Lien therein pursuant to the Bankruptcy Court Order, the Loan Parties also agree, upon the request of the Administrative Agent, to enter into and deliver and authorize the Administrative Agent to record Mortgages with respect to all such parcels of Real Property no later than 90 days after the Closing Date or, if later, 45 days following request therefor (in each case as such period may be extended in the reasonable discretion of the Administrative Agent). Within the timeframes set forth on Schedule 6.11, or by such later date as the Administrative Agent may agree, the Loan Parties shall cause the actions set forth on Schedule 6.11 to be taken.

**6.12 Information Regarding Collateral**.

(a)    Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office or principal place of business, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), unless all filings, publications and registrations have been made under the UCC or other Applicable Law that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest with the priority required by the Intercreditor Agreement (subject only to Permitted Liens having priority by operation of Applicable Law) in all the Collateral for its own benefit and the benefit of the Secured Parties. Each Loan Party agrees to promptly provide the Collateral Agent with certified Organization Documents reflecting any of the changes described in the preceding sentence. Each Loan Party also agrees to promptly notify the Collateral Agent of any change in the location of any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral in excess of $100,000 in value is located (including the establishment of any such new office or facility). Prior to the Discharge of ABL Obligations and solely in the case of any Collateral constituting ABL Priority Collateral (which excludes, for the avoidance of doubt, the Canadian Pledge, the Geoffrey Collateral and all Real Property), the Borrower shall, and shall cause each domestic Subsidiary to, comply with the requirements of this Section 6.12 with respect to the Obligations hereunder only to the same extent that the Borrower and such Subsidiaries are required to comply with provisions analogous to this Section 6.12 with respect to the ABL Credit Agreement Obligations in the ABL Credit Agreement.

(b)    Deliver to the Administrative Agent and the Collateral Agent, promptly following reasonable request, such information reasonably deemed by the Administrative Agent or the Collateral Agent necessary to obtain or maintain (to the extent provided in the applicable Security Document) a valid, perfected Lien on all Collateral acquired after the Closing Date to the extent required under the Security Documents.

-65-

**6.13   Lender Calls**. The Loan Parties and/or their advisors, as applicable (including appropriately senior members of management with respect to clause (c) below), shall host the following telephonic conference calls with the Administrative Agent, the Lenders, and their advisors:

(a)   Promptly following the delivery of each variance report pursuant to Section 6.01(h), a call to discuss the contents of such variance report;

(b)   a weekly call (at a time to be mutually agreed) with the Administrative Agent and its advisors (which may be joint with the agent and advisors under the ABL Credit Agreement) to discuss contemplated lease rejections and any related going out of business sales, which will include a discussion of the cost benefit analysis with respect to any contemplated lease rejection dates and the maximization of value of inventory and any other assets with respect to any stores contemplated to be closed; and

(c)   No less frequently than monthly, a call to discuss the Budget and Budget-related initiatives (including SG&A and Capital Expenditures).

**6.14   Access to Information**. Promptly deliver all information reasonably requested by the Administrative Agent (whether directly or through its advisors) in connection with the Restructuring; <u>provided</u> that, notwithstanding anything to the contrary in this Section 6.14, none of the Borrower or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (x) constitutes non-registered Intellectual Property or non-financial trade secrets, (y) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by applicable law or any binding agreement or (z) is subject to attorney-client or similar privilege or constitutes attorney work product.

**6.15   Maintenance of Ratings**. Use commercially reasonable efforts to obtain within 60 days of the Petition Date and maintain (i) a public corporate family rating of the Borrower and a rating of the term loan credit facility provided hereunder, in each case from Moody's, and (ii) a public corporate credit rating of the Borrower and a rating of the term loan credit facility provided hereunder, in each case from S&P (it being understood and agreed that "commercially reasonable efforts" shall in any event include the payment by the Borrower of customary rating agency fees and cooperation with information and data requests by Moody's and S&P in connection with their ratings process).

**6.16   Revisions to Budget**. Not later than January 31, 2018, the Loan Parties will propose revisions to the Budget (as so revised, the "Revised Budget"), which may include reductions (but not increases) to SG&A, capital expenditures and/or other cash outlays that, together with a revised projections of receipts in light of results since the Petition Date, reasonably calculated in good faith to achieve, over a reasonable timeframe, go-forward liquidity not less than that contemplated by the existing Budget. The Loan Parties and their professional advisors shall consult in good faith with designated representatives of the Lenders and the Lenders' financial advisors in connection with preparation of the Revised Budget.

# ARTICLE VII
# NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnity obligations with respect to unasserted claims), the Loan Parties shall not, nor shall any Loan Party permit any of its Subsidiaries (other than the Excluded JVs, to the extent they are Subsidiaries) to, directly or indirectly:

**7.01  Liens**. Create, incur, assume or suffer to exist any Lien upon any of their assets, whether now owned or hereafter acquired, other than the following ("Permitted Liens"):

(a)   Liens imposed by law for Taxes that are not required to be paid pursuant to Section 6.04;

(b)   Statutory or common law Liens of landlords, sublandlords, carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by Applicable Law, (i) arising in the ordinary course of business and securing obligations that are not overdue by more than sixty (60) days, (ii) (A) that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation or (iii) the existence of which would not reasonably be expected to result in a Material Adverse Effect;

(c)   Liens provided in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)   deposits to secure or relating to the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds (and Liens arising in accordance with Applicable Law in connection therewith), and other obligations of a like nature, in each case in the ordinary course of business;

(e)   Liens securing judgments that do not constitute an Event of Default under Section 8.01(e);

(f)   easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way, development, site plan or similar agreements and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects, or survey matters that are disclosed by current surveys, but that, in each case, do not interfere with the current use of the Property in any material respect;

(g)   (i) Liens existing on the Petition Date on any property or assets of a Loan Party or its Subsidiaries securing the Prepetition Term Obligations or set forth on Schedule 7.01(g); (ii) the Carve-Out; (iii) Liens pursuant to the Bankruptcy Court Orders, the CCAA DIP Orders or the Adequate Protection Orders; (iv) Liens on the Collateral ranking pari passu with the Liens securing the Obligations to secure Wayne Loans and/or TRU Canada Loans; and (v) Liens existing on the Petition Date or granted as adequate protection on the assets of Giraffe Junior Holdings, LLC and Propco II to secure the Indebtedness of such entities existing as of the Petition Date;

-67-

(h)    (i) Liens on fixed or capital assets acquired by any Loan Party or any Subsidiary to secure obligations permitted under Section 7.03(f) so long as (A) such Liens and the Indebtedness secured thereby are incurred prior to or within ninety days after such acquisition or the completion of the construction or improvement thereof (other than refinancings thereof permitted hereunder), (B) the Indebtedness secured thereby does not exceed 100% of the cost of acquisition or improvement of such fixed or capital assets, (C) [Reserved], and (D) such Liens shall not extend to any other property or assets of the Loan Parties (other than (x) upon or in after-acquired property that is affixed or incorporated into the property covered by such Lien or any proceeds or products thereof or (y) assets subject to any cross-collateralization of obligations owed to the holder of such Lien with respect to any capitalized leases) and (ii) Liens incurred in connection with sale leaseback transactions of fixed or capital assets as long as such Liens shall not violate the terms of the Indentures and the proceeds are applied in accordance with Section 7.08;

(i)    (ii) Liens on Collateral having the priority set forth in the Intercreditor Agreement securing Indebtedness incurred pursuant to Section 7.03(b) and (e) and (ii) other obligations in accordance with the terms of the Intercreditor Agreement;

(j)    landlords' and lessors' Liens in respect of rent not in default for more than sixty days or the existence of which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect;

(k)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(l)    [Reserved];

(m)    Liens attaching solely to cash earnest money deposits in connection with any letter of intent or purchase agreement in connection with any Investment permitted pursuant to Section 7.02(m);

(n)    Liens arising from precautionary UCC filings regarding "true" operating leases or the consignment of goods to a Loan Party or a Subsidiary thereof;

(o)    Liens in favor of customs and revenues authorities imposed by Applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations (i) that are not overdue by more than sixty (60) days, (ii) (A) that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, or (iii) the existence of which would not reasonably be expected to result in a Material Adverse Effect;

-68-

(p)   Liens placed on any of the assets of a Foreign Subsidiary securing Indebtedness or other obligations not otherwise prohibited hereunder;

(q)   any interest or title of a licensor, sublicensor, lessor or sublessor under any license or operating or true lease agreement; provided that no such lease or sublease shall constitute a Capital Lease Obligation;

(r)   licenses, sublicenses, leases or subleases granted to third Persons in the ordinary course of business which do not (i) interfere in any material respect with the business of Holdings, the Borrower and the Subsidiaries, taken as a whole or (ii) secure any debt for borrowed money;

(s)   the replacement, extension or renewal of any Permitted Lien; provided that such Lien shall at no time be extended to cover any assets or property other than such assets or property subject thereto on the Petition Date or the date such Lien was incurred (or upon or in after-acquired property that is affixed or incorporated into the property covered by such Lien or any proceeds or products thereof or assets subject to any cross-collateralization of obligations owed to the holder of such Lien with respect to any capitalized leases), as applicable;

(t)   Liens on insurance policies and the proceeds thereof incurred in the ordinary course of business in connection with the financing of insurance premiums; provided that such Liens shall be limited only to the insurance policies and proceeds of such insurance premiums;

(u)   [Reserved];

(v)   Liens arising by operation of law under Article 4 of the UCC (or, with respect to the assets of any Foreign Subsidiary of the Borrower organized under the Laws of Canada, any similar Laws in Canada) in connection with collection of items provided for therein;

(w)   Liens arising by operation of law under Article 2 of the UCC (or, with respect to the assets of any Foreign Subsidiary of the Borrower organized under the Laws of Canada, any similar Laws in Canada) in favor of a reclaiming seller of goods or buyer of goods;

(x)   Liens on deposit accounts or securities accounts in connection with overdraft protection and netting services in the ordinary course of business;

(y)   security given to a public or private utility or any Governmental Authority as required in the ordinary course of business;

(z)   possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the date hereof and Investments permitted pursuant to Section 7.02; provided that such Liens (i) attach only to such Investments and (ii) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

-69-

(aa)   with respect to any Real Property located in Canada, any rights, reservations, limitations and conditions contained in the grant from the Crown or any Crown Patent;

(bb)   Liens relating to Indebtedness permitted by Section 7.03(r) that comply with the provisions of Section 7.03 (r);

(cc)   Liens in favor of a financial institution encumbering deposits (including the right of setoff) held by such financial institution in the ordinary course of business in respect of Indebtedness permitted hereunder and which are within the general parameters customary in the banking industry;

(dd)   Liens in the nature of the right of setoff in favor of counterparties to contractual agreements with the Loan Parties (other than the Sponsors (other than Holdings and any of its Subsidiaries)) in the ordinary course of business; and

(ee)   Liens on assets not otherwise permitted by this Section 7.01; provided that the aggregate outstanding principal amount of the obligations secured by such Liens shall not exceed (as to all Loan Parties) $25.0 million at any one time;

(ff)   Liens created under the Loan Documents;

(gg)   [Reserved];

(hh)   Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Borrower or any Subsidiary in the ordinary course of business permitted by this Agreement;

**7.02   Investments**. Make any Investments, except:

(a)   Investments held by any Loan Party or a Subsidiary thereof in the form of Cash Equivalents;

(b)   Investments (i) of any Loan Party in any Subsidiary Guarantor, (ii) of any Subsidiary Guarantor in the Borrower or any other Subsidiary Guarantor, (iii) of up to $10.0 million in one or more Non-Guarantor Subsidiaries (other than a Propco Subsidiary) by the Borrower and/or one or more Subsidiary Guarantors at any time outstanding, (iv) of a Non- Guarantor Subsidiary (other than a Propco Subsidiary) in another Non-Guarantor Subsidiary, (v) consisting of the Wayne Loans and/or the TRU Canada Loans and (vi) of any Non-Guarantor Subsidiary in any Loan Party; provided that in the case of Investments in the form of Indebtedness, all such Indebtedness shall be evidenced by promissory notes;

(c)   Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case, in the ordinary course of business;

(d)   Indebtedness permitted by Section 7.03(d);

-70-

(e)    Hedge Agreements permitted by <u>Section 7.03(e)</u>;

(f)    non-cash consideration received in any asset sale permitted by <u>Section 7.05</u>;

(g)    transactions permitted by <u>Section 7.04</u> and Investments constituting loans or advances by the Borrower to Holdings in lieu of dividends or other distributions otherwise permitted pursuant to <u>Section 7.06</u>;

(h)    [Reserved];

(i)    Investments existing or contemplated on the Petition Date and set forth on <u>Schedule 7.02(i)</u>, and refinancings thereof on substantially the same terms;

(j)    loans or advances to employees for the purpose of travel, entertainment or relocation in the ordinary course of business; <u>provided</u> that all such loans or advances to employees shall not exceed $2.5 million in the aggregate at any time, and determined without regard to any write-downs or write-offs thereof;

(k)    capitalization or forgiveness of any Indebtedness owed to a Loan Party by another Loan Party, excepting by Wayne or any Subsidiary thereof of obligations of Borrower or any other Subsidiary of Borrower;

(l)    to the extent permitted by Applicable Law, notes from officers and employees of a Loan Party issued by such officers and employees in exchange for equity interests of Toys "R" Us Holdings, Inc. purchased by such officers or employees pursuant to a stock ownership of purchase plan or compensation plan;

(m)    other Investments in non-Affiliates of the Loan Parties, including Permitted Acquisitions but excluding other Acquisitions, an amount not to exceed $25.0 million, in the aggregate outstanding at any time, determined without regard to any write-downs or write-offs thereof;

(n)    [Reserved];

(o)    [Reserved];

(p)    Investments consisting of the posting of letters of credit, guarantees or cash collateral to secure obligations of TRU (Vermont), Inc. in respect of insurance policies issued in favor of Holdings and its domestic Subsidiaries, in each case relating to or for the benefit of the Borrower and its Subsidiaries in the ordinary course of business not to exceed $10.0 million at any time outstanding;

-71-

(q)   Investments (i) required to be made pursuant to the organizational documents of SALITRU Associates JV as in effect on the Petition Date, and (ii) other Investments in SALITRU Associates JV and SAJV Holdings, LLC in an aggregate amount not to exceed $10.0 million at any one time outstanding; and

(r)   Investments in the form of loans or advances by any Loan Party that is a Debtor in the Cases to Holdings in an amount necessary for Holdings to pay Permitted Holdings Expenses consistent with the Budget; provided that the claims in respect of such loans constitute allowed superpriority administrative expense claims against Holdings pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507 and are secured by Liens that are junior only to any third-party debtor-in-possession financing of Holdings.

An Investment shall be deemed to be outstanding to the extent not returned in the same form (or (i) in assets that may be used in those businesses in which the Loan Parties and their Subsidiaries are permitted to be engaged under Section 7.04(b) and have at least the same fair market value or (ii) in Marketable Securities with at least the same fair market value; provided that such Marketable Securities are otherwise permitted by this Section 7.02 or such Marketable Securities are liquidated within 45 days) as the original Investment to such Loan Party.

**7.03   Indebtedness and Disqualified Capital Stock**. Create, incur, assume or suffer to exist any Indebtedness or Disqualified Capital Stock, except:

(a)   Indebtedness created under (I) the Loan Documents; and (II) (y) Wayne Loans; and (z) TRU Canada Loans, in the case of this clause (z) in an aggregate principal amount at any time outstanding not to exceed $75,000,000; provided, in the case of clauses (y) and (z), if requested by the Agent, the lender thereunder shall enter into an intercreditor agreement in form and substance reasonably acceptable to the Agent providing for the pari-passu treatment of such Indebtedness and the Obligations and Agent's exclusive control of remedies with respect to the Collateral pending payment in full of the Obligations.

(b)   Indebtedness under the ABL Credit Documents in an aggregate principal amount not to exceed $2,300,000,000; provided that, the aggregate principal amount of Indebtedness incurred under this clause (b) by the Canadian Borrower (as defined in the ABL Credit Agreement) or any borrower under the ABL Credit Agreement which is not organized under the laws of the United States, any state thereof or the District of Columbia, shall not exceed $300,000,000;

(c)   Indebtedness outstanding or contemplated on the Closing Date and listed on Schedule 7.03(c), including any modification, replacement, refinancing, refunding, renewal or extension thereof to the extent indicated on Schedule 7.03(c); provided that after giving effect thereto (i) the principal amount of such Indebtedness is not greater than the aggregate principal amount of Indebtedness being refinanced, plus (x) the amount of any interest, premiums or penalties required to be paid thereon and (y) fees and expenses associated therewith, (ii) if the final maturity date of such Indebtedness is prior to the Maturity Date, the result of such

-72-

refinancing shall not be an earlier maturity date or decreased weighted average life (other than nominal amortization), and (iii) if the final maturity date of such Indebtedness is after the Maturity Date, the result of such extension shall not be a maturity date earlier than the Maturity Date;

(d)   guarantees by (i) any Loan Party of Indebtedness or obligations of the Loan Parties arising in the ordinary course of business of any other Loan Party and (ii) any Foreign Subsidiary (other than Toys "R" Us (Canada) Ltd. / Toys "R" Us (Canada) Ltee.) of Indebtedness of any other Foreign Subsidiary;

(e)   obligations (contingent or otherwise) of a Loan Party or any Subsidiary thereof existing or arising under any Hedge Agreement; provided that such obligations are (or were) entered into by such Person in the ordinary course of business (including on behalf of another Loan Party or Subsidiary of a Loan Party) and not for speculative purposes;

(f)   Indebtedness in respect of Capital Lease Obligations and purchase money obligations incurred after the Petition Date for fixed or capital assets in an aggregate amount outstanding at any time not to exceed $100.0 million, and within the limitations set forth in Section 7.01(h) (including any such Indebtedness or purchase money obligations assumed pursuant to Section 7.02(h)) and refinancings of any such Indebtedness; provided that after giving effect thereto the principal amount of such Indebtedness is not greater than the aggregate principal amount of Indebtedness being refinanced, plus (x) the amount of any interest, premiums or penalties required to be paid thereon, and (y) fees and expenses associated therewith; and provided, further, for purposes of calculating Cumulative Net Cash Flow Before DIP ABL Draw/Paydown, the entire aggregate amount of such Capitalized Lease Obligations or purchase money obligations shall be treated as disbursements made on the date such transaction is entered into (and any subsequent lease payments not in excess of such amount shall be excluded in calculating Cumulative Net Cash Flow Before DIP ABL Draw/Paydown).

(g)   Indebtedness permitted by Section 7.02(b);

(h)   Indebtedness relating to surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(i)   Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business;

(j)   indemnification, adjustment of purchase price, earn-out or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition of any business or assets of a Loan Party or any of its Subsidiaries or Equity Interests of a Subsidiary thereof, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Equity Interests for the purpose of financing or in contemplation of any such acquisition; provided that in the case of a disposition, the maximum aggregate liability in respect of all such obligations outstanding under this subsection (j) shall at no time exceed the gross proceeds actually received by a Loan Party and its Subsidiaries in connection with such disposition;

-73-

(k)    [Reserved];

(l)    [Reserved];

(m)    [Reserved];

(n)    [Reserved];

(o)    without duplication, non-cash accruals of interest, accretion or amortization of original issue discount and/or pay-in-kind interest on Indebtedness otherwise permitted to be incurred under this Agreement;

(p)    [Reserved];

(q)    [Reserved];

(r)    Indebtedness relating to letters of credit obtained (i) in the ordinary course of business or (ii) in connection with the purchase of inventory from suppliers located outside the United States and Canada;

(s)    Indebtedness constituting Investments permitted under Section 7.02;

(t)    other Indebtedness in an aggregate principal amount not to exceed $25.0 million.

(u)    guarantee obligations incurred in the ordinary course of business (including in respect of construction or restoration activities) in respect of trade obligations of (or to) suppliers, customers, franchisees, lessors and licensees;

(v)    [Reserved];

(w)    advances made by non-Affiliate landlords to finance tenant improvements of Real Property in the ordinary course of business; and

(x)    Indebtedness incurred by the Borrower in an amount up to the amount of any cash equity contribution or investment of cash by Holdings to the Borrower.

**7.04    Fundamental Changes**.

(a)    Merge or amalgamate into or consolidate with any other Person, or permit any other Person to merge or amalgamate into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing or would arise therefrom, (i) any Subsidiary may liquidate, dissolve, consolidate, amalgamate or merge into a Loan Party in a transaction in which a Loan Party is the surviving Person, (ii) any Subsidiary that is not a Loan Party may liquidate, dissolve, consolidate, amalgamate or merge into any Subsidiary that is not a Loan Party, (iii) any Loan Party (other than the Borrower) may amalgamate or merge with or into any other Loan Party and (iv) transactions permitted by Sections 7.02 or 7.05 may be consummated in the form of a merger, amalgamation or consolidation.

-74-

(b)   Engage, to any material extent, in any business other than businesses of the type conducted by such Loan Party on the date of execution of this Agreement and businesses reasonably related thereto and those complementary or ancillary thereto.

**7.05   Asset Sales**. Make any Asset Sales, except:

(a)   sales of obsolete, damaged or worn out property or, in the judgment of a Loan Party, property no longer useful or necessary in its business or that of any Subsidiary, whether now owned or hereafter acquired, in each case in the ordinary course of business;

(b)   Liens permitted under <u>Section 7.01</u> and transactions permitted by <u>Sections 7.02</u>, <u>7.04(a)</u>, <u>7.06</u> and <u>7.08</u>;

(c)   licensed departments and leases, subleases, licenses and sublicenses of real or personal property, in each case in the ordinary course of business, excluding exclusive licenses of intellectual property;

(d)   sales of assets by a Loan Party or any of its Subsidiaries to (i) any of such Person's Subsidiaries or (ii) another Loan Party or its Subsidiaries; <u>provided</u> that if the transferor in such a transaction is a Loan Party, then the transferee must be a Loan Party;

(e)   [Reserved];

(f)   sales or forgiveness of accounts in the ordinary course of business or in connection with the collection or compromise thereof;

(g)   leasing of Real Property that is no longer used in the business of the Loan Parties;

(h)   (I) Asset Sales (other than of Geoffrey Collateral) by a Loan Party and or any of its Subsidiaries not otherwise permitted under this <u>Section 7.05</u> in an aggregate amount not to exceed $20,000,000 and/or (II) the sale of the Borrower's corporate headquarters located in Wayne, New Jersey; <u>provided</u> that, with respect to any Asset Sale pursuant to this clause (h), (i) at the time of such Asset Sales, no Event of Default shall exist or would result from such Asset Sale, (ii) the consideration paid for such asset shall be paid to such Loan Party or such Subsidiary at least 75% in cash or Cash Equivalents, (iii) 100% of the Net Cash Proceeds from such Asset Sale are applied in accordance with <u>Section 2.03</u>, promptly following the receipt of such Net Cash Proceeds and (iv) any such sales shall be for fair market value (as determined in good faith by the Borrower).

(i)   any disposition of Real Property to a Governmental Authority as a result of a condemnation of such Real Property;

(j)   dispositions described on Schedule 7.05;

-75-

(k)   issuances of equity by Foreign Subsidiaries to qualifying directors of such Foreign Subsidiaries;

(l)   the sales of Real Property, inventory, fixtures and related assets in connection with up to 22.5% of the Borrower's operating Stores as of the Closing Date which are closed or to be closed (including through "going out of business" sales) by the Borrower after the Petition Date; <u>provided</u> that (i) all such sales (A) of inventory are made in accordance with customary liquidation agreements with professional liquidators, and (B) of other assets, are made on arm's-length terms, and (ii) the Net Proceeds thereof are applied in accordance with <u>Section 2.03(b)</u>;

(m)   [Reserved];

(n)   exchanges or swaps of equipment owned or leased by any Loan Party or a Subsidiary for other equipment; <u>provided</u> that (i) such exchange or swap shall be made for substantially equivalent fair value, (ii) the equipment so exchanged or swapped must be replaced with equipment reasonably concurrently with such exchange or swap and (iii) all Net Cash Proceeds, if any, received in connection with any such exchange or swap shall be applied to the Obligations pursuant to <u>Section 2.03(b)</u> hereof;

(o)   swaps or exchanges of Real Property, Stores or Store leases owned by any Loan Party or a Subsidiary for other Real Property, Stores or Store leases; <u>provided</u> that (i) such swap or exchange shall be made for substantially equivalent fair value, (ii) the Real Property, Store or Store lease swapped or exchanged shall be replaced with Real Property, Stores or Store leases reasonably concurrently with such swap or exchange, (iii) if the swap or exchange is in respect of Real Property, the replacement property must be Real Property and such Real Property shall become Term Priority Collateral, and (iv) all Net Cash Proceeds, if any, received in connection with any such exchange or swap shall be applied to the Obligations pursuant to <u>Section 2.03(b)</u> hereof; and

(p)   sales of Real Property, Stores or Store leases by any Loan Party or a Subsidiary thereof for fair market value, all or a portion of the net proceeds of which are to be used in connection with a relocation of such Real Property, Stores or Store leases to an identified site that is under contract. All Net Cash Proceeds, if any, received in connection with any such relocation in excess of the portion applied in connection with such relocation shall be applied to the Obligations pursuant to <u>Section 2.03(b)</u> hereof.

Notwithstanding anything contained herein to the contrary, (I) the application of net proceeds of any sale of assets constituting a sale leaseback transaction (other than with respect to Real Property) shall be applied in accordance with <u>Section 7.08</u> and (II) no Equity Interests of any Guarantor shall be sold or otherwise disposed of without the prior written consent of the Required Lenders.

**7.06   Restricted Payments**. Declare or make, directly or indirectly, any Restricted Payment, except:

(a)   (i) each Subsidiary of a Loan Party may make Restricted Payments to its direct equity holders and (ii) any Non-Guarantor Subsidiary may make Restricted Payments to another Non-Guarantor Subsidiary;

(b)   the Loan Parties and each Subsidiary thereof may declare and make dividend payments or other distributions payable solely in the stock or other Equity Interests of such Person;

-76-

(c)   to the extent actually used by Holdings to pay such expenses, the Loan Parties and their Subsidiaries may make Restricted Payments to or on behalf of Holdings in an amount necessary to pay Permitted Holdings Expenses that are allocable and chargeable to the Loan Parties in accordance with Holdings' ordinary course practice;

(d)   Permitted Tax Distributions to Holdings, so long as Holdings uses such distributions to pay its taxes;

(e)   [Reserved];

(f)   other transactions constituting Restricted Payments and expressly permitted by Section 7.02(p), (q), (r), or Section 7.07(l); and

(g)   Restricted Payments described on Schedule 7.05;

**7.07   Transactions with Affiliates**. Sell, lease or otherwise transfer or license any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or provide any service to, or enter into any contract, agreement or understanding, or otherwise engage in any other transactions with, any of its Affiliates, except that the following shall be permitted:

(a)   transactions between or among the Loan Parties and their Subsidiaries not prohibited hereunder; provided, that any such transaction involving one or more Loan Parties, on the one hand, and one or more Non-Loan Parties, on the other hand, shall be on terms and conditions, taken as a whole, not less favorable to each such Loan Party than could be obtained on an arm's-length basis from unrelated third parties in the good faith judgment of the Borrower, or in the ordinary course of business of such Loan Party.

(b)   [Reserved];

(c)   [Reserved];

(d)   other transactions specifically permitted under Sections 7.02(p) or (q);

(e)   payment of reasonable compensation to directors, officers and employees for services actually rendered to any such Loan Party or any of its Subsidiaries and indemnification arrangements;

(f)   stock option and compensation plans of the Loan Parties and their Subsidiaries;

(g)   employment contracts with officers and management of the Loan Parties and their Subsidiaries;

-77-

(h)    advances and loans to officers and employees of the Loan Parties and their Subsidiaries to the extent specifically permitted by Section 7.02(j);

(i)    transactions contemplated by and permitted pursuant to Sections 7.02(l);

(j)    transactions set forth on Schedule 7.07 hereto and any amendments and replacements thereto on arm's-length terms and on five (5) Business Days' notice to the Administrative Agent;

(k)    payment of reasonable director's fees, expenses and indemnities;

(l)    payment and performance under the Specified Intercompany Agreements, in each case, as in effect on the Petition Date or as may be amended, supplemented, modified or waived (i) with the approval of the Bankruptcy Court after a hearing on notice to the Administrative Agent and the Lenders or (ii) in a manner that is not adverse in any material respect (taken as a whole) to the interests of the Lenders in their capacities as such; and

(m)    other transactions on arm's-length-terms, subject to five (5) Business Days' written notice to the Administrative Agent and, in the case of any transaction involving consideration in excess of $5 million, subject to prior approval of either the Required Lenders or the Bankruptcy Court.

**7.08    Sales and Leasebacks.** Enter into any arrangement with any Person providing for the leasing by any Loan Party of property that has been or is to be sold by such Loan Party to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Loan Party; provided that nothing in this Section 7.08 shall prohibit the SALITRU Transaction.

**7.09    Clauses Restricting Subsidiary Distributions.** Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of a Loan Party to:

(a)    make Restricted Payments in respect of any Equity Interests of such Subsidiary held by, or pay any Indebtedness owed to, any Loan Party,

(b)    make loans or advances to, or other Investments in, any Loan Party or

(c)    transfer any of its assets to any Loan Party except for such encumbrances or restrictions existing under or by reason of:

(i)    any restrictions existing under the Loan Documents, the ABL Credit Documents or Indebtedness permitted by Sections 7.03(a), (e) (solely with respect to the party and its subsidiaries to such Hedge Agreement), (f), (h) (solely with respect to the party and its subsidiaries to such Indebtedness), (q) and (s);

(ii)    any encumbrance or restriction pursuant to applicable law or an agreement in effect at or entered into on the Closing Date or other applicable order of the Bankruptcy Court or the CCAA or contained in any amendment thereto, to the extent enforceable in the Chapter 11 Cases or related cases in foreign jurisdictions, including

-78-

without limitation, the Taj Bankruptcy Court Orders and the ABL Bankruptcy Court Orders;

(iii)  any encumbrance or restriction with respect to a Loan Party or any of its Subsidiaries pursuant to an agreement relating to any Indebtedness incurred by such Subsidiary prior to the date on which such Subsidiary was acquired by a Loan Party or its Subsidiary and outstanding on such date, which encumbrance or restriction is not applicable to such Loan Party or its Subsidiaries, or the properties or assets of such Loan Party or a Subsidiary thereof, other than the Subsidiary, or the property or assets of the Subsidiary, so acquired, or any Subsidiary thereof or the property or assets of any such Subsidiary;

(iv)  any encumbrance or restriction pursuant to an agreement effecting a refinancing of Indebtedness incurred pursuant to an agreement referred to in subsection (i), (ii) or (iii) of this Section or this subsection (iv) or contained in any amendment to an agreement referred to in subsection (i), (ii) or (iii) of this Section or this subsection (iv); provided that the encumbrances and restrictions contained in any such refinancing agreement or amendment are not materially less favorable taken as a whole, as determined by the Loan Party in good faith, to the Lenders than the encumbrances and restrictions contained in such predecessor agreement;

(v)  any encumbrance or restriction (A) that restricts the subletting, assignment, subleasing, sublicensing or transfer of any property or asset or right and is contained in any lease, license or other contract entered into in the ordinary course of business or (B) contained in security agreements securing Indebtedness of a Loan Party or a Subsidiary of a Loan Party to the extent such encumbrance or restriction restricts the transfer of the property subject to such security agreements;

(vi)  any restrictions (related to the assets being sold) imposed pursuant to an agreement that has been entered into in connection with the disposition of the Equity Interests or assets of a Loan Party or a Subsidiary thereof;

(vii)  any encumbrances or restrictions applicable solely to a Foreign Subsidiary and contained in any credit facility extended to any Foreign Subsidiary; provided that such encumbrances and restrictions do not extend to any Subsidiary that is not a Foreign Subsidiary;

(viii)  restrictions on transfers of assets pursuant to a Lien permitted by Section 7.01;

(ix)  any encumbrance or restriction arising under or in connection with any agreement or instrument governing Equity Interests of any Person other than a wholly owned Subsidiary of a Loan Party that is acquired after the Closing Date; and

(x)  restrictions which the Borrower has reasonably determined in good faith will not materially impair the Borrower's ability to make payments under this Agreement when due.

**7.10  Use of Proceeds**. The proceeds of the Loans shall be applied in accordance in all material respects with the Budget (subject to permitted variances). No part of the proceeds of the Loans will be used, whether directly or indirectly:

(a)   in any manner that causes such Loan or the application of such proceeds to violate the Regulations of the Board, including Regulation T, Regulation U and Regulation X, or any other regulation thereof, or to violate the Securities Exchange Act;

(b)   for any purpose that is prohibited under the Bankruptcy Code or the Bankruptcy Court Order;

(c)   to pay interest, principal or other amounts in respect of Indebtedness or other pre-Petition Date or post-Petition Date obligations of any kind or nature, or make any other payment or transfer to or for the benefit of Holdings and its Subsidiaries (other than the Loan Parties and their respective Subsidiaries, other than Giraffe Junior Holdings, LLC and its Subsidiaries) (the "Non-Delaware Silo Entities") except (i) payments by the Borrower of professional fees and other direct expenses of administration of the Chapter 11 Cases that are allocable to the Non-Delaware Silo Entities and (ii) payments permitted by Section 7.06(f)); provided such payments are, pursuant to the Adequate Protection Order, reimbursable by the applicable Non-Delaware Silo Entities within 30 days and the claims in respect thereof are granted super-priority administrative claim status with respect to any Non-Delaware Silo Entity that is a Debtor, subject only to claims in respect of any new money debtor-in-possession financing provided by non-Affiliates of Holdings; provided further that this clause (c) shall not limit the amount of professional fees payable by the Loan Parties;

(d)   subject to the Bankruptcy Court Order, to investigate, commence, prosecute or finance any action, proceeding or objection with respect to or related to the claims, Liens or security interest of the Administrative Agent, the Lenders, the Prepetition Term Agent or the Prepetition Term Lenders or their respective rights and remedies under this Agreement, the other Loan Documents, the Bankruptcy Court Orders or the Prepetition Term Loan Documents, as the case may be, including to commence or prosecute or join in any action against any or all of the Administrative Agent, the Lenders the Prepetition Term Agent or the Prepetition Term Lenders seeking (x) to avoid, subordinate or recharacterize the Obligations or the Prepetition Term Obligations or any of the Liens securing the Obligations or the Prepetition Term Obligations, (y) any monetary, injunctive or other affirmative relief against any or all of the Administrative Agent, the Lenders, the Prepetition Term Agent or the Prepetition Term Lenders or the Liens and collateral under the Prepetition Term Loan Documents, or (z) to prevent or restrict the exercise by any or all of the Administrative Agent, the Lenders, the Prepetition Term Agent or the Prepetition Term Lenders of any of their respective rights or remedies under the Loan Documents or the Prepetition Term Loan Documents; or

(e)   subject to the Bankruptcy Court Order, to finance any adversary action, suit, arbitration, proceeding, application, motion, contested matter or other litigation of any type materially adverse to the interests of any or all of the Administrative Agent, the Lenders, the Prepetition Term Agent or the Prepetition Term Lenders or their respective rights and remedies under the Loan Documents, the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order or the Prepetition Term Loan Documents.

-80-

Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications).

**7.11    Modifications of Charter Documents and Other Documents, Etc.**

(a)    amend, modify or waive any of its rights under its Charter Documents in any manner material and adverse to the Lenders;

(b)    amend, supplement, waive any provision of or otherwise modify the terms of any Specified Intercompany Agreement, except: (i) with the approval of the Bankruptcy Court after a hearing on notice to the Administrative Agent and the Lenders, (ii) in a manner that is not adverse in any material respect (with any material reduction in receipts to the Loan Parties being deemed material and adverse) to the interests of the Lenders in their capacities as such or (iii) with the Required Lenders' consent;

(c)    fail to enforce any of the rights of the Loan Parties under the Specified Intercompany Agreements upon breach thereof by any other party thereto, other than with respect to (i) defaults that are not material to the interests of the Lenders (it being agreed that monetary defaults aggregating in excess of $3,500,000 are material to the interests of the Lenders) or (ii) monetary defaults in respect of amounts not greater than $3,500,000 in aggregate for all such monetary defaults at any such time, provided that if the defaulting party is a Debtor, the liability for any overdue amount constitutes a secured, super-priority administrative claim against such Debtor, subject only to any third-party debtor-in-possession financing and any Lien or claim to which such third-party financing is subject;

(d)    (i) fail to use commercially reasonably efforts to cause Toys "R" Us Property Company I, LLC and Wayne Real Estate Holding Company, LLC to distribute to Wayne the maximum amount of cash permissible consistent with applicable law, fiduciary duties and contractual obligations binding on such entities, or fail to cause Wayne to maintain (from and after the date that is 30 days after the Closing Date) all cash and cash equivalents held by it in one or more segregated accounts solely in the name of Wayne, (ii) permit Wayne to make any distribution to or Investment in Holdings or any Subsidiary of Holdings other than Loan Parties and Subsidiaries of Wayne, or (iii) permit Wayne to enter into any contract or other obligation out of the ordinary course of its business without the consent of the Required Lenders, other than on notice and a hearing before the Bankruptcy Court.

**7.12    Fiscal Year**. Make any change in its Fiscal Year.

**7.13    Chapter 11 Modifications**. Without the consent of the Required Lenders:

(a)    Make or permit to be made any change, amendment or modification, to the Bankruptcy Court Orders ; and

(b)    Incur, create, assume or suffer to exist or permit any claim or Lien against any Loan Party ranking pari passu with or senior to the claims and Liens of the Administrative

-81-

Agent and the other Secured Parties hereunder, except for the Wayne Loans and the TRU Canada Loans (and the Liens securing them), the Carve Out, Adequate Protection Orders, CCAA Orders and claims and Liens in respect of the ABL Facility Indebtedness .

**7.14  Anti-Terrorism Law; Anti-Money Laundering**.

(a)   Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in Section 5.20, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and the Loan Parties shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with this Section 7.14).

(b)   Knowingly cause or permit any of the funds of such Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any applicable law.

**7.15  Embargoed Person**. Knowingly cause or permit (a) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, any Person subject to sanctions or trade restrictions under United States law ("Embargoed Person" or "Embargoed Persons") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or applicable law promulgated thereunder, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by applicable law, or the Loans made by the Lenders would be in violation of applicable law, or (2) the Executive Order, any related enabling legislation or any other similar Executive Orders or (b) any Embargoed Person to have any direct or indirect interest, of any nature whatsoever in the Loan Parties, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by applicable law or the Loans are in violation of applicable law.

**7.16  No Further Negative Pledge**. Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of any Loan Party or any Subsidiary thereof to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues constituting or required to constitute Collateral under the Loan Documents, whether now owned or hereafter acquired, or which requires the grant of any security in such property or revenues for an obligation if security is granted for another obligation, except the following: (1) this Agreement, the other Loan Documents, the ABL Credit Agreement Documents, agreements and arrangements permitted under Section 7.09 and the documents governing any Indebtedness incurred pursuant to Sections 7.03(a)(c), (d)(ii), (f) (prohibiting further Liens on the properties financed thereby) and (h); (2) covenants in documents creating Liens permitted by Section 7.01(h) prohibiting further Liens on the properties encumbered thereby; (3) any prohibition or limitation that (a) exists pursuant to applicable Requirements of Law, (b) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property

-82-

permitted under Section 7.05 pending the consummation of such sale, (c) restricts sublicensing, the granting of a Lien or subletting or assignment of any contract, license or lease of a Loan Party or a Subsidiary thereof, exists in any agreement in effect at the time such Subsidiary becomes a Subsidiary of a Loan Party, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary of a Loan Party or (e) is imposed by any amendments, modifications, supplements, waivers, extensions or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in subsection (3); provided that such amendments and refinancings are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment or refinancing (as determined in good faith by the Borrowers); and (4) restrictions which the Borrower has reasonably determined in good faith will not materially impair the Borrower's ability to make payments under this Agreement when due.

### 7.17   Maximum Cumulative Net Cash Flow Before DIP ABL Draw/Paydown.

The Borrower shall not permit the Cumulative Net Cash Flow Before DIP ABL Draw/Paydown as of any Test Date to exceed (x) beginning on the first Test Date until the Test Day for September fiscal month 2018, $150,000,000 and (y) thereafter, $200,000,000.

### 7.18   Minimum Liquidity.

Beginning on October 28, 2017, the Loan Parties (excluding Wayne) shall not allow Liquidity to be less than $175,000,000 on any Test Date.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01   Events of Default**. Any of the following shall constitute an "Event of Default":

(a)   Non-Payment. Any Loan Party fails to pay when and as required to be paid herein, any amount of principal or interest on any Loan, or any fee due or any other amount payable hereunder or under any other Loan Document and, other than with respect to principal amounts, such nonpayment continues for three (3) Business Days; or

(b)   Other Defaults. Any Loan Party (i) fails to perform or observe any other covenant or agreement (not specified in subsection (a) above or (c) below) contained in any Loan Document on its part to be performed or observed or (ii) fails to perform or observe any term of any Bankruptcy Court Order or Adequate Protection Order in a manner that is materially disadvantageous to the Lenders, and in each such case where such failure is capable of cure (other than in respect of a breach under Section 6.02(a) or Article VII) such failure continues for fifteen (15) days after the earlier of notice given by the Administrative Agent to the Borrower and knowledge of the Borrower (or five (5) days with respect to reports or other information pursuant to Section 6.01(h) and (i) and Section 6.16, required to be delivered to the Administrative Agent or any Lender on a particular deadline); or

(c)   Cross-Default/Acceleration. Any Loan Party (A) fails to make any payment when due (whether by scheduled maturity, required prepayment or otherwise, and

-83-

giving effect to any applicable grace period) in respect of any Specified Indebtedness (other than Indebtedness hereunder or under the Guarantee), (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating to such Indebtedness, the effect of which default or other event is to cause, or (other than with respect to Taj DIP Debt) to permit the lenders or holders thereof (or a trustee or agent on behalf of such lenders or holders) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise) prior to its stated maturity; provided that this paragraph (c) shall not apply to (A) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement or the agreement governing such Indebtedness) or (B) Indebtedness which is convertible into Equity Interest and converts to Equity Interests in accordance with its terms or (C) any breach or default that (x) is remedied by the Loan Party or the applicable Subsidiary or (y) waived (including in the form of amendment) by the requisite holders of the applicable Indebtedness, in either case, prior to the acceleration of all the Loans pursuant to this Section 8.01; or

(d)    [Reserved]; or

(e)    Judgments. One or more final post-petition judgments for the payment of money in an aggregate amount in excess of $25.0 million in excess of insurance coverage or indemnities from indemnitors reasonably satisfactory shall be rendered against any Loan Party or any Subsidiary or any combination of Loan Parties and/or Subsidiaries and the same shall remain undischarged for a period of forty-five (45)) days during which execution shall not be effectively stayed, satisfied or bonded or any action shall be legally taken by a judgment creditor to attach or levy upon any material assets of any Loan Party or Subsidiary to enforce any such judgment; or

(f)    ERISA. An ERISA Event shall have occurred that when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect and the same shall remain undischarged for a period of thirty (30) consecutive days during which period any action shall not be legally taken to attach or levy upon any material assets of any Loan Party to enforce any such liability; or

(g)    Invalidity of Loan Documents. Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations (other than contingent indemnity obligations with respect to unasserted claims), ceases to be in full force and effect; or any Loan Party contests in any manner in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document except by reason of payment in full of all Obligations (other than contingent indemnity obligations with respect to unasserted claims), or purports to revoke, terminate or rescind any provision of any Loan Document except pursuant to the express terms thereof; or

(h)    Representations and Warranties. Any representation or warranty made by any Loan Party (or any of its Responsible Officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made; or

-84-

(i) <u>Collateral</u>. The Interim Bankruptcy Court Order and the Final Bankruptcy Court Order, as applicable, together with the Loan Documents shall cease to create a valid and perfected Lien, with the priority required by this Agreement (other than in accordance with their terms or as a result of the action or inaction of any Agent or Lender), subject to Permitted Liens, on a material portion of the Collateral purported to be covered thereby; or

(j) <u>Change of Control</u>. There occurs any Change of Control ; or

(k) <u>Entry of Order</u>. The Final Bankruptcy Court Order shall not have occurred within 45 after the Petition Date; or

(l) <u>Conversion to Chapter 7</u>. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case; or

(m) <u>Alternate Financing</u>. Except in respect of the ABL Credit Agreement, any Loan Party shall file a motion in the Chapter 11 Cases without the express written consent of Required Lenders, to obtain additional financing from a party other than Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code that does not either have the prior written consent of the Agent or provide for the payment of the Obligations in full and in cash upon the incurrence of such additional financing; or

(n) <u>Prepetition Claims</u>. Any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim other than (x) as provided for in the First and Second Day Orders or, subject to the consent of the Administrative Agent to the extent not presented to them prior to the date hereof, "second day" orders, (y) contemplated by the Budget, or (z) otherwise consented to by the Administrative Agent in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $10.0 million in the aggregate, or (iii) except as provided in the Bankruptcy Court Orders, , approving any settlement or other stipulation not approved by the Required Lenders with any pre-Petition secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor; or

(o) <u>Appointment of Trustee or Examiner</u>. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing (i) a trustee under Section 1104, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(p) <u>Dismissal of Chapter 11</u>. An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the total Commitment, and payment in full of all Obligations (other than contingent Obligations not due and owing) of the Loan Parties hereunder and under the other Loan Documents upon entry thereof; or

(q) <u>Order With Respect to Chapter 11 Cases</u>. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or

-85-

duties of the Administrative Agent, the Administrative Agent), (i) to revoke, reverse, stay, modify, supplement or amend any of the Bankruptcy Court Orders or the Adequate Protection Order in a manner adverse to the Lenders or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Administrative Agent and the Required Lenders in respect of the Obligations (other than the Carve Out, the Wayne Loans, the TRU Canada Loans or the ABL Obligations); or

(r)    Application for Order By Third Party. An application for any of the orders described in clause (q) above shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within 45 days after filing or any Person obtains a final order under § 506 (c) of the Bankruptcy Code against the Administrative Agent; or

(s)    Right to File Chapter 11 Plan. The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders; or

(t)    Liens. (i) Any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Administrative Agent and/or the other Secured Parties, claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) the Lien or security interest created by Collateral Documents or the Bankruptcy Court Orders with respect to the Collateral shall, for any reason (other than as a result of the action or inaction of the Administrative Agent), cease to be valid or (iii) any action is commenced by the Loan Parties which contests the validity, perfection or enforceability of any of the Liens and security interests of the Administrative Agent and/or the other Secured Parties created by any of the Bankruptcy Court Order, this Agreement, or any Collateral Document; or

(u)    Invalidation of Claims. Any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or contest any material provision of any Loan Document or any material provision of any Loan Document shall cease to be effective (other than in accordance with its terms or as a result of the action or inaction of the Administrative Agent);

(v)    Liquidation. (i) The suspension of the operation of all or substantially all of the business of the Loan Parties in the ordinary course for 20 consecutive Business Days, or (ii) the permanent closing of more than 22.5% of the Loan Parties Stores (net of new Store openings) in operation as of the Closing Date without the written consent of the Required Lenders; or

(w)    IP Licenses. Holdings or any of its Subsidiaries shall move to assume any license of Intellectual Property to which Borrower or any of its Subsidiaries is a party prior to the 21st day following the Petition Date, unless the Required Lenders have provided their prior written consent to such motion.

-86-

**8.02   Remedies upon Event of Default**. Subject to the terms of the Bankruptcy Court Order, the Intercreditor Agreement and the next succeeding paragraph, if any Event of Default occurs and is continuing, the Administrative Agent shall, at the direction of the Required Lenders, take any or all of the following actions:

(i)   declare (A) the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower, and (B) the Commitments to be immediately terminated, and (C) the application of the Carve-Out has occurred through the delivery of a Carve-Out Trigger Notice (as defined in the Bankruptcy Court Orders) to the Borrower; and

(ii)   exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents

Upon the Maturity Date and following the giving of five (5) Business Days' notice to the Debtors and other applicable parties ("Remedies Notice Period"), subject in all respects to the Intercreditor Agreement, the Administrative Agent shall have relief from the automatic stay in the Cases and may setoff against deposits and financial assets of the Loan Parties (other than customary excluded accounts), foreclose on all or any portion of the Term Loan Priority Collateral located in the United States or otherwise exercise remedies against the Term Loan Priority Collateral located in the United States permitted by applicable non-bankruptcy law. During the Remedies Notice Period, the Loan Parties and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court. Unless the Bankruptcy Court orders otherwise during the Remedies Notice Period, the automatic stay, as to the Lenders and the Administrative Agent, shall be automatically terminated at the end of such notice period and without further notice or order. The occurrence and continuance of an Event of Default or acceleration shall trigger the prepayment premium under Section 2.03(a).

**8.03   Application of Funds**. After the exercise of remedies provided for in Section 8.02, or after the commencement of any Liquidation, subject to the terms of the Intercreditor Agreements and Bankruptcy Court Order, any amounts received on account of the Obligations shall be applied by the Administrative Agent:

(a)   First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agents and amounts payable under Article III) payable to the Administrative Agent and the Collateral Agent in their capacities as such;

(b)   Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders (including fees and time charges for attorneys who may be employees of any Lender) and amounts payable under Article III), ratably among them in proportion to the amounts described in this subsection payable to them;

-87-

(c)  <u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations, ratably among the Lenders in proportion to the respective amounts described in this subsection (c) payable to them;

(d)  <u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Loans ratably among the Lenders;

(e)  <u>Fifth</u>, to payment of any other Obligations then outstanding ratably among the Secured Parties; and

(f)  <u>Last</u>, the balance, if any, after all of the Obligations then due and owing have been paid in full in cash, to the Borrower or as otherwise required by Law.

Each Loan Party acknowledges the relative rights, priorities and agreements of the Secured Parties and the secured parties under the ABL Credit Agreement set forth in the Intercreditor Agreement and the Bankruptcy Court Order.

## ARTICLE IX
## AGENTS

**9.01  Appointment and Authority**. Each of the Lenders hereby irrevocably appoints NexBank SSB to act on its behalf as the Administrative Agent and Collateral Agent hereunder and under the other Loan Documents and authorizes each Agent to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and no Loan Party shall have rights as a third party beneficiary of any of such provisions.

**9.02  Rights as a Lender**. Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not one of the Agents and the term "<u>Lender</u>" or "<u>Lenders</u>" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Persons serving as the Administrative Agent hereunder in its individual capacity. Such Persons and their Affiliates may accept deposits from, lend money to, act as financial advisor or in any other advisory capacity for and generally engage in any kind of business with Holdings, the Loan Parties or any Subsidiary thereof or other Affiliate thereof as if each such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**9.03  Action by Agent**. In performing its functions and duties under this Agreement, (a) each Agent shall act solely as an agent for the Lenders and, as applicable, the other Secured Parties, and (b) no Agent assumes any (and shall not be deemed to have assumed any) relationship of agency or trust with or for the Borrower or any of the Subsidiaries of Holdings. Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact (including the Collateral Agent in the case of the Administrative Agent), and shall be entitled to advice of counsel concerning all matters pertaining to such duties. No Agent shall be

-88-

responsible for the negligence or misconduct of any agents or attorneys-in-fact or counsel selected by it with reasonable care and in good faith.

**9.04  Exculpatory Provisions**. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)  shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)  shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)  shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings, the Borrower or any of their Affiliates that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 8.02 and 10.01) or (ii) except to the extent of any liability imposed by law by reason of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower or a Lender. An Agent shall be fully justified in failing or refusing to take any action hereunder and under any other Loan Document (except actions expressly required to be taken by it hereunder or under the Loan Documents) unless it shall first be indemnified to its satisfaction by the Lenders pro rata against any and all liability, cost and expense that it may incur by reason of taking or continuing to take any such action.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to

-89-

the Administrative Agent. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead, such term as used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

**9.05  Reliance by the Administrative Agent**.

(a)   Each Agent may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Loan Documents an Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, the requesting Agent shall be absolutely entitled as between itself and the Lenders to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Lender for refraining from any action or withholding any approval under any of the Loan Documents until it shall have received such instructions from Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement. Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of an Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of the Required Lenders (or such other applicable portion of the Lenders), an Agent shall have no obligation to any Lender to take any action if it believes, in good faith, that such action would violate Applicable Law or exposes an Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 10.4(c).

(b)   The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.06  Delegation of Duties**. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of their duties and exercise their rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article IX shall apply to any such sub-agent and to the Related Parties of the Administrative

-90-

Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities of the Administrative Agent.

**9.07   Resignation of the Agent**. Each of the Administrative Agent and Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States, which appointment shall be subject to approval (not to be unreasonably withheld) by the Borrower. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment and shall have been approved by the Borrower (where such approval is required) within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent (which shall also be a Lender) meeting the qualifications set forth above; provided that if the Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section. Upon the acceptance and approval (if applicable) of a successor's appointment as Agent hereunder, and upon the execution and filing or recording of such financing statements or amendments thereto, and such other instruments or notices, as may be necessary, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.07). The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Section 9.07 and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

**9.08   Non-Reliance on the Agents and Other Lenders**. Each Lender expressly acknowledges that none of the Agents nor any of their officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of the Borrower or any other Loan Party, shall be deemed to constitute any representation or warranty by such Agent to any Lender. Each Lender further represents and warrants to the Agents that it has had the opportunity to review each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof. Each Lender represents to the Agents that, independently and without reliance upon any Agent or

-91-

any other Lender, and based on such documents and information as it has deemed appropriate, it has made and will make, its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties, it has made its own decision to make its Loans hereunder and enter into this Agreement and it will make its own decisions in taking or not taking any action under this Agreement and the other Loan Documents and, except as expressly provided in this Agreement, no Agent shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. Each Lender represents to the Agents that (i) it is a bank, savings and loan association or other similar savings institution, insurance company, investment fund or company or other financial or investment institution which makes or acquires commercial loans in the ordinary course of its business and that it is participating hereunder as a Lender for such commercial purposes and (ii) it has the knowledge and experience to be and is capable of evaluating the merits and risks of being a Lender hereunder. Each Lender acknowledges and agrees to comply with the provisions of Section 10.04(c) applicable to the Lenders hereunder. Each party to this Agreement acknowledges and agrees that the Agents may use an outside service provider for the tracking of all UCC financing statements required to be filed pursuant to the Loan Documents and notification to the Agents of, among other things, the upcoming lapse or expiration thereof, and that any such service provider will be deemed to be acting at the request and on behalf of the Borrowers and the other Loan Parties. No Agent shall be liable for any action taken or not taken by any such service provider.

**9.09    No Other Duties, Etc.** Anything herein to the contrary notwithstanding, no Agent shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity as the Administrative Agent, Collateral Agent or a Lender hereunder, as applicable, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agents.

**9.10    Administrative Agent May File Proofs of Claim**. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on any Loan Party) shall be entitled and empowered, by intervention in such proceeding or otherwise.

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due the Lenders and the Agents under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee,

-92-

liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.03(g), 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**9.11  Collateral and Guarantee Matters**.

(a)  Each Lender authorizes and directs the Administrative Agent and the Collateral Agent to enter into (x) the Security Documents for the benefit of the Lenders and the other Secured Parties and (y) any amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to the Security Documents in accordance with the terms hereof or such Security Document. Each Lender hereby agrees, except as otherwise set forth herein, that any action taken by the Administrative Agent, the Collateral Agent or the Required Lenders in accordance with the provisions of this Agreement or the Security Documents and the exercise by the Agents or the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Administrative Agent and the Collateral Agent are hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected security interests in and liens upon the Collateral granted pursuant to the Security Documents. Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Loans unless instructed to do so by the Collateral Agent, it being understood and agreed that such rights and remedies may be exercised only by the Collateral Agent (acting at the direction of the Administrative Agent or the Required Lenders).

(b)  The Lenders irrevocably authorize the Administrative Agent and the Collateral Agent, at its option and in its discretion,

(i)  to release any Lien on any property granted to or held by an Agent under any Loan Document (i) upon termination of the Commitments and payment in full of all Obligations (other than contingent indemnity obligations with respect to unasserted claims), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document to a Person that is not a Loan Party, (iii) in accordance with the requirements of the Intercreditor Agreements, (iv) to the extent constituting Excluded Collateral (as defined in the Security Agreement) or (v) subject to Section 10.01, if approved, authorized or ratified in writing by the Required Lenders;

-93-

(ii)   to subordinate any Lien on any property granted to or held by an Agent under any Loan Document to the holder of any Lien on such property that is permitted by <u>Section 7.01(h)</u>;

(iii)   to release any Guarantor from its obligations under the Guarantee if such Person ceases to be a Subsidiary of a Loan Party as a result of a transaction permitted hereunder; <u>provided</u> that no such release shall occur if such Guarantor continues to be a guarantor in respect of any other Indebtedness of the Borrower or any other Loan Party unless and until such Guarantor is (or is being simultaneously) released from its guarantee with respect to such other Indebtedness; and

(iv)   subject to the other provisions of this <u>Article IX</u>, to take such actions, including making filings and entering into agreements and any amendments or supplements to any Security Document or the Intercreditor Agreement, as may be necessary or desirable to reflect the intent of this Agreement and the refinancing of any Indebtedness permitted hereunder; <u>provided</u> that upon request by the Administrative Agent or any Loan Party at any time, the Lenders will confirm in writing the Administrative Agent's authority to enter into such agreements, amendments or supplements.

(c)   No Agent shall have any obligation whatsoever to the Lenders to assure that the Collateral exists or is owned by Holdings or any of its Subsidiaries or is cared for, protected or insured or that the Liens granted to any Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Agents in this Section 9.11 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, each Agent may act in any manner it may deem appropriate, in its sole discretion, given such Agent's own interest in the Collateral as Lender (if any) and that no Agent shall have any duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct.

(d)   The Collateral Agent may, and hereby does, appoint the Administrative Agent as its agent for the purposes of holding any Collateral and/or perfecting the Collateral Agent's security interest therein and for the purpose of taking such other action with respect to the Collateral as such Agents may from time to time agree.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property pursuant to this <u>Section 9.11</u>.

**9.12   Withholding Tax**. To the extent required by any applicable Law, the Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not

-94-

properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective, or for any other reason), such Lender shall indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by Borrower pursuant to <u>Sections 3.01</u> and <u>3.04</u> and without limiting any obligation of Borrower to do so pursuant to such Sections) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise (including any and all related losses, claims, liabilities, penalties, and interest), together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this <u>Section 9.12</u>. The agreements in this <u>Section 9.12</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement

.

<div align="center">

**ARTICLE X**
**MISCELLANEOUS**

</div>

**10.01   Amendments, Etc.** No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u> that no such amendment, waiver or consent shall:

(a)   extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default shall constitute an increase or extension in the Commitment of any Lender);

(b)   (A) change the scheduled Maturity Date, (B) postpone the scheduled date for payment of any interest or fees payable hereunder, (C) change the amount of, waive or excuse any payment of principal, interest or premium (other than waiver of default interest or any mandatory payments) or (D) postpone the scheduled date of expiration of any Commitment, in any case, without the written consent of each Lender directly and adversely affected thereby (but not Required Lenders);

(c)   reduce the principal of, or the rate of interest (other than waiver of default interest) specified herein on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document (other than waiver of mandatory prepayments), change the form or currency of payment or increase the maximum duration of Interest Periods, without the written consent of each Lender directly and adversely affected thereby;

<div align="center">

-95-

</div>

(d)   change <u>Section 2.11</u> or <u>Section 8.03</u> in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender;

(e)   change any provision of this <u>Section 10.01</u> or reduce the percentage set forth in (i) the definition of "<u>Required Lenders</u>," or (ii) any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender, other than to increase such percentage or number or to give any additional Lender or group of Lenders such right to waive, amend or modify or make any such determination or grant any such consent;

(f)   other than releases of Collateral in accordance with <u>Section 10.11</u>, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; and

(g)   except for releases of a Guarantor in accordance with <u>Section 9.11</u> hereof, provided herein or in any other Loan Document, release any Subsidiary that is a Guarantor from the Guarantee without the written consent of each Lender;

<u>provided</u>, <u>further</u>, that (i) no amendment, waiver or consent shall, unless in writing and signed by any Agent in addition to the Lenders required above, affect the rights or duties of such Agent under this Agreement or any other Loan Document; and (ii) <u>Section 10.06(g)</u> may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each directly and adversely affected Lender that by its terms affects any Defaulting Lender disproportionately adversely than other affected Lenders shall require the consent of such Defaulting Lender.

If, in connection with any proposed change, waiver, discharge or termination of the provisions of this Agreement as contemplated by this <u>Section 10.01</u>, the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right to replace all non-consenting Lenders required to obtain such consent with one or more Eligible Assignees in accordance with <u>Section 10.13</u>, so long as at the time of such replacement each such new Lender consents to the proposed change, waiver, discharge or termination. Notwithstanding the foregoing, each non-consenting Lender to such amendment removed pursuant to this paragraph shall be paid a prepayment fee equal to 1.00% of the principal amount of any portion of such Loans assigned.

Notwithstanding anything to the contrary, without the consent of any other Person, the applicable Loan Party or Parties and the Administrative Agent may (in its or their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment or

-96-

waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law.

Notwithstanding the foregoing, this Agreement and any other Loan Document may be amended solely with the consent of the Administrative Agent and the Borrower without the need to obtain the consent of any other Lender if such amendment is delivered in order to correct or cure (i) ambiguities, errors, omissions, defects, (ii) to effect administrative changes of a technical or immaterial nature, (iii) incorrect cross references or similar inaccuracies in this Agreement or the applicable Loan Document or (iii) extend deadlines in its discretion, in each case and the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof. Guarantees, collateral documents, security documents, intercreditor agreements, and related documents executed in connection with this Agreement may be in a form reasonably determined by the Administrative Agent or Collateral Agent, as applicable, and may be amended, modified, terminated or waived, and consent to any departure therefrom may be given, without the consent of any Lender if such amendment, modification, waiver or consent is given in order to (x) comply with local law or advice of counsel or (y) cause such guarantee, collateral document, security document or related document to be consistent with or to give effect to or to carry out the purpose of this Agreement and the other Loan Documents.

**10.02  Notices; Effectiveness; Electronic Communication**.

(a)  <u>Notices Generally</u>. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)  if to the Borrower, the Administrative Agent, the Collateral Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on <u>Schedule 10.02</u>; and

(ii)  if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in subsection <u>(b)</u> below, shall be effective as provided in such subsection <u>(b)</u>.

(b)  <u>Electronic Communications</u>. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to <u>Article II</u> if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "<u>return receipt requested</u>" function, as available, return e-mail or other written acknowledgement); <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing subsection (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)  <u>The Platform</u>. THE PLATFORM IS PROVIDED "<u>AS IS</u>" AND "<u>AS AVAILABLE</u>." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "<u>Agent Parties</u>") have any liability to any Loan Party or any Lender for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other electronic platform or electronic messaging service, or through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; <u>provided</u> that in no event shall any Agent Party have any liability to any Loan Party, any Lender for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)  <u>Change of Address, Etc.</u> The Borrower and each Agent may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative

-98-

Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(e)    <u>Reliance by Administrative Agent and Lenders</u>. The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Borrowing or Conversion Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, liabilities, reasonable costs, and actual out-of-pocket expenses resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower, except to the extent of gross negligence, bad faith or willful misconduct. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

**10.03   No Waiver; Cumulative Remedies**. No failure by any Lender or the Agents to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**10.04   Expenses; Indemnity; Damage Waiver**.

(a)    <u>Costs and Expenses</u>. The Borrower shall, from time to time, pay (i) all reasonable and documented out-of-pocket expenses incurred by the Lenders, the Agents and their respective Affiliates (in the case of counsel and advisors, limited to the reasonable and documented fees, charges and disbursements of (a) in the case of the Agents, Cole Schotz P.C. in its capacity as U.S. counsel and one Canadian counsel (if necessary), and (b) in the case of the Lenders, Wachtell in its capacity as U.S. counsel for certain of the Lenders and one counsel on each of Virginia and Canada for such Lenders and (c) Houlihan as financial advisor) in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not such amendments, modifications or waivers shall be consummated) and otherwise in connection with the Chapter 11 Cases and the Restructuring, (ii) all reasonable and

-99-

documented out-of-pocket expenses incurred by the Agents and Lenders (including the reasonable out-of-pocket fees, charges and disbursements of financial, legal and other advisors to the Agents and Lenders) in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this <u>Section 10.04</u>.

         (b)   <u>Indemnification by the Loan Parties</u>. The Loan Parties shall jointly and severally indemnify each Agent and each Lender (solely in their capacity as such pursuant to this Agreement and not in their capacity as Prepetition Term Agent or Prepetition Term Lender) and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all actual out-of-pocket losses, claims, damages, liabilities and related expenses (in the case of counsel and advisors limited to the reasonable and documented fees, charges and disbursements of (i) one primary U.S. counsel for the Administrative Agent and one Canadian counsel, (ii) Wachtell, in its capacity as U.S. counsel for certain of the Lenders and one counsel in each of Virginia and Canada for such Lenders and (iii) Houlihan Lokey and BRG as financial advisors, incurred, suffered, sustained or required to be paid by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the transactions contemplated by the Loan Documents or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Material on or from any property currently or formerly owned or operated by any Loan Party or any Subsidiary, or any Environmental Liability related in any way to any Loan Party or any Subsidiary, (iv) the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including the Security Agreement, (v) any documentary taxes, assessments or similar charges made by any Governmental Authority by reason of the execution and delivery of this Agreement or any other Loan Document, (vi) otherwise related to the Chapter 11 Cases and the Restructuring, and (vii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (w) are determined by a court of competent jurisdiction or another independent tribunal having jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of any Agent or such Indemnitee or any Affiliate of such Indemnitee (or any officer, director, employee, advisor or agent of such Indemnitee or any such Indemnitee's Affiliates), (x) are related to disputes among Indemnitees or (y) are determined by a court of competent jurisdiction or another independent tribunal having jurisdiction to have resulted from a breach by such Indemnitee of its obligations to a Loan Party. In connection with any indemnified claim hereunder, the Indemnitee shall be entitled to select its own counsel if a potential or actual conflict exists and the Loan Parties shall promptly pay the reasonable fees and expenses of such counsel to the extent required hereunder.

         (c)   <u>Reimbursement by Lenders</u>. To the extent that the Loan Parties for any reason fail to pay any amount required under subsection <u>(a)</u> or <u>(b)</u> of this <u>Section 10.04</u> to be paid by them to each Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-

agent) or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought or, if the applicable unreimbursed expense of indemnity payment is sought after the date upon which the loans have been paid in full, ratably in accordance with each such Lender's Pro Rata Share immediately prior to such date) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), or against any Related Party thereof acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.10(d). All amounts due under this Section 10.04(c) shall be payable not later than ten Business Days after demand therefor. This Section 10.04(c) shall survive the payment of the Loans and all other amounts payable hereunder.

(d)    Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable law, the parties hereto shall not assert, and each such party hereby waives, any claim against any other party hereto or Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby and thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof except, in the case of a Loan Party, to the extent otherwise required to be indemnified by a Loan Party pursuant to Section 10.04(b). No party hereto or person referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents; provided that such waiver shall not, as to any Indemnitee, be effective to the extent that such damages (w) are determined by a court of competent jurisdiction or another independent tribunal having jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Person or any Affiliate of such Person (or any officer, director, employee, advisor or agent of such Person or any such Person's Affiliates) or are determined by a court of competent jurisdiction or another independent tribunal having jurisdiction to have resulted from a breach by such Person of its obligations to another party hereto.

(e)    Payments. After the Closing Date, all amounts due under this Section 10.04 shall be payable not later than fifteen Business Days after receipt of an invoice therefor setting forth such expenses in reasonable detail; provided that in the event the Borrower has a bona fide dispute with any such expenses, payment of such disputed amounts shall not be required until the earlier of the date such dispute is resolved to the reasonable satisfaction of the Borrower or thirty (30) days after receipt of any such invoice (and any such disputed amount which is so paid shall be subject to a reservation of the Borrower's rights with respect thereto).

(f)    Survival. The agreements in Sections 10.04(b), (c) and (d) shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

-101-

**10.05   Payments Set Aside**. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside and is required to be repaid to a trustee or receiver in connection with any proceeding under any Debtor Relief Law then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (b) each Lender severally agrees to pay to each Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by such Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under subsection (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06   Successors and Assigns**.

(a)   Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and the Lenders (and any such attempted assignment of transfer without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section 10.06(a) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   Assignments by Lenders. Any Lender may, with the consent of the Administrative Agent not to be unreasonably withheld and except in the case of any assignment to a Lender, an Affiliate of a Lender or an Approved Fund, assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that:

(i)   each assignment (except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender, the aggregate amount of the Commitment or the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment, is delivered to the Administrative Agent or, if "trade date" is specified in the Assignment and Assumption, as of the trade date) shall not be less than $1.0 million with respect to Commitments and Loans unless the Administrative Agent and the Borrower otherwise consents (such consent not to be unreasonably withheld or delayed); provided that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee

-102-

and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)   each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)   the parties of each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

(iv)   no such assignment shall be made to any Defaulting Lender or any of its Subsidiaries or any Disqualified Lender; and

(v)   in connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon). Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance by the Administrative Agent and obtaining of required consents and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 10.04 with respect to facts and

-103-

circumstances occurring prior to the effective date of such assignment. Upon request, the Borrower (at its expense) shall execute and deliver the applicable Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be null and void.

(c)    Register. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Loan Parties, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time. The entries in the Register shall be conclusive absent manifest error, and the Loan Parties, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender. The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice. In no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any prospective assignee is a Disqualified Lender or an Affiliated Lender.

(d)    Participations. Any Lender may at any time, without the consent of, or notice to, the Loan Parties or any other Person, sell participations to any Person (other than a natural person) (each, a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it), subject to the following:

(i)    such Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged;

(ii)    such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations;

(iii)    the Loan Parties, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement;

(iv)    any agreement or instrument pursuant to which a Lender sells a participation in the Commitments and the Loans shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the proviso to Section 10.01(b), (c), (f) or (g) that affects such Participant;

(v)    subject to clause (vii) of this Section 10.06(d), the Loan Parties agree that each Participant shall be entitled to the benefits of Section 3.01 and Section 3.04 (subject to the requirements and limitations of those Sections, including

-104-

Section 3.01(e)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b);

(vi)   to the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender so long as such Participant agrees to be subject to Section 2.11 as though it were a Lender;

(vii)   each Lender, acting for this purpose as a non-fiduciary agent of the Loan Parties, shall maintain at its offices a record of each agreement or instrument effecting any participation and a register (each a "Participation Register") meeting the requirements of 26 CFR § 5f.l03-l(c) for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts and related interest amounts and other Obligations from time to time. The entries in each Participation Register shall be conclusive (absent manifest error) and such Lender shall treat each Person whose name is recorded in a Participation Register as a Participant for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under Sections 3.01, 10.07 and 10.08) notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register. The Participation Register shall be available for inspection by the Borrower and the Administrative Agent at any reasonable time and from time to time upon reasonable prior notice; and

(viii)   a Participant shall not be entitled to receive any greater payment under Section 3.01 or Section 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent

(e)   Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note(s), if any) to secure obligations of such Lender, including (i) any pledge or assignment to secure obligations to a Federal Reserve Bank and (ii) any pledge or assignment to any holders of obligations owed, or securities issued, by such Lender as collateral security for such obligations or securities, or to any trustee for, or any other representative of, such holders; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)   Electronic Execution of Assignments. The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

-105-

(g)  Special Purpose Funding Vehicles. Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Administrative Agent as is required under Section 2.10(b)(i). Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01 and 3.04 (subject to the requirements and the limitations of such Sections) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b), but an SPC shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to such grant, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. In furtherance of the foregoing, each Lender party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of, the Borrower and the Administrative Agent and with the payment of a processing fee of $2,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis in accordance with Section 10.07 any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC.

**10.07  Treatment of Certain Information; Confidentiality**. Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Laws or any subpoena or similar legal process (the Agents and/or the Lenders agreeing to furnish the Borrower with notice of such process and an opportunity to contest such disclosure as long as furnishing such notice and opportunity would not result in the Agents' and/or the Lenders' violation of Applicable Law), (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement

of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement and any actual or prospective counterparty or advisors to any swap or derivative transactions relating to the Loan Parties and the Obligations so long as such Person or any of their Affiliates does not compete in the retail toy and/or infant products industry, (g) with the prior consent of the Loan Parties or (h) to the extent such Information (I) becomes publicly available other than as a result of a breach of this Section, or to the knowledge of such Agent or Lender, the breach of any other Person's obligation to keep the information confidential or (II) becomes available any Agent or Lender on a nonconfidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Borrower or any Subsidiary relating to the Borrower or any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary, provided that, in the case of information received from the Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents, including conference calls or meetings with the Borrower to review its earnings and other information, may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

**10.08  Right of Setoff**. If an Event of Default shall have occurred and be continuing, each Agent, Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law but subject to the terms of the Bankruptcy Court Order, the Intercreditor Agreement and the Carve-Out, to set off and apply any and all deposits (general or special, time or demand, provisional or final, but excluding Designated Accounts (as defined in the ABL Credit Agreement), payroll, trust, escrow, gift card and tax withholding accounts) at any time held and other obligations (in whatever currency) at any time owing by such Agent, Lender or any Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the Obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such

-107-

Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; <u>provided</u> that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.13</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have but subject to the terms of the Bankruptcy Court Order, the Intercreditor Agreement and the Carve-Out. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application. No Agent or Lender will or will permit its Participant to exercise its rights under this <u>Section 10.08</u> without the consent of the Agents or the Required Lenders. In no event shall the provisions of this paragraph be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or, any payment obtained by a Lender or consideration for the assignment of sale of a participation in any of its Loans to any assignee or participant other than the Borrower or any of its Affiliates thereof (as to which the provisions of this paragraph shall apply).

**10.09   Interest Rate Limitation**. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10   Counterparts; Integration; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

**10.11    Survival of Representations and Warranties**. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Agents and each Lender, regardless of any investigation made by the Agents or any Lender or on their behalf and notwithstanding that the Agents or any Lender may have had notice or knowledge of any Default at the time of any borrowing of Loans, and shall continue in full force and effect as long as any Loan or any other Obligation (other than contingent indemnity obligations with respect to unasserted claims) hereunder shall remain unpaid or unsatisfied.

**10.12    Severability**. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this <u>Section 10.12</u>, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13    Replacement of Lenders**. If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender is a Defaulting Lender or as provided in <u>Section 10.01</u>, then the Borrower may, at its sole expense and effort, (i) terminate the commitment of such Lender and repay all Obligations of the Borrower due and owing to such Lender relating to the Loans and participations held by such Lender as of such termination date or (ii) upon notice to such Debtor and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 10.06</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee specified in <u>Section 10.06(b)</u>;

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of and premium (if any) on its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 3.05</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

-109-

(c)   in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)   such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**10.14   Governing Law, Jurisdiction; Etc.**

(a)   <u>GOVERNING LAW</u>. EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND ALL ACTIONS ARISING UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)   <u>JURISDICTION; PROCESS</u>. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AGENT AT ITS ADDRESS FOR NOTICES AS SET FORTH HEREIN. THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH PARTY HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

**10.15   Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) AND EXCEPT AS OTHERWISE PROVIDED HEREIN AND AS REQUIRED BY LAW WAIVES DUE DILIGENCE, DEMAND, PRESENTMENT AND PROTEST AND ANY NOTICES THEREOF AS WELL AS NOTICE OF NONPAYMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16   USA PATRIOT Act Notice**. Each Lender that is subject to the Patriot Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Patriot Act. The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" an anti-money laundering rules and regulations, including the Patriot Act.

**10.17   Intercreditor Agreements**. Notwithstanding anything herein to the contrary, the Lien and security interest granted to the Collateral Agent pursuant to the Security Documents and the exercise of any right or remedy by the Collateral Agent thereunder are subject to the provisions of the Intercreditor Agreement and the Bankruptcy Order. In the event of any conflict between the terms of the Security Documents and the Intercreditor Agreement, the terms of the Intercreditor Agreement shall govern and control.

**10.18   [Reserved]**.

**10.19   No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document ), the Borrower acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent and the other Lenders, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate and (C) the Borrower is capable of evaluating,

-111-

and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Affiliates, or any other Person and (B) neither the Administrative Agent nor any Lender has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and neither the Administrative Agent nor any Lender has any obligation to disclose any of such interests to the Borrower or its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent and the Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**10.20   Electronic Execution of Assignments and Certain Other Documents**. The words "execution," "execute," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments or other Borrowing or Conversion Notices, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

<div align="center">

**ARTICLE XI
SECURITY AND PRIORITY**

</div>

**11.01   Collateral; Grant of Lien and Security Interest**.

(a)   Pursuant to, and otherwise subject to the terms of, the Bankruptcy Court Order and in accordance with the terms thereof and subject to the Carve-Out, as security for the full and timely payment and performance of all of the Obligations, the Loan Parties hereby, pledge and grant to the Secured Parties, a security interest in and, subject to the Intercreditor Agreement, a Lien on all of the Collateral.

(b)   Notwithstanding anything herein to the contrary all proceeds received by the Administrative Agent and the Lenders from the Collateral shall be subject to the Carve Out.

**11.02   Priority and Liens Applicable to Loan Parties**.

<div align="center">

-112-

</div>

(a)   Upon entry of the Interim Bankruptcy Court Order or Final Bankruptcy Court Order, as applicable, and subject to the terms thereof and the Carve Out:

(i)   pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507, all of the Obligations, the ABL Credit Agreement Obligations and the obligations owed to the other DIP Secured Parties (as defined in the Interim Bankruptcy Court Order) shall constitute allowed superpriority administrative expense claims ("DIP Superpriority Claims"), which DIP Superpriority Claims in respect of the Obligations and the ABL Credit Agreement Obligations and the other obligations owed to the other DIP Secured Parties shall rank pari passu with each other and superior to all other claims (other than the Carve Out);

(ii)   pursuant to Bankruptcy Code Section 364(c)(2) with respect to all "DIP Collateral" (as defined in the Bankruptcy Court Order) that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date subject to the Carve Out: (a) a Lien on and security interest in all such Collateral that is "Prepetition ABL/FILO Priority Collateral" under the Intercreditor Agreement junior only to the Lien securing the ABL Credit Agreement Obligations, the Prepetition ABL/FILO Adequate Protection Liens, the Contingent ABL/FILO Liens and the Carve Out; and (b) a first priority Lien on and security interest in all other such Collateral (pari passu with the Wayne Lien and the Canadian Intercompany Lien).

(iii)   pursuant to Bankruptcy Code Section 364(c)(2), a Lien on and security interest in the proceeds of Avoidance Actions; provided that such Lien shall be junior in priority and subordinate to the Liens only in respect of ABL Credit Agreement Obligations and the Carve Out and pari passu with the Wayne Lien and the Canadian Intercompany Lien;

(iv)   pursuant to Bankruptcy Code Section 364(c)(3), a Lien on and security interest in all ABL Priority Collateral of the Loan Parties (now or hereafter acquired and all proceeds thereof); provided that such Lien on the ABL Priority Collateral shall be junior in priority and subordinate to the Liens in respect of ABL Credit Agreement Obligations and the Carve Out and pari passu with the Wayne Lien and the Canadian Intercompany Liens and senior in priority to the Liens in respect of the Prepetition Obligations under the Prepetition Term Loan Documents; and

(v)   pursuant to Bankruptcy Code Section 364(d), a first priority priming Lien on and security interest in (the "Priming Liens") all assets of the Loan Parties encumbered by a first priority lien under the Prepetition Term Loan Documents not otherwise described in clauses (i) through (v) above (now or hereafter acquired and all proceeds thereof) that were subject to a Lien as of the Petition Date; provided that such Priming Liens shall be senior in priority to the Liens in respect of the Prepetition Term Loan Obligations under the Prepetition Term Loan Documents and the Liens in respect of ABL Credit Agreement and pari passu in priority with the Wayne Lien and the Canadian Intercompany Lien.

-113-

(b)    The Priming Liens shall prime all of the Liens securing the Prepetition Term Loan with respect to the Loan Documents, but the Liens so created as described in clauses (a)(iv), and (a)(v) above shall be subject valid, perfected, enforceable and unavoidable Liens existing as of the Petition Date.

(c)    The Liens to be granted by the Bankruptcy Court on the Collateral shall cover all such property of the Loan Parties (now or hereafter acquired and all proceeds thereof), including property or assets that do not secure the Prepetition Indebtedness except as expressly excluded under the Security Agreement.

(d)    All of the Liens described herein with respect to the Collateral shall be effective and perfected as of the Interim Bankruptcy Court Order Entry Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other notices or agreements, the taking of possession or control or any other action.

(e)    Notwithstanding anything herein or in any Loan Document to the contrary, (1) no DIP Superpriority Claims shall be valid or asserted against Toys "R" Us (Canada) Ltd./Toys "R" Us (Canada) Ltee or any other CFC or CFC Holdco (other than TRU of Puerto Rico, Inc.); (2) none of the assets of Toys "R" Us (Canada) Ltd./Toys "R" Us (Canada) Ltee or of any other CFC or CFC Holdco (other than TRU of Puerto Rico, Inc.) shall be subject to any of the liens described in this Section 11.02; and (3) no more than 65 percent of the voting Equity Interests of any CFC (including Toys "R" Us (Canada) Ltd./Toys "R" Us (Canada) Ltee but excluding TRU of Puerto Rico, Inc.) or CFC Holdco shall be subject to any of the liens described in this Section 11.02), *provided,* that if any voting stock of any such CFC or CFC Holdco is pledged with respect to the Prepetition Term Loan Documents, such stock shall constitute the stock that is part of the Collateral unless the parties otherwise reasonably agree.

(f)    Notwithstanding the equal ranking and priority of Liens securing the Obligations, the Wayne Loans and the TRU Canada Loans, the Collateral Agent shall have sole and exclusive control over the enforcement of such Liens and the exercise of any remedies in respect thereof for so long as any Obligations remain outstanding.

(g)    All capitalized terms used in this Section 11.02 not otherwise defined herein shall have the meanings set forth in the Bankruptcy Court Order.

**11.03    Grants, Rights and Remedies**. The Liens and security interests and the administrative priority and Lien priority specified above hereof may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the Bankruptcy Court Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative; provided that to the extent of conflict the Bankruptcy Court Order controls.

**11.04    Survival**. The Liens, Lien priority, administrative priorities and other rights and remedies granted to the Administrative Agent and the Lenders pursuant to this Agreement, the Bankruptcy Court Orders and the other Loan Documents (specifically including, but not limited

-114-

to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)   except with respect to the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Administrative Agent and the Lenders against the Borrower in respect of any Obligation; and

(b)   the Liens in favor of the Administrative Agent and the Lenders shall constitute valid and perfected Liens and security interests, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever (subject to Permitted Liens and any action required under foreign law with respect of Collateral solely to the extent that such foreign law is applicable).

**11.05   <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)   the effects of any Bail-in Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)   the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[Signature Pages Follow]

-115-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**TOYS "R" US-DELAWARE,
INC.,**
as Borrower

By: /s/ Michael J. Short
Name: Michael J. Short

Title: Executive Vice President -
Chief Financial Officer

-116-

**GIRAFFE HOLDINGS, LLC**

By: /s/ Michael J. Short

Name: Michael J. Short

Title: Executive Vice President -
Chief Financial Officer


**TOYS ACQUISITION, LLC**

By: /s/ Michael J. Short

Name: Michael J. Short

Title: Executive Vice President -
Chief Financial Officer


**GEOFFREY HOLDINGS,
LLC**

By: /s/ Michael J. Short

Name: Michael J. Short

Title: Executive Vice President -
Chief Financial Officer


**TRU OF PUERTO RICO,
INC.**

By: /s/ Michael J. Short

Name: Michael J. Short

Title: Executive Vice President -
Chief Financial Officer


**TRU-SVC, INC.**

By: /s/ Michael J. Short

Name: Michael J. Short

Title: President


**GEOFFRY, LLC**

By: Geoffrey LLC

Its: Managing Member


**GEOFFREY
INTERNATIONAL, LLC**

By: Geoffrey LLC

Its: Managing Member

By: /s/ Michael J. Short

Name: Michael J. Short

Title: President

117

**WAYNE REAL ESTATE
PARENT COMPANY, LLC**

By: /s/ Michael J. Short

Name: Michael J. Short

Title: Executive Vice President -
Chief Financial Officer

118

**NEXBANK SSB,**

as Administrative Agent and
Collateral Agent

By: /s/ Bill Mansfield

Name: Bill Mansfield

Title: Senior Vice President

**KAISER FOUNDATION
HOSPITALS,**

as a lender

By: Angelo Gordon & Co., L.P.,
as Investment Manager

By: /s/ D. Forest Wolfe

Name: D. Forest Wolfe

Title: Authorized Signatory

119

**SILVER OAK CAPITAL,
L.L.C.,** as a lender

By: /s/ Kirk Wickman

Name: Kirk Wickwam

Title: Authorized Signatory

**AG CENTRE STREET
PARTNERSHIP, L.P.,** as a
lender

By: Angelo Gordon & Co., L.P.,
as

Investment Manager

By: /s/ Kirk Wickman

Name: Kirk Wickwam

Title: Chief Operating Officer

**AG SUPER FUND
INTERNATIONAL
PARNTERS, L.P.,** as a lender

By: Angelo Gordon & Co., L.P.,
as

Investment Manager

By: /s/ Kirk Wickman

Name: Kirk Wickwam

Title: Chief Operating Officer

120

**EQ ADVISORS TRUST -
AXA/MUTUAL LARGE CAP
EQUITY MANAGED
VOLATILITY PORTFOLIO,**
as a lender

By: /s/ Shawn Tumulty

Name: Shawn Tumulty

Title: Vice President

**JNL/FRANKLIN
TEMPLETON MUTUAL
SHARES FUND,** as a lender

By: Franklin Mutual Advisors,
LLC

By: /s/ Shawn Tumulty

Name: Shawn Tumulty

Title: Vice President

**FRANKLIN MUTUAL
SERIES FUNDS -
FRANKLIN MUTUAL
QUEST FUND,**
as a lender

By: Franklin Mutual Advisors,
LLC

By: /s/ Shawn Tumulty

Name: Shawn Tumulty

Title: Vice President

**FRANKLIN MUTUAL
SERIES FUNDS -
FRANKLIN SHARES
FUND,** as a lender

By: Franklin Mutual Advisors,
LLC

By: /s/ Shawn Tumulty

Name: Shawn Tumulty

Title: Vice President

**FRANKLIN TEMPLETON**

**VARIABLE INSURANCE
PRODUCTS TRUST -
FRANKLIN MUTUAL
SHARES VIP FUND,** as a
lender

By: Franklin Mutual Advisors,
LLC

By: /s/ Shawn Tumulty

Name: Shawn Tumulty

Title: Vice President

121

**FRANKLIN MUTUAL U.S. SHARES FUND,** as a lender

By: Franklin Mutual Advisors, LLC
By: /s/ Shawn Tumulty
Name: Shawn Tumulty

Title: Vice President

**ARCH INVESTMENT HOLDINGS IV LTD.,** as a lender

By: HPS Investment Partners, LLC, its Investment Manager

By: /s/ Serge Adam
Name: Serge Adam

Title: Managing Director

**CAPITAL FUND, L.P.,** as a lender
By: HPS Investment Partners, LLC, its Investment Manager

By: /s/ Serge Adam
Name: Serge Adam

Title: Managing Director

**CREDIT VALUE MASTER FUND 2016 SUBSIDIARY, LTD.,** as a lender

By: HPS Investment Partners, LLC, its Investment Manager

By: /s/ Serge Adam
Name: Serge Adam

Title: Managing Director

**CREDIT VALUE MASTER FUND 2016 SUBSIDIARY, LTD.,** as a lender
By: HPS Investment Partners,

LLC, as Investment Manager

By: /s/ Serge Adam

Name: Serge Adam

Title: Managing Director

**INTERNATIONAL CREDIT FUND SUBSIDIARY, L.P.,** as a lender

122

By: HPS Investment Partners,
LLC, its Investment Manager

By: /s/ Serge Adam

Name: Serge Adam

Title: Managing Director

**WATFORD ASSET TRUST
I,** as a lender

By: HPS Investment Partners,
LLC, its Investment Manager

By: /s/ Serge Adam

Name: Serge Adam

Title: Managing Director

**ZALICO VL SERIES
ACCOUNT - 2,** as a lender

By: HPS Investment Partners,
LLC, its Investment Manager

By: /s/ Serge Adam

Name: Serge Adam

Title: Managing Director

123

**REDWOOD MASTER FUND, LTD.,** as a lender

By: /s/ Ruben Kliksberg

Name: Serge Adam

Title: Managing Director

**REDWOOD DRAWDOWN MASTER FUND, L.P,** as a lender

By: /s/ Ruben Kliksberg

Name: Serge Adam

Title: Managing Director

124

**ROYSTONE CAPITAL
MASTER FUND LTD.,** as a
lender

By: /s/ Laura Roche

Name: Laura Roche

Title: COO/CFO Roystone
Capital

Management LP its Investment
Manager

**NFB MANAGER FUND SPC
- SEGREGATED
PORTFOLIO 100,** as a lender

By: /s/ Laura Roche

Name: Laura Roche

Title: COO/CFO Roystone
Capital

Management LP its Investment
Manager

125

**SOL LOAN FUNDING LLC,**
as a lender

By: Citibank N.A.

By: /s/ Paul Plank
Name: Paul Plank

Title: Senior Director

126

**BLACKROCK MULTI-
MANAGER ALTERNATIVE
STRATEGIES FUND,**
as a lender

By: Marathon Asset
Management L.P

Its: Investment Manager and
Authorized Signatory

By: /s/ Vijay Srinivasan

Name: Vijay Srinivasan

Title: Authorized Signatory

**MARATHON SPECIAL
OPPORTUNITY MASTER
FUND LTD.,**
as a lender

By: Marathon Asset
Management L.P

Its: Investment Manager and
Authorized Signatory

By: /s/ Vijay Srinivasan

Name: Vijay Srinivasan

Title: Authorized Signatory

**MARATHON CREDIT
DISLOCATION FUND LP.,**
as a lender

By: Marathon Asset
Management L.P

Its: Investment Manager and
Authorized Signatory

By: /s/ Vijay Srinivasan

Name: Vijay Srinivasan

Title: Authorized Signatory

**KTRS CREDIT FUND, LP.,**
as a lender

By: Marathon Asset
Management L.P

Its: Investment Manager and
Authorized Signatory

By: /s/ Vijay Srinivasan

Name: Vijay Srinivasan

Title: Authorized Signatory

**MARATHON CENTRE STREET PARTNERSHIP, L.P.,** as a lender

By: Marathon Asset Management L.P

127

Its: Investment Manager and
Authorized Signatory

By: /s/ Vijay Srinivasan

Name: Vijay Srinivasan

Title: Authorized Signatory

**MARATHON BLUE GRASS
CREDIT FUND, LP,** as a
lender

By: Marathon Asset
Management L.P

Its: Investment Manager and
Authorized Signatory

By: /s/ Vijay Srinivasan

Name: Vijay Srinivasan

Title: Authorized Signatory

**MARATHON CLO V LTD.,**
as a lender

By: Marathon Asset
Management L.P

Its: Investment Manager and
Authorized Signatory

By: /s/ Vijay Srinivasan

Name: Vijay Srinivasan

Title: Authorized Signatory

**MARATHON CLO VI LTD.,**
as a lender

By: Marathon Asset
Management L.P

Its: Investment Manager and
Authorized Signatory

By: /s/ Vijay Srinivasan

Name: Vijay Srinivasan

Title: Authorized Signatory

**MARATHON STRATEGIC
OPPORTUNITIES
PROGRAM, LP,** as a lender

By: Marathon Asset
Management L.P

Its: Investment Manager and
Authorized Signatory

By: /s/ Vijay Srinivasan

Name: Vijay Srinivasan

Title: Authorized Signatory

129

# EXHIBIT 4-D

Excerpts from
TRU's Mar. 24, 2016 Form 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended January 30, 2016**
**Commission file number 1-11609**



# TOYS "R" US, INC.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **22-3260693** |
| **(State or other jurisdiction of incorporation or organization)** | **(IRS Employer Identification Number)** |
| **One Geoffrey Way** | |
| **Wayne, New Jersey** | **07470** |
| **(Address of principal executive offices)** | **(Zip code)** |

**(973) 617-3500**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) or 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.   Yes ☒   No ☐

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☐   No ☐

(Note: As a voluntary filer not subject to the filing requirements of Section 13(a) or 15(d) of the Exchange Act, the registrant has filed all reports pursuant to Section 13(a) or 15(d) of the Exchange Act during the preceding 12 months as if the registrant were subject to such filing requirements.)

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by checkmark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one)

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

As of March 1, 2016, there were 49,347,672 outstanding shares of common stock, $0.001 par value per share, of Toys "R" Us, Inc., none of which were publicly traded.

**DOCUMENTS INCORPORATED BY REFERENCE**
None

PART III

## ITEM 10.   DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

### Directors

The following persons were members of our Board of Directors (the "Board") as of March 1, 2016. Each elected director will hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal from office by our stockholders.

| Name | Age | Principal Occupation and Business Experience During Past Five Years and Other Directorships |
|---|---|---|
| Joshua Bekenstein | 57 | Mr. Bekenstein has been our director since September 2005. Mr. Bekenstein is currently a Managing Director of Bain Capital LLC ("Bain"), having joined the firm at its inception in 1984. Mr. Bekenstein currently serves as a member of the Boards of Directors of Bob's Discount Furniture, Bombardier Recreational Products Inc., Bright Horizons Family Solutions, Inc., Burlington Coat Factory Warehouse Corporation, Canada Goose, Dollarama, The Gymboree Corporation, Michaels Stores, Inc., TOMS Shoes and Waters Corporation. |
| David A. Brandon | 63 | Mr. Brandon has served as both our Chairman of the Board and Chief Executive Officer since July 2015. From June 2015 to July 2015, Mr. Brandon served as CEO - Designate of the Company. Mr. Brandon served as Chief Executive Officer of Domino's Pizza from March 1999 to March 2010, and as Director of Intercollegiate Athletics at the University of Michigan from March 2010 to November 2014. Mr. Brandon currently serves as a member of the boards of directors of Domino's Pizza, Inc., Herman Miller, Inc. and DTE Energy, Inc. Mr. Brandon also previously served as a member of the boards of directors of Kaydon Corporation, The TJX Companies, Inc. and Burger King Corporation. |
| Richard Goodman | 67 | Mr. Goodman has been our director since October 2011. Mr. Goodman served as an Executive Vice President of Global Operations at PepsiCo, Inc. from March 2010 until his retirement at the end of 2011. From October 2006 to March 2010, Mr. Goodman served as Chief Financial Officer of PepsiCo Inc. Prior to that, from 2003 to October 2006, Mr. Goodman served as Chief Financial Officer of PepsiCo International. He has been a Director of Johnson Controls Inc. since 2008, of Western Union since January 2011 and of Kindred Healthcare since March 2014. |
| Matthew S. Levin | 49 | Mr. Levin has been our director since July 2005. Mr. Levin is a Senior Advisor of Bain Capital in the private equity business. From 2000 through 2015, Mr. Levin was a Managing Director of Bain. Prior to joining Bain in 1992, Mr. Levin was a consultant at Bain & Company where he consulted in the consumer products and manufacturing industries. Mr. Levin received an M.B.A. from Harvard Business School where he was a Baker Scholar, and a B.S. from the University of California Berkley. Mr. Levin currently serves on the board of directors of Michaels Stores and Guitar Center, Inc. He previously served as a Director of Bombardier Recreational Products Inc., Dollarama Capital Corporation, Edcon Holding (Pty) Ltd., Jupiter Shop Channel and Unisource Worldwide, Inc. |
| Joseph Macnow | 70 | Mr. Macnow has been our director since May 2013. Mr. Macnow has served as Executive Vice President - Finance and Chief Administrative Officer of Vornado Realty Trust ("Vornado") since June 2013. He served as Executive Vice President - Finance and Administration of Vornado from January 1998 to June 2013. He was Vice President and Chief Financial Officer of Vornado from 1985 to January 1998 and from March 2001 to June 2013. He has been the Vice President and Chief Financial Officer of Alexander's, Inc. since August 1995. |
| Paul E. Raether | 69 | Mr. Raether has been our director since October 2015. Mr. Raether is an executive of Kohlberg, Kravis Roberts & Co., L.P. and/or one of its affiliates ("KKR") and has served in various positions and played a significant role in numerous portfolio companies since he joined KKR in 1980. Mr. Raether has served on the board of directors of WMI Holdings Corp since May 2015. |
| Wendy Silverstein | 55 | Ms. Silverstein has been our director since September 2005. Ms. Silverstein served as Executive Vice President and Co-Head of Acquisitions and Capital Markets of Vornado from November 2010 to April 2015. She served as Executive Vice President — Capital Markets of Vornado from 1998 to October 2010. |
| Nathaniel H. Taylor | 39 | Mr. Taylor has been our director since January 2011. Mr. Taylor is an executive of KKR and he has been an investment professional at KKR since November 2005. |

In appointing Mr. Brandon to the Board, the Board considered his significant retail business experience gained while serving in various positions at Valassis Communications Inc. over a twenty year period including as its Chief Executive Officer. In addition, the Board considered the significant accomplishments achieved at Domino's Pizza during Mr. Brandon's eleven year term as its Chief Executive Officer. The Board also considered the intimate knowledge of the Company's business and operations that Mr. Brandon will bring to the Board from his experience as the Chief Executive Officer of the Company.

In appointing Mr. Goodman to the Board, the Board considered his significant business experience including his extensive knowledge of financial statements and reporting.

Other than Messrs. Brandon and Goodman, each of the Directors were elected to the Board pursuant to a stockholders agreement dated July 21, 2005, as amended, by and among the Company and Bain, KKR and Vornado (collectively, the "Sponsors") and a private investor (the "Stockholders' Agreement"). Pursuant to such agreement, Messrs. Bekenstein and Levin were appointed to the Board as a consequence of their respective relationships with Bain; Messrs. Raether and Taylor were appointed to the Board as a consequence of their respective relationships with KKR; and Ms. Silverstein and Mr. Macnow were appointed to the Board as a consequence of their respective relationships with Vornado.

**Executive Officers**

The following persons were our Executive Officers as of March 1, 2016, having been elected to their respective offices by the Board:

| Name | Age | Position with the Registrant |
|---|---|---|
| David A. Brandon [1] | 63 | Chairman of the Board; Chief Executive Officer |
| Michael J. Short | 55 | Executive Vice President — Chief Financial Officer |
| Richard Barry | 49 | Executive Vice President — Global Chief Merchandising Officer |
| Timothy Grace | 52 | Vice Chairman; Executive Vice President — Global Chief Talent Officer |
| Dr. Wolfgang Link | 48 | President — Toys "R" Us, Europe |
| Kevin Macnab | 55 | Executive Vice President — Special Assistant/Office of the Chairman |
| Monika M. Merz | 66 | President — Toys "R" Us, Asia Pacific |
| David J. Schwartz | 48 | Executive Vice President — General Counsel & Corporate Secretary |
| Patrick J. Venezia | 52 | Executive Vice President — Global Store Operations |

(1)  Refer to "Directors" above for Mr. Brandon's biography.

The following is a brief description of the business experience of each of our Executive Officers:

Mr. Short has served as our Executive Vice President — Chief Financial Officer since June 2014. From January 2007 to January 2014, Mr. Short served as Executive Vice President — Chief Financial Officer of AutoNation, an automotive retailer. From 2000 to 2007, Mr. Short served as Executive Vice President — Chief Financial Officer of Universal Orlando.

Mr. Barry has served as our Executive Vice President — Global Chief Merchandising Officer since October 2014. Mr. Barry served as our Executive Vice President — Chief Merchandising Officer from October 2012 to October 2014. From January 2012 to October 2012, Mr. Barry served as Senior Vice President — Chief Merchandising Officer. From March 2010 to January 2012, Mr. Barry served as Vice President — General Merchandising Manager and from September 2006 to March 2010, he served as Vice President — Divisional Merchandising Manager.

Mr. Grace has served as our Executive Vice President — Global Chief Talent Officer since September 2015. From March 2014 to September 2015, Mr. Grace served as Group Vice President — Human Resources of L'Oreal Group. From April 2002 to March 2014, Mr. Grace served as Senior Vice President — Human Resources and Administration of Schindler Elevator Corporation.

Dr. Link has served as President, Toys "R" Us, Europe since October 2013. From August 2007 to October 2013, Dr. Link served as Managing Director, Toys "R" Us, Central Europe.

Mr. Macnab has served as our Executive Vice President — Special Assistant/Office of the Chairman since September 2015 and continues to provide leadership to Toys "R" Us (Canada) Ltd. ("Toys Canada"). From November 2007 to September 2015, Mr. Macnab served as President, Toys Canada. From May 2000 to October 2007, Mr. Macnab was Vice President of Finance, Real Estate and Information Technology for Toys Canada.

Ms. Merz has served as President — Toys "R" Us, Asia Pacific since November 2011. She served as the President and Chief Executive Officer of Toys "R" Us – Japan Ltd. ("Toys – Japan") from November 2007 to November 2011. From January 2000 until November 2007, Ms. Merz served as the President of Toys Canada. Prior to that, from October 1996 until January 2000, Ms. Merz served as Vice President and General Merchandise Manager for Toys Canada.

Mr. Schwartz has served as our Executive Vice President – General Counsel since October 2009 and has served as Corporate Secretary since April 2006. From September 2003 until October 2009, Mr. Schwartz served as Senior Vice President — General Counsel. From January 2002 until September 2003, Mr. Schwartz served as our Vice President — Deputy General Counsel, and served as Assistant Corporate Secretary from that time until April 2006. From February 2001 to January 2002, Mr. Schwartz served as our Vice President — Corporate Counsel and Assistant Corporate Secretary.

Mr. Venezia has served as our Executive Vice President — Global Store Operations since February 2016. From February 2014 to February 2016, Mr. Venezia served as our Senior Vice President — Store Operations. From August 2012 to February 2014, Mr. Venezia served as Head of Stores, Senior Vice President — Store Operations and Company Officer of The Pantry Inc., a convenience store chain. From February 2012 to August 2012, Mr. Venezia served as President of Title Max, a title lending business. From January 2008 to January 2012, he served in multiple operational roles for Walmart, culminating as Division President of the North East Division, SVP and Company Officer.

## Section 16(a) Beneficial Ownership Reporting Compliance

As our equity securities are not registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), none of our directors, officers or ten percent holders were subject to Section 16(a) of the Exchange Act for the past fiscal year or the filing requirements thereof.

## Code of Ethics

We have adopted a code of ethics that applies to our principal executive officer, principal financial officer and principal accounting officer or any person performing similar functions (the "Code of Ethics"). The Code of Ethics is available on the Corporate Governance page of our website at www.Toysrusinc.com. If we ever were to amend or waive any provision of our Code of Ethics, we intend to satisfy our disclosure obligations with respect to any such waiver or amendment by posting such information on our Internet website set forth above rather than by filing a Form 8-K. The Code of Ethics is also available in print, free of charge, to any investor who requests it by writing to: Toys "R" Us, Inc., One Geoffrey Way, Wayne, New Jersey 07470, Attention: Investor Relations.

## Audit Committee

Our Board of Directors has a separately designated audit committee established in accordance with Section 3(a)(58)(A) of the Exchange Act. The Audit Committee consists of Joseph Macnow and Richard Goodman, who serves as Chairman of the Audit Committee. Our Board of Directors has determined that each member of the Audit Committee is financially literate and that Messrs. Macnow and Goodman are "audit committee financial experts" within the meaning of the regulations adopted by the Securities and Exchange Commission. The Board has made the determination that Mr. Goodman is an independent member of the Audit Committee.

## ITEM 11.    EXECUTIVE COMPENSATION

We refer to the persons included in the Summary Compensation Table below as our "named executive officers." References to "2015," "2014," and "2013" mean, respectively, our fiscal years ended January 30, 2016, January 31, 2015 and February 1, 2014, respectively.

## COMPENSATION DISCUSSION AND ANALYSIS

The following Executive Compensation discussion and analysis discusses our compensation policies and decisions regarding our named executive officers and describes the material elements of compensation for our named executive officers. Our named executive officers are:

- David A. Brandon, Chairman of the Board and Chief Executive Officer;
- Michael J. Short, Executive Vice President — Chief Financial Officer;
- Richard Barry, Executive Vice President — Global Chief Merchandise Officer;
- Monika M. Merz, President — Toys "R" Us, Asia Pacific[1];
- David J. Schwartz, Executive Vice President — General Counsel & Corporate Secretary;
- Antonio Urcelay, Former Chairman of the Board and Chief Executive Officer[2]; and
- Deborah Derby, Former Vice Chairman and Executive Vice President[3].

[1] Ms. Merz announced her retirement from the Company effective as of May 31, 2016.
[2] In connection with the appointment of Mr. Brandon, Mr. Urcelay stepped down from the Board in May 2015 and as Chief Executive Officer in July 2015. In addition, Mr. Urcelay, pursuant to his employment agreement, continued to make himself available from July 2015 until December 2015 to assist the Company in connection with Mr. Brandon's transition to Chief Executive Officer.
[3] Ms. Derby's employment was terminated in August 2015.

# EXHIBIT 4-E

Excerpts from
TRU's June 10, 2008 Form 10-Q

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

## QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
## OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended May 3, 2008

Commission file number 1-11609



# TOYS "R" US, INC.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **22-3260693** |
| **(State or other jurisdiction of incorporation or organization)** | **(IRS Employer Identification Number)** |
| **One Geoffrey Way Wayne, New Jersey** | **07470** |
| **(Address of principal executive offices)** | **(Zip code)** |

**(973) 617-3500**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by checkmark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

As of June 10, 2008 there were outstanding 48,955,808 shares of common stock of Toys "R" Us, Inc.

**Exhibit 3.2**

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**OF**

**TOYS "R" US, INC.**

Toys "R" Us, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

1. The name of the Corporation is Toys "R" Us, Inc. The Corporation filed its original Certificate of Incorporation with the Secretary of State of the State of Delaware on October 26, 1993, under the name Toys "R" Us-Headquarters, Inc., filed a Restated Certificate of Incorporation on January 2, 1996 under the name of Toys "R" Us, Inc., filed a Restated Certificate of Incorporation with the Secretary of State of the State of Delaware on July 21, 2005 and filed Amendment No. 1 to the Restated Certificate of Incorporation of July 21, 2005 with the Secretary of State of the State of Delaware on June 10, 2008 ("Amendment No. 1").

2. Pursuant to Sections 228, 242 and 245 of the Delaware General Corporation Law, the attached Amended and Restated Certificate of Incorporation has been duly adopted and restates and integrates and further amends the provisions of the Restated Certificate of Incorporation of the Corporation, as amended by Amendment No. 1, in its entirety to read as set forth in Exhibit A attached hereto and made a part hereof.

IN WITNESS WHEREOF, the undersigned has caused this Amended and Restated Certificate of Incorporation to be executed this 10th day of June, 2008.

TOYS "R" US, INC.

By: _____ /s/ David J. Schwartz
Name:                                    David J. Schwartz
Title:                      Senior Vice President – General Counsel

**AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**TOYS "R" US, INC.**

**ARTICLE ONE**

The name of the corporation is Toys "R" Us, Inc.

**ARTICLE TWO**

The address of the corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808. The name of its registered agent at such address is Corporation Service Company.

**ARTICLE THREE**

The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware, as amended from time to time.

**ARTICLE FOUR**

(i) Authorized Shares. The total number of shares of stock which the corporation has authority to issue is 55,000,000 shares of common stock, par value one-tenth of one cent ($0.001) per share (together, the "Common Stock").

(ii) Voting Rights. The holders of Common Stock shall be entitled to one vote per share on all matters to be voted on by the corporation's stockholders.

(iii) Registration of Transfer. The corporation shall keep at its principal office (or such other place as the corporation reasonably designates) a register for the registration of the Common Stock. Upon the surrender of any certificate representing shares of Common Stock at such place, the corporation shall, at the request of the registered holder of such certificate, execute and deliver a new certificate or certificates in exchange therefor representing in the aggregate the number of shares represented by the surrendered certificate and the corporation forthwith shall cancel such surrendered certificate. Each such new certificate will be registered in such name and will represent such number of shares as is requested by the holder of the surrendered certificate and shall be substantially identical in form to the surrendered certificate. The issuance of new certificates shall be made without charge to the holders of the surrendered certificates for any issuance tax in respect thereof or other cost incurred by the corporation in connection with such issuance.

(iv) Replacement. Upon receipt of evidence reasonably satisfactory to the corporation (it being understood that an affidavit of the registered holder will be satisfactory) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing one or more shares of Common Stock, and in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the corporation, or, in the case of any such mutilation upon surrender of such certificate, the corporation shall (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the number of shares represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

**ARTICLE FIVE**

The corporation is to have perpetual existence.

## ARTICLE SIX

In furtherance and not in limitation of the powers conferred by statute, the board of directors of the corporation is expressly authorized to make, alter or repeal the by-laws of the corporation.

## ARTICLE SEVEN

Meetings of stockholders may be held within or without the State of Delaware, as the by-laws of the corporation may provide. The books of the corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the board of directors or in the by-laws of the corporation. Election of directors need not be by written ballot unless the by-laws of the corporation so provide.

## ARTICLE EIGHT

A director of the corporation shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent that exculpation from liability is not permitted under the DGCL as in effect at the time such liability is determined. No amendment or repeal of this Eighth Article shall apply to or have any effect on the liability or alleged liability of any director of the corporation for or with respect to any acts or omissions of such director occurring prior to such amendment or repeal.

## ARTICLE NINE

To the maximum extent permitted from time to time under the laws of the State of Delaware, the corporation renounces any interest or expectancy of the corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to its officers, directors or stockholders or the Affiliates of the foregoing, other than those officers, directors, stockholders or Affiliates who are employees of the corporation. No amendment or repeal of this Ninth Article shall apply to or have any effect on the liability or alleged liability of any such officer, director, stockholder or Affiliate of the corporation for or with respect to any opportunities of which such officer, director, stockholder or Affiliate becomes aware prior to such amendment or repeal.

## ARTICLE TEN

Any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (whether or not by or in the right of the corporation) by reason of the fact that he is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall be entitled to be indemnified by the corporation to the extent permitted by law against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement incurred by him in connection with such action, suit or proceeding. Such right of indemnification shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

## ARTICLE ELEVEN

The corporation expressly elects not to be governed by §203 of the General Corporation Law of the State of Delaware.

## ARTICLE TWELVE

The corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation in the manner now or hereafter prescribed by statute, subject to the right of certain of the corporation's stockholders to vote with respect to any alteration or amendment of this Amended and Restated Certificate of Incorporation.

2

# EXHIBIT 5

*K&E DRAFT: 8/23/17*
*ATTORNEY WORK PRODUCT*
*PRIVILEGED AND CONFIDENTIAL*

**TOYS "R" US, INC.**

## MINUTES OF A MEETING OF THE BOARD OF DIRECTORS
### August 23, 2017

**Participants:**

| | |
|---|---|
| **Board of Directors:** | David A. Brandon |
| | Joshua Bekenstein |
| | Richard Goodman |
| | Matthew S. Levin |
| | Joseph Macnow |
| | Paul E. Raether |
| | Wendy A. Silverstein |
| **Toys "R" Us, Inc.** | Michael J. Short |
| | N. Cornell Boggs, III |
| **Alvarez & Marsal:** | Jeffery Stegenga |
| | Jon Goulding |
| **Lazard Freres & Company:** | David Kurtz |
| | Chetan Bhendari |
| **Kirkland & Ellis LLP** | Joshua A. Sussberg |
| | Chad J. Husnick |

A meeting of the Board of Directors (the "***Board***") of Toys "R" Us, Inc. (the "***Company***") was duly called, convened and held via telephone at 10:34 a.m. CT on August 23, 2017.

The meeting was conducted in accordance with the Amended & Restated By-Laws of Toys "R" Us, Inc. providing that directors of the Board may participate in a meeting of the Board by conference telephone by which all persons participating in the meeting can hear each other.

David Brandon, acting as Chairman of the meeting, called the meeting to order. Mr. Boggs served as Secretary of the meeting.

     1.    **Corporate Governance Matters.**  Mr. Brandon provided an overview of corporate governance initiatives. Mr. Brandon discussed installing Mr. Goodman as a member of the executive committee of the Board ("ECOB"), in addition to current members Mr. Taylor and Mr. Levin. Mr. Brandon requested a motion to approve Mr. Goodman's appointment. The motion was brought and approved unanimously by the Board. The necessary documents will be amended to reflect this appointment. Mr. Brandon then raised the potential appointment of independent directors and asked Mr. Sussberg to provide an overview. Mr. Sussberg discussed the potential appointment of ten independent directors to five entities in the corporate structure.

TRU-Trust0000029081

Mr. Sussberg explained that independent directors will enable the boards to address and resolve matters where conflicts may arise which is good governance and helpful to all directors. Mr. Sussberg noted the materials that were distributed that propose individuals and locations of the ten independent directors. He stated that Mr. Brandon interviewed several of the individuals himself and identified two that would be appropriate for this Board, Mohsin Meighji and Alan Miller. They will sign confidentiality agreements that will allow them to gain more information about the Company until officially appointed to the Board. Mr. Brandon called for a motion to approve (i) the appointment of the independent directors at the four subsidiary boards, including Alan Carr and Neil Goldman at Toys "R" Us Delaware, Inc., Jeff Stein and David Weinstein at TRU Taj LLC / TRU Taj Finance, Inc., Paul Leland and John Foster at Wayne Real Estate Parent Company, LLC, and Kurt Cellar and Richard Feintuch at Giraffe Holdings, LLC, and (ii) entering into confidentiality agreements with Mohsin Meighji and Alan Miller. The motion passed unanimously. The necessary documents will be drafted and amended as necessary to reflect these appointments.

2. **Financing Update**. Mr. Brandon then asked Mr. Kurtz to provide an update with respect to achieving potential incremental financing. Mr. Kurtz explained that seven of the majority lenders under the B-4 Tranche of that certain Amended and Restated Credit Agreement, dated as of October 24, 2014 (such agreement, the "***Secured Term Loan Agreement***," and such lenders, the "***B-4 Lenders***") have signed non-disclosure agreements and are engaging on the terms of incremental financing in the form of a sale-leaseback transaction. The B-4 Lenders requested a meeting with management, which was held on August 21, 2017. The B-4 Lenders also retained BRG as financial advisor with the permission of the Company. Mr. Kurtz stated that while they were optimistic that some amount of financing may be offered, the B-4 Lenders are focused on the appraised value of the real estate (with particular attention to "dark value") relative to the $200 million investment. A discussion ensued with respect to the B-4 Lender financing and the sale-leaseback transaction. Mr. Kurtz stated that while the B-4 Lenders appear to be working in good faith, it is prudent for the Company to explore other alternatives. Mr. Kurtz discussed reaching out to Centerbridge and the holders of the majority of the Taj notes for an alternative transaction structure involving second lien financing at the Taj silo. Mr. Kurtz also discussed the need to reach out to potential DIP lenders now. Discussion ensued, and the Board agreed to continue with this approach. Mr. Brandon suggested that the Board reconvene for a further update in a week's time.

There being no other business, the meeting was adjourned at 11:38 a.m. CT.

TRU-Trust0000029082

Respectfully submitted,

_____
N. Cornell Boggs, III, Secretary of the Meeting

Approved:

_____
David A Brandon, Chairman

3

TRU-Trust0000029083

# EXHIBIT 6

KIRKLAND & ELLIS LLP          LAZARD          



# Contingency Preparation Overview
## July 31, 2017

Highly Confidential / Privileged Attorney-Client Communication / Privileged Attorney Work Product

# Employee Retention
## Overview

- Companies facing a financial restructuring often face significant difficulties in retaining and motivating high performing executives and key employees.
  - Existing long-term equity compensation often has little or no actual value, and likely no realistic potential value to employees.
  - Uncertainty regarding Company performance in a volatile market may create a lack of confidence in employees' ability to earn an annual bonus.
  - Lack of knowledge regarding the restructuring process and the future of the Company may decrease the retentive power of existing compensation programs due to uncertainty surrounding the Company's ability to provide and/or pay compensation.
  - The amount of additional work required to restructure effectively can be daunting.
  - It may be difficult to project how long the restructuring will take.
- As a result, key employees may find otherwise uncompetitive employment opportunities more attractive.

TRU-Trust0000026657

# EXHIBIT 7



# TOYS "R" US

## RESTRUCTURING COMPENSATION PROPOSAL

August 25, 2017

PRIVILEGED & CONFIDENTIAL
DRAFT – FOR DISCUSSION PURPOSES ONLY

NORTH AMERICA EUROPE MIDDLE EAST LATIN AMERICA ASIA

TRU-Trust0000000882

# EXECUTIVE SUMMARY

Ⓐ The chart below shows the potential cost for each element of the proposed compensation program:

| Program | Number of Participants | Total Payout | | Per Participant Average | |
|---|---|---|---|---|---|
| | | Target | Maximum | Target | Maximum |
| *Tier 1 Executives* | | | | | |
| September Retention Bonus | 22 | $9,578,891 | $9,578,891 | $435,404 | $435,404 |
| Incentive Program (Annual) | 22 | $19,540,062 | $39,080,125 | $888,185 | $1,776,369 |
| *Tier 2 Executives* | | | | | |
| September Retention Bonus | 92 | $7,543,213 | $7,543,213 | $81,991 | $81,991 |
| Incentive Program (Annual) | 75 | $8,549,655 | $17,099,310 | $113,995 | $227,991 |
| | | | | | |
| **Tier 1 Total** | **22** | **$29,118,954** | **$48,659,016** | | |
| **Tier 2 Total** | **92** | **$16,092,868** | **$24,642,523** | | |
| **Total** | **114** | **$45,211,821** | **$73,301,538** | | |
| | | | | | |
| **September Retention Bonus** | **114** | **$17,122,104** | **$17,122,104** | | |
| **Incentive Programs (Annual)** | **97** | **$28,089,717** | **$56,179,435** | | |
| **Total** | **-** | **$45,211,821** | **$73,301,538** | | |
| | | | | | |
| **Quarterly Cost of Incentive Program** | | | | | |
| **Tier 1 Executives** | **22** | **$4,885,016** | **$9,770,031** | | |
| **Tier 2 Executives** | **75** | **$2,137,414** | **$4,274,828** | | |
| **Total** | **97** | **$7,022,429** | **$14,044,859** | | |

Privileged & Confidential
DRAFT – For Discussion Purposes Only

**ALVAREZ & MARSAL**

TRU-Trust0000000887



# SEPTEMBER RETENTION BONUS

- To maximize the recovery of creditors and other parties of interest, the Company will require the continued efforts of current employees to preserve the value of the Company's assets.  The loss of essential personnel could jeopardize the Company's ongoing operations, significantly reducing the value of the estate.

- The Company has identified 114 key employees (i.e., Tier 1 and Tier 2 Executives) to receive a retention bonus.

- Retention payments would be based on level as shown in the table below.

| Level | Number of Executives | Average Salary | % of Base Salary | Average Retention Payment | Total Retention Payments |
|---|---|---|---|---|---|
| Tier 1 Executives | 22 | $580,539 | 75% | $435,404 | $9,578,891 |
| | | | | | |
| Tier 2 Executives | 92 | | | | $7,543,213 |
| VPs | 33 | $285,448 | 50% | $142,724 | $4,709,900 |
| Executive Directors | 18 | $189,587 | 35% | $66,355 | $1,194,396 |
| Directors/Others | 39 | $153,863 | 25% | $38,466 | $1,500,167 |
| Key Executive Support Personnel | 2 | $107,500 | 75%/50% | $69,375 | $138,750 |
| | | | | | |
| Total (Tier 1 and Tier 2) | 114 | | | | $17,122,104 |

- Amounts would be paid upon approval by the board and would be subject to a contractual clawback if the Executive terminates his or her employment with the Company (other than involuntary termination by the Company without Cause or death/disability) within one year following the payment date.

- A&M conducted a reasonable compensation analysis to evaluate the proposed September Retention Bonuses. Please see Appendix A for additional details on this analysis.

**A&M believes that the proposed compensation structure for the Executives is reasonable in terms of the aggregate payout and design and is supportable as reasonable compensation for services rendered.**

# EXHIBIT 8



# TOYS "R" US

## RESTRUCTURING COMPENSATION PROPOSAL

September 13, 2017

PRIVILEGED & CONFIDENTIAL
DRAFT – FOR DISCUSSION PURPOSES ONLY

TRU-Trust0000001094

NORTH AMERICA **EUROPE** MIDDLE EAST **LATIN AMERICA** ASIA



This report was prepared by:

**Alvarez & Marsal**
Compensation and Benefits Group
2100 Ross Avenue
Suite 2100
Dallas, TX 75201

Brian Cumberland
*National Managing Director,*
*Compensation and Benefits*
bcumberland@alvarezandmarsal.com
214-438-1013

Allison Hoeinghaus
*Senior Director*
ahoeinghaus@alvarezandmarsal.com
214-438-1037

© Copyright 2017 Alvarez & Marsal Holdings, LLC. All rights reserved. ALVAREZ & MARSAL®,
Ⓜ ® and A&M® are trademarks of Alvarez & Marsal Holdings, LLC.

Privileged & Confidential
DRAFT – For Discussion Purposes Only

TRU-Trust0000001095



# EXECUTIVE SUMMARY

# EXECUTIVE SUMMARY

*Summary of Changes since September 6th Report*

- Chetan Bhandari has been recently hired and added to the September Retention Bonus program as part of the Tier 1 group.  He will receive a retention bonus valued at $450,000 (75% of his base salary of $600,000), and he will participate in the Incentive Program with a target of $570,000 (95% base salary).

- The September Retention Bonus payment has been increased from 50% to 75% for certain VPs that are a part of the Project Team (10 employees total).  These employees are heavily involved in the restructuring efforts and are considered essential personnel at the Company.

- Two more international participants have been added to the September Retention Bonus program, one at the VP level and one at the Executive Director level (50% and 35% of base salary, respectively).

- Actual salaries were used for Executive Directors and Directors in the calculation of the September Retention Bonus program's cost.  Previously, the average salary by level was used as an estimate since not all Tier 2 Executives had been specifically identified.  Accordingly, the numbers changed slightly from the previous estimates.

*Change in Aggregate Numbers since September 6th Report*

- Overall, the proposed September Retention Bonus participation has increased from 114 to 117 participants while the total proposed cost has increased from $17,197,104 to $18,763,641 (9% increase).  Consequently, the per participant cost has increased from $150,852 to $160,373 (6% increase).

- The total cost of all programs (September Retention Bonus, Incentive Program, and TAD) has increased only 2%.

# EXECUTIVE SUMMARY

- In light of a potential restructuring, A&M has developed a proposed compensation program to address the compensation of the following key employees (the "Executives"):

| Executive | Position |
|---|---|
| **Tier 1 Executives (23 Employees)** | |
| Dave Brandon | CEO |
| Michael Short | EVP, CFO |
| Richard Barry | EVP, Chief Merchandising Officer |
| Lance Wills | EVP, Global Chief Technology Officer |
| Kevin Macnab | EVP, President TRU International |
| Carla Hassan | EVP, Global Chief Marketing Officer |
| Tim Grace | EVP, Global Chief Talent Officer |
| Mark Johnson | EVP, US Marketplace Operations |
| Cornell Boggs | EVP, General Counsel & Corporate Secretary |
| Diane Preston | EVP, US Supply Chain |
| Amy von Walter | EVP, Communications and Customer Care |
| Andre Javes | EVP, President TRU Asia Pacific |

| Executive | Position |
|---|---|
| **Tier 1 Executives** | |
| Chetan Bhandari | SVP |
| Charles Knight | SVP, Controller |
| Dieter Haberl | Managing Director, Japan |
| Jean Charretteur | Managing Director, France and Iberia |
| David Picot | SVP, Property Development |
| Amit Poddar | SVP, Chief Software Architect |
| Andrea Zaretsky | SVP, Loyalty and Analytics |
| Stephen Knights | Country Manager TRU UK |
| Jean Daniel Gatignol | SVP "R" Brands |
| Detlef Mutterer | Managing Director, Central Europe |
| Melanie Teed-Murch | SVP, President TRU Canada |
| **Tier 2 Executives (94 Employees)** | |

- We propose the following programs for the Executives:

  – Pay currently a retention bonus subject to a one year cliff vesting contractual clawback (the "September Retention Bonus") to the following two tiers of employees:

    » Tier 1 Executives includes all SVPs and higher ("Tier 1 Executives"). Some, but not all, Tier 1 Executives will be considered "insiders" under the Bankruptcy Code.

    » Tier 2 Executives includes all VPs and a select population of Executive Directors, Directors/Other and Key Executive Support Personnel ("Tier 2 Executives"). All Tier 2 Executives are expected to be non-insiders.

  – Consolidate short-term and long-term incentive plans into one comprehensive quarterly incentive program with certain adjustments in light of the pending restructuring.

ALVAREZ & MARSAL

# EXECUTIVE SUMMARY

- For employees not participating in these new programs, they will continue to participate in the Team Achievement Dividend Plan ("TAD") at their current target levels, but the performance periods will be converted to quarterly as is being done in the proposed incentive program for the Executives.

- The chart below shows the potential cost for each element of the proposed compensation programs:

| Program | Number of Participants | Total Payout | | | Per Participant Average | | |
|---|---|---|---|---|---|---|---|
| | | Threshold | Target | Stretch | Threshold | Target | Stretch |
| *Tier 1 Executives* | | | | | | | |
| September Retention Bonus | 23 | $10,103,891 | $10,103,891 | $10,103,891 | $439,300 | $439,300 | $439,300 |
| Incentive Program (Annual) | 23 | $0 | $20,285,062 | $40,570,125 | $0 | $881,959 | $1,763,918 |
| *Tier 2 Executives* | | | | | | | |
| September Retention Bonus | 94 | $8,659,749 | $8,659,749 | $8,659,749 | $92,125 | $92,125 | $92,125 |
| Incentive Program (Annual) | 75 | $0 | $8,549,655 | $17,099,310 | $0 | $113,995 | $227,991 |
| | | | | | | | |
| **Tier 1 Total** | **23** | **$10,103,891** | **$30,388,954** | **$50,674,016** | | | |
| **Tier 2 Total** | **94** | **$8,659,749** | **$17,209,404** | **$25,759,059** | | | |
| **Total** | **117** | **$18,763,641** | **$47,598,358** | **$76,433,075** | | | |
| | | | | | | | |
| **September Retention Bonus** | **117** | **$18,763,641** | **$18,763,641** | **$18,763,641** | | | |
| **Incentive Programs (Annual)** | **98** | **$0** | **$28,834,717** | **$57,669,435** | | | |
| **Total** | **-** | **$18,763,641** | **$47,598,358** | **$76,433,075** | | | |
| | | | | | | | |
| **TAD (Non-Tier 1 or Tier 2 Executives)** | **TBD** | **$0** | **$56,540,000** | **$56,540,000** | | | |
| | | | | | | | |
| **Grand Total (All Programs)** | **TBD** | **$18,763,641** | **$104,138,358** | **$132,973,075** | | | |
| | | | | | | | |
| **Vs. Prior Programs (TAD + Leadership Team Cash Awards) Target** | | | **$132,843,000** | | | | |

| | *% Change* | *-22%* |
|---|---|---|

**A&M believes that the proposed compensation programs are reasonable in terms of the aggregate payout and design and are supportable as reasonable compensation for services rendered.**

# EXECUTIVE SUMMARY

## September Retention Bonus

- To maximize the recovery of creditors and other parties of interest, the Company will require the continued efforts of current employees to preserve the value of the Company's assets. Accordingly, the September Retention Bonuses would be implemented to aid in these efforts as follows:

| Level | Number of Executives | Average Salary | % of Base Salary | Average Retention Payment | Total Retention Payments |
|---|---|---|---|---|---|
| Tier 1 Executives | 23 | $585,733 | 75% | $439,300 | $10,103,891 |
| Tier 2 Executives | 94 | | | | $8,659,749 |
| VPs | 34 | $284,613 | 75%/50% | $164,649 | $5,598,053 |
| Executive Directors | 21 | $198,819 | 35% | $69,587 | $1,461,322 |
| Directors/Others | 37 | $158,014 | 25% | $39,503 | $1,461,625 |
| Key Executive Support Personnel | 2 | $107,500 | 75%/50% | $69,375 | $138,750 |
| Total (Tier 1 and Tier 2) | 117 | | | | $18,763,641 |

## Incentive Program

- The Incentive Program will replace both the annual and long-term incentive programs and be structured as a quarterly program starting in the 4th quarter of fiscal year 2017. Since the business is seasonal and the fourth quarter is the most crucial financial period, the fourth quarter will be weighted 40% and each remaining quarter will be weighted 20%.

- The performance metric will be EBITDA and performance levels will be established once the overall construct of the Incentive Program is approved. The potential payout ranges from 0% (threshold) to 200% (stretch) of target. A "catch-up" provision would also be implemented so executives can still earn amounts for prior periods if the applicable objectives are satisfied in a subsequent period. The table below summarizes the program by level:

| Level | Participants | Average Base Salary | Target Percentage of Base Salary | Average Target per Participant | Incentive Program | | |
|---|---|---|---|---|---|---|---|
| | | | | | Threshold | Target | Stretch |
| EVPs and above | 12 | $779,875 | 175% | $1,364,781 | $0 | $16,377,375 | $32,754,750 |
| SVPs | 11 | $373,941 | 95% | $355,244 | $0 | $3,907,687 | $7,815,375 |
| VPs | 31 | $287,655 | 60% | $172,593 | $0 | $5,350,380 | $10,700,760 |
| Executive Directors | 44 | $193,895 | 38% | $72,711 | $0 | $3,199,275 | $6,398,550 |
| Total | 98 | | | | $0 | $28,834,717 | $57,669,435 |

# ALVAREZ & MARSAL

TRU-Trust0000001101

# EXHIBIT 9

**Derek Sederman**

| | |
|---|---|
| **From:** | Brandon, Dave |
| **Sent:** | Tuesday, September 5, 2017 7:07 PM |
| **To:** | Cumberland, Brian |
| **Cc:** | Hoeinghaus, Allison |
| **Subject:** | Re: Board meeting |

Brian,

I suggest we simply circulate an executive summary of the plan. I don't think we need to provide the 37 page version…

If anyone requests the full version, we can send it to them following the meeting.

Thanks, appreciate your help today!

Dave

David A. Brandon
Chairman & Chief Executive Officer
Toys R Us, Inc.
One Geoffrey Way
Wayne, NJ  07470
Office: 973-617-4515
Email: Dave.Brandon@toysrus.com

On Sep 5, 2017, at 6:30 PM, Cumberland, Brian <bcumberland@alvarezandmarsal.com> wrote:

> Dave,
>
> For the board meeting, are you circulating the full deck or do you want something shorter?
>
> Thanks!
>
> Brian L. Cumberland
> National Managing Director, Executive Compensation & Benefits
> Alvarez & Marsal
> 2100 Ross Avenue
> 21st Floor
> Dallas, TX 75201
> Phone:  (214) 438-1013
> Cell:  (214) 232-5372
> Fax:  (214) 438-1001
> Email:bcumberland@alvarezandmarsal.com
> Web:www.alvarezandmarsal.com
>
> This message is intended only for the use of the addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any

1

dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

TRU-Trust0000001073

# EXHIBIT 10

**JOINT MEETING OF TOYS "R" US, INC., TOYS "R" US-DELAWARE, INC., TRU TAJ, LLC, TRU TAJ FINANCE, INC, WAYNE REAL ESTATE PARENT COMPANY, LLC, AND GIRAFFE HOLDINGS, LLC**

**MINUTES OF A MEETING OF THE BOARD OF DIRECTORS**
**September 13, 2017**

Participants:

| | |
|---|---|
| **Board of Directors of Toys "R" Us, Inc.:** | David A. Brandon<br>Joshua Bekenstein<br>Richard Goodman<br>Matthew S. Levin<br>Joseph Macnow<br>Paul Raether<br>Wendy Silverstein<br>Nathaniel H. Taylor<br>Mohsin Meighji*<br>Alan Miller*<br>[*Upon appointment] |
| **Board of Directors of Toys "R" Us-Delaware, Inc.:** | David A Brandon<br>Michael J. Short<br>Alan Carr<br>Neal Goldman |
| **Board of Managers / Directors of TRU Taj, LLC / TRU Taj Finance, Inc.** | Matthew Finigan<br>Jeffrey Stein<br>David Weinstein |
| **Board of Managers of Wayne Real Estate Parent Company, LLC** | Paul Leand<br>Jonathan Foster |
| **Board of Managers of Giraffe Holdings, LLC** | Gary Begeman<br>Kurt Cellar |
| **Toys "R" Us, Inc.** | N. Cornell Boggs, III |
| **Alvarez & Marsal:** | Jeffery Stegenga<br>Brian Cumberland |
| **Lazard Freres & Company:** | David Kurtz |
| **Kirkland & Ellis LLP** | Joshua A. Sussberg<br>Chad J. Husnick |

78536-1

A meeting of the Board of Directors and Managers (the "***Board***") of Toys "R" Us, Inc., Toys "R" Us-Delaware, Inc., TRU Taj, LLC, TRU Taj Finance, Inc., Wayne Real Estate Parent Company, LLC, and Giraffe Holdings, LLC (each, a "***Company***," and together, the "***Companies***") was duly called, convened and held via telephone at 4:03 p.m. CT on September 13, 2017.

The meeting was conducted in accordance with the organizational documents of the Companies, providing that directors of the Board may participate in a meeting of the Board by conference telephone.

David Brandon, acting as Chairman of the meeting, called the meeting to order. Mr. Boggs served as Secretary of the meeting.

1.      **Minute Approval**. Mr. Brandon requested a motion to approve minutes from meetings of June 2, 2017, August 9, 2017, August 12, 2017, August 23, 2017, and August 30, 2017. The motion passed unanimously and minutes were approved.

2.      **Independent Director Appointment**. Mr. Brandon requested a motion to approve appointment of Independent Directors Mohsin Meighji and Alan Miller. The motion passed unanimously and their appointment was approved, as reflected in the resolutions below attached as **Exhibit A**.

3.      **Contingency Planning Update.** Mr. Brandon explained the timing with respect to contingency planning efforts. The publicity surrounding the Company's exploration of financing alternatives has necessitated that the Company file as soon as the Company has obtained DIP financing. Assuming the Company can obtain DIP financing on this timeframe, the Company would look to file for chapter 11 early next week.

4.      **DIP Financing Update.** Mr. Brandon then asked Lazard to provide an update with respect to the DIP financing. Mr. Kurtz provided an update with respect to DIP financing, including a walkthrough of materials provided to the Board. Discussion ensued.

5.      **Retention of Chetan Bhandari**. Mr. Brandon provided an update with respect to Mr. Bhandari. From August 4, 2014 until December 13, 2016, Mr. Bhandari was employed by Toys "R" Us - Delaware, Inc. as its Senior Vice President, Corporate Finance and Treasurer, Toys U.S. From January 9, 2017 until September 8, 2017, Mr. Bhandari was employed as a Managing Director of Lazard. Once it became apparent that the Company may be filing for chapter 11, the Company and Lazard became concerned that Lazard would not be able to continue its critical services to the Company if Mr. Bhandari remained employed at Lazard because he had been an officer of the Company within two years before the company's filing chapter 11 (and was therefore not disinterested under section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code). Thus, to avoid losing the invaluable assistance of Lazard or Mr. Bhandari, Mr. Bhandari resigned from Lazard on September 8, 2017, and the Company has decided to re-hire Mr. Bhandari as its Senior Finance Director, effective September 11, 2017.

78536-1

TRU-Trust0000001140

6.    **Compensation**.  Mr. Brandon then asked Mr. Cumberland to provide an overview of the compensation proposal, including walking through materials provided to the Board. Discussion ensued.  Mr. Brandon requested a motion to approve the retention payments and the structure of the incentive compensation arrangements.  The motion passed unanimously.

There being no other business, the meeting was adjourned at 4:45 p.m. CT.

78536-1

3

TRU-Trust0000001141

Respectfully submitted,

N. Cornell Boggs, III, Secretary of the Meeting

Approved at October 25, 2017
Board meeting

James Young
EVP + General Counsel

78536-1

## EXHIBIT A

TOYS "R" US, INC.
RESOLUTIONS APPOINTING INDEPENDENT DIRECTORS

### APPOINTMENT OF DIRECTORS

WHEREAS, pursuant to Section 2.1.2(e) of the Stockholders Agreement among Toys "R" Us, Inc. (as successor to Toys "R" Us Holdings, Inc.), Funds managed by Bain Capital Partners, LLC or its Affiliates, Toybox Holdings, LLC, Vornado Truck LLC and certain other Persons, dated as of July 21, 2005 as amended by Amendment No. 1, dated as of June 10, 2008 as amended by Amendment No. 2, dated as of October 14, 2015, as amended by Amendment No. 3, dated as of the date hereof (the "Stockholders Agreement"), the number of Independent Directors (as that term is defined therein) was increased to three (3);

WHEREAS, pursuant to Section 2.1.2(e) of the Stockholders Agreement, the Board is to select such Independent Directors;

WHEREAS, pursuant to Article III Section 4 of the Bylaws, the Board is entitled to fill any vacancies and newly created directorships; and

WHEREAS, the Board deems it advisable and in the best interest of the Corporation to select two new Independent Directors.

FURTHER RESOLVED, the Board hereby appoints and elects the following individuals to serve as Independent Directors of the Board, to serve in such capacity until their successors are duly elected and qualified or until their earlier death, resignation or removal:

Alan Miller
Mohsin Y. Meighji

### MISCELLANEOUS

RESOLVED, that in order to fully carry out the intent and effectuate the purposes of the foregoing resolutions, the Board be, and hereby is, authorized to take all such further action, and to execute and deliver all such further instruments and documents, in the name and on behalf of the Corporation and to pay all such fees and expenses, which shall in the Board's judgment be necessary, proper or advisable.

\*   \*   \*   \*

# EXHIBIT 11

## JOINT MEETING OF TOYS "R" US, INC.

## MINUTES OF A MEETING OF THE BOARD OF DIRECTORS
### January 28, 2018

**Participants:**

| | |
|---|---|
| **Board of Directors of Toys "R" Us, Inc.:** | John Belitsos |
| | David A. Brandon |
| | Matthew S. Levin |
| | Joseph Macnow |
| | Mohsin Meighji |
| | Alan Miller |
| | Paul Raether |
| | Wendy Silverstein |
| | Nathaniel H. Taylor |
| **Toys "R" Us, Inc.** | James Young |
| **Alvarez & Marsal:** | Jon Goulding |
| **Lazard Freres & Company:** | David Kurtz |
| **Kirkland & Ellis LLP** | James H.M. Sprayregen |
| | Joshua A. Sussberg |
| | Chad Husnick |

A meeting of the Board of Directors and Managers (the "**Board**") of Toys "R" Us, Inc. (the "**Company**") was duly called, convened, and held via telephone at 7:01 p.m. prevailing Eastern Time on January 28, 2018.

The meeting was conducted in accordance with the organizational documents of the Company, which provide that directors of the Board may participate in a meeting of the Board by conference telephone.

David Brandon, acting as Chairman of the meeting, called the meeting to order. Mr. Young served as Secretary of the meeting.

      1.    **Situation Update.** Mr. Brandon provided an update related to the Company's ongoing analysis of its business performance and development of a go-forward business plan and cash flow forecast, including related challenges, concerns regarding upcoming DIP covenants, and additional liquidity needs. Specifically, Mr. Brandon indicated that while at the last meeting he said that the company would need $150–$200 million of additional capital to fill a hole in the budget and emerge from chapter 11, the revised numbers based on additional diligence from the advisors indicate that the Company will require at least $200 million in order to emerge from the chapter 11 cases as a reorganized operating company, plus additional capital for planned capital expenditures. Additionally, Mr. Brandon advised that based on a recent update he received, the

TRU-Trust0000001274

Company is not going to breach any DIP covenants in January but will likely breach a DIP covenant at the end of February 2018 and have substantial cash flow challenges. Mr. Brandon advised that the Company plans to reach out to J.P. Morgan to negotiate to stretch a DIP default to the end of March in order to give the Company time to continue their ongoing analysis and develop their ongoing business plan.

Mr. Brandon then addressed the Company's options related to reducing costs in the near term, including meetings, discussions, and analysis of the store closing budgets, SG&A budgets, Babies "R" Us registries, Babies "R" Us pricing, consolidation with Canada to cut overhead, store planning and inventory control considerations, and the IT department structure. Mr. Brandon also provided an update related to performance in the United Kingdom and meetings with the Company's Asian joint-venture partner and the Creditors' Committee regarding such parties' ability to assist in the reorganization process.

Mr. Brandon specifically addressed the three likely outcomes of these chapter 11 cases, including: (i) total liquidation of the enterprise, which Mr. Brandon advised he and the management team see as a last resort, (ii) shrink and rethink the business by considering what combination of activities and assets puts the company in a viable operating position, and (iii) procure the funding for emergence and capital expenditures to emerge from chapter 11 and continue operating the current business plan and rebuild the brand, with the likely investors being either the current B-4 lenders or the PropCo I lenders. Mr. Brandon advised that the third option was the Company's initial hope but seems unlikely to materialize given current facts.

Mr. Brandon advised that of these three options, the Company and advisors are now actively working towards developing a plan consistent with the second option, including focusing and analyzing (i) the real estate strategy and its implications on operations and scaling, (ii) the Company's inventory and supply chain strategy and alternatives (iii) the Company's store layout and shelf-stocking strategies, (iv) the Company's pricing strategy and competiveness against other retailers, (v) the Company's central services and personnel strategy and related cost-saving options.

Mr. Brandon then provided an update related to upcoming meetings between the Company and advisors and certain key lenders, including the B-4 lenders, the PropCo lenders, the Taj noteholders, and the Creditors Committee related to the Company's performance and such parties' ability to assist in the upcoming months.

Mr. Brandon then advised that a key overarching factor of the Company's challenges is that competitors are operating at margins which are substantially lower than those that the Company traditionally sees. Mr. Brandon discussed the Company's challenges in an environment where key competitors are using toys as loss leaders. Mr. Brandon also addressed challenges related to brand health and the cost and time that the Company may need to repair brand health and establish any ongoing business plan.

Mr. Brandon asked Mr. Kurtz to provide additional details and advice. Mr. Kurtz advised that the best near-term strategy is to implement as many liquidity saving measures as possible in order to extend the runway for the Company to develop and implement a plan.

2

Mr. Brandon, after concluding the overall update, inquired whether any members of the Board had questions. Mr. Brandon, Mr. Short, Mr. Kurtz, and Mr. Sussberg responded to such questions with regard to, among other topics, (i) the key driving factors related to the Company's current situation, (ii) the specifics of certain of the DIP assumptions, covenant relief, timing of liquidity needs and covenant breaches, and underlying forecasts, (iii) current and expected challenges with certain vendors, (iv) employee morale, vacant positions, opportunities and challenges related to downsizing headcount, and challenges related to recruiting, and (v) the role of the Company's advisors in assisting the Company in these efforts. A conversation ensued related to these topics and the overall challenges facing the Company.

There being no other business, the meeting was adjourned at 8:07 p.m. prevailing Eastern Time.

TRU-Trust0000001276

Approved:

_____
James Young, Secretary of the Meeting

4

# EXHIBIT 12

# JOINT MEETING OF TOYS "R" US, INC., TOYS "R" US-DELAWARE, INC., TRU TAJ LLC, TRU TAJ FINANCE, INC., WAYNE REAL ESTATE PARENT COMPANY, LLC AND GIRAFFE HOLDINGS, LLC

## MINUTES OF A MEETING OF THE BOARD OF DIRECTORS
### January 31, 2018

**Participants:**

| | |
|---|---|
| **Board of Directors of Toys "R" Us, Inc.:** | Josh Bekenstein<br>John Belitsos<br>David A. Brandon<br>Matthew S. Levin<br>Joseph Macnow<br>Mohsin Meighji<br>Alan Miller<br>Paul Raether<br>Wendy Silverstein<br>Nathaniel H. Taylor |
| **Board of Directors of Toys "R" Us-Delaware, Inc.:** | David A Brandon<br>Michael J. Short<br>Neal Goldman |
| **Board of Managers / Directors of TRU Taj LLC / TRU Taj Finance, Inc.** | Matthew Finigan<br>Jeffrey Stein<br>David Weinstein |
| **Board of Managers of Wayne Real Estate Parent Company, LLC** | Jonathan Foster<br>Paul Leand |
| **Board of Managers of Giraffe Holdings, LLC** | Gary Begeman<br>Kurt Cellar |
| **Toys "R" Us, Inc.** | James Young |
| **Alvarez & Marsal:** | Jon Goulding<br>Richard Fleming<br>Bill Kosturos |
| **Lazard Freres & Company:** | David Kurtz |
| **Kirkland & Ellis LLP** | James H.M. Sprayregen<br>Joshua A. Sussberg<br>Chad Husnick<br>Kon Asimacopoulos<br>Elaine Nolan |

Robert Britton

A meeting of the Board of Directors and Managers (the "**Board**") of Toys "R" Us, Inc., Toys "R" Us-Delaware, Inc., TRU Taj LLC, TRU Taj Finance, Inc., Wayne Real Estate Parent Company, LLC, and Giraffe Holdings, LLC (each, a "**Company**," and together, the "**Companies**") was duly called, convened, and held via telephone at 5:02 p.m. prevailing Eastern Time on January 31, 2018.

The meeting was conducted in accordance with the organizational documents of the Companies, which provide that directors of the Board may participate in a meeting of the Board by conference telephone.

David Brandon, acting as Chairman of the meeting, called the meeting to order. Mr. Young served as Secretary of the meeting.

     1.    **Business Update.** Mr. Brandon advised the board that (i) the Company's poor performance continues, (ii) the forecasted cash liquidity position is dire, and (iii) the Company projects it will breach its postpetition financing covenants in February or March. He described the Company's strategy to delay a breach to March, including liquidity-preserving cash flow and cost-cutting measures, developing a store closing strategy, assessing margins and options to increase them in a highly competitive market, and planning for the upcoming store liquidation sales. Mr. Brandon reported he advised the leadership team on the Company's dire circumstances. It has been directed to conserve cash throughout the Company, including by, among other things, suspending travel, cutting expenses, and otherwise halting cash disbursements, all in order to delay a covenant breach until the end of March 2018, at the earliest. Mr. Brandon advised that there is a meeting on Friday to develop cash projections for the next two quarters. Mr. Brandon then advised he is pursuing any and all opportunities to monetize assets, including an upcoming meeting with Google regarding the juvenile business and potential meetings with certain individuals who Mr. Kurtz believes are interested in the Company's assets. Certain members of the Board advised the Company to look at any and all options and urged Mr. Brandon to continue his outreach. A discussion ensued related to finding potential buyers and addressing their interest as rapidly as possible.

     2.    **Cash Liquidity Update**. Mr. Brandon then asked Mr. Short to provide an update regarding the Company's cash liquidity projections. Referring to materials provided to the board prior to the meeting, Mr. Short presented the Company's current cash flow analysis, highlighting efforts to mitigate a cash shortfall in order to avoid breaching DIP covenants, including potentially delaying paying rent at PropCo I by a few days, delaying payments to vendors by a few days, modifying the timing of certain payments, and not entering into additional critical vendor agreements. Members of the board asked for more information about the payment delays and other line items. Mr. Short advised that the Company will delay payments by a week in order to push them to the next fiscal month, but will still make payments within the applicable grace periods. Mr. Short then reviewed portions of the written materials regarding liquidity estimates through September 1, 2018. Board members asked about the $500 million shortfall from the earlier budget. Mr. Short explained that liquidity issues arose mainly because the Company's 2017 EBITDA of about $210 million was far lower than the projected $640 million EBITDA, resulting in a lower borrowing base, and because vendors restricted trade terms more than expected after the chapter

2

11 filing. Mr. Short, responding to questions from the Board, advised that the Company's advisors, the unsecured creditors committee, and the lenders under the postpetition financing facilities are each aware of the liquidity challenges. Mr. Husnick advised that prior to the previous hearing, there was a pre-hearing chambers conference with the judge and counsel to other parties at which time K&E also informed the judge of the liquidity situation.

Mr. Short discussed the liquidity forecast and certain adjustments the Company is making or considering making to improve it, including adjustments related to store closings, certain rate changes anticipated based on conversations with lenders, fees owed to lenders, and professional fees. Mr. Sussberg advised that while the Company controls some adjustments, others, such as reducing or modifying rent payments to PropCo or adequate assurance payments to lenders, require third-party consent which the Company and its advisors are working to obtain. Mr. Short then discussed the variances between the total current liquidity and the liquidity projected in the DIP budget. Responding to questions from members of the board, Mr. Short advised that the forecast builds in the borrowing base and cash impact of the store closings. Members of the Board asked what the the Company is telling lenders about the budget shortfall. Mr. Short advised that there has been substantial conversation with lenders related to this, as Mr. Brandon will discuss later in the meeting, and Mr. Goulding advised that the January 9, 2018 forecast that had been shared with the ABL Lenders is less dire than the one being discussed today. Mr. Goulding also advised that Mr. Kurtz will address sharing the current forecast with outside parties. Members of the Board inquired as to how disbursements on account of rent, salaries, and other expenses can be cut to conserve liquidity. Mr. Short advised that the Company is working to assess this and is cutting as much as it can to meet liquidity needs, adding that the current forecast is conservative in that it doesn't anticipate all of the decreases the Company hopes to realize and includes continued compressed margins, which the Company hopes to increase. Members of the Board inquired as to the Company's efforts to reduce the cash burn rate and how the model accounts for certain downside scenarios, such as vendors refusing to ship, landlords and lenders not consenting to modifications, and other, more substantial cost cutting that may become necessary. A discussion ensued related thereto.

3.    **DIP Financing.** Mr. Brandon asked Mr. Kurtz to provide an update related to conversations with lenders regarding the postpetition financing facilities. Mr. Kurtz advised, based on the Company's cash conservation strategies, that he and the Company's other advisors believe it can avoid breaching a financial covenant in the financing facilities until the end of March. Given the current forecast, Mr. Kurtz advised that he believes it will be very difficult to obtain covenant relief from J.P. Morgan, so the Company has until March to develop a compelling story and go-forward business strategy to convince J.P. Morgan to provide covenant relief. Mr. Kurtz advised that the Company is meeting with certain lenders who specialize in making high-risk loans that may help reduce J.P. Morgan's exposure in order to convince them to grant relief. Mr. Kurtz advised that until the Company develops a story that would be more compelling to J.P. Morgan, conversations between J.P. Morgan and the Company related to covenant relief are on hold. Responding to questions from members of the Board, Mr. Kurtz advised that the Company will be sharing with J.P. Morgan a draft of the forecast next week, but it will be made very clear that the forecast is only a draft and does not account for the Company's self-help efforts. Members of the board inquired as to any potential consequences of sharing this forecast with J.P. Morgan and Mr. Kurtz advised that because the Company is in compliance with existing covenants, J.P. Morgan cannot take any action now. Also, he will tell them that the Company will soon provide

3

TRU-Trust0000001270

a revised version reflecting its self-help measures before asking to reopen covenant relief negotiations. Mr. Sussberg, responding to a request from a member of the Board, advised it is best to remain open, honest, and transparent with stakeholders throughout the process. Even if J.P. Morgan needs to book a reserve based on this information, the Company does not need covenant relief now, but it may very well need lender support to implement a restructuring. Mr. Sussberg advised that implementing cost cutting measures and developing a revised business plan is critical ultimately to obtaining their support. Mr. Kurtz again advised that when we give this forecast to to J.P. Morgan, we will acknowledge that it doesn't work and advise the lenders that we will come back with a realistic budget that does work prior to seeking relief.

4.   **UK Update.**



TRU-Trust0000001271



5.    **Meetings with Stakeholders and Business Model Development.** Mr. Brandon provided an update regarding recent meetings with both advisors and principals of the Company's lenders. Mr. Brandon advised that he discussed where the Company was last summer, including corporate objectives and plans to update the business model, and the unforeseen havoc of the chapter 11 cases leading to the Company's current situation. Mr. Brandon advised that he provided as much information as he could given that the principals wished to remain unrestricted. He noted they asked lots of questions related to what the Company would look like with fewer stores. Mr. Brandon advised that the Company is working on that analysis. Mr. Brandon than provided an update related to his meeting with the PropCo I advisors, including discussions regarding the help the Company needs and what the business would look like if it shrunk to just the best performing stores. Mr. Brandon then provided an update related to a meeting with the Creditors Committee, including a discussion related to seeking a new investor and what the Company would look like with a smaller store footprint, fewer distribution centers, and lower overhead. Mr. Brandon then advised that at a meeting with the leadership team, the team mobilized around developing a plan for what the Company would look like as a smaller, perhaps regional, toy company. A&M is assisting the team in developing this analysis. Mr. Brandon noted that he hopes to have this analysis complete in the next two weeks so it can be timely presented to lenders. Lastly, Mr. Brandon advised that he believes that the Company needs to demonstrate hope and success in terms of increasing customers, transactions, and margin levels in order to have a chance of emerging from chapter 11. He added that the Company needs to balance carefully its need to increase sales against its need to reduce marketing spending to improve liquidity.

There being no other business for members of all Boards to discuss, the meeting was adjourned at 6:23 p.m. prevailing Eastern Time.

The members of the Board of Toys "R" Us. Inc. dialed into a new conference line and continued the meeting at 6:27 p.m., prevailing Eastern Time. Also in attendance were Mr. Sprayregen, Mr. Sussberg, Mr. Husnick, Mr. Kurtz, and Mr. Goulding. During this portion of the meeting, the Board and the Company's advisors discussed legal issues pertaining to the Company's current challenges and proposed solutions.

At 7:17 p.m. prevailing Eastern Time, Mr. Brandon left the call.

There being no other business for members of the Board to discuss, the meeting was adjourned at 7:32 p.m. prevailing Eastern Time.

5

TRU-Trust0000001272

Approved:

_____

James Young, Secretary of the Meeting

6

TRU-Trust0000001273

# EXHIBIT 13

**Derek Sederman**

| | |
|---|---|
| **From:** | Brandon, Dave |
| **Sent:** | Wednesday, September 20, 2017 3:07 PM |
| **To:** | Mike Volkema |
| **Subject:** | Re: Quick Note |

Mike,

Many thanks for your kind message! As you know, this has been a distinct possibility since I joined the company two years ago. I'm afraid $5 billion worth of debt at high interest rates is simply not sustainable today's retail world.

This will put our company on a more solid financial footing for a brighter future. 65,000 families will have a more secure future as a result of the pain and agony we are going through right now!

I hope all is well with you... See you soon!

Dave

David A. Brandon
Chairman & Chief Executive Officer
Toys R Us, Inc.
One Geoffrey Way
Wayne, NJ  07470
Office: 973-617-4515
Email: Dave.Brandon@toysrus.com

On Sep 20, 2017, at 2:12 PM, Mike Volkema <mike_volkema@hermanmiller.com> wrote:

> Dave,
>
> I just finished a two-day board meeting in Chicago. You have been on my mind given the recent news. The company and its employees are fortunate to have you leading them through this transition. Anyway, you're in my thoughts.
>
> Mike
>
>
>
> **Michael A. Volkema**
> Chairman
> Herman Miller, Inc.
>
> 616 654 6873 office

TRU-Trust0000000001

# EXHIBIT 14

**S&P Global**
Market Intelligence

# Toys "R" Us, Inc.

# FQ3 2018 Earnings Call Transcripts

## Thursday, December 21, 2017 4:00 PM GMT

S&P Global Market Intelligence Estimates

Unable to generate Chart: There is no row at position 0.

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents

| Call Participants | ..................................................................................... | 3 |
|---|---|---|
| Presentation | ..................................................................................... | 4 |
| Question and Answer | ..................................................................................... | 8 |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Amy von Walter**
*Executive Vice President of
Communications & Customer Care*

**David Allen Brandon**
*Chairman and Chief Executive
Officer*

**Michael J. Short**
*Chief Financial Officer and
Executive Vice President*

**ANALYSTS**

**Carla Casella**
*JP Morgan Chase & Co, Research
Division*

**Dennis Cantalupo**
*Creditntell.com, Inc.*

**Joe Kinney**

**Kirk Ludtke**
*Cowen and Company, LLC,
Research Division*

**Ron Turner**

**Unknown Analyst**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

### Operator

Good morning. My name is Nicole, and I will be your conference operator today. At this time, I would like to welcome everyone to the Toys"R"Us Third Quarter 2017 Earnings Conference Call. [Operator Instructions] Ms. Amy von Walter, Executive VP, Communications and Customer Care, you may begin your conference.

### Amy von Walter
*Executive Vice President of Communications & Customer Care*

Thanks, Nicole, and good morning, everyone. We're pleased to welcome you all.

The statements we make today may include forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, which are intended to be covered by the safe harbors they create.

All statements that are not facts, including statements about beliefs or expectations, are forward-looking statements. These statements are subject to risks, uncertainties and other factors, including, among others, those set forth in our reports and documents filed with the SEC, which should be read in conjunction with these statements. For additional information concerning factors that could affect our results of operations or cause actual results to differ materially, please refer to the cautionary statements included in our filings with the SEC, including the Risk Factors section of the quarterly report on Form 10-Q for the period ended October 28, 2017, in which we discuss some important assumptions and business and bankruptcy risks that could cause our actual results to differ materially from those in our forward-looking statements. And you should refer to that filing for a complete discussion of those risks.

We believe that all forward-looking statements are based upon reasonable assumptions when made. However, we caution that you should not place undue reliance on these statements. Forward-looking statements speak only as of the date when made, and we undertake no obligation to update these statements. Actual results and outcomes may differ materially from anticipated results or outcomes discussed by us.

Today's discussion will include remarks from Dave Brandon, Chairman and Chief Executive Officer of Toys"R"Us, Inc.; and Mike Short, Executive Vice President and Chief Financial Officer of Toys"R"Us, Inc., who will provide highlights of the operating results of Toys"R"Us, Inc., Toys"R"Us-Delaware and TRU Taj LLC for the third quarter of fiscal 2017, which ended on October 28, 2017.

Please note we will not be discussing our holiday results on this call. Additionally, joining us on the call today is Joshua Sussberg, our legal counsel with Kirkland & Ellis, to ensure we stay on track during the call. At the conclusion of our prepared remarks, we will conduct a question-and-answer session.

It is now my pleasure to introduce Dave Brandon.

### David Allen Brandon
*Chairman and Chief Executive Officer*

Thanks, Amy, and good morning, everyone. Obviously, our top line softness that we experienced in the first of the year continued into the third quarter, which created overall disappointing results. We can go into more detail during Q&A as it relates to some of the factors that led to that, but certainly, a highlight would be our baby business, where we continue to experience a significantly challenging retail environment in terms of pricing and margin pressure in that particular category. We also had certain specific categories within our toy properties that were lagging behind in the year previous. But I would point a significant amount of the disappointment attributable to our Babies"R"Us business. And then obviously, as you all know, mid-September, we filed for Chapter 11, and this was a critical time. I think it's important to note that we had worked for quite some time on a variety of financing and strategic alternatives, and we got to a point in September where we felt like the only option for us at that stage was

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

to file for reorganization and restructure the company. It was a sensitive time in light of the fact that that is typically the window in which we would have been very focused on preparing for holiday and instead we found ourselves dealing with major disruptions in the business that impacted our inventories, our shipping schedules, certainly put pressure on our vendor relationships and probably, most importantly, is the consumer confidence that was lost as a result of a lack of understanding generally about a Chapter 11 process and what that means for the future of the company. It's difficult to measure that, although we've done some consumer research, and interestingly enough, we've determined that about 50% of the people in the U.S. were aware of the fact that Toys"R"Us had filed for bankruptcy. And 17% of the people in the U.S. indicated that the fact that we had filed would impact their decision-making and their shopping habits as it relates to our brand and our company. So in all aspects of the business, filing in the middle of the quarter put a lot of pressure on our company and our people, and I'm very proud of the way that our teams have hung in there during a very difficult time and worked hard to keep things on track.

As it relates to the restructuring, specifically, we obviously recognized the need to change. We need to create top-line growth in the business not only domestically, but in many of our international venues as well, and we realized that there are investments that need to be made to enable that growth. We made that filing, that Chapter 11 filing in mid-September, and it was the critical first step to us getting where we need to go. This will enable us to restructure our balance sheet and invest in some of the initiatives that we know we need to reinvent our business. Those initiatives will impact real estate, they'll impact digital investments, they'll impact the way our stores operate, they'll impact our team members, they'll impact our supply chain, and, certainly, investments in technology will be part of our overall plan as well.

During the fourth quarter, our focus has been doing our very best to execute during a critical time of the year. We'll talk more about that at our next call, but we have not spent much time on our business planning process because that will really -- that will be initiated in earnest in January. And at that time, our focus will turn to building a very customer-focused strategy and a business emergence plan that will enable us to achieve our real vision for the company, and that is we really want to be that company that is a champion of play for kids everywhere and someone who can be a trusted resource and a friend for parents not only here domestically, but around the world. So we have very ambitious plans for both of our brands in terms of reinventing ourselves as part of this emergence plan, and we'll be excited to talk about that more later when that plan evolves.

As you're all aware, as part of the restructuring process, we secured a $3.1 billion DIP financing, which has allowed us to continue our operations during this timeframe.

The last thing I'll comment on before turning it over to Mike for more detailed information is that on December 5, we announced the launch of a company voluntary agreement, otherwise known as the CVA, in the U.K. For those of you who may not be familiar, a CVA is a formal process in the U.K. that allows a company to agree to an arrangement with its creditors in satisfaction of some or all of its debt while continuing to operate. I'm pleased to report that just a matter of hours ago, the vote was completed, and we carried with a 98% majority -- overwhelming majority of votes to approve the CVA, and that's a very positive step, which will allow the company to restructure our U.K. lease obligations and reposition our real estate portfolio for future growth and profitability. And so that's a major outcome that is hot off the presses, and I want to share that with you today.

And with that, I'd like to turn things over to Mike Short, and Mike will take you through some more detailed information. Mike?

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

Thank you, Dave. Good morning, everyone. Prior to discussing the financial results, I'd like to talk about a significant change in our financial statement presentation. Since we filed for bankruptcy in both the United States and Canada, from an accounting point of view, the company no longer has sole control of the operations of Canada. And this required that we deconsolidate Toys"R"Us Canada in our financial statements as of September 19. Additionally, applying the accounting guidance to the valuation of our investment resulted in us recording the value of our investment in Canada at 0. This was due to limitations

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

in our ability to access Canada's equity value while we're in bankruptcy. The values are solely based on GAAP accounting standards and don't reflect the stand-alone market value of our Canadian operations.

Now let me explain the impacts of our financial statement presentation as a result of this deconsolidation. I'll turn your attention to the first table in our press release. Our GAAP income statement includes the operations of Toys-Canada through September 18. In the subsequent columns, we eliminate the operating results for Toys"R"Us Canada prefiling and present the Toys"R"Us, Inc. and Delaware results excluding Canada. Consistent with this presentation, I'll exclude the results of Canada from my comments on this call.

Consolidated net sales were $2 billion for the quarter, a decline of $89 million, largely attributable to the declines in the baby category that Dave alluded to, partially offset by a 4% improvement in e-commerce sales. Consolidated same-store sales were down 4.4%, with domestic down 7%. Domestically, the largest declines were in the baby and learning categories, offset by an increase in Core Toy sales. International same-store sales were up 0.4%. This was driven by growth in the Asia Pacific markets, and from a category perspective, Entertainment and Core Toy.

The benefit we saw from the Nintendo Switch in previous quarters continued into the third quarter, particularly in Japan. Growth in the Asia Pacific markets was offset by softness across Europe, particularly in the U.K. and France where we continued to see an increase in competition.

Gross margin was $644 million, a decrease of $113 million; and gross margin rate was 31.9%, a decline of 400 basis points, primarily attributable to a reduction in domestic vendor allowances as a result of the Chapter 11 filing and an increase in promotions.

SG&A was $798 million, an increase of $13 million primarily due to an increase in advertising spending and professional fees for the prepetition restructuring advisers. That was offset by an expense reduction initiative that we implemented earlier this year.

Operating loss increased by $168 million to $208 million, driven mainly by reduced domestic gross margin dollars and last year's $45 million gain on the sale of FAO Schwarz.

Adjusted EBITDA was negative $97 million for the quarter compared to positive $5 million in the prior year.

We incurred $334 million of reorganization costs, which represent amounts that directly relate to the restructuring process. $156 million of that amount was the impact of deconsolidating Canada.

Net loss was $624 million compared to $160 million in the prior year. Total consolidated inventory decreased by $560 million, or 16%, compared to Q3 last year primarily due to a temporary interruption of shipping as a result of the Chapter 11 filing and the deconsolidation of Toys-Canada.

In October, we received approval from the bankruptcy court authorizing $3.1 billion of post-petition DIP financing, and we ended the quarter with liquidity at Toys"R"Us, Inc., including Toys-Canada, of $1.3 billion. This included cash and cash equivalents of $461 million and availability of $837 million under committed lines of credit and $100 million under the Term DIP Facility.

The total availability under the $1.8 billion DIP Facility was initially capped at $1.3 billion. That cap has subsequently been released. Excluding the cap, the company would have had total liquidity of $1.5 billion as of the third quarter. In addition, as of the end of the third quarter, the company had $225 million in restricted cash under the Taj DIP Notes.

Now let me turn to the results of Toys"R"Us-Delaware. Adjusted EBITDA decreased by $86 million primarily due to a decline in domestic net sales, particularly in the baby and learning categories as previously discussed. Gross margin was $373 million, a decline of $103 million compared to prior year. Gross margin rate was 29.3%, a decline of 550 basis points, with the drivers consistent with what was mentioned earlier for Toys, Inc. SG&A was relatively consistent with prior year. Delaware, including Toys-Canada, ended the quarter with liquidity of $840 million, close of $584 million of availability under the DIP

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

revolver, a $100 million of availability under the Term DIP Facility, and cash and cash equivalents of $156 million. Excluding the $1.3 billion cap referenced above, total liquidity would have been $1.1 billion.

Finally, at TRU Taj, total revenues of $824 million were in line with prior year. Gross margin was $353 million, a decrease of $9 million. And SG&A was $302 million, an increase of $15 million.
I'll now turn the microphone back over to our operator, who will moderate our question-and-answer session. As a reminder, we will not be discussing our Q4 or holiday results on this call. Operator?

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] And our first question comes from the line of Norman Ludtke from Cohen.

**Kirk Ludtke**
*Cowen and Company, LLC, Research Division*

I think my initial question is, without talking specifically about the fourth quarter, could you give us a sense for how the competitive environment has changed year-over-year in terms of what your major competitors are doing in the categories and maybe take us through the major geographies? And then I have a follow-up question on minority interest.

**David Allen Brandon**
*Chairman and Chief Executive Officer*

Well, I could say, through the third quarter, as I kind of mentioned in my remarks, particularly on the baby business, we've seen continued margin pressure as a result of lower margins with lower pricing and more promotionality. We've seen a bit of that in the Toy category as well, but I think it's been more dramatic in the baby category. I think a lot of that is being fueled by the fact that a significant amount of the growth is coming online in that category and when you look at kind of the dynamic pricing process that takes place and you've got a couple of major players out there that are in a bit of a war for market share and growth, it's created a lot of price pressure in the online space. And the inclusion of free shipping on top of those low margins puts a significant pressure on everybody who is playing around in that category, and it draws more attention away from bricks and mortar based on the values that are provided very conveniently online. And so I think that's impacted our baby business the most in the first 3 quarters of the year, but certainly to a lesser degree the Toy category as well.

**Kirk Ludtke**
*Cowen and Company, LLC, Research Division*

That's helpful. And then with respect to minority interest, in the Taj release you've indicated, there was $5 million of minority interest in the quarter. And in the footnote, you talk about that being attributable to, at least in part, to the Asia JV. I'm just -- I wanted to make sure that -- is the minority interest there only attributable to the 15% of the JV owned by Fung Retailing? Or are there other minority interests going through that line?

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

No, that's it.

**Kirk Ludtke**
*Cowen and Company, LLC, Research Division*

That's it. So it would imply there's $33 million of EBITDA in the third quarter for the Asia JV?

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

That's a minority interest, so it was just the income impact of it. So it's a bit different when you go up to -- so I wouldn't go directly to the EBITDA on that.

**Kirk Ludtke**
*Cowen and Company, LLC, Research Division*

Okay. Is it after [indiscernible] and royalties?

**Michael J. Short**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

TOYS "R" US, INC. FQ3 2013 EARNINGS CALL | DEC 21, 2012

*Chief Financial Officer and Executive Vice President*

Yes, it's fully burdened P&L for the JV.

**Kirk Ludtke**
*Cowen and Company, LLC, Research Division*

Great. And then last question, how much is attributable to Japan?

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

Sorry, you broke up a little bit there. Say that again.

**Kirk Ludtke**
*Cowen and Company, LLC, Research Division*

How much of the $5 million is attributable to Japan?

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

We don't break that out. That's a consolidated operation at this point. Sorry, when you said -- when you were talking about the minority interest, I thought you were talking about the number on the base of the P&L. In our press release, we do give you detail on the EBITDA impact from an overall perspective as well. So that -- I think that's the $5 million that you were referring to.

**Kirk Ludtke**
*Cowen and Company, LLC, Research Division*

Yes, that's the $5 million. I'm just trying to figure out what 100% of that is, and it looks like it's $33 million -- 100% of that would be $33 million, right?

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

Yes. So that represents 15% of the EBITDA at the end of the year.

**Operator**

And our next question comes from the line of Carla Casella Hodulik from JP Morgan.

**Carla Casella**
*JP Morgan Chase & Co, Research Division*

I'm wondering if you can give us any sense for what number of stores that are EBITDA negative or potential plans for store closures after the holiday. And then also on the other -- flip side of that, how many stores have you added the new toy labs to at this point?

**David Allen Brandon**
*Chairman and Chief Executive Officer*

The toy lab tests we've rolled out in, I believe, 20 stores -- I'm sorry, 40 stores. And we can comment more when we have more runway to provide you in terms of results, but the initial results have been very positive. And we'll leave it at that until we get a little bit more experience with that particular test. The other part of your question was...

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

It was about the EBITDA-negative store closures.

**Carla Casella**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*JP Morgan Chase & Co, Research Division*

EBITDA-negative store closures.

**David Allen Brandon**
*Chairman and Chief Executive Officer*

Yes. We are working on a real estate strategy right now that's a work in progress. There's been a lot of reporting about -- it's pure conjecture at this point as to what we're going to do and when we're going to do it. So my main message here is to not believe what you read as it relates to that topic because that work stream is not yet completed, but we'll have more to say about that early in the New Year.

**Carla Casella**
*JP Morgan Chase & Co, Research Division*

Okay. And are you limited in closing some of your stores because of the mass releases? Or does it make more difficult to close some of the stores?

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

It's a -- let's just say, Carla, it's a complicated process. There's a -- as you know, we have a complicated capital structure and, as part of that, there are various entities that have interests in our -- in some of our leasehold properties, and so I'd say that's one of the reasons why Dave said we'll probably comment on that at the beginning of next year after we've completed the -- a more holistic review of the real estate strategy.

**David Allen Brandon**
*Chairman and Chief Executive Officer*

I'll just build on what Mike said to the stand-point that the way we're approaching it is what's right for the business. The right decisions for the business will be ultimately the best decisions for our partners and our lenders in the business, and so that's how we're approaching it. And to Mike's point, there'll be some complexities associated with those master leases, but we feel like we can work through that.

**Carla Casella**
*JP Morgan Chase & Co, Research Division*

Okay, great. And then just one question on the holiday -- I'm sorry, the third quarter sales. Can you attribute any of the weakness to just having less inventory in stock? Is that hurting sales that your inventory is down so much?

**David Allen Brandon**
*Chairman and Chief Executive Officer*

I can tell you that when we announced in the middle of September based on the trends that we saw for the first couple of weeks following the announcement when we had regular inventory levels, we saw a little bit of a dip in our sales, but generally, it was business as usual. And then once we got into the point where we had vendors who stopped shipping and we started to see dislocations of the supply chain and we moved into October, that's when we started to see significant drops in sales, and you have to assume that when our fill rates and, ultimately, our in-stock levels dipped severely, we start to disappoint customers and we lose sales. So it clearly had an impact on the back half of the quarter, particularly October.

**Operator**

Our next question comes from the line of Dennis Cantalupo from Credit Intel.

**Dennis Cantalupo**
*Creditntell.com, Inc.*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Actually, I had a follow-up to one of the caller's question just now. My question was related to the vendor support. And obviously, as you mentioned, there's been a -- there was a disruption following the bankruptcy filing. How would you categorize the vendor support since then? And have they returned to historical terms? And if not, how is that impacting cash flow?

**David Allen Brandon**
*Chairman and Chief Executive Officer*

I think the process of -- during the third quarter of working through the complexities of the credit insurer stepping aside and the reality of the restructuring process created a significant interruption and, in some cases, the larger the vendor partner was, the more complex it became and the longer it took to restore our supply chain. So generally speaking, I think you could characterize that time period as one that was pretty stressful, pretty difficult and certainly had a negative impact on the business. Post that, you work through those things, you work through your agreements, and you get your supply chains reestablished. That happened at different times with different vendors. We still have got certain vendors where we've got some issues that we're managing as best as we can, but it's all part of the process. We can likely be a lot more specific with you when we talk about the fourth quarter because that will be more at the end of the story as opposed to just the first 4 weeks of the story.

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

Yes, regarding cash flow, I don't think I would make any comments regarding cash flow that would be particularly instructive. As Dave mentioned, there was significant supply chain disruption, which caused inventory levels to drop for a period of time. That was offset by some negotiations we were going through as we were trying to reestablish the supply chain. So there was a lot -- certainly a lot of activity, but I'm not sure that there're any conclusions that can be drawn about our third quarter cash flow that would be instructive about what's going to happen through the balance of process.

**Dennis Cantalupo**
*Creditntell.com, Inc.*

And just one follow-up question. I'm not sure how much color you can provide. As far as the vendors who have returned, have you seen more the Core Toy vendors returning with more support versus Babies"R"Us or vice versa? Have you see any part of the business that's having a harder time getting the inventory that they need?

**David Allen Brandon**
*Chairman and Chief Executive Officer*

Yes, I think, to be fair, it's -- that's a better question for us to answer when we talk about fourth quarter because we just have to be really careful here that we don't start leading into discussions about things that are happening now or have happened more recently. So hold that question, and I'll be very happy to answer it specifically in conjunction with the fourth quarter results.

**Dennis Cantalupo**
*Creditntell.com, Inc.*

Okay. I appreciate it. One last question, if I may. With regard -- it seems like you ended the third quarter with fairly strong liquidity. Is that about where you felt you would end the quarter on the Delaware side of the business as far as availability under the credit line?

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

Well, yes. We obtained a very strong DIP financing package, which put us in a position to have strong liquidity through this process. And so you can see that represented in the way we ended the third quarter. I guess, that's the way I'd characterize it.

**Operator**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And your next question comes from the line of Joe Kinney from Glendon Capital.

**Joe Kinney**

A question on the gross margin deterioration in Delaware. I think you gave in the MD&A and on the call that a major cause of it was the reduction in vendor allowance. Can you quantify that in any way?

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

I'd rather not get into taking apart the components of that. I would just say that it was a -- it was probably the most significant piece of the overall margin, but I don't think I want to quantify in terms of basis points how much it contributed to it.

**Joe Kinney**

Okay. No problem. And then with respect to the trends within the categories. So Juvenile, baby, I think, you gave a great explanation and most folks understand the competitive dynamic that's happening there. Can you speak a little to what's going on within the learning category?

**David Allen Brandon**
*Chairman and Chief Executive Officer*

Yes, the learning category clearly is a significant issue for us in the third quarter. We're -- the nature of our business and the relationships that we've built over the years put us in a position where there's really 3 very major important relationships that we have that are really important to us. And certainly, one of those is LEGO, and LEGO is kind of the king of the learning category. And I think it's pretty widely known that LEGO has had a difficult year, and we've suffered along with LEGO through that difficult year. And so that's a big part of it. Certain licensed properties where we were doing year-against-year comparisons, things like PAW Patrol that were very, very hot in 2016 when you compare to this year's performance, although those brands are still important, those properties are important, we saw degradation. I think the Fisher-Price brand, which is real important to us. Another one of our really key important vendor partners is Mattel. And the Fisher-Price brand has disappointed and underperformed, particularly during the third quarter. So that particular category, that learning category was clearly one that we would point to where we lagged behind significantly where we were a year ago and where we would have expected to be in the third quarter.

**Joe Kinney**

Okay. And there has been a continuation in the Entertainment category decline. Is there some way that you guys would think about there's some floor or base level of sales? Obviously, there're issues going on within the category generally, and particularly within brick and mortar, but is there -- is it just a continued decline to nothing? Or is there some way to think about there should be a base of sales within that category?

**David Allen Brandon**
*Chairman and Chief Executive Officer*

Well, obviously, we believe there should be a base of sales. We believe we have the elements of a plan that creates dramatic change of the company, but if we didn't believe that plan was there and we didn't believe that plan was viable to establish not only a base of business for the company but the platform from which we could grow, then we wouldn't be going through the pain of this restructuring process. We believe when we get to the other end and we can start to have the investment capital we need to do the things that we know need to be done, that we have a very viable business, 2 very strong brands, and we have a bright future to look forward to.

**Operator**

And our next question comes from Ron Turner from Oriental Trading Company.

**Ron Turner**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

I just have a real quick question here. I understand that you're not filing a list of your critical vendors with the courts. Have you notified all your critical vendors?

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

We've been in discussions with all of our vendors. I don't think it's appropriate to comment on who we've given critical vendor dollars to and who we haven't at this point.

**Ron Turner**

Okay. I'm just -- have you notified all the ones that you're going to notify? Sorry.

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

We've been in discussion with all -- I think, all of our vendors about their status with us and -- or how we're building on our relationship going forward.

**Operator**

Our next question is from [ Alex Gamma ] from Gamma Wealth Management.

**Unknown Analyst**

My question relates to the advisory fees that have been paid to the private equity backers or the sponsors of Toys"R"Us. And my question is twofold. So one is, I'd like to understand your viewpoint on the merits of these adviser -- let's say, advisory arrangements leading up to the bankruptcy. And post-bankruptcy, do you feel that your advisory relationship with your private equity backers holds merit in driving towards a better future than where it is currently?

**David Allen Brandon**
*Chairman and Chief Executive Officer*

I'm confused as to what advisory fees you're referring to. Could -- maybe you can detail what those are and we could be more responsive.

**Unknown Analyst**

Sure. Basically, the monthly advisory fees that are being reported and are paid to the private equity backers since the 2005 leveraged buyout of Toys"R"Us, there has been discussion that there are some recurring advisory fees at least to the tune of $10 million or $40 million that are continuously paid to the private equity sponsors. And there is a discussion that many people have as to what's the merit of this advice towards your organization. And going forward, is this advice crucial in maintaining such fees on an ongoing basis post-bankruptcy?

**David Allen Brandon**
*Chairman and Chief Executive Officer*

Well, first of all, back in 2005 when the private equity firms took over the business, there was an agreed to sponsor fee that was paid for a period of time that was part of the construct when the acquisition was made and the company was taken private. My understanding, and this predated me, but my understanding is that those sponsor fees went on for a period of time and as the business started to struggle a bit, though they were adjusted, they were adjusted down. I think they were adjusted a third time and then from my understanding, in the last couple of years or at least the most recent past, those have been suspended completely. And so we have not been paying those sponsor fees. Now we have adviser fees that are being paid as part of our restructuring process. But obviously, those are not fees being paid to our equity sponsors.

**Michael J. Short**
*Chief Financial Officer and Executive Vice President*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

TOYS "R" US, INC. FQ3 20... 8 MONTHS Agt... 21 2017

So -- and just further to Dave's point, in our Q, we disclosed that we have related party transactions associated with those advisory fees in the amount of $6 million per year, but there is a consent agreement that's referred to in the document where the sponsors have agreed to defer those, and we're not paying -- and the company is not required to pay those at this point.

**Operator**

So there are no further questions at this time. I will now turn the call over to the company for closing remarks.

**David Allen Brandon**
*Chairman and Chief Executive Officer*

Operator, if you could, I just saw Carla reappear in our queue. Is -- if she has a question, we'd certainly like to hear.

**Operator**

Okay. And we have a follow-up question from Carla Casella.

**Carla Casella**
*JP Morgan Chase & Co, Research Division*

So I've seen a lot in the press about gift card -- use your gift card now. Are you seeing any kind of late pickup now in the holiday season with people coming in? I mean -- meaning, has the negative press actually caused any increase in traffic as we get closer to holiday?

**David Allen Brandon**
*Chairman and Chief Executive Officer*

Well, what's interesting about gift cards is that when the restructuring announcement was made in September, we saw a huge spike in the redemption of gift cards. So it kind of adds flavor to the notion that customers were panicking that their store was going to go away and they needed to hurry up and redeem. And then we saw a big dip in September and, certainly, in October where consumer behavior was to stop buying or slow down their buying of gift cards as a result of that same fear factor. As it relates to what's happened during the holiday season, we'll look forward to reporting that when we can. And there is a story to tell there, but it's not appropriate for today.

**Operator**

And there are no further questions at this time.

**David Allen Brandon**
*Chairman and Chief Executive Officer*

On behalf of all of us here around the table and all of us at Toys"R"Us, we want to thank you all for your interest and participation in today's call, and we want to wish you all a very happy holiday season, and here's to a great happy, healthy 2018. Goodbye, everybody.

**Operator**

And that does conclude today's conference call. We thank you for your participation and ask that you please disconnect your lines.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.