Greg Dovel (*pro hac vice*)
Christin Cho (*pro hac vice*)
**DOVEL & LUNER, LLP**
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Tel:  310-656-7066


- and -

Michael Wilson (VSB No. 48927)
**MICHAEL WILSON PLC**
12733 Storrow Rd.
Henrico, Virginia 23233
Tel:    804-614-8301
Email:  mike@mgwilsonlaw.com

*Counsel for Plaintiff*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re | Chapter 11 |
| TOYS "R" US, INC., *et al.*,[1] | Case No. 17-34665 (KLP) |
| Debtors. | (Jointly Administered) |
| TRU CREDITOR LITIGATION TRUST, | |
| Plaintiff, | Adv. Proceeding No. 20-03038-KLP |
| v. | |
| DAVID A BRANDON, *et al.*, | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78].  The location of Debtors' service address is One Geoffrey Way, Wayne, NJ 07470.

Plaintiff TRU Creditor Litigation Trust, by and through its undersigned counsel alleges as follows:

## PRELIMINARY STATEMENT

1.     This case arises from the abrupt business failure of Toys "R" Us, one of the world's largest retail businesses.  Toys "R" Us entered chapter 11 bankruptcy with its officers and directors touting an unprecedented "milestone free" $3.1 billion debtor-in-possession financing facility that would give the company the ability to pay its post-bankruptcy suppliers, mostly toy vendors, for at least 16 months while it developed a viable restructuring plan.  These assurances were illusory.  Toys "R" Us soon defaulted on its financing and the company collapsed, leaving post-bankruptcy creditors holding more than $800 million in administrative claims, the largest amount ever in any chapter 11 case.  It also left unpaid about $1.76 billion in pre-bankruptcy claims, and resulted in more than 31,000 employees losing their jobs.  These staggering losses were caused by the breaches of fiduciary duty, fraudulent concealment, misrepresentations, and negligence of a handful of senior executives and corporate directors acting in their own self-interest and against the best interests of the company, its creditors, and its employees.

2.     To hold these individuals accountable, the Bankruptcy Court approved the formation of the TRU Creditor Litigation Trust.  The Trust was charged with investigating and, if appropriate, bringing claims against the former directors and officers of Toys "R" Us for their wrongful acts.  The Trust's investigation uncovered ample evidence of wrongdoing, and the Trust brings this action—alleging breach of fiduciary duty, negligent misrepresentation, fraudulent concealment, and misrepresentation and deceit claims against ten former directors and

officers—to call these individuals to account.  The Trust provides an overview of the

Defendants' conduct in this preliminary statement.

**Background.**

3.      Toys "R" Us operated an international chain of big box retail toy stores as well as

Babies "R" Us stores.  In 2005, three private equity companies—Bain, KKR, and Vornado—

joined forces and purchased Toys "R" Us ("TRU").  They did not purchase it using their own

money.  Instead, they funded the purchase primarily by having TRU borrow $5.3 billion.  This

left TRU saddled with debt payments of about $400 million per year.  In addition, Bain, KKR,

and Vornado required TRU to pay them quarterly dividends (styled as "advisory fees")

amounting to hundreds of millions of dollars in total.  As a result of having to make large debt

payments and pay large "fees" to these private equity firms, TRU was starved for capital.  It did

not have enough money to invest in its stores, its employees, or online technology.  This under-

investment eventually caught up with TRU.  It lost customers, profit margins slipped, and it

began to lose money.  To make up the gap, TRU had to borrow even more money.  By 2014,

TRU owed more money than the company was worth.

**Defendants' wrongful decision to continue paying advisory fees.**

4.      As of 2014, TRU was controlled by six directors: two of whom were employed by

Bain, two by KKR, and two by Vornado.  On June 1, 2015, these directors installed Defendant

David Brandon as CEO and Chairman of the Board of TRU.  Each year, the directors had to

decide whether to renew TRU's Advisory Agreement with Bain, KKR, and Vornado, and

negotiate the amount of the fees TRU would pay.  On its face, the agreement made no sense.

TRU paid large fees each quarter to Bain, KKR, and Vornado—the equity owners of the company.  But Bain, KKR, and Vornado were not required to provide any actual services in exchange for these fees.  Moreover, TRU was already paying expensive outside consultants, such as McKinsey and AlixPartners, for business advice.

5.    In deciding whether to continue paying for "advice" from Bain, KKR, and Vornado, the directors had an obvious conflict of interest.  Paying those fees might not have benefited TRU, but it directly benefited the private equity companies to whom the directors were beholden.  Therefore, Defendants' fiduciary duties required that they hand over the decision-making on advisory fees to independent directors or consultants.  Defendants failed to do so.  Instead, they made the decisions to renew the fee agreement themselves.  And when it came time to negotiate the terms of the renewed agreements, Defendants again failed to turn to disinterested directors or consultants.  Instead, the very persons negotiating on behalf of TRU were also representing Bain, KKR, and Vornado in that same negotiation.  Given that irreconcilable conflict of interest, the result is not surprising: they agreed that TRU would continue paying large quarterly fees, and Bain, KKR, and Vornado still were not required to provide any minimum level of services, or any services at all.  This breach of fiduciary duty cost TRU (and its creditors) $17,863,110 from the fourth quarter of 2014 through 2017.

**Improper executive bonuses.**

6.    TRU filed for bankruptcy protection on September 18, 2017.  In the months leading up to that bankruptcy filing, at the top of CEO David Brandon's worry list was executive bonuses, particularly for himself.  Brandon knew that he could never justify an executive bonus plan based on a comparison to market compensation rates.  In a July 15, 2017, email, Brandon

wrote, "Outside stats and comparisons are not going to help us," because "our base salaries …

particularly in leadership roles [and] our annual bonus percentages were over indexed to

market." Brandon concluded: "We have to be creative and design something that works for us."

7.      Consequently, to design an executive bonus plan, Brandon did not turn to an

independent compensation consultant. Instead, Brandon designed it himself. He determined that

all of the top executives at TRU, including himself, should get a cash bonus of 75 percent of their

base salary. Brandon would get the largest amount: $2,812,500. TRU's lawyers advised the

Defendant directors, including Brandon, that such bonuses to insiders were significantly

restricted by bankruptcy law and would not be approved after TRU filed for bankruptcy. To

circumvent these restrictions, Brandon ordered all bonuses to be paid three days before TRU

filed for bankruptcy.

8.      In approving Brandon's executive bonus plan, Brandon and the TRU directors

abdicated the fiduciary duties that they owed TRU. This breach of fiduciary duty caused TRU

and its creditors to lose $16,019,665 million.


**Defendants' negligent misrepresentations and fraudulent concealment.**

9.      Beginning the day that TRU filed bankruptcy on September 18, 2017, in a blitz of

press releases, telephone calls, texts, and emails, Defendants Brandon, Short, and Barry

represented to toymakers that TRU had secured $3.1 billion in new financing that gave TRU the

ability to pay for goods provided to TRU on credit while TRU was in bankruptcy. They further

represented that because TRU's financing was not contingent on TRU meeting any milestones,

TRU would have access to this financing until TRU emerged from bankruptcy. TRU's directors

approved and ratified this course of conduct. These representations were not true.

10.     In truth, TRU's financing was contingent on TRU meeting an important milestone: no later than January 31, 2018, TRU had to present a budget demonstrating that TRU would achieve specified levels of available cash.  To do so, TRU would need to make immediate and massive cuts in operating costs or have a 2017 holiday season with terrific sales and profit margins.  But TRU had no plan (and no ability) to execute such cost cutting, and no hope of great holiday results, given robust competition from Amazon and Walmart and the impacts of operating while under the costs and cloud of bankruptcy.  Consequently, TRU could not possibly satisfy the budget milestone, which meant its access to financing would cease in early 2018.  These critical facts were not revealed to the Bankruptcy Court or to TRU's stakeholders.

11.     As early as September 2017, Defendants knew (or should have known) that TRU could not possibly satisfy the budget milestone.  By October 25, 2017, Defendants knew that TRU's available cash was already projected to be $160 million below the amount required to meet the budget milestone, which meant TRU would default on its DIP financing.  The news continued to get worse, and Defendants soon learned that TRU's holiday results would be a disaster.  By December 13, 2017, Defendants learned that TRU could not satisfy the budget milestone and other covenants in TRU's financing, which meant TRU's financing could terminate, leaving TRU with no ability to pay for goods that TRU ordered on credit.

12.     Defendants knew (or should have known) these facts and Defendants also knew that toymakers and other TRU trade vendors did not know these facts.  But Defendants failed to reveal the truth and did not correct their earlier false statements.

13.     Instead, Defendants concealed the truth and continued to negligently misrepresent facts.  Defendants Brandon, Barry, and Short personally communicated with trade vendor executives, assuring them that TRU was not defaulting on its financing, that TRU's future was

bright, and that TRU was working on plans to emerge from bankruptcy.  Defendants instructed

TRU employees to deliver the same message to their counterparts at toymakers, and to continue

placing orders on credit.  This continued right up to the day in March 2018, when TRU

announced that it was going to liquidate.  Defendants' negligent misrepresentations and

fraudulent concealment caused trade vendors losses of more than $600 million.


**Defendants' wrongful decision to take on $3.1 billion in DIP financing.**

14.    By early 2017, Defendants knew that TRU was losing money and it was only

getting worse.  Each quarter, sales and profit margins declined, and losses mounted.   By August

2017, TRU had run out of money and time.  The TRU directors had fiduciary duties to chart a

path forward that would preserve the value of TRU's remaining assets for the benefit of TRU's

creditors.  Defendants abdicated those duties.  The Defendant directors took TRU down a path

that would benefit themselves personally and could benefit the private equity companies to

whom they were beholden—Bain, KKR, and Vornado—to the detriment of TRU and its trade

creditors.

15.    The Defendant directors and officers authorized TRU to pledge all of its

remaining assets to obtain $3.1 billion in debtor-in-possession ("DIP") financing, in the hopes

that they could use that money to come up with some new business model that would make TRU

a vital and successful company.  In reaching this decision, the directors completely abdicated

their fiduciary duties.

16.    The directors gave no consideration—none at all—to weighing the costs of the

DIP financing strategy.  Between financing fees, DIP interest, professional fees for TRU and the

lenders, and extended operating losses that could otherwise be avoided, this strategy cost TRU

more than $700 million.  In addition, to obtain the DIP financing, the directors had to grant liens

on substantially all of TRU's unencumbered assets, including approximately $600 million in

appraised value of real estate held by TRU.

17.     The directors gave no consideration—none at all—to assessing the probability

that the DIP financing strategy would fail.  The grave risks staring the directors in the face were

never even considered, much less intelligently weighed.  For example, for the DIP financing

strategy to succeed, TRU needed to actually obtain the required financing, i.e. financing that

could be accessed the entire time TRU was in bankruptcy, giving TRU at least 16 months to

revitalize and emerge from bankruptcy.  But that financing was not available.  The best TRU

could do was DIP financing that was subject to a January 31, 2018, budget milestone and could

terminate if TRU could not satisfy that milestone.  If the financing terminated, TRU would have

no choice but to conduct an immediate liquidation.  The directors never assessed the likelihood

of this outcome.  They adopted a "we don't care about the risks" attitude.

18.     Furthermore, when deciding TRU's fate in August and September 2017, the

directors' fiduciary duties required them to consider other reasonable alternatives.  But the only

option the Defendant directors would entertain—large-scale DIP financing—was one that would

allow TRU to continue business as usual.  A business-as-usual strategy would personally benefit

Brandon and Short because they could continue to receive their large salaries and also could

justify paying themselves large bonuses on the eve of filing bankruptcy.  And this option could

benefit the directors beholden to Bain, KKR, and Vornado—if TRU could revitalize and emerge

as a successful business with a going-concern value in excess of its debt, the equity owned by

Bain, KKR, and Vornado would have value.

19.    The Defendant directors refused, however, to consider reasonable alternatives that would stop the bleeding, and preserve the value of TRU's remaining assets.  For example, rather than taking on $3.1 billion in DIP financing, TRU could have used bankruptcy protection to sell off the business, or parts of the business, if buyers could be found, or to intelligently wind-down TRU's U.S. business.  In fact, subsequent events would confirm that a structured wind-down alternative was not merely a reasonable alternative that should have been considered, it was the only strategy that would preserve the value of TRU's remaining assets.  This would have stopped further losses and preserved TRU's remaining unencumbered assets to pay TRU's unsecured creditors, primarily toymakers and other trade vendors, as well as employee severance obligations.  The Defendant directors, however, breached their fiduciary duty by failing to consider any alternative other than large-scale DIP financing.

20.    In addition, the Defendant directors also failed to comply with their fiduciary duty to reassess their decision as new information came in.  By October 25, 2017, the directors knew that TRU's available cash was already projected to be $160 million below the amount required to meet the budget milestone, which meant TRU would default on its DIP financing.  By mid-December 2017, the directors knew about TRU's terrible holiday sales results, and they were told that TRU would be defaulting on its financial covenants.  By January 2018, TRU's available cash was $500 million short of the amount required to meet the budget milestone.  There was no possibility TRU could survive.

21.    Throughout this collapse, the Defendant directors never once reconsidered their decision.  They did not order a structured wind-down in October, or November, or December 2017, or January 2018.  They never once considered that option.  They did not even request that a liquidation plan be prepared, just in case.  TRU proceeded on, unnecessarily incurring

additional losses, until TRU's lenders finally forced the company to implement a liquidation

plan.

22.    The DIP financing strategy was not only a foolish gamble, it was a very expensive

gamble.  It would cost TRU more than $700 million in financing fees, interest, professional fees,

and additional operating losses.  But these costs would not be paid by the private equity firms,

Bain, KKR, and Vornado.  The costs would be borne by TRU's trade creditors and employees.

The DIP financing would eliminate TRU's remaining unencumbered assets as a source to pay the

debt owed to trade creditors and severance obligations.

# PARTIES

## Plaintiff TRU Creditor Litigation Trust

23.     Plaintiff TRU Creditor Litigation Trust ("TRU Trust") is a Delaware Trust,
established for the purpose of pursuing claims assigned to the TRU Trust by debtors and
creditors in the Toys "R" Us bankruptcy.  Toys "R" Us, Inc. ("Toys Inc.") and Toys "R" Us-
Delaware, Inc. ("Toys Delaware") were Delaware corporations.  Toys Delaware was a wholly-
owned subsidiary of Toys Inc.  The term "TRU" means Toys, Inc., Toys Delaware, and their
subsidiaries.  The TRU entities have assigned to the TRU Trust all of their claims against the
former directors and officers of Toys Inc. and Toys Delaware.

24.     From September 18, 2017, through March 15, 2018, various companies provided
goods and services as post-petition trade vendors to TRU (the "Trade Vendors").  Each Trade
Vendor has assigned to Plaintiff TRU Trust each of their claims against the directors and officers
of TRU.  The following are some of the Trade Vendors who sold goods or services to TRU post-
petition on credit and, as a result of Defendants' wrongful acts, suffered losses: Accessory
Innovations, LLC; Adventure Playsets, LLC; Alliance Media Holdings, Inc.; American
Greetings Corporation; American Plastic Toys Inc.; Animal Adventure, LLC; Artsana (including
Chicco; The Boppy Company); Baby Trend Inc.; Bandai America Inc. (including Bandai
Creation); Best Chairs, Inc.; Bestway Hong Kong International Limited; Bright Kingdom
Development Limited; Britax Child Safety, Inc.; C&T International; Caben Asia Pacific Limited;
Cardinal Industries Inc.; Chap Mei Plastic Toys Manufactory Limited; Cherry Group Company
Limited; Crayola, LLC; Delta Enterprise Corporation; Dickie Toys Hong Kong, LTD; Digital
Complex Inc. (Big Toys); Dorel Industries (including Dorel Juvenile Group Inc.; Dorel Asia

LTD; Pacific Cycle, LLC; Pacific Cycle - Schwinn Division; Pacific Cycle Mongoose Division;

Pacific Cycle - Ride On); eKids, LLC; Epoch Everlasting Play, LLC; Evenflo Company, Inc.

(including Evenflo Feeding Inc.); Funko, Inc.; Funrise, Inc.; General Lion Footwear Limited;

Genexus, LLC; Gerber Childrenswear, LLC; GHCL Limited; GI-GO Toys Factory Limited;

Goliath Games, LLC (including Pressman Toy Corp; Goliath Far East); Graco Children's

Products Inc.; GreenLight, LLC; Greyland Trading Limited; Guangdong Textiles Import &

Export Company LTD; Hachette Book Group USA; Halo Innovations, Inc.; Handi-Craft

Company; Hasbro Inc. (including Hasbro International Trading BV); Heritage Baby Products,

LLC; Huffy Corporation (including Huffy Bicycles); Infantino, LLC; Innovation First

International, Inc. (including Innovations First Trading; Innovation First Labs); Jada Toys, Inc.

(including Jada Toys, Co. LTD); Jakks Pacific Inc. (including Creative Design International

LTD; Moose Mountain Toymakers Limited; Tollytots LTD; Arbor Toys Co. LTD); Jazwares

(including Jazwares Inc.); Just Play, LLC (including all non-Canadian Subsidiaries); KAS

Direct, LLC; Kent International, Inc. (Including USA Helmet; Kazam); Kiddieland International

Limited; Kids II, Inc.; Kitex Garments Limited; KLL Dolls, LLC; Kolcraft Enterprises, Inc.;

Lambs & Ivy, Inc.; LaRose Industries, LLC; Learning Resources, Inc.; Levtex, LLC; Luv N

Care, Inc.; M Design Village, LLC; MAM USA Corporation; Mattel (including Mattel Sales

Corporation;  Power Wheels/Fisher Price;  Fisher Price Toys; Arco Toys LTD; Fisher Price Inc.;

Fisher Price Juvenile Products Division; Mega Brands America Inc.; Rivtik Toy Corp; Rose Art

Industries; American Girl Publishing, Inc.; Mattel Boys; Mattel Girls); Maya Group Corporation

Limited; Melissa & Doug, LLC; MerchSource, LLC; MGA Entertainment (including MGA

Entertainment Inc.; The Little Tikes Company); Moose Toys, Limited; Multi-Link Apparel;

Munchkin, Inc.; New Adventures, LLC; North States Industries, Inc.; NSI International

(including NSI Products Limited); Ontel Products Corporation; Ovation Toys Company Limited;

Pearhead International; Playmates Toys, Inc.; PlayFusion Limited; PLAYMOBIL USA, Inc.;

PlayMonster, LLC; Ravensburger North America, Inc.; Razor USA Inc.; Regalo International

LLC; RR Donnelley & Sons Company; Salland Industries Limited; Schleich North America;

Shermag International Division of BDM + Furniture Inc.; Skip Hop, Inc.; Skyrocket Toys LLC;

Solowave Design Corporation; Spin Master (including Spin Master Toys Far East LTD);

Summer Infant, Inc. (including Summer Infant Prod. Inc.;  Summer Infant Asia LTD);

Swimways Far East Co LTD; The Bridge Direct, Inc. (including The Bridge Direct Hong Kong

Limited); The Lego Group; The Step2 Company, LLC; Tomy Corporation (including Tomy

International Inc.); Vtech Communications Inc.; Warner Bros. Home Entertainment; Watch-Us,

Inc.; Wicked Cool Toys, Inc.; The William Carter Company; Wow Wee Group Limited; Xiamen

Well-east Import and Export Trade Company Limited; Xin Yao International Textiles LTD;

Yottoy Productions, Inc; Yvolve Sports Limited; Zuru, Inc. USA.


### Defendants

25.    Defendant David Brandon was a director of Toys Delaware and also the

Chairman of the Board and Chief Executive Officer of Toys Inc. during the relevant time period.

As the CEO of TRU, Defendant Brandon was a key spokesperson for TRU with top executives

at the most important Trade Vendors, including Mattel, Hasbro, Lego, Just Play, Spin Master,

Graco, and MGA.  As of September 2017, Brandon had a previous and continuing relationship

with these and other Trade Vendors for the previous two years.

26.    Defendant Joshua Bekenstein was a director of Toys Inc. during the relevant time

period.  Bekenstein was appointed to the Toys Inc. Board based on his relationship with Bain

Capital ("Bain"), which he joined in 1984 and where he serves as a Managing Director and Co-Chairman.

27.     Defendant Matthew S. Levin was a director of Toys Inc. during the relevant time period.  Levin was appointed to the Toys Inc. Board based on his relationship with Bain, which he joined in 1992 and where he serves as a Senior Advisor in the private equity business.

28.     Defendant Paul E. Raether was a director of Toys Inc. during the relevant time period.  Raether was appointed to the Toys Inc. Board based on his relationship with Kohlberg, Kravis Roberts & Co ("KKR"), which he joined in 1980 and where he serves as an executive.

29.     Defendant Nathaniel H. Taylor was a director of Toys Inc. during the relevant time period.  Taylor was appointed to the Toys Inc. Board based on his relationship with KKR, which he joined in 2005 and where he serves as an executive.

30.     Defendant Joseph Macnow was a director of Toys Inc. during the relevant time period.  Macnow was appointed to the Toys Inc. Board based on his relationship with Vornado Realty Trust ("Vornado"), which he joined in 1985 and where he serves as Executive Vice President – Finance, Chief Administrative Officer, and interim Chief Financial Officer.

31.     Defendant Wendy A. Silverstein was a director of Toys Inc. during the relevant time period.  Silverstein was appointed to the Toys Inc. Board based on her relationship with Vornado, where she served as Executive Vice President and Co-Head of Acquisitions and Capital Markets.

32.     Defendant Richard Goodman was a director of Toys Inc. during the relevant time period.

33.     Defendant Michael Short was a director of Toys Delaware and the Chief Financial Officer of Toys Inc. during the relevant time period.

34.    Defendant Richard Barry was Executive Vice President, Global Chief Merchandising Officer of Toys Delaware during the relevant time period.  As the Global Chief Merchandising Officer, Defendant Barry was the main spokesperson for TRU with each of the Trade Vendors, and Barry was also the main decision-maker for purchasing goods from each Trade Vendor.  In that role, Defendant Barry had a previous and continuing relationship with each Trade Vendor going back many years before September 2017.

### Brandon's relationship with Bain, KKR, and Vornado

35.    Defendant Brandon was beholden to and influenced by Bain, and the Bain-appointed directors (Bekenstein and Levin) were beholden to and influenced by Brandon, as a result of their mutually beneficial ongoing business relationship and their practice of periodically cutting each other into mutually beneficial deals and roles.  This relationship had a substantial and material inhibiting effect on their ability to act adversely to each other and to act objectively and in the best interest of TRU.

36.    Brandon and Bain shared a long history of business relationships.  In 1998, Bain acquired Domino's Pizza.  The following year, Bain brought Brandon in to become CEO of Domino's.  Brandon has been Chairman of the Board of Bain's Domino's company since 1999.  Brandon was and is highly compensated by Domino's.  Bain also appointed Brandon to the board of Burger King in 2003, where he remained until Bain sold its Burger King interest in 2010.  In 2015, Bain brought Brandon in to be CEO of TRU.  While Brandon had no prior experience in the toy industry, retail industry, or related fields, he possessed one very desirable quality for Bain:  loyalty to Bain.

37.    Brandon and Bain regularly did important business favors for each other.  For example, on July 12, 2016, Defendant Bekenstein asked Brandon to do Bain a business favor for a potential Bain investment in the Jimmy John's fast-food restaurant company: "We are trying to get into the next round, which is the round of getting to meet the company.  Do you think you call Jimmy and hopefully telling [sic] him we would be good partners?"  Defendant Brandon responded, "I've done this for you guys 100 times!  I'm happy to reach out to him."  Brandon then had a telephone call with Jimmy John's founder.  Brandon reported back to Bekenstein:

> **From:** Brandon, Dave [mailto:Dave.Brandon@toysrus.com]
> **Sent:** Tuesday, July 19, 2016 10:36 PM
> **To:** Bekenstein, Josh <JBEKENSTEIN@baincapital.com>
> **Subject:** Jimmy...
>
> Josh,
>
> I spent about 30 minutes on the phone with Jimmy this evening. It was great to get caught up…he was very appreciative of my call!
>
> I did the very best I could. I had my Bain Capital sales hat on! It got a little bit awkward at one point because
> he spent today with another private equity firm that you and I are very familiar with…
>
> However, I gave them my best pitch!
>
> He gave me a fair bit of insight as to what was going on with the deal…
>
> Let me know if you want to discuss further!
>
> Dave
>
> David A. Brandon
> Chairman & Chief Executive Officer
> Toys R Us, Inc.
> One Geoffrey Way
> Wayne, NJ 07470
> Office: 973-617-4515
> Email: Dave.Brandon@toysrus.com

Defendant Bekenstein responded, "Thanks so much Dave!!!! … THANKS!!!!"  Bekenstein later called Brandon to get filled in on the details Brandon had learned from his call.

38.     These favors went both ways.  Brandon was paid compensation in his role as CEO of Bain-owned companies that was far above market.  And as Brandon admitted in an email, "Over the years, Bain Capital has allowed me (as a CEO of one of their portfolio companies) to invest in any of their funds/deals and waive the minimum, some fees, etc. sometimes required for institutional investors or higher net worth investors than me."

39.     Defendant Brandon was also beholden to and influenced by KKR, and the KKR-appointed directors (Raether and Taylor) were also beholden to and influenced by Brandon, as a result of their mutually beneficial ongoing business relationship and their practice of periodically cutting each other into mutually beneficial deals and roles.  This relationship had a substantial and material inhibiting effect on their ability to act adversely to each other and to act objectively and in the best interest of TRU.  For example, on September 2, 2016, after Bain passed on the Jimmy John's deal, Brandon emailed Bekenstein to explain that he was now going to go to bat for KKR: "KKR is still in the running and they have asked me to provide them some help.  I am assuming that is OK with you if Bain is no longer in the deal.… I want to make sure I don't get involved in any 'double dealing' with my two sponsors!!"  In return for Brandon's support, KKR offered to provide Brandon special consideration to make personal investments in KKR deals.

40.     Defendant Brandon was beholden to and influenced by Vornado, and the Vornado-appointed directors (Macnow and Silverstein) were also beholden to and influenced by Brandon, as a result of their mutually beneficial ongoing business relationship.  This relationship had a substantial and material inhibiting effect on their ability to act adversely to each other and to act objectively and in the best interest of TRU.  For example, on August 24, 2015, Brandon had a lengthy meeting with Steve Roth, the founder and chairman of Vornado.  As Brandon later reported, Brandon promised Roth that Brandon would look out for Vornado's interest in keeping

17

TRU alive, and "promised to 'check in with him' from time to time with updates."  Roth

reciprocated and "he offered me [Brandon] theater tickets, the use of his helicopter, airplane, and

his willingness to help me in any way."

## JURISDICTION AND VENUE

41.     This Court has personal jurisdiction over each Defendant, pursuant to the

provisions of Sections 301-302 of the New York Civil Practice Law and Rules ("CPLR")

because each Defendant: (a) resides and/or is domiciled in New York; and/or (b) regularly

conducts business in New York as an individual; and/or (c) committed tortious acts in New

York, as alleged in this Complaint (including, for example, making misrepresentations that took

place at the New York Toy Fair); and/or (d) authorized, directed, benefited from, or consented to

tortious acts alleged in this Complaint that took place in New York, over which the Defendants

exercised a significant degree of control (including, for example, authorizing, directing,

consenting to, and benefiting from the misrepresentations that took place at the New York Toy

Fair).

42.     This Court is the proper venue for this action, pursuant to Section 503(a) of the

Civil Practice Law and Rules, because one or more of the parties reside in New York County.

43.     TRU filed bankruptcy on September 18, 2017.  As a result, TRU Trust's claims

(as the assignee of TRU's claims) were tolled under 11 U.S.C. § 108 until at least September 18,

2019.  In addition, on September 10, 2019, the TRU Trust and each Defendant entered a Tolling

and Confidentiality Agreement and then entered various extensions of that agreement that further

tolled any applicable limitations periods from September 10, 2019, through March 13, 2020,

such that the time period from September 10, 2019, through March 13, 2020, "shall not be counted in determining the applicability of any statute of limitations or other time-based defense" in this action.

44.    The TRU Trust is a business trust.  Accordingly, for purposes of determining potential federal court jurisdiction based on diversity of citizenship, the citizenship of the TRU Trust is determined by the citizenship of its beneficiaries.  The citizenship of the TRU Trust overlaps with the citizenship of Defendants because the citizenship of certain TRU Trust beneficiaries is the same as the citizenship of certain Defendants.  For example:

- Defendant Silverstein resides in and is a citizen of New York, New York, and several TRU Trust beneficiaries are also citizens of New York (because they are corporations having their principal place of business in New York) including Skip Hop, Inc. and Pearhead, Inc.

- Defendants Short and Barry reside in and are citizens of New Jersey, and several TRU Trust beneficiaries are also citizens of New Jersey (because they are corporations or limited liability companies having their principal place of business in New Jersey), including LaRose Industries, LLC and Epoch Everlasting Play LLC.

## STATEMENT OF FACTS

### A.    Defendants' wrongful decision to pay advisory fees.

45.    TRU had been insolvent since at least 2014.  The sum of TRU's debts exceeded the aggregate value of its assets and there was no reasonable prospect that TRU's business could

be successfully continued in the face of that insolvency.  As Brandon himself put it, "$5 billion

worth of debt at high interest rates is simply not sustainable."

46.     Because TRU was insolvent, the officers and directors of TRU each had a

fiduciary duty to protect the value of TRU for TRU's creditors, and not merely to focus on

advancing the interests of the majority equity holders—Bain, KKR, and Vornado (the

"Sponsors").  As TRU's lawyers informed the directors, "when the company is insolvent, the

company's creditors become the primary beneficiaries of those duties."  Even apart from

insolvency, about 2.5 percent of the equity of TRU was owned by minority shareholders.  The

directors had a duty to advance the interests of all shareholders equally and not to favor the

interests of the majority shareholders at the expense of the minority shareholders.

47.     To comply with their fiduciary duties, TRU's directors were required to curtail

improper payments by TRU to Bain, KKR, and Vornado.  Back in 2005, Bain, KKR, and

Vornado had required that TRU enter an Advisory Agreement that required TRU to pay

quarterly advisory fees of millions of dollars to each Sponsor for advisory services, regardless of

the actual amount, quality, or redundancy of any advice that the Sponsors provided TRU.

Moreover, the Advisory Agreement did not actually require any Sponsor to perform any advisory

services.  The Advisory Agreement stated that "no minimum number of hours is required to be

devoted by any or all of the Advisors on a weekly, monthly, annual, or other basis."  The

Advisory Agreement stated that "The fees … specified in this Agreement will be payable by

[TRU] regardless of the extent of services" provided.

48.     Each Sponsor had unfettered discretion in determining the extent of any services

it would provide—the fees were not tied to any actual services.  Yet each Sponsor received the

exact same quarterly fee.  That each Sponsor's fees were perfectly pro-rated to its respective

ownership percentage in TRU (rather than the value or extent of any services provided) demonstrates that the fees were not a payment for services but instead were a not-so-well disguised dividend for TRU's private equity Sponsors.  This is especially true when TRU had its own highly compensated internal management team in addition to expensive outside advisory firms that provided the exact same advisory services.  And this is particularly problematic when TRU became insolvent.  Between 2005 and 2017, TRU paid Bain, KKR, and Vornado more than $250,000,000 in "Advisory Fees" as TRU sunk further into debt.

49.    The Advisory Agreement had an initial 10-year term.  The agreement and its terms could be revaluated during its initial 10-year term and each year after the initial 10-year term, based on any change in circumstances, such as changes in TRU's financial condition.  If the decisions to continue or renew the agreement and continue to pay advisory fees to the Sponsors had been handled lawfully, the decision-making process would have included the following:

- The process would have been conducted by directors who were disinterested and had no personal stake or interest in whether TRU continued to pay the Sponsors fees.  As TRU's attorneys advised, the TRU board should "delegate to disinterested directors … the sole decision-making authority in situations where decisions implicate an actual or potential conflict of interest."

- The disinterested directors, prior to making a decision, would have informed themselves of all reasonably available information relating to the decision to pay the Sponsors fees.

- The disinterested directors would have worked with independent expert consulting firms to evaluate whether TRU should continue to pay the Sponsors fees based on TRU's financial condition and, if so, the amount of such fees.

- The independent consulting firms would have identified, and justified with reasoned analysis, whether TRU should continue to pay the Sponsors fees and, if so, the amount of such fees.

- The disinterested directors would have independently reviewed and evaluated the consulting firms' work to make sure it supported the conclusions and, where necessary, requested additional data and adjustments regarding the decision whether TRU should continue to pay the Sponsors fees and, if so, how much. They would have independently evaluated the assumptions and information presented by the consultants.

- After becoming well informed, the disinterested directors would have determined whether TRU should continue to pay the Sponsors fees and, if so, the amount of such fees.

The process used by Defendants followed none of these steps.

50. The process was not controlled by disinterested directors. Instead it was controlled by directors Bekenstein, Levin, Raether, Taylor, Macnow, and Silverstein, and (from June 1, 2015, on) Brandon. These were not disinterested directors. Bekenstein and Levin were appointed by, and represented the interests of, Bain. Raether and Taylor were appointed by, and represented the interests of, KKR. Macnow and Silverstein were appointed by, and represented the interests of, Vornado. As alleged more specifically above, Brandon was beholden to and looked out for the interests of Bain, KKR, and Vornado.

51.     For these Sponsor directors, TRU's payments of fees to the Sponsors was pure self-dealing.  The quarterly payments were direct transfers from TRU's bank account to each Sponsor director's company—Bain, KKR, and Vornado.  The Sponsors who received the advisory fees were the very companies that employed the Sponsor directors and paid their salaries and bonuses.  As a result, the Sponsor directors were not disinterested in TRU's decision to pay advisory fees.

52.     Moreover, when the amount of the advisory fees was periodically renegotiated and the Advisory Agreement was renewed, Defendants did not even pretend to have an arms-length negotiation.  Instead, the same people represented both sides.  The persons assigned by Bain, KKR, and Vornado to act on their behalf were directors of TRU who were supposed to be acting on behalf of TRU:

> By: Vornado Realty L.P.
> Its:  Sole Member
>
> By: Vornado Realty Trust
> Its:  General Partner
>
> By: _Wendy Silverstein_

53.    In addition, Defendants Brandon, Beckenstein, Levin, Raether, Taylor, Macnow, and Silverstein failed to inform themselves of any, much less all, material information reasonably available to them before deciding whether TRU should continue paying Sponsor fees. To rationally evaluate whether to pay advisory fees to the Sponsors and how much to pay, the directors would need at least the following information:

- the extent of advisory services that each Sponsor would provide;

- an assessment of the value or expected benefit of the advisory services for each Sponsor;

- whether advisory services from each Sponsor was entirely duplicative of advisory services that TRU was already paying for from top-tier consulting firms, including McKinsey and AlixPartners;

- whether the advisory services of a given Sponsor was duplicative of the services provided by another Sponsor; and

- whether TRU could afford to pay advisory fees given its financial distress and corresponding inability to adequately invest in its stores, employees, technology, and web presence.

54.    The TRU directors and officers, however, made no effort to obtain this information.  They made no attempt to assess the value of the services, if any, that TRU was receiving.  They made no effort to compare the services provided by each Sponsor to the services provided by independent companies who offered the same advisory services.  They made no

effort to seek competitive submissions between the Sponsors.  They made no effort to determine

if TRU could afford to allocate its increasingly limited resources to Sponsor payments.  They did

not even raise the subject, much less obtain the relevant information.

55.     Defendants Brandon, Beckenstein, Levin, Raether, Taylor, Macnow, and

Silverstein breached their fiduciary duties of loyalty and good faith to TRU by authorizing TRU

to pay advisory fees to Bain, KKR, and Vornado.  This breach of duty caused TRU and its

creditors losses of $17,863,110 from the fourth quarter of 2014 through 2017.

### B.     The improper executive bonuses.

56.     Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow,

Silverstein, and Goodman (the "Director Defendants") improperly approved paying bonuses of

over $16 million to TRU executives five days before the company filed for bankruptcy, violating

their fiduciary duties of loyalty and good faith to TRU and its creditors.

### 1.     The directors' fiduciary duties.

57.     If the Director Defendants had complied with their fiduciary duties of loyalty and

good faith, all of the following would have occurred:

- The process of determining executive bonuses would have been conducted by

  directors who were disinterested and had no personal stake in the outcome.

- These independent directors, prior to making a decision on what bonuses should be

  paid, would have informed themselves of all material information reasonably

  available to them.

- The independent directors would have worked with an independent expert consulting firm that would have identified, and justified with reasoned analysis, alternative objective target levels for executive cash compensation (e.g. "the median cash compensation for comparable executives at peer companies").

- The consulting firm would have collected data on compensation for comparable executives and determined which executives needed bonuses to bring them to the identified target levels.

- The independent directors would have reviewed the consulting firm's work to make sure it supported the conclusions and, where necessary, requested additional data and adjustments.  After becoming well informed on the alternatives, the independent directors would have selected an appropriate bonus plan.

The Director Defendants followed none of these steps.


### 2.     Brandon controls the executive bonus plan.

58.     The process of awarding executives cash bonuses started with, and was controlled throughout by, Defendant Brandon.  Brandon failed to assure that the bonus plan was designed by persons who had no personal stake in the outcome.  Instead, the plan was designed by Brandon, with assistance from another top TRU executive, Tim Grace, who was an Executive Vice President and Chief Talent Officer.  Because Brandon and Grace were designing a plan to pay themselves bonuses, both Brandon and Grace had a direct personal stake in the outcome.

59.     The consideration of executive bonuses should have started with data on executive compensation in comparable companies.  But Brandon knew that such data would not justify giving bonuses to most TRU executives, in particular himself.  As Brandon explained to

Grace, in a July 15, 2017, email, they had to "deal[] with a reality." "About a year ago you put us all in a room and explained that our base salaries … particularly in leadership roles [and] our annual bonus percentages were over indexed to market" and "that the combination of the two was costing [TRU] millions of dollars in out-of-market, excess compensation." Brandon concluded: "We have to be creative and design something that works for us. Outside stats and comparisons are not going to help us."

60.    A little later, the company's lawyers, Kirkland & Ellis, advised Brandon of another obstacle. The lawyers explained that the top tier of executives at the company would be considered "insiders" under the Bankruptcy Code, and that bonuses paid to insiders during the bankruptcy case would be "subject to stringent bankruptcy rules and much greater scrutiny" and would have to be "incentive-based and 'reasonable' compared to market levels of compensation."

61.    To overcome this obstacle, Brandon and Grace designed a two-tier plan for executive bonuses.

| From: | Grace, Tim |
|---|---|
| Sent: | Monday, August 14, 2017 12:48 PM |
| To: | Brandon, Dave |
| Subject: | Supplemental Retention/Incentive Plan |
| Attachments: | BOD KERP KEIP.pptx |

Dave,

Attached is a draft of the proposed plans; Retention and Incentive as discussed.

The executives in the lower tier (which their plan labeled "non-insiders") would receive retention-based bonuses of between 10 percent and 75 percent of base salary:

## KERP - Non-Insiders

|              | #   | $'s        | % Base Salary | % Population | 1/31/2018  | 7/31/2018  | 1/31/2019  |
|--------------|-----|------------|---------------|--------------|------------|------------|------------|
| SVP          | 3   | 1,025,000  | 75%           | 100%         | $256,250   | $256,250   | $256,250   |
| VP           | 32  | 9,129,699  | 50%           | 50%          | $760,808   | $760,808   | $760,808   |
| Exec. Dir.   | 44  | 8,531,400  | 25%           | 25%          | $177,738   | $177,738   | $177,738   |
| Director/Other | 197 | 30,003,330 | 10%         | 10%          | $100,011   | $100,011   | $100,011   |
|              |     |            |               |              | $1,294,807 | $1,294,807 | $1,294,807 |

These bonuses would be paid in three installments, with the first installment not due until January 31, 2018, after filing for bankruptcy.  The executives in the top tier, which the plan labeled "insiders," would each receive a cash bonus equal to 75 percent of the executive's base salary, paid in September 2017 before the company filed for bankruptcy:

## KERP - Insiders

|               | Base Salary: | 1-Sep-17 |
|---------------|--------------|----------|
|               |              | 75% Base Salary |
| Dave Brandon  | $3,750,000   | $2,812,500 |
| Michael Short | $700,000     | $525,000 |
| Lance Wills   | $550,000     | $412,500 |
| Tim Grace     | $475,000     | $356,250 |
| Carla Hassan  | $500,000     | $375,000 |
| Cornell Boggs | $450,000     | $337,500 |
| Kevin Macnab  | $525,000     | $393,750 |
| Mark Johnson  | $475,000     | $356,250 |
| Diane Preston | $400,000     | $300,000 |
| Amy von Walter | $400,000    | $300,000 |
| Richard Barry | $600,000     | $450,000 |
| Chuck Knight  | $440,000     | $330,000 |
| Matt Finigan  | $290,000     | $217,500 |
|               |              | $7,166,250 |

As a result, the "insiders" could evade oversight by the Bankruptcy Court.

### 3.      Brandon directs Alvarez & Marsal to propose Brandon's bonus plan.

62.      After determining which executives should receive a bonus and how much each should receive, Brandon and Grace gave a copy of the executive bonus plan to the consulting firm of Alvarez & Marsal, and asked them to prepare an analysis that would support the bonuses.

63.      Alvarez & Marsal were not independent from Brandon and were not disinterested in whether Brandon received a bonus.  Brandon had a long association with Bryan Marsal, the co-founder of Alvarez & Marsal.  And it was Brandon who brought in Alvarez & Marsal to serve

28

as the financial restructuring advisor for TRU.  Brandon had personally contacted Marsal

(reaching Marsal while he was attending the Bohemian Grove on July 24, 2017) to tell him that

TRU needed his services.  Brandon explained that TRU's sponsors had previously engaged

AlixPartners (a chief competitor of Alvarez & Marsal), but that Brandon had persuaded the

sponsors to use Alvarez & Marsal rather than AlixPartners.  Throughout the entire time that

Alvarez & Marsal provided analysis on the TRU executive bonus plan, Alvarez & Marsal was

beholden to Brandon.  Alvarez & Marsal needed Brandon's continued support to serve as the

restructuring advisor for TRU, which was a very lucrative assignment that paid Alvarez &

Marsal more than $40 million.

64.    After receiving the executive bonus plan designed by Brandon, Alvarez & Marsal

gathered a list of comparable companies and obtained data on the compensation for the top five

executives at these companies.  Alvarez & Marsal then analyzed how compensation for the top

five TRU executives compared to top executives at the comparable companies.  Alvarez &

Marsal then put their analysis into a presentation and, on August 21, 2017, provided it to

Brandon for editing and approval.

65.    The presentation contained the identical bonus plan that Brandon had designed

and provided to Alvarez & Marsal, including the two-tiered structure with each top TRU

executive receiving a cash bonus of 75 percent of base salary, payable immediately, and paying

the remaining executives in installments during the bankruptcy case, starting in 2018.  Upon

reviewing the presentation, however, Brandon realized that paying most executive bonuses in

installments commencing January 31, 2018, while paying top executives immediately, would

only highlight that his plan was improperly giving favorable treatment to "insiders," in particular

to himself.  Brandon decided to change the plan so that all executives would receive their entire

bonus immediately, prior to TRU filing for bankruptcy. Alvarez & Marsal prepared a revised presentation that incorporated this change, which Brandon then approved.

### 4. The directors on the compensation committee abdicate their fiduciary duties and approve the executive bonus plan.

66. The bonus presentation was then sent to the directors on the TRU compensation committee, consisting of directors Taylor, Levin, and Goodman. As described above, directors Taylor and Levin were not disinterested directors.

67. The compensation committee directors did nothing to assure that an executive bonus plan was designed without the influence and control of Brandon, and in fact knew that Brandon had been intimately involved in, and controlled, the design of the plan.

68. The compensation committee directors met on August 28, 2017, to discuss the bonus plan. The compensation committee directors did not meet independently from Brandon. Instead, Brandon participated in and led the meeting. In that meeting, the compensation committee learned what Brandon already knew: the Alvarez & Marsal analysis did not support the proposed executive bonuses.

69. First, Alvarez & Marsal conducted no analysis, and made no determination, as to what cash compensation level was needed to serve the purported goal of retaining executives. Brandon and the directors on the committee should have directed Alvarez & Marsal to perform an analysis and present recommendations grounded in objective data. No such direction was given.

70. Second, for 109 of the 114 executives that were to receive a bonus, Alvarez & Marsal provided no analysis. For these executives, there was no data regarding compensation levels for comparable executives and no analysis, discussion, or even speculation as to how the

compensation for these executives compared to the market.  There was no data and no analysis whatsoever.  Brandon and the directors on the committee should have directed Alvarez & Marsal to collect the data and determine what cash bonuses, if any, would be appropriate for these executives.  No such direction was given.

71.      Third, for the top five TRU insider executives, Alvarez & Marsal did provide data and analysis.  That data showed, however, that giving each executive a bonus equal to 75 percent of base salary did not make sense.  The most glaring example was that the data showed that CEO David Brandon should not be paid any cash bonus, because his cash compensation was already excessive.  At comparable companies the 50th percentile for base salary of the CEO was $1.1 million and the 90th percentile was $1.56 million.  Brandon's base salary was $3.75 million.



| | |
|---|---:|
| 25th Percentile | $1,000 |
| Average | 1,278 |
| 50th Percentile | 1,100 |
| 75th Percentile | 1,320 |
| 90th Percentile | 1,560 |
| | |
| Toys "R" Us    Dave Brandon    CEO | $3,750 |



At comparable companies the 50th percentile for total cash compensation of the CEO was $2.75 million, and the 90th percentile was $3.97 million. With the proposed cash bonus of 75 percent of base salary, Brandon's total cash compensation would be $6.56 million, which would be $2.5 million more than the 90th percentile and would exceed the total cash compensation of any executive at any other peer company.

72.    Brandon should have pointed out to the compensation committee that the data showed that his base salary and total cash compensation were sufficient and that he should not be paid a bonus. The compensation committee members each should have stated the same thing. But that didn't happen. Instead, Brandon and the committee instructed Alvarez & Marsal to go

back and try to come up with a different set of comparable companies, so that the data would look better for the CEO Brandon.

73.     Alvarez & Marsal prepared a revised analysis and, on August 31, 2017, sent it to Brandon.  The revised analysis deleted seven of the companies from the list of comparable firms, added six new firms, and then recalculated the benchmarks.  The result was to significantly increase the average base salary, average cash compensation, and average total compensation for the CEO position at peer companies.  But even using this revised and upwardly-skewed peer group, the data still showed that Brandon should not be paid a cash bonus.  Brandon's total cash compensation without a bonus was still well above the 50th percentile of the revised peer group, and with the proposed bonus, Brandon's cash compensation would still exceed that of any other executive.

74.     Neither Brandon nor the three directors on the compensation committee requested any further analysis from Alvarez & Marsal, nor did any of them point out that the analysis failed to justify the executive bonuses.

### 5.     The full board abdicates its fiduciary duties and approves the executive bonus plan.

75.     Before the executive bonus plan was submitted to the full board for approval, Brandon instructed Alvarez & Marsal that its complete analysis should not be distributed to the board members.  Brandon instructed that the board members should be provided only an "executive summary," which omitted the data on comparable CEOs.

76.     This executive summary contained no discussion (or even conclusion) as to what an appropriate benchmark target should be for TRU executives.  It provided no discussion or data as to how TRU executive compensation stacked up against comparable companies.  It

included neither the original comparability analysis that Alvarez & Marsal had prepared for the top five executives, nor the revised version. It contained no comparability analysis whatsoever.

77.      The executive bonus plan was presented to the directors for approval at a board meeting on September 13, 2017. In attendance were Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman. The board meeting was chaired by Brandon. Brandon did not recuse himself from the discussion, and no board member asked him to leave. In addition, the executive bonus plan would pay Defendant Short an immediate cash bonus of $600,000. Short did not recuse himself from the discussion, and no board member asked him to leave.

78.      During the discussion none of the board members asked to see what was plainly missing. None of the board members asked whether Alvarez & Marsal had determined (or even considered) what the target level compensation should be at TRU compared to its peers. No board member asked whether there had been any analysis comparing compensation for TRU executives to executives at peer companies. No board member asked how Brandon's cash compensation compared to CEOs at peer companies. No director questioned whether it was rational for Brandon to receive a cash bonus equal to 75 percent of his salary.

79.      No board member made any inquiry to ascertain whether the bonus program had been developed without the undue influence of Brandon, who had an obvious conflict of interest. No director inquired how Alvarez & Marsal had arrived at a 75 percent of salary bonus for all top executives, including Brandon.

80.      No board member asked whether consideration had been given to using an alternative structure that did not pay the entire bonus immediately prior to the bankruptcy filing—paying the bonus in installments over time, so that it would be paid only if the executive

stayed with the company and the company was still in business.  No board member questioned

whether it was appropriate to pay large bonuses to insiders days before filing bankruptcy so as to

evade the oversight of the bankruptcy court.  None of the directors asked about the economic

impact on TRU of taking $16 million of desperately-needed cash out of the company on the eve

of bankruptcy.

81.     Neither Brandon nor any of the three directors on the compensation committee

pointed out to the other directors that Brandon himself had designed the bonus program.  No one

pointed out that, before Alvarez & Marsal prepared their analysis, David Brandon had already

determined that the result should be that all top executives, including himself, should receive a

bonus equal to 75 percent of base salary.  Neither Brandon nor any of the three directors on the

compensation committee pointed out that the comparability analysis performed by Alvarez and

Marsal did not support giving Brandon a 75 percent cash bonus, and that the data showed that

Brandon's cash compensation was already excessive.

82.     Moreover, at that same September 13, 2017, board meeting, the Director

Defendants appointed two new independent directors, purportedly for the purpose of taking

control of decisions for which the other directors would have conflicts of interest.  TRU's

lawyers, Kirkland & Ellis, had advised the board that it should "delegate to disinterested

directors or managers the sole decision-making authority in situations where decisions implicate

an actual or potential conflict of interest."  But the Director Defendants failed to follow that

advice.  None of the Director Defendants requested that the independent directors be given the

time, resources, or authority to independently consider and develop an executive bonus plan, or

even to properly evaluate the proposed plan.  Instead, at that same September 13, 2017, meeting

where the independent directors were appointed, Defendant Brandon requested immediate

approval of the executive bonus plan that he had designed.

83.     Brandon did not in fact rely on Alvarez & Marsal and his purported reliance was

not in good faith, because Brandon knew that Brandon controlled the design of the plan, that Tim

Grace had worked with him in designing the plan, that TRU's own data showed that TRU

executives were overpaid, that there was insufficient data supporting the plan, that the data for

Brandon showed that the proposed 75% bonus was excessive, that Alvarez & Marsal had been

instructed to manipulate the comparability data to make Brandon's CEO compensation look

comparatively worse, and that Alvarez & Marsal had not proposed paying all bonuses prior to

bankruptcy.

84.     The compensation committee directors (Taylor, Levin, and Goodman) did not in

fact rely on Alvarez & Marsal and their purported reliance was not in good faith, because each of

them knew about Brandon's influence on the plan, of the absence of data supporting the plan,

that the data for Brandon showed that the proposed 75% bonus was excessive, that Alvarez &

Marsal had been instructed to manipulate the comparability data to make Brandon's CEO

compensation look comparatively worse, and that Alvarez & Marsal had not proposed paying all

bonuses prior to bankruptcy

85.     Alvarez & Marsal was not selected with reasonable care and the faulty selection

was the fault of the Director Defendants, because they failed to select an advisor who was not

beholden to Brandon and failed to assure that the advisor reached its conclusions without the

influence and control of Brandon.

86.     Material facts were so obvious that the Director Defendants' failure to consider

and act on them was grossly negligent and in bad faith regardless of the advice or lack of advice

of Alvarez & Marsal, including the absence of comparability analysis for each executive, that the comparability data for Brandon showed that the proposed 75% bonus was excessive, that there was no legitimate reason to pay all bonuses prior to filing bankruptcy rather than in installments over time, and that the newly appointed independent directors had not been given the time, resources, or authority to independently consider and develop an executive bonus plan.

87.    Each of Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman voted to approve the payment of executive bonuses, with the payment to be made before TRU filed for bankruptcy protection.  They specifically authorized paying all of the top executives an immediate bonus equal to 75 percent of base salary.  The bonuses were paid on September 14 and 15, 2017.  The following Monday, September 18, 2017, TRU filed for bankruptcy protection.

88.    Even after the bonuses were paid, Brandon was not honest and candid about them. On February 28, 2018, Beth Burns, a TRU employee who had worked at the Babies 'R' Us store in Nashua, New Hampshire, wrote Brandon an email to express her frustration.  Her store had been selected for closing, and Brandon had initially promised all of the employees a severance. A week later, Brandon told them they would get no severance.  She requested, "Please re-think your decision to hand out to the Executives and leave your devoted Associates with nothing."

89.    Brandon responded, "While there is nothing I can do or say to make you feel any better about the very painful situation we are living through at TRU, I want you to know that I share your pain."  Brandon did not, however, offer to share his bonus.  Instead, he continued:

> I did want you to know that there have not been millions of bonuses paid to the executives at our company despite what you may have heard. Bonuses at TRU are tied to financial performance... and based on our performance the past several years, there have not been – nor will there be - any bonuses paid to executives or anyone else given the current financial condition of our company.

Brandon's statements were false.

### C.    Defendants' misrepresentations: September 18, 2017 - November 23, 2017.

#### 1.    Representations to Trade Vendors (September 18, 2017, to November 23, 2017).

90.    Beginning on September 18, 2017, David Brandon, Richard Barry, and Michael Short represented to Trade Vendors that Toys "R" Us had obtained $3 billion in DIP financing that for the next 16 months gave TRU funds to pay Trade Vendors for goods or services provided on credit.  If true, these representations established that a Trade Vendor could safely provide its merchandise to Toys "R" Us on credit for at least 16 months—i.e., not only for the upcoming 2017 Holiday season, but all the way through the 2018 Holiday season.

91.    Defendants Brandon and Short laid the foundation for later misrepresentations in statements they made in TRU's bankruptcy filing.  In a declaration filed to support the bankruptcy, Brandon stated, "These [DIP financing] facilities will enhance the Debtors liquidity by almost $1 billion, ensuring that the Debtors will have sufficient liquidity to maintain the free flow of inventory to the Debtors' stores and customers, make operational and strategic improvements, and fund the administrative costs of these chapter 11 cases."  Brandon stated that the DIP financing would "ensure adequate liquidity during … these chapter 11 cases."  Brandon stated, "I believe that the DIP Facilities provide the Debtors sufficient liquidity to stabilize their operations and fund administration of these chapter 11 cases."  Brandon stated, "With more than $3.1 billion in new financing commitments in hand … the Company has an opportunity to stabilize operations and reset its balance sheet."  Brandon stated that the DIP funding "will ensure the iconic Toys 'R' Us brand stays viable for years to come."  Brandon further

emphasized that there were no material conditions to accessing the DIP funding.  He stated, "Importantly the DIP Facilities include very few case controls.  Specifically, the only terms that can be viewed as case controls are the conditions that the DIP Facilities" get court approval in the U.S. and Canada within 45 days.

92.     Defendant Short made similar representations.  Short represented that "the DIP Facilities will also provide the Debtors liquidity to fund the administrative costs of these chapter 11 cases … and emerge from bankruptcy."  Short stated, "The amount of interim financing contemplated by the DIP Motions will ensure that [TRU has] the necessary liquidity to continue to operate without material disruption."  Short stated, "the DIP Facilities will provide the Debtors with the liquidity needed to reactivate their supply chain, provide assurance to their vendors, and capitalize on the holiday season."  Short further represented that the DIP funding facilities "contain no material milestones or other case controls (a feat that has not been accomplished in any other recent major retail case), and … will ensure that the North American Debtors have the liquidity necessary to stabilize their vendor base."

93.     Brandon and Short knew and intended that the above representations would be disseminated to and reach decision-makers at each of the Trade Vendors.  Brandon and Short knew and intended that Trade Vendors would rely upon these representations and that the representations provided Trade Vendors assurance that if the Trade Vendor shipped goods to TRU on credit, then TRU had the ability to pay for the goods.

94.     Defendant Brandon also made DIP financing representations in press statements that he knew would be read by and relied upon by Trade Vendors.  On September 19, 2017, Brandon told Reuters, "we successfully obtained debtor-in-possession financing today, we can

assure our vendors that we are in a good position to accept shipments on a normal basis and they have great assurance they will be paid."

95.     At the direction of Brandon, Short, and Barry, on September 19, 2017, employees of TRU posted on TRU's website and vendor portal key messages that were intended to be read by each of the Trade Vendors.  These messages were read by each of the Trade Vendor within 48 hours.  These messages included the following:

- "Does Toys 'R' Us have sufficient liquidity to meet its obligations?  Yes.  We have received commitments for over $3.0 billion in new financing that will help enable us to meet our business obligations during the financial restructuring process."

- "Will vendors be paid for goods or services provided on or after the filing date? Yes.  We intend to pay vendors for all goods and services received on or after the filing date."

96.     Brandon, Barry, and Short knew that these messages were on the TRU website and knew (or were willfully blind to the fact, or, alternatively, reasonably should have known) that it continued to be displayed to Trade Vendors and relied on by Trade Vendors from September 19, 2017, through March 15, 2018.

97.     At the direction of Brandon, TRU employees prepared a letter that was sent to each Trade Vendor on the morning of September 19, 2017, from the relevant TRU Managing Director.  The letter stated:

- **We intend to pay vendors in full under normal terms for goods and services provided on or after the filing date.** We have received commitments for over $3.0 billion in new financing that will support our operations and enable us to meet our business obligations during the financial restructuring process.

98.     At the direction of Brandon, TRU employees prepared a script of talking points to be delivered directly to key decision makers at each Trade Vendor.  The script included:

- "Do you have sufficient liquidity to meet your business obligations?  Yes.  We intend to pay vendors in full under normal terms for goods and services provided on or after the filing date.  We have received commitments for over $3.0 billion in new financing that will help enable us to meet our business obligations during the financial restructuring process."

- "Why should I sell you goods now?  We intend to pay vendors to our U.S. and Canadian subsidiaries in full under normal terms for goods and services provided on or after the filing date.  …We have received commitments for over $3.0 billion in new financing that will help enable us to meet our business obligations during the financial restructuring process."

99.     Beginning September 19, 2017, at the direction of Brandon, Short, and Barry, a "war room" was set up for TRU employees to contact Trade Vendors and deliver the message in the talking points.  That morning, each of the TRU employees that would be contacting Trade Vendors was given instructions and told to communicate to Trade Vendors that TRU had access to over $3 billion in new financing that would enable TRU to pay vendors in full for goods shipped on credit, and would enable TRU to meet its business obligations during the bankruptcy case.

100.    Commencing September 18, 2017, Brandon, Barry, and Short personally contacted key Trade Vendors through telephone calls, texts, and emails, and represented that TRU had obtained $3 billion in DIP financing that for the next 16 months gave TRU funds to pay Trade Vendors for goods or services provided on credit.  For example:

- On September 18, 2017, Brandon had a telephone conversation with Geoffrey
  Greenberg and Charlie Emby, who were the top executives at Just Play, a Trade
  Vendor.  Brandon communicated that TRU had obtained $3 billion in financing and
  was now in a very strong financial position.  Brandon requested that, in light of that
  fact, Just Play continue shipping goods on credit.

- On September 19, 2017, Barry emailed Sharon Danzig at Claire's,

> Toys has secured 3.1bn in DIP financing and we have ample liquidity to drive business with you and under the
> protection of Chapter 11.

- On September 19, 2017, at 9:26 p.m. Barry emailed Brandon and four other TRU
  employees who were making calls to TRU Trade Vendors to report that Barry and
  two TRU employees working under his direction (Jamie Uitdenhowen and Robert
  Magarino) had just completed discussions with over 30 top Trade Vendors and had
  confirmed to each of them that TRU had DIP financing that would provide TRU
  liquidity to pay vendors.  Barry reported: "Confirmation of the DIP financing is a
  crucial issue for the vendors."  Brandon responded: "Great work Richard, Jamie,
  and Rob!"

Other specific examples of calls placed by Brandon, Short, and Barry are identified in the table
below.

101.    In addition to their personal contacts with Trade Vendors, Brandon and Barry
directed other TRU employees to contact Trade Vendors and inform them that TRU had obtained
$3 billion in DIP financing that gave TRU funds to pay Trade Vendors for goods or services
provided on credit.  For example, on about September 19, 2017, Shirley Ng, a Senior Director at
TRU, acting on direction from Brandon and Barry, spoke with Nancy Feldman of GHCL
Limited.  Ng assured Feldman "that there was no risk to ship on open terms" because TRU "had

DIP financing." As another example, on September 25, 2017, Jamie Uitdenhowen of TRU

emailed Steven Dweck of Accessory Innovations, LLC to emphasize "You are getting paid on all

you ship!" and that future risk was minimal because "We just got $3.1B in dip financing."

102.    The table below identifies other specific examples of TRU employees contacting

Trade Vendors, at the direction of Brandon and Barry, and representing that TRU had obtained

$3 billion in financing that gave TRU the ability to pay for goods delivered on credit:

| Vendor | Vendor Contact | TRU Contact | Date |
|---|---|---|---|
| Mattel | Margo Georgadias | Dave Brandon | September 18-20 |
| Mattel | Christopher Sinclair | Dave Brandon | September 20 |
| Mattel | Kevin Farr | Mike Short | September 18-20 |
| Mattel | Gabriel Zalzman | Kevin Macnab | September 19-22 |
| Mattel | Sanjay Luthra | Kevin Macnab | September 19-22 |
| Mattel | Thomas Birkemeyer | Detlef Mutterer | September 19-22 |
| Mattel | Dom Geddes | Steve Knights | September 19-22 |
| Mattel | Christophe Salmon | Gaetan Henry | September 19-22 |
| Mattel | Steve Adams | Diane Guerreiro | September 19-22 |
| Mattel | Peter Broegger | Jo Hall | September 19-22 |
| Mattel | Fernando Marco | Jean Charretteur | September 19-22 |
| Hasbro Inc | Brian Goldner | Dave Brandon | September 18-20 |
| Hasbro Inc | Brian Goldner | Richard Barry | September 18 |
| Hasbro Inc | Deb Thomas | Mike Short | September 18-20 |
| Hasbro Inc | Wiebe Tinge | Kevin Macnab | September 19-22 |
| Hasbro Inc | Ryan Blane | Kevin Macnab | September 19-22 |
| Hasbro Inc | Markus Grossweischede | Detlef Mutterer | September 19-22 |
| Hasbro Inc | Ryan Blane | Steve Knights | September 19-22 |
| Hasbro Inc | Mickael Bertoux | Gaetan Henry | September 19-22 |
| Hasbro Inc | Ricardo Donoso | Diane Guerreiro | September 19-22 |
| Hasbro Inc | Tomek Micek | Jo Hall | September 19-22 |
| Hasbro Inc | Angel Tena | Jean Charretteur | September 19-22 |
| Lego | Bali Padda | Dave Brandon | September 18-20 |
| Lego | Loren Shuster | Dave Brandon | September 18-20 |
| Lego | Loren Shuster | Richard Barry | September 20 |
| Lego | Marjorie Lao | Mike Short | September 18-20 |
| Lego | Loren Shuster | Kevin Macnab | September 19-22 |
| Lego | Henrik Sjögren | Kevin Macnab | September 19-22 |

| Lego | Frédéric Lehmann | Detlef Mutterer | September 19-22 |
|---|---|---|---|
| Lego | Marina Edwards | Steve Knights | September 19-22 |
| Lego | Craig Mair | Steve Knights | September 19-22 |
| Lego | Niels Jorgensen | Marie-Christine Mendes | September 19-22 |
| Lego | Claus Kristensen | Diane Guerreiro | September 19-22 |
| Lego | Marko Ilincic | Jo Hall | September 19-22 |
| Lego | César Ridruejo | Jean Charretteur | September 19-22 |
| Just Play | Charlie Emby | Dave Brandon | September 18-20 |
| Just Play | Charlie Emby | Richard Barry | September 22 |
| Just Play | Geoffrey Greenberg | Dave Brandon | September 18-20 |
| Just Play | Charlie Emby | Kevin Macnab | September 19-22 |
| Jazwares, Inc. | Matt Siesel | Mike Short | September 18-20 |
| Jazwares, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Spin Master | Ben Gadois | Dave Brandon | September 18-20 |
| Spin Master | Mark Segal | | |
| Spin Master | Chris Beardall | Jamie Uitdenhowen | September 19 |
| Spin Master | Chris Beardall | Kevin Macnab | September 19-22 |
| Spin Master | Hedley Barnes | Michael Orttmann | September 19-22 |
| Spin Master | Hedley Barnes | Steve Knights | September 19-22 |
| Spin Master | Guillaume Manez | Gaetan Henry | September 19-22 |
| Graco Childrens Product Inc | Mike Polk | Dave Brandon | September 18-20 |
| Graco Childrens Product Inc | Laurel Hurd | Richard Barry | September 18 |
| Graco Childrens Product Inc | Laurel Hurd | Kevin Macnab | September 19-22 |
| Graco Childrens Product Inc | Kris Hallee | Steve Knights | September 19-22 |
| MGA Entertainment | Isaac Larian | Dave Brandon | September 18-20 |
| MGA Entertainment | Isaac Larian | Richard Barry | September 19 |
| MGA Entertainment | Stephen Shultz | Global Merchandising Team | September 19-22 |
| MGA Entertainment | Isaac Larian | Kevin Macnab | September 19-22 |
| MGA Entertainment | Thomas Eichhorn | Michael Orttmann | September 19-22 |
| MGA Entertainment | Andy Laughton | Steve Knights | September 19-22 |
| Vtech | William To | Richard Barry | September 19 |
| Vtech | Christoph Anton | Michael Orttmann | September 19-22 |
| Vtech | Graham Canning | Steve Knights | September 18-22 |
| Vtech | Gilles Sautier | Gaetan Henry | September 19-22 |
| Vtech | King Pang | Jo Hall | September 19-22 |
| Vtech | Michel Senra | Jacobo Villegas | September 19-22 |
| Skyrocket Toys LLC | TBD | Global Merchandising Team | September 19-22 |

| Jakks | Stephen Berman | Richard Barry | September 20 |
|---|---|---|---|
| Radio Flyer Inc | TBD | Global Merchandising Team | September 19-22 |
| Moose Toys | Manny Stul | Global Merchandising Team | September 19-22 |
| Moose Toys | Paul Solomon | Kevin Macnab | September 19-22 |
| Moose Toys | Manny Stul | Kevin Macnab | September 19-22 |
| Moose Toys | Denis Norman | Kevin Macnab | September 19-22 |
| Moose Toys | Ben Sage | Diane Guerreiro | September 19-22 |
| William Carter | Mike Casey | Dave Brandon | September 22 |
| William Carter | Mike Casey | Richard Barry | September 21 |
| C&T | TBD | Global Merchandising Team | September 19-22 |
| Dorel Juvenile Group | Michael Goldberg | Robert Margarino | September 20 |
| Pacific Cycle/Schwinn | Michael Goldberg | Robert Margarino | September 19-22 |
| Zuru Inc | TBD | Global Merchandising Team | September 19-22 |
| Kids II | Dave Calhoun | Richard Barry | September 19 |
| Kids II | Karen Neblett | Kevin Macnab | September 19-22 |
| Kids II | Petra Martin | Ingeborg Kuempers | September 19-22 |
| Huffy | Mike O'gara | Richard Barry, Jamie Uitdenhowen | September 19-22 |
| Delta Enterprises Corp | Alan Jemal | Richard Barry | September 19-22 |
| Chicco | Steve McLaughlin | Robert Margarino | September 19 |
| Chicco | Josemaria Fontclara | Jean Charretteur | September 19-22 |
| Bandai | Nick Contreras | Richard Barry | September 19 |
| Bandai | Clive Smith | Steve Knights | September 19-22 |
| Bandai | Raúl Guerrero | Jean Charretteur | September 19-22 |
| Evenflo | TBD | Robert Margarino | September 19-22 |
| Summer Infant | Mark Messner | Robert Margarino | September 21 |
| Summer Infant | Lisa Harnsch | Kevin Macnab | September 19-22 |
| Alex Toys | TBD | Global Merchandising Team | September 19-22 |
| Gerber Childrenswear Llc | TBD | Global Merchandising Team | September 19-22 |
| Mayborn Usa | Chris Parsons | Robert Margarino | September 19 |
| Wow Wee Limited | TBD | Global Merchandising Team | September 19-22 |
| Kent International | TBD | Global Merchandising Team | September 19-22 |
| Nintendo | Doug Bowser | Richard Barry | September 26 |

| Nintendo | Philippe Lavoué | Jacky Bizeul | September 19-22 |
|---|---|---|---|
| Nintendo | Ángel Andrés | Jean Charretteur | September 19-22 |
| Yvolution Usa Inc | TBD | Global Merchandising Team | September 19-22 |
| Razor Usa Inc | TBD | Global Merchandising Team | September 19-22 |
| International Playthings LLC (Epoch) | Michael Varda | Jamie Uitdenhowen | September 19-22 |
| The Bridge Direct Inc | Jay Foreman | Richard Barry | September 23 |
| New Bright Ind Co LTD | TBD | Global Merchandising Team | September 19-22 |
| Chap Mei Plastic Toys MFY LTD | TBD | Global Merchandising Team | September 19-22 |
| Chap Mei Plastic Toys MFY LTD | Simon Lam | Jean Daniel Gatignol | September 19-22 |
| Tomy | Greg Kilrea | Robert Margarino | September 21 |
| Tomy | Jean Christophe Bonifaci | Corinne Grenet | September 19-22 |
| Singing Machine Co Inc | TBD | Global Merchandising Team | September 19-22 |
| Goodbaby | TBD | Global Merchandising Team | September 19-22 |
| Crayola | Smith Holland Jr. | Jamie Uitdenhowen | September 25 |
| Crayola | Paul Zadorsky | Kevin Macnab | September 19-22 |
| Baby Trend | Jeff Meyer | Robert Margarino | September 20 |
| Playmates Toys Inc | Michael Chan | Richard Barry | September 19 |
| Procter & Gamble Corp | TBD | Global Merchandising Team | September 19-22 |
| Procter & Gamble Corp | Pablo Lapeña | Jean Charretteur | September 19-22 |
| Best Chairs Inc | TBD | Global Merchandising Team | September 19-22 |
| LaRose Ind/Cra-Z-Art | TBD | Global Merchandising Team | September 19-22 |
| NSI International Inc | TBD | Global Merchandising Team | September 19-22 |
| Funko LLC | TBD | Global Merchandising Team | September 19-22 |
| Step2 Company LLC | Bill McCallum | Jamie Uitdenhowen | September 19 |
| Ontel Products Corp | TBD | Global Merchandising Team | September 19-22 |
| Melissa & Doug LLC | TBD | Global Merchandising Team | September 19-22 |

| M Design Village LLLC | TBD | Global Merchandising Team | September 19-22 |
|---|---|---|---|
| Munchkin | Marc Hayes | Robert Margarino | September 20 |
| Britax Child Safety Inc | Kyle Brown | Robert Margarino | September 19 |
| Britax Child Safety Inc | Nic Naes | Diane Guerreiro | September 19-22 |
| Levtex LLC | Michael Levin | Robert Margarino | September 19-22 |
| Playmobil | Axel Schmitz | Kevin Macnab | September 19-22 |
| Artsana | Pietro Suardi | Rémi Portes | September 19-22 |
| Asmodee | Christophe Arnoult | Marie-Christine Mendes | September 19-22 |
| Bizak (Spin Master Distr) | Santiago Guerra Blasco | Jean Charretteur | September 19-22 |
| Bugaboo | Aaron White | Steve Knights | September 19-22 |
| Cherry | Michael Zhou | Jean Daniel Gatignol | September 19-22 |
| Claire's | Ron Marshall | Richard Barry, Jamie Uitdenhowen | September 21 |
| Claire's | Jerome Florin | Steve Knights | September 19-22 |
| Claire's | Cati Moreira | Geoffrey Mingaud | September 19-22 |
| Clementoni | Christophe Denis | Corinne Grenet | September 19-22 |
| Corolle S.A.S | Ricardo Mazry | Geoffrey Mingaud | September 19-22 |
| Dickie Toys | Tom Gerigk | Jean Daniel Gatignol | September 19-22 |
| Famosa North America | Marie-Eve Rougeot | Jean Charretteur | September 19-22 |
| General Lion | Eddie Lau | Jean Daniel Gatignol | September 19-22 |
| Gi-Go | Bede Leung | Jean Daniel Gatignol | September 19-22 |
| Gi-Go | Danny Leung | Jean Daniel Gatignol | September 19-22 |
| Gi-Go | Sam Lau | Jean Daniel Gatignol | September 19-22 |
| Goliath | Philippe Bernard | Marie-Christine Mendes | September 19-22 |
| Goliath | Carlos Prieto | Jean Charretteur | September 19-22 |
| Guangdong Textiles | Max Ling | Jean Daniel Gatignol | September 19-22 |
| Hauck | Jörg Feyler | Ingeborg Kuempers | September 19-22 |
| Kidztech Toys | Kenny Pui | Jean Daniel Gatignol | September 19-22 |
| Kitex | Sabu Jacob | Jean Daniel Gatignol | September 19-22 |
| Maxim Co Taiwan LTD | David Chai/ Jessica Wang | Jean Daniel Gatignol | September 19-22 |
| Ovation Toys | Kenneth Hong | Jean Daniel Gatignol | September 19-22 |
| Playmobil | Silke Heinrich | Michael Orttmann | September 19-22 |
| Playmobil | Bruno Bérard | Marie-Christine Mendes | September 19-22 |
| Playmobil | Juan Carlos Altares | Jean Charretteur | September 19-22 |
| Ravensburger | Susanne Knoche | Detlef Mutterer | September 19-22 |
| Ravensburger | Michel Schuller | Corinne Grenet | September 19-22 |
| Schleich | Dirk Engehausen | Michael Orttmann | September 19-22 |
| Simba | Jose Luis Villar | Jean Charretteur | September 19-22 |

| Simba Smoby Toys | Richard Belford | Steve Knights | September 19-22 |
|---|---|---|---|
| Simba-Dickie | Michael Sieber | Detlef Mutterer | September 19-22 |
| Simba-Dickie | Oliver Naumann | Elke Lauf | September 19-22 |
| GHCL LTD | Nancy Feldman | Shirley Ng | September 19-22 |
| Abbott Nutrition | TBD | Global Merchandising Team | September 19-22 |
| Accessory Innovations, LLC | TBD | Global Merchandising Team | September 19-22 |
| Aden & Anais, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Ad Sutton & Sons, Inc. | TBD | Global Merchandising Team | September 19-22 |
| American Greetings Corporation | TBD | Global Merchandising Team | September 19-22 |
| Anki, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Avent America, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Baby Jogger LLC | TBD | Global Merchandising Team | September 19-22 |
| Bestway Hong Kong International Limited | TBD | Global Merchandising Team | September 19-22 |
| Bright Kingdom Development Limited | TBD | Global Merchandising Team | September 19-22 |
| Dream On Me Industries | TBD | Global Merchandising Team | September 19-22 |
| Ergobaby, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Explore Scientific, LLC | TBD | Global Merchandising Team | September 19-22 |
| Farallon Brands | TBD | Global Merchandising Team | September 19-22 |
| Funrise, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Fusion MFG Group Limited | TBD | Global Merchandising Team | September 19-22 |
| Genexus, LLC | TBD | Global Merchandising Team | September 19-22 |
| GI-GO Toys Factory Limited | TBD | Global Merchandising Team | September 19-22 |
| Goldlok Toys Holdings (Guangdong) | TBD | Global Merchandising Team | September 19-22 |
| Hain Celestial Group | TBD | Global Merchandising | September 19-22 |

|  |  | Team |  |
|---|---|---|---|
| Halo Innovations, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Handi-Craft Company | TBD | Global Merchandising Team | September 19-22 |
| Heritage Baby Products | TBD | Global Merchandising Team | September 19-22 |
| Innovation First International, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Jada Toys, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Jay Franco & Sons | TBD | Global Merchandising Team | September 19-22 |
| Kidz Delight Limited | TBD | Global Merchandising Team | September 19-22 |
| Kolcraft Enterprises, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Kolcraft Enterprises, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Lambs & Ivy, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Learning Resources, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Longshore Limited | TBD | Global Merchandising Team | September 19-22 |
| Luv N Care, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Maya Group Corporation Limited | TBD | Global Merchandising Team | September 19-22 |
| Mead Johnson and Company | TBD | Global Merchandising Team | September 19-22 |
| MerchSource, LLC | TBD | Global Merchandising Team | September 19-22 |
| MJ Holding Company, LLC | TBD | Global Merchandising Team | September 19-22 |
| Multi-Link Apparel | TBD | Global Merchandising Team | September 19-22 |
| New Adventures, LLC | TBD | Global Merchandising Team | September 19-22 |
| NoJo, Inc. | TBD | Global Merchandising Team | September 19-22 |
| North States Industries, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Pearhead International | TBD | Global Merchandising Team | September 19-22 |

| Phoenix International Publications | TBD | Global Merchandising Team | September 19-22 |
|---|---|---|---|
| Playgo Toys Enterprises Limited | TBD | Global Merchandising Team | September 19-22 |
| Playhut, Inc. | TBD | Global Merchandising Team | September 19-22 |
| PlayMonster, LLC | TBD | Global Merchandising Team | September 19-22 |
| Playtex Products, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Readerlink Distribution Services | TBD | Global Merchandising Team | September 19-22 |
| Regent Oriental Industrial Limited | TBD | Global Merchandising Team | September 19-22 |
| Salland Industries Limited | TBD | Global Merchandising Team | September 19-22 |
| Scientific Toys Limited | TBD | Global Merchandising Team | September 19-22 |
| Solowave Design Corporation | TBD | Global Merchandising Team | September 19-22 |
| Solutions 2 GO, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Thorley Industries, LLC | TBD | Global Merchandising Team | September 19-22 |
| Toy Major Trading Company Limited | TBD | Global Merchandising Team | September 19-22 |
| Toy State International Limited | TBD | Global Merchandising Team | September 19-22 |
| Triboro Quilt Manufacturing Corporation | TBD | Global Merchandising Team | September 19-22 |
| Warner Home Video | TBD | Global Merchandising Team | September 19-22 |
| Wicked Cool Toys, Inc. | TBD | Global Merchandising Team | September 19-22 |
| Xiamen Well-east Import and Export Trade Company Limited | TBD | Global Merchandising Team | September 19-22 |

103.    On October 11, 2017, a meeting of the TRU board of directors was held with

Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman in

attendance.  Brandon and Short explained TRU's efforts to persuade Trade Vendors to agree to

ship goods on credit to TRU, and that those efforts were highly successful. Brandon and Short explained that TRU had set up a "Vendor War Room" "with the primary focus of getting vendors to start shipping again." Brandon and Short explained that they and other TRU employees had contacted Trade Vendors and told them that TRU was in a strong position because of its DIP financing. Short told the Board that TRU had convinced 48 of the top 50 vendors, and 168 of the top 200 vendors, to ship merchandise to TRU on credit. Brandon and Short explained that efforts were continuing to persuade the remaining vendors to ship merchandise to TRU on credit. Each of the Defendants knew that Brandon and Barry had directed, and would continue to direct, TRU employees to order merchandise from Trade Vendors on credit and to represent that TRU would have the ability to pay for the merchandise. Each of the directors attending this meeting ratified this course of conduct and no director objected to it.

104.    On October 22, 2017, Brandon participated in editing, and then approved and authorized, a press release that was issued on October 24, 2017, with the headline "Toys 'R' Us, Inc. Receives Final Court Approval for $3.1 Billion of New Financing and Completes Plan to be Customers' Go-To-Play Destination for Holiday and Beyond." The press release stated "Toys 'R' Us, Inc. ('the Company') today announced that the U.S. Bankruptcy Court for the Eastern District of Virginia entered a final order granting the company authority to access the full amount of its more than $3.0 billion in debtor-in-possession (DIP) financing." Brandon knew and intended that this announcement would be disseminated to and read by decision-makers at each of the Trade Vendors. Brandon knew and intended that Trade Vendors would rely upon the statement that TRU had obtained final approval of $3.1 billion of new financing. Brandon knew and intended that this representation would provide Trade Vendors assurance that if they shipped goods to TRU on credit, then TRU had the ability to pay for the goods.

## 2.   The representations to Trade Vendors were false.

105.   The representations described above concerning TRU's $3 billion in financing were false and misleading.  TRU did not have access to $3 billion in DIP financing that would unconditionally provide liquidity until TRU emerged from bankruptcy.  Instead, the DIP financing was subject to a budget milestone that could terminate the financing on January 31, 2018, unless holiday sales and profits exceeded reasonable expectations.

106.   Brandon and Short knew (or were willfully blind to the fact, or, alternatively, reasonably should have known) each of the following facts:

- On September 18-21, when Brandon, Short, and other TRU officers and employees were representing to Trade Vendors that TRU had secured $3.1 billion in DIP financing with no milestones, in fact TRU did not yet have any financing signed up. The process hinged on reaching agreement with a group of lenders known as the "B-4 lenders" on the terms for their $450 million loan.  That agreement was not reached until after noon on September 22, 2017.

- When terms were finally reached with the B-4 lenders, the lenders had insisted on a critical January 31, 2018, milestone, known as "covenant 6.16."

- The lenders required this milestone so that they could reevaluate and possibly terminate the financing if TRU's holiday results were not good.   As TRU's lawyers later describe covenant 6.16: "This budget covenant was required by the B4 lenders … The B4 lenders demanded this covenant to have visibility into holiday results."

- Covenant 6.16 required that "Not later than January 31, 2018" TRU must submit a revised go-forward budget based on "revised projections of receipts in light of

results since the Petition Date [of the TRU bankruptcy filing]" that still achieved the

monthly liquidity amounts set forth in the original DIP budget.

- If holiday sales resulted in operating cash flows less than set forth in the original

  DIP budget, then TRU could not satisfy the covenant 6.16 milestone, and the DIP

  financing could be terminated as of January 31, 2018, which would leave TRU with

  no ability to pay for goods received from Trade Vendors in the preceding 60 days.

107.    When Defendants represented, and caused to be represented, to Trade Vendors

that TRU had the ability to pay for goods bought on credit because TRU had obtained $3 billion

in DIP financing that would be available during TRU's restructuring process, they failed to

mention any of these facts that they knew (or should have known).

108.    By September 22, 2017, Defendants knew (or were willfully blind to the fact, or,

alternatively, should have known) that TRU could satisfy covenant 6.16 only with a great

holiday season.  Defendants also knew that if TRU experienced stiff competition from Amazon

and Walmart, coupled with reduced consumer confidence as a result of TRU entering

bankruptcy, it would be impossible for TRU to achieve great holiday results in 2017.  Moreover,

Defendants already knew that this was exactly the circumstance TRU would be facing.

109.    On June 20, 2017, Barry had made a presentation to the Board of Directors,

including to Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and

Goodman.  Barry stated that there were "rapid changes that have been taking place in the

industry due to … technology pricing solutions by both Amazon and Walmart."  Barry provided

the board specific "examples of the dynamic pricing that is taking place at both Amazon and

Walmart, reflecting the algorithms used by those companies."  Barry stated that "the resulting

effects are … lower traffic levels, sales and margins" at TRU.  Barry pointed out that Amazon

and Walmart also competed on "service, shipping and speed."  Barry pointed out that there has

been "growth in both Amazon and Walmart market share" and "Amazon has overtaken TRU as

the 3rd largest toy retailer."

110.    Defendants also knew (or were willfully blind to the fact, or, alternatively, should

have known) that TRU's filing for bankruptcy protection would further dissuade customers from

purchasing at TRU during the holiday season.  For example, Defendants knew that sales of gift

cards at TRU would likely be substantially lower, and redemptions of outstanding gift cards

would likely be substantially greater, because some customers would be reluctant to take the risk

that a gift card would be honored by a retailer in bankruptcy.  In fact, just five days after filing

bankruptcy, on September 24, 2017, Brandon reported to director Raether that the bankruptcy

had caused gift card redemptions to increase dramatically because "consumers are concerned we

are going to shut our doors soon and they will not be able to cash in their gift cards at a later

date."

### 3.    Defendants had special knowledge and expertise.

111.    Defendants possessed special knowledge and expertise concerning TRU's DIP

financing and TRU's ability to pay for goods ordered on credit, and that special knowledge and

expertise was not readily available to the Trade Vendors.

112.    Defendants had peculiar knowledge about the existence, significance, and effects

of covenant 6.16.  When the DIP financing was announced on September 19, 2017, drafts of the

various DIP financing agreements were filed with the Bankruptcy Court.  But covenant 6.16 was

omitted from the document filed with the Court.  Moreover, Defendants Brandon and Short had

special knowledge that while other case milestones had been eliminated from the DIP financing

agreements, the B-4 lenders had insisted that covenant 6.16 be inserted to serve the purpose of a case milestone.  Defendants Brandon and Short further knew that covenant 6.16 was specifically inserted to serve as a tripwire so that the financing could be reevaluated or even terminated if TRU's holiday results were not great.

113.    Defendants further had special knowledge concerning the state of TRU's actual and anticipated operating profits, as well as special knowledge and access to data to evaluate the impact of TRU's holiday results on the covenant, and to evaluate whether covenant 6.16 was innocuous or fatal.  Determining whether TRU could satisfy covenant 6.16 required knowledge of the then-current state of TRU's operating cash flows, as well as the then-projected operating cash flows for the rest of 2018.  Only Defendants had this information.  Each individual Trade Vendor knew only the volume of its sales with TRU.  Each Trade Vendor did not know TRU's profits margins on those sales, did not know TRU's sales and profit margins on the products of other vendors, did not know TRU's success or failure in cutting operating costs (including selling, general, and administrative expenses) as a result of the bankruptcy, and did not know TRU's projected revenues and costs based on recent results.  And the Defendants concealed this information from the Trade Vendors and other stake holders.

114.    Trade Vendors justifiably assumed that the Defendants possessed expertise and unique knowledge concerning TRU's DIP financing and TRU's ability to pay for goods ordered on credit.

### 4.    Defendants intended that Trade Vendors would rely on the representations.

115.    Each Defendant knew (or was willfully blind to the fact) that the Trade Vendors were relying on the representations that TRU had the ability to pay for goods ordered on credit

because it had a commitment for over $3 billion in DIP financing available during the

bankruptcy process, and each Defendant knew that the representations were made for the

purpose of having the Trade Vendors rely on those representations to induce the Trade Vendors

to ship goods on credit.  Each Defendant knew that the DIP financing would provide the Trade

Vendors assurance so that they would accept new purchase orders and ship goods to TRU on

credit.  For example, at the October 11, 2017, meeting of the Board of Directors, Defendants

Brandon and Short explained that TRU had been successful in persuading Trade Vendors to ship

goods on credit by emphasizing that TRU had DIP financing in place.


### 5.    The Trade Vendors justifiably relied.

116.    The Trade Vendors justifiably relied on Defendants' representations regarding the

stability of TRU's DIP financing beginning on September 18, 2017, and continued to justifiably

rely on those representations through March 15, 2018.

117.    The budget milestone, known as "covenant 6.16," was not adequately disclosed.

Defendants did not personally bring it to the attention (or instruct others to bring it to the

attention) of any of the Trade Vendors at any point from September 18, 2018, through March 15,

2018.  To the contrary, Defendants made, caused to be made, and ratified statements implying

that no such condition existed.  In addition, the Trade Vendors did not have access to the special

knowledge possessed by Defendants, as alleged more specifically above, and therefore each

Trade Vendor had no ability to assess whether covenant 6.16 was material to the DIP financing.

The facts were peculiarly within the Defendants' knowledge, not available to the Trade Vendors,

and could not have been discovered by the Trade Vendors through the exercise of ordinary

intelligence.  Trade Vendors could not have obtained the true facts about the state of TRU's DIP

financing by direct inquiry of TRU because TRU employees were instructed to not provide the true facts (specific examples are alleged below). When Trade Vendors did make direct inquiries to Toy "R" Us on the status of its DIP financing, they were not told the truth (specific examples are detailed below).

118.    In reliance on Defendants' representations and omissions, the Trade Vendors provided goods and services to TRU on credit from September 18, 2017, through March 15, 2018.

**D.    Defendants' misrepresentations: November 24, 2017 – February 15, 2018.**

    **1.    Defendants knew (or should have known) that the DIP financing would terminate but concealed that fact.**

119.    As alleged above, Defendants knew (or were willfully blind to the fact, or, alternatively, should have known) before September 2017 that online competition from Amazon and Walmart, combined with the reluctance of consumers to shop at a store that was in bankruptcy would almost certainly result in poor results during the 2017 holiday season. This was confirmed even as the first sales results started coming in for the 2017 holiday season, and even more so on Black Friday, November 24, 2017. By December 13, 2017, Defendants knew that they would not be able to satisfy the budget milestone because holiday sales were not great; in fact, they were terrible.

120.    On December 13, 2017, Brandon presented at a meeting of the Board of Directors that was attended by Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman. Brandon reported that "business results had not improved since the previous Board meeting, and that sales are down and the sales forecasts continue to be revised." Then "Brandon

informed the Board that Management recently told Lazard that the Company will likely end the

year with an EBITDA that would result in a default under its financing milestones."

121.    Defendants knew that Brandon, Short, Barry, and other TRU employees acting

under their direction, had represented to Trade Vendors that TRU had the ability to pay for goods

ordered on credit because TRU had obtained $3 billion in DIP financing that would carry it

through the end of 2018 and emergence from bankruptcy.  Defendants knew that those

representations continued to be made to Trade Vendors, both by personal communications and

communications on TRU's website.  But by no later than December 13, 2017, Defendants knew

that covenant 6.16 could not be satisfied, which meant that the DIP financing could terminate

and, therefore, TRU did not have a commitment for $3 billion in DIP financing that would carry

it through bankruptcy.

122.    As every day passed, the news only got worse.  On December 19, 2017, Brandon

reviewed TRU's holiday results to date and concluded they were a "disaster" and in "freefall."

<div style="border:1px solid black; padding:10px; text-align:center;">

**4<sup>th</sup>Q Notes....December 19, 2017**

**- Review 4<sup>th</sup>Q to-date SSS results – "Disaster" "Freefall"**

</div>

On December 23, 2017, Brandon emailed Barry, "Our sales are SO bad!!"  On December 24,

2017, Barry sent Brandon a report on Christmas Eve sales, which were 37 percent lower than the

previous year, commenting, "The number is horrendous."

123.    At a meeting of the Board of Directors on January 10, 2018, attended by Brandon,

Short, Levin, Macnow, Raether, Silverstein, and Goodman, Brandon had David Kurtz of Lazard

explain why TRU needed "covenant relief with regard to each of the Debtors' post-petition DIP

financing facilities."  But neither Brandon nor any other board member made a motion or

requested a resolution from the Board, or issued any instruction to TRU management, requiring

that TRU stop ordering goods on credit, place only cash on delivery orders, or tell Trade Vendors the true state of its DIP financing.

124.     Instead, at that same January 10, 2018, board meeting, Brandon told the other Board members about "the decision to not release holiday results."  Brandon told the other Board members that TRU would engage in a "communications strategy," i.e. would conceal and obfuscate the effect of the terrible holiday results on TRU and its financing.  Each of the Board members in attendance ratified that decision.

125.     On January 24, 2018, Brandon reported to the other directors on the Board the effect of "the Company's poor holiday performance metrics."  "Brandon advised the Board that the Company's 2017 EBITDA is currently projected to be under $300 million—significantly short of the Company's $640 million projection in the DIP budget."  Brandon explained that this shortfall would cause an "anticipated breach of financial covenants under the DIP Financing."  Brandon stated that "as a result of the Company's poor performance and based on current projections the Company will now require a $150-$200 million cash infusion from a third-party in order to fill a hole in the proposed budget and emerge as a reorganized operating business."

126.     Four days later, on January 28, 2018, Brandon reported to the Board of Directors that further analysis showed "the Company will require at least $200 million in order to emerge from the chapter 11 cases as a reorganized operating company, plus additional capital for planned capital expenditures."  As a result, Brandon reported to the board that TRU "will likely breach a DIP covenant."  Three days later, on January 31, 2018, Brandon and Short told the Board that TRU's budget projection showed that it was more than $500 million below the amount required to satisfy the budget milestone.  "Short explained that liquidity issues arose mainly because the Company's 2017 EBITDA of about $210 million was far lower than the

projected $640 million EBITDA." Brandon advised the board that "(i) the Company's poor performance continues, (ii) the forecasted cash liquidity position is dire, and (iii) the Company projects it will breach its postpetition financing covenants." At these board meetings, neither Brandon nor any other board member made a motion or requested a resolution from the Board, or issued any instruction to TRU management, requiring that TRU stop ordering goods on credit, place only cash on delivery orders, or disclose to Trade Vendors the true state of TRU's DIP financing.

127.    TRU notified the B-4 lenders that TRU had "determined that they will not be able to comply with the Revised Budget Covenant [i.e. covenant 6.16]." On January 31, 2018, the B-4 Lenders agreed to give TRU a waiver of the covenant default until March 3, 2018. Defendants knew that TRU had not complied with the milestone. Defendants also knew (or were willfully blind to the fact, or, alternatively, should have known) that TRU had no prospect of meeting it on March 3, 2018. TRU had attempted to prepare the go-forward budget required by the budget milestone, but TRU could not come close to the required liquidity levels. Defendant Short worked with his staff and financial advisors to adjust what they referred to as "liquidity levers." They penciled in every plausible cost cutting and spending reduction they could come up with. Even with all of these adjustments, TRU's projected cash available for January 2018 was $500 million short of the amount required by the budget milestone:

| Total Liquidity - Adjusted | $ | 603 |
|---|---|---|
| Total Liquidity DIP Budget 2017-09-18 | $ | 1,102 |
| Variance to Total Liquidity - Baseline | $ | (533) |
| Variance to Total Liquidity - Adjusted | $ | (500) |

128.    In January 2018, Barry knew that, due to the poor holiday season, TRU's projected EBITDA was significantly below what was projected for the DIP budget. He knew

that this liquidity hole was at least $150-$200 million, and that TRU would require a large cash infusion to fill that liquidity gap.

129.    And Short's go-forward projection was that this deficit would rise to almost $600 million by June of 2018.  TRU would therefore need an infusion of at least $500 million to fill that hole.  But Defendants knew that TRU had already pledged all of its remaining material assets in September 2017 when obtaining the original DIP financing.  The directors and officers of TRU had no plan to come up with $500 million in the next 31 days.  Accordingly, Defendants knew (or were willfully blind to the fact, or, alternatively, should have known) that when March 3, 2018, came around, TRU's financing would terminate, and TRU would have no ability to pay for goods ordered on credit in January and February 2018.

130.    Defendants had special knowledge as to whether TRU could comply with covenant 6.16, which required TRU to "in good faith" calculate a future budget based on "revised projections of receipts" that would achieve the liquidity required by the existing DIP budget.  Defendants had special knowledge concerning the state of TRU's actual and anticipated operating profits each day and week throughout the period from December 2017 through March 15, 2018.  This included special knowledge of TRU's sales, profit margins, SG&A expenses, and the effect of TRU's efforts to cut costs.  Defendants also had special knowledge of TRU's "revised projections of receipts" and of what budget "in good faith" could be proposed.  The Trade Vendors had none of this information and no reasonable method of obtaining it.  The facts were peculiarly within the Defendants' knowledge, not available to the Trade Vendors, and could not have been discovered by the Trade Vendors through the exercise of ordinary intelligence.  Trade Vendors could not have obtained the true facts about the state of TRU's DIP financing by direct inquiry of TRU because TRU employees were instructed to not provide the

true facts.  When Trade Vendors did make direct inquiries to Toy "R" Us on the status of its DIP financing, they were not told the truth (examples are detailed below).  Defendants Brandon and Short instructed TRU employees to keep secret, and not share, information about the impact of TRU's terrible Holiday Season and TRU's inability to comply with the milestones and financial covenants required by the DIP financing.

131.    Defendants also knew (or were willfully blind to the fact, or, alternatively, should have known) that while Defendants had represented, and caused to be represented, to each Trade Vendor that TRU had the ability to pay for goods ordered on credit because TRU had access to $3 billion in DIP financing, this representation was incomplete and thus false and misleading. Defendants knew that, for those statements to be complete and truthful, the Trade Vendors needed to be told that the DIP financing was conditioned on a highly material covenant, and that TRU had determined that TRU could not satisfy that covenant, which could cause the termination of the DIP financing and TRU would not have the ability to pay for goods ordered on credit.   Defendants also knew (or were willfully blind to the fact, or, alternatively, should have known) that the Trade Vendors were continuing to ship goods to TRU on credit and were acting on the basis of mistaken knowledge about the security of TRU's DIP financing.

132.    Defendants failed to disclose, or cause the disclosure of, these facts to the Trade Vendors.  Instead, Defendants took steps to actively conceal these facts from Trade Vendors, continued to make (and allow others to make) representations to Trade Vendors that it was business as usual at TRU, and continued to direct TRU employees to order merchandise from Trade Vendors representing that TRU would be able to pay for the merchandise in the future.

**2.    Continued orders on credit and representations that TRU would have the ability to pay.**

133.    Defendants knew that throughout December 2017 and continuing through March 15, 2018, TRU's merchandise and supply chain employees were continuing to place orders on credit with each of the Trade Vendors and were continuing to represent that TRU would have the ability to pay for the goods and services provided by the Trade Vendors.  Defendants Brandon and Barry specifically instructed and directed TRU employees to continue to place orders on credit, and to urge Trade Vendors to increase the quantity of goods stocked on TRU store shelves.  Each of these orders included the representation that TRU would have the ability to pay for the goods.

134.    At meetings of the Board of Directors on January 10, January 24, and January 31, 2018, the board members discussed that TRU was continuing business as usual, which meant continuing to place orders to Trade Vendors on credit.  None of the board members made a motion or requested a resolution from the Board, or issued any instruction to management, requiring that TRU stop ordering goods, place only cash on delivery orders for merchandise, or disclose to Trade Vendors the true state of TRU's DIP financing.

135.    The amount of goods ordered by TRU on credit from Trade Vendors that was delivered and not paid for during the period from December 2017 through March 14, 2018, exceeds $600 million.

**3.    Continued false and negligent representations and concealment.**

136.    Throughout this period from November 24, 2017, through February 15, 2018, Defendants Brandon, Short, and Barry actively participated in encouraging Trade Vendors to believe that it was business as usual, that TRU would be emerging from bankruptcy, and

encouraging the Trade Vendors to continue delivering merchandise to TRU on credit.  Below are some examples.

137.    On December 21, 2017, Brandon and Short participated in an earnings conference call.  Brandon and Short knew that key Trade Vendors would be listening on that conference call and that members of the press would also be listening and would report on the conference call, and Trade Vendors would read those press reports.  Brandon and Short knew that reporters from the following media outlets participated in the call: The Wall Street Journal, USA Today, Bloomberg, CBS News, CNN, PBS News, and others.  Brandon and Short intended that their statements on that call would be received by Trade Vendors and that the Trade Vendors would rely upon these statements.

138.    The following Trade Vendors participated in the call and heard the statements made by Brandon and Short:

- Accessory Innovations (Ralph Dweck)

- Arduino Supply Inc (Jack Joseph)

- Arm's Reach Concepts (Sharon Forshpan, Debra Ambrose)

- Artsana (Steve Burban)

- Baby Gamics (Nadia Estrada)

- Banzai (Hiro Nemoto)

- Claire's (Cara Kreke)

- Crown Crafts (Olivia Elliott, Nancy Freeman, Randall Chestnut)

- Delta Enterprise (Alan Jemal)

- Entertainment Retail (Melinda Wenderlein)

- Funko (Carrie Bratlie)

- GA Pacific (Edwin Thomas)

- I Play (Laura Fairley)

- Infantino (Hector Mamacho)

- Ingram Entertainment (Deddi Campbell)

- Itzy Ritzy (Kristi Arens, Kelly Douglas, Brian Douglas, Tony White)

- Nintendo (Vernon Masunaga, Brenda Morton-Hunt)

- Kidco (Kevin Roberts, Dan Keiser)

- Kidz2 (Luisa Cranford)

- Lambs And Ivy (Walter Adams)

- Larose Industries LLC (Randall Tarino)

- Lego (Amanda Maconde)

- Lillababy (Kyndra Gardener)

- M Design Village (Lavina Dsouza)

- Make It Real (Sara Gibber)

- Mattel (Cathy Mumm)

- Medela LLC (Latha Prakash, Kristin Davis, Dan Yrigoyen)

- Million Dollar Baby (Sara Worland, Teddy Fong, Tracy Fong, Diana Lee, David Luong)

- Newell (Eliar Hatching)

- Nintendo Of America (Brenda Morton-Hunt)

- Oriental Trading Co (Ron Turner)

- Pepsico (Amanda Patrick)

- Simplay 3 Companies (Tom Murdough)

- Summer Infant (Lisa Pierce)

- VTech (Peter Mussenden, Leanne Nesbitt, Laura Taltanitis)

- Warner Brothers (Stacey Hyman, Lester Robert, Mike Reid)

139.    On the December 21, 2017, conference call, Brandon stated that TRU had

"secured a $3.1 billion in DIP financing, which has allowed us to continue our operations."

Short stated, "In October, we received approval for the bankruptcy court authorizing $3.1 billion

of post-petition DIP financing," and "we obtained a very strong DIP financing package which

put us in a position to have strong liquidity through this process."

140.    Brandon and Short failed to mention the disastrous holiday results, and failed to

mention that, as a result, TRU could not satisfy the budget milestone, which meant that TRU

would not be able to access the $3.1 billion in DIP financing.  Brandon's only statement

regarding TRU's holiday results was that "our focus has been doing our very best to execute

during a critical time of the year."  Rather than mention the impending potential termination of

DIP financing, Brandon stated that TRU's focus in January will be on "a business emergence

plan," and "we have a very viable business, two very strong brands and we have a bright future

to look forward to."

141.    In addition, Short stated that TRU "ended the quarter [i.e. October 31, 2017] with

liquidity at Toys Inc. including Toys Canada of 1.3 billion.  This included cash and cash

equivalents of $461 million and availability of $837 million under committed lines of credit and

$100 million under the term DIP facility.  The total availability under the $1.8 billion DIP

facility was initially capped at 1.3 billion.  That cap has subsequently been released.  Excluding

the cap, the company would have had total liquidity of 1.5 billion as of the third quarter."

Because these liquidity amounts exceeded the requirements in the original DIP budget for

October 2017, these statements gave the false impression that TRU was on target to satisfy the

budget milestone.  Short failed to mention the effects of the disastrous holiday results, which

impaired TRU's liquidity.

142.    At the direction of David Brandon and Richard Barry, a team of TRU

representatives that included Barry traveled to Hong Kong in early January 2018 to meet with

Trade Vendors for the purpose of encouraging them to continue shipping goods to TRU on

credit.   Brandon and Barry directed the TRU team to provide the Trade Vendors with assurances

that TRU had secured $3.1 billion in DIP financing, had ample liquidity, and would be emerging

from bankruptcy, and that the Trade Vendors should therefore continue shipping goods to TRU

on credit.

143.    Complying with this directive, the TRU team provided these assurances to the

Trade Vendors in a series of meetings held in Hong Kong on January 9-11, 2018.  Barry

personally attended and delivered these assurances at each of the meetings.  The chart below

identifies the date of each meeting, the Trade Vendor representatives to whom the TRU team

delivered this message, and the TRU team members who attended the meeting.

| January 9, 2018 | | |
| --- | --- | --- |
| **Vendor** | **Vendor Representatives** | **TRU Representatives** |
| Moose | Paul Soloman, Co-CEO | Richard Barry |
| | Mark Sullivan, GM LA Office | Ron Baime |
| | Denis Normand, EVP Global Accounts & | Kevin Macnab |
| | Promotions | Melanie Teed-Murch |
| | Linda Breese, Director of Natl Accounts | Karen Taylor |
| | Brian Weiss, TRU Rep for Moose | Jo Hall |
| | Giles Musker, Director of Intl Accounts | Jean-Daniel Gatignol |
| | Kelly Tomaselli, Intl Account Manager | Pedro Cajarabille |
| | (Canada) | Raina Khumush |
| | Stefanie Moore, Intl Account Manager | |
| Mattel | Steve Totzke, EVP & Chief Commercial | Richard Barry |
| | Officer N.A. | Ron Baime |
| | Rizza Javellana, Director Sales | Kevin Macnab |
| | Mark McColgan, VP Sales | Melanie Teed-Murch |

| | Michael Hick, Sr Director Sales, Regional TRU EuRoMEA<br>Rizza Javellana, Director Sales | Karen Taylor<br>Jo Hall<br>Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |
|---|---|---|

| January 10, 2018 | | |
|---|---|---|
| **Vendor** | **Vendor Representatives** | **TRU Representatives** |
| Jakks | Stephen Berman, CEO<br>Jack McGrath, COO<br>Jon Trent, EVP Sales<br>Carmine Russo, Pres. Intl<br>Martin Stone, Sr. Sales Manager<br>Mark Greenstein, SVP Intl<br>Holly Gibb, VP Sales<br>Dan Cooney, SVP Sales | Richard Barry<br>Ron Baime<br>Kevin Macnab<br>Melanie Teed-Murch<br>Karen Taylor<br>Jo Hall<br>Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |
| Simba Dickie | Michael Siegber, CEO Simba Dickie Group<br>Uwe Weiler, COO Simba Dickie Group<br>Oliver Naumann, MD Dickie Toys | Richard Barry<br>Ron Baime<br>Kevin Macnab<br>Melanie Teed-Murch<br>Karen Taylor<br>Jo Hall<br>Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |
| Hasbro | Wiebe Tinga – Hasbro Global Chief Commercial Officer<br>Michael Hogg – President North America<br>Eric Nyman – GM US Sales and Marketing<br>Lisa Gilbert – US VP Sales | Richard Barry<br>Ron Baime<br>Kevin Macnab<br>Melanie Teed-Murch<br>Karen Taylor<br>Jo Hall<br>Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |
| Spinmaster | Anton Rabie, Chair and Co-Chief Executive Officer<br>Chris Beardall, EVP Global Sales<br>Nancy Zwiers, Chief Marketing Officer<br>Jeff Hurst, VP Sales<br>Andrew Lake, VP Sales, TRU<br>Ben Gadbois, Global President & COO<br>Hedley Barnes, GM Central Europe<br>Guillaume Mamez, GM France | Richard Barry<br>Ron Baime<br>Kevin Macnab<br>Melanie Teed-Murch<br>Karen Taylor<br>Jo Hall<br>Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |

| | Jacqui Webster, GM Australia / New Zealand<br>Derek Seidewant, VP Intl Sales / Marketing | |
|---|---|---|
| Thinkway Toys | Albert Chan, CEO<br>John Barton, EVP | Richard Barry<br>Ron Baime<br>Kevin Macnab<br>Melanie Teed-Murch<br>Karen Taylor<br>Jo Hall<br>Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |
| Funko | Andrew Perlmutter, President<br>Johanna Gepford, VP Global Sales<br>Jaime Beckley, VP N.A. Sales<br>Andy Oddie, Managing director Funko UK-TBD | Richard Barry<br>Ron Baime<br>Kevin Macnab<br>Melanie Teed-Murch<br>Karen Taylor<br>Jo Hall<br>Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |
| MGA | Isaac Larian, President/CEO<br>Andrew Laughton, Managing Director, UK<br>Mark Hardacker, SVP Intl Sales | Richard Barry<br>Ron Baime<br>Kevin Macnab<br>Melanie Teed-Murch<br>Karen Taylor<br>Jo Hall<br>Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |
| Alex Brands | Neil Friedman, CEO<br>Tony DeMichele, President<br>Chris Schaden, EVP Sales<br>Brian Savickis, VP Sales<br>Laurie Conway, VP Marketing<br>Keith Gammon, VP Sales Canada | Richard Barry<br>Ron Baime<br>Kevin Macnab<br>Melanie Teed-Murch<br>Karen Taylor<br>Jo Hall<br>Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |
| WowWee | Michael Yanofsky, VP Sales | Richard Barry<br>Ron Baime<br>Kevin Macnab<br>Melanie Teed-Murch<br>Karen Taylor<br>Jo Hall |

|  |  | Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |
|---|---|---|
| Basic Fun<br>(Bridge Direct) | Jay Foreman, CEO | Richard Barry |

| January 11, 2018 | | |
|---|---|---|
| **Vendor** | **Vendor Representatives** | **TRU Representatives** |
| Just Play | Donald Tsang<br>Drew Stevenson, VP Sales<br>Charlie Emby, Co-President | Richard Barry<br>Ron Baime<br>Kevin Macnab<br>Melanie Teed-Murch<br>Karen Taylor<br>Jo Hall<br>Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |
| Playmates | William Beebe, SVP Sales<br>Karl Aaronian, SVP Marketing and<br>Product Development<br>John Sinclair, EVP Intl<br>William Tran, VP Intl | Richard Barry<br>Ron Baime<br>Kevin Macnab<br>Melanie Teed-Murch<br>Karen Taylor<br>Jo Hall<br>Jean-Daniel Gatignol<br>Pedro Cajarabille<br>Raina Khumush |

144.    On January 29, 2018, Brandon exchanged emails with Diane Preston (a TRU executive reporting to Brandon with responsibilities for TRU's supply chain) and encouraged her to continue her work on getting Trade Vendors to fill store shelves with goods and improve TRU's "instock" percentages.

145.    On January 27, 2018, Barry wrote to Isaac Larian the top executive at Trade Vendor MGA Entertainment: "We look forward to the business with the line of credit from MGA of $25Mm.  We are going to have a big year together!!"

146.    On Saturday, February 3, 2018, Isaac Larian of Trade Vendor MGA Entertainment emailed Brandon inquiring about a rumor that TRU was "leaning towards a

liquidation." Brandon responded that same day, telling Larian that this information was "inaccurate," "[i]f there is something to tell you, you will be hearing it from us," and "[a]t this point we are working on the best plan for emergence," and are "very focused on creating a business plan that will give us an opportunity to emerge from this process as soon as possible."

147.    Brandon discussed this incident at a Board of Directors meeting the next day, February 4, 2018, that was attended by Brandon, Bekenstein, Levin, Macnow, Raether, Taylor, and Silverstein. Brandon explained that a leading Toy-industry blogger had posted "that one of the Company's equity owners told him that the Company is heading towards a liquidation," which caused "vendor inquiries." Brandon's description of the incident made clear that TRU had responded to the inquiries by denying that TRU was heading towards a liquidation. None of the board members challenged that course of action.

### E.    Defendants' misrepresentations:  February 16, 2018 - March 15, 2018.

148.    Defendants Brandon, Barry, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman knew (or were willfully blind to the fact, or alternatively, should have known),that TRU would soon have to announce that its DIP financing was being terminated, that it was going out of business, and that Trade Vendors would not be paid for outstanding invoices. Yet all Defendants knew that TRU's merchandising and supply chain employees continued to place orders for merchandise on credit, representing that TRU would have the ability to pay for the goods. Brandon, Short, and Barry continued to instruct TRU employees to aggressively press Trade Vendors to continue shipping on ordinary trade terms and to represent to the Trade Vendors that it was business as usual. The directors ratified this course of conduct.

### 1.    False representations at the New York Toy Fair, February 16 - 19.

149.    On February 12, 2018, at a meeting of the Board of Directors attended by

Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman,

Brandon discussed the upcoming New York Toy Fair, which would take place from February 17

to February 20, 2018, in New York City.  Brandon told the directors that he "intends to meet

with executives of many large vendors" and that Brandon expects each of these vendors to "push

him for comfort that the Company can pay for shipments."  Brandon told the Board that he and

others at TRU would "provide vendors additional comfort so they do not determine to stop

shipping."  None of the board members objected to this course of action and each of them

ratified it.

150.    A few days later, Defendant Barry approved a "NYTF Fact Sheet" that contained

messaging that TRU employees were directed to deliver to Trade Vendors during meetings at the

New York Toy Fair.  The key message was "we expect you to continue shipping."  Barry also

developed and approved a "NYTF Team Huddle" slide presentation to be presented by Brandon

and Barry to TRU employees who would be communicating with Trade Vendors at the New

York Toy Fair.  Barry explained that it was designed "to get the team in the right mindset."  On

February 14, 2018, Brandon approved the slide presentation, commenting "The deck looks

great!! I believe it contains the appropriate messages."  The key message that the TRU

employees were to convey to Trade Vendors was "to continue shipping" merchandise to TRU.

151.    On February 15, 2018, Brandon and Barry delivered the presentation at the NYTF

Team Huddle.  Rather than instructing the TRU team to inform Trade Vendors that TRU could

not satisfy the covenant required to access its DIP financing and was almost certain to be

liquidating, the TRU team was instructed to convey that "It's the Most Wonderful Time of the

Year."  The slide deck that Brandon and Barry delivered to the TRU New York Toy Fair team

included the following slides:







…we are on our toes, not on our heels



Be aggressive





152.    In addition to Brandon and Barry, the NYTF Team Huddle included TRU

employees Kevin Macnab, Ron Baime, Carla Hassan, Karen Taylor, Beth Duckstein, Raina

Khumush, Mary Cacciacarne, Rich Ryan, and David Ditota.  Brandon and Barry instructed and

directed these TRU employees that they should personally meet with Trade Vendors at the New

York Toy Fair and communicate that things were looking up for TRU, that TRU was working on

plans to emerge from bankruptcy, and that they should aggressively urge each Trade Vendor to

ship goods to TRU on credit.

153.    By February 16, 2018, Brandon and Short knew that the B-4 lenders had

concluded that they would benefit from an immediate liquidation of TRU to cut off "cash burn /

vendor payments" by TRU.  The B-4 lenders required TRU to put in place a liquidation plan.

154.    On February 16, 2018, the eve of New York Toy Fair, Brandon called a

leadership team meeting.  The meeting was attended telephonically by Barry and Short.  At the

February 16, 2018 meeting, Barry learned that TRU's lenders were exploring liquidating TRU,

and that one of the lenders thought that it would be "better to liquidate the company sooner

rather than later."  Barry knew by then that TRU had received a waiver of the DIP budget

covenant only until March 2018.

155.    In emails exchanged on the morning of February 17, 2018, with TRU's advisors,

Brandon and Short confirmed that the liquidation planning was under way with a target date of

"mid March."  Brandon and Barry failed to inform the TRU New York Toy Fair Team about the

impending liquidation of TRU, and failed to instruct TRU's merchandising team to be candid

and admit that TRU would not be paying for goods shipped to TRU on credit.  Brandon, Barry,

and Short knew that later that day and in the following days, they and other TRU officers would

be representing to key Trade Vendors that things were looking up for TRU, that TRU was

working on plans to emerge from bankruptcy, and that they would be aggressively urging Trade

Vendors to ship goods to TRU on credit.

156.    Complying with the instructions from Brandon and Barry, the TRU team

delivered this message in meetings with Trade Vendors on February 17-19, 2018, in New York

City.  Barry personally attended and delivered this message at most of the meetings.  Brandon

personally attended and delivered this message at the meetings on February 18 and 19, including

at a "CEO Meeting" with Hasbro executives Wiebe Tinga and Michael Hogg, and at a meeting

with Lego executives Skip Kodak and Ian Coghill.  The chart below identifies the Trade Vendor

representatives to whom the TRU team delivered this message at the New York Toy Fair, and

the date of the meeting:

| February 17, 2018 | |
| --- | --- |
| **Vendor** | **Vendor Representatives** |
| Radio Flyer, Inc. | Robert Pasin, CEO<br>Tom Schlegel - EVP of Design & Business Dev. |
| Goliath Games | Adi Golad - CEO<br>Jochanan Golad - COO<br>David Norman - GM USA |
| PlayMonster | Bob Wann - CEO<br>Scott Flynn - VP Sales and Marketing<br>Mary Pearson - Director of National Accounts<br>Russ Haglund - Sales Manager |
| Basic Fun, Bridge Diect, K'nex | Jay Foreman - CEO<br>David Gardiner - TRU Sales Rep<br>Rick Mershon - SVP Head of Sales<br>Josh Butt - TRU Sales Executive K'NEX |
| Playmobil | Kees Nederstigt - President, PMUSA<br>Marc Shinderman - VP Sales, Marketing PMUSA |
| Schleich | Dirk Engehausen – CEO<br>Michael Keaton – President<br>Jamal Jones – National Account Manager |
| Nowstalgic | Carl C. Zealer - President / CEO<br>Carl G. Zealer - Director of Operations |

| Melissa & Doug (lunch) | Doug Bernstein - CEO<br>Lee Tsukroff - CFO<br>Brian Bernstein - National Head of Sales<br>Andrea Kline - Sales Manager |
|---|---|
| Fashion Angels | Mark Miller - CEO<br>Melissa Fudala - SVP<br>Mark Rincon - VP Sales |
| Cra-Z-Art | Nellie Mahabir - CEO<br>Larry Rosen, Chairman<br>Luci Kuemmerle |
| Wicked Cool Toys | Michael Rinzler, Co-President, Founding Partner<br>Jeremy Padawer, Co-President & Partner<br>Herb Mitschele - Executive VP Global Sales & Operations<br>Bob Turner - VP Sales<br>Brian Weiss, Sales Rep |
| Ravensberger | Clemens Maier - CEO Ravensburger AG<br>Filip Franke - CEO Ravenburger NA<br>Thomas Kaeppeler - President Ravensburger NA<br>Joerg Starke - CFO Ravensburger NA |
| Innovation First International | Tony Norman - CEO (owner)<br>Dennis Feeney - SVP Sales NA<br>Paul Warner - VP Sales (TRU Account Manager)<br>Larry Harris - COO<br>Warren Weeks - CFO |
| Jakks | Stephen Berman - CEO<br>Jack McGrath - COO<br>Jon Trent - EVP Sales<br>Dan Cooney - SVP Sales<br>Holly Gibb - VP Sales<br>Carlton Griffin - Sr Director Sales |
| Alex Brands | Neil Freidman - CEO<br>Tony DeMichelle - President<br>Chris Schaden - EVP Sales<br>Keith Gammom - SVP Sales<br>Laurie Conway - VP Marketing<br>Louise Lafond - VP Design<br>Brian Savickie - Alex Brands Sales Rep |

| | |
|---|---|
| Jazwares | Jud Zebersky - CEO<br>Laura Zebersky - CCO<br>Guy Thomas - VP Sales<br>Danielle Jones - Sr. Director<br>Business Development<br>Rachel Bekerman - Account Manager<br>Craig Lesser - Sales Rep |
| TOMY | Greg Kilrea, Chief Operating Officer<br>Pete Henseler - President<br>Vinnie D'alleva - Chief Brand Officer<br>Ed Young - SVP Sales<br>Sara Rosenheck - Director of Sales |
| Playmates Toys | Jeff Haglund - VP Sales, TRU<br>Bill Beebe - SVP Sales<br>Karl Aaronian - SVP Marketing/Product Development<br>Michael Chan - VP Finance<br>Chris Kay - VP Operations<br>John Sinclair - EVP International |
| Simplay 3 | Tom Murdough - CEO & President<br>Brian McDonald - VP Sales<br>Scott Satell - Rep (BPI, Ltd.) |
| Yvolution | Padriag Bracken - VP Sales<br>Les Friedland - Sales Rep |
| Funko | Brian Marriotti - CEO<br>Jaime Beckley - Vice President Sales<br>Jeff Hutchinson - Director of Sales |
| New Adventures | Steve Arnold |
| University Games | Bob Moog |
| Easy Karaoke | Steve Hurst |
| Gym1 Indoor Playgrounds | TBD |

| February 18, 2018 | |
|---|---|
| **Vendor** | **Vendor Representatives** |
| Hasbro | Wiebe Tinga - Chief Commercial Officer<br>Michael Hogg - President NA<br>Eric Nyman - GM US<br>Jamie Guthrie - VP Sales<br>Lisa Gilbert - VP Sales<br>Eric Nyman - GM US<br>Kim Fitzgerald - Director of Customer Marketing |
| Lego | Skip Kodak - SVP U.S.<br>Anders Loewe Nielsen - Head of Finance U.S.<br>Ian Coghill, Key Accounts Sr. Dir. U.S. Sales, TRU |
| Wow Wee | Nick Nowbray - CEO<br>Lance James - VP Sales<br>Les Friedland - Sales Rep<br>Kevin Friedland - Sales Rep |
| Zuru | Michael Yanofsky - Owner<br>Richard Yanofsky - Owner<br>Les Friedland - Sales Rep<br>Kevin Friedland - Sales Rep |
| Vtech | William To - President<br>Sean Hynes - Sr VP Sales<br>Jen Eiselein - VP Marketing & Products Dev.<br>Jim Mackenzie - Director of Sales |
| Step 2 | Bill McCallum - SVP Sales<br>Mark Collier - VP Sales National Accounts |
| EPOCH-<br>Everlasting Play | Michael Varda - CEO North America<br>Michihiro Maeda - President<br>Mark Cohen - SVP Sales<br>Tom Albrecht - Strategic Account Manager |
| Crayola | Smith Holland - President and CEO<br>Mike Magee - SVP, Sales<br>Melanie Boulden - SVP, Global Marketing<br>Orville Trout - SVP, Human Resources<br>Paul Zadorsky - SVP, Crayola International<br>Eric Johnson - General Manager<br>Jennifer Gould-Simon - Team Leader<br>Brian Lichtenberger - JBP Planning Manager |

| Vivid | Tony Hicks - President<br>Jonathan Busher - VP Sales<br>Les Friedland - Sales Rep |
|---|---|
| Rooftop/Propel | Darren Matloff, CEO<br>Sunny Runil, COO<br>Jeremy Underwood SVP Sales<br>Anita York, Operations |
| KidKraft | Lawrence / Chris |
| Maxx Marketing | Les Friedland |

| February 19, 2018 | |
|---|---|
| **Vendor** | **Vendor Representatives** |
| Spin Master | Anton Rabie - Chair & Co-Chief Executive Officer<br>Ben Gadbois – Global President & COO<br>Chris Beardall - EVP Global Sales<br>Nancy Zwiers - Chief Marketing Officer<br>Andrew Lake - VP Sales, Toys "R" Us<br>Jeff Hurst - VP Sales, Canada |
| Fashion Angels | Mark Miller - CEO<br>Melissa Fudala - SVP<br>Mark Rincon - VP Sales |
| Mattel | Margo Georgiadis - CEO<br>Richard Dickson - EVP, Global CMO<br>Steve Totzke - EVP & Chief Commercial Officer<br>Lori Pantel - SVP Brand Activation-North America<br>Mark McColgan - VP Sales<br>Ryan Ciociola - Sr Director Customer Marketing<br>Riza Javellana - Director Sales Canada |
| Just Play | Charlie Emby - Co-Owner / Co-President<br>Geoffrey Greenberg - Co-Owner / Co-President<br>Drew Stevenson - VP Sales |
| MGA | Isaac Larian - CEO<br>Janine Brisbois - VP Sales Tru North America<br>Robin Marinelli - Sr National Account Manager<br>Corinne Mescher - VP Brand Marketing (Girls)<br>Simon Waldron - VP Brand Marketing (Boys)<br>Shannon Sackett - Director Brand Marketing (LT) |

| Moose | Manny Stull - Co-CEO<br>Paul Soloman - Co-CEO<br>Mark Sullivan - Director of Strategy<br>Denis Norman - VP Sales<br>Linda Breese - Director National Accounts<br>Brian Weiss - Rep (Impact Sales) |
|-------|------|
| Razor | Mark Bleiweis - EVP Sales<br>Carlton Calvin - President<br>David Kim - Director Sales Planning &<br>Far East Development<br>Erin Bitar - VP Marketing<br>Tony Rodriguez - National Sales Manager |
| Funko | Brian Marriotti - CEO<br>Jaime Beckley - Vice President Sales<br>Jeff Hutchinson - Director of Sales |

157.    In addition, on February 17, 2018, Brandon attended the "International Toy Industry CEO Roundtable" held in conjunction with the New York Toy Fair.  At this event, Brandon had individual conversations with the top executives from nine Trade Vendors in attendance, then gave remarks to the entire group and answered questions on TRU's reorganization.  Throughout, Brandon communicated that TRU would be emerging from bankruptcy, that things were looking up for TRU, and that it was important that Trade Vendors continue to ship merchandise and increase the merchandise stocks on TRU shelves.  At the CEO Roundtable, Brandon delivered this message to the following executives:  Ben J. Badbois (Spin Master), John Gessert (American Plastic Toys), George Irwin (Itoys USA), Michihiro Maeda (Epoch, International Playthings), Clemens Maier (Ravensburger), Robert Pasin (Radio Flyer), Neil Shinner (Worlds Apart), Michael Sieber (Simba-Dickie Group), and Kenneth Wong (Jenna Company).

### 2. Additional misrepresentations between February 16 and March 15.

158. On February 16, 2018, Gregg Stefanick of Mattel emailed Michael Short at TRU to say that Mattel's auditors wanted TRU to provide an updated cash flow forecast and a "Letter from TRU confirming they are in compliance with their covenants." Brandon and Short failed to direct that Stefanick of Mattel should be told the truth: that TRU was not in compliance with the January 31, 2018, budget milestone for the DIP Term Loan, that TRU had obtained a waiver that was due to expire in two weeks, and that TRU still could not meet the covenant. Instead, Brandon and Short conferred and agreed that "we are going to tell Gregg [Stefanick] that if we were in covenant default, we would have had to issue an 8K. Since we did not, he, his company, and their auditors ought to assume that we are not in breach."

159. On February 20, 2018, Brandon and Short met with top executives from Mattel, Margoe Georgiadia and Joe Euteneuer, at the Palace Hotel in New York City. During this meeting, Brandon and Short communicated that if there had been a covenant default, the company would have made a public filing. They assured Mattel that TRU had sufficient liquidity and would be able to pay the receivables balance when it came due. They assured Mattel that it could continue shipping goods on credit and encouraged them to increase the stocks of Mattel merchandise on shelves at TRU stores.

160. On February 21, 2018, Barry had a telephone call with an executive from Synchrony (the Toys "R" Us branded credit card provider) who was asking about a CNBC article and "looking for assurances regarding [TRU] breaking covenants." Barry "told them all covenants were in place and we are working hard on the plan." Brandon ratified this action and encouraged Barry to take a similar approach in response to additional requests from Trade Vendors that were expected to come in on February 22, 2018.

161.    On February 21, 2018, a CNBC reporter contacted Amy von Walter, the TRU

Executive Vice President for Communications, saying that CNBC was "working on a story

(likely to run later today) that we are at risk of breaching our DIP covenant."  Amy von Walter

responded by representing, on the record: "we have NOT breached any covenants," and if

anyone says otherwise that is "just speculation."  Von Walter then immediately reported this

interaction by emailing Brandon, Short, and Barry.  Brandon responded, "Thanks."  That same

day, Von Walter also responded to an inquiry by the Bergen Record stating that reports that TRU

could be at risk of liquidation were "full of speculation" and "We have not breached any

covenants."  Such statements were misleading and false, because TRU had not been able to

comply with covenant 6.16.  As set forth in the Waiver Agreement dated January 31, 2018, TRU

has "determined that they will not be able to comply with the Revised Budget Covenant."

162.    At the direction of Brandon, in February 2018, Von Walter prepared talking

points to use in responding to press inquiries in case the truth leaked out about TRU's financial

condition.  The talking points included the following:

- "Does the company have enough liquidity to meet its business obligations? We
  are continuing to meet our obligations as usual and are paying our vendors under
  agreed terms."

- "Will Toys 'R' Us remain in compliance with its covenants under its financing
  agreements?  Is it true it could default in the near future?  The Company is in
  compliance with its financing."

163.    Brandon knew and intended that these representations would be communicated to

Trade Vendors, and that the Trade Vendors would reply upon these representations to ship

merchandise to TRU on credit.  In response, TRU employees continued to communicate these

messages to Trade Vendors.  For example, on February 23, 2018, in response to an inquiry from

a Trade Vendor regarding the CNN story that TRU was in danger of liquidating, Albert Au

(TRU Senior Director) wrote "our headquarter[s] has responded and denied the report that it may

be forced to liquidate," and then linked to an online article.

164.    Throughout, Defendants knew that TRU's merchandising and supply chain

employees continued to place orders on credit to Trade Vendors, representing that TRU had the

ability to pay for merchandise shipped on credit.


**3.    Defendants' final wrongful acts.**

165.    On March 3, 2018, a Board of Directors meeting took place and was attended by

Defendants Brandon, Short, Bekenstein, Levin, Taylor, Silverstein, and Goodman.  For the first

time in any board meeting, Brandon said out loud what he, Short, and the other directors had

known for months.  Brandon pointed out that TRU was buying merchandise that it would not be

able to pay for.  Brandon stated "he believed the Company should notify vendors as soon as

possible of the [covenant default] so they could decide whether to keep shipping."  Brandon

suggested that perhaps TRU could "cancel orders" and "issue a press release describing the

circumstances."  But neither Brandon nor any other board member made a motion or requested a

resolution from the Board, or issued any instruction to TRU management, requiring that TRU

stop ordering goods on credit, place only cash on delivery orders, or issue a press release

disclosing the true state of TRU's ability to pay.

166.    On March 4, 2018, another TRU Board of Directors meeting occurred that was

attended by Defendants Brandon, Short, Bekenstein, Levin, Taylor, Macnow, and Silverstein.  At

the meeting, Brandon pointed out that "the company [TRU] is scheduled to receive

approximately $80 million of merchandise from vendors in the coming week" and that "he is

uncomfortable letting the Company accept product for which it may not be able to pay."

Brandon stated that because "liquidation is close to inevitable, the Company should shut down

the supply chain."  Neither Brandon nor any other board member made a motion or requested a

resolution from the Board, or issued any instruction to management, requiring that TRU stop

ordering goods, place only COD orders, or issue a press release disclosing the truth.  Instead, the

Defendants were satisfied that TRU would continue business as usual.

167.    It wasn't until March 14, 2018, that Brandon finally issued a directive that TRU

stop ordering merchandise on credit.  Defendants directed TRU's lawyers to make a public filing

the next day, March 15, 2018, announcing that TRU would be winding down.


### 4.    The Trade Vendors justifiably relied throughout.

168.    The Defendants knew that the Trade Vendors would rely on the foregoing

representations and knew that the representations were made for the purpose of having the Trade

Vendors rely on those representations to induce the Trade Vendors to ship goods on credit.  The

Trade Vendors justifiably relied on Defendants' representations regarding TRU's ability to pay

for goods ordered on credit and the availability of TRU's DIP financing commencing on

September 18, 2017, and continued to justifiably rely on those representations through March 15,

2018.  The location where acts of reliance by Trade Vendors occurred varied depending on

where each Trade Vendor was located.  For example, some Trade Vendors (such as Mattel) acted

in reliance in California; others (such as Skiphop, Inc. or Pearhead, Inc.) acted in reliance in New

York.  In addition, the Trade Vendors did not have access to the special knowledge and expertise

possessed by Defendants, as alleged more specifically above.  In reliance on Defendants'

representations and omissions, the Trade Vendors provided goods and services to TRU on credit

from September 18, 2017, through March 15, 2018, and suffered losses totaling more than $600

million.

### F.  Defendants' wrongful decision to take on DIP financing, breaching their fiduciary duties.

#### 1.  Defendants decide TRU's future.

169.    By August 2017, TRU was at a crossroads and the directors and officers of TRU

had to decide TRU's future.  TRU faced increasing competition from Walmart and Target who

offered toys at low prices to entice shoppers to their stores, particularly during the critical

holiday season.  And an ever-larger segment of sales was moving online, where Amazon and

Walmart had superior technology and could afford to sell toys on razor-thin margins.  TRU had

large, expensive stores on long-term leases, but each year TRU had fewer customers who bought

fewer toys.  And even when TRU did make sales, the sales were at lower profit margins.  Sales

and profit margins declined, and losses mounted.  By August 2017, Defendants knew that TRU

had run out of money and time.  To maximize the value of TRU's remaining assets, the logical

path forward was to stop the bleeding.

170.    Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, and

Silverstein failed, however, to fulfill their fiduciary duty to maximize the value of the enterprise

for TRU's creditors.  These Defendants each had personal interests that conflicted with this

fiduciary duty, and each acted to benefit their personal interests over the interests of TRU and its

creditors.

171.    Rather than informing themselves of all material information and carefully

considering alternatives such as selling all, or part, of TRU's business or a structured wind-

down, Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, and Silverstein entirely abdicated their duties.  They allowed the decision-making process to be controlled by Defendant Brandon, who had an irreconcilable conflict of interest—Brandon would receive more than $4 million dollars if TRU could continue business as usual and keep going for another six months.  Defendants failed even to consider the alternatives, including a structured wind-down or selling all, or part, of TRU's business.  Instead, Defendants took an irrational gamble that squandered TRU's remaining assets, caused more than $700 million in losses that would have been avoided by a structured wind-down, and resulted in the precipitous liquidation of TRU in March of 2018.

### 2. Defendants' duties of loyalty to TRU and its creditors.

172.    In choosing a course of action, it was improper for Defendants to select one that potentially benefited TRU's equity holders at the expense of creditors.  By the beginning of 2017, TRU was deeply insolvent.  Because TRU was insolvent, the officers and directors of TRU had fiduciary duties to protect value for the benefit of TRU's creditors, and not merely to focus on protecting equity holders.  As TRU's legal counsel, Kirkland & Ellis, explained to Defendants, "when the company is insolvent, the company's creditors become the primary beneficiaries of those duties."

173.    If the directors had complied with their fiduciary duties of loyalty and good faith, all of the following would have occurred:

- The process of determining TRU's future and whether it should sell all, or part, of its business or wind-down would have been conducted by directors who were disinterested and had no conflicts of interest or personal stake in the outcome.

- The directors, prior to making a decision on TRU's future, would have informed themselves of all material information reasonably available to them, including all reasonably available alternatives, such as a structured wind-down or sale.

- The directors would have asked independent expert consulting firms to evaluate all reasonable alternatives.

- The directors would have assessed the risks for each alternative, determined whether the risks were reasonable, and determined that the chosen course of action was reasonably achievable.

- After becoming well informed of the pros and cons of each reasonable alternative, the directors would have selected the appropriate course of action.

Defendants took none of these steps.


### 3. The process was controlled by interested directors.

174.     The process of determining TRU's future was not conducted by directors who were disinterested and had no personal financial benefit or stake in the outcome.

175.     The process of determining TRU's future was controlled by David Brandon, who had a direct personal interest in the outcome of that decision.  Brandon could continue receiving a $3,750,000 salary, paid biweekly, for as long as TRU continued in operation.  If TRU went out of business, Brandon's salary would disappear.  In addition, Brandon enjoyed perks from his position, including travel on a private jet for him and his guests, and a car and driver (for both business and personal use).  Moreover, if TRU continued in business and did not commence a structured wind-down or pursue a sale of the business, Brandon could be paid a "retention" bonus of $2,812,500.  If TRU was instead to commence a structured wind-down or sale, there

would be no potential for Brandon to pay himself that $2.8 million bonus.  As a result, Brandon had a direct financial interest in advocating for a strategy that kept TRU alive as long as possible. As he admitted in an email, his sole interest was in "doing everything within my power to keep this company alive."  In addition, as described above, Brandon was also beholden to Bain, KKR, and Vornado and had an interest in protecting their equity interests in TRU.

176.    Michael Short was also not a disinterested director.  Short could continue receiving a $800,000 salary, paid biweekly, so long as TRU continued operations, plus a $600,000 cash bonus paid immediately.  If TRU was to commence a structured wind-down or sale, Short would not receive the bonus and his salary would stop when TRU no longer needed his services.

177.    Defendants Bekenstein, Levin, Raether, Taylor, Macnow, and Silverstein (the "Sponsor directors") were not disinterested directors but, instead each represented the interests of their respective Sponsor, one of the three major equity holders in TRU.  Bekenstein and Levin were appointed by, and represented the interests of, Bain.  Raether and Taylor were appointed by, and represented the interests of, KKR.  Macnow and Silverstein were appointed by, and represented the interests of, Vornado.

178.    Bain, KKR, and Vornado each owned about 32.5 percent of TRU's equity. Because TRU was insolvent, if TRU commenced a structured wind-down, there would have been no assets left over after paying debts, and the Sponsors would have received nothing.  But if TRU could access DIP financing for 16 months, quickly reinvent itself and build a thriving ongoing business whose value exceeded its debts, and then emerge from bankruptcy, the equity could have value.  Achieving that would be a longshot.  The gamble was worthwhile for Bain, KKR, and Vornado, however, because they had nothing to lose.  Their equity in TRU would be

worthless if the directors of TRU instead voted to send TRU into a structured wind-down.

Moreover, by maintaining control of the Board and the company through the Chapter 11 process,

and using the Debtor's exclusive right to file a Chapter 11 Plan, these interested directors could

seek to obtain releases from liability for themselves and for Bain, KKR, and Vornado in any such

Chapter 11 Plan.  This would shield the private equity companies from potentially needing to

repay the hundreds of millions of dollars in sponsor fees and other payments they received while

they owned TRU, as well as other claims.

179.    The Defendants failed to delegate the decision on TRU's future to disinterested

directors.  Instead, the process was controlled and conducted by Brandon, with the assistance of

Short, and then ratified by Bekenstein, Levin, Raether, Taylor, Macnow, and Silverstein.  None

of them were disinterested in the outcome of the decision.

### 4.    Defendants allowed Brandon and Short to dominate TRU's professional advisors.

180.    The key firms advising TRU in August 2017 were Lazard Freres & Co. as

investment banker, Kirkland & Ellis as legal counsel, and Alvarez & Marsal as financial advisor.

Defendants did not retain independent advisors to evaluate alternatives for TRU's future for the

TRU board to consider.  Instead, they allowed Brandon and Short to be the principal contacts

with the advisors, to control the direction and scope of tasks assigned to the advisors, and to

control communications with the Board on the advice received from those firms.  These three

firms did not advise the Board of Directors independently from Brandon and Short.  Instead, all

three took their ultimate direction from Brandon.  Moreover, as described above, Alvarez &

Marsal was not independent from Brandon (but rather was uniquely beholden to Brandon).

181.    In addition, Kirkland & Ellis had advised the Board that the directors' fiduciary duties required them to obtain "professional" input on "the achievability of a potential course of action."  The Director Defendants did not follow that advice.  At no time did Brandon (or any of the other Director Defendants) instruct TRU's professional advisors to assess the probability that the DIP financing option would fail, to evaluate the risks and total costs of that option, or to evaluate the alternative of implementing a structured wind-down or sale rather than pursuing DIP financing.

182.    The Director Defendants did not in fact rely on the professional advisors (and any purported reliance was not in good faith) because each of them knew that Brandon was not disinterested and controlled the professional advisors; that the advisors provided no advice or analysis on a wind-down strategy or on any other alternative to large-scale DIP financing; that the advisors provided no assessment of the probability that the DIP financing strategy would fail and the estimated costs of such a failure; that the professional advisors provided no assessment of whether the proposed DIP financing was subject to any conditions, the probability that TRU would not meet the conditions, and to the likely consequences of an early termination of the DIP financing; and that the professional advisors provided no assessment of whether the budget required by the financing was reasonably attainable.  In addition, Defendant Short did not rely on the professional advisors, and any purported reliance was in bad faith, because he knew that the DIP budget could not plausibly be achieved.

183.    Alvarez & Marsal was not selected with reasonable care and the faulty selection was the fault of the Director Defendants, because they failed to select an advisor who was not beholden to Brandon and failed to assure that the advisor reached its conclusions without the influence and control of Brandon.

184.    Material facts were so obvious that the Director Defendants' failure to consider

and act on them was grossly negligent and in bad faith regardless of the advice or lack of advice

of professional advisors, including that the Board had not received any analysis of a wind-down

option or of any alternative to large-scale DIP financing; that the professional advisors provided

no assessment of the probability that the DIP financing strategy would fail or of the estimated

costs of such a failure; that the professional advisors provided no assessment of whether the

proposed DIP financing was subject to any conditions, the probability that TRU would not meet

the conditions, and to the likely consequences of an early termination of the DIP financing; that

the decision was being made by directors who were biased and not disinterested; and that

independent directors had not been given the time, resources, or authority to independently

consider and develop alternatives to DIP financing.

185.    In addition, material facts were so obvious that the failure of Brandon and Short

to consider and act on them was grossly negligent and in bad faith regardless of the advice or

lack of advice of professional advisors, including that Brandon and Short knew that the B-4 DIP

lenders had insisted that the financing would be conditioned on satisfying a budget covenant in

lieu of other case milestones, which would allow the lenders to terminate the financing early in

the process before TRU had completed a reorganization and emerged from bankruptcy; that

Brandon and Short had not received any analysis from professional advisors regarding the risk of

that milestone on the DIP financing; and that as of September 18, 2017, the budget covenant had

not yet been drafted, much less agreed on, and no one could possibly assess the risk posed by this

covenant, much less could they conclude that TRU had lined up over $3 billion in DIP financing

that was not subject to any material conditions for the next 16 months.

186.    In addition, Short knew the obvious material fact that the DIP financing required

meeting a budget that equated to a fiscal year 2017 EBITDA for TRU of $640 million, which

would be unattainable, and the failure of Short to consider and act on this fact was grossly

negligent and in bad faith regardless of the advice or lack of advice of professional advisors.


   **5.      Abdication of fiduciary duty by failing to consider reasonable alternatives.**

187.    In the summer of 2017, as Defendants Brandon, Short, Bekenstein, Levin,

Raether, Taylor, Macnow, and Silverstein considered the future of TRU, they knew that TRU

was losing money, and that the losses were increasing.  In a board meeting on June 20, 2017,

Defendant Short presented a financial update, explaining that sales and profit margins continued

to decline.  Short explained that while first quarter losses in 2016 had been $126 million, first

quarter 2017 was even worse, with a net loss of $164 million.

188.    Defendants also knew that the competitive landscape was quickly deteriorating

for TRU.  Walmart and Target had adopted a practice of offering toys at low prices to entice

shoppers to their stores, particularly during the critical holiday season.  In addition, every year,

more shoppers were moving online, where Amazon and Walmart had technology superior to

TRU.  At the June 20, 2017, board meeting, Barry explained how Amazon and Walmart used

real-time pricing algorithms to undercut TRU.  Barry explained to the other Defendants that this

new threat from Amazon and Walmart was already causing even lower store traffic, sales, and

margins at TRU.

189.    At the August 9, 2017, Board of Directors meeting, Brandon explained that,

unless TRU could quickly obtain access to $200 million in additional cash, TRU would have to

announce on September 13, 2017, that TRU may not have the ability to continue as a going

concern.  TRU had run out of money and time.  To maximize the value of TRU's remaining

assets, the logical path forward was to stop the bleeding.  TRU could use bankruptcy protection

to intelligently wind down TRU's U.S. business, perhaps selling off parts of the business if

buyers could be found.

190.    But that alternative was never considered, analyzed, or presented to the Board.

The sole alternative that Brandon and Short presented to the directors for consideration was

having TRU take on $3.1 billion in debtor-in-possession financing that would encumber TRU's

remaining assets.  Defendants Brandon and Short failed to ask TRU's advisors to evaluate or

consider a structured wind-down strategy or to investigate any alternative other than large-scale

DIP financing.  Defendants Brandon and Short failed to mention a wind-down option to the other

TRU directors.

191.    Furthermore, none of the TRU directors raised a wind-down as an alternative that

should be considered.  The issue of TRU's future was discussed at seven meetings of the Board

of Directors between June 20, 2017, and September 18, 2017.  Never once was there a single

word spoken about the option of a structured wind-down.  No director requested that Brandon,

Short, and the advisors analyze the wind-down option or any other alternative to large-scale DIP

financing.

192.    By failing to give any consideration to alternatives other than DIP financing,

Defendants failed to comply with their fiduciary duty to maximize the value of TRU's assets for

the benefit of its creditors.  This abdication of duty was particularly egregious because the DIP

financing path was not a plausible strategy and would almost certainly result in the liquidation of

TRU anyway, after destroying value and depriving unsecured creditors of access to hundreds of

millions of dollars of unencumbered assets to at least partially satisfy their claims.

6.      **Abdication of fiduciary duty by failing to evaluate the risks of the DIP
financing strategy and whether it had a reasonable chance of success.**

193.    Before selecting DIP financing as the option for TRU, the officers and directors of

TRU had a fiduciary duty to evaluate the risks of that option, and to evaluate whether that option

had a reasonable chance of success.  Defendants were required to assess the probability that a

reorganization strategy funded by DIP financing would fail, and to estimate the costs of such a

failure.  As Defendants' actions demonstrate, Defendants did not care what the risk or costs

were.  They took no action to investigate the risk or costs.

194.    Defendants thus abdicated their fiduciary duties.  Had Defendants considered the

issue, they would have quickly concluded that a reorganization premised on DIP financing was

not a plausible strategy, was almost certain to fail, and that it would result in losses of more than

$500 million for TRU.

195.    A key variable in determining whether the DIP financing strategy had a

reasonable chance of success was to assess whether the financing was subject to any milestone or

condition that was likely to terminate the financing early in the process, before TRU had

completed a reorganization and emerged from bankruptcy.  If the DIP financing were

conditioned on such a milestone, then TRU's access to the money would end if TRU could not

satisfy it.  Accordingly, the Director Defendants were required to assess whether the proposed

DIP financing was subject to any conditions, to assess the probability that TRU would not meet

the conditions, and to assess the likely consequences of an early termination of the DIP

financing.

196.    The Director Defendants failed to undertake any assessment of the covenants in

the proposed DIP financing, failed to assess the potential for a covenant breach, and failed to

assess or understand the consequences of such a breach.  Consistent with the Defendants' "we

don't care about the risks" attitude, the directors failed even to ask a single question on the subject.

197.    In addition, as of September 18, 2017, Defendants Brandon and Short knew that the B-4 DIP lenders had insisted that the financing would be conditioned on satisfying a "budget" covenant in lieu of other case milestones.  And Brandon and Short knew that, because the budget covenant had not yet been drafted, much less agreed on, as of September 18, 2017, Brandon and Short could not possibly assess the risk posed by this covenant, much less could they represent that TRU had lined up over $3 billion in DIP financing that was not subject to any material conditions for the next 16 months.  Brandon and Short failed to mention this covenant to the other directors.

198.    The drafting of the missing budget milestone was completed to the satisfaction of the B-4 DIP lenders on September 22, 2017, and inserted as section 6.16 in the financing agreement.  At that point, consistent with their "we don't care about the risks" attitude, neither Brandon nor Short conducted any analysis of covenant 6.16, much less did they assess the probability that it could be satisfied.  Neither Brandon nor Short requested any risk analysis from TRU's advisors, and neither one brought the covenant to the attention of the other directors on the TRU board.


**7.    Abdication of fiduciary duty by failing to evaluate budget projections.**

199.    Another key variable in determining whether the large-scale DIP financing strategy was a plausible strategy with a reasonable chance of success was to assess whether it was based on a reasonable going forward budget.  The DIP financing strategy could succeed only if TRU could emerge from bankruptcy as a successful ongoing business, which would require

that TRU would be projected to make profits, rather than losses.  In addition, Brandon, Short, and each of the Sponsor directors knew that the DIP financing would be conditioned on financial covenants triggered by some financial metric (such as TRU's cash flow, liquidity, or EBITDA). Although Brandon, Short, and the Sponsor directors made no effort to understand or assess the risk from these financial covenants, they knew that, whatever the covenants provided, to satisfy them would require that TRU achieve financial projections.

200.    Short had been directly involved with the budget projections that were used to obtain the DIP financing and knew that the budget projections on which the DIP financing hinged were not realistic.  The budget projection equated to a fiscal year 2017 EBITDA for TRU of $640 million.  But Short knew (or was willfully blind to the fact) that such results were unattainable.  Short knew (or was willfully blind to the fact) that even achieving EBITDA of $485 million would require TRU's same store sales and profit margins to be better than the current trend.  This would not be possible, particularly for a retailer entering bankruptcy shortly before the holiday season.  Short failed to bring this information to the attention of the other directors.

201.    None of the directors (other than Short) made any effort to obtain the reasonably available information on TRU's projected 2017 EBITDA with TRU in bankruptcy.  The Board was not presented with a projection of fiscal year 2017 EBITDA with TRU in bankruptcy.  None of the directors asked to see such a projection.  None of the directors (other than Short) made any effort to assess how realistic the budget projections were.  This was entirely consistent with their "we don't care about the risks" attitude.

**8.**     **Abdication of fiduciary duty by failing to reassess the course of action.**

202.     Having elected to take TRU down the path of DIP financing, the directors were

required to reassess this course of action as new facts developed.  Brandon, Short, and the

Sponsor directors failed to do so.

203.     A meeting of the Board of Directors took place on October 25, 2017, attended by

Brandon, Short, and the Sponsor directors.  The directors were told that TRU was projecting

sales and margins to be below what was projected in the DIP budget.  They were told that 2017

EBITDA of $484 MM would be difficult to achieve.  The news kept getting worse.  By

December 13, 2017, the directors learned that TRU's holiday results would be a disaster.

Brandon told the other directors that TRU could not meet the milestone required by covenant

6.16 and would default on various liquidity and cash flow covenants in the DIP financing.  In

January 2018, TRU prepared the go-forward budget required by the budget milestone.  But TRU

could not come close to the required liquidity levels.  Short worked with his staff and financial

advisors to adjust what they referred to as "liquidity levers."  They penciled in every plausible

cost cutting and spending reduction they could.  Even with all of these adjustments, TRU's

projected cash available for January 2018 was $500 million short of the amount required by the

budget milestone:

| Total Liquidity - Adjusted | $ | 603 |
|---|---|---|
| *Total Liquidity DIP Budget 2017-09-18* | *$* | *1,102* |
| *Variance to Total Liquidity - Baseline* | *$* | *(533)* |
| *Variance to Total Liquidity - Adjusted* | *$* | *(500)* |

TRU had no plausible strategy for erasing a half a billion-dollar deficit, particularly when the

news kept getting worse, not better.

204.    Throughout this collapse, Brandon, Short, and the Sponsor directors never once reconsidered their decision.  They did not order an immediate structured liquidation in October, or November, or December, or January.  They never once considered the option.  To perform an orderly wind-down that maximizes the value of assets requires time and planning.  A disinterested director, who was looking out for the value of the enterprise, at the very least would have insisted that TRU management develop a liquidation plan, as a plan B in case the DIP financing option failed.  None of the Defendants requested that such a plan be prepared.  They did not even request that the advisors investigate the option, just in case.  The directors engaged in deliberate indifference and inaction in the face of their duty to act.  TRU proceeded on, unnecessarily incurring additional losses, until TRU's lenders finally forced TRU to announce that it would wind-down and liquidate.

### 9.    Losses resulting from Defendants' breaches of fiduciary duty.

205.    Because the Defendants breached their duties by not considering or approving a structured wind-down, TRU and its creditors were damaged.  Had the Defendants not breached their duties, TRU would have avoided more than $700 million in losses and expenses, including the following:

- payment of DIP financing fees of more than $140 million;

- payment of professional fees to TRU's professionals, as well as the professionals of the lenders and creditors, of more than $124 million;

- payment of interest on the DIP loans of more than $132 million; and

- operational losses and payment of additional expenses and fees of over $300 million.

206.    Defendants' breaches of duty also caused TRU to encumber previously unencumbered assets.  To obtain the DIP financing, the Defendants granted liens on substantially all of TRU's unencumbered assets, including approximately $600 million in appraised value of real estate held by TRU and more than $300 million in appraised equity value of a Delaware subsidiary known as Toys "R" Us Property Company II, LLC.  Had TRU not encumbered its remaining assets by entering into the DIP financing and instead adopted a structured wind-down, the value of those unencumbered assets would have been available to the estate and its unsecured creditors, including the Trade Vendors.

## FIRST CAUSE OF ACTION

**Breach of fiduciary duties for authorizing advisory fees**
**(against Defendants Brandon, Beckenstein, Levin,**
**Raether, Taylor, Macnow, and Silverstein).**

207.    The allegations set forth in the foregoing paragraphs are incorporated here by reference.

208.    Defendants Brandon, Beckenstein, Levin, Raether, Taylor, Macnow, and Silverstein owed fiduciary duties of loyalty and good faith to TRU.  These duties required Defendants to use their positions of trust and confidence to further solely the interests of TRU and not to further their own private interests, to protect the interests of TRU, and to refrain from doing anything that would injure TRU or deprive it of profit or advantage.

209.    Defendants Brandon, Beckenstein, Levin, Raether, Taylor, Macnow, and Silverstein further had a duty of candor to conspicuously disclose and make known all material information relevant to corporate decisions from which they may derive personal benefit, or that may personally benefit someone to whom the director or officer is beholden.

210.    As set forth above, Defendants Brandon, Beckenstein, Levin, Raether, Taylor, Macnow, and Silverstein were not disinterested and each had a personal stake in deciding whether TRU should continue to pay the Sponsor advisory fees that conflicted with the interests of TRU and its creditors.

211.    Defendants Brandon, Beckenstein, Levin, Raether, Taylor, Macnow, and Silverstein engaged in the acts and omissions set forth above with reckless indifference to the outcome.  By the acts and omissions set forth above, each Sponsor Defendant and Brandon breached their duties of loyalty and good faith, including by furthering their own private interests by continuing to pay advisory fees to their own companies.

212.    The foregoing breaches of duty were the proximate cause, and a substantial factor, in causing TRU (and the creditors of TRU) to suffer losses of at least $17,863,110.

## SECOND CAUSE OF ACTION

**Breach of fiduciary duty of good faith for authorizing executive bonuses
(against Defendants Brandon, Short, Bekenstein, Levin,
Raether, Taylor, Macnow, Silverstein, and Goodman)**

213.    The allegations set forth in the foregoing paragraphs are incorporated here by reference.

214.    Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman each owed TRU a fiduciary duty of loyalty and good faith in deciding whether to authorize executive bonuses on the eve of filing a bankruptcy petition, who should receive a bonus, and the amount of the bonuses.

215.    Each of these Defendants engaged in the acts and omissions set forth above with deliberate or reckless indifference to the outcome, including by:

- failing to inform themselves of all material information reasonably available to them before approving the executive bonuses;

- failing to act in a deliberate and knowledgeable way in identifying and exploring alternative executive compensation plans;

- consciously and intentionally disregarding their responsibilities and adopting a "we don't care" attitude regarding executive bonuses;

- enacting an executive bonus plan that was outside the bounds of reason;

- acting in a manner that cannot be attributed to a rational business purpose;

- permitting the illicit manipulation of the board's deliberative processes by self-interested corporate fiduciaries; and

- providing a complete lack of oversight, which afforded the opportunity to indulge in the misconduct described above.

216.    As a consequence, Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman breached their fiduciary duties and acted in bad faith by consciously disregarding and abdicating their duties to TRU, and by intentionally failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties.

217.    Defendants' breach of fiduciary duty was the proximate cause, and a substantial factor, in causing TRU (and the creditors of TRU) to suffer losses of more than $16 million.

## <u>THIRD CAUSE OF ACTION</u>

**Breach of the fiduciary duty of loyalty for authorizing executive bonuses
(against Defendants Brandon, Short, Bekenstein, Levin,
Raether, Taylor, Macnow, and Silverstein)**

218.    The allegations set forth in the foregoing paragraphs are incorporated here by

reference.

219.    Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, and

Silverstein each owed a fiduciary duty of loyalty to TRU.  This duty required Defendants to use

their positions of trust and confidence to further solely the interests of the shareholders and

creditors of TRU and not to further their own private interests, to protect the interests of the

corporation, and to refrain from doing anything that would injure the corporation or deprive it of

profit or advantage.  The Defendants further had a duty of candor to conspicuously disclose and

make known all material information relevant to corporate decisions from which they may derive

personal benefit, or that may personally benefit someone to whom the director or officer is

beholden.

220.    As set forth above, each of Defendants Brandon and Short had a personal stake in

the executive bonus plan and Brandon and Short each personally profited from that plan.

221.    As set forth above, each of Defendants Bekenstein, Levin, Raether, Taylor,

Macnow, and Silverstein was not disinterested and had a personal stake in rewarding Defendant

Brandon to serve their interests that conflicted with the interests of TRU creditors.

222.    Each of Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor,

Macnow, and Silverstein engaged in the acts and omissions set forth above with deliberate or

reckless indifference to the outcome.  By the acts and omissions set forth above, each of

Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, and Silverstein breached their duty of loyalty, including by:

- furthering their own private interests by authorizing an executive bonus plan to award a $2,812,500 bonus to David Brandon and a $600,000 bonus to Michael Short days before filing a chapter 11 bankruptcy; and

- depriving TRU of more than $16 million.

223.    In addition, Defendants Brandon, Taylor, and Levin breached the duty of loyalty and candor by failing to disclose to the other directors the following material facts:

- Brandon had participated in designing the bonus program;

- before Alvarez & Marsal prepared its analysis, David Brandon had already determined that the result should be that he and the other top executives should each receive a bonus equal to 75 percent of base salary;

- the comparability analysis performed by Alvarez and Marsal did not support giving Brandon a bonus equal to 75 percent of his base salary, and the data showed that Brandon's cash compensation was already excessive; and

- Brandon modified the plan to the detriment of TRU by having all bonuses paid immediately prior to filing for bankruptcy.

224.    In addition, Defendant Brandon breached his duty of loyalty and candor by failing to disclose to the other directors the following material facts:

- Alvarez & Marsal was beholden to Brandon;

- Brandon and Grace had developed the plan and then provided the plan to Alvarez & Marsal;

- Alvarez & Marsal took direction and control from Brandon when preparing its analyses of executive bonuses; and

- Alvarez & Marsal was not acting as an independent consultant when preparing its analyses of executive bonuses.

225.    Defendants' breach of fiduciary duty was the proximate cause, and a substantial factor, in causing TRU (and the creditors of TRU) to suffers losses of more than $16 million.

## FOURTH CAUSE OF ACTION

### Breach of fiduciary duty for authorizing the DIP Financing
### (against Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, and Silverstein)

226.    The allegations set forth in the foregoing paragraphs are incorporated here by reference.

227.    Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, and Silverstein each owed TRU a fiduciary duty of loyalty, a duty of candor, and a duty of good faith in deciding whether to authorize TRU to encumber its remaining assets with more than $3.0 billion in DIP financing or to consider other alternatives, including a structured wind-down or exploring a possible sale of the business.

228.    Each of these Defendants breached these duties by engaging in the acts and omissions set forth above with deliberate or reckless indifference to the outcome, including by:

- failing to inform themselves of all material information reasonably available to them before authorizing DIP financing;

- failing to consider all reasonable alternatives, including the alternative of a structured wind-down;

- consciously and intentionally disregarding their responsibilities and adopting a "we don't care about the risks" attitude regarding DIP financing;

- consciously abdicating their duties to reasonably assess the risks and consequences of DIP financing, including the presence of conditions or covenants in the proposed financing;

- authorizing a DIP financing option that was outside the bounds of reason;

- acting in a manner that cannot be attributed to a rational business purpose;

- permitting the illicit manipulation of the board's deliberative processes by self-interested corporate fiduciaries;

- providing a complete lack of oversight, which afforded the opportunity to indulge in the misconduct described above; and

- engaging in the other acts and omissions alleged above.

229.    As set forth above, each of Defendants Bekenstein, Levin, Raether, Taylor, Macnow, and Silverstein were not disinterested and had a personal stake in selecting an alternative that had the potential to benefit the equity Sponsors that employed them, and benefit them personally, rather than an alternative that best served the interests of TRU and its creditors.

230.    As set forth above, each of Defendants Brandon and Short were not disinterested and had a personal stake in selecting an alternative that would benefit them personally, rather than an alternative that best served the interests of TRU and its creditors.

231.    Each of Defendants Brandon, Short, Beckenstein, Levin, Raether, Taylor, Macnow, and Silverstein engaged in the acts and omissions set forth above with reckless indifference to the outcome.  By the acts and omissions set forth above, each of Defendants

Brandon, Short, Beckenstein, Levin, Raether, Taylor, Macnow, and Silverstein breached their duty of loyalty and candor.

232.     Defendants' breaches of duty were the proximate cause, and a substantial factor, in causing TRU (and the creditors of TRU) to suffer losses in excess of $700 million.

## FIFTH CAUSE OF ACTION

**Fraudulent concealment**
**(against Defendants Brandon, Barry, Short, Bekenstein, Levin,**
**Raether, Taylor, Macnow, Silverstein, and Goodman)**

233.     The allegations set forth in the foregoing paragraphs are incorporated here by reference.

234.     As more specifically alleged above, Defendants Brandon, Barry, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman had a duty to disclose material facts to the Trade Vendors because Defendants had superior knowledge about material facts, the facts were peculiarly within the Defendants' knowledge, not available to the Trade Vendors, and could not have been discovered by the Trade Vendors through the exercise of ordinary intelligence, and Defendants knew that the Trade Vendors would be acting on the basis of mistaken knowledge about the facts.

235.     As more specifically alleged above, Defendants Brandon, Barry, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman had a duty to disclose material information to the Trade Vendors because Defendants made, caused to be made, or ratified statements that were incomplete, only partially true, and misleading unless clarified and corrected.

236.   As more specifically alleged above, Defendants Brandon, Barry, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman omitted and failed to disclose to the Trade Vendors material facts including:

- by mid-December 2017, these Defendants knew that TRU's holiday results were an utter disaster;

- no later than the end of December 2017, these Defendants knew (or were willfully blind to the fact) that TRU's DIP financing was conditioned on a budget milestone and other covenants that TRU had no plausible way of satisfying, which meant TRU's DIP financing would terminate soon after January 31, 2018;

- because of the impending termination of TRU's DIP financing, TRU would have no ability to pay for merchandise that was ordered from Trade Vendors on credit in January and February 2018; and

- by mid-February 2018, TRU was working on plans to liquidate and would soon be liquidating.

237.   The Trade Vendors did not know the foregoing concealed facts, and Defendants Brandon, Barry, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman intended to deceive the Trade Vendors by concealing these facts.  As more specifically alleged above, Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman omitted and failed to disclose these facts to mislead the Trade Vendors and to induce them to deliver merchandise to TRU on credit.

238.   As more specifically alleged above, the Trade Vendors reasonably relied on Defendants to disclose the material facts.  Had the omitted information been disclosed, the Trade

Vendors would have discontinued shipping merchandise to TRU on credit and avoided substantial losses.

239.    As more specifically alleged above, Defendants' concealment caused, and was a substantial factor in causing, the Trade Vendors harm, including suffering losses of more than $600 million.

## SIXTH CAUSE OF ACTION

### Negligent concealment and negligent omission
### (against all Defendants)

240.    The allegations set forth in the foregoing paragraphs are incorporated here by reference.

241.    As more specifically alleged above, Defendants had a duty to impart correct information to the Trade Vendors because Defendants had superior knowledge about material facts, the facts were peculiarly within the Defendants' knowledge, not available to the Trade Vendors, and could not have been discovered by the Trade Vendors through the exercise of ordinary intelligence, and Defendants knew that the Trade Vendors would be acting on the basis of mistaken knowledge about the facts.

242.    As more specifically alleged above, Defendants possessed unique knowledge and expertise concerning TRU's DIP financing and TRU's ability to pay for goods ordered on credit, and that special knowledge and expertise was not readily available to the Trade Vendors.  The Trade Vendors justifiably assumed that the Defendants possessed expertise and unique knowledge concerning TRU's DIP financing and TRU's ability to pay for goods ordered on credit.

243.    As more specifically alleged above, Defendants had a duty to disclose material information to the Trade Vendors because Defendants made, caused to be made, or ratified statements that were incomplete, only partially true, and misleading unless clarified and corrected.

244.    As more specifically alleged above, Defendants Brandon and Barry had a previous and continuing relationship with Trade Vendors.

245.    As more specifically alleged above, Defendants omitted and failed to disclose to the Trade Vendors material facts including:

- by mid-December 2017, Defendants knew that TRU's holiday results were an utter disaster;

- no later than the end of December 2017, these Defendants knew (or were willfully blind to the fact or, alternatively, should have known) that TRU's DIP financing was conditioned on a budget milestone and other covenants that TRU had no plausible way of satisfying, which meant TRU's DIP financing would terminate soon after January 31, 2018;

- because of the impending termination of TRU's DIP financing, TRU would have no ability to pay for merchandise that was ordered from Trade Vendors on credit in January and February 2018; and

- by mid-February 2018, TRU was working on plans to liquidate and would soon be liquidating.

246.    The Trade Vendors did not know the foregoing omitted facts.  As more specifically alleged above, by omitting and failing to disclose these facts, Defendants misled the Trade Vendors and induced them to deliver merchandise to TRU on credit.

247.    As more specifically alleged above, the Trade Vendors reasonably relied on Defendants to disclose the material facts.  Had the omitted information been disclosed, the Trade Vendors would have discontinued shipping merchandise to TRU on credit and avoided substantial losses.

248.    As more specifically alleged above, Defendants' concealment caused, and was a substantial factor in causing, the Trade Vendors harm, including suffering losses of more than $600 million.

## SEVENTH CAUSE OF ACTION

**Fraud, misrepresentation, and deceit**
**(against Defendants Brandon, Barry, Short, Bekenstein, Levin,**
**Raether, Taylor, Macnow, Silverstein, and Goodman)**

249.    The allegations set forth in the foregoing paragraphs are incorporated here by reference.

250.    As more specifically alleged above, Defendants Brandon, Barry, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman made, caused to be made, and ratified material misrepresentations of fact, including:

- TRU has the ability to pay for goods ordered on credit during the bankruptcy proceeding, because TRU has more than $3 billion in DIP financing;

- TRU's DIP financing has no material milestones;

- TRU will have the DIP financing throughout the restructuring process;

- TRU had the ability to pay and would pay for the goods it ordered on credit during the period from December 2017 through March 15, 2018;

- TRU would have the ability to pay for goods shipped on credit when the invoice came due;

- TRU was not heading towards a liquidation;

- TRU has a positive outlook and is preparing to emerge from bankruptcy;

- TRU is in compliance with financing covenants in the DIP financing.

251.    As more specifically alleged above, Defendants Brandon, Barry, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman knew (or were willfully blind to the fact) that these misrepresentations were false and misleading.

252.    As more specifically alleged above, Defendants Brandon, Barry, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman knew (or were willfully blind to the fact) that each Trade Vendor would rely upon these misrepresentations and intended the Trade Vendors to rely upon these misrepresentations.

253.    As more specifically alleged above, the Trade Vendors reasonably and justifiably relied on the misrepresentations and did not have reasonable means of knowing the truth.

254.    As more specifically alleged above, the Trade Vendors suffered losses as a result of their reliance on Defendants' misrepresentation in an amount in excess of $600 million.

## EIGHTH CAUSE OF ACTION

### Negligent misrepresentation (against all Defendants)

255.    The allegations set forth in the foregoing paragraphs are incorporated here by reference.

256.    As more specifically alleged above, Defendants possessed unique knowledge and expertise concerning TRU's DIP financing and TRU's ability to pay for goods ordered on credit,

and that special knowledge and expertise was not readily available to the Trade Vendors.  The

Trade Vendors justifiably assumed that the Defendants possessed expertise and unique

knowledge concerning TRU's DIP financing and TRU's ability to pay for goods ordered on

credit.  As more specifically alleged above, Defendants Barry and Brandon had a previous and

continuing relationship with Trade Vendors.

257.    As more specifically alleged above, Defendants made, and caused to be made,

and ratified material misrepresentations of fact.

258.    As more specifically alleged above, Defendants reasonably should have known

that these misrepresentations were false and misleading and Defendants failed to exercise

reasonable care to ascertain the truth of the statements.

259.    As more specifically alleged above, Defendants knew (or were willfully blind to

the fact) that each Trade Vendor would rely upon these misrepresentations and intended the

Trade Vendors to rely upon these misrepresentations.

260.    As more specifically alleged above, the Trade Vendors reasonably relied on the

misrepresentations and did not have reasonable means of knowing the truth.

261.    As more specifically alleged above, the Trade Vendors suffered losses as a result

of their reliance on Defendants' misrepresentations in an amount in excess of $600 million.


**<u>NINTH CAUSE OF ACTION</u>**

**Negligence**
**(against Defendants Brandon, Short, Bekenstein, Levin,**
**Raether, Taylor, Macnow, Silverstein, and Goodman)**

262.    The allegations set forth in the foregoing paragraphs are incorporated here by

reference.

263.    As more specifically alleged above, Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein, and Goodman each owed a duty of reasonable care to the creditors of TRU, including to each of the Trade Vendors.

264.    As more specifically alleged above, the acts and omissions of each of these Defendants breached their duty of care, including by:

- failing to inform themselves of all material information reasonably available to them before approving the executive bonuses;

- failing to act in a deliberate and knowledgeable way in identifying and exploring alternative executive compensation plans;

- disregarding their responsibilities and adopting a "we don't care" attitude regarding executive bonuses;

- enacting an executive bonus plan that was outside the bounds of reason;

- permitting the illicit manipulation of the board's deliberative processes by self-interested corporate fiduciaries; and

- providing a complete lack of oversight, which afforded the opportunity to indulge in the misconduct described above.

- failing to inform themselves of all material information reasonably available to them before authorizing DIP financing;

- failing to consider all reasonable alternatives, including the alternative of a structured wind-down;

- disregarding their responsibilities and adopting a "we don't care about the risks" attitude regarding DIP financing;

- abdicating their duties to reasonably assess the risks and consequences of DIP financing, including the presence of conditions or covenants in the proposed financing;

- authorizing a DIP financing option that was outside the bounds of reason;

- acting in a manner that cannot be attributed to a rational business purpose;

- permitting the illicit manipulation of the board's deliberative processes by self-interested corporate fiduciaries;

- providing a complete lack of oversight, which afforded the opportunity to indulge in the misconduct described above; and

- engaging in the other acts and omissions alleged above.

265.    The breaches of the duty of care by each of these Defendants were the proximate cause, and a substantial factor, in causing, losses to the creditors of TRU, including the Trade Vendors, in excess of $700 million.


**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff demands relief as follows against Defendants:

(a) An award of money damages in an amount sufficient to compensate for the losses resulting from Defendants' wrongful conduct;

(b) An award of punitive damages;

(c) An award of pre-judgment interest;

(d) An award of TRU Trust's costs;

(e) Granting a jury trial on all matters subject to jury trial; and

(f) Such other and further relief as the Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Dated: April 30, 2020

                              Respectfully submitted,

                              By: */s/ Michael Wilson*
                                      Counsel

                                    Greg Dovel (admitted *pro hac vice*)
                                    **DOVEL & LUNER, LLP**
                                    201 Santa Monica Blvd., Suite 600
                                    Santa Monica, California 90401
                                    Tel:  310-656-7066
                                    greg@dovel.com

                            - and -

                                    Michael Wilson (VSB No. 48927)
                                    **MICHAEL WILSON PLC**
                                    12733 Storrow Rd.
                                    Henrico, Virginia 23233
                                    Tel:    804-614-8301
                                    Email:  mike@mgwilsonlaw.com

                                  *Counsel for Plaintiff*
                                  *TRU Creditor Litigation Trust*