Robert I. Bodian (admitted *pro hac vice*)
Scott A. Rader (admitted *pro hac vice*)
John P. Sefick (admitted *pro hac vice*)
Kaitlin R. Walsh (admitted *pro hac vice*)
Amanda B. Asaro (admitted *pro hac vice*)
Kerime S. Akoglu (admitted *pro hac vice*)
**MINTZ LEVIN COHN FERRIS GLOVSKY
and POPEO, P.C.**
666 Third Avenue, 25th Floor
New York, New York 10017
(212) 935-3000
*Counsel for Defendants*

James C. Cosby, Esq. (VSB No. 25992)
J. Brandon Sieg, Esq. (VSB No. 84446)
**O'HAGAN MEYER, PLLC**
411 E. Franklin Street, Suite 500
Richmond, Virginia 23219
(804) 403:7100
*Counsel for Defendants*

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| TRU CREDITOR LITIGATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proceeding No. 20-03038-K |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID A. BRANDON, *et al* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION AND
## MEMORANDUM OF LAW FOR SUMMARY JUDGMENT[2]

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*.  (ECF No. 78.)  The location of Debtors' service address is One Geoffrey Way, Wayne, NJ 07470.

[2]    Pursuant to the Court's Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief, Case 17-34665-KLP (Bankr. E.D. Va. Sept. 21, 2017), ECF No. 129, Defendants have filed their motion and memorandum together.

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ...................................................................................1

STANDARD OF REVIEW .......................................................................................4

UNDISPUTED MATERIAL FACTS ........................................................................5

ARGUMENT ..............................................................................................................5

I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE
TRUST'S FIDUCIARY DUTY CLAIM RELATING TO THE DIP FINANCING .........5

    A.    This Court's Ruling in the Final DIP Order That the DIP Financing Was
an Exercise of Debtors' "Prudent Business Judgment Consistent with
[Their] Fiduciary Duties" Is Binding Law of the Case ...........................5

    B.    The Final DIP Order Is Binding on the Trust by Its Own Terms ...........7

    C.    The Trust is Estopped from Alleging That the DIP Financing Was a
Breach of Defendants' Fiduciary Duty .................................................7

    D.    The Exculpatory Provision in TRU's Certificate of Incorporation Bars the
Trust's Duty of Care Claim Relating to the DIP Financing....................9

    E.    The Business Judgment Rule Prevents the Trust from Challenging with the
Benefit of Hindsight the Board's Decision to Obtain DIP Financing .................11

        1.    The Trust Cannot Demonstrate a Breach of the Duty of Loyalty
Because There Is No Evidence of Self-Interest or Self-Dealing ..............11

        2.    The Trust Cannot Demonstrate Bad Faith or Failure to Exercise
Due Care .......................................................................................14

II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE
TRUST'S FIDUCIARY DUTY CLAIM RELATING TO THE PRE-PETITION
RETENTION PAYMENTS..........................................................................18

    A.    The Trust is Estopped From Asserting Breach of Fiduciary Duty Claims
Relating to the Pre-Petition Retention Payments...................................18

    B.    The Board's Decision to Approve Pre-Petition Retention Payments Is
Protected by the Business Judgment Rule .............................................19

        1.    The Business Judgment Rule Applies with Particular Force to
Matters of Executive Compensation .........................................19

        2.    The Undisputed Factual Record Does Not Support a Finding of the
Board's Bad Faith or a Breach of the Duty of Care................................20

        3.    The Undisputed Factual Record Does Not Support a Finding That
the Board Engaged in Self-Dealing .........................................23

        4.    The Board's Decision to Pay the Pre-Petition Retention Payments
Indisputably Had a Rational Business Purpose .........................26

C.      TRU's Board Is Immunized from a Claim That the Pre-Petition Retention
        Bonuses Constituted a Breach of the Duty of Care by the Exculpatory
        Provision in TRU's Certificate of Incorporation ..................................................27

III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE
        TRUST'S CLAIMS REGARDING THE PAYMENT OF ADVISORY FEES ..............27

A.      The Payment of Advisory Fees Was Not a Breach of Fiduciary Duty
        Because TRU Was Solvent When the Bonuses Were Paid ..................................27

B.      Even if TRU Were Insolvent, Defendants Did Not Breach Their Duty to
        TRU By Authorizing the Payment of Advisory Fees ...........................................29

C.      The Advisory Fees Were Disclosed Contemporaneously in TRU's SEC
        Filings and Cannot Now Be Challenged..............................................................29

IV.     THE TRUST'S TORT CLAIMS MUST BE DISMISSED BECAUSE THE
        TRUST LACKS STANDING TO PURSUE THE CLAIMS OF INDIVIDUAL
        CREDITORS ...............................................................................................................30

V.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE
        TRUST'S TORT CLAIMS BECAUSE THE UNDISPUTED EVIDENCE
        SHOWS THAT THE TRUST CANNOT SATISFY ITS BURDEN OF PROOF
        FOR ANY INDIVIDUAL TRADE VENDOR .............................................................32

A.      The Trust's Tort Claims Must Be Dismissed for All Trade Vendors Who
        Signed Critical Vendor Agreements ....................................................................34

B.      The Alleged Misrepresentation Claim Must Be Dismissed Because the
        Trust Cannot Identify Actionable Misstatements ...................................................38

        1.      The Trust Cannot Pursue Fraudulent Misrepresentation Claims
                Based on Statements Made to Vendors in September and October
                2017...........................................................................................................38

        2.      The Trust Cannot Pursue Fraud Claims on Behalf of Vendors Who
                Could Not Identify the Words Spoken or Dates of Any
                Misstatements They Allegedly Relied Upon .............................................42

C.      The Trust's Fraud-Based Claims Must Be Dismissed Because the
        Undisputed Factual Evidence Does Not Support a Finding of Scienter................44

D.      The Trust's Tort Claims Must Be Dismissed for Every Vendor Whose
        30(b)(6) Testimony Precludes the Trust from Establishing Reliance....................47

E.      The Trust's Tort Claims Must Be Dismissed Because the Trust Cannot
        Prove Reasonable Reliance....................................................................................48

F.      The Trust Cannot Cite Evidence to Prove Causation for Most Trade
        Vendors ..................................................................................................................49

G.      The Trust Cannot Prove a Fraudulent Omission Claim Because No Duty
        to Disclose Existed.................................................................................................50

        1.      The Trust Cannot Establish a Claim for Fraudulent Concealment ...........50

2.  The Trust Cannot Establish a Claim for Negligent
    Misrepresentation ...................................................................55

H.  The Trust Cannot Prove Reasonable Reliance on the Allegedly Omitted
    Information .............................................................................57

I.  The Trade Vendor's Own 30(b)(6) Testimony Demonstrates That the
    Trust Cannot Prove Every Element of Any Trade Vendor's Claims...................58

    1.   The Trust's Claims on Behalf of Lego Must Be Dismissed ......................58

    2.   The Trust's Claims on Behalf of Hasbro Must Be Dismissed.................60

    3.   The Trust's Claims on Behalf of Funrise Must Be Dismissed .................62

    4.   The Trust's Claims on Behalf of Huffy Must Be Dismissed....................63

    5.   The Trust's Claims on Behalf of Jakks Must Be Dismissed ....................64

    6.   The Trust's Claims on Behalf of Graco Must Be Dismissed....................65

    7.   The Trust's Claims on Behalf of Mattel Must Be Dismissed..................66

    8.   The Trust's Claims on Behalf of Best Chairs Must Be Dismissed............67

    9.   The Trust's Claims on Behalf of Dorel Must Be Dismissed ....................68

    10.  The Trust's Claims on Behalf of Jazwares Must Be Dismissed...............69

    11.  The Trust's Claims on Behalf of Just Play Must Be Dismissed .............70

    12.  The Trust's Claims on Behalf of Kent International Must Be
         Dismissed .........................................................................71

    13.  The Trust's Claims on Behalf of Kids2 Must Be Dismissed....................73

    14.  The Trust's Claims on Behalf of MGA Must Be Dismissed ....................74

    15.  The Trust's Claims on Behalf of Skyrocket Must Be Dismissed .............75

    16.  The Trust's Claims on Behalf of RR Donnelley Must Be
         Dismissed .........................................................................76

    17.  The Trust's Claims on Behalf of LSC Communications Must Be
         Dismissed .........................................................................77

    18.  The Trust's Claims on Behalf of Crayola Must Be Dismissed.................78

    19.  The Trust's Claims on Behalf of Evenflo Must Be Dismissed.................80

    20.  The Trust's Claims on Behalf of Bandai Must Be Dismissed ..................81

    21.  The Trust's Claim on Behalf of Spin Master Must Be Dismissed ...........82

    22.  The Trust's Claims on Behalf of American Plastic Toys Must Be
         Dismissed .........................................................................83

    23.  The Trust's Claims on Behalf of Munchkin Must Be Dismissed.............84

    24.  The Trust's Claims on Behalf of Bestway Must Be Dismissed.................85

    25.  The Trust's Claims on Behalf of Yvolve Must Be Dismissed.................86

26. The Trust's Claims on Behalf of Jada Toys Must Be Dismissed ..............88

27. The Trust's Claims on Behalf of North States Must Be Dismissed ..........89

28. The Trust's Claims on Behalf of eKids Must Be Dismissed ....................89

29. The Trust's Claims on Behalf of Handi-Craft Must Be Dismissed ...........90

30. The Trust's Claims on Behalf of Learning Resources Must Be Dismissed .................................................................................................91

31. The Trust's Claims on Behalf of MerchSource Must Be Dismissed ........92

32. The Trust's Claims on Behalf of Warner Brothers Must Be Dismissed .................................................................................................92

33. The Trust's claims on Behalf of Artsana Must Be Dismissed ..................94

34. The Trust's Claims on Behalf of Delta Enterprise Must Be Dismissed .................................................................................................95

35. The Trust's Claims on Behalf of Kitex Must Be Dismissed ....................96

36. The Trust's Claims on Behalf of Step2 and Adventure Playsets Must Be Dismissed ..................................................................................96

37. The Trust's Claims on Behalf of Bridge Direct Must Be Dismissed ........98

J. The Trust's Stand-Alone Negligence Claim Cannot Survive Summary Judgment ....................................................................................................99

K. The Trust Cannot Prosecute the Claims of Trade Vendors That Received More Than They Lost During the Period of the Alleged Fraudulent Omissions ..................................................................................................100

CONCLUSION ....................................................................................................102

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n,*
  731 F.2d 112 (2d Cir. 1984).................................................................32

*In re AgFeed USA, LLC,*
  558 B.R. 116 (Bankr. D. Del. 2016) ...................................................19

*Alley Sports Bar, LLC v. SimplexGrinnell, LP,*
  58 F. Supp. 3d 280 (W.D.N.Y. 2014) .................................................56

*Am. Bottling Co. v. Repole,*
  2020 Del. Super. LEXIS 3049 (Del. Super. Ct. Dec. 30, 2020) ............16

*In re Am. Int'l Grp., Inc. Derivative Litig.,*
  700 F. Supp. 2d 419 (S.D.N.Y. 2010).............................................. 51-52

*In re Answers Corp. S'holders Litig.,*
  2014 Del. Ch. LEXIS 17 (Del. Ch. Feb. 3, 2014)....................................17

*In re ATP Oil & Gas Corp.,*
  711 F. App'x 216 (5th Cir. 2017) ........................................................26

*Bioenergy Life Sci., Inc. v. Ribocor, Inc.,*
  2015 N.Y. Misc. LEXIS 289 (N.Y. Sup. Ct. Feb. 3, 2015)....................49

*Bolling v. Va. Dep't of Health,*
  2013 U.S. Dist. LEXIS 187486 (E.D. Va. Sept. 3, 2013)........................ 42, 46-47

*Bomardier Capital, Inc. v. Naske Air GMBH,*
  2003 U.S. Dist. LEXIS 16173 (S.D.N.Y. Sept. 17, 2003).............. 43-44

*In re Books-A-Million, Inc. Stockholders Litig.,*
  2016 Del. Ch. LEXIS 154 (Del. Ch. Oct. 10, 2016)........................... 22

*Brehm v. Eisner,*
  746 A.2d 244 (Del. 2000) ..............................................................14, 19

*Brown v. Wolf Grp. Integrated Commc'ns, Ltd.,*
  23 A.D. 3d 239 (N.Y. App. Div. 2005) ...............................................43

*Campers' World Int'l, Inc. v. Perry Ellis Int'l, Inc.,*
  2002 U.S. Dist. LEXIS 14909 (S.D.N.Y. Aug. 13, 2002).....................43

*Caplin v.Marine Midland Grace Tr. Co.*,
    406 U.S. 416 (1972)...............................................................................................31

*Caviness v. DeRand Res. Corp.*,
    983 F.2d 1295 (4th Cir. 1993) ..................................................................... 49-50

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................................................................4

*Century Pac., Inc. v. Hilton Hotels Corp.*,
    528 F. Supp. 2d 206 (S.D.N.Y. 2017).................................................................44

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. Martin*,
    219 Cal. App. 4th 924 (Cal. Ct. App. 2013) ...................................................... 24

*In re Chase*,
    372 B.R. 133 (Bankr. S.D.N.Y. 2007) ...............................................................40

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
    2021 U.S. Dist. LEXIS 189502 (S.D.N.Y. Sept. 30, 2021)................................46

*City of Millville v. Rock*,
    683 F. Supp. 2d 319 (D.N.J. 2010) ....................................................................54

*Cole v. Daoud*,
    2016 U.S. Dist. LEXIS 39749 (E.D. Va. Feb. 17, 2016).......................................49

*Connaughton v. Chipotle Mexican Grill, Inc.*,
    29 N.Y.3d 137 (2017) .......................................................................................101

*Continuing Creditors' Comm. Of Star Telecomms. Inc. v. Edgecomb*,
    385 F. Supp. 2d 449 (D. Del. 2004)...................................................................99

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ..............................................................................55

*Corona Heights Real Estate, LLC v. LaSalle Tech., Inc.*,
    2011 U.S. Dist. LEXIS 173449 (E.D.N.Y. Feb. 11, 2011)...................................38

*Coughlan v. Jachney*,
    473 F. Supp. 3d 166 (E.D.N.Y. 2020) ...............................................................35

*Coyne v. Gen. Elec. Co.*,
    2010 U.S. Dist. LEXIS 70879 (D. Conn. July 15, 2010)....................................55

*Crescent/Mach I Partners, L.P. v. Turner*,
    846 A.2d 963 (Del. Ch. 2000).......................................................................... 13-14

*In re Cyan, Inc. Stockholders Litig.*,
2017 Del. Ch. LEXIS 79 (Del. Ch. May 11, 2017) ...............................................11

*Devansky v. Dryvit Sys., Inc.*,
52 Va. Cir. 359 (Va. Cir. Ct. 2000)........................................................................43

*Dopp v. Teachers Ins. & Annuity Ass'n of Am.*,
1993 U.S. Dist. LEXIS 13980 (S.D.N.Y. Sept. 27, 1993)....................................51

*Douglas v. Dry Clean Concepts, Inc.*,
2021 U.S. Dist. LEXIS 205104 (D. Md. Oct. 25, 2021)........................................41

*In re Duane Reade Inc. Sec. Litig.*,
2003 U.S. Dist. LEXIS 21319 (S.D.N.Y. Nov. 24, 2003) .....................................55

*In re DuFrayne*,
194 B.R. 354 (Bankr. E.D. Pa. 1996) .....................................................................6

*In re Earned Capital Corp.*,
331 B.R. 208 (Bankr. W.D. Pa. 2005) ................................................................ 7-8

*Emmett v. Johnson*,
532 F.3d 291 (4th Cir. 2008) ............................................................................. 4-5

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)..............................................................................................44

*Esposus Creek Value LP v. Hauf*,
913 A.2d 593 (Del. Ch. 2006)..............................................................................28

*In re Express Scripts Holdings Co. Sec. Litig.*,
773 F. App'x 9 (2nd Cir. 2019) ............................................................................54

*Favour Mind Ltd. v. Pac. Shores, Inc.*,
2004 U.S. Dist. LEXIS 637 (S.D.N.Y. Jan. 16, 2004)..........................................58

*Ferens v. John Deere Co.*,
494 U.S. 516 (1990)..........................................................................................30, 32

*Ferry v. Black Diamond Video, Inc.*,
2016 U.S. Dist. LEXIS 76893 (D.N.J. June 13, 2016) ....................................51, 52

*FMC Corp. v. Fleet Bank*,
226 A.D.2d 225 (N.Y. App. Div. 1996) ................................................................41

*Frederick Hsu Living Tr. v. ODN Holding Corp.*,
2017 Del. Ch. LEXIS 67 (Del. Ch. Apr. 14, 2017) .............................................29

*Friedman v. Dolan*,
  2015 Del. Ch. LEXIS 178 (Del. Ch. June 30, 2015) ..............................................25

*Garbutt v. S. Clays, Inc.*,
  894 F. Supp. 456 (M.D. Ga. 1995) ......................................................................50

*Gennari v. Weichert Co. Realtors*,
  148 N.J. 582 (1997) ............................................................................................32

*Geyer v. Ingersoll Publ'ns Co.*,
  621 A.2d 784 (Del. Ch. 1992)..............................................................................28

*Goodwin v. Live Entm't, Inc.*,
  1999 Del. Ch. LEXIS 5 (Del. Ch. Jan. 22, 1999) ................................................14

*Grobow v. Perot*,
  539 A.2d 180 (Del. 1988) ....................................................................................14

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
  748 F.2d 729 (2d Cir. 1984)...........................................................................49, 52

*Guinness PLC v. Ward*,
  955 F.2d 875 (4th Cir. 1992) ................................................................................8

*Hau Yin To v. HSBC Holdings, PLC*,
  700 F. App'x 66 (2d Cir. 2017) ...........................................................................30

*In re HH Liquidation, LLC*,
  590 B.R. 211 (Bankr. D. Del. 2018) ....................................................................16

*Holbrook v. Trivago N.V.*,
  2021 U.S. Dist. LEXIS 189502 (S.D.N.Y. Feb. 26, 2019)...................................46

*Horton v. Greenwich Hosp.*,
  2014 U.S. Dist. LEXIS 33161 (S.D.N.Y. Mar. 10, 2014) ...................................32

*HSH Nordbank AG v. RBS Holdings USA Inc.*,
  2015 U.S. Dist. LEXIS 36087 (S.D.N.Y. Mar. 20, 2015) ...................................51

*IBM Credit Fin. Corp. v. Mazda Motor Mfg. Corp.*,
  152 A.D.2d 451 (N.Y. App. Div. 1989) ..............................................................35

*ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*,
  2015 U.S. Dist. LEXIS 131211 (S.D.N.Y. Sept. 29, 2015)..................................35

*Icebox-Scoops, Inc. v. Finanz St. Honore, B.V.*,
  676 F. Supp. 2d 100 (E.D.N.Y. 2009) .................................................................55

*ISM Connect Inv. Grp. LLC v. ISM Connect, LLC*,
 2018 U.S. Dist. LEXIS 152120 (D.N.J. Sept. 5, 2018) ................................................... 51-52

*Johnson v. Washington*,
 559 F.3d 238 (4th Cir. 2009) ........................................................................................39, 57

*JP Morgan Chase Bank v. Winnick*,
 350 F. Supp. 2d 393 (S.D.N.Y. 2004)....................................................................................56

*Kalnit v. Eichler*,
 264 F.3d 131 (2d Cir. 2001)...................................................................................................45

*Kattawar v. Logistics & Distribution Servs., Inc.*,
 111 F. Supp. 3d 838 (W.D. Tenn. 2015)................................................................................50

*Krim v. Pronet, Inc.*,
 744 A.2d 523 (Del. Ch. 1999)................................................................................................14

*In re La Paloma Generating Co.*,
 2020 Bankr. LEXIS 67 (Bankr. D. Del. Jan. 13, 2020) ......................................................1, 6

*LaSalle Nat'l Bank v. Perelman*,
 82 F. Supp. 2d 279 (D. Del. 2000).........................................................................................49

*Lissmann v. Hartford Fire Ins. Co.*,
 848 F.2d 50 (4th Cir. 1988) ...................................................................................................41

*Lucas v. Icahn*,
 616 F. App'x 448 (2d Cir. 2015) ...........................................................................................46

*Magee-Boyle v. Reliastar Life Ins. Co. of N.Y.*,
 2016 N.Y. Misc. LEXIS 17542 (N.Y. Sup. Ct. Apr. 4, 2016)...............................................39

*Maier-Schule GMC, Inc. v. Gen. Motors Corp.*,
 1993 U.S. Dist. LEXIS 21728 (W.D.N.Y. May 3, 1993) .......................................................43

*Medtronic Sofamor Danek, Inc. v. Michelson*,
 2004 U.S. Dist. LEXIS 26385 (W.D. Tenn. May 20, 2004)...................................................54

*Megaris Furs, Inc. v. Gimbel Bros., Inc.*,
 172 A.D.2d 209 (N.Y. App. Div. 1991) ............................................................................3, 35

*In re Midway Games Inc.*,
 428 B.R. 303 (Bankr. D. Del. 2010) ......................................................................................99

*Mills Acquisition Co. v. Macmillan, Inc.*,
 559 A.2d 1261 (Del. 1989) ....................................................................................................22

*Mizrahi v. Adler*,
    2014 N.Y. Misc. LEXIS 2934 (N.Y. Sup. Ct. June 30, 2014).................................49

*In re Munford, Inc.*,
    98 F.3d 604 (11th Cir. 1996) ...................................................................................22

*Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*,
    2019 U.S. Dist. LEXIS 66581 (S.D.N.Y. Apr. 17, 2019)......................................41

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
    930 A.2d 92 (Del. 2007) ...................................................................................27-28

*Nat'l Org. for Marriage, Inc. v. United States*,
    24 F. Supp. 3d 518 (E.D. Va. 2014) ....................................................................4-5

*Nat'l Westminster Bank, U.S.A. v. Ross*,
    130 B.R. 656 (S.D.N.Y. 1991)................................................................................44

*Norddeutsche Landesbank Girozentrale v. Tilton*,
    149 A.D.3d 152 (N.Y. App. Div. 2017) .................................................................32

*Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*,
    2004 Del. Ch. LEXIS 122 (Del. Ch. Aug. 24, 2004)........................................25-26

*Official Comm. of Unsecured Creditors v. Meltzer*,
    589 B.R. 6 (D. Me. 2018)........................................................................................27

*Orban v. Field*,
    1997 Del. Ch. LEXIS 48 (Del. Ch. Apr. 1, 1997) .................................................29

*Owens v. DRS Auto. Fantomworks, Inc.*,
    288 Va. 489 (2014) ..................................................................................................32

*Palmisano, LLC v. N. Am. Capacity Ins. Co.*,
    2021 U.S. Dist. LEXIS 91955 (E.D. La. May 13, 2021).........................................5

*Parnes v. Bally Entm't Corp.*,
    2001 Del. Ch. LEXIS 34 (Del. Ch. Feb. 20, 2001)................................................11

*Pereira v. Farace*,
    413 F.3d 330 (2d Cir. 2005).....................................................................................10

*Peterson v. Bass*,
    48 Va. Cir. 206 (Va. Cir. Ct. 1999).........................................................................43

*Puma v. Marriott*,
    283 A.2d 693 (Del. Ch. 1971)..................................................................................25

*Quadrant Structured Prods. Co. v. Vertin*,
102 A.3d 155 (Del. Ch. 2014)..................................................................27, 28, 99

*In re Radnor Holdings Corp.*,
353 B.R. 820 (Bankr. D. Del. 2006) ...............................................................6, 12

*Raul v. Rynd*,
929 F. Supp. 2d 333, 346 (D. Del. 2013) ............................................................25

*Revak v. SEC Realty Corp.*,
18 F.3d 81 (2nd Cir. 1994)...................................................................................50

*In re RSL COM Primecall, Inc.*,
2003 Bankr. LEXIS 1635 (Bankr. S.D.N.Y. Dec. 11, 2003)...............................33

*Ryan, Inc. v. Circuit City Stores, Inc.*,
2010 U.S. Dist. LEXIS 120627 (E.D. Va. Nov. 15, 2010) ....................................8

*Seidman v. Clifton Sav. Bank, S.L.A.*,
2009 N.J. Super. Unpub. LEXIS 2267 (N.J. Super. Ct. App. Div. Aug. 19,
2009) ............................................................................................................. 22-23

*Small v. Lorillard Tobacco Co.*,
252 A.D.2d 1 (N.Y. App. Div. 1998) ..................................................................39

*In re SportCo Holdings, Inc.*,
2021 Bankr. LEXIS 2848 (Bankr. D. Del. Oct. 14, 2021)..............................11, 14, 17, 22, 23

*Staples v. Billing*,
1994 Del. Ch. LEXIS 10 (Del. Ch. Jan. 31, 1994) ...............................................29

*In re Stylesite Mktg., Inc.*,
253 B.R. 503 (Bankr. S.D.N.Y. 2000) .................................................................38

*Thomas v. FTS USA, LLC*,
2016 U.S. Dist. LEXIS 82679 (E.D. Va. June 24, 2016) ......................................33

*Torch Liquidating Tr. ex rel. Bridge Assocs., LLC v. Stockstill*,
2008 U.S. Dist. LEXIS 19535 (E.D. La. Mar. 13, 2008)......................................31

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,
906 A.2d 168 (Del. Ch. 2006)...................................................................17, 28, 31

*In re Triangle Capital Corp. Sec. Litig.*
988 F.3d 743 (4th Cir. 2021) ..........................................................................44, 46

*Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*,
2009 Del. Ch. LEXIS 88 (Del. Ch. May 18, 2009) .............................................99

*In re Tropicana Entm't, LLC*,
  520 B.R. 455 (Bankr. D. Del. 2014) ......................................................28

*Tyler v. Berger*,
  2005 U.S. Dist. LEXIS 57466 (W.D. Va. Nov. 1, 2005)........................................41

*United Artists Theatre Circuit, Inc. v. Sun Plaza Enter. Corp.*,
  352 F. Supp. 2d 342, 351 (E.D.N.Y. 2005) ......................................................38

*In re Vance*,
  298 B.R. 262 (Bankr. E.D. Va. 2003)................................................102

*Walker v. Action Indus., Inc.*,
  802 F.2d 703 (4th Cir. 1986) ......................................................55

*In re Walt Disney Co. Derivative Litig.*,
  731 A.2d 342 (Del. Ch. 1998)................................................16, 20, 23

*In re Walt Disney Co. Derivative Litig.*,
  907 A.2d 693 (Del. Ch. 2005)................................................11

*Warhanek v. Bidzos*,
  2013 U.S. Dist. LEXIS 133099 (D. Del. Sept. 18, 2013) ......................................24

*White v. Panic*,
  793 A.2d 356 (Del. Ch. 2000)................................................20

*Williams v. Prince George's Cty.*,
  157 F. Supp. 2d 596 (D. Md. 2001) ......................................................4

*In re Wonderwork, Inc.*,
  611 B.R. 169 (Bankr. S.D.N.Y. 2020) ......................................................23

**Rules and Statutes**

8 Del. C. § 102(b)(7)......................................................10-11, 99

8 Del. C. § 141(e)......................................................22

28 U.S.C. § 1404(a) ......................................................30

11 U.S.C. § 1129 (b)(2) ......................................................13

Fed. R. Bankr. P. 7056......................................................1

Fed. R. Civ. P. 56......................................................1, 4, 101

Restatement (Second) of Torts § 551 cmt. l (Am. Law Inst. 1997)......................................................51

## SUMMARY OF ARGUMENT

As mandated by the binding law of this case, sound principles of estoppel and clear contractual requirements, and because the Trust cannot prove essential elements of any of the claims alleged, this action lacks a viable basis to proceed to trial. This case should be dismissed and summary judgment granted in Defendants' favor pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7056 of the Federal Rules of Bankruptcy Procedure for the reasons set forth below.

The Trust's claims against Defendants, former Directors and Officers of Debtor Toys "R" Us, Inc. ("TRU"), fall within four categories: (1) breach of fiduciary duty claims relating to TRU's decision to obtain DIP financing and file a Chapter 11 case in this Court (the "Chapter 11 Proceeding"); (2) breach of fiduciary duty claims relating to TRU's pre-petition retention payments to company executives; (3) breach of fiduciary duty claims relating to TRU's advisory fee payments to TRU's private equity sponsors from the fourth quarter of 2014 through the first quarter of 2017; and (4) tort claims relating to Defendants' alleged statements and omissions about the DIP financing and TRU's ability to pay for goods post-petition. None of these claims can survive summary judgment.

*First*, the Trust's breach of fiduciary duty claim relating to TRU's decision to obtain DIP financing, which seeks a range of $515 million to $835 million in damages, is barred by the law of the case doctrine. This doctrine "applies to factual findings made in a main bankruptcy proceeding and is binding on parties to a subsequent adversary proceeding." *In re La Paloma Generating Co.*, 2020 Bankr. LEXIS 67, at *13 (Bankr. D. Del. Jan. 13, 2020). Here, following two evidentiary hearings in the Chapter 11 Proceeding, this Court entered a Final DIP Order which concluded that the "DIP Documents are fair and reasonable, reflect the [Debtors'] exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably

equivalent value and fair consideration." (ECF No. 711 ¶ 5(d).)  The Final DIP Order is binding

in this adversary proceeding as a matter of law.  In addition, the Final DIP Order is binding by its

terms upon any "fiduciary appointed as a legal representative of any of the Debtors or with respect

to the property of the estate of any of the Debtors." (ECF No. 711 ¶ 27.)  This includes the Trust,

which is the successor-in-interest to the Debtors and the representative of their estate.  (ECF No.

6925, Ex. A §§ 2.3(a), 2.3(b)).  Moreover, the Board's decision to obtain DIP financing is protected

by the business judgment rule, and the exculpatory provision in TRU's Certificate of Incorporation

immunizes Board members for alleged breaches of their duty of care.  For each of these reasons,

the Trust's claim relating to the DIP financing must be dismissed.

*Second*, the Trust's claim for breach of fiduciary duty relating to TRU's pre-petition

retention payments to approximately 117 company executives totaling about $16.2 million must

be dismissed.  During the Chapter 11 Proceeding, the Official Committee of Unsecured Creditors

("UCC") told this Court that these payments were "addressed" through adjustments to the Senior

Employee Incentive Program ("SEIP") approved by this Court upon the UCC's support.  The UCC

stated that these adjustments were "a more pragmatic and constructive way to address those

retention payments rather than litigating about them." (ECF No. 1184 at 166:14-23.)  Because this

Court approved the negotiated SEIP following the UCC's advocacy in favor of it, the Trust is

estopped from litigating the retention payments now.  In addition, the Board's decision to authorize

these payments is protected by the business judgment rule, which applies with particular force to

decisions relating to executive compensation.  Further, the exculpatory provision in TRU's

Certificate of Incorporation immunizes Board members from the Trust's claim that they breached

their duty of care, and the undisputed factual record does not support the Trust's claim that they

breached the duty of loyalty.

*Third*, the Trust's claim for breach of fiduciary duty relating to TRU's payments of advisory fees totaling approximately $17.8 million must be dismissed. A company's payments to its owners never breach a fiduciary duty when the company is solvent, and here the undisputed evidence demonstrates that TRU was solvent when the advisory fees were paid. Moreover, even if the company were insolvent, the advisory fee payments were contemporaneously disclosed in TRU's SEC filings and never challenged by any person or entity, and the governing agreements between TRU and its sponsors required the payments to be made. This contractual requirement further precludes any claim that the payments violated a fiduciary duty.

*Fourth*, the Trust's tort claims, which seek approximately $250 million, cannot survive summary judgment because the Trust lacks standing to bring the claims of individual creditors, and no evidence in the record suggests that any Defendant acted with scienter. Moreover, because this is not a class action, the Trust must be able to cite evidence to support each element of its tort claim for every vendor whose claims it is bringing. The Trust cannot do so as a matter of law for (i) vendors who signed critical vendor agreements requiring them to ship for the duration of the Chapter 11 Proceeding because "a plaintiff cannot claim to have been defrauded into doing what it was legally bound to do" (*Megaris Furs, Inc. v. Gimbel Brothers, Inc.*, 172 A.D.2d 209, 212 (N.Y. App. Div. 1991)); or (ii) vendors who testified that Defendants' only statements to them during the Chapter 11 Proceeding were made in September or October 2017 and were forward-looking statements of optimism and/or true at the time they were made. The Trust also cannot bring tort claims against Defendants based on an alleged failure to disclose confidential information to trade vendors during the Chapter 11 Proceeding because no such duty to disclose existed. In addition, the undisputed evidence, including the vendors' own testimony at their Rule 30(b)(6) depositions, demonstrates that the Trust cannot satisfy the necessary elements of reliance

and causation for nearly all trade vendors, including because many of the trade trade vendors *expressly disavowed* the Trust's allegations of reliance and causation attributed to them in the Trust's Complaint. And, perhaps unsurprisingly given these fatal defects in the Trust's claims, nearly all vendors testified that the Trust never asked them to corroborate the Trust's allegations before the Trust filed claims on their behalf. Finally, the Trust cannot pursue the tort claims of the many vendors that the undisputed evidence demonstrates suffered no damages even according to the Trust's view of how damages should be calculated.

## **STANDARD OF REVIEW**

On summary judgment, "[a] party who bears the burden of proof on a particular claim must factually support each element of his or her claim." *Williams v. Prince George's Cty.*, 157 F. Supp. 2d 596, 600 (D. Md. 2001). "[A] complete failure of proof concerning an essential element . . . ***necessarily renders all other facts immaterial.***" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis added). The party opposing summary judgment therefore must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial. *Nat'l Org. for Marriage, Inc. v. United States*, 24 F. Supp. 3d 518, 522 (E.D. Va. 2014). And of particular importance in the instant case, once that burden has shifted to the Trust, it cannot be met simply by "rest[ing] upon mere allegations or denials . . . [the Trust] must come forward with specific facts showing that there is a genuine issue for trial. . . . ***Nor can [the Trust] create a genuine issue of material fact through mere speculation or the building of one inference upon another.*** When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (emphasis added); *see also Nat'l Org. for Marriage*,

24 F. Supp. 3d at 522 (explaining that the nonmoving party further "must show more than some metaphysical doubt as to the material facts."). Moreover, the Trust must recognize that the testimony of key Rule 30(b)(6) witnesses is binding on a company and therefore that "a party may not create a material issue of fact at the summary judgment stage by submitting an affidavit or testimony that contradicts statements made in a 30(b)(6) deposition." *Palmisano, LLC v. N. Am. Capacity Ins. Co.*, 2021 U.S. Dist. LEXIS 91955, at *5-7 (E.D. La. May 13, 2021).

## UNDISPUTED MATERIAL FACTS

Defendants respectfully refer to the Statement of Facts filed herewith listing the undisputed material facts relevant to this motion.

## ARGUMENT

### I. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE TRUST'S FIDUCIARY DUTY CLAIM RELATING TO THE DIP FINANCING

The Trust's breach of fiduciary duty claim relating to the DIP financing must be dismissed for each of the reasons set forth below.

### A. This Court's Ruling in the Final DIP Order That the DIP Financing Was an Exercise of Debtors' "Prudent Business Judgment Consistent with [Their] Fiduciary Duties" Is Binding Law of the Case

On October 24, 2017, this Court held a Final Hearing on Debtors' motion for authorization to obtain DIP financing following an earlier evidentiary hearing. (ECF No. 749.) Debtors' legal counsel presented the DIP financing package to this Court on a completely consensual basis, and the UCC's counsel spoke in favor of it. This Court then entered the Final DIP Order authorizing TRU to obtain post-petition DIP financing (the "Final DIP Order"). (ECF No. 711.) The Final DIP Order recognized TRU's need for DIP financing and found that the DIP financing constituted an exercise of Debtors' prudent business judgment consistent with their fiduciary duties:

> The access of the DIP Loan Parties to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition

> Collateral, incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents **are necessary and vital to the preservation and maintenance of the going concern values of the DIP Loan Parties** and to a successful reorganization of the DIP Loan Parties.
>
> . . .
>
> [T]he terms of the DIP Financing and the terms on which the DIP Loan Parties may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Final Order and the DIP Documents are fair and reasonable, **reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties** and constitute reasonably equivalent value and fair consideration.

(ECF No. 711 ¶¶ 5(b), (d) (emphasis added).)

This Court's ruling that the DIP financing reflected the Debtors' exercise of prudent business judgment and did not breach their fiduciary duties constitutes law of the case in this adversary proceeding and cannot be disturbed.  As a different bankruptcy court recently explained:

> The law of the case doctrine bars the re-litigation of matters once decided during the course of a continuing lawsuit. . . . **The doctrine applies to factual findings made in a main bankruptcy proceeding and is binding on parties to a subsequent adversary proceeding**.

*In re La Paloma Generating Co.*, 2020 Bankr. LEXIS 67, at *12-13 (emphasis added); *see also In re Radnor Holdings Corp.,* 353 B.R. 820, 843-844 (Bankr. D. Del. 2006) (rejecting a Litigation Committee's argument that the defendant "aided and abetted the board's breach of fiduciary duty of accepting TCP's stalking horse bid.  That argument is precluded by the law of the case, since the Bidding Procedures Order already approved the stalking horse bid as in the best interests of the estates."); *In re DuFrayne*, 194 B.R. 354, 358 (Bankr. E.D. Pa. 1996) ("The factual findings made in the Prior Opinion [in the underlying Bankruptcy Proceeding] are the law of the case and are therefore binding on the parties in this [adversary] proceeding.").

B.      **The Final DIP Order Is Binding on the Trust by Its Own Terms**

This Court ruled in the Final DIP Order that all provisions and findings of the Final DIP

Order are final and binding upon all parties in interest in the Chapter 11 Proceeding:

> The DIP Documents and the provisions of this Final Order, including all findings herein, **shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation**, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases, **the Debtors and their respective successors and assigns** (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, **or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors**).

(ECF No. 711 ¶ 27 (emphasis added).)  This language includes the Trust, which is the successor-

in-interest to the Debtors with respect to the claims asserted in this proceeding and the

representative of the Debtors' estate with respect to these claims.  (ECF No. 6925, Ex. A §§ 2.3(a),

2.3(b).)  The Final DIP Order was never challenged on any appeal before the time to do so expired.

Consequently, the Final DIP Order's own terms prevent the Trust from litigating its findings now.

C.      **The Trust is Estopped from Alleging That the DIP Financing Was a Breach of Defendants' Fiduciary Duty**

The Trust's counsel and the UCC argued in favor of the DIP financing in the Chapter 11

Proceeding, and this Court approved it.  (SOF ¶¶ 46-49, 92.)  The Trust, which is pursuing claims

on behalf of the UCC's constituency and remains represented by the UCC's counsel (*see infra*, at

54), is now advancing the opposite argument.  This inconsistency is not permitted as a matter of

law.  *See In re Earned Capital Corp.*, 331 B.R. 208, 224-226 (Bankr. W.D. Pa. 2005) ("The

Plaintiffs herein, as constituents of the Committee, may not now change their position" where

"Plaintiffs, whether directly or through their Committee, had every opportunity to litigate,

investigate and question every aspect of the Debtor's operation, finances, assets and valuations"

prior to plan confirmation); *Ryan, Inc. v. Circuit City Stores, Inc.*, 2010 U.S. Dist. LEXIS 120627, at *13-14 (E.D. Va. Nov. 15, 2010) ("It cannot be supposed that the committee of unsecured creditors, which is duty bound to act in the best interest of unsecured creditors, would support a decision which is inimical to the best interests of the debtor's estate and unsecured creditors."); *Guinness PLC v. Ward*, 955 F.2d 875, 899 (4th Cir. 1992) ("That an estoppel can arise because of a prior inconsistent claim or position taken in a judicial proceeding is clear.  A party cannot have its cake and eat it too.").

Specifically, at the first-day hearing at which this Court approved the DIP financing on an interim basis, Mattel's outside counsel (who is now one of three members of the Trust's Oversight Committee) spoke emphatically about the DIP financing's importance for trade vendors:

> We think this is an important company.  We think it's important not just to the suppliers like Mattel, it's important to lots of the employees, really, to the retail environment.  Retail's, obviously, under great stress, the brick and mortar retail.  So we think it's important that this company survive and thrive . . .
>
> **[W]e think that it's important they get the liquidity and that the flow of goods is uninterrupted, particularly for Christmas.**  And so, Your Honor, we would urge the Court to approve it today on an interim basis as requested.

(ECF No. 192 at 132:22-134:14 (emphasis added).)  This Court entered an Interim Order approving the DIP financing in order to avoid immediate and irreparable harm to the Debtors' estates.  (ECF No. 29 at 12-13.)

The UCC subsequently was formed and represented to this Court that it "worked diligently" to review and improve the terms of the DIP financing.  (ECF No. 659 ¶ 1.)  The UCC explained in its written submission:

> **The Committee supports the Debtors' decision to seek postpetition financing, as the Debtors have a compelling need to obtain capital as they enter the busiest time of the year for their**

**business.**   Accordingly, from the date of its inception, the Committee has worked diligently with the Debtors and their pre- and postpetition lenders to reach consensus regarding the terms on which the estates should be permitted to borrow.

(*Id.*)

In addition, the UCC's counsel asked this Court to approve the DIP financing at the Final DIP Hearing:

Your Honor, **the committee had two goals leading into today's hearing.  Its first goal was a clear recognition from the outset that this company clearly needed debtor-in-possession financing**. . . . [T]he key to this company's business is the fourth quarter and the holiday season.  The case was filed on the eve of the fourth quarter.   And **the committee recognized that it was important to make sure that the company had the financial wherewithal and the market confidence to operate successfull**y.  And we believed that a consensual order or consensual orders and a consensual hearing would help facilitate both the necessary financing and the confidence that the marketplace would have in the company's viability and success going forward, and **we worked hard to try to achieve consensus**.

(ECF No. 749 at 29:3-17.)  This Court then stated that it was pleased that "the parties have been able to work together to this point and table any potential disputes in an effort to try to stabilize the debtor.  I do think that's important and I think that's being accomplished with the orders that are being presented at this point.  Appreciative of that, and I'll grant the motion in respect to both DIP facilities and overrule any objections."  (*Id.* at 43:20-44:1.)  The Trust therefore cannot now argue that obtaining the DIP financing was a breach of Defendants' fiduciary duties.

### D.      The Exculpatory Provision in TRU's Certificate of Incorporation Bars the Trust's Duty of Care Claim Relating to the DIP Financing

Delaware law governs the Trust's breach of fiduciary duty claims based on the internal affairs doctrine.  This doctrine provides that the law of the state where a corporation is incorporated governs issues relating to the internal affairs of a corporation, which include issues relating to a corporations' directors' and officers' fiduciary duties.  *See In re Hydrogen, L.L.C.*, 431 B.R. 337,

346 (Bankr. S.D.N.Y. 2010) ("A claim for breach of fiduciary duty brought against a corporate officer or director raises issues relating to the internal affairs of a corporation and therefore should be governed by the law of the state of incorporation of the relevant corporation.").

Here, TRU's Board members are immunized from the Trust's claim that they breached their duty of care in approving the DIP financing in their capacity as company directors pursuant to the exculpatory clause in TRU's Amended and Restated Certificate of Incorporation that is effective under Delaware law. *See* SOF Ex. 126 at Article Eight ("A director of the corporation shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent that exculpation from liability is not permitted under the DGCL as in effect at the time such liability is determined."); 8 Del. C. § 102(b)(7) (providing that an exculpatory provision is effective under Delaware law in eliminating personal liability of directors for breaches of their duty of care); *Pereira v. Farace*, 413 F.3d 330, 342 (2d Cir. 2005) ("[B]ecause breach of fiduciary duty claims belong to the corporation, they are subject to the exculpatory clause defense even when pressed by a trustee."). Consequently, the Trust cannot assert these claims.

The Trust carefully avoids explicitly alleging that Defendants breached their duty of care, instead alleging that Defendants breached "a fiduciary duty of loyalty, a duty of candor, and a duty of good faith." (Compl. ¶ 227.)[3] However, the substantive allegations asserted by the Trust in connection with the DIP financing go directly to alleged breaches of the duty of care, such as an alleged failure to learn all material information, alleged failure to consider alternatives, and allegedly authorizing the DIP financing unreasonably. (*Id.* ¶ 228.) The Trust's claim therefore implicates the duty of care, and the Trust cannot use artful pleading to avoid the exculpatory

---

[3]    All citations to the Complaint ("Compl.") herein are to the Second Amended Complaint (ECF No. 146), which is the operative Complaint in this action.

provision.  *See In re Cyan, Inc. Stockholders Litig.*, 2017 Del. Ch. LEXIS 79, at *47-48 (Del. Ch. May 11, 2017) ("[P]laintiffs cannot circumvent the protection afforded in [a corporation's] certificate of incorporation through artful pleading.  To hold otherwise would undermine the very purpose of 8 Del C. § 102(b)(7).").

### E.    The Business Judgment Rule Prevents the Trust from Challenging with the Benefit of Hindsight the Board's Decision to Obtain DIP Financing

Even if the above arguments did not defeat the DIP financing claims as a matter of law (and they do), the undisputed factual evidence demonstrates that the Board's decision to obtain DIP financing is protected by the business judgment rule.  This rule is a presumption that in "making a business decision the directors of a corporation acted on an informed basis and in the honest belief that the action taken was in the best interest of the company." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746-47 (Del. Ch. 2005).  The Trust bears the burden of rebutting the business judgment rule by introducing evidence that a director breached the duty of loyalty (*i.e.*, by engaging in self-interest or self-dealing), or that the directors lacked good faith or failed to exercise due care.  *See Parnes v. Bally Entm't Corp.*, 2001 Del. Ch. LEXIS 34, at *29 (Del. Ch. Feb. 20, 2001).  Otherwise, a court will not second-guess any director's decision that had a rational business purpose.  *Id.*

### 1.    The Trust Cannot Demonstrate a Breach of the Duty of Loyalty Because There Is No Evidence of Self-Interest or Self-Dealing

"A director is interested in a transaction if he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders . . . . The private benefit to the director must be of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . . without being influenced by her overriding personal interest." *In re SportCo*

*Holdings, Inc.*, 2021 Bankr. LEXIS 2848, at *16 (Bankr. D. Del. Oct. 14, 2021).  Here, the

undisputed factual evidence precludes any claim of self-interest or self-dealing.

First, the factual record contains no evidence that the Sponsor-affiliated Directors received

any personal benefit from TRU's decision to file for Chapter 11.  The Trust alleges in its Complaint

that the Sponsor-affiliated Directors authorized the Chapter 11 as a "longshot" and "gamble" to

protect their equity, and thus they were interested in the transaction.   (Compl. ¶ 177-78.)   A

different bankruptcy court recently rejected this same type of argument:

> The Radnor Board did not act disloyally in entering into the
> transactions with Tennenbaum.  **Given the company's prospects
> with its new products, the advice of competent financial advisors
> and the consideration of the board, I find no basis in the record
> for the Committee's repeated assertion that Mr. Kennedy was
> "swinging for the fences" just to protect his equity investmen**t,
> rather than acting in the best interests of the company and its
> stakeholders.  Indeed, the Court notes that Mr. Darr's concession
> that had the company liquidated in October 2005, even without
> considering transaction costs, such  liquidation would have ensured
> a substantial loss for unsecured creditors, provides a good faith basis
> for the Radnor board to have continued with its business plan rather
> than shutting down prematurely.
>
> The Radnor Board's good faith decisions to enter into the subject
> transactions with Tennenbaum to aid Radnor in carrying out its
> business plan are afforded the protection of the business judgment
> rule.  **Radnor's business judgment against liquidation and in
> favor of attempting to continue operations and continue with its
> business plan of expansion was not inherently wrongful**.

*Radnor*, 353 B.R. at 843-44.

Further, TRU's bankruptcy counsel testified in this action that the Chapter 11 filing was

the exact opposite of a "Hail Mary" because as a matter of law a formal restructuring inures to the

best interests of the company's creditors and estate at the *expense* of the equity holders:

> [Though] the [B]oard and management team very much wanted to
> avoid a bankruptcy [filing,] all of the options that otherwise could
> have been explored and effectuated [that would potentially solve

> TRU's liquidity issues] outside of the Court process were akin to a
> Hail Mary.
>
> . . .
>
> A Hail Mary pass in this context is taking an action that effectively
> ***is for the benefit of shareholders [KKR, Bain, and Vornado]*** that
> ultimately inures to the detriment of lenders and creditors.
> [T]ypically, it's the type of transaction ***where a company is seeking
> to avoid a formal restructuring***, the review of a court, the process
> associated with the restructuring, to keep the company out and
> extend its runway.
>
> …
>
> [T]he filing of a Chapter 11 crystallizes that the shareholders are out
> of the money and they are recognizing that the restructuring process
> is one that's meant to benefit the entire stakeholder universe and
> maximize the value of the company.

(Sussberg Tr. (SOF Ex. 58) 13:25–16:21.)  Consistent with this testimony, the absolute priority

rule of the Bankruptcy Code ensures that all creditors must first be paid in full following a Chapter

11 filing and that a debtor's shareholders are the *last* in line to be repaid.  *See* 11 U.S.C. § 1129

(b)(2).  Thus, the Trust's theory that the Sponsor-affiliated Defendants violated their fiduciary

duties by voting in favor of a Chapter 11 filing to protect their equity investments is contradicted

by the relevant case law, the undisputed factual evidence, and the Bankruptcy Code.

Second, the Trust's allegations concerning David Brandon's purported self-interest also

fail as a matter of law.  The Trust alleges that Brandon voted in favor of his own self-interest

because a Chapter 11 filing would allow him to continue to earn his salary.  (Compl. ¶ 175.)  Even

if there were evidence to support this conclusory allegation, which there is not, an executive's

ongoing receipt of salary does not constitute sufficient self-interest to obviate the protection of the

business judgment rule.  *See, e.g.*, *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 980

(Del. Ch. 2000) ("Under the terms of the merger, DLJ was to receive compensation for its efforts

in orchestrating the merger.  It cannot be reasonably inferred from this fact alone that Sweezey

acted self-interestedly. . . . There are no well-pleaded allegations of financial interest other than

the compensation paid to his firm, DLJ, for their work."); *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988) ("The only averment permitting such an inference is the allegation that all GM's directors are paid for their services as directors.  However, such allegations, without more, do not establish any financial interest."), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Krim v. Pronet, Inc.*, 744 A.2d 523, 528 n.16 (Del. Ch. 1999) ("The fact that several directors would retain board membership in the merged entity does not, standing alone, create a conflict of interest.").  Further, even if Brandon were self-interested, his one vote as a Board member was insufficient to outweigh the vote of the other Board members, and therefore his alleged self-interest cannot constitute self-dealing as a matter of law.  *See Goodwin v. Live Entm't, Inc.*, 1999 Del. Ch. LEXIS 5, at *77-78 (Del. Ch. Jan. 22, 1999) (dismissing breach of fiduciary duty claims on summary judgment because plaintiff could not show that the allegedly materially self-interested members "either:  a) constituted a majority of the board; b) controlled and dominated the board as a whole; or c) i) failed to disclose their interests in the transaction to the board").

Lastly, Defendant Michael Short (whom the Trust also alleges breached a fiduciary duty in connection with the DIP financing) was not even a member of the TRU Board, and there is nothing in the record to suggest that he influenced the Board's vote in any improper way.

> 2.   *The Trust Cannot Demonstrate Bad Faith or Failure to Exercise Due Care*

The Trust also cannot show that in obtaining the DIP financing the Board acted in bad faith or failed to exercise due care, which requires evidence that the "directors were intentionally disregarding their duties, or that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."  *In re SportCo Holdings, Inc.*, 2021 Bankr. LEXIS 2848, at *16.

It is undisputed that TRU's Board retained outside expert legal and financial advisors to assist it in considering and evaluating various potential solutions to TRU's liquidity issues. (SOF ¶ 11.) It also is undisputed that the Board was briefed throughout August 2017 concerning the different solutions that TRU's advisors Kirkland & Ellis ("Kirkland"), Lazard Ltd. ("Lazard") and Alvarez & Marsal ("A&M") were pursuing with TRU management to solve TRU's liquidity issues. (*Id.* ¶¶ 21-26.) Further, it is undisputed that during the five-week period when TRU management and its advisors were sizing and negotiating the DIP financing, the Board met at least six times, and was presented with materials prepared by TRU's advisors intended to update and inform the Board on the Chapter 11 process and the status of the DIP financing facilities. (*Id.* ¶ 25.) The undisputed factual record thus does not create a triable issue as to whether the "directors were intentionally disregarding their duties."

Further, the Trust's claim that the Board failed to consider alternatives to the DIP financing (Compl. ¶ 192) is contradicted by the undisputed factual record, which includes the following:

- TRU retained Kirkland in July 2017 and tasked Kirkland and the company's investment banker, Lazard, with determining if there were liquidity solutions that would allow TRU to avoid a formal restructuring and bankruptcy. (SOF ¶ 11.)

- In early August 2017, Lazard provided Board member Matt Levin with an outline for a potential sale-leaseback transaction that was intended to "supplement the Company's near-term liquidity needs and could be negotiated and closed by early September 2017." (SOF ¶ 11.)

- On August 23, 2017 the Board met again with Lazard to discuss the sale-leaseback transaction and also discussed other alternatives, including second-lien financing. (SOF ¶ 13.)

- The Board met on August 30, 2017 to discuss these potential solutions again and met multiple times in September 2017 to discuss the same topics. (SOF ¶¶ 13, 25-26, 28-30.)

At these meetings, the Board regularly received and reviewed materials and analysis from TRU's advisors, and was given the opportunity to ask questions and provide feedback.  (SOF ¶¶ 21-24.)

These undisputed facts reflecting the involvement of Kirkland, Lazard, and A&M in the Board's process to obtain DIP financing and explore reasonable alternatives preclude a finding of bad faith.  *See In re HH Liquidation, LLC*, 590 B.R. 211, 279 (Bankr. D. Del. 2018) ("Caple, like everyone at Comvest and Haggen, relied on the subject matter expertise of the numerous advisors they hired. . . . Caple spent enormous time and effort trying to make Holdings successful.  While in the end it did not prove successful, to fulfill his fiduciary duties Caple needed only to act reasonably, not perfectly.").

The Trust relies on TRU's ultimate liquidation as proof that TRU should have conducted a structured wind-down instead of filing for Chapter 11 and pursuing a going concern reorganization.  But the law precludes the Trust from premising claims on such Monday-morning quarterbacking.  *See, e.g.*, *Am. Bottling Co. v. Repole*, 2020 Del. Super. LEXIS 3049, at *19-20 (Del. Super. Ct. Dec. 30, 2020) (rejecting arguments that "do nothing more than second-guess prototypical business decisions.  Delaware law eschews that type of 'Monday Morning quarterbacking.'"); *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 362 (Del. Ch. 1998) ("It is the essence of the business judgment rule that a court will not apply 20/20 hindsight to second guess a board's decision, except in rare cases [where] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment.").

The undisputed factual evidence makes clear that the Trust cannot prove that Defendants' decision to authorize DIP financing was so "egregious on its face" to overcome the protection of the business judgment rule.  In fact, as explained above, the UCC itself supported this decision in

recognition of TRU's need for liquidity (*see supra*, at Section I.C.), as did TRU's outside financial advisor who submitted an affidavit to this Court in favor of the DIP financing.  (ECF No. 33.) TRU's legal advisors also argued emphatically to this Court in support of the DIP financing (*see, e.g.*, ECF No. 192 at 41:18-23), and this Court entered a Final DIP Order authorizing it.  (ECF No. 711.)  These undisputed facts underscore the frivolity of the Trust's claim that the DIP financing was "egregious on its face."  Moreover, the relevant Delaware law governing the Board's fiduciary obligations imposed no duty on the Board to liquidate TRU.  *See Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 204-05 (Del. Ch. 2006) ("Delaware law imposes no absolute obligation on the board of a company that is unable to pay its bills to cease operations and to liquidate. . . . Chapter 11 of the Bankruptcy Code expresses a societal recognition that an insolvent corporation's creditors (and society as a whole) may benefit if the corporation continues to conduct operations in the hope of turning things around."); *In re SportCo Holdings, Inc.*, 2021 Bankr. LEXIS 2848, at *15 ("When assessing claims for breach of fiduciary duties, the Court bears in mind that a director does not become 'a guarantor of success' by choosing to continue a firm's operations when it may be insolvent.") (quoting *Trenwick*, 906 A.2d at 174); *In re Answers Corp. S'holders Litig.*, 2014 Del. Ch. LEXIS 17, at *49 (Del. Ch. Feb. 3, 2014) ("[A]lthough Plaintiffs identify a variety of ways in which they believe the process could have been better conducted, they offer no evidence of that extreme set of facts required to show that the board utterly failed to attempt to comply with its duties.").

Finally, the Trust's theory is nonsensical.  As TRU's lead bankruptcy counsel testified in this action with respect to the Trust's hindsight-based theory, "[i]t's pretty unprecedented for someone to suggest that a company of this size that was able to access this amount of liquidity without having milestones tied to plan[] deadlines and disclosure statements would precipitously

decide to wind down and turn off the lights."  (Sussberg Tr. (SOF Ex. 58) 341:25–342:6.)  And of course, no party – be it potential investors, the secured lenders, the UCC, nor any trade vendors – suggested contemporaneously that the company should have done so; rather, they suggested the exact opposite, highlighting the absurdity of the Trust's current position.

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE TRUST'S FIDUCIARY DUTY CLAIM RELATING TO THE PRE-PETITION RETENTION PAYMENTS

The Trust alleges that Defendants breached their fiduciary duty by approving the payment of retention bonuses to a group of 117 TRU executives and management-level employees in September 2017 before TRU filed for Chapter 11 protection.  This claim must be dismissed as a matter of law because the Trust is estopped from making it.  Even if the Trust were not estopped, the claim would fail because the Board's decision relating to executive compensation is protected by the business judgment rule, and the undisputed facts demonstrate that the Trust cannot overcome this protection.

### A.   The Trust is Estopped From Asserting Breach of Fiduciary Duty Claims Relating to the Pre-Petition Retention Payments

The undisputed factual record establishes that the UCC addressed the pre-petition retention payments during the Chapter 11 bankruptcy proceeding through its negotiation of a reduction to the senior employees incentive payments ("SEIP").  The UCC explained to this Court:

> So essentially, **from the committee's perspective, of the eight million dollars that was paid to the senior executives pre-petition, seven million dollars was essentially addressed through a reduction of the payment amounts by two million and a deferral of the five million dollars to the back of the case**.  Now, let me speak briefly, Your Honor, as to -- and we thought that was important because we thought the retention payments were unusual, and **we thought that this was a more pragmatic and constructive way to address those retention payments rather than litigating about them**.
> . . .

18

> **There's no question that we all want the employees to stay with the company and work through the Chapter 11 case.**  That's obvious, so it's not does it have some element of retention, but is it properly structured so that it's primarily an incentive coupled with retention.

(ECF No. 1184 at 166:14-23; 169:9-13) (emphasis added).  This Court then approved the SEIP, which incorporated the UCC's proposal to address the pre-petition retention payments through adjustments to the SEIP.  (SOF ¶ 79.)

As explained above, the Trust cannot take a position in an adversary proceeding that is inconsistent from the position that the UCC took during the Chapter 11 restructuring on behalf of the same constituency.  (*See supra*, at Section 1.C.)  Having sought and received the Court's approval to address the retention payments through a compromise rather than litigation, the Trust is estopped from litigating the retention payments here.

## B.   The Board's Decision to Approve Pre-Petition Retention Payments Is Protected by the Business Judgment Rule

### 1.   *The Business Judgment Rule Applies with Particular Force to Matters of Executive Compensation*

Boards are given "the power, authority, and wide discretion to make decisions on executive compensation" because a board's decisions relating to executive compensation are "the essence of business judgment."  *Brehm,* 746 A.2d at 262 n.56.  Courts therefore must reject a claim relating to executive compensation under the business judgment rule unless "a majority of either the Board or the Compensation Committee—whichever approved [the executive's]  compensation—was not independent of [the recipient] or lacked good faith in making the award."  *In re AgFeed USA, LLC*, 558 B.R. 116, 128 (Bankr. D. Del. 2016).

Here, the Trust cannot show that a majority of the Board or the Independent Compensation Committee that approved the pre-petition retention payments was not independent or lacked good faith, and their decision indisputably had a rational business purpose.  Consequently, the business

judgment rule protects it.  *See White v. Panic*, 793 A.2d 356, 369 (Del. Ch. 2000) ("Except for cases involving allegations of fraud, 'this Court's deference to directors' business judgment is particularly broad in matters of executive compensation.'") (quoting *In re Walt Disney Co. Derivative Litig*., 731 A.2d at 362).

> 2.    *The Undisputed Factual Record Does Not Support a Finding of the Board's Bad Faith or a Breach of the Duty of Care*

The Trust cannot overcome the protection of the business judgment rule by arguing that the Board's decision to approve the pre-petition retention payments constituted bad faith or a breach of the duty of care.  The undisputed evidence reflects that the Board authorized these payments to retain key personnel due to demonstrated employee attrition and concern over continued attrition.  (SOF ¶¶ 54, 69-71, 77.)  Specifically, in July 2017, two months prior to TRU's Chapter 11 filing, TRU's Chief Talent Officer, Tim Grace, observed that some key TRU employees had left the company and that others were thinking about leaving.  (SOF ¶ 54.)  TRU management was worried that additional employees might leave the company because TRU was projected to miss the EBITDA target to which performance-based compensation was tied, which meant that these employees would not be compensated under this plan.  (SOF ¶ 54.)  Grace personally believed that although TRU's salaries were competitive, two-thirds of executive compensation was tied to EBITDA, so executives were not actually reaping the benefits of the salaries that initially brought them in.  (SOF ¶ 55.)  Accordingly, in early August 2017, TRU retained A&M's executive compensation team to help advise the Board on how to retain key personnel.  (SOF ¶ 56.)

The factual record demonstrates a robust process whereby A&M and Kirkland worked alongside TRU management to develop a plan to retain key employees, and advised on the propriety of making pre-petition retention payments.  The following evidence is undisputed and

reflects the knowledge and involvement of TRU's legal and executive compensation advisors with respect to the timing and scope of the pre-petition retention payment plan.

- On August 3, 2017, A&M sent Brandon a presentation entitled "Overview of Compensation Alternatives for a Distressed Company and Compensation Issues in Chapter 11." (SOF ¶¶ 60-61, SOF Ex. 75.)  The deck explained that retention payments are "often provided to key employees to ensure they remain with the Company during this uncertain time." (SOF Ex. 75 at 5).  The presentation advised that "any retention payments **must be paid prior to the bankruptcy filing**" and are generally subject to clawback from the employee if the employee leaves the company to provide an effective retention.  (*Id.* (emphasis in original).)

- On August 9, 2017, Kirkland provided TRU's Board with a presentation listing seven possible options for retaining key employees.  (SOF ¶ 64-65.)  One such option was the payment of pre-petition retention bonuses to critical employees.  (*Id.*)

- A&M discussed with Kirkland the implications of paying retention payments before the Chapter 11 filing and asked whether such payments would trigger SEC disclosure requirements.  (SOF ¶¶ 64-66.)

- Throughout August 2017, A&M collected documents from TRU, requested and obtained a significant amount of employee/compensation data, and had regular calls with Grace in which they discussed the structure of the compensation plan.  (SOF ¶¶ 62-64.)  Grace also sent drafts to A&M for its review, which A&M often would forward to Kirkland for review.  (*Id.* ¶¶ 62-66.)

- On August 28, 2017, the Compensation Committee met to review and discuss the proposed pre-petition retention payments.  (SOF ¶ 67.)  A&M provided a presentation at this meeting, which confirmed the business rationale of adopting a retention bonus plan, including that "loss of essential personnel could jeopardize the Company's ongoing operations, significantly reducing the value of the estate." (*Id.* ¶ 69, SOF Ex. 100 at 8.)  The presentation also confirmed that A&M believed the proposed structure was reasonable in terms of payout and design.  (SOF ¶ 70, SOF Ex. 100 at 8.)  The Compensation Committee raised a number of questions for management and TRU advisors to consider and address at a follow-up meeting.  (*Id.* ¶¶ 71-72.)

- On September 5, 2017, A&M and Kirkland attended another Compensation Committee meeting to discuss the updated proposal for the pre-petition retention payments that A&M circulated in response to the questions the Committee raised during the prior meeting.  (SOF ¶ 74.)  A&M set forth the issues raised by the Committee and the advisors' and management's collective recommendation for each point set forth in bold.  (*Id.* ¶ 75.)  The Compensation Committee also discussed a potential increase in CFO compensation and whether they should increase the clawback period to 18 months.  (*Id.*)

- On September 6, 2017, a full Board meeting was held to discuss, among other topics, the "Compensation Committee Report." At this meeting, the Board was provided with an 11-page executive summary of the full presentation that had been vetted and reviewed by TRU's advisors and the Compensation Committee. (*Id.* ¶ 76.)

- On September 13, 2017, another Board meeting was held. At that meeting, A&M's National Director of Executive Compensation, Brian Cumberland, walked the Board through the compensation proposal, and the full Board approved the Compensation Committee's recommendation. (SOF ¶ 77.)

Based on these undisputed facts, the Trust cannot establish that TRU's Board was recklessly uninformed or acted outside the bounds of reason. The Board's decision to retain Kirkland and A&M to work with management to develop a lawful and reasonable plan that was presented to the fully independent Compensation Committee for consideration and approval is sufficient to withstand any challenge to the duty of care. *See, e.g.*, *In re Books-A-Million, Inc. Stockholders Litig.*, 2016 Del. Ch. LEXIS 154, at *63 (Del. Ch. Oct. 10, 2016) (stating that a special committee assigned to negotiate a transaction "can satisfy its duty of care by negotiating diligently with the assistance of advisors."); *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283-84 (Del. 1989) ("Under 8 Del. C. § 141(e), when corporate directors rely in good faith upon opinions or reports of officers and other experts selected with reasonable care, they necessarily do so on the presumption that the information provided is both accurate and complete. Normally, decisions of a board based upon such data will not be disturbed when made in the proper exercise of business judgment."); *In re Munford, Inc.*, 98 F.3d 604, 611 (11th Cir. 1996) (dismissing breach of fiduciary duty claim on summary judgment because "the record is replete with evidence that the directors and officers consulted legal and financial experts throughout the solicitation and negotiation for a purchaser for Munford, Inc. Applying the business judgment rule, we conclude that the directors and officers satisfied their duties."); *Seidman v. Clifton Sav. Bank, S.L.A.*, 2009 N.J. Super. Unpub. LEXIS 2267, at *29 (N.J. Super. Ct. App. Div. Aug. 19,

2009) ("Here, the board members had the assistance of outside advisors; they reviewed substantial data regarding the compensation paid to senior executives by other New Jersey institutions in setting Celentano's cash compensation. There is simply no evidence that the directors were grossly negligent in setting Celentano's cash compensation.").

To manufacture a claim of bad faith, the Trust alleges that (i) certain executives should have been excluded from receiving a retention bonus, (ii) Brandon's $2 million retention bonus was higher than it should have been, and (iii) the peer group that A&M and management used was flawed. (Compl. ¶¶ 57, 73.) But even if these allegations were true (and they are not), they would not establish that the directors intentionally disregarded their duties or that their decision is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *In re SportCo Holdings, Inc.*, 2021 Bankr. LEXIS 2848, at *16. Moreover, a "board is not required to be informed of every fact, but rather is required to be reasonably informed." *In re Walt Disney Co. Derivative Litig.*, 731 A.2d at 362. Here, the undisputed factual record discussed above demonstrates that the Board was so informed.

3. *The Undisputed Factual Record Does Not Support a Finding That the Board Engaged in Self-Dealing*

The Trust asserts three bases for its claim that the Board engaged in self-dealing: (1) Brandon's receipt of a payment and alleged involvement in the plan's development tainted the process; (2) A&M was not an independent financial advisor because one of A&M's co-founders had an alleged personal friendship with Brandon; and (3) some of the Sponsor-related directors allegedly were "beholden" to Brandon because they had offered him jobs or did him favors with respect to other portfolio companies. (Compl. ¶¶ 35-40, 58, 63, 66.) These contentions are meritless.

*First*, Brandon is the only one of ten Board members who received a retention payment, and the factual record does not reflect that he had the power to control or unduly influence the other Board members.  As a matter of law, when a CEO is a Board member and receives compensation that the majority of disinterested Board members approve, the Board's decision is protected by the business judgment rule even where the CEO participates in developing the compensation plan.  *See, e.g.*, *In re Wonderwork, Inc.*, 611 B.R. 169, 203 (Bankr. S.D.N.Y. 2020) ("Mullaney's participation in the development of the peer groups does not constitute bad faith.  He was participating in the process at Pearl Meyer's request with the knowledge of the independent Board and the Board approved his compensation."); *Warhanek v. Bidzos*, 2013 U.S. Dist. LEXIS 133099, at *16-17 (D. Del. Sept. 18, 2013) ("Bizdos is the only executive officer who also serves on the VeriSign Board. . . . [The plaintiff] Warhanek has, therefore, failed to establish that a majority of the Director Defendants have a disabling self-interest"); *Charter Twp. of Clinton Police & Fire Ret. Sys. v. Martin*, 219 Cal. App. 4th 924, 935-36 (Cal. Ct. App. 2013) ("Plaintiffs do not argue that the complaint supports a reasonable doubt that the Jacobs directors are independent.  There are 11 directors on the Board, 10 of whom are independent and are not covered by the executive compensation plan.  The one exception is Martin, who is president and chief executive officer and is one of the recipients . . . However, there is no allegation he had a controlling interest in the corporation or exercised undue influence over the Board.").

Moreover, as A&M's lead executive compensation director testified during the Chapter 11 Proceeding, "[i]t's standard practice that any company putting in a bonus program, their insiders are going to have some types of insight into what -- what is appropriate and what type of performance metrics are right.  And then we stepped in and looked at it saying it is appropriate in the marketplace as far as design and amount."  (ECF No. 1184 at 67:14-19.)  Even the Litigation

Trustee ███████████████████████████████████████████████

███████████████████████████████████████.”  (Kors Tr. (SOF Ex.

66) 278:5-21.)

*Second*, even if Brandon did have more than one-tenth of a vote on the Board (and he did

not), that would be immaterial because the Board followed the advice of Kirkland and A&M and

set up an Independent Compensation Committee to review and approve the pre-petition retention

payments.  (SOF ¶¶ 56-79.)  When an independent committee is established to review and approve

a plan, as was done here, the protection of the business judgment rule applies.  *See e.g.*, *Friedman

v. Dolan*, 2015 Del. Ch. LEXIS 178, at *17 (Del. Ch. June 30, 2015) ("Entire fairness is not the

default standard for compensation awarded by an independent board or committee, even when a

controller is at the helm of the company.  The significance of an independent committee is well-

recognized by our case law."); *Puma v. Marriott*, 283 A.2d 693, 696 (Del. Ch. 1971) (holding that

because the transaction "was accomplished as a result of the exercise of independent business

judgment of the outside, independent directors whose sole interest was the furtherance of the

corporate enterprise, the court is precluded from substituting its uninformed opinion for that of the

experienced, independent board members of [the company].").

*Third*, the alleged conflicts of interest asserted by the Trust are immaterial under the

relevant law which "presumes that a corporation's board of directors is disinterested and

independent."  *Raul v. Rynd*, 929 F. Supp. 2d 333, 346 (D. Del. 2013).  To rebut this presumption,

a plaintiff "must undertake a 'director-by-director analysis' showing that a majority of the Board

was incapable, due either to a material personal interest or domination and control," of objectively

evaluating a particular transaction.  *Id*.  In this regard, an alleged friendship or outside business

relationship between two individuals does not negate independence as a matter of law.  *See Official*

25

*Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, 2004 Del. Ch. LEXIS

122, at *39 (Del. Ch. Aug. 24, 2004) ("Our cases have determined that personal friendships,

without more; outside business relationships, without more; *and approving of or acquiescing in*

*the challenged transactions, without more*, are each insufficient to raise a reasonable doubt of a

director's ability to exercise independent business judgment.") (emphasis in original).  Because

this is all that the Trust alleges with respect to the relationships at issue, the Trust cannot create a

triable issue of material fact by referencing Brandon's relationships with A&M or other Board

members.

> 4.    *The Board's Decision to Pay the Pre-Petition Retention Payments*
>        *Indisputably Had a Rational Business Purpose*

The need to retain key employees is indisputably a legitimate business purpose.  As

Kirkland explained to the Board, "[c]ompanies facing a financial restructuring often face

significant difficulties in retaining and motivating high performing executives and key

employees. . . . As a result, key employees may find otherwise uncompetitive employment

opportunities more attractive."  (SOF ¶¶ 64-65.)  Similarly, the UCC represented to this Court

during the Chapter 11 Proceeding that retaining employees was critical: "[t]here's no question that

we all want the employees to stay with the company and work through the Chapter 11 case.  That's

obvious . . . ."    (ECF No. 1184 at 169:9-13.)    Courts likewise regularly recognize the

efficaciousness of retention payments in helping to keep critical employees during challenging

financial times.  *See, e.g.*, *In re ATP Oil & Gas Corp.*, 711 F. App'x 216, 222 (5th Cir. 2017)

("Executives may judge that continuing to compensate corporate management during times of

financial hardship may be necessary to retain those employees.  And during a time of potential

insolvency, retaining corporate leadership may be the best way to revitalize the corporation."); *In*

*re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 446 (S.D.N.Y. 2010) ("In light of

the challenging environment in the financial markets that prevailed at the time, and the necessity to retain personnel in the near-term to navigate those challenges, the Court concludes that the decision to offer retention payments to personnel that, in management's view, were valuable to the Company, does not appear to be one which no person of ordinary, sound business judgment could conclude represents a fair exchange."). Consequently, the business judgment rule protects the Board's decision.

### C.  TRU's Board Is Immunized from a Claim That the Pre-Petition Retention Bonuses Constituted a Breach of the Duty of Care by the Exculpatory Provision in TRU's Certificate of Incorporation

As explained above, TRU's Certificate of Incorporation contains an exculpatory provision that immunizes TRU's Directors against duty of care claims in their capacity as Directors. (*See supra*, at Section I.D.) Therefore, the Trust's claim relating to the pre-petition bonuses must also be dismissed to the extent it alleges a violation of the duty of care.

## III.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE TRUST'S CLAIMS REGARDING THE PAYMENT OF ADVISORY FEES

### A.  The Payment of Advisory Fees Was Not a Breach of Fiduciary Duty Because TRU Was Solvent When the Fees Were Paid

Under Delaware law, so long as a company is not insolvent, its Board members owe a fiduciary duty to the company and its owners, and can take actions that benefit the owners to the detriment of the company. *See, e.g.*, *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 184 (Del. Ch. 2014) ("A transfer of value from a solvent subsidiary to the holder of 100% of the equity cannot give rise to a fiduciary wrong."); *Official Comm. of Unsecured Creditors v. Meltzer*, 589 B.R. 6, 27 (D. Me. 2018) ("Remember that it is acceptable, even required, for the directors of a solvent wholly-owned subsidiary to serve its parent's interests."). This remains the case even where a company is in the "zone of insolvency" but not yet insolvent. *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-103 (Del. 2007) ("When a solvent

corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change:  directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners.").

Based on this principle, in order to survive summary judgment, the Trust would have to show that there is a material issue of fact regarding TRU's insolvency.  Delaware law uses two tests to determine solvency:  the cash flow test and the balance sheet test.

Under the "Cash Flow" test, a corporation is considered insolvent when "it is unable to pay its debts as they fall due in the usual course of business."  *Geyer v. Ingersoll Publ'ns Co*., 621 A.2d 784, 789 (Del. Ch. 1992).  The undisputed factual evidence of TRU's continued ability to operate and pay its debts until the Chapter 11 filing date demonstrates that it was not insolvent under this test.  *See Esposus Creek Value LP v. Hauf*, 913 A.2d 593, 604 (Del. Ch. 2006) (company is "clearly solvent" given its ability to pay debts as they mature).

Under the "Balance Sheet" test, an entity is insolvent if it "'has liabilities in excess of a reasonable market value of assets held[,]'" *Quadrant Structured Prods.*, 102 A.3d at 176 (quoting *Trenwick*, 906 A.2d at 195 n.74), and a plaintiff can plead facts showing that there is "no reasonable prospect that the business can be successfully continued."  *In re Tropicana Entm't, LLC*, 520 B.R. 455, 472 (Bankr. D. Del. 2014).  Defendants' expert conducted a detailed solvency analysis during the challenged period and determined that TRU was solvent according to the balance sheet test (as well as the cash flow test) during the entire time that the challenged advisory fees were paid.  (SOF ¶ 7, SOF Ex. 8A.)  Neither of the Trust's experts conducted a rebuttal solvency analysis, and no other evidence in the record supports a conclusion that the company was insolvent under any test on or before the last date that advisory fees were paid.  To the contrary,

undisputed factual evidence in the record regarding solvency – including a contemporaneously

conducted Duff & Phelps opinion – demonstrates that TRU was solvent during the relevant time

period.  (SOF ¶ 7; SOF Ex. 19).

**B.**      **Even if TRU Were Insolvent, Defendants Did Not Breach Their Duty to TRU By Authorizing the Payment of Advisory Fees**

Even if TRU were insolvent, TRU still was contractually obligated to pay the advisory

fees.  (SOF ¶¶ 1-8.)  The Trust cannot cite any evidence demonstrating that it would have been

reasonable, must less required, for the Board to direct TRU to breach these contractual obligations.

The case law also does not support the proposition that it was a breach of fiduciary duty for the

Board not to do so.  *See Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 Del. Ch. LEXIS

67, at *53 (Del. Ch. Apr. 14, 2017) ("It is true that the fiduciary status of directors does not give

them Houdini-like powers to escape from valid contracts."); *Orban v. Field*, 1997 Del. Ch. LEXIS

48, at *31-32 (Del. Ch. Apr. 1, 1997) ("[I]t would be bizarre to take [the efficient breach doctrine]

so far as to assert . . . that the Board had a duty to common stock[holders] to refrain from

recognizing the corporation's [contractual] obligations to its other classes of voting securities.").

**C.**      **The Advisory Fees Were Disclosed Contemporaneously in TRU's SEC Filings and Cannot Now Be Challenged.**

A party with access to knowledge of actions that take place regularly for years, who lodges

no objection to those actions, when an objection easily could have been made in court or elsewhere,

is estopped from later claiming that those actions were a breach of fiduciary duty.  *See Staples v.

Billing*, 1994 Del. Ch. LEXIS 10, at *37 (Del. Ch. Jan. 31 1994) (holding that plaintiff's breach of

fiduciary claim is barred by the equitable defense of acquiescence, which provides that "one who

has full knowledge of and accepts the benefits of a transaction may be denied equitable relief if he

or she thereafter attacks the same transaction.").  TRU regularly disclosed the advisory fees as

Related Party Transactions in its SEC filings (SOF ¶ 7), and no party challenged these payments. The Trust cannot do so for the first time now.

## IV. THE TRUST'S TORT CLAIMS MUST BE DISMISSED BECAUSE THE TRUST LACKS STANDING TO PURSUE THE CLAIMS OF INDIVIDUAL CREDITORS

Because the Trust filed this lawsuit in New York and this case was transferred to this District upon Defendants' motion, New York's choice-of-law rules govern the analysis of whether the Trust has standing to bring its tort claims on behalf of the trade vendors. *See Ferens*, 494 U.S. at 519 (following a "transfer under § 1404(a) initiated by a defendant, the transferee court must follow the choice-of-law rules that prevailed in the transferor court."). Under New York's choice-of-law rules, on issues relating to "plaintiffs' standing to bring direct claims," New York courts look to the jurisdiction that has the "greatest interest in resolving the particular issue." *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68-69 (2d Cir. 2017).

Here, this jurisdiction is Delaware. The Trust is a Delaware entity formed for purposes of liquidating and distributing certain of the Trust's assets, and the Trust Agreement has a governing law provision prescribing that the agreement "shall be governed by and construed in accordance with the laws of the State of Delaware." (*See* ECF No. 6925, Ex. A § 12.1.) In addition, the Litigation Trustee testified that



"                                  " (Kors Tr. (SOF Ex. 66) at 62:5-10.) Thus, because the Trust's powers are derived from a contract that is governed by Delaware law and the Trust

, Delaware has the greatest interest in determining what powers the Trust can exercise.

Under Delaware's interpretation of federal bankruptcy law, a litigation trust does not have standing to pursue the direct claims of individual creditors, even where creditors have assigned their claims to the Trust.  The Delaware Chancery Court has explained the reason for this principle:

> [E]ven if the Litigation Trust Agreement or plan of reorganization did expressly assign the direct claims of Trenwick America's creditors to the Litigation Trust, **federal bankruptcy law is clear that litigation trusts do not have standing to pursue the direct claims of creditors.**  In *Caplin v. Marine Midland Grace Trust Co.*, the U.S. Supreme Court established that bankruptcy trustees and litigation trusts formed as part of reorganization plans do not have standing to bring direct claims belonging to creditors under the federal bankruptcy statute.  The U.S. Supreme Court explained that the bankruptcy statute authorized bankruptcy trustees or litigation trusts to bring only those claims belonging to the *debtor* at the time of the debtor's bankruptcy filing, but that it did not vest with trustees or litigation trusts standing to pursue separate claims belonging to others, such as the direct claims of individual creditors.  **The rule articulated in *Caplin* holds true even in cases where a creditor has assigned her claims to a trustee or Trust.**

*Trenwick*, 906 A.2d at 191 (emphasis added) (footnotes omitted); *see also Torch Liquidating Tr. ex rel. Bridge Assocs., LLC v. Stockstill*, 2008 U.S. Dist. LEXIS 19535 (E.D. La. Mar. 13, 2008) (same).

The *Torch* decision is illustrative.  There, the confirmed bankruptcy plan and the bankruptcy court's orders transferred to a litigation trust all D&O claims within the debtors' policies.  The court dismissed the creditors' fraud and other tort claims because "prior case law is explicit that Litigation Trusts such as Plaintiff do not have standing to pursue the direct claims of creditors."  *Id.* at *20 n.4.  Likewise here, the Trust cannot pursue the direct claims of creditors.

## V. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE TRUST'S TORT CLAIMS BECAUSE THE UNDISPUTED EVIDENCE SHOWS THAT THE TRUST CANNOT SATISFY ITS BURDEN OF PROOF FOR ANY INDIVIDUAL TRADE VENDOR

The Trust is pursuing tort claims against Defendants on behalf of thirty-seven trade vendors.[4] As will be demonstrated below, the Trust cannot satisfy the elements of its tort claims for any of the trade vendors. These elements of its fraud-based claims are the following:

- Fraud: (i) a defendant's false representation of an existing, material fact; (ii) a defendant's scienter/intent to deceive; (iii) the plaintiff's reasonable reliance; (iv) causation; and (v) damages. *Norddeutsche Landesbank Girozentrale v. Tilton*, 149 A.D.3d 152 (N.Y. App. Div. 2017).[5]

- Fraudulent omission: (i) a defendant's omission of an existing, material fact; (ii) a defendant's scienter/intent to deceive; (iii) the plaintiff's reasonable reliance; (iv) causation; (v) damages; and (vi) a legal duty to disclose the allegedly withheld information. *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 123 (2d Cir. 1984).

---

[4] Many more trade vendors were listed in the Trust's Complaint, but the Trust has dropped its claims for numerous trade vendors, as reflected in correspondence with Defendants' counsel.

[5] Because this case was transferred from the Southern District of New York, New York's choice-of-law principles govern the tort claims in this action. *See Ferens*, 494 U.S. 516, 519 (1990). Under New York choice-of-law rules, unless the applicable laws from each potentially applicable jurisdiction will have the potential to affect the outcome of the case significantly, New York's choice-of-law rules require the application of New York substantive law to tort claims like fraud and negligent misrepresentation. *See Horton v. Greenwich Hosp.*, 2014 U.S. Dist. LEXIS 33161, at *5 n.1 (S.D.N.Y. Mar. 10, 2014). In this action, there is significant overlap between the law of New York and that of other states that have an interest in the tort claims asserted in this jurisdiction, like New Jersey (TRU's headquarters) or Virginia (the location of the bankruptcy proceeding). *See, e.g.*, *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997); *Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (2014).

Because this is not a class action, the Trust must be able to cite evidence to support every element of each vendor's claims or that vendor's claim must be dismissed.  As one bankruptcy court has explained:

> Plaintiffs cannot be deemed to act as surrogates for all creditors who extended credit to the Debtors throughout this entire period and necessarily relied (or did not rely) on different information at different times. . . . Plaintiffs are not relieved of their burden of alleging and proving individual reliance and damages. . . . Fraud is a claim that peculiarly belongs to individual plaintiffs who had different access to information about RSL USA at different times, and in some cases may not have relied on any information.

*In re RSL COM Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *15-16 (Bankr. S.D.N.Y. Dec. 11, 2003).   Accordingly, the Trust's claims must be dismissed for all trade vendors whose individualized claims are not supported by the undisputed evidence in the record or that gave 30(b)(6) testimony directly contradicting the Trust's claims.  *See Thomas v. FTS USA, LLC*, 2016 U.S. Dist. LEXIS 82679, at *24 n.4 (E.D. Va. June 24, 2016) ("[I]t is well settled in the Fourth Circuit that as a general proposition, a party may not submit an affidavit or declaration at the summary judgment stage contradicting its earlier deposition testimony, including corporate testimony taken pursuant to Rule 30(b)(6).").[6]

As set forth in detail below, the undisputed evidence shows that (a) the critical vendor agreements that required vendors to ship for the duration of the Chapter 11 Proceeding completely undermine any possibility of reliance or causation for the vendors who signed these agreements and received payments on their pre-petition claims they otherwise would not have received; (b) the alleged misstatements are not actionable; (c) no Defendant acted with scienter; (d) the Trust cannot

---

[6]   In this regard, nearly every trade vendor testified that the Trust (i) never communicated with it before asserting claims on its behalf, (ii) never asked for emails or other documents to assess the Trust's claims on its behalf, and (iii) never asked the vendor to corroborate the Trust's allegations on its behalf.  A table reflecting many of the vendors who gave this testimony is contained in Appendix 1 attached hereto.

establish reliance for the vendors who disavowed the Trust's allegations of reliance; (e) the Trust

cannot establish that any vendor's reliance was reasonable; (f) no duty to disclose existed; (g) no

trade vendor could have reasonably relied on allegedly omitted information that was publicly

known and available; and (h) most vendors did not suffer damages from the alleged misconduct.

A. **The Trust's Tort Claims Must Be Dismissed for All Trade Vendors Who Signed Critical Vendor Agreements**

The Trust is asserting the claims of fifteen trade vendors who signed Critical Vendor

Agreements during the Chapter 11 proceeding.   These vendors, in exchange for receiving

significant payments on pre-petition shipments they otherwise would not have, agreed to assume

a contractual obligation to ship to TRU for the duration of the Chapter 11 Proceeding. (*See, e.g.*,

SOF ¶¶ 189-192.)   These vendors acknowledged that they made a business decision to receive

payments on their pre-petition claims and incur an obligation ship for the duration of the Chapter

11 Proceeding despite the risk involved in doing so. (*See, e.g.*, *id*. ¶ 188.)   The Critical Vendor

Agreement itself made clear that "liquidation of the Company or conversion of the Debtor's

chapter 11 cases to cases under chapter 7 of the Bankruptcy Code" and "a default under any of the

Company's debtor-in-possession financing facilities that results in the Company losing access to

funds available under any such facility" were two possible outcomes of the Debtors' cases. (*See*

ECF No. 708, Schedule 1 ¶ 3(a) (Form of Trade Agreement).)[7]

As a matter of law, the Critical Vendor Agreements prevent the Trust from proving reliance

or causation for the vendors who signed them because these vendors were contractually obligated

---

[7]     By contrast, other trade vendors did not enter into critical vendor agreements and turned down the significant payment on pre-petition claims because they wanted to retain flexibility about whether and on what terms to ship.   *See, e.g.*, ▮▮▮▮▮▮ (SOF Ex. 254) 183:21-184:2 (▮▮▮▮▮) ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); ▮▮▮▮▮ (SOF Ex. 198) 81:9-82:24 (same).

to ship regardless of what Defendants said to them. *See, e.g., Coughlan v. Jachney*, 473 F. Supp.

3d 166, 195 (E.D.N.Y. 2020) (granting defendant's cross-motion for summary judgment on fraud

claim because the plaintiff "[could not] have been induced to perform an obligation already

required by [a contract] by any of defendant's alleged misrepresentations."); *ICBC (London) PLC*

*v. Blacksands Pac. Grp., Inc.*, 2015 U.S. Dist. LEXIS 131211, at *33 (S.D.N.Y. Sept. 29, 2015)

(dismissing fraud counterclaim where allegedly defrauded party "was legally obligated to make

all required payments under the contract"); *Megaris Furs*, 172 A.D.2d at 212 (dismissing fraud

claim because "a plaintiff cannot claim to have been defrauded into doing what it was legally

bound to do."); *IBM Credit Fin. Corp. v. Mazda Motor Mfg. Corp.*, 152 A.D.2d 451, 453 (N.Y.

App. Div. 1989) (where a party was contractually bound to make payments, a communication by

defendant "cannot be reasonably regarded as communication which constitutes an inducement in

reliance upon which [the party] changed its position.").

The vendors who signed Critical Vendor Agreements also acknowledged at their Rule

30(b)(6) depositions that they were required to ship for the duration of the Chapter 11 Proceeding,

as the below chart demonstrates:

| Critical Vendor | Date of Signing | Payment on Pre-Petition Claim | Vendor's Testimony Confirming Contractual Obligation to Ship |
|---|---|---|---|
| ███ ████ █. | 11/8/17 | ██████ | "████████████████████████ ████████████████████████ ████████████████████████ ██████████████████████ ██████████████████████████ ████████████████████████ ██████████████████████." (██████. Tr. (SOF Ex. 182) 207:6-22.[8] ) |

---

[8]   Objections to form are omitted in citations to deposition testimony herein.  Emphasis is added.



| | 10/24/17 | $ | "Q. ████████████████████████<br>████████████████████████<br>██████████<br>██████████████████████████." (██████<br>(SOF Ex. 206)130:4-8.) |
|---|---|---|---|
| ██████<br>██ | 1/2/18 | ██████ | "███████████████████<br>█████████████████████<br>███████████████████████<br>██████████████████████<br>██████████" (██████ (SOF Ex. 229) 59:3-8 (████).) |
| ██████ | 12/21/17 | ██████ | "████████████████████<br>██████████████████<br>██████████████████<br>████████████████" (██████ (SOF Ex. 238)<br>49:10-23.) |
| ██████ | 10/22/17 | ██████ | "███████████████████<br>█████████████████████████<br>██████████." (██████ (SOF Ex. 263) 49:19-50:4.) |
| ██████ | 11/28/17 | ██████ | "████████████████████████<br>███████████████████<br>██████<br>███████████████████<br>████████<br>████████████████████<br>██████████" (██████ (SOF Ex. 279) 87:21-88:4 (████).) |
| ██████ | 12/8/17 | ██████ | "████████████████████████<br>████████████████████<br>██████████" (J██████ (SOF Ex. 290) 95:22-96:1.) |
| ██████ | 10/20/17 | ██████ | "███████████████████████<br>██████████████████████<br>██████████████<br>██████████████████" (██████ (SOF Ex. 300)<br>111:13-17.) |
| ██████ | 10/18/17 | ██████ | "███████████████████████<br>██████████████████<br>███████████████<br>████████████████████████<br>██████████" (██████ (SOF Ex. 302) 168:20-169:2.) |



| | | | |
|---|---|---|---|
| ▮ | 10/19/17 | ▮ | " ▮▮▮▮ ▮▮ ▮▮ " ( ▮ (SOF Ex. 307) 103:3-8.) |
| ▮ | 10/20/17 | ▮ | " ▮▮▮ ▮▮ " ( ▮ (SOF Ex. 314) 151:19-23 ( ▮ ).) |
| ▮ | 11/15/17 | ▮ | " ▮▮▮ ▮ " ( ▮ (SOF Ex. 333) 136:10-14.) |
| ▮ | 9/29/17 | ▮ | " ▮▮▮▮▮▮ " ( ▮ (SOF Ex. 348) 63:1-8 ( ▮ ) |
| ▮ | 10/6/17 | ▮ | " ▮▮▮ . " ( ▮ (SOF Ex. 365) 63:21-25.) |
| ▮ | 11/20/17 | ▮ | " ▮▮▮▮▮▮▮ " ( ▮ (SOF Ex. 383) 92:15-25.) |

Finally, the Trust cannot argue that the trade vendors were fraudulently induced into signing the Critical Vendor Agreements. The remedy for a fraudulent inducement of contract claim would be (i) rescission of the contract – which would require the trade vendor to return the critical vendor payment on pre-petition shipments – or (ii) the trade vendor's alleged losses after subtracting the amount of the critical vendor payment received on pre-petition payments under the

contract.  *See Corona Heights Real Estate, LLC v. LaSalle Tech. , Inc.*, 2011 U.S. Dist. LEXIS

173449, at *9 (E.D.N.Y. Feb. 11, 2011) ("'[A] party fraudulently induced to enter into a contract

has two general avenues; rescind the contract, return any consideration and seek restitution, or

affirm the contract and seek damages.'") (quoting *In re Stylesite Mktg., Inc.*, 253 B.R. 503, 511

(Bankr. S.D.N.Y. 2000)).  Here, no vendor is seeking to rescind the Critical Vendor Agreement

and return the payment it received on pre-petition shipments nor has any vendor subtracted the

payment it received on pre-petition shipments from its claimed damages.  Indeed, most of these

vendors' pre-petition payments exceed the total amount of their claimed damages based on the

Trust's own damages theory, as reflected in the chart contained in Appendix 2 attached hereto.

Further, none of the alleged misrepresentations allegedly made before the critical vendor

agreements were executed can give rise to tort liability for the reasons explained below (at Section

V.B).  And in any event, nearly all the Critical Vendor Agreements contain integration provisions

which expressly disclaim reliance on any prior representation as the basis for entering into the

agreements.  *See United Artists Theatre Circuit, Inc. v. Sun Plaza Enter. Corp.*, 352 F. Supp. 2d

342, 351 (E.D.N.Y. 2005) (concluding that reliance is "unreasonable and undermined" by written

disclaimer in contract that oral representations shall have no force or effect).

### B. The Alleged Misrepresentation Claim Must Be Dismissed Because the Trust Cannot Identify Actionable Misstatements

The Trust must be able to identify a specific actionable representation to every trade vendor

that was false when made to proceed with its fraudulent misrepresentation claim for that vendor.

The Trust cannot do so for the reasons below.

#### 1. The Trust Cannot Pursue Fraudulent Misrepresentation Claims Based on Statements Made to Vendors in September and October 2017

The Trust cannot pursue tort claims of vendors based on alleged misrepresentations made

to them in the September or October 2017 time period.  These statements generally consisted of

written statements in TRU's Frequently Asked Questions ("FAQs") and a business letter to trade vendors informing them that (i) TRU received commitments for over $3 billion in new financing that would support the company's operations and enable TRU to meet its business obligations during the financial restructuring process; and (ii) TRU would pay vendors in full for services provided on or after the filing date.  (SOF ¶¶ 178; 186.)  Some trade vendors also testified that Defendants Brandon, Short, or Barry verbally told them the same substantive information or that they saw this information contained in TRU's press releases and court filings.  (SOF ¶¶ 135-138.[9])  As explained below, these statements cannot give rise to tort liability because they were true when made and/or forward-looking aspirational or promissory statements.  *See Johnson v. Washington*, 559 F.3d 238, 245 (4th Cir. 2009) ("[W]e reject the [Plaintiffs'] claim of fraud because the statements made . . . were either accurate or were forward-looking statements of opinion.").

*First*, the undisputed evidence shows that Defendants' statements made in September and October 2017 regarding TRU's access to DIP financing were true when they were made:  it is undisputed that TRU *did* receive commitments for new financing that was expected to support Debtors' operations during the financial restructuring process.  (SOF ¶¶ 35-51, 93.)  The undisputed evidence also demonstrates that all parties involved in the Chapter 11 Proceeding – including TRU's legal counsel and financial advisors, and the UCC and its financial advisors and legal counsel – believed that the DIP financing provided TRU with sufficient liquidity to pay trade vendors.  (*See supra*, at Section I.)  This Court's Final DIP Order affirmed that one purpose of the

---

[9]    The Trust does not allege that Board members made misrepresentations directly to trade vendors.  And the Board members cannot be found liable for "ratifying" management's statements. *Magee-Boyle v. Reliastar Life Ins. Co. of N.Y.*, 2016 N.Y. Misc. LEXIS 17542 (N.Y. Sup. Ct. Apr. 4, 2016) (dismissing complaint where there were no factual allegations supporting claim that Reliastar "ratified statements"); *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 8-9 (N.Y. App. Div. 1998) (dismissing fraud claim where complaint did not show any specific misrepresentation and instead based claim on "defendants' general strategy of trying to hide the fact that nicotine was addictive").

DIP financing was to provide TRU with liquidity to pay its trade vendors. (ECF No. 711 § 5(b).) Nothing in the factual record suggests that these statements were not true when they were made.

Moreover, the undisputed factual evidence demonstrates that TRU's legal and financial advisors reviewed and approved the messaging and written statements that TRU issued during this time period -- including TRU's FAQs, vendor talking points, press releases and letter to customers – which were prepared by TRU's outside public relations firm and distributed in connection with TRU's Chapter 11 filing. (SOF ¶¶ 85-88, SOF Ex. 109-11.) Further, TRU's counsel made these same substantive representations to trade vendors. *See*, *e.g.*, ███ (SOF Ex. 333) 98:7-13 ("███.''); SOF ¶ 753; SOF Ex. 110.) And the Trust does not contend that Kirkland engaged in any wrongdoing in connection with DIP financing. (███ (SOF Ex. 66) 116:24-117:3 ("███"). This disproves any claim that Kirkland was transmitting false information.

Consequently, statements by Defendants in September and October 2017 to trade vendors regarding TRU's liquidity and ability to pay trade vendors cannot give rise to tort liability because there is no evidence in the record to suggest they were false when made. *See In re Chase*, 372 B.R. 133, 139 (Bankr. S.D.N.Y. 2007) (if debtor "'so intend[ed] at the time he made the promise [to perform], but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.'").

*Second*, Defendants' alleged misstatements in September and October 2017 regarding the purpose of the DIP financing and TRU's intent to pay trade vendors as a result of its access to DIP

financing were forward looking and aspirational or promissory statements and therefore not actionable as a matter of law.  *See Landes v.* Sullivan, 235 A.D.2d 657, 659 (N.Y. App. Div. 1997) ("a representation of opinion or a prediction of something which is hoped or expected to occur in the future will not sustain an action for fraud"); *Glidepath Holding B.V. v. Spherion Corp.*, 2010 U.S. Dist. LEXIS 33255, at *34 (S.D.N.Y. Mar. 26, 2010) (rejecting claim for tort liability based on "forward looking statements of opinion that could not reasonably have been relied on.  Just as it was not fraudulent in this context to predict success, it was not fraudulent to fail to predict failure.")  As a district court within this Circuit recently concluded, even "repeated false assurances and predictions can be puffing and related expressions of opinion that are common in sales but are not actionable as fraud."  *Douglas v. Dry Clean Concepts, Inc*., 2021 U.S. Dist. LEXIS 205104, at*9 (D. Md. Oct. 25, 2021) (emphasis added).   The court there found that governing Fourth Circuit law supported the Bankruptcy Court's dismissal of a fraud claim because a "promise to perform an act in the future is not, in a legal sense, a representation as that term is used in the fraud context."  *Id*. at *10 (citing *Lissmann v. Hartford Fire Ins. Co*., 848 F.2d 50, 53 (4th Cir. 1988)); *see also Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*, 2019 U.S. Dist. LEXIS 66581 (S.D.N.Y. Apr. 17, 2019) (finding that defendant's representation that it would pay royalties owed under a contract cannot give rise to a fraud claim); *FMC Corp. v. Fleet Bank*, 226 A.D.2d 225, 225 (N.Y. App. Div. 1996) (an opinion based on a "prediction as to future performance" is not actionable fraud); *Tyler v. Berger,* 2005 U.S. Dist. LEXIS 57466, at *5-6 (W.D. Va. Nov. 1, 2005) ("Mere statements of opinion, unfulfilled promises, or statements as to future events cannot give rise to a fraud claim, because common law fraud requires proof of a false representation of a material present or pre-existing fact.").

Here, Defendants' alleged assurances to trade vendors that TRU would make payments on post-petition shipments and that the DIP financing received would provide sufficient liquidity to TRU throughout the restructuring period were clear examples of promissory or aspirational forward-looking statements, and these statements therefore cannot serve as the basis for tort liability. *See also Music Royalty Consulting*, 2019 U.S. Dist. LEXIS 66581, at *20 ("[The Plaintiff's] naked attempt to restyle a future intent to abide by a contract as a fraudulent misrepresentation of a present fact is unavailing.").

*Finally*, many vendors testified that they *still* believe that Defendants were speaking truthfully when they made these statements in September and October 2017. *See, e.g.*, ███ Tr. (SOF Ex. 263) at 49:2-9 ("████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████"); █████. Tr. (SOF Ex. 396) at 139:12-16 ("███████

████████████████████████████████████

████████████████████") These admissions by the trade vendors that Defendants' statements were truthful when they were made are fatal to the Trust's misrepresentation claims brought on behalf of the trade vendors. *See Bolling*, 2013 U.S. Dist. LEXIS 187486, at *9 (E.D. Va. Sept. 3, 2013) (granting defendant's motion for summary judgment on the basis of "[p]laintiff's sworn testimony" that is "admissible as a party admission").

> 2. *The Trust Cannot Pursue Fraud Claims on Behalf of Vendors Who Could Not Identify the Words Spoken or Dates of Any Misstatements They Allegedly Relied Upon*

A number of vendors testified that they could not identify the specifics of any misstatements allegedly made to them.  This requires dismissal of these vendors' claims because

fraud cases "turn upon whether the statements alleged contain factual statements as opposed to an opinion, so the actual words upon which the tort of fraud is premised are critical to the pleading and the viability of the action." *Peterson v. Bass*, 48 Va. Cir. 206, 210 (Va. Cir. Ct. 1999); *see also Devansky v. Dryvit Sys., Inc.*, 52 Va. Cir. 359, 360 (Va. Cir. Ct. 2000) (holding that "[t]he facts out of which the fraud arises, including the identity of the person or persons making the misrepresentations and the date and time that they were made, must be alleged as well as proven."); *Brown v. Wolf Grp. Integrated Commc'ns, Ltd.*, 23 A.D. 3d 239, 240 (N.Y. App. Div. 2005) (dismissing a fraud claim where the plaintiff failed to specify "the words or actions used to deceive him"). Similarly, the inability of many vendors to specifically identify when the alleged misstatements were made to them requires their dismissal. *Maier-Schule GMC, Inc. v. Gen. Motors Corp.*, 1993 U.S. Dist. LEXIS 21728, at *99 (W.D.N.Y. May 3, 1993) (dismissing fraud claim on summary judgment for plaintiff's failing "to allege the dates and places of the representations that were allegedly made to it, the manner in which it was misled, and what the defendants allegedly obtained as a result of the misrepresentations."); *see also Campers' World Int'l, Inc. v. Perry Ellis Int'l, Inc.*, 2002 U.S. Dist. LEXIS 14909, at *10-11 (S.D.N.Y. Aug. 13, 2002) (finding counter-claimant's fraud allegations insufficient where it did "not provide the names of the agents who made the alleged misrepresentations, which of the alleged misrepresentations were made by each agent, the dates on which the alleged misrepresentations were made, or the location at which the misrepresentations were made."); *Bomardier Capital, Inc. v. Naske Air GMBH*, 2003 U.S. Dist. LEXIS 16173, at *11 (S.D.N.Y. Sept. 17, 2003) (dismissing the borrowers' fraud claim because they failed to meet their "obligation to plead the specific representations that constitute the fraud and to identi[fy] the speaker and date of the

43

representations.").   The vendor-by-vendor analysis contained below (at Section V.I) reflects

numerous examples of vendors unable to identify any specifics of alleged misstatements.

> ### C.    The Trust's Fraud-Based Claims Must Be Dismissed Because the Undisputed Factual Evidence Does Not Support a Finding of Scienter

To proceed on its fraudulent misrepresentation and fraudulent omission claims, the Trust

must be able to cite specific evidence in the record that Defendants acted with scienter, defined as

"a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*,

425 U.S. 185, 193 n.12 (1976).  Conclusory allegations of scienter are not sufficient.  Nor can the

Trust prove scienter by showing that the alleged promises of future performance did not come true.

*See In re Triangle Capital Corp. Sec. Litig.,* 988 F.3d 743, 754-756 (4th Cir. 2021) (explaining

that scienter cannot be based on "statements and omissions of facts arising from the execution of

legitimate, subjective business judgments that, only when viewed in hindsight, allegedly become

misleading"); *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 664 (S.D.N.Y. 1991) ("The

law is well settled, however, that a party may not establish fraudulent intent solely from the non-

performance of the future event.").  Rather, the Trust must be able to cite specific facts that "could

support a reasonable finding, by clear and convincing evidence, that Defendants had a present

intent to defraud the Plaintiffs" when they made the representations at issue.  *Century Pac., Inc. v.

Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 225 (S.D.N.Y. 2017).  To meet this standard "the

evidence cannot be loose, equivocal, or contradictory." *Id.*  No such evidence appears in the factual

record.

The Trust alleges in its Complaint that Defendants wanted "to continue business as usual"

as a means of "continu[ing] to receive their large salaries" or maintaining their Board

memberships.  (Compl. ¶ 18.)  This does not suffice to establish scienter, however, because to

prove scienter a plaintiff "'must do more than merely charge that executives aim[ed] to prolong the benefits of the positions they hold.'" *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

Moreover, the undisputed evidence reflects that Defendants did *not* want to deceive the trade vendors:  for example, the minutes of TRU's March 3, 2018 Board meeting clearly reflect that David Brandon *"said he believed the Company should notify vendors as soon as possible of the B-4 Lenders' change of position so they could decide whether they keep shipping."*  (SOF ¶ 129.)  In addition, the minutes of TRU's March 4, 2018 Board meeting reflect that David Brandon reiterated his concerns about vendors shipping once it seemed likely that TRU would need to liquidate, and his concerns were promptly and appropriately addressed:

> **Mr. Brandon expressed concerns about not informing all parties of a pending liquidation.** . . . **Mr. Brandon advised that last week he believed the Company could restructure by partnering with Sycamore but now it seems that the U.S. business will liquidate, so he is looking for guidance on how best to address the vendors**.  A discussion ensued related to communications with vendors, and the Board agreed that, if asked prior to the expected update that will be given to the Bankruptcy Court on Thursday, management should tell vendors truthfully the Company is working towards a resolution with its lenders and has a covenant waiver through March 12.  Further, **the Board advised management that, if asked, the Company should be open that payment for shipped goods is not guaranteed**.  The Board, with input from the advisors, determined that these statements were truthful and accurate, and would allow the Vendors to determine their own risk threshold.

(SOF ¶ 130, Ex. 162).

In addition, TRU made a detailed public disclosure in its contemporaneous SEC filing at the beginning of the Chapter 11 Proceeding alerting the trade vendors and all interested parties to the risk that TRU might not be able to emerge:

> **We cannot assure you that we will be able to comply with the covenants of our DIP Financing or that cash on hand and cash flow from operations will be sufficient to continue to fund our operations and allow us to satisfy our obligations related to the**

45

> **Chapter 11 proceedings until we are able to emerge from our
> Chapter 11 proceedings.** Our liquidity, including our ability to
> meet our ongoing operational obligations, is dependent upon, among
> other things: (i) our ability to comply with the terms and conditions
> of our DIP Financing agreements, (ii) our ability to comply with the
> terms and conditions of any cash collateral order that may be entered
> by the Bankruptcy Court in connection with the Chapter 11
> proceedings, (iii) our ability to maintain adequate cash on hand, (iv)
> our ability to generate cash flow from operations, (v) our ability to
> develop, confirm and consummate a Chapter 11 plan or other
> alternative restructuring transaction, and (vi) the cost, duration and
> outcome of the Chapter 11 proceedings.

(TRU Form 10-Q, September 29, 2017, at 39 (emphasis added); *see* SOF ¶ 94.)  This disclosure

further prevents the Trust from establishing that Defendants acted with an intent to deceive.  *See,*

*e.g.*, *In re Triangle Capital*, 988 F.3d at 756 ("While Defendants shared with investors their

optimism with the quality of investment opportunities Defendants saw in those years, this did not

mean that they were guaranteed to prove fruitful.  That is precisely what Defendants disclosed.");

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 2021 U.S. Dist. LEXIS 189502,

at *21 (S.D.N.Y. Sept. 30, 2021) ("[A] defendant's decision to make significant disclosures about

the exact risk he or she is purportedly trying to hide is 'inconsistent with a state of mind going

toward deliberate illegal behavior or conduct which is highly unreasonable and which represents

an extreme departure from the standards of ordinary care.'") (quoting *Holbrook v. Trivago N.V.*,

2021 U.S. Dist. LEXIS 189502, at *58 (S.D.N.Y. Feb. 26, 2019)); *Lucas v. Icahn*, 616 F. App'x

448, 450 (2d Cir. 2015) (holding that "even if" statements were misleading, the plaintiff had not

adequately pleaded that the defendants acted with scienter in light of disclosures).

Lastly, vendors testified at their 30(b)(6) depositions in this action that they do not believe

that Defendants had an intent to deceive.  *See, e.g.*, ███████████ Tr. (SOF Ex. 378) 77:14-2 ("█

████████████████████████");  The Trust cannot pursue tort claims on behalf of those who

have testified that this element of their claim is not met.  *See Bolling*, 2013 U.S. Dist. LEXIS

187486, at *9 (E.D. Va. Sept. 3, 2013) (granting summary judgment to defendant because "[p]laintiff's sworn testimony is admissible as a party admission").

**D.**     **The Trust's Tort Claims Must Be Dismissed for Every Vendor Whose 30(b)(6) Testimony Precludes the Trust from Establishing Reliance**

The Trust alleges that Defendants represented to the trade vendors that the DIP financing was guaranteed and they could ship goods during the Chapter 11 proceeding based on an assurance that they would be paid.  (*See, e.g.*, Compl. ¶ 93 (alleging that Defendants' "representations provided Trade Vendors assurance that if the Trade Vendor shipped goods to TRU on credit, then TRU had the ability to pay for the goods").)  But the vast majority of trade vendors at their 30(b)(6) depositions *rejected* the Trust's theory that they relied on Defendants' assurances they would get paid for the goods that they shipped.  The chart contained in Appendix 3 (attached hereto) contains examples of many vendors acknowledging at their 30(b)(6) depositions that they did not ship in reliance on Defendants' alleged guarantees of payment and that they knew that receiving payment on their postpetition shipments was not guaranteed.

Moreover, the Trust in its Complaint lists numerous vendors that it claims relied on Defendants' statements made to them at the Hong Kong Toy Fair in January 2018 and the New York Toy Fair in February 2018.  (Compl. ¶¶ 143, 156, 157.)  But many of these vendors testified explicitly that they did *not* rely on any statements made to them by Defendants or anyone affiliated with TRU at these toy fairs.  *See, e.g.*, ████████ Tr. (SOF Ex. 387) 159-61 ("████████

████████████████████████████████████████████████████████████████

████████"); ████████ Tr. (SOF Ex. 302) 159:15-160:11 ("████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████); ████████ Tr. (SOF Ex. 198) 75:23-

76:5 (" 

"); ▓▓▓▓ Tr. (SOF Ex. 302) 141:3-6 ("

"). This testimony is binding upon these vendors as a matter of law and undisputed in the factual record, and the Trust cannot bring claims of reliance for the vendors who disavowed the Trust's claims on their behalf. And on the undisputed evidence, including the admissions of trade vendors at their Rule 30(b)(6) depositions, the Trust cannot prove that many of the vendors even attended the Hong Kong Toy Fair or the New York Toy Fair. *See, e.g.,* ▓▓▓▓ Tr. (SOF Ex. 170) 195:12-18 (reflecting that ▓▓▓▓ did not attend the Hong Kong Toy Fair or New York Toy Fair).

Lastly, several vendors testified that representations they received from Defendants in February 2018 were not reassuring, as the chart contained in Appendix 3 also reflects. The Trust cannot bring fraud claims on behalf of these vendors who testified that, directly contrary to the Trust's allegation, they relied on Defendants' statements as their basis to *stop* shipping.

### E.    The Trust's Tort Claims Must Be Dismissed Because the Trust Cannot Prove Reasonable Reliance

Even if the Trust could prove the trade vendor's reliance (and it cannot), the Trust cannot prove that any vendor's reliance was *reasonable* because TRU publicly and explicitly disclosed in its SEC filings the risk that it might not emerge. (*See supra*, at 46; SOF ¶ 94.) In addition, the DIP financing agreements themselves were publicly filed and contained the governing covenants. (ECF No. 158.) The trade vendors were all sophisticated companies. (*See, e.g.*, SOF ¶¶ 520, 660, 741, 907, 1055.) They and their counsel therefore knew or could have known about the risk of shipping goods to TRU through reasonable diligence by reviewing these disclosures, as many trade

vendors readily admitted.  (*See, e.g.*, SOF ¶ 180.)  This precludes the Trust from proving reasonable reliance on their behalf.  *See Bioenergy Life Sci., Inc. v. Ribocor, Inc.,* 2015 N.Y. Misc. LEXIS 289, at *5 (N.Y. Sup. Ct. Feb. 3, 2015) ("[W]here the fraud could have been discovered with reasonable due diligence, a plaintiff cannot claim reasonable reliance.")*; LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 296 (D. Del. 2000) ("This is a case where investors who purchased high-risk bonds are seeking to rescind the investments because the potential risks that they were warned of materialized.  Each offering memorandum contains an abundance of warnings and cautionary language concerning the notes."); *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.").

In addition, the Trust cannot predicate tort liability on alleged statements that the DIP financing was guaranteed because, as a matter of law, no vendor could reasonably believe that shipping goods to a company during a Chapter 11 proceeding was risk free.  *See, e.g.*, *Mizrahi v. Adler*, 2014 N.Y. Misc. LEXIS 2934, at *15-16 (N.Y. Sup. Ct. June 30, 2014) (plaintiff cannot establish reasonable reliance on any representation that deal was "risk free"); *Cole v. Daoud*, 2016 U.S. Dist. LEXIS 39749, at *39 (E.D. Va. Feb. 17, 2016) (holding that because the promises at issue "reflect funding conditioned on the occurrence of other requirements . . . the result of the promise was necessarily uncertain and any reliance by [Plaintiff] was not reasonable.").

### F.    The Trust Cannot Cite Evidence to Prove Causation for Most Trade Vendors

To prove causation, the Trust must be able to cite evidence to prove that Defendants' statements are what caused it to ship.  *See, e.g.*,  *Caviness v. DeRand Res. Corp.*, 983 F.2d 1295, 1305 (4th Cir. 1993) (affirming district court decision to dismiss common law fraud count because

"the common law of Virginia requires a showing of proximate cause to establish a fraud claim");

*Revak v. SEC Realty Corp.*, 18 F.3d 81, 89-90 (2nd Cir. 1994) (explaining a plaintiff must be able

to establish that "the loss complained of is a direct result of the defendant's wrongful actions and

independent of other causes."). The Trust cannot satisfy this requirement of causation for the many

vendors listed in the chart contained in Appendix 4 (attached hereto) who testified that factors

other than Defendants' statements were the proximate cause of their decision to ship.

### G.    **The Trust Cannot Prove a Fraudulent Omission Claim Because No Duty to Disclose Existed**

The Trust alleges that Defendants were required to tell the trade vendors earlier than they

did that TRU was having financial difficulties and was in danger of breaching its financial

covenants. (Compl. ¶¶ 234-236, 243, 245.) As a matter of law, Defendants had no obligation to

disclose this information in the manner the Trust alleges.

#### 1.    *The Trust Cannot Establish a Claim for Fraudulent Concealment*

To establish its claim for fraudulent concealment, the Trust must be able to demonstrate

that Defendants had a duty to disclose material information. This duty generally does not exist in

the context of a vendor-vendee relationship. *See Kattawar v. Logistics & Distribution Servs., Inc.*,

111 F. Supp. 3d 838, 855 (W.D. Tenn. 2015) (holding that "a vendor-vendee relationship where

two companies enter into an arms-length transaction will not, as a matter of law, create a special

relationship and attendant duty to disclose."); *Garbutt v. S. Clays, Inc.*, 894 F. Supp. 456, 461

(M.D. Ga. 1995) (granting the defendants' summary judgment motion as to all fraud claims

because a "vendor and vendee of property are not, by virtue of such fact, placed in a confidential

relationship to each other, but on the contrary are presumed to be dealing at arm's length.").

Courts have held that exceptions to the general absence of a duty to disclose can arise in

limited exceptions. One exception is where the parties are in a fiduciary or confidential

relationship.  Here, the trade vendors have testified that they had an arms-length relationship with

TRU, as the chart set forth in Appendix 5 (attached hereto) demonstrates.  Consequently, the Trust

cannot prove that any vendor was in a confidential or fiduciary relationship with TRU, much less

with any individual Defendant.  *See Dopp v. Teachers Ins. & Annuity Ass'n of Am.*, 1993 U.S.

Dist. LEXIS 13980, at *15 (S.D.N.Y. Sept. 27, 1993) ("The arm's-length relationship of parties in

a business transaction is, if anything, antithetical to the notion that either would owe a fiduciary

relationship to the other.  Consequently the Court finds that defendants did not owe a fiduciary

duty to plaintiff, and that defendants' alleged failure to disclose their negotiations cannot constitute

fraudulent concealment."); *HSH Nordbank AG v. RBS Holdings USA Inc.*, 2015 U.S. Dist. LEXIS

36087, at *38 (S.D.N.Y. Mar. 20, 2015) ("Plaintiffs have not alleged facts demonstrating the

special relationship necessary to sustain actions for negligent misrepresentation and fraudulent

concealment.  The parties here are 'sophisticated entities [who were] engaged in an arm's length

transaction.'").

A second exception exists where "either one or each of the parties in entering the

transaction, expressly reposes a trust and confidence in the other or because of the circumstances

of the case, the nature of their dealings, or their position towards each other, such a trust and

confidence is necessarily implied."  *Ferry v. Black Diamond Video, Inc.*, 2016 U.S. Dist. LEXIS

76893, at *21-22 (D.N.J. June 13, 2016).  Courts find that this duty exists where the defendant has

"superior knowledge" and "'the advantage taken of the plaintiff's ignorance is so shocking to the

ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling.'"

*Ferry*, 2016 U.S. Dist. LEXIS 76893, at *21-22 (quoting Restatement (Second) of Torts § 551

cmt. l (Am. Law Inst. 1997)); *see also ISM Connect Inv. Grp. LLC v. ISM Connect, LLC*, 2018

U.S. Dist. LEXIS 152120, at *37 (D.N.J. Sept. 5, 2018) (explaining that this standard "creates a high bar for plaintiffs to meet in establishing a duty to disclose.").

Whether this duty to disclose exists is a question of law for the court to decide. *Ferry*, 2016 U.S. Dist. LEXIS 76893, at *22. Here, this duty does not exist for several reasons.

First, there is no evidence in the record that the vendors "reposed a trust and confidence" in Defendants that would create a duty to disclose. The vendors consistently testified that they were in an arms-length relationship with TRU, with both parties typically represented by their own counsel protecting their respective client's own interests. (*See, e.g.*, SOF ¶¶ 168, 185.) This type of arms-length relationship between two sophisticated parties represented by counsel precludes a claim that the vendors shipped based on their reposing trust and confidence in TRU. *See Grumman*, 748 F.2d at 739 ("Grumman's attempt to transmute its ordinary arms-length business relationship with Rohr into a fiduciary relationship is unpersuasive. The fact that Rohr has sold aircraft components to a subsidiary of Grumman in no way alters our conclusion. Grumman has completely failed to offer any evidence indicating that the parties placed sufficient trust and confidence in each other to trigger a duty of disclosure.").

Second, the Trust cannot credibly argue that any trade vendor was "taken advantage of" in a manner that is "so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling." Indeed, it is undisputed that the UCC and its lawyers were well aware that the company was having financial difficulties. The UCC was contemporaneously informed when the B-4 lenders provided a waiver of section 6.16 on January 31, 2018, and the UCC participated in conversations in chambers in this Court on January 23, 2018 and February 6, 2018 in which TRU's counsel discussed TRU's financial condition. (SOF ¶¶ 107-109, 115.) As the Litigation Trustee testified with respect to one of these conversations:



....

(Kors Tr. (SOF Ex. 66) at 258:11-260:18.)  The UCC's counsel, which owed a fiduciary

duty to the trade vendors, never disclosed this information to the trade vendors contemporaneously.

That same counsel now represents the Trust, as the Litigation Trustee testified.  *See id.* 41:4-9 ("▮

▮

▮▮▮").  The Trust cannot credibly allege that Defendants' decision not to

disclose information to the trade vendors was "shocking to the ethical sense of the community"

when the Trust's counsel decided not to make the same disclosures to the trade vendors and even

owed them a fiduciary duty (unlike Defendants, who were in arms-length relationships with them).

*See also* ▮▮ Tr. (SOF Ex. 279) 96:16-21 (▮▮) ("▮▮▮

▮▮

▮▮

▮▮").  Given this, Defendants and their counsel cannot be accused by the

same individuals to have engaged in an ethically shocking decision by following the same course

of action.  This is particularly so where, as discussed above, nearly all trade vendors testified that

they understood that TRU was in Chapter 11 and that there was risk in shipping to TRU.  *See also*

*City of Millville v. Rock*, 683 F. Supp. 2d 319 (D.N.J. 2010) (holding that defendants did not have

a duty to disclose that they were contemplating bankruptcy when securing a loan because the

circumstances of the case, including the plaintiff's knowledge of the potential risk, did not

demonstrate conduct "so shocking . . . as to amount to a form of swindling").

    In addition, the statements made by Defendants in September and October 2017 that the

Trust now claims were misleading did not create any duty to update or correct.  As explained

above, these statements were true when made and were promissory statements not cognizable as

tort claims.  (*See supra*, at Section V.B.1.)  As a result, no duty to update them existed.  *See*

*Medtronic Sofamor Danek, Inc. v. Michelson,* 2004 U.S. Dist. LEXIS 26385, at * 48 (W.D. Tenn.

May 20, 2004) (dismissing fraudulent omission claim because where parties had a "significant

history of arms-length negotiations," there was no duty to disclose updated sales projections to

counterparty that developed after initial representations).

    Finally, the undisputed evidence demonstrates that TRU's Board was concerned in the

December through February time period about the company's liquidity issues and was working to

renegotiate existing covenants or obtain new sources of financing.  (SOF ¶¶ 102, 106, 107, 108,

116, 117, 119.)  As a matter of law there was no duty to update the trade vendor community with

real-time confidential information about these discussions while the outcome of these discussions

and state of the company's access to liquidity remained highly uncertain. *See, e.g*., *In re Express*

*Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2nd Cir. 2019) ("[Plaintiff] essentially argues

that Defendants should have anticipated the outcome of the negotiations sooner or that the

negotiations would deteriorate, but in the circumstances here, where the discussions were ongoing,

Defendants did not have a duty to disclose more about the uncertain state of the negotiations."); *Coyne v. Gen. Elec. C*o., 2010 U.S. Dist. LEXIS 70879, at \*21 (D. Conn. July 15, 2010) ("Those statements of earnings projections for the quarter established goals at the start of the quarter and could not plausibly mislead.  Thus, GE was under no duty to correct them during the quarter. Holding otherwise would lead to an absurd result, effectively imposing on GE a duty to inform investors constantly about the company's earnings throughout the quarter."); *Walker v. Action Indus., Inc.*, 802 F.2d 703, 710 (4th Cir. 1986) ("Because of the frequency and volatility of these projections, the imposition of a duty to disclose them would have required virtually constant statements by [the issuer] in order not to mislead investors.  Under these circumstances, we deem the projection disclosures urged by [appellant] to be impractical, if not unreasonable."); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991) (explaining that a company is generally "not obliged to disclose [its] internal projections."); *In re Duane Reade Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 21319, at \*35 (S.D.N.Y. Nov. 24, 2003) ("Plaintiffs' argument that because sales were down at the end of the first quarter, the impending final results for the second quarter must have been apparent throughout the quarter (including after the first three weeks) mimics the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain.").

> 2.     *The Trust Cannot Establish a Claim for Negligent Misrepresentation*

To establish a claim for negligent misrepresentation, the Trust must be able to prove (1) a special or privity-like relationship between the parties sufficient to impose on the defendant a duty to impart correct information, (2) that the information provided by the defendant was incorrect, and (3) reasonable reliance on the information.  *See Icebox-Scoops, Inc. v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 110 (E.D.N.Y. 2009).  The Trust is unable to prove these factors.

The Trust cannot point to facts establishing a special or privity-like relationship that would trigger a duty to disclose, which means it cannot establish a required element to maintain its negligent misrepresentation claim. As explained above, nearly all of the vendors testified that they were in an arms-length relationship with TRU, and testimony to the contrary is not creditable. It is well established that an ordinary, arms-length business relationship does not create a special or privity-like relationship. *See Alley Sports Bar, LLC v. SimplexGrinnell, LP*, 58 F. Supp. 3d 280, 293-94 (W.D.N.Y. 2014) ("A special relationship requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified.").

In addition, the case law is clear that one party's "[k]nowledge of the particulars of the company's business" is not the type of special knowledge and expertise that gives rise to a special relationship creating a duty to disclose. *See, e.g.*, *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 401-02 (S.D.N.Y. 2004) (knowledge and experience of accounting and financial condition is not the type of specialized knowledge that triggers a duty of care in the commercial context); *Alley Sports Bar*, 58 F. Supp. 3d at 294 (comparing professionals, like lawyers and engineers, who by virtue of their training and experience may have special relationships of confidence and trust with their clients, with a fire alarm inspector, who "is simply not such a professional," notwithstanding that he knew that plaintiff would be relying on information he provided). Thus, the Trust cannot establish that Defendants and the vendors had a special relationship based on their "expertise" about TRU's own financials.

In addition, as explained above, the Trust cannot establish that the information provided by Defendants was incorrect at the time it was given, or that the trade vendors reasonably relied

on information to their detriment.  (*See supra*, at Sections V.B.1 and V.C.)  For these reasons as well, the negligent misrepresentation claims must be dismissed.

    **H.**    **The Trust Cannot Prove Reasonable Reliance on the Allegedly Omitted Information**

Even if a duty to disclose existed (and it did not), the Trust's fraudulent omission and negligent misrepresentation claims cannot survive because the trade vendors knew or could have known the allegedly omitted information.

The Trust alleges in its Complaint that vendors shipped goods to TRU because Defendants told them that TRU had entered into DIP financing agreements but failed to tell them that the DIP financing agreements contained covenants that needed to be met.  (Compl. ¶ 117.)  But numerous trade vendors acknowledged knowing that the DIP financing agreements contained covenants and these covenants were contained in the publicly filed DIP financing agreements.  (ECF No. 158.)  Even the Litigation Trustee conceded in his deposition testimony that any interested party could have accessed them.  *See* █████ Tr. (SOF Ex. 66) 174:24-175:3 ("████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████").  This alleged omission therefore cannot give rise to a fraud claims as a matter of law.  *See Johnson*, 559 F.3d at 245 ("Even assuming that [Defendant] did mislead the [Plaintiffs], which we do not suggest, the documents that they signed plainly stated the terms of the transaction and more than corrected any misleading oral statements. Plaintiffs cannot be heard to complain when they failed to read the relevant documents.").

The Trust also alleges that Defendants failed to disclose to the trade vendors TRU's poor holiday sales.  (Compl. ¶¶ 236, 245.)  But multiple vendors testified that they saw news of TRU's poor holiday results and/or knew about TRU's poor holidays results based on their access to

information on TRU's portal, as the chart contained in Appendix 6 demonstrates. Thus, this alleged omission also cannot give rise to a tort claim.

Finally, the Trust alleges that Defendants failed to tell trade vendors that TRU was in danger of breaching its covenants. (Compl. ¶ 124.) But numerous trade vendors testified they knew this information as well because it was publicly reported and/or was told to them by Defendants, as the chart contained in Appendix 6 also demonstrates. The Trust cannot bring tort claims on behalf of vendors who testified they knew the information that the Trust alleges was hidden from them and chose to ship goods to TRU anyway. *See Favour Mind Ltd. v. Pac. Shores, Inc.*, 2004 U.S. Dist. LEXIS 637, at *20 (S.D.N.Y. Jan. 16, 2004) ("Plaintiff's decision to do business with [the company] in light of this knowledge indicates an informed decision. After Plaintiff was alerted to signs that [the company] needed help in paying its bills, Plaintiff's unabated business with [the company] indicates a ratification of its previous decision and evinces a deeper appreciation of the risks involved.")

## I.      The Trade Vendor's Own 30(b)(6) Testimony Demonstrates That the Trust Cannot Prove Every Element of Any Trade Vendor's Claims

For the reasons explained above and summarized on a vendor-by-vendor basis below, the undisputed evidence makes clear that none of the trade vendors' tort claims asserted by the Trust can survive summary judgment, even if the Trust had standing to pursue them and could cite evidence in the record to support a finding of a Defendant's scienter, duty to disclose, and the trade vendor's damages (and it cannot).

### 1.    *The Trust's Claims on Behalf of Lego Must Be Dismissed*

Lego's claims must be dismissed because ███████████████████████████████████████████████████████████████████████████████. Lego's claims also must be dismissed because ███████████████████████████████



---

[10]   These citations regarding statements relied upon were given in response to Defendants'
questioning of the trade vendors' 30(b)(6) witnesses.  As reflected in the Statement of Facts,
upon questioning by the Trust's counsel (typically through leading questions that are
inadmissible), some of these vendors testified that they relied upon the written materials that
TRU distributed in September 2017 in connection with the Chapter 11 filing, including a press
release, Frequently Asked Questions ("FAQs"), a Dear Valued Business Partner letter signed by
Richard Barry, and/or declarations in support of the DIP financing submitted to this Court.  For
the reasons explained above, none of these documents give rise to tort claims because they were
true when made and/or forward-looking.



2.    _The Trust's Claims on Behalf of Hasbro Must Be Dismissed_

The Trust's claims on behalf of Hasbro must be dismissed because





| Element Requiring Dismissal | Hasbro's 30(b)(6) Testimony |
|---|---|
| | " _____ " (Hasbro Tr. 49:19-50:4.) |
| | " _____ " (Hasbro Tr. 39:5-9.) " _____ " (Hasbro Tr. 49:2-9.) |
| | " _____ " (Hasbro Tr. 74:5-10.) |
| | " _____ . (Hasbro Tr. 53:4-11.) " _____ . . . . _____ " (Hasbro Tr. 96:4-21 (emphasis added).) |
| | " _____ ." (Hasbro Tr. 172:6-17.) |



*3.*    *The Trust's Claims on Behalf of Funrise Must Be Dismissed*

The Trust's claims on behalf of Funrise must be dismissed because ███████████ ████████████████████████████████████████████████████████████████████. In addition, ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████.



| Element Requiring Dismissal | Funrise's 30(b)(6) Testimony |
|---|---|
| ████████ ████ ███████ | "████████████████████████████ ████████████████████████████ ████████████████████████████ ███████" (Funrise Tr. 59:3-8 (████).) |
| ██ ██████████ ███ | "████████████████████████████ ████████████████████████████ ███████████████ ██████████ ████ ████" (Funrise Tr. 27:4-11 (████).) |
| ████████ | "████████████████████████████ █████████████████ ██████████ ████████████████████ ████ ████" (Funrise Tr. 69:3-9 (████).) |
| ██████████ | "██████████████████████████ ██████████████████████████ ████████████████ ████████████████████████████████" (Funrise Tr. 72:25-73:22 (████).) |

62



" (Funrise Tr. 163:24-164:4 (███).)

#### 4. *The Trust's Claims on Behalf of Huffy Must Be Dismissed*

The Trust's claims on behalf of Huffy must be dismissed because ████████



██████. The Trust also cannot establish ████████

| Element Requiring Dismissal | Huffy's 30(b)(6) Testimony |
|---|---|
| ████████ | "████████ ... " (Huffy Tr. 87:21-88:4 (███).) |
| ████████ | "████████ ... ." (Huffy Tr. 30:10-13 (███).) |
| ████████ | "████████ ... ." (Huffy Tr. 66:25-67:8 (███).) |
| ████████ | "████████ |





*5.*     *The Trust's Claims on Behalf of Jakks Must Be Dismissed*

The Trust's claims on behalf of Jakks must be dismissed because ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████. In addition, ██████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████.





" (Jakks Tr. 96:25-97:7.)

6.   *The Trust's Claims on Behalf of Graco Must Be Dismissed*

The Trust's claims on behalf of Graco must be dismissed because ▮▮▮▮▮



▮▮▮▮ Graco's 30(b)(6) testimony (SOF ¶¶ 379-413; SOF Ex. 238 (Graco

Tr.)) ▮▮▮▮▮

▮▮▮▮ .



| Element Requiring Dismissal | Graco's 30(b)(6) Testimony |
|---|---|
| ▮▮▮ | " ▮▮▮▮▮ ." (Graco Tr. 49:10-23.) |
| ▮▮▮▮ | " ▮▮▮▮▮ " (Graco Tr. 34:15-35:8.) |
| ▮▮ | " ▮▮▮▮ ." (Graco Tr. 46:11-14.) |
| ▮▮▮ | " ▮▮▮▮ " (Graco Tr. 32:14-20.) |

65



7.    *The Trust's Claims on Behalf of Mattel Must Be Dismissed*



| Element Requiring Dismissal | Mattel's 30(b)(6) Testimony |
|---|---|
| ███████ ███████ ███████ | "███████████████████████ ███████████████████████ ████████████ ███████████████████████ ███████████████████████ ███████" (Mattel Tr. 63:1-8 (███████).) "███████████████████████ ███████████ ███████" (Mattel Tr. 96:3-5 (███████).) |
| ███████ | "███████████████████████ ███████████ ███████████████ ███████████████████████ ███████ |



(Mattel Tr. 70:20-71:17 (          ).)

" (Mattel Tr. 85:7-12 (          ).)

" (Mattel Tr. 73:3-21 (          ).)

." (Mattel Tr. 130:5-12 (          ).)

8.    *The Trust's Claims on Behalf of Best Chairs Must Be Dismissed*

The Trust's claims on behalf of Best Chairs must be dismissed because



. In addition,

.

| Element Requiring Dismissal | Best Chairs' 30(b)(6) Testimony |
|---|---|
|  | " |

." (Best Chairs Tr. 208:4-15.)



” (Best Chairs Tr. 261:13-262:6.)

” (Best Chairs Tr. 147:22-148:11.)

” (Best Chairs Tr. 176:15-22.)

9.    _The Trust's Claims on Behalf of Dorel Must Be Dismissed_

The Trust's claims on behalf of Dorel must be dismissed because ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████. Dorel's 30(b)(6) testimony (██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████.

| Element Requiring Dismissal | Dorel's 30(b)(6) Testimony |
|---|---|
| | " |



10. *The Trust's Claims on Behalf of Jazwares Must Be Dismissed*





| Element Requiring Dismissal | Jazwares' 30(b)(6) Testimony |
|---|---|
| ████ ████ ████ | "████████████ ████████████ ████" (Jazwares Tr. 114:12-16.) |
| ██ ████████ ████████ ████████ | "████████████ ████████ ████████████ ████████████ ████" (Jazwares Tr. 41:1-10.) |
| ████████ ██████ | "████████ ████ ████████████ ████████████ ████████████ ████████████" (Jazwares Tr. 68:5-14.) |
| ██████ ████████ | "████████ ████████████ ████████████ ████████████ ████████████ ████████ ████████████ ████" (Jazwares Tr. 131:2-21 (emphasis added).) |

> 11.    *The Trust's Claims on Behalf of Just Play Must Be Dismissed*

The Trust's claims on behalf of Just Play must be dismissed because ██████████



████████████████████████████████████████. The Trust

also cannot establish ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████.



| Element Requiring Dismissal | Just Play's 30(b)(6) Testimony |
|---|---|
| ████ ████ ████t | "████████████████ ████████" (Just Play Tr. 125:16-19.)  "████████████ ███████ █████████ ██████ ████████████." (Just Play Tr. 223:23-224:12.) |
| ████████ | "████████████████ ████████████████ ████████████████ █████████████ ██████████████ ██████████████ ████████████████ ████████ █ ██████████████" (Just Play Tr. 159:15-160:11.)  "████████████████ ████████████████ ████████████ ████████.." (Just Play Tr. 169:24-171:19 (emphasis added).) |
| ████████████ | "████████████████ ████████" (Just Play Tr. 110:10-14.) |

*12.    The Trust's Claims on Behalf of Kent International Must Be Dismissed*

The Trust's claims on behalf of Kent International must be dismissed because ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████. The Trust also cannot

prove ███████████████████████████████████████████████████████████

████████████████████████████████████.

| Element Requiring Dismissal | Kent International's 30(b)(6) Testimony |
|---|---|
| ████████ ████ ████████ | "████████████████████████████████████ ██████████████████████████████████ ████████████████████████████ ████████████████████████████████" (Kent Tr. 108:3-11.) |
| ██ ████████ ████████ ████████ ████████ | "██████████████████████████████ ████████████████████████████████ ██████████████████ " (Kent Tr. 140:21-25.) "████████████████████████████████ ████████████████████████████████ ████████████████ " (Kent Tr. 141:13-18.) "████████████████████████████████ ██████████████████████████████ ██████████████████████████ ████████████████████████████████████████ " (Kent Tr. 142:11-143:4.) |
| ████████████ | "████████████████████████████████ ██████████████████████████████ ████████████████████████ " (Kent Tr. 143:23-144:4.) "████████████████████████████████ ████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████ ████████████████████████████████████ " (Kent Tr. 145:3-18.) |
| ████████████ | "████████████████████████████████ ██████████████████████████ ████████████ |



." (Kent Tr. 88:11-19.)

### 13.   *The Trust's Claims on Behalf of Kids2 Must Be Dismissed*

The Trust's claims on behalf of Kids2 must be dismissed because ████



. Kids2 further testified that ████

| Element Requiring Dismissal | Kids2's 30(b)(6) Testimony |
|---|---|
| |  |



14. *The Trust's Claims on Behalf of MGA Must Be Dismissed*

The Trust's claims on behalf of MGA must be dismissed because ███████





| | |
|---|---|
| ███ ███ | ███ ███ ███ ███ ███ " (MGA Tr. 54:15-24.) |
| ███ | "███ ███ ███ ███ " (MGA Tr. 140:9-16.) |
| ███ ███ ███ ███ | "███ ███ ." (MGA Tr. 166:21-23.) "███ ███ ███ ." (MGA Tr. 211:10-16.) |

### 15.    *The Trust's Claims on Behalf of Skyrocket Must Be Dismissed*

The Trust's claims on behalf of Skyrocket must be dismissed because ███████

███████████

███████████

███████████

███ .



| Principle Requiring Dismissal | Skyrocket's 30(b)(6) Testimony |
|---|---|
| ███ ███ ███ | "███ ███ ███ ███ ███ ███ ███ ." (Skyrocket Tr. 92:15-25.) |



16.   *The Trust's Claims on Behalf of RR Donnelley Must Be Dismissed*

The Trust's claims on behalf of RR Donnelley must be dismissed because ▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The

Trust also cannot prove ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮.





" (RR Donnelley Tr. 49:6-13.)

." (RR Donnelley Tr. 60:8-15.)

" (RR Donnelley Tr. 62:9-63:5.)

17. _The Trust's Claims on Behalf of LSC Communications Must Be Dismissed_

The Trust's claims on behalf of LSC Communications must be dismissed because ███

███████████████████████████████████████████████████████

███████████████████████████████████████. The Trust also cannot prove

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████"

| Principle Requiring Dismissal | LSC Communications 30(b)(6) Testimony |
|---|---|
| ███████ ███████ ███ | "██████████████████████████ ████████████████ █████████████" (LSC Tr. 69:7-11.) |



18.   *The Trust's Claims on Behalf of Crayola Must Be Dismissed*





| ▮▮▮▮▮ | "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Crayola Tr. 162:8-18.) |
| ▮▮▮▮▮▮ ▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮" (Crayola Tr. 83:2-7.) |

19.  *The Trust's Claims on Behalf of Evenflo Must Be Dismissed*

The Trust's claims on behalf of Evenflo must be dismissed because ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

| Element Requiring Dismissal | Evenflo's 30(b)(6) Testimony |
|---|---|
| ▮ ▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮ | "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮" (Evenflo Tr. 40:18-41:11 (▮▮▮▮▮) (emphasis added).) |
| ▮▮▮▮ | "▮▮▮▮▮▮▮▮▮" (Evenflo Tr. 13:14-16 (▮▮▮▮).)<br><br>"▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮" (Evenflo Tr. 14:21-23 (▮▮▮▮).) |
| ▮▮▮▮▮ | "▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮" (Evenflo Tr. 38:20-23 (▮▮▮▮).) |



." (Evenflo Tr. 127:4-12 (⬛⬛⬛).)

20.    *The Trust's Claims on Behalf of Bandai Must Be Dismissed*

The Trust's claims on behalf of Bandai must be dismissed because ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛. The Trust also cannot prove ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛.



." (Bandai Tr. 50:18-51:2.)

| Principle Requiring Dismissal | Bandai's 30(b)(6) Testimony |
|---|---|
| | |



(Bandai Tr. 53:6-13.)

21.   *The Trust's Claim on Behalf of Spin Master Must Be Dismissed*

The Trust's claims on behalf of Spin Master must be dismissed because ███████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████. The Trust

also cannot demonstrate ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████.



| Element Requiring Dismissal | Spin Master's 30(b)(6) Testimony |
|---|---|
| ████████ ████████ ████████ ██████ █████ ██ | "████████████████ ████████████████████ ███████████████████ █████████████████████ ████████████████████ ████████████████" (Spin Master Tr. 143:1-10.) "████████████████████████████ █████████" (Spin Master Tr. 65:6-8.) |
| ████████ | "████████████████████ ████████████████████████ ████ ████████████████████████ ████████████████████████ ██████████" (Spin Master Tr. 196:14-197:16.) |



." (Spin Master Tr. 198:25-199:13.)

" (Spin Master Tr. 98:5-8.)

." (Spin Master Tr. 156:12-157:6.)

22. *The Trust's Claims on Behalf of American Plastic Toys Must Be Dismissed*

The Trust's claims on behalf of American Plastic Toys must be dismissed because

. American Plastic Toys also testified that

.



| Element Requiring Dismissal | American Plastic Toys' 30(b)(6) Testimony |
|---|---|
| ██████ ██████████ ████████ ████████ ███ ██████████ ██████ ██████████ ███████ | "████████████████████████ ████████████████████████ ████████████ ████████████████ █████████████████████ ████████████████ █████████████████████ █████████ █ ████████████████████████ ███ ██████████████ ██████████████ " (APT Tr. 211:22-213:2, APT Tr. 218:13-18.) |
| ████████████ ██████ | "████████████████████████ ██████████████ ██████████ ████████████████████████ ████████████████ ████████ ████████████████████████ ██████████ ████." (APT Tr. 223:7-18.) |
| ████████ | "████████████████████████ ████████████████████ ████████████ ████████████████████████ ████." (APT Tr. 175:7-15.) |

23.     _The Trust's Claims on Behalf of Munchkin Must Be Dismissed_

The Trust's claims on behalf of Munchkin must be dismissed because ████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████. In addition, the Trust cannot demonstrate ██████████████████████████████

██████████████████████████████████████████████████████████████████████████.

84



## 24. *The Trust's Claims on Behalf of Bestway Must Be Dismissed*





| Element Requiring Dismissal | Bestway's 30(b)(6) Testimony |
|---|---|
| ▮ ▬▬▬▬ ▬▬ ▬▬▬ | " ▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ ▬▬▬▬ ▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬ ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬ ▬▬ ▬▬" (Bestway Tr. 100:16-101:11.) |
| ▬▬▬▬ ▬▬▬ ▬▬▬ ▬▬ ▬▬▬▬ ▬▬▬▬▬ | " ▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ ▬▬▬▬▬" (Bestway Tr. 102:3-103:2.) |



25.    _The Trust's Claims on Behalf of Yvolve Must Be Dismissed_

The Trust's claims on behalf of Yvolve must be dismissed because ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬. The Trust also cannot prove ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬.



| Element Requiring Dismissal | Yvolve's 30(b)(6) Testimony |
|---|---|
| | " ____ ____ ____ ____ ____ " (Yvolve Tr. 42:3-43:2.)  " ____ ____ ____ " (Yvolve Tr. 208:6-9.)  " ____ ____ ____ ____ ____ ____ ____ ." (Yvolve Tr. 56:21-57:9.) |
| | " ____ ____ ____ ____ ____ ____ ____ " (Yvolve Tr. 166:8-20.) |
| | " ____ ____ ____ " (Yvolve Tr. 118:22-119:2.) |
| | " ____ ____ ____ " (Yvolve Tr. 170:24-171:5.) |

26.    *The Trust's Claims on Behalf of Jada Toys Must Be Dismissed*

The Trust's claims on behalf of Jada Toys must be dismissed because ███████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████.

| Element Requiring Dismissal | Jada Toys' 30(b)(6) Testimony |
|---|---|
| ██ ████████████ ████████ ███████ | "██████████████████████████ ████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ██████████████████████ ██████" (Jada Tr. 194:24-195:12.) |
| ██████████ | "███████████████████████ ████████████████ ███████████████ █████████████████████ ████████████████ ███████████████" (Jada Tr. 114:7-16.)  "██████████████████████ ██████████████████████ █████████████" (Jada Tr. 183:3-7.) |
| ████████████ | "██████████████████████ ██████████████████ ██████████████ █████████████████ ████████████████" (Jada Tr. 205:18-206:7.) |

27. *The Trust's Claims on Behalf of North States Must Be Dismissed*

The Trust's claims on behalf of North States must be dismissed because ███████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████

In addition, ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████.

| Element Requiring Dismissal | North States' 30(b)(6) Testimony |
|---|---|
| ██ ████████ ████████ ██ | "████████████████████████████████████████ ██████████████████████████████████████ ██████████████████.  " (North States Tr. 61:6-10 (███).) <br><br> "████████████████████████████████████████ ████████████████████████████ .  " (North States Tr. 61:22-25 (███).) <br> "████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████" (North States Tr. 63:15-20 (███).) |
| ██ ████████ ████████ | "████████████████████████████████████████ ██████████████████ ████████████████████████████████████████████████." (North States Tr. 55:1-5 (███).) |

28. *The Trust's Claims on Behalf of eKids Must Be Dismissed*

The Trust's claim on behalf of eKids must be dismissed because ███████████ ██████████████████████████████████████████████████████████████████



. The Trust's claim on behalf of eKids also must be dismissed because



| Element Requiring Dismissal | eKids' 30(b)(6) Testimony |
|---|---|
| ███ ██████ ██████ ███ | " ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ██████████████████ ███ " (eKids Tr. 246:23-247:8.)  " ██████████████████ ███████ " (eKids Tr. 251:2-4.) |
| █████████ | " ███████████████████████ ████████████████ " (eKids Tr. 263:14-17.) |
| █████████ | " ███████████████████████ █████████ " (eKids Tr. 232:11-13.) |

29.    *The Trust's Claims on Behalf of Handi-Craft Must Be Dismissed*

The Trust's claims on behalf of Handi-Craft must be dismissed because ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████.



| Element Requiring Dismissal | Handi-Craft's 30(b)(6) Testimony |
|---|---|
| ▮▮▮▮▮ | " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ." (Handi-Craft Tr. 184:3-9 (▮▮▮▮).) |
| ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮ | " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ." (Handi-Craft Tr. 181:8-17 (▮▮▮▮).) |

30.    _The Trust's Claims on Behalf of Learning Resources Must Be Dismissed_

The Trust's claims on behalf of Learning Resources must be dismissed because ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  The Trust also cannot

prove c▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮.



| Element Requiring Dismissal | Learning Resources' 30(b)(6) Testimony |
|---|---|
| ▮▮ ▮▮▮▮▮ ▮▮▮▮ | " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ." (Learning Resources Tr. 36:3-14.) |
| ▮▮▮▮▮ | " ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ." (Learning Resources Tr. 212:9-19 (emphasis added).) |

31.      *The Trust's Claims on Behalf of MerchSource Must Be Dismissed*

The Trust's claims on behalf of MerchSource must be dismissed because ████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████.

| Element Requiring Dismissal | MerchSource's 30(b)(6) Testimony |
|---|---|
| ██ ████████████ | "████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████ ████████" (MerchSource Tr. 44:12-22.) <br><br> "████████████████████████████████ ████████████████████████████████ ██████████" (MerchSource Tr. 45:7-12.) |
| ██████████ | "████████████████████████████████ ████████████████████████ ██████████" (MerchSource Tr. 48:25-49:4.) |

32.      *The Trust's Claims on Behalf of Warner Brothers Must Be Dismissed*

The Trust's claims on behalf of Warner Brothers must be dismissed because ████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████.



| Element Requiring Dismissal | Warner Brothers' 30(b)(6) Testimony/Documentary Evidence |
|---|---|
| ██ ███████ ██████ █████ ██ | "████████████████████ ████████████████████ ██████████ █████████" (Warner Bros. Tr. 134:8-13.) "████████████████ █████████████████ ██████████████ ██████████████ ████████████ ██████████████████████" (Warner Bros. Tr. 137:4-23.) "███████████████ ██████████ █████████████████ ██████████████████ ██████████████ ████████" (Warner Bros. Tr. 139:12-21.) |
| ██████ | "███████████████████ ████████████████████ ████████████████ █████████████ ████████████ ████." (Warner Bros. 93:1-10.) "██████████████ ███████████████ ███████ ███████ ████████████████████ ██████████████████ ██████ ████████" (Warner Bros. Tr. 106:6-18.) |
| █████████ ██████ | "████████████████ ███████████████ ███████ ████████████████████ █████████████████ ████████ ████████" (Warner Bros. Tr. 96:17-97:2.) |



| | |
|---|---|
| ▬▬▬▬▬ | "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ." (Warner Bros. Tr. 143:4-7.) ▬▬▬▬▬▬▬▬▬ |
| | "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" (Warner Bros. Tr. 113:1-18.) |
| | "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" (Warner Bros. Tr. 154:11-16.) |

### 33.   *The Trust's claims on Behalf of Artsana Must Be Dismissed*

The Trust's claims on behalf of Artsana must be dismissed because ▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.



| Element Requiring Dismissal | Artsana's 30(b)(6) Testimony |
|---|---|
| ▬▬ ▬▬▬▬▬ ▬▬▬▬ ▬▬ | "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬ (Tr. 186:21-187:1.) |
| | "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ ." (Artsana Tr. 189:7-15.) ▬▬▬▬▬▬▬▬▬▬ |
| | "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬" (Artsana Tr. 190-12:17.) |



” (Artsana Tr. 194:8-19.)

” (Artsana Tr. 195:19-196:12.)

*34.*    *The Trust's Claims on Behalf of Delta Enterprise Must Be Dismissed*

The Trust's claims on behalf of Delta Enterprise must be dismissed because ███████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████.

| Element Requiring Dismissal | Delta Enterprise's 30(b)(6) Testimony |
|---|---|
| ██ | " |

” (Delta Tr. 38:15-23.)



" ████████████████████████████████
██
█████████████████████████████████████████
███████████████████████████████" (Delta Tr. 40:16-42:13.)

### 35.    _The Trust's Claims on Behalf of Kitex Must Be Dismissed_

The Trust's claims on behalf of Kitex must be dismissed because ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████.



| Principle Requiring Dismissal | Kitex's Testimony |
|---|---|
| ██████ ██████ | " █████████████████████████████<br>████████████████████████<br>█████████████████████████████<br>████████████████████████<br>██████████████████████████████<br>██████████████████████<br>██████████████████████████████<br>█████████████████ " (Kitex Tr. 63:23-64:66:17.)<br>" ████████████████████████████<br>█████████████████████<br>█████████████████████████████<br>█████████████████████████<br>████████████████████████<br>██████ " (Kitex Tr. 54:2-55:24.) |

### 36.    _The Trust's Claims on Behalf of Step2 and Adventure Playsets Must Be Dismissed_

The claims on behalf of Step2 and its associated entity Adventure Playsets must be

dismissed because ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



| Element Requiring Dismissal | Step2's and Adventure Playset's 30(b)(6) Testimony |
|---|---|
| ███████ ███████ ████ | "████████████████████████ ████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████" (Step2 Tr. 22:19-23:1.) "████████████████████████ ████████████████████████ ██████████ ████ ██████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████" (Step2 Tr. 25:18-26:5.) "████████████████ ████████████████████████ ██████████ ████████████ " (Step2 Tr. 29:4-16.) "████████████████████████ ████████████████████████ ████████████████ ████████████████████" (Step2 Tr. 32:14-19.) |
| ████████ | "████████████████████████ ████████████████████ ██████ ██ ████████████" (Step2 Tr. 56:25-57:8.) |

97

| ██████████ ██████ | "████████████████████████████████████ ████████████████████████████████ ██████." (Step2 Tr. 124:23-125:2.) |

### 37.    *The Trust's Claims on Behalf of Bridge Direct Must Be Dismissed*

The Trust's claims on behalf of Bridge Direct (also referred to as Basic Fun) ████████



██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████.

| Principle Requiring Dismissal | Bridge Direct's 30(b)(6) Testimony |
|---|---|
| ██ ██████████████ ██████████ ██████ | "████████████████████████████ ████████████████████████████ ██████████████████████ ████████████████████████████ ████████████████████ ██████████████ ████████████████████████ ████████████████ ██████████ ████████████ ████████████████████ ████████████████████████ ████████████████" (Bridge Direct Tr. 113:18-114:1; *id.* 116:6-10.) ████████████████████ ████████████████████████ ██████████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ██████████████████ (Bridge Direct Tr. 122:16-123:21.) |



| | ████████████████████████████████████████ |
| | ████████.” (Bridge Direct Tr. 126:4-7.) |
| ████████ | “████████████████████████████████ |
| | ████████████████████████████████████████ |
| | ████████████████████████.” (Bridge Direct Tr. 119:12-16.) |
| ████████ | “████████████████████████████████████ |
| ████ | ████████████████████████████████████████ |
| | ████ |
| | ████” (Bridge Direct Tr. 151:6-8.) |

**J.     The Trust's Stand-Alone Negligence Claim Cannot Survive Summary Judgment**

To proceed on a negligence claim, the Trust must be able to show that a Defendant owed a duty of care to the plaintiff, the defendant breached that duty, and the breach proximately caused injury to the plaintiff. *Triton Constr. Co. v. E. Shore Elec. Servs.*, Inc., 2009 Del. Ch. LEXIS 88, at *74 (Del. Ch. May 18, 2009).

Under Delaware law, even where a company is insolvent, the company's directors and officers do not owe any "special duties" to the creditors; rather, upon insolvency, creditors gain derivative standing to enforce "the fiduciary duties that directors owe to the corporation to maximize its value for the benefit of all residual claimants." *See Quadrant Structured Prods. Co. v. Vertin,* 102 A.3d 155, 176 (Del. Ch. Ct. 2014) (citing *Gheewalla,* 930 A.2d at 101). As stated above, there is no duty to liquidate under U.S. bankruptcy law. *See also In re Midway Games Inc.*, 428 B.R. 303, 316 (Bankr. D. Del. 2010) ("The law is thus settled that directors do not have a duty to creditors of an insolvent corporation to abandon the effort to rehabilitate the corporation in favor of creditors' interests."). Therefore, even if TRU was insolvent, as a matter of law, Defendants did not owe a duty to the trade vendors apart from the duty the Defendants owed to the company, which the creditors, standing in the shoes of the company, can bring on the company's behalf. *Gheewalla*, 930 A.2d at 103. Consequently, the Trust's negligence claim must be dismissed

because it is brought as a direct claim on behalf of the individual creditors in their capacity as creditors, rather than on behalf of the company.

In addition, as explained above, pursuant to 8 Del. C. § 102(b)(7), corporations may eliminate personal liability of directors for breaches of their duty of care. *See also Continuing Creditors' Comm. Of Star Telecomms. Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 463 (stating that § 102(b)(7) applies to prevent shareholder and creditors from bringing duty of care claims). TRU did so, and the vendors cannot assign their claims from the Trust to get around this prohibition. Accordingly, the negligence claim must be dismissed for this reason as well.

## K. The Trust Cannot Prosecute the Claims of Trade Vendors That Received More Than They Lost During the Period of the Alleged Fraudulent Omissions

The Trust claims that the Defendants should have disclosed to the vendors in December 2017 or January 2018 that TRU's holiday results were "disastrous," and that as a result, TRU was expected to default under the DIP financing. (Compl. ¶¶ 120, 124, 140.) The Trust contends that this failure to disclose constitutes fraud and that, had the trade vendors known this information, they would not have shipped to TRU, and would have been saved from incurring losses in the form of unpaid invoices. Based on the Trust's questioning at various depositions, it appears that the Trust believes that as early as December 13, 2017, Defendants should have informed the trade vendor community that TRU was having a difficult holiday season and liquidity issues that would have led to the trade vendors ceasing shipping at that time. If so, the company would have needed to liquidate as of this date, and the trade vendors would not have received any of the payments they received from this date forward during the Chapter 11 proceeding. *See, e.g.* ████████████ (SOF Ex. 254) 214:12-216:14 (█████████) ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

100

However, as the below table demonstrates, the undisputed evidence shows that nearly all of the trade vendors benefitted from TRU's continuing to operate because they received payments from December 13, 2017 onward (including many invoices that were due in this timeframe on earlier shipments) that far exceeded the invoiced amounts of the goods they shipped after this time (and while the analysis must be individualized for each vendor, the undisputed facts demonstrate that in the aggregate the vendors benefitted collectively by well over one hundred million dollars). As a result, the undisputed evidence demonstrates that the Trust cannot establish that the majority of trade vendors suffered damages as a result of the alleged fraud. This requires dismissal of these trade vendors' claims as a matter of law. *See Connaughton v. Chipotle Mexican Grill, Inc.*, 29 N.Y.3d 137, 142 (N.Y. 2017) ("Critically, a false representation does not, without more, give rise to a right of action, either at law or in equity, in favor of the person to whom it is addressed. To give rise, under any circumstances, to a cause of action, either in law or equity, reliance on the false representation must result in injury. If the fraud causes no loss, then the plaintiff has suffered no damages"). Moreover, this chart does not even account for the fact that a trade vendor's tort damages are out-of-pocket losses, not the invoiced value of their goods under the governing law.[11]

| Trade Vendor | Amounts invoiced 12/13/17 through wind down announcement | Amounts paid 12/13/17 through wind down announcement | Net Benefit to Trade Vendor |
|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |

---

[11]    *See Connaughton*, 29 N.Y.3d at 142 ("In New York, as in multiple other states, the true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or what is known as the 'out-of-pocket' rule. Under that rule, damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained . . . . There can be no recovery of profits which would have been realized in the absence of fraud.").

| Trade Vendor | Amounts invoiced 12/13/17 through wind down announcement | Amounts paid 12/13/17 through wind down announcement | Net Benefit to Trade Vendor |
|---|---|---|---|
| ██ | ██████ | ██████ | █████ |
| ████ | ██████ | ██████ | █████ |
| ███ | ██████ | ██████ | █████ |
| ████████ | ██████ | ██████ | █████ |
| ███ | ██████ | █████ | ██████ |
| ████ | ██████ | ██████ | █████ |
| ████████ | ████ | ██████ | █████ |
| ████ | ██████ | ██████ | █████ |
| █████ | ██████ | ██████ | █████ |
| ███████ | ████ | ██████ | █████ |
| ███████ | ████ | ██████ | █████ |
| ███ | ██████ | ██████ | █████ |
| ███ | ██████ | ██████ | █████ |
| ██████ | ██████ | ██████ | █████ |
| ███ | ██████ | ██████ | █████ |
| ████ | ██████ | ██████ | █████ |
| ██ | ██████ | ██████ | ████ |
| █████ | ██████ | ██████ | ████ |
| ██████ | ██████ | ██████ | █████ |
| ██████ | █████ | ████ | █████ |
| ██████ | █████ | ██████ | █████ |

The Trust cannot pursue any tort claims for these vendors that *benefitted* from the ongoing operations of TRU that Defendants' allegedly wrongfully enabled.

## CONCLUSION

Summary judgment is favored as a mechanism to secure the just, speedy and inexpensive determination of a case when the requirements of Rule 56 are met. *In re Vance*, 298 B.R. 262, 265 (Bankr. E.D. Va. 2003). This mechanism is appropriate here for the reasons discussed above. Defendants thus request that this Court grant summary judgment and dismiss the Trust's claims.

Dated: December 13, 2021
     Richmond, Virginia

By: _/s/_ J. Brandon Sieg
Robert I. Bodian (admitted *pro hac vice*)
Scott A. Rader (admitted *pro hac vice*)
John P. Sefick (admitted *pro hac vice*)
Kaitlin R. Walsh (admitted *pro hac vice*)
Amanda B. Asaro (admitted *pro hac vice*)
Kerime S. Akoglu (admitted *pro hac vice*)
**MINTZ LEVIN COHN FERRIS
   GLOVSKY and POPEO, P.C.**
Chrysler Center
666 Third Avenue, 25th Floor
New York, New York 10017
(212) 935-3000
RIBodian@mintz.com
SARader@mintz.com
JPSefick@mintz.com
KRWalsh@mintz.com
ABAsaro@mintz.com
KSAkoglu@mintz.com

- and -

James C. Cosby, Esq. (VSB No. 25992)
J. Brandon Sieg, Esq. (VSB No. 84446)
**O'HAGAN MEYER, PLLC**
411 E. Franklin Street, Suite 500
Richmond, Virginia 23219
Tel:   (804) 403-7100
Fax: (804) 403-7110
jcosby@ohaganmeyer.com
bsieg@ohaganmeyer.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 13, 2021, I caused a true and accurate copy of the

foregoing to be electronically served by the Court's CM/ECF System on all parties that receive

CM/ECF notification in the above-captioned case.


DATED:  December 13, 2021                    By: /s/ J. Brandon Sieg_____
                                             Counsel