Greg Dovel (*pro hac vice*)
Christin Cho (*pro hac vice*)
**DOVEL & LUNER, LLP**
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Tel:  310-656-7066
Email:  greg@dovel.com
        christin@dovel.com

Michael Wilson (VSB No. 48927)
**MICHAEL WILSON PLC**
12733 Storrow Rd.
Henrico, Virginia 23233
Tel:  804-614-8301
Email:  mike@mgwilsonlaw.com

*Counsel for Plaintiff*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| TRU CREDITOR LITIGATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proceeding No. 20-03038-KLP |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID A BRANDON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**THE TRUST'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGEMENT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78].  The location of Debtors' service address is One Geoffrey Way, Wayne, NJ 07470.

## **Table of Contents**

I.    Introduction.............................................................................................................. 1

    A.    The Court has not approved Defendants' conduct.................................... 2

    B.    Defendants fail to apply the summary judgment standard...................... 3

    C.    Defendants' fail to apply the correct legal principles. ........................... 4

    D.    Defendants' motion ignores and fails to address most of the Trust's
        theories................................................................................................... 6

    E.    Defendants' motion ignores and fails to address most of the Trust's
        evidence. ................................................................................................. 8

    F.    Defendants do not seek partial summary judgment of part of a claim. ................. 9

II.   The Director Defendants are liable for breaches of fiduciary duties in approving
    the DIP financing and failing to implement an immediate wind-down........................... 11

    A.    The Defendants' fiduciary duties......................................................... 12

    B.    When evaluating whether to authorize DIP financing and attempting a
        turnaround strategy, the Directors knew and understood the requirements
        of their fiduciary duties. ....................................................................... 16

    C.    The Director Defendants abdicated their duty and entirely failed to assess
        the Company's ability to comply with the financial covenants in the DIP
        financing. .............................................................................................. 22

    D.    Defendants' deposition testimony confirms their breach of fiduciary duty. ........ 27

    E.    Brandon and Short knew that the Company could not comply with the
        financial covenants............................................................................... 36

    F.    The Director Defendants abdicated their duty and entirely failed to assess
        the risks of the turnaround strategy or to consider the alternative of an
        immediate wind-down. ......................................................................... 41

    G.    Defendants knew that attempting a turnaround was an implausible "Hail
        Mary."................................................................................................... 44

        1.    The Directors knew that the Company was losing money, and that
            its sales, market share, and margins were trending down........................ 46

        2.    The Directors knew that the Company's outdated business model
            could not compete. ................................................................... 48

        3.    The Directors knew that the Company did not have a viable
            turnaround plan and could not come up with one..................................... 51

    H.    The Director Defendants' breaches of duty were exacerbated by conflicts
        of interest. ............................................................................................. 58

        1.    The six Sponsor Directors had conflicts of interest. ................................ 58

        2.    Brandon and Short had conflicts of interest............................................. 62

3.      Defendant Directors failed to eliminate the conflicts by assigning the decision to independent directors.......................................................... 64

I.    The facts establish Defendants' breaches of the fiduciary duties of good faith, loyalty, and due care................................................................................ 67

    1.      Breach of the duty of good faith. ................................................. 67

    2.      Breach of the duty of loyalty. .................................................... 71

    3.      Breach of the duty of care. ......................................................... 74

    4.      Defendants cannot establish that their actions meet the entire fairness standard....................................................................... 74

J.    Defendants' breaches caused harm to the Company. ............................ 76

    1.      Extended operating losses........................................................... 77

    2.      Increased professional fees. ......................................................... 78

    3.      Excess financing costs. ............................................................... 78

    4.      Adequate protection payments.................................................... 79

    5.      Extraordinary expenses. ............................................................. 79

III.    Defendants' arguments concerning Defendants' unlawful approval of the DIP financing and turnaround fail for multiple reasons. .......................................... 79

A.    The law of the case doctrine does not protect Defendants' unlawful conduct....................................................................................................... 79

    1.      Defendants' "by its own terms" premise fails. ........................... 80

    2.      The Court's plan confirmation orders bar application of preclusion doctrines to claims against the Defendants............................... 80

    3.      Law of the case does not apply because new evidence is available that was not presented to the Court........................................ 84

        a.      False and misleading information about the DIP financing negotiations and terms. ................................................. 85

        b.      False and misleading information about the DIP budget projections...................................................................... 87

        c.      False and misleading information about the Directors' assessment of the DIP financing. .................................... 88

        d.      False and misleading information about the turnaround plan................................................................................... 89

        e.      False and misleading information reiterated at the final hearing............................................................................. 91

    4.      The Court's order approving DIP financing did not address the issues asserted against Defendants........................................... 95

B.   Judicial estoppel does not protect Defendants' unlawful conduct. ...................... 96

   1.   The Trust is not a successor to the UCC and Mattel and is not bound by their prior statements. ................................................... 96

   2.   The Court's confirmation order bars application of preclusion doctrines, including estoppel. ............................................... 98

   3.   The Trust has not engaged in bad faith or an attempt to intentionally mislead the court. ................................................ 98

   4.   Because the Trust's position is based on facts not known to the UCC or Mattel, judicial estoppel cannot apply. ....................................... 101

   5.   Defendants do not assert, and could not assert, collateral estoppel. ....... 102

C.   The exculpatory provision does not protect the Defendants against any of the Trust's claims. ............................................................... 103

D.   The business judgment rule does not protect Defendants' conduct. .................. 106

   1.   The business judgment rule does not apply because Defendants failed to inform themselves of all material information that was reasonably available to them. .............................................. 107

   2.   The business judgment rule does not apply because Defendants failed to act with requisite care. ........................................... 108

   3.   The business judgment rule does not apply because Defendants abdicated their duties. ............................................ 109

   4.   The business judgment rule does not apply because Defendants were not disinterested directors. .......................................... 110

E.   Defendants' arguments regarding their breaches of the duty of loyalty fail. ....... 110

   1.   Defendants ignore the facts and evidence. ................................... 110

   3.   Under controlling Delaware law, Defendant Brandon's substantial financial interest in continued employed constituted a conflict of interest. ................................................................ 114

   4.   Defendant Short was both a member of the Board and an officer, and he actively participated in the decision-making. .............................. 116

F.   Defendants' arguments regarding their breaches of the duty of good faith and the duty of care fail. .................................................... 117

   1.   The presence of advisors does not shield Defendants' wrongful conduct. .......................................................... 117

   2.   Defendants' failed contention that the Board reviewed alternatives. ..... 121

   3.   Defendants' failed Monday morning quarterbacking contention. .......... 121

   4.   Defendants' failed contention that everyone supported the DIP financing. .......................................................... 122

5.     Delaware law did impose a duty on Defendants to liquidate the
Company. ........................................................................................ 126

IV.   Defendants breached their fiduciary duties in approving the executive bonus plan ....... 127

A.   Defendants knew that their fiduciary duties required them to preclude a
director with a conflict of interest from making the decisions, to assess all
reasonable alternatives, and to obtain all material information reasonably
available. ..................................................................................................... 129

B.   While Brandon had a glaring conflict of interest in personally benefiting
from an executive bonus plan, it was Brandon who controlled the bonus
plan's development and made each of the key decisions—who would
receive a bonus, how much the bonus payments would be, and when the
bonus would be paid. ................................................................................. 132

C.   When the compensation committee was presented with the plan Brandon
had developed, it failed to guard against conflicts of interest, consider all
reasonable alternatives, or consider critical material information. .................... 139

1.   The compensation committee Directors abdicated their duties to
preclude Brandon from controlling the development of the bonus
plan. .................................................................................................. 140

2.   The compensation committee Directors abdicated their
responsibility to evaluate reasonable alternatives and inform
themselves of all material information reasonably available to
them .................................................................................................. 143

D.   When the full board was presented with the plan Brandon had developed,
it failed to guard against conflicts of interest, consider all reasonable
alternatives, or consider critical material information. ..................................... 149

1.   The full board abdicated their duties to preclude Brandon from
controlling the development of the bonus plan. .................................... 149

2.   The Board knowingly failed to obtain critical information they
knew was available and knowingly failed to analyze alternatives. ........ 150

E.   The Directors breached their fiduciary duties by knowingly authorizing an
illegal fraudulent transfer that was designed to evade creditors. ....................... 152

1.   There was a "transfer" by paying bonuses to executives. ...................... 154

2.   Defendants authorized the transfer with actual intent to hinder and
defraud creditors. .............................................................................. 155

3.   Defendants made the transfer in contemplation of a case under title
11 and with intent to defeat the provisions of title 11 ............................ 159

F.   The Directors breached their fiduciary duties of loyalty, good faith, and
care. .......................................................................................................... 159

1.   The Directors breached their duty of loyalty. ....................................... 159

|   |   | a. | Directors breached their duty of loyalty by authorizing an illegal fraudulent transfer. | 160 |
|   |   | b. | Brandon breached his duty of loyalty because he was an interested director | 161 |
|   |   | c. | Director Defendants breached their duty of loyalty by allowing Brandon—an interested director—to control the bonus process. | 161 |
|   | 2. |   | The Directors breached their duty of good faith | 162 |
|   |   | a. | The Directors abdicated their duties by failing to obtain an analysis of comparable compensation or alternative compensation plans. | 164 |
|   |   | b. | The Directors abdicated their duty to ensure that the process of developing the bonus was not controlled by an interested director | 165 |
|   |   | c. | Brandon and the compensation committee Directors made a decision that they knew was beyond the bounds of reason and not in the best interests of the Company. | 166 |
|   | 3. |   | The directors breached their duty of care. | 167 |
| G. |   |   | Defendants cannot meet their burden of proving the bonus payments were entirely fair. | 168 |
| H. |   |   | Defendants' breaches of fiduciary duty caused losses to Toys "R" Us. | 169 |
| V. |   |   | Defendants' arguments concerning Defendants' unlawful approval of the executive bonuses fail for multiple reasons. | 169 |
| A. |   |   | Estoppel does not apply to the Trust's claims. | 169 |
| B. |   |   | Defendants' conduct is not protected by the business judgment rule | 172 |
|   | 1. |   | The business judgment rule does not apply because Defendants did not act with the requisite care or adequately inform themselves. | 173 |
|   | 2. |   | The business judgment rule does not apply because Defendants breached their duties of good faith and loyalty | 174 |
| C. |   |   | Defendants' specific arguments concerning the business judgment rule are contrary to the law and the facts. | 175 |
|   | 1. |   | The business judgment rule does not automatically shield all executive compensation decisions. | 175 |
|   | 2. |   | Defendants' arguments on the fiduciary duties of due care and good faith fail. | 176 |
|   |   | a. | Defendants' "employee attrition" argument fails. | 176 |
|   |   | b. | Defendants' argument based on the participation of advisors fails. | 177 |

c.      Defendants' arguments on the duty of good faith fail. ............... 181

3.      Defendants' "lack of self-dealing" arguments fail................................. 182

a.      Defendant' "majority of the board" argument fails. ................... 182

b.      Defendants' "independent compensation committee" argument fails............................................................................. 185

c.      Defendants' "conflicts of interest" argument fails..................... 186

4.      Defendants' "rational business purpose" argument fails. ...................... 187

D.      The exculpatory provision does not protect the Defendants against any of the Trust's claims. ............................................................................. 188

VI.    The Director Defendants are liable for breaches of fiduciary duties in paying advisory fees to Sponsors........................................................................... 189

A.      Defendants' fiduciary duties applied to their decisions to allow payment of advisory fees to the Sponsors............................................................. 190

B.      Defendants' decision to allow the Company to make payments to Bain, KKR, and Vornado violated their fiduciary duty of loyalty. .............................. 194

C.      Defendants' decision to allow the Company to make payments to Bain, KKR, and Vornado violated their fiduciary duty of good faith........................ 198

1.      The advisory fee agreements were objectively unreasonable in their terms and not in the best interests of the Company....................... 198

2.      The advisory fee payments were not justified by the amount, quality, or value of the services provided and therefore were objectively unreasonable and not in the best interests of the Company. ...................................................................... 200

a.      The Directors had insufficient evidence that advisory services were actually provided by Sponsors to the Company 2014-2017.................................................. 201

b.      The Directors had insufficient evidence of the value of advisory services provided by Sponsors to the Company 2014-2017. ................................................. 203

3.      The Director Defendants abdicated their fiduciary duties to consider material information and alternatives...................................... 204

a.      The Directors did not consider what services were provided or the value of those services. ....................................... 205

b.      The Directors did not consider whether the services were duplicative of other services already being provided to Toys "R" Us................................................................ 206

c.      The Directors did not consider whether payment was required to ensure that services were provided by the Sponsors and Sponsor directors. ................................. 208

4.     The Directors abdicated their fiduciary duty to ensure that decisions were made by disinterested directors. ................................... 210

C.     Defendants' decision to allow the Company to make payments to Bain, KKR, and Vornado violated their fiduciary duty of care................................... 211

D.     Defendants cannot demonstrate that their actions meet the entire fairness standard. ................................................................................................ 211

E.     The Director Defendants' breach of their fiduciary duties caused harm to Toys "R" Us. ............................................................................................ 212

F.     Defendants' arguments fail. ................................................................... 213

1.     Defendants' "solvency justifies payments" argument fails. ................... 213

2.     Defendants' "even if insolvent, no breach of fiduciary duty argument" fails. ................................................................................ 215

3.     Defendants' "acquiescence" argument fails. ........................................ 217

VII.     Defendants are liable for fraudulent concealment. ......................................... 218

A.     The law of fraudulent concealment.......................................................... 219

1.     Choice of law: The tort claims of each Trade Vendor are governed by the law of the state where that vendor is located, not by New York law.................................................................................... 219

a.     There is an actual conflict between the tort laws of different states........................................................................ 220

b.     The law of the Trade Vendors' home states governs the Trust's tort claims. ...................................................... 221

c.     The states with most relevant vendors include California, Connecticut, Georgia, Rhode Island, Florida, and Illinois. ........ 223

2.     Elements of fraudulent concealment....................................................... 226

3.     Liability of directors and officers for concealments or representations of other officers or employees. ..................................... 227

a.     Intended to influence vendors................................................... 227

b.     Failing to stop fraudulent conduct. ........................................... 228

B.     The information concealed and suppressed by Defendants was actionable. ...... 229

1.     The concealments.................................................................................. 229

2.     The concealments are actionable as facts capable of empirical verification. ......................................................................................... 233

3.     The concealments are actionable statements that imply the existence of facts that justify a belief in the truth of the statement and imply the maker knows of nothing that would make the statement improbable. .......................................................................... 234

4.      The concealments are actionable statements because Defendants possessed superior knowledge or special information on the subject. ................................................................................ 236

C.      The concealed information was "material." ...................................... 239

1.      Whether Trade Vendors will be paid for goods that they ship was of paramount importance to the Trade Vendors. ................................... 240

2.      The continued availability of the DIP financing was directly relevant to whether Trade Vendors would be paid for goods that they shipped. ...................................................................... 241

3.      Each of the concealed facts was highly material to a Trade Vendor's decision to ship goods on credit. ............................................. 242

4.      The vendors testified that the concealed facts would have been relevant to their decision-making, and would have caused them to act differently. .................................................................... 244

D.      Defendants were under a duty to disclose the concealed facts to the Trade Vendors. ................................................................... 245

1.      Defendants had a duty to disclose subsequently acquired information that made their earlier statements untrue or misleading. ...................................................................... 245

a.      Defendants' representations in September 2017 ........................ 246

b.      The information acquired by Defendants made the earlier representations false or misleading. .......................................... 255

2.      Because Defendants continued to make representations, they had a duty to disclose all material facts. ............................................. 258

3.      Defendants were under a duty to disclose because they possessed superior knowledge and knew that Trade Vendors were acting on the basis of mistaken facts. ................................................... 276

a.      Defendants had superior knowledge of material facts. ............... 277

b.      Information about those material facts was not readily available to the Trade Vendors. .................................................. 279

c.      Defendants knew that the Trade Vendors were acting on the basis of mistaken knowledge. ................................................. 280

4.      Defendants had a relationship of trust and confidence with Trade Vendors that created a duty to disclose. ................................... 283

E.      Defendants' concealment was intended to induce action by the Trade Vendors. ................................................................... 286

F.      Trade Vendors were unaware of the concealed facts and would have acted differently. ............................................................... 289

G.      Trade Vendors were damaged by Defendants' concealment of facts. ................ 290

H. All Defendants are liable for the fraudulent concealments and
representations. ................................................................................... 291

   1. Defendants intended that that the concealment would be passed on
   and influence Trade Vendors. ................................................... 291

   2. Defendants failed to stop fraudulent conduct. ......................... 295

VIII. Defendants are liable for fraudulent misrepresentation. ................................. 296

   A. Law of fraudulent misrepresentation. ............................................. 296

   B. The representations from Defendants were actionable. ..................... 297

      1. The representations. ................................................................ 297

      2. The representations are actionable as facts capable of empirical
      verification. .......................................................................... 302

      3. The representations are actionable statements that imply the
      existence of facts that justify a belief in the truth of the statement
      and imply the maker knows of nothing that would make the
      statement improbable. ........................................................... 305

      4. The representations are actionable statements because Defendants
      possessed superior knowledge or special information on the
      subject. .................................................................................. 307

   C. The representations were material. .................................................. 309

   D. Defendants knew the representations were false or misleading when made. ..... 315

   F. Defendants intended the representations to induce the Trade Vendors to
   ship goods on credit. ....................................................................... 325

   G. Trade Vendors acted in reliance on Defendants' statements. ............... 329

   H. Trade Vendors' reliance was reasonable. .......................................... 331

   I. Trade Vendors suffered losses. ........................................................ 332

   J. All Defendants liable. ..................................................................... 333

IX. Defendants are liable for negligent concealment, negligent misrepresentation, and
negligence. ................................................................................................ 334

   A. The Trust's evidence proves each element of its claims for negligent
   misrepresentation and concealment. ................................................. 334

   B. The Trust's evidence proves each element of its claim for negligence. ............. 335

X. Each of Defendants' arguments on the Trust's tort claims fails. ....................... 337

   A. The Trust has standing to pursue claims assigned to it by the Trade
   Vendors. ......................................................................................... 337

      1. Fourth Circuit precedent governs issues of federal bankruptcy law. ....... 337

2.  Under binding Fourth Circuit precedent, the Trust has standing to pursue claims assigned to it by the Trade Vendors ................................ 338

B.  Defendants' "30(b)(6) testimony contradicts" argument fails. ........................... 341

C.  Defendants' "Critical Vendor Agreements" argument fails. ............................ 344

1.  Critical Vendor Agreements did not obligate Trade Vendors to ship goods to Toys "R" Us on credit. ..................................................... 344

2.  Each Critical Vendor testified that they would have acted differently had they learned of concealed facts, establishing reliance and causation. .............................................................. 345

3.  Defendants' "fraudulent inducement" argument is a red herring. .......... 348

D.  Defendants' "actionable misstatements" arguments fail. ................................. 348

1.  Statements made in September and October are actionable. ................. 348

2.  Defendants' "advisors approved" argument fails. ................................. 350

3.  Forward looking and aspirational or promissory statements are actionable ............................................................................. 353

4.  Defendants "cannot identify specific statements" argument fails. ......... 355

E.  Defendants' "scienter" arguments fail. ............................................... 357

1.  The Trust has ample evidence of Defendants' intent. ........................... 357

2.  Defendants' cited securities law cases are inapposite. ........................... 358

3.  Defendants' March board minutes argument fails. ................................ 358

4.  Defendants' "public disclosure" argument fails. ................................... 360

5.  Defendants' argument that vendors testified that Defendants had no intent to deceive is irrelevant as a matter of law, and grossly mischaracterizes the facts. ...................................................... 361

F.  Defendants' "reliance" argument fails. ................................................ 363

G.  Defendants' "reasonable reliance" arguments fail. ............................... 366

1.  Defendants' "SEC filings" argument fails. ............................................ 366

2.  Defendants' "DIP financing agreements" argument fails. ...................... 368

3.  Defendants' "no risk" and "guaranteed" argument mischaracterizes the Trust's contentions and attacks a straw man. ................................... 369

4.  Reasonable reliance cannot be adjudicated on summary judgment. ....... 370

H.  Defendants' "causation" argument fails. ............................................. 371

1.  The Trust has ample evidence of causation. .......................................... 371

2.  Defendants' cited cases are inapposite. ................................................. 372

3.  Proximate causation is a question of fact not amenable to resolution at summary judgment....................................................... 373

I.  Defendants' "duty to disclose" arguments fail. .................................. 374

    1.  Defendants' proof of "swindling" argument fails................................. 374

    2.  Defendants' "trust and confidence" argument fails. ........................... 375

    3.  Defendants' "the UCC knew" argument fails....................................... 376

    4.  Statements made in September and October created a duty to correct those statements when they became false................................. 378

    5.  Defendants' no duty to update with "real-time confidential information" argument fails.................................................................. 379

    6.  Defendants' negligent misrepresentation arguments fail...................... 382

        a.  The Trust has evidence of each of the elements of negligent misrepresentation ............................................................... 382

        b.  There is no requirement that Defendants and vendors be in a "special or privity-like relationship." ...................................... 383

        c.  The single New York Trade Vendor satisfies the special relationship test. ................................................................... 384

J.  Defendants' argument regarding reliance on omitted information fails............. 386

    1.  The Trust has never asserted a claim based on the mere fact that the DIP financing contained covenants.................................. 387

    2.  Defendants intentionally withheld the holiday sales results data, and then lied about what holiday sales meant for the Company's ability to pay. ................................................................................ 388

    3.  Trade Vendors did not have, and could not obtain, any of the concealed facts regarding the Company's covenant breaches............... 390

K.  Defendants' arguments based on the Trade Vendors' 30(b)(6) testimony fail. .......................................................................................... 393

L.  Defendants' argument on the negligence claim fails. ........................................ 393

M.  Defendants' "received more than they lost" argument fails. .............................. 393

    1.  Toys "R" Us would not have had to liquidate on December 13, 2017, if Defendants had decided to not engage in fraud........................ 394

    2.  Trade Vendors would have received payments after December 13, 2017, if Defendants had not engaged in fraud. ...................................... 395

    3.  Defendants' payment offset argument fails for multiple additional reasons....................................................................................... 396

XI.  Conclusion. ........................................................................................................ 398

## Table of Authorities

**Cases**

*Abu Dhabi Inv. Auth. v. Citigroup, Inc.,*
   2013 U.S. Dist. LEXIS 30214, at n.9 (S.D.N.Y. Mar. 4, 2013) ............................................ 222

*Adickes v. S. H. Kress & Co.,*
   398 U.S. 144 (1970).......................................................................................................... 6

*ADT Holdings, Inc. v. Harris,*
   *No. 2017-0328-JTL,* 2017 Del. Ch. LEXIS 163 (Ch. Sep. 7, 2017)...................................... 363

*AFA Protective Sys. v. AT&T,*
   57 N.Y.2d 912 (1982) ........................................................................................................ 386

*Alexander v. Azar,*
   396 F. Supp. 3d 242 (D. Conn. 2019)................................................................................. 11

*Alley Sports Bar, LLC v. SimplexGrinnell, LP,*
   58 F. Supp. 3d 280 (W.D.N.Y. 2014)........................................................................... 384, 385

*Am. Canoe Ass'n v. Murphy Farms, Inc.,*
   326 F.3d 505 (4th Cir. 2003) .......................................................................... 81, 84, 85

*Ams. Mining Corp. v. Theriault,*
   51 A.3d 1213 (Del. 2012) ............................................................................................... 177

*Anschutz Corp. v. Merrill Lynch & Co.,*
   690 F.3d 98 (2d Cir. 2012) .............................................................................................. 220

*Antipodean Domestic Partners, LP v. Clovis Oncology, Inc.,*
   2018 NY Slip Op 30809(U) (Sup. Ct. 2018) ...................................................................... 221

*Apollo Capital Fund LLC v. Roth Capital Partners, LLC,*
   158 Cal. App. 4th 226 (2007) ................................................................................... 236, 307

*Aronson v. Lewis,*
   473 A.2d 805 (Del. 1984) ............................................................... 106, 109, 172, 174

*Art Inst. of Phila. Llc v. Nelson,*
   Nos. Chapter 7, 20-50627 (CTG), 2022 Bankr. LEXIS 68 (Bankr. D. Del. Jan. 12, 2022)... 338

*Asahi Kasei Pharma Corp. v. Actelion Ltd.,*
   222 Cal. App. 4th 945 (2013) ...................................................................... 228, 295, 296, 333

*Ayers v. United States DOD,*
   819 F. App'x 180 (4th Cir. 2020) ..................................................................................... 81

*B.L.M. v. Sabo & Deitsch,*
   55 Cal. App. 4th 823 (1997) ............................................................................................ 221

*Barrie House Coffee Co. v. Teampac, LLC,*
   No. 13 CV 8230 (VB), 2016 U.S. Dist. LEXIS 85527 (S.D.N.Y. June 30, 2016)................ 347

*Basho Techs. Holdco B, Ltd. Liab. Co. v. Georgetown Basho Inv'rs, Ltd. Liab. Co.,*
   No. 11802-VCL, 2018 Del. Ch. LEXIS 222 (Ch. July 6, 2018). ..................................... passim

*Bass v. Janney Montgomery Scott, Inc.,*
   210 F.3d 577 (6th Cir. 2000) ............................................................... 370

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,*
   833 A.2d 961 (Del. Ch. 2003) ............................................................... 73

*Beckwith v. Dahl,*
   205 Cal. App. 4th 1039 (2012) ................................................ 286, 325, 357, 360

*Blankenheim v. E. F. Hutton & Co.*
   217 Cal. App. 3d 1463 (1990) ............................................................... 332

*Boeken v. Philip Morris, Inc.,*
   127 Cal. App. 4th 1640 (2005) ............................................................... 331

*Boles v. Filipowski (in re Enivid, Inc.),*
   345 B.R. 426 (Bankr. D. Mass. 2006) .................................................... 15

*Bradley v. United States,*
   161 F.3d 777 (4th Cir. 1998) ............................................................... 338

*Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.),*
   906 A.2d 27 (Del. 2006) ............................................................... passim

*Bridgeport Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings, Inc.),*
   388 B.R. 548 (Bankr. D. Del. 2008) ...................................................... passim

*Brinckerhoff v. Enbridge Energy Co.,*
   159 A.3d 242 (Del. 2017) ............................................................... passim

*Bullard v. Blue Hills Bank,*
   575 U.S. 496 (2015) ............................................................... 81

*Burns v. Bd. of Cty. Comm'rs,*
   330 F.3d 1275 (10th Cir. 2003) ............................................................... 343

*Campbell-Ewald Co. v. Gomez,*
   577 U.S. 153 (2016) ............................................................... 343

*Capiccioni v. Brennan Naperville, Inc.,*
   339 Ill. App. 3d 927 (2003) ............................................................... 372

*Caplin v. Marine Midland Grace Trust Co.,*
   406 U.S. 416 (1972) ............................................................... 340

*Caviness v. DeRand Res. Corp.,*
   983 F.2d 1295 (4th Cir. 1993) ............................................................... 372, 373

*Cede & Co. v. Technicolor,*
   634 A.2d 345 (Del. 1993) ............................................................... passim

*Century Pac., Inc. v. Hilton Hotels Corp.,*
   2004 U.S. Dist. LEXIS 6904 (S.D.N.Y. Apr. 20, 2004) ............................ 276

*Chaffin v. GNI Grp., Inc.,*
   Civil Action No. 16211-NC, 1999 Del. Ch. LEXIS 182 (Ch. Sep. 3, 1999) .......... 74, 198

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. Martin*,
219 Cal. App. 4th 924 (2013) ....................................................................... 185

*Chase v. Dep't of Pub. Safety & Corr. Servs.*,
Civil Action No. ELH-18-2182, 2020 U.S. Dist. LEXIS 68944 (D. Md. Apr. 20, 2020)........ 84

*Cinerama, Inc. v. Technicolor*,
663 A.2d 1134 (Del. Ch. 1994) ...................................................................... 75

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
2021 U.S. Dist. LEXIS 189502 (S.D.N.Y. Sept. 30, 2021)......................................... 361

*Cody v. Micale*, Civil Action No. 7:19-MC-4,
2019 U.S. Dist. LEXIS 98333 (W.D. Va. June 10, 2019) ....................................... 81

*Cohen v. S & S Constr. Co.*,
151 Cal. App. 3d 941 (1983) ............................................................. passim

*Cole v. Daoud*,
2016 U.S. Dist. LEXIS 39749 (E.D. Va. Feb. 17, 2016)...................................... 370

*Collins v. Pond Creek Mining Co.*,
468 F.3d 213 (4th Cir. 2006) ......................................................... 103

*Collins v. Throckmorton*,
425 A.2d 146 (Del. 1980) ........................................................... 8, 191

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*,
35 Cal. 3d 197 (1983) .......................................................... 227, 291

*Connick v. Suzuki Motor Co.*,
174 Ill. 2d 482 (1996) ........................................................... 284

*Cooper v. Equity Gen. Ins. Co.*,
219 Cal. App. 3d 1252 (1990) .................................................. 297

*Cooper v. Jevne*,
56 Cal. App. 3d 860 (1976) ................................................ 235, 305

*Coughlan v. Jachney*,
473 F. Supp. 3d 166 (E.D.N.Y. 2020) ......................................... 347

*Coyne v. Gen. Elec. Co.*,
2010 U.S. Dist. LEXIS 70879 (D. Conn. July 15, 2010) ....................... 381

*Crescent/Mach I Partners, L.P. v. Turner*,
846 A.2d 963 (Del. Ch. 2000) ............................................ 13, 163

*Curley v. AMR Corp.*,
153 F.3d 5 (2d Cir. 1998) ................................................ 220

*Daiuto v. Evolve Guest Controls, LLC*,
No. 17-CV-1279 (NGG) (JO), 2020 U.S. Dist. LEXIS 38689 (E.D.N.Y. Mar. 4, 2020) ...... 221

*Dent v. Ramtron Int'l Corp.*,
No. 7950-VCP, 2014 Del. Ch. LEXIS 110 (Del. Ch. June 30, 2014) ............... 13, 163

*Desimone v. Barrows*,
    924 A.2d 908 (Del. Ch. 2007) ........................................................................ 159

*Devan v. Zamoiski Se., Inc. (In re Merry-Go-Round Enters.)*,
    272 B.R. 140 (Bankr. D. Md. 2000) ................................................................... 6

*Eaton v. Weichert Workforce Mobility, Inc.*,
    No. X10UWYCV186040244S, 2021 Conn. Super. LEXIS 73 (Super. Ct. Feb. 3, 2021) ..... 373

*Edgar v. Mite Corp.*,
    457 U.S. 624 (1982) ...................................................................................... 336

*Elantech Devices Corp. v. Synaptics*,
    No. C 06-01839 CRB, 2007 U.S. Dist. LEXIS 82017 (N.D. Cal. Oct. 26, 2007) .................... 10

*Emerald Partners v. Berlin*,
    726 A.2d 1215 (Del. 1999) ...................................................................... 103, 104

*Engalla v. Permanente Med. Grp., Inc.*,
    15 Cal. 4th 951 (1997) ............................................................................ passim

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ...................................................................................... 358

*Fairview Dev. Corp. v. Aztex Custom Homebuilders, LLC*,
    No. CV-07-0337-PHX-SMM, 2009 U.S. Dist. LEXIS 16501 (D. Ariz. Mar. 2, 2009) ......... 275

*Ferris Ave. Realty, LLC v. Huhtamaki, Inc.*,
    No. PB 07-1995, 2011 R.I. Super. LEXIS 25 (Super. Ct. Feb. 18, 2011) ..................... 334, 383

*Ferry v. Black Diamond Video, Inc.*,
    No. 15-7723 (RBK/AMD), 2016 U.S. Dist. LEXIS 76893 (D.N.J. June 13, 2016) ............. 375

*Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*,
    414 F.3d 325 (2d Cir. 2005) ........................................................................... 220

*First Bank v. Robertson Grading, Inc.*,
    328 Ga. App. 236 (2014) ............................................................................... 384

*Fla. Rock & Tank Lines v. Moore*,
    258 Ga. 106 (1988) ...................................................................................... 228

*Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*,
    No. 1:17-cv-8987-GHW, 2019 U.S. Dist. LEXIS 43682 (S.D.N.Y. Mar. 17, 2019) ............ 221

*Frances T. v. Village Green Owners Assn.*,
    42 Cal. 3d 490 (1986) ................................................................ 228, 295, 333, 337

*Frederick Hsu Living Tr. v. ODN Holding Corp.*,
    No. 12108-VCL, 2017 Del. Ch. LEXIS 67, at *102 ............................... 191, 213, 216

*Friedman v. Dolan*,
    No. 9425-VCN, 2015 Del. Ch. LEXIS 178 (Ch. June 30, 2015) ......................... 185

*Fringer v. Kersey Homes, Inc.*,
    No. 9780-VCG, 2018 Del. Ch. LEXIS 203, (Ch. June 25, 2018) ......................... 158

*Gaines Serv. Leasing Corp. v. Carmel Plastic Corp.*,
   432 N.Y.S.2d 760 (Civ. Ct. 1980) ...................................................... 276

*Geernaert v. Mitchell*,
   31 Cal. App. 4th 601 (1995) ................................................... 228, 294

*Geruschat v. Ernst & Young, LLP (In re Earned Capital Corp.)*,
   331 B.R. 208 (Bankr. W.D. Pa. 2005) ........................................ 96, 103

*Giulietti v. Giulietti*,
   65 Conn. App. 813 (2001) ...................................................... 228, 292

*Gold v. Univ. of Bridgeport Sch. of Law*,
   19 Conn. App. 379 (1989) ............................................................. 296

*Graves v. Lioi*,
   930 F.3d 307 (4th Cir. 2019) ........................................................... 84

*Grede v. Bank of N.Y. Mellon*,
   598 F.3d 899 (7th Cir. 2010) ........................................................ 341

*Greenberg v. Life Ins. Co.*,
   177 F.3d 507 (6th Cir. 1999) ........................................................ 371

*Greenwald v. Odom*,
   314 Ga. App. 46 (2012) ................................................................ 239

*Grobow v. Perot*,
   539 A.2d 180 (Del. 1988) ............................................................. 115

*Grumman Allied Indus. v. Rohr Indus.*,
   748 F.2d 729 (2d Cir. 1984) .......................................................... 376

*Guessous v. Fairview Prop. Invs., LLC*,
   828 F.3d 208 (4th Cir. 2016) ........................................................ 215

*Guinness PLC v. Ward*,
   955 F.2d 875 (4th Cir. 1992) ........................................................ 100

*Gutter v. Wunker*,
   631 So. 2d 1117 (Fla. Dist. Ct. App. 1994) ................................... 258

*Guttman v. Jen-Hsun Huang*,
   823 A.2d 492 (Del. Ch. 2003) ...................................................... 152

*Guvenoz v. Target Corp.*,
   30 N.E.3d 404 (Ill. App. 2015) ..................................................... 315

*Hampshire Grp., Ltd. v. Kuttner*,
   No. 3607-VCS, 2010 Del. Ch. LEXIS 144 (Ch. July 12, 2010)................... 152, 159

*Harrison v. Westinghouse Savannah River Co.*,
   176 F.3d 776 (4th Cir. 1999) ..................................................... 5, 233

*Hooper v. Barnett Bank of W. Fla.*,
   474 So. 2d 1253 (Fla. Dist. Ct. App. 1985) ................................... 284

*Hughes v. Ester C Co.*,
  317 F.R.D. 333 (E.D.N.Y. 2016) .................................................................. 223

*Huls v. Clifton, Gunderson & Co.*,
  179 Ill. App. 3d 904 (1989) ........................................................................ 289

*Hutto v. Davis*,
  454 U.S. 370 (1982) ..................................................................................... 338

*IBM Credit Fin. Corp. v. Mazda Motor Mfg. Corp.*,
  152 A.D.2d 451 (App. Div. 1st Dept. 1989) ................................................ 347

*ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*,
  2015 U.S. Dist. LEXIS 131211 (S.D.N.Y. Sep. 29, 2015) ........................... 347

*In re Activision Blizzard, Inc. Stockholder Litig.*,
  124 A.3d 1025 (Del. Ch. 2015) ................................................................... 339

*In re Agfeed USA, LLC*,
  558 B.R. 116 (Bankr. D. Del. 2016) ............................................................ 176

*In re Answers Corp. S'holder Litig.*,
  2012 Del. Ch. LEXIS 162 (Ch. July 19, 2012) .............................................. 64

*In re Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
  833 A.2d 961 (Del. Ch. 2003) ..................................................................... 115

*In re Books-A-Million, Inc. Stockholders Litig.*,
  2016 Del. Ch. LEXIS 154, (Del. Ch. Oct. 10, 2016) .................................... 180

*In re Convergent Techs. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991) ....................................................................... 382

*In re Duane Reade Inc. Sec. Litig.*,
  2003 U.S. Dist. LEXIS 21319 (S.D.N.Y. Nov. 24, 2003) ............................. 382

*In re Escalera Res. Co.*,
  563 B.R. 336 (Bankr. D. Colo. 2017) .......................................................... 338

*In re Express Scripts Holdings Co. Sec. Litig.*,
  773 F. App'x 9 (2nd Cir. 2019) ................................................................... 381

*In re HH Liquidation, LLC*,
  590 B.R. 211 (Bankr. D. Del. 2018) ............................................................ 120

*In re Hutchinson*,
  27 B.R. 247 (Bankr. E.D.N.Y. 1983) ........................................................... 275

*In re Massey Energy Co. Derivative & Class Action Litig.*,
  No. 5430-VCS, 2011 Del. Ch. LEXIS 83 (Ch. May 31, 2011) ..................... 152

*In re McCurnin*,
  590 B.R. 729 (Bankr. E.D. Va. 2018) ................................................... 338, 341

*In re Mindbody, Inc.*,
  2020 Del. Ch. LEXIS 307 (Ch. Oct. 2, 2020) .................. 72, 105, 115, 160

*In re Munford, Inc.*,
  98 F.3d 604 (11th Cir. 1996) ................................................................ 181

*In re Nat'l Century Fin. Enters.*,
  846 F. Supp. 2d 828 (S.D. Ohio 2012) ................................................. 371

*In re Oracle Corp. Derivative Litig.*,
  No. 2017-0337-SG, 2018 Del. Ch. LEXIS 92 (Ch. Mar. 19, 2018) ......................................... 58

*In re Reading Co.*,
  711 F.2d 509 (3d Cir. 1983). ................................................. 190, 213

*In re Refco Inc. Sec. Litig.*,
  No. 07 MDL 1092 (JSR), 2011 U.S. Dist. LEXIS 33554 ................................................... 371

*In re Rodgers*,
  115 B.R. 678 (Bankr. C.D. Cal. 1990) ................................................ 275

*In re Smoot*,
  265 B.R. 128 (Bankr. E.D. Va. 1999) ................................................. 155

*In re Triangle Capital Corp. Sec. Litig.*,
  988 F.3d 743 (4th Cir. 2021) ............................................. 358, 361

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) ................................................. 341

*In re Walt Disney Co. Derivative Litig.*,
  825 A.2d 275, (Del. Ch. 2003) ............................................... passim

*In re Walt Disney Co. Derivative Litig.*,
  907 A.2d 693 (Del. Ch. 2005). ................................................. 192

*In re Xura, Inc. Stockholder Litig.*,
  2018 Del. Ch. LEXIS 563 (Ch. Dec. 10, 2018) ............................................. 72, 183

*Jacobs v. N.C. Admin. Office of the Courts*,
  780 F.3d 562 (4th Cir. 2015) ................................................. 4

*John S. Clark Co. v. Faggert & Frieden, P.C.*,
  65 F.3d 26 (4th Cir. 1995) ............................................. 99, 101, 171

*Johnson v. Waterfront Servs. Co.*,
  391 Ill. App. 3d 985 (2009) ................................................. 332

*Jolley v. Chase Home Fin., LLC*,
  213 Cal. App. 4th 872, 892 Cal. Rptr. 3d 546 (2013) .................................. passim

*Jones v. ConocoPhillips Co.*,
  198 Cal. App. 4th 1187 (2011) ................................................. 258, 276

*JPMorgan Chase Bank, N.A. v. Ballard*,
  213 A.3d 1211 (Del. Ch. 2019) ................................................. 154

*Kahn v. Stern*,
  183 A.3d 715 (Del. 2018) ................................................. passim

*Kahn v. Tremont Corp.*,
694 A.2d 422 (Del. 1997) ........................................................................ 177, 185

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ................................................................... 358

*Kaufman v. I-Stat Corp.*
165 N.J. 94 (2000) .................................................................................. 384

*Kibler v. Wooters*,
No. 1351-VCN, 2007 Del. Ch. LEXIS 83 (Ch. June 6, 2007) ............................ 158

*Kilroy v. Alpharetta Fitness, Inc.*,
295 Ga. App. 274 (2008) ......................................................................... 363

*Kimmell v. Schaefer*,
89 N.Y.2d 257 (1996) .............................................................................. 385

*Konstantinidis v. Chen*,
626 F.2d 933 (D.C. Cir. 1980) .................................................................. 102

*Kopley Grp. V., Ltd. P'ship v. Sheridan Edgewater Props.*,
376 Ill. App. 3d 1006 (2007) ................................................................... 296

*Kurtz v. Foy*,
65 A.D.3d 741 (App. Div. 3rd Dept.) ........................................................ 222

*Leal v. Meeks (In re Cornerstone Therapeutics, Inc.)*,
115 A.3d 1173 (Del. 2015) ...................................................................... 104

*Lennon v. Christoph*,
No. 94 C 6152, 1997 U.S. Dist. LEXIS 1231 (N.D. Ill. Feb. 4, 1997)................... 364

*Leslie v. Frederique*,
Civil Action No. 1:17cv1061 (TSE/JFA), 2020 U.S. Dist. LEXIS 158925 (E.D. Va. Aug. 31,
2020) .................................................................................................... 6

*Lewis Tree Serv. v. Lucent Techs., Inc.*,
211 F.R.D. 228 (S.D.N.Y. 2002) ................................................................ 222

*Logan v. JKV Real Estate Servs. (In re Bogdan)*,
414 F.3d 507 (4th Cir. 2005) ........................................................ 338, 339, 340, 341

*Lucas v. Icahn*,
616 F. App'x 448 (2d Cir. 2015) .............................................................. 361

*LVNV Funding, LLC v. Harling*,
852 F.3d 367 (4th Cir. 2017) ............................................................... 80, 81

*Macomber v. Travelers Prop. & Cas. Corp.*,
261 Conn. 620 (2002) ............................................................................. 258

*Malpiede v. Townson*,
780 A.2d 1075 (Del. 2001) ...................................................................... 105

*Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commercial Mortgage Corp.*,
265 F. Supp. 2d 366 (S.D.N.Y. 2003) ......................................................... 222

*Martineau v. Wier*,
  934 F.3d 385 (4th Cir. 2019) ............................................................................ 99

*Mata v. Brooks Petroleum Co.*,
  No. 12-02-00075-CV, 2003 Tex. App. LEXIS 3511 (Tex. App. Apr. 23, 2003).................. 365

*McPadden v. Sidhu*,
  964 A.2d 1262 (Del. Ch. 2008) ................................................................... passim

*Medivox Prods. v. Hoffmann-LaRoche, Inc.*,
  107 N.J. Super. 47 (Super. Ct. 1969) .............................................................. 315

*Medtronic Sofamor Danek, Inc. v. Michelson*,
  2004 U.S. Dist. LEXIS 26385 (W.D. Tenn. May 20, 2004) .................................. 378

*Megaris Furs v. Gimbel Bros.*,
  172 A.D.2d 209 (App. Div. 1st Dept. 1991).......................................................... 347

*Mest v. Cabot Corp.*,
  449 F.3d 502 (3d Cir. 2006) ............................................................................ 343

*Miller v. Greystone Bus. Credit II, L.L.C. (In re USA Detergents, Inc.)*,
  418 B.R. 533 (Bankr. D. Del. 2009) .......................................................... 105, 189

*Mills Acquisition Co. v. MacMillan, Inc.*,
  559 A.2d 1261 (Del. 1989) ........................................................................ passim

*Mindspirit, LLC v. Evalueserve Ltd.*,
  2019 U.S. Dist. LEXIS 167060 (S.D.N.Y. Sep. 2019)........................................ 336

*Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*,
  867 F.3d 449 (4th Cir. 2017) ........................................................................... 99

*Mirkin v. Wasserman*,
  5 Cal. 4th 1082 (1993) ................................................................................. 358

*Mizrahi v. Adler*,
  2014 N.Y. Misc. LEXIS 2934 (N.Y. Sup. Ct. June 30, 2014)............................... 370

*Murphy v. Kuhn*,
  90 N.Y.2d 266 (1997) ................................................................................. 386

*Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*,
  295 Ill. App. 3d 567 (1998) .......................................................................... 286

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ................................................................................... 171

*Nielsen Co. (US), LLC v. Success Sys.*,
  2012 U.S. Dist. LEXIS 115774 (S.D.N.Y. Aug. 13, 2012)........................... 229, 295

*Nissan Motor Acceptance Cases*,
  63 Cal. App. 5th 793 (2021) ................................................... 246, 258, 272, 276

*O'Brien v. Ed Donnelly Enters.*,
  575 F.3d 567 (6th Cir. 2009) ........................................................................ 343

*OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*,
  157 Cal. App. 4th 835 (2007) ................................................................................. 331

*Official Emp't-Related Issues Comm. of Enron Corp. v. Arnold (In re Enron Corp.)*,
  Nos. 01-16034-AJG, 03-3522, 03-3721, 2005 Bankr. LEXIS 3261, (Bankr. S.D. Tex. Dec. 9,
  2005) ........................................................................................................................ 158

*Padula v. Lilarn Props. Corp.*,
  84 N.Y.2d 519 (N.Y. 1994) ..................................................................................... 221

*Parnes v. Bally Entm't Corp.*,
  722 A.2d 1243 (Del. 1999) ...................................................................... 13, 130, 163

*Persson v. Smart Inventions, Inc.*,
  125 Cal. App. 4th 1141 (2005) .................................................. 239, 245, 258, 314

*PhotoMedex, Inc. v. Irwin*,
  601 F.3d 919 (9th Cir. 2010) ........................................................................ 237, 307

*Pim Brands LLC v. Cabot Acquisition, LLC*,
  2008 N.J. Super. Unpub. LEXIS 3075 .................................................................. 384

*PMC, Inc. v. Kadisha*,
  78 Cal. App. 4th 1368 (2000) ....................................................................... 228, 295

*Polonetsky v. Better Homes Depot, Inc.*,
  97 N.Y.2d 46 (2001) ..................................................................................... 229, 295

*Prakashpalan v. Engstrom, Lipscomb & Lack*,
  223 Cal. App. 4th 1105 (2014) ............................................................ 227, 289, 290

*Puma v. Marriott*,
  283 A.2d 693 (Del. Ch. 1971) ............................................................................... 186

*Pursuit Partners, LLC v. UBS AG*,
  No. X05CV084013452S, 2009 Conn. Super. LEXIS 2313 (Super. Ct. Sep. 8, 2009) ........... 276

*Quadrant Structured Prods. Co. v. Vertin*,
  102 A.3d 155 (Del. Ch. 2014) ............................................................................... 213

*R.I. Indus.-Recreational Bldg. Auth. v. CAPCO Steel, LLC*,
  No. PC 14-6055, 2015 R.I. Super. LEXIS 90 ............................................... 246, 284

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993) ............................................................................... passim

*Ray Communs., Inc. v. Clear Channel Communs., Inc.*,
  673 F.3d 294 (4th Cir. 2012) ......................................................................... passim

*Revak v. SEC Realty Corp.*,
  18 F.3d 81 (2nd Cir. 1994) .................................................................................... 373

*Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*,
  66 A.3d 963 (Del. Ch. 2013) ................................................................................. 172

*Roselink Inv'rs, L.L.C. v. Shenkman*,
  386 F. Supp. 2d 209 (S.D.N.Y. 2004) ................................................................... 336

*Ryan, Inc. v. Circuit City Stores, Inc.*,
   2010 U.S. Dist. LEXIS 120627 (E.D. Va. Nov. 15, 2010) ................................................... 97

*Sack v. Low*,
   478 F.2d 360 (2d Cir. 1973) ..................................................................................... 221

*Sadiq Marafi v. Hind El Achchabi*,
   No. FSTCV186036789, 2020 Conn. Super. LEXIS 1333 (Super. Ct. Nov. 2, 2020) ............ 329

*Sama v. Mullaney (In re Wonderwork, Inc.)*,
   611 B.R. 169 (Bankr. S.D.N.Y. 2020) ........................................................................ 183, 184

*Schnelling v. Crawford (In re James River Coal Co.)*,
   360 B.R. 139 (Bankr. E.D. Va. 2007) .......................................................................... 341

*Schrager v. N. Cmty. Bank*,
   328 Ill. App. 3d 696 (2002) .............................................................. 284, 332, 334, 382

*Schultz v. Boy Scouts of Am.*,
   65 N.Y.2d 189 (N.Y. 1985). ...................................................................................... 222

*Seidman v. Clifton Sav. Bank*,
   No. A-4033-07T2, 2009 N.J. Super. Unpub. LEXIS 2267 (Super. Ct. App. Div. Aug. 19,
   2009) ............................................................................................................................ 181

*Sejman v. Warner-Lambert Co.*,
   845 F.2d 66 (4th Cir. 1988) ........................................................................................ 84

*Semi-Tech Litig., LLC v. Bankers Trust Co.*,
   272 F. Supp. 2d 319 (S.D.N.Y. 2003) (same) .............................................................. 341

*Sher v. JPMorgan Chase Funding (In re Thornburg Mortg., Inc.)*,
   610 B.R. 807 (Bankr. D. Md. 2019) ............................................................................ 155

*Silvercreek Mgmt. v. Citigroup, Inc.*,
   346 F. Supp. 3d 473 (S.D.N.Y. 2018) ........................................................................ 386

*Sinclair Oil Corp. v. Levien*,
   280 A.2d 717 (Del. 1971) .......................................................................... 7, 191, 213

*Sloan v. GM LLC*,
   No. 16-cv-07244-EMC, 2020 U.S. Dist. LEXIS 71982 (N.D. Cal. Apr. 23, 2020) ....... 289, 329

*Smith v. North Carolina*,
   528 F.2d 807 (4th Cir. 1975) ..................................................................................... 84, 95

*Southern Cal. etc. Assemblies of God v. Shepherd of Hills etc. Church*,
   77 Cal. App. 3d 951 (1978) ................................................................................ 235, 305

*Staples v. Billing*,
   Civil Action No. 11339 Del. Ch. LEXIS 10, at *37 (Ch. Jan. 31, 1994). .................... 217

*Stegeman v. United States*,
   425 F.2d 984 (9th Cir. 1970) ..................................................................................... 153

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) ................................................................................ passim

*Strauss v. Long Island Sports, Inc.*,
  60 A.D.2d 501 (App. Div. 2nd Dept. 1978) ......................................................... 358

*Sutherland v. Sutherland*,
  No. 2399-VCN, 2010 Del. Ch. LEXIS 88 (Ch. May 3, 2010) ............................. 164

*Tenax Corp. v. Tensar Corp.*,
  743 F. Supp. 1204 (D. Md. 1990) ........................................................................ 363

*Testo v. Ruggiero*,
  NO. CV90 27 19 97 S, 1993 Conn. Super. LEXIS 1719 (Super. Ct. July 13, 1993) ..... 289, 329

*Thomas v. FTS USA, LLC*,
  No. 3:13cv825, 2016 U.S. Dist. LEXIS 82679 (E.D. Va. June 24, 2016) ...................... 100, 342

*Tolan v. Cotton*,
  572 U.S. 650, 657 (2014) ......................................................................................... 4

*Torch Liquidating Trust ex rel. Bridge Assocs., LLC v. Stockstill*,
  2008 U.S. Dist. LEXIS 19535 (E.D. La. Mar. 13, 2008) ...................................... 340

*Torralbo v. Davol, Inc.*,
  2017 U.S. Dist. LEXIS 218339 (C.D. Cal. Oct. 19, 2017) .................................... 383

*Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*,
  906 A.2d 168 (Del. Ch. 2006) ....................................................................... 339, 340

*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*,
  1 Cal. 3d 586 (1970) ............................................................................................ 335

*United States v. Colon Ledee*,
  772 F.3d 21 (1st Cir. 2014) .................................................................................. 153

*United States v. Taylor*,
  166 F.R.D. 356 (M.D.N.C. 1996) ........................................................................ 343

*United States v. West*,
  22 F.3d 586 (5th Cir. 1994) ................................................................................. 153

*Valeant Pharm. Int'l v. Jerney*,
  921 A.2d 732 (Del. Ch. 2007) ..................................................................... 160, 175

*Vandashield LTD v. Isaacson*,
  2015 NY Slip Op 31782(U) n.18 (Sup. Ct. 2015) .............................................. 221

*Varacallo v. Mass. Mut. Life Ins. Co.*,
  332 N.J. Super. 31 (Super. Ct. App. Div. 2000) ................................................. 372

*Vedula v. Azar*,
  Civil Action No. TDC-18-0386, 2020 U.S. Dist. LEXIS 166284 (D. Md. Sep. 11, 2020) ...... 11

*Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*,
  839 F.3d 1251 (10th Cir. 2016) ........................................................................... 343

*Walker v. Action Indus.*,
  802 F.2d 703 (4th Cir. 1986) ............................................................................... 381

*Wall Sys. v. Pompa*,
   324 Conn. 718 (2017) .......................................................................... 364

*Warhanek v. Bidzos*,
   2013 U.S. Dist. LEXIS 133099 (D. Del. Sept. 18, 2013) ................... 185

*Weinberger v. Uop*,
   457 A.2d 701 (Del. 1983). ................................................................ 192

*West v. JPMorgan Chase Bank, N.A.*,
   214 Cal. App. 4th 780 (2013) ........................................................... 383

*Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.*,
   267 F. Supp. 2d 601 (E.D. Tex. 2003) .............................................. 338

*White v. Panic*,
   793 A.2d 356 (Del. Ch. 2000) .......................................................... 175

*Whiteley v. Philip Morris, Inc.*,
   117 Cal. App. 4th 635, 681 Cal. Rptr. 3d 807, 845 (2004) ............. passim

*Wigod v. Wells Fargo Bank, N.A.*,
   673 F.3d 547 (7th Cir. 2012) ........................................................... 334

*Xura, Inc. Stockholder Litig.*,
   2018 Del. Ch. LEXIS 563 (Ch. Dec. 10, 2018) ............................... 115

*Zazzali v. Hirschler Fleischer*, P.C.,
   482 B.R. 495 (D. Del. 2012) ............................................................ 340

*Zinkand v. Brown*,
   478 F.3d 634 (4th Cir. 2007) ........................................................ 98, 99

**Statutes**

11 U.S.C. § 548 .................................................................................. 154

18 U.S.C. § 152(7) ............................................................................. 153

353 B.R. at 827. ................................................................................. 111

6 Del. C. § 1304 .......................................................................... 154, 155

6 Del. C. § 1304(b) ............................................................................ 158

8 Del. C. § 102(b)(7) .................................................................. 104, 188

8 U.S.C. § 152(7) ........................................................................ 154, 159

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................... 10

Fed. R. Civ. P. Rule 8 .................................................................. 102, 103

**Treatises**

Collier on Bankruptcy (14th ed. 1968) .............................................. 153

Restatement (Second) of Torts § 546 .................................................. 372

Restatement (Second) of Torts § 551 ........................................................................... 374

Restatement (Second) of Torts § 920 ........................................................................... 396

**Regulations**

17 C.F.R. § 243 ............................................................................................................. 379

## I.      Introduction.

Defendants directed Toys "R" Us to file a chapter 11 bankruptcy on September 18, 2017. They controlled the company for another six months and then announced that the Company was liquidating its U.S. business and selling off all remaining assets. This sudden liquidation surprised employees, vendors, and the Unsecured Creditors' Committee. [2]

The result was nearly $800 million in unpaid administrative claims. [3] That number was shocking. It was "the largest administrative insolvency in the history of this country." [4]

Administrative claimants include the employees and vendors who provide goods and services to a company after it files for bankruptcy protection. Because the bankruptcy code gives administrative claimants priority to be paid, the amount of unpaid administrative claims at the end of the case should be (and almost always is) zero. But the Toys "R" Us bankruptcy resulted in hundreds of millions of dollars in claims from administrative claimants, and no money to pay them.

$800 million. Administrative losses this large cannot be explained by innocent mistake. They cannot be explained by reasonable decisions that just didn't happen to work out. So how did it happen? That question is answered by the evidence compiled by the Trust in this case. The documents and testimony provide overwhelming evidence that those losses were the direct result of Defendants' bad faith actions, knowing abdication of duties, fraudulent transfers, and fraudulent misrepresentations and concealments. The misconduct began before the petition date, and continued throughout the case.

---

[2] Bk. Dkt. 4033 (UCC Statement in Support of Settlement Agreement) ¶9 (the UCC "was surprised and disappointed to learn of the Debtors' plan for a wind-down").

[3] Bk. Dkt. 4030 (Ad Hoc Vendor Group's Statement in Support of Debtor's Motion re Settlement) at 3 ("approximate $800 million of administrative claims that were owed by the Debtors").

[4] Ex. 86 (Greenspan depo.) 133:9-17; Ex. 70 (Greenspan) ¶319.

Defendants' motion for summary judgment fails in every respect. It fails to apply the correct standard of review, fails to apply the controlling legal principles, fails to address the Trust's theories of wrongdoing, and fails to address the Trust's evidence.

### A.    The Court has not approved Defendants' conduct.

Defendants repeatedly imply, or outright assert, that the Court "approved" their conduct, such as by approving the DIP financing. Defendants' assertions and implications are absolutely false, as we demonstrate in Part III, Section A.3, below. The Court was never told the truth and by no means approved Defendants' conduct.

The first-day declarations from Defendant David Brandon and Defendant Michael Short represented to the Court that Toys "R" Us had secured over $3 billion in new financing, without milestones, giving it a 16-month runway to successfully reorganize in Chapter 11, with $1 billion to spend on capital improvements, to fund a turnaround plan. For example, Brandon testified, "of critical importance, the debtor-in-possession financing also provides the Company with hundreds of millions of dollars of new money that is available for immediate and direct investment in the Company's stores and operations." [5] Brandon testified: "Investment in Growth Begins Today" and "This turnaround begins today." [6] Brandon testified: "the Company has developed a four-pillared business plan designed to improve the customer experience, operations and drive sales," and that to "execute on all four of the strategic pillars, the Debtors have identified a comprehensive set of key initiatives," which he spelled out in detail in his declaration. [7]

---

[5] Brandon declaration (Bk. Dkt. 20) at 6-7, ¶13.
[6] Brandon declaration (Bk. Dkt. 20) at p. 30, ¶69.
[7] Brandon declaration (Bk. Dkt. 20) ¶¶70-78.

All of these statements were—at best—highly misleading.  The Court was not told the following facts:

- The Directors had made no assessment of the Company's ability to comply with the financial covenants in the DIP financing, and had not even asked to receive such an assessment from management or the financial advisors.

- The DIP budget and forecast provided to the Court was based on a manipulated revenue projection that would be virtually impossible to achieve.

- Even using the unrealistic DIP budget, the Company's projected liquidity was over $150 million below the amount that Alvarez & Marsal had concluded was necessary for the Company.

- Bandon and Short had concluded that the January revised budget covenant in the DIP financing "just isn't going to work" and the $175 million liquidity covenant "doesn't work."

- The Company was not commencing the turnaround "today" or "immediately" as Brandon had testified.  The Company did not have a turnaround plan, and had no prospects for coming up with one.

- The amount of money from the DIP financing budgeted for capital improvements for turnaround was only $125 million, a small fraction of what would be required by a transformative turnaround plan, and it was not available "immediately," but would only be available if budget covenant 6.16 were satisfied by January 31, 2018, which was highly unlikely.

To call these facts "material" is an understatement.  These facts and the others detailed below explain how and why the Toys "R" Us bankruptcy resulted in $800 million in unpaid administrative claims, "the largest administrative insolvency in the history of this country."  Quite simply, it was the fault of these Defendants.

**B.      Defendants fail to apply the summary judgment standard.**

Every argument in Defendants' motion for summary judgment is constructed on a foundation that (1) includes only evidence favoring the Defendants and that ignores evidence favoring the Trust, and (2) draws all inferences in favor of the Defendants and against the Trust.  That has it backwards.  A defendant's summary judgment motion is required to credit all

evidence favoring the plaintiff, to ignore defendant's conflicting evidence, and to draw all inferences in favor of the plaintiff and against defendant.

The "fundamental principle … at the summary judgment stage" is that "reasonable inferences should be drawn in favor of the nonmoving party" and "a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657, 660 (2014) (internal quotes omitted); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 570 (4th Cir. 2015) ("As in *Tolan*, the district court 'neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.' 134 S. Ct. at 1868. Rather, the court incorrectly drew all inferences in favor of the [defendant], not [plaintiff]. We therefore reverse the district court's determination….").

### C.    Defendants' fail to apply the correct legal principles.

Defendants consistently fail to address the governing legal principles found in controlling law. Here are two examples.

### Actionable misstatements example.

Defendants assert that "statements cannot give rise to tort liability" if they were "forward-looking aspirational or promissory statements." Mot. 39. That assertion is refuted by the controlling law.

First, "it is well settled that an opinion may be actionable when it is made by a party who … possesses, or assumes to possess, superior knowledge or special information regarding the subject matter." *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 892 (2013) (internal quotes omitted) (holding that statements by a party with superior knowledge that it "was 'highly probable,' and 'likely,' and 'look[ed] good'—that a modification of the loan agreement would be approved" were actionable as fraud).

4

Second, a statement that is an opinion or prediction of future events or actions is actionable if it "impl[ies] facts which justify a belief in the truth of the opinion." *Cohen v. S & S Constr. Co.*, 151 Cal. App. 3d 941, 946 (1983) (internal quotes omitted). "A statement about the future may imply a representation concerning an existing or past fact." Restatement (Second) of Torts § 525, comment e. Similarly, "a statement that is in the form of a prediction or promise as to the future course of events may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his prediction or promise impossible or improbable." Restatement (Second) of Torts § 525, comment f; *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999) ("opinion … carries with it an implied assertion … that the speaker knows no facts which would preclude such an opinion" (internal quotes omitted)).

**Duty to disclose example.**

As another example, Defendants assert that "statements cannot give rise to tort liability because they were true when made." Mot. 39. That assertion is wrong. A person has a duty to disclose "subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so." Restatement (Second) of Torts § 551(c). A person who makes "a representation which when made was true or believed to be so" and then "remains silent after he has learned that it is untrue" is "legally in the same position as if he knew that his statement was false when made." Restatement (Second) of Torts § 551, comment h.

The Restatement applies this principle in an illustration that is remarkably similar to the facts of the present case. In that example, the "president of a mercantile corporation makes a true statement of its financial position," that he intends will be relied on by trade vendors.

5

Restatement (Second) of Torts § 551, Illustration 2.  The president then learns that the "corporation's financial position becomes seriously impaired" but does nothing to inform the vendors.  *Id*.  When later the "corporation receives goods on credit from" a trade vendor, the president "is subject to liability in deceit" for any losses suffered by the vendor.  *Id.*

> **D.    Defendants' motion ignores and fails to address most of the Trust's theories.**

Because Defendants are the moving party, Defendants "bear[] the burden of proving that judgment as a matter of law is appropriate.  In order to meet that burden, the moving party must demonstrate that no genuine issues of material fact exist."  *Leslie v. Frederique*, Civil Action No. 1:17cv1061 (TSE/JFA), 2020 U.S. Dist. LEXIS 158925, at *15 (E.D. Va. Aug. 31, 2020) (internal citation omitted).

Defendants made no attempt to address all material theories for any of the Trust's claims, and therefore failed to meet their initial burden of showing the absence of a genuine issue. *Adickes v. S. H. Kress & Co*., 398 U.S. 144, 160 (1970) ("where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented" (emphasis in original, internal quotes omitted); *Ray Communs., Inc. v. Clear Channel Communs., Inc*., 673 F.3d 294, 299-300 (4th Cir. 2012) ("where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing" (internal quotes omitted); *Devan v. Zamoiski Se., Inc. (In re Merry-Go-Round Enters.)*, 272 B.R. 140, 144 (Bankr. D. Md. 2000) ("However, if the evidence provided by a movant is insufficient to establish the absence of a genuine issue of material fact, or to establish that the movant is entitled to judgment as a matter of law, summary judgment must be denied even if no opposing evidentiary matter is presented" (internal quotes omitted)).

6

For each of the Trust's claims, the Trust has multiple theories of wrong doing and has identified multiple wrongful acts. Defendants' have elected to address in their motion only a fraction of those theories. Accordingly, Defendants have not met their initial burden and cannot obtain summary judgment. Here are two examples of theories that Defendants failed to address.

**Minority shareholders:**

The Trust asserts a breach of fiduciary duty claim based on Defendants allowing payments of purported "advisory fees" to KKR, Bain, and Vornado, who were the majority shareholders. One of the Trust's theories of liability is based on the presence of minority shareholders, because payments that are "in essence self-dealing" by majority shareholders, to "the exclusion of and detrimental" to "minority stockholders," are presumed to violate fiduciary duties. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721 (Del. 1971). Defendants' motion entirely ignores this theory. It fails even to mention the minority shareholders.

**Larian**:

One of the Trust's theories of fraud arises from an email exchange on February 3, 2018, between Isaac Larian, who was the head of toymaker MGA, and Defendants Brandon and Barry. Larian emailed Brandon and Barry to ask about a rumor that Toys "R" Us was now "leaning towards a liquidation" with options that included shrinking to "a 200 store chain" or "liquidate the whole thing." [8]

That rumor was true. Just five days earlier, Brandon had told the Directors that the Company did not have the funding "to emerge from chapter 11 and continue operating the

---

[8] Ex. 167 (Larian Post); Ex. 147 (2'3'18 Brandon to Larian re Silver post [TRU-Trust0000272792]).

current business plan," and that the two remaining "likely outcomes" were "shrink and rethink the business" and "total liquidation of the enterprise." [9]

But Brandon and Barry did not tell Larian the truth. Brandon responded that the rumor was not "accurate information about decisions being made in the boardroom of TRU," and that the Company was "working on the best plan for emergence." [10]

Brandon certainly understood that he was engaged in deception. Brandon testified that he understood Larian was "concerned about the rumor" that "Toys 'R' Us was considering a liquidation," and was seeking "to verify whether there was any credibility contained in this blog." [11] And Brandon testified, "my response to him was coaching him that that was not an appropriate source of useful information for him and he should not take it as fact." [12]

Defendants' motion makes no mention of this episode.

### E.    Defendants' motion ignores and fails to address most of the Trust's evidence.

It is understandable that Defendants would want to ignore the powerful evidence compiled by the Trust that proves Defendants' wrong-doing. But by not even attempting to address that evidence, Defendants cannot obtain summary judgment. Here is an example.

In support of the Trust's claim for breach of fiduciary duty claim based on Defendants allowing payments to the majority shareholders, the Trust contends, as one theory, that Toys 'R' Us was insolvent, which means the directors "owe[] a fiduciary duty" to "the company's creditors to preserve assets." *Collins v. Throckmorton*, 425 A.2d 146, 149 (Del. 1980).

Defendants assert that their "expert conducted a detailed solvency analysis" and that "no other evidence in the record" supports a conclusion of insolvency. Mot. at 28. This assertion

---

[9] Ex. 140 (1'28'18 minutes) at 2.
[10] Ex. 147 (2'3'18 Brandon to Larian re Silver post [TRU-Trust0000272792]) at 2.
[11] Ex. 88 (Brandon) 435:8-14, 436:9-17.
[12] Ex. 88 (Brandon) 434:21-435:6

simply pretends that the contrary evidence does not exist.  The Trust's expert, Ron Greenspan, demonstrated the flaws in the analysis of Defendants' expert. [13]  And Greenspan cited and quoted evidence demonstrating that Defendants' themselves concluded that Toys "R" Us was insolvent. [14]

For example, in April 2015, when KKR, Bain, and Vornado were in discussions to hire Brandon as CEO, Brandon conducted a summary valuation of Toys 'R' Us and concluded that ███████████."  [15]  In response, a Bain representative remarked to two of the Defendant Directors, "████████████████████████████████ ███████████████████."  [16]  "The inability to realize any value above the debt is the definition of insolvency." [17]

### F.    Defendants do not seek partial summary judgment of part of a claim.

Defendants have elected to take an all or nothing approach, seeking summary judgment on the entirety of each claim, and not requesting, in the alternative, partial summary judgment on particular identified theories within each claim.

For each of the Trust's claims, the Trust has multiple theories of wrong doing and identifies multiple wrongful acts.  For each of the breach of fiduciary duty claims, the Trust asserts multiple breaches of duty, each of which is based on multiple wrongful acts.  And for each of the fraud claims, the Trust asserts multiple theories of fraudulent and negligent

---

[13] Ex. 70 (Greenspan) ¶¶395-401.

[14] Ex. 70 (Greenspan) ¶¶399-401; Ex. 70 (Greenspan) ¶¶163-165.

[15] Ex. 70 (Greenspan) ¶400; Ex. 13 (4'8'15 Saghir to Taylor Levin re Brandon [DEFS_0049061]).

[16] Ex. 70 (Greenspan) ¶400; Ex. 13 (4'8'15 Saghir to Taylor Levin re Brandon [DEFS_0049061]) at 1.

[17] Ex. 70 (Greenspan) ¶400.

concealment and misrepresentation, and for each theory identified multiple acts of concealment and misrepresentation.

A party may move for summary judgment on a claim in its entirety or may move for partial summary judgment as to part of a claim.  "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).

But to move for partial summary judgment, the party's motion must expressly identify "the part of each claim … on which summary judgment is sought."  *Id*.; *Elantech Devices Corp. v. Synaptics*, No. C 06-01839 CRB, 2007 U.S. Dist. LEXIS 82017, at *28-29 (N.D. Cal. Oct. 26, 2007) (denying motion for summary judgment because, while the court would have granted summary judgment as to certain products, the party "did not move for partial summary judgment; instead, its motion seeks judgment on all [products] without distinction").

Defendants have not moved for summary judgment on part of a claim, nor have they attempted to meet the requirement of "identifying … the part of each claim … on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Defendants did not request that the Court grant partial summary judgment as to any of the theories asserted by the Trust within a claim. Defendants assert only: "None of these claims can survive summary judgment."  Mot. 1.  And "Defendants thus request that this Court grant summary judgment and dismiss the Trust's claims."  Mot. 102.  Defendants have therefore moved for summary judgment on the entirety of each claim, but have not asked the Court, in the alternative, to grant partial summary judgment as to particular theories that form part of a claim.

To grant summary judgment on the entirety of one of the Trust's claims, the Court would have to assess each theory and wrongful act asserted, and find that the claim fails as to all such

theories and acts. By contrast, the Court can deny Defendants' motion as to a claim by concluding that the Trust has evidence sufficient to create a genuine issue for at least one of the asserted wrongful acts and theories of wrongdoing. *Vedula v. Azar*, Civil Action No. TDC-18-0386, 2020 U.S. Dist. LEXIS 166284, at *49-50 (D. Md. Sep. 11, 2020) (holding that "there is sufficient evidence to create a genuine issue of material fact" on one theory supporting a claim and therefore the "Court need not address [plaintiff's] alternative theory").

As the 2010 Advisory Committee Notes expressly clarified, when denying a motion for summary judgment, "[t]he statement on denying summary judgment need not address every available reason." Accordingly, to deny this motion, the Court is not required to assess each of the theories and wrongs asserted. *Alexander v. Azar*, 396 F. Supp. 3d 242, 248 (D. Conn. 2019) (("[The Court's] role is not to provide the parties with a roadmap for trial. I explained why I found that there existed a triable issue of fact [and] decline to expound upon my reasoning further.").

Defendants' motion should be denied as to all claims asserted by the Trust.

## II. The Director Defendants are liable for breaches of fiduciary duties in approving the DIP financing and failing to implement an immediate wind-down.

As of August 2017, Toys "R" Us met all of the criteria for a business that needed to wind down: it had been losing money for years, had a broken business model, had no plausible path for a turnaround, and sales and margins were in an accelerating spiral downward. But rather than directing an orderly liquidation of the Company, the Defendant Directors voted to pledge all of the Company's remaining assets to DIP financing in support of a purported "Turnaround Plan" that would commence "immediately." [18]

---

[18] Brandon declaration (Bk. Dkt. 20) at pp. 6-7, 30, 44, ¶¶13, 69, 103; Ex. 70 (Greenspan) ¶¶50-51.

Defendants failed, however, to assess whether the Company could comply with the financial covenants in the DIP financing, which was required to avoid a precipitous default and forced liquidation. Worse still, Defendants not only knew that the Company lacked sufficient capital and time to conduct a turnaround, they knew the purported "Turnaround Plan" did not exist. This was a "Hail Mary" with no plausible chance of succeeding. It wiped out the previously unencumbered assets, incurred over $500 million in costs for financing costs, restructuring professional fees, and operating losses, and resulted in $800 million in unpaid Administrative Claims. Defendants entirely abdicated their fiduciary duties.

### A.    The Defendants' fiduciary duties.

Under Delaware law [19] a claim for "breach of fiduciary duty has only two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty." *Basho Techs. Holdco B, Ltd. Liab. Co. v. Georgetown Basho Inv'rs, Ltd. Liab. Co.*, No. 11802-VCL, 2018 Del. Ch. LEXIS 222, at *55 (Ch. July 6, 2018). In addition, to recover damages plaintiff must show that "a sufficiently convincing causal linkage exists between the breach of duty" and the claimed losses. *Id*. at *57.

The "plaintiff bears the initial burden of proving that the defendant breached her duty of loyalty or her duty of care, thereby rebutting one of the business judgment rule's presumptions and triggering further review of the decision under the entire fairness test." *Id*. at *56-*57. Having shown a breach of duty, the burden shifts to the defendant: "the defendant fiduciaries

---

[19] Because this case was filed in and transferred from the Southern District of New York, New York's choice-of-law rules apply. *See Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990). Under New York's choice-of-law rules, breach of fiduciary duty claims brought by a company against its directors and officers are governed by the substantive law of the state of incorporation. *See, e.g., RAL Capital Ltd. v. CheckM8, Inc.*, 2017 N.Y. Misc. LEXIS 3593 (Sup. Ct. N.Y. Cty. Sept. 21, 2017). Because the breach of fiduciary duty claims were assigned to the Trust by Delaware corporations (Toys "R" Us, Inc. and Toys "R" Us, Delaware, Inc.), the claims are governed by the substantive law of Delaware.

bear the burden of proof to show that they in fact acted in a manner that was entirely fair to their beneficiaries." *Id*. at *57.

Delaware law imposes three fundamental fiduciary duties: the duty of good faith, the duty of loyalty, and the duty of care. [20] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty").

Duty of good faith.  A breach of the duty of good faith may be shown in several distinct ways, including by subjective bad faith, by objectively unreasonable decision, or by knowing abdication.  First, bad faith may be shown by evidence of "'subjective bad faith,' that is, fiduciary conduct motivated by an actual intent to do harm." *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 64 (Del. 2006).

Second, bad faith may be shown by evidence that a decision is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999) (internal quote omitted); *Dent v. Ramtron Int'l Corp.*, No. 7950-VCP, 2014 Del. Ch. LEXIS 110, at *15 (Del. Ch. June 30, 2014) (same); *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000) (same).

Proving an unreasonable judgment does not require a plaintiff to establish "facts that rule out any possibility other than bad faith." *Kahn v. Stern*, 183 A.3d 715, 715 (Del. 2018).  It

---

[20] Although Delaware cases customarily analyze the duty of good faith as a separate duty, the duty of good faith derives from, and is a component of, the duty of loyalty.  A "director cannot act loyally towards the corporation unless she acts in good faith." *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006).  Therefore, "the fiduciary duty of loyalty is not limited to cases involving a … conflict of interest," and it "also encompasses cases where the fiduciary fails to act in good faith." *Id*.

requires only "facts that support a rational inference of bad faith." *Id.* Bad faith may be shown

by "facts supporting an inference that [the fiduciary] did not reasonably believe that the …

transaction was in the best interests of" the company. *Brinckerhoff v. Enbridge Energy Co.*, 159

A.3d 242, 260 (Del. 2017), *quoted with approval by Kahn v. Stern*, 183 A.3d 715, 715 & n.5

(Del. 2018). Establishing that a director "did not reasonably believe" a transaction was in the

best interests of the company does not require proof of the director's subject belief; instead "the

use of the qualifier 'reasonably' imposes an objective standard of good faith." *Brinckerhoff*, 159

A.3d at 260.

Third, a breach of the duty of good faith occurs "[w]here directors fail to act in the face

of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities."

*Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *Brehm v. Eisner (In re Walt Disney Co.*

*Derivative Litig.)*, 906 A.2d 27, 67 (Del. 2006) (breach of the duty of good faith if a director

"intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard

for his duties").

This is sometimes referred to as breach by "abdication of directorial duty." *Cede & Co.*

*v. Technicolor*, 634 A.2d 345, 363-64 (Del. 1993). This type of bad faith occurs if directors

"adopt[ed] a 'we don't care about the risks' attitude concerning a material corporate decision."

*In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003), *aff'd Brehm v.*

*Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 63 (Del. 2006) (holding that bad

faith may be shown by evidence demonstrating a "conscious[] and intentional[] disregard[] [of]

responsibilities, adopting a 'we don't care about the risks' attitude").

Bad faith by abdication is shown if the facts "imply that the defendant directors knew that

they were making material decisions without adequate information and without adequate

14

deliberation, and that they simply did not care if the decisions caused the corporation and its

stockholders to suffer injury or loss." *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289

(Del. Ch. 2003); *Bridgeport Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings,*

*Inc.)*, 388 B.R. 548, 564 (Bankr. D. Del. 2008) ("t]he D&O Defendants breached their duty of

loyalty and acted in bad faith by consciously disregarding, i.e., abdicating, their duties to the

Company"); *Boles v. Filipowski (in re Enivid, Inc.)*, 345 B.R. 426, 452 (Bankr. D. Mass. 2006)

(directors and officers "breached their duty of good faith … by approaching the operation of [the

company] with a level of indifference or egregiousness that amounted to bad faith") (applying

Delaware law); *Bridgeport Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings,*

*Inc.)*, 388 B.R. 548, 564-65 (Bankr. D. Del. 2008) (fiduciaries are liable "if they fail to obtain

information as a result of their 'knowing abdication of their directorial duties'" (quoting

*Desimone v. Barrows*, 924 A.2d 908, 933 (Del. Ch. 2007)).

    Duty of loyalty.  A breach of the duty of loyalty exists if a director acts while under the

influence of a conflict of interest and a director is "independent only when the director's decision

is based entirely on the corporate merits of the transaction and is not influenced by personal or

extraneous considerations." *Cede & Co. v. Technicolor*, 634 A.2d 345, 362 (Del. 1993).

    "A director is considered interested" in a corporate decision, and not independent, if the

director "will receive a personal financial benefit from a transaction" or "where a corporate

decision will have a materially detrimental impact on a director, but not on the corporation."

*Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).  "In such circumstances, a director cannot be

expected to exercise his or her independent business judgment without being influenced by the

adverse personal consequences resulting from the decision." *Rales v. Blasband*, 634 A.2d 927,

936 (Del. 1993).

The Delaware Supreme Court has "consistently defined the duty of loyalty of officers and directors" in "unyielding terms." *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993). It "has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty." *Id.* (internal quotes omitted).

Any potential for influence by outside interests is prohibited. "The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest." *Id.* As a result, "there is no safe-harbor for divided loyalties in Delaware." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005). A director is "independent only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations." *Cede & Co. v. Technicolor*, 634 A.2d 345, 362 (Del. 1993). "By contrast, a director who receives a substantial benefit from supporting a transaction cannot be objectively viewed as disinterested or independent." *Id.*

Duty of care. "The fiduciary duty of due care requires that directors of a Delaware corporation both: (1) use that amount of care which ordinarily careful and prudent men would use in similar circumstances; and (2) consider all material information reasonably available." *Bridgeport Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 568 (Bankr. D. Del. 2008) (internal quotes omitted). A breach of the duty of care occurs if a director's actions or inactions amount to "gross negligence," which is "conduct that constitutes reckless indifference or actions that are without the bounds of reason." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008).

Defendant Directors breached each of these three fiduciary duties.

**B.      When evaluating whether to authorize DIP financing and attempting a turnaround strategy, the Directors knew and understood the requirements of**

**their fiduciary duties.**

The Defendants were well aware of the requirements of their fiduciary duties.  They had long experience as corporate directors and officer, including years of experience in evaluating large-scale financing, and charting the course for large companies. [21]  As Defendant Brandon stated at the time, "this board obviously has significant understanding of its fiduciary duties." [22]

Moreover, Kirkland and Ellis gave the Directors detailed presentations on the requirements of their fiduciary duties in early August 2017. [23]

As Defendants have admitted, Defendants' fiduciary duties required them to consider and assess "all reasonable alternatives" before coming to a decision. [24]  They were required to "evaluate each alternative to determine which restructuring alternative will maximize the value of the Company." [25]  Defendants were expressly advised that they needed "to demonstrate that they carefully evaluated each restructuring alternative." [26]

Defendants knew that while they were not required to eliminate business risk, "the risks that are undertaken must be reasonable, and the course of action must be reasonably achievable." [27]

---

[21] Ex. 70 (Greenspan) ¶12; Ex. 65 (2017 TRU 10k) at p. 113-14, pdf 118-19.
[22] Ex. 25 (8'3'17 Brandon talking points for BOD [TRU-Trust0000124186]) at 2, bullet 7.
[23] Ex. 25 (8'3'17 Brandon talking points for BOD [TRU-Trust0000124186]) at 2, bullet 7 ("K&E advises that it is important for the record that there be a comprehensive discussion on fiduciary duties"); Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]), attached to Ex. 28 (8'9'17 Kunath email [DEFS_0064533]); Ex. 23 (7'31'17 Contingency Prep Overview [DEFS_0123896]), attached to Ex. 31 (8'17'17 Khalil email [DEFS_0123842]); Ex. 83 (Macnow depo.) 193:21-194:13; Ex. 82 (Goodman depo.) 15:10-13, 16:4-15.
[24] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10.
[25] Ex. 23 (7'31'17 Contingency Prep Overview [DEFS_0123896]) at slide 20, bullet 3.
[26] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 7.
[27] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 8.

The Defendants were expressly advised that, when "an entity is potentially or arguably insolvent," the Board should not "authorize a transaction that could be analogized to a 'Hail Mary' pass for the benefit of shareholders if creditor recoveries are threatened." [28]

Defendants also knew their fiduciary duties required that, before deciding on a course of action, they were required to "inform themselves of all material information that was reasonably available" and "carefully consider that information." [29]

The Defendants knew that, to comply with their fiduciary duties, they could rely on advice from others, including professional advisors, but could "not simply rubber stamp whatever advice they receive." [30] They knew that "directors and officers should not be merely passive recipients of advice." [31] They were required to examine the assumptions underlying the proposal, to independently consider its reasonableness. "Directors and officers should independently evaluate assumptions and information presented by advisors." [32]

Defendants knew that to "comply with the duty of loyalty, a company's directors must exercise disinterested and independent judgment." [33] They knew "that in a situation where a decision would implicate an actual or potential conflict of interest, the board should delegate decision-making authority to disinterested directors or managers." [34]

---

[28] Ex. 23 (7'31'17 Contingency Prep Overview [DEFS_0123896]) at slide 20, bullet 6.
[29] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10.
[30] Ex. 70 (Greenspan) ¶277; Ex. 77 (Raether depo.) 319:23-320:1, 320:9-22; Ex. 80 (Silverstein) 202:111-203:2 ("no, it's not my job to rubber stamp anything," "I don't think it's any board of directors' job to rubber stamp anything").
[31] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10.
[32] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10.
[33] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 11.
[34] Ex. 77 (Raether) 157:3-8; Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 15.

18

In sum, they knew that the job of the Directors was to kick the tires, to make sure that management and the advisors had thoroughly and correctly evaluated the situation, and to come to their own independent judgment that the selected path would maximize value and avoid enhancing losses. [35]

The Director Defendants not only understood the general outlines of fiduciary duty law, they also knew and understood the information they would need and the assessment they would need to make when authorizing the Company to take on DIP financing and pursue a turnaround.

"An important factor in deciding whether a company should take on DIP financing is to assess the risk of defaulting on the financial covenants." [36]  A default that requires "immediate repayment of the outstanding balance and termination of borrowing ability" will cause "a large and sudden reduction in the company's liquidity." [37]  "Such a sudden event can trigger a cascade of negative consequences and force an unplanned liquidation of the company not allowing for the maximization of the value of the company's assets." [38]

For these reasons, the Director Defendants knew that their fiduciary duties required them to assess whether TRU could safely comply with financial covenants in the DIP financing, and to assess the likely harms and losses from an event of default. [39]  For example, Defendant Raether testified that before the Directors could authorize the Company to take on DIP financing the Directors were required "to assess whether Toys 'R' Us, going forward, would be able to comply with the financial covenants in the DIP financing." [40]  He also testified that it was "important"

---

[35] Ex. 70 (Greenspan) ¶277.
[36] Ex. 70 (Greenspan) ¶52.
[37] Ex. 70 (Greenspan) ¶52.
[38] Ex. 70 (Greenspan) ¶52; Ex. 78 (Levin depo.) 283:10-24; Ex. 78 (Levin depo.) 285:2-11; Ex. 80 (Silverstein depo.) 116:6-117:10, 118:18-119:1.
[39] Ex. 70 (Greenspan) ¶¶54-57.
[40] Ex. 77 (Raether depo.) 137:24-138:5.

and "part of your fiduciary duty" for the Director to "examine the DIP budget" and assess whether the Company would have "the ability to pay the money back." [41]

"To assess whether TRU could safely comply with financial covenants in the DIP financing required comparing the requirements of each covenant with a forecast of the company's future performance over the life of the financing." [42] "To understand the reliability of such a forecast, and to comply with a director's fiduciary duty to independently evaluate assumptions and information presented by advisors, the Director would need to understand, and then evaluate the reliability of, the key assumptions underlying the forecast." [43] This would include information on assumed sales growth/decline, assumed margin growth/decline, and projected overhead and other costs and capital expenditures. [44] In addition, because projections cannot "perfectly anticipate what will actually occur," the covenant assessment also requires a "sensitivity analysis." [45] This "sensitivity analysis would make use of a financial model (e.g., a spreadsheet) that allows varying the key inputs to determine the resulting effects." [46] The analysis would "assess the downside case and determine the risks that events would go less well than forecast in the base case, resulting in worse financial performance and a potential default in the covenants." [47]

Defendants do not dispute, and in fact have admitted, that their fiduciary duties required them to perform the assessment described above. [48]

---

[41] Ex. 77 (Raether depo.) 123:17-124:18.
[42] Ex. 70 (Greenspan) ¶54.
[43] Ex. 70 (Greenspan) ¶54.
[44] Ex. 70 (Greenspan) ¶54.
[45] Ex. 70 (Greenspan) ¶56.
[46] Ex. 70 (Greenspan) ¶56.
[47] Ex. 70 (Greenspan) ¶56.
[48] *See, e.g.,* Ex. 78 (Levin depo.) 15:10-16:21, 20:4-9, 20:23-21:11, 21:23-22:8, 133:25-135:1, 135:7-16, 286:3-17, 286:22-287:15, 288:10-17, 288:25-291:4, 291:21-293:16, 294:12-295:9,

For example, Defendant Raether testified that it was "incumbent upon the directors … to understand the terms of the DIP financing and the company's … operating forecast such that it could comply with the covenants that were present in that DIP financing." [49]

Raether further testified that "[t]o understand whether Toys 'R' Us's projections going forward were reasonable," it would be "necessary" for a director "to have some understanding about the assumptions underlying the projections," including "the relative increase or decrease in same-store-sales." [50]  In fact, he said "you wouldn't waste time … on a forecast … looking at it or analyzing it if you didn't have the assumptions that lay behind" the forecast. [51]

Raether also testified that, in "determining whether taking on DIP financing was reasonable," a director would also need to examine a "sensitivity analysis," meaning adjusting the key assumptions "to see how it impacts the projections." [52]  The sensitivity analysis provides information about a "range of outcomes," including one or more less favorable outcomes that would allow an assessment of whether the Company would "be in compliance with the covenants that were in the DIP financing agreement." [53]

---

295:25-297:9; Ex. 79 (Taylor depo.) 188:12-25, 190:15-25, 192:6-14, 193:3-9, 193:10-21, 194:25-195:19, 196:18-197:5, 197:18-24, 198:18-199:14, 200:1-201:7, 207:20-208:7, 210:12-23, 211:11-18, 213:11-16, 214:24-215:11, 215:13-19, 215:21-216:1, 216:5-11, 247:20-248:9; Ex. 80 (Silverstein depo.) 163:13-164:8, 186:25-187:13, 188:13-20, 190:2-12, 190:17-191:9, 191:18-192:17; Ex. 83 (Macnow depo.) 65:5-16, 193:21-194:13, 195:13-196:12, 196:21-197:9, 203:3-204:7, 207:2-9;  Ex. 82 (Goodman depo.) 15:10-13, 16:4-15, 16:21-25, 17:4-18:7, 22:2-23:21, 24:6-13, 27:17-28:3, 28:20-29:2, 41:1-11, 43:6-12, 49:11-15, 50:2-10.
[49] Ex. 77 (Raether) 124:19-125:12.
[50] Ex. 77 (Raether) 125:25-126:11.
[51] Ex. 77 (Raether) 181:22-182:11, 492:25-493:25.
[52] Ex. 77 (Raether) 128:3-19.
[53] Ex. 77 (Raether) 128:20-129:17, 496:14-497:1.

Raether testified that Directors must be presented with "a set of sensitivity analyses such that we can determine with a high degree of confidence that the company will be able to perform and meet its obligations," and "if not, the directors should not approve … financing." [54]

As another example, Defendant Taylor testified that if the Directors "authorized the company to take on DIP financing without assessing the ability of the company to comply with the financial covenants" then the Board "would not have" "complied with our fiduciary duties." [55]  Taylor testified that "to comply with your fiduciary duties" he was "required to investigate the assumptions underlying information provided" from advisors. [56]  He testified that he would need to see assumptions on "sales" and "costs" and "a comprehensive discussion of the key elements of the income statement and balance sheet on a go-forward basis." [57]

And Taylor testified that "part of a board's duty is to contemplate a likely range of outcomes," including "scenarios above and below the forecast," and "an analysis of the downside risk of not being able to comply with the financial covenants." [58]

C.    **The Director Defendants abdicated their duty and entirely failed to assess the Company's ability to comply with the financial covenants in the DIP financing.**

Although the Director Defendants knew they had a fiduciary duty to assess the risk of covenant compliance, they entirely abdicated that duty.  This was not a "situation where the Directors attempted such an analysis, but did not do an adequate analysis," amounting to mere

---

[54] Ex. 77 (Raether) 136:12-137:18.
[55] Ex. 79 (Taylor) 247:20-248:9.
[56] Ex. 79 (Taylor) 211:11-18.
[57] Ex. 79 (Taylor) 199:2-14.
[58] Ex. 79 (Taylor) 200:1-22, 216:5-11.

negligence. [59]  "The record shows a complete absence of any effort by the Directors to assess the covenants, risks of default, and consequences of a default." [60]

As discussed in greater detail below, the Board never even bothered to ask for (much less examine) a forecast with identified assumptions, a comparison of the forecast to the covenants, or a sensitivity analysis assessing a downside case.  In fact, they voted to approve the DIP financing without even bothering to find out what covenants were required, and without even obtaining a conclusory representation from management or the advisors that the Company could reasonably comply with the covenants.  Defendants' conduct was a classic example of adopting a "we don't care about the risks" attitude.

Before voting to approve DIP financing, the seven non-management Defendant Directors (Raether, Taylor, Bekenstein, Levin, Silverstein, Macnow, Goodman) received two forecasts of the Company's projected performance upon entering bankruptcy, neither of which could be used to assess covenant compliance.  On August 17, 2017, Taylor, Levin, and Silverstein received a "Preliminary DIP Sizing Forecast" dated August 17, 2017. [61]  This forecast was "preliminary" and "could not reliably have been used to assess the financial covenants" because it "was prepared several weeks before any DIP proposals had been received." [62]  None of the Defendants contend it was usable (or that it in fact was used).  For example, Defendant Levin testified that the August 17 forecast was not sufficient "to reach a conclusion as to whether or not Toys 'R' Us

---

[59] Ex. 70 (Greenspan) ¶84.
[60] Ex. 70 (Greenspan) ¶84.
[61] Ex. 32 (8'17'17 Lal to Finegan [REV01587062]) ("attached is a prelim DIP sizing that we used for discussion with Dave and Mike this AM"); Ex. 70 (Greenspan) ¶63.
[62] Ex. 70 (Greenspan) ¶63.

is going to be able to comply with its financial covenants" and "I couldn't use this model" "to make an assessment of whether Toys 'R' Us could comply." [63]

Defendants have good reason for distancing themselves from this August 17 forecast: it demonstrated that the DIP loans were far too risky.  To allow for variability, the Company needed a reasonable liquidity cushion (the advisors determined the liquidity cushion should be at least $200 million). [64]  The August 17 forecast projected total liquidity would fall to $2 million. [65]  A "projected margin of only $2 million for a multi-billion-dollar organization created a high risk of default," and "[a]ny sensitivity analysis would have shown a default." [66]

The only other forecast the non-management Director Defendants received was a "Summary DIP Budget and Forecast," in an appendix to the September 13 board materials. [67] This "summary" forecast included a forecast for "Adjusted EBITDA," but "did not include a breakdown of projected sales, margin, or costs, nor did it include the underlying assumptions on which sales, margin, and costs were projected, or a justification for those assumptions." [68]

None of the Defendants contends the limited information in the Summary DIP Budget and Forecast could be used (or was used) to assess projected covenant compliance.  For example, Defendant Raether testified that "you would need more information than just this page to

---

[63] Ex. 78 (Levin depo.) 309:12-310:12, 311:23-312:6; Ex. 78 (Levin depo.) 308:10-22.
[64] Ex. 70 (Greenspan) ¶112; Ex. 37 (8'31'17 attach DIP sizing [TRU-Trust0000373909]) at 3 ("maintains a minimum cushion of $200 million … through the forecast period.  This cushion will allow for a day-to-day operating buffer, and intra-month liquidity troughs"); *id.* at 2 ("maintain liquidity of at least $200 million through the period"); Ex. 42 (9'15'17 Lal 144 not sufficient [LZ-TRU0079112]) ("$144MM … does not provide sufficient cushion").
[65] Ex. 30 (8'17'17 attach to Levin Silverstein Sunrise_Draft DIP Sizing [DEFS_0123956]) at 3; Ex. 70 (Greenspan) ¶64.
[66] Ex. 70 (Greenspan) ¶64.
[67] Ex. 70 (Greenspan) ¶¶69-73; Ex. 41 (9'13'17 Brandon agenda plus attach [DEFS_0004126]).
[68] Ex. 41 (9'13'17 Brandon agenda plus attach [DEFS_0004126]) at pdf p.15; Ex 70 (Greenspan) ¶71.

determine whether the operating cash flow at the top … is reasonable," including information on sales, SG&A, working capital, same store sales assumptions, and a sensitivity analysis with a downside case. [69]  Raether explained: "Without the assumptions, you're just looking at a piece of paper with a bunch of numbers on it that don't mean anything because you have to understand what the assumptions are, and you have to determine whether you think those assumptions are reasonable or not." [70]  Raether testified "you wouldn't waste time … on a forecast … looking at it or analyzing it if you didn't have the assumptions that lay behind" the forecast. [71]

In fact, the September 13 board materials "did not include any assessment or commentary" on the various financial covenants that had been proposed by lenders as of that date. [72]  And the materials did not include any commentary on the likelihood of achieving the forecast, any alternative downside scenarios, any sensitivity analysis, or a financial model that would have permitted a Director to perform an analysis of covenants. [73]  For example, Levin testified "I wouldn't have been able to do an assessment of whether Toys 'R' Us would be able to comply with the cash flow covenants under the DIP financing." [74]

The Director Defendants also received materials for the board meetings held on September 15, 2017, and September 18, 2017 (the day of the vote).  But those "materials did not include any analysis of the financial covenants or any information on a financial forecast." [75]

---

[69] Ex. 77 (Raether) 186:9-20, 188:25-189:13, 190:6-20, 197:9-16.

[70] Ex. 77 (Raether depo.) 181:22-182:11.

[71] Ex. 77 (Raether depo.) 181:22-182:11; *see* Ex. 78 (Levin depo.) 319:8-22, 321:12-17, 325:16-326:1, 328:19-329:7.

[72] Ex. 70 (Greenspan) ¶73; Ex. 41 (9'13'17 Brandon agenda plus attach [DEFS_0004126]) at pdf 6, 9.

[73] Ex. 41 (9'13'17 Brandon agenda plus attach [DEFS_0004126]); Ex. 70 (Greenspan) ¶72.

[74] Ex. 78 (Levin depo.) 328:19-329:7.

[75] Ex. 70 (Greenspan) ¶¶76, 78; Ex. 43 (9'15'17 to BOD re DIP and attach [DEFS_0004093]); Ex. 54 (9'18'17 Sussberg to board with financing [DEFS_0004108]).

Before casting their vote directing the Company to take on DIP financing, none of the Defendants prepared an analysis assessing covenant compliance nor did they review an analysis of covenant compliance prepared by the Company's management or its restructuring advisors. [76] The materials provided to the Directors "did not include any alternative downside scenarios, any sensitivity analysis, or a financial model that would have permitted a director to perform an analysis of covenants." [77]

In fact, on September 18, when the Directors approved the DIP financing and the Company filed its bankruptcy petition and first day motions, the three financial covenants for the DIP Term loan were unknown (as discussed in greater detail below). [78] When the Board voted to authorize the financing, the lenders for the DIP Term loan had not yet even provided a *proposal* for the required financial covenants. [79] Consequently, it was not possible on September 18 for either management or the advisors to have prepared any analysis (much less an adequate sensitivity analysis) to assess covenant compliance for financial covenants.

"The record shows a complete absence of any effort by the Directors to assess the covenants, risks of default, and consequences of a default." [80] The "Board did not request … the terms of each financial covenant" or a "financial forecast that could be used to assess the risks of the financial covenants." [81] The Company's "advisors did not conduct (and were not asked by the Directors to conduct) an analysis of whether the Company could comply with the financial covenants and avoid a default-induced sudden liquidation." [82] There is no record "suggesting

---

[76] Ex. 70 (Greenspan) ¶¶85, 283.
[77] Ex. 70 (Greenspan) ¶85.
[78] Ex. 70 (Greenspan) ¶¶93-108.
[79] Ex. 70 (Greenspan) ¶¶93-95, 97-99.
[80] Ex. 70 (Greenspan) ¶84.
[81] Ex. 70 (Greenspan) ¶85.
[82] Ex. 70 (Greenspan) ¶283.

that any of the Directors requested or received an analysis of risks associated with the financial

covenants in the DIP financing, or any of the information needed to determine whether such an

analysis had been adequately performed by the advisors and management." [83]

**D.      Defendants' deposition testimony confirms their breach of fiduciary duty.**

In their depositions, the Director Defendants "were not able to identify any materials they

received or analyzed that provide sufficient information for them to assess the covenants, risks of

default, or consequences of default." [84]  Here are some examples.

<u>Bekenstein</u>

Defendant Bekenstein, the co-chair of Bain Capital, admitted that he failed to take any

steps to satisfy his fiduciary duty to assess the Company's ability to comply with financial

covenants in the DIP financing.

    9      Q.  In 2017, before Toys "R" Us filed for
    10   bankruptcy, did you conduct any assessment to
    11   determine whether Toys "R" Us would likely be
    12   able to comply with its financial covenants
    13   under the DIP financing?
    15      A.  No.

Ex. 81 (Bekenstein) 21:9-15.

Bekenstein admitted that he has no proof whatsoever on the subject: [85]

    2      Q.  Do you have any information you can
    3   provide the jury on your -- the subject of your
    4   analysis of the DIP budget and forecast?
    6      A.  No, I cannot.

Ex. 81 (Bekenstein) 66:2-6.

<u>Raether</u>

---

[83] Ex. 70 (Greenspan) ¶85.
[84] Ex. 70 (Greenspan) ¶86.
[85] Ex. 81 (Bekenstein depo.) 29:5-30:13, 31:1-24, 32:22-33:2, 49:17-50:1, 54:3-55:11, 56:23-57:4, 60:5-19, 61:6-12, 63:21-64:1, 64:15-18, 65:5-24, 66:2-6.

Defendant Raether was head of the portfolio management committee at KKR, having

joined KKR in 1980. [86]  Raether testified that he produced in discovery his complete files of

board materials for the Company and that he had not destroyed or thrown away any such

materials, or any of his own notes or analysis. [87]  Raether testified that, in preparing for his

deposition, he did not "see any documentation that would substantiate" that he had "obtained the

necessary information" to assess the DIP financing. [88]

At his deposition, Raether was presented with each set of the materials he received for

each of the board meetings, as well as his own handwritten notes from each of the meetings.  In

each case, Raether confirmed that he did not receive the information needed to make an

assessment of the covenants: [89]


September 6 materials. [90]

September 13 materials. [91]

September 15 materials. [92]

September 18 materials. [93]

---

[86] Ex. 77 (Raether depo.) 13:8-10; Ex. 65 (2017 TRU 10K) at 113, pdf 118.

[87] Ex. 77 (Raether) 159:7-14, 163:5-13, 431:9-12, 497:24-498:9.

[88] Ex. 77 (Raether) 197:9-17.

[89] Ex. 70 (Greenspan) ¶86.

[90] Ex. 155 (9'6'17 Raether board materials [DEFS_0124536]); Ex. 77 (Raether) 76:17-78:6;
392:17-21, 397:20-398:8, 499:24-500:5, 503:9-21, 504:13-25, 507:1-10.

[91] Ex. 175 (9'13'17 Raether board materials [DEFS_0124585]); Ex. 77 (Raether) 507:11-18,
514:2-515:13, 516:2-6, 519:23-520:19; Ex. 77 (Raether) 186:9-20, 188:25-189:13, 190:6-20,
197:9-16.

[92] Ex. 43 (9'15'17 to BOD re DIP and attach [DEFS_0004093]); Ex. 77 (Raether) 525:16-
526:11.

[93] Ex. 53 (9'18'17 Raether board materials [DEFS_0124607]); Ex. 77 (Raether) 527:11-15,
531:5-11; 531:23-532:9.

For example, upon reviewing the collection of materials for the September 18, 2018,

board meeting, Raether testified:

> 5      Would you agree, sir, that in your
> 6  September 18, 2017 materials, you were not
> 7  provided the terms of the financial covenants for
> 8  the DIP financing?
> 10      A.      There -- they are not in the document
> 11  that we just went through, no.
>
> 23      Would you agree that in your
> 24  September 18, 2017 board materials, you did not
> 25  receive any information regarding a forecast for
> 1  Toys "R" Us and whether it could comply with the
> 2  financial covenants?
> 3      A.      There is no forecast in the materials
> 4  that we have just gone through.
> 5      Q.      Would you agree, sir, that in your
> 6  September 18th materials, you received no
> 7  information constituting a sensitivity analysis
> 8  for Toys "R" Us?
> 9      A.      Not in this material, no.

Ex. 77 (Raether) 531:5-11; 531:23-532:9.

After reviewing at his deposition all of the board materials that Raether had maintained in

his file, Raether testified as follows:

> 23      Would you agree, sir, that in the
> 24  board materials that were in your file, the board
> 25  materials that we reviewed, that there was no
> Page 533
> 1  identification of the terms of the financial
> 2  covenants that were agreed to for the DIP lenders?
> 3      A.      In the materials that we just
> 4  reviewed, there were not.
> 5      Q.      Would you agree that in the materials
> 6  we reviewed there was no forecast for Toys "R" Us
> 7  assessing how it -- whether it could comply with
> 8  the financial covenants?
> 9      A.      There was no forecast that would
> 10  indicate whether we could comply.
> 11      There was a forecast of cash flow, but
> 12  it did not tie to the covenants that were

29

13  ultimately agreed to in those materials.
14      Q.      Would you agree that there was no
15  sensitivity analysis in those materials?
16      A.      I would agree there was no sensitivity
17  analyses in the materials we reviewed.


Page 534
24      We've looked at the materials for
25  September 2008 -- for September 2017 that were in
1   your files or that were presented to the board.
2       In those materials, can you point the
3   jury to any information that would have allowed
4   you to adequately assess whether Toys "R" Us could
5   comply with financial covenants of the proposed
6   DIP financing?
7       A.      Not in the materials that we reviewed.

Ex. 77 (Raether) 532:33-533:17; 534:24-535:7.

In addition, Defendant Raether testified that he could not recall that any of the advisors or

management had determined that the Company had a sufficient liquidity cushion for the DIP

financing:

21      Before you voted on September 18th to
22  approve the DIP financing, had any of the advisers
23  or management of Toys "R" Us told you that they'd
24  done an assessment of Toys "R" Us' forecast going
25  forward and determined that there was a sufficient
Page 552
1   minimum liquidity for the financial covenants that
2   were agreed to?
3       A.      I don't recall that specifically, no.
4       Q.      Did you ever see any information
5   suggesting to you that Toys "R" Us had sufficient
6   cushion for the financial covenants that were
7   agreed to?
8       A.      I don't recall seeing any specific
9   information, no.
10      Q.      Did you receive an assurance from
11  anyone before you voted on September 18th that the
12  forecast showed that Toys "R" Us had a sufficient
13  cushion to comply with the financial covenants
14  that were agreed to?

15      A.      I don't recall.

Ex. 77 (Raether) 551:21-552:15).

<u>Silverstein</u>

Defendant Silverstein had been a senior executive of Vornado since 1998, serving as executive vice-president, head of capital markets, and co-head of acquisition. [94]  Silverstein was asked whether she was "provided a sensitivity analysis, "provided a downside case analysis," "told about the budget covenant," "provided information about what the DIP term loan covenants were," "provided any information about revenue growth assumptions" or "assumed sales projections, assumed profit margins, cost projections," or did "anything to assess the other covenants," and to all of these questions answered "I don't recall." [95]  And she could not "point to any material" she received "that provided details that would allow you to analyze the reasonableness of the DIP budget." [96]

<u>Macnow</u>

Defendant Macnow was the "chief financial officer, and chief administrative officer" of Vornado, and he was "in charge of all of the financial affairs of Vornado." [97]  He testified that he does not recall "any forecasting that was done to determine whether or not Toys 'R' Us could meet the financial covenants of the DIP financing." [98]  And Macnow failed even to request that management or the advisors provide a risk assessment:

9      Q.   Did you ask Toys "R" Us
10    management or any of their advisors to do

---

[94] Ex. 80 (Silverstein depo.) 6:25-7:16.
[95] Ex. 80 (Silverstein) 182:1-7, 184:25-185:5, 232:10-19, 194:20-195:6, 227:16-19.
[96] Ex. 80 (Silverstein) 226:2-7; *see* Ex. 80 (Silverstein depo.) 126:12-15, 150:21-151:22, 161:5-20, 181:16-182:7, 182:19-183:11, 184:15-185:5, 194:20-195:6, 199:10-23, 208:4-15, 208:20-24, 211:24-212:9, 226:2-7, 232:25-233:13.
[97] Ex. 83 (Macnow depo.) 7:19-8:11.
[98] Ex. 83 (Macnow depo.) 65:17-21, 86:19-23.

11   a risk assessment on the DIP financing?
13      A.   I did not.

Ex. 83 (Macnow depo.) 101:9-13, 101:15-103:8.

Goodman

Defendant Goodman was a "retired executive." [99]  Goodman was asked at his deposition

to examine the materials provided to the Board, and he admitted that the materials did not

identify the financial covenants for the DIP financing. [100]

12      Q.   Is there any discussion of
13   covenants in this document?
14      A.   No.

Ex. 82 (Goodman depo.) 173:12-14.

Goodman testified that he did not remember anything about what was said on the subject

of the DIP financing. [101]

20      Q.   In as much detail as you can
21   recall, can you tell me what was said in
22   the board meetings on the subject of
23   whether Toys "R" Us should take on the
24   3 billion dollars in debtor-in-possession
25   financing?
Page 86
2      A.   I don't remember the discussions.
3      Q.   Is there anything you can recall
4   about those meetings?
5      A.   About the specific -- about a
6   specific meeting?  No.

Ex. 82 (Goodman depo.) 85:20-86:6.

Goodman testified that, as a director, he knew his fiduciary duties required that he

"maintain thorough records" of his decision-making process, and document "the reasons for

---

[99] Ex. 82 (Goodman depo.) 7:3-9.
[100] Ex. 82 (Goodman depo.) 103:11-104:1, 158:20-159:16, 163:8-164:10.
[101] Ex. 82 (Goodman depo.) 86:21-87:6.

32

making those decisions." [102]  Goodman testified, however, that he did not make any such record,

beyond what is in the minutes of the board meetings, and that "[t]he only thing that's in the

minutes is the words, 'Discussion ensued.'" [103]

```
12    Q.   So those minutes of the board
13  meetings, that's the only written record
14  that you're aware of, of what was said in
15  those board meetings, is that right?
16    A.   It's the only written record,
17  yes.
18    Q.   And sitting here today, you don't
19  have a recollection of anything
20  specifically that was said in any of those
21  board meetings, is that right?
22    A.   That's correct.
```

Ex. 82 (Goodman depo.) 87:12-22.

<u>Levin</u>

Defendant Levin had been with Bain for 28 years, including as a partner for 15 years.  He

testified: "I don't recall doing my own independent analysis" "to assess whether Toys 'R' Us

would be able to comply with its financial covenants." [104]  He testified that he reviewed "the

document I got on August 17," and "that would be what I recall I did."  *Id.*  As discussed above,

the August 17 document was an early forecast projecting insufficient liquidity.  And Levin

testified that the August 17 forecast was not sufficient "to reach a conclusion as to whether or not

Toys 'R' Us is going to be able to comply with its financial covenants" and "I couldn't use this

model" "to make an assessment of whether Toys 'R' Us could comply." [105]

<u>Taylor</u>

---

[102] Ex. 82 (Goodman depo.) 41:1-11, 45:16-46:7, 50:2-10.
[103] Ex. 82 (Goodman depo.) 87:3-6, 178:5-179:5. *see* Ex. 82 (Goodman depo.), 103:11-104:1, 104:7-105:16, 108:3-10.
[104] Ex. 78 (Levin) 325:5-15.
[105] Ex. 78 (Levin depo.) 309:12-310:12, 311:23-312:6; Ex. 78 (Levin depo.) 308:10-22.

Defendant Taylor was a partner, investor, and senior executive at KKR.  He testified that he did not perform any financial analysis "myself as an individual" on "the subject of whether Toys 'R' Us should take on DIP financing," nor did he "ask anyone at KKR to perform any financial analysis." [106]  He reviewed only "the analysis that our advisers provided or the company provided." [107]

But Taylor admitted that the information in the materials provided to the Board did not contain "an assessment of the ability of Toys 'R' Us to comply with its financial covenants" and would not have been "sufficient for a board member to make an assessment." [108]

> 20    Q.  In this presentation that we just looked
> 21  at, was there anywhere in writing an analysis by any
> 22  of the financial advisers or management about the
> 23  likelihood that Toys "R" Us could comply with its
> 24  financial covenants?
>  1       THE WITNESS:  I don't see in writing a
>  2  discussion of that topic.

Ex. 79 (Taylor) 242:20-243:2.

Taylor further testified that he does not recall receiving any such analysis from the advisors or management.

> Page 201
> 20    Q.  Did you ever receive any written materials
> 21  that provided an analysis from the advisers
> 22  regarding the ability to comply with the financial
> 23  covenants for the DIP financing?
> 24    A.  I don't recall.
>
> Page 202
> 11       Did you ever have any discussions with
> 12  anyone from Toys "R" Us management or a Toys "R" Us
> 13  employee concerning the DIP financing before the
> 14  board voted to take on the DIP financing?

---

[106] Ex. 79 (Taylor) 187:2-15.
[107] *Id.*
[108] Ex. 79 (Taylor) 236:5-23.

15     A.  I don't have a specific conversation that
16   comes to mind or recall.  It doesn't mean it didn't
17   happen, but I don't recall it.

Ex. 79 (Taylor depo.) 201:20-24, 202:11-17.

Taylor also testified that he does not recall getting any of the key information he would

need to make an assessment of whether the Company would comply with the financial

covenants:

20     Q.  If you, Nate Taylor, were going to
21   undertake to make an assessment of whether
22   Toys "R" Us could comply with the financial
23   covenants under the DIP financing that it was
24   expecting to enter, one of the things you would need
25   are the terms of the covenants; right?
1     A.  Correct.
2     Q.  Another thing you would need would be the
3   forecast; right?
4     A.  Correct.
5     Q.  You would also need to know some of the key
6   assumptions underlying the forecast; right?
7     A.  Correct.

22     Were you provided the terms of the
23   financial covenant so that you could do your own
24   analysis of whether they were reasonable or whether
25   they were risky?
1     A.  I don't recall.

4     Q.  Were you provided the forecast for
5   Toys "R" Us together with the key assumptions so
6   that you could do your own analysis?
8     THE WITNESS:  I don't recall.

21     Q.  Were you provided with any scenarios?
23     THE WITNESS:  I don't recall.

Ex. 79 (Taylor depo.) 207:20-208:7, 208:22-209:1, 209:4-8, 209:21-23. [109]

---

[109] *see* Ex. 79 (Taylor depo.) 225:8-14, 201:25-202:8, 202:11-17, 206:5-12, 209:21-23, 245:4-24,
217:5-9, 217:10-13, 217:14-19, 231:6-17, 237:1-9, 242:20-243:2, 248:18-249:6, 221:14-18,
223:5-19, 251:17-25, 252:2-16, 252:17-253:2, 256:22-257:3, 257:4-11, 257:13-16, 257:17-258:1,

E.   **Brandon and Short knew that the Company could not comply with the financial covenants.**

The conduct of Brandon and Short was even worse than the other Defendant Directors: Brandon and Short had access to the Company's internal forecast and knew that the Company could not comply with the financial covenants.

To begin, Short knew that the forecast used to prepare the DIP budget was being manipulated and was based on sales projections that were far above trend.  As of September 2017, the Company had a well-established trend of declining revenues and margins.  For example, the Company "had experienced U.S. same store sales declines of 2.2% in the second half of 2016, which worsened to 6.5% in the first half of 2017," and margin rates that were down over 2 percentage points. [110]  Using a same store sales rate consistent with the existing trend would result in forecasting a $290 million liquidity shortfall, even with the maximum available DIP financing. [111]

The first DIP financing forecast prepared (dated August 17, 2017) was purportedly "based on the latest thinking" from management, and projected sales declines of only -0.6% for 2018 (much better than the existing trend). [112]  But even these unrealistic assumptions resulted in forecasting insufficient liquidity. [113]

But rather than acknowledging that the DIP financing path would not work, Short went back to the drawing board and produced new projections that dramatically inflated the projected

---

259:2-10, 263:7-14, 269:12-270:4, 274:2-11, 277:10-18, 279:13-24, 281:21-282:2, 282:12-24, 282:25-283:6, 210:12-15, 210:16-23, 211:11-18.
[110] Ex. 70 (Greenspan) ¶¶82, 120; Ex. 9 (2'28'17 2016 Financial Update [DEFS_0125708]) at 3; Ex. 16 (6'20'17 June BOD Financial Update [TRU-Trust0000373950]) at 5; Ex. 5 (2'7'18 weekly board update [DEFS_0125623]) at 3.
[111] Ex. 70 (Greenspan) ¶¶131-132.
[112] Ex. 70 (Greenspan) ¶118; Ex. 30 (8'17'17 attach to Levin Silverstein Sunrise Draft DIP Sizing [DEFS_0123956]) at 4.
[113] Ex. 70 (Greenspan) ¶¶63-64, 118.

revenues and margins.  This resulted in a DIP forecast projecting sales <u>growth</u> for 2018 of a positive 4.0%. [114]  The revised forecast stated that "[t]he Company has recently updated its forecast based on its Turnaround Plan," and that this sale growth was "[b]ased on management's Turnaround Scenario." [115]  Short admitted that he knew that "the actual same-store sales growth for the first half of 2017 had been minus 6.5 percent." [116]  And he admitted that he knew that this revised forecast was "based on an assumption that same-store sales do better" than "the trend." [117]

But Brandon and Short also knew (as demonstrated in detail below), that there was no "Turnaround Plan," that it was "highly unlikely the Company could come up with a viable turnaround plan," and that, "if developed, such a plan would take years to implement and produce meaningful results." [118]  Consequently, there "was nothing presented … to substantiate that results …. would deviate from the exiting sales trends," which projected lower sales, not greater sales. [119]  Accordingly, Brandon and Short knew that the projections used for the forecast could not reasonably be achieved.

Worse still, Brandon and Short knew that even the manipulated revenue forecast projected that the Company could not comply with financial covenants for the DIP Term loan. Commencing on the evening of September 18, 2018 (after the Board vote to approve the DIP

[114] Ex. 44 (9'15'18 attach to Finnegan [TRU-Trust0000377785]) at 4, attached to Ex. 45 (9'15'18 Finnegan DIP budget cleansed [TRU-Trust0000377782]); Ex. 87 (Short depo.) 505:2-7.
[115] Ex. 44 (9'15'18 attach to Finnegan [TRU-Trust0000377785]) at 4, attached to Ex. 45 (9'15'18 Finnegan DIP budget cleansed [TRU-Trust0000377782]).
[116] Ex. 87 (Short depo.) 503:24-504:2.
[117] Ex. 87 (Short depo.) 504:3-10.
[118] Ex. 70 (Greenspan) ¶118.
[119] Ex. 70 (Greenspan) ¶118.

financing), Brandon and Short participated in negotiations for two new financial covenants, a $175 million liquidity covenant, and a January revised budget covenant. [120]

The $175 million liquidity covenant "would be $175 million on top of the $125 million excess availability covenant in the ABL/FILO DIP loan." [121] Even using the far-too-optimistic revenue forecast based on a purported Turnaround Plan, the new $175 million liquidity covenant resulted in "a cushion of less than $50 million" which "created grave risk of default." [122] Short knew that the advisors "had determined that a $200 million liquidity cushion" was required. [123] With a $50 million liquidity cushion, "a small bump in the road of projected better operations would erase that cushion and cause a default in the liquidity covenant." [124] Therefore, "any downside case analysis, would have demonstrated that the $175 million minimum liquidity covenant could not be satisfied." [125]

A Lazard employee wrote an email stating that he had explained to Mike Short "last night" that the $175 million covenant "basically left him with $50m liquidity cushion in trough month," "which gives them angst." [126] After the effect of the $175 million liquidity covenant

---

[120] Ex. 70 (Greenspan) ¶¶97-108; Ex. 48 (9'18'17 2244 pm [LZ-TRU0092221]); Ex. 47 (9'18'17 2228 pm Dobleman [TRU-Trust0000138093]); Ex. 49 (9'18'17 2319 pm Dobleman [TRU-Trust0000072139]); Ex. 46 (9'18'17 11PM draft [TRU-Trust0000138218]) at 67; Ex. 48 (9'18'17 2244 pm [LZ-TRU0092221]) at 4; Ex. 50 (9'18'17 2427 am Short re covenants [TRU-Trust0000336078]); Ex. 56 (9'20'17 0612 am Kilkenney [TRU-Trust0000075262]); Ex. 57 (9'20'17 0652 am [TRU-Trust0000075725]).

[121] Ex. 70 (Greenspan) ¶103; Ex. 56 (9'20'17 0612 am Kilkenney [TRU-Trust0000075262]).

[122] Ex. 70 (Greenspan) ¶111.

[123] Ex. 70 (Greenspan) ¶112; Ex. 37 (8'31'17 attach DIP sizing [TRU-Trust0000373909]) at 3; Ex. 42 (9'15'17 Lal 144 not sufficient [LZ-TRU0079112]).

[124] Ex. 70 (Greenspan) ¶111.

[125] Ex. 70 (Greenspan) ¶133.

[126] Ex. 70 (Greenspan) ¶115; Ex. 59 (9'21'17 Kurtz re negotiations [LZ-TRU0086423]) at 1.

was explained to Short, he wrote an email on the morning of September 20, 2017, to "Agree" that the new covenant "doesn't work." [127]

The January revised budget covenant (covenant 6.16), was even harsher than the $175 million liquidity covenant.  It required the Company to present a reforecast in January 2018 based on actual results through the holiday season demonstrating that the Company would achieve "liquidity not less than that contemplated by the existing Budget" (i.e., the DIP budget).[128]  As Josh Sussberg of Kirkland & Ellis testified, the language of 6.16 was "███████

████████████████████████████████████████████████████████████

████████████████████████████████████." [129]

"The effect of this covenant was zero cushion from achieving the DIP budget," and that virtually assured a default in January 2018. [130]  Normally "a retailer would not trigger a default on customary minimum liquidity covenants in January, when they are typically flush with cash after the holidays."  But covenant 6.16 was structured so that it would trigger a default in January based on projections of future liquidity. [131]  "Given the inherent uncertainties of any retail operation in bankruptcy, and especially a DIP budget projecting the reversal of adverse sales and margin trends, … to have a covenant which had zero cushion" meant that a "default on the DIP loan was likely if not inevitable." [132]  "In fact, the Budget covenant was structured so that any *downside* case necessarily would require a reforecast and likely covenant breach." [133]

---

[127] Ex. 70 (Greenspan) ¶104; Ex. 57 (9'20'17 0652 am [TRU-Trust0000075725]).
[128] Notice of Filing of NA DIP (Bk. Dkt. 158) at pdf 505.
[129] Ex. 84 (Sussberg) 97:14-25; *id.* at 96:11-16, 99:22-100:15.
[130] Ex. 70 (Greenspan) ¶136.
[131] Ex. 70 (Greenspan) ¶136.
[132] Ex. 70 (Greenspan) ¶136.
[133] Ex. 70 (Greenspan) ¶137.

When the January revised budget covenant was first presented on the evening of September 18, Dave Brandon and Mike Short discussed it with Josh Sussberg (from Kirkland). Sussberg then wrote: "Just spoke to Dave and Mike" and "[t]his just isn't going to work." [134]

Because the $175 million liquidity covenant and January revised budget covenant were unacceptably onerous, the Company management and advisors attempted at the last minute to find an alternative Term DIP loan lender that would not require these covenants. [135] They reached out on September 20 to the lead ABL/FILO DIP lender, JP Morgan, to see if it would be willing to step up and provide the $450 million Term DIP Loan as well as the ABL/FILO loan. [136] JP Morgan initially appeared willing to do so, with a Company employee reporting on the evening of September 20: "All systems go on their end." [137]

But within a few hours, after JP Morgan assessed the loan documentation and the collateral package that was offered, they declined to make the DIP Term loan. [138] When JP Morgan was unable to do so, the Company had to accept a Term DIP loan that included both the January revised budget covenant (6.16) and the $175 million minimum liquidity covenant (7.18). [139] Short signed the DIP Term loan September 22, 2017. [140]

Just like the other Director Defendants, Brandon and Short never prepared, or received from advisors, any downside case analysis, much less a downside analysis demonstrating that the Company would be able to satisfy the financial covenants. Worse yet, Brandon and Short knew

---

[134] Ex. 48 (9'18'17 2244 pm [LZ-TRU0092221]) at 4.
[135] Ex. 70 (Greenspan) ¶116.
[136] Ex. 70 (Greenspan) ¶105; Ex. 58 (9'21'17 Bhandari re negotiations [TRU-Trust0000041548]) at 4-5; Ex. 59 (9'21'17 Kurtz re negotiations [LZ- TRU0086423]) at 7-8.
[137] Ex. 58 (9'21'17 Bhandari re negotiations [TRU-Trust0000041548]) at 4-5; Ex. 59 (9'21'17 Kurtz re negotiations [LZ- TRU0086423]) at 7-8; Ex. 70 (Greenspan) ¶105.
[138] Ex. 70 (Greenspan) ¶¶106-107.
[139] Ex. 70 (Greenspan) ¶108; Notice of Filing of NA DIP (Bk. Dkt. 158) at 505, 522.
[140] Notice of Filing of NA DIP (Bk. Dkt. 158).

that the revenue forecast could not be achieved because it was based on a purported "Turnaround

Plan" that did not exist.  And they knew that even that unrealistic forecast did not project a

sufficient liquidity cushion for the $175 million minimum liquidity covenant or the January

budget covenant.  Accordingly, they knew the Company was virtually certain to default. [141]

It "was virtually inevitable that TRU would default on its covenants," and "[t]here was

nothing about the default and the performance that wasn't in plain sight at the time this was

done." [142]

### F.    The Director Defendants abdicated their duty and entirely failed to assess the risks of the turnaround strategy or to consider the alternative of an immediate wind-down.

As Defendants admit, their fiduciary duties required them to consider and assess all

reasonable alternatives before settling on the plan to max out DIP financing and attempt a

turnaround.

For "any retail business experiencing such deteriorating performance and losses that it

needed to consider filing bankruptcy in 2017, the option of an orderly wind-down of the business

should have been evaluated." [143]  After all, in the ten years preceding September 2017, only 16%

of large retail bankruptcies resulted in successful reorganizations. [144]

Moreover, the Directors knew that the circumstances facing Toys "R" Us were far worse

than the average retail bankruptcy, which statistically only had a 1 in 6 chance of successful

reorganization.  As demonstrated below, Defendants knew that the Company "was losing money,

had declining sales, was based on a failed business model, and had not identified a business

---

[141] Ex. 86 (Greenspan depo.) 131:24-133:22.
[142] Ex. 86 (Greenspan depo.) 131:24-133:22.
[143] Ex. 70 (Greenspan) ¶141.
[144] Ex. 70 (Greenspan) ¶141.

model that would turn around the business." [145]  As demonstrated in detail below, the Directors

had known for more than a year that the Company "met all of the criteria" for a business that

should be shut down. [146]

But even as the Company's situation became more acute in 2017, "the Board never once

considered the option of winding down the U.S. business." [147]  None of the correspondence or

board minutes for the entire period contain any contemplation or consideration of a wind-down

or liquidation of the U.S. business. [148]

The Defendants contemplated the future of Toys "R" Us and the options for bankruptcy

for more than three months (from June 20, 2017, through September 18, 2017), including at nine

meetings of the Board of Directors.  Throughout, the Defendants never once considered the

option of liquidating the U.S. business, or asked for any analysis of such a liquidation.[149]

Defendants do not dispute that the Directors gave no consideration to any restructuring

alternative other taking on DIP financing.  For example, Defendant Raether testified:

        1        Q.  Did management or the advisors
        2    consider the alternative of a structured
        3    wind-down of the company in Chapter 11, rather
        4    than taking on DIP financing?
        5        A.  Not that I recall.

---

[145] Ex. 70 (Greenspan) ¶142.
[146] Ex. 70 (Greenspan) ¶142.
[147] Ex. 70 (Greenspan) ¶143.
[148] Ex. 70 (Greenspan) ¶¶140-156.
[149] Ex. 16 (6'20'17 June BOD Financial Update [TRU-Trust0000373950]); Ex. 21 (7'26'17 Brandon Sprayregen [TRU-Trust0000060190]) ("We are off to the races…. Understand the gig and that we just want to do this once!"); Ex. 18 (7'27'17 Brandon Sussberg [TRU-Trust0000060195]) ("The mission is important! Thanks in advance for all you are going to do to help us get through it successfully."); Ex. 22 (7'29'17 Brandon Boggs [TRU-Trust0000021126]); Ex. 25 (8'3'17 Brandon talking points [TRU-Trust0000124186]); Ex. 26 (8'9'17 BOD minutes [TRU-Trust0000374087]); Ex. 29 (8'12'17 BOD minutes [TRU-Trust0000029163]); Ex. 36 (8'30'17 BOD minutes [DEFS_0053984]) at 3; Ex. 39 (9'6'17 agenda BOD [TRU-Trust0000126713]); Ex. 40 (9'13'17 board minutes [TRU-Trust0000165899]); Ex. 52 (9'18'17 BOD minutes [DEFS_0023490]).

Ex. 77 (Raether) 114:1-5.

> 10        Did you consider whether there would
> 11   be advantages to Toys "R" Us if it was to start
> 12   an immediate structured wind-down rather than
> 13   taking on the $3 billion in DIP financing?
> 14        A.  I have no recollection of any
> 15   discussion of that kind.

Ex. 77 (Raether) 116:10-15.

For example, Defendant Macnow testified:

> 11        Q.   At the time that the DIP
> 12   financing was being considered, did the
> 13   Toys "R" Us board consider liquidating
> 14   Toys "R" Us instead?
> 15        A.   No.

Ex. 83 (Macnow depo.) 36:11-15, 38:12-20.

For example, Defendant Taylor testified:

> 14        Q.  Did the Toys "R" Us board of directors
> 15   consider any alternative other than taking on DIP
> 16   financing when discussing what to do if the company
> 17   went into bankruptcy?
> 18        A.  I don't recall.

Ex. 79 (Taylor) 221:14-18.

This was not a situation where the Directors conducted a cost-benefit analysis assessing

the option of commencing a wind-down versus attempting a turnaround and then merely used

poor judgment.  The Directors entirely abandoned and abdicated their fiduciary duties.  They

made no effort whatsoever to consider the wind-down alternative.

At no point did any of the Defendants "ask for an assessment of a winddown or sale of

the domestic business or a comparison of the likely values preserved for creditors under a wind-

down scenario, versus the DIP financing 'Hail Mary' they were considering." [150]  In fact, the

Defendants did not receive an assessment of either (i) the likely results and sensitivity analysis

for a wind-down scenario, or (ii) the likely results and sensitivity analysis for maxing out the DIP

financing and attempting a turnaround. [151]  They "conducted no such comparison." [152]

> As Defendant Macnow testified:

> 11     Q.   Was there a liquidation analysis
> 12   done for Toys "R" Us prior to its Chapter
> 13   11 filing?
> 14     A.   Not that I recall.
>
>  6     Q.   Prior to approving the Chapter
>  7   11 filing in the DIP financing, did the
>  8   board of directors request a liquidation
>  9   analysis be made?
> 10     A.   Not that I'm aware of.

Ex. 83 (Macnow depo.) 183:11-14, 184:6-10.

Their actions reflected a "we don't care about the risks attitude."  *In re Walt Disney Co.*

*Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003), *aff'd Brehm v. Eisner (In re Walt Disney*

*Co. Derivative Litig.)*, 906 A.2d 27, 63 (Del. 2006) (holding that bad faith may be shown by

evidence demonstrating a "conscious[] and intentional[] disregard[] [of] responsibilities,

adopting a 'we don't care about the risks' attitude").

### G.     Defendants knew that attempting a turnaround was an implausible "Hail Mary."

The Director Defendants "had ample warning that the Company's U.S. business met all

the criteria for a business that needed to be shut down: it was losing money, had declining sales,

was based on a failed business model, had no viable turnaround plan, had no reasonable prospect

---

[150] Ex. 70 (Greenspan) ¶157.
[151] Ex. 70 (Greenspan) ¶157; Ex. 79 (Taylor) 225:8-14; Ex. 83 (Macnow depo.) 53:25-54:3, 183:11-14, 183:25-184:18.
[152] Ex. 70 (Greenspan) ¶157.

of developing a viable turnaround plan, and had insufficient capital or time to implement a

turnaround plan." [153]   Because there was no question that the U.S. business needed to be

shuttered, the Directors should have ordered wind-down planning to commence no later than

August 2017, thereby enabling a liquidation of U.S. stores to take advantage of the Holiday

season, allowing a less-rushed sales process for disposing of international subsidiaries, and

avoiding more than $500 million dollars in losses for the Company.  But Defendants failed even

to order *planning* for a liquidation until mid-February when covenant defaults forced a

liquidation commencing in March 2018.

This was not merely poor judgment.  Defendants took the path that advantaged their

personal interests to the detriment of the Company.  Defendants in fact knew that the turnaround

strategy was highly improbable, and that delaying liquidation would generate large losses.  But

those losses would be borne by the Company's creditors, not by the three controlling

shareholders.  And the only way for those shareholders to have a chance at generating value was

by attempting a Hail Mary turnaround.  Defendants entirely abdicated and abandoned their

fiduciary duty to consider reasonable alternatives, acted in bad faith, and breached their duty of

loyalty.

"If an existing business is losing money and trending downward, it does not make sense

to continue in business unless the business can be turned around." [154]   Under those

circumstances, "continuing operations that lose money does not preserve value; it does the

opposite by destroying value." [155]   In that case, "the best alternative is to commence an orderly

---

[153] Ex. 70 (Greenspan) ¶158.
[154] Ex. 70 (Greenspan) ¶159.
[155] Ex. 70 (Greenspan) ¶159.

45

winddown or sale, i.e., a winddown performed in a manner that will maximize the value of the assets that can be distributed to the stakeholders." [156]

Moreover, as shown below, all of these criteria were present, and the Defendants knew it.

**1.    The Directors knew that the Company was losing money, and that its sales, market share, and margins were trending down.**

As of the summer of 2017, the Directors were well aware that the Company's domestic operation was losing money, that the long-term trends were lower market share, sales, and profit margins, and that the downward trend was even worse in the first half of 2017. [157]

Defendants received regular financial updates and each of them personally signed the annual financial reports. [158] As Defendants knew, for many years the Company had been recording net losses. [159]

And 2017 was no different. The Company lost money in the first half of 2017 and was projected to continue losing money while in bankruptcy. [160] In fact, for FY 2017, the Company lost an additional $437,515,000 from operations (i.e. without even including the large bill for restructuring expenses). [161]

---

[156] Ex. 70 (Greenspan) ¶159.
[157] Ex. 70 (Greenspan) ¶160; Ex. 78 (Levin depo.) 126:22-127:7; Ex. 96 (Levin depo. notes re 2017 situation) (as of June 2007, "information that the board knew about Toys 'R' Us's situation" as of "June '17" included "market share lower," "sales lower," "gross profit margins lower," and "company losing money"); Ex. 77 (Raether depo.) 48:22-24, 565:24-566:6, 566:12-15.
[158] Ex. 65 (Form 10-K 2017) at 151; Ex. 69 (Form 10-K 2016); Ex. 68 (Form 10-K 2015); Ex. 67 (Form 10-K 2014); Ex. 66 (Form 10K 2013); Ex. 9 (2'28'17 2016 Financial Update [DEFS_0125708]); Ex. 15 (6'20'17 BOD minutes [DEFS_0053970]); Ex. 17 (6'20'17 Raether board materials [DEFS_0126153]); Ex. 74 (Q2 2017 – internal analytics [DEFS_0002784]).
[159] Ex. 70 (Greenspan) ¶166; Ex. 65 (Form 10-K 2017) at pdf 28. As of the beginning of 2017, the net losses for Toys "R" Us Delaware (the entity running the U.S. operation) totaled "more than $4 billion." Ex. 70 (Greenspan) ¶162; Ex. 6 (2'2'18 Goulding projections [DEFS_0003098]) at pdf 6-7.
[160] Ex. 70 (Greenspan) ¶¶166-167; Ex. 77 (Raether depo.) 577:24-578:1-9.
[161] Ex. 70 (Greenspan) ¶¶166-167.

Defendants knew that, for years, "the Company's U.S. market share had declined for both toys and baby products. [162] That trend continued in 2017, and at the June 20, 2017, meeting of the Board of Directors, Barry told the Directors that "Amazon has overtaken TRU," which now put the Company behind Walmart, Target, and Amazon. [163]

As Brandon put it, because of "consumer demand" shifting "toward online marketplaces and competition from one-stop retailers such as Walmart and Target, the Company's revenue has trended downwards over the past five years." [164] For years "domestic same store sales had declined," and the profits earned on each sale had also declined as the domestic gross margin rate continued to shrink. [165]

Defendants knew that the downward trends were even worse in the first half of 2017. For Q1 2017, domestic same store sales were down 6.2%. [166] And margin rates were down an additional 1.70 percentage points. [167] In fact, every sub-category was down, including toys, baby, brick & mortar, and dotcom. [168] "This showed vividly not only the problems with the traditional brick and mortar stores, but also the failure of TRU's online strategy," because "the online sales of its competitors were increasing whereas TRU's were declining." [169]

---

[162] Ex. 70 (Greenspan) ¶168; Ex. 9 (2'28'17 2016 Financial Update [DEFS_0125708]) at 4; Ex. 77 (Raether depo.) 330:20-25, 331:14-332:7.

[163] Ex. 15 (6'20'17 BOD minutes [DEFS_0053970]) at 2.

[164] Brandon declaration (Bk. Dkt. 20) at 37, ¶86.

[165] Ex. 70 (Greenspan) ¶169; Ex. 65 (Form 10-K 2017) at pdf 33.

[166] Ex. 70 (Greenspan) ¶170; Ex. 16 (6'20'17 June BOD Financial Update [TRU-Trust0000373950]) at 5; Ex. 17 (6'20'17 Raether Board materials [DEFS_0126153]) at pdf 26.

[167] Ex. 70 (Greenspan) ¶171; Ex. 17 (6'20'17 Raether board materials [DEFS_0126153]) at pdf 30; *id*. at pdf 26.

[168] Ex. 16 (6'20'17 June BOD Financial Update [TRU-Trust0000373950]) at 6.

[169] Ex. 70 (Greenspan) ¶1270.

And Defendants knew that the downward trend further accelerated in Q2 2017. [170]

Domestic same store sales were down 6.8%, and the domestic gross margin rate was down 3.10

percentage points. [171]

> **2.    The Directors knew that the Company's outdated business model
> could not compete.**

The Defendants knew full well that the root cause of the Company's poor performance

was that it was operating "an outdated business model that could not succeed against the

competition." [172]

The Toys "R" Us business model "succeeds or fails based on the holiday season, when a

disproportionate share of toys is sold." [173]  But Defendants knew that the Company faced

competition that assured it could not succeed during the holiday season.

"During the Holiday season, mass merchandisers such as Walmart and Target" would

"use aggressive pricing policies and enlarged toy-selling areas … to increase sales and build

traffic for other store departments." [174]  Toys "R" Us "could not follow the same strategy and cut

toy prices to near cost because it did not have those large number of other departments that

would benefit from store traffic." [175]

Defendants knew that Toys "R" Us also faced increasing competition from Amazon and

other on-line retailers. [176]  As with Walmart and Target, price-cutting on toys by Amazon during

---

[170] Ex. 70 (Greenspan) ¶173.

[171] Ex. 70 (Greenspan) ¶173; Ex. 74 (Q2 2017 – internal analytics [DEFS_0002784]) at pdf 40;
Ex. 77 (Raether depo.) 201:21-202:6, 203:2-18, 567:3-8, 568:2-8, 568:13-569:8, 569:23-570:9,
570;18-23.

[172] Ex. 70 (Greenspan) ¶174.

[173] Ex. 70 (Greenspan) ¶175; Brandon declaration (Bk. Dkt. 20) at 6 ("The Company's overall
annual financial performance is driven by sales during this period.").

[174] Ex. 70 (Greenspan) ¶178; Ex. 65 (Form 10-K 2017) at 11, pdf 15, ¶4; Ex. 65 (Form 10-K
2017) at 7, pdf 10, ¶2; Ex. 77 (Raether depo.) 564:4-11, 564:18-565:3.

[175] Ex. 70 (Greenspan) ¶180; Ex. 80 (Silverstein) 277:17-278:7.

[176] Ex. 70 (Greenspan) ¶181; Ex. 80 (Silverstein) 280:21-281:6.

the holiday season would drive traffic to its many other departments. [177] Toys "R" Us could not

compete successfully against Amazon's combination of broad selection, low prices, well-honed

e-commerce platform, and next-day delivery (free for Prime members). *Id.*

Competition from Walmart, Target, and Amazon had not only been "devastating Toys

"R" Us for years," the Defendants knew that this competition "was increasing every year, and

was more intense in 2017 than the year before." [178] Defendant Levin testified that as of June

2017, "the board knew" that "Amazon, Walmart, Target" were "serious competitors," and that

the "competition was intensifying." [179] Defendant Macnow testified that the Company was

"undergoing disruption" and facing "severe competition" from Amazon, Walmart, and Target

that was "increasing." [180]

As the Directors learned at the June 20, 2017, meeting of the Board, "Amazon was

engaged in real-time dynamic pricing, with an automated system that would monitor market

prices and instantly implement price-cuts in real time." [181] In addition, "Walmart, the largest toy

retailer, had acquired an e-commerce platform, … that allowed it to also compete with dynamic

pricing." [182] Barry explained to the Directors that "the resulting effects are … lower traffic

levels, sales and margins," for Toys "R" Us. [183]

---

[177] Ex. 70 (Greenspan) ¶182.
[178] Ex. 70 (Greenspan) ¶¶184, 187.
[179] Ex. 70 (Greenspan) ¶160; Ex. 78 (Levin depo.) 126:22-127:7; Ex. 96 (Levin depo. notes re 2017 situation).
[180] Ex. 83 (Macnow depo.) 28:8-18, 29:13-19.
[181] Ex. 70 (Greenspan) ¶184; Ex. 15 (6'20'17 BOD minutes [DEFS_0053970]) at point 4.
[182] *Id.*
[183] Ex. 15 (6'20'17 BOD minutes [DEFS_0053970]) at point 4; Ex. 77 (Raether depo.) 203:2-18, 204:9-23; Ex. 80 (Silverstein depo.) 276:10-277:1; Ex. 83 (Macnow depo.) 96:21-97:15, 98:6-99:1.

At the June 20, 2017, board meeting, the Directors were expressly told that because of "fierce competition" "customer spending is down across all tiers." [184]  They were presented with the results of a consumer survey demonstrating that consumers were "switching to the convenience and pricing" of "Amazon, Target, and Walmart." [185]  And the Board was told that the Company faced "unrelenting competition from big box retailers (who use toys as loss-leaders) and Amazon (who doesn't always have a current profit motive)," but the Company "cannot engage in price wars and remain profitable." [186]

In addition to the structural problems with the Toys "R" Us business model, the Company's infrastructure was itself substandard. [187]  At the June 20, 2017, board meeting, the Directors were reminded that "the current stores are old, dated, and stuck in the 1990's and in need of significant transformation." [188]  The Company's e-commerce platform was also out of date.  As Brandon stated in an email to board members in June of 2017, "We are years behind everyone else who is a large player in e- commerce and digital marketing right now." [189]  Moreover, "there was nothing presented to the Board to indicate that these adverse competitive pressures would abate, and the upcoming holiday season would not be as bad or worse than the prior year." [190]

The Directors do not dispute that they were well aware of all of these facts.  Director Levin admitted that as of June 2017 "the board knew" that the "stores were old, stuck in the 1990's", the Company was "years behind in e-commerce," "Amazon, Walmart, Target," were

---

[184] Ex. 70 (Greenspan) ¶185; Ex. 17 (6'20'17 Raether board materials [DEFS_0126153]) at 12.
[185] Ex. 70 (Greenspan) ¶185; Ex. 17 (6'20'17 Raether board materials [DEFS_0126153]) at 17.
[186] Ex. 70 (Greenspan) ¶185; Ex. 51 (9'18'17 attach Brandon chapt. 11 [DEFS_0027298]) at 5.
[187] Ex. 70 (Greenspan) ¶189.
[188] Ex. 15 (6'20'17 BOD minutes [DEFS_0053970]) at point 5.
[189] Ex. 14 (6'7'17 Brandon to Levin [DEFS_0005889]) at ¶8; Ex. 80 (Silverstein) 288:2-19.
[190] Ex. 70 (Greenspan) ¶188.

"serious competitors," and the "competition was intensifying." [191] As Brandon put it, the business model of Amazon, Walmart, and Target was "impossible to compete with for a company such as Toys 'R' Us." [192]

### 3. The Directors knew that the Company did not have a viable turnaround plan and could not come up with one.

Because the Company was operating a fundamentally flawed business model, to survive it would need a turnaround plan that included "a transformational change in its business model." [193] Defendants knew that a turnaround required a turnaround plan along with sufficient capital and time. [194] For example, Defendant Silverstein testified:

```
18     Q.  And for Toys "R" Us to turn around and
19   start improving its -- it's going to need what
20   we could call a turnaround plan.  Right?
21     A.  I think it needed more than -- I think
22   it needed capital and a turnaround plan.
23     Q.  Well, it would need a turnaround plan,
24   the capital to fund the turnaround plan, and it
25   would need time to implement the turnaround
 1   plan.  Right?
 2     A.  Generally, I -- that's correct, yes.
```

Ex. 80 (Silverstein) 284:18-285:2.

But when Toys "R" Us filed for bankruptcy, Defendants knew that the Company "had not yet developed a turnaround plan" and in fact did not even intend to attempt to develop such a

---

[191] Ex. 78 (Levin depo.) 126:22-127:7; Ex. 96 (Levin depo. notes re 2017 situation); Ex. 78 (Levin depo.) 113:2-13, 114:1-6, 114:19-115:21, 116:3-8, 117:21-118:10, 121:9-122:12, 123:23-124:19, 136:11-137:1, 142:13-143:9; *see, e.g.*, Ex. 83 (Macnow depo.) 28:8-18, 29:13-19; 96:21-97:15, 98:6-99:1; Ex. 80 (Silverstein depo.) 276:10-277:1, 288:2-19; Ex. 77 (Raether depo.) 203:2-18, 204:9-23; Ex. 81 (Bekenstein depo.) 149:19-150:5, 154:12-155:2, 156:1-17, 158:1-6, 159:12-16.
[192] Ex. 70 (Greenspan) ¶188; Brandon declaration (Bk. Dkt. 20) at 24, ¶54.
[193] Ex. 70 (Greenspan) ¶¶192- 193 (quoting Ex. 33 (Cornershop Advisers presentation, August 22, 2014 [DEFS_0126325])).
[194] Ex. 77 (Raether depo.) 359:10-121.

plan until January 2018, after the Holiday season." [195]  Defendants restructuring expert, Mr.

Kost, acknowledged that the Company had not yet formulated "a business plan that would

provide the foundation for a Plan of Reorganization and successful emergence from chapter 11,"

and that the plan was to focus "attention on formulating a business plan" "[f]ollowing a

successful holiday season." [196]

> Kost testified:

> 4      Q.   Based on your view of the record,
> 5   were the defendants aware that as of
> 6   September 2018 Toys R Us did not possess a
> 7   turnaround plan that would allow it to emerge
> 8   from bankruptcy?
> 9      A.   I -- I think from the record it's
> 10  pretty clear that there was not a specific
> 11  business plan or plan of reorganization
> 12  developed at the time they filed.  It was more
> 13  of a free fall bankruptcy.

Ex. 91 (Kost depo) 146:4-13. [197]

> For example, Defendant Raether testified:

> 17      Q.   I understand there were discussions.
> 18  I want to know if you were actually presented
> 19  with here's our proposed plan, something in
> 20  writing?
> 21      A.   I don't believe there was ever a
> 22  finalized plan.
> 23      Q.   How about a draft plan in writing;
> 24  did you ever get that?
> 25      A.   I don't recall.

Ex. 77 (Raether depo.) 473:17-25. [198]

---

[195] Ex. 70 (Greenspan) ¶¶210.  Ex. 64 (12'21'17 Transcript - Q3 2017 Earnings Call [TRU-Trust0000323034]) at 4, ¶4 ("our business planning process … will be initiated in earnest in January").

[196] Ex. 72 (Kost) ¶36; Ex. 91 (Kost depo) 139:6-140:7.

[197] *See id.* 163:16-21, 210:10-12, 211:8-16, 213:21-214:11.

[198] Ex. 77 (Raether depo.) 368:5-13, 377:6-10; *see* Ex. 80 (Silverstein) 293:1-5.

And Defendant Bekenstein testified:

> 24      Q.   In September of 2017 as Toys "R" Us
> 25   prepared to enter Chapter 11 bankruptcy, did
> 1   Toys "R" Us management present the board of
> 2   directors with a specific plan for turning
> 3   Toys "R" Us around?
> 5      A.   I don't recall specifically in 2017
> 6   whether they presented a specific plan at that
> 7   time.
>
> 19      Q.   So after Toys "R" Us enters
> 20   bankruptcy, September 2017, did the management
> 21   ever present the board with a specific
> 22   turnaround plan?
> 23      A.   I don't recall.
>
> 12      Q.   Do you have any evidence that
> 13   Toys "R" Us did have a plan?
> 14      A.   You haven't presented me a document,
> 15   and all I have in front of me is this computer
> 16   screen and 29 exhibits, so I don't think it was
> 17   in one of those 29 exhibits.
> 18      Q.   Well, I don't want you to limit
> 19   yourself to those 29 exhibits.  Think back
> 20   using your memory, any particular approach you
> 21   want to take, but I want to know if you can
> 22   identify any evidence that Toys "R" Us had a
> 23   plan of reorganization.
> 1      A.   I don't recall specifically.

Ex. 81 (Bekenstein) 177:24-178:7, 178:19-23, 198:12-199:1.

In fact, at the January 10, 2018, meeting of the Board of Directors, Brandon presented an

update stating that even at that point—four months after entering bankruptcy—a key element of

their "go forward plan" was coming up with a plan: "Create a Model and Pricing Strategy that

allows [the Company] to Be Price Competitive." [199]

---

[199] Ex. 70 (Greenspan) ¶¶213, 216-17; Ex. 3 (1'10'18 BOD minutes [TRU-Trust0000374746]) at
2; Ex. 2 (1'9'18 Business Update [REV00328049]) at slide 15.

The Defendants also knew it was highly improbable that the Company could ever come up with a viable turnaround plan. The flawed business model "was not a new problem for the Company that had never been tackled." [200] The Defendants knew that Company had been "under heavy assault from Amazon, Walmart, Target" and others "for at least five years, going back to the 2012 Holiday season." [201]

In those five years, management, including new management in 2015 under David Brandon, had attempted solutions, including "an extensive cost-cutting program spanning 2015 and 2016," "modifications to its inventory management processes," a "Store of the Future" experiment "to test innovative concepts," "an increased focus on beacon brands, which include Star Wars, Lego, Barbie, Nerf," a "new brand campaign architecture, which focuses on Brand Equity, Product Authority and Value," "various in-store activations," and "an increased focus on feature shops and driving trends at the front of the stores with feature shops." [202]

None of those initiatives addressed the fundamental problem of the Company's broken business model, and none of them stemmed the margin erosion and loss of market share to Amazon, Walmart, and Target. [203] In addition, the Company "had hired highly regarded

---

[200] Ex. 70 (Greenspan) ¶222.

[201] Ex. 70 (Greenspan) ¶¶222-224; Ex. 66 (Form 10-K 2013) at 4-5, 9; pdf 8-9; 12; Ex. 67 (Form 10-K 2014) at 9, 12-13, pdf 21, 25-26; Ex. 68 (Form 10-K 2015) at 5, 10, pdf 9, 14; Ex. 69 (Form 10-K 2016) at 10, pdf 14; Form 10-K 2016 at 6, 11, pdf 13, 19; Ex. 63 (11'30'15 Brandon report to Board [DEFS_0124903]) at 2 ("I am sure this is all a theme you have heard before: a major big-box retailer is using toys as a 'loss leader' to drive traffic, Amazon and on-line business continues to steal traffic from bricks and mortar, our stores are bigger than they need to be…even on Black Friday"); *id.* at 3 ("The negative trend of traffic/sales in the bricks and mortar stores continues").

[202] Ex. 70 (Greenspan) ¶195; Brandon declaration (Bk. Dkt. 20) at 23-24, ¶53; Ex. 10 (3'16'15 KKR PMC discussion [DEFS_0126308]) at 2; Ex. 61 (10'14'15 BOD minutes [DEFS_0125435]) at 3, point 5, ¶5; Ex. 60 (9'28'16 BOD minutes [DEFS_0125682]) at 3-4.

[203] Ex. 70 (Greenspan) ¶224; Ex. 80 (Silverstein) 290:6-11.

consultants, including AlixPartners," but none of them could come up with a solution. [204]  The

Company's Directors had long and broad business experience, and yet "none of them came

forward with a solution, or even a plan for finding a solution." [205]

In addition, the remedies available in bankruptcy "could not be expected to solve the

problem with the Company's business model." [206]  For example, because the Company owned or

had ground leases on over 60% of its real estate, the Company had no ability to renegotiate lease

rates for the majority of its stores. [207]  For the rest of the leases, most were already near market

rates, which meant that rejecting and renegotiating leases would result in insignificant

savings. [208]

Likewise, reducing the number of stores was not the answer.  The Company had already

closed 71 of its most unprofitable stores. [209]  When the Company modeled the business with a

smaller number of stores, whether 250, 400, or 650 stores, the models showed that a "smaller

operation would continue to lose money." [210]  For example, the "forecast for 632 stores" was an

EBITDA loss of $300.8 million, and the forecast for operating 411 stores was a loss of $329.8

million. [211]

In addition to not having a turnaround plan, the Defendants also knew that the Company

had "insufficient capital and time to conduct a turnaround." [212]  The U.S. business was a large

---

[204] Ex. 70 (Greenspan) ¶224.
[205] Ex. 70 (Greenspan) ¶224.
[206] Ex. 70 (Greenspan) ¶197.
[207] Ex. 70 (Greenspan) ¶¶198-201.
[208] Ex. 70 (Greenspan) ¶¶198-203.
[209] Ex. 70 (Greenspan) ¶205.
[210] Ex. 70 (Greenspan) ¶¶206-08.
[211] Ex. 70 (Greenspan) ¶¶207-09; Ex. 8 (2'14'18 BOD update [TRU-Trust0000362575]); Ex. 7
(2'4'18 BOD minutes [TRU-Trust0000363548]) at 3, point 3; Ex. 4 (2'4'18 Raether board notes
[DEFS_0124477]) at 3.
[212] Ex. 70 (Greenspan) ¶¶226-229.

enterprise that Brandon estimated would require over $1 billion and at least four years to implement a turnaround. [213]  But the Company had neither the time nor the capital.  If the Company were to come up with a transformational turnaround plan and start implementing it in January 2018 (or even in September 2017), this "left insufficient time for such a plan to affect the Company's course during the bankruptcy proceeding." [214]  As for capital, even with all of the DIP borrowing, the DIP budget only allocated $125 million toward store remodels and other efforts to improve performance. [215]  And the Company had no remaining assets to pledge to raise additional capital and was not projected to generate excess cash from operations. [216]

In sum, as the Directors considered the future of the Company in the summer of 2017, they knew the following: it had a money-losing business model; it had no turnaround plan; it had tried for years to come up with a solution to the broken business model but had failed; conditions were getting worse, not better; and the Company lacked the capital for a transformational turnaround and was now out of time.  Therefore, Defendants knew that "it was implausible that the company would come up with a viable turnaround plan" and "highly improbable that such a plan would emerge in time." [217]  It had such "a low probability of success" that it was "akin to a 'Hail Mary' pass at the end of a football game." [218]  This "had been apparent, quite frankly, for some period of time, but certainly it was apparent by the time you got into summer and late summer of 2017." [219]

---

[213] Ex. 70 (Greenspan) ¶227-28; Brandon Decl. (Bk. Dkt. 20) at 31-34, ¶¶72-78.
[214] Ex. 70 (Greenspan) ¶227.
[215] Ex. 70 (Greenspan) ¶228; Ex. 38 (9'3'17 Goulding for DIP discussion [TRU-Trust0000027886]) at pdf 8, note E.
[216] Ex. 70 (Greenspan) ¶¶113, 229; Ex. 85 (Kurtz depo.) 108:11-109:15, 111:7-22.
[217] Ex. 70 (Greenspan) ¶¶225, 229; Ex. 86 (Greenspan depo.) 148:11-150:8.
[218] Ex. 70 (Greenspan) ¶27.
[219] Ex. 86 (Greenspan depo.) 124:5-20.

56

Given the facts known to Defendants, there was no objectively plausible reason to keep

going and not liquidate.  As Defendant Bekenstein testified:

24      Q.  Well, we've got a business that we've
25  identified on this sheet that is losing money,
 1  sales are trending downward, there's no
 2  reasonable path to turn the business around.
 3  Can you tell the jury why it would still make
 4  sense for this company to keep going rather
 5  than liquidate?
 8      A.  It really depends on the situation.
 9  Maybe there are situations where it still makes
10  sense to operate.

11      Q.  Can you give the jury one example of
12  that?
15      A.  Again, there's so many possibilities
16  out there in the world that I'm not -- that's
17  it.  I'm not able to tell you the specifics,
18  but sure, there's got to be reasons why it
19  might make sense.

20      Q.  Because there are so many
21  possibilities out there, surely you can
22  identify one for the jury, can't you?
24      A.  Yeah, I don't -- I could try to be
25  creative but I'm just guessing and so I
 1  don't -- I'm not -- I can't at this moment come
 2  up with why that's the case.  But I'm sure
 3  there are.

11      Q.  Mr. Bekenstein, if we've got a
12  business that's losing money, sales are
13  trending downward, there's no reasonable path
14  to turn the business around, can you identify
15  for us any situation where it would make sense
16  to keep going and not liquidate the business?
19      A.  Again, as I said, I can't right this
20  moment come up with that situation for you.

21      Q.  Your answer was "I can't right this
22  moment come up with that situation"; right?
23      A.  I don't recall if those are the exact
24  words I used, but it sounds close.
25      Q.  And I've asked you that question in

57

1  various ways several different times; right?
3     A.  I think so.
4     Q.  If you come up with that situation
5  any time today, would you let me know?
6     A.  Yes.

Ex. 81 (Bekenstein) 76:24-78:3, 78:11-20, 78:31-79:6.

### H.    The Director Defendants' breaches of duty were exacerbated by conflicts of interest.

Each of the Defendant Directors had conflicting personal interests in deciding whether the Company should commence an immediate wind-down or, instead, max out DIP financing to continue operating and gamble on a turnaround.

### 1.    The six Sponsor Directors had conflicts of interest.

"A plaintiff may establish that a director lacks independence by alleging with particularity that the director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine the director's ability to judge the matter on its merits." *In re Oracle Corp. Derivative Litig.*, No. 2017-0337-SG, 2018 Del. Ch. LEXIS 92, at *47 (Ch. Mar. 19, 2018) (internal quotes omitted).  Each of the six Sponsor Directors had a personal interest in, and was beholden to, the Sponsor company that appointed them to the Board.

"Bekenstein and Levin were appointed to the Board as a consequence of their respective relationships with Bain." [220]  Bekenstein was a Managing Director and Co-Chairman of Bain Capital, having joined Bain at its inception in 1984. [221]  Levin was a Senior Advisor of Bain in the private equity business, having been a Managing Director of Bain from 2000. [222]

---

[220] Ex. 65 (2017 TRU 10-K) at 114, pdf 119.
[221] Ex. 70 (Greenspan) ¶23; Ex. 65 (2017 TRU 10k) at 113, pdf 118.
[222] Ex. 70 (Greenspan) ¶23; Ex. 65 (2017 TRU 10k) at 113, pdf 118.

58

"Raether and Taylor were appointed to the Board as a consequence of their respective relationships with KKR." [223]   Raether was head of the portfolio management committee at KKR, having joined KKR in 1980. [224]   Raether's corner office at KKR was located near the office of Henry Kravis, a founder of KKR. [225]   Taylor was an investor and partner in KKR and had been at KKR since 2005. [226]

Silverstein and Macnow "were appointed to the Board as a consequence of their respective relationships with Vornado." [227]   Macnow had served as Executive Vice President-Finance and Chief Administrative Officer of Vornado since 2013, had been the CFO of Vornado for over 20 years, and had joined Vornado in 1985. [228]   Silverstein had been a senior executive of Vornado since 1998, serving as executive vice-president, head of capital markets, and co-head of acquisition, and reported directly to Steve Roth, the founder and CEO of Vornado. [229]   Silverstein was paid by Vornado "to sit on the board of Toys 'R' Us on behalf of Vornado."

Each of the Sponsor Directors not only had a personal interest in advancing the equity interests of their respective Sponsor, they also had a personal financial interest in the outcome as a result of their beneficial ownership or indirect ownership in shares of Toys "R" Us. [230]   For example, Bekenstein was "a partner in Bain Capital Partners" which had invested in Toys "R" Us, and as result, Bekenstein "would hope that the equity value would increase" so that the "personal investment that [Bekenstein] made would grow in value." [231]   As another example,

---

[223] Ex. 65 (2017 TRU 10-K) at 114, pdf 119.
[224] Ex. 77 (Raether depo.) 13:8-10; Ex. 65 (2017 TRU 10K) at 113, pdf 118.
[225] Ex. 77 (Raether depo.) 14:4-5, 17:2-10.
[226] Ex. 65 (2017 TRU 10K) at 113, pdf 118; Ex. 79 (Taylor) 4:16-17, 7:5-11.
[227] Ex. 65 (2017 TRU 10-K) at 114, pdf 119.
[228] Ex. 65 (2017 TRU 10K) at 113, pdf 118.
[229] Ex. 80 (Silverstein depo.) 6:25:7-16.
[230] Ex. 65 (2017 10-k) at pp. 140-41, pdf 145-46.
[231] Ex. 81 (Bekenstein) 10:6-24; 12:25-13:20.

Silverstein owned stock and stock options in Vornado valued at between ▮▮▮▮▮▮▮

▮▮▮▮ [232]

Each of the Sponsor Directors signed the 2017 10k, which expressly admitted that the Sponsors had control of the Company "through their ownership of 98%" of the voting shares. [233] And they further admitted that "the Sponsors may have an interest in pursuing … financings or other transactions that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to [Toys 'R' Us] as a company." [234]

It was precisely this conflict of interest that the Sponsor Directors faced in deciding between commencing an immediate wind-down versus taking on DIP financing and attempting a turnaround. A wind-down meant that the Sponsors' equity interests would have no value, "because an orderly sale of assets … would not realize value that would exceed the liabilities." [235] In fact, the Sponsor Directors knew, and acknowledged at the time, that the Company was insolvent and their equity interests had no value. [236]

"The only possibility for realizing substantial equity value was a restructuring that produced a viable operating enterprise with a value above liabilities." [237] As demonstrated

---

[232] Ex. 80 (Silverstein depo.) 13:16-14:25; Ex. 80 (Silverstein depo.) 9:19-11:22.
[233] Ex. 65 (2017 TRU 10-k) at p. 20, pdf 24.
[234] Ex. 65 (2017 TRU 10-k) at 20, pdf 24.
[235] Ex. 70 (Greenspan) ¶27.
[236] Ex. 79 (Taylor) 170:10-21 (testifying that KKR's internal valuation of "KKR's investment in Toys 'R' Us" as of September 2017 showed that "our equity had no value"); Ex. 79 (Taylor) 167:2-24 (testifying that KKR calculated that Toys "R" Us had debt of $4.7 billion but an enterprise value of $3.4 billion to $3.7 billion); Ex. 79 (Taylor depo.) 169:4-18 ("the total value of Toys 'R' Us is less than the debt"); Ex. 78 (Levin depo.) 239:6-25, 240:13-241:3 ("the equity investment in Toys 'R' Us has a value of zero"); Ex. 70 (Greenspan) ¶¶163-165; 399-401; Ex. 75 (Vornado 2013 annual report) at 10 n.7, 57; Ex. 76 (Vornado 2014 annual report) at 36; Ex. 62 (11'4'14 Vornado write down [DEFS_0111323]); Ex. 13 (4'8'15 Saghir to Taylor Levin re Brandon [DEFS_0049061]) at 2; Ex. 1 (1'4'16 Taylor Raether equity calculation [DEFS_0125987]).
[237] Ex. 70 (Greenspan) ¶27.

above, "such a turnaround had a low probability of success and was akin to a 'Hail Mary' pass at the end of a football game." [238] But that Hail Mary was the only potential path to equity value for the Sponsors.  As Defendant Silverstein testified:

    5     Q.  If the company had a very successful
    6  Christmas selling season, was able to reinvent
    7  itself and emerge from bankruptcy with -- as a
    8  very profitable company, it might have resulted
    9  in value for the equity holders.  Right?
    10     A.  It might have, yes.
    11     Q.  Was that your hope at that time?
    12     A.  I -- hope is -- hope always springs
    13  eternal.

Ex. 80 (Silverstein) 120:5-13.

Therefore, commencing an immediate wind-down of the Company would have been detrimental to the Sponsors by eliminating any prospect of obtaining value from their equity interests.  And maxing out DIP financing and attempting a turnaround had the potential (however remote) to create value for the equity, and it had no cost or risk for the Sponsors.

By contrast, the Company would bear the hundreds of millions of dollars in fees and operating losses for pursuing the DIP financing and turnaround strategy, and the Company would bear 100% of the risk that it breached a financial covenant and suffered a precipitous unplanned liquidation.

But "a planned and orderly liquidation" would have allowed the Company to take advantage of the holiday season and "liquidate inventories when demand was at a peak," while "supplementing inventory of hot toys as appropriate to capture additional margins." [239]

---

[238] Ex. 70 (Greenspan) ¶27.
[239] Ex. 70 (Greenspan) ¶330; *id*. ¶244.

"Additionally, the Company would have had more time to sell real estate assets, and to market the international businesses," thereby improving recoveries for creditors. [240]

And most importantly, the Company would have avoided hundreds of millions of dollars in losses including excess professional fees, DIP financing fees, and operating losses.  Even Defendants' own economic expert agrees that commencing an immediate wind-down would have saved at least $400 million. [241]  Those losses were borne entirely by the Company with zero contribution from the Sponsors.

The Sponsor Directors had an additional personal interest served by commencing a turnaround strategy when entering bankruptcy.  "By maintaining control of the Board and the company through the Chapter 11 process, and using the Debtor's exclusive right to file a Chapter 11 Plan, these interested directors could seek to obtain releases from liability for themselves and for Bain, KKR, and Vornado in any such Chapter 11 Plan." [242]  "This would shield the private equity companies from potentially needing to repay the hundreds of millions of dollars in sponsor fees and other payments they received while they owned TRU, as well as being responsible for other claims." [243]

### 2.    Brandon and Short had conflicts of interest.

Both Brandon had Short had a direct financial interest "in the outcome of deciding whether the Company" should stay in business and attempt the turnaround, or instead "should commence a wind-down of U.S. operations." [244]  Brandon and Short could continue to receive their salaries for as long as the Company continued in operation; an earlier liquidation of the

---

[240] Ex. 70 (Greenspan) ¶330.
[241] Ex. 91 (Kost depo) 438:1-8.
[242] Ex. 70 (Greenspan) ¶28.
[243] Ex. 70 (Greenspan) ¶28.
[244] Ex. 70 (Greenspan) ¶¶19, 21.

Company would have eliminated their jobs and their salaries. [245]  In addition, by pursing a turnaround strategy, both Brandon and Short could receive a pre-bankruptcy bonus, while "a strategy of winding down the U.S. business would not have allowed" either to receive such a bonus. [246]  For Brandon, this meant receiving a $3,750,000 annual salary and a bonus of $2,812,500. [247]  For Short, this meant a salary of $700,000 and a bonus of $600,000. [248]

Brandon also had a conflict of interest because he was not independent of Bain and had a personal interest in serving the interests of Bain.  Bain had been handing Brandon lucrative and prestigious corporate positions for Bain-controlled companies for almost 20 years. [249]  When Bain acquired Domino's they brought Brandon in to become the CEO in 1999. [250]  And Bain appointed Brandon to the board of Burger King in 2003 to serve as the Bain sponsor-appointed director. [251]  Throughout his tenure at Toys "R" Us, Brandon was simultaneously paid as the Chairman of Domino's. [252]  And even while serving as CEO of Toys "R" Us, Brandon continued to do important business favors for Bain, for example, assisting Bain in its efforts to acquire the Jimmy John's fast-food restaurant company. [253]  As Brandon put it, "I've done this for you guys 100 times!" [254]  After Brandon's successful intervention, Defendant Bekenstein wrote to Brandon: "Thanks so much Dave!!!! … THANKS!!!!" [255]

---

[245] *Id.*
[246] Ex. 70 (Greenspan) ¶¶19, 21.
[247] Ex. 70 (Greenspan) ¶19.
[248] Ex. 70 (Greenspan) ¶21.
[249] Ex. 70 (Greenspan) ¶¶30-31.
[250] Ex. 70 (Greenspan) ¶30.
[251] *Id.*
[252] Ex. 70 (Greenspan) ¶¶30-31.
[253] Ex. 70 (Greenspan) ¶¶32-34; Ex. 19 (7'12'16 Brandon Bekenstein [TRU-Trust0000322854]).
[254] *Id.*
[255] Ex. 70 (Greenspan) ¶¶33-34; Ex. 20 (7'20'16 Brandon Bekenstein [TRU-Trust0000322857]).

In addition, Brandon had a conflict of interest based on enhancing his personal pride and avoiding personal shame.  "Bad faith can be the result of any emotion that may cause a director to intentionally place his own interests, preferences or appetites before the welfare of the corporation, including . . . shame or pride."  *In re Answers Corp. S'holder Litig.*, 2012 Del. Ch. LEXIS 162, at *3-4 (Ch. July 19, 2012) (cleaned up); *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 754-56 (Del. Ch. 2005) (same), *aff'd* 906 A.2d 27 (Del. 2006).  When Brandon was considering whether to take on the role of CEO of Toys "R" Us, his "big issue" was "making sure he can convince himself he can make this a win." [256]  Before Toy "R" Us, Brandon had "done two very successful transformations in his business career (and made a lot money in both), so this will be his capstone." [257]  As Brandon stated, "I did not move to NYC and take this on to 'preside over a funeral.'" [258]  Therefore, Brandon had a conflicting "personal interest in not being at the helm of an important company when it went under." [259]

### 3. Defendant Directors failed to eliminate the conflicts by assigning the decision to independent directors.

The Defendant Directors were not only well aware of the conflicts of interest, they were also aware of their obligation to eliminate the conflicts by recusing themselves and placing the decision in the hands of independent directors who did not have conflicts.  As described above, Defendants knew "that in a situation where a decision would implicate an actual or potential conflict of interest, the board should delegate decision-making authority to disinterested directors or managers." [260]  Defendants failed to do so.

---

[256] Ex. 12 (4'4'15 Levin to Silverstein [DEFS_0080838]).
[257] Ex. 12 (4'4'15 Levin to Silverstein [DEFS_0080838]).
[258] Ex. 35 (8'25'15 Brandon Levin Taylor [TRU-Trust0000322852]).
[259] Ex. 70 (Greenspan) ¶20.
[260] Ex. 77 (Raether) 157:3-8; Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 15.

Throughout the summer of 2017, the Board had one additional director, Defendant

Goodman, on the board of Toys "R" Us, Inc., and no other directors on the board of Toys "R" Us

Delaware.  The Directors did not delegate decision-making authority to Goodman and, instead,

the full board retained and exercised decision-making authority to authorize DIP financing and

the chapter 11 strategy. [261]  Moreover, as discussed in detail above, just like his fellow board

members, Goodman did not undertake the task of assessing the DIP financing, a wind-down

strategy, or a turnaround strategy.

The Defendants appointed two additional directors to Toys Delaware on August 23, and

two additional directors to Toys Inc. on September 13, a few days before the September 18,

2017, vote approving the DIP financing. [262]  But those last-minute appointments did not nothing

to eliminate the conflicts. [263]

Independent directors can "guard against conflicts of interest" if they are either

"delegated the power to make certain decisions or empowered by the board to investigate

---

[261] Ex. 52 (9'18'17 BOD minutes [DEFS_0023490]).

[262] Ex. 34 (8'23'17 BOD minutes [TRU-Trust0000333026]); Ex. 40 (9'13'17 board minutes [TRU-Trust0000165899]).

[263] Many purportedly independent directors are so-called "Super-Repeaters"—they have close connections to private-equity sponsors and law firms that represent private-equity sponsors, and they serve on multiple boards for companies going into bankruptcy. Ex 71 (Jared A. Ellias, Ehud Kamar, & Kobi Katiel, *The Rise of Bankruptcy Directors* (June 14, 2011)).  These purportedly independent directors have a "structural bias because they are part of a small community of repeat private-equity sponsors and law firms."  *Id*. at 1.  In bankruptcy cases where a Super-Repeater director is added to the board, "unsecured creditors recover on average 21% less," as compared to cases that do not include a Super-Repeater.  *Id*. at 1. All four of the purportedly "independent" directors added to the Toys "R" Us boards were suggested by Kirkland, and three of the four—Alan Miller, Alan Carr, and Neal Goldman— appear on the list of "Super Repeaters."  *Id*. at 49.  As discussed in text, the purportedly "independent" directors did not get an opportunity to exercise decision-making, because the decision on whether to take on DIP financing and forego an immediate liquidation was never delegated to the newly added directors.

potential conflicts and exclude certain directors from decision-making processes." [264]  But the

Defendants did not delegate decision-making authority to Goodman and, instead, the full board

retained and exercised decision-making authority to authorize DIP financing and the chapter 11

strategy. [265]  The Boards of Directors "never delegated" to the independent directors "decision-

making authority on approving the strategy of taking on DIP financing and delaying

liquidation."[266]

Furthermore, the independent directors "could not properly investigate the conflicts of the

sponsor directors with respect to the DIP financing because they were only given the authority to

investigate conflicts in the same board meeting where the DIP financing strategy was

approved." [267]  At the September 18, 2017, board meeting, the Boards passed a resolution giving

the independent directors "the authority to investigate and determine… whether any matter

arising in or related to the Chapter 11 cases constitutes a Conflict Matter." [268]  None of the

independent directors "asked that the decision to take on DIP financing and delay liquidation be

designated a conflict matter," or requested that they control the decisions. [269]  And the Director

Defendants never recused themselves from decision-making and each of them personally

participated in the board meeting and the vote to authorized DIP financing. [270]

Furthermore, the independent directors themselves abdicated their fiduciary duties; if

anything, the abdication of duty by the independent directors was worse than that by the

Defendant Directors.  The independent directors "were given the same type of limited

---

[264] Ex. 70 (Greenspan) ¶39.
[265] Ex. 52 (9'18'17 BOD minutes [DEFS_0023490]).
[266] Ex. 70 (Greenspan) ¶40.
[267] Ex. 70 (Greenspan) ¶40.
[268] Ex. 53 (9'18'17 Raether board materials [DEFS_0124607]) at 20.
[269] Ex. 70 (Greenspan) ¶40.
[270] Ex. 52 (9'18'17 BOD minutes [DEFS_0023490]).

information as the rest of the Board when making the decision to approve the DIP financing." [271]

This information did not provide a basis for assessing compliance with the financial

covenants.[272]  In fact, the independent directors were given a summary forecast dated August 26,

2017, that "showed that the Company would default on any liquidity covenant, because the

Company would have negative liquidity by September of 2018." [273]

> **I.     The facts establish Defendants' breaches of the fiduciary duties of good faith, loyalty, and due care.**

When the Delaware law of fiduciary duties—as recited in controlling cases from the

Delaware Supreme Court—is applied to the facts set forth above, it establishes that the Director

Defendants breached each of their fiduciary duties, including the duties of good faith, loyalty,

and due care.

> **1.     Breach of the duty of good faith.**

As discussed above, a breach of the duty of good faith occurs "[w]here directors fail to

act in the face of a known duty to act, thereby demonstrating a conscious disregard for their

responsibilities."  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  As shown above, the Trust has

powerful evidence that the Defendant Directors knew of their duty to act, but failed to act.

Moreover, those facts are not only supported by admissible evidence, they are admitted by

Defendants.

The Directors were well aware of their fiduciary duties both in general and specifically as

it applied to deciding the future of a company facing insolvency or restructuring.  It is undisputed

that Kirkland expressly explained to the Directors their duties.  Moreover, all of the Directors

---

[271] Ex. 70 (Greenspan) ¶42.
[272] Ex. 70 (Greenspan) ¶¶42-47.
[273] Ex. 70 (Greenspan) ¶¶45-47; Ex. 24 (8'26'17 Preliminary DIP Sizing Forecast [TRU-Trust0000063629]) at 9.

were sophisticated corporate executives, with years of experience in charting a corporation's future and assessing corporate debt obligations.  And all of the Directors were well aware of their obligation to assess whether the Company could reasonably be expected to comply with the financial covenants in the DIP financing.

As Raether testified, for a Toys "R" Us director, it was an "important" "part of your fiduciary duty" to assess whether the Company would have "the ability to pay the money back," and it was "incumbent upon the directors … to understand the terms of the DIP financing and the company's … operating forecast such that it could comply with the covenants that were present in that DIP financing." [274]  Raether testified that directors must be presented with "a set of sensitivity analyses such that we can determine with a high degree of confidence that the company will be able to perform and meet its obligations," and "if not, the directors should not approve … financing." [275]

But the Directors entirely abdicated their duty to make that assessment.  As shown above, the Directors did not assess the ability to comply with the covenants.  They didn't even receive, much less analyze, a sensitivity analysis or downside case projection.  They didn't even receive, much less analyze, the key assumptions underlying the forecast.  In fact, they approved the financing without even knowing the terms of the financial covenants, and never received any analysis of the Company's ability to comply with those covenants.

These facts demonstrate "that the defendant directors knew that they were making material decisions without adequate information and without adequate deliberation," and

---

[274] Ex. 77 (Raether) 123:17-125:12; Ex. 77 (Raether) 137:24-138:5.
[275] Ex. 77 (Raether) 136:12-137:18.

therefore violated their duty of good faith. *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003).

The evidence also demonstrates that the Directors knew that it would violate their fiduciary duties "to authorize a transaction that could be analogized to a 'Hail Mary' pass for the benefit of shareholders if creditor recoveries are threatened." [276]  And they also knew that, in deciding whether to proceed with an attempted turnaround, their fiduciary duties required them to assess all reasonable alternatives, and to gather all information reasonably available before making a decision.  But Defendants entirely abdicated that duty.  Defendants did nothing to assess the alternative of conducting an immediate wind-down.  They did not ask the advisors and management to assess the value that would be generated by an immediate wind-down.  And they did nothing to assess the "Hail Mary" turnaround strategy.  They did not receive, or even ask for, any assessment of the probability that the turnaround could be achieved, or the costs to the Company if the strategy were to fail.

This evidence establishes that the Directors "adopt[ed] a 'we don't care about the risks' attitude concerning a material corporate decision" and thereby breached their fiduciary duties. *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003), *aff'd Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 63 (Del. 2006) (holding that bad faith may be shown by evidence demonstrating a "conscious[] and intentional[] disregard[] [of] responsibilities, adopting a 'we don't care about the risks' attitude").

In addition, as shown above, the Trust has powerful evidence "supporting an inference that [Defendants] did not reasonably believe that the … transaction was in the best interests of"

---

[276] Ex. 23 (7'31'17 Contingency Prep Overview [DEFS_0123896]) at slide 20, bullet 6; Ex. 70 (Greenspan) ¶13.

the Company.  *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 260 (Del. 2017), *quoted with approval by Kahn v. Stern*, 183 A.3d 715, 715 & n.5 (Del. 2018).  Moreover, those facts are not only supported by admissible evidence, they are admitted by Defendants.

All of the Director Defendants knew that U.S. business of the Company met all the criteria for a business that needed an immediate wind-down.  They all knew that it had been losing money for years, that sales, margins, and market share were declining, that the pace of the money losses and the decline in sales, margins, and market share was accelerating, that their business model could not compete with Amazon, Walmart, and Target, that competition was intensifying, that they had not been able to come up with a viable turnaround plan and had no plausible path for coming up with a plan, and that they lacked the time and capital to implement a turnaround.  They also knew that having the Company max out its DIP financing and continue in operation would cost hundreds of millions of dollars in additional operating losses and restructuring costs.

In addition, Brandon and Short knew that the financial covenants in the DIP Term loan were too dangerous and would result in a default.  Brandon and Short knew the forecast was based on unrealistic sales projections, they knew that even with those projections the Company had an insufficient liquidity cushion, and both had concluded that the covenants were too dangerous.  Short agreed that the $175 million liquidity covenant "doesn't work," and both agreed that the January budget covenant "just isn't going to work." [277]

Applying an "objective standard of good faith," these facts support an "an inference that [the Defendants] did not reasonably believe that" maxing out DIP financing and attempting a

---

[277] Ex. 70 (Greenspan) ¶¶100, 104; Ex. 57 (9'20'17 0652 am [TRU-Trust0000075725]); Ex. 48 (9'18'17 2244 pm [LZ-TRU0092221]) at 4.

turnaround "was in the best interests of" the Company, and therefore they breached their fiduciary duty of good faith. *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 260 (Del. 2017).

### 2.    Breach of the duty of loyalty.

"A director is considered interested" in a corporate decision, and not independent, if the director "will receive a personal financial benefit from a transaction" or "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

As demonstrated above, the value of the equity interests of the Sponsors would be zero if the Company commenced an immediate wind-down, and the equity could have value only if a successful turnaround occurred. Therefore, commencing an immediate wind-down of the Company would have been detrimental to the Sponsors by eliminating any prospect of obtaining value from their equity interests. But maxing out DIP financing and attempting a turnaround had the potential to create value for the equity. As demonstrated above, "such a turnaround had a low probability of success and was akin to a 'Hail Mary' pass at the end of a football game." [278] But that Hail Mary was the only potential path to equity value for the Sponsors. And most importantly for the Sponsors, attempting a turnaround had zero cost or risk for the Sponsors.

By contrast, the Company would bear the hundreds of millions of dollars in fees and operating losses for pursuing the DIP financing and turnaround strategy, and the Company would bear 100% of the risk that it breached a financial covenant and suffered a precipitous unplanned liquidation.

---

[278] Ex. 70 (Greenspan) ¶27.

This was the very circumstance that the Directors acknowledge was a conflict of interest: "the Sponsors may have an interest in pursuing … financings or other transactions that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to [Toys 'R' Us] as a company." [279] "Common sense dictates that, in light of these consequences, the [Sponsor-appointed Directors] have a disqualifying financial interest that disables them from impartially considering" whether to authorize the Company to commence an immediate wind-down. *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

In addition, as demonstrated above, the Sponsor Directors had another interest not shared with the Company. "By maintaining control of the Board and the company through the Chapter 11 process, and using the Debtor's exclusive right to file a Chapter 11 Plan, these interested directors could seek to obtain releases from liability for themselves and for Bain, KKR, and Vornado in any such Chapter 11 Plan." [280] "This would shield the private equity companies from potentially needing to repay the hundreds of millions of dollars in sponsor fees and other payments they received while they owned TRU, as well as being responsible for other claims." [281]

Brandon and Short each had conflicts of interest because they would financially benefit if the Company continued operations rather than commencing an immediate wind-down. "Delaware law also recognizes that management's prospect of future employment can give rise to a disabling conflict." *In re Mindbody, Inc.*, 2020 Del. Ch. LEXIS 307, at *36 (Ch. Oct. 2, 2020); *In re Xura, Inc. Stockholder Litig.*, 2018 Del. Ch. LEXIS 563, at *31 (Ch. Dec. 10, 2018) ("Continued employment in itself is a material interest.").

---

[279] Ex. 65 (2017 TRU 10-k) at 20, pdf 24.
[280] Ex. 70 (Greenspan) ¶28.
[281] Ex. 70 (Greenspan) ¶28.

Moreover, Brandon and Short were not disinterested from any decisions affecting the

Sponsors because each of the Sponsors "certainly has the ability to affect [the officer/director's]

employment and compensation." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v.

Stewart*, 833 A.2d 961, 977-78 (Del. Ch. 2003) (holding that an officer/director had a conflict

because she "has a material interest in her own continued employment," and further holding that

she was not disinterested in decisions affecting the 94% shareholder because the shareholder

"certainly has the ability to affect [the officer/director's] employment and compensation"), *aff'd*

845 A.2d 1040 (Del. 2004); *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993) ("Because of their

alleged substantial financial interest in maintaining their employment positions, there is a

reasonable doubt that these two directors are able to consider impartially an action that is

contrary to the interests of the Rales brothers.").

By demonstrating that each of these Directors had a personal interest in the outcome of

the decision that was not shared by the Company, the Trust has met its burden on a claim for

breach of the duty of loyalty. The Delaware Supreme Court has "consistently defined the duty of

loyalty of officers and directors" in "unyielding terms." *Cede & Co. v. Technicolor*, 634 A.2d

345, 361 (Del. 1993).  Any potential for influence by outside interests is prohibited and "there is

no safe-harbor for divided loyalties in Delaware."  *In re Walt Disney Co. Derivative Litig.*, 907

A.2d 693, 751 (Del. Ch. 2005).  A director is "independent only when the director's decision is

based entirely on the corporate merits of the transaction and is not influenced by personal or

extraneous considerations."  *Cede & Co. v. Technicolor*, 634 A.2d 345, 362 (Del. 1993).

Having met the Trust's burden of proving conflicting interests by a majority of the Board,

the burden shifts to the Defendants to demonstrate that the decision was entirely fair to the

Company.  "Absent approval of the transaction by a disinterested director majority, the burden of

proof falls upon the defendants to establish that the transaction was entirely fair to the shareholders." *Chaffin v. GNI Grp., Inc.*, Civil Action No. 16211-NC, 1999 Del. Ch. LEXIS 182, at *16 (Ch. Sep. 3, 1999). "When faced with such divided loyalties, directors have the burden of establishing the entire fairness of the transaction." *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989).

### 3.      Breach of the duty of care.

A breach of the duty of care occurs if a director actions or inactions amount to "gross negligence," which is "conduct that constitutes reckless indifference or actions that are without the bounds of reason." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008).

The evidence establishing Defendants' breach of the duty of good faith also establishes "conduct that constitutes reckless indifference." Accordingly, each of the Defendant Directors breached their duties of care.

### 4.      Defendants cannot establish that their actions meet the entire fairness standard.

Because the Trust has made out a prima facie case that Defendants breached their fiduciary duties, the burden shifts to the Defendants to meet the "entire fairness" test, i.e. to establish that their actions were entirely fair to the corporation.

Under Delaware law, directors start with the protection of the business judgement rule, which creates a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 52 (Del. 2006) (internal quotes omitted). Plaintiff can overcome that presumption by showing that a director breached any of the three fundamental fiduciary duties. "Those

74

presumptions can be rebutted if the plaintiff shows that the directors breached their fiduciary

duty of care or of loyalty or acted in bad faith." *Brehm*, 906 A.2d at 52.

Once "the plaintiff shows that the directors breached their fiduciary duty of care or of

loyalty or acted in bad faith," "the burden then shifts to the director defendants to demonstrate

that the challenged act or transaction was entirely fair to the corporation." *Brehm*, 906 A.2d at

52 (emphasis added).  "A breach of either the duty of loyalty or the duty of care rebuts the

presumption that the directors have acted in the best interests of the shareholders, and requires

the directors to prove that the transaction was entirely fair." *Cede & Co. v. Technicolor*, 634

A.2d 345, 371 (Del. 1993); *Basho Techs. Holdco B, Ltd. Liab. Co. v. Georgetown Basho Inv'rs,

Ltd. Liab. Co.*, No. 11802-VCL, 2018 Del. Ch. LEXIS 222, at \*5 (Ch. July 6, 2018) (holding that

the defendant directors "bore the burden of proving that the Series G financing was entirely

fair"); *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("[w]hen faced

with such divided loyalties, directors have the burden of establishing the entire fairness of the

transaction"); *Cinerama, Inc. v. Technicolor*, 663 A.2d 1134, 1137 (Del. Ch. 1994) (if the

plaintiff "establishes director negligence … he or she has established a prima facie case of

liability," and then "the burden shifts to the director defendants to show that the transaction was

'entirely fair' to the shareholders or the corporation"), *aff'd* 663 A.2d 1156 (Del. 1995).

Under the entire fairness standard "the defendants must establish … that

the transaction was the product of both fair dealing and fair price." *Basho Techs. Holdco B, Ltd.

Liab. Co. v. Georgetown Basho Inv'rs, Ltd. Liab. Co.*, No. 11802-VCL, 2018 Del. Ch. LEXIS

222, at \*80-81 (Ch. July 6, 2018) (internal quotes omitted).  The "fair dealing" aspect concerns

the process by which the transaction was approved.  *Id*. at \*82.  The "fair price" aspect concerns

the economic value.  *Id*.  A "fair price" means "obtaining the highest value reasonably available

to the shareholders under all the circumstances." *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989).

In their motion for summary judgment, Defendants make no attempt to meet their burden of proving entire fairness. "Where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Ray Communs., Inc. v. Clear Channel Communs., Inc.*, 673 F.3d 294, 299-300 (4th Cir. 2012).

Moreover, Defendants could not possibly establish that maxing out DIP financing rather than conducting an orderly wind-down was entirely fair to the Company. As for "fair dealing," the Trust has powerful evidence (described above) that Defendants did not undertake an adequate process for approving DIP financing or considering an immediate wind-down; in fact, they entirely abdicated their duties. And as for "fair price," the evidence is undisputed that the course of action adopted by the Directors caused at least $400 million in losses that would have been avoided. [282]

Defendants "did not demonstrate fairness as to process or price," and therefore cannot prove entire fairness. *Basho*, 2018 Del. Ch. LEXIS 222, at *92 (Ch. July 6, 2018).

## J.    Defendants' breaches caused harm to the Company.

The "Defendants authorizing the Company to take on the maximal amount of DIP financing, in particular the DIP Term Loan, and to delay liquidation planning until mid-February 2018, resulting in a sudden liquidation, was a substantial factor in, and the proximate cause of, harms and losses to the Company." [283]

---

[282] Ex. 91 (Kost depo) 438:1-8; Ex. 70 (Greenspan) ¶¶319-328.
[283] Ex. 70 (Greenspan) ¶319.

Defendants' restructuring and damages expert, Robert Kost, agreed with the Trust's experts that the Company had over $400 million in "losses that could have been avoided as a result of an earlier wind down." [284]  He testified:

```
1    Q.  So there's 350 million in critical vendor
2    payments, $47 million in interest, bonuses that
3    would have been avoided, operating losses of up
4    to $180 million would have been avoided;
5    altogether that's certainly going to exceed
6    $400 million, right?
7    A.  The total of that would be probably
8    higher than 400 million, yes.
```

Ex. 91 (Kost depo) 438:1-8.

The harms and losses caused to the Company include at least five categories.

### 1.      Extended operating losses.

"Delaying the liquidation of the U.S. business extended the operations, which were losing money.  The path followed by the Defendants resulted in a liquidation announcement in mid-March 2018, followed by liquidation sales proceeding in the following months.  If the Company, instead, had announced a wind-down of the U.S. business in conjunction with the holiday season, this would have reduced the period of operations by at least three months." [285]  "For example, an announcement on December 15 would have moved the timeline up 3 months and avoided three months of operating losses…. An earlier announcement, for example at the time of the filing, would have shaved off an additional two months." [286]  This "would have avoided $48 to $85 million per month in operating losses." [287]

---

[284] Ex. 91 (Kost depo.) 437: 8-14.
[285] Ex. 70 (Greenspan report) ¶320.
[286] Ex. 70 (Greenspan) ¶322.
[287] Ex. 70 (Greenspan) ¶322.

## 2. Increased professional fees.

"In addition, extending operations and the bankruptcy increased the professional fees, including the fees of advisors for the debtors, as well as the UCC and other parties whose fees were paid out of the Debtor's estate." [288]  Even an announcement of a wind-down on December 15 "would have cut out three months of professional fees that were devoted to such activities such as negotiations with lenders for covenant relief and emergence planning." [289]  This would have avoided "more than $20 million in professional fees." [290]

## 3. Excess financing costs.

"If the Company would have followed a path of an orderly wind down of U.S. operations, it would not have taken on the Term DIP loan.  DIP financing for U.S. operations during the wind-down may have been needed, but such financing could have been provided by a scaled down version of the ABL/FILO DIP facility.…  As a result, the $450 million Term DIP loan would not have been needed." [291]

"The Company had to pay substantial amounts for the Term DIP loan including financing fees to the lender, interest payments, fees for the lender's professionals and the Company's professionals to negotiate and document the loans.  Those costs and losses would have been avoided by not taking on the Term DIP loan." [292]  These losses "include more than $47 million in interest payments." [293]

---

[288] Ex. 70 (Greenspan) ¶321.
[289] Ex. 70 (Greenspan) ¶322.
[290] *Id.*
[291] Ex. 70 (Greenspan) ¶323.
[292] Ex. 70 (Greenspan) ¶324.
[293] *Id.*

### 4. Adequate protection payments.

"To obtain the Term DIP loan, the Company had to agree to adequate protection payments for the B2, B3, and B4 lenders.  Those payments would have been avoided by not taking on that loan." [294]  Those payment are estimated "to be at least $32 million." [295]

### 5. Extraordinary expenses.

"If the Company had embarked on a path of an orderly wind-down, it would not have made sense to pay the large retention bonuses." [296]  Likewise, the "critical/foreign vendor payments for pre-petition goods and services … would have been avoided if the Company pursued an orderly wind-down." [297]  These extraordinary expenses that would have been avoided total almost $400 million. [298]

## III. Defendants' arguments concerning Defendants' unlawful approval of the DIP financing and turnaround fail for multiple reasons.

We address and rebut each of Defendants' contentions concerning the breach of fiduciary duty claims based on approving DIP financing and failing to commence an immediate wind-down.

### A. The law of the case doctrine does not protect Defendants' unlawful conduct.

Defendants assert "the Trust's breach of fiduciary duty claim relating to TRU's decision to obtain DIP financing … is barred by the law of the case doctrine."  Mot. 1.  Defendants point out that the Court entered an order in October 2017 finding that a DIP loan was "necessary and vital to the preservation and maintenance of the going concern values of the DIP Loan Parties," and that the terms "reflect the DIP Loan Parties' exercise of prudent business judgment

---

[294] Ex. 70 (Greenspan) ¶325.
[295] *Id.*
[296] Ex. 70 (Greenspan) ¶328.
[297] Ex. 70 (Greenspan) ¶327, *id.* ¶¶252-53.
[298] Ex. 70 (Greenspan) ¶¶327-28.

consistent with their fiduciary duties." Mot. 6 (quoting ECF No. 711 ¶¶ 5(b), (d)). Defendants

assert that the Court's order "constitutes law of the case in this adversary proceeding and cannot

be disturbed." Mot. 6. Defendants assert that because the final DIP order stated that it was

"binding upon … the Debtors and their respective successors and assigns," and "was never

challenged on any appeal," it follows that the "Final DIP Order is binding on the Trust by its

own terms," and will "prevent the Trust from litigating its findings now." Mot. 7. Defendants'

argument fails at four different levels.

### 1.    Defendants' "by its own terms" premise fails.

Defendants cite no authority—not a single case—to support their argument that the DIP

approval order "by its own terms" suffices to "prevent the Trust from litigating its findings."

Mot. 7. And Defendants cannot cite such a case, because a party is not precluded from litigating

in a later proceeding issues that were addressed in an earlier order unless a preclusion doctrine

applies (e.g. res judicata or law of the case). *LVNV Funding, LLC v. Harling*, 852 F.3d 367, 371

(4th Cir. 2017) ("In bankruptcy, we look to res judicata principles developed in our own case law

to determine whether an earlier federal judgment, including the judgment of a bankruptcy court,

bars a claim asserted in a later action." (internal quotes and cites omitted)). As a matter of law,

the DIP approval order cannot "by its own terms" preclude litigation of an issue in a subsequent

proceeding.

### 2.    The Court's plan confirmation orders bar application of preclusion
### doctrines to claims against the Defendants.

The availability of preclusion is controlled by the Court's plan confirmation order, which

declared that no preclusion doctrine shall apply to claims against the Defendants.

As between the DIP approval order and the Court's plan confirmation order, the latter

governs. The DIP approval order was an interlocutory order, not an appealable final order. "A

final order ends litigation and leaves nothing for the court to do but execute the judgment.  An interlocutory order decides some intervening matter that requires other action to enable the court to adjudicate the cause on the merits." *Cody v. Micale*, Civil Action No. 7:19-MC-4, 2019 U.S. Dist. LEXIS 98333, at *5 (W.D. Va. June 10, 2019) (internal cites and quotes omitted); *Ayers v. United States DOD*, 819 F. App'x 180, 181 (4th Cir. 2020) ("For an otherwise interlocutory bankruptcy court order to be reviewable on appeal, it must finally resolve an adversary proceeding, controversy, or entire bankruptcy proceeding on the merits and leave nothing for the court to do but execute its judgment.").

"An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) (quoting *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991)).  By contrast, "only plan confirmation—or case dismissal—alters the status quo and fixes the rights and obligations of the parties." *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015). Therefore, this Court's "plan confirmation order is a 'final determination' as to those matters it actually addresses." *LVNV Funding, LLC v. Harling*, 852 F.3d 367, 371 (4th Cir. 2017).

The Court entered two parallel plan confirmation orders, one for Toys Delaware and one for Toys Inc.[299]  In both plan confirmation orders, the Court expressly ordered that all claims against the Defendants were preserved, that the Trust had the authority to prosecute those claims without further order from the Court, and that no doctrine of preclusion applied to these claims.

---

[299] The Court entered an order on November 21, 2018 [Docket No. 5476] confirming the Fourth Amended Chapter 11 Plan of Toys Delaware (the "Delaware Plan") [Docket No. 5602], and an order on December 17, 2018 [Docket No. 5979] confirming the Third Amended Chapter 11 Plan of Toys, Inc. (the "Toys Inc. Plan") [Docket No. 5940].

The Court's confirmation order expressly preserved the claims assigned to the Trust and asserted against the Defendants.  The Court's order and the plan defined the term "D&O Party" to mean "all current and former directors, officers, or managers (including Sponsor-affiliated directors, officers, and managers) of the" debtors. [300]  And if defined "D&O Claims" to mean "all claims or Causes of Action" held by the debtors or their creditors "against any D&O Party."[301] The Court ordered that "all claims or Causes of Action against such parties <u>are preserved</u> … and vested in the Non-Released Claims Trust." [302]

The Court further ordered, "For the avoidance of doubt, <u>the claims preserved</u> under the Delaware–Geoffrey Plan and assigned to the Non-Released Claims Trust <u>include, without limitation, all Non-Released Claims including D&O Claims</u>," and the Trust "shall have the right to prosecute" such claims without further "action, order, or approval of the Bankruptcy Court." [303]

Even more significant, the Court's confirmation order included an express provision stating "No preclusion doctrine …. shall apply."

> No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. [304]

---

[300] Dkt. 5602 at 7.

[301] *Id.*

[302] Dkt 5476 (order confirming 4th Amend Chap 11 plan) at 19 (emphasis added).

[303] Dkt. 5746 at 25, ¶49 (emphasis added).

[304] Dkt. 5979 at p. 25, ¶50; Dkt. 5476 at ¶48 (expressly approving "Article IV.K." in the Plan, which governs "Preservation of Rights of Action"); Dkt. 5602 at 33 ("No preclusion doctrine" provision in the plan).

The Toys Inc. Plan and the Court's order confirming that plan contained similar provisions as the Toys Delaware plan and confirmation order. [305]

The Court had good reason for barring the application of preclusion doctrines for claims against the Defendants. It would waste resources and unduly burden the Trust if the Trust had to litigate preclusion issues arising from facts and circumstances that were known to and under the control of Defendants and hidden or obscured from other stakeholders. And it would obviously be unjust to employ estoppel to protect the positions and statements taken by the Toys "R" Us corporations when they were controlled by Defendants, even if the Trust is asserting claims as the successor to those corporations.

And in fact the Court's confirmation order expressly declared that it "shall be … deemed binding upon … all Entities that are parties to or are subject to the settlements, compromises, [and] releases … described in the [Plan]," which means it is binding upon each of the Defendants. [306] The Court further ordered that each of the provisions in the plan governing "the treatment of Claims" "is an integral, integrated, and inextricably linked part of the Settlement Agreement." [307] Accordingly, the "no preclusion doctrine" provision cannot be disregarded or voided without undoing the entire Settlement Agreement.

The Court's confirmation orders expressly declared that no preclusion doctrine shall apply to the claims asserted by the Trust against the Defendants. Those orders eliminated any

---

[305] Docket No. 5979 (confirmation order) at p. 25, ¶50; Docket No. 5940 (Toys Inc. Plan) at 35 ("No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.").
[306] Dkt. 5746 ¶141.
[307] Dkt. 5746 ¶34.

potential preclusive effect from law of the case based on the earlier, interlocutory order

approving the DIP financing.

> ### 3.    Law of the case does not apply because new evidence is available that was not presented to the Court.

The law of the case doctrine cannot apply because critical evidence was not before the

Court when it approved the DIP financing.  "[T]his Court's articulation of the law-of-the-case

doctrine … acknowledges that different facts will lead to a different legal analysis to which the

doctrine cannot apply."  *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) ("when a court is

presented with a different record at a new stage of the case, the law-of-the-case doctrine will no

longer constrain the court's review").

Accordingly, in the face of "substantially different evidence," the "law of the case

doctrine" does not apply.  *Smith v. North Carolina*, 528 F.2d 807, 810 (4th Cir. 1975); *Chase v.

Dep't of Pub. Safety & Corr. Servs*., Civil Action No. ELH-18-2182, 2020 U.S. Dist. LEXIS

68944, at *34 (D. Md. Apr. 20, 2020) ("because different facts will lead to a different legal

analysis, the doctrine does not apply where the factual milieu has expanded since the court's

initial ruling" (internal quotations and citations omitted)); *Am. Canoe Ass'n v. Murphy Farms,

Inc.*, 326 F.3d 505, 516 (4th Cir. 2003) (applying law of the case was "an abuse of discretion"

when party "presented evidence … that had not previously been considered"); *Sejman v.

Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988) (law of the case does not apply if "a

subsequent trial produces substantially different evidence").

For example, the Fourth Circuit in *Smith* held that the law of the case doctrine only

precludes a contrary finding based on "identical evidence," and "in this case there *was* new

evidence" and that "defeats the operation of the law of the case."  *Smith v. North Carolina*, 528

F.2d 807, 810 (4th Cir. 1975).  And in *American Canoe*, the Fourth Circuit held that "the district

84

court abused its discretion" in precluding a party's argument based on law of the case because

the party "presented evidence going to the … issue that had not been previously considered by

the district court." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 516 (4th Cir. 2003).

The Court was provided declarations from Defendant Brandon and Defendant Short. But

in these declarations, and in the motion papers and arguments that relied on these declarations,

the Court, "was given false information and misleading information, was not told important

facts, and was given inadequate information about certain facts regarding both the proposed DIP

financing and the Company's prospects for a turnaround." [308]

### a.    False and misleading information about the DIP financing negotiations and terms.

The testimony from Brandon and Short provided to the Court at the first day hearing

painted the picture that the Company had firm commitments for all of the DIP loans, with all

material terms finalized favorably for the Company. [309] For example, Defendant Short submitted

a declaration stating that the Debtors had "firm commitments for approximately $3,125 million

of combined postpetition financings." [310] And the Court was told that DIP financing had been

negotiated with multiple competing lenders with a "spirited competition" for the DIP Term loan

that allowed the Company "to improve the terms relative to the initial proposal." [311]

The motion papers filed on September 19, 2017, purported to provide "a summary of the

material terms" for the DIP financing facilities, including the financial covenants. [312] Defendant

Short testified that "the facts set forth in each First Day Motion are true and correct." [313] The

---

[308] Ex. 70 (Greenspan) ¶285.
[309] Ex. 70 (Greenspan) ¶286.
[310] Short decl. (Bk. Dkt. 30) at ¶126.
[311] Ex. 70 (Greenspan) ¶286; Sept. 19, 2017, hearing (Dkt 192) at 72, 76-77; Brandon declaration (Bk. Dkt. 20) at 42, ¶99.
[312] Bk. Dkt. 29 at 8, 19, 29; Ex. 70 (Greenspan) ¶289.
[313] Dkt. 30 at ¶7.

only item highlighted at the hearing as still under negotiation was contract language governing the filing of liens on leaseholds. [314]

This portrait of the negotiations and the resulting terms was highly misleading, for the reasons described in greater detail above and reiterated in summary form as follows:  The Court was not told that material financial covenants had not yet been finalized and that the negotiations were not trending in favor of the Company.  The Court was not told that the DIP Term lenders had just added, the night before the First Day hearing, a new requirement for a $175 million minimum liquidity covenant, and were insisting on a January revised budget covenant that would require the Company to assess liquidity in light of the Holiday results and demonstrate that it could still meet the liquidity levels in the original DIP budget.  The summary of material terms given to the Court made no mention of the January revised budget covenant, it made no mention of the $175 million minimum liquidity covenant, and it failed even to disclose that the amount of the required cash flow variance had not been agreed upon. [315]

Moreover, the summary of material terms stated "Milestones: None," [316] but failed to disclose "that covenant 6.16 required the borrowers to complete a specific act by a specified date"—i.e. demonstrate budget compliance by January 31, 2018.  And it failed to disclose that the DIP Term loan lenders "insisted on including the Revised Budget Covenant 6.16 in lieu of the deleted milestones." [317]

Defendant Short, however, was "one of the chief people … involved in negotiating" the covenants and "had ultimate responsibility for deciding what covenants to accept." [318]  Short

---

[314] Ex. 70 (Greenspan) ¶287; Sept. 19, 2017, hearing (Dkt 192) at 147-49.
[315] Bk. Dkt. 29 at 8, 19, 29; Ex. 70 (Greenspan) ¶289.
[316] Bk. Dkt. 29 at 28.
[317] Ex. 70 (Greenspan) ¶¶262, 289; Ex. 11 (3'2'18 Geier re 6.16 [TRU-Trust0000302970]).
[318] Ex. 87 (Short depo.) 205:14-17, 227:15-23.

knew about the new $175 million minimum liquidity covenant and specifically described it in an email on the evening of September 18, 2017, as a "new ask," i.e. a new covenant from the DIP Term lenders. [319]  Short also knew on the evening of September 18, that "the budget covenant that was ultimately agreed to" was proposed by the lenders as a covenant "tied to missing the DIP budget." [320]

The Court was provided none of this information at the hearing on September 19, 2017.

> **b.    False and misleading information about the DIP budget projections.**

The Court was provided a financial projection (DIP budget). [321]  The Court was told that this financial projection was reliable, and that the Company could comfortably satisfy the financial covenants with no concerns for liquidity. [322]  Defendant Short declared that "the Budget and projections provide an accurate reflection of the funding requirements for the North American and international operations over the identified period and are reasonable and appropriate under the circumstances." [323]  Short also declared that the DIP financing "will ensure that the Debtors have the necessary liquidity to continue to operate without material disruption."[324]  And Brandon declared the "DIP Facilities … will provide them with sufficient liquidity to stabilize operations, implement their holiday business plan, and negotiate a consensual plan of reorganization with their lenders." [325]

---

[319] Ex. 87 (Short depo.) 243:4-18 ("she mentions the B lenders would like a liquidity covenant" and "your response to her, 'Is this a new ask?'").
[320] Ex. 87 (Short depo.) 244:21-245:7.
[321] Dkt. 29 at 145.
[322] Ex. 70 (Greenspan) ¶290; Dkt. 29 at 145.
[323] Short decl. (Bk. Dkt. 30) at ¶129.
[324] Short decl. (Bk. Dkt. 30) at ¶130.
[325] Brandon declaration (Bk. Dkt. 20) at p. 42, ¶99.

Once again, critical facts were not disclosed to the Court regarding the financial

projections and the Company's projected liquidity.  The Court was provided a DIP budget and

forecast but was not provided the same store sales and profit margin assumptions used for the

forecast, and was not told that "those assumptions were above trend, and, therefore, high risk and

unrealistic." [326]  As described in greater detail above, none of the Company's advisors had

offered the opinion that the Company was likely to be able to comply with the January revised

budget covenant or the $175 million minimum liquidity covenant.  In fact, the Company and its

advisors had concluded that the Company needed a liquidity cushion of $200 million, and that

the $175 million minimum liquidity covenant would result in a cushion of less than $50 million,

even using the unrealistic DIP budget projection. [327]  The Court was not told that Bandon and

Short and the Company's advisors had concluded that the January revised budget covenant "just

isn't going to work." [328]  And the Court was not told that Short concluded that the $175 million

liquidity covenant "doesn't work." [329]  The Court was not told that Defendants Brandon and

Short had concluded that the January revised budget covenant and the $175 million minimum

liquidity covenant were too risky and, as a result, that they were seeking to find a new lender as

of the first-day hearing date, or that they had sought to find a new lender, but could not do so, as

of the final hearing date.

        c.        **False and misleading information about the Directors'
assessment of the DIP financing.**

The Court was told that the Directors were "very highly sophisticated financial people"

who were "restructuring professionals in their prior lives and understand the process very

---

[326] Ex. 70 (Greenspan) ¶292.
[327] Ex. 70 (Greenspan) ¶291.
[328] Ex. 70 (Greenspan) ¶100; Ex. 48 (9'18'17 2244 pm [LZ-TRU0092221]) at 4.
[329] Ex. 70 (Greenspan) ¶104; Ex. 57 (9'20'17 0652 am [TRU-Trust0000075725]).

well."[330]  That part was true.  But the Court was also told that "the board is fully informed as to all of the aspects, terms, and conditions of this DIP financing," that the Directors were "very involved," and were kept "very closely advised and updated" on the DIP financing, and provided "a lot of feedback and direction." [331]  None of that was true.

The Court was not told that the Directors had not been kept closely advised, did not even know the terms of the financial covenants, did not receive any analysis of the Company's ability to comply with the covenants, did not seek out any of the needed information or advice to assess the covenants, and did not provide any material feedback and direction apart from rubber-stamping the result. [332]

### d.    False and misleading information about the turnaround plan.

The Court was told that the Company had a turnaround plan, that it was implementing the plan immediately, and that the DIP financing provided the funding needed for that turnaround.[333] Brandon in his first-day declaration stated: "In addition, and of critical importance, the debtor-in-possession financing also provides the Company with hundreds of millions of dollars of new money that is available for immediate and direct investment in the Company's stores and operations." [334]

Brandon further stated in his declaration that the DIP financing includes "significant capital to immediately invest in operations" and "the DIP Financing … includes approximately $1.0 billion of new money commitments that will allow the Debtors to make significant operational investments and drive in-store sales." [335]

---

[330] Sept. 19, 2017, hearing (Dkt 192) at 85-86.
[331] *Id.*
[332] Ex. 70 (Greenspan) ¶295.
[333] Ex. 70 (Greenspan) ¶¶304-09.
[334] Brandon declaration (Bk. Dkt. 20) at 6-7, ¶13.
[335] Brandon declaration (Bk. Dkt. 20) at ¶¶69, 103.

Brandon declared: "Investment in Growth Begins Today" and "This turnaround begins today."[336] Brandon stated that "the Company has developed a four-pillared business plan designed to improve the customer experience, operations and drive sales," and that to "execute on all four of the strategic pillars, the Debtors have identified a comprehensive set of key initiatives," which he spelled out in detail in his declaration.[337]

In reliance on Brandon's declaration, the Court was told at the first day hearing: "we're going to reinvest in operations, and that's going to begin today."[338] And at the final hearing on October 25, 2017, the Court was told that the Company was "in the process of implementing all … four pillars to the company's go-forward plan" using the "significant amount of new money, massive liquidity, available to implement the business plan that we talked about."[339]

All of these statements about the Company's purported "turnaround plan" were highly misleading. As discussed in detail above, the Company did not have a turnaround plan, and had no prospects for coming up with a viable turnaround plan. The Company was not commencing the turnaround "today" or "immediately" and was not using the DIP financing for "immediate and direct investment in the Company's stores and operations," as Brandon had testified. As explained above, the plan was to get through the Holiday season and then in January attempt to come up with a plan.[340] The Court was not told that the amount of money from the DIP financing budgeted for capital improvements for turnaround was only $125 million, a small fraction of what would be required by a transformative turnaround plan.[341] And the Court was

---

[336] Brandon declaration (Bk. Dkt. 20) at p. 30, ¶69.
[337] Brandon declaration (Bk. Dkt. 20) ¶¶70-78.
[338] Sept. 19, 2017, hearing (Dkt 192) at 33.
[339] Oct. 25, 2017, hearing trans. (Bk. Dkt. 749) at 14-15.
[340] Ex. 70 (Greenspan) ¶311.
[341] Ex. 70 (Greenspan) ¶311.

90

not told that this $125 million in capital was not available "immediately," but instead was budgeted to be available commencing after February 2, 2018, and that this capital would only be available if budget covenant 6.16 were satisfied, which was highly unlikely. [342]

### e.    False and misleading information reiterated at the final hearing.

For the final hearing on October 25, 2017, the Court was not provided sufficient disclosures or updated information on any of the above facts. [343]  Instead, the Court was asked to "incorporate the record from the first-day hearing … for purposes of the evidentiary record," which included the declarations of Brandon and Short. [344]

The text of the financial covenants was included in a 708-page filing on the bankruptcy docket on September 22, 2018. [345]  But the new January revised budget covenant and the $175 million minimum liquidity covenant were not brought to the attention of the Court.  In the Debtors' Omnibus Reply brief filed on October 24, 2017, the Court was advised of certain changes to the proposed final order, such as a resolution of the dispute concerning liens on leases (which had been discussed at the First Day hearing). [346]

But the brief did not advise the Court of the financial covenants that were added to the Term DIP loan after the first day hearing. [347]  The only change in terms for the Term DIP loan identified for the Court was that the B-2 and B-3 debt holders "negotiated for a slightly enhanced adequate-protection payment." [348]

---

[342] Ex. 70 (Greenspan) ¶311.
[343] Ex. 70 (Greenspan) ¶296.
[344] Oct. 25, 2017, hearing trans. (Bk. Dkt. 749) at 19.
[345] Notice of Filing of NA DIP (Bk. Dkt. 158).
[346] Debtors' Corrected Omnibus Reply (Bk. Dkt. 688) at 4.
[347] Id.
[348] Oct. 25, 2017, hearing trans. (Bk. Dkt. 749) at 20.

Moreover, if someone had gone through the 700 pages of loan documentation in docket 158 and read the language of the January revised budget covenant and the $175 million minimum liquidity covenant, "they likely would not have appreciated their significance without knowing the background and drafting history that was known to Brandon and Short." [349]

In the original credit agreement filed with the Court on September 19, 2017, the liquidity covenant (section 7.18) tracked a similar covenant in the ABL Credit Agreement, and it appeared that it "did not impose any additional limitations on liquidity beyond the $125 million block in the ABL agreement." [350]  But when section 7.18 was finally negotiated and agreed to on September 22, 2017, it actually imposed an additional requirement to maintain liquidity of $175 million in excess of the $125 million. [351]  But that effect was not immediately obvious from reading the language of the covenant (and, in fact, it even deceived Defendant Short when he first encountered the proposal). [352]

Even more troubling was the January revised budget covenant, section 6.16, which certainly required additional information to appreciate its significance.  "For someone who was not aware of the history of negotiations for covenant 6.16, its wording was deceptively innocuous." [353]  The required action was merely to "propose revisions to the budget" and it contained phrases "that suggested leeway." [354]

But the Court (and other stakeholders such as the UCC) were not told that the lenders for the DIP Term loan (the "B4 lenders") had "insisted on 6.16 to serve as a substitute for specific

---

[349] Ex. 70 (Greenspan) ¶¶298-303.
[350] Bk. Dkt. 29 at pdf 479; Ex. 70 (Greenspan) ¶299.
[351] Ex. 70 (Greenspan) ¶299; Notice of Filing Final NA DIP Agreements (Bk. Dkt. 158) at 673.
[352] Ex. 70 (Greenspan) ¶300; Ex. 59 (9'21'17 Kurtz re covenant negotiations [LZ-TRU0086423]) at 1.
[353] Ex. 70 (Greenspan) ¶301.
[354] Ex. 70 (Greenspan) ¶301; Notice of Filing Final NA DIP Agreements (Bk. Dkt. 158) at 656.

milestones to give them a chance to pull the plug if the Company's Holiday sales did not perform as forecast." [355] "This budget covenant was required by the B4 lenders after case-related milestones were eliminated from the DIP agreements. The B4 lenders demanded this covenant to have visibility into holiday results in the face of potential investment of their DIP funds into go-forward business initiatives." [356]

Moreover, covenant 6.16 allowed the Company to meet the revised budget requirement through "reductions … to SG&A, capital expenditures and/or other cash outlays." [357] But only insiders with access to the Company's internal financial information knew that the Company did not have cost-cutting or capital reductions "as an available tool to offset large revenue shortfalls." [358] The Court (and the UCC) were not told that if the Company did not achieve the holiday sales levels set forth in the (unrealistic and far too optimistic) DIP budget, significant budget cuts would not be available to bring the budget back in line to achieve the liquidity levels required by covenant 6.16. [359] For Brandon and Short, the default on the covenant was "virtually inevitable" and "[t]here was nothing about the default … that wasn't in plain sight" for them. [360] But that information was not shared with the Court or the UCC.

Defendant Short had actively participated in the negotiations that led to 6.16, and he was well aware of its requirements and dangers. [361] But the Court and the UCC were not told about the history or purpose of covenant 6.16 and received no explanation of its significance.

---

[355] Ex. 70 (Greenspan) ¶302.
[356] Ex. 11 (3'2'18 Geier re 6.16 [TRU-Trust0000302970]).
[357] Notice of Filing Final NA DIP Agreements (Bk. Dkt. 158) at 656.
[358] Ex. 70 (Greenspan) ¶¶126-129.
[359] Ex. 70 (Greenspan) ¶303.
[360] Ex. 86 (Greenspan depo.) 131:11-13, 131:24-133:22.
[361] Ex. 87 (Short depo.) 205:14-17, 227:15-23; Ex. 70 (Greenspan) ¶303; Ex. 55 (9'19'17 1737 pm Bhandari [TRU-Trust0000074218]) at point 4 (covenant 6.16 was being negotiated in a

Defendant Short admitted that he knew that the DIP Term Loan covenants had been negotiated "after the court hearing on the 19th" but that he did not "ask anyone to notify the court that a new covenant had been negotiated and added to the … term DIP loan." [362]

Moreover, at the October 24, 2015 hearing the Court was again not told the facts described above:

- The Directors had not performed their fiduciary duties, and had made no assessment of the Company's ability to comply with the financial covenants, and had not even asked to receive such an assessment from management or the financial advisors.

- That DIP budget and forecast provided to the Court was based on a manipulated revenue projection that would be virtually impossible to achieve.

- Even using the unrealistic DIP budget, projected liquidity (taking into account the new $175 million liquidity covenant) that was more than $150 million less than the amount that Alvarez & Marsal concluded was necessary.

- Bandon and Short had concluded that the January revised budget covenant "just isn't going to work" and the $175 million liquidity covenant "doesn't work."

- The Company did not have a turnaround plan, and had no prospects for coming up with a viable turnaround plan, and the Company was not commencing the turnaround "today" or "immediately" as Brandon had testified.

---

"conversation between Mike and Randy at Marathon"); Ex. 84 (Sussberg) 96:11-16, 97:6-25, 99:22-100:15, 102:8-103:10.
[362] Ex. 87 (Short depo.) 256:9-257:2.

- The amount of money from the DIP financing budgeted for capital improvements for turnaround was only $125 million, a small fraction of what would be required by a transformative turnaround plan, and that the amount was not available "immediately," but would only be available if budget covenant 6.16 were satisfied by January 31, 2018, which was highly unlikely.

To call these facts "material" is an understatement.  These facts explain how and why the Toys "R" Us bankruptcy resulted in $800 million in unpaid administrative claims, "the largest administrative insolvency in the history of this country." [363]

Therefore, "in this case there *was* new evidence" and that "defeats the operation of the law of the case."  *Smith v. North Carolina*, 528 F.2d 807, 810 (4th Cir. 1975).

### 4.    The Court's order approving DIP financing did not address the issues asserted against Defendants.

Finally, the Defendants' law of the case argument also fails because the Court's order approving DIP financing did not actually address the issues asserted in the claims against the Defendants.  Furthermore, the Court found only that the DIP Loans were needed to permit "the orderly continuation of the operation of their businesses," and maintenance of the Debtors as a "going concern." [364]  The Court did not consider, and did not issue a ruling on, whether greater value would be preserved by an immediate wind-down rather than by maintaining the Company as a going concern and attempting a highly speculative turnaround.  Similarly, the Court's order stated only that the "DIP Loan Parties," i.e. the corporate entities, exercised prudent business

---

[363] Ex. 86 (Greenspan depo.) 133:9-17; Ex. 70 (Greenspan) ¶319; Ad Hoc Vendor Group's Statement in Support of Debtor's Motion re Settlement (Bk. Dkt. 4030) at 3 ("approximate $800 million of administrative claims that were owed by the Debtors").
[364] Bk. Dkt. 711 at 18, ¶5(b).

judgment. [365]  The Court received no evidence on, and did not consider, what the individual

directors had done or not done in approving the DIP financing, and therefore the Court did not

issue specific rulings on, whether the Director Defendants complied with their fiduciary duties.

**B.      Judicial estoppel does not protect Defendants' unlawful conduct.**

Defendants assert that the "Trust is estopped from alleging that the DIP financing was a

breach of Defendants' fiduciary duty," because "the Trust's counsel and the UCC argued in

favor of the DIP financing."  Mot. at 7-8.  This argument fails for multiple reasons.

**1.      The Trust is not a successor to the UCC and Mattel and is not bound by their prior statements.**

The statements and positions taken by the UCC and Mattel cannot create an estoppel

because the Trust is not their successor.

The Defendants assert the estoppel defense against breach of fiduciary duty claims

assigned to the Trust from Toys Delaware and Toys Inc.  These claims assert that Defendants, in

their capacities as officers and directors of the two Toys "R" Us corporations, breached their

fiduciary duties to the corporations.  In asserting those claims, the Trust is the successor to the

corporations and stands in the shoes of the corporations.

Statements made by the UCC or counsel for Mattel could not possibly estop these two

corporations—Toys Delaware and Toys Inc.—from bringing claims for breaches of fiduciary

duty.  And because the Trust is the successor in interest to the corporations, such statements

equally cannot estop the Trust.  By contrast, in the *Geruschat* case cited by Defendants, the

plaintiffs were unsecured creditors of the debtor who, after plan confirmation, sought to continue

to assert their own claims in their capacity as creditors.  *Geruschat v. Ernst & Young, LLP (In re*

*Earned Capital Corp.)*, 331 B.R. 208, 224 (Bankr. W.D. Pa. 2005).

---

[365] Bk. Dkt. 711 at 19, ¶5(d).

Likewise, the *Ryan* case cited by Defendants does not imply, much less hold, that a party may be estopped based on statements of a creditor's committee. *Ryan, Inc. v. Circuit City Stores, Inc.*, 2010 U.S. Dist. LEXIS 120627, at *13-14 (E.D. Va. Nov. 15, 2010). In fact, the case has nothing whatsoever to do with estoppel (the case does not even mention estoppel or any other preclusion doctrine). The language quoted by Defendants is simply a court identifying the support of the committee of unsecured creditors as one reason for approving the debtor's rejection of an executory contract.

The Trust is not a successor to the UCC for any purpose and therefore is not responsible for, or bound by, any statements or positions taken by the UCC. The Trust is a successor to Mattel only as to Mattel's fraud and other tort claims against the Defendants; not as to any breach of fiduciary duty claims. Therefore, for purposes of the Trust's breach of fiduciary duty claims, the Trust is not a successor to either the UCC or Mattel. No estoppel can apply.

Defendants assert that estoppel of the Trust for breach of fiduciary duty may stem from statements made by the UCC because the Trust "is pursuing claims on behalf of the UCC's constituency." Mot. 7. That assertion is false. Four of the 37 fraud claims asserted by the Trust were assigned from members of the UCC, but not the breach of fiduciary duty claims against which Defendants assert the estoppel defense. In asserting the breach of fiduciary duty claims, the Trust is not a successor to any of the UCC members, and therefore cannot possibly be estopped in asserting the fiduciary duty claims.

Finally, Defendants assert that the "Trust's counsel" argued in favor of the DIP financing. Mot. at 7. That is false. When Mr. Eckstein appeared before the Court in October 2017, he was not speaking on behalf of the Trust. Mr. Eckstein was counsel for the UCC.

## 2.    The Court's confirmation order bars application of preclusion doctrines, including estoppel.

As discussed above, the Court's confirmation orders require that "No preclusion doctrine, including the doctrines of … estoppel (judicial, equitable, or otherwise) … shall apply to such Causes of Action" (i.e. to claims asserted against the former directors and officers of Toys "R" Us). [366]

The Court had good reason for doing so.  It would waste resources and unduly burden the Trust if it had to litigate preclusion issues arising from facts and circumstances that were known to and under the control of Defendants and hidden or obscured from the other stakeholders.  And it would obviously be unjust to employ estoppel to protect the positions and statements taken by the Toys "R" Us corporations when they were controlled by Defendants, even if the Trust is asserting claims as the successor to those corporations.

As the Court ruled in the confirmation order, the "no preclusion doctrine" provision was an "integral, integrated, and inextricably linked part of the Settlement Agreement" and, therefore, cannot be disregarded. [367]  Moreover, as the Court ruled, it was binding on the Defendants because they are "subject to the settlements, compromises, [and] releases … described in the [Plan]." [368]

## 3.    The Trust has not engaged in bad faith or an attempt to intentionally mislead the court.

One of the three elements that "must be satisfied before judicial estoppel will be applied" is that "the party against whom judicial estoppel is to be applied must have intentionally misled the court to gain unfair advantage."  *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007).

---

[366] Dkt. 5746 (Delaware order) ¶48; Dkt. 5602 (Delaware plan) at 33; Dkt. 5979 (Toys Inc. order); Dkt. 5940 (Toys Inc. plan) at 35.
[367] Dkt 5746 ¶34.
[368] Dkt. 5746 ¶141.

Defendants entirely ignore this element, and they cannot prove that the Trust ("the party against whom judicial estoppel is to be applied") "intentionally misled the court to gain unfair advantage." *Id.*

This element is not optional.  It is a "longstanding principle that judicial estoppel applies only when the party who is alleged to be estopped intentionally misled the court to gain unfair advantage." *Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (internal quotes omitted) (reversing district court's grant of summary judgment erroneously premised on judicial estoppel).  "The determinative factor in the application of judicial estoppel is whether the party who is alleged to be estopped intentionally misled the court to gain unfair advantage." *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995) (internal quotes omitted).

As the Fourth Circuit held in *Zinkand*, "Without bad faith, there can be no judicial estoppel." *Id.* (holding that "the district court made a clear error of law and consequently abused its discretion" by applying judicial estoppel in the absence of bad faith); *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 867 F.3d 449, 458 (4th Cir. 2017) (holding that "the district court committed legal error in applying judicial estoppel and, therefore, abused its discretion").

Moreover, showing the required level of intent and bad faith is a high bar.  "Courts must proceed with caution" and "intent to mislead" must be "clear." *John S. Clark*, 65 F.3d at 29 (reversing district court because "it is not clear that Clark had the intent to mislead which is required to invoke judicial estoppel").  For example, in the only Fourth Circuit case cited by Defendants, the estopped party was (a) "explicitly" misleading one court by hiding a prior settlement agreement so that the party could appeal the claim that the agreement settled, "while

at the same time" (b) relying on the same settlement agreement in an enforcement proceeding before another court. *Guinness PLC v. Ward*, 955 F.2d 875, 899-900 (4th Cir. 1992).

Defendants do not assert, much less attempt to prove, bad faith or an attempt to intentionally mislead a court. This is fatal to Defendants' argument because "judicial estoppel is an affirmative defense." *Thomas v. FTS USA, LLC*, No. 3:13cv825, 2016 U.S. Dist. LEXIS 82679, at *44 n.7 (E.D. Va. June 24, 2016). Because it is an affirmative defense, Defendants bear the burden of proof.

"Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense." *Ray Communs., Inc. v. Clear Channel Communs., Inc.*, 673 F.3d 294, 299-300 (4th Cir. 2012). And "where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Id.*

Because Defendants do not mention a bad faith intentional attempt to mislead—much less offer undisputed evidence proving it—Defendants' defense fails as a matter of law.

Ironically, Defendants' assertion of judicial estoppel is itself made in bad faith. In opposing the motion to dismiss, the Trust called Defendants' attention to the controlling Fourth Circuit law setting forth the elements of judicial estoppel. [369] And the Trust pointed out to Defendants that judicial estoppel was an affirmative defense for which Defendants bore the burden of proof. [370] It is therefore inexplicable that Defendants would proceed with a motion for summary judgment that entirely ignores the requirement that Defendants prove bad faith.

---

[369] Dkt. #6 at 13-14.

[370] *Id.* at 15.

In fact, the undisputed evidence demonstrates that the Trust has not engaged in a bad faith attempt to intentionally mislead the Court.  Defendants do not assert that the Trust has no basis for asserting breaches of fiduciary duties by the Defendants in this case.  Nor could they.  The Trust's allegations are well supported by overwhelming evidence, including documentary evidence and admissions from the Defendants themselves.

Nor do Defendants assert that the statements made by the UCC and counsel for Mattel in October 2017 were made in bad faith or were designed to intentionally mislead the Court.  There is no evidence suggesting that, when the UCC and Mattel supported the DIP financing in October 2017, they did not believe their positions and were attempting to mislead the Court.

This is not a circumstance where the Trust is attempting to mislead the Court in this case, or where the UCC and Mattel were attempting to do so in 2017.  There is no credible evidence of bad faith.

> **4.      Because the Trust's position is based on facts not known to the UCC or Mattel, judicial estoppel cannot apply.**

Estoppel does not bar a party from asserting inconsistent positions if the later position is based on facts not known to it when it asserted the earlier position.

Because the "vice which judicial estoppel prevents is the cold manipulation of the courts" "[i]t is inappropriate, therefore, to apply the doctrine when a party's prior position was based on inadvertence or mistake."  *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995), *quoted with approval by New Hampshire v. Maine*, 532 U.S. 742, 753 (2001).  "Jurisdictions recognizing judicial estoppel also refuse to apply the doctrine when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court.  An unintentional error is not penalized by precluding subsequent assertion of the truth.  Because the rule looks toward cold manipulation and not unthinking or confused blunder, it has

never been applied where plaintiff's assertions were based on fraud, inadvertence, or mistake."
*Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C. Cir. 1980) (internal quotes omitted), *cited with approval by approval by New Hampshire v. Maine*, 532 U.S. 742, 753 (2001).

The UCC and Mattel were not aware of, and had no way of knowing, the many facts that have come to light as the result of the Trust's investigation. In September and October 2017, the UCC and Mattel were subjected to the same misinformation, false statements, and concealed information that the Court received at that time (as discussed in detail above). The UCC and Mattel "received misleading information," were "not told important facts," and were "given inadequate information" regarding both the proposed DIP financing and the Company's prospects for a turnaround. [371]

The Trust's position in this case is based on all of the evidence and facts that were known only to Defendants in the fall of 2017.

### 5. Defendants do not assert, and could not assert, collateral estoppel.

Defendants style this defense as "estoppel," and frame their argument in terms consistent with the doctrine of judicial estoppel, which is what the Defendants also asserted in their motion to dismiss, and pleaded in their answer. Defendants do not assert "collateral estoppel," which would fail for even more reasons than judicial estoppel.

1.      Collateral estoppel is an affirmative defense and must be pleaded in an answer for it to be preserved. Fed. R. Civ. P. Rule 8 ("a party must affirmatively state any avoidance or affirmative defense, including … estoppel … res judicata"). Defendants failed to plead the affirmative defense of collateral estoppel. [372]

---

[371] Ex. 70 (Greenspan) ¶312.
[372] Dkt. 149 at 136-37.

2.      Because it is an affirmative defense, on summary judgment Defendants have the

burden of setting forth each element and proffering undisputed evidence establishing each

element. *Ray Communs., Inc. v. Clear Channel Communs., Inc.*, 673 F.3d 294, 299-300 (4th Cir.

2012).  Defendants failed to do so.

3.      The defense of collateral estoppel requires proof that "the issue sought to be

precluded is identical to one previously litigated."  *Collins v. Pond Creek Mining Co.*, 468 F.3d

213, 217 (4th Cir. 2006) (internal quotes omitted).  Defendants cannot show that "the identical

issue was previously adjudicated."

4.      The defense of collateral estoppel requires proof that "the party against

whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the

previous forum."  *Collins*, 468 F.3d at 217.  Defendants cannot prove that element.  "It is not

possible … to have had a full and fair opportunity to litigate when the most essential facts were

excluded."  *Geruschat v. Ernst & Young, LLP (In re Earned Capital Corp.)*, 331 B.R. 208, 227

(Bankr. W.D. Pa. 2005).

**C.      The exculpatory provision does not protect the Defendants against any of the
Trust's claims.**

Defendants assert the Defendant Directors "are immunized from the Trust's claim that

they breached their duty of care in approving the DIP financing in their capacity as company

directors pursuant to the exculpatory clause" in the Company's certificate of incorporation.  Mot.

10-11.  This contention fails at four levels.

*First*, "the shield from liability provided by a certificate of incorporation provision

adopted pursuant to 8 Del. C. § 102(b)(7) is in the nature of an affirmative defense."  *Emerald*

*Partners v. Berlin*, 726 A.2d 1215, 1223 (Del. 1999).  Defendants were required to plead all

asserted affirmative defenses in their answer. Fed. R. Civ. P. 8(c) ("a party must affirmatively

103

state any avoidance or affirmative defense").  Defendants failed, however, to plead the defense of exculpation. [373]

Moreover, because exculpation is an affirmative defense, Defendants "bear the burden of establishing each of its elements."  *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999).  Defendants failed to set forth admissible evidence establishing each of its elements as an undisputed fact and, therefore, cannot prevail on summary judgment.  "Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense."  *Ray Communs., Inc. v. Clear Channel Communs., Inc.*, 673 F.3d 294, 299-300 (4th Cir. 2012).  And "where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing."  *Id*.

*Second*, when the defense is available, an exculpatory provision can apply only to a claim for breach of the duty of care.  8 Del. C. § 102(b)(7).  An exculpatory provision has no effect on claims for breach of the fiduciary duty of loyalty or breach of the fiduciary duty of good faith.  8 Del. C. § 102(b)(7) ("such provision shall not eliminate or limit the liability of a director: For any breach of the directors' duty of loyalty [or] … for acts or omissions not in good faith"); *Leal v. Meeks (In re Cornerstone Therapeutics, Inc.)*, 115 A.3d 1173, 1179-80 (Del. 2015) (holding that exculpation is not effective if "the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith").  The exculpatory provision, therefore,

---

[373] Dkt. 149 at 136-38.

does not protect Defendants against the Trust's claims for breach of the fiduciary duty of loyalty and breach of the fiduciary duty of good faith.

*Third*, if a director's conduct is a breach of the duty of loyalty or the duty of good faith in addition to breaching the duty of care, then the exculpatory provision will not suffice, and a breach of the duty of care may also be asserted against the directors.  *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001) ("a Section 102(b)(7) charter provision bars a claim that is found to state only a due care violation"); *Miller v. Greystone Bus. Credit II, L.L.C. (In re USA Detergents, Inc.)*, 418 B.R. 533, 545 (Bankr. D. Del. 2009) ("Because, as explained in further detail below, the Trustee alleges facts sufficient to sustain a cause of action for breach of the duties of loyalty and good faith, the Director Defendants cannot invoke the exculpation clause and the Court will not dismiss the claims for breach of the duty of due care."); *Bridgeport Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 568 (Bankr. D. Del. 2008) ("In this case, the Trust has alleged facts supporting a breach of the duty of loyalty as well as a lack of good faith, in addition to a breach of the duty care. Since these questions of the D&O Defendants' loyalty or lack of good faith trigger entire fairness review, an exculpatory provision simply cannot justify a dismissal of the duty of care claims.").  Because the facts establish that Defendants breached their duties of loyalty and good faith, the exculpatory provision does not protect them from liability for breaching their duty of care.

*Fourth*, the protection of the exculpatory provision applies only to a "director of the corporation."  Mot. 10.  The provision therefore cannot shield the actions of Brandon and Short in their capacities as officers of the Company.  *In re Mindbody, Inc.*, 2020 Del. Ch. LEXIS 307, at *71 (Ch. Oct. 2, 2020) ("an officer … is not exculpated by the Company's 102(b)(7)

105

provision" (internal quotes omitted)); *McPadden v. Sidhu*, 964 A.2d 1262, 1275 (Del. Ch. 2008)

("an officer does not benefit from the protections of a Section 102(b)(7) exculpatory provision").

>          **D.      The business judgment rule does not protect Defendants' conduct.**

Defendants contend that "the business judgment rule prevents the Trust from challenging

… the Board's decision to obtain DIP financing."  Mot. 11.  This contention fails for four

reasons.

The business judgment rule "may only be invoked by directors who are found to be not

only 'disinterested' directors, but directors who have both adequately informed themselves

before voting on the business transaction at hand <u>and</u> acted with the requisite care." *Cede & Co.

v. Technicolor*, 634 A.2d 345, 367 (Del. 1993) (emphasis in original).  Therefore, "proving that

the defendant breached her duty of loyalty or her duty of care" will be sufficient for "rebutting

one of the business judgment rule's presumptions." *Basho Techs. Holdco B, Ltd. Liab. Co. v.

Georgetown Basho Inv'rs, Ltd. Liab. Co.*, No. 11802-VCL, 2018 Del. Ch. LEXIS 222, at *55

(Ch. July 6, 2018).

Moreover, the duty of good faith is a component of the duty of loyalty, because a

"director cannot act loyally towards the corporation unless she acts in good faith." *Stone v.

Ritter*, 911 A.2d 362, 369-70 (Del. 2006).  Therefore, demonstrating a breach of the duty of good

faith also removes the protection of the business judgment rule. *Brehm v. Eisner (In re Walt

Disney Co. Derivative Litig.)*, 906 A.2d 27, 52 (Del. 2006) ("Those presumptions can be rebutted

if the plaintiff shows that the directors breached their fiduciary duty of care or of loyalty or acted

in bad faith. If that is shown, the burden then shifts to the director defendants to demonstrate that

the challenged act or transaction was entirely fair to the corporation and its shareholders.").  In

particular, the business judgement rule cannot be invoked against a claim for abdication of

directorial duties. *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984).

106

Defendants' contentions fail on all counts.

> **1.    The business judgment rule does not apply because Defendants failed to inform themselves of all material information that was reasonably available to them.**

Directors and officers "have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Cede & Co. v. Technicolor*, 634 A.2d 345, 371 (Del. 1993). "[T]he failure of the members of the board to adequately inform themselves represented a breach of the duty of care, which of itself was sufficient to rebut the presumption of the business judgment rule." *Cede & Co. v. Technicolor*, 634 A.2d 345, 371 (Del. 1993).

As described above, Defendants failed to inform themselves of critical information before voting to approve the DIP financing and the turnaround strategy. This information included:

- The terms of the key financial covenants for the DIP financing;

- A projection or financial model that could be used to assess available liquidity of the Company;

- The key assumptions underlying a financial model, including sales, margins, operating costs, and capital expenditures;

- A sensitivity analysis showing the results of reasonable downside cases;

- An analysis from advisors or management of the Company's ability to comply with all financial covenants for the DIP financing;

- An assessment of whether the Company could plausibly come up with a viable turnaround plan;

- An estimate of the capital required for a turnaround and assessment of whether the DIP financing provided the Company with sufficient liquidity to attempt a turnaround;

- An assessment of the timing of a turnaround and the timing of expected benefits from a turnaround;

- An analysis of the likely "costs and losses that would occur "from a forced liquidation resulting from a covenant default;"

- An analysis of the additional operating losses, costs, and expenses that the Company would incur by the liquidation of the U.S. business. [374]

This information was reasonably available and, in fact is what is always done in similar circumstances. [375]  And, as discussed above, Defendants knew that this was the information they should be gathering before arriving at a decision.  Yet Defendants failed even to ask for this information.

In an analogous case, directors approved a leveraged buyout transaction but "failed to review cash projections indicating that the debtor would be left with insufficient capital after the LBO."  *Bridgeport Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 569 (Bankr. D. Del. 2008).  As a consequence, "the directors did not fulfill their duty to inform themselves, prior to making that business decision, of all material information reasonably available to them."  *Id.* (internal quotes omitted).

Because Defendants failed to inform themselves of all material information reasonably available to them, the business judgment rule does not protect them.

 2. **The business judgment rule does not apply because Defendants failed to act with requisite care.**

For the business judgment rule to apply, directors and officers "must then act with requisite care in the discharge of their duties."  *Cede & Co. v. Technicolor*, 634 A.2d 345, 367

---

[374] *See, e.g.* Ex. 70 (Greenspan) ¶¶157, 272-276; 279
[375] Ex. 70 (Greenspan) ¶¶54-57, 141-42, 157, 159.

(Del. 1993).  As detailed above, Defendants engaged in gross negligence and failed to exercise

due care in approving the DIP financing, authorizing an attempted turnaround, and failing to

consider (and then direct) an immediate wind-down.  As a result, the business judgment rule

does not apply.

### 3. The business judgment rule does not apply because Defendants abdicated their duties.

In addition, the business judgement rule cannot be invoked against a claim for abdication

of directorial duties.  "[T]he business judgment rule … has no role where directors have …

abdicated their functions."  *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984); *Bridgeport*

*Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 569

(Bankr. D. Del. 2008) ("where a loss results from director inaction, the protections of the

business judgment rule do not apply"); *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693,

748 n.418 (Del. Ch. 2005) ("the business judgment rule does not apply to director inaction").

As detailed above, the facts demonstrate that Defendants entirely abdicated their duty to

assess the Company's ability to comply with financial covenants in the DIP financing.  This

evidence establishes that the Directors "adopt[ed] a 'we don't care about the risks' attitude

concerning a material corporate decision" and thereby breached their fiduciary duties.  *In re Walt*

*Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003), *aff'd Brehm v. Eisner (In re*

*Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 63 (Del. 2006) (holding that bad faith may be

shown by evidence demonstrating a "conscious[] and intentional[] disregard[] [of]

responsibilities, adopting a 'we don't care about the risks' attitude").

In addition, the facts detailed above demonstrate that Defendants knew that the U.S.

business met all the criteria for a business that needed an immediate wind-down, knew that

having the Company max out its DIP financing and continue in operation would cost hundreds of

millions of dollars in additional operating losses and restructuring costs. They knew that their fiduciary duties required them to assess all reasonable alternatives, and to gather all information reasonably available before making a decision. But Defendants entirely abdicated that duty and failed to act.

Because the evidence demonstrates that Defendants abdicated their functions, the business judgment rule cannot protect them.

### 4. The business judgment rule does not apply because Defendants were not disinterested directors.

The business judgment rule "may only be invoked by directors who are found to be … 'disinterested directors,'" and does not protect directors from a claim of breach of the duty of loyalty. *Cede & Co. v. Technicolor*, 634 A.2d 345, 367 (Del. 1993). As demonstrated above, Defendants Brandon, Short, and each of the six Sponsor-appointed Directors had conflicts of interest and were not entirely disinterested in the decision whether to commence an immediate wind-down or to instead max-out DIP financing and attempt a turnaround. They ignored their conflicts of interest, failed to delegate the decision to disinterested directors or officers, and, instead, controlled the decision. The business judgment rule, therefore, cannot protect their breaches of fiduciary duty.

### E. Defendants' arguments regarding their breaches of the duty of loyalty fail.

### 1. Defendants ignore the facts and evidence.

Defendants acknowledge that the "Trust alleges in its Complaint that the Sponsor-affiliated Directors authorized the Chapter 11 as a 'longshot' and 'gamble' to protect their equity," Mot. 12, but Defendants do not address the Trust's evidence supporting that theory. Instead, Defendants assert that a court "rejected this same type of argument," implying that the court held that a protecting-the-equity theory failed as a matter of law. Mot. 12 (citing *Radnor*

110

*Holdings Corp. v. Tennenbaum Capital Ptnrs*, 353 B.R. 820, 844 (Bankr. D. Del. 2006)).
Nothing could be further from the truth.  The court in *Radnor* allowed the protecting-the-equity
theory alleged in the complaint to proceed to trial, and then "conducted eight full days of trial" to
decide whether the theory was supported by the evidence and facts.  353 B.R. at 827.  The
*Radnor* court found for the defendants, but the evidence in *Radnor* differed from the evidence
here in every material way.

Two key premises of this theory are: (i) when the defendants directed the company to
take on more debt, the company was insolvent and the defendants must therefore attempt a
turnaround for the equity to have value, and (ii) the defendants did not actually have a plausible
business plan for turning the company around.  While the plaintiff in *Radnor* could not prove
either premise, the Trust has powerful evidence on both.

The plaintiff in *Radnor* alleged a "loan to own" scheme conducted by an investment firm
(Tennenbaum aka TCP) who appointed one of the accused directors, and who was allegedly
conspiring with another accused director.  *Radnor*, 353 B.R. at 827 at 830, ¶15.  The other
accused director was Mr. Kennedy, the majority shareholder and CEO.  *Id*. at 830, ¶15.

The court in *Radnor* found that all of the evidence demonstrated that the company was
solvent when the challenged loans were made.  *Id*. at 823-33, ¶¶32-33.  And the court made a
factual finding that Tennenbaum could not have believed the corporation was "insolvent at the
time," because it also "made a $25 million equity investment" in the corporation.  *Id.* at 830 ¶15.
By contrast, the Trust has powerful evidence, including admissions in Defendants' own
documents, that when the Sponsor-appointed Directors authorized Toys "R" Us to take on DIP
financing they knew their equity had no value.  And, of course, the Sponsors declined to make
any further equity investments in Toys "R" Us.

111

In addition, the court in *Radnor* found that the director appointed by the investment firm (Tennenbaum) did not "vote in his self interest" because he "abstained from the vote" for the first challenged transaction and "resigned from the board" before the second transaction. *Id*. at 844-45, ¶¶27-28. By contrast, in the present case the Sponsor-appointed Directors participated fully in the vote to approve the DIP financing.

As for the other accused director in *Radnor* (Mr. Kennedy, the CEO) the court found that he had "(i) agreed not to receive bonus compensation for calendar 2006; (ii) made a $1 million preferred stock investment in the Company; and (iii) personally guaranteed $10 million of the Tranche C Loans." *Id*. at 833, ¶39. "It would be irrational to believe that Mr. Kennedy would have done this if he believed that Radnor was insolvent or was headed for a bankruptcy filing." *Id.* By contrast, in the present case CEO Brandon did not forego compensation, contribute cash or personal guarantees to Toys "R" Us. Instead, Brandon orchestrated the payment of executive bonuses three days before the bankruptcy filing, including $2,812,500 for himself.

Moreover, in *Radnor*, the court found that the funding was used for "new product initiatives that were already in place" and the "Company had already executed agreements regarding new products, like its polypropylene cup line, at the time." *Id*. at 830, ¶16. By contrast, the Defendants in the present case were pretending they had a "Turnaround Plan" that begins immediately, when in fact they knew there was no plan.

Finally, in *Radnor* there was no evidence of bad faith abdication of directorial duties, such as exists in the present case. The court in *Radnor* found there was a "good faith basis for the Radnor board to have continued with its business plan" and the board made "good faith decisions" to aid the company "in carrying out its business plan." *Id.* at 844, ¶24. For example, the court found that "the Company's projections were well thought out 'bottoms up' projections

and that each assumption was supportable." *Id*. at 828, ¶9. And their analysis "considered a 'downside' scenario' … should the Company not perform as expected." *Id*. at 829, ¶10. By contrast, in the present case the Directors did not see, or ask for, any projections with supportable assumptions or modeling of downside scenarios, and entirely abdicated their directorial duties.

### 2. Because creditors had priority in bankruptcy, the interests of the Sponsors conflicted with those of the creditors.

Defendants contend "the Chapter 11 filing was the exact opposite of a 'Hail Mary' because as a matter of law a formal restructuring inures to the best interests of the company's creditors and estate at the *expense* of the equity holders … because the absolute priority rule of the Bankruptcy Code ensures that all creditors must first be paid in full following a Chapter 11 filing and that a debtor's shareholders are the *last* in line to be repaid." Mot. 12-13.

Defendants' argument has the logic upside down: the priority of creditors over equity is precisely why the Sponsors' interests conflicted with those of the creditors. The Directors knew that the Company's liabilities exceeded assets, which meant an immediate wind-down and orderly liquidation of the U.S. business would provide value only to creditors, and the Sponsors would receive nothing. The Sponsors had a chance to receive value only through a Hail Mary attempt at a turnaround.

But the Directors also knew that the Sponsors would not contribute a single dime to fund that Hail Mary attempt, which would be paid for entirely by the creditors. And those costs were neither trivial, nor were they a mere possibility. In voting to max out DIP financing and continue operations, the Defendants knew that the Company would incur costs that were "certain and

they're monstrous." [376]  They included hundreds of millions of dollars in professional fees,

interest and finance fees, and operating losses.  *Id*.  None of it paid for by the Sponsors.

> **3.** **Under controlling Delaware law, Defendant Brandon's substantial financial interest in continued employed constituted a conflict of interest.**

Defendants' assert that Brandon did not have a conflict because Delaware law holds that

"an executive's ongoing receipt of salary does not constitute sufficient self-interest to obviate the

protection of the business judgment rule."  Mot. 13-14.  This argument fails on the facts and the

law.

On the facts, Brandon's self-interest was not limited to his ongoing salary.  He also

received a bonus of $2,812,500 as a result of the decision to attempt a turnaround, which he

would not have received if the Company had commenced a wind-down. [377]

Moreover, an executive's ongoing salary is a sufficient self-interest to create a conflict.

The Delaware Supreme Court, which is the controlling authority, held that a "substantial

financial interest in maintaining their employment positions" is a sufficient personal interest to

render corporate directors conflicted.  *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993).  In

*Rales*, the Court considered whether director Sherman, who was also the CEO, was "capable of

acting independently" of the "Rales brothers"—two other directors with a personal interest in the

challenged merger transaction.  *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993).  The Court

held that a conflict of interest exists "where a corporate decision will have a materially

detrimental impact on a director."  *Id*. at 936.  The CEO Sherman's only alleged conflicting

personal interest was that his "salary is approximately $1 million per year."  *Id*.  The Court held

that this interest was sufficient because "Sherman's continued employment and substantial

---

[376] Ex. 86 (Greenspan depo.) 152:23-153:17.
[377] Ex. 70 (Greenspan) ¶19.

remuneration" was dependent on the Rales brothers.  *Id*.  The Court held that Sherman cannot "be expected to act independently considering his substantial financial stake in maintaining his current offices."  *Id*.

The Court then considered another director, Ehrlich, who was president of a different company owned by the Rales brothers with "annual compensation of approximately $300,000." *Id*.  The Court held that Ehrlich could not "act independently since it can be inferred that he is beholden to the Rales Brothers in light of his employment."  *Id*.

The Court concluded: "Because of their alleged substantial financial interest in maintaining their employment positions, there is a reasonable doubt that these two directors are able to consider impartially an action that is contrary to the interests of the Rales brothers." *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993).

Accordingly, under Delaware law, "[c]ontinued employment in itself is a material interest."  *Xura, Inc. Stockholder Litig*., 2018 Del. Ch. LEXIS 563, at *31 (Ch. Dec. 10, 2018); *In re Mindbody, Inc.*, 2020 Del. Ch. LEXIS 307, at *36 (Ch. Oct. 2, 2020) ("Delaware law also recognizes that management's prospect of future employment can give rise to a disabling conflict."); *In re Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977-78 (Del. Ch. 2003) (holding that an officer/director had a conflict because she "has a material interest in her own continued employment"), *aff'd* 845 A.2d 1040 (Del. 2004).

Defendants cite *Grobow*, but that case held only that "the allegation that all GM's directors are paid for their services" was not a sufficient personal interest.  *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988).  But this is not a case involving payments for directorial services (which are typically relatively small).  Brandon had a personal interest in continued employment, which paid him a base salary of $3,750,000 per year.

115

A disabling conflict of interest exists whenever "a corporate decision will have a materially detrimental impact on a director." *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993). Because the decision to wind down and liquidate the U.S. business would terminate Brandon's large salary, it had a material detrimental impact on Brandon, and therefore, under controlling Delaware law, created a conflict of interest.

### 4. Defendant Short was both a member of the Board and an officer, and he actively participated in the decision-making.

Defendants' only argument concerning Defendant Short is that he "was not even a member of the TRU Board" and did not influence the Board's vote. Mot. 13. Defendants are wrong. The breach of fiduciary duty claims asserted by the Trust are those of both Toys Delaware (which operated the U.S. business), and Toys Inc., (which was the holding company that owned 100% of the shares of Toys Delaware). [378]

The claims of Toys Delaware are particularly relevant because Toys Delaware was the borrower on the DIP Term loan. [379]

As Defendant Short himself testified, Short was a member of the Board of Directors of Toys Delaware.

```
11    Q.   You were a member of the board of directors
12   of Toys "R" Us Delaware, Inc.; right?
13    A.   Delaware, correct.
```

Ex. 87 (Short depo.) 278:11-13.

The board meeting authorizing the DIP financing and the bankruptcy filing was a joint meeting of both boards, and Short was expressly identified as participating in the meeting as a

---

[378] Dkt. 146 (2nd Amended Complaint) ¶23; Ex. 27 (8'9'17 fiduciary duty presentation [TRU-Trust0000060755]) at 3.
[379] Dkt. 158 at 440 (the party to the credit agreement is "TOYS R' US-DELAWARE, INC., a Delaware corporation, as debtor and debtor-in-possession (the 'Borrower'")).

board member of Toys Delaware. [380]  The minutes do not identify that any director abstained from the vote and, instead, state that the "motion passed unanimously." [381]

Moreover, Short is also liable for conduct in his capacity as CFO of the Company.  As detailed above, Short was personally responsible for negotiating the financial covenants.  As Short testified, he was "the person that had ultimate responsibility for deciding what covenants to accept." [382]  Moreover, Short filed one of the two misleading declarations with the Court that were used to obtain approval of the DIP financing.

### F.    Defendants' arguments regarding their breaches of the duty of good faith and the duty of care fail.

#### 1.    The presence of advisors does not shield Defendants' wrongful conduct.

Defendants assert that the Board "retained outside expert legal and financial advisors," who "briefed" the Board "concerning the different solutions" the advisors "were pursuing with TRU management to solve TRU's liquidity issues."  Mot. 15.  Defendants assert that "the Board met at least six times, and was presented with materials prepared by TRU's advisors" that were "intended to update and inform the Board on the Chapter 11 process and the status of the DIP financing facilities."  Mot. 15-16.  Defendants conclude that the "involvement" of these advisors "preclude a finding of bad faith."  Mot. 16.  This contention fails at four levels.

_First_, retaining professional advisors in connection with a decision does not satisfy a director's fiduciary duties; in fact it triggers a duty to become adequately informed, to conduct an independent analysis, and to investigate the assumptions underlying any advice from an advisor.  As demonstrated above, Defendants knew that their fiduciary duties required that "directors and

---

[380] Ex. 52 (9'18'17 BOD minutes [DEFS_0023490]) at 1.
[381] _Id._ at 3.
[382] Ex. 87 (Short depo.) 227:15-23.

officers should not be merely passive recipients of advice," and instead they must "independently evaluate assumptions and information presented by advisors." [383]

"[T]he job of a director or senior corporate officer is not simply to rubber stamp whatever advice they receive." [384]  The advice a director receives "may be incorrect, because it is based on inadequate information, erroneous reasoning, or biased analysis." [385]  For that reason, one of a director's primary roles is to serve as the final backstop to ensure that important decisions have been adequately vetted.  Directors "must independently assess whether the advice is based on adequate information, is well-reasoned, and is not biased." [386]

As discussed in greater detail above, "there is no record of Defendants performing any independent assessment or diligence on key issues." [387]  These key issues included: the Company's ability to comply with the financial covenants in the DIP financing, the projected costs and losses from a forced liquidation resulting from a covenant default, whether the DIP financing provided sufficient liquidity to attempt a turnaround, whether the Company had a viable turnaround plan or was likely to come upon such a plan in time, the likely results of proceeding with an orderly liquidation of the U.S. business rather than taking on the Term DIP loan.

_Second_, Defendants assert that they were "briefed" and "presented with materials" from advisors, but Defendants fail to acknowledge that those briefings and materials contained none of the key information Defendants needed to comply with their fiduciary duties.  As discussed in

---

[383] Ex. 70 (Greenspan) ¶277; Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10.
[384] Ex. 70 (Greenspan) ¶277.
[385] Ex. 70 (Greenspan) ¶277.
[386] Ex. 70 (Greenspan) ¶277.
[387] Ex. 70 (Greenspan) ¶278.

greater detail above, the materials "did not contain any opinion from the advisors that the Company was likely to be able to comply with the financial covenants in the DIP financing and avoid a default-induced sudden liquidation; that given the requirements of the financial covenants, the DIP financing provided the Company with sufficient liquidity; or that the Company could come up with a viable turnaround plan and had sufficient capital and time to complete a turnaround," and the materials "did not provide sufficient information for the Directors to assess the financial covenants or the viability of the DIP financing," including the terms of the covenants, a financial forecast with key assumptions identified, and a sensitivity analysis showing reasonable downside cases. [388]

_Third_, Defendants completely ignore the facts (compiled above) establishing Defendants' bad faith and abdication of duty, including that Defendants knew what their fiduciary duties required them to do, they knew what information they needed to obtain and knew that they did not have that information, they knew what assessments they needed to perform and knew that they did not perform them.  The presence of advisors does not erase or mitigate any of these facts.

Defendants likewise ignore the facts (compiled above) establishing that Brandon, Short, and each of the Sponsor Directors had personal financial interests that were advantaged by maxing out DIP financing and attempting a Hail Mary turnaround.  In fact, as presented in greater detail above, "the advisors did not conduct (and were not asked by the Directors to conduct) an analysis of whether the Company could comply with the financial covenants and avoid a default-induced sudden liquidation, whether the Company could come up with a viable

---

[388] Ex. 70 (Greenspan) ¶240.

turnaround plan, or whether the Company had sufficient capital and time to complete a turnaround." [389]

This case, therefore, is nothing like the *HH Liquidation* case cited by Defendants.  In that case, there was no "evidence that Caple acted in bad faith," "no evidence that he breached his fiduciary duty of loyalty," and instead the "evidence showed that Caple did not intentionally abandon any of his duties to" the corporation.  *In re HH Liquidation, LLC*, 590 B.R. 211, 279 (Bankr. D. Del. 2018).  On each of these points, the exact opposite is true for the Director Defendants here.

*Fourth*, a director or officer may not rely on expert advice if he is already aware of contrary facts or if contrary information "that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice."  *Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000).  As set forth in detail above, Defendants knew key facts that made it obvious that attempting a turnaround had only a miniscule chance of success, including that Defendants knew: the history of the Company's losses; the downward trending market share, sales and margins; the effects of competition from Amazon, Walmart, and Target; the failed efforts of the Company over the last several years to achieve profitability and find a business model that would allow it to compete successfully; and that the Company lacked a business plan to compete with Amazon, Walmart, and Target.  In addition, as detailed above, Defendant Short knew that the Company did not have a sufficient liquidity cushion even using the proposed DIP budget and also knew that budget was unreliable because it was based on unrealistic assumptions for sale growth and margins. [390]

---

[389] Ex. 70 (Greenspan) ¶283.
[390] E.g., Ex. 70 (Greenspan) ¶280.

## 2.    Defendants' failed contention that the Board reviewed alternatives.

Defendants assert that that the Directors did "consider alternatives to the DIP financing" because they first looked for "solutions that would allow TRU to avoid formal restructuring and bankruptcy" such as a sale-leaseback transaction to raise some additional funds.  Mot. 15.

This contention attacks a straw position and completely ignores the wrong-doing that Defendants are charged with.  Defendants are not accused of failing to consider alternative ways of raising some interim financing, such as by considering a sale-leaseback transaction, before filing bankruptcy.  Instead, having failed in that endeavor, Defendants are accused of authorizing DIP financing while failing to assess whether the Company could avoid a covenant default leading to a sudden and unplanned liquidation, and failing to consider the alternative of an immediate wind-down.  (In fact, Defendants failed even to ask the advisors or management to provide an analysis examining a wind-down strategy.)  Pointing out that Defendants examined a potential sale-leaseback transaction does nothing to address Defendants' wrongdoing.

## 3.    Defendants' failed Monday morning quarterbacking contention.

Defendants assert that the "Trust relies on TRU's ultimate liquidation as proof that TRU should have conducted a structured wind-down instead of filing for Chapter 11 and pursuing a going concern reorganization."  Mot. 16.  That is false.  The Trust relies on evidence (much of it undisputed and established by Defendants' own testimony) that Defendants knew in September 2017 that the conditions establishing a need to shut down the business existed.  Defendants knew the Company was losing large sums of money; that sales, margins, and market share were spiraling downward; that the Company did not have a turnaround plan and no plausible path to find a turnaround plan, and did not have the capital or time required for a turnaround.  That is not Monday morning quarterbacking.  Those facts were known months before the game started.  An

even more apt analogy is that Defendants approved a Hail Mary pass attempt with no time on the

clock, and without a quarterback who could throw the football.

### 4. Defendants' failed contention that everyone supported the DIP financing.

Defendants assert that "the Trust cannot prove that Defendants' decision to authorize DIP

financing was so 'egregious on its face' to overcome the protection of the business judgment

rule," because (i) "the UCC itself supported this decision," (ii) "TRU's outside financial advisor

… submitted an affidavit to this Court in favor of the DIP financing," (iii) "TRU's legal advisors

also argued emphatically to this Court in support of the DIP financing," and (iv) "no party – be it

potential investors, the secured lenders, the UCC, nor any trade vendors – suggested

contemporaneously that the company should have" commenced an immediate wind-down.  Mot.

16-18.  Each branch of this argument fails as well as the entire tree.

*First*, Defendants' contention that the UCC supported Defendants' decision-making is

simply false.  As described above, the UCC had been provided "misleading information, was not

told important facts, and was given inadequate information about certain facts regarding both the

proposed DIP financing and the Company's prospects for a turnaround." [391]  Moreover, the UCC

never endorsed the Directors' decision-making.  The DIP loans were negotiated and received

preliminary court approval "before the UCC was even formed." [392]  "The UCC cannot turn back

the clock … and cannot cause the Debtors' Board to properly plan and consider alternatives

months earlier." [393]  The UCC could only "make the best of a terrible situation perpetrated by"

the Defendants. [394]  By the time of the hearing for final approval on October 24, 2017, "it was

---

[391] Ex. 70 (Greenspan) ¶312.
[392] Ex. 70 (Greenspan) ¶314.
[393] Ex. 70 (Greenspan) ¶314.
[394] *Id.*

clearly too late to completely change course for the case and for the first time begin planning and

properly purchase (and avoid purchases) for an organized liquidation sale coincident with the

holiday selling season." [395]  The UCC's "actions should never be interpreted as endorsing what

the Debtors did pre-petition or that any of the choices made by the Debtors were appropriate

when made, particularly when key facts were concealed from members of the UCC." [396]

   _Second_, Defendants' assertion that "TRU's outside financial advisor … submitted an

affidavit to this Court in favor of the DIP financing," is highly misleading. Mot. 17.  In fact, no

affidavit in favor of the DIP financing was submitted from the Company's outside financial

advisory firm, which was Alvarez & Marsal.  The affidavit cited by Defendants is the one that

was submitted by David Kurtz from Lazard, who served as the Company's investment banker.[397]

   Defendants fail to mention that Kurtz did not submit an affidavit to the Court stating

Lazard had determined that the budget projections were reliable or that the Company could

comply with the financial covenants.  Instead, the Kurtz affidavit declared: "Based on

discussions with management, I understand that the Debtors believe that the Budgets and their

projections … are reasonable and appropriate." [398]  And the Kurtz affidavit did not assert that

maxing out DIP financing was a value-maximizing strategy for the Company, or was a better

alternative than commencing an immediate wind-down.  Kurtz merely opined that the DIP

financings were "the best presently available postpetition financing option." [399]

   And Defendants fail to mention that Lazard did no analysis and made no assessment of

the Company's ability to comply with the financial covenants, the reliability of the DIP budget

---

[395] Ex. 70 (Greenspan) ¶314.
[396] Ex. 70 (Greenspan) ¶314.
[397] Dkt. No. 33.
[398] Dkt. 33 ¶16.
[399] Dkt. 33 ¶2.

forecast presented to the Court, the prospects for a successful turnaround, or whether an immediate wind-down would produce greater value for stakeholders. [400]

It was not mere oversight that no affidavit of support was submitted to the Court by Alvarez & Marsal, who was the Company's financial advisor. Alvarez & Marsal had not performed an assessment of the Company's ability to comply with the financial covenants. [401] In addition, to prepare a DIP forecast and budget, the "key underlying assumptions … were provided to A&M by management, including CFO Michael Short." [402] This included a sales growth assumption that had been "recently updated" by "management" to project sales that were far above the trend, based on a purported "Turnaround Plan," which was in fact non-existent. [403]

The only affidavits endorsing the reliability of the budget projections, the sufficiency of the liquidity from the DIP financing, or the existence of a turnaround plan were from Defendants Brandon and Short. [404]

*Third*, that "TRU's legal advisors … argued emphatically … in support of the DIP financing," Mot. 17, has no relevance. Lawyers are advocates. Defendants fail to mention that

---

[400] *See, e.g.,* Ex. 70 (Greenspan) ¶93; Ex. 85 (Kurtz depo.) 122:14-124:2.

[401] Ex. 70 (Greenspan) ¶93; Ex. 85 (Kurtz depo.) 122:14-124:2.

[402] Ex. 70 (Greenspan) ¶282.

[403] Ex. 70 (Greenspan) ¶¶118-119; Ex. 44 (9'15'18 attach to Finnegan [TRU-Trust0000377785]) at 3, 4.

[404] Short decl. (Bk. Dkt. 30) at ¶130 (the DIP financing "will ensure that the Debtors have the necessary liquidity to continue to operate without material disruption"); *id.* ¶129 ("the Budget and projections provide an accurate reflection of the funding requirements for the North American and international operations over the identified period and are reasonable and appropriate under the circumstances"); Brandon declaration (Bk. Dkt. 20) at ¶99 (the "DIP Facilities … will provide them with sufficient liquidity"); *id.* ¶69 ("Investment in Growth Begins Today" and "This turnaround begins today."); ¶¶70-78 ("the Company has developed a four-pillared business plan" with "a comprehensive set of key initiatives"); *id.* ¶13 ("of critical importance, the debtor-in-possession financing also provides the Company with hundreds of millions of dollars of new money that is available for immediate and direct investment in the Company's stores and operations").

these lawyers did not themselves testify as to any facts and, instead, relied upon the false and misleading affidavits of Brandon and Short.

*Fourth*, because the key affidavits came from Brandon and Short, all stakeholders— including the Court, the UCC, the secured lenders, and the trade vendors—necessarily made their assessments based in part on information that came from the sworn affidavits of Brandon and Short touting the reliability of the summary DIP budget and forecast, the sufficiency of the DIP financing to provide liquidity through the process, and the strength of the Turnaround Plan.

In addition, all of these stakeholders could justifiably have the expectation that the Company's very experienced and knowledgeable panel of directors had performed their fiduciary duties, had obtained all material information reasonably available, had carefully examined the underlying assumptions, had examined a reasonable downside case and determined that the Company would comply with its financial covenants under the DIP financing, and had determined that the Company had a viable turnaround plan as well as adequate capital and time to conduct a turnaround.  None of this was true.

*Finally*, this entire argument by Defendants fails for an even more fundamental reason.  It does not matter if someone else thought that maxing out DIP financing and attempting a turnaround was a good idea.  Defendants, as the Directors of the Company, had an independent duty and obligation to assess that course of action before authorizing it.  A company's directors provide the final backstop against foolish decisions arrived at without analysis or influenced by personal bias.  Management and advisors may have a personal financial stake in the DIP financing strategy (advisors benefit from large fees; management benefits from bonuses and continued employment with large salaries and perks).  For example, Lazard's fees were

contingent on how much the Company borrowed and Lazard would "get a greater fee for arranging a greater amount of DIP financing." [405]

    For that reason, the job of directors is not to rubber stamp proposals from management and advisors. The Directors must check the assumptions, ask questions to identify problems overlooked, request that alternatives be considered, and otherwise kick the tires before saying yes.

    As demonstrated above, Defendants utterly abdicated their duties.

### 5.    Delaware law did impose a duty on Defendants to liquidate the Company.

Defendants assert that Delaware law "imposed no duty on the Board to liquidate TRU." Mot. 17. That is false.

    As shown above, Defendants admit that Delaware law imposes a fiduciary duty upon directors to assess all reasonable alternatives, gather all material information that is reasonably available before making a decision, and then choose the path that maximizes stakeholder value. And when a company is losing money, sales and margins are spiraling downward, and there is no viable option to turn the company around, then the value-maximizing path that is required by Delaware law is to shut the company down.

    That is why, when a retail company is facing bankruptcy, more than half the time the company's directors determine that ending operations is the value maximizing path, and the percentage is even higher for companies with more than $50 million in liabilities. [406]

    Defendants quote a Delaware case stating that "Delaware law imposes no absolute obligation on the board of a company that is unable to pay its bills to cease operations and to

---

[405] Ex. 79 (Taylor) 147:5-9, 148:4-7; Ex. 73 (Lazard Summary of Agreed Terms [DEFS_0053419]).
[406] Ex. 70 (Greenspan) ¶141.

liquidate." *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 204-05 (Del. Ch.

2006)  Of course there is no "absolute obligation," because in some cases (a minority of retail

bankruptcies) the value maximizing path is to attempt a turnaround.  What Defendants do not,

and cannot, quote is any Delaware case holding that directors are always justified in attempting a

turnaround.  As *Trenwick* itself holds, directors are justified in taking on additional debt and

pursuing a turnaround only if they have arrived at the decision "acting with due diligence and

good faith."  *Id.*  And if not, the directors are subject to "causes of action for breach of fiduciary

duty."  *Id.*

## IV.    Defendants breached their fiduciary duties in approving the executive bonus plan.

In approving extraordinary retention bonuses days before bankruptcy, Defendants

breached their fiduciary duties in multiple ways.

The fiduciary duties of directors and officers require that they comply with the law and

do not engage in illegal acts.  They must not authorize the company to take any action in

violation of the law.  In approving a retention bonus plan for top executives just four days before

filing for bankruptcy, the Director Defendants knowingly violated the law.

The Defendants knew that the bankruptcy laws required creditor oversight and court

approval of executive bonuses, and altogether prohibited paying retention bonuses to "insider"

executives (unless they met criteria that did not apply to any of the Company's executives).  Any

plan to pay retention bonuses could not include Defendant Brandon (CEO), Defendant Short

(CFO), or other top officers such as Defendant Barry (Chief Merchant) and Tim Grace (the head

of HR and Chief Talent Officer).  But Defendants approved a plan four days before bankruptcy

that paid each of these executives, and others, millions in retention bonuses.  Because

Defendants knew these bonuses would not be permitted in bankruptcy, and knew that the cash

127

paid for executives would otherwise be paid to creditors, Defendants knowingly evaded the

bankruptcy restrictions and knowingly hindered and defrauded the creditors, thereby engaging in

a fraudulent transfer.  In doing so, they violated the law and their duty of loyalty.

Further, the fiduciary duties of directors and officers require that they avoid conflicts of

interest.  They must not participate in decisions in which they have a personal interest, and they

must prohibit other directors and officers with a personal interest from participating in decision-

making.  Determining whether, how much, and when to pay extraordinary bonuses to executives

cannot be controlled by the executives themselves.  It must be delegated to directors with no

personal interest in decision-making on bonuses.

The Director Defendants allowed Brandon, who had an obvious conflict of interest

because he stood to gain millions from the bonus plan, to develop a bonus program and control

its implementation from start to finish.  Brandon made each of the key decisions in the bonus

plan—who would receive a bonus, how much the bonus would be, and when it would be paid—

and orchestrated the presentation of that plan to the other directors.  Brandon breached his

fiduciary duty of loyalty by controlling a plan that would pay him millions.  And by entirely

failing to police Brandon or his influence, the other directors abdicated their responsibilities in

violation of their duty of good faith.

In addition, directors have a fiduciary duty to inform themselves of all reasonably

available material information before making executive compensation decisions, and to consider

reasonable alternatives.  For executive compensation decisions, the key information that is

always available and that must be obtained is a comparison of compensation received by

executives in comparable positions.

128

The Director Defendants knowingly failed to obtain this information. The compensation committee failed to obtain comparable compensation analysis for 109 of 114 executives. And the full board failed to obtain any analysis of comparable compensation for any executive. Moreover, none of the Defendants considered any alternatives to the plan that was created and controlled by Brandon. This knowing abdication of the Defendants' responsibilities constitutes a violation of the duty of good faith.

### A.    Defendants knew that their fiduciary duties required them to preclude a director with a conflict of interest from making the decisions, to assess all reasonable alternatives, and to obtain all material information reasonably available.

As discussed above in greater detail, a "director is considered interested" in a corporate decision, and not independent, if the director "will receive a personal financial benefit from a transaction" or "where a corporate decision will have a materially detrimental impact on a director." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

The Delaware Supreme Court has "consistently defined the duty of loyalty of officers and directors" in "unyielding terms." *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993). It "has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty." *Id.* (internal quotes omitted). Any potential for influence by personal interests is prohibited. "The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest." *Id.* A director is "independent only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations." *Cede & Co. v. Technicolor*, 634 A.2d 345, 362 (Del. 1993).

Directors violate their duty of loyalty to a company when they allow an interested director to control and dominate a transaction. When "[a] board's own lack of oversight in

structuring and directing [a transaction] afforded management the opportunity to indulge in the misconduct which occurred," the directors on the board have breached their duty of loyalty. *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989).  A "board's virtual abandonment of its oversight functions in the face of [a director's] patent self-interest [is] a breach of its fundamental duties of loyalty and care." *Id.* at 1284, n.32.

 Moreover, as demonstrated in detail above, Defendants knew what their fiduciary duties required.  As Defendants have admitted, Defendants knew "that in a situation where a decision would implicate an actual or potential conflict of interest, the board should delegate decision-making authority to disinterested directors or managers." [407]

In addition, Defendants would breach their duty of good faith "[w]here directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). [408]  For example, they would breach their duty of good faith if "the defendant directors knew that they were making material decisions without adequate information and without adequate deliberation." *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003).

And they would also breach that duty by authorizing a decision "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999) (internal quote omitted).  This may be shown by "facts supporting an inference that [the fiduciary] did not reasonably believe that the … transaction was in the best interests of" the company.

---

[407] Ex. 77 (Raether) 157:3-8; Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 15.
[408] Ex. 77 (Raether depo.) 156:11-18.

*Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 260 (Del. 2017), *quoted with approval by*

*Kahn v. Stern*, 183 A.3d 715, 715 & n.5 (Del. 2018).

And finally, Defendants also had a fiduciary duty of care, which is breached by director

actions or inactions that amount to "gross negligence," which is "conduct that constitutes

reckless indifference or actions that are without the bounds of reason." *McPadden v. Sidhu*, 964

A.2d 1262, 1274 (Del. Ch. 2008).

As Defendants have admitted, these fiduciary duties required them to consider and assess

"all reasonable alternatives" before coming to a decision. [409]  And the Directors were expressly

advised that there were multiple "design options for compensation programs during

restructuring" that needed to be considered. [410]

Defendants were also expressly advised that the bankruptcy act placed limitations on

bonuses to executives and prohibited paying retentions bonuses to top executives, unless certain

narrow conditions applied.  They knew that "compensation payable to 'insiders' (senior

management) is subject to stringent bankruptcy rules and much greater scrutiny." [411]

The Defendants knew that, to comply with their fiduciary duties, they could rely on

advice from others, including professional advisors, but could not simply rubber stamp whatever

advice they receive. [412]  They knew that "directors and officers should not be merely passive

recipients of advice." [413]  They were required to examine the assumptions underlying a proposal,

---

[409] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10; Ex. 77 (Raether depo.) 154:24-155:6.
[410] Ex. 23 (7'31'17 Contingency Prep Overview [DEFS_0123896]) at slide 58.
[411] Ex. 23 (7'31'17 Contingency Prep Overview [DEFS_0123896]) at slide 57.
[412] Ex. 77 (Raether depo.) 319:23-320:1, 320:9-22.
[413] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10; Ex. 77 (Raether depo.) 155:17-156:1.

and to independently consider its reasonableness. "Directors and officers should independently

evaluate assumptions and information presented by advisors." [414]

Defendants also knew their fiduciary duties required that, before deciding on a course of

action, they were required to "inform themselves of all material information that was reasonably

available" and "carefully consider that information." [415]  In particular, they knew that in

authorizing a bonus plan, "amounts of compensation must be reasonable compared to reasonable

peer group." [416]  They knew, therefore, that key material information they needed was

information about what comparable executives were paid. [417]

Defendants, therefore, certainly knew what their fiduciary duties required.  But they

entirely abdicated those duties in authorizing the executive bonus plan.

> **B.**      **While Brandon had a glaring conflict of interest in personally benefiting
> from an executive bonus plan, it was Brandon who controlled the bonus
> plan's development and made each of the key decisions—who would receive
> a bonus, how much the bonus payments would be, and when the bonus would
> be paid.**

Defendant Brandon had an obvious and glaring conflict of interest in decisions regarding

whether to implement an executive bonus plan and the design of that plan.  Because of this

conflict, Defendants knew that their fiduciary duties required that bonus plan decision-making

should not be controlled by, or significantly influenced by, Brandon.  Instead, that decision

making must be delegated to independent directors who obtained all material information

reasonably available—in particular information on compensation paid to comparable

executives—and who assessed all reasonable alternatives, and who then exercised reasoned

---

[414] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10.
[415] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10; Ex. 77 (Raether depo.) 155:9-12.
[416] Ex. 23 (7'31'17 Contingency Prep Overview [DEFS_0123896]) at slide 59.
[417] Ex. 79 (Taylor depo.) 75:10-76:13, 78:7-14; Ex. 78 (Levin depo.) 38:7-21, 39:10-15; Ex. 82 (Goodman depo.) 317:19-318:1.

judgment in selecting a bonus plan design in the best interests of the Company.  But the evidence demonstrates that nothing like that happened here.

On July 15, 2017, Brandon sent an email to Tim Grace, Toys "R" Us' Global Chief Talent Officer, reminding Grace that he was "dealing with a reality," which is that Grace had "put us all in a room and explained" that for Company executives, "particularly in leadership roles," both salaries and annual bonus percentages "were over indexed to market," and that this "was costing [Toys 'R' Us] millions of dollars in out-of-market, excess compensation." [418] Brandon said that because "[o]utside stats and comparisons are not going to help us," he and Grace would "have to be creative and design something that works for us." [419]

Brandon and Grace continued to discuss the bonus plan via email and also in many face-to-face meetings. [420]  In fact, Brandon's office was only "12 steps away from" Grace's office. [421]

After these initial discussions between Brandon and Grace, on July 24, 2017, Brandon contacted Bryan Marsal to retain Alvarez & Marsal as a restructuring advisor.  Even though AlixPartners, another advisory firm, had previously been retained by Toys "R" Us, Brandon wanted to work with Alvarez & Marsal because of his pre-existing "relationship and my preference to work with you and your firm." [422]  Brandon personally recommended Alvarez & Marsal as the advisors for Toys "R" Us to the Board. [423]

Brandon had Alvarez & Marsal present to him an overview of compensation for a company considering restructuring, including the recommended steps for implementing a bonus

---

[418] Ex. 99 (7'15'17 Brandon to Grace [TRU-Trust0000011727]).
[419] *Id.*
[420] Ex. 88 (Brandon depo.) 27:22-28:6.
[421] Ex. 88 (Brandon depo.) 28:7-29:1.
[422] Ex. 100 (7'24'17 Brandon to Marsal [TRU-Trust0000123945]).
[423] Ex. 88 (Brandon depo.) 67:15-22.

plan, and a range of options for bonus plans. [424]  This presentation went only to Brandon, and

Brandon did not provide it to Tim Grace, to any of the three directors on the compensation

committee, or to the full board of directors. [425]

The options identified by Alvarez & Marsal included keeping current compensation

programs intact, combining annual and long-term incentive programs, increasing base salaries,

developing programs that comply with bankruptcy requirements after bankruptcy filing,

deferring compensation decisions until post-bankruptcy so that new owners can set

compensation arrangements, and paying pre-bankruptcy filing retention bonuses. [426]

For the option of pre-filing retention bonuses, Alvarez & Marsal highlighted several

downsides, including "[l]iquidity issues," that the payment "[m]ay be challenged as a preferential

transfer/fraudulent conveyance," and that there were "[n]o incentive/performance conditions"

associated with such a bonus. [427]  Alvarez further advised that "other alternative compensation

arrangements" including "keep current compensation programs intact" and "increase base

salaries" should be considered instead of retention payments. [428]

The presentation sent by Alvarez & Marsal also included Alvarez's advice on the

appropriate process for developing and implementing a bonus.  Alvarez recommended that

approving incentive or retention plans should proceed in a seven step process including these

four steps: "[n]egotiation with Stakeholders and U.S. Trustee," "[f]ile motion to request court

---

[424] Ex. 109 (8'3'17 Goulding to Brandon Compensation Deck [TRU-Trust0000124121]).
[425] Ex. 78 (Levin depo.) 181:21-182:3; Ex. 79 (Taylor depo.) 46:12-19, 139:21-140:5; Ex. 77 (Raether depo.) 245:5-11; Ex. 92 (Grace depo.) 39:19-23, 40:6-12; Ex. 133 (9'6'17 Summary Compensation Proposal [DEFS_0004337]).  As a result, only Brandon received this information and advice from Alvarez.
[426] Ex. 108 (8'3'17 A&M Overview of Compensation Alternatives [TRU-Trust0000124123]) at 10.
[427] *Id.* at 14.
[428] *Id.* at 8.

approval," "[w]ork to resolve objections by Stakeholders, Creditors Committee, equity representatives and/or U.S. Trustee," and a "[h]earing (including expert witness testimony, if necessary) to approve plans." [429]  Alvarez recommended that each of these steps occur before "Program implementation." [430]  Brandon did not follow Alvarez's advice and Brandon failed to direct that any of these four steps take place before paying the executive bonuses.

After Brandon received the information and advice from Alvarez & Marsal, he did not then ask Alvarez & Marsal to design the bonus plan that they thought, in their professional judgment, was appropriate.  Instead, Brandon directed Tim Grace to assist him in drafting an executive bonus plan that would pay the leadership team (including Brandon and Grace) large bonuses before the Company filed for bankruptcy.  On August 14, 2017, Grace sent a "draft of the proposed plans" to Brandon "as discussed." [431]  That draft was not developed by Alvarez & Marsal. [432]

The plan identified certain executives as "insiders," including Brandon and Grace. [433] The plan called for paying a bonus to "insiders" in the amount of 75% of each insider's base salary, and paying that bonus before the Company filed for bankruptcy. [434]  This would result in paying Brandon a $2,812,500 bonus.  The plan called for paying smaller bonuses to other executives, also calculated as a percentage of the executive's base salary. [435]

---

[429] Ex. 108 (8'3'17 A&M Overview of Compensation Alternatives [TRU-Trust0000124123]) at 27.
[430] *Id.*
[431] Ex. 111 (8'14'17 Grace to Brandon [TRU-Trust0000012584]).
[432] Ex. 92 (Grace depo.) 42:13-22.
[433] Ex. 110 (8'14'17 Bonus Presentation [TRU-Trust0000012585]) at 3.
[434] *Id.*
[435] *Id.* at 4.

The draft proposal prepared by Grace at Brandon's direction did not include any analysis of alternative programs such as paying no bonus or paying bonuses to insiders in installments over the course of the bankruptcy period.  Brandon never instructed Grace to look at ████ ███████████ than paying lump sum retention bonuses shortly before bankruptcy. [436]

The plan was not accompanied by any analysis comparing the compensation of the insiders to compensation paid to comparable executives at peer group companies.  The plan did not contain any explanation why a lump sum 75% bonus was the appropriate amount for any insider, much less for all of them.  The plan was not accompanied by any analysis comparing the compensation of the Company's executives to compensation paid to comparable executives at peer group companies.  And the plan did not contain any discussion of the email that Brandon had sent to Grace just a month before, declaring that the "reality" was that Company executives, "particularly in leadership roles," had both salaries and annual bonus percentages "over indexed to market," and that this "was costing [Toys 'R' Us] millions of dollars in out-of-market, excess compensation." [437]

The draft of the plan was sent to Brandon by Grace at 12:47 PM PDT on August 14, 2017. [438]  Later that evening, at 7:06 PM PDT, Grace provided the draft to Alvarez & Marsal via email, noting that "I've done additional work on the KERP and KEIP plans.  Attached for your review is the most updated deck." [439]  Before this date, Alvarez & Marsal had not provided any draft of a bonus plan to Brandon or Grace. [440]

---

[436] Ex. 92 (Grace depo.) 43:21-44:2.
[437] Ex. 99 (7'15'17 Brandon to Grace [TRU-Trust0000011727]).
[438] Ex. 111 (8'14'17 Grace to Brandon [TRU-Trust0000012584]).
[439] Ex. 103 (8'14'17 Grace to Cumberland and attach [TRU-Trust0000376712]).
[440] Ex. 88 (Brandon depo.) 72:15-17, Ex. 92 (Grace depo.) 70:1-14.

Brandon himself confirmed that he had the authority to direct and control Alvarez & Marsal in their development of the bonus plan.[441]  And he exercised this control after the initial plan was sent by continuing to make changes to the plan.  Brandon and Grace continued to update the plan by adding some additional executives, and modifying the bonus amount for certain non-insiders.[442]  Up through August 21, 2017, Brandon and Grace sent a total of five drafts of the bonus plan to A&M with updates.[443]

At that point, A&M provided a draft presentation that included a plan for paying executives retention bonuses that was an exact duplicate of what they had received from Brandon.[444]  It called for paying the top executives bonuses in the amount of 75% of their annual salary, to be paid immediately, and paying other executives lesser bonuses, also calculated as percentage of salary.[445]

Alvarez's final internal emails before circulating the draft compensation plan show deference to Brandon and Grace in the decision-making process.[446]  For example, when considering whether it was appropriate for the treasurer to receive a 50% bonus and some SVPs to receive 75%, Jeffery Stegenga of A&M remarked: "That's a Dave [Brandon] question."[447]  As another example, Stegenga asked, "[f]or the call with Dave, whenever it gets scheduled, I

---

[441] Ex. 88 (Brandon depo.), 553:10-17.

[442] Ex. 88 (Brandon depo.) 61:1-12; Ex. 92 (Grace depo.) 79:10-80:2.

[443] Ex. 92 (Grace depo.); Ex. 101 (8'9'17 Grace to Cumberland [TRU-Trust0000376665]); Ex. 102 (8'10'17 Grace to Cumberland [TRU-Trust0000376670]); Ex. 103 (8'14'17 Grace to Cumberland and attach [TRU-Trust0000376712]); Ex. 104 (8'18'17 Grace to Hoeinghaus [TRU-Trust0000376898]); Ex. 119 (8'21'17 Grace re Revised Spreadsheet [TRU-Trust0000376901]).

[444] Ex. 117 (8'21'17 Cumberland to Grace Brandon [TRU-Trust0000125151]); Ex. 120 (8'21'17 Restructuring Compensation Proposal [TRU-Trust0000125152]).

[445] *Id.* at 7.

[446] *See* Ex. 112 (8'19'17 Hoeinghaus to Stegenga [AM-TORU-0000397]) ("Tim [Grace] is still discussing internally whether they want to add the additional potential insiders … to the pre-paid retention bonus program.").

[447] Ex. 113 (8'20'17 Stegenga to Cumberland [AM-TORU-0000475]).

guess the question I would ask of this group is why not raise all the options so he has the ability to understand where he could take it?" [448]  Brian Cumberland responded that "[w]e previously went through all the alternatives with Dave and others. We provided a slide deck with the alternatives. With that information, they landed on the proposed construct." [449]

Brandon continued to exercise control after receiving the draft presentation deck from Alvarez & Marsal by continuing to add or subtract executives, or move executives from one bonus tier to another.  On August 21, 2017, Grace and Brandon had a discussion regarding the bonus plan and proposed changes and submitted those changes to Alvarez. [450]  When Brandon and Grace noticed that some of their desired changes had not made it into the next draft of the deck prepared by Alvarez, Grace informed Brandon that he would "make sure the deck is updated." [451]  And when Grace reached out to Alvarez, he emphasized that "[i]t doesn't look like the changes Dave and I made today made it to the deck." [452]

Other changes came from Brandon and Grace over the next few days. [453]  On August 23, Grace directed Alvarez that "we [Grace and Brandon] would like to add" Brandon's executive assistant to the bonus program. [454]  In response to these directions from Brandon and Grace, Alvarez incorporated each of the requested changes. For example, Alvarez added Brandon's assistant to the bonus plan. [455]

---

[448] Ex. 121 (8'21'17 Stegenga to Geier [AM-TORU-0000497]).
[449] Ex. 105 (8'21'17 Cumberland to Stegenga [AM-TORU-0000505]).
[450] Ex. 92 (Grace depo.) 76:4-77:3.
[451] Ex. 115 (8'21'17 0740pm Comp deck [TRU-Trust0000376991]).
[452] Ex. 118 (8'21'17 0655pm Comp deck [TRU-Trust0000376987]).
[453] Ex. 116 (8'21'17 0511am Comp deck [TRU-Trust0000376999]), Ex. 114 (8'21'17 attach to 0511am Comp deck).
[454] Ex. 122 (8'23'17 Grace to Hoeinghaus [TRU-Trust0000377089]).
[455] Ex. 123 (8'25'17 Hoeinghaus to Grace [TRU-Trust0000377276]).

All of this direction from Brandon and Grace was given to Alvarez & Marsal before Alvarez & Marsal had any contact with the directors who were on the compensation committee. Before the compensation committee had ever heard anything about the proposal, the key elements of the compensation plan—who would receive a bonus, how much they would receive, and when the bonuses would be paid—had already been determined by Brandon and Grace.  The compensation committee would never see any of the alternatives that Alvarez provided to Brandon, and it would not see any of the pros and cons to choosing pre-petition retention bonuses over other compensation options.  It would only be presented with the plan developed by Brandon.

> **C.    When the compensation committee was presented with the plan Brandon had developed, it failed to guard against conflicts of interest, consider all reasonable alternatives, or consider critical material information.**

Toys "R" Us had a compensation committee to address matters of executive compensation.  In August 2017, the compensation committee consisted of Defendants Taylor, Levin, and Goodman. [456]  Goodman was added on August 23. [457]  The Directors' fiduciary duties applied to their work on the compensation committee. [458]  As discussed above, those duties included guarding against conflicts of interest, considering all reasonable alternatives, and considering all reasonably available material information before making a decision.  The compensation committee Directors breached those fiduciary duties.

---

[456] Ex. 78 (Levin depo.) 147:18-148:6.
[457] Ex. 34 (8'23'17 BOD minutes [TRU-Trust0000333026]) at 1.
[458] Ex. 82 (Goodman depo.) 237:22-25.

1.      **The compensation committee Directors abdicated their duties to preclude Brandon from controlling the development of the bonus plan.**

The compensation committee allowed Brandon to orchestrate every part of the compensation committee's process of approving the executive bonus plan.

The compensation committee had no involvement in the creation of the bonus plan.  It had not been involved in developing the lump sum payment for retention. [459]  It had not had communications with Alvarez and Marsal about developing the plan. [460]  The compensation committee had not directed anyone to prepare the proposed compensation plan. [461]  They had not seen the bonus plan before Brandon had it presented to them.

Brandon controlled each part of the presentation of the bonus plan to the compensation committee.  On Saturday, August 26, 2017, Brandon set up a conference call for Brandon, Grace, and the advisors to take place before the compensation committee meeting "to just coordinate the comp committee meeting plan." [462]  And later that same day, Brandon set up the compensation committee meeting and circulated the invitation to the compensation committee phone meeting to take place at 5:00 p.m. on August 28, 2017. [463]  Brandon circulated to the compensation committee the agenda for the meeting and the materials that would be presented at the compensation committee meeting. [464]  The only proposed plan attached to that email was Brandon's executive bonus plan as described in the presentation deck prepared by Alvarez & Marsal. [465]  Brandon did not attach the initial set of potential compensation alternatives that had

---

[459] Ex. 92 (Grace depo.) 96:20-97:1.
[460] Ex. 78 (Levin depo.) 148:23-149:5.
[461] Ex. 92 (Grace depo.) 97:2-4.
[462] Ex. 125 (8'26'17 Brandon to Cumberland [TRU-Trust0000125877]) at 2.
[463] Ex. 124 (8'26'17 Brandon Compensation Committee Invite [DEFS_0006174]).
[464] Ex. 126 (8'27'17 Brandon to Compensation Committee [DEFS_0006360]).
[465] *Id.*

been provided by Alvarez & Marsal.  Brandon did not indicate to the compensation committee

that he was the person who had selected one of multiple alternatives initially proposed by

Alvarez & Marsal.

Both Brandon and Grace were in attendance at the compensation committee meeting on

August 28, 2017.  Brandon was not part of the compensation committee. [466]  But Taylor, the

head of the compensation committee, testified that he considered Brandon to be a member of the

compensation committee due to his participation in compensation committee meetings. [467]

Brandon participated in the meeting and the discussion about the plan and did not recuse

himself.[468]

Each of the four Defendants at that meeting purport to have no recollection about what

was discussed.  Brandon does not "recall the meeting itself" or anything that happened at that

meeting. [469]  Taylor, the head of the compensation committee, claims to have no recollection of

the meeting. [470]  Goodman similarly claims to have no recollection of what was discussed. [471]

And Levin does not have any memory beyond a general recollection that the compensation

committee "did ask questions." [472]

After that first compensation committee meeting, Brandon continued to orchestrate the

compensation committee's receipt of information.  Grace sent an email to A&M on August 31,

2017, stating that he "spoke with Dave this morning" and that "we should only discuss what has

---

[466] Ex. 78 (Levin depo.) 148:7-10.
[467] Ex. 79 (Taylor depo.) 29:17-30:18.
[468] Ex. 127 (8'29'17 Compensation Committee Minutes [DEFS_0006291]).
[469] Ex. 88 (Brandon depo.) 150:21-151:11.
[470] Ex. 79 (Taylor depo.) 31:14-23.
[471] Ex. 82 (Goodman depo.) 272:16-22.
[472] Ex. 78 (Levin depo.) 149:23-150:17.

changed in the deck and any follow up items from the Comp. Committee call." [473]  After

Brandon and Grace spoke with Alvarez later that same day, Alvarez "made the discussed

changes in the attached full report." [474]

The compensation committee Directors utterly failed to guard against Brandon's control

of, and substantial influence over, a bonus program in which Brandon had a glaringly obvious

personal interest.

Defendant Taylor, while the nominal "chairman" of the compensation committee,

allowed Brandon to direct the committee, including:

- scheduling meetings of the committee,

- setting the agenda for committee,

- overseeing and approving materials provided to the committee,

- conferring with the advisers in advance of the committee meeting to script what takes place
  in the meeting,

- directing the activities of Alvarez & Marsal,

- permitting Brandon's attendance and participating on the committee meetings.

But Taylor took no action to ensure that the bonus plan process was free from Brandon's

direction and control.  In fact, Taylor actually knew that Brandon had developed the bonus plan

and that Brandon had made each of the decisions about each of the key elements of the plan. [475]

Those decisions included who would receive a bonus, when the bonuses should be paid, and how

much each person should receive. [476]  Taylor did nothing to intervene.

---

[473] Ex. 128 (8'31'17 Grace re Today's call [TRU-Trust0000377407]).
[474] Ex. 129 (8'31'17 Hoeinghaus re Revised Comp Decks [TRU-Trust0000377450]).
[475] Ex. 77 (Raether depo.) 225:25-224:15.
[476] Ex. 77 (Raether depo.) 227:22-228:1, 228:2-7, 229:19-25.

142

The other two committee members, Levin and Goodman did not investigate how the plan to pay retention bonuses to top executives including Brandon was developed. [477]  They did not make any attempt to ensure that Brandon was not involved in preparing the retention bonus plan that would result in him personally receiving a bonus prior to bankruptcy. [478]  Levin and Goodman made no inquiry at all into Brandon's influence on the bonus plan, even though Brandon had an obvious direct financial interest in the plan. [479]  Goodman was not even "interested in knowing who came up with the plan." [480]  And Levin made no attempt to ensure that "Dave Brandon had no influence on the bonus plan." [481]

Moreover, the compensation committee never made any effort to discuss the plan with an advisor outside of Brandon's presence.  All communications between the compensation committee and Alvarez & Marsal occurred with Brandon there. [482]  The compensation committee Directors never reached out to Alvarez & Marsal separately.  And the compensation committee did not retain any additional advisor to independently evaluate the bonus plan to determine whether it was reasonable or necessary. [483]

### 2. The compensation committee Directors abdicated their responsibility to evaluate reasonable alternatives and inform themselves of all material information reasonably available to them.

The compensation committee Directors failed to evaluate reasonable alternatives to the plan presented by Brandon.  And for the plan that was presented, the compensation committee knowingly disregarded material information.

---

[477] Ex. 78 (Levin depo.) 225:1-9.
[478] Ex. 78 (Levin depo.) 177:7-19, 233:2-14.
[479] Ex. 78 (Levin depo.) 225:1-9; Ex. 82 (Goodman depo.) 268:8-17.
[480] Ex. 82 (Goodman depo.) 267:21-23.
[481] Ex. 78 (Levin depo.) 233:2-10.
[482] Ex. 78 (Levin depo.) 186:18-25.
[483] Ex. 78 (Levin depo.) 229:9-13.

First, as Defendants have admitted, their fiduciary duties required them to consider and assess "all reasonable alternatives" before coming to a decision. [484] And the Directors were expressly advised that there were multiple "design options for compensation programs during restructuring" that they needed to consider. [485]

But the Directors on the compensation committee failed to consider any alternatives to the bonus plan developed by Brandon.  The compensation committee Directors did not evaluate alternative compensation options other than the one proposed by Brandon, such as paying no bonus or spreading bonus payments out over the course of the bankruptcy. [486] The compensation committee did not even ask A&M about different types of compensation programs that could be considered. [487] The committee did not ask whether retention bonuses were necessary to retain executives or inquire into the likelihood that executives would consider leaving. [488] The compensation committee did not evaluate what bonus amounts were appropriate. [489] Instead, the only plan that the Directors ever considered "whether to go ahead with" was the one proposed by Brandon. [490]

Second, the compensation committee Directors entirely failed to consider critical material information in evaluating the bonus plan.  Defendants knew that in authorizing a bonus plan, "amounts of compensation must be reasonable compared to reasonable peer group." [491] To be able to compare the compensation of each executive, the Directors needed information about

[484] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10.
[485] Ex. 23 (7'31'17 Contingency Prep Overview [DEFS_0123896]) at slide 58.
[486] Ex. 82 (Goodman depo.) 296:15-297:12.
[487] Ex. 78 (Levin depo.) 185:10-18, 224:10-25.
[488] Ex. 82 (Goodman depo.) 298:20-299:10.
[489] Ex. 82 (Goodman depo.) 279:15-25.
[490] Ex. 82 (Goodman depo.) 269:21-270:19.
[491] Ex. 23 (7'31'17 Contingency Prep Overview [DEFS_0123896]) at slide 59.

144

each executive's current compensation (including base salary, bonus, and incentive amounts).[492]

The Directors would need to consider what an individual executive's "pay is currently and what

it had been historically," and use that information along with "marketplace comparables" to

"make an assessment of pay relative to retention or flight risk." [493]  As Defendant Goodman

admitted, "you want to know the market data for a comparable position." [494]

The Directors knew that information comparing the compensation of Company

executives to comparable executives was "reasonably available," in fact, that it was readily

available.  The compensation committee Directors had just two months earlier, on June 20, 2017,

performed an analysis of executive compensation for 7 of the top 8 executives (everyone but

Brandon). [495]  For these 7 executives, the committee had received data comparing each

executive's base salary, target bonus, total cash compensation, and long-term option grants to the

market, including identifying where each component of compensation fell for each executive. [496]

And the committee knew that the Company had access to "Market Data Sources" from three data

base providers: "Korn Ferry Hay Group, Equilar and Hewitt." [497]

But the Directors did not receive, ask for, or consider any such information when

considering whether to approve the executive bonus plan in September 2017.  The Directors did

not assess the likelihood of executives leaving the Company absent retention bonuses. [498]  They

did not engage in "individual assessments" of executives and their compensation relative to

---

[492] Ex. 79 (Taylor depo.) 75:10-15.
[493] Ex. 78 (Levin depo.) 38:7-21.
[494] Ex. 82 (Goodman depo.) 317:19-318:1.
[495] Ex. 98 (6'20'17 Comp committee [DEFS_0126153]) at pdf 8.
[496] *Id.*
[497] *Id.*
[498] Ex. 82 (Goodman depo.) 299:1-10.

comparable executives at other firms. [499]  Indeed, for 109 of the 114 executives included in the bonus plan, the compensation committee received no information whatsoever about the compensation of comparable executives at other companies. [500]  The compensation committee Directors never asked Alvarez & Marsal to provide that information. [501]

For those five executives that Alvarez & Marsal did provide comparable compensation information, the information did not justify paying a bonus.  The analysis of Brandon's compensation revealed that Brandon's compensation was already excessive.  Brandon's base salary was already more than <u>double</u> the base salary of the 90th percentile of comparable executives, and Brandon's base salary alone was between the 75th and 90th percentile of the *total cash compensation* of comparable executives. [502]

The other four executives were not actually compared to comparable executives at other firms.  For example, Barry, the Chief Merchandising Officer, was matched to the "3rd highest paid" position at other companies. [503]  This resulted in comparing Barry to CFOs, presidents, and even a CEO. [504]  Similarly, Toys "R" Us' Global Chief Technology Officer was matched with the "4th highest paid" position at other companies. [505]  That resulted in comparisons with presidents, CEOs, CFOs, and chairmen at other companies.  It did not result in a comparison with any other chief technology officers, or any positions that even seemed to approximate that

---

[499] Ex. 82 (Goodman depo.) 306:24-307:8.
[500] Ex. 120 (8'21'17 Restructuring Compensation Proposal [TRU-Trust0000125152]).
[501] Ex. 79 (Taylor depo.) 128:19-24.
[502] Ex. 120 (8'21'17 Restructuring Compensation Proposal [TRU-Trust0000125152]) at 28; Ex. 82 (Goodman depo.) 255:5-21, 259:2-11.
[503] Ex. 120 (8'21'17 Restructuring Compensation Proposal [TRU-Trust0000125152] at 30.
[504] *Id.*
[505] *Id.* at 31.

role. [506]  These comparisons were not the "like-for-like comparisons" that Taylor testified were necessary to appropriately assess executive compensation. [507]

Third, the compensation committee had actual knowledge of material facts demonstrating that the bonuses could not be justified and were therefore not in the best interest of the Company. The analysis that the compensation committee had received just two months earlier (and that did perform a like-for-like comparison to executives in comparable positions) showed that the executives' "total cash compensation" for 2017 exceeded the median compensation at other companies, and for most of the executives was above the 70th percentile. [508]  This was consistent with the discussion between Brandon and Grace on July 15, 2017, that "Outside stats and comparisons are not going to help us." [509]

When the compensation committee received the initial bonus proposal that contained comparable information for Brandon, that information demonstrated that Brandon's compensation without the bonus was already excessive.  But rather than suggest that Brandon be excluded from the program, the compensation committee directed Alvarez & Marsal to find alternative comparables for Brandon. [510]

None of the compensation committee members remember why they needed to request different CEO comparables after receiving the first set from Alvarez & Marsal. [511]  One plausible inference is that the reason that the compensation committee asked for the updated list of comparables was so that Brandon's compensation would look better.  None of the compensation

---

[506] *Id.*
[507] Ex. 79 (Taylor depo.) 78:1-14.
[508] Ex. 98 (6'20'17 Comp committee [DEFS_0126153]); Ex. 78 (Levin depo.) 58:16-59:23.
[509] Ex. 99 (7'15'17 Brandon to Grace [TRU-Trust0000011727]).
[510] Ex. 82 (Goodman depo.) 276:14-277:3.
[511] Ex. 78 (Levin depo.) 270:24-271:11.

147

committee Directors identified any other reason why they would ask for a different set of comparables for the CEO position.  In fact, none of the compensation committee Directors have any recollection of the discussions that took place about the executive bonus. [512]

In response to the compensation committee's request, Alvarez "expanded the scope of potential peers to include retail companies that fall within 33% to 300% of the Company based on assets, revenue and employee count." [513]  This updated set of companies raised the average compensation level for CEOs that Brandon was compared against. [514]

But even with this upwardly skewed data set, Brandon's compensation was still excessive.  Brandon's base salary continued to be over two million dollars higher than the 90th percentile of comparable CEOs. [515]  And Brandon's total cash compensation continued to be almost two and a half million dollars higher than the 90th percentile of comparable CEO total cash compensation. [516]  After receiving that updated information about comparables, the compensation committee Directors again failed to remove Brandon from the bonus plan or to make any changes.

In sum, the compensation committee Directors failed entirely to comply with their fiduciary duties.  They allowed Brandon to develop the bonus plan and control the compensation committee's consideration of that bonus plan.  And they failed to obtain material information (in fact critical information), that they knew was reasonably available.  And they were aware of facts

---

[512] Ex. 79 (Taylor depo.) 97:10-16; Ex. 82 (Goodman depo.) 303:6-21; Ex. 78 (Levin depo.) 149:23-150:17.
[513] Ex. 131 (9'3'17 Summary Restructuring Compensation Proposal [DEFS_0006217]) at 9.
[514] Ex. 136 (9'3'17 Restructuring Compensation Proposal [DEFS_0006228]) at 21.
[515] Id. at 27; Ex 82 (Goodman depo.) 277:4-9.
[516] Ex. 136 (9'3'17 Restructuring Compensation Proposal [DEFS_0006228]) at 27; Ex. 82 (Goodman depo.) 277:10-15.

demonstrating that such large bonuses were not in the best interest of the Company because the top executives, in particular Brandon, were already overpaid.

### D.    When the full board was presented with the plan Brandon had developed, it failed to guard against conflicts of interest, consider all reasonable alternatives, or consider critical material information.

Each of the Directors on the full board had the same duties as the Directors on the compensation committee. [517]  They had to ensure that they fulfilled their duty to inform themselves of all reasonably available material information. [518]  And the Directors on the Board knew that their duty was not just "to rubber stamp any proposals that were sent to [them] from management." [519]  But that is exactly what the Directors did when they received the bonus plan from Brandon.

### 1.    The full board abdicated their duties to preclude Brandon from controlling the development of the bonus plan.

The Board knew that Brandon had an obvious conflict of interest, because he would be receiving several million dollars if the bonus plan were approved.  And they also knew that Brandon set the agenda for the board meeting at which compensation was discussed, put compensation approval on the agenda for that meeting, participated in the meeting, and voted to approve the plan. [520]

But, just like the compensation committee, the full board did nothing to preclude Brandon from controlling the bonus plan.  They did not require Brandon to leave the meeting during the discussion. [521]  They did not require Brandon to recuse himself from the vote. [522]

---

[517] *See e.g.,* Ex. 77 (Raether depo.) 218:1-5.
[518] Ex. 77 (Raether depo.) 155:9-12.
[519] Ex. 77 (Raether depo.) 320:9-22.
[520] Ex. 88 (Brandon depo.) 175:4-17; Ex. 40 (9'13'17 board minutes [TRU-Trust0000165899]).
[521] Ex. 40 (9'13'17 board minutes [TRU-Trust0000165899]) at 3.
[522] *Id.*; Ex. 77 (Raether depo.) 242:5-13.

They did not ask Alvarez & Marsal to discuss the origin of the plan and who had made the decisions in the plan.  In fact, there is no record that the Board made any effort to determine how the bonus plan was developed and the level of Brandon's influence on the plan. [523]  Instead, they were wholly unconcerned about Brandon's interest in the plan and his involvement in creating it. [524]

## 2.  The Board knowingly failed to obtain critical information they knew was available and knowingly failed to analyze alternatives.

As discussed above, the Directors knew that their fiduciary duties required them to consider all reasonable alternatives and they knew that multiple design options were available.  But the full board considered only a single alternative, the plan that had been designed by Brandon that would pay executives large bonuses within a few days.

And as discussed above, the Directors knew they needed to inform themselves of all material information that was reasonably available, and knew that this included a comparison to the compensation of comparable executives.  But, just like the compensation committee, the full board failed even to request such information. [525]

In fact, Brandon directed Alvarez and Marsal to "simply circulate an executive summary of the plan" to the full board. [526]  The summary did not include the chart with CEO comparables showing Brandon's excessive compensation relative to other CEOs. [527]

---

[523] Ex. 40 (9'13'17 board minutes [TRU-Trust0000165899]) at 3; Ex. 83 (Macnow depo.) 141:10-142:9.
[524] *See, e.g.,* Ex. 82 (Goodman depo.) 267:21-268:17; Ex. 83 (Macnow depo.) 128:15-130:7, 130:12-131:6; Ex. 77 (Raether depo.) 231:14-24.
[525] Ex. 83 (Macnow depo.) 141:10-15; Ex. 77 (Raether depo.) 245:5-11.
[526] Ex. 132 (9'5'17 1006pm only summary [TRU-Trust0000126680]).
[527] Ex. 88 (Brandon depo.) 172:16-173:4; Ex. 133 (9'6'17 Summary Compensation Proposal [DEFS_0004337]).

As a result, the Board received the skimpiest of information. The presentation that the Board received did not include any analysis of why a bonus of 75% was considered to be appropriate for each of the Tier 1 executives, an analysis of cash compensation for comparable executives, or any alternative compensation structures for the Board to consider. [528] Indeed, the Board never received the analysis and underlying assumptions that were used in developing the bonus plan. [529]

The Board did not reach out to Alvarez & Marsal separately to discuss the compensation proposal or obtain additional information. [530] The board members did not ask about how the numbers for executive bonuses in the Alvarez & Marsal bonus proposal had been developed, or whether any analysis of comparable executives had been done. [531] There is no indication that the board discussed the timing of payments or whether Brandon should be included at the 75% bonus level. [532] And there is no indication that members of the board asked for any information comparing the compensation of Toys "R" Us executives to other executives. [533] Moreover, there is no indication that any member of the board did any analysis apart from reading the materials presented to the board at Brandon's direction. [534]

---

[528] Ex. 133 (9'6'17 Summary Compensation Proposal [DEFS_0004337]).
[529] Ex. 77 (Raether depo.) 245:5-11.
[530] *See, e.g.,* Ex. 83 (Macnow depo.) 134:18-135:6, 136:22-137:2; Ex. 79 (Taylor depo.) 128:19-24; Ex. 77 (Raether depo.) 245:5-11, 247:4-9.
[531] Ex. 83 (Macnow depo.) 136:3-13.
[532] Ex. 77 (Raether depo.) 242:25-243:8.
[533] Ex. 77 (Raether depo.) 247:4-9; Ex. 83 (Macnow depo.) 136:3-13.
[534] Ex. 83 (Macnow depo.) 137:10-14.

Finally, there is no record of the board's reasoning or decision-making other than these two words in the minutes: "discussion ensued." [535]  None of the Defendants could recall anything about the discussions that took place. [536]

The Directors on the board made the decision to approve the bonus plan knowing that they failed to do anything to ensure that the process was not controlled by Brandon, knowing that they failed to consider reasonable alternative approaches, and knowing that did not have critical information necessary for evaluating executive compensation.

### E.   The Directors breached their fiduciary duties by knowingly authorizing an illegal fraudulent transfer that was designed to evade creditors.

Directors breach their fiduciary duty of loyalty (and its subsidiary duty of good faith) when they direct the corporation to engage in conduct that they know is unlawful.  *Hampshire Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 Del. Ch. LEXIS 144, at *89 (Ch. July 12, 2010) (by "consciously causing" company to violate the law, director "breached his duty of loyalty"); *Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("one cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey"). "For fiduciaries of Delaware corporations, there is no room to flout the law."  *In re Massey Energy Co. Derivative & Class Action Litig.*, No. 5430-VCS, 2011 Del. Ch. LEXIS 83, at *78 (Ch. May 31, 2011).

---

[535] *See, e.g.,* Ex. 82 (Goodman depo.) 302:20-304:6, Ex. 81 (Bekenstein depo.) 277:21-280:6, Ex 83 (Macnow depo.) 139:17-140:6; Ex. 82 (Goodman depo.) 88:20-89:1.

[536] *See* Ex. 79 (Taylor depo.) 104:5-9 ("I don't have a specific recollection"); Ex. 83 (Macnow depo.) 140:3-6 (No recall of discussion); Ex. 82 (Goodman depo.) 303:6-21 ("I don't recall"); Ex. 77 (Raether depo.) 242:25-243:8 ("[N]o recollection" of discussions); Ex. 81 (Bekenstein depo.) 277:12-280:6 (answering "I don't recall" to every question about the executive bonus program).

But flouting the law is exactly what Defendants did in approving the executive bonuses. Defendants knowingly approved a fraudulent transfer of millions of dollars in extraordinary bonuses to insiders, thereby violating their fiduciary duties.

A fraudulent transfer is a violation of both civil and criminal law.  Fraudulent transfer in contemplation of a chapter 11 bankruptcy is a crime under federal law that subjects individuals to criminal penalties.  18 U.S.C. § 152(7).  When an individual "as an … officer of any … corporation, in contemplation of a case under title 11 by … any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such … corporation," that individual "shall be fined under this title, imprisoned not more than 5 years, or both.  18 U.S.C. § 152(7).  The statute "attempts to cover **all the possible methods** by which a bankrupt **or any other person** may attempt to defeat the Bankruptcy Act through an effort to keep assets from being equitably distributed among creditors."  *Stegeman v. United States*, 425 F.2d 984, 986 (9th Cir. 1970) (citing Collier on Bankruptcy (14th ed. 1968)) (emphasis in original)).

Fraudulent transfers prohibited by section 152(7) include any transfer "with intent to defeat the provisions of title 11," including transfer made <u>before</u> filing a bankruptcy petition.  18 U.S.C. § 152(7).  "[A]lthough the transfer or concealment prohibited by § 152(7) must relate to a bankruptcy case—i.e., it must be intended to defeat the provisions of the Bankruptcy Code—the statute reaches beyond the bankruptcy estate itself."  *United States v. Colon Ledee*, 772 F.3d 21, 34 (1st Cir. 2014); *see United States v. West*, 22 F.3d 586, 590 (5th Cir. 1994) ("the government may prosecute individuals under 18 U.S.C. § 152 for transfers of property occurring more than one year prior to the filing of a petition in bankruptcy if such transfers are made knowingly,

fraudulently, and in contemplation of a case under title 11 or with intent to defeat the provisions of title 11"). In addition, 18 states and U.S. territories also criminalize a fraudulent transfer. [537]

A fraudulent transfer claim under section 548 of the bankruptcy code has two elements (1) "any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property," and (2) "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became … indebted"). 11 U.S.C. § 548. The elements of a fraudulent transfer claim under the under the Uniform Fraudulent Transfer Act (such as enacted by Delaware) has the same two elements (1) "a transfer made or obligation incurred," and (2) "with actual intent to hinder, delay, or defraud any creditor of the debtor." 6 Del. C. § 1304.

The federal criminal statute adds one additional element, that the transfer was made "in contemplation of a case under title 11 … or with intent to defeat the provisions of title 11." 8 U.S.C. § 152(7).

The evidence proves each of these elements for the Director Defendants.

### 1.    There was a "transfer" by paying bonuses to executives.

Payments made to officers or employees of a company constitute "transfers or obligations" for the purposes of a fraudulent transfer claim. *See JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1245 (Del. Ch. 2019). The executive bonus plan was a "transfer or obligation" because it was a payment to Toys "R" Us executives. It resulted in Toys "R" Us

---

[537] *See* Jay Adkisson, *US Jurisdictions That Criminalize Fraudulent Transfers*, Forbes (2015) https://www.forbes.com/sites/jayadkisson/2015/11/22/u-s-jurisdictions-that-criminalize-fraudulent-transfers/?sh=1f4a71097943.

transferring at least $16,279,738 to Toys "R" Us executives, including $2,812,500 to Brandon, $600,000 to Short, and $450,000 to Barry. [538]

## 2. Defendants authorized the transfer with actual intent to hinder and defraud creditors.

The required scienter for a fraudulent transfer is "actual intent to hinder, delay, or defraud any creditor of the debtor."  6 Del. C. § 1304.  Any one of the three intents (hinder, defraud, or delay) is sufficient: "the Court need only find that … the Debtors made relevant transfers with the intent to hinder, the intent to delay, or the intent to defraud."  *Sher v. JPMorgan Chase Funding (In re Thornburg Mortg., Inc.)*, 610 B.R. 807, 827 (Bankr. D. Md. 2019) (emphasis added).  The presence of actual intent "may be inferred from the actions of debtor and may be proven by circumstantial evidence."  *In re Smoot,* 265 B.R. 128, 142 (Bankr. E.D. Va. 1999).

The Directors authorized a transfer of funds from Toys "R" Us to Brandon and other insiders knowing that the Company was on the eve of filing bankruptcy, and knowing that such a transfer was prohibited by bankruptcy law and intending to place those funds beyond the reach of creditors.   They intended to hinder the ability of the creditors to provide input, and to eliminate the ability of the bankruptcy court to perform its oversight role.

The Directors voted to authorize the executive bonus plan on September 13, 2017. [539]  When the Directors gave that authorization, they knew that the bonuses were extraordinary and not part of the regular executive compensation package.  For example, Brandon had an employment contract that extended through July 1, 2020, and, under his contract Brandon had no right to this additional bonus. [540]

---

[538] Ex. 135 (Mills) ¶32.
[539] Ex. 40 (9'13'17 board minutes [TRU-Trust0000165900]).
[540] Ex. 176 (Brandon Employment Agree [TRU-Trust0000096961]).

Each of the Defendants also knew on September 13 that the Company was preparing a bankruptcy filing, that it would "file as soon as the Company has obtained DIP financing," and that it was on track "to file for chapter 11 early next week." [541]

And the Directors had been advised that when the Company became insolvent, "the company's creditors become the primary beneficiaries" of the Directors' fiduciary duties. [542] The Directors were advised that their fiduciary duties required them to "evaluate their decisions through the prism of maximizing the value of the enterprise for the benefit of all stakeholders." [543]

The Directors also knew that, with the bankruptcy filing, the Company's actions would be under the oversight of creditors and the bankruptcy court, and this included executive compensation decisions.  The Directors were specifically advised by Kirkland that "[u]pon filing for relief under chapter 11," the "compensation payable to 'insiders' (senior management) is subject to stringent bankruptcy rules and much greater scrutiny." [544]

The Directors therefore knew that, waiting a few days until the bankruptcy filing would have given the creditors (and the Court) the ability to weigh-in on whether paying large bonuses to executives would maximize the enterprise value of the cash-strapped company.  And if bonuses were warranted, the stakeholders could evaluate what sort of bonus plan would be best, how much the bonuses should be, who should participate, and when bonuses should be paid.

But the Directors did not wait, because the Directors also knew that retention bonuses for Brandon and the other top executives would not be approved in bankruptcy.  They had been

---

[541] Ex. 40 (9'13'17 board minutes [TRU-Trust0000165900]).
[542] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535].
[543] *Id.* at 24.
[544] Ex. 106 (8'27'17 attach to Brandon Kirkland presentation [DEFS_0006370]) at 7; Ex. 23 (7'31'17 Contingency Prep Overview [DEFS_123896]) at 57.

advised by Kirkland that to pay retention bonuses to an "insider," that insider would need to have "a bona fide job offer at the same or greater level of compensation." [545]  Kirkland explained that insiders "include: Directors; Officers; Persons in control; and Affiliates." [546]  Kirkland advised that "the title of Vice President or higher creates a rebuttable presumption that the relevant employee is an 'insider.'" [547]

When the board received the retention bonus plan, it was obvious that the plan included multiple insiders.  It included Brandon and Short, who were directors.  And it included 19 executives with titles of Senior Vice President, Executive Vice President, or higher. [548]  Based on the advice the Directors had been given, the Directors knew that this plan was not allowed by bankruptcy laws—it contained no showing that any insider had any job offer, much less one with comparable compensation.  As a result, Brandon made sure the bonus plan was on the agenda and was approved so that the executive bonuses could be transferred out of the Company's bank account before the bankruptcy filing.  In fact, Grace started payroll processing for the bonuses even before the board meeting. [549]

The only plausible reason for the timing of paying the bonuses just before filing bankruptcy is the need to evade the limitations on bonuses to insiders, and to evade the scrutiny of creditors on the executive bonuses.  Defendants certainly knew the obvious fact that a cash bonus paid to an executive comes out of the cash that otherwise would be paid to creditors.  They knew, therefore, that transferring the cash to executives before filing bankruptcy would hinder the ability of creditors to be paid for their debts.  No advisor had offered the opinion that paying

---

[545] Ex. 106 (8'27'17 attach to Brandon Kirkland presentation [DEFS_0006370]) at 9.
[546] Ex. 106 (8'27'17 attach to Brandon Kirkland presentation [DEFS_0006370]) at 9.
[547] *Id.* at 10.
[548] Ex. 134 (9'13'17 Alvarez Board Presentation [DEFS_0004160]) at slide 5.
[549] Ex. 130 (9'12'17 Grace final files to AM Files [TRU-Trust0000374006]).

retention bonuses on the eve of bankruptcy would be lawful.  In fact, Alvarez & Marsal had

specifically warned Brandon that such a program could be "challenged as a preferential

transfer/fraudulent conveyance." [550]

By paying the bonuses before bankruptcy, Defendants knew that the "bonuses were

placed outside the advance scrutiny of the creditors and the bankruptcy court." *Official Emp't-

Related Issues Comm. of Enron Corp. v. Arnold (In re Enron Corp.)*, Nos. 01-16034-AJG, 03-

3522, 03-3721, 2005 Bankr. LEXIS 3261, at *109 (Bankr. S.D. Tex. Dec. 9, 2005).

 Defendants' actual intent to hinder and defraud creditors is strengthened by considering

other factors that courts traditionally consider when evaluating the presence of actual intent.

Those factors include whether "the transfer or obligation was to an insider," whether "the debtor

was insolvent or became insolvent shortly after the transfer was made," and "whether the transfer

occurred shortly before or shortly after a substantial debt was incurred."  6 Del. C. § 1304(b).

"The confluence of several of these factors" generally "support[s] a conclusion that one acted

with the actual intent to defraud." *Kibler v. Wooters*, No. 1351-VCN, 2007 Del. Ch. LEXIS 83,

at *17 (Ch. June 6, 2007); *see Fringer v. Kersey Homes, Inc.*, No. 9780-VCG, 2018 Del. Ch.

LEXIS 203, at *23 (Ch. June 25, 2018).  As discussed above, the transfer was made to insiders.

It was made just four days before Toys "R" Us filed for bankruptcy and admitted its insolvency.

And it was made shortly after the Company had incurred substantial debts to vendors for

merchandise and just four days before the Company incurred large debts by entering the DIP

financing agreements.  Each of these factors further demonstrates actual intent to defraud

creditors.

---

[550] Ex. 108 (8'3'17 A&M Overview of Compensation Alternatives [TRU-Trust0000124123]) at 14.

### 3.     Defendants made the transfer in contemplation of a case under title 11 and with intent to defeat the provisions of title 11.

Defendants authorized the transfer of payments to executives "in contemplation of a case under title 11 … or with intent to defeat the provisions of title 11."  8 U.S.C. § 152(7).

As demonstrated above Defendants authorized the bonuses to executives in direct contemplation of the Company filing a bankruptcy petition.  Therefore, the transfer was "in contemplation of a case under title 11."  In addition, as demonstrated above, Defendants knew of the restrictions on paying bonuses to top executives found in the bankruptcy laws and the only plausible reason for the timing of paying the bonuses just before filing bankruptcy was the need to evade the limitations on bonuses to insiders, and to evade the scrutiny of creditors on the executive bonuses.  Therefore, the transfers were also made "with intent to defeat the provisions of" the bankruptcy code.

\*     \*     \*

By directing the Company to engage in a fraudulent transfer days before the bankruptcy filing, Defendants knowingly directed the Company to violate the law.  And that knowing violation of the law was a breach of their duty of loyalty: "it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully." *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007).

### F.     The Directors breached their fiduciary duties of loyalty, good faith, and care.

### 1.     The Directors breached their duty of loyalty.

Directors breach their duty of loyalty by violating or causing a corporation to violate the law.  *Hampshire Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 Del. Ch. LEXIS 144, at \*89 (Ch. July 12, 2010) (by "consciously causing" company to violate the law, director "breached his duty of loyalty").

Further, "the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993).

A "classic example[] of director self-interest" exists when "a director receiv[es] a personal benefit from a transaction." *Cede*, 634 A.2d at 362. Even a single director's breach of the duty of loyalty can be found "to have infected the board's decision." *Id.* at 364. To establish a breach of the duty of loyalty, a plaintiff does not have to establish conflicting interests "as to a majority of the board," but can instead establish "that one conflicted fiduciary failed to provide material information to the board or that the board failed to sufficiently oversee the conflicted fiduciary." *In re Mindbody, Inc.*, 2020 Del. Ch. LEXIS 307, at *34 (Ch. Oct. 2, 2020).

In cases that "involve[] directors or officers paying themselves bonuses, the court is particularly cognizant to the need for careful scrutiny." *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 745-746 (Del. Ch. 2007) (finding that a transaction did not have fair process when "[t]he entire process from the initial idea of awarding bonuses to the final reallocation of the bonus pool was dominated by [an interested director]").

Defendants breached their duty of loyalty in multiple ways.

### a. Directors breached their duty of loyalty by authorizing an illegal fraudulent transfer.

As discussed in more detail above, Defendants knew that paying the executive bonus payments before bankruptcy would avoid court scrutiny and make the bonus payment unavailable to creditors. But Defendants chose to approve that bonus program anyway, in knowing violation of the law and their fiduciary duty of loyalty.

**b.**    **Brandon breached his duty of loyalty because he was an interested director.**

"[A] director who receives a substantial benefit from supporting a transaction cannot be objectively viewed as disinterested or independent."  *Cede & Co. v. Technicolor*, 634 A.2d 345, 362 (Del. 1993); *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) ("A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.")

Brandon's self-dealing is a breach of his duty of loyalty—he controlled a process that resulted in his receiving an additional $2,812,500 in compensation and he voted to approve his own bonus.

**c.**    **Director Defendants breached their duty of loyalty by allowing Brandon—an interested director—to control the bonus process.**

The Delaware Supreme Court "has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty" of loyalty. *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993) (internal quotes omitted).  Any potential for influence by personal interests is strictly prohibited.  "The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest."  *Id*.  A director is "independent only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations."  *Id*. at 362.

Directors violate their duty of loyalty to a company when they allow an interested director to control and dominate a transaction.  When "[a] board's own lack of oversight in structuring and directing [a transaction] afforded management the opportunity to indulge in the misconduct which occurred," the Directors on the board have breached their duty of loyalty.

161

*Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989). A "board's virtual abandonment of its oversight functions in the face of [a director's] patent self-interest [is] a breach of its fundamental duties of loyalty and care." *Id.* at 1284, n.32.

The Directors allowed an interested director to control the process of developing the bonus plan. They knew Brandon stood to receive a multimillion-dollar cash bonus and therefore had a "direct personal interest in the executive bonus plan." [551] Brandon was thus not a disinterested or independent director. [552] Defendants therefore had an absolute duty to assure that any proposed bonus plan had not been corrupted by Brandon's personal interest, because "there is no safe-harbor for divided loyalties in Delaware." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005).

And yet the Directors utterly failed to take any action to preclude Brandon from controlling the development of the bonus plan. Moreover, Defendants didn't care; they were not "interested in knowing who came up with the plan." [553] This "abandonment of [the board's] oversight functions in the face of [a director's] patent self-interest was a breach of its fundamental duties of loyalty and care." *Mills Acquisition*, 559 A.2d at 1284, n.32.

## 2.    The Directors breached their duty of good faith

Directors breach their duty of good faith when they engage in an "abdication of directorial duty." *Cede & Co. v. Technicolor*, 634 A.2d 345, 363-64 (Del. 1993). A breach of the duty of good faith occurs "[w]here directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). This type of bad faith by abdication exists if the facts "imply that the

---

[551] Ex. 88 (Brandon depo.), 127:8-12.
[552] *See* Ex. 88 (Brandon depo.) 128:15-21 ("If I paid myself a bonus, yes, that would be a conflict of interest").
[553] Ex. 82 (Goodman depo.) 267:21-23.

defendant directors knew that they were making material decisions without adequate information and without adequate deliberation." *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003); *Bridgeport Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 564 (Bankr. D. Del. 2008); *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 66 (Del. 2006) ("[A] conscious disregard for one's responsibilities … is properly treated as a non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith.")

In addition, bad faith may be shown by evidence that a decision is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Dent v. Ramtron Int'l Corp.*, No. 7950-VCP, 2014 Del. Ch. LEXIS 110, at *15 (Del. Ch. June 30, 2014); *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999); *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000) (same). This does not require a plaintiff to establish "facts that rule out any possibility other than bad faith, rather than just pleading facts that support a rational inference of bad faith." *Kahn v. Stern*, 183 A.3d 715, 715 (Del. 2018). It suffices to establish "facts supporting an inference that [the fiduciary] did not reasonably believe that the … transaction was in the best interests of" the company. *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 260 (Del. 2017), *quoted with approval by Kahn v. Stern*, 183 A.3d 715, 715 & n.5 (Del. 2018). This does not require inquiring into the director's subjective beliefs; instead "the use of the qualifier 'reasonably' imposes an objective standard of good faith." *Brinckerhoff*, 159 A.3d at 260.

Defendants violated their duty of good faith under each of these theories.

a.    **The Directors abdicated their duties by failing to obtain an analysis of comparable compensation or alternative compensation plans.**

As demonstrated above, the Directors knew that they were voting to approve the retention bonuses without having adequate material information.  Material information is information that is "relevant" and "important" to what the decision-maker is trying to accomplish.  *Sutherland v. Sutherland*, No. 2399-VCN, 2010 Del. Ch. LEXIS 88, at *44 (Ch. May 3, 2010).  As shown above, the Defendants knew that they needed to obtain information comparing compensation for comparable executives, and knew that information was readily available.

But the full board never received that information.  The executive summary that Brandon directed be provided to the board included no comparison of compensation of executives at other companies.  No director saw an analysis of comparable compensation for 109 out of the 114 executives that were included in the bonus plan.   And only the compensation committee Directors and Brandon saw comparable compensation data for the remaining five executives.  As discussed above, those data were flawed and did not support paying a bonus.

Without comparables or a rationale supporting a 75% bonus payment, board members had no way to evaluate whether the bonus payments were appropriate, reasonable, or in the best interests of the Company.  And they had no way to evaluate whether a pre-petition retention bonus was the appropriate means to pay bonuses because no other alternatives were provided or considered.

The Directors never asked for, received, or considered any of this material information.  Instead, they made their decision to approve the bonus plan knowing only that executives would receive a bonus, the amount they would receive, and when they would receive it.

These facts "imply that the defendant directors knew that they were making material decisions without adequate information and without adequate deliberation," which suffices to

164

establish a breach of the duty of good faith. *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003).

> **b.      The Directors abdicated their duty to ensure that the process of developing the bonus was not controlled by an interested director**

A breach of the duty of good faith occurs "[w]here directors fail to act in the face of a known duty to act." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). As demonstrated above, Defendants knew they had a duty to ensure that conflicts of interest were avoided by delegating decision-making to disinterested directors. The board utterly failed to do so. "The board was torpid, if not supine, in its efforts to establish a truly independent auction, free of [the CEO and Chairman's] interference and access to confidential data. By placing the entire process in [his] hands . . . through his own chosen financial advisors, with little or no board oversight, the board materially contributed to the unprincipled conduct of those upon whom it looked with a blind eye." *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989), *quoted with approval by Kahn v. Stern*, 183 A.3d 715, 715 (Del. 2018).

The Board failed in the first instance to delegate the process of developing bonuses to disinterested directors. No evidence suggests that the board directed that a bonus plan be prepared by independent directors or advisors. The first time that the full board saw a bonus plan was when they received the executive summary of the plan that Brandon had developed.

Three of the board members (Brandon, Taylor, Raether) knew that this bonus plan had been developed by Brandon, who was conflicted. And that conflict should have been readily apparent to the rest of the board: Brandon was voting to approve a compensation plan that would result in him receiving a more than $2.8 million bonus. But none of the directors did anything to ensure that the process by which the bonuses had been developed was free of Brandon's influence. As discussed above, no director asked about Brandon's involvement in creating the

bonus plan.  Neither Taylor nor Raether volunteered to the rest of the board that Brandon had in fact controlled each of the key decisions in the process.  And the board raised no objection to Brandon voting on the plan.  This deliberate "indifference" to Brandon's involvement was a breach of the duty of good faith.

Because the facts demonstrate that the "directors fail[ed] to act in the face of a known duty to act," they breached their duties of good faith.  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

### c. Brandon and the compensation committee Directors made a decision that they knew was beyond the bounds of reason and not in the best interests of the Company.

Before developing the bonus plan, Brandon already knew that his and other executives' compensation was excessive.  As discussed above, Brandon was aware that existing salaries and annual bonus percentages were already above market.  Rather than acknowledge that comparisons to market compensation showed that Toys "R" Us executives would not need additional compensation, Brandon wrote to Grace and indicated that he wanted to side-step those comparisons and design something that works for us." [554]  But Brandon knew that he "was already motivated to do well for the company" without receiving a retention bonus. [555] Brandon's decision to put through a bonus plan that paid executives, including himself, large cash bonuses days before the Company filed bankruptcy thus was objectively not in the best interests of the company and leads to a "rational inference of bad faith."  *Kahn v. Stern*, 183 A.3d 715, 715 (Del. 2018).

For similar reasons, the compensation committee directors' decision to approve the bonus plan was beyond the bounds of reason.  As demonstrated above, the compensation committee

---

[554] Ex. 99 (7'15'17 Brandon to Grace [TRU-Trust0000011727]).
[555] Ex. 88 (Brandon depo.) 182:24-183:4.

had received and reviewed a comparability analysis in June 2017 that showed that Toys "R" Us executives were already paid above market. The compensation committee knew that outside metrics demonstrated that Toys "R" Us executives did not need a bonus. When Alvarez & Marsal attempted to justify Brandon's plan by putting together comparables, the compensation committee directors (Taylor, Levin, Goodman) saw that the comparability analysis showed that Brandon's compensation was excessive. The reaction of the compensation committee directors was not to delete this bonus. Instead, they tasked Alvarez & Marsal with finding a different set of comparable CEOs so that Brandon's bonus payment would not appear so excessive. When the revised set of comparables failed to justify Brandon's bonus, the compensation committee approved the bonus plan anyway (and did not provide those comparables to the full board).

This decision by the compensation committee directors was objectively not in the best interests of the Company. The data that the compensation committee received indicated that the compensation of Brandon and other top executives was substantially higher than market. There was no risk that Brandon would leave to go to another company on the basis that he would be better compensated there. The circumstances surrounding the directors' decision strongly supports "an inference that [the directors] did not reasonably believe that the … transaction was in the best interests of" Toys "R" Us. *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 260 (Del. 2017). Accordingly, they breached their duty of good faith.

### 3.     The directors breached their duty of care.

The duty of care is breached if the actions or inactions of a director amount to "gross negligence," or "conduct that constitutes reckless indifference." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008).

As demonstrated above, the Defendants breached their duty of good faith. The same evidence establishing that breach also demonstrates that Defendants' conduct "constitutes

167

reckless indifference." Thus, each of the Defendants breached their duty of care in approving the executive bonuses.

### G. Defendants cannot meet their burden of proving the bonus payments were entirely fair.

"A breach of either the duty of loyalty or the duty of care rebuts the presumption that the directors have acted in the best interests of the shareholders, and requires the directors to prove that the transaction was entirely fair." *Cede & Co. v. Technicolor*, 634 A.2d 345, 371 (Del. 1993). Moreover, the duty of good faith is a component of the duty of loyalty, because a "director cannot act loyally towards the corporation unless she acts in good faith." *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006). Therefore, demonstrating a breach of the duty of good faith also removes the protection of the business judgment rule. *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 52 (Del. 2006) ("Those presumptions can be rebutted if the plaintiff shows that the directors breached their fiduciary duty of care or of loyalty or acted in bad faith. If that is shown, the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders.").

To meet the entire fairness standard, "the defendants must establish … that the transaction was the product of both fair dealing and fair price." *Basho Techs. Holdco B, Ltd. Liab. Co. v. Georgetown Basho Inv'rs, Ltd. Liab. Co.*, No. 11802-VCL, 2018 Del. Ch. LEXIS 222, at *80-81 (Ch. July 6, 2018) (internal quotes omitted). "Fair dealing" involves consideration of the process by which the transaction was approved. *Id.* at *82. "Fair price" involves assessing whether the directors "obtain[ed] the highest value reasonable available to the shareholders under all the circumstances." *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989).

Defendants make no attempt to meet their burden of proving entire fairness in their motion.  Further, they could not do so.  The Trust has presented evidence that the process was not fair, because Brandon controlled the development of the bonus and the other directors abdicated their duties in evaluating the bonus plan.  As for fair price, Defendants cannot demonstrate that the retention bonuses were fair, because the evidence demonstrates that the Company's top executives had compensation above market even without the additional bonus.

Thus, Defendants "demonstrate fairness as to process or price," and therefore cannot prove entire fairness.  *Basho*, 2018 Del. Ch. LEXIS 222, at *92 (Ch. July 6, 2018).

### H.    Defendants' breaches of fiduciary duty caused losses to Toys "R" Us.

By failing to comply with their fiduciary duties in authorizing the executive bonus plan, the Defendant Directors harmed Toys "R" Us by causing Toys "R" Us to pay unnecessary and excessive retention bonuses.  This reduced Toys "R" Us' liquidity and meant it did not have that money available to pay for other obligations.

As a result of Defendants' breaches of their fiduciary duties, Toys "R" Us executives received $16,279,738 in bonus payments. [556]

## V.    Defendants' arguments concerning Defendants' unlawful approval of the executive bonuses fail for multiple reasons.

### A.    Estoppel does not apply to the Trust's claims.

Defendants contend that "the Trust is estopped from litigating the retention payments" because "the UCC addressed the pre-petition retention payments during the Chapter 11 bankruptcy proceeding."  Mot. at 18-19.  This contention fails for multiple reasons.

---

[556] Ex. 135 (Mills) ¶32.

First, as demonstrated above, the Trust is not a successor to the UCC for any purpose and thus is not bound by the UCC's statements or positions. Defendants' claim that the UCC made statements about the bonus payments "on behalf of the same constituency" that the Trust now represents is patently false. Mot. at 19. The Trust is bringing fiduciary duty claims on behalf of Toys "R" Us Inc. and Toys "R" Us Delaware. Neither of these entities were constituents of the UCC, and they are not bound by any of the UCC's positions or statements.

Second, the UCC never agreed that it would "address the retention payments through a compromise rather than litigation" as Defendants assert. Mot. at 19. The hearing statement quoted by Defendants contains no assertion that the UCC is releasing any right to challenge those payments at a later date. Indeed, the UCC's statement supporting the debtor's motion to approve settlement filed in 2018 highlighted that the lack of releases—including for claims involving "the payment of retention bonuses to senior executives on the eve of bankruptcy"— was of "critical importance to the Committee." [557]

Third, the Court's confirmation order expressly prohibits the application of preclusion doctrines, including estoppel, to claims asserted against the directors and officers. [558] That confirmation order is binding on Defendants and disposes of their estoppel argument.

In fact, in the UCC's brief supporting the Settlement Agreement that was integral to the confirmed plan, the UCC expressly stated that the potential claims against the Defendants included "claims for breach of fiduciary duty arising out of … the payment of retention bonuses to senior management on the eve of bankruptcy." [559] The UCC told the Court that it was of

---

[557] Dkt. 4033 para. 20.
[558] Dkt. 5746 (Delaware order) ¶48; Dkt. 5602 (Delaware plan) at 33; Dkt. 5979 (Toys Inc. order); Dkt. 5940 (Toys Inc. plan) at 35.
[559] Dkt. 4033 at ¶20.

"critical importance to the Committee" that "the Settlement Agreement also expressly preserves,

and ***does not*** release, claims against the Debtors' current and former directors, officers, and

managers." [560]  Defendants never express any disagreement with this statement.  And, on that

basis, the Court approved the Settlement Agreement and the plans of confirmation.

Fourth, as discussed above, Defendants have the burden of proof on a defense of estoppel

and they utterly fail to mention—much less provide undisputable evidence proving—the

required elements of judicial estoppel.  Defendants make no attempt to prove the element of "bad

faith."  And Defendants could not possibly prove bad faith by either the UCC or the Trust.

Fifth, because the "vice which judicial estoppel prevents is the cold manipulation of the

courts" "[i]t is inappropriate, therefore, to apply the doctrine when a party's prior position was

based on inadvertence or mistake."  *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26,

29 (4th Cir. 1995), *quoted with approval by New Hampshire v. Maine*, 532 U.S. 742, 753 (2001).

And here, the Trust's claims against the directors for breach of fiduciary duties relating to the

approval of the bonus plan is based on uncovering new facts that the UCC did not know in

December 2017.

At the time that the UCC and its counsel were informed of the bonus payments, the UCC

did not have knowledge about the process for developing and approving those bonuses.  The

UCC would justifiably expect that the board would comply with their fiduciary duties in creating

the bonus: delegating the entire process to an independent compensation committee, evaluating

material information, and guarding against conflicts of interest.  The UCC did not know that this

process had not been followed.  The UCC did not have access to the emails between Brandon

---

[560] Dkt. 4033 at ¶20 (emphasis in original).

and Grace, the communication between Brandon and Alvarez, the compensation committee

discussion materials, or the board minutes.

When the Trust discovered those facts during its investigation after Toys "R" Us'

liquidation, it brought claims against the directors for breaching their fiduciary duties in

approving the executive bonus plan.  These claims are based on the uncovering of new facts and

thus are not estopped by any prior position adopted by the UCC.

### B.      Defendants' conduct is not protected by the business judgment rule

Defendants' assertion that the decision to approve pre-petition bonuses is "protected by

the business judgment rule" fails for multiple reasons.  Mot. at 19.

As discussed above, the business judgment rule "may only be invoked by directors who

are found to be not only 'disinterested' directors, but directors who have both adequately

informed themselves before voting on the business transaction at hand <u>and</u> acted with the

requisite care."  *Cede & Co. v. Technicolor*, 634 A.2d 345, 367 (Del. 1993) (emphasis in

original).  Therefore, "proving that the defendant breached her duty of loyalty or her duty of

care" will be sufficient for "rebutting one of the business judgment rule's presumptions."  *Basho*

*Techs. Holdco B, Ltd. Liab. Co. v. Georgetown Basho Inv'rs, Ltd. Liab. Co.*, No. 11802-VCL,

2018 Del. Ch. LEXIS 222, at *56 (Ch. July 6, 2018).  Moreover, the duty of good faith is a

component of the duty of loyalty, because a "director cannot act loyally towards the corporation

unless she acts in good faith."  *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006).  Therefore,

demonstrating a breach of the duty of good faith also removes the protection of the business

judgment rule.  *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 977 (Del. Ch. 2013)

("The business judgment rule, however, provides no protection in cases of bad-faith conduct").

In particular, the business judgement rule cannot be invoked against a claim for abdication of

directorial duties.  *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984).

172

### 1.    The business judgment rule does not apply because Defendants did not act with the requisite care or adequately inform themselves.

As shown above, the conduct of the director Defendants constitutes a breach of their duty of care, which is sufficient, without more, to eliminate the protection of the business judgement rule. *Cede & Co. v. Technicolor*, 634 A.2d 345, 371 (Del. 1993) ("This Court has consistently held that the breach of the duty of care, without any requirement of injury, is sufficient to rebut the business judgment rule.)

And a failure by directors "to adequately inform themselves" is by itself "sufficient to rebut the presumption of the business judgment rule." *Cede & Co. v. Technicolor*, 634 A.2d 345, 371 (Del. 1993).

As shown above, the director Defendants failed to adequately inform themselves before voting to approve the retention bonuses.  The reasonably available material information that Defendants failed to obtain included:

- Brandon's role in creating and controlling the bonus plan;

- An appropriate analysis of comparable compensation for executives at other companies;

- An analysis of the alternative options for implementing compensation plans;

- Advantages and disadvantages of different compensation plans;

- The likelihood that executives would leave the company;

- Any rationale for paying bonuses equal to 75% of the annual salary rather than a lower amount.

That information was reasonably available to the Defendants.  Any Defendant could have asked about Brandon's role in developing the plan.  Any Defendant could have asked Alvarez & Marsal to present an analysis of alternative compensation options.  But no Defendant did so.

Taylor and Raether knew about Brandon's control of the bonus plan, and the

compensation committee had some information about comparables for 5 of the 114 executives.

But those directors did not act with the requisite care to discharge their duties.  As discussed in

detail above, neither Taylor nor Raether took any action to curtail Brandon's influence.  And the

compensation committee entirely disregarded that the comparable compensation information

demonstrated that the top executives had compensation that exceeded the market and did not

warrant a bonus.

> **2.      The business judgment rule does not apply because Defendants
> breached their duties of good faith and loyalty.**

As discussed above, the business judgment rule does not apply if Defendants breached

their fiduciary duties.  *Brehm v. Eisner (in re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 52

(Del. 2006) (business judgment rule inapplicable where directors breached their fiduciary duty

"of loyalty or acted in bad faith").   In particular, "the business judgment rule … has no role

where directors have either abdicated their functions, or absent a conscious decision, failed to

act." *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984).

As demonstrated above, Defendants abdicated their fiduciary duties in two ways: (1) by

allowing Brandon, an interested director, to control the bonus plan, and (2) by failing to fulfill

their duty to obtain material information.  Because the directors abdicated their duties, the

business judgment rule does not apply.

Further, the business judgment rule does not apply because Defendants breached their

duty of loyalty by approving an illegal fraudulent transfer.  This breach of the duty of loyalty is

another basis for holding the business judgment rule inapplicable.

174

**C.     Defendants' specific arguments concerning the business judgment rule are contrary to the law and the facts.**

      **1.     The business judgment rule does not automatically shield all executive compensation decisions.**

Defendants' assertion that the business judgment rule "[a]pplies with [p]articular [f]orce" to decisions by a board of directors about executive compensation is false.  Mot. at 19.  Defendants' cited cases stand only for the proposition that when the business judgment rule has been *successfully invoked and not rebutted*, it should protect the *amount* of compensation that is approved by the directors.  In fact, Delaware courts recognize that, in cases that "involv[e] directors or officers paying themselves bonuses, the court is particularly cognizant to the need for careful scrutiny."  *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 745-746 (Del. Ch. 2007).

The *White* and *Brehm* cases cited by Defendants hold only that claims that a bonus was excessive, without more, should fail. *See White v. Panic,* 793 A.2d 356, 369 (Del. Ch. 2000) ("Plaintiff alleges nothing beyond the amount of the bonus paid"); *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (holding that a claim that a bonus payment was unreasonable purely because of the amount of the payment was protected by the business judgment rule).

But the Trust's claim here is not merely one of excessive compensation.  Rather, the Trust has demonstrated that the process for developing the bonus was directed by Brandon, that Brandon had a conflict of interest, that the other Directors knew of Brandon's conflict and knowingly failed to preclude him from corrupting the process, that the Directors knowingly failed to inform themselves of all material information reasonably available, and that the directors breached their duties of good faith in approving the executive bonus plan.  Thus, Defendants' cited cases that deal with claims solely about excessive compensation are inapposite.

175

Defendants' reliance on *In re Agfeed USA, LLC*, 558 B.R. 116, 128 (Bankr. D. Del. 2016), is similarly misplaced.  The claim at issue in *In re AgFeed USA, LLC* was brought under Nevada law.  *Id.* The plaintiff failed "to allege who approved the Employment Agreement," which meant it was impossible to "rebut the business judgment rule."  *Id.*  Further, the complaint did not allege that any of the directors had an interest in the transaction at issue.  It was in this context that the court stated that the plaintiff had failed to make any showing that the board "was not independent … or lacked good faith."  *Id.*

The Trust here has shown both.  The Trust has evidence demonstrating the entire board breached its duty of good faith by abdicating their known duties, and that they board allowed the plan to be controlled by a director with a personal financial interest in the bonus plan.  This is a sufficient basis for a breach of loyalty claim.  The Trust can thus rebut the business judgment rule, and can do so on the basis of each of the three theories discussed above.

**2.    Defendants' arguments on the fiduciary duties of due care and good faith fail.**

Defendants make three arguments.  We rebut each in turn.

**a.    Defendants' "employee attrition" argument fails.**

Defendants assert that the Board authorized the retention payments "to retain key personnel due to demonstrated employee attrition."  Mot. at 20.  To support this claim, Defendants assert that Grace "was concerned that additional employees might leave the company."  Mot. at 20.  These facts do nothing to address or justify the Defendants' breaches of fiduciary duty.  As discussed above, if the board had concerns about retention, that could have provided a reason to task an independent committee with developing a plan, and approving that plan after consideration of all reasonably available material information.  And they could have presented that plan to the bankruptcy court for creditor input and court review.  But neither the

board nor the compensation committee ever instructed anyone to prepare a retention plan, and

allowed Brandon, who had an obvious conflict of interest, to make all of the key decisions in

designing the plan.  And the Directors never made any effort to obtain key comparability

information that they knew was needed to assess executive compensation.   Instead, the Directors

received and rubber-stamped a plan created by Brandon.

>            **b.    Defendants' argument based on the participation of advisors
>                    fails.**

Defendants claim that the "robust process whereby A&M and Kirkland worked alongside

TRU management" means that the Trust "cannot establish that TRU's Board was recklessly

uninformed or acted outside the bounds of reason."  Mot. at 20-22.  And Defendants assert that

their presented facts are "sufficient to withstand any challenge to the duty of care."  Mot. at 22.

This argument fails for several reasons.

First, the mere presence of a special committee and advisors does not establish that no

fiduciary duties were breached.  Directors "must do more than establish a perfunctory special

committee of outside directors" to obtain the protection of the business judgment rule.  *Kahn v.*

*Tremont Corp.*, 694 A.2d 422, 429 (Del. 1997).  For an independent committee and advisors to

provide any protections, "the committee must function in a manner" that complies with all

fiduciary duties.  *Kahn v. Tremont Corp.*, 694 A.2d 422, 429 (Del. 1997).   Evaluating the

actions of a special committee and its advisors "contemplate[s] a look back at the substance, and

efficacy, of the special committee's negotiations, rather than just a look at the composition and

mandate of the special committee."  *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1240-41

(Del. 2012) (affirming trial court's determination that a transaction was not fair even with

Special Committee and advisors involved).  And directors must still fulfill their fiduciary duties

to "not simply rubber stamp whatever advice they receive," and instead must "independently evaluate assumptions and information presented by advisors." [561]

Defendants omit numerous facts that demonstrate that the bonus plan process was not an innocent collaboration between the advisors and management appropriately overseen by an independent committee, but rather one controlled by a CEO with a glaring conflict of interest. And those facts further show that the compensation committee and the board abdicated their fiduciary duties to consider the information that they were presented.  For example, Defendants list of facts fails to mention the following:

- Brandon wanted to work with Alvarez & Marsal because of his close relationship with Bryan Marsal, and personally recommended that A&M be retained;

- Brandon (not Alvarez & Marsal) selected the approach of pre-petition retention payments and he discarded the other options presented by Alvarez & Marsal;

- Brandon (not A&M) made all of the key decisions, including who would receive a bonus, how much they would be paid, and when they would receive the bonus;

- Alvarez & Marsal identified multiple downsides to choosing the option of paying pre-petition retention bonuses, including liquidity issues, that there were "[n]o incentive/performance conditions" and "potential public relations issues post-filing." [562]

- Alvarez & Marsal recommended evaluating alternatives to the pre-petition bonus plan. [563]

---

[561] Ex. 77 (Raether depo.) 319:23-320:1, 320:9-22; Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10.
[562] Ex. 108 (8'3'17 A&M Overview of Compensation Alternatives [TRU-Trust0000124123]) at 14.
[563] *Id.* at 7.

178

- Alvarez & Marsal warned that the payments could be challenged as a "fraudulent conveyance" during the bankruptcy proceedings. [564]

- Alvarez & Marsal advised that a seven step process be followed to provide oversight when installing any bonus plan, including "negotiation with Stakeholders and U.S. Trustee," filing a "motion to request court approval" and "work[ing] to resolve objections by Stakeholders." [565]

- The compensation committee never received, nor considered, nor implemented this advice from A&M.  It did not evaluate downsides, consider alternatives, or follow the prescribed process;

- Neither the board nor the compensation committee had any interactions with A&M outside the presence of Brandon;

- The compensation committee never considered comparables—key material information— for 109 of 114 executives that would participate in the bonus plan;

- Brandon orchestrated the participation of the compensation committee in the process, including calling the meetings, setting the agenda, supervising what materials the committee received, conferring with the advisors to script what happened at the meetings, participating in the meetings, controlling the follow up to those meetings, and then determining what information should be passed from the comp committee to the full board.

---

[564] *Id.*
[565] *Id.* at Slide 27.

- The full board never received nor asked for any comparables, did not evaluate alternatives, did not ask for the rationale behind the bonus, and failed to follow the process recommended by A&M for approving bonuses.

These facts demonstrate that neither the compensation committee nor the board fulfilled their fiduciary duties in working with advisors. The compensation committee failed to obtain all material information from, and follow the advice given by, the advisors. And the full board similarly knowingly failed to consider reasonably available material information and independently assess the bonus plan. Those breaches of fiduciary duty are not excused by the presence of Kirkland and Alvarez.

Second, Defendants' cases are inapposite. *Mills Acquisition* makes clear that when a board is "deceived by those who will gain" from a transaction, any protections from reliance on advisors "vanish." *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283-84 (Del. 1989). And here, the board was deceived by Brandon, who did not inform the full board of his development and control of the plan, or of his excessive compensation. *In re Books-A-Million* dealt with an established special committee that "considered alternative transaction structures," instructed its advisor to "prepare detailed financial analyses," and "sought additional information" beyond what was provided by the advisor. *In re Books-A-Million, Inc. Stockholders Litig.*, 2016 Del. Ch. LEXIS 154, at *61-63 (Del. Ch. Oct. 10, 2016). By contrast, the compensation committee considered no alternatives to the plan presented by Brandon, knowingly failed to obtain comparable compensation information for the vast majority of executives, and did not seek additional information beyond what was provided.

Defendants' two other cases do not apply Delaware law and deal with inapplicable statutory principles. *See Seidman v. Clifton Sav. Bank*, No. A-4033-07T2, 2009 N.J. Super.

180

Unpub. LEXIS 2267, at *23-24 (Super. Ct. App. Div. Aug. 19, 2009) (discussing interpretation of fiduciary duties by New Jersey courts); *In re Munford, Inc.*, 98 F.3d 604, 610-611 (11th Cir. 1996) (analyzing business judgment rule as applied to Georgia statutory duty of directors to act "with the care of an ordinary prudent person").  Moreover, the facts in these cases do not resemble the current case. *See Seidman*, 2009 N.J. Super. Unpub. LEXIS 2267, at *28-30 (no breach when board members "reviewed substantial data" on comparables and approved compensation without any influence by interested employee); *In re Munford, Inc.*, 98 F.3d at 611-612 (no breach where board members gathered all material information and relied on third-party assurances before approving a merger).

Third, Defendants' argument, and the corresponding cases, only deal with the duty of care. *See* Mot. at 22 (involvement of advisors "is sufficient to withstand any challenge to the duty of care.")  Defendants make no attempt to, and cannot, demonstrate that the involvement of advisors absolves directors of breaches of the duties of loyalty or good faith.  And, as discussed above, Defendants breached those fiduciary duties in multiple ways, including by approving a fraudulent transfer in violation of their fiduciary duty of loyalty, and abdicating their responsibility to obtain all material information in violation of their duty of good faith.

### c.    Defendants' arguments on the duty of good faith fail.

Defendants further claim that the Trust's allegations do "not establish that the directors intentionally disregarded their duties" or that their decision is "inexplicable on any ground other than bad faith."  Mot. at 23.  Defendants misconstrue the relevant facts and fail to address the theories establishing their breaches of the duty of good faith.

Defendants characterize the Trust's allegations as "certain executives should have been excluded from receiving a retention bonus," that "Brandon's $2 million retention bonus was higher than it should have been," and that "the peer group that A&M and management used was

181

flawed." Mot. at 23.  These facts are relevant, but they are not the sum total of facts giving rise

to the breach of the duty of good faith.

Each of the directors knowingly failed to fulfill their fiduciary duty to guard against

conflicts of interest by allowing Brandon to dominate the plan.  The compensation committee

directors knowingly failed to obtain comparables for each executive.  The compensation

committee knowingly disregarded Brandon's exorbitant compensation and Brandon's influence

on the plan.  The Board Directors knowingly failed to obtain key material information before

voting to approve the plan.  And the Board ultimately approved the plan knowing that it was an

illegal fraudulent transfer that would harm creditors.  As discussed above, each of these facts

demonstrates a breach of the duties of loyalty and good faith, and Defendants ignore all of them.

### 3.    Defendants' "lack of self-dealing" arguments fail.

Defendants make three arguments that there was no self-dealing.  We rebut each in turn.

### a.    Defendant' "majority of the board" argument fails.

Defendants assert that because "the majority of disinterested board members approve[d]"

the bonus plan, Brandon's participation "in developing the compensation plan" is excused.  Mot.

at 24.  This argument fails.

The Delaware Supreme Court expressly held that there is not "an invariable requirement

that a plaintiff plead facts suggesting that a majority of the board committed a non-exculpated

breach of its fiduciary duties."  *Kahn v. Stern*, 183 A.3d 715, 715 (Del. 2018).  The Court stated

that two such circumstances are (i) "cases where impartial board members did not oversee

conflicted members sufficiently" and (ii) cases "premised on independent board members not

receiving critical information from conflicted fiduciaries." *Kahn*, 183 A.3d at 715 n.4.  Both

circumstances are present here.

182

First, as discussed above, the Board had no, much less sufficient, oversight of Brandon in his development and control of the bonus plan. The Board failed to make any attempt to oversee Brandon, much less curtail his domination of the process.

Second, a board can only ratify decisions when it is aware of the key facts pertaining to those decisions—"[t]he Board, like shareholders, cannot approve (and ratify) what it did not know." *In re Xura, Inc. Stockholder Litig.*, 2018 Del. Ch. LEXIS 563, at *32-33 (Ch. Dec. 10, 2018). And a majority of the Board here was entirely unaware of key facts. Brandon did not inform the Board about his role in designing the plan or about the comparable compensation figures that showed that his compensation was already excessive. Of the ten board members who participated in voting to approve the bonus plan, only three knew that Brandon had made the key decisions (Brandon, Raether, Taylor), and only four knew that the analysis of compensation for comparable CEOs showed that Brandon's compensation was excessive (Brandon, Taylor, Levin, Goodman). A majority of the Board thus did not have the information it needed to appropriately ratify the bonus payments, and thus that vote cannot excuse Brandon's breaches of fiduciary duty. Furthermore, Brandon told none of the directors that A&M had warned him that the pre-petition retention bonuses could be challenged as a fraudulent transfer, that A&M had suggested considering alternatives to pre-petition retention payments, and that A&M had recommended that a seven-step process be followed in deciding to approve any bonus.

Defendants' cited cases confirm that an executive's involvement in a compensation decision can undercut the business judgment rule. For example, in *Sama*, the court reasoned that "an officer will breach his fiduciary duty of loyalty by accepting compensation that is clearly improper or by wrongfully influencing a compensation decision." *Sama v. Mullaney (In re Wonderwork, Inc.)*, 611 B.R. 169, 202 (Bankr. S.D.N.Y. 2020). In that case, the central fact that

led the court to conclude that the officer did not breach his duty of good faith and thus did not wrongfully influence the compensation decision was that "[the advisor] solicited [the executive's] input and not the other way around." *Id.* The executive "was participating in the process at [the advisor's] request with the knowledge of the independent Board*." Id.* at 203.

By contrast, as discussed above, the exact opposite is true here. Brandon, not A&M, developed the bonus plan. Brandon, not A&M, made all decisions, including selecting the type of plan, determining which executives should be included, determining how much each should receive, and determining the timing for when bonus payments should be made. A&M did not solicit input from Brandon; instead, Brandon solicited input from A&M. After the basic plan was developed, A&M did not direct Bandon on what changes should be made to the list of executives or their bonuses. Instead, Brandon directed A&M on what changes to make and A&M followed his directions.

Moreover, Brandon's creation of the plan and direction of A&M was not done "with the knowledge of" the Board. Instead, Brandon initiated the process of creating a bonus plan. Then Brandon brought in A&M, because of his prior relationship with Bryan Marsal. Then Brandon designed the plan and provided it to A&M. None of those details were known to any of the other Directors. The Directors on the compensation committee first became involved only after the plan was finished. The committee did not then act independently. Instead, Brandon orchestrated every aspect of the committee's processing of the plan. He participated in the compensation committee meetings; he coordinated with A&M beforehand on what would be discussed and be presented at the meetings; and he directed how the advisors would respond to the issues that the compensation committee raised.

Defendants' other cited cases purportedly supporting their position deal with independent directors who fulfilled their fiduciary duties, obtained all material information, and did not delegate the process to an interested director.  *See Warhanek v. Bidzos*, 2013 U.S. Dist. LEXIS 133099, at *16-17 (D. Del. Sept. 18, 2013); *Charter Twp. of Clinton Police & Fire Ret. Sys. v. Martin*, 219 Cal. App. 4th 924, 935 (2013).  That is not the present case.

Defendants further assert that Robert Kors, the Trustee of the Trust, conceded in his deposition that Brandon's involvement does not mean that "the program is fatally flawed."  Mot. at 25.  But the Trustee said no such thing.  Defendants entirely omit the rest of the Trustee's answer: that for Brandon and Grace's involvement not to make the program fatally flawed, "the program needs to be developed consistent with the fiduciary duties of the officers and directors, and the requirements of the bankruptcy code." [566]  That did not happen here.

### b. Defendants' "independent compensation committee" argument fails.

Defendants' argument that the Board followed advice and "set up an Independent Compensation Committee to review and approve" bonuses fails.  As a matter of law, directors "must do more than establish a perfunctory special committee of outside directors" to obtain the protection of the business judgment rule.  *Kahn v. Tremont Corp.*, 694 A.2d 422, 429 (Del. 1997).  Indeed, an interested director "providing opinions to an independent committee could be wrongful if the analysis were supported by other facts warranting an inference of improper influence."  *Friedman v. Dolan*, No. 9425-VCN, 2015 Del. Ch. LEXIS 178, at *33 (Ch. June 30, 2015).

 Here, Brandon not only directed how information would be presented to the compensation committee, he set up the compensation committee meetings, met with the advisors

---

[566] Ex. 97 (Kors depo.) 278:5-21.

in advance to script what would happen in the meetings, reviewed the materials from Alvarez before they were provided to the committee, and then personally attended and participated in the committee meetings.  And Brandon sent A&M changes and follow up materials after the compensation committee meeting that they wanted incorporated.  This, coupled with Brandon's control and direction of A&M in the development of the bonus plan, warrants an inference of improper influence.

Defendants' cited cases involved instances where there was no evidence that a director had any influence on an independent committee's decision-making.  *See e.g. Puma v. Marriott,* 283 A.2d 693, 696 (Del. Ch. 1971) ("There is no testimony which even tends to show that the terms of the transaction were dictated by the Marriott Group or any member thereof.")  By contrast, here Brandon dictated all of the terms of the bonus plan.  He designed the plan; he made the key decisions on who, how much, and when; and he continued to direct changes to the plan to add additional employees (such as his personal assistant).  The plan that was presented to the compensation committee was the plan that Brandon developed.

Thus, the board did not in fact delegate decision-making to a disinterested independent committee and cannot claim the protection of the business judgment rule.

### c.    Defendants' "conflicts of interest" argument fails.

Defendants' argument that "conflicts of interest asserted by the Trust are immaterial" fails.  Mot. at 25-26.  The Trust need not show that each Defendant had a conflict of interest in approving the bonus plan.  As discussed above, allowing a conflicted director to dominate a transaction, failing to consider material information or consider alternatives, and making a decision outside the bounds of reason all establish breaches of fiduciary duty.  Defendants do not dispute that Brandon had a glaring and obvious conflict of interest in designing and approving an executive bonus plan that would pay him millions of dollars.  The rest of the Defendant directors

186

allowed Brandon to control the bonus program and failed to consider available information. That some of the Defendant Directors did not themselves personally benefit by receiving a bonus does not excuse their breaches of duty.

### 4.    Defendants' "rational business purpose" argument fails.

Defendants assert that the payment of retention bonuses is "indisputably a legitimate business purpose." Mot. at 26. Defendants seemingly claim that because retention is a legitimate purpose, any decision to pay retention bonuses is protected by the business judgment rule. This is contrary to law.

Although the decision to pay a retention bonus is, like all director decisions, initially presumed to be a valid exercise of business judgment, as discussed above, that presumption is rebutted by demonstrating that Directors failed to inform themselves of all material information reasonably available, knowingly abdicated their fiduciary duties, allowed an interested Director to control the process, or by demonstrating facts supporting an inference that directors did not reasonably believe that the transaction was in the best interests of" the company. That sometimes the payment of retention bonuses may have a rational business purpose does not change that analysis.

Further, there is no evidence that the board in this case actually considered whether the bonus plan designed by Brandon was necessary to achieve the business purpose of retaining employees. For example, the Board never asked whether the purpose could be achieved by awarding employees supplemental quarterly bonuses upon completing each quarter, rather than paying a full year bonus in a lump sum before entering bankruptcy. The Board did not inquire as to whether an amount lower than 75% would serve the purpose of retention, particularly since the top executives already had compensation above market. Instead, the Board approved a plan

without knowing whether it was actually necessary to achieve a business purpose.  As explained

above, this decision is not protected by the business judgment rule.

Moreover, the existence of a "rational business purpose," does not mitigate or justify

using unlawful means to achieve that purpose.  For example, while it may be rational for

directors to have the ultimate purpose of increasing a corporation's bank balance, this purpose

does not justify authorizing employees to obtain funds by robbing a bank.  And having a rational

business purpose does nothing to excuse Defendants from engaging in fraudulent transfers, from

knowing abdication of decision-making steps required by fiduciary duties (e.g. obtaining all

material information reasonably available before making a decision), and disregarding known

facts demonstrating the transaction is not in the corporation's interest.

> **D.     The exculpatory provision does not protect the Defendants against any of the Trust's claims.**

As explained in detail above, the exculpatory clause does not protect Defendants'

conduct for four reasons.

<u>First</u>, exculpation is an affirmative defense, but Defendants failed to plead the

exculpation defense in their answer.  Moreover, have the burden of proof for an affirmative

defense, but Defendants have failed to provide any evidence that establishes each element of the

exculpation defense as an undisputed fact.

<u>Second</u>, an exculpatory provision does not excuse director breaches of the duties of

loyalty or good faith.  8 Del. C. § 102(b)(7).  As discussed above, the Trust has evidence

demonstrating Defendants' breaches of both of these duties.

<u>Third</u>, when directors breach both a duty of care and a duty of loyalty or good faith, then

the exculpatory provision does not immunize directors for their breach of the duty of care.

*Miller v. Greystone Bus. Credit II, L.L.C. (In re USA Detergents, Inc.)*, 418 B.R. 533, 545

(Bankr. D. Del. 2009).  And here, the Trust has demonstrated breaches of all three fiduciary

duties, rendering the exculpatory provision inapplicable.

Fourth, the exculpatory provision does not apply to Brandon's actions in his capacity as

an officer of the company. *McPadden v. Sidhu*, 964 A.2d 1262, 1275 (Del. Ch. 2008).

Brandon's breaches of his fiduciary duties are not excused by the exculpatory provision.

## VI.    The Director Defendants are liable for breaches of fiduciary duties in paying advisory fees to Sponsors.

Directors owe fiduciary duties to the corporation and to minority shareholders to act in

the best interests of all shareholders.  Directors cannot engage in actions for the benefit of

majority shareholders that detriment minority shareholders.  Moreover, when a company is

insolvent, directors owe a fiduciary duty to creditors to preserve the company's assets for the

benefit of creditors. Defendants breached these fiduciary duties in numerous ways.

The fiduciary duties of directors require that directors avoid conflicts of interest in

decision-making.  When directors have conflicts, they must abstain from making decisions or

delegate decisions to disinterested directors.

Six of the eight Directors on the Board were appointed by the Sponsor companies, and

had obvious conflicts of interest on decisions that would financially benefit the Sponsors.

Brandon had a close relationship with Bain that similarly created a conflict of interest.  Yet those

same Directors approved hundreds of millions of dollars of advisory fee payments made to the

Sponsor companies.  They did not make any attempt to delegate the renegotiation and

consideration of the advisory fees to independent and disinterested directors.  By failing to do so,

each of these Directors violated their duty of loyalty.

The fiduciary duties of directors further require that directors act in good faith to only

authorize transactions that are in the best interests of the company.  And directors must not

189

engage in an abdication of their fiduciary duties by making decisions without adequate information or deliberation.

Each of the Directors knew that the Advisory Fee Agreement had unreasonable terms and were not in the best interests of Toys "R" Us.  The Agreement mandated that each Sponsor receive a fee, but did not require that any Sponsor perform any work—it gave the Sponsors full discretion to determine if they would perform any services for the company.  And the Directors never attempted to obtain information about what services, if any, Toys "R" Us was receiving, much less the value of those services.  Because the Directors authorized an objectively unreasonable transaction that was not in the best interest of the Company and abdicated their duty to consider material information, they breached their duty of good faith.

Between 2005 and 2017, Bain, KKR, and Vornado received "over $308 million in fees paid by Toys 'R' Us" pursuant to an Advisory Fee Agreement. [567]  The Trust seeks damages for losses caused by Defendants' breaches of fiduciary duty in the three years preceding the bankruptcy filing, from Q4 2014 to 2017.  The amount of those losses is $17,863,110. [568]

### A.    Defendants' fiduciary duties applied to their decisions to allow payment of advisory fees to the Sponsors.

Directors have "a fiduciary duty to the corporation and to its minority shareholders if the majority shareholder[s] dominate[] the board and control[] the corporation."  *In re Reading Co.*, 711 F.2d 509, 517 (3d Cir. 1983).

When minority shareholders are present, payments that are "in essence self-dealing" by majority shareholders, to "the exclusion of and detrimental" to "minority stockholders," are presumed to violate fiduciary duties unless the Defendants can demonstrate intrinsic fairness in

---

[567] Ex. 70 (Greenspan) ¶346-347.
[568] Ex. 135 (Mills) ¶31.

the transaction.  *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721 (Del. 1971); *see Frederick Hsu Living Tr. v. ODN Holding Corp.*, No. 12108-VCL, 2017 Del. Ch. LEXIS 67, at *102 (Ch. Apr. 14, 2017) (denying motion to dismiss where majority shareholder "was able to extract the cash to the exclusion of [minority] stockholders.").

Bain, KKR, and Vornado each owned a 32.6% interest in Toys "R" Us. [569]  Together, the three Sponsors owned approximately 97.8% of Toys "R" Us. [570]  The remaining 2.2% was held by minority shareholders. [571]  In 2015, 2016, and 2017, there were minority shareholders of Toys "R" Us that were identified in TRU's 10-K filings. [572]  As of 2017, there were approximately 300 minority shareholders, including "current and former employees and a private investor." [573]

The presence of these minority shareholders meant that the Directors needed to comply with their fiduciary duties to the Company and its minority shareholders when approving transactions that would benefit the majority shareholders.

Further, when a company is insolvent, directors "owe[] a fiduciary duty" to "the company's creditors to preserve assets." *Collins v. Throckmorton*, 425 A.2d 146, 149 (Del. 1980).  Numerous pieces of evidence indicate that Toys "R" Us was not solvent at all times during its payment of the advisory fees.  As discussed above, the Sponsor Directors and Brandon

---

[569] Ex. 80 (Silverstein depo.) 84:23-85:10; Ex. 70 (Greenspan) ¶350.
[570] *Id.*
[571] *Id.*; Ex. 65 (2017 TRU 10k); Ex. 69 (Form 10-K 2016); Ex. 68 (Form 10-K 2015).
[572] Ex. 70 (Greenspan) ¶351.
[573] Ex. 65 (2017 TRU 10k) at pdf 28; Ex. 70 (Greenspan) ¶351.

had acknowledged that the Company was insolvent and that the Sponsors' equity interests had no

value. [574]  "The inability to realize any value above the debt is the definition of insolvency." [575]

Thus, because of the presence of minority shareholders and because Toys "R" Us was

insolvent, Defendants had fiduciary duties of loyalty, good faith, and due care that applied to any

decision to allow the Company to make payments to Bain, KKR, or Vornado.

As discussed above, directors have a duty to avoid conflicts of interest in a transaction

and delegate decision-making to disinterested directors if a conflict of interest is implicated.  The

Delaware Supreme Court has "consistently defined the duty of loyalty of officers and directors"

in "unyielding terms."  *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993).  A director is

"independent only when the director's decision is based entirely on the corporate merits of the

transaction and is not influenced by personal or extraneous considerations."  *Id.* at 362.  "[T]here

is no safe-harbor for divided loyalties in Delaware."  *In re Walt Disney Co. Derivative Litig.*, 907

A.2d 693, 751 (Del. Ch. 2005).  When directors have conflicts and do "not totally abstain from

participation in the matter," they must "demonstrate their utmost good faith and the most

scrupulous inherent fairness of the bargain."  *Weinberger v. Uop*, 457 A.2d 701, 710 (Del. 1983).

Defendants' duty of good faith required that they only authorize transactions that they

reasonably believed were in the best interest of the Company.  Bad faith can be shown when

---

[574] Ex. 70 (Greenspan) ¶¶163-165; 399-401; Ex. 79 (Taylor depo.) 170:10-21 (testifying that
KKR's internal valuation of "KKR's investment in Toys 'R' Us" showed that "our equity had no
value"); Ex. 79 (Taylor depo.) 167:2-24 (testifying that KKR calculated that Toys "R" Us had
debt of $4.7 billion but an enterprise value of $3.4 billion to $3.7 billion); Ex. 79 (Taylor depo.)
169:4-18 ("the total value of Toys 'R' Us is less than the debt"); Ex. 78 (Levin depo.) 239:6-25,
240:13-241:3 ("the equity investment in Toys 'R' Us has a value of zero"); Ex. 75 (Vornado
2013 annual report) at 10 n.7, 57; Ex. 76 (Vornado 2014 annual report) at 36; Ex. 62 (11'4'14
Vornado write down [DEFS_0111323]); Ex. 13 (4'8'15 Saghir to Taylor Levin re Brandon
[DEFS_0049061]); Ex. 1 (1'4'16 Taylor Raether equity calculation, [DEFS_0125987]).
[575] Ex. 70 (Greenspan) ¶400.

there are "facts supporting an inference that [the fiduciary] did not reasonably believe that the …

transaction was in the best interests of" the company. *Brinckerhoff v. Enbridge Energy Co.*, 159

A.3d 242, 260 (Del. 2017), *quoted with approval by Kahn v. Stern*, 183 A.3d 715, 715 & n.5

(Del. 2018). This bad faith standard is an objective standard that does not require proof of the

director's subjective intent. *Brinckerhoff*, 159 A.3d at 260.

Directors also breach their duty of good faith if they engage in an "abdication of

directorial duty." *Cede & Co. v. Technicolor*, 634 A.2d 345, 363-64 (Del. 1993). Such a breach

occurs when "the defendant directors knew that they were making material decisions without

adequate information and without adequate deliberation." *In re Walt Disney Co. Derivative

Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003).

Further, Defendants were also obligated to comply with their duty of care. That fiduciary

duty is breached by action or inaction that amounts to "gross negligence," which is "conduct that

constitutes reckless indifference or actions that are without the bounds of reason." *McPadden v.

Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008).

As discussed above, Defendants knew that to fulfill their fiduciary duties "in a situation

where a decision would implicate an actual or potential conflict of interest, the board should

delegate decision-making authority to disinterested directors or managers." [576] Defendants

further knew that they had to consider and assess "all reasonable alternatives" before coming to a

decision. [577] And Defendants understood that their fiduciary duties required them to "inform

---

[576] Ex. 77 (Raether) 157:3-8; Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at
slide 15.
[577] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10.

themselves of all material information that was reasonably available" and "carefully consider

that information" before making a decision. [578]

Defendants knew and understood their fiduciary duties.  But they utterly failed to comply

with those duties in authorizing the payment of advisory fees to the Sponsors.

### B.     Defendants' decision to allow the Company to make payments to Bain, KKR, and Vornado violated their fiduciary duty of loyalty.

Six of the eight directors on the Board were appointed by the Sponsors who received

advisory fee payments from Toys "R" Us: Bekenstein and Levin were appointed by Bain,

Silverstein and Macnow were appointed by Vornado, and Raether and Taylor were appointed by

KKR. [579]  As demonstrated above, each of the Sponsor-appointed Directors was beholden to the

Sponsor company that appointed them to the Board.  And, as demonstrated above, Brandon had a

conflict of interest in decisions involving the Sponsors because Brandon owed his continued

employment and other outside financial benefits to the Sponsors. [580]  Each of these directors

therefore had conflicts of interest in decisions that would provide financial benefits to the

Sponsors.

Each of the Sponsor Directors and Brandon knew that Toys "R" Us was paying advisory

fees to the Sponsors.  Those advisory fees were disclosed in Toys "R" Us' 10-Ks, which

Brandon and the Sponsor Directors signed. [581]  By signing the 10-Ks, the Directors indicated that

they "thoroughly reviewed and agreed with the accuracy and veracity of the contents therein." [582]

---

[578] Ex. 27 (8'9'17 Fiduciary Duty Presentation [DEFS_0064535]) at slide 10.
[579] Ex. 65 (2017 TRU 10k) at pdf 119.
[580] Ex. 70 (Greenspan) ¶356.
[581] Ex. 68 (Form 10-K 2015) at 115-116; Ex. 65 (2017 Form 10k) at 146-47; Ex. 80 (Silverstein depo.) 86:9-23.
[582] Ex. 80 (Silverstein depo.) 86:9-23.

The Advisory Fee Agreements provided significant benefits to each of the Sponsors.  In 2005, Toys "R" Us entered an advisory fee agreement with the Sponsors and agreed to pay the three Sponsors approximately $15 million each year. [583]  The agreement provided that the fees paid would increase by 5% each year. [584]

The agreement also required that the Company pay the Sponsors a fee equal to 1% of the value of each financing, acquisition, or other transaction that the Company engaged in, regardless whether any of the Sponsors had any involvement in arranging the transaction. [585]

The Sponsors benefitted financially from the payment of advisory fees.  As discussed in greater detail below, the Advisory Fee Agreement provided that the Sponsors would receive a specific fee each quarter, and did not require that the Sponsors do anything to receive that fee. To the contrary, the agreement specified that "no minimum number of hours is required to be devoted" by the Sponsors and that the Company was required to pay the fees "regardless of the extent of services requested by [Toys 'R' Us]." [586]  As long as the Advisory Fee Agreement was in effect, the Sponsors were guaranteed their $5 million yearly fee.  And the Sponsors were similarly guaranteed their transaction fees, regardless of work done on any financing. [587]  In total, this resulted in the Sponsors receiving "over $308 million in fees paid by Toys 'R' Us" between 2005 and 2017. [588]

Toys "R" Us and the Sponsors had the ability at any time to negotiate an amendment to the Agreement, including changing the amount of the fees, and, in fact, four amendments were

---

[583] Ex. 169 (Original Advisory Agreement [DEFS_0064739]) at 2, 9-10; Ex. 70 (Greenspan) ¶338.
[584] Ex. 169 (Original Advisory Agreement [DEFS_0064739]) at 2, 9-10.
[585] Ex. 169 (Original Advisory Agreement [DEFS_0064739]) at 2-3. Ex. 70 (Greenspan) ¶338.
[586] Ex. 169 (Original Advisory Agreement [DEFS_0064739]) at 3.
[587] *Id.* at 2-3.
[588] Ex. 70 (Greenspan) ¶346-347.

entered over the years. [589]  The Agreement was amended in August 2014, to change the amount

of the fees that the Company was required to pay to $17 million per year. [590]  The agreement was

amended in June 2015 to change the amount of the fees to $6 million per year. [591]  That 2015

amendment was signed by Defendant Silverstein on behalf of Vornado, by Defendant Taylor on

behalf of KKR, and by Defendant Levin on behalf of Bain. [592]

The parties to the agreement not only had the ability to negotiate amendments that

reduced the amount of the fee, the parties also had the ability to negotiate a complete termination

of the agreement, or to invoke the termination provision in the agreement.  The Advisory Fee

Agreement provided that it could be terminated by either the Sponsors or Toys "R" Us by

"written notice of its desire to terminate." [593]

The Directors not only knew that the Company could negotiate amendments to modify

the fees paid, the Directors participated in the amendment process.  For example, before the

Company entered the 2015 amendment, the Directors received an update email from the Toys

"R" Us general counsel that identified "the reduction of the quarterly sponsor advisory fee" as

one of "several important matters related to the Board." [594]  Silverstein represented Vornado in

the discussions with Bain and KKR. [595]  She shared her views on the extension with Steve Roth,

the CEO of Vornado. [596]  And the signatories on that amendment on behalf of each of the

---

[589] Ex. 70 (Greenspan) ¶¶342-345.
[590] Ex. 177 (Amendment No. 3 to the Advisory Agreement); Ex. 70 (Greenspan) ¶343; Ex. 65 (2017 Form 10k) at 146-47.
[591] Ex. 166 (Amendment No. 4 to the Advisory Agreement) at 1 §2; Ex. 70 (Greenspan) ¶344; Ex. 65 (2017 Form 10k) at 146-47.
[592] Ex. 80 (Silverstein depo) 29:17–30:19, 35:6-14; Ex. 166 (Amendment No. 4 to the Advisory Agreement [TRU-Trust0000323115]).
[593] Ex. 169 (Original Advisory Agreement [DEFS_0064739]) at 1.
[594] Ex. 153 (5'29'15 Silverstein reduction in fees [DEFS_0076425]).
[595] Ex. 153 (5'29'15 Silverstein reduction in fees [DEFS_0076425]).
[596] *Id.*

Sponsors were three of the Sponsor Directors: Levin, Taylor, and Silverstein. [597]  As

demonstrated above, "each of the Sponsor Directors held positions of significant influence

within their organizations and had the ability to influence decisions by the Sponsor in any

renegotiation of the advisory fee agreement."[598]

When considering whether to renegotiate or terminate the Advisory Fee Agreement in the

best interests of the Company, each of the Sponsor Directors and Brandon could not purport to

be independent.  Whereas a disinterested director would only be interested in determining

whether the payment of advisory fees benefitted Toys "R" Us, the Sponsor Directors and

Brandon had a separate interest—whether the fees benefitted the Sponsors. [599]  For the conflicted

directors to comply with their fiduciary duties, they would have to delegate the decision-making

on advisory fee payments to independent and disinterested directors, and recuse themselves from

participating in decision-making on whether to pay advisory fees to the Sponsors. [600]

There is no evidence that the Sponsor Directors and Brandon ever delegated their

decision making to disinterested directors.  The Sponsor Directors did not recuse themselves

from participating in decision making on the advisory fees.  They did not task an independent

committee with evaluating whether the advisory fees were in the best interest of the Company

and whether Toys "R" Us should continue paying them.  And there is no evidence that any

director suggested that the decision to pay advisory fees be delegated to the only independent

---

[597] Ex. 80 (Silverstein depo.) 35:6-14; Ex. 166 (Amendment No. 4 to the Advisory Agreement
[TRU-Trust0000323115]) at 3-5.
[598] Ex. 70 (Greenspan) ¶358.
[599] See Ex. 78 (Levin depo.) 9:19-10:13 (discussing Levin's interest in Bain); Ex. 77 (Raether
depo.) 7:23-8 (discussing Raether's role at and ownership of shares in KKR); Ex. 80 (Silverstein
depo.) 9:19-22, 11:15-22 (discussing ownership interest in Vornado).
[600] Ex. 70 (Greenspan) ¶356.

director on the board at the time (Goodman).  Instead, as demonstrated above, the Sponsor

Directors were active participants in the process.

Because the majority of the Board (7 of 8 directors) were conflicted in the decision to pay

advisory fees, and did not recuse themselves, the burden shifts to Defendants to prove that "the

transaction was entirely fair to the shareholders."  *Chaffin v. GNI Grp., Inc.*, Civil Action No.

16211-NC, 1999 Del. Ch. LEXIS 182, at *16 (Ch. Sep. 3, 1999).  As discussed below,

Defendants have made no attempt to demonstrate entire fairness and cannot do so.

### C.   Defendants' decision to allow the Company to make payments to Bain, KKR, and Vornado violated their fiduciary duty of good faith.

#### 1.   The advisory fee agreements were objectively unreasonable in their terms and not in the best interests of the Company.

Bad faith can be shown when there are "facts supporting an inference that [the fiduciary]

did not reasonably believe that the … transaction was in the best interests of" the company.

*Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 260 (Del. 2017), *quoted with approval by*

*Kahn v. Stern*, 183 A.3d 715, 715 & n.5 (Del. 2018).  Whether a director "reasonably believed" a

transaction was in the best interest of the company is an objective standard that does not require

proof of the director's subjective intent.  *Brinckerhoff*, 159 A.3d at 260.

The structure of the Advisory Fee Agreement was objectively unreasonable and not in the

best interest of the Company.  The Advisory Fee Agreement required the payment of millions of

dollars in fees, but required no work whatsoever to be performed, and gave each of the Sponsors

full discretion on whether to provide services and how to provide those services. [601]

Defendants understood that Toys "R" Us would be better off if it "spent less money" for

the same services and thus "kept more money in its pocket." [602]  "[I]t would have been in the

---

[601] Ex. 70 (Greenspan) ¶355.
[602] Ex. 80 (Silverstein depo.) 81:22-82:4.

best interest of the Company to pay advisory fees only to the extent that the Company was receiving services from each Sponsor, that such services were not duplicative and unnecessary, and that the amount paid was fair value for the services." [603]  "If the Company was receiving no needed services from the Sponsors, then the interests of the Company would be served by not paying any fees to the Sponsors." [604]  The Advisory Fee Agreement did not serve Toys "R" Us' interests.

The Advisory Fee Agreement stated that "[e]ach Advisor will provide and devote to the performance of this Agreement such partners, employees and agents of such Advisor as it shall deem appropriate to the furnishing of the services mutually agreed upon," and that "no minimum number of hours is required to be devoted by any or all of the Advisors." [605]  And the Advisory Fee Agreement further ensured that the Sponsors would receive the same flat fee payment regardless of the services that were actually requested and performed: "[t]he fees and other compensation specified in this Agreement will be payable by the Company regardless of the extent of services requested by the Company pursuant to this Agreement, and regardless of whether or not the Company requests an Advisor to provide any such services." [606]

This meant that by its terms, the Advisory Fee Agreement allowed the Sponsors to perform no work for Toys "R" Us to receive the advisory fee payment in a given quarter.  And it gave the Sponsors an incentive to perform minimal or no work at all for Toys "R" Us because they were guaranteed to receive their advisory fee payment anyway.  Instead of tasking employees with performing work for Toys "R" Us, the Sponsors had an incentive to use those

---

[603] Ex. 70 (Greenspan) ¶354.
[604] Ex. 70 (Greenspan) ¶354.
[605] Ex. 169 (Original Advisory Agreement [DEFS_0064739]) at 3.
[606] Ex. 169 (Original Advisory Agreement [DEFS_0064739]) at 3.

employees on projects that actually required deliverables and measurable work product for fees to be paid.

As a result, "it was unreasonable for the Company to enter into the Advisory Agreement since its terms were materially tilted to benefit the Sponsors, and it was a breach of fiduciary duty by the Defendants to allow the agreement to remain in place without negotiating material revisions or seek its termination." [607] "An advisory agreement that requires the payment of millions of dollars in fees to the advisor, but permits the advisor to determine if and to the extent it will provide services and requires no work whatsoever to collect those fees, is one that the Director Defendants should have recognized as inherently unreasonable." [608]  It posed a high risk that Toys "R" Us would receive nothing in value in exchange for the payment of advisory fees. But instead of terminating the agreement or reducing the fees to zero, Defendants extended it beyond 2015 and caused Toys "R" Us to continue paying advisory fees.

> **2.    The advisory fee payments were not justified by the amount, quality, or value of the services provided and therefore were objectively unreasonable and not in the best interests of the Company.**

In assessing whether the advisory fee payments were in the best interest of the Company, they were highly suspect on their face.  First, as demonstrated above, the payments were not tied to any specific services that the Sponsors were required to provide.  There was thus a significant risk that there would be few or no services provided in exchange for the payments made by Toys "R" Us, because the Sponsors had no incentive to provide services—they were guaranteed their payment regardless of hours worked or services provided.  Second, as discussed above, each of the Directors knew that they already had fiduciary duties to provide services to Toys "R" Us, irrespective of any advisory agreement.  The Company did not need to pay the Sponsors to have

---

[607] Ex. 70 (Greenspan) ¶355.
[608] Ex. 70 (Greenspan) ¶355.

the Directors perform services that the Directors were already required to perform by the Directors' fiduciary duties.  Third, these two concerns were heightened because of the six Sponsor Directors' obvious conflicts of interest in decisions regarding the Sponsors that appointed them to the board.

Moreover, the Directors could not reasonably believe the payments were in the best interests of the Company because, as shown below, the record before the Directors demonstrated that the Company was not receiving any value in exchange for the payments.

> **a.    The Directors had insufficient evidence that advisory services were actually provided by Sponsors to the Company 2014-2017.**

The Advisory Agreement provided that the Sponsors would perform "such services for the Company and/or its subsidiaries as mutually agreed by the Advisors and the Company." [609] There is "no documentary or other evidence demonstrating that the Company requested or agreed that the Sponsor should provide any service to the Company … for the period from 2014-2017." [610]  For example, Silverstein testified as follows:

```
14     Q.  Did -- did Vornado ever enter a
15  specific written agreement where Toys "R" Us and
16  Vornado mutually agreed to certain services that
17  were spelled out and that would be provided by
18  Vornado to Toys "R" Us on a specific project?
19     A.  Not that I recall.
20     Q.  Did that ever occur between
21  Toys "R" Us and Bain or KKR?
22     A.  I -- I don't know -- I don't recall,
23  and I'm not sure I would know if it did or
24  didn't exist.
…
Page 66
6     Q.  Did Vornado and Toys "R" Us ever agree
7  on a specific deliverable that would be provided
8  to Toys "R" Us for a specific set of services
```

---

[609] Ex. 169 (Original Advisory Agreement [DEFS_0064739]) at 1 §2.
[610] Ex. 70 (Greenspan) ¶¶365-366.

9   that Vornado was providing to Toys "R" Us?
10      A.  Nothing specific that I recall.
Ex. 80 (Silverstein depo.) 65:14 – 66:10.

Furthermore, "[o]ne would generally expect that if multi-million dollars' worth of

services were provided over multiple years by a company with which a Sponsor Director had a

relationship, he/she would be readily aware and knowledgeable of such services.  And one would

further expect that such services would be documented in some form." [611]  But there is no

"documentary evidence demonstrating that a Sponsor provided any advisory services to the

Company, in particular for the period from 2014-2017." [612]

Defendant Silverstein testified:

15      Q.  Do you have a -- any recollection of
16   hearing about any services that were provided by
17   Vornado to Toys "R" Us during the time period
18   from 2014 through 2017?
19      MR. SEFICK:  Objection to form.  Asked
20      and answered.
21      A.  I have nothing further to add.
22      Q.  Did you hear about any services that
23   were provided by KKR to Toys "R" Us during the
24   time period from 2014 to 2017?
25      A.  I have no recall as to what KKR or
Page 55
1   Bain did specifically.
2       Q.  Did you hear about any services that
3   were provided by either Bain or KKR to
4   Toys "R" Us during the time period 2014 to 2017?
5       MR. SEFICK:  Objection to form.
6       A.  I have no recollection.
Ex. 80 (Silverstein depo.) 54:15 – 55:6.

---

[611] Ex. 70 (Greenspan) ¶366.
[612] Ex. 70 (Greenspan) ¶366.

b.    **The Directors had insufficient evidence of the value of advisory services provided by Sponsors to the Company 2014-2017.**

For the Directors to reasonably believe the advisory payments were in the best interest of the Company they would need to understand the value of those services, and the relationship between fees paid and services provided.  But the Directors had no "documentation demonstrating the fair market value of any advisory services provided to the Company by a Sponsor." [613]

"Although the Company was paying millions of dollars in fees to the Sponsors each year, it appears the Directors made no effort to audit or assess the quantity, nature, or value of advisory services provided to the Company from the Sponsors. [614]  For example, Silverstein testified:

```
21      Q.  Was there ever an audit done of the
22  services provided by Bain, KKR or Vornado to
23  Toys "R" Us to determine, in the preceding year
24  or five years, the amount of the services and
25  their value to Toys "R" Us
1       A.  I'm -- I'm sorry, an audit done by
2   whom?  Which party?
3       Q.  By anyone.
4       A.  Not that I'm aware of.
5       Q.  Did the board of directors ever
6   receive a report identifying the quantity and
7   nature and value of the services that had been
8   provided by Bain or KKR or Vornado to
9   Toys "R" Us?
10      A.  Not that I recall.
```
Ex. 80 (Silverstein) 66:21 – 67:10.

Furthermore, "the payment of multi-million-dollar consulting fees is typically tied to specific services or workstreams that will be provided. This allows for the company hiring a consultant to periodically evaluate whether the payment of those fees is appropriate and creating

---

[613] Ex. 70 (Greenspan) ¶367.
[614] Ex. 70 (Greenspan) ¶368.

value for the company.  And … companies typically re-evaluate those fees in the context of other retained advisors or advisory services." [615]  But for "the advisory fees paid by Toys 'R' Us to the Sponsors, there is no indication that the advisory fees were ever tied to specific services or levels of services." [616]

Furthermore, the Sponsors were willing to provide those purported services regardless of the amount of money the Sponsors received.  Although the required fees changed dramatically over the years, Silverstein testified that as the fees changed the Sponsors "did the same thing with or without the fees." [617]  "The reasonable inference is that Bain, KKR, and Vornado were not actually providing such services to the Company." [618]

### 3.    The Director Defendants abdicated their fiduciary duties to consider material information and alternatives.

The Director Defendants knew that when making decisions about a transaction, they needed to ensure that they were making that decision only after gathering and considering all reasonably available material information.  And they needed to consider alternatives.  They failed to do either.

The payments to the Sponsors should have been highly suspect for several reasons.  First, the payments were not tied to any specific services that the Sponsors were required to provide.  There was thus a significant risk that there would be few or no services provided in exchange for the payments made by Toys "R" Us, because the Sponsors had no incentive to provide services—they were guaranteed their payment regardless of hours worked or services provided.  Second, as discussed above, each of the Directors knew that they already had fiduciary duties to

---

[615] Ex. 70 (Greenspan) ¶369.
[616] Ex. 70 (Greenspan) ¶370.
[617] Ex. 80 (Silverstein depo) at 81:9-15; *id.* at 97:14-98:12.
[618] Ex. 70 (Greenspan) ¶371.

provide services to Toys "R" Us, irrespective of any advisory agreement.  If the advisory fee agreement was duplicative of the services already required by the Directors' fiduciary duties, it would not create any additional value to the Company. Third, these two concerns should have been heightened by the six Sponsor Directors' obvious conflicts of interest in decisions regarding the Sponsors that appointed them to the board.

To comply with their fiduciary duties in light of the above concerns, Defendants needed to assess all reasonably available material information to determine whether the advisory fee payments were actually in the best interests of Toys "R" Us.  They needed to determine what services were actually being provided by the Sponsors, and whether the value of those services was equal to the price Toys "R" Us was paying for them.  They needed to evaluate whether those services were duplicative of services already being performed by Toys "R" Us directors, employees, or other advisors hired by Toys "R" Us.  They needed to assess whether those services could be obtained by paying less money to other advisors.  And they needed to ensure that these assessments were performed by disinterested, rather than conflicted, directors.  The Directors did none of these things.

> **a.      The Directors did not consider what services were provided or the value of those services.**

A prerequisite to being able to assess the value of services provided under the Advisory Fee Agreement is to determine what services were actually provided.  The Directors failed to take even that basic step.

As demonstrated above, there is no evidence that any of services were ever provided under the Advisory Fee Agreement.  There is no documentation whatsoever of any services provided by Bain, KKR, or Vornado between 2005 and 2017. [619]  And the Directors never made

---

[619] Ex. 80 (Silverstein depo.) 65:14-24, 66:6-10, 73:19-74:7.

any effort to assess whether any services were provided under the advisory agreement or the value of those services. There was no audit of the services provided by Bain, KKR or Vornado to "determine, in the preceding year or five years, the amount of the services and their value to Toys "R" Us." [620] Without knowing the services (if any) that were provided, the number of hours worked by Sponsor employees on particular projects, or the deliverables that each Sponsor provided in exchange for payment, there was no possible way for the Directors to conclude that the payment of advisory fees was a transaction that was in the best interest of the Company.

As demonstrated above, if the Directors had performed an analysis of the value received for the advisory fee payments, they would have seen no correlation between the amount of fees paid and the purported levels of service provided. And they therefore would have seen compelling evidence that the payment of advisory fees was not providing any additional value to the Company.

> **b.      The Directors did not consider whether the services were duplicative of other services already being provided to Toys "R" Us.**

Considering whether the same services listed in the Advisory Fee Agreement were already being provided to Toys "R" Us was a material fact. If a company pays for the same service twice, it is losing money and not gaining value because the company is unnecessarily paying for a duplicative service. Thus, to evaluate whether a transaction is in the interests of the company, a director must to assess whether that transaction is providing value rather than a merely duplicative service. If the services in the Advisory Fee Agreement were already being provided to Toys "R" Us from other sources, Toys "R" Us would receive no value from paying for those same services in the Advisory Fee Agreement.

---

[620] Ex. 80 (Silverstein depo.) 66:21-67:4.

The Directors did not obtain information showing whether the services in the Advisory Fee Agreement were duplicative of those already being provided.  Had they done so, they would have determined that all of the services listed in the Agreement were already being performed by a combination of Toys "R" Us employees and outside advisors. [621]

Toys "R" Us employees provided many of the services detailed in the Advisory Fee Agreement.  The Advisory Fee Agreement services included "general executive and management services," "finance functions," "real estate functions," "marketing functions," and "human resources functions." [622]  As Defendants confirmed, each of these services was already being provided by Toys "R" Us employees.  Toys "R" Us had "executives and employees who fulfilled the function of providing general executive and management services." [623]  It had "employees and managers who performed finance functions, real estate functions, marketing functions, and human resources functions." [624]  And Toys "R" Us was already paying those employees to perform those functions. [625]  The Directors did not evaluate whether these services were entirely duplicative of those in the Advisory Fee Agreement.

Other services were duplicative of the work that other outside advisors were being paid to do for Toys "R" Us.  The Defendants were aware that other outside advisors were performing work for Toys "R" Us during the same time period that Toys "R" Us was paying advisory fees. [626]

---

[621] Ex. 70 (Greenspan) ¶374.
[622] Ex. 169 (Original Advisory Agreement [DEFS_0064739]) at 2-3.
[623] Ex. 80 (Silverstein depo.) 58:4-11.
[624] Ex. 80 (Silverstein depo.) 59:23-60:2.
[625] Ex. 80 (Silverstein depo.) 60:4-7.
[626] *See* Ex. 80 (Silverstein depo.) 61:9-62:5.

For example, the potential services listed in the Advisory Fee Agreement included "analysis of acquisitions and dispositions" and "negotiation and analysis of financing alternatives." [627]  Other advisors were already hired by Toys "R" Us to perform these functions. For example, Blackstone Advisory Partners L.P. was retained by Toys "R" Us in 2014 to provide valuation, financial modeling, and structuring advice. [628]  And Sullivan & Cromwell LLP was retained to evaluate "options for refinancing" and "legal alternatives to increase equity value." [629]

Defendants did not evaluate whether and to what extent these services were entirely duplicative of those contemplated by the Advisory Fee Agreement. [630]  And they made no attempt to determine whether the services listed in the Advisory Fee Agreement could be "provided more cost effectively by outside advisors." [631]

Failing to assess whether the services provided were duplicative was a knowing abdication of the directors' fiduciary duty to assess material information.  And without such a conclusion, it was a breach of the Directors' fiduciary duty to pay the advisory fees.

> **c.      The Directors did not consider whether payment was required to ensure that services were provided by the Sponsors and Sponsor directors.**

Defendants further needed to analyze whether payment for the services contemplated by the Advisory Fee Agreement was superfluous; if Defendants were already required to provide services for Toys "R" Us at no cost to Toys "R" Us, it would be irrational for the Company to make payments for those services.

---

[627] Ex. 169 (Original Advisory Agreement [DEFS_0064739]) at 2-3.
[628] Ex. 70 (Greenspan) ¶381.
[629] Ex. 70 (Greenspan) ¶384.
[630] Ex. 70 (Greenspan) ¶387.
[631] Ex. 80 (Silverstein depo.) 66:12-20.

Defendants did not perform this analysis.  If they had done so, they would have determined that the Sponsor Directors and Sponsors were already obligated to provide services to Toys "R" Us.

The Sponsor Directors were already required by their fiduciary duties to provide services to Toys "R" Us in their roles as directors.  They would "devote time to reading materials, conducting analysis, setting the strategic course of the company, considering and voting on key decisions, and selection, review of the performance, and compensation of the CEO." [632]  Those actions were "customary duties that are expected to be provided by any individual serving as a board member," and "not advisory services under the Advisory Agreement." [633]

Moreover, each of the Sponsor Directors, and the Sponsors themselves, had an obligation to manage the Toys "R" Us investment to the best of their ability based on their duties as fund managers.  "Toys "R" Us was held in Bain's VIII fund, KKR's Millennium Fund, and in Vornado Truck LLC." [634]  Each of the Sponsors received payments from investors to manage the holdings in those funds. [635]  Defendants' obligations as executives at the Sponsor companies included "fiduciary responsibilities … to manage all investments to the best of [their] abilities." [636]  One of those investments was Toys "R" Us. [637]  When employees of the Sponsors performed work related to Toys "R" Us, they did so in fulfillment of their duties to the holders of the investment funds. For example, when KKR employees created a performance summary for

---

[632] Ex. 70 (Greenspan) ¶361.
[633] *Id.*
[634] Ex. 70 (Greenspan) ¶362; Ex. 65 (2017 TRU 10k) at 140-141.
[635] Ex. 70 (Greenspan) ¶363.
[636] Ex. 80 (Silverstein depo.) 104:9-21.
[637] *Id.*

Toys "R" Us and calculated the equity value of Toys "R" Us, they did so because "they were paid by the funds as their investment fund manager." [638]

By failing to even consider whether the services being paid for in the Advisory Fee Agreement were already required by other duties to Toys "R" Us, the Directors knowingly abdicated their duty to consider material information in evaluating the payment of advisory fees.

### 4.    The Directors abdicated their fiduciary duty to ensure that decisions were made by disinterested directors.

A breach of the duty of good faith occurs "[w]here directors fail to act in the face of a known duty to act." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). As discussed above, Defendants knew they had a duty to ensure that decisions were made by disinterested directors who did not have conflicts of interest. And each Director Defendant knew that each of the Sponsor Directors had conflicts of interest in making decisions about advisory fees because the Sponsor Directors were appointed by, and represented the interests of the three Sponsors. [639] The Directors' fiduciary duties meant they could not stand by and simply allow decisions about the advisory fees to be made by interested directors.

As demonstrated above, decisions about advisory fee payments were not delegated to Goodman as an independent director or to an independent committee set up for these purposes. Instead, the advisory fee agreements stayed in place, and the Sponsor Directors were the ones signing the agreements on behalf of the Sponsors. Thus, the Directors knowingly abdicated their duty to ensure that disinterested directors were making decisions about the advisory fee payments.

---

[638] Ex. 70 (Greenspan) ¶364.
[639] Ex. 80 (Silverstein depo.) 93:25-94:11; Ex. 65 (2017 Form 10-K) at 145-46; Ex. 68 (Form 10-K 2015) at 115, 131-32.

**C.** **Defendants' decision to allow the Company to make payments to Bain, KKR, and Vornado violated their fiduciary duty of care.**

A director violates the duty of care when the director's actions or inactions amount to "conduct that constitutes reckless indifference or actions that are without the bounds of reason." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008).  The evidence demonstrating that the Directors breached their duty of good faith by abdicating their duties and entering into transactions that they knew were not in the best interests of Toys "R" Us establishes "conduct that constitutes reckless indifference."  Thus, the Defendant Directors breached their duties of care in paying advisory fees to the Sponsors.

**D.** **Defendants cannot demonstrate that their actions meet the entire fairness standard.**

"A breach of either the duty of loyalty or the duty of care rebuts the presumption that the directors have acted in the best interests of the shareholders, and requires the directors to prove that the transaction was entirely fair."  *Cede & Co. v. Technicolor*, 634 A.2d 345, 371 (Del. 1993)

Under the entire fairness standard "the defendants must establish … that the transaction was the product of both fair dealing and fair price."  *Basho Techs. Holdco B, Ltd. Liab. Co. v. Georgetown Basho Inv'rs, Ltd. Liab. Co.*, No. 11802-VCL, 2018 Del. Ch. LEXIS 222, at *80-81 (Ch. July 6, 2018) (internal quotes omitted).  The "fair dealing" aspect concerns the process by which the transaction was approved.  *Id*. at *82.  The "fair price" aspect concerns the economic value.  *Id*.  A "fair price" means "obtaining the highest value reasonably available to the shareholders under all the circumstances."  *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989).

Although Defendants have the burden of proving entire fairness, in their motion for summary judgment, Defendants make no attempt to demonstrate that the payment of advisory

211

fees satisfies the entire fairness standard.  And "where the movant fails to fulfill its initial burden

of providing admissible evidence of the material facts entitling it to summary

judgment, summary judgment must be denied, even if no opposing evidentiary matter is

presented, for the non-movant is not required to rebut an insufficient showing."  *Ray Communs.,*

*Inc. v. Clear Channel Communs., Inc.*, 673 F.3d 294, 299-300 (4th Cir. 2012).

Moreover, as demonstrated above, the decision to pay advisory fees was not the product

of "fair dealing," because the Sponsor Directors and Brandon had conflicts of interest, and

because Defendants undertook no process to evaluate whether paying advisory fees was

appropriate or in the interests of Toys "R" Us.  And for "fair price," as demonstrated above, there

is no evidence of any services that Toys "R" Us received from the Sponsors in exchange for the

advisory fees, much less that any services were "the highest value reasonably available" for the

millions that Toys "R" Us paid.

Thus, because Defendants "cannot demonstrate fairness as to process or price," they

cannot demonstrate that the payment of advisory fees meets the entire fairness standard.  *Basho*,

2018 Del. Ch. LEXIS 222, at *92 (Ch. July 6, 2018).

### E.    The Director Defendants' breach of their fiduciary duties caused harm to Toys "R" Us.

By failing to comply with their fiduciary duties in allowing Toys "R" Us to pay advisory

fees to the Sponsors, the Defendant Directors caused Toys "R" Us losses.  This was a "diversion

of assets from Toys 'R' Us for the benefit of the three Sponsors." [640]

In total, between Q4 2014 and Q1 2017, the Directors' breaches of fiduciary duty in

authorizing the payment of advisory fees caused Toys "R" Us losses of $17,863,110. [641]

---

[640] Ex. 70 (Greenspan) ¶352.
[641] Ex. 135 (Mills) ¶31.

212

### F.     Defendants' arguments fail.

Defendants make no attempt to argue that the advisory fee agreements were supportable or justifiable.  Instead, they raise three arguments that misstate the law and ignore the facts.  We rebut each in turn.

### 1.     Defendants' "solvency justifies payments" argument fails.

Defendants assert that "as long as a company is not insolvent" that Company's board members "can take actions that benefit the owners to the detriment of the company."  Mot. at 27-28.  Defendants' argument fails.

Defendants' premise holds only when there are no minority shareholders in a company and the owners own 100% of the company's equity.  "A transfer of value from a solvent subsidiary to the holder of *100% of the equity* cannot give rise to a fiduciary wrong." *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 184 (Del. Ch. 2014) (emphasis added) (cited at Mot. 27); Official Comm. of Unsecured Creditors v. Meltzer, 589 B.R. 6, 27 (D. Me. 2018) (cited at Mot. 27) ("directors of a solvent *wholly-owned* subsidiary" may "serve its parent's interest") (emphasis added).

By contrast, when minority shareholders are present, the directors have "a fiduciary duty to the corporation and to its minority shareholders if the majority shareholder dominates the board and controls the corporation." *In re Reading Co.*, 711 F.2d 509, 517 (3d Cir. 1983).  And when payments are "in essence self-dealing" by majority shareholders to "the exclusion of and detrimental" to "minority stockholders," a violation of this fiduciary duty is presumed. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721 (Del. 1971); *see Frederick Hsu Living Tr. v. ODN Holding Corp.*, No. 12108-VCL, 2017 Del. Ch. LEXIS 67, at *102 (Ch. Apr. 14, 2017).

The Sponsors did not own 100% of the equity.  As discussed above, there were 300 minority shareholders that owned roughly 2% of Toys "R" Us' equity.  Because of the presence

213

of those shareholders, the Sponsor Directors could not authorize self-dealing transactions that paid the Sponsors and extracted value from the Company, whether or not Toys "R" Us was solvent.

Moreover, whether Toys "R" Us was solvent is a disputed material issue of fact. Defendants assert that "to survive summary judgment, the Trust would have to show that there is a material issue of fact regarding TRU's insolvency." Mot. at 28. And Defendants then claim that their "expert conducted a detailed solvency analysis" and that "no other evidence in the record" supports a conclusion of insolvency, there is no disputed issue of material fact. Mot. At 28. Defendants' contention fails.

That Defendants' expert prepared a solvency analysis does not compel the conclusion at summary judgment that Toys "R" Us was solvent. Rather, it is one piece of evidence that must be assessed by the finder of fact at trial. The Trust's expert highlighted multiple flaws with Defendants' expert's solvency analysis, including that he relied on "unrealistic projections" by management, failed to "subject [management's] assumptions and resulting projections to any meaningful scrutiny," and ignored "the equity valuations of Toys "R" Us performed by the Sponsors." [642] Defendants' expert testimony on solvency is thus not an undisputed material fact.

Further, multiple pieces of evidence prove that Toys "R" Us was not solvent. The Trust's expert marshalled evidence demonstrating that the Sponsors themselves, who are "arguably the people who know the company best and are incentivized to conclude there is equity" concluded that Toys "R" Us had no equity value. [643]

_____

[642] Ex. 70 (Greenspan) ¶¶395-401.
[643] Ex. 70 (Greenspan) ¶¶399-401; Ex. 70 (Greenspan) ¶¶163-165; Ex. 79 (Taylor depo.) 170:10-21 (testifying that KKR's internal valuation of "KKR's investment in Toys 'R' Us" as of September 2017 showed that "our equity had no value"); Ex. 79 (Taylor depo.) 167:2-24 (testifying that KKR calculated that Toys 'R' Us had debt of $4.7 billion but an enterprise value

For example, in April 2015, when the Sponsors were initially discussing hiring Brandon as CEO, Brandon performed a summary valuation of the company and concluded ████████ ████.” [644]  And then, in a discussion about Brandon's valuation, a Bain representative remarked ████████████████████████████████████████ . . ████████████████████████.” [645]  "The inability to realize any value above the debt is the definition of insolvency." [646]

Summary judgment is not the time to weigh these conflicting pieces of evidence. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016) ("we reverse the district court and vacate the order of summary judgment").  Rather, that is the job of the finder of fact at trial.

> ### 2.    Defendants' "even if insolvent, no breach of fiduciary duty argument" fails.

Defendants assert that "[e]ven if TRU were insolvent, TRU still was contractually obligated to pay the advisory fees," and that it would not be "reasonable, much less required, for the Board to direct TRU to breach these contractual obligations."  Mot. at 29.  Defendants' argument fails for two reasons.

---

of $3.4 billion to $3.7 billion); Ex. 79 (Taylor depo.) 169:4-18 ("the total value of Toys 'R' Us is less than the debt"); Ex. 78 (Levin depo.) 239:6-25, 240:13-241:3 ("the equity investment in Toys 'R' Us has a value of zero"); Ex. 75 (Vornado 2013 annual report) at 10 n.7, 57; Ex. 76 (Vornado 2014 annual report) at 36; Ex. 62 (11'4'14 Vornado write down [DEFS_0111323]); Ex. 13 (4'8'15 Saghir to Taylor Levin re Brandon [DEFS_0049061]); Ex. 1 (1'4'16 Taylor Raether equity calculation, [DEFS_0125987]).

[644] Ex. 70 (Greenspan) ¶400; Ex. 13 (4'8'15 Saghir to Taylor Levin re Brandon [DEFS_0049061]).

[645] Ex. 70 (Greenspan) ¶400; Ex. 13 (4'8'15 Saghir to Taylor Levin re Brandon [DEFS_0049061]) at 1.

[646] Ex. 70 (Greenspan) ¶400.

First, the presence of a contract does not absolve directors of fulfilling their fiduciary duties. As the case that Defendants themselves cite makes clear, "the fact that a corporation is bound by its valid contractual obligations does not mean that a board does not owe fiduciary duties when considering how to handle those contractual obligations." *Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 Del. Ch. LEXIS 67, at *53 (Del. Ch. Apr. 14, 2017). If Defendants' premise were true, directors could freely make payments to majority shareholders without considering minority shareholders, alternatives, or the best interests of the corporation, as long as the parties entered a contract. One way to handle the contractual obligations imposed under the Advisory Fee Agreement was to attempt to renegotiate those fees to zero. Indeed, the amount of advisory fees paid was altered several times between 2005 and 2015, indicating that such renegotiation could be done and that Defendants knew this. [647] And the Sponsor Directors were in positions of influence at the Sponsor companies and could have attempted to renegotiate.

Second, a contractual obligation between 2005 and the first quarter of 2015 does not excuse the Directors' breaches of fiduciary duties between Q2 2015 and Q1 2017. The directors could have instructed Toys "R" Us to issue a notice of termination and the agreement would not have been renewed on July 20, 2015. Nothing in the contract obligated Toys "R" Us to renew the agreement. And in determining to renew the contract, the Directors breached their fiduciary duties. As discussed above, the Directors breached those duties by failing to delegate the renewal decision to disinterested directors, and utterly failing to perform any analysis of whether renewing the agreement would be in Toys "R" Us' best interest. Those breaches are not excused by the presence of an expired contract.

---

[647] Ex. 70 (Greenspan) ¶371.

216

### 3. Defendants' "acquiescence" argument fails.

Defendants assert that "[a] party with access to knowledge of actions that take place regularly for years, who lodges no objection to those actions, when an objection easily could have been made" cannot challenge those actions and "is estopped from later claiming that those actions were breaches of fiduciary duty." Mot. at 29.  This argument fails on all counts.

First, Defendants' argument fails because the Trust is not "a party with access to knowledge" that "easily could have" objected to the advisory fee agreements.  The Trust was not in existence at the time that the advisory fee payments were being made, and thus neither knew about nor could challenge those payments.  Mot. at 29.  The Trust was not established until after Toys "R" Us liquidated.  And, as discussed above, the Trust is not the successor to any party that could have challenged those payments—instead, it is a successor to Toys "R" Us Inc. and Toys "R" Us Delaware.  The Trust thus could not have acquiesced to the advisory fee payments as a matter of law.

Second, Defendants have failed to prove each of the elements of an affirmative defense of acquiescence.  To prevail on an affirmative defense at the summary judgment stage, Defendants bear the burden of proving each of the elements of that defense.  To do so, Defendants must show that (1) a party with "full knowledge" of a transaction, (2) "accept[ed] the benefits of [the] transaction," and (3) "thereafter attack[ed] the same transaction." *Staples v. Billing*, Civil Action No. 11339, 1994 Del. Ch. LEXIS 10, at *37 (Ch. Jan. 31, 1994).

Defendants offer no evidence whatsoever for the latter two elements.  They identify no party that accepted the benefits of the advisory fees that later attempted to challenge that transaction.  Indeed, Defendants fail to provide evidence of any benefit whatsoever that resulted from the Advisory Fee Agreement.  And as discussed above, there was none.

"Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense." *Ray Communs., Inc. v. Clear Channel Communs., Inc.*, 673 F.3d 294, 299-300 (4th Cir. 2012). And "where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Id.*

For the "full knowledge" element, Defendants claim that Toys "R" Us "regularly disclosed the advisory fees as Related Party Transactions." Mot. at 29-30. But these disclosures do not suggest that any party had "full knowledge" of the advisory fees. Indeed, the description of Advisory Fees in Toys "R" Us' 10-K agreements makes no mention of the key facts—that no services were actually being provided beyond what the Directors were already obligated to do for the company, that no analysis was performed on whether the advisory fee payments were reasonable, and that the services were entirely duplicative of other services already being provided. [648] The first time that a party had full knowledge of these facts was when the Trust learned of them in investigating Defendants' misconduct.

**VII.   Defendants are liable for fraudulent concealment.**

Defendants made (and caused to be made) representations of fact to Trade Vendors commencing on September 18, 2017, and continuing until March 14, 2018, when the Company announced it was liquidating. These representations were made for the purpose of inducing the Trade Vendors to ship goods on credit to Toys "R" Us during the bankruptcy. Central to those representations was that Toys "R" Us had received over $3 billion in DIP financing, that the financing would be available to pay vendors during the restructuring process, and that the

---

[648] Ex. 68 (Form 10-K 2015) at 101-102.

financing gave Toys "R" Us the liquidity to pay vendors for goods shipped on credit during the restructuring period.  In reliance on these representations, Trade Vendors shipped goods to Toys "R" Us on credit.

From the beginning, Defendants knew these representations were misleading (overstating both the amount of DIP financing and its availability).  And within weeks, Defendants knew that the Company's sales and margins were far lower than would be needed to comply with the financial covenants in the DIP financing.  By December 13, 2017, Defendants knew that the Company was projecting to default on the DIP financing, and therefore lacked the ability to pay for goods shipped on credit.  Defendants also knew that Trade Vendors did not have this information, and that Trade Vendors would stop shipping goods on credit if they knew the truth.

Defendants did not direct the Company's employees to stop ordering goods on credit.  And they did not disclose the truth to Trade Vendors.  Instead, Defendants concealed the truth and made additional misrepresentations to Trade Vendors reassuring them that the Company had access to over $3 billion in DIP financing, that it had the ability to pay for all goods shipped on credit, and that the Company was focused on emerging from bankruptcy.  This continued as the Company's financial situation spiraled downward right up to the announcement of the Company's liquidation on March 14, 2018.

As a result of Defendants' fraudulent concealments and representations, Trade Vendors lost hundreds of millions of dollars.

**A.     The law of fraudulent concealment**

      **1.     Choice of law: The tort claims of each Trade Vendor are governed by the law of the state where that vendor is located, not by New York law.**

The parties agree that because this case was transferred from the Southern District of New York, New York's choice of law principles apply.  Mot. 32 (citing *Ferens v. John Deere*

*Co.*, 494 U.S. 516, 519 (1990).  Defendants assert that "New York's choice-of-law rules require the application of New York substantive law to tort claims like fraud and negligent misrepresentation" because "there is significant overlap between the law of New York and that of other states that have an interest in the tort claims."  Mot. 32.  This is incorrect.  New York choice of law rules require the Court to apply the law of the state where each Trade Vendor was located.

### a.   There is an actual conflict between the tort laws of different states.

"In New York . . . the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws.  *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (citing *Allstate Ins. Co. v. Stolarz*, 81 N.Y.2d 219, 223 (1993)).  "If the applicable law from each jurisdiction provides different substantive rules, a conflict of laws analysis is required."  *Id.*  Notably, the "party seeking application of non-[New York] law is not required . . . to demonstrate that its case would be lost were the court to apply [New York] law. Such a requirement would be absurd."  *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005).

Contrary to Defendants' assertions, the laws of New York and of the Vendors' home states "provide[] different substantive rules" relevant to this case, thus requiring the Court to engage in a choice of law analysis.  *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).  For example, to "state a claim for negligent misrepresentation under New York law, the plaintiff must allege that . . . the defendant had a duty *as a result of a special relationship*, to give correct information."  *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (emphasis added).  By contrast, California (where the largest number of Vendors is located) does not require a special or privity-like relationship.  *B.L.M. v. Sabo & Deitsch*, 55 Cal. App. 4th

823, 843 (1997) (listing the elements of negligent misrepresentation); Cal. Civ. Code §§ 1709-

1710.  Similarly, many of the Trade Vendors' jurisdictions follow the Restatement (Second) of

Torts, which does not include the requirements of New York law. Restatement (Second) of Torts

§552(1).  "Because New York law requires a plaintiff to plead the existence of a special

relationship, while [these other states' law] does not, a clear conflict exists." *Flatiron*

*Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 1:17-cv-8987-GHW, 2019 U.S. Dist. LEXIS

43682, at *50 (S.D.N.Y. Mar. 17, 2019).

    Accordingly, the Court must engage in a choice-of-law analysis to resolve this conflict.

> **b.      The law of the Trade Vendors' home states governs the Trust's tort claims.**

    Under New York's choice of law rules, when "conduct-regulating laws are at issue, the

law of the jurisdiction where the tort occurred will generally apply." *Padula v. Lilarn Props.*

*Corp.*, 84 N.Y.2d 519, 522 (N.Y. 1994); *Sack v. Low*, 478 F.2d 360, 366 (2d Cir. 1973) ("New

York courts … hold that the cause of action accrues where the loss is suffered."); *Daiuto v.*

*Evolve Guest Controls, LLC*, No. 17-CV-1279 (NGG) (JO), 2020 U.S. Dist. LEXIS 38689, at *6

(E.D.N.Y. Mar. 4, 2020).  Legal rules are conduct-regulating when they have the "effect of

governing conduct to prevent injuries from occurring." *Padula v. Lilarn Props. Corp.*, 84

N.Y.2d 519, 522 (1994).

    Here, the Trust is alleging claims based on fraud and negligent misrepresentation, both of

which are legal rules intended to prevent injuries from occurring, and are therefore conduct-

regulating. *Antipodean Domestic Partners, LP v. Clovis Oncology, Inc.*, 2018 NY Slip Op

30809(U), ¶ 28 (Sup. Ct. 2018) ("negligent misrepresentation . . . is a conduct-regulating rule");

*Vandashield LTD v. Isaacson*, 2015 NY Slip Op 31782(U), ¶ 21 n.18 (Sup. Ct. 2015) (holding

that fraud is "a conduct-regulating body of tort law"); *Abu Dhabi Inv. Auth. v. Citigroup, Inc.*,

221

2013 U.S. Dist. LEXIS 30214, at *22 n.9 (S.D.N.Y. Mar. 4, 2013) ("Fraud and negligent

misrepresentation are conduct-regulating rules."); *Mark Andrew of the Palm Beaches, Ltd. v.*

*GMAC Commercial Mortgage Corp.,* 265 F. Supp. 2d 366, 378 (S.D.N.Y. 2003) (noting that

fraud and negligent misrepresentation are conduct regulating), *aff'd,* 96 F. App'x 750 (2d Cir.

Apr. 22, 2004);

       Thus, the law of the place of the tort applies, which "is considered to be the place where

the last event necessary to make the actor liable occurred." *Schultz v. Boy Scouts of Am.*, 65

N.Y.2d 189, 195 (N.Y. 1985).

       Here, the last event necessary to make the Defendants liable was the Trade Vendors

relying on the false information provided by Defendants. Reliance is a required element of both

fraud and negligent misrepresentation. *Kurtz v. Foy*, 65 A.D.3d 741, 743 (App. Div. 3rd Dept.).

Thus, an actor is not liable until the victim acts in reliance—which occurs where the victim is

located. *J.A.O. Acquisition Corp. v. Stavitsky*, 745 N.Y.S.2d 634, 639 (Sup. Ct. 2001) ("fraud

claims are governed by the law of the place of injury" which is "where plaintiffs are located");

*Conner v. Kira Int'l, Inc.*, No. 13 CV 417 (ARR) (LB), 2015 U.S. Dist. LEXIS 102813, at *9

(E.D.N.Y. July 14, 2015) (holding that for fraud claims, the loss is suffered "where the plaintiff

is located."); *Geron v. Seyfarth Shaw LLP*, 736 F.3d 213, 220 n.7 (2d Cir. 2013) ("When a

person sustains loss by fraud, the place of wrong is where the loss is sustained."). Accordingly,

the tort claims assigned to the Trust are governed by the laws of the states where each Trade

Vendor was located when it acted in reliance on Defendants' false statements—not by New York

law. *See, e.g.*, *Lewis Tree Serv. v. Lucent Techs., Inc.*, 211 F.R.D. 228, 237 (S.D.N.Y. 2002)

(applying New York choice of law rules to conclude that the "fraud alleged in this lawsuit arose

in all fifty states, and their laws would be applied to the fraud claims"); *Hughes v. Ester C Co.*,

317 F.R.D. 333, 352 (E.D.N.Y. 2016) (same for negligent misrepresentation).

> **c.    The states with most relevant vendors include California, Connecticut, Georgia, Rhode Island, Florida, and Illinois.**

The greatest quantity of claims—whether measured by number of Trade Vendors or

amount of losses— are those assigned from California-based Trade Vendors, such as Mattel.

There is only one Trade Vendor, Delta Enterprises, that operated out of New York and that is

therefore subject to the peculiar requirements of New York law.

Each of the Trade Vendors below testified that they are headquartered in and made their

shipping decisions in a state other than New York.  The chart below shows the Trade Vendors in

the most relevant states, the amount of their claimed loss, and testimony from the Trade

Vendor's 30(b)(6) witness about where the company is headquartered and made decisions.  The

laws of the below states are the ones most relevant to this action, and are thus the ones cited by

the Trust in its opposition brief.

**California**

- **Mattel**

- McColgan 197:21-198:20

- $42,728,378

- **Jakks Pacific**

- Cooney 121:9-14

- $9,898,499

- **MGA**

- Elliott 242:18-243:5

- $8,291,976

- **Munchkin**

- Sikand 263:23-264:10

- $3,184,195

- **Bandai**

- Ciminera 144:21-145:5

- $2,136,292

- **Funrise**

- Stone 88:3-4, 90:17-21, 91:19-22

- $1,263,524

- **Warner Bros**

- Gamble 207:10-22

- $1,087,659

- **Merch Source**

- Wysocki 126:14-21

- $922,878

- **Jada Toys**

- Simons 249:24-250:8

- $793,485

- **Skyrocket Toys**

224

- Ardell, 177:21-178:10

- $482,660

**Georgia**

- **Graco**

- Brinkmeier 132:15-21

- $37,180,065

- **Kids II**

- Calhoun 11:10-16

- $6,271,849

**Connecticut**

- **LEGO Group**

- Kodak 257:16-24, 258:15-259:2

- $22,215,747

**Rhode Island**

- **Hasbro**

- Glenn 7:3-5

- $16,109,150

**Illinois**

- **RR Donnelley**

- Elliott 121:16-122:6

- $7,227,475

- **Learning Resources**

- Woldenberg 188:16-189:2

- $1,837,953

- **LSC**

- Pevonka 250:11-18

- $1,642,942

**Florida**

- **Jazwares**

- Zebersky 158:23-159:4, 159:10-11

- $3,312,127

- **Just Play**

- Emby 254:11-24

- $2,207,573

- **Basic Fun**

- Foreman 208:15-20

- $1,841,009

   **2.**  **Elements of fraudulent concealment.**

"The elements of a claim for fraudulent concealment require the plaintiff to show that:

(1) the defendant … concealed or suppressed a material fact, (2) the defendant [was] under a

duty to disclose the fact to the plaintiff, (3) the defendant … intentionally concealed or

suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff [was] unaware of the

226

fact and would not have acted as he did if he had known of the concealed or suppressed fact, and

(5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained

damage." *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1130 (2014)

(internal quotes omitted).

### 3.   Liability of directors and officers for concealments or representations of other officers or employees.

Defendants, as directors and officers, are personally liable for the representations or

concealments of other officers or employees if either (a) the Defendant intends that the

representation or concealment will be passed on and influence vendors, or (b) the Defendant fails

to stop fraudulent conduct.

### a.   Intended to influence vendors.

Defendants are liable for any misrepresentation or concealment of material fact that they

intended to have passed on to vendors to influence their conduct.  "One who makes a

misrepresentation or false promise or conceals a material fact is subject to liability if he or she

intends that the misrepresentation or false promise or concealment of a material fact will be

passed on to another person and influence such person's conduct in the transaction involved."

*Whiteley v. Philip Morris, Inc.*, 117 Cal. App. 4th 635, 681, 11 Cal. Rptr. 3d 807, 845 (2004)

(internal quotes omitted).

The California Supreme Court has also held that indirect liability for fraudulent

representations does not require that the statement reach the ultimate decision-maker; it is

"sufficient that defendant makes a misrepresentation to one group intending to influence the

behavior of the ultimate purchaser, and that he succeeds in this plan."  *Comm. on Children's

Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 219 (1983).

227

As the Restatement frames it, a person is liable for a fraudulent misrepresentation received by another "if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transactions involved."  Restatement (Second) of Torts § 533, *quoted with approval in Whiteley v. Philip Morris, Inc.*, 117 Cal. App. 4th 635, 681, 11 Cal. Rptr. 3d 807, 845 (2004); *Giulietti v. Giulietti*, 65 Conn. App. 813, 842 n.24 (2001); *Fla. Rock & Tank Lines v. Moore*, 258 Ga. 106, 106 n.1 (1988).

Moreover, a defendant is deemed to expect that "a misrepresentation, false promise or nondisclosure of material fact will be passed on to another person and influence that person's conduct if he or she has information that would lead a reasonable person to conclude that there is a likelihood that it will reach such person and will influence his or her conduct in the transaction involved."  *Whiteley*, 117 Cal. App. 45h at 681; *Geernaert v. Mitchell*, 31 Cal. App. 4th 601, 605 (1995) ("if defendant makes the representation to a particular class of persons, he is deemed to have deceived everyone in that class").

### b.    Failing to stop fraudulent conduct.

Directors and officers of a corporation are "personally liable for intentional torts when they knew or had reason to know about but failed to put a stop to tortious conduct." *Asahi Kasei Pharma Corp. v. Actelion Ltd.*, 222 Cal. App. 4th 945, 966 (2013); *Frances T. v. Village Green Owners Assn.*, 42 Cal. 3d 490, 504 (1986) (director liable for tort claim if "they specifically knew or reasonably should have known that some hazardous condition or activity under their control could injure plaintiff, they negligently failed to take or order appropriate action to avoid the harm"); *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1380 (2000) (officers are "personally liable for fraud committed by a managerial employee because [the officers] knew about and

228

allowed the tortious conduct to occur"); *Polonetsky v. Better Homes Depot, Inc.*, 97 N.Y.2d 46,

55 (2001) ("In actions for fraud, corporate officers and directors may be held individually liable

if they participated in or had knowledge of the fraud, even if they did not stand to gain

personally."); *Nielsen Co. (US), LLC v. Success Sys.*, 2012 U.S. Dist. LEXIS 115774, at *16-18

(S.D.N.Y. Aug. 13, 2012).

**B.     The information concealed and suppressed by Defendants was actionable.**

For concealed information to be the subject of fraudulent concealment claim, the

information must be actionable as fraud.  The information concealed by Defendants is actionable

on three different bases.

(i) capable of empirical verification as true or false,

(ii) implies the existence of facts that justify a belief in the truth of the statement or

implies the speaker knows of nothing that would make the statement improbable,

(iii) speaker possessed superior knowledge or special information on the subject.

In the following sections, the Trust identifies the concealments and then demonstrates

that they are actionable under each of these three bases.

**1.     The concealments.**

The information that Defendants concealed from Trade Vendors includes the following

statements.

September 20, 2017: While the Company's advisors had determined that a $200 million

liquidity cushion was required, the DIP Term Loan lenders had insisted on adding a new $175

million liquidity covenant that left the Company with a liquidity cushion of less than $50 million.[649]  Short had determined that the new covenant "doesn't work." [650]

September 20, 2017:  The DIP Term Loan lender had insisted on adding a January 31 revised budget covenant in lieu of deleted milestones. [651]  The covenant provided a zero cushion from achieving the liquidity levels projected in the DIP budget. [652]  Brandon and Short had concluded: "[t]his just isn't going to work." [653]

November 30, 2017:  For the month of November, U.S. sales were down 13.9%. [654]

December 4, 2017:  Brandon wrote an email to Mike Short stating, "We can confidently say that the flash projections for the quarter would indicate that the stretch target is completely unachievable and the target performance … could very well be under achieved by a significant amount." [655]

December 13, 2017: "Brandon informed the Board that Management" had determined "that the Company will likely end the year with an EBITDA that would result in a default under its financing milestones." [656]

December 31, 2017: For the month of December, U.S. sales were down 15.5%. [657]

---

[649] Ex. 70 (Greenspan) ¶¶103, 111-112, 115; Ex. 56 (9'20'17 0612 am Kilkenney [TRU-Trust0000075262]); Ex. 37 (8'31'17 attach DIP sizing [TRU-Trust0000373909]) at 3; Ex. 42 (9'15'17 Lal 144 not sufficient [LZ-TRU0079112]); Ex. 59 (9'21'17 Kurtz re negotiations [LZ-TRU0086423]) at 1.
[650] Greenspan ¶104; Ex. 57 (9'20'17 0652 am [TRU-Trust0000075725]).
[651] Ex. 70 (Greenspan) ¶¶ 103, 262, 289, 302; Ex. 11 (3'2'18 Geier re 6.16 [TRU-Trust0000302970]).
[652] Ex. 70 (Greenspan) ¶136.
[653] Ex. 70 (Greenspan) ¶100; Ex. 48 (9'18'17 2244 pm [LZ-TRU0092221]) at 4.
[654] Ex. 5 (2'7'18 weekly board update [DEFS_0125623]) at 3.
[655] Ex. 163 (12'4'17 Brandon not achieve target [TRU-Trust0000007350]).
[656] Ex. 164 (12'13'17 minutes [DEFS_0061932]).
[657] Ex. 5 (2'7'18 weekly board update [DEFS_0125623]) at 3.

January 10, 2018: Brandon told the Board about management's decision "not to voluntarily release our holiday sales results" contrary to the Company's usual practice. [658] This decision was made because "holiday performance" was "significantly less than expected," which "could have concerned" "the trade vendor community" because the Company "would have reported a weak holiday period," and "[t]hey may have been concerned about the ability of Toys 'R' Us to continue going forward," and "[t]he ability of Toys 'R' Us to pay for goods that were shipped on credit." [659]

January 24, 2018: "Brandon advised the Board that the Company's 2017 EBITDA is currently projected to be under $300 million—significantly short of the Company's $640 million projection in the DIP budget" and the Company "anticipated breach of financial covenants under the DIP Financing in February or March." [660]

January 24, 2018: Brandon told the Board that "the Company will now require a $150-$200 million cash infusion from a third-party in order to fill a hole in the proposed budget and emerge as a reorganized operating business" and also would need "substantial additional amounts of post-emergence capital that will be required for the Company to make planned capital expenditures." [661]

January 28, 2018: Brandon told the Board that "while at the last meeting he said that the company would need $150-$200 million of additional capital to fill a hole in the budget and emerge from chapter 11, the revised numbers … indicate that the Company will require at least

[658] Ex. 88 (Brandon depo.) 344:3-344:24; Ex. 87 (Short depo.) 279:19-23; Ex. 3 (1'10'18 BOD minutes [TRU-Trust0000374746]) at 2.
[659] Ex. 87 (Short depo.) 279:19-23, 281:18-282:9; Ex. 88 (Brandon depo.) 344:3-344:24, Ex. 88 (Brandon depo.) 346:7-16, Ex. 89 (Barry depo.) 519:16-24.
[660] Ex. 139 (1'24'18 minutes [TRU-Trust0000374989]).
[661] Ex. 139 (1'24'18 minutes [TRU-Trust0000374989]); Ex. 88 (Brandon depo.) 555:17-22; Ex. 88 (Brandon depo.) 376:23-377:1.

$200 million in order to emerge from the chapter 11 cases as a reorganized operating company, plus additional capital for planned capital expenditures."  Brandon also told the board that procuring the funding for emergence was "unlikely to materialize," and one of the "likely outcomes of these chapter 11 cases" is "total liquidation of the enterprise." [662]

January 31, 2018: Mike Short signed a waiver agreement stating that the Company had "determined that [it] would not be able to comply with the Revised Budget Covenant [covenant 6.16]." [663]

January 31, 2018: "Brandon advised the board that … the forecasted cash liquidity position is dire" and "the Company projects it will breach its postpetition financing covenants in February or March." [664]

January 31, 2018, Short provided the board "an update regarding the Company's cash liquidity projections," which show that the Company had more than a "$500 million shortfall" below the level required in the DIP budget. [665]

February 16, 2018: Brandon called an "emergency leadership team" meeting to announce that the DIP Term Loan lenders "thought it would be better to liquidate the company sooner rather than later," and the Company was preparing "plans around a liquidation process" including a "liquidation analysis" and "wind-down budget" for the U.S. business, with the focus "around a mid March date." [666]

---

[662] Ex. 140 (1'28'18 minutes [DEFS_0059009]) at 1-2.
[663] Ex. 144 (1'31'18 TRU - Waiver Extension (1-30-18) [Draft] [TRU-Trust0000323056]).
[664] Ex. 142 (1'31'18 minutes [DEFS_0059013]).
[665] Ex. 142 (1'31'18 minutes [DEFS_0059013]); Ex. 141 (1'31'18 2b. Project Sunrise - Forecast Model 2018-01-31 (Liquidity Bridge) [DEFS_0002878]).
[666] Ex. 146 (2'17'18 Brandon to Sussberg [TRU-Trust0000275355]) at 1-3; Ex. 145 (2'16'18 Barry Notes (Barry depo. exh. 44) [DEFS_0026183]); Ex. 89 (Barry depo.) 419:24-421:17.

2. **The concealments are actionable as facts capable of empirical verification.**

Actionable statements include those that are capable of "being adjudged true or false in a way that … admit[s] of empirical verification." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999) (holding that cost estimates are statements of fact; internal citations and quotations omitted).

A statement that can be verified is a fact, as contrasted with an entirely subjective opinion (e.g., "that artwork is beautiful") or a statement that is so vague that it evades verification (e.g., "the coming year will be eventful").  For example, the statement that a company's financial projection for the coming year reports minimum liquidity of $100 million is a statement of fact because the statement can be verified as true or false: the financial projection can be examined to see what it reports.

Each of the concealments is actionable because the truth or falsity of each of these statements could be objectively verified.  The Company's current sales results could be verified because the sales were recorded in Company records, which could be examined to determine what they show.  The liquidity cushion the advisors had determined was required for the Company could be verified by examining documents reporting that information.

The state of the Company's financial projections could be verified because the projections were written down and could be examined to determine what they show. [667] Likewise, how the financial projection compared to the requirements of the financial covenants could be verified by examining the relevant documents.  In fact, the Company prepared exactly these comparisons to test the cash flow covenant and minimum liquidity covenant. [668]

---

[667] Ex. 190 (12'15'17 Project sunrise preliminary model [TRU-Trust0000201870]).
[668] Ex. 141 (1'31'18 2b. Project Sunrise – Forecast Model 2018-01-31 (Liquidity Bridge) [DEFS_0002878]); Ex. 191 (12'30'17 LT forecast [TRU-Trust0000025841]) at 4.

233

Similarly, whether the Company had a hole or shortfall in its projected budget and the amount of that hole could be readily determined by examining the Company's projected budget. And how the Company's budget projection on January 31 compared to the DIP budget could be readily determined by putting the Company's January 31 budget projections next to the DIP budget. [669]

Likewise, whether Short signed a document and whether the document stated that the Company had determined that it could not comply with the revised budget covenant could be verified by looking at the document. [670]  And whether Toys "R" Us was engaging in liquidation planning targeting a mid-March date could be verified by asking those involved in the planning or examining internal emails and notes. [671]

Moreover, whether Brandon told the board that "the forecasted cash liquidity position is dire" or that one of the "likely outcomes of these chapter 11 cases" is "total liquidation of the enterprise" could be verified by examining the minutes of the board meeting.

Because each of the pieces of concealed information was and is objectively verifiable, each is actionable.

> **3.** **The concealments are actionable statements that imply the existence of facts that justify a belief in the truth of the statement and imply the maker knows of nothing that would make the statement improbable.**

A statement that is a prediction of future events or actions, or that is an opinion, is also actionable if it "impl[ies] facts which justify a belief in the truth of the opinion." *Cohen v. S & S Constr. Co.*, 151 Cal. App. 3d 941, 946 (1983) (internal quotes omitted).  "A statement about the

---

[669] Ex. 141 (1'31'18 2b. Project Sunrise – Forecast Model 2018-01-31 (Liquidity Bridge) [DEFS_0002878]); First Day Motion (Bk. Dkt. 29) at 145.
[670] Ex. 143 (1'31'18 signed Waiver [TRU-Trust0000375089]).
[671] Ex. 146 (2'17'18 Brandon to Sussberg [TRU-Trust0000275355]; Ex. 145 (2'16'18 Barry Notes (Barry depo. exh. 44) [DEFS_0026183]).

future may imply a representation concerning an existing or past fact."  Restatement (Second) of Torts § 525, comment e.

Similarly, "a statement that is in the form of a prediction or promise as to the future course of events may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his prediction or promise impossible or improbable."  Restatement (Second) of Torts § 525, comment f; *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999) ("opinion … carries with it an implied assertion … that the speaker knows no facts which would preclude such an opinion" (internal quotes omitted)).

For example, if a contractor provides "cost … estimates" for what a project will end up costing, the cost estimates are actionable representations, because they imply the existence of reasonable cost projections that justify the estimate.  *Harrison*, 176 F.3d at 792.  As another example, a sales agent's representations that a condominium with structural defects was "luxurious" and an "outstanding investment" was actionable.  *Cooper v. Jevne*, 56 Cal. App. 3d 860, 866 (1976); *see Southern Cal. etc. Assemblies of God* v. *Shepherd of Hills etc. Church*, 77 Cal. App. 3d 951, 959 (1978) (a realtor's opinion that the purchaser of a particular lot would have an enforceable access easement is actionable).

Some of the concealed facts identified above contain within them predictions about future events.  But in each such case, the statements necessarily implied the existence of verifiable facts justifying the prediction.  Many of the concealed statements implied the existence of recent data and financial modeling that justified the statement.  These include statements such as the Company "will likely end the year with an EBITDA that would result in a default under its financing milestones," "the Company's 2017 EBITDA is currently projected to be under $300 million," the Company "anticipated breach of financial covenants under the DIP Financing in

February or March," "the Company will now require a $150-$200 million cash infusion from a third-party in order to fill a hole in the proposed budget," and the Company "would not be able to comply with the Revised Budget Covenant [covenant 6.16]." All of these statements imply the existence of recent data, financial modeling, and calculations justifying the statement.

Similarly statements by a CEO delivered at a board meeting that "the forecasted cash liquidity position is dire," that funding for the Company to emerge from bankruptcy was "unlikely to materialize," and that one of the "likely outcomes of these chapter 11 cases" is "total liquidation of the enterprise," imply the existence of analysis and financial modeling justifying the statements. And the statement that "the flash projections for the quarter" indicate that an EBITDA target "is completely unachievable" and "could very well be under achieved by a significant amount," implied the existence of recent financial data justifying these statements.

Each of the concealments identified above is therefore actionable on this basis as well.

**4.     The concealments are actionable statements because Defendants possessed superior knowledge or special information on the subject.**

"[I]t is well settled that an opinion may be actionable when it is made by a party who … possesses, or assumes to possess, superior knowledge or special information regarding the subject matter." *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 892, 153 Cal. Rptr. 3d 546, 562 (2013) (internal quotes omitted).

For example, a defendant with superior knowledge to the plaintiff was held liable for stating that it "was 'highly probable,' and 'likely,' and 'look[ed] good'—that a modification of the loan agreement would be approved." *Jolley*, 213 Cal. App. 4th at 892. Similarly, when a broker with superior knowledge to the plaintiff buyer represented that "early prepayment of notes was 'guaranteed,'" this statement was held to be actionable as fraud. *Apollo Capital Fund LLC v. Roth Capital Partners, LLC,* 158 Cal. App. 4th 226, 241 (2007); *see PhotoMedex, Inc. v.*

236

*Irwin*, 601 F.3d 919, 931 (9th Cir. 2010) (defendants' statement "in March 2003 that the Pharos laser would be available that summer, within just a few months" was actionable).

Because a company's internal data sources and internal communications are, by definition, internal to the company, vendors do not have access to that information unless the company takes specific action to communicate the information outside the company. Accordingly, the Trade Vendors could not access the Company's internal data sources and internal communications.

The Trade Vendors consistently testified that the Company was the best source of information on the its liquidity, ability to pay, and financial results, and that Trade Vendors did not have access to this information. [672]

As Defendants admitted, Trade Vendors "did not have access to the leadership team meetings" at Toys "R" Us. [673] They "did not have access to the cash flow projections that were prepared by Toys "R" Us." [674] And the Trade Vendors "did not have the financial information about Toys "R" Us" such that they could "calculate Toys 'R' Us' cash flow position." [675] Because the Trade Vendors lacked all of this information, they could not "determine whether or

---

[672] For example: Ex. 307 (Cooney (Jakks) depo.) 212:22-213:6 (there was no "source of information besides representations made by Toys 'R' Us" that could provide "accurate information about Toys 'R' Us' internal financial situation"); Ex. 232 (Foreman (Basic Fun) depo). 283:4-12 ("we didn't really have any other source outside of what was coming directly from the company and the employees of the company"); Ex. 278 (Stone (Funrise) depo.) 146:22-147:9 (No "reasonable way" for "Funrise to learn about Toys 'R' Us' internal financial projections in bankruptcy"); Ex. 284 (Brinkmeier (Graco) depo.) 183:13-184:8 (no source "that would be able to validate [covenant compliance] other than Toys 'R' Us"); Trust SOF ¶¶ 404, 410, 416, 422, 428, 434, 440, 446, 452, 458, 464, 470, 476, 481, 486, 491, 496, 502, 508, 513, 519, 525, 532, 537, 542, 548, 553, 559, 565, 571, 576, 581, 586, 592, 597, 603, 608.
[673] Ex. 89 (Barry depo.) 542:23-25.
[674] Ex. 89 (Barry depo.) 543:1-5.
[675] Ex. 89 (Barry depo.) 543:20-544:2.

237

not [Toys "R" Us] was meeting or was likely to meet its financial covenants." [676]  Indeed, it was

"impossible for a vendor to realistically assess and test complex covenants without detailed (and

truthful) information and forecasts by the Company." [677]

     The Defendants had access to the Company's internal data and communications that the

Trade Vendors lacked.  For example, Brandon, Short, and Barry received daily reports of

sales.[678]  The Directors received a "Weekly Board Update" with financial information. [679]  And

the Directors continued "to be updated about Toys 'R' U's financial situation" while it was in

bankruptcy. [680]  And the Directors were "provided detailed status updates by Mike Short and

David Brandon." [681]

     As demonstrated above, these updates included information about Toys "R" Us' financial

position, and how that financial position affected covenant compliance and access to the DIP

financing.  The Defendants therefore possessed both superior knowledge and special information

on the subjects of (i) the Company's recent financial results including sales, margins, SG&A

costs, and capital expenditures, (ii) the Company's projected financial results including sales

growth/ decline, margins, costs, and capital expenditures, (iii) the Company's plan for emergence

or liquidation, (iv) the Company's compliance with financial covenants, (v) the Company's

current or projected liquidity. [682]

---

[676] Ex. 70 (Greenspan) ¶533.
[677] *Id.* ¶538.
[678] Bk. Dkt. 2341 (Transcript of 3'20'17 hearing; Kurtz testimony) at 17 ("the management team" was watching "the day-to-day operating performance of the company during … the holiday season" and "would literally receive … a daily sales tally").
[679] E.g.  Ex. 5 (2'7'18 weekly board update [DEFS_0125623]); Ex. 81 (Bekenstein) 185:2-7, 187:20-189:31.
[680] Ex. 81 (Bekenstein depo.) 185:2-7.
[681] Ex. 77 (Raether) 298:5-8.
[682] *See, e.g.*,  Ex. 5 (2'7'18 weekly board update [DEFS_0125623]) at 3; Ex. 141 (1'31'18 2b. Project Sunrise - Forecast Model 2018-01-31 (Liquidity Bridge) [DEFS_0002878]); Ex. 146

Each of the concealments identified above is a statement on one or more of these subjects.  The Defendants therefore possessed both superior knowledge and special information on the subject matter of the concealments.  The concealments are therefore actionable.

\* \* \*

The concealments are actionable on each of the three bases.  Moreover, "'where there is a reasonable doubt as to whether a particular statement is an expression of opinion or the affirmation of a fact, the determination rests with the trier of the facts.'"  *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 893, (2013) (quoting *Willson v. Municipal Bond Co.*, 7 Cal. 2d 144, 151 (1936)).

### C.    The concealed information was "material."

"[A] fact is material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question."  *Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1163 (2005) (internal quotes omitted); *Greenwald v. Odom*, 314 Ga. App. 46, 55 (2012). ("a fact is material if its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice or action in the transaction in question").

Each of the concealed facts was material to the Trade Vendors because they went to the heart of each Trade Vendor's decision making in choosing to ship goods on credit to Toys "R" Us.

---

(2'17'18 Brandon to Sussberg [TRU-Trust0000275355]) at 1-3; Ex. 163 (12'4'17 Brandon not achieve target [TRU-Trust0000007350]); Ex. 89 (Barry depo.) 543:1-544:2.

### 1.   Whether Trade Vendors will be paid for goods that they ship was of paramount importance to the Trade Vendors.

Trade Vendors sell goods to be paid for those goods.  Whether vendors will be paid for the goods that they ship is of "paramount" importance because the vendors are "not a charity or a nonprofit" and "need to be paid for the goods that [they] ship." [683]  When deciding whether or not to ship goods to a company, Trade Vendors evaluate the risks involved in shipping those goods.[684]  As Defendants admit, part of the risk determination in shipping to Toys "R" Us was "whether [Trade Vendors] would be paid by Toys "R" Us," and that risk was "a reasonable thing for [Trade Vendors] to consider." [685]

Defendants also admit that if Trade Vendors had "doubts about whether they would be paid," then Trade Vendors would not "want to ship [goods] on credit to Toys "R" Us." [686]  For goods that Trade Vendors shipped on credit, the vendors needed to assess the risk of whether Toys "R" Us would be able to pay for those goods when they came due.  For example, for a vendor to choose to ship goods on 60 day terms to Toys "R" Us on January 25, 2018, the Trade Vendor would need to analyze the risk that Toys "R" Us would be unable to pay for those goods in late March.

Trade Vendors testified that the risk level that vendors would not be paid on goods that they ordered would "vary based on information that's available." [687]  Any information about Toys "R" Us' ability to pay for goods shipped was thus highly important to vendors in determining whether to ship goods to Toys "R" Us on credit.

---

[683] Ex. 409 (McCallum (Step2) depo.) 147:5-14; Ex. 258 (Rana (Dorel) depo.) 206:17-207:2; Ex. 372 (Elliott (MGA) depo.) 270:12-20.
[684] *See e.g.* Ex. 372 (Elliott (MGA) depo.) 270:24-271:4.
[685] Ex. 87 (Short depo.) 311:1-17.
[686] Ex. 89 (Barry depo.) 27:15-23; Ex. 372 (Elliott (MGA) depo.) 270:12-20; Ex. 258 (Rana (Dorel) depo.) 247:13-20.
[687] Ex. 258 (Rana (Dorel) depo.) 209:4-11; Ex. 380 (Emrey (Munchkin) depo.) 110:4-7.

## 2.   The continued availability of the DIP financing was directly relevant to whether Trade Vendors would be paid for goods that they shipped.

During the bankruptcy, Toys "R" Us' ability to pay vendors was contingent on the DIP financing.  Defendants admit that it was the presence of the DIP financing that provided vendors with the assurance that Toys "R" Us would be able to pay them for goods shipped on credit. [688] The DIP financing was "necessary for Toys "R" Us to have liquidity to pay for goods shipped on credit. [689]

In fact, Defendants admit that they knew that the presence of the DIP financing was critical to the vendors because it meant that Toys "R" Us had available liquidity to buy and pay for goods. [690]

For example, on September 18, 2017, Defendant Barry reported to Brandon on his phone calls with "over 30" vendors, and stated: "Confirmation of the DIP financing is a crucial issue for the vendors, and subject to this, indications are a return to business as usual terms with a resumption of shipping." [691]

Indeed, the DIP financing was the only source of liquidity that Toys "R" Us identified to vendors that could pay vendors for the goods that they shipped. [692]

Defendants admit that Trade Vendors would be interested in knowing "whether there was a serious risk that the DIP financing would disappear." [693]  The loss of the financing would mean that Toys "R" Us would no longer have the liquidity to pay vendors "for all goods shipped on

---

[688] Short depo. 53:21-54:4.
[689] Ex. 89 (Barry depo.) 396:17-21.
[690] Ex. 89 (Barry depo.) 73:16-22; Ex. 372 (Elliott (MGA) depo.) 265:20-266:8; Ex. 321 (Kamler (Kent) depo.) 166:9-16; Ex. 330 (Woldenberg (Learning Resources) depo.) 198:3-199:8.
[691] Ex. 156 (9'18'17 Barry re DIP crucial [TRU-Trust0000036336]).
[692] *See, e.g.*, Ex. 244 (Schellhase (Bestway) depo.) 171:25-172:5; Ex. 335 (Kodak (LEGO) depo.) 264:16-24, 265:1-10.
[693] Ex. 87 (Short depo.) 434:20-435:1; Ex. 89 (Barry depo.) 461:9-12.

credit." [694]  Trade Vendors needed to have "sufficient information to be able to accurately

evaluate the probability of a catastrophic outcome." [695]  A risk that the DIP financing would be

lost in the coming weeks or months would affect a Trade Vendor's risk calculus on whether it

should ship goods to Toys "R" Us on credit, because Trade Vendors had to assess the likelihood

that they would not be paid for all of the goods that they shipped.

> **3.      Each of the concealed facts was highly material to a Trade Vendor's
> decision to ship goods on credit.**

Each of the concealed facts was highly material for a vendor's assessment of risk and the

Company's ability to pay, and most of the concealed facts signaled that the DIP financing was in

grave danger of disappearing.

As Defendants knew, a breach of covenants in the DIP financing would mean that the

DIP financing would disappear. [696]  A projection that Toys "R" Us would default on its financing

milestones was thus a projection that the DIP financing would become unavailable.

Furthermore, Defendants also knew that the financial covenants in the DIP financing

were (by definition) tied to the Company's financial performance. [697]  And the Defendants also

knew that the Trade Vendors understood this.  Defendants Brandon and Short testified that they

made the decision "not to voluntarily release our holiday sales results" contrary to the

Company's usual practice, because "holiday performance" was "significantly less than

expected," which "could have concerned" "the trade vendor community" because the Company

"would have reported a weak holiday period," and "[t]hey may have been concerned about the

ability of Toys 'R' Us to continue going forward," and "[t]he ability of Toys 'R' Us to pay for

---

[694] Ex. 87 (Short depo.) 56:23-57:2.
[695] Ex. 70 (Greenspan) ¶529.
[696] *See e.g.*, Ex. 89 (Barry depo.) 395:22-396:8; Ex. 87 (Short depo.) 313:25-314:4.
[697] *See, e.g.*, Ex. 78 (Levin depo.) 286:22-287:15; Ex. 77 (Raether depo.) 124:19-125:12.

goods that were shipped on credit." [698]  And, on January 10, 2018, Brandon told the Board about "the decision not to release holiday results, including the communications strategy related thereto." [699]

Moreover, Defendants knew that the discrepancy between Toys "R" Us' actual performance and the DIP budget was enormous—the Company had a liquidity shortfall of $500 million below the levels required by covenant 6.16. [700]  And that deficit would increase, rather than decrease, over time: Short's projection showed that by June 2018 the deficit would be almost $600 million. [701]

Facts about Toys "R" Us' projected breach of the covenants and $500 million shortfall in liquidity would indicate to the Trade Vendors that Toys "R" Us was not on track to comply with its covenants, and that there was a grave risk that the DIP financing would disappear. This in turn would mean that Trade Vendors would not be paid for their goods.  These facts were highly material to the vendors. [702]

Similarly, Toys "R" Us engaging in liquidation planning would indicate to the vendors that there was a high risk that Toys "R" Us would be unable to pay for purchase orders that it placed.  Liquidation means that a company has failed as an ongoing business and will not be able

---

[698] Ex. 87 (Short depo.) 279:19-23, 281:18-282:9; Ex. 88 (Brandon depo.) 344:3-344:24, Ex. 88 (Brandon depo.) 346:7-16, Ex. 89 (Barry depo.) 519:16-24.

[699] Ex. 88 (Brandon depo.) 344:3-344:24; Ex. 87 (Short depo.) 279:19-23; Ex. 138 (1'10'18 BOD minutes [TRU-Trust0000374746]) at 2.

[700] Ex. 141 (1'31'18 2b. Project Sunrise - Forecast Model 2018-01-31 (Liquidity Bridge) [DEFS_0002878]); Ex. 70 (Greenspan) ¶¶455-459.

[701] Ex. 141 (1'31'18 2b. Project Sunrise - Forecast Model 2018-01-31 (Liquidity Bridge) [DEFS_0002878]); Ex. 70 (Greenspan) ¶459.

[702] *See* Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607.

to continue to pay its obligations as they come due. [703]  Liquidation planning would be "a clear

signal that [a Trade Vendor] should expect not to be paid on any further shipments. [704]

> ### 4.  The vendors testified that the concealed facts would have been relevant to their decision-making, and would have caused them to act differently.

Vendors testified that the concealed information about Toys "R" Us' projected covenant

defaults and liquidation planning was relevant to their decision-making. [705]  "Anything that

would have indicated that [Trade Vendors] were at risk of not getting paid back would have been

relevant." [706]  And, as demonstrated above, each of the pieces of concealed information indicated

that there was a risk of non-payment.

For example, had the LEGO Group "known that there was a risk that Toys "R" Us would

be defaulting on its loan covenants," the LEGO Group would have "only ship[ped] on a cash in

advance basis." [707]  If the LEGO Group had any indication that Toys "R" Us had a "half a billion

dollar miss" on the DIP budget requirements, that "would have been a clear sign that the

operation was faltering," and would have caused the LEGO Group "to trade cash in advance

only." [708]

Defendants make no effort to argue that the concealed facts were not material to vendors.

Nor could they.  Each vendor testified that the above facts that were concealed from them were

relevant in their decision-making process.  And the vendors testified that they would have acted

---

[703] Ex. 88 (Brandon depo.) 564:18-21.

[704] Ex. 335 (Kodak (LEGO) depo.) 356:20-357:15. Additional examples can be found in Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607.

[705] *See* Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607.

[706] Ex. 380 (Emrey (Munchkin) depo.) 54:23-55:4.

[707] Ex. 335 (Kodak (LEGO) depo.) 344:23-345:16.

[708] Ex. 335 (Kodak (LEGO) depo.) 352:15-353:16.

on that information by reconsidering their trade terms with Toys 'R' Us, moving to cash in advance, or simply stopping shipments altogether. [709]

The above evidence more than establishes materiality. "Materiality is a question of fact for the jury, unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1163 (2005) (internal quotes omitted).

### D.      Defendants were under a duty to disclose the concealed facts to the Trade Vendors.

Defendants had a duty to disclose the concealed facts to Trade Vendors under four independent theories.

#### 1.        Defendants had a duty to disclose subsequently acquired information that made their earlier statements untrue or misleading.

A person has a duty to disclose "subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so." Restatement (Second) of Torts § 551(c). A person makes "a representation which when made was true or believed to be so" and then "remains silent after he has learned that it is untrue" is "legally in the same position as if he knew that his statement was false when made." Restatement (Second) of Torts § 551, comment h.

---

[709] *See, e.g.*, Ex. 258 (Rana (Dorel) depo.) 251:22-252:4 (information about cash infusion would have "highlight[ed] the liquidity issues, which would definitely help us make our decision of stopping to ship"); Ex. 301 (Simons (Jada Toys) depo.) 295:2-9 ($150 to $200 million required cash infusion would have caused Jada to "sto[p] shipping goods and/or mov[e] them to a cash-in-advance"); Ex. 351 (McColgan (Mattel) depo.) 256:13-257:5 (December 2017 information about projected EBITDA would have led Mattel to "not have shipped them any more goods"); *see* Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607.

"The Restatement provides in subsection 2(c) that a party in a business transaction who subsequently learns of information that renders a prior representation untrue or misleading is under a duty to disclose that information." *R.I. Indus.-Recreational Bldg. Auth. v. CAPCO Steel, LLC*, No. PC 14-6055, 2015 R.I. Super. LEXIS 90, at *37 (Super. Ct. July 22, 2015) (internal citations omitted); *Nissan Motor Acceptance Cases*, 63 Cal. App. 5th 793, 828 (2021) ("[Plaintiff] based its claim on [Defendant's] failure to disclose material information that would have shown [Defendant's] disclosed representations were false or misleading.").

The Restatement applies this principal in an illustration that is remarkably similar to the facts of the present case. In that example, the "president of a mercantile corporation makes a true statement of its financial position," that he intends will be relied on by trade vendors. Restatement (Second) of Torts § 551, Illustration 2. The president then learns that the "corporation's financial position becomes seriously impaired" but does nothing to inform the vendors. *Id*. When later the "corporation receives goods on credit from" a trade vendor, the president "is subject to liability in deceit" for any losses suffered by the vendor. *Id*.

Defendants made, and caused others to make, representations to Trade Vendors and then Defendants acquired information that made those earlier representations untrue and misleading. Defendants therefore had a duty to disclose that subsequently acquired information to Trade Vendors.

### a.    Defendants' representations in September 2017.

The Company's bankruptcy filing caused Trade Vendors to stop shipping goods on credit. [710] Beginning on the day of the filing, September 18, 2017, Defendants directed communications in various forms to Trade Vendors containing key representations to persuade

---

[710] Ex. 89 (Barry depo.) 26:12-19.

Trade Vendors that they could safely ship goods to the Company on credit during the restructuring process.  (In Part VIII, Section B below, we demonstrate that each of these representations is actionable.  And in Part VII, Section H below, we demonstrate that all Defendants are liable for fraudulent concealment as to the representations delivered to Trade Vendors by other officers and employees of the Company.)  The September representations included each of the following.

Vendor FAQ on the website.

A Vendor FAQ was posted on the Toys "R" Us' website and vendor portal stating that Toys "R" Us had "sufficient liquidity to meet its obligations" because it had "access to up to $2.5 billion in debtor-in-possession ('DIP') financing which will support our business and enable us to meet our financial obligations throughout the restructuring process." [711]  It further stated that the Company would later "access almost $1 billion in additional financing for a total of $3.125 billion in new financing." [712]  It also stated that Toys "R" Us "will pay vendors for all goods and services received on or after the filing date." [713]  Barry testified that this Vendor FAQ was posted "for vendors to read and review." [714]

Telephone calls directly to Trade Vendors.

Brandon, Short, Barry, and the Company's merchant team that reported to Barry, made telephone calls to Trade Vendors and communicated that the Company had obtained $3 billion in DIP financing that gave the Company liquidity to pay vendors for all goods shipped on credit throughout the restructuring process.

---

[711] Ex. 172 (Vendor FAQ (Barry Exhibit 8) [TRU-Trust0000349256]).
[712] *Id.*
[713] Ex. 172 (Vendor FAQ (Barry Exhibit 8) [TRU-Trust0000349256]).
[714] Ex. 89 (Barry depo.) 64:15-24.

Barry, Brandon, and Short personally reached out to many trade vendors to inform them about the bankruptcy filing and the DIP financing. [715]

They communicated that "the DIP financing would provide liquidity to Toys "R" Us to be able to pay for goods that were shipped on credit," [716] that the DIP financing "would enable Toys "R" Us to pay for merchandise that was shipped on credit while Toys "R" Us was in bankruptcy." [717]

Defendant Barry was in charge of the merchandising team responsible for interacting with Trade Vendors. [718]  The merchant team was given a set of "Vendor Talking Points" and was trained to deliver those talking points to Trade Vendors. [719]  Barry directed the merchandising team to attend these trainings. [720]

The merchants were trained to communicate to Trade Vendors that "our operations are continuing in the ordinary course," and "We intend to pay vendors in full under normal terms for goods and services provided on or after the filing date." [721]

The Trade Vendors were trained to communicate that the Company does "have sufficient liquidity to meet its obligations" because "we have commitments for over $3.0 billion in new financing that will help support our operations and enable is us to meet our financial obligations during the restructuring process." [722]

---

[715] Ex. 88 (Brandon depo.) 260:12-24; Ex. 87 (Short depo.) 61:24-62:2; Ex. 89 (Barry depo.) 34:8-15, 73:2-15, 83:6-10.
[716] Ex. 89 (Barry depo.) 73:11-5.
[717] Ex. 89 (Barry depo.) 35:6-14.
[718] Ex. 89 (Barry depo.) 40:19-41:4, 135:1-23.
[719] Ex. 89 (Barry depo.) 56:20-57:4, 57:10-15, 58:6-11, 59:5-60:12, 139:9-16, 137:15-23.
[720] Ex. 89 (Barry depo.) 136:6-9.
[721] Ex. 174 (Vendor Talking Points [TRU-Trust0000336056]); Ex. 89 (Barry) 59:13-60:2.
[722] Ex. 174 (Vendor Talking Points [TRU-Trust0000336056]); Ex. 170 (TRU Master Q&A (Barry Exhibit 7) [TRU-Trust0000322879]) at 2, 13; Ex. 173 (Vendor reference guide [DEFS_0026186]) at 8; Ex. 89 (Barry depo.) 47:13-21.

Defendant Barry testified that the Vendor Talking Points "was the information the team

was required to share with vendors." [723]  And he testified:

```
4        Was the Toys"R"Us merchandising
5   team instructed to tell trade vendors
6   that Toys "R" Us had received commitments
7   of over 3 billion in new financing that
8   will help support their operations and
9   enable Toys"R"Us to meet its business
10   obligations during the financial
11   restructuring process?
12   A.   Yes.
```

Ex. 89 (Barry) 60:4-12.

Barry and the merchant team made a list of approximately 200 senior executives at Trade

Vendors who were to be contacted and receive the representations in the talking points. [724]

Barry directed the merchant team to "split up the list between ourselves," and make the

"talking points" calls to all of these Trade Vendors. [725]  Some of the calls were assigned to be

made by Brandon, Short, and Barry. [726]

Brandon delivered the representations in calls to executives at the following Trade

Vendors:

- Lego. [727]

- Hasbro. [728]

---

[723] Ex. 89 (Barry depo.) 59:5-12.
[724] Ex. 89 (Barry) 108:5-20; Ex. 171 (Vendors Call spreadsheet (Barry depo exhibit 16) [TRU-Trust0000364251]).
[725] Ex. 89 (Barry) 139:25-140:4; Ex. 171 (Vendors Call spreadsheet (Barry depo exhibit 16).
[726] Ex. 171 (Vendor Call spreadsheet (Barry Exhibit 16) [TRU-Trust0000364251].
[727] *See* Ex. 335 (Lego (Kodak)) 16:4-16, 17:20-18:14; Ex. 89 (Barry) 115:3-9; Ex. 95 (9'18'17 Brandon RE VIP Vendor List [TRU-Trust0000229765]).
[728] *See* Ex. 293 (Hasbro (Glenn)) 33:13-23, 34:7-23, 34:24-35:7, 40:20-41:6; Ex. 89 (Barry) 112:9-13; Ex. 95 (9'18'17 Brandon RE VIP Vendor List [TRU-Trust0000229765]).

- Huffy. [729]

- Jakks. [730]

- Just Play. [731]

- Mattel. [732]

- Spin Master. [733]

- MGA. [734]

- Graco. [735]

Short delivered the representations in calls to executives at the following Trade Vendors:

- Lego. [736]

---

[729] *See* Ex. 297 (Huffy (O'Gara)) 26:16-22, 53:1-10, 54:16-18.

[730] *See* Ex. 307 (Jakks (Cooney)) 157:17-158:2; Ex. 95 (9'18'17 Brandon RE VIP Vendor List [TRU-Trust0000229765]).

[731] *See* Ex. 315 (Just Play (Emby)) 73:16-18, 74:2-9, 257:18-258:12, 258:13-259:5, 64:4-65:7, 259:20-260:10, 260:11-261:5, 261:13-262:1; Ex. 89 (Barry) 115:19-116:9; Ex. 95 (9'18'17 Brandon RE VIP Vendor List [TRU-Trust0000229765]).

[732] *See* Ex. 351 (Mattel (McColgan)) 230:16-231:8, 231:15-232:2, 237:23-239:8, 241:5-7, 242:16-243:12, 243:3-12; Ex. 95 (9'18'17 Brandon RE VIP Vendor List [TRU-Trust0000229765]).

[733] *See* Ex. 88 (Brandon) 264:2-11; Ex. 89 (Barry) 117:16-118:6; Ex. 95 (9'18'17 Brandon RE VIP Vendor List [TRU-Trust0000229765]).

[734] *See* Ex. 88 (Brandon) 265:5-10, 266:10-19; Ex. 89 (Barry) 118:12-21, 119:17-21; Ex. 95 (9'18'17 Brandon RE VIP Vendor List [TRU-Trust0000229765]).

[735] *See* Ex. 95 (9'18'17 Brandon RE VIP Vendor List [TRU-Trust0000229765]).

[736] *See* Ex. 335 (Lego (Kodak)) 53:9-21, 286:2-18, 288:1-19; Ex. 87 (Short) 143:11-16, 145:13-146:10, 147:9-25.

- Spin Master. [737]

- Mattel. [738]

- Hasbro. [739]

- Jazwares. [740]

Barry delivered the representations in calls to executives at the following Trade Vendors:

- Mattel. [741]

- Lego. [742]

- Spin Master. [743]

- Hasbro. [744]

- MGA. [745]

- Kids 2. [746]

---

[737] *See* Ex. 401 (Spin Master (Stewart)) 193:10-15, 194:2-25, 195:2-16, 197:18-198:2, 199:15-23, 283:19-284:10, 241:5-17; Ex. 87 (Short) 111:1-7, 111:19-22, 112:22-113:7, 112:6-10, 114:15-20.

[738] *See* Ex. 351 (Mattel (McColgan)) 170:21-171:20; Ex. 87 (Short) 116:3-13.

[739] *See* Ex. 87 (Short) 141:1-142:1, 142:18-24.

[740] *See* Ex. 87 (Short) 148:15-21, 149:14-19, 149:7-10.

[741] *See* Ex. 351 (Mattel (McColgan)) 244:13-245:15; Ex. 89 (Barry) 111:25-112:3.

[742] *See* Ex. 335 (Lego (Kodak)) 67:18-68:4, 68:15-23, 310:8-311:16; Ex. 89 (Barry) 115:3-9.

[743] *See* Ex. 401 (Spin Master (Stewart)) 195:18-196:1, 197:18-198:2, 199:15-23; Ex. 89 (Barry) 117:16-118:6.

[744] *See* Ex. 293 (Hasbro (Glenn)) 290:12-291:1; Ex. 89 (Barry) 112:9-13.

[745] *See* Ex. 372 (MGA (Elliott)) 54:25-55:3, 55:23-56:12, 258:21-259:16; Ex. 89 (Barry) 118:12-21, 119:17-21.

[746] *See* Ex. 324 (Kids 2 (Calhoun)) 49:18-50:10, 50:11-21, 51:5-21, 215:23-216:5.

- Step2. [747]

- Jazwares. [748]

- Huffy. [749]

- Just Play. [750]

- Bandai. [751]

- Delta. [752]

- Learning Resources. [753]

- Handi-Craft. [754]

- Funrise. [755]

- Yvolve. [756]

- eKids. [757]

---

[747] *See* Ex. 409 (Step2 (McCallum)) 26:9-12, 76:24-77:3, 27:10-20, 153:21-154:12.

[748] *See* Ex. 311 (Jazwares (Zebersky)) 164:13-17, 164:21-165:5, 41:1-10, 42:14-23, 42:24-43:6.

[749] *See* Ex. 297 (Huffy (O'Gara)) 125:10-14, 36:21-37:16, 38:2-8, 39:1-10, 40:19-21.

[750] *See* Ex. 315 (Just Play (Emby)) 259:20-260:10; Ex. 89 (Barry) 115:19-116:9.

[751] *See* Ex. 213 (Bandai (Ciminera)) 47:7-14, 47:23-48:8, 48:23-49:2, 50:18-51:2

[752] *See* Ex. 255 (Delta (Shamie)) 169:7-22.

[753] *See* Ex. 330 (Learning Resources (Woldenberg)) 192:20-193:17, 198:3-199:8.

[754] *See* Ex. 289 (Handi-Craft (Hentschell)) 23:5-21, 26:24-27:13, 105:15-106:7.

[755] *See* Ex. 279 (Funrise (Price)) 52:23-54:17, 58:9-59:6.

[756] *See* Ex. 421 (Yvolve (Smith)) 42:2-14, 46:12-16, 253:21-255:16; Ex. 89 (Barry) 82:19-24, 81:12-22.

[757] *See* Ex. 267 (eKids (████)) 335:22-336:2, 250:18-251:1, 336:18-337:14, 337:15-25, 338:1-339:11.

- Skyrocket. [758]

The initial contact spreadsheet assigned Company officers or employees to deliver the talking points to executives at the following trade vendors: Mattel, Hasbro, Just Play, Jazwares, Spin Master, Graco, MGA, Skyrocket, Jakks, Dorel, Kids II, Huffy, Delta, Bandai, Evenflo, Kent, Yvolution/Yvolve, Crayola, Best Chairs, Step 2, Munchkin, Artsana, Kitex. [759]  In addition, other merchant team members made calls to the following Trade Vendors.

- eKids (█████) [760]

- Bestway (Schellhase) [761]

- Learning Resources (Woldenberg) [762]

- Funrise (Price) [763]

- Jada Toys (Simons) [764]

- Warner Bros (Gamble) [765]

- North States (Sueker) [766]

---

[758] *See* Ex. 395 (Skyrocket (Ardell)) 65:13-66:5, 105:18-106:4.

[759] Ex. 89 (Barry depo.) 122:17-25, 124:19-128:2, 128:14-18, 128:24-129:13.  Ex. 171 (Vendors Call spreadsheet (Barry depo. exhibit 16) [TRU-Trust0000364251]).

[760] Ex. 267 (eKids (████) depo.) 330:1-21, 250:18-251:1, 336:18-337:14.

[761] Ex. 244 (Bestway (Schellhase) depo.) 102:2-17, 171:11-16, 181:13-17.

[762] Ex. 330 (Learning Resources (Woldenberg) depo.) 192:20-193:17, 198:3-199:8.

[763] Ex. 279 (Funrise (Price) depo.) 44:18-24, 45:2-11, 45:21-46:19, 48:15-49:1, 49:3-13, 52:23-53:17, 58:9-59:6.

[764] Ex. 301 (Jada Toys (Simons) depo.) 51:22-25, 52:19-53:4, 207:11-25.

[765] Ex. 415 (Warner (Gamble) depo.) 212:13-213:18, 215:5-21.

[766] Ex. 385 (North States (Sueker) depo.) 59:1-5, 61:11-62:7.

- Basic Fun (Foreman) [767]

- Handi-Craft (Hentschell) [768]

- LSC (Pevonka) [769]

- RR Donnelly (see LSC)

Barry's letter

A letter signed by Richard Barry was "sent out to all of the major trade vendors." [770]  The letter began "Dear Valued Business Partner." [771]  It said "We have received commitments for over $3 billion in new financing that will support our operations and enable us to meet our business obligations during the financial restructuring process." [772]

Press releases

The Company issued press releases informing the vendor community that Toys "R" Us "successfully obtained debtor-in-possession financing today" and that Toys "R" Us "can assure our vendors that we are in a good position to accept shipments on a normal basis and they have great assurance they will be paid." [773]

---

[767] Ex. 232 (Basic Fun (Foreman) depo.) 246:19-247:5, 247:12-248:1.
[768] Ex. 290 (Handi-Craft (Hentschell) depo.) 90:13-24, 37:4-17, 45:16-46:6, 28:2-13, 23:5-21, 26:4-27:13, 105:15-106:7.
[769] Ex. 347 (LSC (Pevonka) depo.) 181:6-24, 260:9-24, 264:3-13.
[770] Ex. 89 (Barry) 93:25:94:10, 94:18-22, 95:3-6, 96:3-7; Ex. 160 (9'21'17 Barry letter Business Partner Update [TRU-Trust0000374052]).
[771] Ex. 160 (9'21'17 Barry letter Business Partner Update [TRU-Trust0000374052]).
[772] Ex. 160 (9'21'17 Barry letter Business Partner Update [TRU-Trust0000374052]), Ex. 89 (Barry) 95:20-97:2.
[773] Ex. 157 (9'19'17 1000 pm Reuters [TRU-Trust0000375540]); Ex. 159 (9'20'17 TRU First Day Press Release [TRU-Trust000374024]).

<u>Short's declaration</u>

Short submitted a declaration with the First Day filings stating "the DIP Facilities will also provide the Debtors liquidity to fund the administrative costs of these chapter 11 cases … and emerge from bankruptcy." [774]  Short further stated that "the DIP Facilities will provide the Debtors with the liquidity needed to reactivate their supply chain, provide assurance to their vendors, and capitalize on the holiday season." [775]

Additional evidence about these statements and how they were communicated to Trade Vendors is found in Trust SOF ¶¶ 402, 408, 414, 420, 426, 432, 438, 444, 450, 456, 462, 468, 474, 479, 484, 489, 494, 500, 506, 511, 517, 523, 529, 535, 540, 546, 551, 557, 563, 569, 574, 579, 584, 590, 595, 601, 606.

**b.    The information acquired by Defendants made the earlier representations false or misleading.**

As demonstrated above, the Defendants had communicated to trade vendors that Toys "R" Us had access to over $3 billion in DIP financing during the restructuring process that would enable Toys "R" Us to pay for merchandise that was shipped on credit while Toys "R" Us was in bankruptcy.  The concealments identified above constitute information acquired by Defendants establishing that the representations made in September were false and misleading.  The concealed information makes these representations false or misleading in three related ways.

<u>*First*</u>, it was false or misleading to represent that the DIP financing provided Toys "R" Us with sufficient liquidity to meet its obligations throughout the bankruptcy.

As Defendant Short admitted, "By the end of January, we understood that the original amount raised under the DIP financing wouldn't be sufficient." [776]  Defendants understood that

---

[774] Short declaration (Bk. Dkt. 20) at ¶127.
[775] *Id.* at ¶130.
[776] Ex. 87 (Short depo.) 441:15-442:15.

the "DIP financing by itself [was] not enough," because Toys "R" Us "need[ed] an additional $200 million" in financing. [777]

The statement that the DIP financing provided sufficient liquidity for Toys "R" Us to meet its obligations was thus no longer true. [778]  In fact, the exact opposite was true.  Defendants knew that the DIP financing would <u>not</u> provide Toys "R" Us with sufficient liquidity to meet its obligations, and that Toys "R" Us "would need access to additional financing" for the earlier statements to be true. [779]

Short admitted that Defendants' representation that the DIP financing would allow Toys "R" Us to meet its obligations during the restructuring was no longer true in January. [780]  At that time, Defendants knew that Toys "R" Us "would require an additional 150 to $200 million in a cash infusion" to meet its financial obligations. [781]  And because of that information, Short "understood that the DIP financing that [the Company] had secured back in September would no longer enable the company to meet its financial obligations throughout the restructuring process." [782]  He admitted that as of January 2018, "there would be other things that would have to be added to this statement to make it true," including that "we needed additional financing … on the order of 150 to $200 million." [783]

_Second_, it was misleading to represent that the DIP financing would be available for the duration of the bankruptcy process.

---

[777] Ex. 88 (Brandon depo.) 559:18-560:3.
[778] Ex. 88 (Brandon depo.) 558:3-12, 559:23-560:3.
[779] Ex. 87 (Short depo.) 442:17-24.
[780] Ex. 87 (Short depo.) 441:15-442:15.
[781] Ex. 87 (Short depo.) 345:15-18.
[782] Ex. 87 (Short depo.) 441:15-442:15.
[783] Ex. 87 (Short depo.) 443:2-14, 444:16-24.

As discussed above, Defendants learned that the Company was projected to default on financial covenants by February or March 2018, and that they could not comply with the January 31 budget covenant.

A projected breach of the DIP financing covenants would mean that Toys "R" Us would not have access to the financing for the duration of the bankruptcy.  For example, a loss of the financing in March would mean that the DIP financing would only be available for five months, rather than the 16 months that Defendants had represented.

Defendants did not update Trade Vendors with the new information they learned. Instead, they continued to misrepresent the status of Toys "R" Us' covenant compliance.  For example, at the beginning of March 2018, Short sent a PowerPoint on covenant compliance to LEGO that stated that Toys "R" Us was "in compliance with all of our covenants through March 3rd." [784]  That presentation did not mention that the Company had not complied with the January budget covenant (6.16), that the Company had determined that they could not satisfy the covenant, and that the lender had given them a 30 day waiver that would expire on March 3rd. [785]

_Third_, it was misleading to represent that Toys "R" Us had the ability to pay vendors for "all goods and services" provided during the bankruptcy.

Because Toys "R" Us was ordering goods on credit, Toys "R" Us needed sufficient liquidity to pay for those goods when the bill came due, typically 60 days after the order was placed.  As discussed above, the DIP financing was the source of liquidity that allowed Toys "R" Us to satisfy its obligations.  Defendants knew that if the Company breached its financial

---

[784] Ex. 343 (Kodak (LEGO) depo. ex. 113).
[785] Ex. 343 (Kodak (LEGO) depo. Ex. 113) at 3.

covenants and the DIP financing became unavailable, Toys "R" Us would be unable to pay vendors for goods.  And by December 13, 2017, Defendants knew that the Company would breach a financial covenant in February or March 2018.  It was therefore misleading to represent that the Company had the ability to pay vendors for "all goods and services" provided during bankruptcy.

> **2.     Because Defendants continued to make representations, they had a duty to disclose all material facts.**

Someone is liable "for non-disclosure of material facts" if "the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead." *Nissan Motor Acceptance Cases*, 63 Cal. App. 5th 793, 827 (2021) (quoting *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal. 3d 285, 294 (1970)).  In other words, "concealment exists when a party to a transaction, who is under no duty to speak, nevertheless does speak and suppresses facts which materially qualify the facts stated." *Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1164-65 (2005); *Jones v. ConocoPhillips Co.*, 198 Cal. App. 4th 1187, 1198, (2011) (a duty to disclose "[the suppression of a fact, by one … who gives information of other facts which are likely to mislead for want of communication of that fact"); *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 636 (2002) ("A duty to disclose will be imposed, however, on a party insofar as he voluntarily makes disclosure. A party who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak."); *Gutter v. Wunker*, 631 So. 2d 1117, 1118-19 (Fla. Dist. Ct. App. 1994) ("where a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed").

Defendants did not merely remain silent after making the initial representations to vendors in September.  Rather, they continued to make statements to vendors.  Each of these

representations to Trade Vendors required disclosure of all facts that materially qualified the statements or that were needed so that the statement was not misleading.

### a.        The Vendor FAQ on the website.

As Defendant Barry admitted, the Vendor FAQ was maintained on the Company's vendor portal "all the way up through the date that it announced it was liquidating in March 0f 2018." [786]

And that Vendor FAQ continued to represent to vendors that Toys "R" Us "had sufficient liquidity to meet its obligations" during the bankruptcy because it "had access" to billions of dollars in DIP financing that would "enable us to meet our financial obligations throughout the restructuring process." [787]  And it continued to represent that Toys "R" Us would "pay vendors for all goods and services" that Trade Vendors provided after the bankruptcy filing. [788]

Defendants had an obligation to disclose all facts that would materially qualify those statements and that were necessary so that they would not be misleading.  As demonstrated above, Defendants knew that whether the Company "had access" to billions of dollars in DIP financing "throughout the restructuring process," was contingent on satisfying the financial covenants, that the Company was projecting to breach those covenants, and that—by January 31—had determined the Company could not comply.   As Short admitted, "there would be other things that would have to be added to this statement to make it true," including that Toys "R" Us had "concluded we needed additional financing." [789]

---

[786] Ex. 89 (Barry depo.) 64:15-24.
[787] Ex. 172 (Vendor FAQ (Barry Exhibit 8) [TRU-Trust0000349256]).
[788] Ex. 172 (Vendor FAQ (Barry Exhibit 8) [TRU-Trust0000349256]).
[789] Ex. 87 (Short depo.) 443:2-13, 444:16-24.

Furthermore, the Vendor FAQ continued to represent "Will Toys 'R' Us continue normal operations?  Yes.  Our operations are continuing as usual."  That statement was misleading in light of the concealed facts set forth above that were known to Defendants, but not disclosed, including the following:

- "the Company will require at least $200 million in order to emerge from the chapter 11 cases as a reorganized operating company, plus additional capital for planned capital expenditures," the funding for emergence was "unlikely to materialize," and one of the "likely outcomes of these chapter 11 cases" is "total liquidation of the enterprise." [790]

- the Company had "determined that [it] would not be able to comply with the Revised Budget Covenant [covenant 6.16]." [791]

- "the forecasted cash liquidity position is dire" and "the Company projects it will breach its postpetition financing covenants in February or March." [792]

- the DIP Term Loan lenders "thought it would be better to liquidate the company sooner rather than later," and the Company was preparing "plans around a liquidation process" including a "liquidation analysis" and "wind-down budget" for the U.S. business, with the focus "around a mid March date." [793]

As Brandon admitted:

21      Q.  Did you tell any trade vendors that,
22   although you'd represented to them that Toys "R" Us
23   would continue normal operations while in

---

[790] Ex. 140 (1'28'18 minutes [DEFS_0059009]) at 1-2.
[791] Ex. 144 (1'31'18 TRU - Waiver Extension (1-30-18) [Draft] [TRU-Trust0000323056]).
[792] Ex. 142 (1'31'18 minutes [DEFS_0059013]).
[793] Ex. 146 (2'17'18 Brandon to Sussberg [TRU-Trust0000275355]) at 1-3; Ex. 145 (2'16'18 Barry Notes (Barry depo. exh. 44) [DEFS_0026183]).

24  bankruptcy, that you now determined it was unlikely
25  that Toys "R" Us would continue to operate its
1   current business plan?
3       THE WITNESS:  We did not share that
4   information with any stakeholders.

Brandon 565:21-566:4.

### b.    December 21 conference call with vendors.

On December 21, 2017, Brandon and Short conducted a conference call that was attended

by many Trade Vendors as well as major news outlets, such as the Wall Street Journal,

Bloomberg News, U.S.A. Today, PBS, and CBS. [794]  Brandon and Short stated that the Company

had "secured $3.1 billion in DIP financing" and "we obtained a very strong DIP financing

package which put us in a position to have strong liquidity through this process." [795]

But both Brandon and Short knew and failed to disclose facts that materially qualified

those statements.  While representing that they had a "very strong DIP financing package" that

projected "strong liquidity through this process," they failed to disclose that the Term DIP Loan

lender had insisted on two financial covenants that left the Company with an insufficient

liquidity cushion, so that the $175 million liquidity covenant "doesn't work," and the January

budget covenant "just isn't going to work." [796]

They failed to disclose that holiday sales were down double-digits which meant the

Company could not possibly achieve the liquidity levels required by the January budget

---

[794] Ex. 87 (Short) 168:7-170:23; Ex. 165 (12'21'17 participant list).

[795] Ex. 64 (12'21'17 Transcript, Q3 Earnings Call [TRU-Trust0000323034]).

[796] Ex. 70 (Greenspan) ¶¶100, 104; Ex. 57 (9'20'17 0652 am [TRU-Trust0000075725]); Ex. 48
(9'18'17 2244 pm [LZ-TRU0092221]) at 4; Ex. 70 (Greenspan) ¶¶103, 111-112, 115; Ex. 56
(9'20'17 0612 am Kilkenney [TRU-Trust0000075262]); Ex. 37 (8'31'17 attach DIP sizing
[TRU-Trust0000373909]) at 3; Ex. 42 (9'15'17 Lal 144 not sufficient [LZ-TRU0079112]); Ex.
59 (9'21'17 Kurtz re negotiations [LZ-TRU0086423]) at 1.

261

covenant, and that eight days earlier Brandon had told the Board that the Company was

projecting a "default under its financing milestones." [797]

### c.   Hong Kong Toy Fair.

Barry attended the Hong Kong Toy Fair from January 7 to January 11, 2018, along with

Company employees Ron Baime, Rich Ryan, Raina Khumush, Dave Ditota, and Rob

Magarino.[798]  The team had extensive discussions with many Trade Vendors. [799]  Barry reported

that there were "Lots of vendor concerns out here." [800]  To address these concerns, the

employees that accompanied Barry were not given an updated set of talking points and were not

told to say anything different than what they had been saying since September. [801]  The

September talking points instructed the employees to tell Trade Vendors the Company had

"sufficient liquidity to meet its obligations" because it had "a commitment for over $3.0 billion

in new financing which will support our business and enable is us to meet our financial

obligations during the restructuring process." [802]

Barry told vendors "the common message" "that Toys 'R' Us had received … 'DIP

financing' that would help us get through and exit bankruptcy" and that Toys "R" Us was going

to be "purchasing additional merchandise in the coming months over the following years." [803]

He told vendors that Toys "R" Us "was looking forward to doing business with them for the

---

[797] Ex. 5 (2'7'18 weekly board update [DEFS_0125623]) at 3; Ex. 164 (12'13'17 minutes
[DEFS_0061932]); Ex. 70 (Greenspan) ¶¶111, 135.
[798] Ex. 89 (Barry depo.) 143:23-144:2, 145:1-13.
[799] Ex. 89 (Barry depo.) 148:18-22, 152:20-153:8.
[800] Ex. 89 (Barry depo.) 192:15-193:24; Ex. 137 (1'8'18 Barry to Hassan [TRU-
Trust0000376438]).
[801] Ex. 89 (Barry depo.) 92:22-25, 93:8-13, 144:20-25.
[802] Ex. 174 (Vendor Talking Points (Barry Exhibit 6) [TRU-Trust0000336056]); Ex. 170 (TRU
Master Q&A (Barry Exhibit 7) [TRU-Trust0000322879]) at 2, 13.
[803] Ex. 90 (Baime depo.) 25:3-16, 26:25-27:7.

holiday season." [804]  He informed vendors that "we were working through the bankruptcy

process with a plan to emerge and we were looking to get focused on driving business in holiday

2018." [805]  Barry told vendors "things are fine," "[e]verything's on track" and "[f]inance is in

place," and was "giving his word" that vendors would be paid for the goods that they shipped. [806]

Barry did not communicate any negative information to vendors, such as "risks that Toys "R" Us

could default on its financing," or that "there may be obstacles to Toys "R" Us emerging from

bankruptcy." [807]  For additional evidence of representations to vendors at the Hong Kong Toy

Fair see Trust SOF 494, 468, 563, 590, 500, 511, 414, 484, 551, 420.

Multiple meeting schedules show the Trade Vendors that Barry and his team met with in

Hong Kong. [808]  Those vendors included:

Jada Toys
- January 7, 2018, 10:30am

- Ex. 89 (Barry depo.) 162:22-163:5


Funrise
- January 7, 2018, 11:00am

- Ex. 89 (Barry depo.) 151:22-152:5, 162:11-165:7


MGA
- January 7, 2018, 11:45am and January 10, 3:30pm

- Ex. 89 (Barry depo.) 156:4-8, 165:12-16, 190:22-25

---

[804] Ex. 89 (Barry depo.) 158:23-159:4, 186:25-187:5.
[805] Ex. 89 (Barry depo.) 193:9-24.
[806] Ex. 232 (Foreman (Basic Fun) depo.) 263:17-264:11, 266:15-267:14.
[807] Ex. 89 (Barry depo.) 195:16-23, 155:7-19.
[808] Ex. 180 (1'7'18 HK Executive Schedule [TRU-Trust0000376417]); Ex. 181 (1'9'18 HK GCC Schedule [TRU-Trust0000376416]); Ex. 182 (1'10'18 HK GCC Schedule [TRU-Trust0000376410]); Ex. 89 (Barry depo.) 150:14-21.

Spin Master
- January 7, 2018, 1:30pm

- Ex. 89 (Barry depo.) 167:11-168:1, 168:19-169:1

Jakks
- January 7, 2018, 3:45pm and January 9, 2018, 7:00pm

- Ex. 89 (Barry depo.) 157:2-4, 169:2-9, 177:13-17

Just Play
- January 8, 12:45pm and January 10, 2:30pm

- Ex. 89 (Barry depo.) 189:17-24

Bandai
- January 8, 2018, 2:45pm

- Ex. 89 (Barry depo.) 174:12-15

Hasbro
- January 8, 2018, 3:30pm and January 10

- Ex. 89 (Barry depo.) 185:23-186:1

Mattel
- January 8, 5:30pm

- Ex. 89 (Barry depo.) 176:10-19

Basic Fun
- Ex. 89 (Barry depo.) 196:20-23, 200:15-201:9

While representing to Trade Vendors that the Company had "'DIP financing' that would help us get through and exit bankruptcy," Barry and his team omitted critical facts about the status of the financing. Barry did not disclose that the Company's holiday sales were down over

15% and that, as a result, the Company had determined that it would default on the DIP financing financial covenants in February or March or that shipping goods was "a risk." [809] Barry gave no indication that "Toys "R" Us was concerned" that it would not be able "to comply with its financing." [810] Barry made selective disclosures that only provided positive information while withholding information suggesting Toys "R" Us' liquidity was in jeopardy.

### d.    Larian.

When Brandon and Barry received an inquiry from Isaac Larian, the CEO of MGA, on February 3, 2018, Brandon chose to make statements on the subject, but not disclose the whole truth to Larian. [811] Larian forwarded Brandon a LinkedIn post by Jim Silver, an industry commentator, who reported that "Word has leaked from one of ToysRUS financial owners (Bain,Vornado,KKR) that they are leaning toward a liquidation" and were considering various options ranging from shrinking the footprint to "a 200 store chain" or "liquidate the whole thing." [812] Larian asked Brandon "What the hell is going on? … Why NOBODY tell me about this?" [813]

In responding to Larian, Brandon communicated that Larian should not "rely upon Jim Silver as being a source of useful and accurate information about decisions being made in the boardroom of TRU." [814] Brandon stated: "If there is something to tell you, you will be hearing it from us– not rumors on LinkedIn from Jim Silver." [815] Brandon assured Larian that Toys "R" Us was "working on the best plan for emergence and a variety of alternatives are being

---

[809] Ex. 232 (Foreman (Basic Fun) depo.) 263:17-264:11.
[810] Ex. 232 (Foreman (Basic Fun) depo.) 264:13-265:1.
[811] Ex. 147 (2'3'18 Brandon to Larian re Silver post [TRU-Trust0000272792]).
[812] Ex. 167 (Larian Post).
[813] Ex. 147 (2'3'18 Brandon to Larian re Silver post [TRU-Trust0000272792]) at 3.
[814] Ex. 147 (2'3'18 Brandon to Larian re Silver post [TRU-Trust0000272792]) at 2.
[815] *Id.* at 2.

considered." [816]  Brandon's statements were calculated to convince Larian that there was no truth in the rumor of liquidation and that Silver was not an accurate source of information. [817]

Brandon's statements were misleading and failed to disclose all material facts on the subject.  Brandon failed to disclose that, just five days earlier, Brandon had told the board that there were "three likely outcomes of these chapter 11 cases" one of which was "total liquidation of the enterprise," and that the outcome of emergence from bankruptcy "seems unlikely to materialize given current facts." [818]

Brandon failed to disclose that the Company had a "500 million shortfall" in liquidity from the levels stated in the DIP budget. [819]  And he failed to disclose the Company had determined that it could not satisfy the January 31 revised budget covenant, but had only been able to obtain a one-month waiver from the lender. [820]  Brandon omitted that, just three days before, he had told the Board that "the forecasted cash liquidity position is dire," and "the Company projects it will breach its postpetition financing covenants in February or March." [821]

### e.      New York Toy Fair.

Defendants Brandon and Barry attended the New York Toy Fair from February 17 to February 19, 2018.  All of the Defendants knew that Brandon, Barry, and a Toys "R" US team would be attending, because Brandon updated the board about the plans to attend the Toy Fair.  Brandon told the Board that he "intends to meet with the executives of many large vendors" at the Toy Fair. [822]  Brandon explained that each vendor would likely "push him for comfort that

---

[816] *Id*. at 2.
[817] Ex. 88 (Brandon depo.) 433:18-434:3.
[818] Ex. 140 (1'28'18 minutes, [DEFS_0059009]).
[819] Ex. 142 (1'31'18 minutes [DEFS_0059013]) at 2.
[820] Ex. 143 (1'31'18 signed Waiver [TRU-Trust0000375089]).
[821] Ex. 142 (1'31'18 minutes [DEFS_0059013]) at 2.
[822] Ex. 148 (2'12'18 minutes [DEFS_0059030]).

the Company can pay for shipments," and that Brandon and other Toys "R" Us employees visiting the Toy Fair would "provide vendors additional comfort so they do not determine to stop shipping." [823]

As Raether testified, at the board meeting "there was a discussion about the upcoming New York Toy Fair and that Dave Brandon would be meeting with a number of the vendors … [a]nd that undoubtedly, there would be difficult conversations with the vendors about whether they would continue to ship or not." [824]  Brandon told the board "that he expected these vendors at the toy fair to push him for comfort that the company can pay for shipments." [825]  Brandon said "he was hopeful that he would be able to convince those vendors ... that they should continue to ship Toys 'R' Us." [826]  "He hoped that he would be successful in convincing the – the vendors not to stop shipping." [827]

In advance of the Toy Fair, Barry and Brandon prepared and approved messaging that they and the rest of the Toys "R" Us team visiting the Toy Fair would use to communicate to Trade Vendors at the Toy Fair.  On February 15, Barry approved a "NYTF Fact Sheet" that contained messages that the Toys "R" Us employees visiting Toy Fair were expected to deliver. That messaging stated: "The Leadership Team and our advisors are totally focused on our plans for emergence." [828]

---

[823] Ex. 148 (2'12'18 minutes [DEFS_0059030]).  Ex. 82 (Goodman) 346:19-347:3, 347:20-24; Ex. 81 (Bekenstein) 266:23-267:15, 268:6-269:24, 273:4-10; Ex. 83 (Macnow) 145:1-146:12, 150:22-151:11; Ex. 80 (Silverstein) 328:15-25, 329:10-330:10; Ex. 79 (Taylor) 251:17-253:2, 274:2-11, 277:10-18, 279:13-24, 281:21-282:2, 282:12-283:6; Ex. 88 (Brandon) 471:2-9, 471:21-472:4, 472:10-473:6, 473:12-25, 475:1-4, 476:6-12, 477:4-8., 478:2-8, 478:18-479:2.
[824] Ex. 77 (Raether) 282:13-283:4.
[825] Ex. 77 (Raether) 283:5-16.
[826] Ex. 77 (Raether) 283:17-284:4.
[827] Ex. 77 (Raether) 283:5-16, *see* Ex. 77 (Raether) 284:15-22, 285:14-286:2, 287:7-24.
[828] Ex. 150 (2'15'18 - Von Walter to Barry re fact sheet [TRU-Trust0000362680]); Ex. 149 (2'15'18 NYTF Fact Sheet FINAL [TRUTrust0000362681]).

On February 15, 2018, Barry organized a "Team Huddle" to instruct the Toys 'R' Us merchant team that would be attending the Toy Fair what to communicate to Trade Vendors.  At the Team Huddle, Brandon and Barry presented a PowerPoint presentation that included slides such as "be positive," "be aggressive," and "[a]sk unapologetically for everything!" [829]  It contained a slide with a graphic that read "Chapter 11 next exit," which was used to communicate that Toys "R" Us "would emerge from bankruptcy." [830]  And it also included a slide that stated that "We are on our toes, not our heels," which Brandon felt "was a very appropriate metaphor to use" to get the team in the right mindset. [831]

When delivering the presentation, Brandon told the merchant team "to be positive and work with our vendor partners to deliver a successful season as we worked to emerge from bankruptcy." [832]  And Barry's remarks included telling the team to "[b]e positive in your outlook with the vendors and in the way that you are going to drive negotiations," and to "really as[k] the vendors to lean in with us and support us." [833]  Barry further told the team that "we were working hard on the emergence plans," and to focus on Toys "R" Us' future emergence from bankruptcy.[834]

An executive schedule listed the meetings that Brandon and Barry would have with different vendors. [835]  Barry admits that he attended each of the meetings on the Toy Fair executive schedule. [836]

---

[829] Ex. 183 (2'15'18 NYTF team huddle powerpoint [TRU-Trust0000323065]).  *Id.* at 7, 8, 11.
[830] *Id.* at 5; Ex. 89 (Barry depo.) 272:4-8.
[831] Ex. 183 (2'15'18 NYTF team huddle powerpoint [TRU-Trust0000323065]) at 6; Ex. 88 (Brandon depo.) 462:15-21.
[832] Ex. 89 (Barry depo.) 267:21-268:5; Ex. 88 (Brandon depo.) 463:8-12.
[833] Ex. 89 (Barry depo.) 272:16-25, 276:10-25.
[834] Ex. 89 (Barry depo.) 271:13-272:15.
[835] Ex. 189 (2018 Executive Schedule – NY Toy Fair [TRU-Trust0000374795]).
[836] Ex. 89 (Barry depo.) 332:10-15.

That schedule indicates that the following Trade Vendors received representations from

Defendants at the toy fair at specific times.

Basic Fun
- Saturday, February 17, 10:00am [837]


Jakks
- February 17, 2:45pm


Yvolve/Yvolution
- February 17, 5:00pm


Hasbro
- Sunday, February 18, 9:30am [838]


Lego
- February 18, 12:00pm [839]


Step2
- February 18, 2:00pm [840]


Crayola
- February 18, 3:00pm [841]


Spin Master
- Monday, February 19, 9:00am


Mattel

---

[837] Ex. 89 (Barry depo.) 289:15-17.
[838] Ex. 89 (Barry depo.) 332:19-21, 335:13-24.
[839] Ex. 89 (Barry depo.) 340:2-341:3.
[840] Ex. 89 (Barry depo.) 347:18-22.
[841] Ex. 89 (Barry depo.) 351:5-9.

- February 19, 11:00am [842]

- February 20, 5:30pm [843]

Just Play
- February 19, 1:10pm [844]

MGA
- February 19, 2:00pm [845]

For additional evidence of Trade Vendor meetings with Defendants and other Toys "R" Us representatives, see 420, 500, 606, 484, 540, 595, 438, 590, 551, 511, 563.

At the New York Toy Fair, Brandon and Barry delivered a consistent message to Trade Vendors. Brandon told Trade Vendors in a "reassuring and comforting manner" that Toys "R" Us was "working through the bankruptcy" and was working on "exiting" and "having a business." [846]

Brandon sat down with McCallum from Step2, "literally knee to knee," and looked McCallum "straight in the eye" and said "we're coming out of this fast," "load the trucks, and get ready to ship because we're going to need goods." [847]

Brandon admitted that he told Trade Vendors "that Toys "R" Us was working on plans to emerge from bankruptcy." [848] And Brandon further admitted that he did not inform vendors "that Toys "R" Us was working on a plan for liquidation." [849]

---

[842] Ex. 89 (Barry depo.) 355:2-5, 360:5-11.
[843] Ex. 88 (Brandon depo.) 516: 5-15.
[844] Ex. 89 Barry depo. 362:21-363:1; Ex. 88 (Brandon depo.) 508:19-23.
[845] Ex. 89 (Barry depo.) 366:4-67:5.
[846] Ex. 90 (Baime depo.) 43:25-44:14.
[847] Ex. 409 (Step 2 (McCallum)) 149:16-150:5, 184:19-185:10.
[848] Ex. 88 (Brandon depo.) 500:4-7.
[849] Ex. 88 (Brandon depo.) 500:10-14.

Barry delivered the same message: that Toys "R" Us was "focused on emergence and focused on the holiday season." [850]  Barry admitted that he did not provide "any negative information" to Trade Vendors or inform vendors that "there's risks that [they] might not get paid." [851]  Barry told vendors it was "business as usual at Toys "R" Us." [852]  Barry stated: "things are fine," "[e]verything's on track" and "[f]inance is in place," and was "giving his word" that vendors would be paid for the goods that they shipped to Toys "R" Us. [853]

Each of the other Toys "R" Us representatives delivered the message that Brandon and Barry had instructed them to convey.  They told Trade Vendors that management was "totally focused on our plans for emergence." [854]  They assured Trade Vendors that ██████████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████  ██

Each of those statements was misleading and omitted the concealed information described above, which materially qualified the statements.  They omitted that Brandon told the Board that "the Company will require at least $200 million in order to emerge from the chapter 11 cases as a reorganized operating company, plus additional capital for planned capital expenditures" and this funding was "unlikely to materialize." [856]  They omitted that the Company had determined that it could not satisfy the January 31 revised budget covenant, but

---

[850] Ex. 89 (Barry depo.) 343:6-13.
[851] Ex. 89 (Barry depo.) 289:5-9.
[852] Ex. 421 (Smith (Yvolve) depo.) 272:13-273:10.
[853] Ex. 232 (Foreman (Basic Fun) depo.) 263:17-264:11, 266:15-267:14.
[854] Ex. 150 (2'15'18 - Von Walter to Barry re fact sheet [TRU-Trust0000362680]); Ex. 149 (2'15'18 NYTF Fact Sheet FINAL [TRUTrust0000362681]).
[855] Ex. 93 (Ryan depo.) 174:6-10.
[856] Ex. 140 (1'28'18 minutes [DEFS_0059009]) at 1-2.

had only a one-month waiver. [857]  They omitted that on January 31, 2018, "Brandon advised the board that … the forecasted cash liquidity position is dire" and "the Company projects it will breach its postpetition financing covenants in February or March." [858]

And they omitted that on February 16, 2018, the day before the start of the New York Toy Fair, Brandon called an "emergency leadership team" meeting to announce that the DIP Term Loan lenders "thought it would be better to liquidate the company sooner rather than later," and the Company was preparing "plans around a liquidation process" including a "liquidation analysis" and "wind-down budget" for the U.S. business, with the focus "around a mid March date." [859]

Brandon, Barry, and the rest of the team were being "positive," and "provid[ing] vendors additional comfort so they do not determine to stop shipping," and telling vendors that "The Leadership Team and our advisors are totally focused on our plans for emergence." [860]  But Brandon and Barry knew that in fact they had just had an "emergency meeting" on the day before the Toy Fair, that the liquidity situation was dire, that they were not totally focused on emergence, and that liquidation planning was underway.  This constitutes fraudulent concealment.  *Nissan Motor Acceptance Cases*, 63 Cal. App. 5th 793, 827 (2021) (defendant "failed to disclose material facts it had a duty to disclose" when defendant told plaintiff that it

---

[857] Ex. 144 (1'31'18 TRU - Waiver Extension (1-30-18) [Draft] [TRU-Trust0000323056]).
[858] Ex. 142 (1'31'18 minutes [DEFS_0059013]).
[859] Ex. 146 (2'17'18 Brandon to Sussberg [TRU-Trust0000275355]) at 1-3; Ex. 145 (2'16'18 Barry Notes (Barry depo. exh. 44) [DEFS_0026183]); Ex. 89 (Barry depo.) 419:24-421:17; Ex. 89 (Barry depo.) 419:24-421:17.
[860] Ex. 148 (2'12'18 minutes [DEFS_0059030]); Ex. 150 (2'15'18 - Von Walter to Barry re fact sheet [TRU-Trust0000362680]); Ex. 149 (2'15'18 NYTF Fact Sheet FINAL [TRUTrust0000362681]).

"would not shut Superior down while at the same time he and his staff were contemplating that option").

As Raether admitted, telling vendors at the New York Toy Fair that "things are going great," that Toys "R" Us was "working on [its] plans to emerge from bankruptcy," and that Toys "R" Us was "looking forward to the next holiday season" would not be "the whole truth." [861]

### f.    Mattel and the LEGO Group representations.

Defendants made additional, specific statements to Mattel and the LEGO Group falsely claiming covenant compliance.

The LEGO Group entered a non-disclosure agreement with Toys "R" Us to obtain information about Toys "R" Us' covenant compliance in February 2018. [862]  After LEGO signed that NDA, Short sent LEGO a financial covenant forecast deck on March 1, 2018, stating that it provided "info on covenant compliance in Delaware for Jan and Feb." [863]  That slide deck stated that Toys "R" Us had only "two financial covenants," the cash flow and liquidity covenants, and that Toys "R" Us would be "in compliance with both of these covenants" through March 3, 2018. [864]  In reality, Short knew that Toys "R" Us was projected to soon breach these covenants. And Short failed to disclose a third covenant, the January 31 revised budget covenant, and that the Company had determined it could not comply with that covenant, but had only been able to obtain a one-month waiver from the lender. [865]

---

[861] Ex. 77 (Raether depo.) 296:4-19; *see* Ex. 80 (Silverstein depo.) 335:1-24.
[862] Ex. 335 (Kodak (LEGO) depo.) 156:20-157:9.
[863] Ex. 152 (3'2'18 Short to Lao [LEGO-TRU_00012738]).
[864] Ex. 151 (3'1'18 financial covenant forecast).
[865] Ex. 143 (1'31'18 signed Waiver [TRU-Trust0000375089]).

Similarly, Mattel reached out to Short on February 16 and informed Short that its auditors were requesting "a document confirming current compliance with existing covenants." [866]  Short was "the point person for" "understanding whether they were going to be in a position to default" on any of the covenants. [867]  Short did not tell Mattel that Toys "R" Us was projected to breach the liquidity and cash flow covenants and had already determined it could not comply with the January 31 revised budget covenant.  Instead, Short surmised that "we are going to tell Gregg [Stefanick] that if we were in covenant default, we would have had to issue an 8K. Since we did not, he, his company, and their auditors ought to assume that we are not in breach." [868]  Brandon executed this strategy, telling Mattel on February 25 or 26 that "Toys "R" Us would have been required to file an 8-K if it was not in compliance with its covenants." [869]  Brandon and Short did not disclose, or direct anyone else to disclose, the true facts regarding the Company's covenant breaches.  Instead, on February 25, Mattel received an email with forecasts that were claimed to "demonstrate the Company's ability to comply with February covenants." [870]

### g.      Purchase orders representing the ability to pay.

In addition to the verbal and written statements to Trade Vendors directly addressing the status of the Company's financing, liquidity situation, and plans for emergence, vendors received additional representations each time that they received a purchase order from the Company. Trust's SOF ¶¶ 401, 407, 413, 419, 425, 431, 437, 443, 449, 455, 461, 467, 473, 478, 483, 488, 493, 499, 505, 510, 516, 522, 528, 534, 539, 545, 550, 556, 562, 568, 573, 578, 583, 589, 594, 600, 605.

---

[866] Ex. 185 (2'16'18 Stefanick to Short [MATTEL00000537]).
[867] Ex. 357 (Stefanick (Mattel) depo.) 172:2-18.
[868] Ex. 184 (2'16'18 Short to Kosturos [TRU-Trust0000299828]).
[869] Ex. 357 (Stefanick (Mattel) depo.) 177:23-179:14.
[870] Ex. 186 (2'26'18 Johnson to Euteneuer cash flow forecast [MATTEL00005494]).

A buyer's commitment to purchase goods on credit includes an implied representation that the buyer "has the wherewithal"—the ability—to "repay all credit extended." *In re Hutchinson*, 27 B.R. 247, 250-51 (Bankr. E.D.N.Y. 1983) (collecting cases); *In re Rodgers*, 115 B.R. 678, 683-84 (Bankr. C.D. Cal. 1990). A buyer has "a duty to disclose to the seller facts critical to the buyer's ability to perform the transaction." *Fairview Dev. Corp. v. Aztez Custom Homebuilders, LLC*, No. CV-07-0337-PHX-SMM, 2009 U.S. Dist. LEXIS 16501, at *33 (D. Ariz. Mar. 2, 2009) (collecting cases).

The representation that the Company had the ability to pay gave rise to a duty to disclose all facts that materially qualified that representation. These facts included that the Company was projected to soon default on its DIP financing. But Defendants failed to give vendors any of the information that indicated that Toys "R" Us' ability to pay for purchase orders using the DIP financing was in peril. For example, a purchase order placed by Toys "R" Us on January 25, 2018, contained the implied representation that Toys "R" Us would be able to pay for that purchase order when it came due. But Defendants learned just one day earlier that they were projected to lose access to the DIP financing—their ability to pay—because they could not comply with required liquidity levels under the budget covenant. [871]

Trade Vendors were never aware of any of this information. Instead, the Company "just kept merrily producing the POs, and we kept shipping them. And they were trying to induce us to accept more orders and take more financial risk and send them more inventory with free financing up to the very last day." [872] Additional evidence for the Trade Vendors' lack of awareness is found in Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469,

---

[871] Ex. 139 (1'24'18 minutes [TRU-Trust0000374989]).
[872] Ex. 330 (Woldenberg (Learning Resources) depo.) 220:20-222:5.

475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607.

> **3.** **Defendants were under a duty to disclose because they possessed superior knowledge and knew that Trade Vendors were acting on the basis of mistaken facts.**

A person is under a duty to disclose when he knows that another is acting on a mistaken belief about a material fact to the transaction.  "[A] duty to disclose may also arise when a defendant possesses or exerts control over material facts not readily available to the plaintiff." *Jones v. ConocoPhillips Co.*, 198 Cal. App. 4th 1187, 1199 (2011)).  A defendant is liable for "non-disclosure of material facts" if "the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff.  *Nissan Motor Acceptance Cases*, 63 Cal. App. 5th 793, 826 (2021) (quoting *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal. 3d 285, 294 (1970)).

Such a duty exists when "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge."  *Pursuit Partners, LLC v. UBS AG*, No. X05CV084013452S, 2009 Conn. Super. LEXIS 2313, at *40 (Super. Ct. Sep. 8, 2009).

A duty to disclose exists "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Century Pac., Inc. v. Hilton Hotels Corp.*, 2004 U.S. Dist. LEXIS 6904, at *26-27 (S.D.N.Y. Apr. 20, 2004) (discussing Second Circuit application of New York state law). "It is no longer acceptable, if ever it was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumptions when, like the present plaintiff, he 'would reasonably expect a disclosure'." *Gaines Serv. Leasing Corp. v. Carmel Plastic Corp.*, 432 N.Y.S.2d 760, 763 (Civ. Ct. 1980) (citing Restatement, Torts 2d, § 551).

276

The Trust has evidence establishing each of these components.

### a.      Defendants had superior knowledge of material facts.

As demonstrated above, Defendants had access to the Company's internal data and communications that the Trade Vendors lacked.  The Defendants therefore possessed both superior knowledge and special information on the subjects of (i) the Company's recent financial results including sales, margins, SG&A costs, and capital expenditures, (ii) the Company's projected financial results including sales growth/ decline, margins, costs, and capital expenditures, (iii) the Company's plan for emergence or liquidation, (iv) the Company's compliance with financial covenants, (v) the Company's current or projected liquidity.

Defendants had superior knowledge of the concealed facts because the facts consisted of internal Company communications, data, and projections.  For example, Brandon, Short, and Barry received daily reports of sales. [873]  The Directors received a "Weekly Board Update" with financial information. [874]  And the Directors received updates at each board meeting about Toys "R" Us' financial position, and how that financial position affected covenant compliance and access to the DIP financing.  As discussed above, each of these facts was material because they directly related to the risk that Toys "R" Us would be unable to pay vendors for goods as they came due.

As a result, Defendants knew each of the concealed facts, for example:

---

[873] Bk. Dkt. 2341 (Transcript of 3'20'17 hearing; Kurtz testimony) at 17 ("the management team" was watching "the day-to-day operating performance of the company … the holiday season" and "would literally receive … a daily sales tally").

[874] E.g. Ex. 5 (2'7'18 weekly board update [DEFS_0125623]); Ex. 81 (Bekenstein) 185:2-7, 187:20-189:31.

On December 13, 2017, Brandon informed the Board of Directors that Toys "R" Us was projected to "end the year with an EBITDA that would result in a default under its financing milestones." [875]

On January 24, 2018, Brandon told the Board that Toys "R" Us' 2017 EBITDA was "projected to be under $300 million—significantly short of the Company's $640 million projection in the DIP budget" which would lead to an "anticipated breach of financial covenants under the DIP Financing." [876]   And Brandon explained that "as a result of the Company's poor performance and based on current projections the Company will now require a $150-$200 million cash infusion from a third-party in order to fill a hole in the proposed budget and emerge as a reorganized operating business." [877]

Four days later, at a January 28, 2018, board meeting, Brandon told the Board that "the Company will require at least $200 million in order to emerge from the chapter 11 cases as a reorganized operating company, plus additional capital for planned capital expenditures." [878] And on January 31, 2018, Brandon and Short informed the Board that the company was more than $500 million below the level required to satisfy the company's covenant milestones. [879]

---

[875] Ex. 164 (12'13'17 minutes [DEFS_0061932]).
[876] Ex. 139 (1'24'18 minutes [TRU-Trust0000374989]).
[877] Ex. 139 (1'24'18 minutes [TRU-Trust0000374989]); Ex. 88 (Brandon depo.) 555:17-22; Ex. 88 (Brandon depo.) 376:23-377:1.
[878] Ex. 140 (1'28'18 minutes [DEFS_0059009]).
[879] Ex. 142 (1'31'18 minutes [DEFS_0059013]).

By February 16, 2018, Barry, Brandon, and Short understood that the "contingency

planning effort" for a liquidation was "well underway" and was targeting a "mid March date." [880]

And the rest of the Director Defendants learned this at a board meeting on February 18, 2018. [881]

### b.   Information about those material facts was not readily available to the Trade Vendors.

In particular, Toys "R" Us' internal projections for covenant compliance and statements

made at board meetings were not readily available to Trade Vendors.  Defendants admitted as

much: Trade Vendors "did not have access to the leadership team meetings" at Toys "R" Us. [882]

They "did not have access to the cash flow projections that were prepared by Toys "R" Us." [883]

And the Trade Vendors "did not have the financial information about Toys "R" Us" such that

they could "calculate Toys "R" Us' cash flow position." [884]   Because the Trade Vendors lacked

all of this information, they could not "determine whether or not [Toys "R" Us] was meeting or

was likely to meet its financial covenants." [885]   Indeed, it was "impossible for a vendor to

realistically assess and test complex covenants without detailed (and truthful) information and

forecasts by the Company." [886]

Moreover, Trade Vendors could not learn any of this information from outside sources.

As the vendors testified, news sources and rumors in the industry did not provide accurate

information on which they could base their decisions. [887]   The only way that Trade Vendors

---

[880] Ex. 146 (2'17'18 Brandon to Sussberg [TRU-Trust0000275355]); Ex. 89 (Barry depo.) 420:25-421:3; Ex. 87 (Short depo.) 415:9-25.
[881] Ex. 146 (2'17'18 Brandon to Sussberg [TRU-Trust0000275355]); Ex. 188 (2'18'18 board minutes [TRU-Trust0000303812]) at 3-4.
[882] Ex. 89 (Barry depo.) 542:23-25.
[883] Ex. 89 (Barry depo.) 543:1-5.
[884] Ex. 89 (Barry depo.) 543:20-544:2.
[885] Ex. 70 (Greenspan) ¶533.
[886] *Id.* ¶538.
[887] Ex. 372 (Elliott (MGA) depo.) 292:21-293:8 (discussing that other sources be "just speculating on whether [Toys "R" Us was] in compliance or would eventually be out of

could learn this information was by getting it from Defendants or others at Toys "R" Us. [888]  As

one vendor put it "[s]hort of hacking or spying," there was no way to obtain the information that

was communicated in "a private conversation held in confidence behind closed doors." [889]

Vendors attempted to learn that information from Toys "R" Us—they would "ask for and expect

updates from Toys "R" Us about their status." [890]  But vendors were not told the truth when they

asked for those updates.  Instead, they were "told consistently" that Toys "R" Us was "confident

that they would emerge" and never given any information that contradicted the initial

information posted on the Vendor FAQ. [891]  Additional evidence of Defendants' superior

knowledge can be found in Trust SOF ¶¶ 404, 410, 416, 422, 428, 434, 440, 446, 452, 458, 464,

470, 476, 481, 486, 491, 496, 502, 508, 513, 519, 525, 532, 537, 542, 548, 553, 559, 565, 571,

576, 581, 586, 592, 597, 603, 608.

**c.    Defendants knew that the Trade Vendors were acting on the basis of mistaken knowledge.**

As demonstrated above, Defendants knew that the concealed facts were material to the

Trade Vendors' decision to ship goods on credit and that the Trade Vendors did not have this

information.

Brandon, Barry, and Short understood the importance of the DIP financing to Trade

Vendors because they personally made statements to the Trade Vendors and gauged their

reaction. "[I]t was important that [trade vendors] understood that [Toys 'R' Us] had financing

that allowed us to continue going forward." [892]  The DIP was important because Trade Vendors

---

compliance" with its covenants); Ex. 307 (Cooney (Jakks) depo.) 188:17-189:17 ("we couldn't
act on rumor").
[888] Ex. 70 (Greenspan) ¶535.
[889] Ex. 330 (Woldenberg (Learning Resources) depo.) 230:11-231:8.
[890] Ex. 372 (Elliott (MGA) depo.) 293:10-21.
[891] Ex. 372 (Elliott (MGA) depo.) 278:25-279:11, 289:19-290:1.
[892] Ex. 87 (Short depo.) 73:17-74:2; Ex. 88 (Brandon depo.) 206:11-14.

wanted assurances that Toys "R" Us had the ability to pay for goods that it shipped. [893]  And the presence of the DIP facilities "provide[d] assurance to vendors that, if they shipped goods on credit, they would be paid." [894]  After Barry and his team completed 30 discussions with Trade Vendors on September 18, 2017, he wrote an email to the entire leadership team including Brandon and Short, and explained that "Confirmation of the DIP financing is a crucial issue for the vendors" in deciding whether to "return to business as usual terms with a resumption of shipping." [895]

The Directors similarly understood the importance of the DIP financing to vendors because they were told about the vendor communication strategy implemented by Brandon and Barry.  At the board meeting on September 27, 2017, the board was informed that a "vendor war room was established with the primary focus of getting vendors to start shipping again." [896]  Barry described for the Directors "the war room process that Toys 'R' Us was following to reach out to trade vendors to get them to start shipping" to the board. [897]

Barry explained to the Directors that "informing the trade vendors about the $3 billion in DIP financing was important to the trade vendors," that vendors were "reacting positively" to "the liquidity available from the DIP financing" and "had agreed to ship." [898]  Barry explained that "to get trade vendors to start shipping," the vendors were told that "Toys 'R' Us had liquidity to pay for goods shipped on credit as a result of obtaining DIP financing." [899]  As

---

[893] Ex. 87 (Short depo.) 44:3-8.
[894] Ex. 87 (Short depo.) 54:13-18.
[895] Ex. 156 (9'18'17 Barry re DIP crucial [TRU-Trust0000036336]); Ex. 89 (Barry) 132:11-133:2.
[896] Ex. 87 (Short depo.) 155:9-12; Ex. 162 (9'27'17 board minutes [TRU-Trust0000374722]); Ex. 77 (Raether) 261:13-18.
[897] Ex. 89 (Barry depo.) 132:7-133:2; Ex. 162 (9'27'17 board minutes [TRU-Trust0000374722]).
[898] Ex. 89 (Barry depo.) 132:7-134:1.
[899] Ex. 77 (Raether) 262:3-12.

Defendant Raether (one of the Directors) explained, the reason the Company obtained "a substantial amount of DIP financing" was "to be able to say…to the vendors, that … it's demonstrable that we have the cash to pay for the goods that we've ordered." [900]

As a result of those updates, the Directors knew that the "presence of the $3 billion in DIP financing" was "one of the substantial reasons why" Trade Vendors decided to ship goods to Toys "R" Us during the bankruptcy. [901]

Defendants understood that Toys "R" Us "needed the DIP facilities to be able to pay vendors in the future." [902] Without the DIP financing, Toys "R" Us would not "have the ability to pay for all goods shipped on credit." [903] And Defendants further knew that Trade Vendors would be interested in knowing "whether there was a serious risk that the DIP financing would disappear" because vendors were assessing the risk of "whether they would be paid by Toys "R" Us." [904] If vendors had been informed about Toys "R" Us' "dire liquidity position or potential to default its financial covenants," vendors would likely have stopped shipping. [905]

But Defendants knew that Trade Vendors were not receiving updates about these risks, and were acting on the basis of mistaken information. The information that Trade Vendors had—from representations made throughout the bankruptcy—was that the DIP financing provided sufficient liquidity to fulfill Toys "R" Us' obligations and that it would be available for the duration of the bankruptcy. [906] As discussed above, Defendants were aware that these

---

[900] Ex. 77 (Raether) 262:3-12.
[901] Ex. 77 (Raether depo.) 262:23-263:17.
[902] Ex. 87 (Short depo.) 55:7-11.
[903] Ex. 87 (Short depo.) 56:23-57:2.
[904] Ex. 87 (Short depo.) 311:1-9, 313:25-314:4.
[905] Ex. 87 (Short depo.) 401:21-402:17.
[906] *See, e.g.*, Ex. 290 (Hentschell (Handi-Craft) depo.) 129:11-20, 126:13-127:13; Ex. 315 (Emby (Just Play) depo.) 276:24-277:15; Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451,

statements were no longer true, and knew that Defendants had superior knowledge as a result of

communications, data, and projections that were internal to the Company.  Defendants therefore

knew that Trade Vendors did not have this information. [907]

For example, Defendants Brandon and Short testified that they made the decision "not to

voluntarily release our holiday sales results" contrary to the Company's usual practice, because

"holiday performance" was "significantly less than expected," which "could have concerned"

"the trade vendor community" because the Company "would have reported a weak holiday

period," and "[t]hey may have been concerned about the ability of Toys 'R' Us to continue going

forward," and "[t]he ability of Toys 'R' Us to pay for goods that were shipped on credit." [908]

And, on January 10, 2018, Brandon told the Board about "the decision not to release holiday

results, including the communications strategy related thereto." [909]

Thus, Defendants knew that Trade Vendors were acting on the basis of mistaken and

incomplete knowledge in making their decision to ship goods to Toys "R" Us.  And they had a

duty to disclose facts to rectify that mistaken knowledge when entering into transactions with the

Trade Vendors.

### 4.       Defendants had a relationship of trust and confidence with Trade Vendors that created a duty to disclose.

A person has a duty to disclose "matters known to him that the other is entitled to know

because of a fiduciary or other similar relation of trust and confidence between them."

Restatement (Second) of Torts §551(2)(a).  "[A] duty to disclose material facts may arise out of a

---

457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607.
[907] *See, e.g.*, Ex. 89 (Barry depo.) 542:23-25.
[908] Ex. 87 (Short depo.) 279:19-23, 281:18-282:9; Ex. 88 (Brandon depo.) 344:3-344:24, Ex. 88 (Brandon depo.) 346:7-16, Ex. 89 (Barry depo.) 519:16-24.
[909] Ex. 88 (Brandon depo.) 344:3-344:24; Ex. 89 (Short depo.) 279:19-23; Ex. 3 (1'10'18 BOD minutes [TRU-Trust0000374746]) at 2.

283

situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a

position of influence and superiority over plaintiff.  This position of superiority may arise by

reason of friendship, agency, or experience." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500

(1996) (internal citation omitted); *see Schrager v. N. Cmty. Bank*, 328 Ill. App. 3d 696, 708-09

(2002) (holding that superior knowledge of financial history and specific facts of a development

project "placed defendants in a position of influence"); *R.I. Indus.-Recreational Bldg. Auth. v.

CAPCO Steel, LLC*, No. PC 14-6055, 2015 R.I. Super. LEXIS 90, at *36-37 (Super. Ct. July 22,

2015) ("The duty to disclose, or duty to speak, does not depend on the existence of a fiduciary

relationship between the parties. It may arise in any situation where one party imposes

confidence in the other because of that person's position, and the other party knows of this

confidence." (internal quotes omitted)); *Hooper v. Barnett Bank of W. Fla.*, 474 So. 2d 1253,

1257 (Fla. Dist. Ct. App. 1985) ("one who stands in a confidential or fiduciary relation to the

other party to a transaction must disclose material facts").

    Trade Vendors placed trust and confidence in Defendants, and relied on that relationship

in their dealings with Toys "R" Us and Defendants.

    Trade Vendors had "very longstanding, mutually beneficial partnership[s]" with Toys

"R" Us spanning many years. [910]  Trade Vendors and Toys "R" Us representatives built

"relationship[s] based on trust and long-term business together." [911]  When Defendants sent

communications to vendors, they reminded vendors of this partnership.  For example, the letter

---

[910] Ex. 307 (Cooney (Jakks) depo.) 126:18-24; Ex. 272 (Blankenship (Evenflo) depo.) 156:17-21
("We also considered them a partner); Ex. 88 (Brandon depo.) 191:8-14 (Confirming that he
often "referred to the relationship between Toys "R" Us and toy vendors as … a partnership.")
[911] Ex. 409 (McCallum (Step2) depo.) 148:14-149:15 ("[W]e looked each other in the eye and
we made promises, and we delivered on those promises.")

sent bearing Barry's signature that provided Trade Vendors with information about the DIP

financing referred to the Trade Vendors as "valued business partners." [912]

     This close relationship of trust extended to the relationships between Trade Vendors and

Defendants.  Barry had a relationship with many vendors "for years, even decades." [913]  Over

that period, Barry had "developed a reputation as someone who would be honest" with the Trade

Vendors. [914]

     Barry himself agreed that the relationship between him and trade vendors was "one of

mutual trust and partnership." [915]  When Barry communicated with Trade Vendors during the

bankruptcy, he reiterated that he considered "the relationship to be a partnership." [916]  And Barry

continuously "encourage[d] trade vendors to believe that [he was] a man of [his] word and could

be trusted." [917]

     Trade Vendors confirmed that they had close relationships of Trust and confidence with

both Barry and Brandon.  For example, Jay Foreman of Basic Fun had "a warm, personal

friendship and relationship from a business standpoint" with Barry, and felt that he could trust

Barry. [918]  And Joe Shamie of Delta testified that he and Barry were 'close friends" and that he

"trusted [Barry] immensely." [919]  Bill McCallum of Step2 testified of his close relationship with

Brandon: "[W]hen David looked me in the eye and told me something, that's it. We shake hands,

and we moved forward." [920]  Additional evidence of Trade Vendors' trust and confidence is

---

[912] Ex. 160 (9'21'17 Barry letter Business Partner Update [TRU-Trust0000374052]).
[913] Ex. 89 (Barry depo.) 471:5-10.
[914] Ex. 89 (Barry depo.) 88:19-23.
[915] Ex. 89 (Barry depo.) 471:8-10.
[916] Ex. 89 (Barry depo.) 169:17-25.
[917] Ex. 89 (Barry depo.) 201:10-13.
[918] Ex. 232 (Foreman (Basic Fun) depo.) 216:1-217:1.
[919] Ex. 255 (Shamie (Delta) depo.) 169:23-172:3.
[920] Ex. 409 (McCallum (Step2) depo.) 178:5-18.

found in Trust SOF ¶¶ 406, 412, 418, 424, 430, 436, 442, 448, 454, 460, 466, 472, 498, 504, 515, 521, 527, 533, 544, 555, 561, 567, 588, 598, 610.

These special relationships created a duty to share with Trade Vendors information material to the Company's ability to pay for goods shipped on credit.  As discussed above, the concealed facts were not readily available to Trade Vendors.  But they were available to Brandon, Barry, and the other Defendants.  Thus, Defendants' superior knowledge about the Company's ability to pay vendors coupled with the relationship of trust and confidence created a duty to disclose.

**E.    Defendants' concealment was intended to induce action by the Trade Vendors.**

"An intent to deceive is not an essential element of the cause of action; the required intent is an intent to induce action." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1062 (2012) (internal citations omitted).  To demonstrate the requisite intent for fraudulent concealment, a plaintiff must prove that "the concealment was intended to induce a false belief, under circumstances creating a duty to speak." *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 572 (1998).

As demonstrated above, Defendants knew the importance of the concealed facts to Trade Vendors, understood that Trade Vendors did not have this information, but determined not to disclose them so that Trade Vendors would continue shipping goods to Toys "R" Us—this suffices to show knowledge and an intent to induce action.

Defendants intended (in fact had the strong desire) that the Trade Vendors continue shipping goods on credit.  As long-time directors and officers of the Company, Defendants knew that the Company's business model required obtaining goods from Trade Vendors.  2017 Form

10k at 16.  They also knew that the Company did not have sufficient liquidity to pay for goods

COD, and needed the Trade Vendors to ship goods on credit. [921]

Similarly, Short testified that the Company's "business model is effectively built on these

trade terms." [922]  And if the Company's "trade terms contracted from 60 days to cash-on-

delivery," this "would require over $1.0 billion in additional liquidity." [923]  Defendants knew that

if "vendors stopped shipping, then the company would have been unable to continue as a going

concern." [924]

As demonstrated above, Defendants also knew that Trade Vendors would stop shipping

goods on credit if they became concerned about the Company's ability to pay, and that the

presence of the DIP financing was the source of liquidity that gave Trade Vendors the assurance

to ship on credit. [925]  For example, Barry wrote an email to the entire leadership team including

Brandon and Short, and explained that "Confirmation of the DIP financing is a crucial issue for

the vendors" in deciding whether to "return to business as usual terms with a resumption of

shipping." [926]  Barry also explained to the Directors "the war room process that Toys 'R' Us was

following to reach out to trade vendors to get them to start shipping" to the board. [927] And Barry

explained that "informing the trade vendors about the $3 billion in DIP financing was important

---

[921] Ex. 51 (9'18'17 attach Brandon chapt 11 [DEFS_0027298]) at 7 ("The Company does not
have available liquidity to pay cash in advance").
[922] Bk. Dkt. 30 (Short decl.) ¶112.
[923] Bk. Dkt. 30 (Short decl.) ¶113.
[924] Ex. 87 (Short depo.) 401:21-402:17.
[925] Ex. 87 (Short depo.) 54:13-18.
[926] Ex. 156 (9'18'17 Barry re DIP crucial (Barry Exh. 2) [TRU-Trust0000036336]); Ex. 89
(Barry) 132:11-133:2.
[927] Ex. 89 (Barry depo.) 132:7-133:2; Ex. 162 (9'27'17 board minutes [TRU-Trust0000374722]).

to the trade vendors," that vendors were "reacting positively" to "the liquidity available from the DIP financing" and "had agreed to ship." [928]

As demonstrated above, Defendants knew that Trade Vendors were interested in knowing "whether there was a serious risk that the DIP financing would disappear" because vendors were assessing the risk of "whether they would be paid by Toys "R" Us." [929]  And Defendants understood that if vendors had been informed about Toys "R" Us' "dire liquidity position or potential to default its financial covenants," vendors could have stopped shipping. [930]  Had the Trade Vendors been made aware of the Company's financial predicament and the analysis it had conducted, "they would have changed their shipping terms or stopped shipping altogether." [931]

Because Defendants knew that the Trade Vendors would stop shipping goods on credit if they learned the concealed facts, Defendants knew that by concealing that information the Trade Vendors would continue shipping goods on credit, which is the action Defendants intended and desired to induce in Trade Vendors.  For example, Defendants Brandon and Short testified that they made the decision "not to voluntarily release our holiday sales results" contrary to the Company's usual practice, because "holiday performance" was "significantly less than expected," which "could have concerned" "the trade vendor community" because the Company "would have reported a weak holiday period," and "[t]hey may have been concerned about the ability of Toys 'R' Us to continue going forward," and "[t]he ability of Toys 'R' Us to pay for goods that were shipped on credit." [932]

---

[928] Ex. 89 (Barry depo.) 132:7-134:1.
[929] Ex. 87 (Short depo.) 311:1-9, 313:25-314:4.
[930] Ex. 87 (Short depo.) 401:21-402:17.
[931] Ex. 70 (Greenspan) ¶538.
[932] Ex. 87 (Short depo.) 279:19-23, 281:18-282:9; Ex. 88 (Brandon depo.) 344:3-344:24, 346:7-16, Ex. 89 (Barry depo.) 519:16-24.

As another example, all Defendants knew that Brandon, Short, and Barry went to the New York Toy Fair for the express purpose of providing Trade Vendors information about the Company's finances and plans for emergence that would provide "comfort that the Company can pay for shipments," "so they [Trade Vendors] do not determine to stop shipping."[933]  Because Defendants knew that the concealed facts would not "comfort" Trade Vendors, Defendants failed to disclose them and did so with the knowledge that this would induce Trade Vendors to continue shipping.[934]  The Trust has proffered powerful direct and circumstantial evidence that, by failing to disclose the concealed facts, Defendants intended to induce Trade Vendors to continue shipping, and Defendants have never disputed that they had such intent.  "Questions of intent are normally questions of fact properly reserved for the jury." *Sloan v. GM LLC*, No. 16-cv-07244-EMC, 2020 U.S. Dist. LEXIS 71982, at *54 (N.D. Cal. Apr. 23, 2020) (collecting cases); *Testo v. Ruggiero*, NO. CV90 27 19 97 S, 1993 Conn. Super. LEXIS 1719, at *8 (Super. Ct. July 13, 1993) ("Summary judgment is inappropriate to determine questions of motive and intent.").

### F.   Trade Vendors were unaware of the concealed facts and would have acted differently.

The fourth element of fraudulent concealment is: "(4) the plaintiff [was] unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact." *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1130 (2014) (internal quotes omitted); *Huls v. Clifton, Gunderson & Co.*, 179 Ill. App. 3d 904, 909 (1989) ("the concealed information must also have been such that the other party would have acted differently had he been aware of it").

---

[933] Ex. 148 (2'12'18 board minutes [TRU-Trust0000313960]).
[934] Ex. 70 (Greenspan) ¶451.

As demonstrated above, the concealed facts were material to each Trade Vendor because they directly affected each Trade Vendor's evaluation of the risk of shipping goods to Toys "R" Us. Each of the vendors testified that they were unaware of the concealed facts and would have acted differently had they been told each of the concealed facts—they would have stopped shipping goods on credit. Vendors would have either moved to cash in advance (ensuring that they received payment before parting with any additional goods), or stopped shipping and retained the goods (so that they could sell them to other purchasers). *See* Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607. And the testimony of Defendants and outside advisors further supports that Trade Vendors would have acted differently by stopping shipments or tightening credit terms if they had learned the concealed facts. [935]

### G.    Trade Vendors were damaged by Defendants' concealment of facts.

The final element of a claim for fraudulent concealment is: "as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1130 (2014) (internal quotes omitted).

Each Trade Vendor filled purchase orders between December 2017 and March 2018 and therefore sustained damage. As demonstrated above, had Defendants disclosed the concealed facts above, Trade Vendors would have acted differently by not shipping goods or by only shipping those goods if they received cash before shipment. Each Trade Vendor filled purchase orders between December 13, 2017, and March 14, 2018, when the Company's liquidation was

---

[935] *See* Ex. 87 (Short depo.) 401:21-402:17; Ex. 84 (Sussberg depo.) 176:6-14; Ex. 85 (Kurtz depo.) 270:24-271:7.

announced.  Because Trade Vendors shipped goods to Toys "R" Us on credit, and were not paid

for those goods they sustained damage.  *See* Trust SOF ¶¶ 405, 411, 417, 423, 429, 435, 441,

447, 453, 459, 465, 471, 477, 482, 487, 492, 497, 503, 509, 514, 520, 526, 532, 538, 543, 549,

554, 560, 566, 572, 577, 582, 587, 593, 599, 604, 609.

Each Trade Vendor's administrative proof of claim lays out the purchase orders that the

Trade Vendor shipped and was not paid for.  This Court approved those proofs of claim. [936]  And

the specific amounts of those damages are detailed and supported by the Trust's experts. [937]

### H.    All Defendants are liable for the fraudulent concealments and representations.

For Defendants to be liable for fraudulent concealment there is no requirement that each

Defendant personally prepare or distribute each non-disclosure, misleading statement, or half-

truth to Trade Vendors.  Instead, Defendants are personally liable for the representations or non-

disclosures of other officers or employees if either (a) the Defendant intends that the

representation or concealment will be passed on and influence a vendor, or (b) the Defendant

fails to stop fraudulent conduct.

### 1.    Defendants intended that that the concealment would be passed on and influence Trade Vendors.

"One who makes a misrepresentation or false promise or conceals a material fact is

subject to liability if he or she intends that the misrepresentation or false promise or concealment

of a material fact will be passed on to another person and influence such person's conduct in the

transaction involved."  *Whiteley v. Philip Morris, Inc.*, 117 Cal. App. 4th 635, 681 (2004)

(internal quotes omitted); *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d

197, 219 (1983).

---

[936] *See, e.g.*, Bk. Dkt. 4583, Bk. Dkt 5171.
[937] *See* Ex 70 (Greenspan) ¶¶545-571, Ex. 135 (Mills) ¶¶55-61.

As the Restatement frames it, a person is liable for a fraudulent misrepresentation received by another "if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transactions involved."  Restatement (Second) of Torts § 533, *quoted with approval Whiteley v. Philip Morris, Inc.*, 117 Cal. App. 4th 635, 681, 11 Cal. Rptr. 3d 807, 845 (2004); *Giulietti v. Giulietti*, 65 Conn. App. 813, 842 n.24 (2001).

In the immediate aftermath of the bankruptcy filing, Defendants intended that Trade Vendors receive representations about the DIP financing that would influence the Trade Vendors to ship goods to Toys "R" Us.  As discussed above, Defendants knew that Toys "R" Us needed Trade Vendors to ship goods on credit.  Defendants also knew that Trade Vendors needed assurances about payment so that they would make the decision to ship goods to Toys "R" Us.[938] And they knew that the DIP financing would provide Trade Vendors with assurances about payment.  In the words of Defendant Raether, Toys "R" Us' DIP financing would enable Toys "R" Us "to be able to say… to the vendors, that … its demonstrable that we have the cash to pay for the goods that we've ordered." [939]  To convince Trade Vendors to ship goods to the company on credit, Defendants thus needed to ensure that each Trade Vendor was informed about the DIP financing.

To ensure that the Trade Vendors received those representations, Defendants Brandon and Barry took the lead in establishing a "vendor war room" that would aim to "ge[t] vendors to start shipping again." [940]  As part of the war room process, Brandon and Barry instructed the

---

[938] Ex. 87 (Short depo.) 44:3-8.
[939] Ex. 77 (Raether depo.) 262:3-12.
[940] Ex. 87 (Short depo.) 155:9-12.

Toys "R" Us merchant team to deliver specific representations to Trade Vendors about the $3.0 billion in new financing, and Toys "R" Us' ability to pay Trade Vendors for goods shipped for the duration of the bankruptcy. [941]  Each of the other Defendants was informed that the war room was established and that Toys "R" Us employees were communicating the specific messages about the DIP financing that would provide assurances to vendors that they would be paid for goods that they ordered. [942]  No Defendant objected to this process because it accomplished their goal: informing Trade Vendors of the presence of the DIP financing so that Trade Vendors would determine to ship goods during the bankruptcy.

Moreover, Defendants intended that Brandon, Barry, and the team at the New York Toy Fair reassure Trade Vendors and provide them "comfort so they do not determine to stop shipping." [943]  In a board meeting just days before the New York Toy Fair, "there was a discussion about the upcoming New York Toy Fair and that Dave Brandon" would be having "conversations with the vendors about whether they would continue to ship or not." [944] Defendants knew that the concealed facts about Toys "R" Us' liquidity hole, need for an additional cash infusion, and consideration of a full or partial liquidation would not provide comfort to the Trade Vendors.  Instead, those facts would cause Trade Vendors to stop shipping.[945]  But no Defendant raised any objection to Brandon's plan.  They did not instruct Brandon to refrain from visiting the New York Toy Fair.  They did not tell Brandon that instead of providing "comfort," he should provide Trade Vendors with the current facts about Toys "R"

---

[941] Ex. 174 (Vendor Talking Points [TRU-Trust0000336056]); Ex. 89 (Barry depo.) 59:13-60:2.
[942] Ex. 87 (Short depo.) 155:9-12; Ex. 162 (9'27'17 board minutes [TRU-Trust0000374722]); Ex. 77 (Raether) 261:13-18; Ex. 89 (Barry depo.) 132:7-133:2.
[943] Ex. 148 (2'12'18 minutes [DEFS_0059030]).
[944] Ex. 77 (Raether depo.) 282:13-283:4.
[945] *See* Ex. 87 (Short depo.) 401:21-402:17.

Us' situation.  Instead, Defendants allowed Brandon, Barry, and a team of Toys "R" Us

employees to attend the New York Toy Fair and deliver misleading half-truths.  As Raether

confirmed, comforting statements at the New York Toy Fair "that things are going great," that

Toys "R" Us was "working on [its] plans to emerge from bankruptcy" and that Toys "R" Us was

"looking forward to the next holiday season," would not be "the whole truth." [946]  Those

comforting statements necessarily required concealing the facts that Defendants knew would

cause Trade Vendors to stop shipping.

      As demonstrated above, each Defendant had knowledge of the concealed facts and had

reason to expect (in fact intended) that the non-disclosure would be communicated to Trade

Vendors and would influence Trade Vendors in shipping goods to the Company on credit.

Accordingly, all Defendants are liable for all acts of fraudulent concealment.

      Such liability does not require that a Defendant knew with certainty that non-disclosure

would reach each Trade Vendor.  A defendant is deemed to expect that "a misrepresentation,

false promise or nondisclosure of material fact will be passed on to another person and influence

that person's conduct if he or she has information that would lead a reasonable person to

conclude that there is a likelihood that it will reach such person and will influence his or her

conduct in the transaction involved."  *Whiteley*, 117 Cal. App. 4th at 681.  Furthermore, it does

not matter whether each Defendant knew the identity of each Trade Vendor.  If a representation

or non-disclosure is made to "a particular class of persons, [the defendant] is deemed to have

deceived everyone in that class."  *Geernaert v. Mitchell*, 31 Cal. App. 4th 601, 605 (1995)

---

[946] Ex. 77 (Raether depo.) 296:4-19.

## 2.      Defendants failed to stop fraudulent conduct.

Defendants are also liable under the alternative theory that they failed to stop fraudulent conduct.

Directors and officers of a corporation are "personally liable for intentional torts when they knew or had reason to know about but failed to put a stop to tortious conduct." *Asahi Kasei Pharma Corp. v. Actelion Ltd.*, 222 Cal. App. 4th 945, 966 (2013); *Frances T. v. Village Green Owners Assn.*, 42 Cal. 3d 490, 504 (1986) (director liable for tort claim if "they specifically knew or reasonably should have known that some hazardous condition or activity under their control could injure plaintiff, they negligently failed to take or order appropriate action to avoid the harm"); *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1380 (2000) (officers are "personally liable for fraud committed by a managerial employee because [the officers] knew about and allowed the tortious conduct to occur"); *Polonetsky v. Better Homes Depot, Inc.*, 97 N.Y.2d 46, 55 (2001) ("In actions for fraud, corporate officers and directors may be held individually liable if they participated in or had knowledge of the fraud, even if they did not stand to gain personally."); *Nielsen Co. (US), LLC v. Success Sys.*, 2012 U.S. Dist. LEXIS 115774, at *16-18 (S.D.N.Y. Aug. 13, 2012) (same).

As demonstrated above:

- All Defendants knew that the Company's officers and employees had conducted a "war room" strategy to persuade Trade Vendors to ship goods on credit. They knew that the Company's officers and directors had represented to Trade Vendors that the Company had the ability to pay Trade Vendors because it had access to over $3 billion in DIP financing throughout the restructuring process.

295

- All Defendants knew the DIP financing was crucial to the Trade Vendor's continuing to ship goods on credit.

- All Defendants knew that the Company was continuing to place orders for goods on credit, thereby representing that the Company had the ability to pay for the goods.

- All Defendants knew the concealed facts and knew that the Company's officers and employees were not disclosing those facts to Trade Vendors.

- All Defendants knew that the Company's officers and employees would be attending the New York Toy Fair, where they would be receiving questions from Trade Vendors seeking assurances that the Company can pay for shipments, and that officers and employees would respond by providing Trade Vendors comfort so that they do not determine to stop shipping.

Because Defendants thus "knew or had reason to know about but failed to put a stop to tortious conduct," Defendants are "personally liable" for those torts. *Asahi Kasei Pharma Corp. v. Actelion Ltd.*, 222 Cal. App. 4th 945, 966 (2013).

## VIII.    Defendants are liable for fraudulent misrepresentation.

### A.    Law of fraudulent misrepresentation.

A claim for fraudulent misrepresentation claim has the following elements: "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance." *Kopley Grp. V., Ltd. P'ship v. Sheridan Edgewater Props.*, 376 Ill. App. 3d 1006, 1017 (2007); *see Gold v. Univ. of Bridgeport Sch. of Law*, 19 Conn. App. 379, 382 (1989); *Cooper v. Equity Gen. Ins. Co.*, 219

Cal. App. 3d 1252, 1262 (1990) (describing elements as "(1) representation; (2) falsity; (3)

knowledge of falsity; (4) intent to deceive; and (5) reliance and resulting damages").

The Trust has powerful evidence proving each of these elements.

**B.      The representations from Defendants were actionable.**

**1.      The representations.**

As demonstrated above, Defendants made representations directly to Trade Vendors,

authorized and instructed others to make representations directly to the Trade Vendors, and

authorized representations that Toys "R" Us would disseminate publicly.  These statements are

summarized here:

**a.      September representations**

Vendor FAQ on the website:

- Toys "R" Us had "sufficient liquidity to meet its obligations" because it had "access to

   up to $2.5 billion in debtor-in-possession ('DIP') financing which will support our

   business and enable us to meet our financial obligations throughout the restructuring

   process." [947]

- The Company would later "access almost $1 billion in additional financing for a total

   of $3.125 billion in new financing." [948]  It also stated that Toys "R" Us "will pay

   vendors for all goods and services received on or after the filing date." [949]

Telephone calls directly to Trade Vendors:

---

[947] Ex. 172 (Vendor FAQ (Barry Exhibit 8) [TRU-Trust0000349256]).
[948] *Id.*
[949] Ex. 172 (Vendor FAQ (Barry Exhibit 8) [TRU-Trust0000349256]).

- The Company's "operations are continuing in the ordinary course," and "We intend to pay vendors in full under normal terms for goods and services provided on or after the filing date." [950]

- The Company does "have sufficient liquidity to meet its obligations" and "we have commitments for over $3.0 billion in new financing that will help support our operations and enable is us to meet our financial obligations during the restructuring process." [951]

- "the DIP financing would provide liquidity to Toys 'R' Us to be able to pay for goods that were shipped on credit," [952] and "would enable Toys 'R' Us to pay for merchandise that was shipped on credit while Toys 'R' Us was in bankruptcy," [953]

Barry's letter:

- "We have received commitments for over $3 billion in new financing that will support our operations and enable us to meet our business obligations during the financial restructuring process." [954]

Press releases:

---

[950] Ex. 174 (Vendor Talking Points [TRU-Trust0000336056]); Ex. 89 (Barry) 59:13-60:2.
[951] Ex. 174 (Vendor Talking Points [TRU-Trust0000336056]); Ex. 170 (TRU Master Q&A (Barry Exhibit 7) [TRU-Trust0000322879]) at 2, 13; Ex. 173 (Vendor reference guide [DEFS_0026186]) at 8; Ex. 89 (Barry depo.) 47:13-21.
[952] Ex. 89 (Barry depo.) 73:11-5.
[953] Ex. 89 (Barry depo.) 35:6-14.
[954] Ex. 160 (9'21'17 Barry letter Business Partner Update [TRU-Trust0000374052]); Ex. 89 (Barry) 95:20-97:2.

- Toys "R" Us "successfully obtained debtor-in-possession financing today" and Toys "R" Us "can assure our vendors that we are in a good position to accept shipments on a normal basis and they have great assurance they will be paid." [955]

Short's declaration:

- "the DIP Facilities will also provide the Debtors liquidity to fund the administrative costs of these chapter 11 cases … and emerge from bankruptcy." [956]

- "the DIP Facilities will provide the Debtors with the liquidity needed to reactivate their supply chain, provide assurance to their vendors, and capitalize on the holiday season." [957]

### b.    December-March representations

The Vendor FAQ on the website

- The same representations identified above continued to appear on the Vendor FAQ.

Purchase orders representing the ability to pay

- An implied representation that the Company "has the wherewithal to repay all credit extended."

December 21 conference call with vendors.

---

[955] Ex. 157 (9'19'17 1000 pm Reuters [TRU-Trust0000375540]); Ex. 159 (9'20'17 TRU First Day Press Release [TRU-Trust000374024]).
[956] Short declaration (Bk. Dkt. 20) at ¶127.
[957] *Id.* at ¶130.

- The Company had "secured $3.1 billion in DIP financing" and "we obtained a very strong DIP financing package which put us in a position to have strong liquidity through this process." [958]

Hong Kong Toy Fair, January 7-11, 2018.

- The Company had "sufficient liquidity to meet its obligations" and had "a commitment for over $3.0 billion in new financing which will support our business and enable is us to meet our financial obligations during the restructuring process." [959]

- "Toys 'R' Us had received … 'DIP financing' that would help us get through and exit bankruptcy" [960]

- Barry stated: "things are fine," "[e]verything's on track" and "[f]inance is in place," and was "giving his word" that vendors would be paid for the goods that they shipped to Toys "R" Us. [961]

Larian

- An MGA executive asked Brandon and Barry about Jim's Silver post that: "Word has leaked from one of ToysRUS financial owners (Bain, Vornado, KKR) that they are leaning toward a liquidation" and were considering various options ranging from shrinking the footprint to "a 200 store chain" or "liquidate the whole thing." [962]

---

[958] Ex. 64 (12'21'17 Transcript, Q3 Earnings Call [TRU-Trust0000323034]).
[959] Ex. 170 (TRU Master Q&A (Barry Exhibit 7) [TRU-Trust0000322879]) at 2, 13; Ex. 173 (Vendor reference guide [DEFS_0026186]) at 8; Ex. 89 (Barry depo.) 47:13-17.
[960] Ex. 90 (Baime depo.) 25:3-16, 26:25-27:7.
[961] Ex. 232 (Foreman (Basic Fun) depo.) 263:17-264:11, 266:15-267:14.
[962] Ex. 167 (Larian Post); Ex. 147 (2'3'18 Brandon to Larian re Silver post [TRU-Trust0000272792]).

- In response, Brandon communicated that Larian should not "rely upon Jim Silver as being a source of useful and accurate information about decisions being made in the boardroom of TRU." [963]

- Brandon also said Toys "R" Us was "working on the best plan for emergence and a variety of alternatives are being considered." [964]  "If there is something to tell you, you will be hearing it from us– not rumors on LinkedIn from Jim Silver." [965]

NY Toy Fair February 17-19, 2018

-  "The Leadership Team and our advisors are totally focused on our plans for emergence." [966]

- Brandon told Trade Vendors in a "reassuring and comforting manner" that Toys "R" Us was "working through the bankruptcy" and was working on "exiting" and "having a business."

- "Toys "R" Us was working on plans to emerge from bankruptcy." [967]

- Toys "R" Us "would emerge from bankruptcy." [968]

- Toys "R" Us was "focused on emergence and focused on the holiday season." [969]

---

[963] Ex. 147 (2'3'18 Brandon to Larian re Silver post [TRU-Trust0000272792]) at 2.
[964] *Id*. at 2.
[965] *Id.* at 2.
[966] Ex. 150 (2'15'18 – Von Walter to Barry re fact sheet [TRU-Trust0000362680]); Ex. 149 (2'15'18 NYTF Fact Sheet FINAL [TRUTrust0000362681]).
[967] Ex. 88 (Brandon depo.) 500:4-7.
[968] *Id.* at 5; Ex. 89 (Barry depo.) 272:4-8.
[969] Ex. 89 (Barry depo.) 343:6-13.

- "we were working hard on the emergence plans," [970]

- it was "business as usual at Toys "R" Us." "Toys 'R' Us was looking forward to working with the vendor in the holiday season," and "wanted to work with the vendor once [Toys "R" Us] emerged from Chapter 11." [971]

- things are fine," "[e]verything's on track" and "[f]inance is in place," and was "giving his word" that vendors would be paid for the goods that they shipped to Toys "R" Us.[972]

Mattel and Lego representations.

- To LEGO Group: Toys "R" Us has only "two financial covenants" and would be "in compliance with those covenants" throughout March 3, 2018. [973]

- To Mattel: cash flow forecasts purporting to "demonstrate the Company's ability to comply with February covenants." [974]  Statements by Brandon that Toys "R" Us was in compliance with its covenants because otherwise it would have been required to file an 8-K.

### 2.    The representations are actionable as facts capable of empirical verification.

Each of the representations is actionable because the truth or falsity of each of these statements could be objectively verified.

---

[970] Ex. 89 (Barry depo.) 271:13-272:15
[971] Ex. 93 (Ryan depo.) 174:6-10.
[972] Ex. 232 (Foreman (Basic Fun) depo.) 263:17-264:11, 266:15-267:14.
[973] Ex. 151 (3'1'18 financial covenant forecast).
[974] Ex. 186 (2'26'18 Johnson to Euteneuer cash flow forecast [MATTEL00005494]).

Each of the representations about DIP financing were verifiable as true or false in several respects.  Whether the Company had "access to" or had "received commitments for" the financing is a fact that can be determined to be true or false, and can be objectively verified by examining documentation and emails.  Objective evidence would demonstrate whether the Company did have access to the financing, or whether it did not.  The representation as to the amount of financing, such as "over $3 billion in new financing" or "$3.125 billion in new financing" is a fact whose truth or falsity can be determined.  Numerical amounts are facts; and the amount of new financing could be verified from documentation.

The representation that the amount of DIP financing was sufficient to "enable us to meet our financial obligations throughout the restructuring process" was a fact whose truth or falsity could be objectively verified. [975]  The statement would be clearly true, for example, if the Company's budget for the restructuring process projected a $200 million surplus in liquidity.  And the statement would be clearly false if the budget projected a $200 million shortfall in liquidity.  As Defendant Short admitted, by the end of January that representation had become verifiably false: Toys "R" Us needed "access to additional financing for that to be true." [976]  And that financing would have to be "on the order of 150 to $200 million." [977]

And a representation as to the duration of availability, such as "throughout the restructuring process," or "while Toys 'R' Us was in bankruptcy" is a fact capable of being true or false and subject to verification by examining objective documentation.  The fact would be certainly true, for example, if financing documents provided that the financing was committed "for the duration of the restructuring process," and it would be clearly false if the documents

---

[975] Ex. 172 (Vendor FAQ [TRU-Trust0000349256]).
[976] Ex. 87 (Short depo.) 442:17-24, 443:2-13.
[977] Ex. 87 (Short depo.) 444:16-24.

provided that the financing would end in six months, which could be well before any restructuring could be completed.

Each of the representations about the sufficiency of the company's liquidity include facts capable of verification as true or false. Representations such as that the Company does "have sufficient liquidity to meet its obligations," or will "pay vendors in full under normal terms," or has the "ability to pay" for goods shipped on 60 days credit include a statement of fact about the current state of the Company's liquidity projection. And that fact can be verified as true or false based on examining objective evidence. The statement would be clearly true, for example, if the Company was projecting that it would have several hundred million dollars in excess liquidity in 60 days. It would be clearly false if the Company projected a large liquidity shortfall in 60 days.

Each of the representations about the Company's plan for emergence or liquidation include facts capable of verification as true or false, by examining objective documentation, such as emails and board minutes. For example, a representation that the Company was "working on the best plan for emergence" and was not considering the option of "liquidate the whole thing," would be clearly false if management and advisors were in fact considering the option of liquidation. Similarly, a representation that the Company's "Leadership Team and our advisors are totally focused on our plans for emergence," would be false if they were in fact focusing in substantial part on plans to liquidate the Company.

Similarly, representations that its "business as usual" and that the Company's "operations are continuing in the ordinary course" contain facts capable of verification as true or false by examining objective records. The statement would be clearly false if, for example, that

304

Company's management had determined that the Company could no longer be continuing business as usual and instead would need to liquidate the U.S. business.

> **3.      The representations are actionable statements that imply the existence of facts that justify a belief in the truth of the statement and imply the maker knows of nothing that would make the statement improbable.**

A statement that is a prediction of future events or actions, or that is an opinion, is also actionable if it "impl[ies] facts which justify a belief in the truth of the opinion." *Cohen v. S & S Constr. Co.*, 151 Cal. App. 3d 941, 946 (1983) (internal quotes omitted).  "A statement about the future may imply a representation concerning an existing or past fact."  Restatement (Second) of Torts § 525, comment e.

"Similarly a statement that is in form a prediction or promise as to the future course of events may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his prediction or promise impossible or improbable."  Restatement (Second) of Torts, § 525.  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999) ("opinion … carries with it an implied assertion … that the speaker knows no facts which would preclude such an opinion" (internal quotes omitted)).

For example, if a contractor provides "cost … estimates" for what a project will end up costing, this implies existing, reasonable cost projections that justify the estimate, and it is actionable.  *Harrison*, 176 F.3d at 792.  As another example, a sales agent's representations that a condominium with structural defects was "luxurious" and an "outstanding investment" was actionable.  *Cooper v. Jevne*, 56 Cal. App. 3d 860, 866 (1976); *see Southern Cal. etc. Assemblies of God* v. *Shepherd of Hills etc. Church*, 77 Cal. App. 3d 951, 959 (1978) (a realtor's opinion that the purchaser of a particular lot would have an enforceable access easement is actionable).

305

All of the representations implied the existence of verifiable facts justifying the statements, and are therefore actionable.

Statements about the Company's liquidity such as that the Company has "sufficient liquidity to meet its obligations" imply the existence of recent financial data, financial modeling, and calculations justifying the statement. And such statements imply that there are no facts that would make the statement improbable. For example, if the Company's then existing projections showed a $200 million liquidity shortfall, that is a fact (the existence of that projection) that would make the statement improbable. Accordingly, the representation that the Company has sufficient liquidity to pay trade vendors in full for goods shipped on credit implies that no such facts are known.

Statements characterizing the DIP financing as "a very strong DIP financing package which put us in a position to have strong liquidity through this process," imply the existence of data and analysis justifying the statement. And it also implies that there are no known facts that would make statement impossible or improbable.

Some representations include, in part, a statement about the Company's future business operations, such as that it was "business as usual at Toys 'R' Us," that the company was "focused on emergence," and that management and advisors were "totally focused on our plans for emergence." These representations imply the existence of facts that would justify the statement (e.g. supporting analyses and plans), and that no known facts would make the representation impossible or improbable (e.g. that the Company had determined that emergence as a going concern was unlikely to materialize, or was working on plans for liquidation).

4.    The representations are actionable statements because Defendants possessed superior knowledge or special information on the subject.

As discussed above, "it is well settled that an opinion may be actionable when it is made by a party who … possesses, or assumes to possess, superior knowledge or special information regarding the subject matter." *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 892, 153 Cal. Rptr. 3d 546, 562 (2013) (internal quotes omitted).

For example, a defendant with superior knowledge to the plaintiff was held liable for stating that it "was 'highly probable,' and 'likely,' and 'look[ed] good'—that a modification of the loan agreement would be approved." *Jolley*, 213 Cal. App. 4th at 892.  Similarly, a broker with superior knowledge to the plaintiff buyer represented that "early prepayment of notes was 'guaranteed,'" and this statement was actionable.  *Apollo Capital Fund LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 241 (2007); see *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 931 (9th Cir. 2010) (defendants' statement "in March 2003 that the Pharos laser would be available that summer, within just a few months" was actionable).

As demonstrated above, because a company's internal data sources and internal communications are, by definition, internal to the company, vendors do not have access to that information unless the company takes specific action to communicate the information outside the company.  Accordingly, the Trade Vendors could not access the Company's internal data sources and internal communications.

As Defendants admitted, Trade Vendors "did not have access to the leadership team meetings" at Toys "R" Us. [978]  They "did not have access to the cash flow projections that were prepared by Toys "R" Us." [979]  And the Trade Vendors "did not have the financial information

---

[978] Ex. 89 (Barry depo.) 542:23-25.
[979] Ex. 89 (Barry depo.) 543:1-5.

about Toys "R" Us" such that they could "calculate Toys "R" Us' cash flow position."[980]
Because the Trade Vendors lacked all of this information, they could not "determine whether or
not [Toys "R" Us] was meeting or was likely to meet its financial covenants."[981]  Indeed, it was
"impossible for a vendor to realistically assess and test complex covenants without detailed (and
truthful) information and forecasts by the Company."[982] *See* Trust SOF ¶¶ 404, 410, 416, 422,
428, 434, 440, 446, 452, 458, 464, 470, 476, 481, 486, 491, 496, 502, 508, 513, 519, 525, 532,
537, 542, 548, 553, 559, 565, 571, 576, 581, 586, 592, 597, 603, 608.

The Defendants had access to the Company's internal data and communications that the
Trade Vendors lacked.  The Defendants therefore possessed both superior knowledge and special
information on the subjects of (i) the Company's recent financial results including sales,
margins, SG&A costs, and capital expenditures, (ii) the Company's projected financial results
including sales growth/ decline, margins, costs, and capital expenditures, (iii) the Company's
plan for emergence or liquidation, (iv) the Company's compliance with financial covenants, (v)
the Company's current or projected liquidity.

Each of the representations is a statement on one or more of these subjects.  The
Defendants therefore possessed both superior knowledge and special information on the subject
matter of the representations.  The representations are therefore actionable.

\*      \*      \*

The representations are actionable on each of the three bases.  Moreover, "'where there is
a reasonable doubt as to whether a particular statement is an expression of opinion or the
affirmation of a fact, the determination rests with the trier of the facts.'"  *Jolley v. Chase Home*

---

[980] Ex. 89 (Barry depo.) 543:20-544:2.
[981] Ex. 70 (Greenspan) ¶533.
[982] *Id.* ¶538.

*Fin., LLC*, 213 Cal. App. 4th 872, 893, (2013) (quoting *Willson v. Municipal Bond Co.*, 7 Cal. 2d

144, 151 (1936)).

C.      **The representations were material.**

"[A] fact is material if a reasonable man would attach importance to its existence or

nonexistence in determining his choice of action in the transaction in question." *Persson v.*

*Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1163 (2005) (internal quotes omitted).  As

demonstrated above, the Company's ability to pay for goods shipped on credit was highly

material to a Trade Vendors' decision-making.  And the Trade Vendors would "attach

importance" to the existence or nonexistence of any fact that materially affect the credit risk of

shipping to Toys 'R' Us.

And, as demonstrated above, Toys "R" Us's ability to pay vendors was contingent on the

DIP financing, and, as Defendants admitted, it was the presence of the DIP financing that

provided vendors with the assurance that Toys "R" Us would be able to pay them for goods

shipped on credit. [983]  The DIP financing was "necessary for Toys 'R' Us to have liquidity to pay

for goods shipped on credit." [984]  And the presence of the DIP financing was critical to the

vendors as the Company's source of liquidity to pay for goods shipped on credit. [985]  For

example, Defendant Barry reported to Brandon that "Confirmation of the DIP financing is a

crucial issue for the vendors." [986]

Defendants admit that Trade Vendors would be interested in knowing "whether there was

a serious risk that the DIP financing would disappear." [987]  A risk that the DIP financing would

---

[983] *See, e.g.*, Ex. 87 (Short depo.) 53:21-54:4.
[984] Ex. 89 (Barry depo.) 396:17-21.
[985] Ex. 89 (Barry depo.) 73:16-22; Ex. 372 (Elliott (MGA) depo.) 265:20-266:8; Ex. 321 (Kamler (Kent) depo.) 166:9-16; Ex. 330 (Woldenberg (Learning Resources) depo.) 198:3-199:8.
[986] Ex. 156 (9'18'17 Barry re DIP crucial [TRU-Trust0000036336]).
[987] Ex. 87 (Short depo.) 434:20-435:1; Ex. 89 (Barry depo.) 461:9-12.

disappear in the coming weeks or months would affect a Trade Vendor's risk calculus on whether it should ship goods to Toys "R" Us on credit.  The loss of the financing would mean that Toys "R" Us would no longer have the liquidity to pay vendors "for all goods shipped on credit." [988]

Therefore, each of the representations was material to a Trade Vendors' decision-making because it would materially affect the credit risk of shipping to Toys 'R' Us, and a reasonable vendor would attach importance to the existence or non-existence of the fact.

Representations addressing the Company's liquidity and ability to pay were material because liquidity and ability to pay directly affect the credit risk.  Examples include:

- Toys "R" Us had "sufficient liquidity to meet its obligations"

- Toys "R" Us "can assure our vendors that we are in a good position to accept shipments on a normal basis and they have great assurance they will be paid."

- "We will pay vendors in full under normal terms for goods and services provided on or after the filing date."

- The implied representation in each purchase order that the Company "has the wherewithal to repay all credit extended."

Representations addressing the DIP financing were material because that financing was the source of liquidity for the Company's ability to pay for goods shipped on credit, and a reasonable vendor would attach importance to the existence or nonexistence of the DIP financing.  Examples include:

---

[988] Ex. 87 (Short depo.) 56:23-57:2.

- The Company had "access to up to $2.5 billion in debtor-in-possession ('DIP') financing which will support our business and enable us to meet our financial obligations throughout the restructuring process."

- "We have received commitments for over $3 billion in new financing that will support our operations and enable us to meet our business obligations during the financial restructuring process."

- "we have commitments for over $3.0 billion in new financing that will help support our operations and enable is us to meet our financial obligations during the restructuring process."

- "the DIP financing would provide liquidity to Toys 'R' Us to be able to pay for goods that were shipped on credit," [989] and "would enable Toys 'R' Us to pay for merchandise that was shipped on credit while Toys 'R' Us was in bankruptcy," [990]

- Toys "R" Us "successfully obtained debtor-in-possession financing today" and

- "the DIP Facilities will also provide the Debtors liquidity to fund the administrative costs of these chapter 11 cases … and emerge from bankruptcy." [991]

---

[989] Ex. 89 (Barry depo.) 73:11-5.
[990] Ex. 89 (Barry depo.) 35:6-14.
[991] Short declaration (Bk. Dkt. 20) at ¶127.

- "the DIP Facilities will provide the Debtors with the liquidity needed to reactivate their supply chain, provide assurance to their vendors, and capitalize on the holiday season." [992]

- The Company had "secured $3.1 billion in DIP financing" and "we obtained a very strong DIP financing package which put us in a position to have strong liquidity through this process."

- "Toys 'R' Us had received … 'DIP financing' that would help us get through and exit bankruptcy."

- Toys "R" Us had only "two financial covenants" and would be "in compliance with both of these covenants" through March 3, 2018. [993]

- That forecasts "demonstrate the Company's ability to comply with February covenants." [994]

Representations addressing whether the Company will continue as an ongoing business and will emerge from bankruptcy or instead will liquidate were material because they go directly to whether the Company would be around to pay for goods shipped on credit, and a reasonable vendor would attach importance to the representation.  Liquidation planning would be "a clear signal that [a Trade Vendor] should expect not to be paid on any further shipments. [995] Examples include:

---

[992] *Id.* at ¶130.
[993] Ex. 151 (3'1'18 financial covenant forecast).
[994] Ex. 186 (2'26'18 Johnson to Euteneuer cash flow forecast [MATTEL00005494]).
[995] Ex. 335 (Kodak (LEGO) depo.) 356:20-357:15.

- The Company's "operations are continuing in the ordinary course,"

- "things are fine," "[e]verything's on track" and "[f]inance is in place," and

- Toys "R" Us was going to be "purchasing additional merchandise in the coming months over the following years."

- Toys "R" Us was "working on the best plan for emergence and a variety of alternatives are being considered."  "If there is something to tell you, you will be hearing it from us– not rumors on LinkedIn from Jim Silver."

- "The Leadership Team and our advisors are totally focused on our plans for emergence."

- "Toys "R" Us was working on plans to emerge from bankruptcy." [996]

- Toys "R" Us was "focused on emergence and focused on the holiday season." [997]

- it was "business as usual at Toys "R" Us." "Toys 'R' Us was looking forward to working with the vendor in the holiday season," and "wanted to work with the vendor once [Toys 'R' Us] emerged from Chapter 11."

"Anything that would have indicated that [Trade Vendors] were at risk of not getting paid back would have been relevant." [998]  As set forth in the accompanying statement of facts, the Trade Vendors testified that the representations were relevant to their decision-making,

---

[996] Ex. 88 (Brandon depo.) 500:4-7.
[997] Ex. 89 (Barry depo.) 343:6-13.
[998] Ex. 380 (Emrey (Munchkin) depo.) 54:23-55:4.

and if they had known they were not true, they would have acted differently. *See* Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607; Trust SOF ¶¶ 402, 408, 414, 420, 426, 432, 438, 444, 450, 456, 462, 468, 474, 479, 484, 489, 494, 500, 506, 511, 517, 523, 529, 535, 540, 546, 551, 557, 563, 569, 574, 579, 584, 590, 595, 601, 606.

For example, had LEGO "known that there was a risk that Toys "R" Us would be defaulting on its loan covenants," LEGO would have "only ship[ped] on a cash in advance basis." [999] If LEGO had any indication that Toys "R" Us had a "half a billion dollar miss" on the DIP budget requirements, that "would have been a clear sign that the operation was faltering," and would have caused LEGO "to trade cash in advance only." [1000]

As another example, if Learning Resources had known that Toys "R" Us "anticipated the breach of financial covenants under its DIP financing in February or March," it "wouldn't have shipped." [1001] And if it had learned that Toys "R" Us' cash liquidity situation was dire, Learning Resources "would have taken their credit to zero and put them on cash in advance." [1002]

Defendants make no effort to argue that the representations were not material to vendors. Nor could they. The above evidence more than suffices to demonstrate materiality. "Materiality is a question of fact for the jury, unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1163 (2005) (internal quotes omitted).

---

[999] Ex. 335 (Kodak (LEGO) depo.) 344:23-345:16.
[1000] Ex. 335 (Kodak (LEGO) depo.) 352:15-353:16.
[1001] Ex. 330 (Woldenberg (Learning Resources) depo.) 229:23-230:10.
[1002] Ex. 330 (Woldenberg (Learning Resource) depo.) 235:9-236:13.

### D.      Defendants knew the representations were false or misleading when made.

A representation is fraudulent if it is false or if it is a misleading half-truth.  A
representation is known to be false if it includes a material fact that was known to be false when
the representation was made.  *Cohen v. S & S Constr. Co.*, 151 Cal. App. 3d 941, 946 (1983).  A
representation that contains only true facts is also fraudulent if it is a half-truth that is materially
misleading because of the failure to recite matters that materially qualify the statement.  "A
statement containing a half-truth may be as misleading as a statement wholly false. Thus, a
statement which contains only those matters which are favorable and omits all reference to those
which are unfavorable is as much a false representation as if all the facts stated were untrue."
Rest. (2d) Torts §529, comment (a).  "A statement that is technically true may nevertheless be
fraudulent where it omits qualifying material since a 'half-truth' is sometimes more misleading
than an outright lie." *Guvenoz v. Target Corp.*, 30 N.E.3d 404, 425 (Ill. App. 2015).  "A half-
truth may be as misleading as a statement which is wholly false.  A fraudulent misrepresentation
may inhere in a statement which is truthful so far as it goes but which is materially misleading
because of the failure to recite qualifying matters." *Medivox Prods. v. Hoffmann-LaRoche, Inc.*,
107 N.J. Super. 47, 69 (Super. Ct. 1969).

Each of the representations when made was known to be false in material respects, a
misleading half-truth in material respects, or both.

### 1.      September representations.

The September statements to Trade Vendors about the DIP financing were known to be
false in material respects and were known to be misleading half-truths.

As described above, Defendants communicated to Trade Vendors in multiple ways that:
the Company had "sufficient liquidity to meet its obligations" to Trade Vendors because "We
have received commitments for over $3 billion in new financing that will support our operations

and enable us to meet our business obligations during the financial restructuring process."

Several aspects of this were known to be false by Defendants.

When the Company's officers and directors started representing to Trade Vendors on

September 18 that the Company had "commitments for" and "access to" the DIP financing,

Brandon and Short knew those representations were false. As demonstrated above (in explaining

the breach of fiduciary duty for authoring the DIP financing), Brandon and Short knew that the

Company did not have access to the DIP Term Loan, because the lender was insisting on

financial covenants that the Company could not accept. After several days of negotiations with

no access to cash, the Company was "dying," and Brandon and Short had to accept the

covenants. [1003] The loan was not closed until the afternoon of September 22, 2017. [1004]

Defendants also knew that it was false and misleading to represent to Trade Vendors the

amount of the financing as "over $3 billion in new financing" that was available "to support our

operations and enable us to meet our business obligations during the financial restructuring

process." The face amount of the potentially available credit for the DIP financing did exceed $3

billion. But this financing did not give the Company $3 billion to "support our operations and

enable us to meet our business obligations during the financial restructuring process."

The $375 million TAJ DIP loan was "not available to the U.S. entity" at all and most of it

was used to pay off existing loans for international subsidiaries. [1005] The ABL/FILO DIP loan

essentially rolled over the pre-petition ABL/FILO. [1006] The actual available credit for this loan

was determined by the "borrowing base," and there "were no projections which indicated that the

---

[1003] Ex. 158 (9'20'17 1501 pm company dying [TRU-Trust0000338280]) ("I just got off with
Mike Short. We have to get this done … The company is dying.").
[1004] Ex. 161 (9'22'17 352 pm closed [TRU-Trust0000338956]).
[1005] Ex. 70 (Greenspan) ¶442.
[1006] Ex. 70 (Greenspan) ¶442.

Company's borrowing base would allow it to access the full nominal amount of the DIP loans."[1007]  In addition, $1.305 billion of the ABL/FILO was used to pay off the prepetition ABL/FILO, and was not available for ongoing operations.  The available amount was further reduced by over $90 million of then-outstanding letters of credit, and over $90 million of loan fees withheld by the DIP lenders. [1008]  In addition, the loan terms blocked access to another $300 million. [1009]

After subtracting these amounts, available DIP financing at the start of the process was about $1 billion.  But Brandon and Short also knew that about $500 million was committed to pay for pre-petition obligations to foreign and critical vendors.  Consequently, they knew the amount of DIP financing the Company would have access to "to meet our business obligations during the financial restructuring process" was about $500 million, which is a far cry from the $3 billion they represented.

The Directors also knew that it was false to represent that the DIP financing provided over $3 billion in new financing to pay Trade Vendors during the restructuring process.  For example, in the Board meeting on September 13, 2017, the Directors were told that the ABL/FILO would "refinance in full the existing prepetition ABL and FILO … and enhance liquidity by $170 million" and the DIP Term loan would provide "$450 million of incremental liquidity" for a total $620 million. [1010]

---

[1007] Ex. 70 (Greenspan) ¶442.
[1008] Ex. 70 (Greenspan) ¶442.
[1009] Ex. 70 (Greenspan) ¶442.
[1010] Ex. 41 (9'13'17 Brandon agenda plus attach [DEFS_0004126]) at 4; Ex. 155 (9'6'17 Raether board materials [DEFS_0124536]) at pdf 3 (Raether's handwritten calculations that the delta added by the DIP financing was "$620MM").

Whether the Company had a $3 billion credit card or a $500 million credit card to provide liquidity was highly material to vendors. [1011]

Brandon and Short also knew that it was misleading to represent that the Company would have access to the DIP financing "during the financial restructuring process," or "throughout the restructuring process," or "while Toys 'R' Us was in bankruptcy," or "to fund the administrative costs of these chapter 11 cases … and emerge from bankruptcy."  As demonstrated above, Short knew that the DIP Term loan that left the Company with insufficient liquidity to get through bankruptcy and "doesn't work," and Brandon and Short knew that it required a revised budget covenant that "just isn't going to work."  The ability to comply with financial covenants for the DIP financing was plainly material to the Trade Vendors, and it was therefore misleading to represent that the Company had DIP financing without disclosing these key facts.

### 2.      December-March representations.

Each of the representations made from December to March was known by the Defendants to be both false and misleading.

The implied representation in every purchase order that the Company had the ability to repay all credit extended was false as all Defendants knew.  As demonstrated above, all Defendants knew that the DIP financing was required for the Company to have the ability to pay for goods shipped on credit.  And by December 13, 2017, the Directors knew that the Company was projected to default on its DIP financing, which would eliminate the Company's source of liquidity.  It was therefore false to represent otherwise after that date.  And it was misleading,

---

[1011] *See, e.g.*, *Ex.* 330 (Woldenberg (Learning Resources) depo.) 198:2-199:8; Ex. 347 (Pevonka (LSC) depo.) 258:12-22; Ex. 351 (McColgan (Mattel) depo.) 213:10-214:18.

and therefore a fraudulent half-truth, to omit that fact in any representation that the Company had the ability to pay.

Brandon and Short knew that their statements on the December 21 conference call that the Company had "secured $3.1 billion in DIP financing" and "we obtained a very strong DIP financing package which put us in a position to have strong liquidity through this process" were false and misleading. [1012] As demonstrated above, Brandon and Short knew (a) the DIP financing package was subject to financial covenants that left insufficient liquidity, (b) the terrible holiday sales meant that the Company could not possibly satisfy the covenants, and (c) management had already determined—and announced to the Board of Directors that it was projected to default on the covenants. Consequently, Brandon and Short knew that it was misleading to state that the Company had a "very strong DIP financing package" that would provide "strong liquidity through this process."

Moreover, throughout January and February, all Defendants knew additional facts (the concealments described above) that were highly material to the Company's ability to pay, and that the Defendants failed to include when making statements to Trade Vendors on the Company's financial situation and ability to pay, and failed to direct that the Company's officers and directors include in statements to Trade Vendors.

As demonstrated above, Defendants knew by January 2018 that the Vendor FAQ was false and misleading because it represented that the DIP financing "will support our business and enable us to meet our financial obligations throughout the restructuring process," when in fact the DIP financing would not be sufficient, because the Company had a $200 million hole in its budget and was projected to default within weeks.

---

[1012] Ex. 64 (12'21'17 Transcript - Q3 Earnings Call [TRU-Trust0000323034]).

In fact, the Defendants' admissions demonstrate that they knew this information was material to Trade Vendors, and that they withheld this information from Trade Vendors precisely because they knew that Trade Vendors would stop shipping goods on credit if they knew the information.  On January 10, 2018, Brandon told the Board about management's decision "not to voluntarily release our holiday sales results" contrary to the Company's usual practice. [1013]  This decision was made because "holiday performance" was "significantly less than expected," which "could have concerned" "the trade vendor community" because the Company "would have reported a weak holiday period," and "[t]hey may have been concerned about the ability of Toys 'R' Us to continue going forward," and "[t]he ability of Toys 'R' Us to pay for goods that were shipped on credit." [1014]

As demonstrated above, Barry knew that it was false and misleading for him to attend the Hong Kong Toy Fair and represent that "Toys 'R' Us had received … 'DIP financing' that would help us get through and exit bankruptcy," "[e]verything's on track" and "[f]inance is in place," and "giving his word" that vendors would be paid for the goods that they shipped to Toys "R" Us. [1015]

Brandon's response to Trade Vendor executive Larian on February 3 was knowingly false and misleading.  Larian asked Brandon and Barry about Jim's Silver post that: the

---

[1013] Ex. 88 (Brandon depo.) 344:3-344:24; Ex. 87 (Short depo.) 279:19-23; Ex. 138 (1'10'18 BOD minutes [TRU-Trust0000374746]) at 2.
[1014] Ex. 87 (Short depo.) 279:19-23, 281:18-282:9; Ex. 88 (Brandon depo.) 344:3-344:24; Ex. 88 (Brandon depo.) 346:7-16; Ex. 89 (Barry depo.) 519:16-24.
[1015] Ex. 232 (Foreman (Basic Fun) depo.) 263:17-264:11, 266:15-267:14; Ex. 90 (Baime depo.) 25:3-16, 26:25-27:7.

Company was considering the options of shrinking the footprint to "a 200 store chain" or "liquidate the whole thing." [1016]

Brandon and Barry knew that Brandon had presented exactly those options at a Board meeting a few days earlier.  A truthful response would have included: yes, those options are being considered.  But instead, Brandon communicated that Larian should not "rely upon Jim Silver as being a source of useful and accurate information about decisions being made in the boardroom of TRU." [1017]  Brandon also said Toys "R" Us was "working on the best plan for emergence." [1018]  "If there is something to tell you, you will be hearing it from us– not rumors on LinkedIn from Jim Silver." [1019]

Brandon knew the information in Jim Silver's post was highly material to Trade Vendors. In fact, Trade Vendor Larian had just given "TRU a $25 Million line of credit" and was demanding to know: "Why NOBODY tell me about this?" [1020]  Brandon admitted that he understood that Larian was "concerned about the rumor" that "Toys 'R' Us was considering a liquidation," and was seeking "to verify whether there was any credibility contained in this blog." [1021]

And Brandon knew that what Larian was asking about was true: Brandon had just notified the Board five days earlier that the two remaining "likely options" were "shrink and rethink the business" or "total liquidation of the enterprise." [1022]  But Brandon told Larian that

---

[1016] Ex. 167 (Larian Post); Ex. 147 (2'3'18 Brandon to Larian re Silver post [TRU-Trust0000272792]).
[1017] Ex. 147 (2'3'18 Brandon to Larian re Silver post [TRU-Trust0000272792]) at 2.
[1018] *Id.* at 2.
[1019] *Id.* at 2.
[1020] Ex. 147 (2'3'18 Brandon to Larian re Silver post [TRU-Trust0000272792]) at 3.
[1021] Ex. 88 (Brandon) 435:8-14, 436:9-17.
[1022] Ex. 140 (1'28'18 minutes) at 2.

this was not "accurate information."  Brandon admitted: "my response to him was coaching him that that was not an appropriate source of useful information for him and he should not take it as fact." [1023]  But Brandon knew it was fact.  And Brandon falsely stated, "If there is something to tell you, you will be hearing it from us."  Brandon knew there was something to tell Larian but that Larian would not be hearing it from Brandon or anyone else at Toys "R" Us.  Brandon knew that his statements were false and misleading (and obviously designed to deceive Larian).

Defendants knew that the representations given to Trade Vendors at the New York Toy Fair were false and misleading.  Brandon told the Board that he "intends to meet with the executives of many large vendors" at the Toy Fair. [1024]  Brandon explained that each vendor would likely "push him for comfort that the Company can pay for shipments," and that Brandon and other Toys "R" Us employees visiting the Toy Fair would "provide vendors additional comfort so they do not determine to stop shipping." [1025]

As Raether testified, at the board meeting "there was a discussion about the upcoming New York Toy Fair and that Dave Brandon would be meeting with a number of the vendors … [a]nd that undoubtedly, there would be difficult conversations with the vendors about whether they would continue to ship or not." [1026]  Brandon told the board "that he expected these vendors at the toy fair to push him for comfort that the company can pay for shipments." [1027]  Brandon said "he was hopeful that he would be able to convince those vendors ... that they should

---

[1023] Ex. 88 (Brandon) 434:21-435:6.
[1024] Ex. 148 (2'12'18 minutes [DEFS_0059030]).
[1025] Ex. 148 (2'12'18 minutes [DEFS_0059030]).
[1026] Ex. 77 (Raether) 282:13-283:4.
[1027] Ex. 77 (Raether) 283:5-16.

continue to ship Toys 'R' Us." [1028]  "He hoped that he would be successful in convincing the – the vendors not to stop shipping." [1029]

Brandon and Barry organized a "Team Huddle" to get the merchants in the "right mindset." [1030]  They instructed the merchant team to be positive and aggressive with Trade Vendors and tell them: "The Leadership Team and our advisors are totally focused on our plans for emergence." [1031]  The team communicated to Trade Vendors that it was ███████████

████████████████████████████████████████████

████████████████████████████████████████

██ ██

Brandon told Trade Vendors in a "reassuring and comforting manner" that Toys "R" Us was "working through the bankruptcy" and was working on "exiting" and "having a business." Barry and Brandon represented that "Toys "R" Us was working on plans to emerge from bankruptcy." [1033]  And Toys "R" Us was "focused on emergence and focused on the holiday season." [1034]

Defendants knew that responding to questions from Trade Vendors about whether the Company could pay for shipments by providing Trade Vendors comfort so that they continue shipping was misleading and omitted the concealed information described above, which materially qualified the statements.  Defendants were delivering a message "which contains only

---

[1028] Ex. 77 (Raether) 283:17-284:4.
[1029] Ex. 77 (Raether) 283:5-16, see Ex. 77 (Raether) 284:15-22, 285:14-286:2, 287:7-24.
[1030] Ex. 187 (2'14'18 Brandon to Barry [TRU-Trust0000362666]); Ex. 183 (2'15'18 NYTF team huddle [TRU-Trust0000323065]).
[1031] Ex. 150 (2'15'18 Von Walter to Barry re fact sheet [TRU-Trust0000362680]); Ex. 149 (2'15'18 NYTF Fact Sheet FINAL [TRUTrust0000362681]).
[1032] Ex. 93 (Ryan depo.) 174:6-10.
[1033] Ex. 88 (Brandon depo.) 500:4-7.
[1034] Ex. 89 (Barry depo.) 343:6-13.

those matters which are favorable and omits all reference to those which are unfavorable," which

"is as much a false representation as if all the facts stated were untrue."  Restatement (Second)

Torts §529, comment (a).

Defendant Macnow admitted:

```
22      Q.   If as of February 12, the fact
23   was that Toys "R" Us was expected to
24   default on its covenants, would it be
25   appropriate for Mr. Brandon to go to the
 1   Toy Fair and provide comfort for vendors?
 3      A.   No.

 9          In February – as of February
10   12, 2018, you understand that Toys "R" Us
11   was not on track to meet its financial
12   covenants; is that correct?
14      A.   Yes.
15      Q.   And so as of February 12, 2018,
16   it would be inappropriate for Mr. Brandon
17   to provide trade vendors with comfort so
18   that they would continue shipping; is that
19   correct?
21      A.   Yes.
```
Macnow depo. 148:22-149:3, 150:9-21.

For example, Defendants omitted that the Company had determined that it could not

satisfy the January 31 revised budget covenant, but had only a one-month waiver. [1035]  They

omitted that on January 31, 2018, "Brandon advised the board that … the forecasted cash

liquidity position is dire" and "the Company projects it will breach its postpetition financing

covenants in February or March." [1036]

And they omitted that on February 16, 2018, the day before the start of the New York

Toy Fair, Brandon called an "emergency leadership team" meeting to announce that the DIP

---

[1035] Ex. 144 (1'31'18 TRU – Waiver Extension (1-30-18) [Draft] [TRU-Trust0000323056]).
[1036] Ex. 142 (1'31'18 minutes [DEFS_0059013]).

Term Loan lenders "thought it would be better to liquidate the company sooner rather than later," and the Company was preparing "plans around a liquidation process" including a "liquidation analysis" and "wind-down budget" for the U.S. business, with the focus "around a mid March date." [1037]

Brandon, Barry, and the rest of the team were being "positive," and "provid[ing] vendors additional comfort so they do not determine to stop shipping," and telling vendors that they are "totally focused on our plans for emergence." [1038]  In truth, they were not totally focused on emergence, and the Company was planning for a liquidation targeting mid-March.

By stating "only those matters which are favorable and omit[ting] all reference to those which are unfavorable," Defendants knowingly presented false statements and half-truths, thereby engaging in fraudulent misrepresentation.  Restatement (Second) Torts § 529, comment (a).

### F.    Defendants intended the representations to induce the Trade Vendors to ship goods on credit.

As detailed above, "[a]n intent to deceive is not an essential element of the cause of action; the required intent is an intent to induce action." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1062 (2012) (internal citations omitted).  And the statement intended to induce action need not "be the sole or even the predominant or decisive factor in influencing [plaintiff's] conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 976-77 (1997) (quoting Rest. 2d Torts § 546, com. b, p. 103).  Just as Defendants intended that the

---

[1037] Ex. 146 (2'17'18 Brandon to Sussberg [TRU-Trust0000275355]) at 1-3; Ex. 145 (2'16'18 Barry Notes [DEFS_0026183]).  Ex. 98 (Barry depo.) 419:24-421:17.
[1038] Ex. 148 (2'12'18 minutes [DEFS_0059030]); Ex. 150 (2'15'18 Von Walter to Barry re fact sheet [TRU-Trust0000362680]); Ex. 149 (2'15'18 NYTF Fact Sheet FINAL [TRU-Trust0000362681]).

concealment of certain facts would induce the Trade Vendors to continue shipping goods on credit, they also intended that the statements affirmatively made to the Trade Vendors would cause the Trade Vendors to continue shipping goods on credit.

Defendants knew that for Toys "R" Us to remain in business, it needed to obtain goods from Trade Vendors. And they further understood that Toys "R" Us would need to obtain those goods on credit, because it did not have sufficient liquidity to pay for goods cash in advance. [1039]

For the Trade Vendors to ship again, the Trade Vendors "needed some assurance that they would be paid for their goods." [1040] Defendants knew that statements made to Trade Vendors about the DIP financing and its availability throughout the bankruptcy would be "crucial for the vendors" in their determination of whether to ship to Toys "R" Us, because they provided Trade Vendors with those assurances. [1041] Defendants themselves confirmed that the statements made to Trade Vendors in September were made to "get them [Trade Vendors] to start shipping merchandise to Toys 'R' Us again." [1042] Defendants intended for the initial outreach in September to Trade Vendors to "encourage[e] them to ship" to Toys "R" Us. [1043] This demonstrates that those statements were made with the intent to induce Trade Vendors to ship goods on credit.

Each of the representations made to Trade Vendors during the bankruptcy were similarly intended to have those Trade Vendors continue shipping goods to Toys "R" Us. After the initial statements in September that had convinced Trade Vendors to begin shipping goods on credit,

---

[1039] Ex. 51 (9'18'17 attach Brandon chapt 11 [DEFS_0027298]) at 7 ("The Company does not have available liquidity to pay cash in advance").
[1040] Ex. 89 (Barry depo.) 37:4-9.
[1041] Ex. 87 (Short depo.) 66:18-67:2.
[1042] Ex. 89 (Barry depo.) 34:8-15; Ex. 82 (Goodman depo.) 330:4-9 ("the goal of that process was to get vendors to ship goods to Toys 'R' Us").
[1043] Ex. 87 (Short depo.) 61:16-23.

Defendants knew that Trade Vendors would want to know "whether there was a serious risk that

the DIP financing would disappear" because vendors were evaluating "whether they would be

paid by Toys "R" Us." [1044]  Defendants understood that if Trade Vendors felt that Toys "R" Us

was in a "dire liquidity position" or had a "potential to default its financial covenants," vendors

could have stopped shipping. [1045]

Because Defendants knew that the presence of the DIP financing was critical to Trade

Vendors, that Trade Vendors were highly interested in updates from Toys "R" Us, and were

constantly evaluating risk, Defendants knew that statements about Toys "R" Us' position would

influence the Trade Vendors.  And by making statements that misleadingly portrayed Toys "R"

Us' condition as positive, Defendants knew that Trade Vendors would be more likely to ship

goods to Toys "R" Us.  This establishes a strong inference that those statements were made with

the intent to induce Trade Vendors to continue those shipments.

For example, each time that Toys "R" Us placed a purchase order, that purchase order

contained an implied representation of an ability to pay, as discussed above.  Defendants knew

that Trade Vendors would respond to that implied representation by filling the purchase order

and shipping goods.  And because Defendants knew that receiving those goods was critical to

Toys "R" Us' business, there is a strong inference that they made those implied representations

with the intent that Trade Vendors ship goods in response to them.

As another example, on December 21, Brandon and Short participated in an earnings call.

They knew that Trade Vendors would be participating on that call, along with members of the

media. [1046]  They further knew that the reason Trade Vendors were listening was to "learn

---

[1044] Ex. 87 (Short depo.) 311:1-9, 313:25-314:4.
[1045] Ex. 87 (Short depo.) 401:21-402:17.
[1046] Ex. 87 (Short depo.) 169:1-6, 170:9-14.

information about Toys "R" Us' liquidity and its ability to pay for goods shipped on credit." [1047]

On that call, Brandon and Short made statements that Toys "R" Us "secured $3.1 billion in DIP

financing" and "we obtained a very strong DIP financing package which put us in a position to

have strong liquidity through this process." [1048]  Brandon and Short's knowledge of Trade

Vendors participating in the call, coupled with their desire to have Trade Vendors continue

shipping goods on credit, strongly suggests that those statements were made with the intent to

induce Trade Vendors to ship goods on credit.

Moreover, at the Hong Kong Toy Fair, Barry made statements to Trade Vendors with the

intent of getting Trade Vendors "focused on driving business in holiday 2018." [1049]  He told

Trade Vendors that Toys "R" Us was "building plans for the holiday season," so that Toys 'R'

Us "would have a successful 2018 holiday season." [1050]  One part of that "successful holiday

season" included Trade Vendors continuing to "driv[e] the business" by shipping goods to Toys

"R" Us on credit. [1051]  By making those statements to Trade Vendors and planning for the future,

Barry intended that the Trade Vendors would continue shipping product to Toys "R" Us.

Further, Brandon, Barry, and Short attended the New York Toy Fair with the intent to

give vendors "comfort that the Company can pay for shipments," "so they [Trade Vendors] do

not determine to stop shipping." [1052]  As discussed above, each of the other Defendants

understood that Brandon, Barry, and Short would be attending the New York Toy Fair for the

---

[1047] Ex. 87 (Short depo.) 171:10-17, 172:16-24.
[1048] Ex. 64 (12'21'17 Transcript - Q3 Earnings Call [TRU-Trust0000323034]).
[1049] Ex. 89 (Barry depo.) 193:9-24.
[1050] Ex. 89 (Barry depo.) 159:5-12.
[1051] Ex. 89 (Barry depo.) 194:19-195:11, 198:10-20 (asking Basic Fun "to continue to ship to Toys "R" Us").
[1052] Ex. 148 (2'12'18 board minutes [TRU-Trust0000313960]).

purpose of making statements about the Company's finances and plans for emergence. [1053]  And

none of the Defendants objected to that strategy.  This creates a strong inference that the

Defendants wanted statements of comfort to be made to Trade Vendors at the New York Toy

Fair so that they "do not determine to stop shipping."

The evidence detailed above provides compelling inferences that Defendants made

misrepresentations to Trade Vendors throughout the bankruptcy with the intent to induce Trade

Vendors to ship goods to Toys "R" Us on credit.  As discussed above, Defendants have never

disputed that they had this intent.  Whether Defendants had the requisite intent is thus a disputed

issue of material fact that cannot be resolved on summary judgment.  "Questions of intent are

normally questions of fact properly reserved for the jury."  *Sloan v. GM LLC*, No. 16-cv-07244-

EMC, 2020 U.S. Dist. LEXIS 71982, at *54 (N.D. Cal. Apr. 23, 2020) (collecting cases); *Testo

v. Ruggiero*, NO. CV90 27 19 97 S, 1993 Conn. Super. LEXIS 1719, at *8 (Super. Ct. July 13,

1993) ("Summary judgment is inappropriate to determine questions of motive and intent"); *Sadiq

Marafi v. Hind El Achchabi*, No. FSTCV186036789, 2020 Conn. Super. LEXIS 1333, at *17

(Super. Ct. Nov. 2, 2020) ("[i]t is well established that the question of intent is purely a question

of fact").

### G.    Trade Vendors acted in reliance on Defendants' statements.

To demonstrate reliance, a plaintiff "need only make a showing that the

misrepresentations were material, and that therefore a reasonable trier of fact could infer reliance

from such misrepresentations."  *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977

(1997).  This is because "a presumption, or at least an inference, of reliance arises wherever there

---

[1053] *See, e.g.*, Ex. 77 (Raether depo.) 282:13-283:4, 283:17-284:4 (Brandon was going to
convince "vendors" "that they should continue to ship Toys "R" Us.")

is a showing that a misrepresentation was material." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997).

As discussed at length above, each of the misrepresentations that Defendants made were material, because they each impacted the risk of whether a Trade Vendor would be paid for goods shipped on credit. Trade Vendors uniformly testified that the statements about the DIP financing and its availability was a material or key factor in their decision to continue shipping goods to Toys "R" Us on credit. This alone suffices to establish reliance.

Moreover, Trade Vendors provided additional direct evidence of reliance. For example, Trade Vendors testified that the statements made by Defendants were the key factors in determining to ship goods to Toys "R" Us during the bankruptcy. [1054] And other Trade Vendors testified that they relied on the information that Defendants disseminated in letters, press releases, and the Vendor FAQ in deciding to ship goods to Toys "R" Us on credit. [1055] Additional evidence of reliance is found in Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607.

The evidence discussed above establishes not just an inference of, but actual reliance, and thus precludes a grant of summary judgment.

---

[1054] *See, e.g.*, Ex. 232 (Foreman (Basic Fun) depo.) 258:2-10, 260:2-17 (discussing representations received as "critical factor" in decision-making, "in particular" those from Barry); Ex. 330 (Woldenberg (Learning Resources) depo.) 198:19-199:8 (the "representation that" Toys "R" Us had the ability to pay "was essential to" decision to ship); Ex. 421 (Smith (Yvolve) depo.) 253:21-255:16 (discussing "assurances" from Barry as leading Yvolve to believe that shipping to Toys "R" Us "was a low risk"); Ex. 244 (Schellhase (Bestway) depo.) 172:11-17.

[1055] Ex. 307 (Cooney (Jakks) depo.) 149:3-7 (describing vendor FAQ as "critical" in shipping decision); Ex. 321 (Kamler (Kent) depo.) 166:9-16 (describing statement about DIP financing in Dear Valued Business Partner letter as "the most critical piece" in shipping decision).

**H.      Trade Vendors' reliance was reasonable.**

Reasonable reliance can be shown by demonstrating that "circumstances were such to make it reasonable for [the] plaintiff to accept [the] defendant's statements without an independent inquiry or investigation*." OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 157 Cal. App. 4th 835, 864 (2007).  "[W]hether reliance is reasonable in an intentional fraud case is not tested against the standard of precaution or of minimum knowledge of a hypothetical, reasonable man." *Boeken v. Philip Morris, Inc.*, 127 Cal. App. 4th 1640, 1666 (2005) (internal quotes omitted).

Trade Vendors attempted to make independent inquiries and investigations into the truth of Defendants' statements, but they had no way of learning that Defendants' statements were false. Trade Vendors could not independently investigate the internal financial condition of Toys "R" Us.  Trade Vendors had no other source of reliable information other than what they were being told by Toys "R" Us.  News articles, rumors, and other information was neither accurate nor reliable, and Trade Vendors testified that they could not make decisions based on that information. [1056]  To obtain accurate financial information about Toys "R" Us, Trade Vendors had to rely on what they were being told by Defendants and others at Toys "R" Us. [1057]  And, as discussed above, the statements that Defendants made were false and misleading, and did not inform Trade Vendors about the true state of affairs at Toys "R" Us.  As one vendor put it, "[s]hort of hacking or spying," there was no way to obtain the information that was communicated in "a private conversation held in confidence behind closed doors." [1058]

---

[1056] Ex. 307 (Cooney (Jakks) depo.) 188:17-189:17.
[1057] *See, e.g.*, Ex. 307 (Cooney (Jakks) depo.) 188:10-16; Ex. 421 (Smith (Yvolve) depo.) 277:6-21; Ex. 369 (Wysocki (MerchSource)) 150:19-151:14.
[1058] Ex. 330 (Woldenberg (Learning Resources) depo.) 230:11-231:8.

As one Trade Vendor put it, "[w]e felt it was reasonable [to rely on representations] because Toys "R" Us was the source for their information.  They had the facts in hand.  And as our business partner, we relied pretty heavily, unfortunately, on how they communicated those facts to us." [1059]  And in the words of another Trade Vendor, Defendants "had knowledge of the health of the business and we didn't believe people we had known [for] so long and trusted and had a relationship with would tell us anything but the truth." [1060]

Additional testimony and evidence supporting reasonable reliance and the inability of Trade Vendors to learn accurate information from other sources is found in Trust SOF ¶¶ 404, 410, 416, 422, 428, 434, 440, 446, 452, 458, 464, 470, 476, 481, 486, 491, 496, 502, 508, 513, 519, 525, 532, 537, 542, 548, 553, 559, 565, 571, 576, 581, 586, 592, 597, 603, 608.

The evidence above demonstrates that Trade Vendors' reliance was reasonable. "[J]ustifiable reliance is a question of fact that is to be determined by the finder of fact and not the by the trial court as a matter of law." *Schrager v. N. Cmty. Bank*, 328 Ill. App. 3d 696, 709 (2002) (internal quotes omitted); *Blankenheim v. E. F. Hutton & Co.*, 217 Cal. App. 3d 1463, 1475 (1990) ("[w]hether plaintiffs' reliance on this representation was reasonable is a question of fact to be determined by the jury"); *Johnson v. Waterfront Servs. Co.*, 391 Ill. App. 3d 985, 993 (2009) (reversing grant of summary judgment on the issue of reasonable reliance).

## I.    Trade Vendors suffered losses.

As discussed above in the [fraudulent concealment damages section], as a result of Defendants' statements, Trade Vendors shipped hundreds of millions of dollars of goods that they were not paid for. [1061]

---

[1059] Ex. 307 (Cooney (Jakks) depo.) 209:13-210:2.
[1060] Ex. 232 (Foreman (Basic Fun) depo.) 282:4-17.
[1061] *See* Ex. 135 (Mills) ¶¶55-59, Ex. 168 (Mills supplemental report Ex. 15) (collecting post-petition vendor losses).

Each Trade Vendor filled purchase orders between December 13, 2017, and March 14, 2018, when the Company's liquidation was announced. Because Trade Vendors shipped goods to Toys "R" Us on credit, and were not paid for those goods, they sustained losses. Evidence of these losses is found in Trust SOF ¶¶ 405, 411, 417, 423, 429, 435, 441, 447, 453, 459, 465, 471, 477, 482, 487, 492, 497, 503, 509, 514, 520, 526, 532, 538, 543, 549, 554, 560, 566, 572, 577, 582, 587, 593, 599, 604, 609.

Each Trade Vendor's administrative proof of claim lays out the purchase orders that the Trade Vendor shipped and was not paid for. This Court approved those proofs of claim. [1062] And the specific amounts of those damages are detailed and supported by the Trust's experts. [1063]

## J.    All Defendants liable.

As discussed at length above, Defendants are liable for misrepresentations under two theories. First, Defendants are liable if they intended to have representations passed on to Trade Vendors to influence their conduct. *See Whiteley v. Philip Morris, Inc.*, 117 Cal. App. 4th 635, 681, 11 Cal. Rptr. 3d 807, 845 (2004). As detailed above, each of the Defendants intended that representations be made to the Trade Vendors to influence them to continue shipping goods to the Company on credit. Second, Defendants are liable if they knew or had reason to know about but failed to put a stop to tortious conduct. *Asahi Kasei Pharma Corp. v. Actelion Ltd.*, 222 Cal. App. 4th 945, 966 (2013); *Frances T. v. Village Green Owners Assn.*, 42 Cal. 3d 490, 504 (1986). As discussed above, Defendants made no effort to stop the misrepresentations that were being made to Trade Vendors, and thus they are also liable under this theory.

---

[1062] *See, e.g.*, Bk. Dkt. Nos. 4583, 5171, 5562, 6060, 6848, 7073, 7099, 7199, 7248 (Notices of Allowed Administrative Claims).
[1063] *See* Ex. 70 (Greenspan) ¶¶545-571, Ex. 135 (Mills) ¶¶55-61.

IX.     **Defendants are liable for negligent concealment, negligent misrepresentation, and negligence.**

   A.     **The Trust's evidence proves each element of its claims for negligent misrepresentation and concealment.**

"The elements of negligent misrepresentation are substantially similar to those of fraudulent misrepresentation, except that the required mental state is less stringent." *Schrager v. N. Cmty. Bank*, 328 Ill. App. 3d 696, 703 (2002).  "Negligent misrepresentation is a lesser included claim of fraudulent misrepresentation. It differs only in that while [fraudulent misrepresentation] requires knowledge that the pertinent statement was false, [negligent misrepresentation] merely requires that the person who made the statement failed to exercise reasonable care or competence to obtain or communicate true information." *Ferris Ave. Realty, LLC v. Huhtamaki, Inc.*, No. PB 07-1995, 2011 R.I. Super. LEXIS 25, at *32 (Super. Ct. Feb. 18, 2011) (internal quotes and citations omitted). Similarly, negligent concealment is a lesser included claim of fraudulent concealment that differs only in terms of the intent required. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 573 n.11 (7th Cir. 2012) ("We assume the elements of negligent concealment are equivalent to those of a negligent misrepresentation claim, meaning the defendant must have negligently — but not intentionally — failed to disclose a material fact, and that he also must have owed some duty to the plaintiff to disclose it").

As discussed above, the Trust has presented evidence of each of the other elements of fraudulent misrepresentation and concealment.  And the evidence of knowledge above satisfies the "less stringent" mental state requirement for negligent misrepresentation and concealment.  Thus, the evidence above demonstrates that Defendants are liable for negligent misrepresentation and concealment.

**B.      The Trust's evidence proves each element of its claim for negligence.**

"Actionable negligence involves a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury." *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal. 3d 586, 594 (1970).  What is negligence under a particular set of circumstances is a question for the trier of fact.  *Id.*

The Trust's evidence above establishes each of the elements of a negligence claim. Defendants owed a duty of care to the Trade Vendors.  Defendants owed a duty of care to Trade Vendors.  They breached that duty of care in multiple ways.  Defendants paid executive bonuses so that Trade Vendors would not have access to those funds.  They recklessly and carelessly obtained a financing package with no care for the damage that would be caused to Trade Vendors. And Defendants repeatedly made statements to Trade Vendors to induce Trade Vendors to ship goods, knowing that Trade Vendors did not have the information that they needed to make their decision.  And as a result of Defendants' breaches of their duty of care, Trade Vendors suffered hundreds of millions of dollars of damages.  This evidence of a negligence claim precludes summary judgment.

Defendants argue that "[u]nder Delaware law," the Trust's negligence claim cannot survive summary judgment.  Mot. 99.  But Defendants apply the wrong law.  As discussed above, the substantive law of each Vendor's home state governs the Trust's tort claims.  None of the Trade Vendors were located in Delaware.  Thus, Delaware law is irrelevant to the negligence claim.

Moreover, the internal affairs doctrine does not change this analysis.  Under New York choice-of-law rules, the law of a corporation's state of incorporation governs issues relating to the "corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." *Edgar v. Mite Corp.*, 457 U.S.

335

624, 645 (1982); *Mindspirit, LLC v. Evalueserve Ltd.*, 2019 U.S. Dist. LEXIS 167060, at \*16-17

(S.D.N.Y. Sep. 2019) (same).

But the internal affairs doctrine does not apply to torts committed by directors and

officers against a third-party, such as a creditor. *Roselink Inv'rs, L.L.C. v. Shenkman*, 386 F.

Supp. 2d 209, 225 (S.D.N.Y. 2004) ("Creditors' claims at issue here are tort claims regarding the

rights of 'third parties external to the corporation' as they are not brought by shareholders,

officers or directors, nor are they brought derivatively on behalf of the corporation. Therefore,

the 'internal affairs doctrine' is inapplicable."); Tyco, 756 F. Supp. 2d at 560 ("internal affairs

doctrine" does not apply to a claim against "the directors and officers for … the commission of a

tort").

Here, the negligence claim is brought on behalf of Trade Vendors—creditors external to

the corporation—and therefore does not involve a matter peculiar to the internal affairs of TRU.

Thus, the internal affairs doctrine does not apply, and neither does Delaware law. [1064]

Under the applicable state common law, Defendants owed a duty of care to the Trade

Vendors. Defendants argue that they "did not owe a duty to the trade vendors apart from the

duty the Defendants owed to the company." Mot. 99. This is incorrect. For example, under the

law of California, the state where the largest number of Vendors was located, "directors

individually owe a duty of care, independent of the corporate entity's own duty, to refrain from

acting in a manner that creates an unreasonable risk of personal injury to third parties." *Frances*

---

[1064] Defendants also cite a Delaware statute, 8 Del C. § 102(b)(7), that allows corporations to
shield directors from personal liability for breaches of their duty of care. Mot. 100. But
section 102(b)(7) covers only liability for breaches of a duty of care owed to the
corporation, not negligence toward third parties. Moreover, second, section 102(b)(7) does
not insulate officers from liability for actions taken in bad faith, and the Trust has
demonstrated above that Defendants acted in good faith.

*T. v. Vill. Green Owners Ass'n*, 42 Cal. 3d 490, 504 (1986).  Thus, "[d]irectors are liable to third persons injured by their own tortious conduct regardless of whether they acted on behalf of the corporation and regardless of whether the corporation is also liable." *Id.*

And here, as demonstrated above, Defendants breached their duty of care to the Trade Vendors through their actions and caused Trade Vendors to suffer losses, establishing a negligence claim separate from Defendants' duties to the Company.  As demonstrated above, Defendants' conduct breached their duty of care owed to the Trade Vendors.  As demonstrated above, Defendants paid executive bonuses depriving Trade Vendors of access to those funds. Defendants recklessly and carelessly obtained a financing package with no care for the damage that would be caused to Trade Vendors.  And Defendants repeatedly made statements to Trade Vendors to induce Trade Vendors to ship goods, knowing that Trade Vendors did not have the information that they needed to make their decision.

Finally, the evidence presented above demonstrated that Trade Vendors suffered losses caused by Defendants' breach of the duty of care.  Accordingly, the Trust has sufficient evidence of its separate claim for negligence, and the motion for summary judgment should be denied.

**X.     Each of Defendants' arguments on the Trust's tort claims fails.**

**A.     The Trust has standing to pursue claims assigned to it by the Trade Vendors.**

**1.     Fourth Circuit precedent governs issues of federal bankruptcy law.**

Defendants argue that the Court should apply "Delaware's interpretation of federal bankruptcy law" to determine whether the Trust has standing to pursue claims on behalf of the Trade Vendors.  Mot. 31.  Defendants are mistaken.  The Court must apply Fourth Circuit precedent to issues of federal law.  And under binding Fourth Circuit precedent, the Trust has standing to pursue claims assigned to it by the Trade Vendors.

337

Federal courts do not apply a state court's interpretation of federal law.  *Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.*, 267 F. Supp. 2d 601, 628 (E.D. Tex. 2003) ("where a state interpretation of federal law varies from federal interpretation, the state interpretation is ignored") (citing *Hutto v. Davis*, 454 U.S. 370, 375 (1982)).  Rather, when interpreting federal law, courts in the Fourth Circuit must, "of course, apply the law of the Fourth Circuit."  *Bradley v. United States*, 161 F.3d 777, 782 n.4 (4th Cir. 1998).  This is true even when, as here, the case was transferred from another circuit.  "[T]his court cannot and does not apply the law of another circuit simply because the case was transferred from the other circuit."  *Id.*

Thus, the Court need not engage in a choice-of-law analysis on this issue, and Delaware's interpretation of federal bankruptcy law is irrelevant.  *In re Escalera Res. Co.*, 563 B.R. 336, 350 n.6 (Bankr. D. Colo. 2017) ("There is no need for the Court to engage in a choice of law analysis . . . since the Court is only required to construe federal law."); *Art Inst. of Phila. Llc v. Nelson*, Nos. Chapter 7, 20-50627 (CTG), 2022 Bankr. LEXIS 68, at *15 (Bankr. D. Del. Jan. 12, 2022) ("the choice-of-law problem arises only when a federal court exercises jurisdiction over a case that is governed by a law other than federal law.")

**2.      Under binding Fourth Circuit precedent, the Trust has standing to pursue claims assigned to it by the Trade Vendors.**

The Fourth Circuit has held that a "trustee has the requisite standing to sue [for] the causes of action he acquired for the estate from the [creditors] after commencement of [a] bankruptcy case."  *Logan v. JKV Real Estate Servs. (In re Bogdan),* 414 F.3d 507, 512 (4th Cir. 2005).

For example, in *In re McCurnin*, 590 B.R. 729, 740 (Bankr. E.D. Va. 2018), M&T Bank, the creditor of a bankruptcy estate, assigned its claim against the estate to a trust.  Applying

*Logan*, this Court held that "[b]y giving the Trustees the unconditional Assignment [of its claim], M&T Bank relinquished its rights to the claim, and the Trustees, who now stand in place of M&T Bank, may pursue the claim . . . as if they were M&T Bank." *Id.*

Here, under the direction of this Court, the Trade Vendor claims were unconditionally assigned to the Trust for the specific purpose of bringing this action. *E.g.* TRU Trust Agreement [Dkt. 6925] §2.5(a) ("[T]he creditors of the Debtors … hereby irrevocably transfer, assign, and deliver to the TRU Creditor Litigation Trust all assets constituting the Non-Released Claims Trust Assets."). The Trust has the exclusive right to assert the Trade Vendor claims. TRU Trust Agreement [Dkt. 6925] §2.5(f) ("no Person or creditor … other than the TRU Creditor Litigation Trust … shall be permitted to assert … any Claim or Cause of Action that is transferred to the TRU Creditor Litigation Trust pursuant to this Agreement or the Plans."). Thus, the Trust has standing under controlling Fourth Circuit law.

Defendants do not actually apply Delaware state law, nor do they assert any principle of Delaware state law that would bar the Trust from asserting claims assigned to it, and for good reason. "Delaware has a longstanding rule that claims are freely assignable and can be asserted by the acquirer." *In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1050-51 (Del. Ch. 2015).

Instead, Defendants rely on a Delaware state court opinion applying federal bankruptcy law. *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 205 (Del. Ch. 2006). The court in *Trenwick* stated that under federal bankruptcy law, "litigation trusts do not have standing to pursue the direct claims of creditors . . . even in cases where a creditor has assigned her claims to a . . . Trust." The *Trenwick* court based this statement on a

339

misinterpretation of the U.S. Supreme Court case *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972).

The *Trenwick* court's statement was merely dicta, however, because the creditors in *Trenwick* had not actually assigned their claims to the trust. The *Trenwick* court held that the trust could not bring the creditors' claims because the "provisions of the Litigation Trust Agreement … include an express assignment of Trenwick America's pre-petition claims to the Litigation Trust, <u>but not the claims of Trenwick America's creditors</u>." *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 190 (Del. Ch. 2006) (emphasis added); *see Zazzali v. Hirschler Fleischer*, P.C., 482 B.R. 495, 509 (D. Del. 2012) (distinguishing *Trenwick* because it "did not involve the assignment of creditors' claims" and holding: "[T]he Trustee has standing to pursue claims on behalf of assigning creditors. As an assignee, the Trustee has standing to assert the injury in fact suffered by the assignors.") [1065]

More importantly, the Fourth Circuit has already considered and rejected *Trenwick's* misinterpretation of *Caplin*, holding that *Caplin* does not apply to cases (like the present one) where the creditors unconditionally assigned their claims to a trust. *Logan v. JKV Real Estate Servs. (In re Bogdan)*, 414 F.3d 507, 511 (4th Cir. 2005) ("It does not follow from the reasons advanced by the Court in *Caplin* that the trustee lacks the necessary standing in this case…. By taking unconditional assignments from the creditors, the trustee, as assignee, is making his claim

---

[1065] Defendants also assert that *Torch Liquidating Trust ex rel. Bridge Assocs., LLC v. Stockstill*, 2008 U.S. Dist. LEXIS 19535 at *21 n.4 (E.D. La. Mar. 13, 2008) "is illustrative." Mot. 31. It is not. In *Torch* the dispositive finding was that the creditors would not be able to assert fiduciary duty claims on their own behalf if they owned the claims. *Id*. at *10. "If the causes of action are not able to be brought by the creditors … then the Trust, in turn, cannot bring that cause of action." *Id*. There is no similar issue here. In a footnote, the *Torch* court noted hypothetically that the trust would not have standing under *Trenwick*. *Id.* at *20 n.4. Thus, like in *Trenwick*, this statement was merely dicta.

on behalf of Bogdan's estate, not on behalf of the mortgage lenders . . . the Bankruptcy Code implicitly authorizes such a suit."). [1066]

In sum, binding Fourth Circuit precedent—not dicta from the Delaware Court of Chancery—governs issues of federal bankruptcy law. And under Fourth Circuit precedent, the Trust has standing to pursue claims assigned to it by the Trade Vendors. *See Logan v. JKV Real Estate Servs. (In re Bogdan),* 414 F.3d 507, 512 (4th Cir. 2005); *In re McCurnin*, 590 B.R. 729, 740 (Bankr. E.D. Va. 2018); *Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R. 139, 159 (Bankr. E.D. Va. 2007).

### B.      Defendants' "30(b)(6) testimony contradicts" argument fails.

Defendants assert "the Trust's claims must be dismissed for all trade vendors who gave 30(b)(6) testimony directly contradicting the Trust's claims." Mot. at 33. This argument fails for four reasons.

First, the Trust's 30(b)(6) deposition testimony responding to questions on the Trust's contentions is found exclusively in the 30(b)(6) deposition that was taken of the Trust, and not in the deposition of any Trade Vendor witness. The Trust never designated a trade vendor employee to testify as a 30(b)(6) witness for the Trust. The testimony from trade vendor witnesses was the result of notices that Defendants expressly directed at the vendor company, and *not* the Trust. For example, for vendor Just Play, the deposition notice was styled "Defendants' Amended Notice of 30(b)6) Deposition of Just Play, LLC." [1067]   And Charlie

---

[1066] Most other courts to consider this issue have similarly held that *Caplin* does not apply where the creditors assigned their claims to a litigation trust. *See Grede v. Bank of N.Y. Mellon*, 598 F.3d 899, 901-02 (7th Cir. 2010) (holding that *Caplin* does not apply to a plan-created litigation trust asserting claims that were assigned to it by creditors); *Semi-Tech Litig., LLC v. Bankers Trust Co.*, 272 F. Supp. 2d 319, 323-24 (S.D.N.Y. 2003) (same); *In re Tribune Co.*, 464 B.R. 126, 192-93 (Bankr. D. Del. 2011) (same).

[1067] Ex. 179 (Notice of 30(b)(6) of Just Play (Emby exhibit 1)).

Emby, the witness who testified for Just Play, confirmed that he was "designated by Just Play to testify on its behalf," not on behalf of the Trust. [1068]

By contrast, Defendants served a *separate and distinct* 30(b)(6) deposition notice on the Trust: "Defendants' Notice of 30(b)(6) Deposition of TRU Creditor Litigation Trust." [1069]  That notice requested a witness to testify regarding the Trust's contentions, for example, "Your contentions that the Trade Vendors, when deciding to ship goods to TRU on credit, justifiably/reasonably relied on statements or representations You contend Defendant made or caused to be made." [1070]  In response, the sole person designated by the Trust to provide 30(b)(6) testimony on its behalf was the Trustee, Robert Kors. [1071]  The Trust's 30(b)(6) deposition testimony responding to questions on the Trust's contentions is found exclusively in that deposition, not in the deposition of a Trade Vendor witness.

Second, the rule of law that Defendants are referring to (and that is stated in the case that Defendants cite) is that "a party may not submit an affidavit or declaration at the summary judgment stage contradicting its earlier deposition testimony."  *Thomas v. FTS USA, LLC*, No. 3:13cv825, 2016 U.S. Dist. LEXIS 82679, at *23 n.4 (E.D. Va. June 24, 2016) (internal quotes omitted).  The Trust is not seeking to submit an affidavit or declaration from a witness that contradicts earlier deposition testimony from the witness.  Defendants' argument is thus entirely inapplicable.

Moreover 30(b)(6) testimony does not foreclose an issue, because "answers given at a Rule 30(b)(6) deposition are not judicial admissions."  *United States v. Taylor*, 166 F.R.D. 356,

---

[1068] Ex. 315 (Just Play (Emby) depo.) 12:6-10.
[1069] Ex. 178 (Notice of 30(b)(6) of Trust (Kors depo exhibit 1)).
[1070] *Id*. at 32.
[1071] Ex. 97 (Kors depo.) 20:24-21:25.

342

362-63 & n.6 (M.D.N.C. 1996) ("When the court indicates that the Rule 30(b)(6) designee gives a statement or opinion binding on the corporation, this does not mean that said statement is tantamount to a judicial admission. Rather, just as in the deposition of individuals, it is only a statement of the corporate person which, if altered, may be explained and explored through cross-examination as to why the opinion or statement was altered."); *Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1261 (10th Cir. 2016) ("We agree with our sister circuits that the testimony of a Rule 30(b)(6) witness is merely an evidentiary admission, rather than a judicial admission.").

Third, to the extent Defendants contend that the Trust cannot use a statement in vendor deposition testimony that appears to be inconsistent with other parts of the deposition, that argument has been flatly rejected by courts across the country.  "[C]onflicting testimony within [the same deposition] raises a genuine issue of material fact… which precludes summary judgment for defendants." *O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 595 (6th Cir. 2009), *overruled in part on another ground*, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016); *Mest v. Cabot Corp.*, 449 F.3d 502, 514 (3d Cir. 2006) (contradictory testimony in the same deposition must be "viewed in the light most favorable to the non-moving party"); *Burns v. Bd. of Cty. Comm'rs*, 330 F.3d 1275, 1282-83 (10th Cir. 2003) ("internally inconsistent" testimony must be viewed "in the light most favorable" to the non-moving party).  Thus, inconsistent testimony in a Trade Vendor's deposition "raises a genuine issue of material fact … which precludes summary judgment for defendants." *O'Brien*, 575 F.3d at 595.

Fourth, when each vendor's testimony is considered as a whole, and when it is compared against the various alternative theories asserted by the Trust to prove its claims, there is no vendor testimony that is inconsistent with or forecloses any of the Trust's claims.  For example,

the Trust asserts multiple actionable misrepresentations by Defendants across multiple time periods.  A vendor witness, therefore, might testify that the vendor did not receive or rely upon a particular representation, but did receive and rely upon other representations.  The testimony that the vendor did not receive that one particular representation does not contradict all of the Trust's theories for the claim, and therefore provides no basis for summary judgment on the claim.

### C.      Defendants' "Critical Vendor Agreements" argument fails.

Defendants assert that Trade Vendors "were contractually obligated to ship regardless of what Defendants said to them," and thus the Trust cannot "prove reliance or causation for vendors who signed them."  Mot. at 34.  Each part of this argument fails.

### 1.      Critical Vendor Agreements did not obligate Trade Vendors to ship goods to Toys "R" Us on credit.

The Critical Vendor agreements were contractual agreements to supply goods as long as Toys "R" Us paid for those goods.  But the Critical Vendor agreements did not obligate Trade Vendors to extend credit to Toys "R" Us or ship goods on credit.  Trade Vendors were free to move to cash in advance or shorten credit terms if they became concerned about Toys "R" Us' ability to pay for goods shipped.

The Critical Vendor Agreements required Trade Vendors to ship goods to Toys "R" Us under the trade terms that were customary in the 180 days leading up to the bankruptcy.  The Critical Vendor Agreements stated that "supplier shall supply goods and/or perform services to the company" based on "Customary Trade Terms." [1072]  Those "Customary Trade Terms" were defined as "trade terms at least as favorable to the company as those practices and programs,

---

[1072] *See, e.g.*, Ex. 260 (Dorel (Rana depo ex. 13)) at 2.

product mix, availability, and other programs, in place in the 180 days prior to the Petition

Date." [1073]

Trade Vendors confirmed that the trade terms in place with Toys "R" Us during that 180

day period before the bankruptcy would allow the vendors to move to cash in advance or ask for

assurances if they were concerned about Toys "R" Us' ability to pay.  Trade Vendors would still

ship goods—in compliance with the critical vendor agreement—but they would ship those goods

only after receiving payment from Toys "R" Us. [1074]

Moving to cash in advance would have allowed each Critical Vendor to avoid all of its

losses.  There would have been no unpaid goods that were shipped to Toys "R" Us, because

vendors would have received payment before shipping any of those goods.  Defendants entirely

ignore the ability of Trade Vendors to adjust their payment terms in this way.

### 2. Each Critical Vendor testified that they would have acted differently had they learned of concealed facts, establishing reliance and causation.

Defendants' claim that the Trust cannot "prove reliance or causation" for these vendors is

directly contrary to the vendors' testimony.  Mot. at 34.  As discussed above, reliance and

causation require showing that a statement or concealment was a material or important factor in a

decision, and that absent that statement, the Trade Vendor would have acted differently.  The

evidence demonstrates reliance and causation for each Critical Vendor.

---

[1073] *Id.*

[1074] *See, e.g.*, Ex. 372 (Elliott (MGA) depo.) 262:17-263:16 (confirming that "it is very routine" for MGA to "ask for cash in advance in situations where we think the customer is unable to pay"); Ex. 258 (Rana (Dorel) depo.) 233:6-234:15 (confirming that under "customary trade terms," Dorel would have the option to "move to cash in advance terms" if it was "unsure [that a customer] would be able to pay"); Ex. 284 (Brinkmeier (Graco) depo.) 179:11-180:25 (confirming that under customary trade terms, Graco could ship "cash in advance" or "halve the [length of payment] terms" if it believed "there was a substantial chance that Toys "R" Us was not going to be able to pay").

Trade Vendors with critical vendor agreements uniformly testified that they would have acted differently had they known the facts that Defendants concealed from them. For example, Jakks would have "moved to cash in advance" if it had known about projected covenant breaches and the need for additional financing, notwithstanding the existence of the critical vendor agreement. [1075] Best Chairs explained that it would have "terminate[d] the contract pursuant to the provisions that were in there or at a minimum we would have said he who first materially breaches the contract cannot later enforce it. So we would have had lots of arguments to stop shipping them and we would have utilized those at that time." [1076]

As another example, LEGO's Trade Agreement signed after Toys "R" Us entered bankruptcy included the following language under scenarios in which LEGO could stop shipping goods:

> "Supplier determines, in its good-faith business judgment, that the Company or one or more of the Relevant Affiliates fails to satisfy Supplier's customary business credit risk management criteria" [1077]

> "the occurrence of a material adverse change with respect to the ability of one or more of the Relevant Affiliates to purchase goods and services from vendors on credit in the ordinary course of business" [1078]

LEGO testified that the "customary business risk management criteria" would include "evidence of liquidity with the customer" and necessitated "access to that information." [1079] If LEGO "felt that there was risk" that Toys "R" Us would not be "able to access the DIP facilities for any reason," LEGO would have stopped shipping based "on the good-faith business judgment or credit judgment clause that's inside of our trading terms contract." [1080]

---

[1075] Ex. 307 (Cooney (Jakks) depo.) 215:15-217:4.
[1076] Ex. 239 (Sermersheim (Best Chairs) depo.) 329:17-330:15.
[1077] Ex. 341 (Kodak (LEGO) depo. Ex. 107) 6(c)(vi)
[1078] Ex. 341 (Kodak (LEGO) depo. Ex. 107) 6(d)(i)
[1079] Ex. 335 (Kodak (LEGO) depo.) 138:7-19.
[1080] Ex. 335 (Kodak (LEGO) depo.) 342:8-23.

Defendants' present a table with vendor testimony that Defendants assert supports their argument. Mot. 35-37.  Once again, Defendants completely ignore the testimony demonstrating that each Trade Vendor with a critical vendor agreement would have acted differently if Defendants had told them the truth.  To respond to Defendants' table, the Trust presents testimony for each Trade Vendor in the Trust's Appendix A in response to Defendants' tables of vendor testimony, and that Appendix is being filed as a separate document.

Moreover, Defendants' cited cases do not support the proposition that there can be no fraud when a contract exists.  To the contrary, Defendants' own cited case establishes that "a fraud claim may arise when a defendant makes misrepresentations to induce a plaintiff's continuing performance."  *Coughlan v. Jachney*, 473 F. Supp. 3d 166, 194 (E.D.N.Y. 2020); *see Barrie House Coffee Co. v. Teampac, LLC*, No. 13 CV 8230 (VB), 2016 U.S. Dist. LEXIS 85527, at *20 (S.D.N.Y. June 30, 2016).  Defendants' misrepresentations here induced Trade Vendors to ship goods on credit, rather than adjusting payment terms, because the Trade Vendors falsely believed that Toys "R" Us' DIP financing was available and that Toys "R" Us would have the ability to pay for those orders when they came due.

None of Defendants cases involve a similar situation in which the plaintiff could alter his conduct under a contract. *ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*, 2015 U.S. Dist. LEXIS 131211, at *33 (S.D.N.Y. Sep. 29, 2015) (discussing fraud in context of obligation to make interest payments); *Megaris Furs v. Gimbel Bros.*, 172 A.D.2d 209, 212-13 (App. Div. 1st Dept. 1991) (holding no fraud to induce rent payments because plaintiff was "contractually bound to comply with a particular schedule of rent payments"); *IBM Credit Fin. Corp. v. Mazda Motor Mfg. Corp.*, 152 A.D.2d 451, 453 (App. Div. 1st Dept. 1989) (discussing presence of existing contract as defeating a fraudulent inducement claim).  None of these cases involve a

347

plaintiff alleging that it would have exercised its ability to change terms or act differently under

the allowed terms of a contract.  As discussed above, the Trade Vendors here were not

"contractually bound" to ship goods on credit.  They could, and would, have moved to cash in

advance if Defendants had told them the truth.  As discussed at length above, this satisfies the

elements of reliance and causation.

### 3.      Defendants' "fraudulent inducement" argument is a red herring.

Separately, Defendants claim that "the Trust cannot argue that the trade vendors were

fraudulent induced into signing the Critical Vendor Agreements."  Mot. at 37-38.  This is a red

herring.  The Trust is not arguing that Trade Vendors were fraudulently induced into entering the

Critical Vendor Agreements.  Rather, the terms of the critical vendor agreements and the

vendors' testimony demonstrate that the critical vendor agreements do not change the analysis of

vendor reliance or causation.

### D.      Defendants' "actionable misstatements" arguments fail.

Defendants assert that "the Trust must be able to identify a specific actionable

representation to every trade vendor that was false when made to proceed with its fraudulent

misrepresentation claim for that vendor" and "[t]he Trust cannot do so."  Mot. at 38.  Each part

of this argument fails.

As an initial matter, Defendants' argument relates only to the fraudulent and negligent

misrepresentation claims.  Defendants do not address the concealed facts giving rise to

fraudulent concealment claims.  And Defendants' arguments also lack merit regarding the

fraudulent misrepresentation claims.

### 1.      Statements made in September and October are actionable.

Defendants make two arguments: that there is no evidence "to suggest" that statements

made in September and October "were false when made," and that statements "regarding the

348

purpose of the DIP financing and TRU's intent to pay trade vendors" are not actionable because they were "forward looking and aspirational or promissory statements."  Mot. at 39-42.

First, Defendants' claim that "[n]othing in the factual record suggests" that the September and October statements "were not true" is wrong.

As demonstrated at length above, the September statements were both false and misleading half-truths, giving rise to liability for fraudulent misrepresentation.  The statements on September 18 that Toys R" Us had "commitments for" and "access to" the DIP financing as of that date were false, because the DIP financing was not yet available.  Further, the DIP did not provide "over $3 billion in new financing" that would be available "to support [Toys "R" Us'] business obligations during the financial restructuring process."  Instead, the actual amount of new money that could be used to pay for obligations in the post-petition period was less than $500 million.  Each of these falsities gives rise to a cause of action for fraudulent concealment.  Moreover, the statement that the Company had access to the financing throughout the restructuring process was both false and misleading as demonstrated above.

Second, Defendants entirely ignore the additional fraudulent statements made from December 2017 through February 2018.  For example, as demonstrated above, Defendants made additional false and misleading statements to Trade Vendors at the Hong Kong and New York Toy Fairs, including that it was "business as usual at Toys "R" Us," and that Toys "R" Us was "totally focused on plans for emergence"—both of which were false when made.  Further, the Vendor FAQ was posted on Toys "R" Us website throughout the bankruptcy, not just in September.  And in January and February, the statement on the FAQ that the DIP financing "will enable [Toys "R" Us] to meet our financial obligations throughout the restructuring process" was false, because Toys "R" Us needed a cash infusion of at least $150 to $200 million.  Defendants

349

ignore the statements after September and October that separately give rise to liability for

fraudulent misrepresentation and were false when made.

### 2.    Defendants' "advisors approved" argument fails.

Defendants' claim that because advisors "reviewed and approved" messaging used by

Toys "R" Us, there can be no claim that Defendants were "transmitting false information."  Mot.

at 40.  This argument is not only wholly unsupported by evidence, but also fails as a matter of

law.

First, Defendants claim that the "undisputed factual evidence demonstrates" that "legal

and financial advisors **reviewed and approved** the messaging and written statements that TRU

issued during this time period" and that this review and approval included "FAQs, vendor talking

points, press releases, and letter to customers" is false.  Mot. at 40 (emphasis added).

Defendants cite to their statement of facts ¶¶85-88 and Exhibits 109-111 to support this

assertion.  The statement of facts again repeats the assertion that a "legal or financial advisor

approved" of the messaging.  Exhibit 109 shows that Joele Frank (a public relations firm, not a

"legal or financial advisor") circulated drafts to other professionals, but provides no indication

that the materials were "reviewed and approved." [1081]  Defendants' Exhibit 110 is an email in

which a Kirkland lawyer summarizes in an email that he told one vendor that "if they want to

ship on preexisting terms, and the company wants to purchase products, they would be paid in

full for that postpetition purchase." [1082]  That email does not indicate that Kirkland "reviewed or

approved of" the Vendor Talking Points, Vendor FAQ, or the Dear Valued Business Partner

Letter.  Similarly, Defendants' Exhibit 111 reflects a Kirkland lawyer giving advice on

---

[1081] Defs. Ex. 109.

[1082] Defs. Ex. 110.

September 27 about statements at the Dallas Toy Fair, not approving the messaging that was used to contact vendors in the aftermath of the bankruptcy. [1083]

Defendants thus have no evidence or basis for the claim that legal or financial advisors "approved" the messaging being given to vendors, much less evaluated it to ensure that it did not make false or misleading statements. Because Defendants have not provided any evidence, much less undisputed evidence, of review and approval, this argument fails at the threshold.

Second, Defendants claim that Kirkland and Ellis was making "these same substantive representations to trade vendors," demonstrating that they were true. Mot. at 40. But Defendants again provide no evidence to support this statement. Defendants cite an email in which a Kirkland lawyer informed a vendor about shipment as a non-critical vendor. [1084] And Defendants misleadingly excerpt from the deposition of the LEGO Group. Here is the full answer, showing the statement made by Kirkland and the witness' limitation of the answer to "the same type of messaging" to "this particular message."

```
2     Q.   Josh Sussberg writes, "Not sure
3   what you guys are doing here.  You are now
4   the only vendor not shipping."
5         Do you see that?
6     A.   I do see that.
7     Q.   So the same type of messaging
8   that was being provided to Lego Dave
9   Brandon, Mike Short, and Richard Barry was
10   also being provided to LEGO's outside
11   counsel from Toys "R" Us' outside counsel,
12   correct?
13     A.   Yes.  On this particular
14   message, that seems clear.
```

Kodak (LEGO) depo. 98:2-14

---

[1083] Defs. Ex. 111.
[1084] Defs. Ex. 110.

The statement that the LEGO Group was "the only vendor not shipping" was certainly not a statement about $3.0 billion in new financing or that it would be available throughout the restructuring process. Thus, Defendants' argument that Kirkland and Ellis was communicating the same false statements to Trade Vendors is baseless.

Third, any claim of reliance on advisors does not apply when "Defendants knew the true facts" and "the advisors did not provide contrary advice containing false information." [1085] As discussed above, both Brandon and Short knew that the DIP financing did not in fact provide $3.0 billion of new money, but that it instead provided less than $500 million. And they knew that the DIP financing had not been approved as of September 18, when they were calling vendors and informing them that Toys "R" Us had obtained DIP financing. Moreover, Defendants do not provide evidence that Kirkland & Ellis or Alvarez & Marsal gave Brandon and Short advice to the contrary—for example, that the DIP financing truly did provide $3.0 billion in funding to use for ongoing operations. Brandon and Short's decision to make those false statements to vendors would not be excused by advisor approval.

Fourth, throughout the bankruptcy, neither Kirkland nor Alvarez gave Defendants advice that the statements on the FAQ continued to be true, or that the statements in the talking points continued to be accurate. For example, Defendants do not proffer evidence of a Kirkland lawyer telling Defendants that it would be perfectly true and not misleading to tell vendors in February that the DIP financing was sufficient to enable Toys "R" Us to meet its financial obligations during the bankruptcy. Each of those false statements remain actionable, regardless of the presence of advisors.

---

[1085] Ex. 70 (Greenspan) ¶487.

Fifth, the Trust's evidence demonstrates that the Defendants failed to follow the advice they had been given by the advisors. Josh Sussberg of Kirkland & Ellis at a board meeting "advised it is best to remain open, honest, and transparent with stakeholders throughout the process." [1086] Sussberg testified that he instructed Brandon, Short, and the Directors to be ███

███████████████████████████████ and that they should █████████████████████

█████████████████████████████ [1087]

Sussberg also testified that he never advised Defendants that it was permissible to make statements that would mislead the trade vendors, or to make statements that would create false impressions about Toys R Us' financial strength. [1088]

Finally, to attempt to support their position, Defendants use a single quote from the Trustee that the Trust "does not contend that Kirkland engaged in any wrongdoing in connection with the DIP financing." Mot. at 40. That statement does not stand for, nor imply, the proposition that all materials that anyone from Kirkland ever received contained truthful information, or nor does it imply that all statements communicated by Defendants remained true after they were initially disseminated. And indeed, the analysis above indicates that Defendants made many statements that were knowingly false when made, and otherwise became false or misleading during the bankruptcy.

### 3.    Forward looking and aspirational or promissory statements are actionable

Defendants assert that the statements "that TRU would make payments on post-petition shipments" and that "the DIP financing received would provide sufficient liquidity" are forward looking and "cannot serve as the basis for tort liability." Mot. at 42. Defendants are wrong.

---

[1086] Ex. 142 (1'31'18 minutes [DEFS_0059013]) at 4.
[1087] Ex. 84 (Sussberg depo.) 116:9-117:13.
[1088] Ex. 84 (Sussberg depo.) 116:9-13, 212:13-213:9

First, as explained at length above, a statement that is a prediction or an opinion is actionable if it "impl[ies] facts which justify a belief in the truth of the opinion." *Cohen v. S & S Constr. Co.*, 151 Cal. App. 3d 941, 946 (1983) (internal quotes omitted). Because all of the representations made by Defendants implied the existence of verifiable facts justifying the statements, those representations are therefore actionable.

Second, a forward-looking statement or statement of opinion "may be actionable when it is made by a party who … possesses, or assumes to possess, special knowledge or special information regarding the subject matter." *Jolley v. Chase Home Fin. LLC*, 213 Cal. App. 4th 872, 892 (2013) (internal quotes omitted). As detailed above, Defendants had superior knowledge of Toys "R" Us' financial position and internal data. Trade Vendors did not have access to any of this information. Because Defendants had superior knowledge of the facts underlying each of the representations, their forward-looking statements and opinions made area actionable.

Third, Defendants' "aspirational or promissory" argument does not address the additional fraudulent misrepresentation made by Defendants between December 2017 and March 2018. As discussed in detail above, each of those statements were actionable statements of fact when made, and they separately give rise to claims for fraudulent misrepresentation.

Finally, Defendants assert that vendors testified that they still "believe that Defendants were speaking truthfully" when they made statements in September and October 2017. That a Defendant fooled a vendor into believing that the Defendant was speaking truthfully does nothing to undermine a fraud claim: just the opposite, it is perfectly consistent with fraud. As demonstrated above, while Defendants knew the truth, trade vendors did not know the truth, and even today most trade vendors do not know the full truth. It is not surprising, therefore, that a

trade vendor could continue to believe Defendants' false statements.  Likewise, vendors believed that Brandon and Barry were telling them the truth when they represented to vendors at the New York Toy Fair that that it was "business as usual" for the Company. [1089]  Those vendors did not know what Brandon and Barry knew—that the Company was preparing to liquidate and targeting a mid-March date.

Moreover, as discussed above, a Trade Vendors' 30(b)(6) testimony is not a judicial admission by the Trust on any fact, and the Trust has presented powerful evidence of each of the elements of fraudulent misrepresentation, including falsity.

### 4.    Defendants "cannot identify specific statements" argument fails.

Defendants claim that because "vendors testified that they could not identify the specifics of any misstatements allegedly made to them," the Trust's fraudulent misrepresentation claims fail.  Mot. at 42-44.  This argument is wrong on two counts.

First, as demonstrated in the Trust's evidence (examples in the Trust's specific response to Defendants' tables for each Trade Vendor) each Trade Vendor identified multiple specific statements, who those statements were made by, and when the statements were made.  This alone defeats Defendants' argument.  *See* Trust SOF ¶¶ 402, 408, 414, 420, 426, 432, 438, 444, 450, 456, 462, 468, 474, 479, 484, 489, 494, 500, 506, 511, 517, 523, 529, 535, 540, 546, 551, 557, 563, 569, 574, 579, 584, 590, 595, 601, 606.

Second, Defendants falsely assume that the only source of evidence for specific statements is the Trade Vendor depositions.  But Defendants and Toys "R" Us employees also provided testimony identifying specific statements, when they were made, and to whom they were made.  For example, Barry testified that he and other employees at Toys "R" Us had

---

[1089] *See, e.g.,* Ex. 421 (Smith (Yvolve) depo.) 56:21-58:8.

conversations in which they communicated "the information in the talking points" to vendors.

[1090]   Those talking points included: "we have received commitments for over $3.0 billion in new

financing" that would "enable [Toys "R" Us] to meet our business obligations." [1091]   And Barry

admitted specific statements that he made, for example:

> 6   Q.   In September 2017 and in October
> 7   2017 when you were talking to trade
> 8   vendors, did you tell them that
> 9   Toys 'R' Us had over $3 billion in DIP
> 10   financing that would provide liquidity
> 11   and enable Toys 'R' Us to pay for
> 12   merchandise that was shipped on credit
> 13   while Toys 'R' Us was in bankruptcy?
> 14   A.   Yes.

Ex. 89 (Barry depo.) 35:6-14.

He further admitted:

> 6   Q.   Was there any trade vendor that
> 7   you had a conversation with where you
> 8   decided I'm not going to mention the 3
> 9   billion in DIP financing that we got?
> 10   A.   Not that I recall.
> 11   Q.   Did you think it was important to
> 12   tell each of the trade vendors about the
> 13   $3 billion in DIP financing that
> 14   Toys 'R' Us had as a source of liquidity?
> 15   A.   Yes.

Ex. 89 (Barry depo.) 83:6-15.

Furthermore, Barry's testimony may be used to prove which Trade Vendors received this

representation and when they were contacted. [1092]   Further, documents confirm the timing of

particular statements.  For example, they indicate that particular vendors were contacted the day

---

[1090] Ex. 89 (Barry depo.) 83:2-10.
[1091] Ex. 174 (Vendor Talking Points [TRU-Trust0000336056]).
[1092] Ex. 89 (Barry depo.) 118:12-119:6 (testifying about a conversation "in Dave Brandon's office" and a number of conversations that occurred "a day before" the bankruptcy filing).

of the bankruptcy filing, or the day after filing. [1093] Defendants ignore all of this additional evidence that independently establishes specific statements, when they were made, and who made them.

**E.    Defendants' "scienter" arguments fail.**

Defendants claim that no evidence of scienter sufficient for fraudulent misrepresentation or concealment "appears in the factual record." Mot. at 44. Defendants are wrong.

### 1.    The Trust has ample evidence of Defendants' intent.

As discussed above, "[a]n intent to deceive is not an essential element of the cause of action; the required intent is an intent to induce action." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1062 (2012) (internal citations omitted).

As demonstrated above, Defendants knew that Toys "R" Us' business model required that Trade Vendors continue shipping goods on credit and Defendants desired to induce Trade Vendors to continue shipping. Defendants knew that the Trade Vendors would stop shipping goods if they became concerned about Toys "R" Us' ability to pay. And they knew that the DIP financing was what gave the Trade Vendors comfort that Toys "R" Us would have the ability to pay.

Defendants further knew that Trade Vendors would stop shipping goods to the company on credit if they learned the concealed facts. They knew that by concealing information about Toys "R" Us' projected loss of its DIP financing, need for additional financing, and liquidation planning, Trade Vendors would continue shipping. As detailed in the sections above discussing Defendants' intent, this evidence precludes summary judgment.

---

[1093] *See, e.g.*, Ex. 171 (Vendor Call spreadsheet (Barry Ex. 16) [TRU-Trust0000364251]).

### 2.      Defendants' cited securities law cases are inapposite.

Defendants attempt to use cases in the context of securities litigation under Rule 10b-5 and Section 10(b) to support their assertion that Defendants lacked scienter.  But the intent required under securities law fraud cases is not analogous to the intent requirement for common law fraud.

"[T]he body of law that has developed under Rule 10b-5 is not sufficiently analogous to the law of fraud to justify its importation into the latter."  *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993); *see Strauss v. Long Island Sports, Inc.,* 60 A.D.2d 501, 509 (App. Div. 2nd Dept. 1978) ("section 10b-5 cases are very much distinguishable from common-law fraud cases").

Several of Defendants' cases deal with the intent required in securities litigation.  *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976) (assessing intent requirement "for civil liability under §10(b) and Rule 10b-5"); *In re Triangle Capital Corp. Sec. Litig.*, 988 F.3d 743, 750-51 (4th Cir. 2021) (discussing intent requirements for claims based on Section 10(b) and the Private Securities Litigation Reform Act); *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001) (summarizing evolution of intent requirements in the context of the Private Securities Litigation Reform Act).  These cases do not establish the appropriate standard for scienter in common law fraud claims.

### 3.      Defendants' March board minutes argument fails.

Defendants assert that board minutes in March constitute "undisputed evidence" that "Defendants did *not* want to deceive the trade vendors."  Mot. at 45.  This argument fails for two reasons.

First, the Trust has extensively demonstrated above that Defendants possessed the requisite fraudulent intent between September 2017 and late February 2018.  Defendants wanted Trade Vendors to ship goods to Toys "R" Us.  Defendants knew that Trade Vendors would stop

358

shipping if they learned the concealed facts.  And Defendants not only concealed those facts

from Trade Vendors, they made additional misrepresentations to the Trade Vendors so that they

would continue shipping.  The March minutes do not contradict that showing of intent.

Second, the March board minutes do not reflect that Defendants had an intent to stop

deceiving the Trade Vendors as of March.  To the contrary, the minutes reflect that "the Board

advised management" to inform vendors that payment "is not guaranteed" only "if asked." [1094]  If

a Trade Vendor did not ask, that Trade Vendor would have no way of knowing about the

concealed information.  Defendants did not make an additional disclosure to Trade Vendors

warning them about the risks of shipping.  Defendants did not direct the Company's employees

to stop ordering goods on credit.  And Defendants did not take down the Vendor FAQ, which

continued, even as of this date, to reassure vendors that "Toys "R" Us will pay for all goods and

services" and that the DIP financing provided "sufficient liquidity" for Toys "R" Us to meet its

business obligations. [1095]

Third, Defendants' argument fundamentally misunderstands the appropriate summary

judgment standard.  Defendants attempt to draw inferences from the March board minutes that

support a purported lack of intent.  *See* Mot. at 45-46.  But this is not the purpose of summary

judgment.  For summary judgment to be appropriate, Defendants must demonstrate that when all

inferences are drawn in favor of the Trust, there is no genuine issue about Defendants' intent.

Defendants fall far short of meeting this burden.

---

[1094] Ex. 196 (3'4'18 Board minutes [TRU-Trust0000375064]).
[1095] Ex. 172 (Vendor FAQ [TRU-Trust0000349256]).

**4.      Defendants' "public disclosure" argument fails.**

Defendants assert that a "public disclosure" in a "contemporaneous SEC filing at the beginning of the Chapter 11 proceeding" prevents any showing that "Defendants acted with an intent to deceive." Mot. at 46. This argument fails for multiple reasons.

First, Defendants made numerous affirmative statements to Trade Vendors to convince them to ship goods. At the same time that this SEC disclosure was submitted, Defendants were making statements directly to Trade Vendors assuring them that the DIP financing would be available throughout the bankruptcy and that Trade Vendors would be paid for all goods that they shipped to Toys "R" Us during the bankruptcy. Defendants understood that the purpose of these statements was to have Trade Vendors begin shipping to the company again. Defendants did not tell Trade Vendors anything about the potential dangers of covenant compliance, or that Toys "R" Us might be unable to pay for goods during the bankruptcy. That the company submitted a separate voluminous disclosure to the SEC (not to the Trade Vendors) with various boilerplate warnings does not negate the direct statements that Defendants made and authorized to be made in September 2017.

Second, a form statement in an SEC disclosure in September has no bearing on Defendants' intent to conceal additional facts between December and March. As discussed above, intent is established by "knowledge of falsity" and "an intent to induce action." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1062 (2012). Defendants became aware of additional facts after the initial SEC disclosure was published, and made the decision to withhold those facts from Trade Vendors. Defendants did not make any additional disclosure about impending covenant breaches, that the Company required $150-$200 million in new financing to meet its obligations, or was engaged in liquidation planning.

360

<u>Third</u>, none of Defendants' inapplicable securities law cases establish that an SEC

disclosure absolves directors of fraudulent intent in common law fraud claims. *See In re Triangle*

*Capital*, 988 F.3d at 756 (discussing that disclosures to investors meant that plaintiff had "not

satisfied the PSLRA's [Private Securities Litigation Reform Act's] heightened burden for

pleading scienter"); *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 2021 U.S.

Dist. LEXIS 189502, at *10 (S.D.N.Y. Sept. 30, 2021) (discussing scienter requirements under

Section 10(b) and Rule 10b-5); *Lucas v. Icahn*, 616 F. App'x 448, 450 (2d Cir. 2015) (holding

that plaintiff had not "adequately pleaded that the 10b-5 Defendants acted with scienter" and

laying out requirements for pleading scienter in a claim for securities fraud).

> **5.    Defendants' argument that vendors testified that Defendants had no
> intent to deceive is irrelevant as a matter of law, and grossly
> mischaracterizes the facts.**

Defendants assert that because some Vendors testified that they did not "believe that

Defendants had an intent to deceive," the Trust cannot "pursue tort claims on behalf of those"

Trade Vendors.  Mot. at 46-47.

<u>First</u>, the question of Defendants' intent is not determined by whether a Trade Vendor

believed that a Defendant had a particular intent.  The required element for fraud is "an intent to

deceive" not "a plaintiff's belief that a Defendant had an intent to deceive."  That a Trade

Vendor believed a Defendant had a particular intent is not relevant to, much less dispositive of,

Defendants' actual intent.  Rather, the appropriate evidence for intent comes from Defendants'

own testimony, which, as discussed above, demonstrates the requisite intent.

<u>Second</u>, Defendants do not identify any Trade Vendor that actually provided testimony

that Defendants lacked an intent to deceive.  In support of their proposition, Defendants cite a

single Trade Vendor witness.  That Trade Vendor witness was not the 30(b)(6) designee for

statements made by Defendants to that Trade Vendor. [1096]  And the witness did not testify that

Defendants lacked an intent to deceive.  Here is the full question and answer that Defendants

misleadingly excerpt:

```
 7      Sitting here today, does R.R. Donnelley contend
 8   that any of the statements in this document are -- were
 9   false?
10      A.    Well, hindsight is 20/20.  Right?
11      Did they pay vendors for all goods and services
12   received after the filing date?  No.  Because I've got
13   a claim for that.
14      On or before, I didn't get paid for everything,
15   but I agreed to not get paid for everything.  So
16   it's --
17      Q.    Right.
18      Because R.R. Donnelley had an agreement with
19   Toys "R" Us, correct?
20      A.    Yeah.  Yeah.  So, you know, it's a little
21   complicated.  I don't think they meant to deceive.
```

R.R. Donnelley (Elliott) depo. 77:7-21

This excerpt does not address all of the Defendants' representations to R.R. Donnelly; it

concerns a single representation.  And it describes only what this witness "thinks"—a witness

who was fooled by Defendants and who did not have the evidence from Defendants' depositions

establishing that, in fact, they did intend to induce action.  And the opinion offered by the

witness addresses whether "they meant to deceive," it does not address whether Defendants

intended to induce action by Trade Vendors, which is the relevant issue.  This does not have any

bearing on Defendants' intent, much less does it conclusively demonstrate that there is no

disputed issue of fact regarding fraudulent intent.

In sum, Defendants fail to meet their burden to show that there are no issues of material

fact on the question of scienter.  Intent is a question of fact for the jury to evaluate.  "Issues of

---

[1096] Ex. 391 (Elliott (R.R. Donnelley) depo.) 14:19-16:6.

fraud and intent to deceive present questions of fact particularly inappropriate for resolution on a motion for summary judgment." *Tenax Corp. v. Tensar Corp.*, 743 F. Supp. 1204, 1211 (D. Md. 1990); *Kilroy v. Alpharetta Fitness, Inc.*, 295 Ga. App. 274, 280 (2008) ("the question of scienter is an issue of fact for jury determination");

### F.    Defendants' "reliance" argument fails.

Defendants assert that the testimony of "the vast majority of trade vendors at their 30(b)(6) depositions" is grounds for dismissing tort claims on behalf of those vendors.  Mot. at 47.  This argument fails.

Reliance can be shown by demonstrating "that the misrepresentations were material, and that therefore a reasonable trier of fact could infer reliance from such misrepresentations … absent evidence conclusively rebutting reliance." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997).  As discussed above, the Trust has evidence that the misrepresentations were material.  And Defendants' arguments fail to rebut reliance.

First, "Rule 30(b)(6) testimony is not 'binding' in the sense that it precludes the deponent from correcting, explaining, or supplementing its statements." *ADT Holdings, Inc. v. Harris, No. 2017-0328-JTL*, 2017 Del. Ch. LEXIS 163, at *4 (Ch. Sep. 7, 2017).  At Trade Vendor depositions, Defendants would commence the questioning, and would ask broad questions without referencing specific documents.  The Trust then examined the witnesses using the contemporaneous documents from Defendants that contained their representations and using emails Trade Vendor representatives had written at the time discussing Defendants' statements. Not surprisingly, these documents often refreshed the witness's recollection and resulted in specific and compelling testimony of reliance.

As detailed in the Trust's Statement of Facts Trade Vendor's testified statements made by Defendants or at Defendants' direction were material factors in each Trade Vendor's decision to

ship goods on credit.  *See* SOF ¶¶ 402, 408, 414, 420, 426, 432, 438, 444, 450, 456, 462, 468, 474, 479, 484, 489, 494, 500, 506, 511, 517, 523, 529, 535, 540, 546, 551, 557, 563, 569, 574, 579, 584, 590, 595, 601, 606.

For example, no fact "was more important to Basic Fun in deciding whether to ship on credit than Richard Barry's statements and his word." [1097]  As another example, Step2 "believed what [they] learned" from Defendants, and continued "supporting Toys "R" Us' business with the flow of goods." [1098]  As yet another example, the statement on the Vendor FAQ about the DIP financing and its availability throughout the bankruptcy was "the most critical factor" in Jakks' decision to ship. [1099]  And the statement that Toys "R" Us had received ███████████ ████████████████████████████████████████████████ ███████████████  Ex. 321 (Kamler (Kent) depo.) 165:11-166:16.  Further evidence for the decisions to ship can be found in Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607.

Furthermore, to the extent that there is any contradiction within a 30(b)(6) witness' own deposition testimony, such contradiction cannot be resolved at the summary judgment stage. "[I]f there are inconsistencies in a witness' testimony, [i]t is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony."  *Wall Sys. v. Pompa,* 324 Conn. 718, 741 (2017) (internal quotes omitted); *Lennon v. Christoph,* No. 94 C 6152, 1997 U.S. Dist. LEXIS 1231, at *14 (N.D. Ill. Feb. 4, 1997) ("conflicts within deposition testimony create credibility issues which should

---

[1097] Ex. 232 (Foreman (Basic Fun)) 270:22-271:13.
[1098] Ex. 409 (McCallum (Step2)) 24:9-15, 177:13-178:2.
[1099] Ex. 307 (Cooney (Jakks) depo.) 159:19-160:5, 145:16-22.

be considered by the fact-finder"); *Mata v. Brooks Petroleum Co.*, No. 12-02-00075-CV, 2003

Tex. App. LEXIS 3511, at *12 (Tex. App. Apr. 23, 2003) ("conflicting testimony of the same

witness on the same issue creates a fact issue for the fact finder to decide").

> Second, Defendants' assertion that Trade Vendors testifying that they were not present at

the Hong Kong or New York Toy Fair means that those vendors "disavowed the Trust's claims

on their behalf" is wrong.  Mot. at 47.

> That certain Trade Vendor witnesses were not present at the Hong Kong or New York

Toy Fairs or did not rely on statements at those events does not negate those vendors' reliance on

Defendants' representations.  Indeed, each of the Trade Vendors that Defendants cite gave

testimony that they relied on other statements that Defendants made. [1100]  A lack of reliance on

one representation does not establish a lack of reliance on other statements.

> Moreover, each Trade Vendor's testimony establishes that the Trade Vendor relied on

Defendants' September statements, and that Trade Vendors had a continuing expectation that

those statements remained true.  No vendor had access to any of the information that was

concealed by Defendants, and no vendor was told the truth, whether at a Toy Fair or in any other

setting.  Just because certain Trade Vendors did not receive additional statements at the Hong

Kong or New York Toy Fairs does not negate their reliance on other statements made by

Defendants.

> Third, Defendants' argument about Trade Vendors that received representations that were

"not reassuring" fails to establish a basis for granting summary judgment.  Mot. at 48.  No Trade

---

[1100] *See* Ex. 401 (Stewart (Spinmaster) depo.) 213:6-24 ("conversations that SpinMaster had with Short and Barry" were "one of the factors in deciding to ship"); Ex. 315 (Emby (Just Play) depo.) 113:9-17 ("100 percent" true that "conversation with Mr. Brandon influence[d] Just Play's decision to ship goods"); Ex. 249 (Hoff (Crayola) depo.) 242:13-243:2 (statement made about DIP financing "was an important factor" in Crayola's decision to ship).

Vendor testified that they were told any of the concealed facts by Defendants in February. *See* Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607.   And no Trade Vendor testified that they stopped shipping as a result of a statement made by a Defendant—as the lack of any citation or evidence for Defendants' assertion reflects. On the contrary, Trade Vendors uniformly testified that they continued to ship due to the continued availability of the DIP financing and that they believed that Toys "R" Us had the ability to pay for purchase orders when it placed them.

> ### G.     Defendants' "reasonable reliance" arguments fail.

Defendants assert that the Trust cannot prove reasonable reliance because (1) Toys "R" Us' SEC filing included a statement about "the risk that it might not emerge," (2) because the "DIP financing agreements were publicly filed" and that the vendors, as "sophisticated companies," could have "known about the risk of shipping goods" if they "review[ed] these disclosures," and (3) vendors could not "reasonably believe that shipping goods to a company during a Chapter 11 proceeding was risk free."  Mot. at 48-49.  Each of these arguments fail.

> #### 1.     Defendants' "SEC filings" argument fails.

<u>First</u>, the SEC filing Defendants reference could not possibly disclose the facts identified above as concealments.  The SEC filing was on September 29, 2017. [1101]  Defendants' fraudulent concealments occurred between October and March.  The SEC filing did not contain any of that concealed information: for example, that the Company was projecting that it would default on its financial covenants, that Toys "R" Us had a $200 million hole in its budget that was required to emerge from bankruptcy, that there was a $500 million dollar shortfall from the DIP budget, and

---

[1101] Ex. 198 (Toys "R" Us Form 10-Q, Sept. 29, 2017).

that liquidation planning was underway.  Thus, the SEC filing has no bearing on Defendants' fraudulent concealments.

Second, the SEC filings did not actually disclose the magnitude of the risks associated with the DIP financing.  Instead, the SEC filing buried discussion of the DIP financing in various boilerplate warnings such as "We may be subject to claims that will not be discharged," and a warning that "ability to maintain contracts" was a risk factor that Toys "R" Us faced in bankruptcy. [1102]  To evaluate those risks, Trade Vendors would need access to the additional information that Defendants concealed from them.

For example, to evaluate the risk whether Toys "R" Us would breach a covenant, the Trade Vendors would need information about the Company's recent and projected financial results, including sales, margins, costs, and capital expenditures, and the Company's projected compliance with the covenant.  But, as demonstrated above, the Defendants intentionally withheld that information, because, as they admitted, disclosing the terrible holiday results was likely to cause the Trade Vendors to stop shipping.  By knowingly concealing this information, they knowingly induced Trade Vendors to continue shipping, which constitutes fraudulent concealment.

The 10-Q did not contain any information that would allow Trade Vendors to evaluate the risks.  The 10-Q did not mention covenant 6.16 or its requirements, nor did it disclose that the DIP Term Loan lender had required the covenant in lieu of other deleted milestones.  It did not provide any probability of default or likelihood that a covenant would be breached.  It did not disclose that Brandon and Short had determined that the covenants left an insufficient liquidity

---

[1102] Ex. 198 (Toys "R" Us Form 10-Q, Sept. 29, 2017) at 38-39.

cushion.  And it did not inform anyone about the Directors' lack of analysis on the Company's

ability to comply with the covenants or the flawed projections in the DIP budget.

Third, the SEC filing did not give Trade Vendors the information that they needed

to evaluate the risks of shipping to Toys "R" Us during the bankruptcy. Trade Vendors knew there

was a risk that Toys 'R' Us might not emerge from bankruptcy.  But they also testified that what

was critical to evaluating that risk was the availability of accurate information from the

Company.  *See* Trust SOF ¶¶ 404, 410, 416, 422, 428, 434, 440, 446, 452, 458, 464, 470, 476, 481,

486, 491, 496, 502, 508, 513, 519, 525, 532, 537, 542, 548, 553, 559, 565, 571, 576, 581, 586,

592, 597, 603, 608.  Without that information, the risk disclosure on the 10-Q provided vendors

no information that they could use to make an accurate risk determination.

## 2.    Defendants' "DIP financing agreements" argument fails.

The public availability of the DIP financing documents, including the language of the

covenants has no bearing on reasonable reliance.

The public availability of the DIP financing agreements would only inform Trade

Vendors of the presence of covenants.  It would provide vendors with absolutely no way to

determine whether Toys "R" Us was in compliance with those covenants.  Because "current

income and balance sheet accounts and rolling forecasts—which were necessary to determine

whether the DIP budget and covenants were achievable" were not available to Trade Vendors,

the Vendors "did not have the financial information necessary to determine whether or not [Toys

"R" Us] was meeting or was likely to meet its financial covenants." [1103]  A vendor looking at the

DIP financing agreements in February 2018 would have no ability to determine whether

---

[1103] Ex. 70 (Greenspan) ¶533.

368

covenants were in danger of being breached without knowing the information that Defendants concealed.

Thus, the public availability of the DIP financing covenants gave vendors no information about, and no ability to assess, whether Toys "R" Us would be able to comply with the covenants in the DIP financing or whether the DIP financing was sufficient to enable Toys "R" Us to meet its obligations during the bankruptcy.

### 3. Defendants' "no risk" and "guaranteed" argument mischaracterizes the Trust's contentions and attacks a straw man.

Defendants' claim that summary judgment is appropriate because vendors could not reasonably believe that the "DIP financing was guaranteed" or that shipping goods during bankruptcy "was risk free" misstates the Trust's allegations, and distorts the factual record. Mot. at 49.

First, the Trust's list of fraudulent misrepresentations does not include the statement "the DIP financing was guaranteed." Mot. at 49. Thus, Defendants' argument fails at the threshold.

Second, Trade Vendor testimony does not indicate that any vendor believed shipping goods was risk free. Instead, based on the representations that Trade Vendors received from Defendants, and the lack of any follow up information, Trade Vendors believed that the DIP financing was available and provided Toys "R" Us with sufficient liquidity to meet its obligations. As long as the DIP financing was available to satisfy Toys "R" Us' obligations, Trade Vendors believed their risk of shipping was very low, because of the statements that assured them that the DIP financing would pay them for all of the goods that they shipped post-petition. [1104] Defendants did not inform Trade Vendors that the Company was projecting a

---

[1104] *See, e.g.*, Ex. 330 (Woldenberg (Learning Resources) depo.) 212:9-19 (Learning Resources was "comfortable extending 90-day terms" because of the "very large DIP line" and statements about "excess liquidity); Ex. 415 (Gamble (Warner Brothers) depo.) 240:25-241:10, 242:17-

default on its DIP financing, or that Defendants had determined that the DIP financing would not be sufficient to pay for all goods shipped on credit. Thus, Trade Vendors reasonably believed what they were told—that the DIP financing was available and could pay them for goods shipped to Toys "R" Us on credit.

Third, Defendants' cited cases are inapposite. The *Mizrahi* case involved a plaintiff who signed documents acknowledging that he was aware of the specific risks that he later claimed were concealed. *Mizrahi v. Adler*, 2014 N.Y. Misc. LEXIS 2934, at *15-16 (N.Y. Sup. Ct. June 30, 2014). No Trade Vendor signed any document acknowledging that they were aware of any of the concealed information or Toys "R" Us' impending covenant breaches. And *Cole* involved a plaintiff claiming that defendants had promised to pay off his debts in the future and who was unable to show that Defendants "never intended to fulfill their promise." *Cole v. Daoud*, 2016 U.S. Dist. LEXIS 39749, at *39 (E.D. Va. Feb. 17, 2016). By contrast, as discussed above, Defendants made false representations about the Company's present ability to pay, failed to correct or repudiate those representations, and instead continued to make additional representations to mislead Trade Vendors.

### 4. Reasonable reliance cannot be adjudicated on summary judgment.

Whether the Trade Vendors' "reliance was reasonable is beyond doubt a question of fact for a jury to decide, and not a fit subject for judgment as a matter of law." *Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 590 (6th Cir. 2000) (reversing grant of summary judgment and holding that the argument that information was available and could have been investigated by plaintiff's attorney did not preclude reliance); *Greenberg v. Life Ins. Co.*, 177

---

243:1 (fact that "financing was still in place" and "1.8 of the 3.1 billion was still available" provided reasons to ship); Ex. 321 (Kamler (Kent) depo.) 158:18-21, 183:9-22 (" ████████████████████████████████████████ ).

F.3d 507, 516 (6th Cir. 1999) (reversing grant of summary judgment and concluding that

boilerplate language did not preclude justifiable reliance); *In re Nat'l Century Fin. Enters.*, 846

F. Supp. 2d 828, 882 (S.D. Ohio 2012) (denying summary judgment on the issue of reasonable

reliance when Defendant argued that its disclosures contained "cautionary language" and

"advised potential investors to make their own assessments").

Moreover, if there is a factual dispute about whether the plaintiff had the same access to

information as the defendant, there is a question of fact that precludes summary judgment on the

issue of reasonable reliance.  *See In re Refco Inc. Sec. Litig.*, No. 07 MDL 1092 (JSR), 2011 U.S.

Dist. LEXIS 33554, at *53-54 (determining that summary judgment on reliance was

inappropriate because "there is a significant factual dispute on whether the two parties had

reasonable access to the same information").  Here, as discussed above, the Trade Vendors did

not have reasonable access to the information known to, and concealed by, Defendants.  And

Trade Vendors uniformly testified that they could not discover that information from outside

sources.  *See* Trust SOF ¶¶ 404, 410, 416, 422, 428, 434, 440, 446, 452, 458, 464, 470, 476, 481,

486, 491, 496, 502, 508, 513, 519, 525, 532, 537, 542, 548, 553, 559, 565, 571, 576, 581, 586,

592, 597, 603, 608.  Whether their reliance on Defendants statements was reasonable is thus a

material issue of fact precluding summary judgment.

> **H.    Defendants' "causation" argument fails.**

Defendants assert that for the Trust to "prove causation," the Trust must "prove that

Defendants' statements are what caused" Trade Vendors to ship.  Mot. 49-50.  This contention

fails on the law and the facts.

> **1.    The Trust has ample evidence of causation.**

"It is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent

misrepresentation be the sole or even the predominant or decisive factor in influencing his

conduct. . . . It is enough that the representation has played a substantial part, and so has been a

substantial factor, in influencing his decision." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.

4th 951, 976-77 (1997) (quoting Restatement (Second) of Torts § 546, com. b, p. 103).

"Plaintiffs are required to prove only that defendant's conduct was a cause of damages.

They need not prove that [Defendant's] conduct was the sole cause of loss." *Varacallo v. Mass.*

*Mut. Life Ins. Co.*, 332 N.J. Super. 31, 48 (Super. Ct. App. Div. 2000).  "[T]here can be more

than one proximate cause contributing to any one injury." *Capiccioni v. Brennan Naperville,*

*Inc.*, 339 Ill. App. 3d 927, 937-38 (2003). "It need not be the sole cause or the last or nearest

cause." *Id.*

As demonstrated above, Defendants' representations and concealments was a substantial

factor in causing Trade Vendors to suffer harm.  As discussed at length above, Defendants'

statements about the presence of the DIP financing, its availability throughout the bankruptcy,

and its ability to provide Toys "R" Us with sufficient liquidity to meet its obligations were

important factors in the Trade Vendors' decision to resume shipping.

Moreover, the concealment of facts between December and March—for example, that the

Company required a $150-$200 million cash infusion, that it was $500 million below the DIP

budget projections, and that liquidation planning was underway—caused Trade Vendors to

continue shipping.  Trade Vendors uniformly testified that if these concealed facts had been

disclosed to them, they would have stopped shipping goods to Toys "R" Us on credit.  *See* Trust

SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501,

507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607.

### 2.    Defendants' cited cases are inapposite.

Defendants' two cited cases are inapplicable to the facts of this case.  In *Caviness v.*

*DeRand Res. Corp.*, 983 F.2d 1295, 1305 (4th Cir. 1993), the plaintiff failed to present <u>any</u>

"evidence of reliance or damage."  There was "no assertion by the plaintiffs that the stated

misrepresentations were even material" in their decision-making process.  *Id.*  By contrast, the

Trust has powerful evidence of materiality, including admissions from Defendants.  And Trade

Vendors testified that the statements about the DIP financing made by Defendants were "critical"

in their decision making. [1105]  The Trade Vendors further testified about the importance of each

of the concealed facts in that they would have led the vendors to stop shipping goods on credit.

[1106]  And in *Revak v. SEC Realty Corp.*, 18 F.3d 81, 89-90 (2nd Cir. 1994), the plaintiffs "failed

to allege any injury caused proximately (or otherwise)" and thus could not as a matter of law

prove harm.  By contrast, here there is ample evidence of injury to Trade Vendors and that

Defendants' conduct caused that harm.

### 3.    Proximate causation is a question of fact not amenable to resolution at summary judgment.

"[T]he question of proximate causation generally belongs to the trier of fact because

causation is essentially a factual issue." *Eaton v. Weichert Workforce Mobility, Inc.*, No.

X10UWYCV186040244S, 2021 Conn. Super. LEXIS 73, at *25 (Super. Ct. Feb. 3, 2021)

(internal quotes omitted).  Because "[t]he present case is not one where no reasonable person

could conclude that the defendant's acts caused the plaintiffs' alleged injuries," summary

judgment is inappropriate on the issue of proximate causation. *Eaton*, 2021 Conn. Super. LEXIS

73, at *25.

---

[1105] *See, e.g.,* Ex. 307 (Cooney (Jakks) depo.) 149:3-7; Ex. 321 (Kamler (Kent) depo.) 167:18-168:7.
[1106] *See, e.g.,* Ex. 335 (Kodak (LEGO) depo.) 354:25-355:24; Ex. 244 (Schellhase (Bestway) depo.) 205:13-206:8.

## I.    Defendants' "duty to disclose" arguments fail.

As demonstrated above, the Trust has evidence establishing Defendants' duty to disclose on four separate bases: (i) Defendants had a duty to disclose subsequently acquired information that made their earlier statements untrue or misleading.  (ii) Defendants had a duty to disclose all material facts when they continued making representations.  (iii) Defendants had a duty to disclose the concealed facts because they possessed superior knowledge and knew that Trade Vendors were acting on the basis of mistaken facts.  (iv) The Trade Vendors had a relationship of trust and confidence with Defendants that created a duty to disclose.

Defendants assert that "Defendants had no obligation" to disclose the concealed facts "in the manner the Trust alleges."  Mot. at 50.  Every part of this argument fails.

### 1.    Defendants' proof of "swindling" argument fails.

Defendants assert that a duty to disclose because of superior knowledge requires conduct that will "amount to a form of swindling," quoting a phrase from a comment in the Restatement (Second) of Torts.  Mot. 51 (quoting Restatement (Second) of Torts § 551, comment l). Defendants omit the rest of that sentence from the Restatement, which explains "swindling" as a situation "in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware."  *Id.*  That description of "swindling" is exactly what happened here.  Trade Vendors were led by appearances to fill purchase orders and ship goods on credit, unaware of key material facts establishing that the Company did not have the ability to pay.

Moreover, the Restatement comments clarify this branch of the duty to disclose, by stating that it would not arise "[w]hen the facts are patent, or when the plaintiff has equal opportunity for obtaining information … or when the defendant has no reason to think that the plaintiff is acting under a misapprehension."  Restatement (Second) of Torts § 551, comment k.

That description does not apply to any of the concealed facts here. The Trust's evidence establishes that the concealed facts were not patent, the Trade Vendors did not have an equal opportunity for obtaining the information, and the Defendants had good reason to think—in fact they knew— that the Trade Vendors were acting under a misapprehension.

In the *Ferry* case cited by Defendants, the plaintiff "was able to ascertain" the key information at issue "from sources other than Defendants." *Ferry v. Black Diamond Video, Inc.*, No. 15-7723 (RBK/AMD), 2016 U.S. Dist. LEXIS 76893, at *23-24 (D.N.J. June 13, 2016). Because the relevant information "was equally available to both parties," the court determined that there was no duty to disclose. *Id.* As demonstrated above, that is not the situation here. The concealed facts were available only to insiders at Toys 'R' Us and was not information that was equally available to Trade Vendors and Defendants. Indeed, it was information that even the vendors who were UCC members did not have. [1107]

### 2. Defendants' "trust and confidence" argument fails.

Defendants' assertion that "there is no evidence in the record that the vendors 'reposed a trust and confidence' in Defendants is false. Mot. 52. As discussed at length above, vendors had more than simple arms-length relationships with Toys "R" Us. Multiple vendors testified that they had a long-standing relationship of mutual trust with Barry, and that they relied upon Barry to provide them with accurate updates about the Toys "R" Us business. [1108]

---

[1107] *See* Ex. 357 (Stefanick (Mattel) depo.) 144:22-145:14, 148:19-149:8; Ex. 335 (Kodak (LEGO) depo.) 341:20-342:7; Ex. 297 (O'Gara-Kerr (Huffy) depo.) 127:18-128:9, 132:23-133:8; Ex. 273 (Chamberlain (Evenflo) depo.) 37:24-38:8.

[1108] *See, e.g.*, Ex. 255 (Shamie (Delta) depo.) 171:3-172:3 ("I trusted [Barry] immensely); Ex. 232 (Foreman (Basic Fun) depo.) 216:1-217:1 ("didn't believe [Barry]" "would tell us anything but the truth"). Barry himself admitted that he had a relationship of "mutual trust and partnership" with executives at many major trade vendors. Ex. 89 (Barry depo.) 471:5-10.

Moreover, as demonstrated above, Trade Vendors were beholden to the knowledge of Defendants because vendors did not have any access to the internal financial situation of Toys "R" Us beyond what they were being told by Defendants. News reports and speculation about Toys "R" Us' liquidity was not accurate or reliable information. [1109]

The sole case cited by Defendants to support this argument is inapposite. *Grumman Allied Indus. v. Rohr Indus.*, 748 F.2d 729 (2d Cir. 1984). In that case, the plaintiff had "unrestricted access to all personnel and records" of the defendant. *Grumman*, 748 F.2d at 731-32. It was that "unrestricted access to [defendant's] facilities, personnel, and records" that led the Court to conclude that the claim of "superior knowledge" was "without merit." *Id.* at 739. Here, Trade Vendors had no access—much less unrestricted access—to the Company's internal financial situation.

### 3.    Defendants' "the UCC knew" argument fails.

Defendants' claim that their conduct did not amount to "swindling" because the UCC and its lawyers "were well aware that the company was having financial difficulties" similarly fails. Mot. 52.

<u>First</u>, only four of the thirty-seven Trade Vendors in this action were members of the UCC: Mattel, Huffy, the LEGO Group, and Evenflo. And the UCC members were not permitted to disclose information that they learned from their membership on the UCC to other Trade Vendors or to any other source. [1110] Indeed, much of the material provided to the advisors for the UCC was not even provided to those four vendors, because it was marked "FOR

---

[1109] *See, e.g.*, Ex. 330 (Woldenberg (Learning Resources) depo.) (no way to obtain that information "[s]hort of hacking or spying); Ex. 258 (Rana (Dorel) depo.) 247:6-12 ("We could not get any information); Ex. 369 (Wysocki (Merchsource) depo.) 150:19-151:14 (no way to get "accurate information from a source outside of Toys "R" Us").
[1110] *See* Ex. 297 (Huffy (O'Gara-Kerr) depo.) 131:13-21.

PROFESSIONAL EYES ONLY." [1111]  Contrary to Defendants' assertion, the UCC could not

disclose this information to other Trade Vendors.

_Second_, even the four UCC members did not have knowledge of the truth.    Knowledge

that Toys "R" Us was having "financial difficulties" is not a disclosure of the concealed facts,

such as that the Company had determined that it could not possibly comply with covenant 6.16

in the Term DIP loan.  For example, in February, Mattel reached out to Toys "R" Us to confirm

"compliance with existing covenants." [1112]  Short developed a strategy to respond: "we are going

to tell Gregg [Stefanick] that if we were in covenant default, we would have had to issue an 8K"

so that Mattel "would assume that we are not in breach." [1113]  And Brandon executed that

strategy by telling Mattel that "Toys "R" Us would have been required to file an 8-K if it was not

in compliance with its covenants." [1114]  Mattel never knew about the covenant: "it was a big

surprise" that the budget covenant was the basis for default and there were never discussions

with Brandon or Barry or the UCC "that there was a risk of default at all on the budget

covenant." [1115]

As another example, the LEGO Group signed an NDA with Toys "R" Us to obtain

information about covenant compliance. [1116]  But Short chose to withhold information about

covenant 6.16, instead informing the LEGO Group that Toys "R" Us had "two financial

covenants"—cash flow and liquidity—and that it would be "in compliance with both of those

---

[1111] _See, e.g.,_ Ex. 197 (11'30'17 Business Update [REV03792918]).
[1112] Ex. 185 (2'16'18 Stefanick to Short [MATTEL00000537]).
[1113] Ex. 184 (2'16'18 Short to Kosturos [TRU-Trust0000299828]).
[1114] Ex. 357 (Mattel (Stefanick) depo.) 177:23-179:14.
[1115] Ex. 357 (Mattel (Stefanick) depo.) 148:19-149:8.
[1116] Ex. 335 (Kodak (Lego) depo.) 340:18-342:7.

covenants." [1117]  Short did not mention the budget covenant (6.16) that he knew Toys "R" Us

would breach days later.

### 4.    Statements made in September and October created a duty to correct those statements when they became false.

Defendants do not actually address their duty to disclose subsequently acquired

information.  Instead, Defendants simply assert that because the September statements "were true

when made" and were "promissory statements not cognizable as tort claims," there was no duty

to update them.  Mot. at 54.  Defendants are wrong on both counts.

As demonstrated above, the statements made in September were not true when made.

More importantly, statements that are true when made create a duty to update those statements if

the maker of the statements learns of information that makes those statements false.  For

example, if it was true in September that the DIP financing was sufficient to enable Toys "R" Us

to meet its obligations, it certainly was not true in January, when the Defendants knew that Toys

"R" Us required an additional $200 million cash infusion to meet its obligations.

Further, as demonstrated above, each of the representations made by Defendants in

September were actionable statements because they are subject to empirical verification, because

they imply the existence of facts justifying the statement and imply that Defendants are unaware

of any facts that would make the statement improbable, and because Defendants had superior

knowledge on the subject.

The *Medtronic* case cited by Defendants is inapposite.  *Medtronic Sofamor Danek, Inc. v.

Michelson*, 2004 U.S. Dist. LEXIS 26385, at * 48 (W.D. Tenn. May 20, 2004).  The statements

at issue in *Medtronic*, were that "it was **possible** for Medtronic to sell up to $35 million per year"

and that "it could **potentially** achieve sales of $40 million."  *Id.* at *46 (emphasis added).  By

---

[1117] Ex. 151 (3'1'18 financial covenant forecast).

contrast, Defendants here did not merely tell vendors that it was "possible" that the Company

would obtain $3 billion in DIP financing, or that the Company "potentially" might receive DIP

financing.  Instead, Defendants' representations stated as a fact that the Company had secured

more than $3.0 billion in DIP financing that would be available throughout the restructuring

process. [1118]

> **5.    Defendants' no duty to update with "real-time confidential information" argument fails.**

Defendants claim that "there was no duty to update the trade vendor community with

real-time confidential information while the outcome of these discussions and state of the

company's access to liquidity remained highly uncertain."  Mot. 54.  This argument fails for two

reasons.

First, there was no information that was confidential that Defendants were prohibited

from disclosing.  The information was only "confidential" because Defendants were concealing

it.

And there was no legal obstacle preventing Defendants from telling Trade Vendors the

truth.  SEC selective disclosure rules did not prohibit Defendants from sharing information about

Toys "R" Us' financial condition with Trade Vendors.  The SEC rule provides that ("Whenever

an issuer, or any person acting on its behalf, discloses any material nonpublic information

regarding that issuer or its securities to any person described in paragraph (b)(1) of this section,

the issuer shall make public disclosure of that information as provided in § 243.101(e)." 17

C.F.R. § 243.100 (a).  None of the vendors were brokers, dealers, investment advisors, or

investment companies such that this SEC selective disclosure rule would apply to them. [1119]

---

[1118] *See, e.g.*, Ex. 315 (Just Play (Emby) depo.) 64:4-65:7.
[1119] Greenspan ¶508.

Further, under the SEC disclosure rule, Defendants could have entered into nondisclosure agreements with each of the Trade Vendors, and told them the truth about Toys "R" Us' financial condition. [1120]  And the SEC disclosure rule "does not prohibit making accurate disclosure to everyone simultaneously." [1121]  Defendants could have simply told the truth publicly.

Moreover, Defendants cite no SEC disclosure rule that would excuse their conduct.  SEC disclosure rules do not permit a party to make affirmative misrepresentations or engage in fraudulent concealment. [1122]  Having made disclosures to the Trade Vendors in September and October, and continuing to make misleading half-true statements throughout the bankruptcy, created a duty on Defendants to disclose the concealed information.

<u>Second</u>, Defendants' claim about "real-time confidential information" attacks a strawman.  The Trust has never claimed that Defendants were under a duty to provide every minute detail about negotiations (e.g. terms proposed in emails or the number of times an advisor was called on a given day).  Instead, the Trust has established that Defendants were under a duty to disclose key facts that contradicted Defendants' earlier and ongoing representations about the Company's liquidity and ability to pay.  For example, when Defendants knew in January that the DIP financing would no longer be sufficient to allow Toys "R" Us to meet its financial obligations, they had an obligation to disclose that fact.

Moreover, the "uncertainty" that Defendants identify in the January and February time period shows that Defendants' earlier statements about the definite availability of the DIP financing and Toys "R" Us' ability had become false.  Trade Vendors had no knowledge that

---

[1120] Ex. 70 (Greenspan) ¶509.
[1121] Ex. 70 (Greenspan) ¶513.
[1122] Ex. 70 (Greenspan) ¶512.

Toys "R" Us' "access to liquidity" was "highly uncertain." To the contrary, the vendors had been assured (and reassured) that the DIP financing provided the company with ample liquidity that it could use to pay its obligations throughout the bankruptcy.

There was no uncertainty that Defendants' own projections showed that the Company would default on its financial covenants for the DIP financing. There was no uncertainty that Defendants had determined that the Company could not possibly comply with the January revised budget covenant, 6.16. Defendants knew that the Trade Vendors did not have that information, knew that the Trade Vendors needed that information (and in fact Trade Vendors were constantly asking for this information), and Defendants withheld that information precisely because they knew it would cause the Trade Vendors to stop shipping goods on credit.

Third, Defendants cited cases are inapplicable to common law fraud claims. Each of the cases that Defendants cite in support of their arguments deal with a violation of federal securities statutes that have specific knowledge and duty requirements. By contrast, in this case all of the claims are common law fraud claims governed by state law. Defendants' cited cases are thus inapposite.

*In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2nd Cir. 2019), involved duties in the context of securities litigation, and is inapposite to this case. ("Section 10(b) and Rule 10b-5 do not create an affirmative duty") (internal citation omitted). *Coyne v. Gen. Elec. Co.*, 2010 U.S. Dist. LEXIS 70879, at *21 (D. Conn. July 15, 2010) similarly involved duties in the securities fraud context and is inapplicable. *Walker v. Action Indus. Inc.,* is another securities case in which the court stressed that "[w]e do not hold that there is no duty to disclose financial projections under any circumstances. To that extent, the district court's instruction arguably was error." *Walker v. Action Indus.*, 802 F.2d 703, 710 (4th Cir. 1986).

Defendants cite *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991), as purportedly "explaining that a company is generally 'not obliged to disclose [its] internal projections.'" Mot. at 55. The court made no such finding. The court merely made a determination that based on the company continuing "to warn investors of the risks posed by NGEN" the company did not have a duty to disclose certain "more detailed internal NGEN projections." *Id.* at 515-516. By contrast, Defendants did not warn trade vendors about its covenant breaches in any way, much less disclose the underlying projections.

And the court in *In re Duane Reade Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 21319, at *35 (S.D.N.Y. Nov. 24, 2003), held that there was no evidence that Defendants had scienter, not that there was no duty to update. The court rejected the fraud claim because plaintiff had only "unsupported claims" that Defendant "was aware of facts or had access to information suggesting that their public statements were inaccurate." *Id.* By contrast, as demonstrated above, the factual record in the present case is replete with evidence of Defendants' knowledge that the statements being made to Trade Vendors were false.

### 6.   Defendants' negligent misrepresentation arguments fail.

Defendants assert that the "Trust is unable to prove" three factors purportedly required for a negligent misrepresentation claim

### a.   The Trust has evidence of each of the elements of negligent misrepresentation

"The elements of negligent misrepresentation are substantially similar to those of fraudulent misrepresentation, except that the required mental state is less stringent." *Schrager v. N. Cmty. Bank*, 328 Ill. App. 3d 696, 703 (2002). "Negligent misrepresentation is a lesser included claim of fraudulent misrepresentation. It differs only in that while [fraudulent misrepresentation] requires knowledge that the pertinent statement was false, [negligent

382

misrepresentation] merely requires that the person who made the statement failed to exercise reasonable care or competence to obtain or communicate true information." *Ferris Ave. Realty, LLC v. Huhtamaki, Inc.*, No. PB 07-1995, 2011 R.I. Super. LEXIS 25, at *32 (Super. Ct. Feb. 18, 2011) (internal quotes and citations omitted).

As discussed above, the Trust has evidence establishing each of elements of fraudulent misrepresentation. Because the only difference between fraudulent and negligent misrepresentation is that the intent requirement for negligent misrepresentation is lower, the Trust's evidence for each of the elements of fraudulent misrepresentation establishes each of the elements of negligent misrepresentation. And the evidence of fraudulent intent discussed above easily satisfies the "less stringent" mental state requirement for negligent misrepresentation.

### b. There is no requirement that Defendants and vendors be in a "special or privity-like relationship."

Defendants claim that the Trust must prove "a special or privity-like relationship" to establish a claim for negligent misrepresentation. Mot. at 55. Defendants are wrong. Defendants make no effort to demonstrate that the special relationship requirement applies outside of New York. And they cannot do so, because other states do not require that a special relationship exist for a negligent misrepresentation claim.

For example, under California law, "[t]he elements of negligent misrepresentation are (1) a misrepresentation of a past or existing material fact by one who has no reasonable ground for believing it to be true; (2) justifiable reliance; and (3) resulting damage." *Torralbo v. Davol, Inc.*, 2017 U.S. Dist. LEXIS 218339, at *14 (C.D. Cal. Oct. 19, 2017); *see West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 792 (2013). California law does not require that a special relationship exist between the parties to establish liability for negligent misrepresentation.

383

Similarly, in Georgia, "[t]o prevail on a claim of negligent misrepresentation, a party

must prove the following essential elements: (1) the defendant's negligent supply of false

information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance

upon that false information; and (3) economic injury." *First Bank v. Robertson Grading, Inc.*,

328 Ga. App. 236, 246 (2014) (internal quotes omitted).  No requirement of a special

relationship appears in Georgia law.

And in New Jersey, "[t]he elements of negligent misrepresentation are an 'incorrect

statement, negligently made, and justifiably relied on' resulting in economic loss." *Pim Brands

LLC v. Cabot Acquisition, LLC*, 2008 N.J. Super. Unpub. LEXIS 3075 at *35 (quoting *Kaufman

v. I-Stat Corp.*, 165 N.J. 94, 109 (2000)).  No special relationship requirement appears in New

Jersey law.

**c.      The single New York Trade Vendor satisfies the special
relationship test.**

Defendants cite New York law for the proposition that "[a] special relationship requires a

closer degree of trust between the parties than that of the ordinary buyer and seller."  Mot. at 56

(citing *Alley Sports Bar, LLC v. SimplexGrinnell, LP*, 58 F. Supp. 3d 280, 293-94 (W.D.N.Y.

2014)).  The sole New York Trade Vendor, Delta Enterprises, easily meets this test.

Joe Shamie, the president of Delta Enterprises, had a close relationship with Richard

Barry far beyond that "of the ordinary buyer and seller."  Shamie testified that he "trusted

[Barry] immensely" because of their years-long relationship. [1123]  Shamie asked Barry to be an

"honree" at his charity, involved Barry's wife in the charity, and Shamie told Barry's children

"how much the community, vendor community, spoken in a more personal way, loved and

---

[1123] Ex. 255 (Shamie (Delta) depo.) 171:3-12.

384

respected" Barry. [1124]  Because of their extremely close relationship and friendship, Shamie

"really trusted" Barry and did not expect that Barry would tell him anything that was false. [1125]

When Barry reached out and "reassured" Delta that it would be protected and could feel safe

shipping under the protection of the DIP financing, and repeated those assurances during the

bankruptcy, Delta believed Barry and shipped to Toys "R" Us. [1126]

Defendants own cited case confirms that this is sufficient to establish a special

relationship: "the relationship between parties could extend beyond the typical arm's-length

business transaction where defendants initiated contact with plaintiffs, induced them to forebear

from performing their own due diligence, and repeatedly vouched for the veracity of the

allegedly deceptive information." *Alley Sports Bar, LLC v. Simplexgrinnell, LP*, 58 F. Supp. 3d

280, 293 (W.D.N.Y. 2014) (internal quotes omitted).

Moreover, New York courts have concluded that specialized knowledge and expertise in

a particular business is enough to find that a special relationship exists between two parties such

that a duty of care exists. *See Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996).  In *Kimmel*, the

court concluded that a defendant "uniquely situated to evaluate the economics" as the "chief

financial officer and chairman" possessed specialized knowledge. *Id.*  The defendant sought to

"induce plaintiffs to invest" by "[meeting] with each plaintiff," and the court determined that this

combination sufficed to show specialized knowledge or experience.  *Id.*

As discussed above, Barry had the requisite special knowledge of Toys "R" Us' internal

finances and projected failure to comply with financial covenants.

---

[1124] Ex. 255 (Shamie (Delta) depo.) 169:23-171:2.
[1125] Ex. 255 (Shamie (Delta) depo.) 169:18-172:3.
[1126] Ex. 255 (Shamie (Delta) depo.) 178:6-25, 183:2-13.

Finally, the question of whether a special relationship existed between Delta and Barry is a question of fact. "Whether such a special relationship exists in the commercial context is highly fact specific and is not generally amenable to summary disposition." *Silvercreek Mgmt. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 504-05 (S.D.N.Y. 2018) (internal quotes omitted); *AFA Protective Sys. v. AT&T*, 57 N.Y.2d 912, 914 (1982) ("The issue of whether a 'special relationship exists sufficient to make out a cause of action for negligent misrepresentation should also be left to the finder of fact"); *see Murphy v. Kuhn*, 90 N.Y.2d 266, 270 (1997).

**J.    Defendants' argument regarding reliance on omitted information fails.**

Defendants assert that the Trust cannot prove "reasonable reliance" because Trade Vendors "knew or could have known the allegedly omitted information." Mot. at 57. Defendants identify only three facts that Trade Vendors purportedly were aware of and that Defendants assert "cannot give rise to a tort claim": (1) that the DIP financing agreement contained covenants, (2) that Toys "R" Us' holiday sales were poor, and (3) that Toys "R" Us was in danger of breaching its covenants. Mot. at 57-58.

Defendants do not address the extensive additional concealments made by Defendants, that Trade Vendors had no way of knowing. For example:

- December 13, 2017: that Toys "R" Us would end the year with an EBITDA that would result in a default under the financing milestones. [1127]

- January 24, 2018: that the 2017 EBITDA is projected to be under $300 million— significantly short of the Company's $640 million projection in the DIP budget. As a result, the Company anticipated a breach of covenants in February or March. [1128]

---

[1127] Ex. 164 (12'13'17 minutes [DEFS_0061932]).
[1128] Ex. 139 (1'24'18 minutes [TRU-Trust0000374989]).

- January 28, 2018: that Toys "R" Us would need at least $200 million in additional capital to emerge. [1129]

- February 16, 2018: The company was preparing plans around a liquidation process including a liquidation analysis and wind-down budget.

Defendants make no attempt to argue that the Trust cannot prove reasonable reliance on any of this concealed information. Nor could they. None of this information was publicly available. Each Trade Vendor testified that they were unaware of this information, and could not have learned it from any source other than Toys "R" Us. *See* Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607. Summary judgment thus cannot be granted on any of these concealed facts.

Moreover, Defendants' arguments fail on the three facts they do address fail.

### 1.    The Trust has never asserted a claim based on the mere fact that the DIP financing contained covenants.

Defendants assert that because "covenants were contained in the publicly filed DIP financing agreements" the Trust's purported claim that Defendants "failed to tell [Trade Vendors] that the DIP financing agreements contained covenants" fails. Mot. at 57. This argument attacks nothing but straw. The Trust has not asserted that the mere existence of covenants is the basis of a fraud claim.

Rather, as demonstrated above, Defendants failed to disclose facts establishing that Toys 'R' Us would default on those covenants. This was information that the Trade Vendors could not learn from public sources. For example, as demonstrated above, Defendants made the

---

[1129] Ex. 140 (1'28'18 minutes [DEFS_0059009]) at 1-2.

deliberate decision to withhold their holiday financial results precisely because Defendant knew

that, unless they disclosed holiday results to Trade Vendors, Trade Vendors could not get that

information and would continue to ship goods on credit.

Trade Vendors could not learn that the Company was projected to default on its financial

covenants. As one vendor explained: "I could see the covenants, yeah. Doesn't mean I would be

able to assess all the financials of Toys 'R' Us, if they were meeting the covenants or not." [1130]

> ### 2. Defendants intentionally withheld the holiday sales results data, and then lied about what holiday sales meant for the Company's ability to pay.

Defendants claim that because "multiple vendors" saw "news of TRU's poor holiday

results," the omission of holiday results "cannot give rise to a tort claim." Mot. at 57-58. This

argument fails for multiple reasons.

First, information that holiday results were disappointing is not the same as having data

that can be used to project that the Company will default on its financial covenants. Do "poor"

holiday results mean that the Company is on the verge of liquidation, or that the Company is on

track to emerge from bankruptcy? For example, if the Company's DIP budget had been based

on realistic projections that anticipated the Company's declining holiday sales, then the presence

of poor holiday sales would be consistent with projecting compliance with the financial

covenants. Trade Vendors lacked the information that Defendants had and that the Trade

Vendors needed: the data for recent sales, margin, and costs, and the Company's projected sales,

margin, and costs for 2018, which demonstrated that it was impossible for the Company to

comply with its financial covenants.

---

[1130] Ex. 255 (Shamie (Delta) depo.) 132:16-133:1.

Second, because the Trade Vendors lacked the data, for them to learn what "poor" holiday results meant, they could do nothing more than ask Defendants that question. And, as demonstrated above, when Trade Vendors asked Defendants about the holiday results and what that meant for the Company's liquidity and plans for emergence, Defendants elected to "provide vendors additional comfort so they do not determine to stop shipping." [1131]

Defendants knew that they could not "procure the funding for emergence and … emerge from chapter 11 and continue operating the current business plan" as they had been telling Trade Vendors. [1132] As Defendant Macnow admitted, Defendants knew they were down to two options:

> 5   Q.   So as of January 28, 2018, Toys
> 6   "R" Us and the board was aware that the
> 7   two likely outcomes were, one, the total
> 8   liquidation; or two, the shrink and
> 9   rethink plan selling off a portion of Toys
> 10   "R" Us; is that correct?
> 12   A.   Again, I think that's what these
> 13   minutes state.

Ex. 83 (Macnow depo.) 166:5-13.

But even as liquidation planning was underway, Defendants assured vendors that management was totally focused on its plans for emergence.

Those vendors that did hear word of Toys "R" Us' poor holiday sales were "asking for and receiving assurances that things were all right," notwithstanding the holiday sales results. [1133]

---

[1131] Ex. 148 (2'12'18 minutes [DEFS_0059030]).
[1132] Ex. 140 (1'28'18 minutes [DEFS_0059009]).
[1133] Ex. 409 (McCallum (Step2) depo.) 110:2-16; see Ex. 330 (Woldenberg (Learning Resources) depo.) 134:3-13 ("The company itself denied that there was a problem").

For example, Step2 was assured that the "sales trend was ok" and that it was "part of the plan," and encouraged "not to worry about" holiday sales numbers because their "job is to ship." [1134]  At the New York Toy Fair, Brandon sat with McCallum, "literally knew to knee," and looked McCallum "straight in the eye" and said "we're coming out this fast," "load the trucks, and get ready to ship because we're going to need goods." [1135]

As another example, Barry assured Jada Toys that "[Toys "R" Us] came out of the holidays well positioned" and was "looking forward to brighter times ahead." [1136]  None of the Defendants told Trade Vendors the truth—that Toys "R" Us' disastrous holiday season meant that it would breach financing covenants and lose access to the DIP financing.

### 3.    Trade Vendors did not have, and could not obtain, any of the concealed facts regarding the Company's covenant breaches.

Defendants assert that the Trust "cannot bring tort claims on behalf of vendors" who "knew the information that the Trust alleges was hidden from them and chose to ship goods to TRU anyway."  Mot. at 58.  Defendants characterize that information as "TRU was in danger of breaching its covenants."  *Id.*  Defendants mischaracterize the Trust's assertions.

No Trade Vendor knew any of the concealed facts that are discussed at length above. The Trust is not asserting that the information that Defendants concealed was the "danger of breaching [the DIP] covenants."  Instead, the Trust is alleging that Defendants concealed concrete factual information that demonstrated that the covenant breaches would occur by a date certain and that Toys "R" Us did not have any feasible way of addressing those covenant breaches.  For example, Defendants did not disclose that Toys "R" Us' projections were over

---

[1134] Ex. 409 (McCallum (Step2) depo.) 113:8-114:18.
[1135] Ex. 409 (Step 2 (McCallum) depo.) 149:16-150:5, 184:19-185:10.
[1136] Ex. 301 (Simons (Jada Toys) depo.) 196:25-197:10.

$500 million below what was required by the DIP financing budget. [1137]  No Defendant informed

Trade Vendors of any of the concealed facts discussed above, and the Trade Vendors could not

learn any of those facts from public sources.

Moreover, the public information that was available provided no substantive information

about covenant breaches, and Defendants denied any rumors of covenant breaches.  The

"publicly reported" danger of covenant breaches that Defendants refer to was a CNBC article

that included the statement that "Toys "R" Us is at risk of breaching a covenant on one of its

loans." [1138]  The article did not say what the covenant was, give any indication of the timeframe

in which the covenant was at risk of being breached, or give any indication how high or low the

risk was.  Moreover, the Company's spokesperson issued a denial that this article was

accurate. [1139]  The spokesperson promptly let Brandon know what she was communicating, and

Brandon did not direct her to correct the record, or do anything to discourage such denials.  His

only comment in response was to express his "thanks." [1140]

Trade Vendors uniformly testified that they could not rely or act on industry rumors or

speculation in making their business decisions. [1141]  And Trade Vendors that read the article did

not believe that covenant default was imminent, or likely. [1142]

---

[1137] Ex. 141 (1'31'18 2b. Project Sunrise - Forecast Model 2018-01-31 (Liquidity Bridge) [DEFS_0002878]).

[1138] Ex. 194 (2'21'18 Theriot to von Walter [TRU-Trust0000374936]).

[1139] *See, e.g.,* Ex. 195 (2'22'18 Woldenberg to McCabe [LR_002754]) ("TRU denies this report"); Ex. 193 (2'21'18 von Walter to Verdon [TRU-Trust0000363153]) ("the story is full of speculation").

[1140] Ex. 192 (2'21'18 Brandon to von Walter [TRU-Trust0000313052]).

[1141] *See, e.g.*, Ex. 307 (Jakks (Cooney) depo.) 97:8-12 ("Nobody had real facts, but it was a lot of speculation"), 188:17-189:17 ("we couldn't act on rumor"); Ex. 330 (Woldenberg (Learning Resources) depo.) 207:2-208:18 ("whatever grim stories were being told in the press … [t]hey just kept sending the orders, letting us ship stuff, talking about the future, asking for exclusives").

[1142] *See, e.g.*, Ex. 372 (Elliott (MGA) depo.) 213:18-214:7.

No Trade Vendor had any of the concealed information that showed that Toys 'R" Us was hundreds of millions of dollars away from being able to comply with its covenants. *See* Trust SOF ¶¶ 403, 409, 415, 421, 427, 433, 439, 445, 451, 457, 463, 469, 475, 480, 485, 490, 495, 501, 507, 512, 518, 524, 530, 536, 541, 547, 552, 558, 564, 570, 575, 580, 585, 591, 596, 602, 607. They could not learn those facts from news articles, or from any source other than Defendants.

Moreover, even those Trade Vendors that received more detailed information from Toys "R" Us after signing non-disclosure agreements received false and misleading information from Defendants after the article was published. For example, the LEGO Group entered into a non-disclosure agreement with Toys "R" Us to obtain information about Toys "R" Us' covenant compliance. [1143] When Short sent the LEGO Group a financial covenant forecast deck on March 1, 2018, that deck included no mention of covenant 6.16 or Toys "R" Us' projected breach of that covenant just two days later. [1144] The slide deck asserted that Toys "R" Us had only "two financial covenants" and that Toys "R" Us would be "in compliance with both of these covenants" through March 3, 2018. [1145] In reality, Short knew that the Company was projected to breach both of those covenants. And Short knew about a third covenant, the January revised budget covenant, and also knew that the Company did not comply with the covenant's January 31 deadline, that the Company could not possibly comply with it, and that the Company had obtained a waiver that would expire on March 3, 2018. Those facts materially qualified Short's statements, but Short concealed them.

---

[1143] Ex. 335 (Lego (Kodak) depo.) 156:20-157:9.
[1144] Ex. 343 (LEGO (Kodak depo. Ex. 113)), Ex. 335 (LEGO depo.) 340:18-342:7.
[1145] Ex. 343 (LEGO (Kodak depo. Ex. 113)) at 3.

In sum, the publicly reported information did not contain any of the concealed facts. It did not warn Trade Vendors of the impending covenant breach that was just days away. And Trade Vendors uniformly testified that information in the popular press was not a reliable source of information that they could use to make decisions.

**K.    Defendants' arguments based on the Trade Vendors' 30(b)(6) testimony fail.**

Defendants present a series of tables with selectively excerpted vendor testimony that they purport constitutes "undisputed evidence" that "none of the trade vendors' tort claims…can survive summary judgment." Mot. at 58. Defendants' tables present an incomplete and misleading view of the facts, and completely ignore the testimony supporting the Trust's claims. To respond to Defendants' table, the Trust presents testimony for each Trade Vendor in the Trust's Appendix A in response to Defendants' tables of vendor testimony, and that Appendix is being filed as a separate document. The Trust's appendix addresses each vendor and each issue identified in the Defendants' tables, and does so in the ordered presented by Defendants.

**L.    Defendants' argument on the negligence claim fails.**

Defendants' argument concerning the Trust's negligence claim is addressed above in Part IX, Section B.

**M.    Defendants' "received more than they lost" argument fails.**

Defendants assert that if Defendants had disclosed the concealed information, "the company would have needed to liquidate," as of December 13, 2017, and that "the trade vendors would not have received any of the payments they received from this date forward during the Chapter 11 proceeding." Mot. at 100. Based on those premises, Defendants claim that Trade Vendors "benefitted from TRU's continuing to operate" because "payments from December 13, 2017 onward" were in excess of "the invoiced amounts of the goods [Trade Vendors] shipped

after this time," and because of that benefit many of the vendors did not suffer damages,

precluding a fraud claim. Mot. at 101.  Each part of this argument is wrong.

### 1.    Toys "R" Us would not have had to liquidate on December 13, 2017, if Defendants had decided to not engage in fraud.

Defendants claim that if Defendants had informed Trade Vendors of "liquidity issues" as

of December 13, 2017, "the company would have needed to liquidate as of this date."  Mot. at

100.  This unsupported assertion is both wrong and beside the point.

"Defendants were not forced to announce a liquidation on December 13, 2017." [1146]  On

December 13, 2017, Toys "R" Us had not defaulted on its loan covenants or lost access to its

DIP financing. [1147]  This meant that the company "had approximately $258 million of

unrestricted cash and $1,109 million of reported ABL availability." [1148]  Because at that time,

"the entire vendor and tax accounts payable was $972 million," Toys "R" Us could "have

satisfied [those obligations] in full." [1149]  And Toys "R" Us then "could have continued in

operation past December 23, without incurring any trade debt." [1150]

Indeed, even at the end of January, "the Company's advisors confirmed that, so long as

the Company had not actually defaulted," it would be able to "continue to draw on its DIP

loans." [1151]  "[U]ntil [Toys "R" Us] reached the covenant test date, [the] lenders could not stop

[Toys "R" Us] from" using its credit lines to "pay [its] obligations." [1152]  There was no

requirement to liquidate "before the DIP lenders declared a default and forced liquidation." [1153]

---

[1146] Ex. 70 (Greenspan) ¶570.
[1147] Ex. 70 (Greenspan) ¶568.
[1148] *Id.*
[1149] *Id.*
[1150] *Id.*
[1151] Ex. 70 (Greenspan) ¶570; Ex. 142 (1'31'18 minutes [DEFS_0059013]) at 3.
[1152] Ex. 86 (Greenspan depo.) 170:11-171:14.
[1153] Ex. 70 (Greenspan) ¶571.

Defendants simply assume that there would have been "a rushed liquidation in December 2017 that results in the vendors not being paid on account of their outstanding accounts receivable." [1154]  But this assumption is false.

Moreover, the premise of Defendants' argument—that telling Trade Vendors about "liquidity issues" was the only way to avoid a fraud—is false.  For Defendants to avoid engaging in fraud as of December 13 did not require that they inform Trade Vendors of liquidity issues.  Instead, Defendants could have simply avoided engaging in fraudulent conduct from that point forward "by not ordering any goods after December 13" or ordering them on a "cash basis." [1155]  Defendants' assertion that they were required to continue their fraud for the benefit of Trade Vendors is simply false.

### 2.    Trade Vendors would have received payments after December 13, 2017, if Defendants had not engaged in fraud.

Defendants claim that if Defendants had told Trade Vendors the truth about Toys "R" Us' liquidity, "the trade vendors would not have received any of the payments they received from this date forward during the Chapter 11 proceeding."  Mot. at 100.  Defendants are wrong.

As discussed above, Toys "R" Us had sufficient available liquidity to pay all of the outstanding vendor balances as of December.  Toys "R" Us could thus have paid for all of the goods that vendors shipped before December 13, 2017.  Moreover, Defendants could have continued to operate Toys "R" Us after December 13, 2017, without engaging in fraud and while ensuring that vendors were paid in full.  "Had the Defendants reduced orders or shortened terms" as of December 13, "there would have been no vendor accounts payable." [1156]  Trade Vendors would have continued shipping goods to the extent that the company paid for them.  And Trade

---

[1154] Ex. 70 (Greenspan) ¶567.
[1155] Ex. 70 (Greenspan) ¶569.
[1156] Ex. 70 (Greenspan) ¶571.

Vendors would not have shipped hundreds of millions of dollars of invoices that Toys "R" Us did not pay for. [1157]

### 3. Defendants' payment offset argument fails for multiple additional reasons.

Defendants assert that the Trust "cannot establish that the majority of Trade Vendors suffered damages as a result of the alleged fraud," because Trade Vendors received payments in the period between January and March that were greater than the ultimate amount of unpaid invoices. Mot. at 101. This theory is counter to the law, and "makes no sense as a matter of economics or logic." [1158]

First, this theory fails as a matter of law. As demonstrated above, as a result of Defendants' misrepresentations and concealments, Trade Vendors suffered damages because they shipped millions of dollars of goods to Toys "R" Us on credit for which they were never paid. Those damages can be offset only where those misrepresentations and concealments are the cause of the benefit gained by the plaintiff. Restatement (Second) of Torts § 920. For a benefit gained "to justify a diminution of damages the benefit must result from the tortious conduct." *Id.* at cmt. d.

The payments that Trade Vendors received from Toys "R" Us between December and March were not were payments that resulted from Defendants' misrepresentations and concealments. [1159] Rather, Toys "R" Us was contractually obligated to make payments to vendors because it had placed purchase orders to those vendors. As discussed above, Toys "R"

---

[1157] Ex. 70 (Greenspan) ¶¶569-571.
[1158] Ex. 70 (Greenspan) ¶556.
[1159] Ex. 70 (Greenspan) ¶566.

Us could have fulfilled each of those obligations without the Defendants engaging in fraudulent conduct. [1160] Thus, as a matter of law, those payments cannot serve as offsets to damages.

Second, Defendants' theory does not make economic or logical sense. The Trust's expert illustrated why this theory is flawed using am example scenario:

"On December 1, 2017, a vendor sends the Company shipment A, which is $500 in goods. On January 15, as the result of Defendants' wrongful conduct, the vendor sends shipment B, which is also $500 in goods. On February 1, the Company pays $500 for shipment A. The Company never pays for shipment B."

"In this Scenario the vendor's damages are $500. That is the amount of the vendor's loss for shipment B and that loss was caused by Defendants' wrongful conduct. But, according to Mr. Kost [Defendants' expert], the vendor has no damages because the vendor received $500 for shipment A during a period in which wrongful conduct had begun, and that $500 must therefore be deducted from the $500 loss for shipment B. Mr. Kost's reasoning makes no economic sense. The vendor was entitled to, and in fact received, payment for shipment A—that payment was due and owing. Because the vendor received a payment to which it was entitled does not lessen its damages on account of an entirely separate shipment for which it was not paid."

"Moreover, if one were going to include the $500 payment for shipment A in the accounting (i.e. as a subtraction from vendor losses), one would also have to include the order for shipment A in the accounting. In such an accounting, the result would be $1,000 in shipments, less $500 in payments, for a loss of $500. In either case, the damages equal the

---

[1160] Ex. 70 (Greenspan) ¶¶565-566.

amount of goods for which the vendor was wrongly induced to ship and for which payment was not received." [1161]

Defendants make no attempt to address the illogic of their theory.  There is no basis for offsetting the losses caused by Defendants fraudulent conduct with payments that Toys "R" Us was contractually obligated to make.

## XI.    Conclusion.

For the forgoing reasons, the Trust respectfully requests that the Court deny Defendants' motion for summary in its entirety.

---

[1161] Ex. 70 (Greenspan) ¶¶557-564.

**TRU CREDITOR LITIGATION TRUST**

By: _/s/ Michael Wilson_____
                Counsel

Greg Dovel (admitted *pro hac vice*)
**DOVEL & LUNER, LLP**
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Tel: 310-656-7066
Email: greg@dovel.com

   - and -

Michael Wilson (VSB No. 48927)
**MICHAEL WILSON PLC**
12733 Storrow Rd.
Henrico, Virginia 23233
Tel: 804-614-8301
Email: mike@mgwilsonlaw.com

*Counsel for Plaintiff*

399

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on the 18th day of January 2022, I caused a copy of the foregoing pleading to be served by electronic means through the Court's ECF system and emailed to counsel for the Defendants.


     James C. Cosby, Esq. (VSB No. 25992)
     J. Brandon Sieg, Esq. (VSB No. 84446)
     O'HAGAN MEYER, PLLC
     411 E. Franklin Street, Suite 500
     Richmond, Virginia 23219
     jcosby@ohaganmeyer.com
     bsieg@ohaganmeyer.com

     -and-


     Robert I. Bodian, Esq.
     Scott A. Rader, Esq.
     Amanda B. Asaro, Esq.
     Kerime S. Akoglu, Esq\
     MINTZ LEVIN COHN FERRIS
     GLOVSKY and POPEO, P.C.
     Chrysler Center
     666 Third Avenue, 25th Floor
     New York, New York 10017
     RIBodian@mintz.com
     SARader@mintz.com
     ABAsaro@mintz.com
     KSAkoglu@mintz.com

                  */s/ Michael Wilson*
                    Michael G. Wilson