UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

In re Toys "R" Us, Inc., et al.[1]                    Case No. 17-34665-KLP
     Debtors.                                   Chapter 11
                                    Jointly Administered

TRU Creditor Litigation Trust,
     Plaintiff,

v.                                                    Adv. Pro. No. 20-03038-KLP

David A. Brandon, Paul E. Raether,
Nathaniel H. Taylor, Joseph Macnow,
Wendy A. Silverstein, Richard Goodman,
Michael Short, Richard Barry, David A. Brandon,
Joshua Bekenstein, and Matthew S. Levin,
     Defendants.

## **MEMORANDUM OPINION**
(Amended to correct technical error)

Before the Court is the Defendants' Motion for Summary Judgment[2] (the "Motion").

Plaintiff, TRU Creditor Litigation Trust (the "Trust"), commenced this suit against

Defendants, former directors and officers of Toys "R" Us, alleging various breaches of

fiduciary duty, fraudulent misrepresentation and concealment, negligent misrepresentation

and concealment, and negligence. In the Motion, the Defendants contend that the suit is

barred by the law of the case, estoppel principles, contractual mandates, and insufficient

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's tax identification number, are set forth in the Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief. ECF 78. All references to "ECF" are to docket entries in the lead case unless otherwise noted. References to the docket in this adversary proceeding are prefaced by "AP ECF."

[2] At the inception of this adversary proceeding, the Defendants filed a motion to dismiss the complaint. AP ECF 2. The Court deferred ruling on that motion, stating that it would consider the motion to be a motion for summary judgment that would be considered at the appropriate time. After the initial motion for dismissal was filed, the Trust amended the Complaint, and thereafter the Defendants filed the instant Motion, which the Court considers to be an expanded restatement of the original motion to dismiss. Thus, because this Memorandum Opinion resolves issues raised in the motion to dismiss as well and because the original Complaint was amended twice after the motion to dismiss was filed, the Court finds the motion to dismiss to be moot. *See Pettaway v. Nat'l Recovery Sys.*, 955 F.3d 299, 303-04 (2d. Cir. 2020).

evidence. In response, the Trust asserts that the Defendants are not entitled to summary judgment because they have failed to apply the appropriate standard of review, failed to apply the correct legal principles, failed to properly address the Trust's theories of recovery, and failed to acknowledge the Trust's evidence.

After considering the applicable statutory and procedural authority, the case law, the pleadings, and the arguments of counsel, the Court has determined that the Motion should be granted in part and denied in part. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.[3]

### **Background**

On September 18 and 19, 2017, Toys "R" Us, Inc. and twenty-four affiliated entities (collectively, "TRU" or "the Debtors") filed voluntary Chapter 11 petitions for relief in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court" or "Bankruptcy Court"). The cases were jointly administered pursuant to Bankruptcy Rule 1015(b), Fed. R. Bankr. P. 1015(b), the lead case being *In re: Toys R Us, Inc., et al.*, Case No. 17-34665-KLP.[4] At the time of the bankruptcy filing, the Debtors and other related non-filing entities conducted the business of selling toys, childcare items, and related products on a global basis.

On March 22, 2018, the Court entered an Order authorizing TRU to wind down U.S. operations, authorizing U.S. store closings, establishing administrative claims procedures, and granting related relief.[5] On July 17, 2018, in connection with its wind-down, TRU filed with the Court a settlement agreement (the "Settlement Agreement") by and among

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052. *See also infra* note 16.
[4] ECF 78.
[5] ECF 2344.

multiple parties. The Settlement Agreement resolved numerous issues relating to the

liquidation of TRU's U.S. businesses.[6] The parties to the Settlement Agreement agreed to

release all claims against each other. Further, the Settlement Agreement provided that a

Non-Released Claims Trust (the "Trust") would be established for the purpose of

administering all remaining non-released claims, including claims held by TRU and its

creditors against TRU's directors and officers. The Court entered an order approving the

Settlement Agreement on August 8, 2018.[7]

On December 17, 2018, the Bankruptcy Court confirmed the Third Amended Chapter

11 Plan of TRU (the "Plan").[8] On April 30, 2019, the Debtors filed the Non-Released Claims

Trust Agreement.[9] Section 2.3(a) of that agreement provides in part that:

> The TRU Creditor Litigation Trust shall be the successor-in-interest to the
> Debtors with respect to any Non-Released Claims that were or could have been
> commenced or asserted by, or on behalf of, any of the Debtors or their estates
> prior to the applicable Effective Date, shall be deemed substituted for each such
> Debtor as the party in any such litigation and shall have the right to proceed in
> the name, right and stead of the Debtors with respect to all such Non-Released
> Claims.

In furtherance of its duty to pursue the non-released claims, the Trust initiated this

litigation against the Defendants. It originally filed its complaint (the "Complaint") in the

Supreme Court of the State of New York, County of New York.[10] The case was subsequently

removed to the U.S. District Court for the Southern District of New York and then

transferred, upon Defendants' motion, to the District Court for the Eastern District of

---

[6] ECF 3814.

[7] ECF 4083.

[8] The Court entered two confirmation orders, one for the so-called Toys Delaware and Geoffrey Debtors and one for the so-called Taj and TRU, Inc. Debtors. An order entered on November 21, 2018 [Docket No. 5746] confirmed the Fourth Amended Chapter 11 Plan of the Toys Delaware and Geoffrey Debtors and an order entered on December 17, 2018 [Docket No. 5979] confirmed the Third Amended Chapter 11 Plan of the Taj and TRU, Inc. Debtors.

[9] ECF 6925.

[10] *See* AP ECF 10.

Virginia (the "District Court"). The District Court then referred the case to this Court by

Order dated May 5, 2020.[11]

The Complaint, as amended on April 30, 2021,[12] asserts breach of fiduciary duty

claims on behalf of TRU and direct claims on behalf of TRU's trade vendors against

Defendants. Specifically, the Trust alleges that Defendants breached their fiduciary duties

to TRU by (i) taking on DIP financing at the start of the Bankruptcy Proceeding (Complaint

¶¶ 169-201, 226-232); (ii) authorizing pre-petition retention payments to 114 company

executives before the commencement of the Bankruptcy Proceeding (*Id.* ¶¶ 56-89, 213-217);

and (iii) authorizing the payment of advisory fees to TRU's private equity shareholders from

the fourth quarter of 2014 through the first quarter of 2017. (*Id.* ¶¶ 45-55, 207-225).[13] These

claims (the "Fiduciary Breach Claims") comprise Counts 1-4 of the Complaint.

The Trust further alleges that to induce trade vendors to ship goods and provide

services to TRU on credit after the commencement of the bankruptcy cases, the Defendants

misrepresented facts concerning TRU's ability to make payments for those goods and

services. The Trust alleges that because of these misrepresentations, goods and services

ordered by TRU on credit from trade vendors were delivered to TRU but were not paid for

during the period from December 2017 through March 14, 2018. The Trust claims that the

total amount due to vendors for those goods exceeds $600 million (*Id.* ¶¶ 90-135). It also

alleges that TRU continued its misrepresentations to trade vendors, both fraudulently and

negligently concealing and omitting material facts concerning TRU's ability to pay for goods

and services ordered on credit, upon which misrepresentations the trade vendors reasonably

relied. (*Id.* ¶¶ 136-168, 233-265). These claims are referred to as the "Vendor Claims."

---

[11] Case No. 3:20-cv-00311-DJN, ECF 15. *See also* AP ECF 1.
[12] AP ECF 146.
[13] *Id.*

On December 13, 2021, the Defendants filed the Motion,[13] to which the Trust filed a

lengthy opposition. The matter has been extensively briefed and oral arguments were held

on February 23, 2022.

### Jurisdiction

The Court has subject matter jurisdiction over this Adversary Proceeding pursuant

to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference from the United States

District Court for the Eastern District of Virginia dated August 15, 1984. The District Court

has determined that none of the counts set forth in the Complaint constitute core

proceedings under 28 U.S.C. § 157(b)(2) and that the Trust is entitled to a jury trial on all

counts; however, the District Court has not withdrawn the reference pursuant to 28 U.S.C.

§ 157(d), pending the parties' decision on whether to jointly consent to having the trial

conducted by the Bankruptcy Court.[14,15] Venue is appropriate in this Court pursuant to 28

U.S.C. § 1408.

### Standard of Review

Rule 56 of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 56, made applicable

by Rule 7056 of the Federal Rules of Bankruptcy Procedure, Fed. R. Bankr. P. 7056, governs

summary judgment in an adversary proceeding. Summary judgment is proper under Rule

56(c), "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v.*

---

[13] AP ECF 315.

[14] The District Court has scheduled a status conference on July 8, 2022, at which "the Court will discuss the parties' positions on whether they each consent to Bankruptcy Court jurisdiction for the trial of any claims that survive summary judgment or if a party instead will move to withdraw the reference to the Bankruptcy Court." Case No. 3:20-cv-00311-DJN, ECF 63.

[15] Should the reference be withdrawn before entry of this Memorandum Opinion and accompanying Order, or should it otherwise be determined that this Court does not have the authority to issue a final order in this proceeding, this Memorandum Opinion shall constitute proposed findings of fact and conclusions of law pursuant to 28 U.S.C. §157(c)(1).

*Catrett*, 477 U.S. 317, 322 (1986). A moving party, in this case the Defendants, has the

burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 256 (1986). In addition, "reasonable inferences should be drawn in favor

of the nonmoving party" and the "court must view the evidence in the light most favorable to

the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657, 660 (2014) (quotations omitted).

<u>Analysis</u>

I.    ***Fiduciary Duty Claim Relating to DIP Financing (against Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow and Silverstein)***

Defendants maintain that the Court's final order approving the DIP financing and

finding that the financing was an exercise of the Debtor's prudent business judgment

consistent with their fiduciary duties is the binding law in this case. On October 24, 2017,

over a month after conducting first day hearings and approving DIP financing on an interim

basis, the Court held a final hearing on the Debtors' motion for authorization to obtain

postpetition financing. No party opposed the proposed financing or its terms, and it was

approved by the Court on a final basis. The Court subsequently entered an order (the "Final

DIP Order") authorizing the Debtors to access the financing on the terms set forth therein.[16]

The Final DIP Order concluded that the financing was "necessary and vital to the

preservation and maintenance of the going concern values of the DIP Loan Parties and to a

successful reorganization . . . ."[17] The Final DIP Order also found that the terms of the

financing were "fair and reasonable, reflect the DIP Loan Parties' exercise of prudent

business judgment consistent with their fiduciary duties and constitute reasonably

equivalent value and fair consideration."[18]

---

[16] ECF 711.
[17] ECF 711 ¶5(b).
[18] ECF 711 ¶5(d).

The Defendants emphasize that the Final DIP Order specifically provides that it "shall be binding upon all parties in interest in these Chapter 11 Cases, including . . . any . . . fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors."[19] According to the Defendants, the Trust, as the successor in interest to the Debtors in connection with the claims asserted in the Complaint, is included and, therefore, bound by this language. The Final DIP Order was not challenged or appealed.

In support of their position, Defendants cite the case of *LNV Corp. v. Ad Hoc Group of Second Lien Creditors* (*In re La Paloma Generating Co.*), No.16-12700 (JTD), 2020 WL 224569 (Bankr. D. Del. Jan. 13, 2020), for the proposition that the law of the case doctrine bars the relitigation of matters already decided. In *La Paloma*, the court stated that the "doctrine applies to factual findings made in a main bankruptcy proceeding and is binding on parties to a subsequent adversary proceeding." *Id.* at *3. Defendants argue that the Court's factual finding that they, on behalf of the Debtors, exercised prudent business judgment consistent with their fiduciary duties has been decided and can no longer be challenged.

In addition, the Defendants assert that the Trust should be estopped from arguing that the DIP financing was improper after its nominal predecessor, the Official Committee of Unsecured Creditors (the "UCC"), previously argued in favor of granting its approval. IN support, among other cases, the Defendants cite *Ryan, Inc. v. Circuit City Stores, Inc.*, Civil Action No. 3:10CV496–HEH, 2010 WL 4735821, at *5 (E.D. Va. Nov. 15, 2010) (quoting with approval *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co.* (*In re Wheeling-Pittsburgh Steel Corp.*), 72 B.R. 845, 850 (Bankr. W.D. Pa. 1987) ("It cannot be supposed that the

---

[19] ECF 711 ¶27.

committee of unsecured creditors, which is duty bound to act in the best interest of unsecured creditors, would support a decision which is inimical to the best interests of the debtor's estate and unsecured creditors.").

In response to the Defendants' contentions, the Trust asserts that the Final DIP Order was interlocutory in nature rather than an appealable final order. The Trust argues that the Court's plan confirmation orders (the "Confirmation Orders") and the language establishing the duties and authority of the Trust take precedence over, or supersede, the Final DIP Orders.[20] And, the Trust points out, the Confirmation Orders expressly preserve the claims assigned to the Trust that it is now asserting against the Defendants.[21]

The Trust also argues that the law of the case doctrine does not apply because certain material facts were not before the Court when it approved the DIP financing. In particular, the Trust alleges that the declarations of Defendants Brandon and Short that were provided in support of the financing motion, as well as the pleadings and arguments relying on those declarations, were false and misleading, and omitted important facts. The Trust cites *Smith v. North Carolina*, 528 F.2d 807, 810 (4th Cir. 1975), for the proposition that the existence of this new evidence is sufficient to defeat the operation of the law of the case doctrine.

Finally, the Trust parses the language of the orders approving the DIP financing, claiming that they did not address whether greater value would be preserved by an immediate wind-down but only that the "DIP Loan Parties" exercised prudent business judgment. The Trust maintains that because the Court received no evidence regarding the actions that the specific directors took prior to approving the DIP financing, the Court did not actually rule on whether the Defendants complied with their fiduciary duties.

---

[20] *See* note 8, *supra*.
[21] In both Confirmation Orders, the Court expressly ordered that all claims against the Defendants were preserved, that the Trust had the authority to prosecute those claims without further order from the Court, and that no doctrine of preclusion applied to the claims.

Responding to the Defendants' estoppel defense, the Trust asserts that it is not bound

by the positions taken by the UCC (or Mattel, a vendor who assigned its claim to the Trust

whom the Defendants also argue is estopped due to its prior stance) because it is not the

UCC's (or Mattel's) successor but rather is the successor to the Toys "R" Us corporations.

According to the Trust, because those entities, the Toys Delaware and Geoffrey Debtors and

the Taj and TRU, Inc. Debtors, would not be estopped from asserting claims against the

Defendants for breaching their fiduciary duties to the debtor corporations, neither would the

Trust.

In the first step of its analysis, the Court must determine whether the Final DIP

Order was an interlocutory rather than an appealable final order. On this point, it is

undisputed that the Final DIP Order was not appealed, nor was leave to appeal sought,

within the allowable 14-day appeal period after October 24, 2017, its date of entry.[22]

Courts in our jurisdiction, and elsewhere, recognize that "[i]n the bankruptcy context,

the concept of finality 'has traditionally been applied in a more pragmatic and less technical

way . . . than in other situations.'" *First Owners' Ass'n of Forty Six Hundred v. Gordon Props,

LLC*, 470 B.R. 364, 369 (E.D. Va. 2012), (quoting *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d

994, 1009 (4th Cir.1986).[23] This is because bankruptcy cases typically consist of various

contested matters, motions, applications, adversary proceedings and other sub-issues that

must be disposed of by court order during the pendency of, and after, the underlying lead

---

[22] Rule 8002(a)(1) of the Federal Rules of Bankruptcy Procedure, Fed. R. Bankr. P. 8002(a)(1), provides that "a notice of appeal must be filed with the bankruptcy clerk within 14 days after entry of the judgment, order, or decree being appealed." If an appeal is not filed in a timely fashion, "the ability to appeal is lost, and the order, judgment, or decree becomes final." 10 Collier on Bankruptcy ¶8002.01 (16th ed.).

[23] As the Fourth Circuit stated in *Robins*, "[t]he special or unique reason for this relaxed rule of appealability in bankruptcy is that '[b]ankruptcy cases frequently involve protracted proceedings with many parties participating. To avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory.*" A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1009 (quoting *In Re Amatex*, 755 F.2d 1034, 1039 (3d Cir. 1985)).

bankruptcy cases. To address the need for finality of certain issues in the context of the larger case that may remain pending for months if not years, courts, including the Fourth Circuit Court of Appeals, have held that orders in a bankruptcy case "may be immediately appealed if they finally dispose of discrete disputes within the larger case." *See Gold v. Guberman* (*In re Computer Learning Centers, Inc.*), 407 F.3d 656, 660 (4th Cir.2005) (quoting *In re Saco Local Dev. Corp.*, 711 F.2d 441, 444 (1st Cir.1983)).

Section 364(e) of the Bankruptcy Code provides that a reversal on timely appeal of an order authorizing the extension of postpetition credit to a debtor in possession "does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." 11 U.S.C. § 364(e). Congress, when it enacted § 364(e), recognized that parties, in particular those extending postpetition credit to debtors in bankruptcy, should be entitled to rely on the approval of the bankruptcy court when disbursing loan proceeds to a debtor in bankruptcy. Since this provision protects a lender who relies upon the bankruptcy court's order when extending credit *before* the order becomes final (and even while an appeal is pending), it is difficult to envision that finality would not be afforded *after* the 14-day appeal period has run. Moreover, § 364(e) suggests that the immediate, timely appeal of an order authorizing debtor-in-possession financing is necessary to avoid its finality, since the provision would be unnecessary if Congress had intended that finality does not occur until a confirmation order is entered. Instead, the language of the statute contemplates that an appeal would stem from the "authorization under [§ 364] to obtain credit or incur debt," in this case the Final DIP Order, rather than a subsequent confirmation order that may be entered months or years later, if at all.

The Trust's position, that the Final DIP Order was interlocutory and only became final upon entry of the Confirmation Orders, disregards the intent of Congress and Fourth Circuit precedent that together compel the conclusion that a bankruptcy court order approving postpetition debtor-in-possession financing on a permanent basis should be considered final and subject to immediate appeal.[24] The Final DIP Order finally disposed of a discrete issue by authorizing and establishing the terms of the Debtors' postpetition debtor-in-possession financing. Nothing in the Final DIP Order indicates that it was intended to be anything other than the granting of final approval of the DIP financing or that its finality was contingent on entry of a confirmation order. Accordingly, the Court finds that the Final DIP Order was a final and not an interlocutory order. Having not been timely challenged or appealed, it remains final.[25]

In the Final DIP Order, the Court found as a matter of fact that the DIP Financing was an exercise of the Debtors' "prudent business judgment consistent with [their] fiduciary duties." The Court also ordered that its provisions "shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation . . . the Debtors and their respective successors or assigns . . . or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors." Defendants assert these findings are "the law of the case" that neither have been nor could be altered by subsequent orders. The Trust counters that the law of the case

---

[24] Final approval of the DIP financing did not occur until the Court entered the Final DIP Order. ECF 711. The order approving interim DIP financing in connection with first day hearings was intended to be temporary in order to provide parties with an opportunity to educate themselves, whether through discovery or otherwise, on the terms, conditions, and feasibility of the proposed financing.

[25] The Trust's reliance on *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015), is misplaced. *Bullard* dealt exclusively with chapter 13 plan confirmation, did not address debtor-in-possession financing, and has no bearing on this case other than to affirm that "orders in bankruptcy cases [are] immediately appealable 'if they finally dispose of discrete disputes within the larger case.'" 575 U. S. at 501 (quoting *Howard Delivery Service, Inc. v. Zurich American Ins. Co.*, 547 U.S. 651, 657, n.3 (2006)). In this case, the Final DIP Order "altered the status quo and fixed the rights and obligations of the parties" *Bullard,* 575 U.S. at 502. Among other provisions, the Final DIP Order permitted secured parties' liens to be primed to enable the Debtors to obtain postpetition financing on a superpriority basis.

doctrine doesn't apply because the Defendants misrepresented the facts and omitted

important evidence in connection with the Court's approval of the financing.

The District Court recently, and extensively, discussed the law of the case doctrine:

> Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent states in the same case." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009); *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 68 (4th Cir. 1988) ("Accordingly, when a decision of an appellate court establishes 'the law of the case,' it must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal ...."). Unlike *res judicata* or *stare decisis* involving issues of preclusion following a final judgment, the law of the case doctrine "regulates judicial affairs prior to the entry of final judgment." *Hill v. Pitt & Greene Elec. Membership Corp.*, 161 F.3d 2, 1998 WL 482784, at *1 (4th Cir. 1998) (Table). In short, previous legal rulings apply in subsequent proceedings. *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 804 F.3d 646, 665-66 (4th Cir. 2015). The doctrine "applies both to questions actually decided as well as to those decided by necessary implication." *Sejman*, 845 F.2d at 69 (internal quotations omitted); *see also CSX Transportation, Inc. v. S.C. Dep't of Revenue*, 959 F.3d 622, 629 (4th Cir. 2020) (summarily rejecting an argument raised by the appellee, because the appellate court had answered the same question in previous appeal.)
> This prudential doctrine exists, because "[c]learly, courts could not perform their duties satisfactorily and efficiently if a question once considered and decided were to be litigated anew in the same case upon any and every subsequent appeal." *Sejman*, 845 F.2d at 68-69 (quoting *Great Western Tel. Co. v. Burnham*, 162 U.S. 339, 344, 16 S.Ct. 850, 40 L.Ed. 991 (1896)). Moreover, "[p]erpetual litigation of any issue — jurisdiction or nonjurisdictional — delays, and therefore threatens to deny, justice." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 n.5, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).

*Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs U.S., LLC,* 469

F.Supp.3d 505, 524-26 (E.D. Va. 2020).

*Mar-Bow* is consistent with this Court's finding that the Final DIP Order was a final,

appealable order. One could imagine the uncertainty that would ensue if final orders

authorizing DIP financing, which typically are entered near the beginning of a bankruptcy

case, were to remain subject to challenge throughout the pendency of the case until

confirmation, which usually portends the closing of the bankruptcy case.

The Fourth Circuit has held that application of the law of the case doctrine is not mandatory;[26] however, the Supreme Court has cautioned that while a "court has the power to revisit prior decisions of its own . . . as a rule courts should be loathe [sic] to do so in the absence of extraordinary circumstances." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988).[27] This policy, as espoused by the Supreme Court, recognizes the need for parties to be able to rely on the terms of a final order that establishes important rights and duties, such as an order approving the terms of debtor-in-possession financing.

The District Court in *Mar-Bow* observed that the Fourth Circuit recognizes three exceptions to the law of the case doctrine; "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." 469 F. Supp. 3d at 525 (quoting *TFWS, Inc. v. Franchot,* 572 F.3d 186, 191 (4th Cir. 2009)). The Trust has not offered a subsequent, contrary, and controlling decision of law, nor has it mounted a clearly erroneous/manifest injustice argument; rather, it relies on the first exception—that there is new evidence that "defeats the operation of the law of the case." *See Smith v. North Carolina*, 528 F.2d at 810.

In *In re La Paloma Generating Company, LLC,* a first lien lender moved to dismiss a counterclaim brought by a group of second lien creditors who alleged that the first lien creditor breached the covenants of good faith and fair dealing under an intercreditor

---

[26] *See CNF Constructors, Inc. v. Donohoe Constr. Co.*, 57 F.3d 395, 398 n.1 (4th Cir. 1995) (quoting *United States v. Houser*, 804 F.2d 565, 567–69 (9th Cir.1986)) that "the law of the case doctrine is discretionary and not mandatory").

[27] Courts would be unable to perform their duties "satisfactorily and efficiently ... if a question once considered and decided ... were to be litigated anew in the same case upon any and every subsequent appeal." *Sejman v. Warner-Lambert Co.,* 845 F.2d 66, 68–69 (4th Cir. 1988) (quoting *Great Western Tel. Co. v. Burnham,* 162 U.S. 339, 344 (1896)). That being said, "the law of the case doctrine is not an 'inexorable command' but rather a prudent judicial response to the public policy favoring an end to litigation." *Id.* (quoting *White v. Murtha,* 377 F.2d 428 (5th Cir. 1967)). *See also Messenger v. Anderson*, 225 U.S. 436, 444 (1012)("the phrase 'law of the case,' as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided").

agreement by taking certain actions that the second lien creditors claimed intentionally impaired their rights as unsecured creditors. Specifically, the second lien creditors asserted that the first lien creditor excluded them from negotiations with the debtors regarding potentially avoidable liens and coerced the debtors into a settlement "designed to trample on the Second Lien Lenders' rights under the Intercreditor Agreement." *Id.* at *2. That settlement had been incorporated in the debtor's chapter 11 plan and had led to prior litigation in which the bankruptcy court held that the first lien creditor was entitled to enforce its rights under the intercreditor agreement by proceeding against the collateral "however it sees fit . . . ." *Id.* The first lien creditor subsequently brought the new adversary proceeding against the second lien creditors to further enforce its rights under the intercreditor agreement, which resulted in the second lien creditors' counterclaim. The bankruptcy court dismissed the counterclaim. Referring to its earlier decision, the court held that its prior factual findings "are law of the case, and therefore binding." *Id.*

> The law of the case doctrine "bars the re-litigation 'of matters once decided during the course of a continuing lawsuit.' " *In re Radnor Holdings Corporation*, 564 B.R. 467, 482 (Bankr. D. Del. 2017) (citing *Casey v. Planned Parenthood*, 14 F.3d 848, 856 (3d Cir. 1994)). The doctrine applies to " 'subsequent rulings by the same judge in the same case or a closely related one [and] to rulings by different judges at the same level.' " *Id.* The doctrine applies to factual findings made in a main bankruptcy proceeding and is binding on parties to a subsequent adversary proceeding. *Id.*

2020 WL 224569, at *3. The court dismissed the second lien creditors' counterclaim after determining that they had "not cited any new facts or law that would render the Court's prior ruling . . . 'clearly erroneous.'" *Id.*

The Trust places great reliance on *Smith v. North Carolina*, 528 F.2d 807, 810 (4th Cir. 1975), in which the Fourth Circuit found that the district court did not violate the law of the case doctrine on remand after the Fourth Circuit had vacated the district court's decision to grant habeus corpus relief for lack of sufficient evidence. On remand, the district court,

again, granted the requested relief. The circuit court found that additional evidence was

before the district court when it granted the same relief despite having been reversed and,

therefore, the law of the case (the appellate court's order reversing the district court) was not

applicable. Unlike the present case, however, *Smith v. North Carolina* did not involve a

second proceeding where a final order establishing the law of the case already existed;

rather, it involved a single proceeding that resulted in an appeal, a remand and then

another appeal. *Smith v. North Carolina*, therefore, is distinguishable from the present case.

Another case cited by the Trust, *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019), also

fails to support the Trust's position. In *Graves*, the court rejected the law of the case doctrine

in connection with a summary judgment proceeding when the trial court had previously

denied a motion to dismiss. The Fourth Circuit affirmed the granting of summary judgment

for the defendants after pointing out the procedural differences between motions to dismiss

and summary judgment as well as the ability to develop evidence during discovery. *Graves*

involved the progression from review of a motion to dismiss to review of a motion for

summary judgment where the court was "presented with a different record at a new stage of

the case." *Id*. Here, the "case" was limited to resolving the motion to approve the DIP

financing and the "progression" was from approval of the financing on an interim basis to

approval on a final basis. The interim order approving the DIP financing, like the *Graves*

order denying the motion to dismiss, was not the law of the case, because the opportunity to

conduct discovery and present additional evidence at the final hearing may have led to a

different result. The final order granting summary judgment in *Graves* is similar to the

Final DIP Order. Either order, if not appealed, would establish the law of the case.

Having reviewed the cases cited by both parties, the Court finds that *Paloma* is more applicable to the case at bar. In contrast, *Smith* and *Graves*, both non-bankruptcy cases, are easily distinguishable.

The Debtors commenced their cases on September 19, 2017. On that same day, the Debtors filed their motion seeking interim and final authority to obtain postpetition financing (the "DIP Financing Motion").[28] During a hearing conducted later that day, the Court granted the DIP Financing Motion on an interim basis and scheduled a final hearing for October 10, 2017.[29]. The Interim DIP Financing Order was entered on September 20, 2017.[30]

The Interim DIP Financing Order included various factual findings including that the incurrence of indebtedness was "necessary and vital to the preservation and maintenance of the going concern values of the DIP Loan Parties and to a successful reorganization of the DIP Loan Parties."[31] In addition, the Court factually found that the terms of the financing were "fair and reasonable, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration. . . . ."[32] The Interim DIP Financing Order also provided that the terms and conditions of the financing were the best available under the circumstances.[33] These findings are antithetical to the facts now being alleged by the Trust.

The Interim DIP Order provided that "[t]he Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a

---

[28] ECF 29.
[29] ECF 86.
[30] ECF 98.
[31] ECF 98, ¶5(b).
[32] ECF 98, ¶5(d).
[33] ECF 98, ¶5(c).

waiver of rights under sections 506(c) and 552(b) of the Bankruptcy Code) to the parties

having been given notice of the Interim Hearing, to any party that has filed a request for

notices with this Court and to the Creditors' Committee after the same has been appointed,

or such Creditors' Committee's counsel, if the same shall have been appointed."[34] The final

hearing that was originally scheduled to take place on October 10 was subsequently

adjourned to October 24, 2017.[35]

 The docket reflects that twelve objections and joinders to the objections to the DIP

financing were filed prior to the October 24th hearing.[36] The UCC filed a response indicating

that it supported the Debtors' decision to seek postpetition financing, "as the Debtors have a

compelling need to obtain capital as they enter the busiest time of the year for their

business."[37] The UCC added that it had negotiated several improvements to the Interim DIP

Order:

> [F]rom the date of its inception, the Committee has worked diligently with the
> Debtors and their pre- and postpetition lenders to reach consensus regarding
> the terms on which the estates should be permitted to borrow. The Committee
> is pleased to report that those efforts have borne fruit, and the parties have
> reached agreement on modified – and substantially improved – terms for both
> the North American and International DIP Facilities. These terms, coupled
> with additional negotiated protections in the critical and foreign vendor and
> other first day orders, will maintain a level playing field among various parties-
> in-interest during the case, thereby protecting and preserving the rights of
> unsecured creditors and maximizing the value available to unsecured creditors,
> including those providing support postpetition.

*Id*. Following additional negotiations with the UCC and the objecting parties, the Debtors

filed a revised proposed final financing order.[38] On October 24, 2017, the Court heard and

---

[34] ECF 711, ¶42.
[35] ECF 267.
[36] ECF 680.
[37] ECF 659, p. 1.
[38] ECF 677.

granted final approval of the DIP financing and entered the Final DIP Financing Order,

substantially in the form of the proposed final financing order.[39]

The Trust does not allege that the Debtors failed to comply with the requirements of

Bankruptcy Rule 4001 in connection with their financing motion.[40] Neither does the Trust

contend that the Court failed to apply the proper standard when it approved the financing.[41]

Instead, the Trust asserts that "the Court was not provided sufficient disclosures or updated

information . . . ."[42] In its 400-page opposition to the Motion, the Trust repeatedly states that

certain facts "were not brought to the attention of the Court."[43] It is significant, however,

that the Trust does not contend that parties in interest, including those who filed objections,

did not have the *opportunity* to conduct discovery, examine witnesses or offer evidence in

opposition, including those facts that the Trust alleges were not brought to the Court's

attention.[44]

Having considered the Trust's offerings, the Court finds that there is no "new

evidence" that, in the view of the Court, was not available through discovery and that could

have been offered prior to the entry of the Final DIP Order. The Court has reviewed the

---

[39] ECF 711.

[40] Bankruptcy Rule 4001(c)(1), Fed. R. Bankr. P. 4001(c)(1), requires that a motion for authority to obtain credit shall include "a copy of the credit agreement and a proposed form of order" as well as "a concise statement of the relief requested . . . ."

[41] *See, e.g., In re L.A. Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *Trans World Airlines, Inc. v. Travellers Int'l, AG (In re Trans World Airlines, Inc.),* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting its prior approval of a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

[42] AP ECF 343, p. 91.

[43] *See, e.g.,* AP ECF 343, ¶ 3(A)(3)(e).

[44] In its opposition, the Trust refers to deposition testimony to support its contention that material information was withheld: "*if* someone had gone through the 700 pages of loan documentation in docket 158 and read the language of the January revised budget covenant . . . 'they likely would not have appreciated their significance without knowing the background . . . ." P. 92 (quoting Ex. 70 (Greenspan deposition) ¶¶298-303 (emphasis added). This suggests that it was not necessarily a lack of disclosure but rather the failure of creditors and other parties in interest to thoroughly vet the proposed financing prior to the October 24, 2017, hearing that resulted in the omission of evidence that the Trust now contends should have been presented.

allegations in the Complaint alleging breach of fiduciary duty in connection with the

Defendants' authorization of the DIP financing. Those allegations of gross negligence, bad

faith, conflicts of interest, reckless indifference, and an abdication of their fiduciary duties

fall short of claiming that the Defendants committed a fraud on the Court.[45] Nevertheless,

the Trust now seeks to have the Court reverse the factual findings that were an essential

component of a final order entered over four years ago and which concluded that the

Defendants, acting on behalf of the Debtors, exercised sound business judgment consistent

with their fiduciary duties *and* did so on the basis of all evidence that could have been

presented prior to the entry of the Final DIP Order. The Court refuses to exercise its

discretion to set aside its prior order and finds that law of the case doctrine is applicable.[46]

---

[45] Should the Trust take the position that the evidence establishes that there has been a fraud upon the Court that would go unremedied were the Court to dismiss this count of the Complaint, Judge Novak's opinion in *Mar-Bow* again offers guidance:

> Of course, the Court has the inherent authority to remedy a fraud on the court. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580-81, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). Even a party who lacks standing to prosecute may bring the fraud to the Court's attention and *suggest* that it vacate a prior judgment based on a fraud perpetuated on the court. *Kupferman v. Consol. Research & Mfg. Corp.*, 459 F.2d 1072, 1074 n.1 (2d Cir. 1972). . . . Indeed, the U.S. Trustee can raise concerns . . . . Finally, the Bankruptcy Court has the inherent authority to *sua sponte* remedy a fraud on the court.

*Mar-Bow Value Partners, LLC*, 469 F. Supp. 3d at 534.

[46] The Supreme Court has instructed that:

> A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies . . . .' *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48-49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. . . . Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. . . . Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. . . . To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

*Montana v. United States*, 440 U.S. 147, 153–54 (1979) (citations omitted). This rationale also applies to the Law of the Case Doctrine.

The essential facts necessary to establish a breach of fiduciary duty and associated claims in connection with securing the DIP financing have already been decided in favor of the Defendants. These facts were not changed, nor could they be, by subsequent confirmation orders because they had already become the law of the case as a result of the Final DIP Order. For that reason, the Court will grant the Motion as to the count alleging breach of fiduciary duty for authorizing the DIP financing.[47]

## II. Fiduciary Duty Claim Relating to the Prepetition Bonus Payments (against Defendants Brandon, Short, Bekenstein, Levin, Raether, Taylor, Macnow, Silverstein and Goodman).

The Trust alleges that Defendants breached their fiduciary duty by approving payment of retention bonuses to 117 TRU executives and management-level employees before the Debtors filed for bankruptcy. The Trust contends that the bonuses resulted in fraudulent transfers under both bankruptcy[48] and criminal law.[49]

Defendants counter that the Trust is estopped from asserting this claim because the UCC subsequently negotiated a reduction in the amount of the bonuses along with a deferral of the payments. Alternatively, Defendants argue that (1) the undisputed facts establish that they are protected by the business judgment rule, and (2) they are protected by the

---

[47] As the Court has found that the law of the case applies, consideration of the issue of estoppel with respect to the fiduciary duty claim as to the DIP financing is unnecessary.

[48] *See* 11 U.S.C. § 548(a)(1)(A) ("The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily-(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .").

[49] *See* 18 U.S.C. § 152(7) ("A person who (7) in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation . . . shall be fined under this title, imprisoned not more than 5 years, or both.")

internal affairs doctrine and the exculpatory clause contained in TRU's Amended and Restated Certificate of Incorporation.[50].

Unlike the action taken by the Defendants in securing the postpetition DIP financing, the prepetition executive bonus plan was not subject to court approval, for which creditors and interested parties would have been given an opportunity to be heard. The Trust has documented extensive evidence and supporting case law in support of its contention that each of the Defendants breached the duties of loyalty, good faith, and care. It argues that this evidence establishes, *prima facie*, that the Defendants were not disinterested, failed to consider material information reasonably available to them, failed to consider reasonable alternatives, and abdicated the decision-making process to Defendant Brandon, the CEO of TRU, who was the recipient of the largest bonus.

The presumption of the protection otherwise afforded the Defendants by the business judgment rule is rebutted by a showing of the breach of the duties of loyalty, care, or good faith. *See Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.),* 906 A.2d 27, 52 (Del. 2006) ("Those presumptions can be rebutted if the plaintiff shows that the directors breached their fiduciary duty of care or of loyalty or acted in bad faith."); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 371(Del. 1993). If that is shown, the burden then shifts to the Defendants to establish that the transaction "was the product of both fair dealing and fair price." *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC,* C.A. No. 11802-

---

[50] The parties agree that Delaware law governs the breach of fiduciary duty claims. *See* TRU's Amended Certificate of Incorporation, AP ECF 322, Ex. 126, Art. Eight ("A director . . . shall not be liable to the corporation . . . for breach of fiduciary duty as a director, except to the extent that exculpation is not permitted under the DGCL as in effect at the time such liability is determined."); 8 Del. C. 102(b)(7) (providing that an exculpatory provision is effective under Delaware Law in eliminating personal liability of directors for breaches of their duty of care but "such provision shall not eliminate or limit the liability of a director (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit."). *See also Pereira v. Farace*, 413 F.3d 330, 342 (2d Cir. 2005) ("[B]ecause breach of fiduciary duty claims belong to the corporation, they are subject to the exculpatory clause defense even when pressed by a trustee.").

VCL, 2018 WL 3326693, at *35 (Del. Ch. July 6, 2018); *In re Walt Disney Co. Derivative Litigation,* 906 A.2d 27 at 52 ("the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders."). The extensive evidence submitted by the Trust, if proven, is sufficient to establish a breach of the Defendants' fiduciary duties and rebut the presumption associated with the business judgment rule. The Defendants have not shown that the undisputed evidence demonstrates that the transaction was the product of fair dealing and fair price. These issues are a question for the trier of fact. Thus, the issue is ineligible to be determined on summary judgment.

Defendants' argument that the Trust is estopped from litigating the retention payments is similarly unavailing. Defendants maintain that the UCC told the Court that the payments were "addressed" through adjustments to the Senior Employee Incentive Program ("SEIP") approved by the Court with the UCC's support. A review of the order approving the SEIP does not support a finding that the retention payments claim was resolved, released, or even addressed. Moreover, contrary to the statements made by the UCC's counsel, the UCC's subsequent pleading in support of the Settlement Agreement[51] made clear that claims against the Defendants were preserved, as did the Confirmation Orders.[52]

The Court also rejects the Defendants' contention that the exculpatory provision in TRU's certificate of incorporation bars the Trust's duty of care claim. The evidence submitted by the Trust, if proven, is sufficient to establish a *prima facie* case that the Defendants violated their duties of loyalty and good faith in addition to their duty of care.

---

[51] ECF 4033, ¶ 20.
[52] ECF 5746 (Delaware order) ¶48; ECF 5979 (Toys, Inc. order). Judicial estoppel "requires a showing of (1) clear inconsistency and (2) that the party estopped obtained an unfair advantage from that inconsistency." *In re USA Detergents, Inc.*, 418 B.R. 533, 544 (Bankr. Del. 2009).

The Trust has also alleged that the Defendants were grossly negligent[53] and has offered evidence in support of that allegation. When directors are grossly negligent or breach multiple duties, including the duty of loyalty, then the exculpatory provision does not immunize directors for their breach of the duty of care. *Miller v. Greystone Business Credit II, L.L.C.* (*In re USA Detergents, Inc.*), 418 B.R. 533, 54 (Bankr. D. Del. 2009) ("exculpation is only available where the cause of action only states a due care violation and not a claim which alleges gross negligence or breaches of multiple duties"). *See also supra* n.51.

Material questions of fact remain to be decided in connection with the retention payments claim. For this reason, summary judgment will be denied as to the count relating to the prepetition retention payments.

## III. Fiduciary Duty Claim Relating to the Advisory Fees (against Defendants Brandon, Beckenstein, Levin, Raether, Taylor, Macnow, and Silverstein)

In the Complaint, the Trust alleges that the Defendants breached their fiduciary duties of loyalty and good faith by authorizing the payment of advisory fees to TRU's private equity sponsors from the fourth quarter of 2014 through the first quarter of 2017, causing TRU and its creditors to lose $17,863,110.54 The Complaint states that "TRU had been insolvent since at least 2014" and "the officers and directors of TRU each had a fiduciary duty to protect the value of TRU for TRU's creditors, and not merely to focus on advancing the interests of the majority equity holders—Bain, KKR, and Vornado (the "Sponsors")."55 The Complaint further alleges that "in 2005, Bain, KKR, and Vornado had required that TRU enter an Advisory Agreement that required TRU to pay quarterly advisory fees of millions of dollars to each Sponsor for advisory services, regardless of the actual amount, quality, or redundancy of any advice that the Sponsors provided TRU. Moreover, the

---

[53] Complaint, ¶ 86.
[54] Complaint, ¶¶ 5, 55, 212.
[55] Complaint, ¶¶ 45, 46.

Advisory Agreement did not actually require any Sponsor to perform any advisory services."[56] According to the Complaint, "[b]etween 2005 and 2017, TRU paid Bain, KKR, and Vornado more than $250,000,000 in 'Advisory Fees' as TRU sank further into debt."[57]

The Defendants assert that they are entitled to summary judgment because the undisputed evidence demonstrates that TRU was solvent when the fees were paid and that payments to a company's owners when the company is solvent could never equate a breach of the directors' fiduciary duties.[58] The Defendants also argue that the payments were contractually required, thus precluding a claim that authorizing the payments was a breach of their fiduciary duties.

The Trust has pointed to "[n]umerous pieces of evidence [that] indicate that Toys "R" Us was not solvent at all times during its payment of the advisory fees."[59] "Insolvency is a question of fact . . . ." *Heilig-Meyers Co. v. Wachovia Bank, N.A.* (*In re Heilig-Meyers Co.*), 328 B.R. 471, 475 (E.D. Va. 2005), quoting *In re Roblin Indus., Inc.* 78 F.3d 30, 35 (2d Cir. 1996). Defendants contend that the Court should disregard the Trust's evidence of insolvency, finding it "insufficient as a matter of law to create a genuine, triable dispute,"[60] and instead accept their expert's opinion finding that TRU was solvent when each of the advisory fee payments was made. However, the Defendant's expert's opinion is but one piece of evidence that must be assessed by the trier of fact. The Trust has offered competing evidence of insolvency, including the report of the Trust's expert witness who challenges the conclusions of the Defendant's expert. The Court views the Trust's evidence as sufficient to

---

[56] Complaint, ¶ 47.
[57] Complaint, ¶ 48
[58] *See* Motion, p. 37-29.
[59] Opposition, p. 191.
[60] AP ECF 380, p. 57.

establish a genuine dispute and finds that there is a triable issue of fact concerning

insolvency. Thus, the Debtors' prepetition solvency is an issue to be determined at trial.

The Defendant's contention that TRU's contractual obligation to pay the advisory fees

precludes the Trust's claim for breach of fiduciary duties must also fail. The Trust has

submitted evidence that the contractual obligations imposed by the Advisory Fee Agreement

at issue were amended several times between 2005 and 2015, and it points to the failure of

the Defendants to renegotiate or terminate the agreement prior to the disputed payments

having been made. *See Frederick Hsu Living Tr. v. ODN Holding Corp.*, C.A. No. 12108-

VCL, 2017 WL 1437308, at *24 (Del. Ch. Apr. 14, 2017) ("the fact that a corporation is bound

by its valid contractual obligations does not mean that a board does not owe fiduciary duties

when considering how to handle those contractual obligations.").

Payment of the advisory fees was not endorsed by court order, as the payments were

made prior to the bankruptcy filings. The evidence offered by the Trust supports a finding

that the Defendants were not constrained by their contractual obligations to the Sponsors

and had other options available. Again, questions of fact remain to be decided.[61] Accordingly,

granting summary judgment to the Defendants with respect to their approval of the

payment of advisory fees is not appropriate.

## IV.    *The Vendor Claims*

Defendants advance multiple theories in support of their contention that they are

entitled to summary judgment on the Vendor Claims. First, Defendants challenge the

---

[61] Defendants have also raised an estoppel argument, claiming that because the shareholders who were not Sponsors did not object to the payment of the advisory fees, they "acquiesced" to the payments. Under the doctrine of acquiescence, "accepting the benefits of the transaction, even though the corporation's conduct is a breach of some duty owed to the shareholder, may also serve to bar the shareholder's right to equitable relief." *Kahn v. Household Acquisition Corp.*, 591 A.2d 166, 177 (Del. Ch. 1991). Here, the Trust has presented evidence supporting its contention that neither TRU nor its minority shareholders received a benefit from the payment of the advisory fees. Whether the minority shareholders, or any predecessor to the Trust, "knowingly and deliberately permit[ted]" the payments has also not been undisputedly established. *See Papaioanu v. Comm'rs of Rehoboth*, 186 A.2d 745, 749-50 (Del. Ch. 1962). Acquiescence is therefore a question for the trier of fact.

Trust's standing to pursue the claims of any individual trade vendors. Second, Defendants

argue that vendors who signed critical vendor agreements during the Chapter 11

proceedings were contractually obligated to ship goods to TRU, despite the risk of non-

payment, in exchange for payments on their prepetition claims. Finally, Defendants assert

that the undisputed evidence shows that the Trust cannot carry its burden of proof to

establishing the elements necessary to establish tort claims for any of the individual Trade

Vendors.

### The Trust's Standing to Pursue the Vendor Claims.

There is no dispute that each of the Trade Vendors assigned its claims against the

Defendants to the Trust, including the exclusive right to pursue the claims.[62] The Fourth

Circuit has held that "a trustee has the requisite standing to sue [for] the cause of action he

acquired for the estate from the [creditors] after commencement of [a] bankruptcy case."

*Logan v. JKV Real Est. Servs.* (*In re Bogdan*)*,* 414 F.3d 507, 512 (4th Cir.2005). This Court,

applying *Logan*, previously held that a trustee who received an unconditional assignment of

a claim from a creditor stands in the place of the creditor and is entitled to pursue the claim

on behalf of the estate. *Matson v. S. Anna, Inc.* (*In re McCurnin*), 590 B.R. 729, 740 (Bankr.

E.D. Va. 2018). Thus, under Fourth Circuit and this Court's precedent, the Trust has

standing to pursue the claims assigned to it by the Trade Vendors.[63]

---

[62] "[T]he creditors of the Debtors . . . hereby irrevocably transfer, assign, and deliver to the TRU Creditor
Litigation Trust all assets constituting the Non-Released Claims Trust Assets."  TRU Trust Agreement, ECF
6925, § 2.5(a). "[N]o Person or creditor . . . other than the TRU Creditor Litigation Trust . . . shall be permitted to
assert . . . any Claim or Cause of Action that is transferred to the TRU Creditor Litigation Trust pursuant to this
Agreement or the Plans."  *Id.* § 2.5(f).

[63] The result would be the same if, as the Defendants urge, the Court were to apply Delaware law. *See In re
Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1050-51 (Del. Ch. 2015) ("Delaware has a
longstanding rule that claims are freely assignable and can be asserted by the acquirer.").

*Critical Vendor Agreement*.

Defendant's assertion that the critical vendor agreements executed by fifteen of the trade vendors "obligated them to ship regardless of what was said to them"[64] is belied by the language of the agreements themselves, which stated that that the "supplier shall supply goods and/or perform services to the company" based on "Customary Trade Terms."[65] The "Customary Trade Terms" were defined as "trade terms at least as favorable to the Debtors as those practices and programs, product mix, availability, and other programs, in place in the 180 days prior to the Petition Date . . . ."[66] The Trust has offered evidence that customary trade terms existing in the 180 days prior to the bankruptcy filings included the ability to require payment in advance of shipping and other restrictions, such as reducing the time for payment, that could have protected the trade vendors despite having agreed to the language in the critical vendor agreements. The Trust has also offered evidence that each "critical" vendor would have acted differently had it been aware of the alleged "concealed facts."[67] The contractual language in the form agreements approved by the Court would not necessarily have required the vendors to continue to continue to ship on credit during the pendency of the bankruptcy cases even in the face of a catastrophic downturn in the Debtors' business. For that reason, execution of the critical vendor agreements does not mandate granting summary judgment.

*Sufficiency of Evidence to Establish Elements of the Vendor Claims*.

Much of the Motion is devoted to attempting to persuade the Court that the Trust is unable to offer sufficient evidence to establish all the necessary elements to support its

---

[64] Motion, AP ECF 315, pp. 34-35.
[65] *See* Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing The Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief, ECF 6, Ex. C (Form of Trade Agreement), p. 2.
[66] *Id.*
[67] *See* Trust's Opposition, pp. 344-46.

claims for intentional or negligent misrepresentation, fraudulent concealment, or negligence

on the part of each of the individual vendors. In response, much of the Trust's 400-page

Opposition is dedicated to identifying evidence refuting the Defendants' insufficient and

"undisputed" evidence contentions.

Initially, the parties disagree over which state's laws govern the tort claims, although

they concur that because the case was transferred from the Southern District of New York,

New York's choice of law principles apply. *See Ferens v. John Deere Co.,* 494 U.S. 516, 532

(1990) ("[W]e believe that applying the law of the transferor forum effects the appropriate

balance between fairness and simplicity."). Under New York's choice of law rules, "the first

question to resolve in determining whether to undertake a choice of law analysis is whether

there is an actual conflict of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). In

*Curley*, the Second Circuit held that if "the applicable law from each jurisdiction provides

different substantive rules, a conflict of laws analysis is required." *Id*. Here is where the

parties diverge, with the Trust asserting that the law of New York and the law in the states

where the vendors are located provide different substantive rules. By way of example, the

Trust points to the differences between New York and California law; New York law

requires a "special relationship" between the parties in order to state a claim for negligent

misrepresentation,[68] but California law does not.[69]

Defendants' position is that New York substantive law is applicable because "unless

the applicable laws from each potentially applicable jurisdiction will have the potential to

affect the outcome of the case significantly, New York's choice-of-law rules require the

application of New York substantive law to tort claims like fraud and negligent

---

[68] *See Anschutz Corp. v. Merrill Lynch & Co.,* 690 F.3d 98, 114 (2d Cir. 2012).
[69] *See B.L.M. v. Sabo & Deitsch,* 55 Cal. App. 4th 823, 843 (1997).

misrepresentation. . . . ."[70] In the Defendants' view, "there is significant overlap between the law of New York and that of other states that have an interest in the tort claims asserted in this jurisdiction, like New Jersey (TRU's headquarters) or Virginia (the location of the bankruptcy proceeding)."[71] Defendants argue that the law of each state where the vendors are located is inapplicable because the substantive tort laws of New York and the states "that have a significant interest in the . . . claims" are similar. Yet, the Motion falls short of adequately explaining why only New Jersey or Virginia, as opposed to the states where other vendors are located, have an interest in the asserted claims.

Although neither party has presented a comprehensive analysis of the tort laws in each state where the vendors are located, it is sufficient to note that the laws of California, where many of the vendors are located, are substantively different from those of New York. At this stage of the proceedings, it would also be fair to assume that the parties would not be advocating their respective positions so vigorously were the substantive laws in the various states where vendors are located and those in New York substantially the same. Accordingly, the Court finds that there is an actual conflict of laws that requires further analysis.

The next step in the analysis requires the Court to determine which jurisdiction's law to apply. *Curley* again provides guidance:

> In tort actions, if there is a conflict of laws, New York courts apply an "interests analysis," under which the law of the jurisdiction having the greatest interest in the litigation is applied. *AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 270 (2d Cir.1992); *see also Babcock v. Jackson,* 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). "In deciding which state has the prevailing interest, we look only to those facts or contacts that relate to the purpose of the particular laws in conflict. 'Under this formulation, the significant contacts are, almost exclusively, the parties [sic] domiciles and the locus of the tort.' " *AroChem Int'l,* 968 F.2d at 270 (quoting *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985)). "If

---

[70] Motion, ECF 315, p. 32 n.5.

[71] *Id.*

conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993). If the choice of law analysis leads to the application of foreign law, a court may refuse to apply that law only if its application would be violative of fundamental notions of justice or prevailing concepts of good morals. *Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1031 (2d Cir.1996); *cert. denied,* 519 U.S. 1116, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997). The public policy of the forum thus provides an exception to application of foreign law only for law "truly obnoxious" to that policy. *Id.*

*Curley*, 153 F.3d at 12 (2d Cir. 1998). The tort claims being asserted by the Trust, including claims based on fraud and negligent misrepresentation, are based on legal rules intended to prevent injuries. *Antipodean Domestic Partners, LP, v. Clovis Oncology, Inc.*, No. 655908/16, 2018 WL 2045541, at *28, 2018 N.Y. Slip Op 30809 (U) (N.Y. Sup. Ct. Apr. 30, 2018) ("negligent misrepresentation . . . is a conduct-regulating rule"); *Vandashield LTD v. Isaacson*, No. 652183/2014, 2015 WL 5545382, at *10 n.18, 2015 N.Y. Slip Op 31782(U) (N.Y. Sup.Ct. 2015) (fraud is "a conduct-regulating body of tort law"); *Mark Andrew of the Palm Beaches, Ltd. v. GMAC Com. Mortg. Corp.*, 265 F. Supp.2d 366, 378 (S.D.N.Y. 2003) (noting that fraud and negligent misrepresentation are conduct-regulating), *aff'd*, 96 F. App'x 750 (2d Cir. 2004). Consequently, the law of the place where the alleged torts occurred, which "is considered to be the place where the last event necessary to make the actor liable occurred" is applicable. *Schultz v. Boy Scouts of Am.,* 65 N.Y.2d 189, 195 (N.Y. 1985).

For each vendor, the Trust asserts that the last event necessary to establish the Defendants' liability occurred in the vendor's home state, where the vendors relied on the false information allegedly provided. In cases involving fraud and negligent misrepresentation, reliance occurs where the victim is located. *J.A.O. Acquisition Corp. v. Stavitsky*, 745 N.Y.S.2d 634, 639 (Sup.Ct. 2001) ("fraud claims are governed by the law of the place of injury," i.e., "where plaintiffs are located"*); Geron v. Seyfarth Shaw LLP (In re*

*Thelen LLP*), 736 F.3d 213, 220 n. 7 (2d Cir. 2013) ( "When a person sustains loss by fraud, the place of wrong is where the loss is sustained.") (quoting Restatement (First) of Conflict of Laws § 377 n. 4). *See also Lewis Tree Serv. v. Lucent Techs., Inc.*, 211 F.R.D. 228, 237 (S.D.N.Y. 2002) (under New York choice of laws rules, the "fraud alleged in this lawsuit arose in all fifty states, and their laws would be applied to the fraud claims."). For each Vendor Claim in this case, the claim should be governed by the laws of the state where the vendor is located.

Operating under the mistaken assumption that the Court will concur with their position that New York law is applicable to each of the Vendor Claims, Defendants have challenged each individual vendor's claim by pointing to alleged evidentiary deficiencies existing (primarily) under New York substantive law and asserting that these deficiencies are fatal to the Trust's claims. In response, the Trust has extensively documented evidence supporting the necessary elements of each vendor's tort claim under the appropriate state substantive tort law (primarily California). Having reviewed the respective submissions, the Court finds that the Defendants, and each of them, have failed to meet their burden of showing that there is no genuine material issue of fact relating to the Vendor Claims. The Trust, in turn, has submitted sufficient evidence from which a trier of fact may reasonably find in favor of the Trust on each of the claims.

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . [who is] ruling on a motion for summary judgment. . . ." The Court instructed trial courts to "act . . . with caution in granting summary judgment" and reiterated that a trial court may "deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." *Id.*, citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249 (1948). In this

case, the credibility of the witnesses, particularly the Defendants, is particularly important. It is therefore the view of the Court that the better course would be to proceed to trial.

Rule 56(a) of the Federal Rules of Procedure provides that the trial court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Since Defendants have failed to establish that there is no material fact in dispute and that they are entitled to judgment as a matter of law, summary judgment must be denied with respect to the Vendor Claims.

## Conclusion

For the foregoing reasons, summary judgment will be granted in favor of the Defendants as to the Fourth Cause of Action in the Complaint (Breach of Fiduciary Duty for Authorizing the DIP Financing). For all other counts of the Complaint, including the Vendor Claims, summary judgment will be denied.

A separate order shall issue.

Signed: September 19, 2022      <u>   /s/ Keith L. Phillips   </u>
United States Bankruptcy Judge

Copies:

Entered on Docket: Sept 20 2022

Robert I. Bodian
Scott A. Rader
Amanda B. Asaro
Kerime S. Akoglu
MINTZ LEVIN COHN FERRIS
GLOVSKY and POPEO, P.C.
Chrysler Center
666 Third Avenue, 25th Floor
New York, New York 10017

James C. Cosby
J. Brandon Sieg
O'HAGAN MEYER, PLLC
411 E. Franklin Street, Suite 500
Richmond, Virginia 23219

Greg Dovel
Christin Cho
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401

Michael Wilson
MICHAEL WILSON PLC
12733 Storrow Rd.
Henrico, Virginia 23233